THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>      vs.<br><br>ROMAN SELEZNEV,<br>                 Defendant. | No. CR11-070-RAJ<br><br>**DEFENDANT'S MOTION TO DISMISS INDICTMENT PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 12**<br><br>Note Date: April 17, 2015<br><br>***Evidentiary Hearing and Oral Argument Requested*** |

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12
(*Roman Selevnez*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1

## I.  INTRODUCTION AND RELIEF REQUESTED

Since the terrorist attacks of September 11, 2001, the United States Government's power to apprehend foreign nationals suspected of terrorism-related activities outside of the conventional judicial process has greatly expanded under the Bush and Obama administrations' extraordinary rendition program. This expansion of the United States' power has been justified by the rationale that "enemy combatants" who are taking affirmative steps to commit violent acts against United States citizens are subject to the rules of war and not entitled to judicial process. In the context of individuals suspected of *nonviolent* violations of the United States' criminal laws, however, the Government's power to conduct extraterritorial apprehensions of foreigners is significantly limited by United States law, extradition treaties, and general principles of international law. Respecting the rights of these individuals, and the sovereignty of the nations where they reside or travel, is absolutely critical to maintaining the United States' position in the world as a country that stands as a moral beacon, a symbol of freedom, and a nation that respects the rule of law.  Furthermore, our commitment to these principles lends authority and credibility to government efforts to protect United States citizens abroad who might be subject to the persecution or spurious claims of a foreign country.

Defendant Roman Seleznev is a young Russian national who is accused of engaging in "hacking" activities ultimately leading to alleged financial losses in the Western District of Washington. He has no criminal record and no ties to this country. This past summer, while on a vacation with his family to the Maldives, nearly 9,000 miles away from Seattle, Mr. Seleznev was abducted – literally – by United States Secret Service agents acting with what appears to be zero lawful authorization by the Maldivian government. Mr. Seleznev was separated from his family, handcuffed, bundled onto a private jet (chartered by the agents), then flown to the United States territory of Guam – nearly ten hours away – for his initial appearance on this matter.

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 1
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

After Mr. Seleznev's abduction, the United States quickly issued press releases lauding its "state-of-the-art investigative techniques" and its ability to bring "cyber crooks" to justice.[1] Russia quickly lashed out – in the press, and in official statements – calling the U.S. operation a "kidnapping" and a "gross violation of the laws of any civilized state and international law."[2] Media reports followed the subsequent diplomatic posturing and fallout in the Maldives, the Russian Federation and the United States. Amidst all this, Mr. Seleznev – a man with no known criminal record who is accused of purely economic crimes – languishes in a jail in a country that he did not choose to enter voluntarily, and to which he was not lawfully extradited. Whether this stands is a question of the utmost importance.

The truth of the matter is that the United States, in its zeal to apprehend Mr. Seleznev, abandoned its commitment to the rule of law. It did so by: (i) violating United States law prohibiting the execution of arrest warrants on foreign soil; (ii) circumventing the fundamental legal protections Maldivian law provides to those lawfully within its territory; and (iii) disregarding international agreements the United States has signed with Russia, Interpol, and the United Nations.

The United States' conscious decision to overrun at least three separate bodies of substantive law – in addition to further weakening our nation's image overseas and potentially jeopardizing the safety and liberty of our citizens traveling or residing abroad – hopelessly taints this prosecution,

---

[1] *See* U.S. Department of Justice press release, "Russian Hacker Arrested for Computer Hacking Scheme that Victimized Thousands of Credit Card Customers," July 7, 2014 (attached as Exhibit 1). *See also* U.S. Department of Homeland Security/U.S. Secret Service Press Release, July 7, 2014 (Exhibit 2). Numbered exhibits referenced herein are filed under a separate caption entitled "Exhibits to Defendant's Motion to Dismiss Pursuant to Fed. R. Crim. P. 12."

[2] *See* Russian Foreign Ministry reaction (Exhibit 3): "Foreign Ministry outraged by Russian citizen's detention by US secret service in Maldives," Tass Russian News Agency, July 8, 2014; "Comment by the Information and Press Department of the Russian Ministry of Foreign Affairs regarding the situation involving the kidnapping of the Russian national Roman Seleznyov by US intelligence agencies," July 11, 2014; and "Russia Demands United States Release Accused Hacker Roman Selevnez Immediately," Reuters, July 15, 2014.

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 2
(*Roman Seleznev*, No. CR11-070-RAJ)

deprives the Court of personal jurisdiction, mandates dismissal of the Indictments against Mr. Seleznev, and requires his immediate release from confinement and return to Russia.

## II.   STATEMENT OF FACTS

### A.   Mr. Seleznev is Indicted *in absentia* in 2011.

Defendant Roman Seleznev is a 30-year-old citizen and resident of the Russian Federation ("Russia") with only a limited grasp of the English language and no significant ties to the United States.[3]

On March 3, 2011, Mr. Seleznev was indicted, under seal, in the Western District of Washington on numerous counts of Bank Fraud, Intentional Damage to a Protected Computer, Obtaining Information from a Protected Computer, Possession of Fifteen or More Unauthorized Access Devices, Trafficking in Unauthorized Access Devices, and Aggravated Identity Theft relating to allegations of computer "hacking" and credit card theft.[4] A Superseding Indictment was returned two weeks later, also under seal, and a now Second Superseding Indictment, issued on October 10, 2014, currently represents the Government's accusations against Mr. Selevnez.[5] Other than several Orders granting limited unsealing of the Indictment at the United States' request – for the purpose of attempting to lawfully arrest and extradite Mr. Seleznev to the United States to stand trial – there was no action in the case until the summer of 2014.[6]

### B.   The United States Attempts, Unsuccessfully, to Persuade the Government of the Maldives to Expel Mr. Seleznev.

Since the time the United States obtained Mr. Seleznev's initial indictment, it has known he was in Russia. Internal Secret Service reports produced by the United States indicate that the Secret

---

[3] *See* Declaration of Roman Seleznev (the "Seleznev Decl."), (Exhibit 4) at ¶ 3, and previously filed in *United States v. Seleznev*, No. 14-00056 (D. Guam) (the "Guam Proceeding).

[4] Dkt. No. 1.

[5] Dkt. Nos. 5, 90.

[6] Dkt. Nos. 12, 17, 21, 23, 29.

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 3
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Service was aware that Mr. Seleznev resided in Russia as early as March 2013, but deliberately avoided taking action under the Mutual Legal Assistance Treaty between the United States and Russia.[7]

At some undisclosed point in June of 2014, through undisclosed means, the United States became aware that Mr. Seleznev planned to travel on a vacation with his family to the Republic of the Maldives ("the Maldives"), and initiated efforts to apprehend him there. On July 3, 2014, Secret Service Special Agent Dan Schwandner traveled to the Maldives to determine whether Mr. Seleznev was indeed present there and, if so, to see what the United States' "options would be regarding the possible turning over of Mr. Seleznev to U.S. authorities."[8] Because the United States has not signed an extradition treaty with the Maldives, the United States had no right to demand that the Maldives arrest Mr. Seleznev and transfer him to the Secret Service's custody; rather, they were duty-bound to pursue the matter through diplomatic channels and Maldivian law.

On July 3, 2014, the United States Embassy in Colombo, Sri Lanka sent a diplomatic note to the Maldivian Ministry of Foreign Affairs, requesting the "removal" of Mr. Seleznev "by way of deportation, expulsion, or other means available under the laws of the Maldives."[9] The letter made it clear that the United States was requesting the Maldives' assistance on a purely voluntary basis, and closed by noting that "[w]hile the United States would appreciate the assistance of the Maldives in returning SELEZNEV to the United States, because of limitations imposed by U.S. law, we would not be in a position to guarantee reciprocity in the event of the Maldives' interest in our

---

[7] *See, e.g.*, March 13, 2013 U.S. Secret Service Investigative Report (Exhibit 5) at 2: "Efforts continue to locate Roman Seleznev and apprehend him should he travel to a country in which there exists a Mutual Legal Assistance Treaty (MLAT) with the United States of America."

[8] *See United States v. Seleznev*, No. 14-00056 (D. Guam) (the "Guam Proceeding"), Dkt. No. 47, Transcript of Proceedings on July 31, 2014, at 111:16-18, 86:7-16 (the "Guam Transcript") (Exhibit 6).

[9] *See* July 3, 2014 Diplomatic Note from the Embassy of the United States of America, Colombo, to the Ministry of Foreign Affairs of the Republic of Maldives at 1 (Exhibit 7).

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 4
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

similarly deporting or expelling someone to the Maldives."[10] The United States has never produced any correspondence from the Maldives Ministry of Foreign Affairs authorizing Mr. Seleznev's abduction.

On July 4, 2014, United States Secret Service Special Agent David Iacovetti met with authorities from an unspecified branch of the Maldivian government and apparently requested that they assist him in apprehending Mr. Seleznev.[11] Internal Secret Service emails produced by the United States show that State Department Assistant Regional Security Officer D. Michael Lashinsky also requested the assistance of Maldives Police Service Commissioner Hussain Waheed in "coordinating the expulsion" of Mr. Seleznev with Maldives Attorney General Uz Mohamed Anil.[12] In a set of incomplete emails from July 4, 2014 with the subject "Final Op Plan – USSS," Mr. Lashinsky told Mark Smith, another State Department official from the embassy in Colombo, that "[w]e're waiting on the judge to issue the court order/warrant" and that he was "[b]eing told the warrant will be done at 9."[13] According to Special Agent Schwandner's testimony, the Maldivian police requested a copy of an Interpol "Red Notice" late in the evening on July 4, 2014 before they would proceed with expelling or arresting Mr. Seleznev.[14] The request for an arrest warrant was apparently denied:  the United States has never produced any warrant or order from a Maldivian court expelling Mr. Seleznev or authorizing his abduction.

At 8:34 p.m. on the evening of July 4, 2014, Mr. Smith sent an image file titled "seleznev.jpg" to the Gmail.com email address "hussainusham@gmail.com."[15] The United States

---

[10] Exh. 7 at 4.

[11] Exh. 6, Guam Transcript at 114:9-20.

[12] *See* July 3, 2014 email from D. Michael Lashinsky to Hussain Waheed re: "Expulsion Operation" (Exhibit 8).  This exhibit compiles the only discovery provided to date of email (or any other) communications between U.S. officials or agents, and Maldivian authorities, all from July 3, 2014, to July 14.

[13] Exh. 8, July 4, 2014 email from D. Michael Lashinsky to Michael J. Smith re: "Final Op Plan – USSS."

[14] Exh. 6, Guam Transcript at 117:16-20.

[15] Exh. 8, July 4, 2014 email from Mark J. Smith to "hussainusham@gmail.com" re: "seleznev.jpg."

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 5
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

has never explained who "hussainusham" is, or why United States officials were coordinating Mr. Seleznev's abduction with him or her. Mr. Smith's contact with hussainusham or anyone bearing a similar name is omitted from the Secret Service's Investigative Report of the incident,[16] and the only evidence that has been produced indicates this individual was either not associated with the Maldivian government, or was a Maldives official who was acting outside of the scope of his authority in coordinating the abduction.[17] The individual responded from a "gmail.com" email address, as opposed to the "@police.gov.mv" or "@foreign.gov.mv" domains reflected in other communications, and in response to a curious email from Mr. Smith on July 14, 2014 (nine days after Mr. Seleznev's abduction) requesting "that list of names" for his "counterparts back in DC," hussainusham responded "I'm not in a position to authorize to share the list."[18]

Based on the evidence produced to date – or, more accurately, the lack thereof – it is apparent that the abduction of Mr. Seleznev was not authorized by civil authorities in the Maldivian government and was never approved by any Maldivian judicial authority, and not for lack of effort on the part of the United States. Instead, it appears that when the United States was unable to secure timely permission to arrest Mr. Seleznev through proper diplomatic or legal channels, it simply disregarded the Maldives' sovereign rights, and concocted a scheme to kidnap Mr. Seleznev using means outside the Maldivian legal system.

### C.   Unable to Obtain Mr. Seleznev's Lawful Expulsion, the United States Abducts Mr. Seleznev from the Maldives and Forcefully Brings Him to Guam.

On June 21, 2014, Mr. Seleznev traveled from Moscow, Russia to Malé, the capital of the Maldives, with his long-term partner Anna Otisko and her four-year-old daughter on a Transaero

---

[16] *See* July 8, 2014 U.S. Secret Service Investigative Report (Exhibit 9).

[17] A Google search for the name "Hussain Usham" and the word "Maldives" yields a LinkedIn page (Exhibit 10) for an individual who identifies himself as a "Police corporal" with the "Maldives Police Service."

[18] Exh. 8, July 14, 2014 email from "hussainusham@gmail.com" to Mark J. Smith re: "list of names."

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 6
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Airlines direct flight.[19] After an uneventful two-week vacation, on July 5, 2014, Mr. Seleznev and his family returned to Malé from the island on which they had been staying by way of a sea plane and shuttle bus to catch their return flight to Moscow.[20] Unbeknownst to Mr. Seleznev, he was being trailed by Secret Service Special Agent Iacovetti.[21]

When Mr. Seleznev entered the Ibrahim Nasir International Airport in Malé, he and his family proceeded to the security checkpoint where he was detained by two men he did not recognize and who were not members of the Maldivian police force.  They directed Mr. Seleznev to a side inspection area.[22] According to an eyewitness account, Maldivian police officers were in the vicinity but did not speak to Mr. Selezenev or participate in his arrest in any way.[23]

Mr. Seleznev was led into a small room with a couch where he was separated from his family, who were directed into an adjacent room separated by a partial glass door.[24] As soon as Mr. Seleznev was separated from his family, the United States government agents "rushed" him.[25] One of the agents threw him to the couch and shouted that he was a United States Secret Service agent and Mr. Seleznev was under arrest.[26] When Mr. Seleznev asked why he was under arrest, the agent shoved a piece of paper into Mr. Seleznev's face that he did not recognize.[27] Mr. Seleznev

---

[19] Exh. 4, Seleznev Decl. at ¶¶ 4, 5.

[20] Exh. 4, Seleznev Decl. at ¶ 6.

[21] Exh. 6, Guam Transcript at 122:23-123:1.

[22] Exh. 4, Seleznev Decl. at ¶ 7; *see also* July 24, 2014 Declaration of Sharafulla Shihab (Exhibit 11) (the "Shihab Decl.") at ¶¶ 3-10.

[23] Exh. 11, Shihab Decl. at ¶ 9.

[24] Exh. 4, Seleznev Decl. at ¶ 7.

[25] *Id*. at ¶ 8.

[26] *Id*. at ¶¶ 8-9.

[27] *Id*. at ¶ 9.

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 7
(*Roman Seleznev*, No. CR11-070-RAJ)

demanded that he be permitted to contact legal counsel, and asked that the men who were arresting him contact the Russian embassy.[28] Neither request was honored.[29]

Mr. Seleznev was ordered to empty his pockets, and the agents seized his belongings, including a laptop, an iPad, and an iPhone.[30] The agents also searched his family's luggage. Mr. Seleznev's mug shot was taken.[31] One of the agents ordered Mr. Seleznev to give him his hands, and Mr. Seleznev was handcuffed.[32] At one point while Mr. Seleznev was being arrested, the door separating him from his family was opened and he informed his family through the open door that he was being detained. The agents shouted that Mr. Seleznev was not allowed to talk to anyone and abruptly shut the door.[33]

Mr. Seleznev was then led through the airport terminal to a "VIP area" set aside for passengers traveling by private jet.[34] In an effort to conceal Mr. Seleznev's arrest from others in the airport, the agents draped a t-shirt over the handcuffs that bound his wrists and would have clearly indicated to any observer that he was under arrest.[35] Mr. Seleznev was led to another small room, where his passport was stamped with a standard exit stamp (as opposed to those used to mark the passports of those who are expelled from the country).[36] Mr. Seleznev, still handcuffed, was then forced from the airport onto an unmarked private jet.[37] Mr. Seleznev again asked for legal counsel

---

[28] Exh. 4, Seleznev Decl. at ¶¶ 10, 13, 18.

[29] *Id.* at ¶ 13, 18.

[30] *Id.* at ¶ 12.

[31] *See* Photographs of Roman Seleznev, produced by the United States on November 7, 2014 and December 15, 2014 (Exhibit 12).

[32] Exh. 4, Seleznev Decl. at ¶ 12.

[33] *Id.* ¶ 14.

[34] Exh. 11, Shihad Decl. at ¶¶ 7-8.

[35] Exh. 4, Seleznev Decl. at ¶ 16.

[36] *Id.* at ¶ 18.

[37] *Id.*

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 8
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

and the ability to contact a representative of his country.  Both requests were denied a second time.[38]
Mr. Seleznev asked where he was being taken, but the agents did not respond.[39] The plane departed
at roughly 11:20 a.m.[40] About three hours into the flight, the agents showed him for the first time a
Miranda warning sheet that was printed in both English and Russian.[41]

After a roughly ten-hour flight – during which Mr. Seleznev had no inkling of his destination
and only a vague sense of the identity of his captors – the plan touched down in Guam.  It was
roughly 2:45 a.m., on July 6.[42] Less than 11 hours after peacefully entering the Malé airport with
his family, Mr. Seleznev was sitting on the floor of a holding cell 5,000 miles away, in the United
States territory of Guam.

> **D.    Mr. Seleznev's Initial Appearance is Held in Guam Before He is Removed to the Western District of Washington.**

Mr. Seleznev's abduction caused international outrage. The Russian Foreign Ministry
issued a vitriolic press release objecting that the United States did not inform Russia of the charges
against Mr. Seleznev or notify the Russian consulate that he was going to be taken into custody,
and describing the incident as "not the first time" a Russian citizen had been "forcibly removed to
the United States from third-party countries and convicted on questionable charges."[43] Russia
further accused the United States of "kidnapping" Mr. Seleznev, violating its obligations under a
treaty requiring mutual assistance in criminal matters.[44] Russia demanded an explanation from the
government of the Maldives:  "The stance of the Maldives' authorities cannot be but outraging,

---

[38] Exh. 4, Seleznev Decl. at ¶ 18.

[39] *Id*. at ¶ 20.

[40] Exh. 6, Guam Transcript at 134:1-5.

[41] Exh. 4, Seleznev Decl. at ¶ 19.

[42] Exh. 6, Guam Transcript at 134:6-8.

[43] Exh. 3, "Foreign Ministry outraged by Russian citizen's detention by US secret service in Maldives," Tass Russian News Agency, July 8, 2014, at 2.

[44] *Id*.

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 9
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    since despite the existing international norms they allowed another country's special service to

2    kidnap a Russian citizen and take him out of the country."[45]

3           Mr. Seleznev's initial appearance in the United States District Court for the District of Guam

4    was assigned to United States District Judge Frances Tydingco-Gatewood. The United States first

5    appeared on July 7, 2014, and Mr. Seleznev's initial appearance was continued at his request on

6    July 14, 2014.[46] On July 21, 2014, Mr. Seleznev filed a Motion to Discharge and Release Defendant

7    Pursuant to Fed. R. Crim. P. 12(b)(3)(A), arguing that the circumstances of Mr. Seleznev's arrest

8    constituted a fatal defect in the institution of the criminal proceedings against him within the

9    meaning of Rule 12.[47] Mr. Seleznev moved to continue the hearing on his motion to dismiss on

10   July 29, 2014, arguing that the factual basis for the motion, in the absence of any discovery, was

11   woefully incomplete.[48] Judge Tydingco-Gatewood set the argument on Mr. Seleznev's motion to

12   continue on the same date as the argument on his motion to dismiss – and his initial appearance –

13   and a Federal Rule of Criminal Procedure 5 hearing was conducted for July 31, 2014.[49]

14          At the hearing, the United States presented a very different picture of the events that

15   transpired on July 5. According to the testimony of Special Agent Schwandner, he and Special

16   Agent Iacovetti arrived at the Malé airport on the morning of the July 5 and waited in the Maldivian

17   Tourist Police station, where "[a]t approximately 10:20 a.m., the Maldivian tourist police brought

18   Mr. Seleznev and his traveling party into the tourist police station, where he was asked by Special

19   Agent in Charge, Iacovetti, if he would please take a seat on the sofa."[50] Special Agent Schwandner

20   was adamant that he did not "arrest" Mr. Seleznev in the Maldives, but that the "arrest" instead took

21   ───────────────

22   [45] Exh. 3, Id.

23   [46] Guam Proceeding, Dkt. Nos. 1, 9.

     [47] Guam Proceeding, Dkt. No. 13.

24   [48] Guam Proceeding, Dkt. No. 34.

25   [49] Guam Proceeding, Dkt. Nos. 35, 38.

     [50] Exh. 6, Guam Transcript at 91:7-11.

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 10
(*Roman Seleznev*, No. CR11-070-RAJ)

                                        **FEDERAL PUBLIC DEFENDER**
                                        **1601 Fifth Avenue, Suite 700**
                                        **Seattle, Washington 98101**
                                        **(206) 553-1100**

place in Guam.[51] Special Agent Schwandner testified that he and Special Agent Iacovetti had coordinated their effort with "police authorities" in the Maldives, but could not say for certain who the authorities were, instead stating merely that "the decision to undertake this procedure was made at the highest levels of the Maldivian government."[52] Indeed, Special Agent Schwandner said he did not know if an application for a warrant was made in the Maldives, and could not provide any information about *who* in the Maldivian government authorized Mr. Seleznev's abduction, *how* it was authorized, *when* it was authorized, or *why* it was authorized.[53]

Judge Tydingco-Gatewood denied Mr. Seleznev's motion on August 7, 2014.[54] Judge Tydingco-Gatewood recognized that her decision was based on a limited record and a paucity of discovery, ruling that "[t]his court notes, however, that its decision on Seleznev's motion shall not preclude him from reasserting the same allegations at the U.S. District Court for the Western

---

[51]     Q:     Was this card in Mr. Seleznev's possession when you arrested him?

         A:      I did not arrest him in the Maldives. I did not arrest him in the Maldives, sir.

         **Q:     What is it that you think you did to him?**

         **A:     I arrested him when he landed in Guam.**

Exh. 6, Guam Transcript at 120:15-20 (emphasis supplied).

[52]     Q:     [T]he Maldivian authorities you're talking about, which – who are they?

         A:     These are police authorities that we met with on the 4th of July.

         Q:     I didn't hear that. The –

         A:     Police authorities.

         Q:     Is that like a – do you know, is it a national police? You mentioned the airport police. What level police authority was this?

         A:     I believe they – I wouldn't say for certain, sir. . .

Exh. 6, Guam Transcript at 114:9:12; *see also id.* at 122:5-8.

[53] Exh. 6, Guam Transcript at 130:23-131:6, 116:21-117:10, 122:8-15.

[54] *See* August 7, 2014 Decision and Order re: Motion to Discharge and Release Defendant Pursuant to Fed. R. Crim. P. 12(b)(3)(A), Guam Proceeding, Dkt. No. 44 ("Guam Decision and Order") (attached as Exhibit 13).

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 11
(*Roman Seleznev*, No. CR11-070-RAJ)

District of Washington for further consideration by that court, based on full discovery."[55] The United States attorney agreed:

> The proper forum for a motion to dismiss in the context that defense is raising it is a motion to dismiss the indictment, **and that is a motion that is properly addressed in the Western District of Washington. So the defense is certainly entitled to explore these issues; they're just doing it in the wrong forum**.[56]

Mr. Seleznev was removed to the Western District of Washington in August of 2014, and undersigned counsel were appointed in January of 2015.[57]

As envisioned by Judge Tydingco-Gatewood, Mr. Seleznev now brings the instant Motion pursuant to the timeline in the Court's February 9, 2015 Order Continuing Trial Date and Setting Case Schedule.[58] As set forth below, however, the discovery that has been provided to date has raised more questions about the legality of Mr. Seleznev's abduction than it has answered, and an evidentiary hearing is required to resolve the uncertainty around Mr. Seleznev's abduction.

## III.   STATEMENT OF THE ISSUE

Should the Indictment against Defendant Roman Seleznev be dismissed where the United States obtained custody of him through the actions of U.S. Secret Service agents that were in direct, knowing, and flagrant violation of United States law, Maldivian law, and international treaties and covenants?

## IV.   EVIDENCE RELIED UPON

This motion relies on the pleadings and records on file in this matter as well as the Declaration of Counsel in Support of Defendant's Motion to Dismiss Pursuant to Fed. R. Crim. P. 12, filed herewith, and the Exhibits referred to herein and filed contemporaneously with this motion.

---

[55] Exh. 13, Guam Decision and Order at 6-7.

[56] Exh, 6, Guam Transcript at 18:25-19:6 (emphasis supplied).

[57] Dkt. Nos. 115, 116 and 118.

[58] Dkt. No. 125.

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 12
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## V.   **AUTHORITY AND ARGUMENT**

**A.   The Court Should Dismiss the Indictment and Release Defendant Pursuant to Federal Rule of Criminal Procedure 12(b)(2) and 12(b)(3)(A).**

The circumstances of Mr. Seleznev's abduction – in which United States agents directly and knowingly violated the law of the United States, the law of the Maldives, and generally-applicable principles of international law – constitutes a "defect in the institution" of this proceeding that deprives the Court of jurisdiction over this matter. Accordingly, the case must be dismissed under Federal Rules of Criminal Procedure 12(b)(2) and 12(b)(3)(A). Mr. Seleznev's motion is proper because a motion to dismiss for lack of jurisdiction may be made "at any time while the case is pending" and a motion to dismiss based on a defect in the institution of the proceedings must be made "by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(2), 12(b)(3). Judge Tydingco-Gatewood's ruling on Mr. Seleznev's prior motion to dismiss in the District of Guam explicitly recognized this, noting that the "decision on Seleznev's motion shall not preclude him from reasserting the same allegations at the U.S. District Court for the Western District of Washington for further consideration by that court, *based on full discovery*."[59] As stated above, the limited discovery that has been provided by the United States since Judge Tydingco-Gatewood's ruling – particularly disclosure of email traffic between agents and their Maldivian contacts – although not comprehensive, has nonetheless raised more questions about the legality of this prosecution than it

---

[59] Exh. 13, Guam Decision and Order at 6-7 (emphasis supplied). Judge Tydingco-Gatewood also noted her intent to permit Mr. Seleznev to re-bring his motion no less than *four* times on the record at the Guam Proceeding. *See* Exh. 6, Guam Transcript at 23:10-20, 61:4-8, 69:5-12. Mr. Seleznev expects the United States may attempt to argue that the instant Motion is improper notwithstanding Judge Tydingco-Gatewood's without-prejudice ruling. This argument directly contradicts the position taken by the United States in the Guam proceeding, where the government argued no less than *three* times that Judge Tydingco-Gatewood should defer ruling on Mr. Seleznev's motion to the Western District of Washington. *See, e.g.*, Exh. 6, Guam Transcript at 18:25-19:6, 26:7-14, 26:19-24. Given the fact that the United States was able to obtain a denial of Mr. Seleznev's motion in Guam based in part on its own assertions that the Western District of Washington was the proper venue, it would be improper for the United States to now take the position that the District of Guam was the proper place to decide the issue. The Government should be estopped from doing so here.

---

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 13
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

has answered, and an evidentiary hearing is necessary to resolve them.[60] As the facts appear, the only proper remedy for Mr. Seleznev is dismissal.

**B.    The Indictment against Mr. Seleznev Must be Dismissed if the Circumstances Surrounding His Apprehension Violated Due Process.**

United States courts adhere to the so-called "*Ker/Frisbie* doctrine," which provides generally that "the manner by which a defendant is brought to trial does not affect the government's ability to try him." *United States v. Matta-Ballesteros*, 71 F.3d 754, 762 (9th Cir. 1995) (citing *Ker v. Illinois*, 119 U.S. 436, 444 (1886) and *Frisbie v. Collins*, 342 U.S. 519, 522 (1952)). The reasoning behind the *Ker/Frisbie* doctrine is that "due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional safeguards." *United States v. Alvarez-Machain*, 504 U.S. 655, 662 (1992) (citing *Frisbie*, 342 U.S. at 522). However, there are two well-established exceptions to this rule: "[T]he *Ker/Frisbie* doctrine does not apply, and a court is deprived of jurisdiction over an extradited defendant, if either: (1) the transfer of the defendant violated the applicable extradition treaty,[61] or (2) the United States government engaged in 'misconduct of the most shocking and outrageous kind' to obtain his presence." *United States v. Anderson*, 472 F.3d 662, 666 (9th Cir. 2006) (quoting *Matta-Ballesteros*, 71 F.3d at 762-64).

**i.    Absence of an Extradition Treaty Cannot Excuse Violations of Other Prevailing Laws under the First *Ker/Frisbie* Exception.**

The first prong of the test for whether an arrest and extradition on foreign soil is unlawful is whether the abduction in question constituted a violation of the applicable extradition treaty. That

---

[60] To date, discovery received from the Government includes a paucity of documents related to the issues raised in this Motion.  The defense believes that other discovery exists and, contemporaneous with this Motion, is filing a motion seeking an order compelling discovery. We expect that the Government is in possession of and will need to produce more information about that nature and circumstances of Mr. Seleznev's abduction. The defense reserves the right to supplement the record of facts and exhibits related to this Motion based on subsequent disclosures received from the Government or ordered by the Court.

[61] The United States does not have an extradition treaty with the Maldives.

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 14
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

issue has been at the heart of the inquiry in several of the other cases analyzing the *Ker/Frisbie* doctrine and whether actions such as those taken here are legally permissible. *See, e.g. United States v. Alvarez-Machain,* 504 U.S. 655 (1992). However, in this case, that issue has been addressed in a merely cursory fashion, when it has been addressed at all. *See, e.g. United States v. Seleznev*, Mag. Case No. 14-00056, 2014 U.S. Dist. LEXIS 109999 (D. Guam, Aug. 7, 2014). This is not because the actions of the United States Secret Service were obviously in compliance with the applicable extradition treaty. Rather, it is because there is no applicable extradition treaty. *Id.* at *5-6. The lack of an extradition treaty should not, however, give the United States Government the authority to act in any way it so chooses. To the contrary, the lack of an extradition treaty should necessitate a much more thorough inquiry into the conduct of the United States Government officials and the conduct of the Secret Service agents in this case should be treated in the same way that conduct directly contravening an extradition treaty is treated.

An extradition treaty is a negotiated agreement between two countries through which one nation may request that the other detain criminals wanted in the first county and send them to that country for trial. *United States v. Verdugo-Urquidez*, 939 F.2d 1341, 1349-50 (9th Cir. 1991) ("Under accepted principles of international law, in the absence of an extradition treaty there is no general *obligation* of nations to surrender persons sought by another nations, although a nation may surrender such individuals as a matter of comity and discretion."), *vacated on other grounds by* 505 U.S. 1201 (1991). While it may contain limitations on what process is necessary and what crimes are extraditable, it is first and foremost, an enabling document which gives the requesting party rights that it would not otherwise have. *Id.* ("Nations enter into extradition treaties in order to impose such legal obligations on one another under appropriate conditions."); *see also Alvarez-Machain,* 504 U.S. at 664-65 (1992) ("The Treaty thus provides a mechanism *which would not otherwise exist*, requiring, under certain circumstances, the United States and Mexico to extradite individuals to the other country, and establishing the procedures to be followed when the Treaty is invoked.") (emphasis supplied). It is not a limiting agreement curtailing the otherwise unfettered right of a nation to invade the territorial sovereignty of another country and kidnap an individual for the purpose of conducting criminal proceedings against him. However, that is precisely how

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 15
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

the Government had the court in Guam view extradition treaties and it will presumably ask this Court to do the same.

It would be nonsensical to contend that, when a suspect is located in a country with which the United States does not have an extradition treaty, officials of the United States Government are less circumscribed in their ability to apprehend such an individual. *Factor v. Laubenheimer*, 290 U.S. 276, 286-87 (1933) ("[T]he principles of international law recognize no right to extradition apart from treaty. While a government may, if agreeable to its own constitution and laws, voluntarily exercise the power to surrender a fugitive from justice to the country from which he has fled, and it has been said that it is under a moral duty to do so, the legal right to demand his extradition and the correlative duty to surrender him to the demanding country exist only when created by treaty."). In the absence of a treaty providing procedure, the United States must comply with domestic law and follow the proper protocols to obtain custody of an individual suspected of a crime.

The leading case on whether a prohibition against forcible abduction can be read into an extradition treaty is the *Alvarez-Machain* case decided by the Supreme Court in 1992. 504 U.S. 655. In its holding, the Court declined to read an implied prohibition against bypassing the procedures outlined in the treaty and forcibly kidnapping a suspect into the applicable extradition treaty between the United States and Mexico. *Id.* at 665-66. In doing so, it reasoned that the Mexican government was aware of the doctrine established in *Ker* long before entering into the treaty and, although it considered including a prohibition against kidnapping of suspects in the treaty, it chose not to do so. *Id.* Therefore, the Court concluded that such a prohibition could not be inferred. *Id.* At first glance, that may appear to support the Government's argument because the holding was that prohibitions on forcible abductions must be explicit in the treaty to be applicable. However, it must be viewed in a different light when considering a country with which the United States does not have such a treaty.

The Maldives never consciously entered into an agreement with the United States that ignored the *Ker-Frisbie* doctrine as the Mexican government did. It never entered into any agreement. Therefore, the proper analysis is one in which all possible prohibitions are still valid. Thus, the only source that can be relied upon for outlining the necessary extradition procedures is

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 16
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Maldivian law which certainly forbids kidnapping including the conduct of the Secret Service agents here. Unless the Government can show that the Maldives was aware of the *Ker-Frisbie* doctrine and somehow exempted kidnappings masquerading as valid extraditions from their definition of kidnapping, it cannot rely on the lack of an extradition treaty to support an argument that it did not violate the first prong of the test.

The fact that the absence of an extradition treaty does not give a nation *carte blanche* to kidnap a suspect located in another country is further established by the manner in which the United States treats requests for extradition by countries with which it does not have a treaty providing process to do so. While United States law does allow extradition to nations with which it lacks a treaty, Congress has legislated strict limitations on how a request for such an extradition can be handled. The United States will only extradite individuals to such countries if the crimes of which they are accused are crimes of violence and the Attorney General has certified in writing that the foreign government has provided him with evidence that the crimes would be crimes of violence under United States law and are not political in nature.[62] 18 U.S.C. § 3181(b). Clearly, under United States law, foreign officials would be committing illegal acts if they came to this country and kidnapped someone they suspected of a crime, as would any state, local, or federal government official who allowed them to do so without going through the proper legal channels. If we have such an expectation of other nations, we cannot act as though the lack of a treaty means that we are allowed to do whatever we want. That is not the American way and it must not be sanctioned by this Court.

>    **ii.    Shocking and Outrageous Government Conduct is Prohibited by the Second *Ker/Frisbie* Exception.**

The second exception to the *Ker/Frisbie* doctrine was first summarized in the Second Circuit's decision in *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974). The defendant in *Toscanino* was convicted of smuggling heroin into the United States from Uruguay, and appealed

---

[62] It is significant that the United States only allows extradition to nations with which we lack an extradition treaty for individuals accused of crimes of violence. Thus, if the tables were turned, the United States would not have granted an extradition request from the Maldives in a case such as this, even if a request were properly lodged. Perhaps that is why the Maldives balked at the United States' request, prompting this unauthorized and unlawful response.

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 17
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

his conviction on the ground that the circumstances under which he was brought into United States custody, in which he was subjected to brutal physical abuse, violated due process principles. *Id*. at 269-70. While recognizing that the defendant's conviction would normally be permissible under the *Ker/Frisbie* doctrine, the *Toscanino* court relied on subsequent Supreme Court cases expanding the reach of the Due Process clause of the Constitution to conclude that the doctrine had since "eroded" and been "weakened." *Id*. at 273-74 (citing, *inter alia*, *Rochin v. California*, 342 U.S. 165 (1952). The *Toscanino* court also relied on the Supreme Court's recent observation that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes in order to obtain a conviction." *Id*. at 274 (citing *United States v. Russell*, 411 U.S. 423, 431-32 (1973)). The court ultimately concluded that due process "require[s] a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights" and remanded the case for an evidentiary hearing regarding the defendant's allegations. *Id*. at 275.[63]

Since the *Toscanino* decision was handed down, the Ninth Circuit has consistently affirmed the validity of the exception to the *Ker/Frisbie* doctrine that it set forth. *See United States v. Valot*, 625 F.3d 308, 310 (9th Cir. 1980) (recognizing "the exception to the Ker-Frisbie doctrine created by the Second Circuit" and noting that "where the defendant alleges governmental conduct of the most shocking and outrageous kind . . . due process [is] violated and the court [is] required to divest itself of jurisdiction"); *see also United States v. Struckman*, 611 F.3d 560, 571 (9th Cir. 2010) ("Where the government's conduct to obtain a defendant's presence is so shocking and outrageous

---

[63] On remand, the district court found that Toscanino had not presented credible evidence that United States agents were directly involved in his abuse and reinstated his conviction. 398 F.Supp. 916 (E.D. N.Y. 1975).

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 18
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

as to violate the universal sense of justice, the means of obtaining jurisdiction over the defendant amounts to a due process violation, and dismissal is required." (internal citation omitted)).

While the primary factor that drove the Second Circuit to recognize the "outrageousness" exception in *Toscanino* was the physical abuse of the defendant, courts around the country have since broadened the *Toscanino* inquiry to include the degree to which the United States respects the sovereignty of the country in which the suspect is apprehended. In a recent case in the District of District Columbia, for example, the court relied in part on the fact that the host nation had prior notice of, and had even cooperated with, the United States' plan, noting that "the DEA actually worked with the Panamanian government to secure custody of Mr. Torres-Garcia, making its conduct less shocking . . . ." *United States v. Torres-Garcia*, No. 05-267(RMC), 2007 WL 1207204, at *4 (D. D.C. April 24, 2007). In contrast, the government acts more "outrageously" when it kidnaps a defendant *sub rosa* or in violation of the stated wishes of the host nation. *See, e.g.*, *Toscanino*, 500 F.2d at 270 (noting allegation that "the Uruguayan government claims that it has no prior knowledge of the kidnapping nor did it consent thereto and had indeed condemned this kind of apprehension as alien to its laws").

The Ninth Circuit in particular has trended toward examining factors that focus less on the treatment of the defendant and more on the conduct of the United States as it bears on the government's coordination with the host nation and respect for its laws. *See United States v. Anderson*, 472 F.3d 662, 667 (2006) (noting defendant's allegation that United States agents "may have misled Costa Rica into believing Anderson had an unserved prison sentence in North Carolina."). In a more recent case, the court noted the government's "quite disturbing" and "considerably troubling" conduct in making "flat misstatements to Panamanian authorities" to obtain custody of the defendant. *United States v. Struckman*, 611 F.3d 560, 574 (2010). Though the court concluded that the misstatements were essentially "harmless" because they were made after

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 19
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

the defendant had already been transferred, it sent a clear message that deceit of the host government may constitute "outrageous" conduct requiring dismissal:

> We are not prepared to say that blatant lies to a foreign government that induce the foreign government to transfer a defendant to the United States when it otherwise would not could never amount to conduct so shocking and outrageous as to violate due process and require dismissal of pending criminal proceedings in the United States. In this case, though, the district court found that O'Brien's misrepresentations came after the Panamanians had already decided to cooperate with the United States in returning Struckman and had issued the resolutions. So the Panamanians did not rely on these misrepresentations for that purpose.

*Id.* (emphasis supplied).

As the United States will assuredly point out, the *Toscanino* exception is narrow; indeed, the undersigned was unable to locate any case law since *Toscanino* in which a court divested itself from jurisdiction over a case because of the government's misconduct. And as the United States will also point out, it is true that Mr. Seleznev was not subjected to the type of physical brutality that compelled the Second Circuit to recognize the exception. It is equally true, however, that Mr. Seleznev's case differs from those of other defendants who have attempted to invoke the *Toscanino* exception in three absolutely crucial respects. First, United States agents were *directly and personally responsible* for Mr. Selezenv's abduction. Second, those agents were acting in *knowing violation* of United States law, the law of the Maldives, and international law when they arrested Mr. Seleznev – a Russian citizen lawfully present in the Maldives pursuant to a tourist visa – and secreted him onto a chartered jet bound for Guam. In the context of the Ninth Circuit's evolving perception of the *Toscanino* exception, this egregious behavior should not be tolerated in the absence of national security concerns, let alone from agents pursuing a suspect in a non-violent, financial crime. And third, after failing to obtain permission to act from the Maldivian court system, Secret Service Agents went much farther in subverting Maldivian authority by taking action anyway. The apparent facts behind Mr. Seleznev's apprehension compel the Court to provide a

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 20
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

critical check on the executive branch by divesting itself of jurisdiction and dismissing the indictment under the reasoning set forth in *Toscanino*.

### C.    The United States' Conduct in Abducting Mr. Seleznev Was Shocking and Outrageous, and Requires Dismissal of this Action.

As set forth below, the United States' conduct in abducting Mr. Seleznev in plain view of his family by Secret Service agents acting in knowing violation of United States law, the law of the Maldives, and international law meets the *Toscanino* standard for "outrageous" government conduct and requires dismissal of the indictment.

### i.    United States Government Agents Were Personally and Directly Responsible for Mr. Seleznev's Abduction.

The first aspect of Mr. Seleznev's abduction that sets it apart from other abductions that have been tacitly accepted by the federal courts is that it was carried out solely by United States agents. As noted in note 66, *supra*, after the Second Circuit's remand in *Toscanino*, the District Court rejected the defendant's argument and reinstated his conviction on the ground that the defendant had failed to show that United States agents were involved in his abduction:

> Assuming all the allegations of the affidavit to be true, there is no claim of participation by United States officials in the abduction of torture of the defendant. *The defendant has not submitted any credible evidence which would indicate any participation on the part of United States officials prior to the time the defendant arrived in this country.* Nor is there any evidence which shows that the abduction was carried out at the direction of United State officials.

*Toscanino*, 398 F. Supp. at 917 (emphasis supplied). The involvement of United States agents is thus a necessary precondition for dismissal under the exception that was applied in *Toscanino*, and the degree of involvement by United States agents goes directly to the outrageousness of the government's conduct. Since the *Toscanino* decision was handed down, courts have rejected challenges where the United States agents were involved in the defendant's apprehension, but in nearly every case, the agents were working with the approval and support of local authorities. *See, e.g.*, *Valot*, 625 F.2d at 309 (upholding prosecution where DEA agents "arrived, received Valot

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 21
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

from the Thai officials and, over his protest, took him aboard a flight to Honolulu"); *United States v. Matta-Ballesteros*, 71 F.3d 754, 761 (9th Cir. 1995) (rejecting defendant's argument that exception applied where apprehending U.S. Marshals were "[a]ided by Honduran Special Troops, or 'Cobras'"); *United States v. Yousef*, No. S3 08 Cr. 1213(JKK), 2011 WL 2899244 at *8 (S.D. N.Y. June 30, 2011) (rejecting motion to dismiss where insufficient evidence of a government-sponsored kidnapping; "[t]here is no allegation that the masked men in the extended cab pickup truck who allegedly abducted Yousef from the Honduran prison were U.S. Government agents or people working at the behest of the U.S. Government"). It is a very different thing for a defendant to be abducted by police in a different country and handed over to the United States, than it is for a defendant to be personally abducted by a team of United States agents running amok in a foreign nation.

That is exactly what happened in this case. As shown by the facts set forth in Section II, *supra*, and in the supporting exhibits, the Secret Service initially attempted to secure the cooperation of the Maldivian police force and courts in obtaining custody over Mr. Seleznev, but when their efforts fell through, they simply took matters into their own hands. There is no evidence that the Maldivian government formally arrested or expelled Mr. Seleznev. Instead, according to a sworn statement by a disinterested eyewitness, a Maldivian hotel worker who was waiting for guests to arrive, and as corroborated by Maldivian news media reporting on the incident, Maldivian agents did not speak to Mr. Seleznev and did not participate in his abduction in any way.[64] The fact that it was United States Secret Service agents who directly – and independently – committed the flagrant violations of law set forth below is shocking on its face and should compel the Court to exercise its supervisory authority and dismiss this prosecution.

---

[64] Exh. 11, Shihab Decl. at ¶ 9.

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 22
(*Roman Seleznev*, No. CR11-070-RAJ)

1

### ii.     The Secret Service Knowingly Violated United States Law in Abducting Mr. Seleznev.

2      The Secret Service agents who abducted Mr. Seleznev from the Malé airport on July 5 did

3   so not only directly but also in flagrant and knowing violation of United States laws concerning the

4   execution of arrest warrants; the statutory scope of the agents' authority; and Department of Justice

5   guidelines for the extraterritorial apprehension of criminals.

6

### a.     Mr. Seleznev's Extraterritorial Arrest Violated the Law Governing the Execution of Arrest Warrants and the Secret Service's Enabling Statute.

7

8      Under Federal Rule of Criminal Procedure 4, an arrest warrant may be executed "within the

9   jurisdiction of the United States or anywhere else a federal statute authorizes arrest." Fed. R. Crim.

10   P. 4(c)(2).[65] This rule not only prohibits the execution of arrest warrants outside of the territorial

11   jurisdiction of the United States, but also provides that courts *lack jurisdiction* to issue warrants that

12   will be executed outside of the United States. *See Alvarez-Machain v. United States*, 331 F.3d 604,

13   641 (9th Cir. 2003) ("The district court that issued Alvarez's arrest warrant had no jurisdiction to

14   issue a warrant for an arrest in Mexico." (citing Fed. R. Crim. P. 4(c)(2)), *rev'd on other grounds*,

15   *Sosa v. Alvarez-Machain*, 542 U.S. 692, 124 S.Ct. 2739 (2004) (holding there is no common law

16   federal claim for an arrest that violates general principles of international law)). It is beyond

17   question that the Secret Service agents arrested Mr. Seleznev outside of the jurisdiction of the

18   United States.

19      As this Court is aware, an "arrest" is defined extremely broadly and "occurs when a law

20   enforcement officer, through coercion, physical force, or a show of authority, in some way restricts

21   the liberty of a person." *Hopkins v. Bonvicino*, 573 F.3d 752, 773 (9th Cir. 2009) (internal quotation

22   omitted). "A person's liberty is restrained when, taking into account all of the circumstances

23

24

25

---

[65] The clause of Rule 4 authorizing the execution of arrest warrants wherever statutorily authorized was added to the rule in 2002 to reflect the recent enactment of the Military Extraterritorial Jurisdiction Act, Pub. L. No. 106-523. *See* Fed. R. Crim. P. 4 advisory committee's note. It is undisputed that the Secret Service's actions in abducting Mr. Seleznev were not statutorily authorized.

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 23
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id.* (internal quotation omitted). Here, Mr. Seleznev's abduction in the Malé airport bears every hallmark of an arrest:  Special Agent Schwandner testified that once his encounter with Mr. Seleznev began, Mr. Seleznev was not free to walk away, was placed in Agent Schwandner's handcuffs, did not have a choice about whether to board the jet, and did not board the jet voluntarily.[66] Even the press releases issued by the Secret Service and the Department of Homeland Security state that the Secret Service "arrested" Mr. Seleznev on July 5, 2014 – before he arrived in Guam on July 6.[67] Making his misconduct even more flagrant, Agent Schwandner *knew he had no authority to make the arrest, and misrepresented the nature of his interaction with Mr. Seleznev at the motion hearing before Judge Tydingco-Gatewood*:

> Q:     Okay. So he's in your custody at that point, right? You've handcuffed him?
>
> A:     That is the beginning of the point where he is being turned over from the Maldivian authorities to the U.S.
>
> Q:     And he was still on – and geographically, he was –
>
> A:     *But he's not technically under arrest. He's not under arrest by the U.S. authorities at that time, though. **I have no authority in the Maldives**.*[68]

This wordplay is telling.  Secret Service Agents clearly knew that arresting of Mr. Seleznev in the Maldives would be improper without formal legal process from that country. If they believed their actions were proper, they would have been frank with the court about the true nature of those actions. But they clearly were not, indicating that they knew their actions were improper and feared that being honest about them would lead to dismissal of the charges.

---

[66] Exh. 6, Guam Transcript at 124:2-127:11.

[67] Exh. 2, July 7, 2014 Press Releases.

[68] Exh. 6, Guam Transcript at 125:3-10 (emphasis supplied).

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 24
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Furthermore, the Secret Service agents' actions were *ultra vires*. The Secret Service enabling statute, 18 U.S.C. § 3056, provides that "officers and agents of the Secret Service are authorized to – (A) execute warrants issued under the laws of the United States." 18 U.S.C. § 2035(c)(1). Thus, because the warrant was not properly executed, the agents were acting outside their scope of authority. The only remedy for these knowing violations of United States law is dismissal.

### b.    Mr. Seleznev's Abduction Violated Department of Justice Guidelines for the Extraterritorial Apprehension of Criminals.

The United States Attorneys' Criminal Resources Manual (the "Manual") is a set of guidelines, policies, and protocols promulgated by the Department of Justice to guide United States Attorneys and other Department of Justice employees in the exercise of their duties. Chapter 9-15 of the Manual, "International Extradition and Related Matters," provides guidelines for the apprehension of suspected criminals located outside of the United States. Formal extradition of suspects is plainly Department of Justice's preferred approach:  Chapter 9-15 begins by noting that extraterritorial apprehension "is subject to foreign policy considerations" and requires that "prosecutors should consult OIA [the Office of International Affairs] for advice on any matter relating to extradition before taking any action in such a case." Manual § 9-15.100.[69] Section 9-15.610 of the Manual, "Deportations, Expulsions, or other Extraordinary Renditions," permits Department of Justice employees to undertake abductions such as Mr. Seleznev's but only after advance approval from Department of Justice and the Office of International Affairs:

> Due to the sensitivity of abducting defendants from a foreign country, *prosecutors may not take steps to secure custody over persons outside the United States (by government agents or the use of private persons, like bounty hunters or private investigators) by means of Alvarez-Machain type renditions without advance approval by the Department of Justice. Prosecutors must notify the Office of International Affairs before they undertake any such operation.* If a prosecutor anticipates the return of a defendant, with the cooperation of the sending State and

---

[69] Chapter 9-15 of the U.S. Attorneys' Manual (attached as Exhibit 14).

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 25
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1

by a means other than an *Alvarez-Machain* type rendition, and that the defendant may claim that his return was illegal, the prosecutor should consult with OIA before such return.[70]

2

3

To date, the United States has not produced any documentation showing that the Secret

4

Service or the United States Attorney's Office for the Western District of Washington made such a

5

request to either the Department of Justice or OIA. And though the United States initiated a request

6

for Mr. Seleznev to be expelled, it is clear that such a request was never granted.

7

For one, the United States has not produced *any* documents reflecting any form of expulsion,

8

warrant, or authorization to arrest made by the Maldivian government. Second, Agent Schwandner

9

testified that he took Mr. Seleznev into custody *prior* to him reaching the immigration desk at the

10

Malé airport, and that Mr. Seleznev's passport was stamped in the "VIP area" after he had already

11

been handcuffed and had his property seized.[71] The immigration desk is the first point where

12

Maldivian authorities would have run Mr. Seleznev's information and learned that he had been

13

flagged for expulsion. Indeed, Mr. Seleznev's passport bears a *normal exit stamp* from the

14

Maldives.  Based on the defense's investigation, when an individual is expelled from the Maldives,

15

their passport is given a different stamp clearly indicating they have been expelled and may not

16

return.

17

Reason dictates that there was no need for the Maldives to "expel" Mr. Seleznev because

18

he was, in essence, literally attempting to effect his own expulsion by boarding his scheduled flight

19

back to Russia. The United States' assertion that Mr. Seleznev was expelled by the Maldives prior

20

to his illegal arrest in the Malé is not supported by any evidence and is simply not credible. The

21

Secret Service should be held accountable for violating the Court's arrest warrant rules, its own

22

statutory authority, and Department of Justice's own standards in abducting Mr. Seleznev

23

24

[70] Exh. 14, U.S. Attorney's Manual at § 9-15-610 (emphasis supplied).

25

[71] *See* Exh. 6, Guam Transcript at 131:23-132:15

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 26
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1

### i.     The Secret Service Knowingly Violated the Law of the Maldives in Abducting Mr. Seleznev.

The moment before he was arrested by the Secret Service, Mr. Seleznev was lawfully present in the Maldives which had filed no criminal charges against him and which had not ordered his arrest under Maldives law. Had he been arrested under Maldives law, Mr. Seleznev would have been entitled to certain fundamental legal protections including the right to counsel, the right to consular access, and the right to be brought before a Maldives court within 24 hours of his arrest to determine the lawfulness of his detention.[72] Moreover, under Maldives law, given that Maldives is not a party to any extradition treaty with the United States, if expelled following a judicial proceeding, Seleznev would have been returned to his home jurisdiction of Russia and not to the United States.

Mindful that Mr. Seleznev would have been entitled to these legal protections under Maldives law and that his expulsion would result in his return to Russia (where he was headed immediately prior to his arrest), the Secret Service agents took physical custody of Mr. Seleznev in a deliberate circumvention of the legal protections afforded under the local law of the Maldives. This makes the United States' conduct in abducting Mr. Seleznev even more outrageous and compels a finding that this prosecution cannot stand. *See, e.g.*, *Toscanino*, 500 F.2d at 270 (noting that host country "had indeed condemned this kind of apprehension as alien to its laws" in reaching holding).

### ii.     The Secret Service Knowingly Violated International Law in Abducting Mr. Seleznev.

In addition to the foregoing violations of United States and Maldivian law, the Secret Service violated international law when it contravened the terms of the purported Red Notice, ignored its treaty obligations with Russia, and violated a United Nations covenant.

---

[72] *See* Constitution of the Republic of the Maldives (2008) (English translation), Articles 45-48, 50 (attached as Exhibit 15)

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 27
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1

      a.     **The United States Violated its Representations to Interpol in Abducting Mr. Seleznev Without Obtaining his Extradition or the Permission of the Maldivian Government.**

2

      The International Criminal Police Organization, a.k.a. Interpol, is an international non-governmental organization that facilitates international police cooperation and coordination; there are over 190 member nations of Interpol, including the Maldives, Russia, and the United States.[73] Red Notices are described in the United States Attorneys' Manual as "the closest instrument to an international arrest warrant in use today."[74] Further guidance, in the form of the prosecutor's Criminal Resources Manual, advises that when a person whose name is listed in an Interpol Notice comes to the attention of the police abroad, the country that sought the listing is notified through Interpol and can request provisional arrest and/or file a formal request for extradition.[75] Red Notices are intended to be used for "extradition or similar *lawful* action."[76]

      The Interpol Red Notice purportedly provided to Maldivian authorities in order to secure their permission to arrest Mr. Seleznev in the Malé airport contains an affirmation, endorsed by the United States in requesting that the Red Notice be issued, that "[t]he country at the request of which the present notice has been published has given assurances that extradition will be sought upon arrest of the person, *in conformity with its national laws and/or the applicable bilateral and multilateral treaties*."[77] This provision requires the United States to comply with its own laws, the law of the Maldives, and the Mutual Legal Assistance Treaty between the United States and Russia. It prohibits the type of illegal abduction Mr. Seleznev has suffered, and should compel the Court to exercise its supervisory power and dismiss the prosecution against him.

---

[73] *See* "Member Countries," http://www.interpol.int/Member-countries/World (last accessed April 2, 2015) (Exhibit 17).

[74] Exh. 14, U.S. Attorney's Manual 9-15.635 (on Interpol Red Notices).

[75] *See* U.S. Attorneys' Criminal Resources Manual, § 611 (attached as Exhibit 16).

[76] *See* "Notices," http://www.interpol.int/INTERPOL-expertise/Notices (last accessed April 2, 2015) (emphasis supplied) (Exhibit 18).

[77] *See* July 5, 2014 Interpol Red Notice (emphasis supplied) (Exhibit 19).

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 28
(*Roman Seleznev*, No. CR11-070-RAJ)

1

2

### b. The United States Violated its Mutual Legal Assistance Treaty with Russia when it Abducted Mr. Seleznev from a Third-Party Host Nation.

3

The United States and Russia are parties to a Mutual Legal Assistance Treaty (the

"MLAT"), which is intended to "broaden and deepen American-Russian cooperation to prevent and

4

fight against crime" and "reaffirm[] their determination to enhance legal assistance in criminal

5

matters."[78] The MLAT is a self-executing treaty[79] that enables the Attorney General to coordinate

6

requests with the Russian Office of the Procurator General for a wide range of topics, including

7

requests for the location and identification of individuals, the search and seizure of items in the host

8

country, and the transfer of individuals in custody.[80] The MLAT contains detailed provisions

9

regarding each country's duties in responding to requests made pursuant to the treaty, requiring that

10

requests are "promptly executed" and the requesting nation kept apprised of the status of such

11

execution.[81]

12

It is undisputed that the United States could have, but did not invoke the MLAT in an effort

13

to obtain custody of Mr. Seleznev lawfully in this case. Secret Service communications produced

14

by the United States indicate that the government believed it *could* do so under the terms of an

15

MLAT,[82] had already issued requests for information regarding Mr. Seleznev to Russia and the

16

Ukraine – signatory to a separate MLAT with the U.S., and Russia's closest neighbor – thereby

17

undermining any argument that the United States avoided issuing a request to maintain the

18

19

20

---

21

[78] *See* June 17, 1999 Treaty between the United States of America and the Russian Federation on Mutual Legal Assistance in Criminal Matters, Preamble (the "MLAT") (attached as Exhibit 20

22

[79] *See In re: Premises Located at 840 140th Ave. NE, Bellevue, Wash.*, 634 F.3d 557, 567-68 (9th Cir. 2011).

[80] Exh. 20, MLAT Art. 12, 14, 16.

23

[81] Exh. 20, Art. 7.

24

[82] *See, e.g.*, Exh. 5, March 13, 2013 U.S. Secret Service Investigative Report at 2 ("Efforts continue to locate Roman Seleznev and apprehend him should he travel to a country in which there exists a Mutual Legal Assistance Treaty (MLAT) with the United States of America.").

25

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 29
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1  confidentiality of their investigation.[83] Moreover, as noted above, the Russian Foreign Ministry
2  explicitly accused the United States of ignoring the MLAT and resorting to the forcible kidnapping
3  of a Russian citizen.[84] While the MLAT is not an extradition treaty *per se*, it is a formal agreement
4  that provides the United States a mechanism for cooperating with Russia in criminal prosecutions,
5  and it behooves the United States to make a good faith effort to act within its strictures – hence
6  Russia's public outrage over Mr. Seleznev's abduction.[85]

7      Mr. Seleznev anticipates that the Government will argue that attempting to use the MLAT
8  to secure custody of Mr. Seleznev would have been futile and that the agents were therefore justified
9  in bypassing it. However, it is not the province of the Government to assume that acting lawfully
10  through a treaty would be futile and, therefore, other solutions outside of the law need to be
11  explored. The law does not allow a party to skip steps because the party assumes they will not work.
12  Even assuming that the extrajudicial means employed here were lawful – which they were not – the
13  United States still would have needed to exhaust the remedies available to it before claiming that
14  those remedies would be ineffective. As the Government has provided no indication that it
15  attempted to use the MLAT but was rebuffed, an argument that such action would have been futile
16  should be given little to no weight.

---

[83] *See* September 15, 2010 U.S. Secret Service Investigative Report at 5 (attached as Exhibit 21) ("The Moscow RO is requested to continue liaison efforts with the Russian Federal Security Service and attempt to determine subscriber information for IP address 188.120.225.66."); May 10, 2011 Secret Service Investigative Report at 2 (attached as Exhibit 22) (noting contact with Ukrainian officials "concerning a Mutual Legal Assistance Treaty (MLAT) request sent to Ukrainian authorities requesting the imaging of servers hosting carder.su and track2.name . . .").

[84] Exh. 3, "Foreign Ministry outraged by Russian citizen's detention by US secret service in Maldives," Tass Russian News Agency, July 8, 2014, at 2.

[85] *See generally* Exh. 3.

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 30
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1

        c.      **The United States Violated the United Nations International
                Covenant on Civil and Political Rights when it Abducted Mr.
                Seleznev.**

2

        In addition to the foregoing violations of international *agreements*, the United States

3

violated international *law* when it abducted Mr. Seleznev. The United Nations International

4

Covenant on Civil and Political Rights (the "ICCPR") is a widely-accepted international accord

5

that requires signatory countries to observe basic civil political rights of individuals regardless of

6

their citizenship. The ICCPR was ratified by the United States Senate in 1999, *see* 138 Cong. Rec.

7

S4781-01 (April 2, 1992), and both Russia and the Maldives have also ratified the covenant. While

8

the ICCPR is not "self-executing" in that it does not provide *individuals* of member nations with a

9

private cause of action for violation of its terms, *see, e.g.*, *Serra v. Lappin*, 600 F.3d 1191, 1196-97

10

(9th Cir. 2010), the *nations* that have signed and ratified it do have an obligation to observe its

11

terms.

12

        The United States' action in abducting Mr. Selezenev directly contravenes several

13

provisions in the ICCPR. For one, Article 9 of the ICCPR provides that signatory nations may only

14

deprive someone of their liberty "in accordance with such procedure as are established by law,"

15

and requires that anyone who is deprived of their liberty "shall be entitled to take proceedings before

16

a court, in order that that court may decide without delay on the lawfulness of his detention and

17

order his release if the detention is not lawful." ICCPR Art. 9 Cl. 1, 4.[86] The Secret Service violated

18

this provision when it arrested Mr. Seleznev without authority under either United States law or the

19

law of the Maldives, then immediately secreted him out of the country for the purpose of *avoiding*

20

judicial review of the lawfulness of his detention. Article 13 of the ICCPR goes one step further

21

and provides that aliens who are lawfully in another country may not be expelled without having

22

their case reviewed unless their presence implicates national security issues:

23

24

———————————————

25

[86] ICCPR, including Articles 9 and 13 cited herein (attached as Exhibit 23).

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 31
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1
2
3

> An alien lawfully in the territory of a State Party to the present Covenant may be expelled therefrom *only in pursuance of a decision reached in accordance with law and shall, except where compelling reasons of national security otherwise require, be allowed to submit the reasons against his expulsion and to have his case reviewed by, and be represented for the purpose before, the competent authority* or a person or persons especially designated by the competent authority."[87]

4   Here, it is clear that the United States violated Article 13 of the ICCPR by proceeding with Mr.

5   Seleznev's abduction in the absence of a valid order of expulsion from the Maldives government.

6   The only remedy for these flagrant violations of international law is dismissal.

7
8

**D.    Mr. Seleznev's Illegal Abduction Weakens the United States' Image on the Global Stage and Sets a Bad Precedent for Protecting United States Citizens in the Future.**

9   As important as the actual legal issues surrounding the treatment of Mr. Seleznev are the

10  perhaps unanticipated geopolitical ramifications it is likely to bring to bear. There can be no

11  denying that in recent years the United States' global image has suffered substantially, and we

12  have a difficult road ahead of us in the eyes of many to get back to the position where we belong as

13  the world's foremost bastion of liberty and freedom. Kidnapping foreign citizens abroad and

14  violating the territorial interests of other countries sets our country farther back on that road. As

15  noted above, the arrest of Mr. Seleznev was an international incident sparking public outcry

16  against the United States in Russia, the Maldives, and elsewhere.

17  Mr. Seleznev's abduction sets a terrible precedent that will put United States citizens

18
19  traveling or residing in other countries at greater risk. The Government obviously believes that the

20  charges against Mr. Seleznev are sound, and it will no doubt claim that it would only undertake

21  this type of extraordinary action in a case in which it was sure of the defendant's guilt. Other

22
23  nations, however, may have different opinions about what should be illegal, or may set lower

24
25

---

[87] Exh. 23, ICCPR at Art. 13 (emphasis supplied).

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 32
(*Roman Seleznev*, No. CR11-070-RAJ)

thresholds than those purportedly followed by the United States. If a foreign government were to apprehend a United States citizen forcibly in a foreign country without permission or based simply on acquiescence from that nation's authorities, there would certainly be public outcry in this country, particularly if the arrest was based on questionable evidence or actions that most Americans think should not be illegal. But allowing Mr. Seleznev's arrest to stand would give other nations an example to point to in order to justify such conduct and would leave the United States on morally shaky ground in challenging such conduct. If this Court allows this indictment to stand, what is to stop an intelligence agency from Syria, Iran, or another country with whom the United States does not always see eye-to-eye, from abducting a United States citizen in the Maldives and charging him with blasphemy or some other charge that the United States may or may not find dubious?

America is a nation in which we respect the rule of law and respect the rights of all individuals even if they are not citizens or even if they are accused of the most heinous of conduct. Our criminal justice system is not based on the notion of "the ends justify the means" and, while its name contains the word "secret," the Secret Service is not meant to be a secret police force. There can be no question here that United States government agents used dubious means to apprehend Mr. Seleznev, actions more in line with those of a secret police force than an arm of the United States Government. Allowing this arrest to stand would only take this country further down that road. As the Ninth Circuit has recognized, one of the legitimate reasons why a court can exercise its supervisory powers to order dismissal of a prosecution is to "deter future illegal conduct." *Matta-Ballesteros*, 71 F.3d at 763. As set forth above, the conduct by Secret Service agents in this case was unquestionably illegal under United States, Maldivian, and international law. Allowing

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 33
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

government agents to use progressively more illegal methods of taking defendants into custody encourages illegal conduct by suggesting that there is no limit to the means that they can employ. It is not only proper but necessary for a court to step in and stop such activity so that such conduct does not continue in the future, the United States' international black eye is given a chance to heal, and United States citizens are not put at increasingly greater risk of retribution or similar action for which the United States has no response. By dismissing this prosecution, this Court restores our reputation and sends the message that the U.S. is a nation of laws that honors the law with respect to other countries and individuals. Other courts may have been reluctant to do so but this Court is in a unique position to stand up and say "enough is enough." Declining jurisdiction over this case is the legal, equitable, and politically-proper thing to do.

## VI.   <u>CONCLUSION</u>

As set forth above, the United States knowingly and directly violated three separate bodies of substantive law when it abducted Mr. Seleznev from the Malé airport and brought him to the United States. As the Ninth Circuit has clearly stated, an extraterritorial arrest may be found to be so shocking and outrageous that it violates due process principles – even in the absence of physical abuse – if the United States flagrantly disregards the sovereignty of the host nation. The United States' decision to go through with Mr. Seleznev's abduction even after the apparent denial of its request for expulsion; the fact that the abduction was carried out solely by United States agents; and the fact that those agents were acting in knowing violation of United States law, Maldivian law, and international treaties and covenants all set this case apart from early cases rejecting challenges to extraterritorial abductions based on a narrower reading of *Toscanino*. The Court

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 34
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1   should refuse to sanction these abuses and should fulfill its duty of checking executive branch

2   officials whose actions violate Constitutional principles.

3       For these reasons and those set forth above, Mr. Seleznev respectfully asks the Court to:

4       1.      Decline to exercise jurisdiction over this matter and thereby terminate the
                prosecution;

5

6       2.      Dismiss the pending Indictments;

7       3.      Order Mr. Seleznev's release from confinement; and

8       4.      Issue such other orders and further relief as may be appropriate.

9       DATED this 7th day of April, 2015.

10                                      *s/ Russell Leonard*
                                        *s/ Dennis Carroll*
11                                      Assistant Federal Public Defenders
                                        Attorneys for Defendant Roman Seleznev
12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 35
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

## **CERTIFICATE OF SERVICE**

I certify that on April 7, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of filing to all registered parties.

/s/  Barbara Hughes
Barbara Hughes, Paralegal
Office of the Federal Public Defender

DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CRIM. P. 12 – 36
(*Roman Seleznev*, No. CR11-070-RAJ)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**