# EXHIBIT 1

United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE
# WESTERN DISTRICT *of* WASHINGTON

U.S. Attorneys » Western District of Washington » News

**Department of Justice**

U.S. Attorney's Office

Western District of Washington

FOR IMMEDIATE RELEASE                                           Monday, July 7, 2014

# Russian Hacker Arrested for Computer Hacking Scheme that Victimized Thousands of Credit Card Customers

## Seattle Area Businesses Had Their Point Of Sale Computers Hacked, Information Stolen

A Russian man, indicted in the Western District of Washington for hacking into point of sale systems at retailers throughout the United States was arrested this weekend and transported to Guam for an initial appearance, announced U.S. Attorney Jenny A. Durkan. ROMAN VALEREVICH SELEZNEV, 30, of Vladivostok, also known as "Track2" in the criminal carding underground, was indicted in March 2011, for operating several carding forums that engaged in the distribution of stolen credit card information. At his first appearance in Guam today, SELEZNEV was ordered detained pending a further hearing scheduled for July 22, 2014.

"Cyber crooks should take heed: you cannot hide behind distant keyboards. We will bring you to face justice," said U.S. Attorney Jenny A. Durkan, who leads the Justice Department's Cybercrime and Intellectual Property Enforcement Subcommittee of the Attorney General's Advisory Committee. "I want to thank the U.S. Secret Service for their work in investigating this case and in apprehending the defendant. I also want to give credit to the work of the Electronic Crimes Task Force, and Seattle Police Department in particular, and our partners in the United States Attorney's Office in Guam, the Department of Justice's Office of International Affairs, and the Computer Crime and Intellectual Property section of the Department of Justice's Criminal Division."

The indictment, unsealed today following his arrest on July 5, 2014, details a bank fraud scheme in which SELEZNEV is charged with hacking into retail point of sale systems and installing malicious software on the systems to steal credit card numbers. The illegal hacking outlined in the indictment occurred between October 2009, and February 2011. The indictment alleges that SELEZNEV created and operated infrastructure to facilitate the theft and sales of credit card data and used servers located all over the world to facilitate the operation. This infrastructure included

servers that hosted carding forum websites where cybercriminals gathered to sell stolen credit card numbers. The charges in the indictment include five counts of bank fraud, eight counts of intentionally causing damage to a protected computer, eight counts of obtaining information from a protected computer, one count of possession of fifteen or more unauthorized access devices (stolen credit card numbers), two counts of trafficking in unauthorized access devices and five counts of aggravated identity theft.

"The arrest of Roman Seleznev is yet another example of how the Secret Service continues to successfully combat data theft and financial crime," said Robert Kierstead, Special Agent in Charge of the U.S. Secret Service Seattle Field Office. "The Secret Service utilized state-of-the-art investigative techniques to dismantle this criminal network. Our success in this case and other similar investigations is a result of the extraordinary work of our investigators and our close work with our network of law enforcement partners."

Bank Fraud is punishable by up to thirty years in prison and a $2 million fine. Intentionally causing damage to a protected computer resulting with a loss of more than $5,000 is punishable by up to ten years in prison and a $250,000 fine. Obtaining information from a protected computer is punishable by up to five years in prison and a $250,000 fine. Possession of more than 15 unauthorized access devices is punishable by up to ten years in prison and a $250,000 fine. Trafficking in unauthorized access devices is punishable by up to 10 years in prison and a $250,000 fine. Aggravated identity theft is punishable by an additional two years in prison on top of any sentence for the underlying crimes. In determining the actual sentence, the Court will consider the United States Sentencing Guidelines, which are not binding but provide appropriate sentencing ranges for most offenders.

SELEZNEV is also charged in a separate indictment in the District of Nevada with participating in a racketeer influenced corrupt organization (RICO) and conspiracy to engage in a racketeer influenced corrupt organization as well as two counts of possession of fifteen or more counterfeit and unauthorized access devices. Those charges carry maximum penalties of up to 20 years in prison for RICO and RICO conspiracy and up to 10 years in prison for possession of fifteen or more counterfeit and unauthorized access devices.

Credit card fraud costs financial institutions $40 billion annually. In the Western District of Washington more than 180,000 stolen credit card numbers have been identified in recent cyber cases.

The charges contained in the indictment are only allegations. A person is presumed innocent unless and until he or she is proven guilty beyond a reasonable doubt in a court of law.

The case is being investigated by the U.S. Secret Service Electronic Crimes Task Force which includes detectives from the Seattle Police Department. The Office of International Affairs, the Computer Crime and Intellectual Property Section of the Department of Justice's Criminal Division and the U.S. Attorney's Office for the District of Guam provided substantial assistance. Assistant United States Attorney Norman M. Barbosa is prosecuting the case in the Western District of Washington.

For additional information please contact Todd Greenberg, Assistant United States Attorney for the United States Attorney's Office, at (206) 553-7970.

USAO - Washington, Western District

Updated March 20, 2015

# EXHIBIT 2



*U.S. Department of
Homeland Security*

**United States
Secret Service**

# PRESS RELEASE

July 7, 2014
Contact: (202) 406-5708
GPA 06-14

## U.S. SECRET SERVICE ARRESTS ONE OF THE WORLD'S MOST PROLIFIC TRAFFICKERS OF STOLEN FINANCIAL INFORMATION

(Washington, D.C.) On July 5, 2014 the U.S. Secret Service arrested Roman Valerevich Seleznev. A Russian national, Seleznev was indicted in the Western District of Washington in March 2011 for hacking into point of sale systems at retailers throughout the United States between October 2009 and February 2011.

"This important arrest sends a clear message: despite the increasingly borderless nature of transitional organized crime, the long arm of justice – and this Department – will continue to disrupt and dismantle sophisticated criminal organizations," said Secretary of Homeland Security Jeh Johnson. "This arrest reflects the hard work by the U.S. Secret Service and our interagency and international partners, and we must continue close collaboration with the law enforcement community to counter this ever evolving threat."

According to the indictment, Seleznev hacked into point of sale systems throughout the United States and operated servers and international carding forum websites to facilitate the theft and sale of stolen credit card data. Seleznev, known as "Track2" in the criminal carding underground, remains in custody pending trial.

"Secret Service agents utilize state-of-the-art investigative techniques to identify and pursue cyber criminals around the world. This scheme involved multiple network intrusions and data thefts for illicit financial gain. The adverse impact this individual and other transnational organized criminal groups have on our nation's financial infrastructure is significant and should not be underestimated," said Julia Pierson, Director of the U.S. Secret Service.

The charges in the indictment include five counts of bank fraud, eight counts of intentionally causing damage to a protected computer, eight counts of obtaining information from a protected computer, one count of possession of 15 or more unauthorized access devices, two counts of

trafficking unauthorized access devices, and five counts of aggravated identity theft. The case remains under investigation by the U.S. Secret Service Electronic Crimes Task Force in Seattle and is being prosecuted by the U.S. Attorney's Office for the Western District of Washington.

"Cyber crooks should take heed: you cannot hide behind distant keyboards. We will bring you to face justice," said U.S. Attorney Jenny A. Durkan. "I want to thank the U.S. Secret Service for their work investigating this case and apprehending the defendant. I want to also acknowledge the work of the Seattle Electronic Crimes Task Force, the Seattle Police Department, the Department of Justice Office of International Affairs, and the U.S. Attorney in Guam."

Seleznev is also charged in a separate indictment in the District of Nevada with participating in a racketeer influenced corrupt organization (RICO) and conspiracy to engage in a racketeer influenced corrupt organization as well as two counts of possession of 15 or more counterfeit and unauthorized access devices. Those charges carry maximum penalties of up to 20 years in prison for RICO and RICO conspiracy and up to 10 years in prison for possession of 15 or more counterfeit and unauthorized access devices.

The U.S. Secret Service has taken a lead role in mitigating the threat of financial crimes since the agency's inception in 1865. As technology has evolved, the scope of the U.S. Secret Service's mission has expanded from its original counterfeit currency investigations to also include emerging financial, electronic and cyber-crimes. As a component agency within the U.S. Department of Homeland Security, the U.S. Secret Service has established successful partnerships in both the law enforcement and business communities – across the country and around the world – in order to effectively combat financial crimes.

# # #

*EDITOR'S NOTE: For questions concerning this release, please contact the U.S. Secret Service Office of Government and Public Affairs at 202-406-5708.*

# EXHIBIT 3



RUSSIAN NEWS AGENCY

# Foreign Ministry outraged by Russian citizen's detention by US secret service in Maldives

**World**   July 08, 13:17   UTC+3

**July 5, Russian citizen Roman Seleznyov was detained in the airport of Male, Maldives, forced by agents of American secret service into a private jet and brought to Guam Island**

 Russian Foreign Ministry building in Moscow

Russian Foreign Ministry building in Moscow
© ITAR-TASS/Gennady Khamelyanin

MOSCOW, July 8. /ITAR-TASS/. Russia considers the detention of the Russian citizen Roman Seleznyov by US secret services as Washington's unfriendly step, the Russian Foreign Ministry said on Tuesday.

"As it became known, July 5, Russian citizen Roman Seleznyov was detained in the international airport of the city of Male, the capital of Maldives," the ministry recalled. "On the same day, he was forced by agents of American secret service into a private jet and delivered to Guam Island. This fact has been already confirmed by the US Department of Homeland Security."

"We consider the incident as another Washington's unfriendly step," the Russian Ministry of Foreign Affairs stressed.

"It is not the first time that the US kidnaps a Russian citizen ignoring the 1999 mutual legal assistance agreement," the ministry said. "In particular, the same occurred with Viktor Bout and Konstantin Yaroshenko, who were brought by force in the USA from third countries and convicted on questionable charges." "Noteworthy that we are not informed about the claims lodged against our compatriots, furthermore, as in Seleznyov's case, they don't even inform Russia's diplomatic agencies about their detention," the ministry emphasized.

## About the stance of Maldives' authorities

"The stance of Maldives' authorities cannot be but outraging, since despite the existing international legislation norms they allowed another country's special service to kidnap a Russian citizen and take him out of the country," the diplomatic service stressed. "We demand that the Maldives' government provides necessary explanations."

"Russian diplomats are making every possible effort to find out the circumstances of Roman Seleznyov's detention and to provide his soonest return to homeland," the Foreign Ministry said. "We are insisting on intelligible explanations of the incident from US authorities, strict compliance with the rights of the Russian citizen and provision of consular access to him."

"In view of the aforementioned situation, we once more strongly recommend our compatriots to give serious consideration to Russian Foreign Ministry's warning published on the ministry's website regarding the risks linked with trips abroad when there are concerns that American law enforcement agencies might lodge any claims against them," the statement says.

## Detained Russian turns out to be son of lawmaker

State Duma member representing the Liberal Democratic Party (LDPR) Valery Seleznyov has confirmed his son Roman had been detained by US secret service in the Maldives.

"I am now in negotiations with the Russian Foreign Ministry. Kidnapping is a crime," he told ITAR-TASS on Tuesday. "The country must protect its citizens, and Roman should go back to Russia."

Earlier on Tuesday, Valery Seleznyov dubbed a provocation media reports saying that his son Roman was allegedly arrested in the USA on suspicion of a cyber attack, data theft and computer-related fraud.

"This is some monstrous lie and provocation," the lawmaker told ITAR-TASS.

"The case in hand is that in media reports, there are many evidential inaccuracies: my son was not on the territory of the USA and he was not born in Moscow," Seleznyov specified.

In addition, he said that his son Roman had nothing to do with computer technologies. Furthermore, Seleznyov recalled that in 2011, his son became victim to a terrorist attack in Morocco. "It's painful to me as a father to speak about it, but consequences of this tragedy are seen until today, Roman is going through a medicated rehabilitation course, and I cannot image how he could be involved in any cyber attacks amid the issues he has," the MP said.

He added, however, that he couldn't get in touch with his son yet.

The lawmaker doesn't exclude that "a terrible coincidence occurred, and the detained young man is just a namesake of Roman". "In any case, I wish him success, since we all know what American justice actually is," the lawmaker concluded.



© 2015 TASS
Beta-version. Some publications may contain information not suitable for users under 16 years of age.

# THE MINISTRY OF FOREIGN AFFAIRS
# OF THE RUSSIAN FEDERATION

*official site*

**Comment by the Information and Press Department of the Russian Ministry of
Foreign Affairs regarding the situation involving the kidnapping of the Russian
national Roman Seleznyov by the US intelligence agencies**

1681-11-07-2014

We continue to ask Washington to immediately free Roman Seleznyov, who was forcibly
removed from the Maldives to Guam, a US island, on the 5 July. From the phone
conversation of the Russian national, who is now in one of Guam's prisons, with
representatives of the Russian General Consulate in San Francisco, we have learnt new
shocking details of this story.

It turns out that when Roman Seleznyov passed through airport control before his flight,
in the airport of the Maldives capital, from where he wanted to fly to Moscow, he was
asked to visit a room for an extra check. Then three employees of the US intelligence
agencies broke in, roughly announced that he was being detained, put him in handcuffs
and immediately took him on board a private plane, which immediately started to move
onto the take-off strip. No more than 20 minutes passed from the detention of our
compatriot to take-off.

No legal procedures with the participation of local authorities, which are necessary when
extraditing, were held. The detention itself was committed by the US agents, who were
acting in the Maldives territory in a blitz style disregarding any legal formalities. Thus,
the Russian national was actually kidnapped, which is a gross violation of the laws of any
civilised state and international law.

It is outrageous that the US prison refuses to provide necessary medication to Roman
Seleznyov, who was severely injured in a terrorist attack in 2011 and constantly needs his
medication. As a result of this his health and even his life are under threat. Another way
of applying pressure on the Russian seemingly is the cold in his single cell, where he is
being kept. The purpose of such methods seemingly is to break the will of our compatriot,
because the accusations raised against him are seriously doubtful.

For our part, in our contacts with the US authorities, we insist that they stop torturing the
Russian national and strictly observe his rights, including the provision of adequate
medical aid to him. It is expected that Russian diplomats will visit Roman Seleznyov on
the 14 July within the framework of a consular visit.

11 July 2014

Register                                    Sign in

# Russia Demands United States Releases Accused Hacker Roman Seleznev Immediately

BY **REUTERS** 7/15/14 AT 6:15 AM

MOSCOW (Reuters) - The Russian Foreign Ministry said on Tuesday it had issued an official protest to the United States demanding immediate release of a Russian citizen detained last week on hacking charges.

Moscow accused Washington of kidnapping Roman Seleznev who was detained at an airport in the Maldives and accused of hacking into U.S. retailers' computer systems to steal credit card data.

The arrest of the 30-year-old son of a deputy in Russia's lower house of parliament has increased tensions between the two countries, already at their worst since the end of the Cold War over the Ukraine crisis.

### Try Newsweek for only $1.25 per week

"From our side, we stressed the unacceptability of such actions which are a flagrant violation of the legitimate rights and interests of the Russian citizen, who was in fact kidnapped from the territory of a third country," the Foreign Ministry said in a statement.

It issued a demarche - a formal diplomatic statement of concern - to a representative of the U.S. embassy.

"We again demanded the immediate release of Roman Seleznev, providing him with adequate medical care and in general respecting his legal rights and interests," the ministry said.

The U.S. State Department has dismissed Moscow's accusations of kidnapping, saying Seleznev was indicted in the state of Washington in March 2011 on charges including bank fraud, causing damage to a protected computer, obtaining information from a protected computer and aggravated identity theft.

## JOIN THE DISCUSSION

Add a comment...

Comment

Facebook social plugin

# EXHIBIT 4

**CIVILLE & TANG, PLLC**
SUITE 200, 330 HERNAN CORTEZ AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671)472-8868
FACSIMILE: (671) 477-2511

*Attorneys for the Person Being Detained As*
*Defendant* Roman Seleznev

## IN THE UNITED STATES DISTRICT COURT
## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | MAGISTRATE CASE NO. 14-00056 |
| Plaintiff, | |
| vs. | **DECLARATION OF** |
| ROMAN SELEZNEV,<br>aka TRACK2,<br>aka ROMAN IVANOV,<br>aka RUBEN SAMVELICH,<br>aka nCuX,<br>aka Bulba,<br>aka bandysli64,<br>aka smaus,<br>aka Zagreb,<br>aka shmak, | **ROMAN SELEZNEV** |
| Defendant. | |

1.    My name is Roman Seleznev, and I am being detained as and accused of being the Defendant named Roman Seleznev in the indictment in Case No. CR11-070RAJ from the United States District Court of the Western District of Washington.

2.    I am over the age of 21, and competent to make this declaration.

3.    I am a citizen and a resident of the Russian Federation.

4.    On or about July 5, 2014, I was in the Republic of the Maldives on the last day of a family vacation.

5.    I was traveling with my family consisting of my girlfriend Anna Otisko, and her four year old daughter.

# ORIGINAL

6.     On the morning of July 5, 2014, I proceeded with my family to the Male International airport for our 11:55 a.m. scheduled flight back to the Russian Federation.

7.     When I arrived at the airport, I was directed to a side inspection area with my family. We were led into a small room, and I was separated from Anna and the child who were directed into an adjacent room with a partial glass door.

8.     As soon as I was separated from my family, three Americans I had not seen before rushed in behind me and I was thrown by the Americans to the couch that was in the small room.

9.     One of the three Americans screamed loudly that he was with the United States Secret Service and that I was under arrest. When I asked why I was under arrest, a paper was aggressively dangled in front of my face. None of these three individuals was a Maldives law enforcement agent as far as I could determine.

10.    I demanded that I be allowed to contact legal counsel, and asked those arresting me to contact my Embassy and representatives from the Russian Federation.

11.    I was eventually allowed to review the document that had been thrust in my face. The document appeared to be an American court document describing certain crimes. As I was reviewing the paper, the paper was taken away and I noticed that the American agents were searching my family's luggage.

12.    I was ordered to empty my pockets and my belongings were seized from me by the American agents. One of the American agents ordered me to give him my hands. I was told that I had no choice in the matter, and I was then handcuffed.

13.    As I was being handcuffed, I again asked for legal counsel and consular assistance, but none was provided.

14.    My family could witness my arrest through the partial glass door, but the American agents would not allow me to communicate with them. At one point, the door to the room in which I was being held was opened and I informed my family that they were keeping me here. The American agents immediately began to yell and told me that I was not allowed to talk to anyone and then immediately closed the door.

15.    While the American agents were searching our luggage they told me to go over and unlock it. I walked over and from a distance looked at the luggage and told them it was unlocked. I then sat down without touching the luggage. The agents never asked for permission to search our luggage and neither my girlfriend nor I gave them permission to search our luggage.

2

16.     The American agents then led me on through the Male International airport. It was clear to me that the arresting agents were trying to disguise my arrest from others in the airport by forcing me to have a t-shirt draped over the handcuffs.

17.     The American agents also took the laptop from our baggage, and a mobile phone. I was never shown a warrant or any other similar document allowing such a seizure.

18.     We made a stop in another small room as we took our route through the airport, and then I was led by the American agents to an unmarked jet and forced to board it. I again asked about legal counsel and contacting my country, and was not allowed to do so.

19.     I only have a limited grasp of English. About three hours into the flight the American agents for the first time showed me Miranda warnings that were written in Russian and English.

20.     Although I asked where I was being taken to, I was provided with no answer. After a long flight, we eventually landed in Guam and I was immediately placed in jail.

21.     I have worked with a Russian language translator in preparing this declaration.

I declare under penalty of perjury that the foregoing is true and correct and that I execute this Declaration in Hagåtña, Guam this 20th day of July, 2014.

ROMAN SELEZNEV

3

CERTIFIED TRANSLATION

I do hereby declare under penalty of perjury that I am fluent in the Russian and English languages and that I met with Roman Seleznev at the Department of Corrections, Mangilao, Guam and translated to him, to the best of my ability, the attached document entitled *"Declaration of Roman Seleznev"* from English to Russian.

Dated: July 20, 2014

_____
PAULINA COLLINS
Translator

GUAM, U.S.A.                )
                            ) ss:
CITY OF HAGÅTÑA             )

On this 20th day of July, 2014, before me, the undersigned notary, personally appeared PAULINA COLLINS, the person whose name is signed on the preceding or attached document, and acknowledged to me that She signed it voluntarily for its stated purpose.

_____
Notary Public

MARY A. CRUZ
NOTARY PUBLIC
In and for Guam, U.S.A.
My Commission Expires: Mar. 01, 2015
P.O. Box 975 Hagatna, GU 96932

# EXHIBIT 5

CC: MacDougall

# CT 771.110 (409-771-23434-S) Broadway Grill - Request for IOD (Continued)

**SEA**
**Sent:** Wednesday, March 13, 2013 1:15 PM
**To:** CID; cis; PAR
**Cc:** SEA; ISD; PHX; ATL; MIA

```
                  U. S. SECRET SERVICE INVESTIGATIVE REPORT

FROM:     SEATTLE FIELD OFFICE            FILE:   409-771-23434-S
TO  :     CRIMINAL INVESTIGATIVE DIVISION X-REF:  178-771-43719-S
          CYBER INTELLIGENCE SECTION              410-775-09446-S
          PARIS FIELD OFFICE                      417-769-08288-S
INFO:     PHOENIX FIELD OFFICE                    202-768-22869-S
          ATLANTA FIELD OFFICE                    203-771-42801-S
          MIAMI FIELD OFFICE                      404-771-20456-S
                                        SEIZURE #:  N/A

SUBJECT:  REPORT OF CONTINUING INVESTIGATION / REQUEST FOR INVESTIGATION OTHER
DISTRICT

          ACTUAL LOSS: $6,300,000    POTENTIAL LOSS: $100,000,000

CASE TITLE          :  BROADWAY GRILL
CASE TYPE           :  771.110 - FRAUDULENT USE OF ACCOUNT NUMBERS - BANK CARDS
SECONDARY TYPES     :  775.610, 774.060, 775.120, 775.220, 775.230,
                       775.520, 725.110, 767.100, 767.120,
                       768.100, 769.110, 848.290, 848.920
                       848.930, 848.940, 848.950, 848.191
CONTROLLING OFFICE:    SEATTLE FIELD OFFICE
REPORT MADE BY      :  SA Kirk Arthur, (206)553-1922
DATE CASE OPENED    :  11/01/10
PREVIOUS REPORT     :  REQUEST FOR IOD / REPORT OF CONTINUING INVESTIGATION DATED
11/19/12
REPORTING PERIOD    :  11/20/12 - 03/10/13
STATUS              :  CONTINUED

SYNOPSIS:
```

The Seattle ECTF is investigating a case involving over four-hundred (400)
individual network intrusions linked to Roman V. Seleznev, two-hundred and fifty-
three (253) of which involved the theft of financial information.  Seleznev has
stolen financial information from at least eight (8) businesses located in the
Western District of Washington.  Seleznev has been indicted by the United States
Grand Jury, Western District of Washington, for numerous violations stemming from
this investigation.

Efforts are currently underway to locate and apprehend Seleznev should he travel to
a country in which there exists a Mutual Legal Assistance Treaty (MLAT) with the
United States of America.

The Paris Field Office is requested to continue working with Ukranian law
enforcement regarding the www.bulba.cc server.

On 2/14/13, this case was reassigned to SA Kirk Arthur.

Case continued.

DETAILS OF INVESTIGATION:

USSS_PHOENIX_0000029

Reference is made to all previous reports for this investigation, the most recent being the Report of Continuing Investigation/Report of Investigation Other District, dated 11/19/12 by TFO David Dunn, SEA/ECTF.

Reference is made to the Investigative Report from SA Joey Ward, Atlanta Field Office, dated 01/28/13, closing SEA's IOD request.

Reference is made to the Investigative Report from SA Daniel MacDougal, Phoenix Field Office, dated 01/28/13, regarding SEA's IOD request.

Reference is made to the Investigative Reports from SA Jerry Heyn, Paris Field Office, regarding the status of SEA's IOD request, the most recent dated 02/15/13.

TFO David Dunn is no longer assigned as the case agent for this investigation.  On 2/14/13, this case was reassigned to SA Arthur.

Efforts continue to locate Roman Seleznev and apprehend him should he travel to a country in which there exists a Mutual Legal Assistance Treaty (MLAT) with the United States of America.

No other investigation occurred during this time period.

JUDICIAL ACTION:

No judicial action occurred during this reporting period.

SUSPECTS/DEFENDANTS:

Seleznev, Roman - Suspect
        1599 :  Yes
        1599A:  No

Unknown Subject - Suspect
        1599 :  Yes
        1599A:  No

EXAMS CONDUCTED:

        ESCAP:          N/A
        Polygraph:      N/A
        FSD:            N/A

DATABASE SEARCHES:

        MCI / CI:       01/25/11
        NCIC/NLETS:     N/A
        ISD SEARCHES:   N/A

EVIDENCE/CONTRABAND/PERSONAL PROPERTY:

All evidence remains as previously reported.

DISPOSITION:

The Paris Field Office is requested to continue working with Ukranian law enforcement regarding the www.bulba.cc server.

Case continued pending further investigation and judicial action.

USSS_PHOENIX_0000030

CT 771.110 (409-771-23434-S) Broadway Grill - Request for IOD (Continued)          Page 3 of 3

USSS/SEATTLE                    ARTHUR/PAGE/HELMINSKI

USSS_PHOENIX_0000031

# EXHIBIT 6

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM


UNITED STATES OF AMERICA,      ) Magistrate Case No. 14-00056
                               )
                 Plaintiff,    )
                               )
          vs.                  )
                               )
ROMAN SELEZNEV,                )
aka TRACK2,                    )
aka ROMAN IVANOV,              )
aka RUBEN SAMVELICH,           )
aka nCuX,                      )
aka Bulba,                     )
aka bandysli64,                )
aka smaus,                     )
aka Zagreb,                    )
aka shmak,                     )
                               )
                 Defendant.    )
_____)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANCES TYDINGCO-GATEWOOD
CHIEF JUDGE
8:53 A.M.; JULY 31, 2014
HAGATNA, GUAM



**Motion to Discharge and Release Defendant Pursuant to
FRCP12(b)(3)(A); if Motion Denied, Rule 5 Hearing**



Proceedings recorded by *mechanical stenography*, transcript
produced by computer.

Veronica F. Reilly, CSR No. 2004
Federal Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910

APPEARANCES


Appearing on behalf of plaintiff:


**OFFICE OF THE UNITED STATES ATTORNEY**
**BY: MARIVIC DAVID, AUSA,**
**ANDREW FREEDMAN, AUSA (via telephone)**
**MICHAEL MORGAN, AUSA (via telephone)**
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, Guam




Appearing on behalf of defendant:


**LAW OFFICES OF CIVILLE & TANG**
**BY: PATRICK CIVILLE, ESQ.,**
**JOSHUA WALSH, ESQ.**
330 Hernan Cortez Avenue
Suite 200
Hagatna, Guam


**LAW OFFICES OF FOX ROTHSCHILD**
**BY: ROBERT RAY, ESQ.,**
**ELY GOLDIN, ESQ.**
10 Sentry Parkway
Suite 200
Blue Bell, PA


ALSO PRESENT:

David Iacovetti, Secret Service

Polina Collins, Russian interpreter

Veronica F. Reilly, CSR No. 2004
Federal Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910

```
                            I N D E X

                                                       Page

The Court hereby denies motion to continue             32

The Court finds that it does have
personal jurisdiction over defendant                   68

The Court denies request to continue the
identify hearing                                       73

Court finds that the government have met its
burden of proof regarding whether or not
there's probable cause to believe that the
person arrested is the person named in the
charging instrument                                    197

The Court will order that the defendant will
be held and transferred                                201

The Court also will issue a decision on the
personal jurisdiction matter                           201
```

### EXAMINATION

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **GOVERNMENT WITNESSES:** |  |  |  |  |
| Dan Schwandner | 83 | 108(C) | 133(D) 136(F) | 134(C) 138(C) |
| Michael Fischlin | 140 | 164(G) | 180(D) | 184(G) 188(C) |

### EXHIBITS

| **GOVERNMENT EXHIBITS:** | Description | Admitted |
|---|---|---|
| 1 | Arrest warrant | 89 |
| 2 | Superseding indictment | 89 |

Veronica F. Reilly, CSR No. 2004
Federal Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910

| 3 | Red Notice | 89 |
| 4 | Russian Federation passport No. 640410831 | 107 |
| 5 | Russian Federation passport No. 4511393969 | 107 |
| 6 | Departure card | 107 |
| 7 | Transaero itinerary | 107 |
| 8 | Boarding pass | 107 |
| 4-B | Translation | 162 |
| 5-B | Translation | 162 |
| 7-B | Translation | 162 |
| 9 | Domain registration | 162 |
| 10-A | Screenshot of e-mail | 162 |
| 11-A | Paypal transaction log | 162 |
| 11-B | Paypal activity log | 162 |
| 12-A | Screenshot 1 | 162 |
| 12-B | Screenshot 2 | 162 |
| 13-A | Ozon travel reservation | 162 |
| 13-B | Translation | 162 |

Veronica F. Reilly, CSR No. 2004
Federal Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910

1          **July 31, 2014; at 8:53 a.m.; Hagatna, Guam**

2                              \* \* \*

3              THE COURT:  Please be seated.  We'll call the

4     case.

5              THE CLERK:  Criminal Case Number -- Magistrate

6     Case Number 14-00056, *United States of America v. Roman*

7     *Seleznev;* hearing on motion to continue hearing on

8     Mr. Seleznev's motion to discharge and release, hearing on

9     motion to discharge and release defendant pursuant to FRCP

10    12(b)(3)(A); and if motion is denied, Rule 5 hearing.

11             Counsel, please state your appearances.

12             MS. DAVID:  Good morning, Your Honor.  Marivic

13    David for the United States, with Resident Agent in Charge

14    David Iacovetti from Secret Service.  And I believe government

15    counsel from Seattle, Washington, is -- are also on the

16    telephone.

17             THE COURT:  Okay.  Let me just see.  This is

18    David -- how do you say your last name, sir?

19             AGENT:  Iacovetti, ma'am.

20             THE COURT:  Iacovetti?

21             AGENT:  Yes, ma'am.

22             THE COURT:  Okay.  David Iacovetti.

23             All right.  And on line is Assistant U.S.

24    Attorney.  Is that -- you want to go ahead and identify

25    yourself for the record.

```
 1            MR. MORGAN:  Yes.  Good morning, Your Honor.
 2   United States Attorney Michael Morgan for the United States.
 3            MR. FREEDMAN:  And also Assistant United States
 4   Attorney Andrew Freedman, both in Seattle.
 5            THE COURT:  Okay.  Mr. Morgan and Mr. Freedman,
 6   thank you.  And I understand there was a little delay based on
 7   some technical difficulties arising from coordinating with
 8   Washington, D.C., and so forth.  Is that right?  On the VTC?
 9            MR. MORGAN:  There was certainly a technical
10   problem, so, yes.  I apologize, Your Honor.
11            THE COURT:  That's fine.  That's fine.  We can
12   proceed with you telephonically.
13            Yes, Mr. Civille.
14            MR. CIVILLE:  Buenas and hafa adai, Your Honor.
15   Patrick Civille, Joshua Walsh.
16            THE COURT:  Okay.  Good morning.
17            MR. CIVILLE:  And we are here for the person
18   charged as being the defendant, Roman Seleznev.  This -- that
19   person is sitting in court.  He apologizes for his attire,
20   Your Honor.  The -- apparently the marshals office has taken
21   it upon itself to decide when a person -- in detention can
22   dress appropriately to come into court, but that's another
23   matter we can raise.
24            With Mr. Seleznev is our translator, Polina
25   Collins.  Also on the line are our -- my co-counsel, Robert
```

7

```
 1    Ray and Ely Goldin.
 2              THE COURT:  Okay.  Mr. Goldin and Mr. Ray, are
 3    you there?
 4              MR. RAY:  Yes.
 5              MR. GOLDIN:  We are.
 6              THE COURT:  Okay.  Very well.
 7              MR. GOLDIN:  Yes, Your Honor.
 8              THE COURT:  All right.  Good evening, I guess, or
 9    good morning here.
10              And I just want to reconfirm that the
11    interpreter -- Russian interpreter, Ms. Polina Collins, you
12    have already been sworn in previously?  She has not?  I
13    thought she said she had.
14              Okay.  Why don't you please rise and be sworn in,
15    Ms. Polina Collins.
16              THE CLERK:  Ma'am, please raise your right hand.
17              (Interpreter Polina Collins, sworn.)
18              THE CLERK:  Ma'am, please speak into the mic.
19              INTERPRETER:  I do.
20              THE CLERK:  And for the record, again, please
21    state your name and spell your last name.
22              INTERPRETER:  Polina Collins, C-O-L-L-I-N-S.
23              THE CLERK:  Thank you.
24              THE COURT:  Thank you.
25              All right.  Okay.  The -- okay, let me just go
```

| 1 | ahead and begin before I hear from you, Mr. Civille.  The |
| 2 | Court is in receipt of the motion to continue hearing, which I |
| 3 | received -- let's see.  Today is Thursday, so I received it |
| 4 | late Tuesday afternoon, as did the U.S. Attorneys' Office. |
| 5 | And then the United States submitted an opposition this |
| 6 | morning, I believe, at 7:30 a.m.  Is that correct, Ms. David? |
| 7 |             MS. DAVID:  That is correct, Your Honor. |
| 8 |             THE COURT:  Which the Court was reading this |
| 9 | morning.  And then the defense then filed a supplemental |
| 10 | memorandum, which the Court has also read before.  I was just |
| 11 | trying to get all this reading done this morning.  I just want |
| 12 | to ensure that -- first of all, have you had an opportunity to |
| 13 | review the opposition filed by Mr. Civille, Ms. David? |
| 14 |             MS. DAVID:  Um, just very quickly, Your Honor, |
| 15 | given the time allotted until the Court called us in session. |
| 16 |             THE COURT:  Okay.  All right.  Well -- |
| 17 |             MR. CIVILLE:  Your Honor, I've -- when I came in, |
| 18 | I had a chance to -- to the courtroom, I had a chance to read |
| 19 | over the government's documents. |
| 20 |             THE COURT:  Okay.  Can you bring the mic a little |
| 21 | closer, up a little higher, Mr. Civille? |
| 22 |             MR. CIVILLE:  Yes, Your Honor. |
| 23 |             THE COURT:  All right.  Let me just -- before we |
| 24 | begin, let me just say, the Court has read your motion and the |
| 25 | exhibits filed, and it appears to me that the discovery |

9

1   request is tailored in such a way that you're trying to prove

2   that there was a -- that -- whether or not there was an

3   agreement between the Republic of Maldives and the United

4   States.  And this is also supported by your last-minute filing

5   this morning, ECF37.  Is this an accurate assessment of what

6   you're trying to accomplish with your discovery request?

7              MR. CIVILLE:  Your Honor, I think that's too

8   narrow a reading of what we're trying to accomplish.  What we

9   are trying to establish, and what we believe we have a right

10  to establish and a right to develop evidence on at this stage

11  of the proceedings, is that Mr. Seleznev was forcibly rendered

12  to the United States by conduct of -- by outrageous conduct of

13  the United States, and that under the outra- -- we have

14  several theories on why this Court does not have jurisdiction

15  over Mr. Seleznev, but the discovery in -- is in particular

16  focused on the shocking and outrageous behavioral allegation

17  that we are making.

18             Part of that is -- is directed, as you can see

19  from the papers we've submitted, to the representations that

20  United States agents made to Maldivian authorities, whether

21  those were accurate representations, truthful representations,

22  whether the Maldivian -- whether U.S. agents actively

23  participated and circumvent[sic] a ruling of the Maldivian

24  court.  And I think that those are -- those are issues that

25  are fairly raised.

```
 1              I would note that the Ninth Circuit most recent
 2    pronouncement on this is in U.S. v. Struckman --
 3              THE COURT:  Okay.
 4              MR. CIVILLE:  -- a 2010 decision.
 5              THE COURT:  Mm-hmm.
 6              MR. CIVILLE:  In part there at page 574 of -- 611
 7    F.3d 574, the Court noted, "In Anderson, we decline to" --
 8    which is another Ninth Circuit decision which supports
 9    generally our right to pursue this line of inquiry.  But in
10    Struckman, decided four years after Anderson, the Court
11    said -- let me put it on the screen here.
12              THE COURT:  Mm-hmm.
13              MR. CIVILLE:  "In Anderson, we declined to apply
14    the Ker/Frisbie shocking and outrageous conduct exception
15    because Costa Rica's decision to expedite the defendant was
16    not dependant on representations made by United States
17    government agents to Costa Rican authorities that may have
18    misled Costa Rica."
19              Here, similarly, Struckman has not demonstrated
20    prejudice from O'Brien's misstatement.  But what's important,
21    Your Honor, is that the Court recognize that misstatements or
22    misrepresentations by the United States could form a basis for
23    -- potentially form a basis for an outrageous conduct claim.
24    And you can see that in the paragraph above where the --
25    that's under -- that's highlighted here:  "The lies told by
```

```
 1   O'Brien to Panamanian officials" -- and this is in the
 2   Struckman case -- "are considerably more troubling than other
 3   aspects of U.S. governmental involvement in Panama.  We are
 4   not prepared to say that blatant lies to a foreign government
 5   that induce the foreign government to transfer a defendant to
 6   the United States when it otherwise would not could never
 7   amount to conduct so shocking and outrageous as it violate due
 8   process and require dismissal of pending criminal proceedings
 9   in the United States."
10              Okay.  So the Ninth Circuit has -- has clearly
11   announced that this -- that we are well beyond the -- the
12   notion that only torture is the way for a person in
13   Mr. Seleznev's shoes to challenge the jurisdiction of the
14   Court at this stage.
15              THE COURT:  And you're not claiming that there
16   was any torture of any kind by any agents?
17              MR. CIVILLE:  No, we're not, Your Honor.
18              THE COURT:  I mean, this particular -- I mean,
19   even assuming everything Mr. Seleznev has said in his
20   declaration is true, obviously that does not amount to the
21   level of shocking and outrageous conduct found in the Second
22   Circuit case of Toscanino.
23              MR. CIVILLE:  Toscanino was -- no, that --
24   Toscanino was -- frankly, Your Honor, that was low-hanging
25   fruit.  Despite the fact that the Department of Justice argued
```

*Case No. MJ14-00056*

```
 1    that -- you may recall, I mean, the facts in that case were so
 2    shocking.  It involved kidnapping, torture over a period of
 3    days, starvation, injecting fluids into the anal cavity,
 4    injecting fluids by -- forcibly by mouth, beatings.  It was
 5    such -- such a -- I mean, that's at one end of the spectrum
 6    where if you don't find that's outrageous conduct, well, I
 7    mean, there -- you know, call Satan and tell him when the day
 8    of judgment comes, you're coming to live with him because
 9    you've lost your conscience.  That is so far at one end of the
10    spectrum.
11              What's important, though, Your Honor, is that --
12    and the Ninth Circuit is very clear on this, that you don't
13    have to be all the way out at the far end of that spectrum for
14    there to be a finding of outrageous governmental misconduct.
15    And what Struckman stands for, Your Honor, is that even
16    misrepresentations by the United States to induce -- to
17    falsely -- or to trick a foreign country into releasing
18    somebody can amount to outrageous conduct, conduct that shocks
19    the conscience.  And that's really the key phrase, does it
20    shock the conscience.  And I don't -- I don't think we have to
21    have that discussion this morning --
22              THE COURT:  Right.
23              MR. CIVILLE:  -- I'm hoping.  What we're asking
24    for, what we've suggested, Your Honor, and what we've
25    presented the Court with is evidence that we're not whistling
```

1   in the dark here.  We have what we think is solid -- or we're

2   developing solid evidence that there were misrepresentations.

3   We think certainly we've raised a serious enough question that

4   the government should be required to respond to our discovery

5   request so that we can know fully what were the circumstances

6   under which Mr. Seleznev was forcibly rendered to the United

7   States.

8            THE COURT:  But what you cite in *Struckman* -- I'm

9   looking at the particular highlighted portion above -- above

10  the highlighted portion, when you talk about the lies.  In

11  that particular paragraph, wasn't it a situation where the

12  misstatements caused the local government to expel the

13  defendant?

14           MR. CIVILLE:  And the -- it appears that way.

15  Yes, Your Honor.  And here -- yes.  Now, here, the government

16  -- the United States is on -- at least in its press release,

17  claims that the Maldives expelled Mr. Seleznev.  We don't

18  believe that's true, and that's one of the things we want to

19  explore.  What we think is -- actually, we think this is even

20  more serious than *Struckman*, is that -- that the United States

21  ignored Maldivian judicial process.

22           We have reliable information, and we think that

23  this -- and we're look -- and -- well, let me tell what you

24  the reliable information is and I'll tell you what -- how I

25  think this relates to this -- the discovery request.  We have

```
 1    reliable information that at the United States' request,
 2    perhaps it was -- and we don't know.  We're not sure if the
 3    United States directly made this or the Maldivian police made
 4    this request to the Maldivian court for an order of -- calling
 5    for Mr. Seleznev's arrest and removal.  We understand that
 6    that was denied and that the United States, instead of -- and
 7    we want to know the circumstances of that, whether it was
 8    denied subject to Mr. Seleznev being brought before a
 9    Maldivian court and allowed -- and being given notice of the
10    charges against him and being given counselor access before
11    being removed.
12                THE COURT:  But even if -- let's assume the Court
13    accepts your representation in your favor, the worst-case
14    scenario where there was no agreement, they alledgedly
15    violated Maldives law.  Is there any case law -- any case law
16    that requires this Court or, actually, any federal Court --
17    but let's just focus on my Court right now -- that requires a
18    mandatory divestment of personal jurisdiction because the
19    government's conduct violated Maldives law or customary
20    international law?  Is there anything that requires that?
21                MR. CIVILLE:  Well, Your Honor, I do -- yes.
22    Well, I guess I'm troubled by the Court's use of the word
23    "required."  I always hate to tell a judge you have to do --
24                THE COURT:  Okay.
25                MR. CIVILLE:  Okay.  But I think that when we
```

```
 1    read the development -- this is a dynamic area of the law.
 2    There aren't that many cases, but it is a dynamic area.  We've
 3    -- we've gone -- we've seen a real progression of judicial
 4    thought since Ker and Frisbie, which is in 1952 -- Frisbie in
 5    1952.  We've even seen a progression of thought in the past
 6    ten years.
 7              Certainly in this circuit, Your Honor, which is,
 8    I think, a particular concern for this Court, we've seen a
 9    real development of thought in this area.  And what that is,
10    is that development is showing that, yes, we're going have --
11    we're going to allow defendants to bring before the Court, and
12    in the form of an evidentiary hearing, their claim that their
13    forcible rendition to the United States was the result of some
14    sort of outrageous government conduct that shocks the
15    conscience.  And we submit that if we can establish that, that
16    this -- that Your Honor -- that the remedy that Your Honor is
17    -- and, once again, I hate to always say -- tell the judge you
18    have to, but I think the appropriate remedy is dismissal or to
19    return Mr. Seleznev outside the United States.
20              So in specific answer, Your Honor, I think the
21    Anderson and Struckman in particular, read together, and also,
22    oddly, an old case out of the Southern District of New York,
23    United States v. Malik, is another -- stands for -- Malik is
24    important, Your Honor, and instructive because it stands for
25    the well-established principle that in removal proceedings,
```

*Case No. MJ14-00056*

```
1   the issue of jurisdiction should be addressed -- if raised by
2   the defendant, must be addressed at that point.
3              And I don't know if the Court has any -- is
4   thinking about that or that's an issue for you, but we think
5   that the case law is very clear that we -- that -- the
6   criminal proceedings that have certainly been initiated.  Even
7   -- this is the second time in my career I've cited to Justice
8   Thomas.  Even Justice Thomas, who normally would rely with the
9   government on these things, very forcefully and clearly has
10  said that once the indictment -- certainly by the time the
11  indictment is handed down, criminal proceeding has been
12  initiated.  Under Rule 16, we think criminal proceedings have
13  been initiated.
14             So we are appropriately raising at the first
15  possible instance, which is what you need to do, which any --
16  any lawyer worth their salt would do, is raise at the first
17  possible instance the issue of Court's jurisdiction over the
18  person of the defendant.  And we have to do that.  That's a
19  waivable issue.  So you have -- you have -- certainly have the
20  authority to decide this issue of jurisdiction over
21  Mr. Seleznev.  And we think, yes, you are required, that this
22  isn't something, you know, take this cup from my lips, you can
23  pass it off to the Western District in Washington.  This is --
24  for better or worse, has landed on your lap, and I think it
25  needs to be decided here.
```

```
 1              THE COURT:  Well, but focus -- let's just focus
 2     on the discovery aspect, though.  And so you're saying the
 3     Court is just taking a narrow view of your request made in the
 4     letter submitted by Mr. Walsh on July 9th and then 20 days
 5     later, July 29th, and then now at this motion for continuance.
 6     It seems to me that it -- that all of the request -- the
 7     requested discovery specifically is dealing with the arrest of
 8     -- I mean the circumstances of his arrest, his rendition,
 9     whether or not there was an agreement, even if -- you know,
10     whether or not there was an agreement with the Maldives
11     government, how did the -- how did the Secret Service get over
12     there and assert its jurisdiction over the defendant.  I mean,
13     that's what you're saying.
14              MR. CIVILLE:  Yes, Your Honor.  That's
15     specifically -- our discovery at this point is -- you're --
16     you've -- that's spot on, is narrowly focused to those two
17     issues.
18              The only thing I thought was a little confining
19     in your previous question is, we're not sure what that
20     discovery -- I mean, we have some good ideas of what that
21     discovery is going to show, but we don't -- it may show some
22     things we're not fully expecting.  So I don't want to limit --
23     when we come back and say, okay, Your Honor, here's what we
24     think is the outrageous conduct, I don't want to limit myself
25     today to saying it's just one thing if the discovery is --
```

*Case No. MJ14-00056*

```
 1   proves that it's really more extensive than even we know at
 2   this point or believe at this point.
 3                THE COURT:  All right.  So let me hear from the
 4   U.S. Attorneys' Office, then, on the particular request for
 5   discovery.
 6                MS. DAVID:  Your Honor, my colleagues from
 7   Seattle who are on the phone can address that particular
 8   issue.
 9                THE COURT:  Okay.  Who is going to be speaking,
10   then?  Will it be Mr. Morgan or Mr. Freedman?
11                MR. MORGAN:  It's gonna be Mr. Morgan, Your
12   Honor.  Thank you.
13                With respect to the discovery request, there is
14   simply no authority for the notion that Rule 16 provides any
15   discovery in the context of a Rule 5 proceeding.  The
16   government's Rule 16 obligations aren't gonna be triggered
17   when and until Mr. Seleznev is removed to the Western District
18   of Washington.  So the short answer is that the defense has no
19   right to discovery at this stage of the proceeding.
20                That point aside, I think the Court hit it right
21   on the head when it described the nature of the defense's
22   motion, which is the motion to divest itself of jurisdiction.
23   Well, of course you can't divest yourself of jurisdiction
24   unless you have jurisdiction, and the Court plainly has
25   personal jurisdiction over Mr. Seleznev.  The proper forum for
```

1    a motion to dismiss in the context that defense is raising it

2    is a motion to dismiss the indictment, and that is a motion

3    that is properly addressed in the Western District of

4    Washington.

5            So the defense is certainly entitled to explore

6    these issues; they're just doing it in the wrong forum.

7            THE COURT:  Anything else?  Anything else,

8    Mr. Morgan?

9            MR. MORGAN:  With respect to the discovery --

10           THE COURT:  Right.

11           MR. MORGAN:  -- no.  I mean, I suppose counsel

12   has -- his argument has sort of morphed over into the merits

13   of their motion, and I guess the short answer to that is that

14   the allegations they've made, even accepting them as true, as

15   a matter of law will not support their motion.  The *Struckman*

16   case they cite, as the Court rightly pointed out, involved a

17   case in which the government affirmatively misrepresented

18   facts to the Panamanian government to secure the defendant's

19   expulsion from the country and rendition to the United States.

20           That is, in essence, what they're alleging here.

21   And I would want to point out, it's purely allegation.  None

22   of the attachments, none of the exhibits I've seen present any

23   concrete proof of any of their allegations.  They may have

24   suspicions, and I don't know what those suspicions are based

25   on, but it's certainly not in anything in the record before

```
 1   this Court.
 2             And I think it's quite clear that when the Court
 3   asked is there any case law that supports this, there's not a
 4   single reported decision where a Court has ever divested
 5   itself of jurisdiction on the basis of an outrageous
 6   government misconduct claim.  And with respect to claims far
 7   more severe than Mr. Seleznev has alleged -- and I would just
 8   point the Court to the Matta-Ballesteros case from the Ninth
 9   Circuit, which is a pretty severe case.  So that's the case
10   where the defendant was literally kidnapped, hooded, bound, in
11   a military raid from his home.  I mean, if that's not in
12   violation of the law of Honduras, I would be surprised.  And
13   the Ninth Circuit was quite clear that that's not enough to
14   divest this Court of jurisdiction.
15             So I guess as far as discovery and a continuance,
16   it's pointless because they're trying to litigate something
17   that is -- their allegations at present will not succeed.
18             THE COURT:  Okay.  Yes, finally, Mr. Civille.
19             MR. CIVILLE:  Thank you, Your Honor.
20             THE COURT:  Before I make my ruling on the motion
21   for continuance.
22             MR. CIVILLE:  Your Honor, I always love to get a
23   chance to use Paul Newman's line in -- what's that movie where
24   he was, I don't know, a washed up lawyer and then he makes the
25   big comeback?  Okay.  Well, in that case, the judge kept
```

```
 1   interrupting his examination and asking the witness very --
 2   questions that were just prejudicial to Newman's case.  And
 3   when I heard the -- the gentleman from DOJ just argue that,
 4   eh, Judge, don't worry, you don't need -- you don't not[sic]
 5   need this discovery or Seleznev doesn't need this discovery
 6   because it doesn't make any difference.  I remember this line.
 7   Paul Newman in that case looked at the judge and said -- the
 8   prosecutor, and said, "If you're gonna try my case for me,
 9   would you try not to lose it."

10            And that's -- of course the government is gonna
11   say it doesn't worry.  Interestingly, they don't say they
12   don't have discovery that's responsive, they don't have
13   information that's responsive to our request.  They're not
14   saying that.  And I think it's very -- and we have raised, I
15   think, issues, Your Honor, that fairly -- that show once again
16   that this is not a fishing trip.  We have good reason to
17   pursue this line of inquiry.

18            The Court in -- I think it was Struckman, Your
19   Honor -- and this is one of those things that I always think
20   trial courts may find helpful, just trying to guess what you
21   might find helpful, Your Honor.  There, the judge allowed an
22   evidentiary hearing, and he ended up issuing in that -- and I
23   don't think you'll need to do that here, but he issued an
24   83-page opinion.  And the Ninth Circuit in, I think, at least
25   three instances very positively alluded to the record that the
```

22

```
 1   trial court had allowed to be developed, said, well, the judge
 2   did this, the judge did that.  And they were very impressed by
 3   that.
 4             And I think that is what we are looking for the
 5   opportunity to do, is to develop the record and to present the
 6   record fully so that -- so that Your Honor can make a ruling.
 7   And, Your Honor, we think that what we're asking the Court to
 8   do at the end of the day -- we believe we will be asking the
 9   Court to make a decision that is well within the parameters
10   that -- of the Ninth Circuit case law in Anderson and
11   Struckman.
12             When the -- one other thing I wanted to point
13   out, and the government raised this in the -- in their
14   opposition, is that they said, well, we're not entitled to
15   discovery.  Well, under Rule 16(a)(E)(i), it very clearly says
16   that we are entitled -- and this is -- if you're in the
17   purple.  Oh, I'm in the wrong book, Your Honor.  I'm in the
18   blue book.  Anyway, it's --
19             THE COURT:  Okay, it's purple.  But go ahead.
20             MR. CIVILLE:  I have the blue one.
21             THE COURT:  Well, hopefully it hasn't changed.
22             MR. CIVILLE:  The panel will get me my fresh
23   copy.
24             THE COURT:  Okay.
25             MR. CIVILLE:  It's one of the benefits.
```

```
 1                    Your Honor, the --
 2              THE COURT:  Rule 16.
 3              MR. CIVILLE:  -- 16(a)(E) -- okay.  "Upon
 4   defendant's request, the government must permit inspection."
 5   Small i:  "The item is material to preparing the defense."
 6   And that's what this is, Your Honor.  This is material -- at
 7   this stage of proceeding, the defense is -- that -- it's a
 8   jurisdictional defense.  And we are -- and I believe we are
 9   entitled to those documents.
10              THE COURT:  Don't you think the Court can make a
11   decision by accepting your factual allegations as true, all
12   the allegations that you have submitted, even the allegations
13   that you believe you're going to receive in terms of discovery
14   in the future regarding the arrest and the expulsion of
15   Mr. Seleznev -- and so if I accept it as true for purposes of
16   this motion -- motion of discharge and release and make a
17   ruling and -- still allowing you to preserve -- allowing your
18   client to preserve his right to bring up the motion again
19   before the indicting Court after full discovery, then he will
20   have not lost his right to proceed forward.
21              MR. CIVILLE:  Your Honor, I don't -- I think that
22   would -- no, I don't think that would be appropriate or the
23   better -- I don't think that would be the correct course of
24   conduct for a couple -- one, is to force us to rely simply on
25   the record we have now without the benefit of the
```

```
 1   specifically-tailored discovery that we've requested as to
 2   these issues, is going to result in an incomplete record.  And
 3   the prejudice to Mr. Seleznev is that it also means that we
 4   may be overlooking issues or we may not be fully articulating
 5   issues that we have because we haven't seen evidence that's in
 6   the government's possession that's relevant to this issue.
 7             THE COURT:  What you're saying is, though,
 8   relevant to the facts of shocking and outrageous conduct.
 9   That's what you're saying.  That's what --
10             MR. CIVILLE:  Yes, relevant to our challenge to
11   jurisdiction over --
12             THE COURT:  Right.  And the two challenges -- I
13   mean, the two exceptions would be, number one, either the
14   violation of an extradition treaty, which there are none, and
15   the second one would be this -- a shocking and outrageous
16   governmental conduct.
17             MR. CIVILLE:  Yes.
18             THE COURT:  That's what you're focusing in on?
19             MR. CIVILLE:  Yes, Your Honor.
20             And -- and we think that at -- and I think the
21   cases that we've cited and -- stand for the proposition that
22   we should have the opportunity to develop the record at this
23   stage, that we're entitled to at least the limited discovery
24   we've requested at this stage, not -- and that it's
25   prejudicial to Mr. Seleznev to have to go to Washington and --
```

```
 1   I mean, he's here -- by our position, he was forcibly rendered
 2   here.  He should not be here.
 3           The rule of law kicks in right here.  I mean,
 4   that's where it starts, the rule of law.  And he's entitled to
 5   -- at this -- and the Melekh case fully supports this idea
 6   that you have the authority and the power and, with all
 7   respect, the duty to decide this threshold jurisdictional
 8   issue.
 9           So I think it's really important that we be
10   allowed to have the limited discovery that we've requested,
11   and then we can present that to you.  We would like to call
12   the witnesses.  We -- certainly the Secret Service agent who
13   is here, we would probably want to call him to the stand.  And
14   there -- depend -- and there may be other witnesses that we
15   want to call that we -- that will be disclosed in the
16   discovery, to address this jurisdictional issue.  And I think
17   that has to happen here and now, Your Honor.  Or not today,
18   but that has to happen here in this Court, and that's -- the
19   case law, I think, supports that.  The rule, Rule 5, supports
20   that.  And the Supreme Court pronouncements that we refer to
21   in our papers about when a criminal proceeding starts -- and
22   it has started.  There's no doubt about it.  The proceedings
23   have started.  Mean that this is the place where you should
24   raise them.
25           THE COURT:  Okay.  All right.
```

*Case No. MJ14-00056*

```
 1                    MR. CIVILLE:  Thank you, Your Honor.

 2                    THE COURT:  Thank you.

 3                    I will allow the U.S. Attorneys to go ahead and

 4     speak on this issue because it's an important issue for them

 5     as well.  Mr. Morgan?

 6                    MR. MORGAN:  Yes, Your Honor.  I -- truthfully, I

 7     have little to add to what I had said previously.  We don't

 8     dispute that at some juncture the defense is perfectly

 9     entitled to raise a challenge to the circumstances of

10     Mr. Seleznev's apprehension in the context of a motion to

11     dismiss the indictment.  That is, in every single case that

12     the defense has cited, the vehicle by which that motion was

13     brought before the Court.  That's the proper vehicle, and the

14     forum for that is in the district of indictment.  Rule 5 is

15     quite clear that in a removal proceeding like this, the

16     Court's inquiry is very circumscribed.  Once you've been

17     presented with an indictment, the issue before the Court is

18     identity.  Any other issue that's a defense -- and the defense

19     has raised that.  They're calling it a jurisdictional defense,

20     but it's nevertheless the defense for the indictment.  Those

21     issues are properly addressed in the district of indictment.

22                    So the defense will -- the defense will be

23     entitled to discovery once they're in the District of

24     Washington, and then they can pursue the issue there.  They

25     lose -- they don't lose anything, frankly, except they would
```

```
 1    like to litigate this issue now.  And with respect, this is
 2    simply the wrong forum.
 3                    MR. CIVILLE:  Your Honor?
 4                    THE COURT:  Okay.  Yes?
 5                    (Pause.)
 6                    MR. CIVILLE:  Your Honor, the Mikla [sic]
 7    decision is -- Melekh decision is also, I think, a good source
 8    of guidance on this for -- standing for the proposition that
 9    if the Court doesn't -- if the -- and what I think the
10    government is missing -- okay.  This is a jurisdictional
11    question, jurisdiction over the person of this man sitting
12    here.  What Melekh said is that if you don't -- if the Court
13    doesn't have jurisdiction, which is what you're saying here,
14    then it doesn't have the power to remove.  Your power to
15    remove is based on your jurisdiction over this person, but if
16    you don't have that jurisdiction, then you don't have the
17    power to remove.
18                    The Supreme Court -- or the Guam Supreme Court --
19    and these are civil contexts in light of the recent DFS Lotte,
20    criticized the trial court for making comments -- after
21    finding that it did not have jurisdiction, it made some
22    comments on the record.  And the Court said, no, once you --
23    once the Court doesn't have jurisdiction, you can't make it --
24    you can't continue to do things in the case.  And I think
25    that's -- if Your Honor doesn't have jurisdiction, if we get
```

```
 1    our discovery and we show you that -- that we don't have --
 2    that Your Honor, for whatever reason, doesn't have
 3    jurisdiction -- I shouldn't say -- if we establish our
 4    argument that the Court does not have jurisdiction over the
 5    person of Mr. -- of Mr. Seleznev, then I think the only
 6    appropriate remedy is -- has to be in this Court.
 7                  And we're not talking about the indictment.  The
 8    indictment may be -- we're not arguing about whether the
 9    indictment was proper.  This is --
10                  THE COURT:  Although you did ask in the initial
11    motion to discharge the case.  I mean, basically, a dismissal
12    of the case.
13                  MR. CIVILLE:  Well, it would be a dismissal at
14    least as to this person, as to him.  Now, I don't -- frankly,
15    I don't know that that requires then a dismissal of the
16    indictment.  I don't want to commit myself on that.  Your
17    Honor, if I can just -- just so you'll know, some of the major
18    issues that we want -- that we believe the discovery will
19    raise:  Did the U.S. know that the Maldives had denied -- the
20    judge in the Maldives denied an arrest warrant; did the U.S.
21    agents there do anything to circumvent the lawful process by
22    arranging for his extraterritorial arrest; did the U.S.A. use
23    the idea of the Red Notice, the INTERPOL Red Notice, as a
24    pretext to cover up what actually happened.
25                  And the INTERPOL Red Notice is interesting, Your
```

```
 1   Honor, because it's dated July 5th, the same day that he was
 2   -- that Seleznev was taken -- was arrested in the Maldives by
 3   the U.S. agent.  And that needs to be explored because -- just
 4   on the time difference alone.  The Maldives -- first of all,
 5   that would have been still July 4th in the Western District of
 6   Washington.  So -- and where this issue -- where was this
 7   issue from, when was it issued?  It seems there's something
 8   amiss about just the fact that Seleznev's arrested in the
 9   early -- mid-morning on July 5th, and the U.S. apparently used
10   a INTERPOL Red Notice dated July 5th, so we want to inquire
11   into that.
12           THE COURT:  But, again, even if the United States
13   did do that -- I mean, you've seen the case law about forceful
14   abductions allowed or sanctioned.  And even if there was some
15   discrepancy with regard to the INTERPOL Red Notice and you
16   were to try to find this in the discovery, and if you were to
17   discover that the United States Secret Service or other --
18   and/or other law enforcement agents disregarded a Maldives
19   judge's order -- even if you were to assume all that, all to
20   the benefit of your client --
21           MR. CIVILLE:  Okay.
22           THE COURT:  -- then the Court can -- the Court
23   can accept those factual allegations as true and move on to
24   the issue of whether or not that's shocking and outrageous.
25   We can go ahead and proceed forward.
```

```
 1            MR. CIVILLE:  Well, except you won't have the
 2   record.  And I think -- and, certainly, it's prejudicial
 3   farther down the road because we don't have -- then if
 4   somebody is looking at this, they say, well, you know, the
 5   judge just accepted all of these unsupported allegations.  If
 6   you're going to -- even if the Court were inclined to do it as
 7   -- to -- let's say, worst-case scenario, that you're inclined
 8   to rule against us on the merits of our jurisdictional
 9   argument.  I think that, in fairness, we should be allowed to
10   develop the record so that it's not -- it's not just the
11   suppositions by the defendant that, okay, we'll accept these
12   wild, fanciful notions by Mr. Seleznev, even accepting those
13   as true.  That's -- that's a completely different flavor than
14   if we have testimony and we have documents and we say, "Judge,
15   look, here it is.  Here is the arrest warrant, here is the
16   internal memo from DO- -- from the Secret Service saying, 'The
17   Maldives judge turned us down.  They want to have Seleznev
18   brought before him before we can take him out of the country.
19   What are we gonna do?  Hey, I got an idea.'"
20            That kind of evidence is far more -- I mean, it's
21   important, and fair play demands that if that evidence is out
22   there, we be given an opportunity to bring it before you.
23   Even if you think you -- it may not make a difference to you,
24   we have a right to develop that record.  That's what I'm
25   suggesting.  And we think that there is evidence -- I mean, we
```

```
 1   think that there's something there that -- that we're -- I
 2   keep saying this.  We're not on a fishing expedition.  There's
 3   enough discrepancies that we think that -- in the information
 4   that the government's provided and in the information that
 5   we've developed and the research we've been able to do,
 6   investigation we've been able to do, to suggest that we're not
 7   getting -- that Your Honor is not getting the full story.
 8              And so if Your Honor is going to -- even if Your
 9   Honor were to say at the end of the day, "I don't think this
10   is outrageous.  This conduct by the government doesn't shock
11   my conscience," we very much want the opportunity to allow you
12   to make that decision on a full record, or certainly a much
13   more developed record than just what will certainly be
14   characterized as defendant's speculation.
15              THE COURT:  All right.  All right.
16              MR. CIVILLE:  Thank you.
17              THE COURT:  Okay.  Let me -- okay.  Mr. Morgan,
18   I'm gonna take about a five-minute -- let me take a ten-minute
19   recess and I'll come back and make my ruling on the motion for
20   continuance.  Ten minutes, Counsels.
21              MR. CIVILLE:  Thank you.
22              THE CLERK:  All rise.  The Court's in recess.
23              (Recess taken at 9:36 a.m.)
24              (Back on the record at 10:43 a.m.)
25              THE COURT:  We're back on the record.  This is
```

1    *USA v. Roman Seleznev* and this is Criminal Case No. 14-56.

2    All counsels are present.  Defendant is present.  Interpreter

3    is present.  Agent's present.

4            All right.  The Court -- thank you for your patience,

5    Counsels.  Of course this is an important position for the

6    defense.  And the Court believes, though, based on all of the

7    filings before the Court, the Court will accept all the fact

8    -- factual allegations in defendant's favor as true, including

9    the allegations made today for the purposes of the hearing --

10   of hearing Mr. Seleznev's motion to discharge and release

11   defendant pursuant to Federal Rule Criminal Procedure

12   12(b)(3)(A).  Accordingly, the Court hereby denies the motion

13   to the -- continue, and this Court will move forward with the

14   hearing.

15           The Court, as stated -- notes that it does have the

16   motion to discharge and release the defendant pursuant to this

17   motion -- to Federal Rule Criminal Procedure 12(b)(3)(A),

18   alleging a defect and instituting the prosecution.  Mr.

19   Seleznev moves the Court to:

20               Number 1, decline jurisdiction and terminate the

21   prosecution; 2, discharge the case; 3, release him; and 4,

22   issue such orders and further relief as may be appropriate.

23           Mr. Seleznev makes the following legal arguments:

24               Number 1, the Court lacks jurisdiction because

25   the manner in which he was arrested constitutes shocking and

1    outrageous government conduct amounting to a due process
2    violation, such that this Court has  divested a personal
3    jurisdiction over him; 2, the arrest violates customary
4    international law and should shock the conscience of this
5    Court and cause it to divest itself of jurisdiction; and 3,
6    the arrest violates jus cogens norms of international law, and
7    thus the Court should exercise its supervisory power and
8    dismiss the case.

9          The Court will first address Mr. Seleznev's argument
10   that the arrest violates jus cogens norms of international
11   law, and thus the Court should exercise its supervisory power
12   and dismiss the case.  A Court may dismiss an indictment under
13   its inherent supervisory authority if it finds that the
14   government's conduct violated the jus cogens norms of national
15   law, citing to *U.S. v Struckman*, Ninth Circuit case, 2010.
16   However, the Court finds this to be a matter of substance that
17   must be addressed by the transferee Court or the indicting
18   Court and not by the removal Court, given that the indictment
19   is pending in the Western District of Washington.

20         The Court's subject matter jurisdiction is limited by
21   Federal Rule Criminal Procedure 5(c)(3)(D), which provides
22   that this Court must transfer the defendant to the district
23   where the offense was alledgedly committed if the government
24   produces a warrant, a certified copy of the warrant, or a
25   reliable electronic form of either and the judge finds that

1  the defendant is the same person named in the indictment,

2  information or warrant.

3          In this case, the United States, I believe, will

4  be producing a copy of an arrest warrant for an individual

5  named Roman Seleznev.  And if it does that and the Court finds

6  that it's proper, then the only remaining issue is whether the

7  arrestee is the same person named in the superseding

8  indictment.  Any other matter must be addressed by the

9  district where the offense was alledgedly committed.  And that

10 -- the Court cites to *U.S. v Green*, 499 F.2d 538, 541 (DC Cir.

11 1974).  The clear mandate of former Rule 40 sharply limits the

12 function and authority of the magistrate and, by the same

13 token, the jurisdiction of the district court for the transfer

14 or district.

15         Where the terms of the removal are met in a

16 proceeding for removal in furtherance of a prosecution by

17 indictment, that Court lacks power to dismiss either the

18 proceeding or the prosecution.  However, because Mr. Seleznev

19 is challenging this Court's personal jurisdiction over him,

20 the Court believes it must address this before it can proceed

21 with the Rule 5 hearing.

22         The Ninth Circuit has noted that the starting

23 point in a personal jurisdictional challenge is, quote, "The

24 venerable principle that the manner by which a defendant is

25 brought to trial does not affect the government's ability to

```
 1   try him," end quote; citing Struckman -- which case -- that
 2   case cites to U.S. v Matta-Ballesteros.  And this is known --
 3   and the Matta-Ballesteros case is 71 F.3d 754, 762 (9th Cir.
 4   1995).  This is known as the Ker-Frisbie doctrine.  Recognized
 5   exceptions to the Ker-Frisbie doctrine are if either, one, the
 6   transfer of the defendant violated the applicable extradition
 7   treaty; or two, the United States government engaged in
 8   misconduct of the most shocking and outrageous kind to obtain
 9   its presence.  And the Court cites to U.S. v Anderson, Ninth
10   Circuit case, 472 F.3d 662, 666.
11            So I'd like to ask the defense counsel, aside
12   from these two exceptions, the extradition treaty or the
13   shocking outrageous conduct, are there any other exceptions to
14   this doctrine, Mr. --
15            MR. CIVILLE:  If I could have just one moment,
16   Your Honor.
17            THE COURT:  Yeah.
18            MR. WALSH:  Your Honor, if I may.
19            THE COURT:  Yes, Mr. Walsh, you may proceed.
20            MR. WALSH:  Your Honor, this is just for clarity
21   of the record.  And I think it would have been an aspect that
22   might have been developed if we were able to pursue some more
23   discovery, what I understand the Ninth Circuit Anderson
24   exceptions to the Ker-Frisbie Doctrine look for an extradition
25   treaty and look for, perhaps, outrageous conduct.
```

```
 1                    THE COURT:  Right.
 2                    MR. WALSH:  But we would also ask for -- again,
 3       for clarity of the record of the Court, the International
 4       Covenant on Civil and Political Rights, the United States is a
 5       party to that treaty -- to that covenant, as is the Maldives,
 6       and we would say Article 9 and Article 13 of that
 7       convention --
 8                    THE COURT:  Of the international what?  I'm
 9       sorry.
10.                   MR. WALSH:  The International Covenant on Civil
11       and Political Rights --
12                    THE COURT:  Mm-hmm.
13                    MR. WALSH:  -- of which the United States is a
14       party, as is the Maldives.  While that is not an extradition
15       treaty that exists between the United States and the Maldives,
16       since both -- since both the United States and the Maldives
17       are party to that convention, and Article 9 of that convention
18       lays out certain rights for arrestees and Article 13 of that
19       convention specifically prevents the expulsion without
20       judicial process of somebody, as the defendant is here, from
21       the Maldives, we would say that that would fall under the
22       Anderson exceptions and Ker-Frisbie.  That would be the only
23       other thing we would add.
24                    THE COURT:  Is there any federal case law that
25       specifically addresses that International Covenant of Civil
```

```
 1   and Political Rights such that it would require the Court to
 2   divest itself of jurisdiction because it violates customary
 3   international law?
 4              MR. WALSH:  No, Your Honor.  I -- I am -- but,
 5   again, Your Honor, this has -- because of the time constraints
 6   that we've been dealing with, this aspect of briefing was
 7   never fully completed.  But I'm not going to misrepresent
 8   anything to the Court.  The ICCPR is dealt with by federal
 9   districts in various challenges that various litigants have
10   brought.  As to the specific question as to whether or not the
11   ICCPR carves out a new area of law under the Ninth Circuit
12   jurisprudence here, I don't know the answer to that.  All I
13   would respectfully submit to the Court is what Mr. Civille
14   said earlier, which is this is a moving area of law, this is a
15   moving area of jurisprudence.  So I think each juris, as these
16   issues come up, will look toward international law and try to
17   see, is this what the Ninth Circuit meant when we're looking
18   for the violations of the international treaties.
19              And I'll just give a recent example to the Court
20   about that.  Previously, in the United States of America, we
21   executed juveniles.  We executed juveniles.  States allowed
22   the execution of juveniles.  Various international covenants
23   and conventions were put together that laid out what seemed to
24   be a developing norm of customary international law saying you
25   don't do that.  And eventually, the United States of America,
```

1 | our Supreme Court -- I don't remember the citation, Your
2 | Honor. I apologize, but I'll submit it to Court. The United
3 | States Supreme Court eventually said, well, as we look toward
4 | the rest of the world -- again, the development of law -- we
5 | are the only nation that is around that still does this, so
6 | we're going to look toward some of that law and then we will
7 | lay down a new tentative law. We don't execute juveniles
8 | anymore in the United States.

9 |         So what we're urging is this sort of continual
10 | analysis of what's going on in the rest of the world. And we
11 | think this is one more thing to add to our papers, that when
12 | the Ninth Circuit in *Anderson* says look toward the violation
13 | of a treaty -- look toward the violation of an extradition
14 | treaty, we think the ICCPR would fit into that category. And,
15 | again, Your Honor, there is no extradition treaty between the
16 | FSM and the United States. There is no extradition treaty
17 | from the RMI and the United States. That doesn't mean that
18 | there isn't judicial processes that exist, and it doesn't mean
19 | that there is a codified international law that would be
20 | violated if a kidnapping occurred. So I think because the
21 | United States and the Maldives are both parties to the ICCPR,
22 | we'd submit that that would be something the Court should
23 | consider when trying to figure out if there's an exception
24 | here under the *Ker-Frisbie* doctrine. Thank you.
25 |         THE COURT: Okay. All right. Very well. Let me

 1   just ask Mr. -- Mr. Morgan, from the justice department, do
 2   you want to respond to that -- this particular argument in
 3   question that the Court had?
 4           MR. MORGAN:  Yes, Your Honor.  Noting that this
 5   is the first time this particular treaty has ever been
 6   mentioned at any point in the litigation --
 7           THE COURT:  Right.
 8           MR. MORGAN:  -- I would note that my
 9   understanding is, that treaty is not self-executing, so it
10   would confer no rights upon any individual defendant.  It
11   would simply be a diplomatic matter between the states.  More
12   importantly, the United States Supreme Court decision in
13   *United States v. Alvarez Machain* makes quite clear that only
14   the violation of an extradition treaty can be an exception to
15   the *Ker-Frisbie* doctrine.  Any other alleged violation of
16   international law will not suffice as an exception to
17   *Ker-Frisbie*.  That's the square holding of the United States
18   Supreme Court.
19           THE COURT:  Okay.  Very well.  So -- okay.  The
20   Court finding is that defense counsel has not provided any
21   particular case law or federal legal authority to support this
22   particular argument.
23           The Court will now examine the defense's other
24   argument on personal jurisdiction, whether this Court lacks
25   jurisdiction because the manner in which Mr. Seleznev was

```
 1   arrested constitutes shocking and outrageous government
 2   conduct amounting to a due process violation.  As noted
 3   earlier, shocking and outrageous governmental misconduct
 4   amounting to due process -- to a due process violation is one
 5   of two exceptions to the Ker-Frisbie doctrine.  I will not
 6   concern myself with the other exception to the doctrine
 7   because, as I understand it, both parties agree that there is
 8   no extradition treaty between the United States and the
 9   Republic of the Maldives; correct?  U.S. Attorney?
10              MR. MORGAN:  Yes, Your Honor.
11              THE COURT:  And defense?
12              MR. CIVILLE:  Yes, Your Honor.
13              THE COURT:  All right.  Very well.
14              So Mr. Seleznev alleges the following with
15   respect to the manner in which he was arrested:  On or about
16   July 5, 2014, the U.S. Secret Service agents detained him at
17   the Ibrahim -- Ibrahim Nasir International Airport, more
18   commonly known as the Male International Airport, as he was
19   boarding -- preparing to board a commercial airline scheduled
20   to depart at approximately 11:55 a.m., local time, to Moscow.
21   They informed him that he was under arrest.  Then a U.S.
22   Secret Service agent separated him from his partner and her
23   minor child.  They confiscated his mobile phone and laptop and
24   prohibited him from having any communication with his family,
25   prohibited him from making telephone calls, placed him in a
```

```
 1   confined holding area, searched his person, physically pushed
 2   him on to a couch and instructed him to remain seated,
 3   presented him with a copy of an indictment originating from
 4   the Western District of Washington, informed him that he was
 5   under arrest and handcuffed him.  Therefore -- thereafter,
 6   Mr. Seleznev was led from the holding facility in the airport
 7   onto a private jet that was flown to Guam -- Guam.
 8            Upon arrival on Guam, Mr. Seleznev was
 9   transferred into the custody of the United States Marshal
10   Service and he was permitted to make one telephone call.  He
11   contends that -- that is, Mr. Seleznev contends that he was
12   never taken into custody by law enforcement officials of the
13   Republic of the Maldives based on the Red Notice issued by
14   INTERPOL.
15            So I want to ask defense and prosecution to
16   present their argument on the following:
17            Assuming Mr. Seleznev's factual allegations are
18   all true, including the statements made by.
19   Mr. Civille earlier today, what constitutes shocking and --
20   what constitutes a shocking and outrageous arrest?  I'd like
21   the counsels to focus their argument on this particular issue.
22   So we'll start with defense counsel, and then I'll hear from
23   prosecution after that.
24            And again, Counsels, please make sure that you
25   focus on, you know, shocking and outrageous as defined by the
```

*Case No. MJ14-00056*

```
 1   federal courts, and in particular the Ninth Circuit and the
 2   United States Supreme Court, such that it would require the
 3   Court to divest its personal jurisdiction over the defendant.
 4             Okay.  Before you do that, Mr. -- Mr. Civille,
 5   give me a couple minutes.  I'm going to check about my jury
 6   trial, the jurors.  But you can get ready.
 7             (Pause.)
 8             THE COURT:  Okay, Mr. Civille.  You may proceed.
 9             MR. WALSH:  Thank you, Your Honor.
10             (Pause.)
11             (Judge conferring with clerks.)
12             (Pause.)
13             MR. CIVILLE:  Oh, I'm sorry.
14             THE COURT:  That's okay.
15             Go ahead.  You may proceed.  So let's talk about
16   your argument on the shocking and outrageous arrest here.
17             MR. CIVILLE:  Okay.  Your Honor, I'll start with
18   the -- with the comment -- and I understand your ruling.  I'm
19   not challenging your ruling at this moment, but we are working
20   on an incomplete record and we think -- and that was why
21   discovery was so important, was to be able to present a
22   complete record.  And -- and we just -- we have bits and
23   pieces of what happened there, but the full story of what
24   happened in the Maldives, we don't know because we haven't
25   received the documents.  The government has provided us the
```

```
 1   evidence it plans to use today, but it hasn't provided us the
 2   other discovery --
 3              THE COURT:  Mm-hmm.
 4              MR. CIVILLE:  -- that we requested, and so we're
 5   handicapped by that.  But the record as you've read it -- the
 6   facts that you've read into the record thus far, Your Honor,
 7   we would suggest are incomplete.  And the reason they are --
 8   sorry, Carm.  The reason they are incomplete is that they
 9   leave out, basically, most of the facts the defendant alleges
10   in this case, and those would include that the U.S. agents
11   went to the Maldives, that they did not have an INTERPOL Red
12   Notice at the time, that they either directly -- and we don't
13   know yet the answer to this -- they either directly or through
14   Maldivian authorities applied for an arrest warrant through
15   the Maldivian court, which is, of course, the proper thing to
16   do, and that was denied.  We don't know the full reasons -- or
17   we don't know the reasons for the denial.  And that the United
18   States -- and we don't know what representations the United
19   States made to obtain or to apply for that arrest warrant.
20              And that's -- the Struckman court, I think, makes
21   it pretty clear, Your Honor -- the Ninth -- this circuit has
22   made it pretty clear that those kind of representations are
23   important to the shock of the conscience test.  The facts that
24   would illuminate what sort of representations or
25   misrepresentations or inaccurate representations or even
```

```
 1   outright lies, those are -- that's information that is
 2   critical and relevant to a shock the conscience test.
 3            We also think the evidence would -- will show
 4   that we -- we, through discovery, if we're able to get it --
 5   but we've presented what we do have to show that after being
 6   denied judicial relief in the Maldives through the normal
 7   appropriate process, that somehow the United States was able
 8   to convince other Maldivian authorities to cooperate in
 9   allowing them to directly arrest Mr. Seleznev in the Maldives
10   when he had not been taken into custody by the Maldivians.  He
11   had not been issued a detention order.  And the United States
12   later lied about that.  We think the United States later lied,
13   because this is the kind of thing -- of course there's an
14   outcry, and it becomes -- you know, it's not CNN News, but it
15   is -- it is a matter of international comment.  And the United
16   -- and apparently the Secret Service felt sufficiently
17   concerned about what happened that they -- they issued --
18   their press officer gave -- issued a press release on it and
19   said, oh, well he was -- he was removed -- or not removed...
20            THE COURT:  Expelled?
21            MR. CIVILLE:  Expelled.  And we believe that that
22   wasn't true, that that was -- the U.S. was simply
23   misrepresenting what happened there.  Because they -- okay.
24   And what do you do when you have, you know, a criminal case
25   like we're going to start?  Somebody -- if somebody
```

```
 1   misrepresents something, there's an inference that can be
 2   drawn that it is -- it is proof of -- the inference is that if
 3   you lie about something, it is an indication of guilty
 4   knowledge, that you know you did something wrong and so now
 5   you put a spin on it; or in this case, it appears just flat
 6   out you make stuff up: Oh, he was -- he was removed.  Yeah, we
 7   picked him up after he was removed.  And we think that's
 8   absolutely not true.  He wasn't removed.  The U.S. guys went
 9   into the airport, and they obviously had to have some
10   cooperation from the Maldivian police or the airport people,
11   and they just grabbed our boy; plain and simple, arrested him.
12   We had a declaration from an eyewitness who said the Maldivian
13   authorities didn't do anything.  I mean, they were watching,
14   and the U.S. agents did everything.
15           The Red Notice, which is now purportedly being
16   used to justify the --
17           THE COURT:  Isn't that -- that's allowed under
18   U.S. law, isn't it, just to go in and abduct someone?
19           MR. CIVILLE:  No, Your Honor.  I don't think -- I
20   don't think those agents had -- U.S. agents, I don't think
21   they had the authority to arrest in the Maldives.  And -- but
22   more importantly, I don't -- okay.  Now you're -- I don't
23   think they had the right to circumvent the Maldivian judicial
24   system.  And interestingly, the Red Notice -- okay, we are
25   apparently part of this INTERPOL system by some agreement by
```

46

```
 1    the U.S., and the Red Notice provides -- you know, we make the
 2    representation -- and I'll throw it up on the screen here if I
 3    can.
 4                 THE COURT:  Okay.  We'll have it marked as an
 5    exhibit, please.  What do you want to call this Mr. Civille,
 6    Exhibit...
 7                 MR. CIVILLE:  This is, I think, a government
 8    exhibit.  But it's -- it's also ours.  However, the Court --
 9                 THE COURT:  Well, let's just mark it as an
10    exhibit since you're putting up.  And then we're going to --
11    the Court will consider that.  Exhibit A.
12                 MR. CIVILLE:  Exhibit A, Your Honor.
13                 THE COURT:  Okay.  Defense exhibit.
14                 (Exhibit A marked: Red Notice.)
15                 THE COURT:  Go ahead.
16                 MR. CIVILLE:  And this is -- just so -- and this
17    will be the first page of the Red Notice, Your Honor.  And
18    then the last page --
19                 THE COURT:  Okay.  So that's Defendant's Exhibit
20    -- okay.  So I'm sorry.  Are they all the same?
21                 MR. CIVILLE:  This is all the same document.
22                 THE COURT:  Okay.  So Exhibit A -- what, is that
23    page 2?  And that's page 1?
24                 MR. CIVILLE:  Okay.  They're not numbered.  Let
25    me see -- 1, 2, 3, 4, 5 -- page 5 of the Red Notice.  So the
```

1    final -- it appears to be the final page of the Red Notice.

2    It provides that -- the U.S. represents that, "The country, at

3    the request of which the present notice has been published,

4    has given assurances that extradition will be sought upon

5    arrest of the person in conformity with its national laws

6    and/or the applicable bilateral and multilateral treaties."

7              There is not an extradition treaty.  But as

8    Mr. Walsh noted before, both countries are party to a

9    bilateral convention that, while not self-executing in the

10   United States, nonetheless is -- is an agreement entered into

11   between both countries.  And we submit that part of the

12   shocking behavior here is that, okay, we have these

13   agreements, we say do -- we want your help and we're going to

14   abide by your laws, and then when we do abide -- apparently we

15   -- and once again, we don't have -- we haven't received

16   discovery on this, but once again -- so it appears that we did

17   initially do that.  And when it turned out not to be a pro

18   forma event when the judge in the Maldives actually had a

19   response -- and we think that response was, no, you haven't

20   given me proper evidence, you haven't supported this

21   adequately yet.  That being -- the U.S., instead of continuing

22   to go through the proper legal authorities, the judicial

23   process there, just nabbed the guy, just cut -- just made a

24   deal with the cops in the Maldives and apparently -- well, not

25   apparently.  By all evidence -- the only evidence we really

```
 1   have from the eyewitness is that the U.S. grabbed him, nakedly
 2   grabbed him, okay.  And we believe that that is shocking
 3   behavior, shocking in a number of ways, not the least of
 4   which, Your Honor -- and this is -- this is -- the Court in
 5   Struckman foresaw that this is the kind of behavior that is --
 6   is becoming more -- certainly is a particular concern to the
 7   Court, is that there were lies and misrepresentations or
 8   circumvention in this case, deliberate circumvention of the
 9   Maldive judicial process and judicial rulings, then that is --
10   that is behavior which shocks the conscience.
11             THE COURT:  But what about the cases that have
12   been cited, Mr. Civille, like the Matta-Ballesteros case where
13   there was torture and abduction of the defendant by the U.S.
14   Marshals from the defendant's home in Honduras?  And the Court
15   found that that's not so shocking and outrageous to warrant a
16   dismissal.  And then Anderson, when there's no outrageous
17   conduct, despite the defendant alleging that his -- that the
18   government's conduct in removing the defendant during the
19   pendency of his extradition and citizenship appeals in Costa
20   Rica were ongoing;  that was not outrageous.  I mean, those --
21   those particular situations even seemed more severe than
22   what's presented here so far.
23             MR. CIVILLE:  Your Honor, a couple of things on
24   that.  One, in the Honduras case, Anderson, I believe that the
25   Court was not convinced that it was done by U.S. agents, that
```

```
 1   it was done by Honduran police, for one thing.

 2              The other -- the other point on this is that is

 3   this a dynamic area of the law; the concept of what is

 4   shocking is developing.  The case -- the Ballesteros case you

 5   mentioned really focused primarily on treaty issues.  And --

 6   and since then, the Ninth Circuit's view on -- on shocking

 7   conscience -- shocking behavior has actually evolved since

 8   Ballesteros, and that's reflected in Struckman.  Struckman is

 9   the latest pronouncement by -- in this circuit.  And it is --

10   and it is -- it shows an evolution of thought, and that's

11   where -- and that's where the Court said we are troubled, more

12   troubled, and we are not prepared to -- are the lies,

13   misrepresentations -- deceitful conduct is what they're

14   talking about.  "We're not prepared to say that blatant lies

15   to a foreign government to induce the foreign government to

16   transfer a defendant when it otherwise would not, could never

17   amount to so shocking and outrageous as to violate due process

18   and require dismissal of pending criminal proceedings in the

19   U.S.  in this case."

20              Okay.  The Ninth Circuit has clearly said that we

21   are -- we are not -- that the bar is not set at torture.  And

22   -- and stop and think about this for a second.  The whole

23   concept, the choice of words, "shock to the conscience," what

24   is -- okay.  That suggests that, A, you're stepping -- you

25   know, what's our conscience?  Our conscience is, I think,
```

1  understood.  Most people would say, "What's your conscience?"
2  Well, it's that inner voice that really tells us right from
3  wrong, that -- the moral compass inside, that shorn of
4  legalisms and complex analytical nuances, it's your gut that
5  tells you -- well, not your gut; your soul that tells you this
6  is right, that's wrong.
7          Okay.  So the Court -- I think when they use that
8  phrase "shock the conscience," it's referring to the kind of
9  behavior that -- that -- first, it's telegraphing that the
10  Court is not going to be hung up necessarily on real technical
11  legalisms, that it's looking for something deeper.  And the
12  trouble with -- my one trouble with this test is that, you
13  know, whose conscience are they talking about?  And -- and the
14  reason that's troubling -- and I think the answer is, of
15  course, it's the idealized reasonable person.  Because in
16  day-to-day life, the trouble with consciences is that they
17  become numb.  You know, the -- Cambodia.  Just dramatic
18  examples, the killing fields of Cambodia.  Millions of people
19  killed, and of course there's outrage.  But Rwanda, then,
20  30 years later and a million people killed, several million
21  people dispossessed.  They're still outraged, but, you know,
22  we're getting kind of accustomed to this.  And now, finally,
23  we have Sudan, hundreds of thousands of people killed.  But
24  for George Clooney's activism, largely ignored in the world
25  stage.  And now Central African Republic, close to a million

*Case No. MJ14-00056*

```
 1   people killed, several million people displaced, complete
 2   anarchy, and it gets almost no coverage.  Why?  Because our
 3   conscience has just become numbed after a while.  And we're
 4   seeing that now in the -- what's going on in Israel and the
 5   Gaza strip.  It's just -- okay.
 6             That's not the conscience, the numb conscience.
 7   And I think that this -- when I argue to a judge, you know, of
 8   all people who -- no matter how good-hearted the judge is and
 9   how conscientious and moral and I -- no questions on that
10   score -- you see the bottom end of society on a daily basis;
11   the beatings, the murders, you had the Blue House Lounge case
12   here, human trafficking.  And your conscience becomes numb in
13   the sense of what is acceptable or not acceptable behavior,
14   what does it take to shock you.  I mean, you've seen it all,
15   everything.  What -- what can you say?  What could I say that
16   would shock you?  What could I show you?  What photographs
17   could I show you that would shock you?  Because you've seen it
18   all.
19             So that test, when we talk about shocking
20   conscience, it's not to the battle-hardened people that,
21   really, we all have become just over the course of life.  I
22   think it's really to the reasonable person, what shocks their
23   conscience, what offends their core sense of right and wrong.
24   And, Your Honor, I think that what the Ninth Circuit has said
25   in Struckman is that, yes, we're the good -- "we" being the
```

1    United States, we're the good guys on the world stage.  You
2    know, we are the moral beacon.  We are supposed to stand for
3    righteousness and truth and the proper way.  And what we stand
4    for above all is the rule of law.

5              And so if our agents are going out and lying to
6    people, if they're misrepresenting things to -- to get some,
7    you know -- to get some benefit, if they -- if they run
8    roughshod over the judicial system of co-equal countries,
9    well, then what's the difference?  How are we different?
10   We're -- you know, we're standing up -- to put it in the
11   context, you know, we're on the brink of some very serious
12   matters right now globally, and the U.S. is ramping up to go
13   after Russia about shooting down -- its participation in
14   shooting down the Malaysian aircraft.  And we are going to
15   take the moral high ground and accuse Russia of arming the
16   militants or the separatists or maybe even firing the
17   missiles.  Okay.  And Russia has, apparently, tens of
18   thousands of troops poised on the Ukraine border, ready to --
19   we think, ready to invade.  And what is our position?  We're
20   saying Russia, you have to obey the rule of law.

21             Now, okay.  That's on a much larger -- that's --
22   this case is not shooting down the Malaysia aircraft.  It's
23   not invading a country.  But it's the principle, the rule of
24   law, the respect for the rule of law.  So when we stand up in
25   the international forum and demand of Russia that it obey the

```
 1   rule of law, that it respect the law of nations and
 2   international law, well, in this small corner of the world, we
 3   have said, basically, do as we say, not as we do, and that
 4   shocks the conscience.  If we can't stand up there with a
 5   clear conscience and say, "We obey the law.  You should obey
 6   the law, too," that shocks the conscience.
 7               And that's what I'm suggesting, Your Honor.  And
 8   that's why it was so important to us to try to develop the
 9   record in this case, to get the information we know the
10   government has had -- that we believe the government has, that
11   they never denied having, to show the Court that in this
12   expanding area of the law, the Ninth Circuit has clearly said
13   torture isn't the test anymore.  That should be an absolute
14   given.  I mean -- so those cases that agonized about torture,
15   we don't have to agonize about that.  We're -- we're -- we're
16   evolving, we're progressing, and that's our -- so our point,
17   Your Honor, is that I think the Court needs to -- that what
18   shocks the conscience is duplicity, deception and corruption
19   of another country's judicial process, knowingly participating
20   in the corruption of another country's judicial process or the
21   abrogation of that process.
22               THE COURT:  Okay.  Any other facts that will
23   constitute shocking and outrageous?  Because that's really the
24   test, shocking and outrageous.
25               MR. CIVILLE:  Yeah.  The facts -- the other --
```

```
 1    and this is what's more of a context argument, Your Honor, but
 2    -- all right.  As this area evolves, okay, the Court will --
 3    courts will do what they always do, and they'll draw
 4    distinctions.  And you mentioned the Honduras case and the --
 5                 THE COURT:  Anderson case.
 6                 MR. CIVILLE:    -- Ballesteros case.
 7                 THE COURT:  Yeah, and Ballesteros.
 8                 MR. CIVILLE:  Okay.  This is not a case involving
 9    terrorism.  It's not a case involving violence, murder, a
10    narco-terrorism.  This is pretty -- this is, you know -- this
11    is -- the alleged crime does not fall into any of those
12    categories.  So in that context where the Court's conscience
13    might not be shocked by us, for example, surreptitiously
14    invading Pakistan to kill Osama bin Laden, okay, because of
15    who Osama bin Laden was and the history of our pursuit him --
16    this is very different.  This is a much more mundane sort of
17    case where the behavior then becomes all the more shocking,
18    that we're not now reserving what would otherwise be
19    outrageous behavior for extreme cases, with now becoming the
20    order of business, SOP.
21                 Other facts.  I think we've talked about the
22    dating on the Red Notice, whether that was properly given.
23    Our belief -- not whether it was properly given; our belief
24    that the Red Notice was pretextual, that whatever had been
25    done had been done before the Red Notice had actually been
```

```
 1    properly issued.  Yeah.  And, once again, I just go back to
 2    our -- our allegation that we really are looking for discovery
 3    for -- to substantiate more fully.  You have on the -- that we
 4    ignored the judicial process in that country and the -- we've
 5    attached the declaration of Ali Naaviz -- Naaviz, N-A-A-V-I-Z,
 6    a journalist in the Maldives -- Maldives.  I'm sorry, Your
 7    Honor.  And we've attached both the native language and the
 8    English translation, which shows the basis for some of our
 9    allegations regarding how this happened factually.
10              We also have submitted a declaration of an
11    eyewitness to the arrest, showing that the U.S. agents just
12    took over inside the Male Airport in the Maldives and --
13    without assistance or any -- really -- I mean, they just came
14    in -- our guy walked in, and he was arrested by U.S. agents,
15    without any Maldivian participation.
16              Let me see if I've hit all the facts, Your Honor.
17              (Pause.)
18              (Consulting with co-counsel.)
19              MR. CIVILLE:  The other fact, Your Honor, I --
20    it's in, actually, our client's declaration, is that when he
21    was arrested and still in the territory of the Maldives, he
22    requested to contact -- that the Russian consulate be
23    contacted, and that was not done.  So he was denied access to
24    the consulate there.
25              THE COURT:  Okay.
```

```
 1                MR. CIVILLE:  Okay.

 2                THE COURT:  All right.  So, thank you,

 3    Mr. Civille.

 4                MR. CIVILLE:  Thank you.

 5                THE COURT:  So the Court will accept as true for

 6    purposes of this motion all the additional factual allegations

 7    that you have just made regard -- not only the ones that have

 8    been filed through a declaration and/or news articles, but the

 9    additional statements made here that the United States agents

10    did not have a proper INTERPOL notice, that it may have been

11    pretextual, that there was an application to the Maldives

12    court, there could have been a violation, and representations

13    made to the Maldives government may have been improper, and

14    that there was no -- potentially no detention order, and that

15    the defendant had been arrested by the U.S. Secret Service.

16    So the Court will accept that as true.  And, in particular,

17    all of the filings submitted by defense counsel.

18                Okay.  Let me hear from the United States

19    Attorneys, Mr. Morgan.

20                MR. MORGAN:  Yes, Your Honor.

21                Accepting the defendant's allegation as true and

22    -- simply for purposes of this motion -- I mean, the

23    government does not concede the allegations in any way -- the

24    facts as alleged do not rise to the level of shocking and

25    outrageous conduct as defined by the precedents which control
```

1   this Court.  The notion that the conduct was shocking and

2   outrageous because the agent effectively made a warrantless

3   arrest in a foreign country, that, as a matter of law since

4   the *Ker* decision, does not rise to the level of shocking,

5   outrageous conduct.

6           I would point out that the *Matta-Ballesteros*

7   case, which defense counsel cited, did indeed involve U.S.

8   agents effecting an arrest of a foreign national on foreign

9   soil.  And as the Court has pointed out, the facts in that

10  case were quite severe.  The agents arrested him at his home,

11  in a pre-dawn raid, with the assistance of the Honduran

12  military.  They put a hood on his head, they bound him, they

13  took him to the airport and spirited him away.  And there were

14  also allegations that he was physically abused on the flight.

15  The Ninth Circuit squarely held that those allegations, even

16  if true, did not rise to the level of shocking, outrageous

17  conduct as would justify dismissal of the indictment.

18          With respect to the allegations concerning the

19  circumvention of the Maldivian judicial process, well, that's

20  exactly what happened in the *Anderson* case, which the Court

21  has noted.  In *Anderson*, the defendant was attempting to

22  appeal an extradition order and an order depriving him of

23  Costa Rican citizenship, so he was attempting to utilize the

24  Costa Rican judiciary to vindicate his rights in that state.

25  The United States took him and removed him to the United

58

1  States.  The Ninth Circuit held that that was not outrageous
2  conduct.

3          With respect to allegations that the United
4  States might have misrepresented some facts to the Maldivian
5  authorities, I would want to point out that there is sort of a
6  logical disconnect with the -- supposedly the U.S. officials
7  went to a Maldivian judge to get a warrant and they didn't get
8  a warrant.  How the -- whatever they said to that judge, how
9  that could have been outrageous conduct, since they didn't get
10 a warrant, that's sort of a logical disconnect there because
11 they didn't utilize the Maldivian process.  But that's an
12 aside.

13         The fact of the matter is in *Struckman,* the case
14 upon which the defendant so repeatedly rely, that was a case
15 where agents affirmatively lied to the Panamanian government,
16 secure that government's cooperation, and having that
17 defendant expelled from Panama and rendered into the United
18 States custody.  The Ninth Circuit held that those allegations
19 were not sufficient to rise to the level of outrageous
20 conduct.

21         And on a more general level, there's just --
22 there's something counterintuitive about the argument the
23 defense is presenting.  Essentially, they want to say that a
24 misrepresentation can be shocking, outrageous when forcible
25 rendering cannot, and that just can't be right.  It can't be

```
1   the case that you can literally kidnap someone by force at
2   gunpoint in a foreign country and have that be sanctioned by
3   the United States Supreme Court; and yet a misrepresentation
4   to a foreign government somehow surpasses that in conscience
5   shocking behavior.  That -- that simply isn't -- that just
6   cannot be right.
7              And I would also point out that there are other
8   cases in which the United States has purportedly circumvented
9   the local authorities.  One of those is United States v.
10  Valot, which is cited in our most recent filing.  This is a
11  case where Thai authorities are -- arrested the defendant, and
12  rather than afford him the benefits of Thai law and Thai
13  extradition proceeding, simply took him to the airport and,
14  over his objections, handed him over to U.S. -- to the DEA
15  agents who were waiting at the airport.  The Ninth Circuit
16  held that that was not shocking and outrageous conduct.
17             So I think that there are circumstances far worse
18  than anything Mr. Seleznev has alleged, and the Ninth Circuit
19  and both the -- and the Supreme Court have made quite clear
20  that they are not enough to rise to that level.  Indeed, as
21  the government pointed out earlier, there is not a single
22  reported decision in which any court in the United States has
23  ever held that the government has engaged in sufficiently
24  shocking conduct to justify divestiture of jurisdiction and
25  dismissal of an indictment.
```

```
 1              MR. CIVILLE:  Your Honor, if I could respond to
 2    that?
 3              THE COURT:  Yes, you may.
 4              MR. CIVILLE:  The government's reliance on
 5    Matta-Ballesteros is interesting.  That was a 1995 case.
 6              THE COURT:  Right, okay.
 7              MR. CIVILLE:  It predates the Anderson and
 8    Struckman decisions by about ten years, and it doesn't reflect
 9    the way that the Ninth Circuit's thought in this area has
10    evolved.  In Matta-Ballesteros, the Court there did not -- did
11    not frame the -- did not recognize the Ker-Frisbie exceptions
12    in the manner that the Ninth Circuit now recognizes those
13    exceptions.
14              What's interesting about the Matta-Ballesteros
15    exception -- or decision, Your Honor, is that there -- and
16    once again, Your Honor, your decision this morning is not
17    etched in stone, and you might want to consider that.  The
18    district court conducted a limited evidentiary hearing.  Okay.
19    Once again, as in Struckman --
20              THE COURT:  This is a limited evidentiary
21    hearing.
22              MR. CIVILLE:  No, no.  A limited evidentiary
23    hearing, Your Honor, is like where we put on witnesses --
24              THE COURT:  This is a limited hearing.  Let's put
25    it that way.
```

```
 1              MR. CIVILLE:  It's a limited hearing, okay.
 2              THE COURT:  And I'm going to assume for the sake
 3    of argument that your facts are true for purposes of this
 4    hearing.  And if the Court finds that the conduct is not
 5    shocking and outrageous, you certainly will have, I believe,
 6    the right to proceed forward after further discovery before
 7    the transferee court, before the indicting court, to bring
 8    this issue up again.
 9              MR. CIVILLE:  I understand Your Honor's position
10    on that.  And our concern, of course, is by doing that, you
11    are exercising jurisdiction over Mr. Seleznev, and that's the
12    threshold question which we think --
13              THE COURT:  I understand what you're saying.
14              MR. CIVILLE:  Okay.  But in any event, in
15    Matta-Ballesteros, there wasn't at least an opportunity for an
16    evidentiary hearing.  And it's not clear to me, but the manner
17    in which that's -- well, no.  It is clear.  So the Court
18    actually heard testimony and -- and -- and that would imply
19    that there was an opportunity to really delve into the facts.
20    And that's why I think it's so important to be able to have a
21    -- a more fully developed factual record.  I appreciate the
22    Court accepting what we say is true, but that's -- the trouble
23    is, we just -- we don't know everything that's out -- we -- we
24    may have much more -- I'm concerned we have an even more
25    compelling argument or would have an even more compelling
```

```
 1    argument if we saw the discovery we requested.  That -- I
 2    guess that's -- you know, when you put the evidence on the
 3    table, the actual papers, the e-mails, correspondence, the
 4    reports, that's where you really see the full extent.  And
 5    that's where you get -- have the opportunity to decide, oh,
 6    either this is shocking or it's not.
 7                Okay.  I don't know if that answers your question
 8    or --
 9                THE COURT:  Did you -- I mean, do you have
10    anything to -- to respond to in relation to what U.S.
11    Attorney, the Justice Department, has just indicated?
12                MR. CIVILLE:  I think the Justice Department is
13    simply -- yeah.  My final point on that is, the Justice
14    Department is not acknowledging the state of law as it has
15    been recognized in this circuit --
16                THE COURT:  Well, I don't know about that.  I
17    mean, the -- you know, I'm looking at all the case law,
18    Mr. Civille.  And, I mean, isn't it true -- even if what
19    you're saying is that the world, the international world, the
20    academias and others, have matured in terms of this area of
21    law, it -- you -- I'm not -- I'm not able to ignore, neither
22    are you -- we're not able to ignore the United States Supreme
23    Court decisions and the Ninth Circuit decisions that allow
24    forcible abductions on foreign soil.  I mean, that's basically
25    -- they allow it.
```

```
 1              MR. CIIVLLE:  Your Honor --
 2              THE COURT:  That's -- you haven't shown me
 3    anything that doesn't allow it, other than -- unless it's
 4    shocking and outrageous and it doesn't rise to that level and
 5    so forth.  But, I mean, that's the case law, and the Court is
 6    duty-bound to follow that case law.
 7              MR. CIVILLE:  Okay.  And, Your Honor, I think my
 8    -- I think my response to that is, let's assume for a moment
 9    that there are circumstances under which forcible rendition is
10    lawful, okay.  And certainly --
11              THE COURT:  Well, you're not disputing any of the
12    cases and the facts that Mr. Morgan has just cited to, are
13    you?
14              MR. CIVILLE:  Well, I'm not disputing the holding
15    in those cases.  I am disputing that earlier -- for example,
16    Ballesteros now has to be read in conjunction with Struckman
17    -- Anderson and then Struckman.  And you can't read
18    Ballesteros and Anderson and Struckman and say the law is
19    fixed and rigid in this area.  Those cases represent a --
20    demonstrate a real progression of thought in this circuit, and
21    Struckman being the most recent declaration of where this
22    circuit has evolved to on this.  In -- okay.
23              So -- so now the government comes -- so it's not
24    open season out there for agents -- U.S. agents running around
25    the world.  They can't just run amuck.  They can't -- saying
```

1    just anything you have to say to -- to trick somebody into

2    getting into the van with you or to trick a government into

3    cooperating with you is not acceptable behavior.  You know, I

4    understand from -- for the law enforcement guys, of course

5    they -- anything.  They're still complaining about *Miranda*,

6    you know, for -- you know, anything that they see as

7    infringing on their absolute right to do whatever they want,

8    they resist.  But that's not what the rule of law is about, of

9    course.  And the rule of law is about having restrictions and

10   limits on what you can do.

11            And in this arena, it's about respecting the

12   judicial process.  I didn't really understand the government's

13   argument, well, okay, we tried to -- maybe I simply

14   misunderstood him.  He doesn't see the logic, well, if the

15   local government -- if the local judiciary didn't allow us to

16   -- give us the arrest warrant, okay, we'll just grab the guy,

17   was apparently the government's position.  We don't know why

18   the local judiciary denied that warrant.  And very

19   importantly, we don't know -- and the government has this

20   information in confident, because they must have gotten

21   reports and sent reports on this.  Did the judge in the

22   Maldives say, under our law, this person is lawfully in the

23   Maldives, and if the U.S. wants him, you have to bring him

24   before me first to see if there is -- you know, under the

25   Maldive constitution, what rights he may have here.  So did

1   the U.S. ignore that?

2            Now, this is -- you know, this is another area

3   that's come up.  And *Struckman*, I think, is -- it represents

4   by this circuit a recognition -- and I don't think the Court

5   needs to anticipate the Supreme Court.  We just have to follow

6   the law in this circuit.  The law in this circuit is really --

7   and I think really clear.  You look at -- okay.  If -- if

8   there is evidence that the judge -- that the U.S. consciously

9   --

10           THE COURT:  Lied to everybody?  Lied to

11   everybody?

12           MR. CIVILLE:  Lied to everybody, did something --

13   no, not just -- no, it's not just -- that's bad enough.  But

14   now you go through the process.  It appears we actually did

15   the right thing.  We went down there and somehow applied for

16   an arrest warrant.  Okay.  Well, if you -- and then that

17   didn't turn out the way we liked it, so we said, well, enough

18   of this pretense.  We're not going to abide by the arrest

19   warrant or the judicial process of the Maldives.  Grab the guy

20   in the Maldives, on Maldives territory.  Well, that's a very

21   cynical view of -- and that is shocking, Your Honor.  Think

22   about that.  Does that offend our innate sense of right and

23   wrong, that -- you know, your kid comes up and says, "I want

24   an ice cream cone from the refrigerator."

25           "No, you can't."

Case 2:11-cr-00070-RAJ   Document 132-3   Filed 04/07/15   Page 91 of 389

66

```
 1                   And you turn your back, and the kid goes and gets
 2       the ice cream cone.
 3                   "Well, I said no."
 4                   "Well, I know you said no.  I went through the
 5       right process, Mom.  I asked you.  You said no, so what could
 6       I do except get it myself."
 7                   That's wrong.  We know that's wrong.  We would
 8       tell a child that's wrong, that you have to respect the
 9       process, respect the rule of law.  And that's what I think the
10       government just can't come to grips with, is that the Ninth
11       Circuit is -- is -- that's what Struckman is really saying.
12                   THE COURT:  Yeah, but Struckman did cite the
13       Matta-Ballesteros case with approval.  They did do that.
14                   MR. CIVILLE:  They did, Your Honor.  But they
15       went beyond that, though.  They clearly went beyond that.  I
16       mean, they didn't overrule Ballesteros, but they went beyond
17       that.  And they certainty clarified, as Anderson had done.
18       Matta-Ballesteros, the standard in that case -- announced in
19       that case was, I think, much less clear than the very precise
20       language in both Anderson and Struckman.  The analytical
21       framework -- in Struckman and Anderson, they both said, okay,
22       we start with the vulnerable principle that -- venerable
23       principle -- sorry -- that the manner by which a defendant is
24       brought to trial does not affect the government's ability to
25       try him, citing Matta-Ballesteros, citing Ker and Frisbie.
```

```
1   Okay.
2              So the Ninth Circuit says, okay, that's our
3   starting point.  And you're right; they've --
4   Matta-Ballesteros is right in -- on that starting point.  But
5   then -- now the Ninth Circuit says we have however recognized
6   exceptions to the Ker-Frisbie doctrine -- and that would also
7   be Matta-Ballesteros, they could have added -- if either, one,
8   the transfer violated an extradition treaty or the United
9   States government engaged in misconduct of the most shocking
10  and outrageous kind to obtain his presence.
11             And so that goes beyond Matta-Ballesteros, and
12  that is now the law in this circuit.  And I think -- and the
13  other cases we have cited, so misconduct of the most shocking
14  and outrageous kind is -- and has been applied.  The standard
15  or the other -- and this goes back to Justice Frankfurter,
16  actually.  Does it shock your conscious, when it says the most
17  shocking kind.  And Justice Frankfurter, a towering
18  conservative on the board, a legendary conservative, said,
19  "Does it shock your conscience?"  The average, the -- kind of
20  very patrician way, he said, "to the English-speaking people
21  of the world, would it shock our conscience."
22             And that's the standard that now exists, Your
23  Honor.  And it's not tethered to torture.  The government, as
24  a fallback position, wants to tether all of this to torture
25  and say anything we do is okay as long as we don't torture
```

```
 1   you.  And that, I submit, is not the law any longer.
 2   Struckman is -- has certainly laid rest that notion that only
 3   torture shocks the conscience.  Because if that's the
 4   standard, then that's the numbed conscience -- conscience that
 5   I was describing.  If we've got -- if we are so beaten down by
 6   life that our consciences can only be shocked by horrible,
 7   grizzly torture stories, then we have a real problem.  And
 8   that's not what the standard is.
 9               THE COURT:  Okay.  Thank you.
10               MR. CIVILLE:  Thank you.
11               THE COURT:  All right.  The Court has considered
12   the federal case law, in particular the Ninth Circuit case law
13   and the U.S. Supreme Court, that would require the Court to
14   divest its personal jurisdiction over the defendant.  Based on
15   what has been presented to the Court thus far -- and the Court
16   is assuming that all the factual allegations as Mr. Seleznev
17   has indicated in his declaration and all the other
18   declarations submitted by the other witnesses and all the
19   other exhibits submitted by defense -- assuming all of that is
20   true, the Court finds that the Court cannot simply ignore
21   federal law, and the Court finds that these allegations thus
22   far are not shock -- so shocking and outrageous that it would
23   warrant this Court to divest its jurisdiction.  Accordingly,
24   the Court finds that because the allegations of his arrest are
25   not so shocking and outrageous as submitted, the Court finds
```

```
 1   that it does have personal jurisdiction over Mr. Seleznev.
 2   His motion for discharge and release is hereby denied, and the
 3   Court will proceed forward with the identity hearing, the Rule
 4   5 hearing.
 5           The Court notes, however, that its decision on
 6   the motion to preclude Mr. Seleznev from reasserting the same
 7   allegations -- it will not preclude him from reasserting the
 8   same allegations before the United States District Court for
 9   the Western District of Washington for further consideration
10   by that court after full and additional discovery if counsels
11   are going to proceed forward that way.  So the Court will now
12   proceed with the Rule 5 hearing.
13           MR. CIVILLE:  Your Honor, may we approach for a
14   moment?
15           THE COURT:  Yes.
16           (Sidebar.)
17           MR. CIVILLE:  Thank you, Your Honor.  Thank you
18   for giving me so much time.  Your Honor, in anticipation of
19   the ruling, I have discussed with Ms. David -- as you know, we
20   have a jury to pick today.
21           THE COURT:  Right.
22           MR. CIVILLE:  If we could do -- the Rule 5
23   hearing -- I'm not sure, in light of some of the other
24   evidence we have, how quickly that's going to go, and my
25   suggestion, my request, would be that we proceed with picking
```

```
 1    the jury and perhaps and do the Rule 5 hearing at 8:30 or 9
 2    o'clock tomorrow.
 3              MS. DAVID:  Your Honor, we would like to proceed.
 4    The Court has indicated that in its earlier order, the
 5    government is proceeding pursuant to that -- wishes to proceed
 6    pursuant to that order.  We have the binders ready to proceed,
 7    to the Court, to counsel and to the witness.
 8              THE COURT:  We might have some issues with
 9    jurors.  We may not have enough jurors.
10              THE CLERK:  You can get additional jurors there.
11              THE COURT:  But we don't have any right now.  We
12    don't have any additional -- oh, we can just bring them in
13    later?
14              LAW CLERK:  Bring in another set, so if we don't
15    have enough right now, we can bring in another set.
16              THE COURT:  We may not have -- I don't think we
17    -- we may not have enough jurors anyway right now anyway to
18    proceed forward.  I've got to talk to the counsels.  Why don't
19    we -- let me talk to the -- I think we should proceed forward
20    this afternoon.  It's not that difficult, is it?
21              MR. CIVILLE:  Is anything in this case not
22    difficult?
23              THE COURT:  No, no.  I mean but you know, we're
24    trying --
25              MR. CIVILLE:  Okay.
```

71

```
 1              THE COURT:  -- to, you know, give you your day in
 2    court.
 3              MS. DAVID:  We didn't want to distribute the
 4    binders because we were obviously waiting for the Court's
 5    ruling, but I do have the judge's copy, the defense copy and
 6    the witness copy.
 7              THE COURT:  How big is it?  It shouldn't be that
 8    big.
 9              MS. DAVID:  It's not, Your Honor.  It's -- there
10    are government exhibits that Mr. Civille has already received.
11    They're designated 1 through 13, except there are 20 exhibits;
12    some are like 13-A, 13-B.
13              THE COURT:  Have you given him all of these
14    exhibits?
15              MS. DAVID:  Yes.
16              THE COURT:  So he has received all of them
17    previous to today?
18              MS. DAVID:  Correct, Your Honor.
19              THE COURT:  Oh, okay.  So it's not like anything
20    new.
21              MR. CIVILLE:  I don't think -- I hope not.  She's
22    very good about that.
23              THE COURT:  So why don't we -- we'll go ahead and
24    proceed forward with the identity hearing this afternoon.
25              MR. CIVILLE:  Okay.
```

```
 1                    THE COURT:  What I'm going to do with the jury is
 2      I'm going to talk to the other defense counsels, so we'll let
 3      you -- we'll give you -- how many -- you want to start at
 4      1:15?
 5                    MR. CIVILLE:  Okay.
 6                    THE COURT:  That will give him a chance to have
 7      lunch.  All of you guys have time for lunch.  Then I'll talk
 8      to your other counsels, your co-counsels, and we might move
 9      out our jury selection 'til August -- the day that we are
10      going to start opening, maybe that date.  Okay.
11                    MR. CIVILLE:  Thank you, Your Honor.
12                    THE COURT:  All right.  Because of the numbers of
13      jurors.
14                    MS. DAVID:  So that would be August 11th, right,
15      Your Honor?
16                    THE COURT:  That's right.  August 11th.  Yeah.
17                    MS. DAVID:  Thank you.
18                    THE COURT:  I'll look at the date.  Hold on, you
19      guys.  Why don't you talk to your client and then  talk to
20      your agent.  And we will go proceed this afternoon.  Okay.
21                    MS. DAVID:  The identity hearing will proceed at
22      1:15?
23                    THE COURT:  Yeah.  Definitely, yeah.
24                    (Off the record discussion with the Court and law
25      clerk.)
```

```
 1              THE COURT:  Okay.  We're good?  I'm gonna talk to
 2   -- I'll call up the other case real quick.
 3              MR. CIVILLE:  Your Honor, so we're not gonna pick
 4   the jury today?
 5              THE COURT:  We're not going pick the jurors.  We
 6   don't have enough jurors.  You know what --
 7              MR. CIVILLE:  I didn't think we were going to.
 8              THE COURT:  Well, I was -- we already called
 9   them.  We only have 49.  We only have 49.  So I can talk to
10   them and just say, you know, because of the storm, they just
11   -- we just don't have enough.
12              MR. CIVILLE:  Okay.  Can I -- I'm fine to do Rule
13   5.  Can we start it at 2:00 instead of 1:15?
14              THE COURT:  Sure.  Two is fine.  We'll call --
15              (End of sidebar.)
16              THE COURT:  Okay, let me just -- we're back on
17   the record.
18              What we're going to do is -- I know there's a
19   request to continue the identity hearing, but the Court will
20   deny that request and we will proceed forward this afternoon
21   at two.  We'll allow Mr. Seleznev to have lunch.
22              And then let me just talk to the other attorneys,
23   Mr. Civille, Ms. David, Mr. Gavras and Mr. Van de veld.  Okay.
24   So because of the typhoon Condition of Readiness 1 yesterday,
25   the Court had summoned in 100 jurors for our trial for jury
```

```
 1   selection and only 40 -- how many appeared?  Forty-nine have
 2   appeared.  That's not enough to proceed forward with the
 3   challenges for cause.  It's enough to just like -- if you only
 4   had -- okay.  If we have 49 jurors, if we only had 3
 5   challenges for cause -- if I could just assume that there's
 6   only 3 challenges for cause and that you exercise all your
 7   peremptory challenges, doing the mathematics, we'd need 45
 8   jurors here.  So there's just no way that we would have enough
 9   to proceed forward, so what the Court is gonna do, because of
10   an act of God, we're not able to get all the jurors in.  I'm
11   going to move out the jury selection until next week, and that
12   will give us enough time to summons in -- no.  The following
13   week.  What day do we have that set for?
14                  (Discussion with clerks.)
15                  THE COURT:  August 11th -- but she had needs
16   until August 12th.  So my jury administrator needs until
17   August 12th, which is Tuesday, to proceed forward with jury
18   selection.  We were going to proceed forward with opening
19   statement anyway on August 11th, as you will recall, on
20   Monday, but the Court's going to have to move that to
21   August 12th.
22                  MR. VAN DE VELD:  Your Honor, as I explained when
23   we last met --
24                  THE CLERK:  Microphone, please.  Thank you.
25                  MR. VAN DE VELD:  As I explained when we last
```

```
 1   met, I have a trial scheduled before Judge Cenzon in Superior
 2   Court on a criminal sexual conduct case, and that was --
 3   that's scheduled to start on the 5th.  Because the jury
 4   selection in this case was going to start before that, I have
 5   a basis for a motion for it to be continued.  But if we don't
 6   start the jury selection until the 12th, that case will have
 7   started beforehand and I will not be complete with it by the
 8   12th.  And so, you know, I really need to have the jury
 9   selection on this case start before the 5th; otherwise, I'm
10   gonna have to ask the Court to continue this matter.
11             THE COURT:  Well, I have a call out to Judge
12   Cenzon.  Have you spoken to her since then?
13             MR. VAN DE VELD:  Yes.  And she said, "Well,
14   submit your motion."  But I haven't heard anything from the
15   chief judge, so...
16             THE COURT:  Right.  Okay.  Yeah.  All right.  So
17   -- no, no.  I did submit a -- I mean, we do have a call out to
18   her, and I have -- I don't know if she called me yesterday.  I
19   haven't checked my calls because we were in court yesterday.
20   So I will get ahold of her.
21             But what we're going do as of right now -- let 's
22   just do this, and I'll try to work out something between
23   myself and Judge Cenzon-Duenas, because this is an older case
24   than -- as you've represented to me.  Correct, Mr. --
25             MR. VAN DE VELD:  That's correct.
```

```
 1                THE COURT:  Okay.  So let me get ahold of her.
 2   But as of right now, the Court will -- based on the inability
 3   to get enough jurors to come in today because of the storm,
 4   the Court will continue the jury selection until August 12th,
 5   and that will give the jury administrator enough time to call
 6   in the additional jurors.  In the meantime, we will try to
 7   work out the situation with you, Mr. Van de veld, sometime
 8   this afternoon.  Okay?
 9                MR. VAN DE VELD:  Thank you.
10                THE COURT:  Okay.  Very well.
11                MR. CIVILLE:  Thank you, Your Honor.
12                THE COURT:  Mr. Civille and Ms. David, I'll see
13   you all at 2 o'clock.  We'll begin the identity hearing at
14   that time.  Thank you.
15                MR. CIVILLE:  Thank you, Your Honor.
16                THE COURT:  Mm-hmm.  We'll get the -- okay.
17   Thank you, Counsels, on the phone.
18                MR. MORGAN:  Thank you, Your Honor.
19                THE COURT:  Talk to you soon.
20                (Recess taken at 12:01 p.m.)
21                (Back on the record at 2:12 p.m.)
22                THE CLERK:  Magistrate Case No. 14-00056, *United*
23   *States of America v. Roman Seleznev;* identity hearing.
24                Counsel, please state your appearances.
25                MS. DAVID:  Good afternoon.  Marivic David for
```

```
 1    the United States, and Agent David Iacovetti from Secret
 2    Service.
 3                  THE COURT:  Okay.  Good afternoon.  You may be
 4    seated.
 5                  MR. CIVILLE:  Buenas again, Your Honor.  Patrick
 6    Civille; Joshua Walsh; the person being detained as the
 7    defendant, Roman Seleznev; and our interpreter, Polina
 8    Collins, are all present.
 9                  THE COURT:  Okay.  Good afternoon.  You may be
10    seated, everyone.
11                  MR. CIVILLE:  Your Honor, as a preliminary
12    matter, if I may...
13                  (Pause.)
14                  (The Court conferred with courtroom deputy.)
15                  THE COURT:  Okay.  Also present on the phone,
16    Mr. Freedman, you're there and I -- is that correct?
17                  MR. FREEDMAN:  I am.  In Seattle, Your Honor.
18                  THE COURT:  Very well.  And Mr. Ray and
19    Mr. Goldin, you are also present for the defense team?
20                  MR. RAY:  We are, yes.
21                  THE COURT:  Okay, very well.
22                  MR. GOLDIN:  Yes, Your Honor.
23                  THE COURT:  Yes, Mr. Civille.
24                  MR. CIVILLE:  As a preliminary matter -- I hope
25    this is not going to be a problem -- my client's been --
```

```
 1   everybody else in this courtroom is cold --
 2              THE COURT:  Right.
 3              MR. CIVILLE:  Except he's in a T-shirt.
 4              THE COURT:  Right.
 5              MR. CIVILLE:  I've asked -- I've provided a
 6   windbreaker.  I understand it's being screened.  But I just
 7   want to inquire, so I don't get -- we're not interrupted
 8   during the hearing, if there's gonna be any problem having him
 9   wear a windbreaker.
10              THE COURT:  No, I don't think so.  As long -- has
11   it already been screened?  Do we have it?
12              DEPUTY MUNA:  It's being screened right now.
13              THE COURT:  Oh, okay.  Yeah.  All right.  How
14   long will it -- how long does it take?
15              DEPUTY MUNA:  It's being conducted right now,
16   Your Honor.  It will come up once it's done.
17              THE COURT:  You want to wait until it comes?
18              MR. CIVILLE:  No, it's fine.  We can proceed,
19   Your Honor.  I assume they're going to bring it into the
20   courtroom.
21              DEPUTY MUNA:  We'll take care of it.
22              THE COURT:  Yeah.  No, I know, but the --
23              DEPUTY MUNA:  We'll give it to him once it's
24   done.
25              MR. CIVILLE:  Well, okay, but we're trying to
```

```
 1   figure out -- so -- just so long as they do it with some
 2   alacrity, Your Honor.
 3                 (Deputy Muna conferred with the Court.)
 4                 THE COURT:  All right.  There -- it should be
 5   coming up shortly, Mr. Civille.  So if your client gets too
 6   cold, then the Court will pause and then we could -- I mean,
 7   if you want to wait, we can wait for his --
 8                 MR. CIVILLE:  No, no.  We're good.  We're good.
 9                 THE COURT:  -- for his windbreaker to come in.
10   But I just understand that the marshals got it a few minutes
11   ago, as well.  I mean, if you guys would have brought it
12   earlier, of course we would have had it prepared for him even
13   this morning.  But they do have to screen it.
14                 MR. CIVILLE:  It seems like something one could
15   simply pat down, but --
16                 THE COURT:  Well, the marshals have to take, you
17   know, extreme caution in all -- and believe me, it's not just
18   Mr. Seleznev.  It's all the other defendants that come before
19   my court --
20                 MR. CIVILLE:  Thank you, Your Honor.
21                 THE COURT:  -- that we have the security issue
22   with.  And it does get cold here.
23                 All right.  So the Court is in receipt of -- and
24   I haven't had a chance to review the defendant's exhibits, but
25   am I to assume they're the same, they're similar to --
```

80

```
 1              MR. CIVILLE:  They are, Your Honor.  They are
 2    documents that we've already filed.
 3              THE COURT:  And, Ms. David, did you have an
 4    opportunity to review those?
 5              MS. DAVID:  Yes, Your Honor.  And I understand
 6    Mr. Freedman may have been informed about them, as well.
 7              THE COURT:  Okay.  Mr. Freedman?
 8              MR. FREEDMAN:  Your Honor, I received the
 9    defendant's filings from this morning, which included two
10    declarations, if that's the exhibits we're talking about?
11              MR. CIVILLE:  It is, Your Honor.
12              MR. FREEDMAN:  And if so, I have reviewed them.
13              THE COURT:  Right.  That's correct, Mr. Civille?
14              MR. CIVILLE:  Yes, Your Honor.
15              THE COURT:  Okay.  Are we ready to proceed to the
16    removal proceeding, Ms. David?
17              MS. DAVID:  Yes, Your Honor.  At this time, the
18    government calls Daniel Schwandner.
19              THE COURT:  Okay.  And just before we begin, I
20    want to be clear:  The defendant, Mr. Civille, your client,
21    has full access to his interpreter and there's no issues with
22    -- regarding communication with his interpreter and with you;
23    is that correct?
24              MR. CIVILLE:  That's a good question.  Let me
25    just confirm that, Your Honor.
```

*Case No. MJ14-00056*

```
 1                    (Pause.)

 2                    THE COURT:  Agent, you may...

 3                    (Witness took the stand.)

 4                    (Pause.)

 5                    (Mr. Civille and defendant conferred.)

 6                    MR. CIVILLE:  Your Honor, thank you for that

 7     inquiry.  Unlike the legal arguments this morning, which Ms.

 8     Collins translated as best we could as we went along, the

 9     testimony that's going to be given now, it's much more

10     important that my client understand it fully, not -- and so

11     I've asked Ms. Collins to be certain to raise her hand or

12     speak up if things are going too fast for her to translate.

13                    THE COURT:  Okay.  That's right.  And then I'll

14     just ask the agent to slow down in his responses.

15                    THE WITNESS:  Yes, Your Honor.

16                    THE COURT:  All right.  Let me just also say,

17     Mr. Civille and the court interpreter, Mr. Seleznev, do you

18     want to use the hearing aid here?  Because it is a -- you

19     know, it actually -- the understanding and the -- is a lot

20     clearer, I think.  It's not that it's necessarily a lot

21     clearer.  I mean a lot louder, I should say, to use this.  So

22     you can give this to your client as well as to -- for sure to

23     the interpreter if she needs that.  So the Court has passed

24     that on to both of them if they wish to use that.

25                    MR. CIVILLE:  Thank you, Your Honor.  They're --
```

```
 1                THE COURT:  So you want to put it on and see
 2     if --
 3                MR. CIVILLE:  They're examining the devices now.
 4                THE COURT:  So put it on like this.  I don't know
 5     if he needs to because -- unless if he can understand a little
 6     bit of English.
 7                MR. CIVILLE:  It's pretty much clear.
 8                THE COURT:  So I'll go "testing, testing."  Can
 9     you hear?  Testing, testing, test.  Okay.  You can hear.  Is
10     it a lot easier?  It's just a lot louder to hear it --
11     clearer, I think, or louder, I should say.  Okay.  In case any
12     of the interpreter or the defense needs this.
13                Also, for the record, the Court notes that the
14     United States Marshals have completed the screening of the
15     defendant's windbreaker and he now has it.  Is the defendant
16     warm enough, Ms. Interpreter?
17                (Pause.)
18                THE COURT:  Only she needs to do it if he doesn't
19     understand English.
20                MR. CIVILLE:  He can't hear the interpreter as
21     clearly.
22                THE COURT:  Okay.
23                MR. CIVILLE:  So she'll wear it, and he'll listen
24     to the interpreter.
25                THE COURT:  Okay.  Very well.  And is he warm
```

```
 1    enough?
 2                    THE DEFENDANT:  Yes.  Thank you.  (In English.)
 3                    THE COURT:  He's indicating yes?
 4                    INTERPRETER:  Yes.  Thank you.
 5                    THE COURT:  Oh.  "Yes, thank you."  I'm sorry.  I
 6    didn't hear the last few words.
 7          All right.  U.S. Attorneys' Office, Ms. David?  We
 8    have a witness.  Let me have him please stand and be sworn in
 9    by the clerk.
10                    THE CLERK:  Please raise your right hand, sir.
11                    (DAN SCHWANDNER, government witness, sworn.)
12                    THE WITNESS:  I do.
13                    THE CLERK:  Thank you, sir.  Please be seated.
14    Please state your full name and spell your last named for the
15    record.
16                    THE WITNESS:  My name is Dan Schwandner,
17    S-C-H-W-A-N-D-N-E-R.
18                    THE CLERK:  Thank you, sir.
19
20                         DIRECT EXAMINATION
21    BY MS. DAVID:
22       Q.   Sir, where do you work?
23       A.   Ma'am, I work for the U.S. Secret Service.  I am a
24    special agent.  I have been so employed since December of
25    1997, and I am currently assigned to our office in Bangkok,
```

 1 | Thailand.
 2 |     Q.   Agent Schwandner, I want to direct your attention to
 3 | July 5 of this year, 2014.  Did you happen to be in Male
 4 | Maldives on that date?
 5 |     A.   I did, ma'am.
 6 |     Q.   Okay.  And did you happen to be in the airport in
 7 | Male on that date?
 8 |     A.   Yes, ma'am.
 9 |     Q.   Okay.  In front of you, sir, is an exhibit binder.
10 | If you can take a look at Exhibits 1, 2 and 3 and, for the
11 | record, identify each one.
12 |     A.   Yes, ma'am.  Exhibit 1 is a warrant for the arrest of
13 | Roman Seleznev issued by the United States District Court in
14 | the Western District of Washington.  Exhibit No. 2 is a grand
15 | jury indictment issued by the grand jury for Roman Seleznev.
16 | And Exhibit No. 3 is the Red Notice issued by INTERPOL for
17 | Defendant Roman Seleznev.
18 |     Q.   And did you have copies of these three exhibits with
19 | you on July 5th of 2014?
20 |     A.   I did, ma'am.
21 |     Q.   Okay.  And directing your attention to Exhibit 3,
22 | which you identified as a Red Notice for a -- a Mr. Seleznev.
23 | For the record, can you explain what a Red Notice is?
24 |     A.   Yes, ma'am.  A Red Notice is issued by INTERPOL,
25 | which is a multi-national police cooperating agency that is

```
 1   designed particularly to induce the cooperation of nations
 2   when it comes to conducting investigations.  So a Red Notice
 3   --
 4              INTERPRETER:  Excuse me.
 5              THE COURT:  Slow down?
 6              INTERPRETER:  A little bit slower, please.
 7              THE WITNESS:  A Red Notice in particular is
 8   issued by INTERPOL to request the assistance of identifying a
 9   defendant or a suspect regarding an investigation currently
10   being conducted, or a wanted person.
11              THE COURT:  Okay.  Hold on a second.  We'll wait
12   until she completes.  All right.  Next question.
13   BY MS. DAVID: (CONTINUING)
14      Q.   By INTERPOL, do you also mean like the international
15   police?
16      A.   Yes.
17      Q.   And is the Maldives also a member of this INTERPOL?
18      A.   Yes, ma'am.  To my knowledge, there are approximately
19   190 members of INTERPOL, of which the Maldives is a member.
20      Q.   What is --
21              THE COURT:  Hold on, hold on.  Ms. David, maybe
22   you can just turn back and forth while she's explaining.
23   Okay.  Go ahead.
24              (Pause.)
25   BY MS. DAVID: (CONTINUING)
```

*Case No. MJ14-00056*

1    Q.    What was your purpose for going to the Maldives and
2    being at the airport on July 5th of this year with Exhibits 1,
3    2 and 3?

4    A.    My purpose of being there was, I was asked on behalf
5    of my headquarters to travel to the Maldives because there was
6    a belief that the defendant, Roman Seleznev, may be located in
7    the Maldives.  So my purpose was to work with our diplomatic
8    partners in the U.S. State Department and our partners in law
9    enforcement in the Maldivian authorities -- basically a
10   two-fold purpose:

11            One was to inquire of the Maldivian authorities
12   whether we could get confirmation that Mr. Seleznev was indeed
13   in the Maldives, and two, if the U.S. Secret Service presented
14   the government of the Maldives with the Red Notice request,
15   what our options would be regarding the possible turning over
16   of Mr. Seleznev to U.S. authorities.

17   Q.    Okay.  Sir, if you could take a look at Exhibit 3,
18   which you identified as the Red Notice.  Generally, what
19   information is reflected on that form?

20   A.    Well, the Red Notice is always going to have the
21   identifying particulars of the person in question, such as the
22   name, the -- potentially the date of birth if it's known, a
23   photo if it's available, the nationality of the person if it's
24   available, any type of aliases that the person may have if
25   known; also, things such as their occupation, their marital

87

```
 1   status, languages spoken, any type of identity documents that
 2   could be verified, such as passport numbers.  And it will also
 3   give a description of the offenses that have occurred and the
 4   districts that they've occurred and the jurisdictional venue
 5   of where the arrest warrant and the indictment was issued.
 6       Q.   So Exhibits 1, 2 and 3, which you've identified, you
 7   had copies of these with you when you were in Male on
 8   July 5th; correct?
 9       A.   Yes, ma'am.
10       Q.   And you recognize them to be copies of the warrant of
11   arrest, which is Exhibit 1 --
12       A.   Yes, ma'am.
13       Q.   -- the superseding indictment, which is Exhibit 2,
14   and the Red Notice which is Exhibit 3; correct?
15       A.   Yes, ma'am.
16            MS. DAVID:  Your Honor, we move to admit these
17   three exhibits at this time.
18            THE COURT:  Defense counsels?  Exhibit 3 has
19   already been admitted --
20            MS. DAVID:  That's correct, Your Honor.
21            THE COURT:  -- in the prior hearing, as I recall.
22   The Exhibit A, pages 1 through 5.  Mr. Civille, would you
23   agree with that?
24            MR. CIVILLE:  Your Honor, actually, Exhibit 3 was
25   admitted -- was referred to in argument because it was a
```

```
 1    document that was used, but I don't think it was -- I would
 2    distinguish that from being actually admitted into evidence.
 3    But --
 4                 THE COURT:  It was identified.  You're right.  It
 5    was marked -- it was marked and identified as an Exhibit A-1
 6    through 5.
 7                 MR. CIVILLE:  And, Your Honor, just to clarify,
 8    on Exhibit 1, it is -- the second page of that document is not
 9    completed.  And am I understanding that they're representing
10    -- the government is offering this as the condition of the
11    document when it was taken to the Maldives -- the Maldives?
12    In other words, I've seen a completed version or a partially
13    completed version of the second page, so I'm -- I'm just
14    trying to inquire, is this meant to be the document as of
15    July 5th?
16                 THE COURT:  As of the date that he had it in his
17    possession?
18                 MR. CIVILLE:  Yes, Your Honor.
19                 THE COURT:  Right.  You see the second page?
20                 THE WITNESS:  Yes.  Yes, sir.  This is the
21    document that was in my possession on July the 5th.
22                 THE COURT:  So no information provided on that --
23                 THE WITNESS:  On page 2?
24                 THE COURT:  Right.
25                 THE WITNESS:  No, ma'am.
```

```
 1              THE COURT:  That's correct?

 2              THE WITNESS:  That is correct.

 3              MR. CIVILLE:  Okay.  Thank you, Your Honor.  No

 4    objection, Your Honor.

 5              THE COURT:  All right.  For -- Exhibits 1, 2 and

 6    3 are all admitted without objection.

 7              (Exhibits 1, 2 and 3 admitted.)

 8    BY MS. DAVID:  (CONTINUING)

 9       Q.   So did there come a time --

10              MR. CIVILLE:  I'm sorry, Your Honor.  Let me --

11    because the Court has allowed us to preserve our

12    jurisdictional argument --

13              THE COURT:  Mm-hmm.

14              MR. CIVILLE:  -- um, you know, for identification

15    purposes only, we do not object.  We accept that these were

16    the documents that they took, as far as it goes.

17              THE COURT:  Okay.  For purposes of this removal

18    hearing, then, the Court is admitting these Exhibits 1, 2 and

19    3 without objection.

20              MR. CIVILLE:  Thank you.

21              THE COURT:  All right.  Go ahead.

22    BY MS. DAVID:  (CONTINUING)

23       Q.   Agent Schwandner, approximately what part of the day

24    on July 5th were you at the Male airport?

25       A.   I believe I arrived at the Male airport shortly after
```

1     9 a.m. on the morning of July 5th.

2         Q.   And did -- that morning, did you have an occasion to

3     meet up with an individual later identified to you as a Roman

4     Seleznev?

5         A.   I did.

6         Q.   Can you explain where that encounter took place?

7         A.   Well, the encounter took place in the tourist police

8     station inside the airport in the Maldives.  The --

9              INTERPRETER:  I'm sorry.  Just one second,

10    please.

11             THE COURT:  Yes, of course.  Yeah.  So why don't

12    we do it like this.

13             (Pause.)

14             INTERPRETER:  Thank you.

15             THE COURT:  So I think what we'll do is -- so

16    I'll ask Agent Schwandner -- so, you know, just break it down,

17    like part of your sentence, a little slower, then just wait,

18    let her interpret, and then come back and continue on.  Okay?

19             THE WITNESS:  Yes, Your Honor.

20             THE COURT:  We can do that.  Just -- it'll make

21    it easier, instead of getting the interruptions.

22             THE WITNESS:  Thank you, Your Honor.

23             THE COURT:  All right.  So you arrived at

24    9:25 a.m.?

25             THE WITNESS:  Approximately.  It was probably

```
 1    shortly after 9 a.m., Your Honor.

 2              THE COURT:  Okay.  After 9 a.m.  Okay.  You may

 3    proceed.

 4              THE WITNESS:  So --

 5    BY MS. DAVID:  (CONTINUING)

 6       Q.  If you can continue, sir.

 7       A.  Right.  At approximately 10:20 a.m., the Maldivian

 8    tourist police brought Mr. Seleznev and his traveling party

 9    into the tourist police station, where he was asked by Special

10    Agent in Charge, Iacovetti, if he would please take a seat on

11    the sofa.  His traveling party was asked by the Maldivian

12    authorities to go into the back room of the police station.

13    And at this time, the Maldivian authorities confirmed that --

14    their -- their concern in looking at the Red Notice was to

15    ensure the identity of Mr. Seleznev.  So at that moment, they

16    told me that they indeed had confirmed, based on the Red

17    Notice, that the defendant's name, his identifying birthmark,

18    his passport number, matched those in the Red Notice, and the

19    Maldivian authorities then told me that they were confident

20    that this was the person that was listed in the Red Notice.

21              So at that moment, with Mr. Seleznev sitting on the

22    sofa, I approached the defendant and I asked the defendant if

23    he was Roman Seleznev, and his response was, "Yes, I am."

24       Q.  And at that time, did you have an opportunity to also

25    review, for example, travel documents related to that
```

```
1   individual?
2       A.   Yes, ma'am, I did.  After I introduced myself to the
3   defendant, I told him who I was, who I worked for.  I told him
4   the purpose of my being there.  I showed him a copy of the
5   indictment and the arrest warrant.  And the defendant had a
6   bag that he was carrying on his shoulder that the police
7   authorities then took from him, and then inside that bag were
8   several travel documents relating to the defendant's trip.
9       Q.   And when you say "travel documents," generally, what
10  sort of travel documents?  You mentioned passport --
11      A.   Boarding pass, itineraries, receipts for tickets,
12  names of travelers.  I believe his departure card from the
13  Maldives was also there.
14               THE COURT:  Slow down a little bit.
15               THE WITNESS:  Sorry, Your Honor.
16               THE COURT:  Just be a little -- just watch the
17  defendant and the interpreter so she can interpret.
18               Okay.
19  BY MS. DAVID:  (CONTINUING)
20      Q.   Sir, can you take a look at Exhibit 4-A and identify
21  that for the record?
22      A.   Yes, Exhibit 4-A is a copy of the defendant's Russian
23  federation passport that was in his possession when he arrived
24  at the tourist police station in the Maldives.
25      Q.   And can you identify for the record the passport
```

1   number for this document?

2       A.   The passport number is 64 November 0410831.

3       Q.   So when you reference November, are you -- do you

4   mean the letter N?

5       A.   The letter N; yes, ma'am.

6       Q.   Where on that document would, for example, the

7   biographical data be located?

8       A.   Well, the defendant's biographical data would be

9   listed -- I have to look.

10          THE COURT:   I'm sorry.   Can you just -- what was

11  the passport number again?

12          THE WITNESS:   I'm sorry.   I have to look again.

13          The biographical data page lists the defendant's

14  name as Roman Seleznev.   Passport No. 64 N0410881.   But it's

15  N-O, actually, so I don't know if that's supposed to be

16  number.

17  BY MS. DAVID:

18      Q.   Sir, do you mean 0831?   As the last three digits?

19          MR. CIVILLE:   Your Honor, if I -- I lost -- I

20  missed what page Ms. Marivic is referring to -- Ms. David is

21  referring to.   Sorry.

22          THE COURT:   Let's see.   What page is he -- I

23  think he's Exhibit 4, but what page is he referring to in

24  Exhibit 4?   Agent?

25          THE WITNESS:   It's 4-A, 21, Your Honor.

```
 1                    THE COURT:  Oh, 21.

 2                    THE WITNESS:  At the top right-hand corner, the

 3      biographical page, the passport number is 640410831.

 4                    MS. DAVID:  Your Honor, that would be the last

 5      page.

 6      BY MS. DAVID:  (CONTINUING)

 7          Q.   Is that the last page of the exhibit, sir?

 8          A.   Yes, ma'am.

 9                    THE COURT:  So for the record, 4-A is pages 4-A,

10      1 through 21.  Okay.

11      BY MS. DAVID:  (CONTINUING)

12          Q.   On that last page for the biographical data, you

13      mentioned the name of the passport holder.  Is there also a

14      photograph?

15          A.   Yes, ma'am, there is a photograph.

16          Q.   Okay.

17                    INTERPRETER:  Excuse me.  I did not hear the

18      question.

19                    THE COURT:  Okay.  Repeat the question, please.

20      Go ahead, Veronica.  What's the last question?

21                    (Ms. David proceeded to repeat question.)

22      BY MS. DAVID:  (CONTINUING)

23          Q.   Sir, on the biographical data page of that

24      passport --

25                    THE COURT:  All right.  She's going to repeat it.
```

```
 1   Never mind.
 2   BY MS. DAVID:  (CONTINUING)
 3        Q.    -- is there also a photograph?
 4        A.    Yes, ma'am, affirmative.  There is a photograph.
 5        Q.    And did that photograph match the person who
 6   identified himself to you as Roman Seleznev?
 7        A.    Yes.
 8              MR. CIVILLE:  Objection, Your Honor.  Calls --
 9   speculation on the part of this witness.  That's really a
10   decision for Your Honor to make.
11              THE COURT:  Did he indicate to you that that was
12   his name, Roman Seleznev?
13              THE WITNESS:  Yes, Your Honor.  That was the
14   first question that I asked him.  When he -- when I approached
15   him, I asked him if he was Roman Seleznev, and he responded,
16   "Yes."
17              THE COURT:  Okay.  All right.  Overruled.  Go
18   ahead.
19   BY MS. DAVID:  (CONTINUING)
20        Q.    Sir, you had a chance to peruse through the pages of
21   this passport; correct?
22        A.    Yes, ma'am.
23        Q.    I want to direct your attention to what is the fourth
24   page of this exhibit.
25              THE COURT:  Is that 4-A-4?  Is that what you're
```

96

```
 1   looking at?

 2                  MS. DAVID:  Yes, Your Honor.

 3                  THE COURT:  Okay.

 4   BY MS. DAVID: (CONTINUING)

 5       Q.   Are you there, sir?

 6       A.   Yes, ma'am.

 7       Q.   Okay.  On the left page of that passport, do you

 8   recognize the information reflected on that page?

 9       A.   At the top, it looks like an arrival and departure

10   stamp.  At the bottom of the page, I recognize the arrival and

11   departure stamp for a visit to Singapore.

12       Q.   And what dates are reflected on that stamp?

13       A.   It appears that the defendant arrived in Singapore on

14   7 April 2010 and departed on 9 April 2010.

15       Q.   Agent Schwandner, you mentioned in addition to this

16   travel document, there were other documents you saw at the

17   airport.  Could you take a look, please, at Exhibit 5-A.

18       A.   Yes, ma'am.

19       Q.   Had you seen -- what is 5-A?

20       A.   5-A is the -- is an additional passport that was in

21   the possession of the defendant.  It was located in the travel

22   bag that he was carrying with him.

23       Q.   And is there also a photograph page in this exhibit,

24   and can you identify what page for the record?

25       A.   Yes, ma'am.  It's Exhibit 5-A-3.  It shows the
```

1    photograph of the defendant, Roman Seleznev.

2        Q.   What, if any, similarities did you find comparing the

3    Red Notice, which is Exhibit 3, and these travel documents

4    that you just identified, Exhibits 5-A and/or Exhibit 4-A?

5        A.   Well, ma'am, the --

6             MR. CIVILLE:   Your Honor, if that question is

7    directed at the photograph in Exhibit 5-A-3, then we make the

8    same objection as to the earlier photograph, that the witness

9    isn't -- it's just speculation on his part.   It's really an

10   issue for your court -- Your Honor to decide.

11            THE COURT:   All right.

12            MS. DAVID:   I'm not asking him in particular of

13   the photograph.   I'm asking him what, if any, similarities he

14   found with these three exhibits.

15            THE COURT:   Okay.   Overruled.   Go ahead.

16            THE WITNESS:   Well, the passport numbers matched

17   the Red Notice to the passport numbers that were in the

18   possession of the defendant at that time.

19   BY MS. DAVID:   (CONTINUING)

20       Q.   And which passport number are you referring to?

21       A.   I'm referring to his international passport, which is

22   Exhibit 4-A.

23       Q.   Okay.

24       A.   So that would have been the Passport No. 640410831.

25       Q.   And where on the Red Notice document is that

1   information reflected?

2       A.   Page 32, identity documents, Russian Passport

3   No. 640410831.

4       Q.   So in -- you're saying -- are there any other

5   similarities other than the passport number that you just

6   mentioned?

7       A.   Well, aside from the photograph, the identifying

8   marks of the defendant's mole underneath his left eye, his

9   name matched, and, obviously, the country of origin.

10      Q.   Okay.  And when you talked about distinguishing marks

11  or characteristics, where is that reflected on the Red Notice

12  document, sir?

13              INTERPRETER:  I'm sorry.

14              THE WITNESS:  It's on page 3-2, distinguishing

15  marks and characteristics.

16              THE COURT:  I'm sorry.  What is it,

17  Ms. Interpreter?

18              INTERPRETER:  Could you please repeat the last

19  question?

20              THE COURT:  Repeat the last question.

21  BY MS. DAVID:  (CONTINUING)

22      Q.   With respect to distinguishing marks information that

23  you just referred to, where is that referenced in the Red

24  Notice, sir?

25      A.   In the Red Notice, it is on page 3-2, above numeral

99

```
 1    2, "distinguishing marks and characteristics."  It says
 2    "Seleznev's height and weight are estimated, and he has a mole
 3    below his left eye."
 4         Q.   Do you see that person here in the courtroom today,
 5    sir?
 6         A.   I do, ma'am.
 7              MR. CIVILLE:  Objection as to when she says "that
 8    person."  You mean the person that they arrested in the
 9    Maldives?
10              MS. DAVID:  Let me rephrase, Your Honor.
11              THE COURT:  All right.  Very well.  Rephrase.
12    BY MS. DAVID:  (CONTINUING)
13         Q.   Agent Schwandner, the person who you encountered in
14    the Maldives who identified himself to you as Roman Seleznev,
15    do you see him in the courtroom today?
16         A.   Yes, ma'am.
17         Q.   For the record, can you describe what color of shirt
18    he's wearing?  And if you need to stand...
19              THE COURT:  You may step down.
20              THE WITNESS:  May I step down, Your Honor?
21              THE COURT:  You may.  You may.
22              (Witness stepped down from stand and walked up to
23    defense table.)
24              THE COURT:  Why don't you give him a mic, Carm,
25    just in case there's additional --
```

```
 1                THE WITNESS:  It appears the defendant is wearing

 2     a blue shirt and blue jacket.

 3                THE COURT:  Hold on a second, Agent.  Why don't

 4     you speak on that mic right next to you right there.

 5                THE WITNESS:  It appears the defendant is wearing

 6     a blue shirt with a blue jacket.

 7     BY MS. DAVID: (CONTINUING)

 8        Q.   And, sir, the person that you just identified, do you

 9     see that distinguishing mark you just referenced earlier?

10        A.   Yes, ma'am.

11        Q.   And what would that be?

12        A.   The defendant has a mole below his left eye.

13        Q.   If you can go back to the witness stand.

14        A.   (Witness complied.)

15        Q.   Sir, can you next take a look at Exhibit 6 for the

16     record?  And have you seen that before?

17        A.   Yes, ma'am.

18        Q.   Can you explain what it is and where you saw it

19     before?

20        A.   It is a departure card.  So that's a two-part -- when

21     you arrive in a country, some countries have arrival and

22     departure cards.  So they collect the arrival card at the time

23     you arrive, and you hold onto the departure card and then it's

24     taken from you as you pass through Immigration when you're

25     clearing Immigration as you're departing the country.  So in
```

1    this instance, it's a departure card from the country of the

2    Maldives.

3        Q.    And is there any stamp reflected on this exhibit?

4        A.    Yes, ma'am.

5        Q.    And what is it -- what information is --

6        A.    The stamp is Maldivian immigration stamp of 21 June

7    2014, which indicates the day of arrival.

8        Q.    And where did you --

9                MR. CIVILLE:  Wait.  I'm sorry.  Your Honor, I

10   object to that, too.  The witness has testified it's a

11   departure stamp, a departure card, and now he's testifying

12   that the June 21 stamp is actually an arrival date.  And I

13   don't think the witness has been shown to have any -- the

14   foundation for making that jump.

15               THE COURT:  Okay.  So the objection is lack of

16   foundation?

17               MR. CIVILLE:  Yes, Your Honor.

18               THE COURT:  Sustained.  You want to build a

19   foundation?

20   BY MS. DAVID: (CONTINUING)

21       Q.    Sir, you indicated that you are currently stationed

22   in the Bangkok resident office --

23       A.    Yes, ma'am.

24       Q.    -- correct?

25               So part of your duties -- does it include a lot of

1  travel?

2      A.   Yes, ma'am.

3      Q.   Like how many ports -- international airports, for

4  example, have -- approximately, have you visited while you

5  were in that region?

6      A.   I have visited probably approximately ten

7  international airports in the Asia-Pacific region in the past

8  two years.

9      Q.   And have you yourself, for example, had to fill out

10  arrival/departure cards of countries and airports you visited?

11      A.   Yes, ma'am.  And I filled this card out myself when I

12  arrived in the Maldives on July the 3rd.  That's how I knew

13  that that was the date of arrival, because they stamped "3

14  July" on my card.

15      Q.   So Exhibit No. 6 -- when you reference June 21, 2014,

16  as a stamp of arrival date, that's consistent with your

17  experience traveling to the Maldives yourself; correct?

18      A.   Yes, ma'am.  It's also consistent with the

19  information that was provided to us by the Maldivian

20  authorities.

21      Q.   And where did you see a copy of Exhibit 6?

22      A.   I believe it was with his passport.

23      Q.   And when you say "passport," are you referring to the

24  passport listed as 4-A?

25      A.   Yes, ma'am.

103

```
 1        Q.   You mentioned earlier that you also saw

 2   travel-related documents in connection with Mr. Seleznev.  Can

 3   you take a look at Exhibit 7-A?

 4        A.   Yes, ma'am.

 5        Q.   Have you seen this exhibit before?

 6        A.   Yes, ma'am.

 7        Q.   And where?

 8        A.   These are the documents that were found in the travel

 9   bag that was contained -- that the defendant had on his

10   shoulder.  Inside the bag where these itineraries, receipts,

11   boarding passes.

12        Q.   And when you talk about itinerary, are you referring,

13   sir, to Exhibit 7?

14        A.   Exhibit 7; yes, ma'am.

15        Q.   7-A?

16        A.   Yes, ma'am.

17        Q.   And when you're referencing a boarding pass, are you

18   referring to Exhibit 8?

19        A.   Yes, ma'am.

20             MR. CIVILLE:  Your Honor, if I may interject at

21   this point.  We'd like to preserve an objection.  My

22   understanding of the case law, Your Honor, is that as a

23   removal proceeding, although it was appropriate for us to

24   raise the issue of jurisdiction, it would not be appropriate

25   for us to raise a substantive challenge such as a motion to
```

```
 1    suppress.  So we would ask the Court to note simply an ongoing
 2    objection to any -- the admission of any evidence or the
 3    testimony of any documents that were taken from our client in
 4    the Maldives because we believe those are properly subject
 5    later on to a motion to suppress.
 6                THE COURT:  All right.  So you want to preserve
 7    your --
 8                MR. CIVILLE:  Yes, Your Honor.
 9                THE COURT:  -- right to have a motion to suppress
10    heard before the indicting court?
11                MR. CIVILLE:  That's right.
12                THE COURT:  So noted.
13                MR. CIVILLE:  And I won't keep making the same
14    objection, but I'd like to -- I'd ask the Court for a
15    continuing objection.
16                THE COURT:  All right.  The Court will accept
17    that as a continuing objection, anything related to --
18    specifically --
19                MR. CIVILLE:  Any evidence or, actually, any
20    statements by our client.
21                THE COURT:  All right.  Very well.
22                MR. CIVILLE:  Thank you.
23                THE COURT:  The Court will preserve that
24    objection for you.
25                You may proceed.
```

*Case No. MJ14-00056*

```
 1              MS. DAVID:  Your Honor, the government at this
 2    time, noting counsel's objection, moves to admit Exhibit 4-A,
 3    which is the passport identified with the last three digit
 4    number 831.
 5              THE COURT:  Okay.  Let me just make sure, before
 6    we do that -- before you go into the other exhibits, I just
 7    want to make sure we're on record in terms of the number of
 8    pages.  With regard to Exhibit 1 that has already been
 9    previously admitted, there's only two pages; is that correct?
10              MS. DAVID:  That is correct, Your Honor.
11              THE COURT:  And then Exhibit 3 is the superseding
12    indictment that has been sealed and -- that has not been
13    unsealed, has it?  I see "sealed" there.
14              MS. DAVID:  No, it has been unsealed, Your Honor.
15              THE COURT:  It has been unsealed?  So that is
16    pages 1 through 27; correct?
17              MS. DAVID:  Actually, for the record, Your Honor,
18    Exhibit 1 is the two-page arrest warrant.  Exhibit 2 --
19    correct, Your Honor -- is the 27-page indictment.
20              THE COURT:  Okay.  And then Exhibit 3 is marked
21    as 3 and then all the way up to 3-5.  So there's five pages,
22    right?
23              MS. DAVID:  That is correct, Your Honor.
24              THE COURT:  All right.  Then Exhibit 4, you're
25    moving to admit -- moving for admission of Exhibit 4, which is
```

```
 1    the passport, and that has four -- just for -- 4-A to 4-A-21?

 2              MS. DAVID:  That is correct, Your Honor.

 3              THE COURT:  Okay.  What else?

 4              MS. DAVID:  Also, I move to admit Exhibit 5-A.

 5    That also has multiple pages.

 6              THE COURT:  Okay.  So for the record, that's 5-A

 7    through -- is it 5-12?

 8              MS. DAVID:  That's correct, Your Honor.

 9              THE COURT:  So 5-A through 5-12, okay.

10              MS. DAVID:  The Maldives department -- departure

11    card identified as Exhibit 6.

12              THE COURT:  Which has one page.  Okay.

13              MS. DAVID:  The itinerary identified as

14    Exhibit 7-A.

15              THE COURT:  Consisting of three pages -- two

16    pages.

17              MS. DAVID:  Two pages, Your Honor.

18              And the boarding pass identified as Exhibit 8.

19              THE COURT:  All right.  Okay, Counsels.  Just --

20    you just want to preserve your objections?

21              MR. CIVILLE:  Yes, Your Honor.

22              THE COURT:  All right.  Very well.  For purposes

23    of the suppression.

24              All right.  So the Court will admit Exhibit 4 in

25    its entirety, from 4-A to 4-21.  The Court will also admit 5-A
```

```
 1   to 5-12.  The Court also admits, for the record, Exhibit 6,
 2   which is -- consists of one page; Exhibit 7, from 7-A to
 3   7-A-2.  So there's two pages there.  And then, also, Exhibit 8
 4   is admitted.  And the Court notes the objection already raised
 5   by defense counsel.
 6                  (Exhibits 4, 5, 6, 7 and 8 admitted.)
 7                  THE COURT:  Okay.
 8   BY MS. DAVID: (CONTINUING)
 9      Q.   Agent Schwandner, if you can compare Exhibit 7-A and
10   Exhibit 8, can you tell what airline information is reflected
11   on both these exhibits?
12      A.   On Exhibit 7-A, it looks like a receipt from
13   Transaero Airlines, and Exhibit 8 is a boarding pass from
14   Transaero Airlines for Mr. Roman Seleznev from Moscow to Male.
15      Q.   Okay.  Showing an arrival date of what?
16      A.   21 June.
17                  MS. DAVID:  May I have a moment, Your Honor?
18                  THE COURT:  You may.
19                  (Pause.)
20                  MS. DAVID:  Your Honor, may I inquire if my
21   colleague, Mr. Freedman, has any questions at this time for
22   the agent?
23                  THE COURT:  Mr. Freedman, yes.
24                  MR. FREEDMAN:  I do not.  Thank you.
25                  THE COURT:  No questions.
```

108

```
 1              MS. DAVID:  Um, I have no questions at this time,
 2    Your Honor, for Agent Schwandner.
 3              THE COURT:  Okay.  Mr. Civille, any questions?
 4              MR. CIVILLE:  Yes, Your Honor.
 5              THE COURT:  Okay.  You may proceed.
 6
 7                        CROSS-EXAMINATION
 8    BY MR. CIVILLE:
 9        Q.   Agent Schwandner, I'm Patrick Civille.  I'm counsel
10    for Mr. Seleznev.
11              Turning to Exhibit 2, the superseding indictment,
12    apparently issued on March 16, 2011.  Let me ask you, sir,
13    were you involved in any way in the presentment of evidence --
14    in presenting evidence to that grand jury that returned that
15    indictment?
16        A.   I was not, sir.
17        Q.   Okay.  Were you involved in the investigation that
18    led up to the issuing of that superseding indictment?
19        A.   I was not, sir.
20        Q.   Okay.  Listening to your testimony, I had the
21    impression that your first involvement in anything involving a
22    person named Roman Seleznev was shortly before you went to the
23    Maldives in July of this year; is that correct?
24        A.   I initially became aware of the defendant in 2012,
25    also, while I was working in the Bangkok office.
```

```
 1      Q.   Okay.  And when you say "became aware of," knew that

 2   there was a warrant out for somebody named Roman Seleznev?

 3      A.   Yes, sir.

 4      Q.   Were you -- did -- were you -- other than knowing --

 5   having that general information, were you involved at all in

 6   2012 in the investigation into Roman --

 7      A.   As far as the facts of the indictment, sir?

 8      Q.   Yes.

 9      A.   No, sir.

10      Q.   Okay.  Or into the -- any efforts to pursue Roman

11   Seleznev?

12      A.   In December of 2012, yes, sir.

13      Q.   Okay.  And what was your involvement then?

14      A.   I was in Bali, Indonesia.

15      Q.   And what was the nature of your involvement in Bali

16   -- and that was in December 2012?  I'm sorry.

17           MS. DAVID:  Your Honor, the government objects.

18   The purpose of this hearing is strictly identity as to the

19   individual the agent encountered at the Maldives airport.

20           THE COURT:  Okay.  Mr. Civille?

21           MR. CIVILLE:  Well, actually, that's not at all

22   correct, Your Honor.  The issue is, is the Roman Selez- --

23   Valerievich Seleznev who is here in the courtroom, is that the

24   person named in the superseding indictment.  So far, we

25   haven't heard any testimony on that, nothing to link --
```

```
 1   they've arrested a person named Roman Seleznev, and now

 2   they're asking you to believe that that's the Roman Seleznev

 3   named in the superseding indictment.  This witness so far

 4   hasn't given us any link to that.

 5              MS. DAVID:  And the government does intend to

 6   call another witness for that purpose.

 7              MR. CIVILLE:  And that's fine.  I anticipate,

 8   though, they're going to call somebody else, but they've

 9   chosen to put this witness on the stand, and I think he's fair

10   for cross-examination.

11              THE COURT:  Okay.  Overruled.  Go ahead.

12              MR. CIVILLE:  Thank you, Your Honor.

13   BY MR. CIVILLE:  (CONTINUING)

14     Q.    In Bali, sir, was that December 2012?

15     A.    December of 2012; yes, sir.

16     Q.    Okay.  And what was your -- give me a brief rundown

17   of what happened in Bali.

18     A.    It was just -- again, there -- we believed that the

19   defendant was possibly traveling in Bali at that time.  We

20   were unsure.  We, being the Secret Service, were unsure if

21   that was the case or not, and we were just making some initial

22   inquiries with the Indonesian government to potentially see.

23   So I became aware of the actual indictment and the arrest

24   warrant at that time.

25     Q.    Okay.  And did anything come of your trip to Bali?
```

111

```
 1        A.    No, sir.

 2        Q.    It didn't produce any useable information for your

 3   investigation?

 4        A.    No, sir.

 5        Q.    All right.   Then you mentioned that -- and I was a

 6   little unclear of this -- um -- okay, you got a call from

 7   headquarters in Bangkok or wherever your headquarters is -- is

 8   that --

 9        A.    Washington.

10        Q.    Washington, all right.   To head down to the Maldives.

11   I thought you said you arrived a little after 9 a.m. on

12   July 5th, but perhaps what you said was you arrived at the

13   airport.   You had actually arrived in the Maldives earlier

14   than that; is that correct?

15        A.    I did, sir.

16        Q.    Okay.   And I believe you said you arrived on

17   July 3rd.

18        A.    3 July; yes, sir.

19        Q.    Were you part of a contingency of Secret Service

20   agents or did you arrive alone?

21        A.    No, sir.   At that time, I was the only Secret Service

22   agent in the Maldives.

23        Q.    And when you got there, were there other agents

24   already in place?

25        A.    Not at that time, sir.
```

```
 1      Q.   Other agents did join you?

 2      A.   The next day, sir.

 3      Q.   And how many?

 4      A.   One, the special agent in charge from our Honolulu

 5   field office.

 6      Q.   And who is that, sir?

 7      A.   Mr. Dave Iacovetti.

 8      Q.   Okay.  And who else?

 9      A.   And Special Agent Mark Smith, the assistant regional

10   security officer from the U.S. Embassy in Columbo, Sri Lanka.

11      Q.   These are all Secret Service agents?

12      A.   No, sir.  Special Agent Iacovetti is Secret

13   Service -- Special Agent in Charge Iacovetti is Secret

14   Service.  I work for the Secret Service.  ARSO Smith works for

15   the Diplomatic Security Service, State Department.

16      Q.   So that would be -- do I have that correct, there

17   were three of you then?

18      A.   Yes, sir.

19      Q.   Okay.  Was that the entire contingent, or were you

20   joined by anybody else by July 5th?

21      A.   That was it, sir.

22      Q.   All right.  And when -- on the 3rd, did you receive

23   additional information or -- than what you -- let me back up.

24           What information did you have besides -- when you

25   arrived in the Maldives besides the superseding indictment and
```

113

```
 1   the -- if you had it at the time, the warrant?
 2        A.   That's all the information that I had.
 3        Q.   Just those two documents?
 4        A.   Those two documents, yes.
 5        Q.   And then after the -- Agent Iacovetti, who's in
 6   charge of the --
 7        A.   He's the special agent in charge of the Honolulu
 8   field office, so he supervises the entire Asia-Pacific region
 9   for the Secret Service.
10        Q.   So this was pretty much his show?
11        A.   (No response.)
12        Q.   He was in charge of this detail then?
13        A.   He was the supervisor on the ground.
14        Q.   Okay.  All right.  And when he arrived, did you
15   receive additional information?
16        A.   No, sir.  Not at that time.
17        Q.   All right.  Did you have contact with the Maldivian
18   authorities when you arrived on July 3rd?
19        A.   I did not.
20        Q.   After -- how about on July 4th?
21        A.   July 4th, yes, sir.
22        Q.   Okay.  What contact did you have with the Maldivian
23   authorities on July 4th?
24        A.   We met with the Maldivian authorities on July 4th.
25   Again, as I told the assistant U.S. attorney, our purpose in
```

```
 1   the Maldives was simply to ascertain information.  We believed
 2   that the defendant was possibly in the Maldives.  We were
 3   asking the Maldivian authorities to assist us in determining
 4   whether Roman Seleznev was indeed in the Maldives; and, two,
 5   if we provided the Maldivian authorities with a INTERPOL Red
 6   Notice, would they consider action on their part or what
 7   options would they consider then to potentially turn the
 8   defendant over to U.S. authorities.
 9       Q.   All right.  And which authority -- the Maldivian
10   authorities you're talking about, which -- who are they?
11       A.   These are police authorities that we met with on the
12   4th of July.
13       Q.   I didn't hear that.  The --
14       A.   Police authorities.
15       Q.   -- police -- thank you.
16            Is that like a -- do you know, is it a national
17   police?  You mentioned the airport police.  What level police
18   authority was this?
19       A.   I believe they -- I wouldn't say for certain, sir,
20   but I believe they were the Maldivian national police force.
21       Q.   You said that you had reason to believe --
22            INTERPRETER:  Excuse me.
23            MR. CIVILLE:  I'm sorry.
24            INTERPRETER:  Uh -- the defendant...
25            (Mr. Civille consulted with interpreter.)
```

115

```
 1              MR. CIVILLE:  I'm sorry, Your Honor.  The -- Your
 2   Honor, in a few minutes, I'm going to ask -- I always have
 3   translators say this, "I'm fine.  I'm fine."  But, actually,
 4   translating is really exhausting --
 5              THE COURT:  Sure.
 6              MR. CIVILLE:  -- and it leads to a lot of errors.
 7   And I'd ask the Court in a few minutes if we could take just a
 8   ten-minute break for the translator.
 9              THE COURT:  Sure.  Okay.
10              MR. CIVILLE:  Thank you.
11   BY MR. CIVILLE: (CONTINUING)
12     Q.   Okay.  Going back to the -- I'm sorry.  I think your
13   last answer was, not to hold you to it, but you thought it was
14   some kind of national police force?
15     A.   Yes, sir.
16     Q.   And was this in a -- just for -- so it wasn't at the
17   airport?  It was somewhere downtown?
18     A.   It was in Male.
19     Q.   You mentioned that you went there just on -- the
20   information you had is you thought that a person named
21   Seleznev was going to be there in the Maldives.  Is that
22   right?
23     A.   Well, I mean, I had the previous information that I
24   knew of the indictment and the arrest warrant.
25     Q.   Okay.
```

1    A.    So I was familiar with the case.  So the knowledge
2    that I went there with was, yes, there was the potential that
3    Roman Seleznev was present in the Maldives, but I did not have
4    any confirmation at the time that I met with the police on
5    July 4th.
6    Q.    And what was the source of the information that you
7    -- that --
8    A.    I received the information from my headquarters, sir.
9    I do not know where they received the information from.
10   Q.    Very good.  Thank you.
11         So you went and had the meeting with the Maldivian
12   police, possibly the national police.  How did they respond to
13   your inquiry?
14   A.    Well, on the first part of the inquiry is what we
15   were looking -- seeking confirmation that Roman Seleznev was
16   in the Maldives.  The police confirmed through immigration
17   records that a Roman Seleznev matching the passport number was
18   present in the Maldives and did arrive on the 21st, I believe
19   it was, of July.
20   Q.    And as to the second part of your inquiry?
21   A.    We'd asked, of course -- my second part of my inquiry
22   was, if we were able to present the authorities with a Red
23   Notice, would any action be considered or any potential action
24   be considered on the part of the Maldivian authorities to turn
25   the defendant over to U.S. authorities, and we did not receive

1   any answer on that day.  We were not given any specific

2   information by the Maldivian authorities as to whether they

3   would or would not at that time.

4       Q.    Did they indicate to you that they would have to seek

5   authority from a Maldivian court?

6       A.    They did not.

7       Q.    Do you know as to -- did you receive -- subsequently

8   receive information that they had sought authority from a

9   Maldivian court?

10      A.    No, sir.

11      Q.    Okay.  All right.  What was your next step, then?

12  You had this meeting that was, I gather, inconclusive as least

13  as to the question of --

14      A.    Well, like I said, it was --

15      Q.    -- would they honor a Red Notice.

16      A.    Correct.  So the next step was -- I believe it was

17  late -- late in the evening on July 4th in Male.  They

18  indicated that the -- the police asked us if we would present

19  or give them a copy of the Red Notice.  That was their

20  request.

21      Q.    Now, at that time, am I correct, you did not have a

22  Red Notice yet?

23      A.    The Red Notice was ready to go.  The Secret Service

24  was prepared to send out the Red Notice through INTERPOL,

25  through our INTERPOL liaison.  So we were prepared to do that,

1    but we as of yet had not released the Red Notice.

2         Q.   The Red Notice, for those of us who don't deal with

3    these things, it is -- and that's Exhibit 3.  It bears at the

4    top right-hand corner a stamp that appears to be a red stamp,

5    hence the term, perhaps.  But it appears to be the stamp of

6    INTERPOL?

7         A.   Yes, sir.

8         Q.   Okay.  But the notice itself is -- do I understand

9    that was prepared by the Secret Service?

10        A.   The Secret Service has a liaison officer assigned to

11   INTERPOL in Lyon, France.  They also have a liaison officer in

12   Washington, D.C., as I believe most federal law enforcement

13   agencies do.

14        Q.   All right.  And --

15        A.   So I wouldn't be -- as far as the source of the

16   notice, the source of the notice is actually from INTERPOL.

17   INTERPOL sends out the notice.

18        Q.   All right.  But the information in the Red Notice,

19   that's strictly provided by, in this case, the United States?

20        A.   Yes.

21        Q.   I think what I was trying to confirm is that there's

22   no independent verification of this information by INTERPOL as

23   a separate entity.  This is information that -- the United

24   States sends this information, prepares the Red Notice or

25   prepares the information, and then INTERPOL issues it; is that

1    right?

2         A.    To my knowledge, yes, sir.

3         Q.    Okay.  The date on the INTERPOL notice at the top --

4    and that's on first page of Exhibit 3 -- is July 5th.  And

5    would I be correct in saying that's the day you received it?

6         A.    Yes.  The actual Red Notice was released at 10 p.m.,

7    Eastern Standard Time, Washington time, on July 4th, but that

8    would have been early morning hours in Lyon, so that's why

9    it's 5 July.  It was actually issued at 7 a.m., local time, in

10   the Maldives on July 5th.

11        Q.    That's what's confusing me.  When you say -- if it's

12   issued by INTERPOL --

13        A.    The Secret Service, through our liaison to

14   INTERPOL -- this is the way my understanding is.  The Secret

15   Service, through our liaison to INTERPOL, was asked to release

16   the Red Notice at 10 p.m., Eastern Time, Washington time, on

17   the 4th of July.  When it was released, that would have been

18   early morning, probably 3 a.m. in Lyon, France, which is where

19   INTERPOL headquarters are, and it was 7 a.m. on Saturday,

20   July 5th in the Maldives.

21        Q.    Did you have any input into the contents of the Red

22   Notice?

23        A.    I did not.

24        Q.    Turning to Exhibit 6; this is the departure stamp

25   from the Maldives?

```
1        A.    Departure card.

2        Q.    I'm sorry.  You got me.  Departure card.

3        A.    Yes, sir.

4        Q.    And your testimony, if I understood it, is that the

5    June 21st stamp on the departure card is an arrival date.

6        A.    Yes, sir.  That's to my -- best of my knowledge.

7    They also stamped my card when I arrived.

8        Q.    All right.  And -- I'm sorry.  When you left, they

9    stamped your card again?

10       A.    When they left, I don't know if they stamped my card.

11   They took the card, and that was it.

12       Q.    Okay.  All right.  And there's no departure stamp

13   that you're aware of on this card?

14       A.    I do not see that.

15       Q.    Okay.  Was this card in Mr. Seleznev's possession

16   when you arrested him?

17       A.    I did not arrest him in the Maldives.  I did not

18   arrest him in the Maldives, sir.

19       Q.    What is it that you think you did to him?

20       A.    I arrested him when he landed in Guam.

21       Q.    All right.  Well, let's walk through that for a

22   moment.  So your testimony is that he was escorted or shown

23   into the tourist police station room?

24       A.    That is correct.

25       Q.    Okay.  And there, he was met by the three members of
```

```
 1   your team?
 2       A.   That is correct.
 3       Q.   Okay.  And you asked him if his name was Roman
 4   Seleznev?
 5       A.   I did ask him that.  Yes, sir.
 6       Q.   And at that point, that was -- you didn't -- did you
 7   show him any documents at that point or did you simply ask
 8   him --
 9       A.   Well, my first question was, what is his name.
10       Q.   Pardon me?
11       A.   My first question was, "Are you Roman Seleznev?"
12       Q.   All right.  And from that moment, was Mr. Seleznev
13   ever out of your custody before he arrived on Guam?
14       A.   At that moment, Mr. Seleznev was not technically in
15   my custody.  He was still in the custody of the Maldivian
16   authorities at that time.
17       Q.   Well, had he been arrested by the Maldivian
18   authorities?
19       A.   I don't know if I could clarify or speak for the
20   Maldivian authorities as to what his status was, sir.  All I
21   can tell you is what the Maldivian authorities told me.
22       Q.   What did they tell you?
23       A.   They told me or informed me on the morning of
24   Saturday, July 5th, that they were comfortable with detaining
25   Mr. Seleznev based on the INTERPOL Red Notice as long as they
```

122

```
 1   could verify to their satisfaction that the information
 2   contained on the Red Notice matched that of the defendant.
 3       Q.   Did you see any documentation that they had -- the
 4   Maldivian police had detained him?
 5       A.   I also -- just if -- if I also may add further that
 6   they told me on the morning of the 5th that the decision to
 7   undertake this procedure was made at the highest levels of the
 8   Maldivian government.  But I was not privy to any internal
 9   discussions as to who was involved.  I do know the president
10   of the Maldives issued a statement following this operation
11   where he very clearly stated that the -- that the defendant
12   was not arrested or no foreign agents arrested the defendant
13   on Maldivian soil, that this was a -- a operation conducted by
14   Maldivian law enforcement and under the control of Maldivian
15   law enforcement.
16       Q.   Do you know how Mr. Seleznev arrived at the airport?
17       A.   It is my understanding that he arrived via bus.  I
18   was in the tourist police station, so I can't confirm.
19       Q.   Was one of the members of your squad out there
20   looking to see when he arrived?
21       A.   At the?
22       Q.   At the airport.
23       A.   I believe the Maldivian police invited Special Agent
24   in Charge Iacovetti to ride on the bus with them from the
25   seaplane to the airport.  So one of our agents was actually on
```

```
 1    the bus with Mr. Seleznev when he arrived at the airport.
 2         Q.   Okay.  But -- and it is your understanding that
 3    Mr. Seleznev did not know that he was under detention at that
 4    point?  He was on the bus voluntarily, in other words?
 5         A.   Yes.  As far as I know, yes, sir.
 6         Q.   Okay.  As far as you know, he was just checking in to
 7    go back home?
 8         A.   My understanding from what my counterparts told me is
 9    that when Mr. Seleznev approached the departure hall to enter
10    the departure hall, he was then approached by the tourist
11    police at the airport, where he was asked to present his
12    documentation.  And at that point, they looked at his
13    documentation to his passport, and my only -- and this is,
14    again, my belief, that they were confirming his identity from
15    his passport -- his name, his passport number, his photo, and
16    such -- because they wanted to ensure that those matched the
17    information that was provided on the INTERPOL Red Notice.  And
18    when they were comfortable with that, they brought Mr.
19    Seleznev and his party to the tourist police station.
20         Q.   Okay.  And when he was taken into the tourist -- into
21    that room you described in the tourist police station, he was
22    handcuffed by you or one of the members of the --
23         A.   Negative.  Not that moment, sir.  At that time, he
24    was asked to sit on the couch.
25         Q.   And at some point while he was in that room, was he
```

```
 1   handcuffed?
 2        A.   He was handcuffed prior to leaving that room to go to
 3   the departure hall.
 4        Q.   All right.  And he went to the departure hall -- and
 5   whose handcuffs was he wearing, yours?
 6        A.   They were mine, sir.
 7        Q.   Okay.
 8        A.   Again --
 9        Q.   And at that point, you don't think he's under arrest?
10        A.   At that point, he was turned over to the custody of
11   the United States, as instructed by the Maldivian authorities.
12   This was a very coordinated effort on the part of the
13   Maldivian authorities, sir.  They were in control of the
14   operation.  At no time did I do anything on my own without
15   their consent or authorization.
16             We were told by the Maldivian authorities that at the
17   time of the escort, there would be two Maldivian police in
18   front, two tourist police in back, and that myself and Special
19   Agent Smith would actually escort the defendant to the
20   departure hall for departure processing.
21             It was at this point that I asked the Maldivian
22   police if I could handcuff the defendant because I was not
23   going to transport the defendant at their request, because of
24   officer safety, without a pair of handcuffs on.  So I asked
25   and was granted permission to handcuff the defendant in front,
```

1   with his hands in front, for the short walk from the airport

2   tourist police station to the departure hall.

3       Q.   Okay.  So he's in your custody at that point, right?

4   You've handcuffed him?

5       A.   That is the beginning of the point where he is being

6   turned over from the Maldivian authorities to the U.S.

7       Q.   And he was still on -- and geographically, he was --

8       A.   But he's not technically under arrest.  He's not

9   under arrest by the U.S. authorities at that time, though.  I

10  have no authority in the Maldives.

11      Q.   So he could have walked away?

12      A.   The Maldivian authorities, I don't believe, would

13  have allowed him to do that.  But, again, that was their

14  decision.

15      Q.   But from you, he could have walked away?

16      A.   Excuse me?

17      Q.   From you.  You're saying from you, he could have

18  walked away?

19      A.   He could have walked away from me if he chose to.  I

20  don't believe the Maldivian authorities would have allowed

21  that --

22      Q.   Would you have unlocked the handcuffs --

23               COURT REPORTER:  One at a time.

24               THE COURT:  Okay.  One at a time.

25  BY MR. CIVILLE:  (CONTINUING)

126

Q.   Would you have unlocked the handcuffs and said,
"Okay"?

A.   Sir, the handcuffs were in front.  He wasn't detained
in any way.  He could walk freely.

Q.   And at what point do you believe that the Maldivian
authorities relinquished control over him to you?

A.   Relinquished control completely?  When the plane went
wheels up from Maldivian soil.  That's the actual point of
transfer.

Q.   Did have a choice about entering the airplane, your
airplane?

A.   No, he did not have a choice, sir.  Again, Maldivian
authorities were dictating the circumstances of this -- of
this entire operation.

Q.   Okay.  Is there anything in writing to this effect?

A.   No, sir.  Again, I was not privy to any of their
discussions.  I was just told what was going to happen.

Q.   Oh, so you don't even know if this is really what the
Maldivian authorities said?

A.   All I have to say, sir, is what they told me.

Q.   Who --

A.   They told me.  The Maldivian police.

        (Pause.)

Q.   And, I'm sorry, the aircraft was a United States
charted aircraft?

```
 1      A.   I believe the aircraft was charted by the U.S. Secret
 2   Service.  Yes, sir.
 3      Q.   And you're not suggesting that my client voluntarily
 4   boarded that aircraft, are you?
 5      A.   I'm saying that the Maldivian authorities --
 6      Q.   That's not my question.  I think you understand my
 7   question, sir.
 8      A.   Do I think your client voluntarily boarded the
 9   aircraft?
10      Q.   Yes.
11      A.   No.
12               THE COURT:  Sorry.  The answer is?
13               THE WITNESS:  No, ma'am.  No, Your Honor.
14               MR. CIVILLE:  Thank you.  If I could have one
15   moment, Your Honor.
16               Your Honor, would now be a convenient time to let the
17   interpreter take a few minutes?
18               THE COURT:  Oh, sure.  Okay.  We'll take a
19   ten-minute recess.  Do you have any further questions of this
20   witness?
21               MR. CIVILLE:  I do, Your Honor.
22               THE COURT:  Oh, you do.  All right.  Ten-minute
23   recess.
24               (Recess taken at 3:24 p.m.)
25               (Back on the record at 3:47 p.m.)
```

*Case No. MJ14-00056*

```
1              THE COURT:  Please be seated.  All counsels are
2    present.  The defendant's present with the court interpreter.
3    You may proceed, Mr. Civille.  And the agent is still on the
4    stand.
5              THE WITNESS:  Thank you, Your Honor.
6              MR. CIVILLE:  Thank you, Your Honor.
7              THE COURT:  All right.
8              (Pause.)
9    BY MR. CIVILLE: (CONTINUING)
10     Q.   Agent Schwandner, thank you.  I'll try not to keep
11   you too much longer.  Going to Exhibit 4-A-21.
12     A.   Yes, sir.
13     Q.   You recognize the -- there is -- next to the
14   photograph, there's printing both in English and in Cyrillic
15   characters, yes?
16     A.   Yes, sir.
17     Q.   Next to the word "Roman" -- "Roman," actually -- is a
18   Cyrillic word which is not translated.  Were you aware that
19   that was his patronymic name?
20     A.   I was not.
21             THE COURT:  I'm sorry.  His what kind of name?
22             MR. CIVILLE:  We would call it -- it's similar to
23   -- it's akin to a middle name, Your Honor.
24             THE COURT:  Okay.
25             MR. CIVILLE:  Although it has a different
```

129

```
 1   distinction in Russian.  We would represent that -- and we'll
 2   see if the government agrees -- that that word next to the
 3   name -- and we can actually have the translator, if we have
 4   to, testify on this limited issue, that that name is
 5   Valerievich.
 6              COURT REPORTER:  Can you spell that, please.
 7              THE COURT:  Spell.
 8              MR. CIVILLE:  I believe it's
 9   V-A-L-E-R-I-E-V-I-C-H.  Valerievich.
10   BY MR. CIVILLE:  (CONTINUING)
11       Q.   Going back, then, to Exhibit 1, the warrant for
12   arrest.  And, actually, start on Exhibit 2.  You, on -- in
13   questioning by Ms. David, you pointed out some identifying
14   characteristics that you relied on in the Maldives.  You
15   mentioned the photograph and the mole on the face.  Do any of
16   these identifying characteristics appear in the superseding
17   indictment, to your knowledge?
18       A.   To my knowledge, I do not know, sir.
19       Q.   Pardon?
20       A.   I do not know, sir.
21       Q.   Okay.  And the warrant for arrest, it does not have
22   any of those identifying characteristics?
23       A.   No, sir.
24       Q.   When you asked Mr. Seleznev in the Maldives in that
25   room in the airport if he was Roman Seleznev, you did not
```

1    first show him the indictment and ask him, "Now, are you this

2    Roman Seleznev?"

3         A.   I did not show him the indictment or the warrant

4    until afterwards, sir.

5         Q.   Thank you.

6              Do you know where the identifying characteristics in

7    the Red Notice came from?

8         A.   I do not at this time, sir.

9         Q.   And I'm gathering that since you were not involved in

10   the investigation back in 2011, you would not know whether the

11   information in the Red Notice was part of the grand jury

12   proceedings.

13        A.   I would not know, sir.

14        Q.   Do you know if the photo in the Red Notice -- do you

15   know, did that come from the PISCES system?

16        A.   I do not know that either, sir.

17        Q.   Was that PISCES system information available in the

18   Maldives?

19        A.   I do not know the answer to that, sir.

20        Q.   Was there a Red Notice issued in December 2012 when

21   you went to Bali?

22        A.   Not to my knowledge.

23        Q.   And I think I asked you this, but I just want to back

24   up for one moment and clarify.  When you -- you mentioned you

25   spoke to the authorities, the national -- possibly the

*Case No. MJ14-00056*

1  national police; do you know if an application for a warrant
2  was made in the Maldives?
3      A.   You mean by the Maldivian authorities?
4      Q.   Yes.
5      A.   I do not know.  They did not provide me with any
6  information.
7      Q.   As you were -- once you were all present in that room
8  at the airport, did the Maldivian authorities say anything to
9  you from that point on?  Did you have a discussion with them?
10     A.   No, sir.  You mean when -- in what room?
11     Q.   In the airport?
12     A.   At the tourist police station?
13     Q.   At the tourist police station, once Mr. Seleznev
14  arrived at the airport, did you have any further discussion
15  with the Maldivian authorities?
16     A.   Yes.  Yes.  They -- the discussion was to confirm --
17  again, their concern was that they wanted to match for sure
18  the person listed in the Red Notice with the person that was
19  present in the room.  So my discussion with them at the time
20  was examining the defendant's passport and the Red Notice, and
21  from what they observed, they matched the passport numbers to
22  the names, to the identifying marks, to the date of birth.
23  Then they were convinced that it was the same person.  And
24  then the next discussion we had with them was when they were
25  ready to move the defendant to the -- to the VIP hall for

1    immigration processing.  Actually, all of us were going to the

2    VIP hall for immigration processing.

3        Q.    Okay.  So Mr. Seleznev had not been through

4    processing yet when he was brought into the police room?

5        A.    He had not gone through immigration at that time, no.

6        Q.    And the departure card that I think was in Exhibit 6

7    that there's been testimony about, that was in Mr. Seleznev's

8    possession when he left the Maldives?

9        A.    It was.  I believe in normal procedures, they would

10   normally take the card.  They did not.  In my experience, they

11   normally do.

12       Q.    Who did you -- who was -- do you recall, who was your

13   point of contact?

14       A.    I'm sorry, sir; I don't know his name.  There was

15   more than one.

16       Q.    On the Maldivian side?

17       A.    Yes, sir.

18       Q.    Just as a further point of clarification, you refer

19   to Exhibit 5 as another passport.  In fact, do you recognize

20   that, from your experience, as being an internal Russian

21   passport document, something we don't have in the U.S.?

22       A.    I did not recognize that at the time, sir, no.

23       Q.    Okay.  Was that later explained to you by someone?

24       A.    I was told that that was most likely what would, I

25   guess, be considered a domestic passport.  Something similar

*Case No. MJ14-00056*

133

```
 1   to that, like -- as you said, we would not have in the United

 2   States.

 3               MR. CIVILLE:  Okay.  Thank you.  If I have just

 4   one second, I think I'm finished.

 5               THE COURT:  Okay.

 6               (Pause.)

 7               MR. CIVILLE:  Okay.  Thank you, Your Honor.  No

 8   other questions.

 9          Thank you, sir.

10               THE COURT:  Ms. David, any other questions?

11               MS. DAVID:  Just very briefly, Your Honor.

12               THE COURT:  Sure.

13                    REDIRECT EXAMINATION

14   BY MS. DAVID:

15     Q.   So, sir, Government Exhibit 6, which is the Maldives

16   departure card, you indicated you happened to -- this was one

17   of the travel documents you had in your possession when you

18   left the Maldives -- Maldives; correct?

19     A.   That is correct.

20          Are you talking about this exhibit, ma'am?

21     Q.   Yes.

22     A.   Yes, ma'am.

23     Q.   Okay.  And that stamp reference is an arrival stamp

24   of --

25     A.    Yes, ma'am.
```

134

```
 1       Q.   -- June 21st?  So approximately what time of the day,
 2   then, did you, Mr. Seleznev, your colleagues, leave the
 3   airport, "wheels up"?
 4       A.   It was approximately 11:20 a.m. on Saturday, July
 5   the 5th.
 6       Q.   And approximately when, then, did you arrive in Guam?
 7       A.   We arrived in Guam at approximately 2:45 a.m. on July
 8   the 6th.
 9            MS. DAVID:  One moment, Your Honor.
10            Your Honor, I will just ask my colleague,
11   Mr. Freedman, if he has any follow-up questions for the agent.
12            THE COURT:  Mr. Freedman?
13            MR. FREEDMAN:  I do not.  Thank you.
14            MS. DAVID:  Thank you, Your Honor.  No further
15   questions for Mr. Schwandner.
16            THE COURT:  You may step down.
17            THE WITNESS:  Thank you, Your Honor.
18            MR. CIVILLE:  Your Honor, I do have one question,
19   just to follow up to --
20            THE COURT:  Okay.  Go ahead.
21
22                      RECROSS-EXAMINATION
23   BY MR. CIVILLE:
24       Q.   I'm sorry.  The last question for you:  The
25   departure -- the -- looking at Exhibit 6 again, the departure
```

1    card and the passport number that appears there.  You know, is

2    that the source of the passport number that was in the Red

3    Notice, do you know?

4         A.   I believe so, sir.  I'd have to look to confirm.

5              Yes, sir, it is.

6         Q.   So the red -- the information on the Red Notice came

7    -- at least for that particular piece of information came from

8    the departure card?

9         A.   The information in the Red Notice?

10        Q.   I'm sorry.  Yeah.  That was my question.

11        A.   No.

12        Q.   The departure card, the immigration number there or

13   the passport number, that was the source of the information in

14   the Red Notice?

15        A.   As far as what his passport number was?

16        Q.   Yes.

17        A.   Negative, sir.  I do not know where the source of the

18   information was, how his passport number was obtained, but

19   this number would have -- he would have filled this out on

20   arrival in the Maldives.

21        Q.   And, well -- all right.  Is that where -- so on the

22   4th, when you met with the Maldivian police, is that where you

23   got his passport number?

24        A.   Right.  They had a -- they showed me a printout with

25   that passport number that indicated that he had arrived into

```
1    the Maldives on 21 June --

2        Q.   Okay.

3        A.   -- 2014.

4        Q.   I guess my question is, was that information the

5    source of the passport number that went into the Red Notice?

6        A.   I don't believe so, sir.  I think the passport number

7    was already known from the Secret Service perspective.  I'm

8    not sure what the source of that was, but I believe we had

9    already known what his passport number was or believed his

10   passport number to be.

11       Q.   Thank you.

12            MR. FREEDMAN:  I apologize, Your Honor.  This is

13   Andrew Freedman, and I do actually have a couple question, if

14   I might.

15            THE COURT:  All right.  Go ahead, Mr. Freedman.

16                      REDIRECT EXAMINATION

17   BY MR. FREEDMAN:

18       Q.   Agent, would you take a look at Exhibit -- what I

19   believe is Exhibit 5-A.

20       A.   The passport?

21       Q.   Do you recognize that?  I'm sorry.  5-B.

22       A.   5-B?

23       Q.   Yeah.  Do you recognize that?

24       A.   Um...

25       Q.   And it might help you to compare it to Exhibit 5-A.
```

137

```
 1      A.    (Witness compared exhibits.)  You're talking about

 2  the translation of the passport?

 3      Q.    I am.

 4      A.    Okay.  I just -- I recognize the name and the

 5  passport number.

 6      Q.    Okay.  And if you turn -- let's look for a moment

 7  first, if we could, at Exhibit 5-A.

 8      A.    Okay.

 9      Q.    If you turn to the fourth page, do you see a stamp

10  with some handwriting on it?

11      A.    I do.

12      Q.    And it's fair to say some of that is in Cyrillic or

13  Russian script?

14      A.    Yes.

15      Q.    Do you see some -- some Arabic numerals that you're

16  able to read?

17      A.    Um, I see 18 2014.

18      Q.    And one line above that, do you see some numerals?

19      A.    One line above that, I see 26.  I believe it's 26.

20      Q.    And then in the far right?

21      A.    And then the far right is 113.

22      Q.    And if we turn to Exhibit 5-B, which is the -- a

23  translation on the document, on the third page of -- would you

24  turn to the third page of that?

25      A.    Yes, sir.  I see that.
```

1     Q.   Do you see the same Arabic numerals there?

2     A.   I do.  I see Building 26, Apartment 113.

3     Q.   And the two numbers, the 18 and 24, are part of a

4 date?

5     A.   Yes, sir.  18 February 2014 in English.

6     Q.   And so looking at the translation of the whole page,

7 what is the information that that stamp and that page are

8 providing?

9     A.   It appears that it's providing his address.

10     Q.   His residence?

11     A.   His residence; yes, sir.

12     Q.   Okay.  And so I'm sure I'm going to butcher the sound

13 of it, but that's on Ostryakova Street, Building No. 26?

14     A.   Yes.

15     Q.   Apartment 113?

16     A.   Ostryakova Street, Building 26, Apartment 113.

17          MR. FREEDMAN:  Thank you.  I have no further

18 questions.

19          MR. CIVILLE:  I'm sorry.

20

21                 RECROSS-EXAMINATION

22 BY MR. CIVILLE:

23     Q.   Agent, am I correct that the information you were

24 just asked about -- that none of that information appears in

25 either the warrant or the indictment?

```
 1       A.    Not to my knowledge, sir.

 2       Q.    Thank you.

 3             THE COURT:  Okay.  That was not -- as I

 4   understand it, the 5-B has not been moved into evidence, Ms.

 5   David.

 6             MS. DAVID:  Not yet, Your Honor.

 7             THE COURT:  Okay.  Anything further?

 8             MS. DAVID:  I have nothing further.  And if I can

 9   just verify that with Mr. Freedman.

10             MR. FREEDMAN:  And I do not either.  Thank you.

11             THE COURT:  You may step down, sir.

12             THE WITNESS:  Thank you, Your Honor.

13             THE COURT:  Okay.  Thank you.

14             MS. DAVID:  Your Honor, the government next calls

15   Michael Fischlin.

16             THE COURT:  Okay.  How many witnesses do you

17   have, Ms. David?

18             MS. DAVID:  That would be it.

19             THE COURT:  That's the last witness?  Okay.

20             THE CLERK:  Sir, please raise your right hand.

21        (MICHAEL FISCHLIN, government witness, sworn.)

22             THE WITNESS:  Yes, I do.

23             THE CLERK:  Thank you, sir.  Please be seated.

24   Please state your full name and spell your last name for the

25   record.
```

```
 1              THE WITNESS:  My name is Michael Stephen
 2   Fischlin, F-I-S-C-H-L-I-N.
 3
 4                   DIRECT EXAMINATION
 5   BY MS. DAVID:
 6      Q.   Sir, where do you work?
 7      A.   I am a special agent with the Secret Service,
 8   assigned to the Seattle field office.
 9      Q.   And approximately how many years have you been an
10   agent for that agency?
11      A.   Seven years.
12      Q.   As a preliminary matter, you are also being
13   translated, so when you do answer, just keep that in mind.
14      A.   I'll do my best.
15              THE COURT:  Why don't you, yeah, look at the
16   interpreter, who is seated here to our far left.  And when
17   she's trying to translate to the defendant, you can see it and
18   then just slow down a little bit if you need to --
19              THE WITNESS:  Yes, Your Honor.
20              THE COURT:  -- so it won't be interrupted.  All
21   right.  You may proceed.  Thank you.
22   BY MS. DAVID: (CONTINUING)
23      Q.   Agent Fischlin, are you currently the case agent for
24   the Seattle case of United States v. Roman Seleznev?
25      A.   Yes.
```

```
 1        Q.    And if you can take a look at what's already been
 2   admitted.  In your -- in front of you is an exhibit binder.
 3   If you can take a look at Exhibit 2.
 4                THE COURT:  Okay.  Are you looking at the -- you
 5   want the U.S. exhibits?
 6                MS. DAVID:  That is correct, Your Honor.
 7                THE COURT:  Okay.  Okay.  There you go.
 8   BY MS. DAVID: (CONTINUING)
 9        Q.    Okay.  So you've seen a copy of that superseding
10   indictment from your field office; correct?
11        A.    Yes.
12        Q.    Okay.  And you -- you are currently part of the
13   investigative team for USA v. Roman Seleznev, that case;
14   correct?
15        A.    Yes.
16                MR. CIVILLE:  Your Honor, I'm sorry.  I just
17   didn't hear the first part of that question, Your Honor.
18                THE COURT:  Okay.
19                MR. CIVILLE:  He was some part of what team?
20   BY MS. DAVID: (CONTINUING)
21        Q.    You were part of the investigation with the Secret
22   Service of U.S. v. Roman Seleznev; correct?
23        A.    Yes.
24        Q.    And you just mentioned you -- you're familiar with
25   Exhibit No. 2, which is the indictment or the superseding
```

```
 1   indictment out of Seattle; correct?

 2       A.   Yes.

 3       Q.   Can you also take a look, sir, at Government

 4   Exhibit 9 and tell me if you've seen that copy before?

 5       A.   Yes, I have.

 6       Q.   And can you identify what Exhibit 9 is?

 7       A.   It is a Whois record for the domain "track2.name."

 8       Q.   And what information is reflected on this Exhibit 9?

 9       A.   A Whois record shows who owns a domain and how to

10   contact that --

11            MR. CIVILLE:  I'm sorry, Your Honor.  I'd object

12   to this on lack of foundation.  This is a fairly technical

13   piece of information he's testifying to.

14            THE COURT:  All right.  You want to lay the

15   foundation, then?

16   BY MS. DAVID:  (CONTINUING)

17       Q.   Agent Fischlin, is Exhibit 9 one of the documents

18   obtained as part of this investigation in connection with the

19   indictment out of Seattle?

20       A.   Yes.

21       Q.   And you identified Exhibit 9 -- or you were going to

22   begin to identify Exhibit 9 as a track2.name exhibit.  What is

23   the significance of this track2.name in connection with the

24   indictment that is Government Exhibit No. 2?

25            MR. CIVILLE:  Your Honor, once again, the
```

```
 1   objection isn't that it was part of the investigation.  The
 2   objection is that it calls for some technical interpretation,
 3   and a foundation has not been laid as to this witness's
 4   qualifications.
 5            THE COURT:  Why don't you lay the foundation as
 6   to how he recognizes this exhibit.  How does he know about
 7   this type of exhibit?
 8   BY MS. DAVID: (CONTINUING)
 9      Q.   How do you recognize Government Exhibit 9, Agent
10   Fischlin?
11      A.   Well, I've been -- I've seen it via -- the ex-case
12   agent showed me a copy of this exhibit, and then the U.S.
13   Attorneys' Office prior to submitting it as an exhibit.
14      Q.   And what do you understand -- also, based on your
15   experience with the Secret Service as an agent for that
16   agency, what Government Exhibit 9 and the information on
17   Government Exhibit 9 to be?
18            MR. CIVILLE:  I'm sorry, Your Honor, but once
19   again, this is not a foundation.  The witness has simply said
20   the ex-case agent and U.S. Attorney showed it to him.
21            MS. DAVID:  Your Honor, let me just, for the
22   record --
23            THE COURT:  Why don't you just --
24            MS. DAVID:  -- state that this is a preliminary
25   proceeding where formal rules of evidence don't apply.  This
```

```
 1   witness is going to explain how he recognizes Exhibit 9 and
 2   the other exhibits in connection with the investigation and
 3   case.
 4            MR. CIVILLE:  Well, Ms. David is correct; the
 5   Court does not have to strictly apply the rules of evidence.
 6   Nevertheless, it doesn't mean you have to throw the rules of
 7   evidence out the window.  And this is apparently an important
 8   piece of information.  They wouldn't bring it to the Court --
 9   you have to have some way of evaluating whether it's
10   sufficient to establish whatever they're trying to establish.
11   And if this witness doesn't really know what it is, if he
12   doesn't have the technical background to know what it is or to
13   draw conclusions from this, then it's not very helpful to you,
14   I suggest, Your Honor, and I don't think you are by any means
15   required to allow it in.
16            THE COURT:  What's the offer of proof on this?
17   What is this exhibit for?
18            MS. DAVID:  Your Honor, Exhibit 9 is a domain
19   registration for a track2.name website.  I can ask the exhibit
20   [sic] what technical expertise is needed --
21            THE COURT:  All right.  Go ahead.
22   BY MS. DAVID: (CONTINUING)
23      Q.  Sir, what technical expertise is needed to obtain
24   this information that's reflected in Government Exhibit 9?
25      A.  The information is publicly available via a variety
```

1   of online resources.  So it's easy to obtain this information.

2      Q.   And how was this information obtained?  Exhibit 9?

3      A.   It was obtained by the ex-case agent via a publicly

4   available tool to research domains.

5      Q.   And this public available tool that you just referred

6   to, what is that?

7      A.   I believe he used DomainTools.  It's a website to

8   research domains.

9      Q.   And tell me what a domain is.

10     A.   A domain is a website, essentially.

11     Q.   Okay.  And what is this track2.name website with

12  respect to this investigation?

13     A.   It was a website that was a part of the

14  investigation.  I don't know how much you want me to elaborate

15  on it.

16     Q.   Is track2 listed as one of the aliases in the Seattle

17  indictment?

18     A.   Yes.

19     Q.   So having conducted a search of the track2.name

20  website from that publicly available tool, what information

21  was derived with respect to this track2.name website?

22     A.   Who owns the domain and how to contact them.

23     Q.   And looking at Government Exhibit 9, what information

24  did law enforcement rely on to associate ownership of this

25  track2.name website?

```
 1        A.    Under the registrant info would be the owner.    And
 2   the primary data they relied on was the e-mail address
 3   rubensamvilech@yahoo.com.
 4                 MR. CIVILLE:   Okay.   Object -- Your Honor,
 5   objection to the testimony "the primary address they relied
 6   upon."   I don't know who he's referring to, but that's clearly
 7   hearsay.
 8                 THE COURT:   All right.   You want to just clarify
 9   that?   When you say "they," who are you talking about?
10                 THE WITNESS:   The case agents at the time when
11   this investigation started.
12   BY MS. DAVID: (CONTINUING)
13        Q.    So --
14                 THE COURT:   Okay.   All right.   So the primary
15   address of the domain owner?
16                 THE WITNESS:   Yes.   The primary contact info is
17   what that shows.   It shows the information for the owner of
18   the domain and the e-mail address.   That would be a contact
19   e-mail address for the owner.
20                 THE COURT:   Okay.   Go ahead.
21   BY MS. DAVID: (CONTINUING)
22        Q.    And what e-mail information was obtained based on
23   this search?
24        A.    It showed that the e-mail address associated with the
25   owner was rubensamvilech@yahoo.com.
```

1     Q.    And is the name Ruben Samvilech also one of the

2     listed aliases in that Seattle indictment?

3     A.    Yes.

4     Q.    With that information, what next -- what other law

5     enforcement steps was conducted to further determine who's

6     this rubensamvilech@yahoo.com?

7     A.    Multiple federal search warrants were obtained from

8     Yahoo for the e-mail account rubensamvilech@yahoo.com.

9     Q.    Let me direct your attention then to Government

10    Exhibit --

11              MR. CIVILLE:  You know, I'm -- Your Honor, I'm

12    sorry.  I have translation going on in my ear, and I'm not --

13    and that's very important.  But I just missed the last part of

14    that answer.

15              THE COURT:  You said -- about multiple search

16    warrants, you want to repeat that?

17              THE WITNESS:  Yes, Your Honor.  Multiple federal

18    search warrants were obtained for the -- from Yahoo for the

19    e-mail address rubensamvilech@yahoo.com.

20              MR. CIVILLE:  Thank you.

21    BY MS. DAVID: (CONTINUING)

22    Q.    Based on the search warrants, what, if any, e-mails,

23    for example, were retrieved in connection with this

24    rubensamvilech@yahoo.com e-mail?

25    A.    In particular, there was an e-mail from PayPal.

*Case No. MJ14-00056*

```
1        Q.    Okay.  Can I -- please take a look at Exhibit 10-A.

2   And, sir, Exhibit 10-B is the English translation of 10-A.

3   Can you please identify 10-A?

4        A.    Yes.  It was an e-mail obtained via a federal search

5   warrant for the e-mail address rubensamvilech@yahoo.com.

6        Q.    And what does 10-A represent?

7        A.    Essentially, it shows -- it's an e-mail to Roman

8   Seleznev, e-mail address rubensamvilech@yahoo.com, dated

9   September 19th, 2009, from PayPal regarding a PayPal account.

10       Q.    Okay.  And taking a look at Exhibit 10-B, which is

11  the English translation, what information then -- what further

12  information is reflected on this screen shot, which is 10-A?

13       A.    An e-mail address associated with the PayPal account

14  of rubensamvilech@yahoo.com and an address of Ostryakova 26,

15  Apartment 113, Vladivostok, Russia.

16       Q.    Okay.  And that address information that you

17  mentioned, you're referring to Exhibit 10-B; is that correct?

18       A.    That is correct.

19       Q.    Can you next take a look at Government Exhibit 11-A

20  and 11-B?  Are these documents also obtained pursuant to the

21  search warrants that you referred to?

22       A.    These records were obtained via a subpoena to PayPal.

23       Q.    Okay.  And what information, then, did PayPal provide

24  pursuant to the subpoena?

25       A.    They provided a record which showed a PayPal account
```

1    in the name of Roman Seleznev.  The e-mail address associated

2    with that PayPal account was rubensamvilech@yahoo.com.

3        Q.   And, sir, are you referring to Government

4    Exhibit 11-A, which is the PayPal transaction log?

5        A.   11-A, yes.

6        Q.   And can you explain what a PayPal transaction log is

7    in general?

8        A.   The transaction log shows some of the activity on the

9    PayPal account.  It shows when the account was created, when

10   an e-mail address was added to the account, and when a

11   physical address was added to the account, among other things.

12       Q.   So if you can next take a look at Exhibit 11-B.  For

13   the record, can you identify that exhibit?

14       A.   Yes.  It is the activity log that corresponds to the

15   first exhibit with the PayPal account.

16       Q.   And looking at Exhibit 11-B, which is the activity

17   log associated with that rubensamvilech@yahoo.com address, do

18   you see the last column that's -- that shows action data, sir?

19       A.   Yes.

20       Q.   Does this activity log provide information as to

21   address of the user?

22       A.   Yes.

23       Q.   And can you tell us, from the -- starting from the

24   bottom of that column, where you would find that address

25   information?

150

1       A.    Yes.  It is on the far right, three rows up from the
2   bottom.
3       Q.    And what information, then, did PayPal provide with
4   respect to the address of this user?
5       A.    That on September 19, 2009, the address of Ostryakova
6   26, kv 113, Vladivostok, Russia, was added to the account.
7       Q.    Okay.  And that is a consistent address information,
8   for example, with respect to Exhibits 10-A and 10-B; correct?
9       A.    Yes.
10      Q.    Sir, can you next take a look at Exhibits 12-A and
11  12-B?  Have you seen these two exhibits before?
12      A.    Yes.
13      Q.    What are they?
14      A.    Records obtained during a forensic examination of
15  servers owned by HopOne Internet Corporation.
16      Q.    Okay.  And what is the connection of HopOne Internet
17  Corporation with, for example, the track2 website?
18      A.    The HopOne servers were identified during the
19  investigation to store credit card data related to the
20  investigation.
21      Q.    And what information is reflected on --
22            MR. CIVILLE:  I'm sorry, Your Honor.  That's not
23  really a responsive question.  The question was what was the
24  relationship or -- I think is what she asked, between the
25  HopOne server and the track2, and the answer was HopOne

```
 1    servers are used to store credit card data.  That's not really
 2    responsive to the question.  It doesn't say how they're
 3    related to track2.
 4                   THE COURT:  All right.  Ms. David?
 5    BY MS. DAVID:  (CONTINUING)
 6        Q.   Can you elaborate as to the connection?
 7        A.   Yes.  The connection would be that track2.name was
 8    identified as a site used to sell credit card information.
 9    The HopOne servers were found to house some of the credit card
10    information that was sold on that site.
11        Q.   So 12-A and 12-B are what, basically?
12        A.   They reflect the records obtained during a forensic
13    examination of the HopOne servers identified during an
14    investigation.  This record in particular relates to an
15    OZON.travel order which reflects travel for four people.
16        Q.   And are you referring, sir, initially to
17    Exhibit 12-A?
18        A.   Yes, initially to 12-A.
19        Q.   And can you just tell us generally where on the page
20    you see information regarding OZON.travel?
21        A.   The very top line.
22        Q.   And what other information were you able to obtain
23    from this exhibit?
24        A.   From 12-A, about midway down on the page, there is an
25    e-mail that is associated with the travel order.
```

*Case No. MJ14-00056*

```
 1      Q.   And what e-mail are you referring to?

 2      A.   Romariogro1@mail.ru.

 3      Q.   So unlike, for example, Exhibit 10-A, which is a

 4 screen shot information -- correct?

 5      A.   Correct.

 6      Q.   What's this data reflected on 12-A and 12-B?

 7      A.   It was obtained during computer forensic -- forensics

 8 of servers.

 9      Q.   Okay.  And were these found, for example, in a

10 folder?

11      A.   No.

12           MR. CIVILLE:  I'm sorry.  Obtained what, please?

13 I didn't hear the question.  I'm sorry.

14           THE COURT:  Okay.  Ms. David.

15 BY MS. DAVID: (CONTINUING)

16      Q.   I asked you, Agent, what data is reflected on

17 Exhibits 12-A and 12-B, and you began to say first where they

18 were -- from where they were obtained and to then identify

19 them.

20      A.   Could you ask the question again?

21      Q.   How was -- how were you able to obtain 12-A and 12-B?

22      A.   Via computer forensics.

23      Q.   Computer forensics of that HopOne server?

24      A.   Correct.

25      Q.   And computer forensics pursuant to a search warrant
```

```
 1    of that HopOne server; correct?

 2         A.   Yes.  Multiple HopOne servers.

 3         Q.   Okay.  And is the information on 12-A and 12-B --

 4    what -- how do you characterize this information?

 5         A.   It was a screen shot of what was found during a

 6    forensic examination of those HopOne servers.

 7         Q.   12-A and 12-B?

 8         A.   Correct.

 9         Q.   So you began to explain that in 12-A there was

10    information with respect to OZON.travel and an e-mail address,

11    Romariogro1@mail.ru.  For the record, can you spell that?

12         A.   R-O-M-A-R-I-O-G-R-O-1@mail.ru.

13         Q.   What about information on Exhibit 12-B?

14         A.   12-B lists four travelers associated with the order.

15         Q.   Okay.  And was one of the traveler names pertained to

16    an individual identified as an adult with a first name

17    Svetlana and the last name Selezneva?

18         A.   Yes.

19         Q.   Okay.  And where is that information reflected on

20    Exhibit 12-B?

21         A.   About midway down the page.

22         Q.   Okay.  And that -- what is the gender information as

23    to that adult name?

24         A.   Female.

25         Q.   Was there any other name reflected on this 12-B
```

154

1    exhibit with respect to a female infant?

2        A.    Yes.

3        Q.    And first tell us where on this page you can find

4    that information and what is the information.

5        A.    The bottom of the page and information lists a first

6    name of Eva, last name Selezneva.

7        Q.    So you said these were screen shots from one of the

8    HopOne servers.  Were these -- like where, for example, on the

9    hard drive were they found?

10       A.    In the page file.

11       Q.    Can you next take a look at Exhibits 13-A -- and 13-B

12   is the English translation of that exhibit -- and identify

13   them for the record?

14       A.    Yes.  It is another travel order obtained during a

15   forensic examination of the HopOne servers.

16       Q.    And, again, when you mentioned HopOne server, that

17   was one of the servers used for the track2 website; correct?

18       A.    Yes, to house credit card data.

19       Q.    What information is reflected on 13-A?  And that is a

20   two-page exhibit.

21       A.    13-A is the Russian version.  Can I read off of 13-B,

22   the English translation?

23       Q.    Pardon me.  Yes, Your Honor -- yes, sir.

24       A.    So 13-A shows the travel order is affiliated with

25   OZON.travel.  Or the first page of 13-B.  My apologies.  The

1   second page shows that this order was for a flight on

2   Singapore Airlines, Flight 941 from Indonesia to Singapore on

3   April 7, 2010.  And it lists two travelers.  One of the

4   travelers listed is Roman Seleznev, date of birth July 23,

5   1984, citizenship Russia, and a document travel passport

6   number of 640410831.

7       Q.   And, again, this information was obtained how?

8       A.   Via computer forensics of the HopOne servers.

9       Q.   Agent Fischlin, if you can take a look at Exhibit 5-A

10  and Exhibit 5-B, which is the English translation of

11  Exhibit 5-A.  Starting first with Exhibit 5-A, can you flip to

12  the fourth page; and comparing that to Exhibit 5-B, which is

13  on the third page in the box identified as page 5 -- do you

14  see it, sir?

15      A.   Yes.

16      Q.   Okay.  Basically, the information -- and it's been

17  already mentioned earlier -- the information on page 5 lists

18  an address for an internal Russian Federation passport in the

19  name of Roman Seleznev.  Can you take a moment and take a look

20  at the address information reflected on the English

21  translation?  And the Russian version on page 5 of

22  Exhibit 5-A.  Was this the same address that you referenced in

23  the PayPal exhibit?

24      A.   Yes.

25      Q.   And, again, let me direct your attention to PayPal,

1    Exhibits 10-A and 10-B?  Are you talking about the Vladivostok

2    address?

3         A.   Yes.

4         Q.   Okay.  And for the record, what is that address

5    again?

6         A.   Ostryakova 26, Apartment 113, Vladivostok, Russia.

7         Q.   Directing your attention to Exhibit 12-B, which is

8    another screen shot information you mentioned that was

9    obtained from one of the HopOne servers.  You identified two

10   individuals, an adult and infant.  Do you have that exhibit in

11   front of you, sir?

12        A.   Yes.

13        Q.   Okay.  If you can take a look at -- again comparing

14   the internal Russian Federation passport, Exhibit 5-A, and its

15   English translation.  Starting with Exhibit 5-A, can you go to

16   the page where it lists pages 14 and 15 on that internal

17   passport?  Are you there, sir?

18        A.   Yes.

19        Q.   Okay.  Starting with -- and then can you turn to

20   Government Exhibit 5-B; and on the page that also lists a

21   block at No. 14 -- do you see that, sir?

22        A.   Yes.

23             THE COURT:  I'm sorry.  5-B, what page?  5-B

24   what?  What are you looking at?

25             MS. DAVID:  One -- 5-B-5, Your Honor.

1        THE COURT:  5-B-5.  All right.

2    BY MS. DAVID: (CONTINUING)

3        Q.   Do you see any reference to that adult female whose

4    name was reflected and retrieved on that screen shot

5    information from HopOne?  And I'm, again, referring to

6    Exhibit 12-B.

7        A.   Yes.

8        Q.   And what name would that be?

9        A.   Svetlana Selezneva.

10       Q.   And that is a person identified as an individual who

11   had been previously married but now divorced; is that correct?

12       A.   Yes.

13       Q.   Associated with the Russian federation passport

14   belonging to a Roman Seleznev; is that correct?

15       A.   Yes.

16       Q.   Okay.  If you -- focusing on that same exhibit, 5-B,

17   if you turn one page over, do you see the page that has a top

18   box portion identified as "children"?

19       A.   Yes.

20       Q.   Okay.  And cross-referencing that to the Russian

21   passport page in 5-A --

22            THE COURT:  I'm sorry.  Russian passport page

23   5-A, what number?

24            MS. DAVID:  Ten, Your Honor.

25            THE COURT:  5-A-10.

1    BY MS. DAVID: (CONTINUING)

2        Q.   Are you there, sir?

3        A.   Yes.

4        Q.   Okay.  What information is reflected as to that page

5    titled "children"?

6        A.   A birth of a child.

7        Q.   Identified how?

8        A.   As Eva Selezneva, date of birth in 2009.

9        Q.   With a gender information; is that correct?

10       A.   That's correct.  Female.

11       Q.   Okay.  And is that the same information that you had

12   referred to in Exhibit 12-B, which was the -- one of the

13   HopOne screen shot information?

14       A.   Yes.

15       Q.   And going back to the 12-B information, does -- in

16   addition to the adult name and the infant name of these

17   passengers reflecting on this OZON.travel document, does --

18   are there birthday information, for example, as to the adult

19   and child?

20       A.   Yes.

21       Q.   And are the dates of birth consistent with the dates

22   of birth reflected in the passport?

23       A.   Yes.

24       Q.   Earlier, Agent Fischlin, there was testimony about a

25   stamp on a passport identified as Government Exhibit 4-A.  Can

```
 1    you take a look at that?  And the testimony -- and if you can
 2    take a look at page 4 of that passport, on the left side of
 3    that passport page.  There was testimony earlier about a
 4    Singapore stamp reflecting travel of April 7, 2010.
 5                 MR. CIVILLE:  I'm sorry.  What exhibit, please?
 6                 MS. DAVID:  Exhibit 4-A.
 7                 MR. CIVILLE:  Thank you.
 8    BY MS. DAVID: (CONTINUING)
 9         Q.   Do you see that in front of you?
10         A.   Yes.
11         Q.   Okay.  Can you again identify in Exhibit 13-B -- do
12    you recall identifying the information on 13-B, sir?
13         A.   Yes.
14         Q.   Okay.  And, again, 13-B is -- is -- is what?
15         A.   It relates to a travel order to Singapore on April 7,
16    2010.
17         Q.   For a passenger name identified as Roman Seleznev; is
18    that correct?
19         A.   Yes.
20         Q.   And, again, this was information obtained from where?
21         A.   Via a computer forensic examination of HopOne
22    servers.
23         Q.   And looking again at Exhibit 13-B, the second page,
24    you identified earlier a travel passport number.  Is that
25    number the same as the number on Exhibit 4-A?
```

```
 1      A.   The passport numbers are the same.

 2           (Pause.)

 3    BY MS. DAVID:  (CONTINUING)

 4      Q.   Going back, sir, to Exhibit -- pardon me.  Going

 5    back, sir, to Exhibit 12-A.  Again, this is the screen shot

 6    information that was retrieved from one of the HopOne servers

 7    you identified.  And you mentioned an e-mail address and you

 8    even identified and spelled out the e-mail address.  What

 9    e-mail address did you identify on Exhibit 12-A?

10      A.   Romariogro1@mail.ru.

11      Q.   Agent Fischlin, it's been identified earlier,

12    Exhibit 7-A, as one of the travel documents seized in the

13    Maldives.  Do you see that same e-mail address on Exhibit 7-A?

14      A.   Yes.

15      Q.   And where would that e-mail address be reflected?

16      A.   At the top.

17      Q.   At the top left-hand corner?

18      A.   Top left-hand corner, the addressing information.

19      Q.   Okay.  And for the record, Exhibit 7-B is the English

20    translation of that document.  Again, it's -- the same e-mail

21    address is reflected; is that correct?

22      A.   Yes.

23           THE COURT:  That's the -- I'm sorry.  Just for

24    clarification, the Romariogro1 address?

25           THE WITNESS:  Yes, Your Honor.
```

```
 1                THE COURT:  All right.  Thank you.
 2                MS. DAVID:  Your Honor, at this time the
 3   government move to admit the translated exhibits, which are
 4   4-B, 5-B, 7-B, and the remaining exhibits, 9 through 13-B;
 5   nine being the domain registration, 10-A being the screen shot
 6   e-mail information from PayPal, 10-B being the translated
 7   version of 10-A, 11-A and 11-B being the PayPal transaction
 8   and activity log, 12-A and 12-B being the screen shot
 9   information from the HopOne servers, and 13-A and 13-B being,
10   again, information obtained from the HopOne servers, and the
11   translated -- the translated version of Exhibit 13-A.
12                THE COURT:  Okay.  Anything further?  That's it
13   on the exhibits, Ms. David?
14                MS. DAVID:  Yes, Your Honor.
15                THE COURT:  Okay.  Mr. Civille, any --
16                MR. CIVILLE:  Your Honor, we would preserve all
17   of our objections at this stage.
18                THE COURT:  All right.  So you're -- okay.  I
19   understand that.  You are continuing your objection to the
20   admission of these exhibits for purposes of a suppression
21   hearing motion you will have later on at trial?
22                MR. CIVILLE:  Or any other pretrial motion.  Yes,
23   Your Honor.
24                THE COURT:  That's fine.  That's fine.  All
25   right.  The Court will admit Exhibits 4-B, 5-B, 7-B, 9-B,
```

*Case No. MJ14-00056*

```
 1    10-A, 11-A, 11-B, 12-A, 12-B, 13-A and 13-B into evidence for

 2    purposes of this identity hearing.

 3                    (Exhibits 4-B, 5-B, 7-B, 9-B, 10-A, 11-A, 11-B,

 4    12-A, 12-B, 13-A and 13-B admitted.)

 5                    MS. DAVID:  One moment, Your Honor.

 6                    Your Honor, I would like to ask my colleague if

 7    Mr. Freedman has any questions for Agent Fischlin.

 8                    MR. FREEDMAN:  I do not.  Thank you.

 9                    THE COURT:  No questions.  Okay.

10                    Mr. Civille.  Thank you.

11                    MR. CIVILLE:  Your Honor, I'd ask for a few

12    minutes to consult with my client before I start.

13                    THE COURT:  Sure.

14                    MR. CIVILLE:  May I inquire -- I don't know if my

15    co-counsel are still on the line or not.

16                    THE COURT:  Co-counsel for defense, are you still

17    there?

18                    MR. RAY:  Yes.  This is Mr. Ray.  I'm here.

19                    MR. GOLDIN:  Yes, Your Honor.  Ely Goldin is

20    still on.

21                    MR. CIVILLE:  Okay, thank you.

22                    Your Honor, perhaps could we ask for maybe a

23    ten-minute recess and then -- it just takes a while to

24    translate our questions.

25                    THE COURT:  All right.  Ten minutes.  That's
```

*Case No. MJ14-00056*

```
 1   fine.  Ten-minute recess.
 2                 MR. CIVILLE:  But we need to have our client
 3   remain.
 4                 THE COURT:  That's fine.  He can remain here in
 5   the courtroom with counsel and his interpreter.  Very well.
 6   He may do so.  Okay.  Ten minutes.  We can take a recess.
 7                 THE CLERK:  All rise.  The Court's in recess.
 8                 (Recess taken at 4:50 p.m.)
 9                 (Back on the record at 5:21 p.m.)
10                 THE COURT:  Please be seated.  We're back on the
11   record.  All counsel is present.  Mr. Seleznev is present, and
12   so is the court interpreter.
13                 You may proceed, Mr. Civille.
14                 MR. CIVILLE:  Thank you, Your Honor.  Your Honor,
15   I would like to -- I'd ask the Court's indulgence.  Mr. Goldin
16   -- 3 o'clock -- 3:30 in the morning there.  He's been with us
17   the entire time.  He has been admitted pro hac vice, and he
18   would like to conduct at least the first part of this
19   examination.
20                 THE COURT:  He may.
21                 MR. CIVILLE:  And, Your Honor, if I can stand up
22   here and just -- he doesn't have the numbered exhibits, so
23   I'll call out the numbers if he asks for them.
24                 THE COURT:  Okay.  Very well.  No problem.
25                 MR. CIVILLE:  Thank you.
```

```
 1                    THE COURT:  Okay.  Mr. Goldin, you may proceed.
 2                    Hello?
 3                    MR. CIVILLE:  Hello, Ely?
 4                    THE COURT:  Okay.  Let's see.  Mr. Ely Goldin,
 5      are you there?
 6                    MR. CIVILLE:  He was there a moment ago.
 7                    MR. GOLDIN:  I am.  I'm sorry, Your Honor.  Can
 8      you hear me okay now?
 9                    THE COURT:  I can hear you now.  All right.  You
10      may proceed, sir.  And Mr. Civille will be here to assist you
11      with the exhibits.
12                    MR. GOLDIN:  Thank you very much, Your Honor.
13
14                          CROSS-EXAMINATION
15      BY MR. GOLDIN:
16         Q.   Agent, good afternoon.
17         A.   Hello.
18         Q.   Do you have the indictment in front of you that was
19      returned by the grand jury in the Western District of
20      Washington?
21                    MR. CIVILLE:  That's Exhibit 2, the superseding
22      indictment.
23                    THE WITNESS:  Yes.
24      BY MR. GOLDIN:  (CONTINUING)
25         Q.   Looking at that indictment, would you agree with me
```

*Case No. MJ14-00056*

1  that the indictment makes no effort to identify the accused by

2  the fact that he lives in Vladivostok, Russia?

3      A.   I haven't read the whole thing right before coming up

4  here, so from memory, I couldn't answer that question.

5      Q.   As you sit here today, do you have any reason to

6  believe that the indictment attempts to identify the accused

7  by the fact that he lives in Vladivostok, Russia?

8      A.   I don't believe that's specifically mentioned in the

9  indictment.

10      Q.   And do you have any reason to believe the -- that the

11  indictment attempts to identify the accused by the fact that

12  he lives at a particular address within the Russian

13  Federation?

14      A.   I do not believe it mentions a specific address, no.

15      Q.   Do you know whether the indictment attempts to

16  identify the accused by his current marital status?

17      A.   I do not believe it does.

18      Q.   Do you know whether the indictment attempts to

19  identify the accused by his former marital status?  You

20  mentioned something about a former spouse.

21      A.   I do not believe it does.

22      Q.   Does the indictment attempt to identify the accused

23  by the fact that he has any children?

24      A.   I do not believe it does.

25      Q.   Does the indictment attempt to identify the accused

1 by his -- by some reference to his father?

2  A. No.

3  Q. Does the indictment make any mention that the

4 accused's father is a member of the Russian parliament or

5 Duma?

6  A. I do not believe the indictment does.

7  Q. Does the indictment make reference to the accused's

8 patronymic name or middle name?

9  A. I do not believe it does.

10  Q. Agent, do you speak Russian by any chance?

11  A. I do not.

12  Q. Was there a Russian-speaking Secret Service agent who

13 was also physically on the ground at Male?

14  A. I do not know.  I was not there.

15  Q. Do you have any knowledge, either firsthand,

16 secondhand or thirdhand, whether there were any

17 Russian-speaking Secret Service agent physically present when

18 the person before the Court was taken into custody?

19  A. I do not know.

20  Q. Do you know whether the indictment attempts to

21 identify the defendant -- strike that.

22  Do you know whether the indictment attempts to

23 identify the accused by the fact that he traveled to either

24 Singapore or Indonesia or somewhere else?

25  A. No, I do not believe it does.

```
1       Q.   Do you know whether the pre-indictment investigation
2    developed any photographs of the person that is accused in the
3    indictment?
4       A.   I do not know.  A photo was obtained, but I do not
5    know if it was before the date of this indictment or after.
6       Q.   Are you referring to the photo on the Red Notice?
7       A.   Yes.  I do not know --
8       Q.   Has any -- go ahead.
9       A.   I do not know what date that was obtained, so I
10   cannot say if it was pre-indictment or after.
11      Q.   And you don't know who took that photo; correct?
12      A.   No, I don't.
13      Q.   And a photo of the person who is seated before the
14   Court -- there is no witness or -- strike that.
15           There is no witness that during the investigation or
16   pre-indictment pointed to a photo and said, "That's the guy.
17   That's the person you want"?
18      A.   I do not know.
19      Q.   Was there any information regarding identity provided
20   to the Secret Service or any other government agencies by a
21   cooperating witness or a co-defendant in some other case?
22      A.   I do not know.
23      Q.   You have no knowledge whether the source of the
24   identifying information comes from any witness or confidential
25   informant or co-defendant or anyone else?
```

```
1      A.    I'm unsure.  I know that --

2      Q.    I -- please go ahead.  I'm sorry.

3      A.    I know that some of the identifying information was

4   obtained via those computer forensics.

5      Q.    Are you a forensic computer professional yourself?

6      A.    Yes, I am.

7      Q.    Did you conduct the actual forensic examinations to

8   which you testified?

9      A.    I did not.

10      Q.    Do you know who conducted the forensic examinations

11   to which you testified?

12      A.    I know one of the forensic examiners, yes.

13      Q.    And did you rely on any reports made by that forensic

14   examiner?

15      A.    No.  Had communications with him, though.

16      Q.    What kind of communications?

17      A.    Verbal.

18      Q.    Verbal communications?

19      A.    Verbal communications.

20      Q.    Over the telephone or in person?

21      A.    In person.

22      Q.    And when did those communications take place?

23      A.    Approximately three weeks ago; two, three weeks ago.

24      Q.    Is that before or after the defendant -- the person

25   before the Court was taken into custody?
```

*Case No. MJ14-00056*

1    A.   After.

2    Q.   So did you have any conversations with any computer

3  professional or forensic computer professional employed by the

4  government prior to the detention of the person before the bar

5  of the Court?

6    A.   I personally did not.

7    Q.   Now, the indictment makes reference to a bunch of

8  nicknames or nics, N-I-C-S, supposedly used by the accused in

9  connection with certain alleged criminal activity.   Do you see

10 that?

11   A.   I do.

12   Q.   As you sit here before the Court, do you have any

13 documentary evidence to show the judge that the person before

14 the Court used the nickname Shmak, S-H-M-A-K?

15   A.   I do not have any documents on me right now to

16 support that.

17   Q.   Do you have any document that would support that the

18 person before the Court used the nickname Zagreb, Z-A-G-R-E-B?

19   A.   Not at this time.

20   Q.   Do you have any document that the person before the

21 Court used the nickname Smaus, S-M-A-U-S?

22   A.   Not on me at this time.

23   Q.   What about Bandysli64, B as in bravo A-N-D-Y-S as in

24 Sam L-I-6-4?

25   A.   Not on me at this time.

*Case No. MJ14-00056*

170

```
 1      Q.    How about Bulba, B-U-L-B-A?

 2      A.    Not on me at this time.

 3      Q.    How about N-C-U-X?

 4      A.    Not on me at this time.

 5      Q.    Now, you gave some testimony, Agent, on direct

 6  examination regarding a name called -- strike that.

 7            You gave some testimony on direct examination

 8  regarding something called track2.  Do you recall that?

 9      A.    Yes.

10      Q.    And I believe, if I'm not mistaken, you told the

11  Court that your predecessor or someone that had previously

12  worked for the Secret Service ran a domain search on a website

13  that bore the track2 name; correct?

14      A.    Yes.  Track2.name.

15      Q.    Do you have any documentary evidence to show the

16  Court that the person seated before the Court actually used

17  the nickname track2 as opposed to evidence concerning a

18  website that has the letters track2 in it?

19      A.    I do not have those documents on me at this time.

20      Q.    Now, with regard to the website called track2, your

21  predecessor in interest ran a Whois domain registration search

22  on that website; correct?

23      A.    Yes.

24      Q.    And he used a domain search tool called Whois?  Or is

25  it GoDaddy?  Which one did he use?
```

*Case No. MJ14-00056*

```
1        A.    I believe he used the site DomainTools.  It is a site
2   which you can use to do a Whois search.
3        Q.    And which website did your predecessor in interest
4   search?
5        A.    Track2.name.
6        Q.    And that is one of the four websites identified in
7   paragraph 6 of the indictment?
8        A.    Yes.
9        Q.    And that is the same paragraph that alleges that
10  Roman Seleznev and others unknown --
11       A.    Yes.
12       Q.    -- rented and configured servers and computers in
13  countries outside the United States?
14       A.    Yes.
15       Q.    And these servers were then used, according to the
16  indictment, for hosting carding forum websites?
17       A.    Yes.
18       Q.    Or websites used to allegedly sell stolen credit card
19  numbers, right?
20       A.    Yes.
21       Q.    So one of the websites -- I guess it's your
22  contention that one of the websites -- that track2.name is the
23  website that host -- that contained information that somehow
24  linked to some servers that were set up on -- somewhere around
25  the world?
```

1      A.    Yes.

2      Q.    Did you run a -- or your predecessor run a domain

3    registration check on the other three websites listed in

4    paragraph 6 of the indictment?

5      A.    I believe so, but I do not have those documents on me

6    today.

7      Q.    So the only documents that you have on you today for

8    purposes of the Rule 5 hearing is the reverse domain

9    registration search on the track2.name website; correct?

10     A.    Yes.   Regarding those domains, yes.

11                 MR. CIVILLE:   That would be Exhibit 9.

12   BY MR. GOLDIN:  (CONTINUING)

13     Q.    And, ultimately, that led you to an address in

14   Vladivostok that you contend is the defendant's address?

15     A.    Yes.

16     Q.    But the -- you'll agree with me that the indictment

17   itself makes no reference to any address whatsoever; correct?

18     A.    Not a physical address.

19     Q.    Do you know how many adult individuals resided at the

20   physical address in Vladivostok --

21     A.    No.

22     Q.    -- or -- at or around the time of the indictment?

23     A.    Could you ask that question again, please?

24     Q.    Sure.   Do you know how many adult individuals

25   physically resided at the address which you claim is tracked

1    to the defendant in or around the time of the indictment?

2         A.   No.

3         Q.   But you produced or you made reference to some travel

4    documents that the government supposedly found as part of its

5    investigation, showing that multiple adult persons traveled, I

6    guess, around the world that are somehow associated with that

7    address?  Is that what you're telling us?

8         A.   No.

9         Q.   All right.  Let me ask the scope and then the

10   question.  What is the connection between the indictment and

11   the person seated before the bar of the Court?

12        A.   That would be via two nicknames, the nicknames track2

13   and a nickname Ruben Samvilech.

14        Q.   Okay.  And focusing on the nickname Ruben Samvilech,

15   it is your contention that there are e-mails that were sent

16   from that nickname; correct?

17        A.   Yes, sent to that e-mail address.

18        Q.   And what is that e-mail address?

19        A.   Rubensamvilech@yahoo.com.

20        Q.   So you put a subpoena on Yahoo.com to discover the

21   identity of the person who's registered the name Ruben

22   Samvilech?

23        A.   I know they executed three search warrants.  I don't

24   know it they executed a subpoena on it.

25        Q.   When you say "three search warrants," is there some

1   significance to the fact that there's three?  In other words,
2   was this impossible to get through one search warrant?
3       A.   Sure, different time frames.  So the e-mail account
4   will contain different content in it at different points in
5   time.
6       Q.   So which of the three subpoenas actually yielded
7   information that is part of your testimony today?  Was that
8   subpoena one, subpoena two or subpoena three?
9       A.   I don't know.  I know three search warrants were
10  executed and this was obtained from one of them.
11      Q.   And what is the time frame of the search warrant that
12  actually yielded the information regarding which you testified
13  to today?
14      A.   I'm unsure.  It was prior to my assignment to the
15  case.
16      Q.   And what is the time frame for the e-mail that you
17  contend ties the person before the bar of the Court to the
18  indictment?
19      A.   May I look at the exhibit to get the date of the
20  e-mail?
21      Q.   Of course.  Of course.
22           MR. CIVILLE:  I believe you're talking about
23  Exhibit 10-A.  10-B is the trans- -- is perhaps the
24  translation.
25           THE WITNESS:  The e-mail is dated September 19,

1    2009.

2                    THE COURT:  I'm sorry.  Where are you looking at,

3    Agent?

4                    THE WITNESS:  Um, Your Honor, at Exhibit 10-A and

5    10-B.

6                    THE COURT:  Okay.  10-A.  I'm looking -- okay.

7    Like six lines down from the left, top left, 10-A?

8                    THE WITNESS:  Yes, Your Honor.

9                    THE COURT:  You have September 19, 2009.  Okay.

10   BY MR. GOLDIN: (CONTINUING)

11       Q.   And the indictment reference is a time period of

12   October 2nd, 2009, continuing through February 22, 2011; is

13   that right?

14       A.   I'd have to review it.

15       Q.   Paragraph 1 of the indictment?

16                   THE COURT:  Exhibit 2?

17                   THE WITNESS:  Yes.

18                   MR. CIVILLE:  Exhibit 2.

19                   THE WITNESS:  From October 2, 2009, to

20   February 22nd, 2011, on or about.

21                   MR. GOLDIN:  Your Honor, not having these

22   documents in front of me and being 3:30 where I am, that's all

23   the questions I have.

24                   THE COURT:  Okay.  Do you have a -- but you have

25   a copy -- you don't have a copy of the indictment?  You want

```
 1    to know what the dates are that it states just initially?

 2                MR. GOLDIN:  No.  I do have a copy of the

 3    indictment, Your Honor.  It was e-mailed to me by the U.S.

 4    Attorney in the Western District of Washington.  I'm looking

 5    at it electronically.

 6                THE COURT:  Okay.  Very well.  Okay.  No further

 7    questions?

 8                MR. CIVILLE:  If I may, Your Honor.

 9                THE COURT:  You may proceed.

10                MR. CIVILLE:  Thank you, Your Honor.

11                          RECROSS-EXAMINATION

12    BY MR. CIVILLE:

13        Q.   Agent, look at Exhibit 11, the PayPal account, it has

14    as the name Seleznev, Roman, and it has the e-mail address

15    you've testified about.  But on account type, it says "Russian

16    personal unverified."  Do you see that?

17        A.   Yes.

18        Q.   Okay.  Are you familiar with unverified accounts?

19        A.   No, I'm not.

20        Q.   Okay.  Do you know if that -- through your

21    investigation, do you know that means that pretty much anybody

22    can open an account and use whatever name they choose?

23        A.   No.

24        Q.   And that -- do you know that means that PayPal does

25    not verify the information that it's provided?
```

```
 1        A.   No, I do not.

 2        Q.   Okay.  Have you inquired into that, whether they

 3   verified the information that's provided?

 4        A.   I personally have not.

 5        Q.   Looking at Exhibit 9, the track2 domain name, that

 6   shows a registrant of Alexey Davydov?

 7        A.   Yes.

 8        Q.   Okay.  And that is a different name than the name of

 9   the person accused in the indictment?

10        A.   Yes, it is.

11        Q.   Okay.  And that is not a name -- that is not any of

12   the aliases named in the indictment?

13        A.   No.

14        Q.   Were you involved at all in the preparation of the

15   Red Notice of -- I think that's, what, Exhibit 3?

16        A.   I was aware of it but I didn't prep it.

17        Q.   Did you provide any of the information that's --

18   that's contained in the Red Notice?

19        A.   No.  I didn't need to.

20        Q.   Do you know who did prepare this?

21        A.   AUSA Norman Barbosa.

22        Q.   Who is he, please?

23        A.   He's the AUSA on the case in the Western District of

24   Washington.

25        Q.   He's not on the line with us now, I don't believe.
```

*Case No. MJ14-00056*

178

```
 1        A.    (Witness shrugged.)

 2        Q.    Do you know?

 3        A.    I don't know.

 4        Q.    Okay.  When did you become involved -- you made

 5   several references to the person you took over from.  When did

 6   you -- what year did you become involved?

 7        A.    This year.

 8        Q.    Oh, just -- okay.  So you were not involved when this

 9   case went to the grand jury?

10        A.    No, I was not.

11        Q.    Not involved in any of the investigation up until

12   this year?

13        A.    That's correct.

14        Q.    If you'll look at page 5-B-2 on Exhibit 5, please.

15   And do you see on 5-B-2 that under the name -- in the bottom

16   box there, it shows "Photo," although that's blank, right?

17        A.    Yes, it is.

18        Q.    And then to the right of that is -- this is the

19   English translation of what's taken from the passport that was

20   seized -- the local Russian passport seized in the Maldives.

21   That's your understanding, right?

22        A.    Yup.

23        Q.    Okay.  And then it shows the name -- last name

24   Seleznev, name Roman, and then paternal name Valerievich.

25        A.    (Nodded head.)
```

*Case No. MJ14-00056*

```
1        Q.    And are you familiar with the Russian use of paternal

2   names?

3        A.    I am not.

4        Q.    Or patronymics, they're sometimes called?

5        A.    No, I'm not.

6        Q.    All right.  And would you agree with me that the name

7   Roman Valerievich does not appear in the indictment?

8        A.    I don't believe it does.

9        Q.    Okay.

10                  MR. CIVILLE:  If I could have just a moment.

11                  THE COURT:  Mm-hmm.

12                  (Pause.)

13  BY MR. CIVILLE:  (CONTINUING)

14       Q.    Have you participated, Agent Shalin -- did I

15  pronounce that -- I'm sorry.  Pronounce your last name.

16       A.    Fischlin.  Fischlin.

17       Q.    My hearing is going.  I thought it began with an S.

18       A.    F, as in Frank, Fischlin.

19       Q.    Oh, Fischlin.  I'm sorry.  Boy, I was really off.

20             Okay.  Other than the three search warrants you've

21  mentioned, have there been any other search warrants executed

22  with respect to this matter?

23       A.    I believe there have been.

24       Q.    Do you know how many?

25       A.    I don't.
```

*Case No. MJ14-00056*

```
 1        Q.   Okay.  When was the last one that you're aware of?

 2        A.   I'm unsure.

 3        Q.   Okay.  What efforts, if any, have you undertaken to

 4   ascertain the identity of Alexey Davydov, the person named as

 5   the registrant in Exhibit 9?

 6        A.   I have not taken any.

 7        Q.   Do you know if any -- just so I'm not -- you're not

 8   being too literal, when I say "you," do you know if the --

 9   your agency has or any other investigative personnel?

10        A.   I do not know.

11        Q.   On the face of it, it would appear, then, that the

12   track2 name is actually registered to a person named Alexey

13   Davydov based on the evidence before us; is that right?

14        A.   That's the registered owner with the e-mail address

15   seen on the exhibit.

16        Q.   Okay.  And do you have any -- okay.  And you just

17   don't have any information on who this Alexey Davydov might

18   be?

19        A.   No.

20             MR. CIVILLE:  Your Honor, that's all I have.

21             THE COURT:  All right.  Ms. David?  And then

22   we'll close up here.

23

24                     REDIRECT EXAMINATION

25   BY MS. DAVID:
```

181

1       Q.    Agent Fischlin, can you take a look again at
2  Exhibit 9 --
3       A.    Yes.
4       Q.    -- which is the domain registration for that website
5  track2.name?
6       A.    Yes.
7       Q.    Counsel asked you questions about the registrant
8  information on Exhibit 9, you recall?
9       A.    Yes.
10      Q.    Questions about the Alexey Davydov name and the
11 e-mail address rubensamvilech@yahoo.com.  Do you recall that?
12      A.    Yes.
13      Q.    You also indicated earlier that your -- you're
14 trained in computer forensics; correct?
15      A.    Yes.
16      Q.    Tell me, if someone is going to manage a website,
17 which would be the more trustworthy information if you want to
18 make sure you know what's happening to that website?
19      A.    Contact information.
20      Q.    And with respect to Government Exhibit 9, what
21 contact information is reflected?
22      A.    An e-mail address.
23      Q.    And, again, that is rubensamvilech@yahoo.com?
24      A.    Yes.
25      Q.    And using that contact information, agents and you --

*Case No. MJ14-00056*

182

1    you testified that that e-mail address tied law enforcement to

2    a PayPal screen shot; is that correct?

3         A.    Yes.

4         Q.    Are you familiar with PayPal?

5         A.    A little bit, yes.

6         Q.    And, generally, what is PayPal?

7         A.    A payment service.

8         Q.    Okay.  So whether you receive or make the payment;

9    correct?

10        A.    That's correct.

11        Q.    So at some point, you also want your contact

12   information with PayPal to be reliable; is that correct?

13        A.    Sounds correct to me.

14        Q.    Okay.  And with this rubensamvilech Yahoo e-mail on

15   that track2.name website, again, PayPal provided information

16   that that e-mail address was connected to Roman Seleznev with

17   the Vladivostok Ostryoka[sic] address; is that correct?

18        A.    Yes.

19        Q.    And earlier you testified about obtaining, for

20   example, screen shot information from -- from one of the

21   servers that the track2 website used; is that correct?

22        A.    Could you ask the question again, please?

23        Q.    Okay.  Earlier you reference about a HopOne server;

24   correct?

25        A.    Yes.

1    Q.   And how screen shots were retrieved from that server

2    with respect to this investigation.  Do you recall that?

3    A.   Yes.  Yes.

4    Q.   And I'm referring you to -- I'm referring you, for

5    example, to Exhibit 13-A and the translated version, which is

6    13-B.

7    A.   Yes.

8    Q.   That's information about one of the screen shots from

9    that server; correct?

10   A.   It's information obtained from examination of the

11   server, yes.

12   Q.   Correct.

13        And you mentioned earlier that 13-A reflects a travel

14   reservation under the name Roman Seleznev for travel to

15   Singapore on April 7, 2010; is that correct?

16   A.   Yes.

17   Q.   And that stamp, you recall, you noticed on Government

18   Exhibit 4-A, which is the one of the -- the Russian Federation

19   passport of Roman Seleznev; is that correct?

20   A.   That's correct.

21             MS. DAVID:  May I have a moment, Your Honor?

22             THE COURT:  Okay.

23             (Pause.)

24             MS. DAVID:  Your Honor, I have no further

25   questions, unless my colleague, Mr. Freedman, does.

*Case No. MJ14-00056*

184

```
 1              THE COURT:  Mr. Freedman?
 2              MR. FREEDMAN:  I do not.  Thank you.
 3              MR. GOLDIN:  Your Honor, this is Ely Goldin.  May
 4  I briefly?
 5              THE COURT:  Go ahead, Mr. Goldin.
 6              MR. GOLDIN:  With your permission, Your Honor.
 7              THE COURT:  Yes.
 8
 9                   RECROSS-EXAMINATION
10  BY MR. GOLDIN:
11     Q.   Agent, do I understand you correctly that the PayPal
12  account to which you testified was used to book travel for a
13  person named Roman Seleznev?
14     A.   I don't know anything about travel, just there's a
15  PayPal account in the name of Roman Seleznev.
16     Q.   And the travel documents that you mentioned or the
17  travel itineraries that you mentioned, were those travel items
18  purchased with that PayPal account?
19     A.   I don't know.
20     Q.   PayPal is an e-commerce portal that allows people to
21  pay for services purchased over the Internet; correct?
22     A.   Yes.
23     Q.   And PayPal enables people to actually pay for those
24  services with money that emanates from someplace; correct?
25     A.   Yes.
```

185

1       Q.    Did your investigation pinpoint any credit cards

2    associated with the PayPal account that you claim belongs to

3    the defendant?

4       A.    I do not know.

5       Q.    Did your investigation pinpoint any bank account

6    which is linked to the PayPal account that you attribute to

7    Mr. Seleznev?

8       A.    I do not know.

9       Q.    But you know that the Secret Service served a

10   subpoena on PayPal; is that correct?  Or search warrant?

11      A.    That's correct.

12      Q.    Do you know if that search warrant or subpoena

13   revealed any financial information linking the person before

14   the Court to the PayPal account with money, credit cards, a

15   wire transfer, any financial connection whatsoever?

16      A.    I do not know.

17      Q.    So the only connection between the PayPal account

18   that you gave testimony today is the fact that somewhere on

19   the Internet it is listed that Roman Seleznev owns that PayPal

20   account?

21      A.    That PayPal produced a record showing that there is a

22   PayPal account in Roman Seleznev's name.

23      Q.    Do you know -- did PayPal produce a record showing

24   who set up that PayPal account?

25      A.    They just provided information that was provided by a

```
1   user who entered the information.
2       Q.   Did they provide a merchant services agreement like
3   the kind you would get if I'm a store and I sign up to accept
4   American Express, Visa or MasterCard?  Is there an electronic
5   or written end user license agreement or any merchant
6   agreement between Seleznev before the Court and PayPal that
7   you were able to find?
8       A.   I don't have any documents like that.  I believe you
9   do have to accept a Yula when you sign up, but I don't have
10  any documents with me today.
11      Q.   Do you know if the government attempted to
12  investigate any financial connections between the accused
13  person in the indictment and PayPal --
14      A.   I do not know.
15      Q.   -- to establish a link between that person and some
16  bank or some credit card or some other financial institution
17  that might be the source of payments?
18      A.   I don't know.
19      Q.   The indictment before you accuses the defendant of
20  running a massive carding scheme; correct?
21      A.   Correct.
22      Q.   And the indictment suggests that the defendant earned
23  illicit profits as a result of his activities; correct?
24      A.   Yes.
25      Q.   Is there any information that you can provide the
```

```
 1    Court that shows that the supposed illicit profits went into a
 2    bank account or a -- went -- a bank account associated with a
 3    person named Roman Seleznev?
 4        A.   I don't have any records with me like that today, no.
 5        Q.   Do you have any documents to show that any illicit
 6    profits went into an account that is affiliated in any way
 7    with the person that is seated at the bar of the Court?
 8        A.   I don't have anything like that with me today.
 9        Q.   When the government took Mr. Seleznev into custody,
10    they took from him credit cards, did it not?
11        A.   Yes.  There were credit cards in his possession.
12        Q.   Have you linked those credit cards to any of the
13    allegations in the indictment?
14        A.   Not at this time.
15        Q.   Have you linked those credit cards to any of the
16    allegation -- to any of the -- strike that.
17             Have you linked those credit cards to the PayPal
18    account to which you testified?
19        A.   Not at this time.
20        Q.   Have you linked those credit cards to the servers
21    which supposedly were used in connection with the illicit
22    activity?
23        A.   Not at this time.
24        Q.   Have you linked those credit cards to anything that
25    is even remotely related to the indictment?
```

*Case No. MJ14-00056*

```
 1      A.    Not at this time.

 2            MR. GOLDIN:  No further questions.

 3            THE COURT:  Okay.

 4            MR. CIVILLE:  Your Honor, if I may, just a couple

 5  follow-up questions to that.

 6

 7                   RECROSS-EXAMINATION

 8  BY MR. CIVILLE:

 9      Q.    Agent, going back to Exhibit 11-B, PayPal log.  You

10  had earlier testified that the indictment -- paragraph 1 of

11  the indictment states that beginning October 2, 2009, and

12  continuing through February 22, 2011, it alleges certain

13  criminal activity.  And my question is, on Exhibit 11-B, this

14  PayPal log shows activity of September 27, 2009, through

15  September 19, 2009; is that correct?

16      A.    Yes.

17      Q.    And that's before the period specified in the

18  indictment?

19      A.    Yes, but the indictment notes that activity began no

20  later than October 2, 2009.

21      Q.    And did you make any effort, you know -- and "you,"

22  once again I refer to the entire Secret Service or whatever --

23  and whatever other law enforcement is involved in this

24  investigation -- into determining whether at any time after

25  September 19th did Alexey Davydov, the person named in
```

189

1    Exhibit 9 -- did he reside at the address of Ostryakova 26,

2    113, in Vladivostok that we've been discussing?

3         A.    No.

4         Q.    Okay.  And I believe the answer to this -- but you

5    don't know what other persons may have been living at that

6    address?

7         A.    No.

8         Q.    Okay.  And if someone were living at an address and

9    then moved away and -- well, strike that.

10              With respect to Exhibit 9, you said the contact

11   information -- you thought the e-mail was the most important

12   piece of information.  And if -- tell me how this works now.

13   If somebody has an e-mail and then they stop using it for some

14   reason or they share that e-mail with somebody else, but the

15   original -- even assuming the original owner stopped using it,

16   anybody could use -- continue to use that e-mail; correct?

17        A.    So long as it's active and you had the proper user

18   credentials.

19        Q.    Okay.  And user credentials would really only mean a

20   password?

21        A.    Yeah.  Username, password; yes, sir.

22        Q.    And going to Exhibit 12-B.  Did you identify who

23   Sergei Nikulnikov is?

24        A.    No.

25        Q.    And that was a person who was apparently traveling

*Case No. MJ14-00056*

1    with the identified -- I think you said was the --

2    Mr. Seleznev's wife?

3        A.    Yes.

4        Q.    And child?

5        A.    Yes.

6        Q.    Okay.  So there was an adult male apparently, a

7    Sergei, and you don't have any information on him?

8        A.    I don't.

9        Q.    Okay.  Thank you.

10            I ask you to have a look at Defense Exhibit 2.  And

11   that's the declaration of Ely Goldin.  And I recognize you may

12   not have seen that before, so I give you a moment to look at

13   it.  And what's -- Mr. Goldin is the lawyer who was just

14   questioning you a few moments ago.  But attached to that as

15   Exhibit 1 is a printout which he represents is from a -- a

16   website called -- I'll spell it:  O-D-N-O-K-L-A-S-S-N-I-K-I

17   dot R-U, Odnoklassniki in Russian, and showing 162 people just

18   with that one website -- this is for people to identify old

19   classmates -- having the name Roman Seleznev -- Roman

20   Seleznev.  Sorry.  Did you -- did your investigation look into

21   any other Roman Seleznevs?

22       A.    I don't know.

23       Q.    Okay.  That would not have been part of the work you

24   did?

25       A.    No.

1    Q.   Was your function limited -- or your role, not -- was

2    your role really concentrated on the computer aspects of this

3    case?

4    A.   My role was to become the agent -- the case agent

5    upon the departure of the previous case agent.

6    Q.   Okay.  And I don't really -- I'm sorry.  I just don't

7    know what that means, to say you're the case agent.

8    A.   Sure.  Previous case agent moved on.  Somebody has to

9    take that case in Seattle to work it, and so it was reassigned

10   to me.

11   Q.   Okay.

12   A.   It stays in the field office.  It doesn't move with

13   an individual to different locations.

14   Q.   Okay.  I think what I'm asking is, when you say

15   you're the case agent, are you in charge of the case, then,

16   for the Secret Service?

17   A.   I would be the investigating agent on the case now,

18   yes.

19   Q.   Okay.  So -- so you're at the top of the totem pole

20   as far as the investigators go for this particular case?

21   A.   At this point in time, yes.

22   Q.   Okay.  Okay.

23        MR. CIVILLE:  Thank you, Your Honor.  Very

24   patient.  Thank you.

25        THE WITNESS:  Oh, you're welcome.

```
 1                THE COURT:  All right.

 2                MS. DAVID:  Your Honor, I would ask if my

 3     colleague, Mr. Freedman, has any follow-up questions.

 4                THE COURT:  Okay.  Mr. Freedman?

 5                MR. FREEDMAN:  I don't, Your Honor.  Thank you.

 6                THE COURT:  Okay.  Any further evidence,

 7     Ms. David?

 8                MS. DAVID:  No, Your Honor.

 9                MR. CIVILLE:  Your Honor, we would offer into

10     evidence and we -- since the rules of evidence are relaxed, we

11     would ask to do this without a witness -- without testimony, I

12     should say.  We offer into evidence Exhibit 1, which is the

13     declaration of a language expert -- a Russian language expert,

14     Tatiana Hay.  That's -- and also Exhibit 2, the declaration of

15     Ely Goldin and the exhibit attached to that from the Russian

16     website.

17                THE COURT:  All right.

18                MS. DAVID:  Your Honor, I would defer to my

19     colleague, Mr. Freedman.

20                THE COURT:  Mr. Freedman?

21                MR. FREEDMAN:  We have no objection on behalf of

22     the government, Your Honor.

23                THE COURT:  Very well.  Exhibits 1, 2 and 3 are

24     admitted without objection.

25                (Exhibits 1, 2 and 3 admitted.)
```

*Case No. MJ14-00056*

193

```
 1                    MR. CIVILLE:  Thank you, Your Honor.
 2                    THE COURT:  Okay.  There being no further
 3      evidence, Mr. Civille?
 4                    MR. CIVILLE:  No further evidence, Your Honor.
 5                    THE COURT:  Okay.  Let me, just for formality
 6      sake, Mr. Civille, before -- before the Court makes its final
 7      ruling, I do want to just give the defendant some of the
 8      general rights.  This is kind of a little backwards that we
 9      presented -- yeah, when it was presented --
10                    MS. DAVID:  May the witness be excused, Your
11      Honor?
12                    THE COURT:  Oh, I'm sorry.  Yeah.  I'm sorry.
13                    THE WITNESS:  Thank you, Your Honor.
14                    THE COURT:  You may be excused.  You may step
15      down.  That's right.
16           So, Mr. Civille, let's -- let me just indicate a few
17      things to your client to make sure he understands these
18      matters.  Do you want to -- can you come up to the podium, Mr.
19      Civille, with your client and the court interpreter?
20      Interpreter can come up as well.
21           Let me just give you a few rights.  All right.  So,
22      first of all, from what has been presented so far, the alleged
23      offense is committed in the State of Washington, the defendant
24      has been arrested with a warrant, and an indictment has been
25      returned.  A superseding indictment.
```

```
 1                    INTERPRETER:  Is it a question?
 2                    THE COURT:  No.  I'm just informing him of these.
 3     Does he understand?
 4                    THE DEFENDANT:  Yes.
 5                    THE COURT:  Okay.  Very well.
 6           The defendant is a foreign national, and regardless
 7     of his immigration status, the Court -- I believe -- I assume
 8     that Judge Manibusan had advised him of his right to consular
 9     notification.  Did he not?  Did he do that?
10                    MR. CIVILLE:  You know, I believe he did, Your
11     Honor.  And he -- he has -- the Russian consulate has come to
12     Guam and visited with him.
13                    THE COURT:  Okay.  So -- very well.  So he has
14     already met with the Russian consulate officer from his
15     country.  And I just wanted to at least be assured that he has
16     received that ability to speak to a consulate official.  Very
17     well.
18                    MR. CIVILLE:  He did, Your Honor.
19                    THE COURT:  Okay.  Without asking the defendant
20     to state his name, because I know that -- that he is not
21     conceding to his identity or any other identifying information
22     at this time, I want to make sure I advise the defendant of
23     his general rights.  Does he understand the nature of the
24     charge as contained in the superseding indictment?  Charges.
25                    THE DEFENDANT:  Yes, I do.
```

*Case No. MJ14-00056*

```
1              THE COURT:  Okay.  Very well.  Do you waive a
2     reading of all of those charges?
3              INTERPRETER:  I'm sorry?
4              THE COURT:  Does he waive a reading of the
5     charges?  In other words, I don't have -- does he want me to
6     read every charge or does he waive a reading?
7              MR. CIVILLE:  Your Honor...
8         (Counsel consulting with client and translator.)
9         THE DEFENDANT:  Okay.  It's okay.  I read.
10             THE COURT:  It's okay?  You waive a reading?
11             MR. CIVILLE:  Yes, Your Honor.
12             THE DEFENDANT:  Yes.
13             MR. CIVILLE:  Yes, he waives reading.
14             THE COURT:  Very well.  And as you know, you've
15    been advised previously before Judge Manibusan of your right
16    to a lawyer.  You do have your attorney present here and also
17    from, I believe, New York.  It's like four in the morning.  I
18    apologize for that early morning, Mr. Goldin.  You understand
19    that?  You have your rights and you've been exercising your
20    right to your lawyers?
21             THE DEFENDANT:  Yes, I do.
22             THE COURT:  Okay.  You also have the right to
23    remain silent.  Do you understand that?
24             THE DEFENDANT:  Yes.
25             THE COURT:  Okay.  Very well.  And the Court is
```

*Case No. MJ14-00056*

```
 1   going to also advise you that you also have a right to waive

 2   the removal hearing.  But you obviously are not waiving that,

 3   and you're obviously not voluntarily returning to the District

 4   of Washington, where the charges are pending.  But you

 5   understand that you do have that right; correct?

 6                 INTERPRETER:  Sorry.  Please repeat the last

 7   sentence.

 8                 THE COURT:  Right.  You understand that you do

 9   have those rights?  You have the right to -- you waive the

10   removal hearing, which you have not done, and you have the

11   right to voluntarily return to -- voluntarily go to Washington

12   state, where the charges are pending?

13                 INTERPRETER:  He understands.

14                 THE COURT:  He understands.  Okay.  Very well.

15       He also understands that we are going through an

16   identity hearing and he has a right to waive that hearing?

17   But as I understand it, he's not doing that.  Is that correct?

18                 THE DEFENDANT:  Okay.  I understand.

19                 THE COURT:  Okay.  Very well.

20                 And, also, the Court has to advise you that you

21   have the right under Federal Rule Criminal Procedure 20 to

22   plead guilty or no contest in this district if both the United

23   States attorneys consent.  Do you understand that?

24                 THE DEFENDANT:  I understand.

25                 THE COURT:  He understands.  Okay.  Very well.
```

1        The Court having advised you of those rights, do

2    you have any questions about any of them?

3            INTERPRETER:  He doesn't have questions.

4            THE COURT:  Very well.

5            All right.  The Court has heard the evidence as

6    to whether or not this defendant is the person named in the

7    indictment, the person who's been arrested in the -- the

8    person who's before the Court and who has been arrested is the

9    person named in the superseding indictment issued by the grand

10   jury in the State of Washington, the Western District in

11   Seattle, Criminal Case 117ORAJ, and it indicates *United States*

12   *of America v. Roman Seleznev* and then several aliases or

13   a/k/a's.  The two in particular which the United States

14   Attorneys' Office have zeroed in on are a/k/a track2 and a/k/a

15   Ruben Samvilech or Samvilech, according to the testimony.

16           The Court notes that after having considered all

17   the exhibits that have been admitted and the testimony that

18   has been presented, the Court finds that the United States

19   Attorneys' Office have met its burden of proof regarding

20   whether or not there's probable cause to believe that the

21   person arrested is the person named in the charging

22   instrument.  The Court has considered, No. 1, the arrest

23   warrant, along with the INTERPOL notice, Red Notice, and the

24   superseding indictment, along with the forensic investigation

25   results.  In particular, the Court notes the -- with regard to

```
 1    the forensic investigation results submitted today by the
 2    second agent, the Court notes that the name of the city --
 3    Vladivostok city, the address, Ostryakova Street, Building 26,
 4    wing Apartment 13; the two alias names, track2 and Ruben
 5    Samvilech -- Samvilech -- Samvilech, the e-mail addresses
 6    rubensamvilech@yahoo.com; and the names -- the name -- even
 7    though the name Alexey Davydov -- Davydov, I'm sorry if I'm
 8    not saying the names correctly -- was noted as the registrant.
 9    The -- on Exhibit 9.
10              The Court notes on Exhibit 10-B, according to the
11    PayPal search warrant records, it does indicate the name of
12    Roman Seleznev, which is the name noted in the grand jury
13    indictment.  Also, the Court notes under 12-B and 5-B-5 and
14    5-B-6 the names S-V-E-T-L-A-N Selezneva, S-E-L-E-Z-N-A --
15    N-E-V-A, and Eva or Eva Selezneva, S-E-L-E-Z-N-E-V-A, are
16    contained in the 5-B-5 and 5-B-6 internal -- I believe it's
17    been testified to as an internal passport of Russia, as
18    opposed to the international passport or the foreign passport,
19    and those names are contained therein.  And those -- that
20    particular internal passport, if you will, or -- comes from
21    the bag that the person who was arrested was carrying in the
22    Maldives.  And the first agent who testified, Agent Dan
23    Schwandner, had looked at, as well.
24              The Court also notes that the addresses -- the
25    address I've already indicated contained in Exhibit 5, 10-A --
```

1    are also contained in Exhibit 10-A and 10-B.  The Court notes

2    that.  And then, also, the travel information contained in the

3    forensic investigation of Roman Seleznev traveling to

4    Singapore, that particular information has matched up to the

5    Exhibit 4-A, which is the foreign Russian passport, insofar as

6    the date and the name of Roman Seleznev.

7              In addition, the Court notes that the identifying

8    features contained in the INTERPOL Red Notice states that the

9    person before the Court has a mole below his left eye, which

10   was noted by the Agent Schwandner.  And Agent Schwandner

11   testified in court that he compared the photo of the defendant

12   -- I'm sorry, the person before the Court or the defendant --

13   that's right.  He compared the photo of that person with

14   Exhibit 3 and also with Exhibit 4 and 5, the foreign passport

15   and the internal passport.  And he also conducted an in-court

16   identification of Roman Seleznev as being the same person in

17   the INTERPOL Red Notice and the two passports and the person

18   he believed to be the person who was taken into custody.  The

19   issue of custody can be debated with the trial court, but

20   taken into custody, whether it's by the Maldives authority

21   and/or the U.S. Secret Service at Male Maldives, to be that

22   same person.  And, also, the name of Roman Seleznev was --

23   matches the name as contained in the indictment, as well as

24   the passport, as well as in the INTERPOL notice, including the

25   a/k/a Ruben Samvilech in the Red Notice is also contained here

*Case No. MJ14-00056*

```
 1   in the indictment and the Red Notice, as I've indicated.
 2              In addition, the Court has considered the
 3   testimony of Agent Schwandner when he indicated that he asked
 4   the person who was arrested in -- arrested and who's now
 5   before the Court what his name was, and that person identified
 6   himself as Roman Seleznev, whose name is consistent with the
 7   name contained in the superseding indictment under -- pursuant
 8   to Exhibit 2.
 9              In addition, the passport number -- the passport
10   number -- in particular, the Court notes passport number as
11   contained in Exhibit 4-B -- I'm sorry.  Strike that.  4-A --
12   the passport number as contained in 4 as well as -- hold on
13   one second.
14              (Pause.)
15              Okay.  Passport number as contained in 4-A-5,
16   640410831, is the same Russian passport number stated
17   belonging to Roman Seleznev in Exhibit 3-2, which is the
18   INTERPOL Red Notice.  And... okay.  The Court also notes that
19   the agent -- the first agent identified -- that first agent,
20   Dan Schwandner, in-court identification also includes the
21   identification of the defendant in person not just by his
22   mole, but his -- by what he was wearing, the shirt that he was
23   wearing and the jacket that he was wearing.  The Court takes
24   notice of that with regard to the in-court identification.
25              And then with regard to the departure card,
```

```
 1    Exhibit 6, the Court has also taken into consideration the
 2    date of arrival as testified to by the first agent, even
 3    though it says the departure card.  The Court notes that on
 4    Exhibit 6 in particular, it does state that -- if you look at
 5    the stamp, it does state June 21, 2014, and then there's a
 6    check indicating permitted to stay at the Male International
 7    Airport, it's the Maldives immigration stamp noted.  So the
 8    Court does note that as well.
 9             Then these exhibits that I've -- that the agent,
10    Dan Schwandner, had testified to, he's indicated all came from
11    the bag that the defendant had in his possession and in which
12    he was able to look through and match up all of this evidence
13    with regard to identification.
14             Okay.  So, therefore -- let me see if I have
15    anything else.  Therefore, the Court, as I've indicated,
16    believes that the United States Attorneys' Office have met its
17    burden of proof to show there's probable cause that the person
18    arrested is the person named in the charging indictment, that
19    person being Roman Seleznev.  And the Court will order that
20    the defendant will be held and transferred, and I will
21    transmit the papers to the clerk of the charging district.
22    The Court also will issue a decision on the personal
23    jurisdiction matter that I ruled upon earlier today, and that
24    will come out probably in a few days.  That will take me a few
25    days to issue that out.
```

```
 1                    Okay.  Any questions, Mr. Civille?

 2                    MR. CIVILLE:  No, Your Honor.

 3                    THE COURT:  Okay.  Your client have any issues?

 4                    MR. CIVILLE:  Your Honor, I would like to -- and

 5        not take a picture of the courtroom, just for our files, I'd

 6        like to take a picture of Mr. Seleznev for our investigative

 7        purposes.  Then I'll just face him to the back so it's not

 8        showing any of the courtroom.

 9                    THE COURT:  Okay.  That's fine.  You can do that

10        like right at end of the hearing.  That's fine.  You have a

11        camera?

12                    MR. CIVILLE:  Yes, Your Honor.

13                    THE COURT:  All right.  Okay.  Thank you,

14        Mr. Walsh.

15                    All right.  Anything further, Ms. David?

16                    MS. DAVID:  No, Your Honor.  Thank you.

17                    THE COURT:  All right.  Do you have a proposed

18        order on the removal?

19                    MS. DAVID:  I will have my office submit a copy

20        to chambers.

21                    THE COURT:  Oh.  You do have -- you already have

22        one?  Did you submit an original?

23                    MS. DAVID:  We typically submit usually around

24        the first initial appearance before the magistrate.

25                    THE COURT:  Oh, okay.  Let me see.  I don't know
```

203

```
 1    if you did.  You do think you submitted that?
 2                MS. DAVID:  I believe we may have.
 3                THE COURT:  I'm sorry.  Let me see.  That was
 4    before Judge Manibusan, you submitted it?
 5                MS. DAVID:  Yes, Your Honor.
 6                THE COURT:  Okay.  That was assuming, I think,
 7    that he waived identity.
 8                MS. DAVID:  We will prepare one.
 9                THE COURT:  Okay.
10                MS. DAVID:  And send it to chambers for tomorrow
11    morning, if that's okay.
12                THE COURT:  Okay.  That's fine.  I'll review it
13    then.
14                MS. DAVID:  Thank you, Your Honor.
15                THE COURT:  Yes, Mr. Civille?
16                MR. CIVILLE:  Your Honor, I realize they're
17    always hesitant to give an exact date for security reasons, so
18    I'm not asking for an exact date, but I would like to alert
19    the defense team back in the mainland.  May we inquire -- will
20    he be transported -- I know there's some Secret Service agents
21    out here.  I don't know if they're going back that way and
22    will take him or he'd be going on the regular U.S. Marshal
23    transport that sometimes takes several weeks to get through.
24    So I'm just curious --
25                THE COURT:  You just want to get an idea, is it
```

```
 1   gonna take several weeks or several hours?  Several days?
 2                MR. CIVILLE:  Yeah.  Is he on an expedited track
 3   or is he going back with the -- as prisoners --
 4                THE COURT:  Agent?
 5                MR. FISCHLIN:  Your Honor, I would default to the
 6   U.S. marshals.
 7                THE COURT:  Okay, so it's going to be the U.S.
 8   Marshals to do the transport, not the Secret Service?  Am I --
 9                MS. DAVID:  That is correct, Your Honor.
10                THE COURT:  Am I remanding him to the custody of
11   the U.S. Marshals, then?
12                MS. DAVID:  Yes, Your Honor.
13                THE COURT:  Not to the U.S. Secret Service.
14                MS. DAVID:  That's correct.
15                THE COURT:  I will -- okay, so I'm remanding him
16   to the custody of U.S. Marshals.  I know that our U.S.
17   Marshals have always indicated to me that because it's a top
18   security issue, they have to work that out.  But what I'll do
19   is have them -- have them coordinate that with you.  You will
20   know.  How's that?
21                MR. CIVILLE:  Okay.  Thank you, Your Honor.
22                THE COURT:  Just so -- for purposes of -- of
23   what?
24                MR. CIVILLE:  So I can alert the defense team
25   back in the -- on the mainland when -- approximately when
```

```
 1   he'll be back.  I'm not asking for the flight number or the
 2   day of departure, but, you know, something within a few-day
 3   range would be helpful.
 4              THE COURT:  Well, first of all, I'll have to get
 5   the removal order also.  That's going to be first and
 6   foremost.  And then -- then the personal jurisdiction order
 7   can follow after that.  We'll probably get that next week.  So
 8   -- yes, Mr. Walsh?
 9              MR. WALSH:  I was just going to add one other
10   reason, Your Honor, is because the defendant doesn't have any
11   family or relatives around, so in terms of clothing and/or
12   providing him with quarters while he's in confinement, those
13   sort of little practical matters of being a detainee while
14   confined, information in terms of how long we would be helping
15   him, that would be useful.  That's the only thing I wanted to
16   add.
17              THE COURT:  Well, you know, we do have clothing
18   downstairs, too, with Probation.  Men's clothing.
19          Grace, do we still have men's clothing about this
20   size of this defendant if it's necessary?
21              MS. FLORES:  We do have large clothing.  It's
22   usually for women.  But regarding his size, I'm not absolutely
23   sure.  But there is clothing available if necessary.
24              THE COURT:  Okay, well, we can -- Mr. Walsh and
25   Mr. Civille, with regard to clothing for Mr. Seleznev, the
```

*Case No. MJ14-00056*

```
 1   Court can make sure there's arrangements for him.  I mean,
 2   we've done that.  We've had to do that with some of the
 3   defendants who don't have clothing.  So we can get that for
 4   him, especially warmer clothing if he needs that, especially
 5   on the plane.  And that will be cleared with U.S. Probation,
 6   something that we have with one of our probation officers.
 7   Would you like that, Mr. Walsh?
 8               MR. WALSH:  Yes.  Thank you, Judge.  Just a
 9   practical consideration.
10               MR. CIVILLE:  Thank you, Your Honor.
11               THE COURT:  Okay.  Very well.  So we'll
12   coordinate that.  I'll have Ms. Flores, our chief probation
13   officer, assist Mr. Civille in getting the defendant some
14   clothing.  Can you let him know that?
15               INTERPRETER:  Yeah.
16               THE COURT:  Yeah, if you can let him know that.
17   We'll make sure he gets that.
18               All right.  Anything further, Counsels?
19               MR. CIVILLE:  No, Your Honor.
20               THE COURT:  Okay.  There being nothing further,
21   thank you very much.
22               MR. CIVILLE:  Thank you, Your Honor.
23               THE COURT:  Okay.  Have a nice day.
24               MR. RAY:  Thank you, Your Honor.
25               THE COURT:  Yeah, thank you.
```

```
 1              MR. GOLDIN:  Bye-bye, Your Honor.  Thanks.

 2              THE COURT:  Yeah, thank you, both of you.

 3   Appreciate your time.

 4              THE CLERK:  Court's adjourned.

 5              (Proceedings concluded at 6:32 p.m.)

 6   ---------------------------------------------

 7              CERTIFICATE OF OFFICIAL REPORTER

 8

 9   CITY OF HAGATNA          )
                              )  ss.
10   TERRITORY OF GUAM        )

11

12         I, Veronica F. Reilly, Federal Official Court

13   Reporter for the United States District Court of Guam, do

14   hereby certify the foregoing pages, 1 to 207, to be a true and

15   correct transcript of the stenographically-reported

16   proceedings held in the above-entitled matter.

17              Dated this 29th day of August, 2014.

18

19                        /s/Veronica F. Reilly
                          Veronica F. Reilly, CSR NO. 2004
20                        Federal Official Court Reporter

21

22

23

24

25
```

*Case No. MJ14-00056*

# EXHIBIT 7

No. 051

The Embassy of the United States of America presents its compliments to the Ministry of Foreign Affairs of the Republic of Maldives and has the honor to request the removal of Russian citizen ROMAN VALEREVICH SELEZNEV, alias "Roman Ivanov," alias "Ruben Samvelich," alias "Track2," alias "nCuX," alias "Bulba," alias "bandysli64," alias "smaus," alias "zagreb," alias "shmak," to the United States by way of deportation, expulsion, or other means available under the laws of the Maldives.

In addition to the above assistance, the United States requests the seizure of all articles in the possession of the fugitive that may serve as evidence of the offenses, for surrender with the fugitive if he is transferred to U.S. custody.

ROMAN VALEREVICH SELEZNEV ("SELEZNEV"), is believed to be planning to depart the Maldives on the morning of July 5, 2014. Therefore, the Embassy considers this request to be urgent.

SELEZNEV is wanted to stand trial in the United States District Court for the Western District of Washington for bank fraud, damage to computers, illegally obtaining information from computers, illegal possession of credit card information, trafficking in credit cards, and identity theft. On March 16, 2011, Superseding Indictment Number CR11-070RAJ was filed in the U.S. District Court for the Western District of Washington, charging SELEZNEV with the following offenses:

- Five counts (Counts 1 – 5) of bank fraud, in violation of Title 18, United States Code (U.S.C.), §§ 1344 and 2, with a maximum penalty of thirty years' imprisonment for each count;

**DIPLOMATIC NOTE**

- Eight counts (Counts 6 – 13) of intentional damage to a protected computer, in violation of 18 U.S.C. §§ 1030(a)(5)(A), 1030(c)(4)(B)(I), and 2, with a maximum penalty of ten years' imprisonment for each count;

- Eight counts (Counts 14 – 21) of obtaining information from a protected computer, in violation of 18 U.S.C. §§ 1030(a)(2), 1030(c)(2)(B)(ii), and 2, with a maximum penalty of five years' imprisonment for each count;

- One count (Count 22) of possession of fifteen or more unauthorized access devices (credit cards), in violation of 18 U.S.C. §§ 1029(a)(3), 1029(c)(1)(A)(i), and 2, with a maximum penalty of ten years' imprisonment;

- Two counts (Counts 23 and 24) of trafficking in unauthorized access devices, in violation of 18 U.S.C. §§ 1029(a)(2), 1029(c)(1)(A)(i), and 2, with a maximum penalty of ten years' imprisonment for each count; and,

- Five Counts (Counts 25 – 29) of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2, with a maximum penalty of two years' imprisonment for each count.

The applicable statute of limitation does not bar prosecution for the offenses charged.

On March 16, 2011, a warrant for the arrest of SELEZNEV was issued by the United States District Court for the Western District of Washington based on the charges in the superseding indictment. This arrest warrant remains valid and executable to apprehend SELEZNEV for the charges filed in the superseding indictment. The indictment and the arrest warrant are attached.

The court has authorized the Indictment and warrant of arrest to be unsealed for the limited purpose of allowing the United States to provide copies of these documents to any foreign officials necessary to effectuate the arrest and transfer of SELEZNEV to the United States, but they will remain sealed until the apprehension of SELEZNEV.

The facts of the case are as follows:

The U.S. Secret Service (USSS) has been investigating the internet nickname of "Track2" since May 2010. During the investigation, it was determined that the nickname belongs to SELEZNEV and that he is responsible for network intrusions or computer hacks at over 100 businesses. It has also been determined that he is responsible for the sale of hundreds of thousands of stolen credit card numbers.

The first network intrusion investigated by the USSS was at Schlotszki's Deli in Coeur D'Alene, Idaho. On May 17, 2010, computers belonging to the business were imaged and it was determined that malicious computer software had been installed on the computers of the business since early April 2010 and that stolen credit card numbers were being transmitted to a server in Russia. During the investigation, it was also determined that the server where the data was being sent was the same server that was hosting or storing all of the variations of the malicious software.

In June 2010, a suspect was arrested in Ohio who was in possession of credit card numbers stolen from the Coeur D'Alene, Idaho, network intrusion. A forensic examination of the suspect's computer revealed that he had communicated online with SELEZNEV via a chat program and had purchased the credit card numbers from a website belonging to SELEZNEV.

Between April 2010 and March 2011, SELEZNEV hacked multiple businesses in at least five different states including Washington, Maryland, Arizona, Illinois, and New York. Numerous court orders and warrants have been served as part of this case. These court orders have included search warrants for email accounts, computer servers, and

business records from various providers. The cumulative information from these records and searches have positively identified SELEZNEV as the computer hacker behind the aforementioned network intrusions, as well as being the person responsible for the marketing and sale of hundreds of thousands of stolen credit card numbers stolen from the victim businesses.

The most recent fraud loss numbers obtained in this case show that there has been a confirmed actual loss of over US$ 1.9 million. This number is expected to rise significantly as the investigation continues.

SELEZNEV is a citizen of the Russian Federation born on July 23, 1984, in the Russian Federation. He is described as a Caucasian male, approximately 5 feet 10 inches tall, weighing approximately 190 pounds, with brown hair and brown colored eyes. He has a mole below his left eye. Photographs of SELEZNEV are included with this request. SELEZNEV's Russian Federation passport number is 640410831 issued on or about December 31, 2009. In 2007 and 2008, SELEZNEV traveled on a Russian Federation passport with a number of 623910597.

The United States will attempt to provide any further documentation required by authorities in the Maldives in a timely manner, including translations of documentation provided with this diplomatic note, if needed. If Maldivian authorities are willing to assist the United States Government in this matter, the United States Government has agents that are able to escort SELEZNEV to the United States.

While the United States would appreciate the assistance of the Maldives in returning SELEZNEV to the United States, because of limitations imposed by U.S. law, we would not be in a position to guarantee reciprocity in the event of the Maldives' interest in our similarly deporting or expelling someone to the Maldives.

The Embassy of the United States of America avails itself of this opportunity to renew to the Ministry of Foreign Affairs of the Republic of Maldives the assurances of its highest consideration.


Embassy of the United States of America,

Colombo, July 03, 2014.



# EXHIBIT 8

| From: | Lashinsky, Dennis M (Colombo) |
|---|---|
| To: | Commissioner@police.gov.mv; Rana Waheed (rw_C1258@police.gov.mv) |
| Subject: | Arrest Warrant for Fugitive in Maldives |
| Attachments: | image2014-02-11-021753.pdf |
| | image2014-02-11-041308.pdf |

Commissioner Waheed,

Attached is the local arrest warrant from the United States Secret Service and the photos for the subject. Also attached is a copy of a Diplomatic Note. SA Mark Smith will arrive around 0815 tomorrow morning. I will follow-up with an email with flights details momentarily. If it is possible to send a an officer to meet him at the airport and arrange for the boat to take him from the HIH to MPS HQ that would be great. He will have all the additional details regarding the case upon his arrival. Thank you for everything. Good luck with the operation.

Regards,

Mike

**D. Michael Lashinsky**
**Assistant Regional Security Officer**
**U.S. Embassy Colombo, Sri Lanka**
**Tel: (94-11) 249-8500 ext. 8756**
**Cell: 077-700-4070**
**IVG: 761-8756**


SBU
This email is UNCLASSIFIED.

**From:** Hussain Waheed [mailto:h.waheed@police.gov.mv]
**Sent:** Thursday, July 03, 2014 12:34 PM
**To:** Lashinsky, Dennis M (Colombo)
**Subject:** RE: Expulsion Operation

Hello Mike,

It would be most helpful if Ambassador Sison could give AG Anil a call from
your side as well.

Best

*Hussain Waheed*
*Commissioner of Police*
*Maldives Police Service*

*Police Headquarters, Shaheed Hussain Adam Building, Henveiru, Boduthakurufaanu*
*Magu, Male' 20125, Republic of Maldives*
*Tel: +960 3323588|Mobile: +960 9998226|Fax: +960 3346809 |*
*Email:commissioner@police.gov.mv/ h.waheed@police.gov.mv*

**From:** Lashinsky, Dennis M (Colombo) [LashinskyDM@state.gov]
**Sent:** Thursday, July 03, 2014 11:17 AM
**To:** commissioner
**Cc:** Rana Waheed
**Subject:** Expulsion Operation

Commissioner Waheed,

I would like to thank you for offering us your assistance in coordinating the expulsion of this high value fugitive. As I mentioned, the U.S. Secret Service has described the subject as the most notorious credit card trafficker today accessing over 1,000,000 accounts, and as a major player in cybercriminal activities.

This morning, I anticipated that all the documentation required to launch this operation would be in my inbox. However, it appears that due to the time difference, or what I would like to call the 8900 mile screwdriver, the release of this information is hung up back in Washington. It should come through this evening when DC reopens.

I addition, I have discussed the delay of this operation with Ambassador Sison. If you think it would help for her to notify the AG Anil, please let me know. We can pass him the same information that we gave to you to help facilitate the agency's request for removal/expulsion of the subject.

Sincerely,

Mike


**D. Michael Lashinsky**
**Assistant Regional Security Officer**
**U.S. Embassy Colombo, Sri Lanka**
**Tel: (94-11) 249-8500 ext. 8756**
**Cell: 077-700-4070**
**IVG: 761-8756**


SBU
This email is UNCLASSIFIED.

| From: | Dehoag, Charles (Colombo) |
|---|---|
| To: | protocol@foreign.gov.mv |
| Cc: | Ross, Robert K (Colombo); Anderson, Jason (Colombo); Fallon, Sokhoeun N; Lashinsky, Dennis M (Colombo); Hulsman, Raymond J (Colombo) |
| Subject: | URGENT: Request Landing for US Flight |
| Date: | Friday, July 04, 2014 2:30:40 AM |
| Attachments: | 057-14 DAO (Landing VJT 510).pdf |

Protocol,

Ramazan Mubarak! I must apologize in advance for such very late notice. Please see the attached request for landing/overflight. This aircraft mission acting in close cooperation and coordination with the Maldives Police Service. Please contact the Honorable Rana Waheed with additional questions.

All of those cc'd can also address any concerns. We will reach out to you telephonically as well, due to the urgency of the matter, at 9607990993 and 9603304128. Please advise if there are better or preferred numbers.

Again, my sincerest thanks in advance for your assistance. All the best to you and yours in this Holy Month.

v/r
Chuck

Charles A. DeHoag, GS-14
**Deputy Defense Attache**
**USDAO Colombo, Sri Lanka**
United States Embassy, Sri Lanka
and the Maldives
210 Galle Road, Colombo 3
Comm: 94-11-249-8577
Fax: 94-11-249-8675
Mobile: 94-077-7709-583


SBU
This email is UNCLASSIFIED.

**From:**     Smith, Mark J (Colombo)
**To:**        Lashinsky, Dennis M (Colombo)
**Subject:**  Re: Final Op Plan - USSS
**Date:**     Friday, July 04, 2014 3:56:06 AM

We're waiting on the judge to issue the court order/warrant

**From**: Lashinsky, Dennis M (Colombo)
**Sent**: Friday, July 04, 2014 04:13 PM Sri Lanka Standard Time
**To**: DAVID IACOVETTI (HNL) <David.Iacovetti@usss.dhs.gov>; JOHN SZYDLIK (CID)
<John.Szydlik@usss.dhs.gov>; JOHN TANI JR (HNL) <John.Tani@usss.dhs.gov>; Smith, Mark J
(Colombo); Hayes, Blake D; DANIEL SCHWANDNER (BAN) <dschwandner@usss.dhs.gov>; Hulsman,
Raymond J (Colombo)
**Cc**: Robrahn, Daniel W; Caniglia, Nicholas D; ANGELO ANGELOPULOS (CID)
<angelo.angelopulos@usss.dhs.gov>; ARI BARANOFF (CID) <ari.baranoff@usss.dhs.gov>;
'Luke.Dembosky@usdoj.gov' <Luke.Dembosky@usdoj.gov>; 'Christine.Chen@usdoj.gov'
<Christine.Chen@usdoj.gov>; 'Jeffrey.Olson@usdoj.gov' <Jeffrey.Olson@usdoj.gov>;
'Michael.Dick2@usdoj.gov' <Michael.Dick2@usdoj.gov>; 'Norman.Barbosa@usdoj.gov'
<Norman.Barbosa@usdoj.gov>; MICHAEL FISCHLIN (SEA) <michael.fischlin@usss.dhs.gov>; JOHN
MARENGO (CID) <john.marengo@usss.dhs.gov>; RICHARD LATULIP (CID)
<richard.latulip@usss.dhs.gov>; DMITRIY BUKIN (LAX) <Dmitriy.Bukin@usss.dhs.gov>; SCOT LAM
(LAX) <scot.lam@usss.dhs.gov>; LOREN CRUZADA (HNL) <loren.cruzada@usss.dhs.gov>; JOHN
KEAVENEY (HNL) <john.keaveney@usss.dhs.gov>; EDWARD LOWERY III (CID)
<Edward.Lowery@usss.dhs.gov>; JONATHAN BARTLETT (INV) <Mark.Bartlett@usss.dhs.gov>;
FREDERICK SELLERS (INV) <frederick.sellers@usss.dhs.gov>; (U) Yi, Sung H (Bangkok)
**Subject**: Re: Final Op Plan - USSS

**From:** DAVID IACOVETTI (HNL)
**Sent:** Friday, July 4, 2014 3:21 PM
**To:** JOHN SZYDLIK (CID); JOHN TANI JR (HNL); Smith, Mark J (Colombo); Hayes, Blake D; DANIEL
SCHWANDNER (BAN); Lashinsky, Dennis M (Colombo); Hulsman, Raymond J (Colombo)
**Cc:** Robrahn, Daniel W; Caniglia, Nicholas D; ANGELO ANGELOPULOS (CID); ARI BARANOFF (CID);
'Luke.Dembosky@usdoj.gov'; 'Christine.Chen@usdoj.gov'; 'Jeffrey.Olson@usdoj.gov';
'Michael.Dick2@usdoj.gov'; 'Norman.Barbosa@usdoj.gov'; MICHAEL FISCHLIN (SEA); JOHN MARENGO
(CID); RICHARD LATULIP (CID); DMITRIY BUKIN (LAX); SCOT LAM (LAX); LOREN CRUZADA (HNL);
JOHN KEAVENEY (HNL); EDWARD LOWERY III (CID); JONATHAN BARTLETT (INV); FREDERICK
SELLERS (INV); (U) Yi, Sung H (Bangkok)
**Subject:** Re: Final Op Plan - USSS

**From**: JOHN SZYDLIK (CID)
**Sent**: Friday, July 04, 2014 04:13 AM
**To**: JOHN TANI JR (HNL); 'SmithMJ1@state.gov' <SmithMJ1@state.gov>; 'HayesB2@state.gov'
<HayesB2@state.gov>; DANIEL SCHWANDNER (BAN); 'LashinskyDM@state.gov'
<LashinskyDM@state.gov>; 'HulsmanRJ@state.gov' <HulsmanRJ@state.gov>
**Cc**: 'RobrahnDW2@state.gov' <RobrahnDW2@state.gov>; 'CanigliaND@state.gov'

<CanigliaND@state.gov>; ANGELO ANGELOPULOS (CID); ARI BARANOFF (CID); 'Dembosky, Luke'
<Luke.Dembosky@usdoj.gov>; 'Chen, Christine' <Christine.Chen@usdoj.gov>; 'Olson, Jeffrey'
<Jeffrey.Olson@usdoj.gov>; 'Dick, Michael' <Michael.Dick2@usdoj.gov>; 'Barbosa, Norman (USAWAW)'
<Norman.Barbosa@usdoj.gov>; MICHAEL FISCHLIN (SEA); JOHN MARENGO (CID); RICHARD LATULIP
(CID); DAVID IACOVETTI (HNL); DMITRIY BUKIN (LAX); SCOT LAM (LAX); LOREN CRUZADA (HNL);
JOHN KEAVENEY (HNL)
**Subject**: Final Op Plan - USSS

All e-mail to/from this account is subject to official review and is for official use only.
Action may be taken in response to any inappropriate use of the Secret Service's e-
mail system. This e-mail may contain information that is privileged, law enforcement
sensitive, or subject to other disclosure limitations. Such information is loaned to you
and should not be further disseminated without the permission of the Secret Service.
If you have received this e-mail in error, do not keep, use, disclose, or copy it; notify
the sender immediately and delete it.

| | |
|---|---|
| **From:** | Smith, Mark J (Colombo) |
| **To:** | Lashinsky, Dennis M (Colombo) |
| **Subject:** | Re: Final Op Plan - USSS |
| **Date:** | Friday, July 04, 2014 8:03:44 AM |

Being told the warrant will be done at 9

**From**: Lashinsky, Dennis M (Colombo)
**Sent**: Friday, July 04, 2014 04:13 PM Sri Lanka Standard Time
**To**: DAVID IACOVETTI (HNL) <David.Iacovetti@usss.dhs.gov>; JOHN SZYDLIK (CID)
<John.Szydlik@usss.dhs.gov>; JOHN TANI JR (HNL) <John.Tani@usss.dhs.gov>; Smith, Mark J
(Colombo); Hayes, Blake D; DANIEL SCHWANDNER (BAN) <dschwandner@usss.dhs.gov>; Hulsman,
Raymond J (Colombo)
**Cc**: Robrahn, Daniel W; Caniglia, Nicholas D; ANGELO ANGELOPULOS (CID)
<angelo.angelopulos@usss.dhs.gov>; ARI BARANOFF (CID) <ari.baranoff@usss.dhs.gov>;
'Luke.Dembosky@usdoj.gov' <Luke.Dembosky@usdoj.gov>; 'Christine.Chen@usdoj.gov'
<Christine.Chen@usdoj.gov>; 'Jeffrey.Olson@usdoj.gov' <Jeffrey.Olson@usdoj.gov>;
'Michael.Dick2@usdoj.gov' <Michael.Dick2@usdoj.gov>; 'Norman.Barbosa@usdoj.gov'
<Norman.Barbosa@usdoj.gov>; MICHAEL FISCHLIN (SEA) <michael.fischlin@usss.dhs.gov>; JOHN
MARENGO (CID) <john.marengo@usss.dhs.gov>; RICHARD LATULIP (CID)
<richard.latulip@usss.dhs.gov>; DMITRIY BUKIN (LAX) <Dmitriy.Bukin@usss.dhs.gov>; SCOT LAM
(LAX) <scot.lam@usss.dhs.gov>; LOREN CRUZADA (HNL) <loren.cruzada@usss.dhs.gov>; JOHN
KEAVENEY (HNL) <john.keaveney@usss.dhs.gov>; EDWARD LOWERY III (CID)
<Edward.Lowery@usss.dhs.gov>; JONATHAN BARTLETT (INV) <Mark.Bartlett@usss.dhs.gov>;
FREDERICK SELLERS (INV) <frederick.sellers@usss.dhs.gov>; (U) Yi, Sung H (Bangkok)
**Subject**: Re: Final Op Plan - USSS

**From:** DAVID IACOVETTI (HNL)
**Sent:** Friday, July 4, 2014 3:21 PM
**To:** JOHN SZYDLIK (CID); JOHN TANI JR (HNL); Smith, Mark J (Colombo); Hayes, Blake D; DANIEL
SCHWANDNER (BAN); Lashinsky, Dennis M (Colombo); Hulsman, Raymond J (Colombo)
**Cc:** Robrahn, Daniel W; Caniglia, Nicholas D; ANGELO ANGELOPULOS (CID); ARI BARANOFF (CID);
'Luke.Dembosky@usdoj.gov'; 'Christine.Chen@usdoj.gov'; 'Jeffrey.Olson@usdoj.gov';
'Michael.Dick2@usdoj.gov'; 'Norman.Barbosa@usdoj.gov'; MICHAEL FISCHLIN (SEA); JOHN MARENGO
(CID); RICHARD LATULIP (CID); DMITRIY BUKIN (LAX); SCOT LAM (LAX); LOREN CRUZADA (HNL);
JOHN KEAVENEY (HNL); EDWARD LOWERY III (CID); JONATHAN BARTLETT (INV); FREDERICK
SELLERS (INV); (U) Yi, Sung H (Bangkok)
**Subject:** Re: Final Op Plan - USSS

**From**: JOHN SZYDLIK (CID)
**Sent**: Friday, July 04, 2014 04:13 AM
**To**: JOHN TANI JR (HNL); 'SmithMJ1@state.gov' <SmithMJ1@state.gov>; 'HayesB2@state.gov'
<HayesB2@state.gov>; DANIEL SCHWANDNER (BAN); 'LashinskyDM@state.gov'
<LashinskyDM@state.gov>; 'HulsmanRJ@state.gov' <HulsmanRJ@state.gov>
**Cc**: 'RobrahnDW2@state.gov' <RobrahnDW2@state.gov>; 'CanigliaND@state.gov'

<CanigliaND@state.gov>; ANGELO ANGELOPULOS (CID); ARI BARANOFF (CID); 'Dembosky, Luke'
<Luke.Dembosky@usdoj.gov>; 'Chen, Christine' <Christine.Chen@usdoj.gov>; 'Olson, Jeffrey'
<Jeffrey.Olson@usdoj.gov>; 'Dick, Michael' <Michael.Dick2@usdoj.gov>; 'Barbosa, Norman (USAWAW)'
<Norman.Barbosa@usdoj.gov>; MICHAEL FISCHLIN (SEA); JOHN MARENGO (CID); RICHARD LATULIP
(CID); DAVID IACOVETTI (HNL); DMITRIY BUKIN (LAX); SCOT LAM (LAX); LOREN CRUZADA (HNL);
JOHN KEAVENEY (HNL)
**Subject**: Final Op Plan - USSS

All e-mail to/from this account is subject to official review and is for official use only.
Action may be taken in response to any inappropriate use of the Secret Service's e-
mail system. This e-mail may contain information that is privileged, law enforcement
sensitive, or subject to other disclosure limitations. Such information is loaned to you
and should not be further disseminated without the permission of the Secret Service.
If you have received this e-mail in error, do not keep, use, disclose, or copy it; notify
the sender immediately and delete it.

| | |
|---|---|
| **From:** | Smith, Mark J (Colombo) |
| **To:** | "hussainusham@gmail.com" |
| **Subject:** | seleznev.jpg |
| **Date:** | Friday, July 04, 2014 8:34:20 PM |
| **Attachments:** | seleznev.jpg |

| From: | Abdulla Rasheed |
|---|---|
| To: | Dehoag, Charles (Colombo); badoora@foreign.gov.mv |
| Cc: | Ross, Robert K (Colombo); Anderson, Jason (Colombo); Fallon, Sokhoeun N; Lashinsky, Dennis M (Colombo); Hulsman, Raymond J (Colombo); rw_C1258@police.gov.mv |
| Subject: | Diplomatic Clearance Issued |
| Date: | Tuesday, July 08, 2014 10:55:59 AM |
| Attachments: | Diplomatic Clearance Issued.pdf |

Dear Chuck,

Please find attached here with the  Ministry letter number  (D2) EA-US/B/2014/28
dated  4 July 2014. Regarding the issued of the Diplomatic clearance of US aircraft ,
Bombardier Global 5000/ VJT 510 to overfly Maldivian airspace and land at Male
International Airport.

Regards
Rasheed

**Abdulla Rasheed**
Protocol Department
Ministry of Foreign Affairs
Republic of Maldives
T  (960)3304138
M  (960) 741 1975
F  (960) 3329178

Ministry of Foreign Affairs, Male' 20077, Republic of Maldives
Direct: +960 3301437| Tel: +960 3323400 | Fax: +960 3329178    Web:
www.foreign.gov.mv

_____ Information from ESET NOD32 Antivirus, version of virus signature
database 3948 (20090319) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

| From: | Dehoag, Charles (Colombo) |
|---|---|
| To: | "protocol@foreign.gov.mv"; "badoora@foreign.gov.mv" |
| Cc: | Ross, Robert K (Colombo); Anderson, Jason (Colombo); Fallon, Sokhoeun N; Lashinsky, Dennis M (Colombo); Hulsman, Raymond J (Colombo); "rw_C1258@police.gov.mv" |
| Subject: | Re: Diplomatic Clearance Issued |
| Date: | Tuesday, July 08, 2014 7:00:54 PM |

Thank you, Rasheed!

Best,
Chuck

**From:** Abdulla Rasheed [mailto:protocol@foreign.gov.mv]
**Sent:** Tuesday, July 08, 2014 11:14 PM Sri Lanka Standard Time
**To:** Dehoag, Charles (Colombo); badoora@foreign.gov.mv <badoora@foreign.gov.mv>
**Cc:** Ross, Robert K (Colombo); Anderson, Jason (Colombo); Fallon, Sokhoeun N; Lashinsky, Dennis M (Colombo); Hulsman, Raymond J (Colombo); rw_C1258@police.gov.mv <rw_C1258@police.gov.mv>
**Subject:** Diplomatic Clearance Issued

Dear Chuck,

Please find attached here with the Ministry letter number (D2) EA-US/B/2014/28 dated 4 July 2014. Regarding the issued of the Diplomatic clearance of US aircraft , Bombardier Global 5000/ VJT 510 to overfly Maldivian airspace and land at Male International Airport.

Regards
Rasheed

**Abdulla Rasheed**
Protocol Department
Ministry of Foreign Affairs
Republic of Maldives
T (960)3304138
M (960) 741 1975
F (960) 3329178

Ministry of Foreign Affairs, Male' 20077, Republic of Maldives
Direct: +960 3301437| Tel: +960 3323400 | Fax: +960 3329178   Web: www.foreign.gov.mv

_____ Information from ESET NOD32 Antivirus, version of virus signature database 3948 (20090319) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

| | |
|---|---|
| **From:** | Smith, Mark J (Colombo) |
| **To:** | "hussainusham@gmail.com" |
| **Subject:** | list of names |
| **Date:** | Monday, July 14, 2014 2:12:48 AM |

Usham,

Sorry to bother but do you think you will be able to provide that list of names today. I need to try and get it to our Secret Service counterparts back in DC today.

Thanks so much.
Mark Smith
TDY ARSO-I
Ext 8790
BB 077-310-4201


This email is UNCLASSIFIED.

**From:** Smith, Mark J (Colombo)
**To:** "Hussain Usham"
**Subject:** RE: list of names
**Date:** Monday, July 14, 2014 3:14:37 AM

Usham,

I'll get in touch with Shuhad to get the list.

Many thanks
Mark

**From:** Hussain Usham [mailto:hussainusham@gmail.com]
**Sent:** Monday, July 14, 2014 3:31 PM
**To:** Smith, Mark J (Colombo)
**Subject:** Re: list of names

Since I'm not in a position to authorize to share the list, I request to contact ACP Areef or SP Shuhad for the list.

Regards,
USHAM

On Monday, July 14, 2014, Smith, Mark J (Colombo) <SmithMJ1@state.gov> wrote:
Usham,

Sorry to bother but do you think you will be able to provide that list of names today. I need to try and get it to our Secret Service counterparts back in DC today.

Thanks so much.
Mark Smith
TDY ARSO-I
Ext 8790
BB 077-310-4201

This email is UNCLASSIFIED.

This email is UNCLASSIFIED.

# EXHIBIT 9

**MICHAEL FISCHLIN (SEA)**

| | |
|---|---|
| **From:** | HNL |
| **Sent:** | Tuesday, July 08, 2014 6:34 PM |
| **To:** | CID; SEA |
| **Cc:** | GUA; cis; ISD; HKG; SYD; BAN; LAS; SPO; HNL |
| **Subject:** | CT 771.110 Notification of Federal Arrest - Robert Seleznev (Guam) |

```
                 U.S. Secret Service Investigative Report

FROM:    GUAM RESIDENT OFFICE              FILE:   J-409-771-23434-S
TO  :    CRIMINAL INVESTIGATIVE DIVISION   X-REF:  178-771-43719-S
         SEATTLE FIELD OFFICE                      410-775-09446-S
                                                   417-769-08288-S
                                                   202-768-22869-S
                                                   203-771-42801-S
                                                   404-771-20456-S

                                          SEIZURE #:  N/A


INFO:    CYBER INTELLIGENCE SECTION
         INVESTIGATIVE SUPPORT DIVISION
         HONOLULU FIELD OFFICE
         HONG KONG RESIDENT OFFICE
         SYDNEY RESIDENT OFFICE
         BANGKOK RESIDENT OFFICE
         LAS VEGAS FIELD OFFICE
         SPOKANE RESIDENT OFFICE


SUBJ:    NOTIFICATION OF FEDERAL ARREST
             ROMAN SELEZNEV - DATE OF ARREST 07/06/14

         ACTUAL LOSS: $6,300,000     POTENTIAL LOSS: $100,000,000

CASE TITLE          :  BROADWAY GRILL
CASE TYPE           :  771.110 - FRAUDULENT USE OF ACCOUNT NUMBERS -
                          BANK CARDS
SECONDARY TYPES     :  775.610, 774.060, 775.120, 775.220, 775.230,
                       775.520, 725.110, 767.100, 767.120,
                       768.100, 769.110, 848.290, 848.920
                       848.930, 848.940, 848.950, 848.191
CONTROLLING OFFICE  :  SEATTLE FIELD OFFICE
REPORT MADE BY      :  SA DANIEL SCHWANDNER (BAN) +66 81 810-9333
DATE CASE OPENED    :  11/01/10
PREVIOUS REPORT     :  REPORT OF INVESTIGATION BY SA MICHAEL FISCHLIN
                       DATED 5/23/14
REPORTING PERIOD    :  7/6/14 - 7/7/14
STATUS              :  CONTINUED


SYNOPSIS:

At approximately 0252 HRS On 7/6/14, Russian National Roman Seleznev was arrested at the
Guam International Airport by SA Dan Schwandner (BAN), and other Honolulu Field Office
agents after arriving in Guam aboard a private charter flight from Male, Maldives.

The arrest was executed based on arrest warrant CR11-70 RAJ issued on 03/16/11, by the
U.S. District Court, Western District of Washington.
```

1

USSS_0000243

There is an additional arrest warrant for this Defendant number 2:12-cr-004 issued on 01/10/12 by the U.S. District Court, District of Nevada.

On 7/8/14, I received an e-mail from SA John Szydlik, USSS Cyber Intelligence Section informing me that notification of Seleznev's arrest was sent via fax at 1627 HRS EST on 7/5/14 (0627 HRS on 7/6/14 Guam time) to the Russian Embassy in Washington, DC.

Details of Investigation:

Reference is made to the previous report in this case, dated 05/23/14, wherein SA Michael Fischlin, Seattle Field Office reported that this case was continued pending judicial action.

On 7/3/14, I received a call from ATSAIC John Marengo, USSS Cyber Intelligence Section providing me with information that Russian National Roman Seleznev, a U.S. Secret Service high value target was possibly vacationing in the Maldives.

Coordination had been on-going for several days between the U.S. Secret Service, the U.S. State Department to include the U.S. Embassy in Colombo, Sri Lanka and Maldivian authorities in order to confirm that Seleznev was in the Maldives and to determine the willingness of the Maldivian authorities to turn Seleznev over to United States law enforcement officials based on a red notice request from Interpol (Control No A-5063/7-2014) relating to the above mentioned arrest warrants.

On 7/3/14, I departed Bangkok at 0941 HRS and arrived in Male, Maldives at 1140 HRS.

On 7/4/14, I met with ARSOI Mark Smith, Diplomatic Security Service from the U.S. Embassy in Colombo, Sri Lanka regarding this matter. ARSOI Smith told me that based on his previous communications with Maldivian Law Enforcement authorities, there was a high probability they were willing to expel Seleznev from the Maldives and turn him over to U.S. law enforcement authorities on the aforementioned Interpol red notice.

Continuing on 7/4/14, SAIC Dave Iacovetti (HNL) arrived in Male, Maldives at approximately 1140 HRS. At 1430 HRS, SAIC Iacovetti, ARSOI Smith, and I met with Maldivian Police regarding this matter. At this meeting, it was confirmed by Maldivian Immigration records that Seleznev arrived in the Maldives on 6/21/14, and is believed to be staying at the Atmosphere Hotel, located on Kanifushi Island, about a 30 minute sea plane trip from the Male International Airport. It is also believed that he was scheduled to depart the Maldives on Saturday 7/5/14, at 1155 HRS via Transaero Flight UN510.

On the evening of 7/4/14, Maldivian authorities confirmed that Seleznev was scheduled to depart the Atmosphere resort via sea plane at approximately 0900 HRS on 7/5/14, en route to the Male International Airport.

At approximately 0830 on 7/5/14, it was confirmed by our Maldivian police counterparts that Seleznev would be expelled from the Maldives based on the aforementioned Interpol red notice and turned over to the custody of myself, SAIC Iacovetti and ARSOI Smith. We were further told this decision was made at the highest level of the Maldivian Government and received the approval of the President of the Maldives.

Continuing on 7/5/14, at approximately 1002 HRS, the Sea Plane carrying Seleznev, his girlfriend Ganna Otisko and her daughter Anastasia Otisko arrived at Male International airport. All three passengers boarded a shuttle bus en route to the Male International Airport terminal.

At approximately 1028 HRS, all three passengers approached the departure entrance to the Male International airport terminal, where they were approached and detained by Maldivian Tourist Police Officers, and asked to accompany police to the tourist police office inside the airport terminal.

USSS_0000244

At the police office, Maldivian Tourist Police directed Otisko and her daughter into a back office and asked Seleznev to sit down in the front office. Maldivian Police officials informed Seleznev that based on the issuance of the previously mentioned red notice from Interpol; he was being expelled from the Maldives and turned over to the custody of U.S. law enforcement officials. At this time, ARSOI Smith and I introduced ourselves and presented a copy of the indictment and the aforementioned arrest warrant from the U.S. District Court, Western District of Washington to Seleznev and informed him that he was going to be transported from Male to the United States to answer to the charges listed in the warrant.

Maldivian Tourist Police, assisted by myself and ARSOI Smith, searched through the bags that Seleznev and his party had brought to the airport with them. During this search, evidence to include electronic equipment, genuine U.S. currency, genuine Russian Rubles, miscellaneous travel documents, credit cards, and Seleznev's passports were seized by me, and later inventoried on the SSF 1544 forms listed below. All other items were left in the care of the Maldivian Tourist Police for release to Otisko.

At approximately 1051 HRS, SAIC Iacovetti, ARSOI Smith, Seleznev and I departed the Tourist Police office via foot escorted by Maldivian authorities to the VIP departure terminal. Upon arrival, we presented our documents to the Maldivian authorities to clear immigration. After clearing immigration, we were taken by vehicle and escorted by Maldivian authorities to our awaiting charter flight, and boarded the plane at 1105 HRS.

At approximately 1120 HRS on 7/5/14, SAIC Iacovetti, ARSOI Smith, myself and Seleznev departed Male, Maldives via charter aircraft en route to Guam.

JUDICIAL ACTION:

At 1400 HRS On 07/07/14, an initial appearance/identity hearing was held for Seleznev in Guam. During this time, the defendant refused to acknowledge the public defender, forcing the postponement of this hearing until 7/22/14, to allow the defendant to secure his own legal counsel.

Continuing on this date, I received an e-mail from SAIC Iacovetti, indicating correspondence with the U.S. Attorney's Office in Seattle that the New York law firm of Fox Rothschild LLP had been retained to represent Seleznev.

The U.S. Attorney's office in Guam has released the evidence seized from Seleznev at the time of his arrest to the Western District of Washington. This evidence will be delivered in person to the Seattle Field Office by SAIC Iacovetti.

SUSPECTS/DEFENDANTS:

SELEZNEV, ROMAN - DEFENDENT - ARRESTED (FEDERAL)
    1599:    YES (completed previously in SEA)
    1599A:   YES

EXAMS CONDUCTED:

None

DATABASE SEARCHES CONDUCTED:

NONE

EVIDENCE/CONTRABAND/PERSONAL PROPERTY:

Items seized from Seleznev and inventoried on SSF 1544 serial numbers 0001 DAI, 0002 DAI, 0003 DAI, 0004 DAI, 0005 DAI and 0006 DAI are being transported from Guam to the Seattle Field Office by SAIC Iacovetti.

All previously inventoried evidence is being held in the Seattle Field Office vault.

3

USSS_0000245

DISPOSITION:

Case continued in Guam pending results of federal judicial action.

HONOLULU FO                                    SCHWANDNER/JONES/IACOVETTI/cc

4

USSS_0000246

# EXHIBIT 10

What is LinkedIn?    Join Today    Sign In

# Hussain Usham

POLICE CORPORAL / NSO NCB MALE' at Maldives Police Service

Maldives    Law Enforcement

**28**
connections

**Search by name**

Over 300 million professionals are already on LinkedIn. Find who you know.

First Name          Last Name          🔍

**Example:** Jeff Weiner

## Join LinkedIn and access Hussain's full profile. It's free!

As a LinkedIn member, you'll join 300 million other professionals who are sharing connections, ideas, and opportunities.

- See who you know in common
- Get introduced
- Contact **Hussain** directly

**View Hussain's Full Profile**

**People Also Viewed**

 Abdulla Fairoosh
Research Student

 Aly Naashid
Consultancy

 Mohamed Hameed
Executive Director at Total Investment
Security Solutions PVT Ltd

## Experience

**POLICE CORPORAL / NSO NCB MALE'**

Maldives Police Service

**Ads You May Be Interested In**

 your free trading system
This simple and 100%
automated system can make
you up to $15,500

Sales Teams Comms
Creative comms to sales teamson
Screensavers, Tickers & Alerts

 Lowest Wavelength Pricing
10G and 100G. Highly diverse
and reliable long haul route
NY-Chicago

## View Hussain's full profile to...

- See who you know in common
- Get introduced
- Contact **Hussain** directly

**View Hussain's Full Profile**

Not the Hussain Usham you're looking for? View more

LinkedIn member directory: a b c d e f g h i j k l m n o p q r s t u v w x y z more    Browse members by country

© 2015    User Agreement    Privacy Policy    Community Guidelines    Cookie Policy    Copyright Policy    Guest Controls

# EXHIBIT 11

## IN THE UNITED STATES DISTRICT COURT

## FOR THE TERRITORY OF GUAM

UNITED STATES OF AMERICA,

          Plaintiff,

    vs.

ROMAN SELEZNEV,
    aka TRACK2,
    aka ROMAN IVANOV,
    aka RUBEN SAMVELICH,
    aka nCuX,
    aka Bulba,
    aka bandysli64,
    aka smaus,
    aka Zagreb,
    aka shmak,

          Defendant.

MAGISTRATE CASE NO. 14-00056

**DECLARATION OF
SHARAFULLA SHIHAB**

I, Sharafulla Shihab, being of full age and sound mind do hereby swear and affirm:

1.    I am a citizen of the Republic of Maldives.

2.    I work at a Hotel in the Maldives, and as part of my job, I meet guests upon their arrival and prior to their departure at the Maldives Ibrahim Nasir International Airport.

3.    On July 5, 2014, I witnessed two United States agents detain and handcuff a person later identified by me from news reports as Roman Seleznev.

4.    Mr. Seleznez appeared to me to be travelling with two other individuals that I observed – a female companion and a female minor child.

5.    Both agents were white men, and one was wearing a green t-shirt and jeans.

1

6.     I saw the agent who was wearing a green t-shirt and jeans actually place handcuffs on Mr. Seleznev while in the airport's departure hall.

7.     After his arrest, I watched the agents escort Mr. Seleznev to the airport's private "VIP" lounge.

8.     The "VIP" lounge is for people traveling by private jet, and it was very unusual for a person arrested at the airport to be taken into this lounge.

9.     I saw some Maldives law enforcement officers standing behind Mr. Seleznev at the time of his arrest; however, I did not see these officers speak with Mr. Seleznev or participate in his arrest in any way.

10.     As far as I can tell, the apprehension of Mr. Seleznev was carried out by the two United States agents.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Sign: _____

Sharafulla Shihab


Date: July ____, 2014

2

# EXHIBIT 12



SELEZNEV_ARREST_0000008



SELEZNEV_ARREST_0000009



SELEZNEV_ARREST_0000016

# EXHIBIT 13

1

2

3

4

5

6

7

8

9

IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

10 | UNITED STATES OF AMERICA,

11 |                   Plaintiff,          MAGISTRATE CASE NO. 14-00056

      vs.

12 |                                       **DECISION AND ORDER
                                           RE: MOTION TO DISCHARGE AND**
13 | ROMAN SELEZNEV,                       **RELEASE DEFENDANT PURSUANT TO**
        aka TRACK2,                        **FED. R. CRIM. P. 12(b)(3)(A)**
        aka ROMAN IVANOV,
14 |    aka RUBEN SAMVELICH,
        aka nCuX,
15 |    aka Bulba,
        aka brandysli64,
16 |    aka smaus,
        aka Zagreb,
17 |    aka shmak,

18 |                   Defendant.

19

20        The Motion to Discharge and Release Defendant Pursuant to FED. R. CRIM. P.

21   12(b)(3)(A) came before the court on July 31, 2014. Having considered the parties' arguments

     and submissions, as well as relevant caselaw and authority, the court orally **DENIED** said
22
     motion. The court now issues its written decision.
23

24

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

On July 7, 2014, the United States filed a Petition for Writ of Removal as to Roman Seleznev.[1] *See* ECF No. 1. On that same day, Roman Seleznev (hereinafter "Seleznev") made his initial appearance before Magistrate Judge Joaquin V.E. Manibusan, Jr. However, the initial appearance (hereinafter referred to as "Rule 5 hearing") was continued to July 22, 2014, because Seleznev wanted to retain his own counsel. On July 18, 2014, Seleznev's counsel filed a motion to continue and requested a briefing schedule on a Rule 12 motion that he anticipated to file. *See* ECF No. 10. Consequently, the court vacated the Rule 5 hearing, set a briefing schedule, and subsequently set a hearing date on the motion for discharge and release, as well as the Rule 5 hearing (in the event the motion was denied).[2]

On July 21, 2014, Seleznev filed his Rule 12 motion, seeking the court to (1) decline jurisdiction and terminate the prosecution, (2) discharge the case, (3) release him, and (4) issue such other and further relief as may be appropriate. *See* ECF No. 13, at 17. Seleznev alleges the following with respect to the manner in which he was arrested:

- On or about July 5, 2014, U.S. Secret Service agents:
  - detained Seleznev at the Ibrahim Nasir International Airport (more commonly known as the Malé International Airport) as he was preparing to board a commercial airliner scheduled to depart at approximately 11:55 a.m. local time to Moscow;
  - informed him that he was under arrest;
  - separated him from his partner and her minor child;
  - confiscated his mobile phone and laptop and prohibited him from having any communication with his family;
  - prohibited him from making telephone calls;
  - placed him in a confined holding area;
  - searched his person;
  - physically pushed him onto a couch and instructed him to remain seated;

---

[1] Filed with the Petition was a copy of a Superseding Indictment pending in the Western District of Washington and an arrest warrant issued in that district.

[2] Seleznev also filed a motion to continue the hearing on the motion for discharge and release, based on discovery request (ECF No. 34). The court denied the motion and accepted all factual allegations in Seleznev's favor as true for the purposes of hearing the motion for discharge and release.

2

- presented him with a copy of the indictment originating from the U.S. District Court for the Western District Washington;
- informed him that he was under arrest; and
- handcuffed him.
- Thereafter, Seleznev was led from the holding facility in the airport onto a private jet that was flown to Guam.
- Upon arrival on Guam, Seleznev was transferred into the custody of the U.S. Marshals Service, and he was permitted to make one telephone call.
- Seleznev contends that he was never taken into custody by law enforcement officials of the Republic of the Maldives.
- Seleznev further contends that the United States purposefully circumvented the laws of the Republic of the Maldives and the judicial process of that country.

*See* ECF No. 13, at 3-6. Based on these factual allegations, Seleznev makes the following legal arguments, which will be discussed *infra*: (1) the court lacks jurisdiction because the manner in which he was arrested constitutes shocking and outrageous government conduct amounting to a due process violation, such that this court is divested of personal jurisdiction over him; (2) the arrest violates customary international law and should shock the conscience of this court and cause it to divest itself of jurisdiction; and (3) the arrest violates *jus cogens* norms of international law and thus, the court should exercise its supervisory power and dismiss the case. *Id.* at 7-16.

As noted by the court during the motion hearing, the court herein incorporates all factual allegations made by Seleznev in his filing and during the July 31, 2014 hearing, and hereby accepts them as true for the purposes of addressing Seleznev's motion for discharge and release.

## II. ANALYSIS

### a. The court has personal jurisdiction over Seleznev.

Seleznev argues that this court does not have personal jurisdiction over him. Thus, in order for this court to proceed with the Rule 5 hearing, the court must first determine personal jurisdiction. Seleznev's argument on personal jurisdiction is two-fold: first, the arrest constitutes shocking and outrageous government conduct that it amounts to a due process violation; and

3

1  second, the arrest violates customary international law and should shock the conscience of this

2  court. *See* ECF No. 13, at 9-14.

3           The Ninth Circuit has noted that the starting point in a personal jurisdictional challenge

4  "is the venerable principle that 'the manner by which a defendant is brought to trial does not

5  affect the government's ability to try him.'" *United States v. Struckman*, 611 F.3d 560, 571 (9th

6  Cir. 2010) (quoting *United States v. Matta-Ballesteros*, 71 F.3d 754, 762 (9th Cir. 1995)). This is

7  known as the *Ker/Frisbie* doctrine. Recognized exceptions to the *Ker/Frisbie* doctrine are "if

8  either: (1) the transfer of the defendant violated the applicable extradition treaty, or (2) the

9  United States government engaged in misconduct of the most shocking and outrageous kind to

10  obtain his presence." *United States v. Anderson*, 472 F.3d 662, 666 (9th Cir. 2006) (citing *Matta-*

11  *Ballesteros*, 71 F.3d at 762–64) (internal quotation marks omitted).

12           There is no extradition treaty between the United States and the Republic of the

13  Maldives. Therefore, the court will only address the second exception: whether the government's

14  conduct was so shocking and outrageous that it would require this court to divest its personal

15  jurisdiction over Seleznev.

16           Having accepted all the factual allegations made by Seleznev in his filings and at the July

17  31, 2014 hearing as true, the court finds that these factual allegations are not shocking and

18  outrageous. Although the court does not condone the actions of the government as alleged by

19  Seleznev, Seleznev's factual allegations do not meet the extremely high standard required for

20  mandatory divestment of personal jurisdiction. For example, in *Matta-Ballesteros*, the defendant

21  was forcibly abducted from his home in Honduras, wherein the U.S. Marshals "bound his hands,

22  put a black hood over his head, [and] thrust him on the floor of a car[.]" *Matta-Ballesteros*, 71

23  F.3d at 761. The defendant in that case also alleged that he was beaten and tortured by a stun gun

24

4

1  applied to different parts of his body, including his genitals. *Id.* The court held that the

2  government's conduct was not so shocking and outrageous as to warrant dismissal. *Id.* at 763.

3  As to Seleznev's argument that the arrest violates customary international law, there is no

4  U.S. federal caselaw that specifically allows for mandatory divestment of personal jurisdiction

5  for such.

6  ### b. The court does not have the authority to entertain Seleznev's motion to dismiss.

7

8  Seleznev argues that the circumstances of his arrest violate *jus cogens* norms of

9  international law and thus, the court should exercise its supervisory power and dismiss the case.

10  ECF No. 13, at 15-16.

11  In cases such as this, wherein the defendant was arrested in a district other than where the

12  offense was allegedly committed, Rule 5 of the Federal Rules of Criminal Procedure provides for

13  how the court should properly proceed. Pursuant to FED. R. CRIM. P. 5(c)(3)(D), this court "must

14  transfer the defendant to the district where the offense was allegedly committed if: (i) the

15  government produces the warrant, a certified copy of the warrant, or a reliable electronic form of

16  either; and (ii) the judge finds that the defendant is the same person named in the indictment,

17  information, or warrant[.]"

18  In this case, the United States has produced a certified copy of the arrest warrant for an

19  individual named Roman Seleznev. At the Rule 5 hearing, the court found that the individual

20  arrested is the same person named in the Superseding Indictment.

21  Any other matter must be addressed by the district where the offense was allegedly

22  committed. In *United States v. Green*, 499 F.2d 538 (D.C. Cir. 1974), an indictment was pending

23  in the Southern District of Florida but the indictees were arrested in the District of Columbia.

24  The indictees then moved the District Court for the District of Columbia for dismissal of the

5

1    indictment pending in Florida, and the district court granted the dismissal of the case. *Id.* at 539.

2    The appellate court overturned the district court's dismissal and held that "[t]he clear mandate of

3    [former] Rule 40[3] sharply limits the function and authority of the magistrate, and by the same

4    token the jurisdiction of the district court for the transferor district. Where the terms of [the

5    removal rule] are met in a proceeding for removal in furtherance of a prosecution by indictment,

6    that court lacks power to dismiss either the proceeding or the prosecution." *Id.* at 541. In

7    reaching its conclusion, the appellate court stated:

8    > A contrary provision would threaten consequences seriously adverse to the
>    orderly administration of criminal justice, not the least of which is potential
9    > frustration of the unequivocal objective of [the removal rule] to avoid delay in
>    bringing arrestees to trial. The full panoply of defenses is, of course, available to
>    the arrestee in the transferee court, and any inconvenience incidental to assertion
10   > of defenses there is simply unavoidable.

11   *Green*, 499 F.2d at 541. Similarly, the Ninth Circuit in *Vazquez v. United States District*

12   *Court for the District of Nevada*, 572 F.2d 697 (9th Cir. 1978), refused to allow a

13   defendant resisting his removal under the former Rule 40 to file a motion to suppress. *See*

14   *also Frost v. Yankwich*, 254 F.2d 633, 637 (9th Cir. 1958) ("Petitioner's remedy, if any,

15   lies in the Illinois jurisdiction. If he has a defense, it is there that it must be presented.").

16   **III. CONCLUSION**

17       The court finds that the factual allegations by Seleznev are not so shocking and

18   outrageous that it would require mandatory divestment of personal jurisdiction. In addition, the

19   court finds that it does not have the authority to entertain Seleznev's motion to dismiss the case,

20   as that authority lies within the indicting court. Accordingly, for the reasons set forth above, the

21   court hereby **DENIES** Seleznev's motion for release and discharge pursuant to FED. R. CRIM. P.

22   12(b)(3)(A). This court notes, however, that its decision on Seleznev's motion shall not preclude

23

---

24   [3] Effective December 1, 2002, the substance of former Rule 40(a) was moved to Rules 5 and 5.1. *See* Advisory
Committee Notes to 2002 Amendments to FED. R. CRIM. P. 40.

6

1   him from reasserting the same allegations at the U.S. District Court for the Western District of

2   Washington for further consideration by that court, based on full discovery.

3       **SO ORDERED.**



/s/ **Frances M. Tydingco-Gatewood**
      **Chief Judge**
Dated: **Aug 07, 2014**

7

# EXHIBIT 14

Westlaw.

U.S. Attorneys' Manual 9-15.100, 1997 WL 1944598 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.100 Definition and General Principles

International extradition is the formal process by which a person found in one country is surrendered to another country for trial or punishment. The process is regulated by treaty and conducted between the Federal Government of the United States and the government of a foreign country. It differs considerably from interstate rendition, commonly referred to as interstate extradition, mandated by the Constitution, Art. 4, Sec. 2.

Generally under United States law (18 U.S.C. § 3184), extradition may be granted only pursuant to a treaty. However, some countries grant extradition without a treaty. However, every such country requires an offer of reciprocity when extradition is accorded in the absence of a treaty. Further, the 1996 amendments to 18 U.S.C. 3181 and 3184 permit the United States to extradite, without regard to the existence of a treaty, persons (other than citizens, nationals or permanent residents of the United States), who have committed crimes of violence against nationals of the United States in foreign countries. A list of countries with which the United States has an extradition treaty relationship can be found in the Federal Criminal Code and Rules, following 18 U.S.C. § 3181, but consult the Criminal Division's Office of International Affairs (OIA) to verify the accuracy of the information. See the Criminal Resource Manual at 535 for the text of § 3184, and at 536 for links to some of the extradition treaties the United States has negotiated.

Because the law of extradition varies from country to country and is subject to foreign policy considerations, prosecutors should consult OIA for advice on any matter relating to extradition before taking any action in such a case, especially before contacting any foreign official.

See the Criminal Resource Manual at 601, for a discussion of the constitutionality of 18 U.S.C. § 3184.

U.S. Attorneys' Manual 9-15.100, 1997 WL 1944598 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

U.S. Attorneys' Manual 9-15.200, 1997 WL 1944599 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.200 Procedures For Requesting

Extradition

From Abroad

See the Criminal Resource Manual at 602.

U.S. Attorneys' Manual 9-15.200, 1997 WL 1944599 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

U.S. Attorneys' Manual 9-15.210, 1997 WL 1944600 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.210 Role of the Office of International Affairs

The Office of International Affairs (OIA) provides information and advice to Federal and State prosecutors about the procedure for requesting extradition from abroad. OIA also advises and provides support to Federal prosecutors handling foreign extradition requests for fugitives found in the United States.

Every formal request for international extradition based on Federal criminal charges must be reviewed and approved by OIA. At the request of the Department of State, formal requests based on State charges are also reviewed by OIA before submission to the Department of State.

Acting either directly or through the Department of State, OIA initiates all requests for provisional arrest of fugitives pursuant to extradition treaties. Neither prosecutors nor agents are permitted to contact their foreign counterparts to request the arrest of a fugitive for extradition. Unauthorized requests cause serious diplomatic difficulties and may subject the requester to financial liability or other sanctions.

Every extradition treaty is negotiated separately, and each contains different provisions. Experience with one treaty is not a guide to all others. Therefore, after reviewing this section of the United States Attorneys' Manual, the first step in any extradition case should be to contact OIA. Attorneys in OIA will advise prosecutors about the potential for extradition in a given case and the steps to be followed.

U.S. Attorneys' Manual 9-15.210, 1997 WL 1944600 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

U.S. Attorneys' Manual 9-15.220, 1997 WL 1944601 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.220 Determination of Extraditability

See the Criminal Resource Manual at 603.

U.S. Attorneys' Manual 9-15.220, 1997 WL 1944601 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

U.S. Attorneys' Manual 9-15.225, 1997 WL 1944602 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.225 Procedure When Fugitive is Non-Extraditable

If the fugitive is not extraditable, other steps may be available to return him or her to the United States or to restrict his or her ability to live and travel overseas. See USAM 9-15.600 *et seq*. These steps, if taken, should likewise be documented.

Courts may require the government to request the extradition of a fugitive as soon as his or her location becomes known, unless the effort would be useless. If the decision is made to not seek extradition in a particular case, the prosecutor and the Office of International Affairs (OIA) will make a record to document why extradition was not possible in the event of a subsequent Speedy Trial challenge.

[cited in USAM 9-15.600; Criminal Resource Manual 602]

U.S. Attorneys' Manual 9-15.225, 1997 WL 1944602 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

U.S. Attorneys' Manual 9-15.230, 1997 WL 1944603 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.230 Request for Provisional Arrest

Every extradition treaty to which the United States is a party requires a formal request for extradition, supported by appropriate documents. Because the time involved in preparing a formal request can be lengthy, most treaties allow for the provisional arrest of fugitives in urgent cases. Once the United States requests provisional arrest pursuant to the treaty, the fugitive will be arrested and detained (or, in some countries, released on bail) as soon as he or she is located. Thereafter, the United States must submit a formal request for extradition, supported by all necessary documents, duly certified, authenticated and translated into the language of the country where the fugitive was arrested, within a specified time (from 30 days to three months, depending on the treaty). See USAM 9-15.240. Failure to follow through on an extradition request by submitting the requisite documents after a provisional arrest has been made will resu lt in release of the fugitive, strains on diplomatic relations, and possible liability for the prosecutor.

The Office of International Affairs (OIA) determines whether the facts meet the requirement of urgency under the terms of the applicable treaty. If they do, OIA requests provisional arrest; if not, the prosecutor assembles the documents for a formal request. The latter method is favored when the defendant is unlikely to flee because the time pressures generated by a request for provisional arrest often result in errors that can damage the case. If provisional arrest is necessary because of the risk of flight, the prosecutor should complete the form for requesting provisional arrest and forward it, along with a copy of the charging document and arrest warrant, to OIA by fax (see the Criminal Resource Manual at 604); alternatively, this exchange of forms and completed requests between the United States Attorney and OIA can be made by Email. State prosecutors who request provisional arrest must also certify that the necessary documents will be submitted on time and that all expenses, including the cost of transportation by United States Marshals, will be covered.

Prosecutors should complete the form in any case in which it appears that provisional arrest may be necessary. Once it is completed, it may be emailed directly to the Office of International Affairs (OIA) attorney or team responsible for the country in which the fugitive has been found or emailed to the general OIA email address, CRM03(OIAINBOX), and OIA's docketing unit will forward it to the appropriate attorney in OIA. The form may also be faxed to OIA at (202) 514-0080. A copy of the charging document and warrant should be faxed to OIA.

The form was created with both Federal and State cases in mind. Thus, Assistant United States Attorneys are free to print the form and give it to state and local prosecutors working on extradition cases. State prosecutors should fax the form to OIA at (202) 514-0080.

[cited in USAM 9-15.700]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

U.S. Attorneys' Manual 9-15.230, 1997 WL 1944603 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

U.S. Attorneys' Manual 9-15.240, 1997 WL 1944604 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.240 Documents Required in Support of Request for
Extradition

The request for extradition is made by diplomatic note prepared by the Department of State and transmitted to the foreign government through diplomatic channels. It must be accompanied by the documents specified in the treaty. The Office of International Affairs (OIA) will advise the prosecutor of the documentary requirements, but it is the responsibility of the prosecutor to prepare and assemble them and forward the original and four copies to OIA in time to be reviewed, authenticated, translated, and sent through the Department of State to the foreign government by the deadline.

OIA will provide samples of the documents required in support of the request for extradition. Although every treaty varies, all generally require:
   • An affidavit from the prosecutor explaining the facts of the case. See Criminal Resource Manual at 605.
   • Copies of the statutes alleged to have been violated and the statute of limitations. See Criminal Resource Manual at 607.
   • If the fugitive has not been convicted, certified copies of the arrest warrant and complaint or indictment. See Criminal Resource Manual at 606.
   • Evidence, in the form of affidavits or grand jury transcripts, establishing that the crime was committed, including sufficient evidence (i.e., photograph, fingerprints, and affidavit of identifying witness) to establish the defendant's identity (CAVEAT: The use of grand jury transcripts or trial transcripts should, if at all possible, be avoided). See Criminal Resource Manual at 608.
   • If the fugitive has been convicted, a certified copy of the order of judgment and committal establishing the conviction, an affidavit stating the sentence was not or was only partially served and the amount of time remaining to be served, and evidence concerning identity. See Criminal Resource Manual at 609.

Prosecutors should be aware that there are few workable defenses to extradition, although appeals and delays are common. Fugitives, however, may be able to contest extradition on the basis of minor inconsistencies resulting from clerical or typographical errors. Although these can be remedied eventually, they take time to untangle. Therefore, pay careful attention to detail in preparing the documents.

[cited in USAM 9-15.230]

U.S. Attorneys' Manual 9-15.240, 1997 WL 1944604 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

U.S. Attorneys' Manual 9-15.250, 1997 WL 1944605 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.250 Procedure After Assembling Documents

After assembling the documents required in support of extradition, the prosecutor must review them carefully to ensure that all dates and charges mentioned in the affidavit and accompanying exhibits are consistent.

Unless told that the foreign country will require a different number of copies of the documents, the prosecutor should forward the original and four copies of the entire package to Office of International Affairs (OIA).

Attorneys in OIA review the package for completeness and send a copy to the Department of State for translation, which can take three weeks even for common languages. The cost of translation will be billed to the district requesting extradition. OIA secures the required certifications on the original and transmits it to the Department of State.

U.S. Attorneys' Manual 9-15.250, 1997 WL 1944605 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

U.S. Attorneys' Manual 9-15.300, 1997 WL 1944606 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.300 Procedure in the Foreign Country

The Department of State will send the extradition documents and the translation to the American Embassy in the foreign country, which will present them under cover of a diplomatic note formally requesting extradition to the appropriate agency of the foreign government, usually the foreign ministry. The request and supporting documents are then forwarded to the court or other body responsible for determining whether the requirements of the treaty and the country's domestic law have been met.

In general, the foreign government's decision on our extradition request is based on the request itself and any evidence presented by the fugitive. Because the American prosecutor will not have the opportunity to appear before the foreign court, the written submission, particularly the prosecutor's affidavit, must be as persuasive as possible. This is particularly essential when the charges are based on statutes unique to United States law, such as RICO or CCE.

Though factual defenses to extradition are limited, the fugitive may delay a decision through procedural challenges. The determination of extraditability is often subject to review or appeal. Prediction of the time required to return an individual to the United States is difficult and depends on the circumstances of the individual case and the practice of the foreign country involved.

U.S. Attorneys' Manual 9-15.300, 1997 WL 1944606 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

U.S. Attorneys' Manual 9-15.400, 1997 WL 1944607 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.400 Return of the Fugitive

Once the foreign authorities notify the American Embassy that the fugitive is ready to be surrendered, the Office of International Affairs (OIA) will inform the prosecutor and arrange with the United States Marshals Service for agents to escort the fugitive to the United States. United States Marshals must provide the escort even in a State case. However, in rare cases arrangements are sometimes made for State or other federal law enforcement agents to accompany the U.S. Marshals. If the fugitive is an alien, OIA will ask the INS to issue a "parole letter" authorizing the alien to enter the country.

U.S. Attorneys' Manual 9-15.400, 1997 WL 1944607 (U.S.A.M.)

END OF DOCUMENT

Westlaw.

U.S. Attorneys' Manual 9-15.500, 1997 WL 1944608 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.500 Post

Extradition

Considerations--Limitations on Further Prosecution

Every extradition treaty limits extradition to certain offenses. As a corollary, all extradition treaties restrict prosecution or punishment of the fugitive to the offense to which extradition was granted unless (1) the offense was committed after the fugitive's extradition or (2) the fugitive remains in the jurisdiction after expiration of a "reasonable time" (generally specified in the extradition treaty itself) following completion of his punishment. This limitation is referred to as the Rule of Specialty. Prosecutors who wish to proceed against an extradited person on charges other than those for which extradition was granted must contact the Office of International Affairs (OIA) for guidance regarding the availability of a waiver of the Rule by the sending State.

Frequently, defendants who have been extradited to the United States attempt to dismiss or limit the government's case against them by invoking the Rule of Specialty. There is a split in the courts on whether the defendant has standing to raise specialty: some courts hold that only a party to the Treaty (i.e., the sending State) may complain about an alleged violation of the specialty provision, other courts allow the defendant to raise the issue on his own behalf, and other courts take a middle position and allow the defendant to raise the issue if it is likely that the sending State would complain as well. Whenever a defendant raises a specialty claim, the prosecutor should contact OIA for assistance in responding.

Defendants also occasionally make other substantive or procedural challenges to their extradition. It is impossible to anticipate all the creative challenges that may be devised; if a returned defendant challenges his extradition, you should contact OIA.

U.S. Attorneys' Manual 9-15.500, 1997 WL 1944608 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

U.S. Attorneys' Manual 9-15.600, 1997 WL 1944609 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.600 Alternatives To

Extradition

A fugitive may be non-extraditable for any number of reasons, including but not limited to instances where he or she is a national of the country of refuge, the crime is not an extraditable offense, the statute of limitations has run in the foreign country, or extradition was requested and denied. (If, after discussing the case with the Office of International Affairs (OIA), the prosecutor concludes that the fugitive is not extraditable, that conclusion and the reasons should be documented. See USAM 9-15.225.)

There may be available alternatives that will result either in the return of the fugitive or limitations on his or her ability to live or travel overseas. OIA will advise the prosecutor concerning the availability of these methods. These alternative methods are discussed in USAM 9-15.610- 650.

[cited in USAM 9-15.225]

U.S. Attorneys' Manual 9-15.600, 1997 WL 1944609 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

U.S. Attorneys' Manual 9-15.610, 1997 WL 1944610 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.610 Deportations, Expulsions, or other Extraordinary Renditions

If the fugitive is not a national or lawful resident of the country in which he or she is located, the Office of International Affairs (OIA), through the Department of State or other channels, may ask that country to deport or expel the fugitive.

In *United States v. Alvarez-Machain*, 504 U.S. 655 (1992), the Supreme Court ruled that a court has jurisdiction to try a criminal defendant even if the defendant was abducted from a foreign country against his or her will by United States agents. Though this decision reaffirmed the long-standing proposition that personal jurisdiction is not affected by claims of abuse in the process by which the defendant is brought before the court, it sparked concerns about potential abuse of foreign sovereignty and territorial integrity.

Due to the sensitivity of abducting defendants from a foreign country, prosecutors may not take steps to secure custody over persons outside the United States (by government agents or the use of private persons, like bounty hunters or private investigators) by means of *Alvarez-Machain* type renditions without advance approval by the Department of Justice. Prosecutors must notify the Office of International Affairs before they undertake any such operation. If a prosecutor anticipates the return of a defendant, with the cooperation of the sending State and by a means other than an *Alvarez-Machain* type rendition, and that the defendant may claim that his return was illegal, the prosecutor should consult with OIA before such return. See Criminal Resource Manual at 610, for further discussion of the law on this issue.

[cited in USAM 9-15.600]

U.S. Attorneys' Manual 9-15.610, 1997 WL 1944610 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

U.S. Attorneys' Manual 9-15.620, 1997 WL 1944611 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.620

Extradition

From a Third Country

If the fugitive travels outside the country from which he or she is not extraditable, it may be possible to request his or her extradition from another country. This method is often used for fugitives who are citizens in their country of refuge. Some countries, however, will not permit extradition if the defendant has been lured into their territory. Such ruses may also cause foreign relations problems with both the countries from which and to which the lure takes place. Prosecutors must notify the Office of International Affairs before pursuing any scenario involving an undercover or other operation to lure a fugitive into a country for law enforcement purposes ( extradition, deportation, prosecution).

[cited in USAM 9-15.635]

U.S. Attorneys' Manual 9-15.620, 1997 WL 1944611 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

U.S. Attorneys' Manual 9-15.630, 1997 WL 1944612 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.630 Lures

A lure involves using a subterfuge to entice a criminal defendant to leave a foreign country so that he or she can be arrested in the United States, in international waters or airspace, or in a third country for subsequent extradition, expulsion, or deportation to the United States. Lures can be complicated schemes or they can be as simple as inviting a fugitive by telephone to a party in the United States.

As noted above, some countries will not extradite a person to the United States if the person's presence in that country was obtained through the use of a lure or other ruse. In addition, some countries may view a lure of a person from its territory as an infringement on its sovereignty. Consequently, a prosecutor must consult with the Office of International Affairs before undertaking a lure to the United States or a third country.

U.S. Attorneys' Manual 9-15.630, 1997 WL 1944612 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

U.S. Attorneys' Manual 9-15.635, 1997 WL 1944613 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.635 Interpol Red Notices

An Interpol Red Notice is the closest instrument to an international arrest warrant in use today. Please be aware that if a Red Notice is issued, the prosecutor's office is obligated to do whatever work is required to produce the necessary extradition documents within the time limits prescribed by the controlling extradition treaty whenever and wherever the fugitive is arrested. Further, the prosecutor's office is obliged to pay the expenses pursuant to the controlling treaty.

Interpol Red Notices are useful when the fugitive's location or the third country to which he or she may travel (see USAM 9-15.620), is unknown. For additional information about Interpol Red Notices, see the Criminal Resource Manual at 611.

U.S. Attorneys' Manual 9-15.635, 1997 WL 1944613 (U.S.A.M.)

END OF DOCUMENT

Westlaw.

U.S. Attorneys' Manual 9-15.640, 1997 WL 1944614 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.640 Revocation of United States Passports

The Department of State may revoke the passport of a person who is the subject of an outstanding Federal warrant. Revocation of the passport can result in loss of the fugitive's lawful residence status, which may lead to his or her deportation. If the fugitive is wanted on State charges only, it will be necessary to obtain a warrant on a UFAP complaint because the Department of State is only authorized to revoke the passports of persons named in Federal warrants.

U.S. Attorneys' Manual 9-15.640, 1997 WL 1944614 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



U.S. Attorneys' Manual 9-15.650, 1997 WL 1944615 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.650 Foreign Prosecution

If the fugitive has taken refuge in the country of which he or she is a national, and is thereby not extraditable, it may be possible to ask that country to prosecute the individual for the crime that was committed in the United States. This can be an expensive and time consuming process and in some countries domestic prosecution is limited to certain specified offenses. In addition, a request for domestic prosecution in a particular case may conflict with U.S. law enforcement efforts to change the "non-extradition of nationals" law or policy in the foreign country. Whether this option is available or appropriate should be discussed with OIA.

[cited in USAM 9-15.600]

U.S. Attorneys' Manual 9-15.650, 1997 WL 1944615 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

U.S. Attorneys' Manual 9-15.700, 1997 WL 1944616 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.700 Foreign

Extradition

Requests

Foreign requests for extradition of fugitives from the United States are ordinarily submitted by the embassy of the country making the request to the Department of State, which reviews and forwards them to the Criminal Division's Office of International Affairs (OIA). The requests are of two types: formal requisitions supported by all documents required under the applicable treaty, or requests for provisional arrest. (Requests for provisional arrest may be received directly by the Department of Justice if the treaty permits. See USAM 9-15.230 for an explanation of provisional arrest.)

When OIA received a foreign extradition request, in summary, the following occurs:

    1. OIA reviews both types of requests for sufficiency and forwards appropriate ones to the district.

    2. The Assistant United States Attorney assigned to the case obtains a warrant and the fugitive is arrested and brought before the magistrate judge or the district judge.

    3. The government opposes bond in extradition cases.

    4. A hearing under 18 U.S.C. § 3184 is scheduled to determine whether the fugitive is extraditable. If the court finds the fugitive to be extraditable, it enters an order of extraditability and certifies the record to the Secretary of State, who decides whether to surrender the fugitive to the requesting government. In some cases a fugitive may waive the hearing process.

    5. OIA notifies the foreign government and arranges for the transfer of the fugitive to the agents appointed by the requesting country to receive him or her. Although the order following the extradition hearing is not appealable (by either the fugitive or the government), the fugitive may petition for a writ of habeas corpus as soon as the order is issued. The district court's decision on the writ is subject to appeal, and the extradition may be stayed if the court so orders.

See Criminal Resource Manual at 612, for a more detailed discussion of foreign extradition requests.

U.S. Attorneys' Manual 9-15.700, 1997 WL 1944616 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

U.S. Attorneys' Manual 9-15.800, 1997 WL 1944617 (U.S.A.M.)

UNITED STATES DEPARTMENT OF JUSTICE
CHAPTER 9-15.000 INTERNATIONAL EXTRADITION AND RELATED MATTERS

2009

9-15.800 Plea Agreements and Related Matters--Prohibition

Persons who are cooperating with a prosecutor may try to include a "no extradition" clause in their plea agreements. Such agreements, whether formal or informal, may be given effect by the courts. If a foreign country subsequently requests the person's extradition, the United States faces the unpleasant dilemma of breaching its solemn word either to the person involved or to its treaty partner. *Petition of Geisser*, 627 F.2d 745 (5th Cir. 1980), describes the enormous practical problems of resolving such a dilemma. Related matters involve agreements with potential witnesses to prevent or delay their deportation.

Prosecutors may not agree either formally or informally to prevent or delay extradition or deportation unless they submit a written request for authorization, and receive an express written approval from the Assistant Attorney General, Criminal Division. Requests should be submitted to the Office of International Affairs after endorsement by the head of the section or office responsible for supervising the case.

[cited in USAM 9-16.020; USAM 9-73.510]

U.S. Attorneys' Manual 9-15.800, 1997 WL 1944617 (U.S.A.M.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 15

Functional Translation of the

# Constitution

## of the

# Republic of Maldives

# 2008

**Done By**

## Ms. Dheena Hussain

*LLB. (Hons), (Birmingham), LLM. (London), Barrister-at-Law (Lincoln's Inn)*

**At the Request of**

## Ministry of Legal Reform, Information and Arts

# INDEX

*Article*                                                                    *Page No*

## CHAPTER I
## STATE, SOVEREIGNTY AND CITIZENS

1.  Constitution.................................................................................1
2.  Republic of the Maldives ...........................................................1
3.  Territory of the Maldives............................................................1
4.  Powers of the citizens................................................................1
5.  Legislative power .......................................................................1
6.  Executive power .........................................................................1
7.  Judicial power............................................................................1
8.  Supremacy of Constitution ........................................................2
9.  Citizens.......................................................................................2
10. State Religion .............................................................................2
11. National Language .....................................................................2
12. National Flag..............................................................................2
13. Currency of the Maldives...........................................................3
14. Capital .......................................................................................3
15. National Day ..............................................................................3

## CHAPTER II
## FUNDAMENTAL RIGHTS AND FREEDOMS

16. Guarantee of Rights ..................................................................3
17. Non-discrimination.....................................................................5
18. Duty of the State ........................................................................5
19. Freedom from restraint ..............................................................5
20. Equality......................................................................................5
21. Right to life ................................................................................5
22. Protection of the environment ...................................................5
23. Economic and social rights .......................................................6
24. Privacy........................................................................................6
25. No slavery or forced labour .......................................................7
26. Right to vote and run for public office.......................................7
27. Freedom of expression ..............................................................7
28. Freedom of the media ...............................................................7
29. Freedom of acquiring and imparting knowledge.......................7
30. Freedom to form political parties, associations and societies ........8
31. Right to strike.............................................................................8

i

| | | |
|---|---|---|
| 32. | Freedom of assembly | 8 |
| 33. | Right to protect reputation and name | 8 |
| 34. | Right to marry and establishment of the family | 8 |
| 35. | Special protection to children, young, elderly and disadvantaged people | 8 |
| 36. | Right to education | 9 |
| 37. | Right to work | 9 |
| 38. | Right of pension | 10 |
| 39. | Right to participate in cultural life | 10 |
| 40. | Right to acquire and hold property | 10 |
| 41. | Freedom of movement and establishment | 11 |
| 42. | Fair and transparent hearings | 11 |
| 43. | Fair administrative action | 12 |
| 44. | Personal liability | 12 |
| 45. | No unlawful arrest or detention | 12 |
| 46. | Power of arrest and detention | 12 |
| 47. | Search and seizure | 13 |
| 48. | Rights on arrest and detention | 13 |
| 49. | Release of accused | 13 |
| 50. | Prompt investigation and prosecution | 14 |
| 51. | Rights of the accused | 14 |
| 52. | Confessions and illegal evidence | 15 |
| 53. | Assistance of legal counsel | 15 |
| 54. | No degrading treatment or torture | 15 |
| 55. | No imprisonment for non-fulfilment of contractual obligation | 15 |
| 56. | Right to appeal | 15 |
| 57. | Humane treatment of arrested or detained persons | 15 |
| 58. | Compensation | 16 |
| 59. | Retrospective legislation | 16 |
| 60. | Prohibition of double jeopardy | 16 |
| 61. | Publication of acts and regulations | 16 |
| 62. | Retention of other rights | 17 |
| 63. | Voidance of laws inconsistent with fundamental rights | 17 |
| 64. | Non-compliance with unlawful orders | 17 |
| 65. | Application to court to obtain a remedy | 17 |
| 66. | Voidance of laws inconsistent with rights and freedoms | 18 |
| 67. | Responsibilities and duties | 18 |
| 68. | Interpretation | 19 |
| 69. | Non-destructive interpretation of Constitution | 19 |

ii

# CHAPTER III
# THE PEOPLE'S MAJLIS

| | | |
|---|---|---|
| 70. | Legislative authority | 19 |
| 71. | Determination of the composition of the People's Majlis | 20 |
| 72. | Election of members | 21 |
| 73. | Qualifications of members | 22 |
| 74. | Court jurisdiction | 24 |
| 75. | Function of members | 24 |
| 76. | Declaration of assets | 24 |
| 77. | Resignation | 24 |
| 78. | Filling vacancy | 24 |
| 79. | Term of the People's Majlis | 24 |
| 80. | Extension of term of the People's Majlis | 25 |
| 81. | Oath of office of members of the People's Majlis | 25 |
| 82. | Speaker and Deputy Speaker of the People's Majlis | 25 |
| 83. | Sittings of the People's Majlis | 27 |
| 84. | Presidential address | 27 |
| 85. | Proceedings open to the public | 27 |
| 86. | Quorum | 27 |
| 87. | Voting | 27 |
| 88. | Regulation of procedure | 28 |
| 89. | Publication of proceedings of the People's Majlis | 29 |
| 90. | Privilege | 29 |
| 91. | Presidential assent or return for reconsideration | 29 |
| 92. | Publication of laws in the Government Gazette | 30 |
| 93. | Treaties | 30 |
| 94. | Delegation of power to make regulations and orders with lawful authority | 30 |
| 95. | Reference to Supreme Court | 31 |
| 96. | Annual budget | 31 |
| 97. | Taxation and expenditures | 31 |
| 98. | Questioning of Ministers and members of the Government | 32 |
| 99. | Summoning persons | 33 |
| 100. | Removal of President or Vice President | 33 |
| 101. | Vote of no confidence in a member of the Cabinet | 34 |
| 102. | Salary and allowances | 35 |
| 103. | Improper benefit | 35 |
| 104. | Secretary General | 35 |
| 105. | Security | 35 |

# CHAPTER IV
# THE PRESIDENT

106. Executive power ................................................................. 36
107. Term of office .................................................................. 36
108. Manner of Presidential election ...................................... 36
109. Qualifications for election as President ........................... 36
110. Election ........................................................................... 37
111. Presidential election ........................................................ 37
112. Vice President ................................................................. 38
113. Jurisdiction of the Supreme Court .................................. 38
114. Oath of office of the President and Vice President ......... 39
115. Powers and responsibilities of the President ................. 39
116. Government Ministries .................................................... 41
117. Responsibilities of the Vice President ............................ 42
118. Salary and allowances .................................................... 42
119. Restrictions .................................................................... 42
120. Declaration of assets ...................................................... 42
121. Resignation ..................................................................... 42
122. Vacancy of office of Vice President ................................ 43
123. Temporary inability of the President to perform his
     responsibilities ............................................................... 43
124. Temporary incapacity to carry out duties ....................... 44
125. Presidential elections on the vacancy of the office of
     President and Vice President .......................................... 44
126. Oath of office by persons temporarily discharging the
     duties of the office of President and Vice President ....... 45
127. Criminal accountability .................................................. 45
128. Immunity to a person who has served as the President .. 45

# CHAPTER V
# THE CABINET OF MINISTERS

129. Cabinet of Ministers ....................................................... 46
130. Qualifications of Ministers ............................................. 46
131. Oath of office ................................................................. 47
132. Responsibilities of the Cabinet ...................................... 47
133. Attorney General ............................................................ 48
134. Accountability and responsibility of the Cabinet ........... 49
135. Salary and allowances .................................................... 50
136. Restrictions .................................................................... 50
137. Dismissal ........................................................................ 50
138. Declaration of assets ...................................................... 50

iv

139. Resignation........................................................................50
140. A minister to be responsible for each government
     authority..........................................................................50

## CHAPTER VI
## THE JUDICIARY

141. Judiciary..........................................................................51
142. Compliance with Law.........................................................52
143. Jurisdiction of the courts...................................................52
144. Powers in constitutional matters.........................................52
145. Supreme Court...................................................................53
146. High Court........................................................................54
147. Appointment of the Chief Justice..........................................54
148. Appointment of Judges.......................................................54
149. Qualifications of Judges.....................................................55
150. Oath of office of Judges.....................................................55
151. Full time performance........................................................56
152. Salary and allowances........................................................56
153. Declaration of assets.........................................................56
154. Tenure and removal...........................................................56
155. Power to determine the jurisdiction of courts and to enact
     administrative laws relating to the courts..............................56
156. Administration of the courts................................................56

## CHAPTER VII
## INDEPENDENT COMMISSIONS AND OFFICES

## JUDICIAL SERVICE COMMISSION

157. Judicial Service Commission...............................................57
158. Composition of the Judicial Service Commission.....................57
159. Responsibilities and powers................................................58
160. Constituting the Judicial Service Commission........................59
161. Term of office of members of the Judicial Service
     Commission......................................................................59
162. Resignation from membership of the Judicial Service
     Commission......................................................................60
163. Quorum and voting.............................................................60
164. Salary and allowances........................................................60
165. Removal from office...........................................................60
166. Oath of office....................................................................60

v

## ELECTIONS COMMISSION

167. Elections Commission .................................................................. 61
168. Appointment and composition of the Elections
     Commission ............................................................................... 61
169. Qualifications .............................................................................. 61
170. Responsibilities and powers ...................................................... 62
171. Voting and recording of results ................................................ 63
172. Elections petitions...................................................................... 63
173. Term of office of members of the Elections Commission............ 63
174. Resignation from membership of the Elections
     Commission ............................................................................... 63
175. Quorum and voting ..................................................................... 64
176. Salary and allowances ................................................................ 64
177. Removal from office.................................................................... 64
178. Oath of office .............................................................................. 64

## CIVIL SERVICE COMMISSION

179. Civil Service Commission .......................................................... 65
180. Appointment and composition of the Civil Service
     Commission ............................................................................... 65
181. Qualifications .............................................................................. 65
182. Responsibilities and powers ...................................................... 66
183. Term of office of members of the Civil Service Commission ...... 68
184. Resignation from membership of the Civil Service
     Commission ............................................................................... 68
185. Quorum and voting ..................................................................... 68
186. Salary and allowances ................................................................ 68
187. Removal from office.................................................................... 68
188. Oath of office .............................................................................. 69

## HUMAN RIGHTS COMMISSION

189. Human Rights Commission.......................................................... 69
190. Appointment and composition of the Human Rights
     Commission ............................................................................... 69
191. Qualifications .............................................................................. 70
192. Responsibilities and powers ...................................................... 70
193. Term of office of members of the Human Rights
     Commission ............................................................................... 71

194. Resignation from membership of the Human Rights
     Commission ........................................................................ 71
195. Quorum and voting ............................................................ 71
196. Salary and allowances ........................................................ 71
197. Removal from office ............................................................ 71
198. Oath of office ...................................................................... 72

## ANTI-CORRUPTION COMMISSION

199. Anti-Corruption Commission .............................................. 72
200. Appointment and composition of the Anti-Corruption
     Commission ........................................................................ 72
201. Qualifications .................................................................... 73
202. Responsibilities and powers .............................................. 73
203. Term of office of members of the Anti-Corruption
     Commission ........................................................................ 74
204. Resignation from the Anti-Corruption Commission ........... 74
205. Quorum and voting ............................................................ 74
206. Salary and allowances ........................................................ 74
207. Removal from office ............................................................ 74
208. Oath of office ...................................................................... 75

## AUDITOR GENERAL

209. Auditor General .................................................................. 75
210. Appointment of Auditor General ...................................... 75
211. Qualifications of Auditor General ...................................... 75
212. Responsibilities and powers .............................................. 75
213. Reporting ............................................................................ 77
214. Audit of the Auditor General's office ................................ 77
215. Term of office of the Auditor General ................................ 77
216. Resignation of Auditor General .......................................... 77
217. Salary and allowances ........................................................ 77
218. Removal from office ............................................................ 77
219. Oath of office ...................................................................... 77

## PROSECUTOR GENERAL

220. Prosecutor General ............................................................ 78
221. Appointment of Prosecutor General .................................. 78

222.  Qualifications of Prosecutor General ............................................. 78
223.  Responsibilities and powers of the Prosecutor General .............. 79
224.  Acting through agents ..................................................................... 80
225.  Term of office of the Prosecutor General ...................................... 80
226.  Resignation of Prosecutor General ................................................ 80
227.  Salary and allowances ..................................................................... 80
228.  Removal from office ......................................................................... 80
229.  Oath of office ................................................................................... 81

### CHAPTER VIII
### DECENTRALISED ADMINISTRATION

230.  Decentralised administration .......................................................... 81
231.  Election of Councils ........................................................................ 82
232.  Responsibilities ................................................................................ 82
233.  Authority to enact subordinate legislation .................................... 83
234.  Finance .............................................................................................. 83
235.  Ownership of property and liability for debts .............................. 83

### CHAPTER IX
### SECURITY SERVICES

236.  Security services .............................................................................. 83
237.  Responsibilities and duties ............................................................. 83
238.  Constitutional limitations .............................................................. 83
239.  Authority of the People's Majlis over the security services ........ 84
240.  Separate services ............................................................................. 84
241.  Multiparty committee of the People's Majlis ................................ 84
242.  Ministerial Responsibility .............................................................. 84
243.  Military Service ................................................................................ 84
244.  Police Service ................................................................................... 84
245.  Illegal orders and non-compliance ................................................ 85
246.  Equal treatment ............................................................................... 85

### CHAPTER X
### PROPERTY, LIABILITIES AND LEGAL ACTIONS OF THE STATE

247.  Property and assets owned and acquired by the State ................. 85
248.  Land, sea and naturally occurring valuable resources ................. 86
249.  Ownerless property .......................................................................... 86
250.  Transactions relating to State property .......................................... 86

251. Prohibition of foreign ownership and foreign military
     purposes..................................................................87
252. Legal actions in the name of the State..................................87

## CHAPTER XI
## STATE OF EMERGENCY

253. Declaration of a state of emergency................................87
254. Content of the declaration...........................................88
255. Limitations of the declaration .....................................88
256. Publication............................................................90
257. Submission of declaration to the Peoples Majlis ..................90
258. Determination of disputes relating to the declaration...............90
259. Expiry or revocation of declaration ...............................90
260. Public announcement of expiry of state of emergency ...............91

## CHAPTER XII
## AMENDMENT OF THE CONSTITUTION

261. Amendment of the Constitution.....................................91
262. Assent of President....................................................91
263. Publication in Government Gazette.................................92
264. Non-assent by President and national referendum ..................92
265. Defeat of Bill..........................................................92
266. Provisions included in Bill ...........................................93
267. No amendment during emergency ................................93

## CHAPTER XIII
## APPLICATION AND CONSTRUCTION OF THE
## CONSTITUTION

268. Supremacy of the Constitution ....................................93
269. Continuance of laws in force.........................................93
270. Continued effect of repealed laws .................................93
271. Regulations enacted under authority of Statute ...................93
272. Ascertainment of time ...............................................94
273. Headings ..............................................................94
274. Definitions.............................................................94

# CHAPTER XIV
## TRANSITIONAL MATTERS

275. Application of this Chapter ................................................................. 97
276. Elections Commission ....................................................................... 97
277. Vacancy in Elections Commission ................................................... 99
278. Qualifications of members of the Elections Commission ............. 99
279. Responsibilities of the Elections Commission ............................... 99
280. Term of Elections Commission ....................................................... 99
281. Judicial Service Commission ........................................................... 99
282. Supreme Court................................................................................. 100
283. Appointment of Judges to the Supreme Court............................. 102
284. Term of Supreme Court .................................................................. 102
285. Continuation of Judges................................................................... 102
286. Other courts...................................................................................... 103
287. Jurisdiction of the courts ............................................................... 103
288. Prosecutor General.......................................................................... 103
289. Anti-Corruption Commission ........................................................ 104
290. Independent Commissions ............................................................. 104
291. Continuance of laws ........................................................................ 104
292. No amendment to the Constitution .............................................. 104
293. Commencement of this Constitution............................................. 104
294. Continuance of the People's Majlis ............................................... 105
295. Responsibilities and powers of the People's Majlis..................... 105
296. Election of the People's Majlis....................................................... 106
297. Continuance of other posts and institutions ............................... 106
298. Decentralised administration ........................................................ 107
299. Obedience to the Constitution ....................................................... 107
300. Continuation in office of the President and the Cabinet of
     Ministers ........................................................................................... 108
301. Presidential election........................................................................ 109

# SCHEDULE 1
## OATHS OF OFFICE

1. OATH OF OFFICE OF PRESIDENT ................................................ 110
2. OATH OF OFFICE OF VICE PRESIDENT ...................................... 110
3. OATH OF OFFICE OF MEMBERS OF THE CABINET................ 110
4. OATH OF OFFICE OF MEMBERS OF THE PEOPLE'S
   MAJLIS................................................................................................ 111
5. OATH OF OFFICE OF CHIEF JUSTICE AND JUDGES.............. 111
6. OATH OF OFFICE OF MEMBERS OF INDEPENDENT
   COMMISSIONS AND INDEPENDENT OFFICES ....................... 111

x

## SCHEDULE 2
## ADMINISTRATIVE DIVISIONS

112

## SCHEDULE 3
## NATIONAL FLAG

National flag ........................................................................................ 113
Composition of national flag .............................................................. 113
Dimensions ......................................................................................... 113
Colours ................................................................................................ 114

xi

# CHAPTER I

## STATE, SOVEREIGNTY AND CITIZENS

Constitution        **1.**  This is the *"Constitution of the Republic of the Maldives"*. Any reference to the "Constitution" herein is a reference to the Constitution of the Republic of the Maldives.

Republic of the Maldives    **2.**  The Maldives is a sovereign, independent, democratic Republic based on the principles of Islam, and is a unitary State, to be known as the Republic of the Maldives. Any reference to "the Maldives" is a reference to the Republic of the Maldives.

Territory of the Maldives    **3.**  The territory of the Maldives encompasses the land, air space, sea and seabed within the archipelagic baselines of the Maldives drawn in accordance with the law, and includes the territorial waters, the seabed and air space thereof beyond the said baselines. Any changes to the territory of the Maldives may only be made pursuant to a law enacted by at least a two-third majority of the total membership of the People's Majlis.

Powers of the citizens    **4.**  All the powers of the State of the Maldives are derived from, and remain with, the citizens.

Legislative power    **5.**  All legislative power in the Maldives is vested in the People's Majlis.

Executive power    **6.**  As provided for in this Constitution the executive power is vested in the President.

Judicial power    **7.**  The judicial power is vested in the courts of the Maldives.

1

Supremacy of
Constitution

**8.** The powers of the State shall be exercised in accordance with this Constitution.

Citizens

**9.** (a) The following persons are citizens of the Maldives:

   1. citizens of the Maldives at the commencement of this Constitution;

   2. children born to a citizen of the Maldives; and

   3. foreigners who, in accordance with the law, become citizens of the Maldives.

(b) No citizen of the Maldives may be deprived of citizenship.

(c) Any person who wishes to relinquish his citizenship may do so in accordance with law.

(d) Despite the provisions of article (a) a non-Muslim may not become a citizen of the Maldives.

State Religion

**10.** (a) The religion of the State of the Maldives is Islam. Islam shall be the one of the basis of all the laws of the Maldives

(b) No law contrary to any tenet of Islam shall be enacted in the Maldives

National Language

**11.** The national language of the Maldives is Dhivehi.

National Flag

**12.** (a) The national flag of the Maldives consists of a white crescent in the centre of a green rectangle

2

surrounded by a red border.

(b) The dimensions and colour code of the national flag and the placing of the crescent on the national flag shall be as specified in Schedule 3 of this Constitution.

Currency of the Maldives    **13.**    The unit of currency of the Maldives is the Rufiyaa, divided into one hundred Laari.

Capital    **14.**    The capital of the Maldives is the island of Male'.

National Day    **15.**    The national day of the Maldives is the first day of the month of Rabeeu al-Awwal.

# CHAPTER II

## FUNDAMENTAL RIGHTS AND FREEDOMS

Guarantee of Rights    **16.**    (a) This Constitution guarantees to all persons, in a manner that is not contrary to any tenet of Islam, the rights and freedoms contained within this Chapter, subject only to such reasonable limits prescribed by a law enacted by the People's Majlis in a manner that is not contrary to this Constitution. Any such law enacted by the People's Majlis can limit the rights and freedoms to any extent only if demonstrably justified in a free and democratic society.

(b) The limitation of a right or freedom specified in this Chapter by a law enacted by the People's Majlis as provided for in this Constitution, and

3

in order to protect and maintain the tenets of Islam, shall not be contrary to article (a).

(c) In deciding whether a right or freedom in this Chapter, has been limited in accordance with article (a) and (b), a court must be fully cognisant of and make reference to all the facts, including:

    1. the nature and character of the right or freedom;

    2. the purpose and importance of limiting the right or freedom;

    3. the extent and manner of limiting the right or freedom;

    4. the relationship between the limitation of the right or freedom and the importance of the right or freedom;

    5. the extent to which the objective for which the right or freedom has been limited could have been achieved by limiting the right or freedom to a lesser degree;

    6. the extent to which the right or freedom must be limited in order to protect the tenets of Islam, where the right or freedom has been limited pursuant to article (b).

(d) The onus of establishing that the limitation to any extent, of a right or freedom included in this Chapter is within the reasonable limitations prescribed in this Constitution is on the State or the person asserting the limitation of the right or freedom.

4

| | | |
|---|---|---|
| Non-discrimination | 17. | (a) Everyone is entitled to the rights and freedoms included in this Chapter without discrimination of any kind, including race, national origin, colour, sex, age, mental or physical disability, political or other opinion, property, birth or other status, or native island. |

(b) Special assistance or protection to disadvantaged individuals or groups, or to groups requiring special social assistance, as provided in law shall not be deemed to be discrimination, as provided for in article (a).

| | | |
|---|---|---|
| Duty of the State | 18. | It is the duty of the State to follow the provisions of this Constitution, and to protect and promote the rights and freedoms provided in this Chapter. |

| | | |
|---|---|---|
| Freedom from restraint | 19. | A citizen is free to engage in any conduct or activity that is not expressly prohibited by Islamic Shari'ah or by law. No control or restraint may be exercised against any person unless it is expressly authorised by law. |

| | | |
|---|---|---|
| Equality | 20. | Every individual is equal before and under the law, and has the right to the equal protection and equal benefit of the law. |

| | | |
|---|---|---|
| Right to life | 21. | Everyone has the right to life, liberty and security of the person, and the right not be deprived thereof to any extent except pursuant to a law made in accordance with Article 16 of this Constitution. |

| | | |
|---|---|---|
| Protection of the environment | 22. | The State has a fundamental duty to protect and preserve the natural environment, biodiversity, resources and beauty of the country for the benefit of present and future generations. The State shall undertake and promote desirable economic and social goals through ecologically balanced sustainable development and shall take measures necessary to |

5

foster conservation, prevent pollution, the extinction of any species and ecological degradation from any such goals.

Economic and social rights  **23.** Every citizen  the following rights pursuant to this Constitution, and the State undertakes to achieve the progressive realisation of these rights by reasonable measures within its ability and resources:

(a) adequate and nutritious food and clean water;

(b) clothing and housing;

(c) good standards of health care, physical and mental;

(d) a healthy and ecologically balanced environment;

(e) equal access to means of communication, the State media, transportation facilities, and the natural resources of the country;

(f) the establishment of a sewage system of a reasonably adequate standard on every inhabited island;

(g) the establishment of an electricity system of a reasonably adequate standard on every inhabited island that is commensurate to that island.

Privacy  **24.** Everyone has the right to respect for his private and family life, his home and his private communications. Every person must respect these rights with respect to others.

6

No slavery or forced
labour

**25.**   (a) No one shall be held in slavery or servitude, or be required to perform forced labour.

(b) Compulsory military service, service required in cases of emergency or calamity threatening the life or well-being of the community, or service required pursuant to a court order shall not be deemed to be contrary to article (a).

Right to vote and
run for public office

**26.**   Unless otherwise provided in this Constitution, every citizen of the Maldives eighteen years of age or older has the right:

(a) to vote in elections, and in public referendums, which shall be held by secret ballot;

(b) to run for public office;

(c) to take part in the conduct of public affairs, directly or through freely chosen representatives.

Freedom of
expression

**27.**   Everyone has the right to freedom of thought and the freedom to communicate opinions and expression in a manner that is not contrary to any tenet of Islam.

Freedom of the
media

**28.**   Everyone has the right to freedom of the press, and other means of communication, including the right to espouse, disseminate and publish news, information, views and ideas. No person shall be compelled to disclose the source of any information that is espoused, disseminated or published by that person.

Freedom of
acquiring and
imparting
knowledge

**29.**   Everyone has the freedom to acquire and impart knowledge, information and learning.

7

Freedom to form political parties, associations and societies

**30.** (a) Every citizen has the right to establish and to participate in the activities of political parties.

(b) Everyone has the freedom to form associations and societies, including the following:

1. the right to establish and participate in any association or society for economic, social, educational or cultural or purposes;

2. the right to form trade unions, to participate or not participate in their activities.

Right to strike

**31.** Every person employed in the Maldives and all other workers have the freedom to stop work and to strike in order to protest.

Freedom of assembly

**32.** Everyone has the right to freedom of peaceful assembly without prior permission of the State.

Right to protect reputation and name

**33.** Everyone has the right to protect one's reputation and good name.

Right to marry and establishment of the family

**34.** (a) Every person of marriageable age as determined by law has the right to marry, and to establish a family as specified in law. The family, being the natural and fundamental unit of society, is entitled to special protection by society and the State.

(b) Children must be afforded special protection as specified in law in the event of a marital breakdown of the parents.

Special protection to children, young, elderly and

**35.** (a) Children and young people are entitled to special protection and special assistance from

8

disadvantaged people

the family, the community and the State. Children and young people shall not be harmed, sexually abused, or discriminated against in any manner and shall be free from unsuited social and economic exploitation. No person shall obtain undue benefit from their labour.

(b) Elderly and disadvantaged persons are entitled to protection and special assistance from the family, the community and the State.

Right to education    **36.**    (a) Everyone has the right to education without discrimination of any kind.

(b) Primary and secondary education shall be freely provided by the State. It is imperative on parents and the State to provide children with primary and secondary education. Opportunity for higher education shall be generally accessible to all citizens.

(c) Education shall strive to inculcate obedience to Islam, instil love for Islam, foster respect for human rights, and promote understanding, tolerance and friendship among all people.

Right to work    **37.**    (a) Every citizen has the right to engage in any employment or occupation.

(b) Everyone is entitled to just and safe conditions of work, fair wages, equal remuneration for work of equal value, and equal opportunity for promotion.

(c) Everyone has the right to rest and leisure, including limits on hours of work and periodic holidays with pay.

9

(d) Everyone has the right to spend time at rest and leisure. In order to provide this right to each employed person, the maximum number of working hours have to be determined as well as the length of paid holidays.

Right of pension

**38.** Every one engaged in employment with the State shall have the right of pension as provided by law.

Right to participate in cultural life

**39.**

(a) Everyone has the right to participate in the cultural life of the nation, and to benefit from literary and artistic endeavours.

(b) The State shall promote education, culture, literature and the arts, within the limits of its resources.

Right to acquire and hold property

**40.**

(a) Every citizen has the right to acquire, own, inherit, transfer or otherwise transact of such property.

(b) Private property shall be inviolable, and may only be compulsorily acquired by the State for the public good, as expressly prescribed by law, and as authorised by order of the court. Fair and adequate compensation shall be paid in all cases, as determined by the court.

(c) Nothing in this Article prevents any law authorising a court to order the forfeiture (without the giving of any compensation) of illegally acquired or possessed property, or enemy property.

(d) Property of a person shall not be forfeited in substitution for any offence.

10

Freedom of movement and establishment

**41.**

(a) Every citizen has the freedom to enter, remain in and leave the Maldives, and to travel within the Maldives.

(b) Every citizen has the right to move to, and take up residence on, any inhabited island of the Maldives.

(c) Every citizen shall have equal access to the receipt of rights and benefits from any island where he has established residency.

Fair and transparent hearings

**42.**

(a) In the determination of one's civil rights and obligations or of any criminal charge, everyone is entitled to a fair and public hearing within a reasonable time by an independent court or tribunal established by law.

(b) All judicial proceedings in the Maldives shall be conducted with justice, transparency and impartiality.

(c) Trials of any matter shall be held publicly, but the presiding judge may exclude the public from all or part of a trial in accordance with democratic norms:

1. in the interests of public morals, public order or national security;

2. where the interest of juveniles or the victims of a crime so require; or

3. in other special circumstances where publicity would prejudice the interests of justice.

11

(d) All judgements or orders of a Court shall be pronounced publicly, unless the Court specifically orders otherwise for the reasons stipulated in article (c). All publicly pronounced judgements or orders shall be available to the public.

**Fair administrative action**   **43.**   (a) Everyone has the right to administrative action that is lawful, procedurally fair, and expeditious.

(b) Everyone whose rights have been adversely affected by administrative action has the right to be given written reasons.

(c) Where the rights of a person, a group or community has been adversely affected by administrative action, every such person, group or every person who may be directly affected by such action has the right to submit the matter to court.

**Personal liability**   **44.**   The application of the criminal law or criminal procedure, including the conduct of investigations, criminal proceedings and enforcement of sentences as provided by law, shall extend to the accused person only and shall not affect the legal rights or obligations of any other person.

**No unlawful arrest or detention**   **45.**   Everyone has the right not to be arbitrarily detained, arrested or imprisoned except as provided by law enacted by the People's Majlis in accordance with Article 16 of this Constitution.

**Power of arrest and detention**   **46.**   No person shall be arrested or detained for an offence unless the arresting officer observes the offence being committed, or has reasonable and probable grounds or evidence to believe the person has committed an offence or is about to commit an offence, or under the

12

authority of an arrest warrant issued by the court.

Search and seizure   **47.**   (a) No person shall be subject to search or seizure unless there is reasonable cause.

(b) Residential property shall be inviolable, and shall not be entered without the consent of the resident, except to prevent immediate and serious harm to life or property, or under the express authorisation of an order of the Court.

Rights on arrest or detention   **48.**   Everyone has the right on arrest or detention:

(a) to be informed immediately of the reasons therefore, and in writing within at least twenty four hours;

(b) to retain and instruct legal counsel without delay and to be informed of this right, and to have access to legal counsel facilitated until the conclusion of the matter for which he is under arrest or detention;

(c) to remain silent, except to establish identity, and to be informed of this right;

(d) to be brought within twenty four hours before a Judge, who has power to determine the validity of the detention, to release the person with or without conditions, or to order the continued detention of the accused.

Release of accused   **49.**   No person shall be detained in custody prior to sentencing, unless the danger of the accused absconding or not appearing at trial, the protection of the public, or potential interference with witnesses or

13

evidence dictate otherwise. The release may be subject to conditions of bail or other assurances to appear as required by the court.

**Prompt investigation and prosecution** **50.** After notice of an alleged offence has been brought to the attention of the investigating authorities, the matter shall be investigated promptly, and where warranted, the Prosecutor General shall lay charges as quickly as possible.

**Rights of the accused** **51.** Everyone charged with an offence has the right:

(a) to be informed without delay of the specific offence in a language understood by the accused;

(b) to be tried within a reasonable time;

(c) not to be compelled to testify;

(d) to an interpreter to be provided by the State where he does not speak the language in which the proceedings are conducted, or is deaf or mute;

(e) to have adequate time and facilities for the preparation of his defence and to communicate with and instruct legal counsel of his own choosing;

(f) to be tried in person, and to defend himself through legal counsel of his own choosing;

(g) to examine the witnesses against him and to obtain the attendance and examination of

14

witnesses;

(h) to be presumed innocent until proven guilty beyond a reasonable doubt.

Confessions and illegal evidence

**52.** No confession shall be admissible in evidence unless made in court by an accused who is in a sound state of mind. No statement or evidence must be obtained from any source by compulsion or by unlawful means and such statement or evidence is inadmissible in evidence.

Assistance of legal counsel

**53.** (a) Everyone has the right to retain and instruct legal counsel at any instance where legal assistance is required.

(b) In serious criminal cases, the State shall provide a lawyer for an accused person who cannot afford to engage one.

No degrading treatment or torture

**54.** No person shall be subjected to cruel, inhumane or degrading treatment or punishment, or to torture.

No imprisonment for non-fulfilment of contractual obligation

**55.** No person shall be imprisoned on the ground of non-fulfilment of a contractual obligation.

Right to appeal

**56.** Everyone related to a matter has the right to appeal a conviction and sentence, or judgement or order in a criminal or civil matter.

Humane treatment of arrested or detained persons

**57.** Everyone deprived of liberty through arrest or detention as provided by law, pursuant to an order of the court, or being held in State care for social reasons, shall be treated with humanity and with respect for the inherent dignity of the human person. A person may be deprived of the rights or freedoms specified in this Chapter only to the extent required for the purpose for which he is deprived of his liberty.

15

| | | |
|---|---|---|
| Compensation | **58.** | Everyone who has been arrested or detained without legal authority or justification has the right to be compensated. |

| | | |
|---|---|---|
| Retrospective legislation | **59.** | (a) No person shall be found guilty of any act or omission which did not constitute an offence under Islamic Shari'ah or law at the time committed. Nor shall a more severe penalty be imposed than the one applicable at the time the offence was committed. If the punishment for an offence has been reduced between the time of commission and the time of sentencing, the accused is entitled to the benefit of the lesser punishment. |

(b) This Article shall not prejudice the trial and punishment of any person for any act which was criminal according to international law.

| | | |
|---|---|---|
| Prohibition of double jeopardy | **60.** | (a) If an accused is acquitted of an offence by a court, he shall not be tried again for the same or substantially the same offence. If an accused is found guilty and punished for an offence he shall not be tried or punished again for the same or substantially the same offence. |

(b) The principle stated in article (a) does not apply to appeals relating to the offence.

| | | |
|---|---|---|
| Publication of acts and regulations | **61.** | (a) All statutes, regulations, government orders requiring compliance by citizens and government policies shall be published and made available to the public. |

(b) No person may be subjected to any punishment except pursuant to a statute or pursuant to a regulation made under authority of a statute, which has been made available to the public and which defines the criminal offence and the

16

punishment for commission of the offence.

(c) All information concerning government decisions and actions shall be made public, except information that is declared to be State secrets by a law enacted by the People's Majlis.

(d) Every citizen has the right to obtain all information possessed by the Government about that person.

Retention of other rights **62.** (a) The enumeration of rights and freedoms in this Chapter are guaranteed equally to female and male persons.

(b) The enumeration of rights and freedoms individually in this Chapter shall not be construed to deny or negate other rights retained by the people which are not specified in this Chapter.

Voidance of laws inconsistent with fundamental rights **63.** Any law or part of any law contrary to the fundamental rights or freedoms guaranteed by this Chapter shall be void or void to the extent of such inconsistency.

Non-compliance with unlawful orders **64.** No employee of the State shall impose any orders on a person except under authority of a law. Everyone has the right not to obey an unlawful order.

Application to court to obtain a remedy **65.** Anyone whose rights or freedoms, as guaranteed by this Chapter, have been infringed or denied may apply to a court to obtain a just remedy.

Voidance of laws inconsistent with rights and freedoms **66.** All existing statutes, regulations, decrees and notices inconsistent with the fundamental rights and freedoms provisions in this Chapter shall, to the extent of the inconsistency, become void on the commencement of this Constitution.

17

Responsibilities and duties   **67.**   The exercise and enjoyment of fundamental rights and freedoms is inseparable from the performance of responsibilities and duties, and it is the responsibility of every citizen:

    (a) to respect and protect the rights and freedoms of others;

    (b) to foster tolerance, mutual respect, and friendship among all people and groups;

    (c) to contribute to the well-being and advancement of the community;

    (d) to promote the sovereignty, unity, security, integrity and dignity of the Maldives;

    (e) to respect the Constitution and the rule of law;

    (f) to promote democratic values and practices in a manner that is not inconsistent with  any tenet of Islam;

    (g) to preserve and protect the State religion of Islam, culture, language and heritage of the country;

    (h) to preserve and protect the natural environment, biodiversity, resources and beauty of the country and to abstain from all forms of pollution and ecological degradation;

    (i) to respect the national flag, state emblem and the national anthem.

Every person in the Maldives must also respect these

18

# EXHIBIT 16

Case 2:11-cr-00070-RAJ   Document 132-3   Filed 04/07/15   Page 331 of 389





U.S. Attorneys » U.S. Attorneys' Manual » Criminal Resource Manual

# Criminal Resource Manual 611 Interpol Red Notices

## 611    Interpol Red Notices

An Interpol Red Notice is the closest instrument to an international arrest warrant in use today. Interpol (the International Criminal Police Organization) circulates notices to member countries listing persons who are wanted for extradition. The names of persons listed in the notices are placed on lookout lists (e.g., NCIC or its foreign counterpart). When a person whose name is listed comes to the attention of the police abroad, the country that sought the listing is notified through Interpol and can request either his provisional arrest (if there is urgency) or can file a formal request for extradition.

Please be aware that if a Red Notice is issued, the prosecutor's office is obligated to do whatever work is required to produce the necessary extradition documents within the time limits prescribed by the controlling extradition treaty whenever and wherever the fugitive is arrested. Further, the prosecutor's office is obliged to pay the expenses pursuant to the controlling treaty. Those expenses, which can be quite high, will typically include the costs of translating the extradition documents and may include the costs of hiring local counsel to represent the United States. Further, these obligations, which remain until the fugitive is arrested or the Red Notice is withdrawn, may result in prosecutors who have succeeded the Assistant United States Attorney who originally requested the Red Notice having to prepare the documents and arrange for payment of hefty fees years after the fugitive originally fled from the United States. Therefore, it is important for prosecutors to make certain that the case is significant enough to warrant placing their offices under such a burden in deciding whether or not to request issuance of a Red Notice.

[cited in USAM 9-15.635]

‹ Criminal Resource Manual 610 Deportations, Expulsions, Or Other Extraordinary Renditions        up        Criminal Resource Manual 612 Role Of The Department Of State In Foreign Extradition Requests ›

# EXHIBIT 17

Case 2:11-cr-00070-RAJ  Document 132-3  Filed 04/07/15  Page 333 of 389

Search : Keyword     English

## CONNECTING POLICE FOR A SAFER WORLD

HOME    ABOUT INTERPOL    NEWS AND MEDIA    MEMBER COUNTRIES    INTERPOL EXPERTISE    CRIME AREAS

| | |
|---|---|
| World | **World** |
| Africa | **A global presence** |
| Americas | At INTERPOL today, we have a global membership of 190 countries. Each country maintains a National Central Bureau (NCB), staffed by national law enforcement officers. It forms the link with INTERPOL's global network, enabling member countries to work together on cross-border investigations. NCBs are increasingly involved in shaping the Organization's direction. |
| Asia & South Pacific | |
| Europe | |

From A to F     From G to L     From M to R     From S to Z

**A**

Afghanistan | Albania | Algeria | American Samoa (United States) | Andorra | Angola | Anguilla (UK) | Antigua & Barbuda | Argentina | Armenia | Aruba | Australia | Austria | Azerbaijan

**B**

Bahamas | Bahrain | Bangladesh | Barbados | Belarus | Belgium | Belize | Benin | Bermuda (UK) | Bhutan | Bolivia | Bosnia and Herzegovina | Botswana | Brazil | British Virgin Islands (UK) | Brunei | Bulgaria | Burkina-Faso | Burundi

**C**

Cambodia | Cameroon | Canada | Cape Verde | Cayman Islands (UK) | Central African Republic | Chad | Chile | China | Colombia | Comoros | Congo | Congo (Democratic Rep.) | Costa Rica | Croatia | Cuba | Curaçao | Cyprus | Czech Republic | Côte d'Ivoire

**D**

Denmark | Djibouti | Dominica | Dominican Republic

**E**

Ecuador | Egypt | El Salvador | Equatorial Guinea | Eritrea | Estonia | Ethiopia

**F**

Fiji | Finland | Former Yugoslav Republic of Macedonia | France

**G**

Gabon | Gambia | Georgia | Germany | Ghana | Gibraltar (UK) | Greece | Grenada | Guatemala | Guinea | Guinea Bissau | Guyana

**H**

Haiti | Honduras | Hong Kong (China) | Hungary

**I**

Case 2:11-cr-00070-RAJ   Document 132-3   Filed 04/07/15   Page 334 of 389

Iceland | India | Indonesia | Iran | Iraq | Ireland | Israel | Italy

**J**

Jamaica | Japan | Jordan

**K**

Kazakhstan | Kenya | Korea (Rep. of) | Kuwait | Kyrgyzstan

**L**

Laos | Latvia | Lebanon | Lesotho | Liberia | Libya | Liechtenstein | Lithuania | Luxembourg

**M**

Macao (China) | Madagascar | Malawi | Malaysia | Maldives | Mali | Malta | Marshall Islands | Mauritania | Mauritius | Mexico | Moldova | Monaco | Mongolia | Montenegro | Montserrat (UK) | Morocco | Mozambique | Myanmar

**N**

Namibia | Nauru | Nepal | Netherlands | New Zealand | Nicaragua | Niger | Nigeria | Norway

**O**

Oman

**P**

Pakistan | Panama | Papua New Guinea | Paraguay | Peru | Philippines | Poland | Portugal | Puerto Rico (United States)

**Q**

Qatar

**R**

Romania | Russia | Rwanda

**S**

Samoa | San Marino | Sao Tome & Principe | Saudi Arabia | Senegal | Serbia | Seychelles | Sierra Leone | Singapore | Sint Maarten | Slovakia | Slovenia | Somalia | South Africa | South Sudan (Rep. of) | Spain | Sri Lanka | St Kitts & Nevis | St Lucia | St Vincent & Grenadines | Sudan | Suriname | Swaziland | Sweden | Switzerland | Syria

**T**

Tajikistan | Tanzania | Thailand | Timor Leste | Togo | Tonga | Trinidad & Tobago | Tunisia | Turkey | Turkmenistan | Turks & Caicos (UK)

**U**



Uganda | Ukraine | United Arab Emirates | United Kingdom | United States | Uruguay | Uzbekistan

**V**

Vatican City State | Venezuela | Vietnam

**W**

**X**

**Y**

Yemen

**Z**

Zambia | Zimbabwe

Site map    |    FAQs    |    Terms of use    |    Calls for tender    |    Recruitment    |    Commission for the Control of INTERPOL's Files    |    Contact INTERPOL
|    e-Learning

© INTERPOL 2015. All rights reserved.

# EXHIBIT 18

Search : Keyword          English

## CONNECTING POLICE FOR A SAFER WORLD

HOME     ABOUT INTERPOL     NEWS AND MEDIA     MEMBER COUNTRIES     INTERPOL EXPERTISE     CRIME AREAS

Overview

Training and capacity building

Data exchange

Databases

Notices

Command & Coordination Centre

Response teams

Forensics

Criminal Intelligence analysis

Border management

I-Checkit

Back                                                          Share  |  Print

## Notices

INTERPOL Notices are international requests for cooperation or alerts allowing police in member countries to share critical crime-related information.

Notices are published by INTERPOL's General Secretariat at the request of National Central Bureaus (NCBs) and authorized entities, and can be published in any of the Organization's official languages: Arabic, English, French and Spanish.

In the case of Red Notices, the persons concerned are wanted by national jurisdictions for prosecution or to serve a sentence based on an arrest warrant or court decision. INTERPOL's role is to assist the national police forces in identifying and locating these persons with a view to their arrest and extradition or similar lawful action.

In addition, Notices are used by the United Nations, International Criminal Tribunals and the International Criminal Court to seek persons wanted for committing crimes within their jurisdiction, notably genocide, war crimes, and crimes against humanity.

### Types of Notice



**Red Notice**
To seek the location and arrest of wanted persons with a view to extradition or similar lawful action.

**Yellow Notice**
To help locate missing persons, often minors, or to help identify persons who are unable to identify themselves.

**Blue Notice**
To collect additional information about a person's identity, location or activities in relation to a crime.

**Black Notice**
To seek information on unidentified bodies.

**Green Notice**
To provide warnings and intelligence about persons who have committed criminal offences and are likely to repeat these crimes in other countries.

**Orange Notice**
To warn of an event, a person, an object or a process representing a serious and imminent threat to public safety.

**INTERPOL–United Nations Security Council Special Notice**
Issued for groups and individuals who are the targets of UN Security Council Sanctions Committees.

**Purple Notice**
To seek or provide information on modi operandi, objects, devices and concealment methods used by criminals.

### Publication

Only those notices approved for public dissemination appear on this website (the full list of Notices is available to authorized users via INTERPOL's Information System).

Any individual who is subject to an INTERPOL Notice should be considered innocent until proven guilty.

Any unauthorized alteration of any portion of any INTERPOL Notice is considered as a violation and subject to legal prosecution.

### Legal basis

A Notice is published only if it fulfils all conditions for processing the information. For example, a Notice will not be published if it violates Article 3 of the INTERPOL Constitution, which forbids the

### VIEW NOTICES

Red Notices

Yellow Notices

Orange Notices

Purple Notices

INTERPOL–United Nations Security Council Special Notices
Individuals · Entities

### SEE ALSO

What are your rights?

**Can you help?**

Do you have information that could help locate a fugitive or missing person? If so, contact the police in your area who will notify INTERPOL.

**Links**

UK Missing Persons Bureau

**International Criminal Tribunals**

International Criminal Court
International Criminal Tribunal for the Former Yugoslavia
International Criminal Tribunal for Rwanda
Special Tribunal for Lebanon
Special Court for Sierra Leone
Mechanism for International Criminal Tribunals

**INTERPOL E-Extradition**

View video

### NEWS

20 March 2015
**Increased use of INTERPOL tools and network focus of European police training**

19 February 2015
**Information sharing is a 'tripwire' against foreign**

Organization from undertaking any intervention or activities of a political, military, religious or racial character.

Notices are processed in line with INTERPOL's Rules on the Processing of Data, which ensure the legality and quality of information, and the protection of personal data.

The legal basis for a Red Notice is an arrest warrant or court order issued by the judicial authorities in the country concerned. Many of INTERPOL's member countries consider a Red Notice to be a valid request for provisional arrest.

Furthermore, INTERPOL is recognized as an official channel for transmitting requests for provisional arrest in a number of bilateral and multilateral extradition treaties, including the European Convention on Extradition, the Economic Community of West African States (ECOWAS) Convention on Extradition, and the United Nations Model Treaty on Extradition.

### Diffusions

Similar to the Notice is another request for cooperation or alert mechanism known as a 'diffusion'. This is less formal than a notice but is also used to request the arrest or location of an individual or additional information in relation to a police investigation. A diffusion is circulated directly by an NCB to the member countries of their choice, or to the entire INTERPOL membership and is simultaneously recorded in INTERPOL's Information System.

terrorist fighters – INTERPOL Chief

16 February 2015
Nepal's top wildlife criminal nabbed in Malaysia

29 January 2015
Foreign fighter threat to Europe requires global response says INTERPOL Chief

24 December 2014
Tanzanian police hold suspected Kenyan ivory smuggling ring leader targeted in INTERPOL operation

15 December 2014
INTERPOL operation in Central America and the Caribbean nets almost 30 tonnes of drugs

20 November 2014
Heads of INTERPOL and United Nations meet on global security challenges

25 September 2014
INTERPOL global role against foreign terrorist fighters recognized in UN Resolution

14 September 2014
INTERPOL condemns 'depraved' murder of British hostage by Islamic State group

12 September 2014
International jewel thief wanted via INTERPOL nabbed by Swiss police

11 September 2014
Terrorist suspect wanted by Algeria found in Malian jail following checks via INTERPOL

29 August 2014
INTERPOL issues global alert for missing British boy

12 August 2014
Albanian fugitive targeted by INTERPOL arrested in Ecuador

24 July 2014
INTERPOL supports renewed campaign to track remaining Rwandan genocide fugitives

16 July 2014
INTERPOL Nigeria escorts Nyanya bombing suspect extradited from Sudan

04 June 2014
Innovation in biometric technology key in fighting transnational crime, says INTERPOL Chief



21 May 2014 *ar* *en* *es* *fr*
'Wave of violence' in Nigeria condemned by INTERPOL Chief

30 April 2014 *ar* *en* *es* *fr*
Criminal network involved in payment card fraud dismantled with INTERPOL support

14 April 2014 *ar* *en* *es* *fr*
INTERPOL condemns Abuja terror 'slaughter'

05 March 2014 *ar* *en* *es* *fr*
International collaboration via INTERPOL leads to arrest in Thailand of fugitive rapist

28 February 2014 *ar* *en* *es* *fr*
Tackling drug trafficking across Middle East and North Africa focus of INTERPOL meeting

12 February 2014 *ar* *en* *es* *fr*
Spanish police arrest 'Pink Panther' gang suspect in 2007 Dubai mall robbery

14 January 2014 *ar* *en* *es* *fr*
Qatar requests first INTERPOL notice for illicit trade offences

29 October 2013 *ar* *en* *es* *fr*
Enhancing genocide, war crimes and crimes against humanity investigations focus of INTERPOL training

22 October 2013 *ar* *en* *es* *fr*
Greek authorities ask INTERPOL to help identify unknown girl using DNA comparison

04 October 2013 *ar* *en* *es* *fr*
Bahrain million dollar watch raid suspects arrested following issue of INTERPOL Red Notices

26 September 2013 *ar* *en* *es* *fr*
INTERPOL issues Red Notice for arrest of Samantha Lewthwaite at Kenya's request

23 September 2013 *ar* *en* *es* *fr*
Korean arrest of INTERPOL Red Notice subject major blow to Chinese organized crime

20 September 2013 *ar* *en* *es* *fr*
Individual rights and police information sharing focus of INTERPOL and Fair Trials International meeting

12 July 2013 *ar* *en* *es* *fr*
'Foreign fighters' threat focus of INTERPOL counterterrorism meeting

Site map  |  FAQs  |  Terms of use  |  Calls for tender  |  Recruitment  |  Commission for the Control of INTERPOL's Files  |  Contact INTERPOL  |  e-
Learning

© INTERPOL 2015. All rights reserved.

# EXHIBIT 19

**SELEZNEV Roman**         **Control No.: A-5063/7-2014**

**Requesting Country:** UNITED STATES
**File No.:** 2014/40408
**Date of Publication:** 05 July 2014

CIRCULATION TO THE MEDIA (INCLUDING INTERNET) OF THE EXTRACTED
VERSION OF THE RED NOTICE AS PUBLISHED ON INTERPOL'S PUBLIC WEB
SITE: NO



## FUGITIVE WANTED FOR PROSECUTION

### 1.    IDENTITY PARTICULARS



**Family Name:** SELEZNEV
**Family Name in the Original Script or Chinese Telegraphic Code:** N/A
**Family Name at Birth:** SELEZNEV
**Forenames:** Roman
**Forenames in the Original Script or Chinese Telegraphic Code:** N/A
**Date and Place of Birth:** 23 July 1984 - Russia
**Sex:** Male

**Nationality:** RUSSIAN (CONFIRMED)

**Also Known As / Other Dates of Birth Used:**
| *Family name* | *Forenames* |
|---|---|
| "BANDYSLI64" | |
| "BULBA" | |
| "NCUX" | |
| "SHMAK" | |
| "SMAUS" | |
| "TRACK2" | |
| "ZAGREB" | |
| IVANOV | Roman |
| SAMVELICH | Ruben |
| SELEZNEV | Roman V |
| SELEZNEV | Roman Valerevich |
| SELEZNEV | Valery |

**Marital Status:** N/A
**Father's Family Name and Forenames:** N/A
**Mother's Maiden Name and Forenames:** N/A
**Occupation:** Computer and network security/hacking

GUAM_RULE5_PRODUCED_0000043

**Languages Spoken:** Russian, English

**Regions/Countries Likely to Be Visited:** China, Indonesia (Bali), Indonesia (Jakarta), Korea (Republic of), Maldives, Russia, Thailand, Eastern Europe, Baltic Region

**Additional Information:** SELEZNEV is a computer hacker and vendor of stolen credit card numbers. It is very likely that SELEZNEV is in possession of a laptop or other computer storage devices, and the data on those devices is likely to be encrypted. SELEZNEV Russian passport number may be 640410831, 640610831, or partial number 0410831, and his phone number of79024835285.

**Identity Documents:**
Russian passport No. 640410831, issued on 31 December 2009 (Expires on 31 December 2014)
Russian passport No. 623910597

**DNA Code:** N/A

| Description: | **Height:** 178 cm | **Weight:** 85 kg |
|---|---|---|
| | **Hair:** Brown | **Eyes:** Brown |
| | **Build:** Medium | |

**Distinguishing Marks and Characteristics:** SELEZNEV's height and weight are estimated, and he has a mole below his left eye. SELEZNEV may have substantial scarring or disfigurement to one of his hands as a result of being caught in an explosion in 2011.

## 2.   JUDICIAL INFORMATION

*The summary of facts and judicial information reflect the original request from the NCB and are not modified by the General Secretariat.*

**Summary of Facts of the Case:** UNITED STATES, District of Nevada and western district of Washington: On 22 November 2005

Roman SELEZNEV is wanted in the District of Nevada and the Western District of Washington for his role in a criminal organization that trafficked in stolen credit card data obtained through computer hacking and using computer viruses. From November 2005 to June 2011, in Nevada and elsewhere, the organization was an ongoing racketeering enterprise committing identity theft and credit and debit card fraud. The organization created a secret marketplace on the Internet, for the distribution of victims' stolen personal and financial means of identification. From October 2009 to February 2011, SELEZNEV was involved with network intrusions of the computer systems of retail businesses in Washington, and elsewhere. SELEZNEV caused malicious software to be downloaded to computer systems, stole credit card numbers of the businesses' customers, and sold those stolen credit cards on "carding" websites, causing financial losses through the fraudulent use of the credit card accounts' information.

**Additional Facts of the Case:** Roman SELEZNEV is charged in the District of Nevada for his criminal activities relating to the "carder.su" criminal organization that trafficked in stolen credit card data, and counterfeit identifications, laundered money, and committed computer crimes, including hacking and using computer viruses. From 22 November 2005 to 30 June 2011, in the District of Nevada and elsewhere, the organization was an ongoing racketeering enterprise whose purpose was to enrich its members by committing identity theft and credit and debit card fraud. The organization created a secret marketplace on the Internet, called a forum, for the distribution of victims' stolen personal and financial means of identification in order for the enterprise to protect itself and its members from detection, apprehension and prosecution by law enforcement. SELEZNEV's role in the organization was a vendor in the carder.su organization dumps. SELEZNEV sells members such a large volume of product that he has created an automated website, which he advertises on the carder.su organizations websites. SELEZNEV's automated website allows members to log into and purchase stolen and otherwise stolen credit card account data without personal interaction with SELEZNEV. SELEZNEV's website has a simple interface that allows members to search for the particular type

**File No.** 2014/40408                                                                 **Control No.** A-5063/7-2014

GUAM_RULE5_PRODUCED_0000044

of credit card information they want to buy, and the number of accounts they wish to purchase to their "shopping cart" and then check out. Payment of funds is automatically deducted from the already-established account funded through an on-line digital currency payment system. Upon checking out, the purchased credit card account data is available for members to download. SELEZNEV sells each stolen account number for approximately $20 USD. On two different occasions in January and May 2011, SELEZNEV possessed a total of at least 129 counterfeit and unauthorized access devices, such as credit cards. As of June 2011, the criminal organization had at least 7,000 members worldwide, and was responsible for at least $50 million USD in losses as a result of their criminal enterprise.

From 2 October 2009 to 22 February 2011, SELEZNEV was involved with network intrusions, or "hacks," of the computer systems of retail businesses in the Western District of Washington, and elsewhere. SELEZNEV caused malicious software, or "malware" to be downloaded to the computer systems compromised by the hacks, made use of that malware to steal the credit card numbers of the customers of the compromised businesses, and sold those stolen credit cards on "carding" websites with the knowledge and the intent that they will be used by those who bought them for fraudulent transactions, causing financial losses to numerous banks that issued the credit card accounts. A "carding" website is a site that sells stolen credit card numbers to others so they can in turn use them in fraudulent criminal activity.

SELEZNEV was identified with the online nicknames "nCuX" and "Track2," and was one of the most prolific worldwide sellers of stolen credit card numbers through online carding sites during the time frame of 2002 through 2009. In 2007, SELEZNEV ordered a device to re-encode credit card data to magnetic strips on credit cards. This device is used to transfer stolen credit card numbers to blank credit cards, and use the stolen numbers.

In May 2010, the computer system at a restaurant in Idaho was hacked and credit card information was stolen and sent to an Internet Protocol (IP) address of a computer server located in Russia. Shortly thereafter, individuals were arrested in Ohio using credit card numbers stolen during the intrusion of the computer system in Idaho. The computer seized from the Ohio suspects indicated that they had purchased the stolen credit card numbers from SELEZNEV's carding website. In October, 2010, there was another computer network intrusion at a restaurant in Seattle, Washington, which was determined to be connected to the Idaho intrusion, because the malware was downloaded from the same Russian server. The investigation revealed that the malware and server in Russia used in the Idaho and Washington intrusions were used in further intrusions into businesses throughout the U.S. that had credit card data stolen from their systems. Western Union records were obtained showing that SELEZNEV had received transfers of money in Indonesia in 2010.

In one of the intrusions the stolen data was transmitted to an IP address of a computer server located in Virginia for which activation records were discovered in an e-mail account belonging to SELEZNEV. The Virginia server was analyzed by U.S. law enforcement, and found to contain evidence of intrusions into the computer systems of over 100 U.S. businesses infected with the same type of malware that had been downloaded from the same Russian server, and the theft from them of over 180,000 credit card numbers. The Virginia server housed the same type of "hacking programs" that had been used on the victim businesses and the type of software needed to deliver and upload the stolen credit card numbers to the Virginia server. This particular server was also used to make an airline reservation for SELEZNEV to travel between Bali, Indonesia and Singapore. Another Virginia server associated with an e-mail account belonging to SELEZNEV was searched and found to contain e-mails from 12 December 2009, to 11 February 2011, regarding the lease and use of the Russian server used in the computer intrusions in Idaho, Washington, and elsewhere, tying SELEZNEV directly to the hacks and malware installation on the victim businesses' systems.

The fraudulent use of the stolen credit card numbers in this case has caused losses of millions of dollars to the financial institutions that issued those accounts. The confirmed losses to financial institutions due to the fraudulent use of credit card numbers stolen just from the Seattle restaurant is alone approximately $6 million USD. The theft and fraudulent use of the stolen credit card numbers have also damaged the personal identities and financial integrity of the individuals to whom the credit card numbers were assigned.
**Accomplices:** N/A

File No. 2014/40408                                                                 Control No. A-5063/7-2014

FUGITIVE WANTED FOR PROSECUTION

ARREST WARRANT OR JUDICIAL DECISION 1
Charge: 1) Bank Fraud (5 counts)
2) Intentional Damage to a Protected Computer (8 counts)
3) Obtaining Information from a Protected Computer (8 counts)
4) Possession of Fifteen or More Unauthorized Access Devices
5) Trafficking in Unauthorized Access Devices (2 counts)
6) Aggravated Identity Theft (5 counts)
Law Covering the Offence: 1) Title 18, U.S. Code, Sections 1344 and 2
2) Title 18, U.S. Code, Sections 1030(a)(5)(A), 1030(c)(4)(B)(i) and 2
3) Title 18, U.S. Code, Sections 1030(a)(2), 1030(c)(2)(B)(ii) and 2
4) Title 18, U.S. Code, Sections 1029(a)(3), 1029(c)(1)(A)(i), and 2
5) Title 18, U.S. Code, Sections 1029(a)(2), 1029(c)(1)(A)(i) and 2
6) Title 18, U.S. Code, Sections 1028A(a)(1) and 2
Maximum Penalty Possible: 30 years imprisonment  1) 30 years imprisonment per count
2) 10 years imprisonment per count
3) 5 years imprisonment per count
4) 10 years imprisonment
5) 10 years imprisonment per count
6) 2 years imprisonment per count
Time Limit for Prosecution or Expiry Date of Arrest Warrant: None

Arrest Warrant or Judicial Decision Having the Same Effect: No. CR11-70 RAJ, issued on 16 March 2011
by the U.S. District Court, Western District of Washington in United States
Name of signatory: James Kelly, Deputy Clerk
Copy of Arrest Warrant Available at the General Secretariat in the Language Used by the Requesting
Country: No

ARREST WARRANT OR JUDICIAL DECISION 2
Charge:
1) Participate in a Racketeer Influenced Corrupt Organization (RICO)
2) Conspiracy to Engage in a Racketeer Influenced Corrupt Organization (RICO)
3) Possession of Fifteen or More Counterfeit and Unauthorized Access Devices (2 counts)
Law Covering the Offence: 1) Title 18, U.S. Code, Section 1962(c)
2) Title 18, U.S. Code, Section 1962(d)
3) Title 18, U.S. Code, Section 1029(a)(3)
Maximum Penalty Possible: 20 years imprisonment  1) 20 years imprisonment
2) 20 years imprisonment
3) 10 years imprisonment per count
Time Limit for Prosecution or Expiry Date of Arrest Warrant: None

Arrest Warrant or Judicial Decision Having the Same Effect: No. 2:12-cr-004, issued on 10 January 2012
by the U.S. District Court, District of Nevada in United States
Name of signatory: Lance S. Wilson, Clerk
Copy of Arrest Warrant Available at the General Secretariat in the Language Used by the Requesting
Country: No

3.    ACTION TO BE TAKEN IF TRACED

LOCATE AND ARREST WITH A VIEW TO EXTRADITION

The country at the request of which the present notice has been published has given assurances that extradition will be sought upon arrest of the person, in conformity with its national laws and/or the applicable bilateral and multilateral treaties.

## PROVISIONAL ARREST

For the country at the request of which the present notice has been published, this red notice is to be treated as a formal request for provisional arrest. Please apply provisional arrest, in conformity with national laws and/or the applicable bilateral and multilateral treaties.

Immediately inform NCB WASHINGTON United States of America (NCB reference: 20121243224 of 03 July 2014) and the ICPO-INTERPOL General Secretariat that the fugitive has been found.

Control No. A-5063/7-2014

GUAM_RULE5_PRODUCED_0000047

# EXHIBIT 20

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 13046

# MUTUAL LEGAL ASSISTANCE

**Treaty Between the**

**UNITED STATES OF AMERICA**

**and the RUSSIAN FEDERATION**

Signed at Moscow June 17, 1999

with

Related Notes



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

# RUSSIAN FEDERATION

## Mutual Legal Assistance

*Treaty signed at Moscow June 17, 1999;*
*Transmitted by the President of the United States of America*
*    to the Senate February 10, 2000 (Treaty Doc. 106-22,*
*    106th Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
*    December 12, 2001 (Senate Executive Report No. 107-3,*
*    107th Congress, 1st Session);*
*Advice and consent to ratification by the Senate*
*    December 19, 2001;*
*Ratified by the President January 18, 2002;*
*Ratified by the Russian Federation November 3, 2000;*
*Ratifications exchanged at Washington January 31, 2002;*
*Entered into force January 31, 2002.*
*With related notes.*

**TREATY BETWEEN**
**THE UNITED STATES OF AMERICA**
**AND**
**THE RUSSIAN FEDERATION**
**ON**
**MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS**

The United States of America and the Russian Federation (hereinafter referred to as "the Parties"),

Striving to broaden and deepen American-Russian cooperation to prevent and fight against crime, and

Reaffirming their determination to enhance legal assistance in criminal matters,

Have agreed as follows:

-2-

## ARTICLE 1

### GENERAL PROVISIONS

1.      The Parties shall provide to each other, in accordance with this Treaty, comprehensive mutual legal assistance in criminal matters.

2.      For the purposes of this Treaty, legal assistance in criminal matters shall mean any assistance provided by the Parties in connection with:  prevention, suppression, and investigation of crimes; criminal prosecutions; and other proceedings related to such criminal matters.

3.      Legal assistance shall be provided in accordance with the provisions of this Treaty where the conduct that is the subject of the request constitutes a crime under the laws of both Parties.  The Requested Party may, in its discretion, also provide legal assistance where the conduct that is the subject of the request would not constitute a crime under the laws of the Requested Party.

4.      This Treaty is intended solely for cooperation and legal assistance between the Parties.  The provisions of this Treaty shall not give rise to a right on the part of any other persons to obtain evidence, to have evidence excluded, or to impede the execution of a request.

5.      For purposes of this Treaty, the term "person" shall mean both individuals and legal entities in the following articles: Article 1(4), Article 2(4), Article 5(3) subparagraphs 1-5, Article 10(1), Article 14, and Article 15(2).

## ARTICLE 2

### SCOPE OF LEGAL ASSISTANCE

Legal assistance under this Treaty shall include:

(1)      obtaining testimony and statements;

(2)      providing documents, records, and other items;

(3)      serving documents;

(4)      locating and identifying persons and items;

(5)      executing requests for searches and seizures;

(6)      transferring persons in custody for testimony or other purposes under this Treaty;

(7)      locating and immobilizing assets for purposes of forfeiture, restitution, or collection of fines; and

(8)      providing any other legal assistance not prohibited by the laws of the Requested Party.

-3-

## ARTICLE 3

## CENTRAL AUTHORITIES AND PROCEDURES
## FOR COMMUNICATIONS

1.     Each Party shall implement the provisions of this Treaty, including the making and receiving of requests, through its Central Authority.

2.     For the United States of America, the Central Authority shall be the Attorney General or persons designated by the Attorney General.  For the Russian Federation, the Central Authority shall be the Office of the Procurator General of the Russian Federation or persons designated by the Procurator General.

3.     The Central Authorities shall communicate directly with one another for the purposes of this Treaty and may agree upon such practical measures as may be necessary to facilitate the implementation of this Treaty.

## ARTICLE 4

## DENIAL OF LEGAL ASSISTANCE

1.     The Central Authority of the Requested Party may deny legal assistance if:

   (1)     the request relates to a crime under military law that is not a crime under general criminal law;

   (2)     the execution of the request would prejudice the security or other essential interests of the Requested Party; or

   (3)     the request does not conform to the requirements of this Treaty.

2.     The Requested Party shall not decline execution of a request on the ground of bank secrecy.

3.     Before denying legal assistance pursuant to paragraph 1 of this Article, the Central Authority of the Requested Party shall consult with the Central Authority of the Requesting Party to consider whether legal assistance can be given subject to such conditions as it deems necessary.  If the Requesting Party accepts legal assistance subject to these conditions, it shall comply with the conditions.

4.     If the Central Authority of the Requested Party denies legal assistance, it shall inform the Central Authority of the Requesting Party of the reasons for the denial.

+

## ARTICLE 5

### FORM AND CONTENTS OF REQUESTS
### FOR LEGAL ASSISTANCE

1.     A request for legal assistance shall be in writing, but in urgent situations the Central Authority of the Requested Party may accept a request in another form.  If the request is not in writing, the request shall be confirmed in writing within ten days of its receipt by the Requested Party unless the Central Authority of the Requested Party agrees otherwise.

2.     The request shall include:

    (1)     the identity of the authority on whose behalf the request is made;

    (2)     a description of the facts and circumstances of the case;

    (3)     the text of the law under which the conduct constitutes a crime;

    (4)     a description of the legal assistance sought; and

    (5)     a statement of the purpose for which the legal assistance is sought.

3.     To the extent necessary and possible, a request shall also include:

    (1)     information on the identity and suspected location of a person to be located;

    (2)     information on the identity and location of a person to be served, that person's relationship to the proceeding, and the manner in which service is to be made;

    (3)     information on the identity and location of a person from whom evidence is sought;

    (4)     a list of questions to be asked of a person identified in the request;

    (5)     a precise description of the place or person to be searched and of the item to be seized;

    (6)     a description of procedures for the execution of the request;

    (7)     information as to the allowances and expenses to which a person asked to appear in the territory of the Requesting Party will be entitled; and

    (8)     any other information that may be brought to the attention of the Central Authority of the Requested Party to facilitate the execution of the request.

4.     The request shall be prepared and signed in accordance with the regulations of the Requesting Party.

-5-

## ARTICLE 6

### LANGUAGE

Except as otherwise agreed by the Central Authorities of the Parties, requests for legal assistance and documents attached thereto shall be accompanied by a translation into the language of the Requested Party.

## ARTICLE 7

### EXECUTION OF REQUESTS

1.    The Central Authority of the Requested Party shall promptly execute the request or shall transmit it to the authority having jurisdiction to do so. The competent authorities of the Requested Party shall do everything in their power to execute the request in a timely manner.

2.    The Central Authority of the Requested Party shall represent the interests of the Requesting Party in executing the request.

3.    Requests shall be executed in accordance with the laws of the Requested Party except if this Treaty provides otherwise. The competent authorities of the Requested Party shall have the authority to issue subpoenas, search warrants, or other orders necessary for the execution of requests. Except if prohibited by its laws, the Requested Party shall follow procedures specified in the request.

4.    If the Central Authority of the Requested Party considers that execution of a request will interfere with a criminal investigation, criminal prosecution, or proceeding related to a criminal matter ongoing in that State, it may postpone execution, or make execution subject to conditions determined to be necessary after consultations with the Central Authority of the Requesting Party. If the Requesting Party accepts the legal assistance subject to these conditions, it shall comply with the conditions.

5.    The Requested Party shall use its best efforts to keep confidential a request and its contents if so requested by the Central Authority of the Requesting Party. If execution of the request would require a breach of this confidentiality, the Central Authority of the Requested Party shall so inform the Central Authority of the Requesting Party, which shall then determine whether the request should be executed under such circumstances.

6.    The Central Authority of the Requested Party shall respond to inquiries by the Central Authority of the Requesting Party concerning progress toward execution of the request.

7.    Upon request of the Central Authority of the Requesting Party, the Central Authority of the Requested Party shall furnish information in advance about the date and place of the execution of a request. During the execution of a request, the Requested Party shall permit the presence of such persons as are specified therein.

8.    The Central Authority of the Requested Party shall promptly inform the Central Authority of the Requesting Party of the outcome of the execution of the request. If the request is not executed, or if execution is delayed or postponed, the Central Authority of

-6-

the Requested Party shall inform the Central Authority of the Requesting Party of the reasons for non-execution, delay, or postponement.

## ARTICLE 8

### COSTS

1.    The Requested Party shall pay all costs relating to the execution of the request, except that the Requesting Party shall pay for the fees of experts, the costs of translation, interpretation, and transcription, and the allowances and expenses related to travel of persons pursuant to Articles 11 and 12 of this Treaty.

2.    If it becomes apparent that the execution of the request requires expenses of an extraordinary nature, the Central Authorities of the Parties shall consult to determine the terms and conditions under which the requested legal assistance can be provided.

## ARTICLE 9

### LIMITATIONS ON USE
### OF THE RESULTS OF EXECUTED REQUESTS

1.    The Central Authority of the Requested Party may require that the Requesting Party not use the results of the execution of a request obtained under this Treaty for purposes other than those described in the request without the prior consent of the Central Authority of the Requested Party.  In such cases, the Requesting Party shall comply with such limitations on use of the results of the executed request.

2.    Nothing in this Article shall preclude the use or disclosure of the results of an executed request to the extent that there is an obligation to do so under the Constitution of the Requesting Party in a criminal prosecution.  The Central Authority of the Requesting Party shall notify the Central Authority of the Requested Party in advance of any such possible or proposed use or disclosure.

3.    The results of an executed request that have been used for the purpose for which they were provided and, in the course of such use, have been made public in the Requesting Party in accordance with this Treaty may thereafter be used for any purpose.

## ARTICLE 10

### OBTAINING TESTIMONY AND EVIDENCE IN
### THE REQUESTED PARTY

1.    A person requested to testify and produce documents, records, or items in the Requested Party shall be summoned, if necessary by subpoena or order, to appear and testify and produce such documents, records, or items, in accordance with the requirements of the law of the Requested Party.

2.    In accordance with procedures used in the Requested Party, persons present at the execution of a request shall be permitted to pose questions directly or to formulate

-7-

questions that shall be posed to the person being questioned, and to make a verbatim
transcript of the proceeding using, if necessary, technical means.

3.     If the person referred to in paragraph 1 of this Article asserts a claim of immunity,
incapacity, or privilege under the laws of the Requested Party, the evidence shall
nonetheless be taken and the claim made known to the Requesting Party for resolution by
the authorities of the Requesting Party.


## ARTICLE 11

### OBTAINING TESTIMONY IN
### THE REQUESTING PARTY

1.     When the Requesting Party requests the appearance of a person in its territory, the
Requested Party shall invite the person to appear before the appropriate authority in the
Requesting Party.  The Requesting Party shall indicate the extent to which the expenses
and allowances will be paid.  The Central Authority of the Requested Party shall
promptly inform the Central Authority of the Requesting Party of the response of the
person.  A person who agrees to appear may ask that the Requesting Party advance
money to cover these expenses.  This advance may be provided through the Embassy or a
consulate of the Requesting Party.

2.     A person appearing in the Requesting Party pursuant to this Article shall not be
subject to service of process, or be detained or subjected to any restriction of personal
liberty, by reason of any acts or convictions that preceded the person's departure from
the Requested Party.  If such guarantee cannot be provided for any reason, the Central
Authority of the Requesting Party shall indicate this in the request in order to inform the
invited person and to allow that person to decide whether to appear taking these
circumstances into account.

3.     The safe conduct provided for by this Article shall cease seven days after the
Central Authority of the Requesting Party has notified the Central Authority of the
Requested Party that the person's presence is no longer required, or if the person has left
the Requesting Party and voluntarily returned to it.  The Central Authority of the
Requesting Party may, in its discretion, extend this period up to fifteen days if it
determines that there is good cause to do so.


## ARTICLE 12

### TRANSFER OF PERSONS
### IN CUSTODY

1.     A person in the custody of either Party whose presence in the other Party is sought
for purposes of legal assistance under this Treaty shall be transferred from the sending
Party to the receiving Party for that purpose if the person consents and if the Central
Authorities of both Parties agree.

-8-

2.   For the purposes of this Article:

   (1)   the receiving Party shall have the authority and the obligation to keep the person transferred in custody unless otherwise authorized by the sending Party;

   (2)   the receiving Party shall return the person transferred to the custody of the sending Party as soon as circumstances permit or as otherwise agreed by both Central Authorities;

   (3)   the receiving Party shall not require the sending Party to initiate extradition proceedings for the return of the person transferred;

   (4)   the person transferred shall receive credit for service of the sentence imposed in the sending Party for time served in the custody of the receiving Party; and

   (5)   where the sentence imposed expires, or where the sending Party advises the receiving Party that the transferred person is no longer required to be held in custody, that person shall be treated as a person invited pursuant to Article 11 or returned to the sending Party.


## ARTICLE 13

### PRODUCTION OF OFFICIAL RECORDS

1.   Upon request, the Requested Party shall provide the Requesting Party with copies of publicly available records, including documents or information of any nature and in any form in the possession of an executive, legislative, or judicial authority in the Requested Party.

2.   The Requested Party may provide copies of any records, including documents or information of any nature and in any form that are in the possession of an executive, legislative, or judicial authority in that Party, but that are not publicly available, but only to the same extent and under the same conditions as such records would be available to the competent authorities of that Party.  The Requested Party may in its discretion deny a request pursuant to this paragraph entirely or in part.


## ARTICLE 14

### LOCATION OR IDENTIFICATION OF PERSONS AND ITEMS

   If the Requesting Party seeks the location or identity of persons or information about items in the Requested Party, the Requested Party shall use its best efforts to execute the request.

-9-

## ARTICLE 15

### SERVICE OF DOCUMENTS

1.    The Requested Party shall use its best efforts to effect service of documents pursuant to a request.

2.    The Requesting Party shall transmit any request for the service of a document requiring the appearance of a person before a competent authority in the Requesting Party a reasonable time before the scheduled appearance.

3.    The Requested Party shall return to the Requesting Party a proof of service in the manner specified in the request.

## ARTICLE 16

### SEARCH AND SEIZURE

1.    The Requested Party shall execute a request for the search, seizure, and transfer of any item to the Requesting Party if the request includes the information justifying such action under the laws of the Requested Party.

2.    If requested, every official of the Requested Party who has had custody of a seized item shall certify the identity of the item, the continuity of its custody, and the integrity of its condition.

3.    The Requested Party may require that the Requesting Party agree to the terms and conditions deemed necessary to protect third party interests in the item to be transferred.

## ARTICLE 17

### TRANSFER OF DOCUMENTS, RECORDS, AND OTHER ITEMS

1.    When a request for legal assistance concerns the transfer of documents or records, the Requested Party shall transfer true copies thereof, unless the Requesting Party expressly requests the originals, in which case the Requested Party shall make every effort to comply with the request.

2.    Insofar as not prohibited by its laws, the Requested Party shall transfer documents, records, or other items in such manner or accompanied by such certification as may be requested by the Requesting Party in order to make them admissible according to the law of the Requesting Party.  For this purpose, the Central Authorities of the Parties shall exchange information pursuant to Article 3(3) with respect to the requirements for admissibility in their respective legal systems.  Documents, records, and other items transferred as requested under this paragraph shall require no further certification to make them admissible.

-10-

3.    The Central Authority of the Requested Party may require that the Central Authority of the Requesting Party return, as soon as possible, any documents, records, or other items furnished to it in execution of a request under this Treaty.

## ARTICLE 18

### PROCEEDS AND INSTRUMENTALITIES
### OF CRIME

1.    The Parties, in accordance with their laws, shall assist each other in locating, immobilizing, and seizing proceeds, including earnings from, or that are the result of, criminal activities, as well as instrumentalities of crime, for the purpose of: forfeiture; restitution to victims of crime; and collection of fines imposed pursuant to judicial decisions in criminal matters.

2.    If the Central Authority of one Party becomes aware that proceeds and instrumentalities of crime that may be subject to forfeiture are located in the territory of the other Party, it may so inform the Central Authority of the other Party so that the other Party may take appropriate measures under paragraph 3 of this Article. The Central Authority receiving the information shall notify the Central Authority providing the information of the action taken.

3.    The Party that has immobilized, seized, or forfeited the proceeds and instrumentalities of crime shall dispose of them in accordance with its laws. That Party shall transfer all or part of such assets, or the proceeds of their sale, to the other Party, including for the purpose of forfeiture and restitution (which includes returning them to the rightful owner) insofar as permitted by its laws and to the extent it deems it appropriate and within the time frame and under the conditions it deems acceptable.

## ARTICLE 19

### CONSULTATION

The Central Authorities shall consult, at times mutually agreed to by them, to promote the most effective use of this Treaty.

## ARTICLE 20

### SCOPE OF APPLICATION

This Treaty shall apply to any requests presented after its entry into force even if the relevant acts or omissions occurred before that date.

-11-

## ARTICLE 21

### OTHER LEGAL BASES FOR COOPERATION

The provisions in this Treaty shall not prevent either of the Parties from cooperating and from granting legal assistance in accordance with the provisions of other applicable international treaties and agreements, national laws, and practices.

## ARTICLE 22

### ENTRY INTO FORCE AND TERMINATION

1.     This Treaty shall be subject to ratification, and shall enter into force upon the exchange of the instruments of ratification, which shall take place as soon as possible.

2.     Upon entry into force of this Treaty, the Agreement between the Government of the United States of America and the Government of the Russian Federation on Cooperation in Criminal Matters, signed on June 30, 1995, shall no longer be in force.

3.     Either Party may terminate this Treaty by means of written notice to the other Party through the diplomatic channel.  Termination shall take effect six months following the date of receipt of such notification.

DONE at *Moscow* , this  *17th*   day of *June* , 1999, in duplicate, in the English and Russian languages, both texts being equally authentic.

FOR THE UNITED STATES OF AMERICA:       FOR THE RUSSIAN FEDERATION:

EMBASSY OF THE
UNITED STATES OF AMERICA

LES/063                        Moscow, June 17, 1999

Excellency:

I have the honor to refer to the treaty between the United States of America and the Russian Federation on Mutual Legal Assistance in Criminal Matters (the "Treaty",) signed on this date.

In connection with the treaty, my government notes that during its negotiation the United States delegation agreed to delete from Article 4(1) its proposal for the inclusion of an express reference to a "political offense" exception among the bases for denial of assistance under the treaty.  In so doing, the United States took into account the view of the Russian delegation that the term "political offense" is not used in Russian law and that Article 4(1) (2) of the treaty provided an adequate basis upon which to deny assistance requests in cases the United States would consider "political offenses."  Article 4(1) (2) permits each party to deny assistance if the execution of the request would prejudice the "security or other essential interests" of the requested party.  I hereby confirm that it is the view of the United States that Article 4(1) (2) is sufficient to meet the

His Excellency

    Igor Ivanov,

        Minister of Foreign Affairs,

            The Russian Federation.

- 2 -

concerns of the United States in this area, and the United States will

implement the treaty accordingly.

Accept, Excellency, the renewed assurances of my highest

consideration.

**DEPARTMENT OF STATE**
OFFICE OF LANGUAGE SERVICES
(Translation Division)

LS No.    0992972
JS/
Russian

His Excellency
J. Collins
Ambassador Extraordinary and Plenipotentiary
of the United States of America
in the Russian Federation

Moscow

No. 3729/dsa

Moscow, September 22, 1999

Your Excellency:

I have the honor to confirm receipt of your note no. LES/063 of June 17, 1999, concerning the Treaty between the United States of America and the Russian Federation on Mutual Legal Assistance in Criminal Matters signed on June 17, 1999, which [note] reads as follows:

[The Russian translation of the aforesaid note corresponds in all substantive respects to the text of the English original, with the following exception:

English: ...is sufficient <u>to meet the concerns of the United States</u> in this area...
Russian [translated]: ...is <u>sufficient grounds for concern</u> in this area...]

I have the honor to report that the Russian side shares the understanding in regard to Article 4(1)(2) set forth in the above-mentioned note.

Please accept, Your Excellency, the assurances of my highest consideration.

[s] A. Avdeyev

/Stamp of the RF Ministry of Foreign Affairs/

# DEPARTMENT OF STATE
## OFFICE OF LANGUAGE SERVICES
### (Translation Division)

LS No.     1000193
                JS/
                Russian

**MINISTRY OF FOREIGN AFFAIRS
OF THE RUSSIAN FEDERATION**

No. 4289/dsa

The Ministry of Foreign Affairs of the Russian Federation presents its compliments to the Embassy of the United States of America and, referring to its note no. 3729 of September 22, 1999, concerning paragraph 1(2) of Article 4 of the Treaty between the Russian Federation and the United States of America on Cooperation in Criminal Law Matters, has the honor to request that the final sentence in the first paragraph on the second page of the aforesaid note read as follows: "I hereby confirm that, from the viewpoint of the United States, paragraph 1(2) of Article 4 is sufficient to meet the concern in this area, and that the United States will apply this Treaty accordingly."

The Ministry avails itself of this opportunity to renew to the Embassy the assurances of its high consideration.

Moscow
October 20, 1999

/Stamp of the MFA of the Russian Federation/

To the Embassy of the United States of America
Moscow

# ДОГОВОР

## МЕЖДУ СОЕДИНЕННЫМИ ШТАТАМИ АМЕРИКИ И РОССИЙСКОЙ ФЕДЕРАЦИЕЙ О ВЗАИМНОЙ ПРАВОВОЙ ПОМОЩИ ПО УГОЛОВНЫМ ДЕЛАМ

Соединенные Штаты Америки и Российская Федерация, в дальнейшем именуемые Сторонами,

стремясь к расширению и углублению американо-российского сотрудничества по предупреждению преступности и борьбе с ней и подтверждая свою решимость совершенствовать оказание правовой помощи по уголовным делам,

согласились о нижеследующем:

## СТАТЬЯ 1

## ОБЩИЕ ПОЛОЖЕНИЯ

1. Стороны оказывают друг другу в соответствии с настоящим Договором всестороннюю взаимную правовую помощь по уголовным делам.

2. Для целей настоящего Договора под правовой помощью по уголовным делам понимается любая помощь, оказываемая Сторонами в связи с предупреждением, пресечением, расследованием преступлений и уголовным преследованием, а также с производством, имеющим отношение к таким уголовным делам.

3. Правовая помощь оказывается в соответствии с положениями настоящего Договора, если деяние, в связи с которым поступил запрос, является преступлением по законодательству обеих Сторон. Запрашиваемая Сторона может по своему усмотрению оказать правовую помощь также в случае, если деяние, в связи с которым поступил запрос, не является преступлением по ее законодательству.

4. Настоящий Договор направлен исключительно на достижение целей сотрудничества и взаимной помощи Сторон. Положения настоящего Договора не ведут к возникновению у каких-либо иных лиц права получать доказательства, добиваться исключения тех или иных доказательств либо препятствовать исполнению запроса.

5. Для целей настоящего Договора термин "лица" означает как физических, так и юридических лиц, в пункте 4 настоящей статьи, а также

2

в подпункте 4 статьи 2, подпунктах 1-5 пункта 3 статьи 5, пункте 1 статьи 10, статье 14 и пункте 2 статьи 15.

## СТАТЬЯ 2

### ОБЪЕМ ПРАВОВОЙ ПОМОЩИ

Правовая помощь в соответствии с положениями настоящего Договора включает:

1) получение показаний и заявлений;
2) предоставление документов, материалов и других предметов;
3) вручение документов;
4) установление местонахождения и идентификацию лиц и предметов;
5) исполнение запросов о проведении обысков и выемок;
6) передачу лиц, содержащихся под стражей, для дачи показаний или для других целей, предусмотренных настоящим Договором;
7) установление местонахождения и арест имущества с целью его конфискации, возмещения ущерба и взимания штрафов;
8) любую иную правовую помощь, не запрещенную законами запрашиваемой Стороны.

## СТАТЬЯ 3

### ЦЕНТРАЛЬНЫЕ ОРГАНЫ И ПОРЯДОК СНОШЕНИЙ

1. Каждая Сторона осуществляет реализацию положений настоящего Договора, включая направление и получение запросов, через свой Центральный орган.

2. Центральным органом для Соединенных Штатов Америки является Министр юстиции или назначенные им лица. Центральным органом для Российской Федерации является Генеральная прокуратура Российской Федерации или назначенные Генеральным прокурором Российской Федерации лица.

3. Центральные органы в целях выполнения настоящего Договора сносятся друг с другом непосредственно и могут согласовывать между собой практические меры, необходимые для облегчения выполнения настоящего Договора.

3

## СТАТЬЯ 4

## ОТКАЗ В ОКАЗАНИИ ПРАВОВОЙ ПОМОЩИ

1.   Центральный орган запрашиваемой Стороны может отказать в оказании правовой помощи в случае, если:

1) запрос касается преступления, предусмотренного военным законодательством, которое не является преступлением по общеуголовному праву;

2) исполнение запроса нанесло бы ущерб безопасности или иным существенным интересам запрашиваемой Стороны; или

3) запрос не соответствует требованиям настоящего Договора.

2.   Запрашиваемая Сторона не должна отказывать в исполнении запроса по основаниям необходимости сохранения банковской тайны.

3.   Центральный орган запрашиваемой Стороны до вынесения решения об отказе в оказании правовой помощи на основании пункта 1 настоящей статьи проводит консультации с Центральным органом запрашивающей Стороны для рассмотрения вопроса о том, может ли правовая помощь быть оказана при соблюдении тех условий, которые он считает необходимыми.   Если запрашивающая Сторона принимает правовую помощь на таких условиях, она должна соблюдать эти условия.

4.   Если Центральный орган запрашиваемой Стороны отказывает в оказании правовой помощи, он информирует Центральный орган запрашивающей Стороны о причинах отказа.

## СТАТЬЯ 5

## ФОРМА И СОДЕРЖАНИЕ ЗАПРОСА О ПРАВОВОЙ ПОМОЩИ

1.   Запрос о правовой помощи направляется в письменной форме, однако при наличии чрезвычайных обстоятельств Центральный орган запрашиваемой Стороны может принять запрос в иной форме.   Если запрос направляется не в письменном виде, он должен быть подтвержден письменно в течение десяти   дней со дня получения запроса запрашиваемой   Стороной,   если   только   Центральный   орган запрашиваемой Стороны не примет другого решения.

2.   Запрос включает:

1) название органа, от имени которого направляется запрос;

2) изложение фактов и обстоятельств дела;

3) текст   закона,   на   основании   которого   деяние   признается преступлением;

4

4) описание запрашиваемой помощи;

5) указание цели, для которой запрашивается помощь.

3. В той мере, в какой это необходимо и возможно, запрос также содержит:

1) данные о личности и предполагаемом местонахождении разыскиваемого лица;

2) данные о личности и местонахождении лица, которому необходимо вручить документ, о связи этого лица с проводимым разбирательством и порядке вручения документа;

3) информацию о личности и местонахождении лица, от которого необходимо получить доказательства;

4) перечень вопросов, которые требуется задать лицу, обозначенному в запросе;

5) точное описание места или лица, подлежащих обыску, и предмета, подлежащего выемке;

6) описание порядка исполнения запроса;

7) информацию о выплатах и возмещении расходов, на которые будет иметь право лицо, вызываемое на территорию запрашивающей Стороны;

8) любую иную информацию, которая может быть доведена до сведения Центрального органа запрашиваемой Стороны для облегчения исполнения запроса.

4. Запрос оформляется и подписывается в соответствии с правилами, установленными в запрашивающей Стороне.

## СТАТЬЯ 6

### ЯЗЫК

Запрос и прилагаемые к нему документы, направляемые в соответствии с настоящим Договором, сопровождаются переводом на языке запрашиваемой Стороны, если между Центральными органами Сторон не будет достигнута договоренность об ином.

## СТАТЬЯ 7

### ИСПОЛНЕНИЕ ЗАПРОСА

1. Центральный орган запрашиваемой Стороны незамедлительно исполняет запрос или направляет его органу, компетентному исполнить этот запрос. Компетентные органы запрашиваемой Стороны делают все от них зависящее для своевременного исполнения запроса.

5

2. Центральный орган запрашиваемой Стороны представляет интересы запрашивающей Стороны при исполнении запроса.

3. Запрос исполняется в соответствии с законодательством запрашиваемой Стороны, если иное не предусмотрено настоящим Договором. Компетентные органы запрашиваемой Стороны имеют право вручать повестки, выдавать ордера на обыск и другие ордера, необходимые для исполнения запроса.   Запрашиваемая Сторона исполняет запрос в соответствии с указанными в нем требованиями, если это не запрещено ее законодательством.

4. Если Центральный орган запрашиваемой Стороны считает, что исполнение запроса помешает осуществляемому в его государстве расследованию преступления, уголовному преследованию или производству, относящемуся к какому-либо уголовному делу, он может отложить исполнение запроса или связать его исполнение с соблюдением условий, признанных необходимыми после консультаций с Центральным органом запрашивающей Стороны.   Если запрашивающая Сторона принимает помощь на таких условиях, она должна соблюдать эти условия.

5. Запрашиваемая Сторона делает все от нее зависящее для обеспечения конфиденциальности запроса и его содержания при наличии просьбы об этом Центрального органа запрашивающей Стороны.  Если сохранение конфиденциальности при исполнении запроса невозможно, Центральный орган запрашиваемой Стороны информирует об этом Центральный орган запрашивающей Стороны, который решает, следует ли исполнять запрос при таких обстоятельствах.

6. Центральный орган запрашиваемой Стороны по просьбе Центрального органа запрашивающей Стороны информирует его о ходе исполнения запроса.

7. По запросу Центрального органа запрашивающей Стороны Центральный орган запрашиваемой Стороны заблаговременно предоставляет информацию о дате и месте исполнения запроса. Запрашиваемая Сторона допускает при исполнении запроса присутствие указанных в нем лиц.

8. Центральный орган запрашиваемой Стороны незамедлительно информирует Центральный орган запрашивающей Стороны о результатах исполнения запроса. Если запрос не был исполнен либо его исполнение было задержано или отсрочено, Центральный орган запрашиваемой Стороны информирует Центральный орган запрашивающей Стороны о причинах неисполнения запроса либо его задержки или отсрочки.

6

## СТАТЬЯ 8

## РАСХОДЫ

1.    Запрашиваемая  Сторона  несет  все  расходы,  связанные  с
исполнением  запроса,  за  исключением  того,  что  запрашивающая
Сторона несет расходы по оплате услуг экспертов, письменного и устного
перевода и протоколирования, а также расходов и выплат, связанных с
поездками лиц в соответствии со статьями 11 и 12 настоящего Договора.

2.    Если становится очевидным, что исполнение запроса потребует
чрезвычайных  расходов,  Центральные  органы  Сторон  проводят
консультации в целях определения условий, в соответствии с которыми
может быть оказана соответствующая помощь.

## СТАТЬЯ 9

## ОГРАНИЧЕНИЯ НА ИСПОЛЬЗОВАНИЕ РЕЗУЛЬТАТОВ
## ИСПОЛНЕНИЯ ЗАПРОСА

1.  Центральный орган запрашиваемой Стороны может потребовать
от  запрашивающей  Стороны,  чтобы  она  не  использовала  без
предварительного  согласия  Центрального  органа  запрашиваемой
Стороны результаты исполнения запроса, полученные в соответствии с
настоящим Договором, в иных целях, чем те, которые были указаны в
запросе. В таких случаях запрашивающая Сторона соблюдает указанные
ограничения на использование результатов исполнения запроса.

2.    Ничто в настоящей статье не исключает использования или
разглашения  результатов  исполнения  запроса,  если  конституцией
запрашивающей Стороны предусмотрено обязательство сделать это в
ходе уголовного преследования. Центральный орган запрашивающей
Стороны  заранее  уведомляет  запрашиваемую  Сторону  о  таком,
возможном или предстоящем использовании или разглашении.

3.   Результаты исполнения запроса, использованные в указанных в
нем целях и при этом обнародованные в запрашивающей Стороне в
соответствии  с  настоящим  Договором,  могут  в  дальнейшем  быть
использованы в любых целях.

7

## СТАТЬЯ 10

## ПОЛУЧЕНИЕ ПОКАЗАНИЙ НА ТЕРРИТОРИИ ЗАПРАШИВАЕМОЙ СТОРОНЫ

1. Лицо, от которого требуется дача показаний, представление документов, записей либо предметов, в запрашиваемой Стороне вызывается, при необходимости, повесткой или распоряжением для явки и дачи показаний, а также для представления таких документов, записей либо предметов в соответствии с требованиями законодательства запрашиваемой Стороны.

2. В соответствии с процедурой, применяемой в запрашиваемой Стороне, лицам, присутствующим при исполнении запроса, разрешается непосредственно задавать вопросы опрашиваемому лицу или формулировать вопросы, которые должны быть ему заданы, а также осуществлять дословную запись в ходе производства процессуального действия, используя, при необходимости, технические средства.

3. Если лицо, упомянутое в пункте 1 настоящей статьи, заявляет о своем иммунитете, неспособности или привилегии в соответствии с законодательством запрашиваемой Стороны, показания, тем не менее, будут получены, а о его заявлении будет сообщено запрашивающей Стороне для принятия решения ее компетентным органом.

## СТАТЬЯ 11

## ПОЛУЧЕНИЕ ПОКАЗАНИЙ В ЗАПРАШИВАЮЩЕЙ СТОРОНЕ

1. В случае запроса запрашивающей Стороны о явке какого-либо лица на ее территорию запрашиваемая Сторона приглашает это лицо явиться в соответствующий компетентный орган в запрашивающей Стороне. Запрашивающая Сторона указывает, в каком объеме такому лицу будут возмещены расходы и выданы пособия. Центральный орган запрашиваемой Стороны незамедлительно информирует Центральный орган запрашивающей Стороны об ответе данного лица. Лицо, давшее согласие на явку, может обратиться к запрашивающей Стороне с просьбой о выдаче аванса на покрытие этих расходов. Этот аванс может быть предоставлен через посольство или консульство запрашивающей Стороны.

2. Лицо, явившееся на территорию запрашивающей Стороны в соответствии с настоящей статьей, не может быть привлечено к участию в процессуальных действиях либо подвергнуться задержанию или каким бы

8

то ни было ограничениям личной свободы по причине каких-либо деяний или фактов осуждения, имевших место до отбытия этого лица с территории запрашиваемой Стороны. Если такая гарантия не может быть предоставлена по каким-либо причинам, Центральный орган запрашивающей Стороны указывает это в запросе с целью проинформировать приглашенное лицо и позволить ему принять решение о явке с учетом данных обстоятельств.

3. Гарантия неприкосновенности, предоставленная настоящей статьей, прекращает действовать по прошествии семи дней после того, как Центральный орган запрашивающей Стороны уведомил Центральный орган запрашиваемой Стороны об отсутствии потребности в дальнейшем присутствии этого лица либо в том случае, если это лицо покинуло территорию запрашивающей Стороны, а затем добровольно туда возвратилось. Центральный орган запрашиваемой Стороны может по своему усмотрению продлить этот срок до пятнадцати дней, если он придет к выводу, что на это есть достаточные основания.

## СТАТЬЯ 12

## ПЕРЕДАЧА ЛИЦ, СОДЕРЖАЩИХСЯ ПОД СТРАЖЕЙ

1. Лицо, содержащееся под стражей в одной из Сторон, чье присутствие в другой Стороне запрашивается для целей оказания правовой помощи согласно настоящему Договору, передается в этих целях из направляющей Стороны в принимающую Сторону при наличии согласия этого лица на такую передачу, а также при наличии согласия Центральных органов обеих Сторон.

2. Для целей настоящей статьи:

1) принимающая Сторона вправе и обязана содержать переданное лицо под стражей, если только направляющей Стороной не предусмотрено иное;

2) принимающая Сторона возвращает переданное лицо в распоряжение направляющей Стороны, как только это позволят обстоятельства либо в соответствии с иной договоренностью Центральных органов Сторон;

3) принимающая Сторона не требует, чтобы направляющая Сторона инициировала процедуры выдачи для возврата переданного лица;

4) период пребывания переданного лица под стражей в принимающей Стороне засчитывается в срок отбытия наказания, назначенного переданному лицу в направляющей Стороне;

9

5) в случае истечения срока отбытия наказания или когда направляющая Сторона сообщит принимающей Стороне, что нет более необходимости содержать данное лицо под стражей, с этим лицом должны обращаться как с лицом, приглашенным в соответствии со статьей 11 настоящего Договора, либо это лицо должно быть возвращено направляющей Стороне.

## СТАТЬЯ 13

### ПРЕДОСТАВЛЕНИЕ ОФИЦИАЛЬНЫХ МАТЕРИАЛОВ

1.   Запрашиваемая Сторона предоставляет запрашивающей Стороне по ее запросу копии общедоступных официальных материалов органов исполнительной, законодательной и судебной власти, включая информацию и документы любого характера и в любой форме, которыми располагают органы исполнительной, законодательной и судебной власти запрашиваемой Стороны.

2.   Запрашиваемая Сторона может предоставить копии любых записей и материалов, включая информацию и документы любого характера и в любой форме, которыми располагают органы исполнительной, законодательной и судебной власти этой Стороны, не являющиеся общедоступными; однако такие информация и документы могут предоставляться лишь в том объеме и на тех условиях, какие действовали бы в отношении доступа к ним компетентных органов запрашиваемой Стороны.   Запрашиваемая Сторона может по своему усмотрению полностью или частично отклонить запрос, сделанный на основании настоящего пункта.

## СТАТЬЯ 14

### УСТАНОВЛЕНИЕ МЕСТОНАХОЖДЕНИЯ И ИДЕНТИФИКАЦИЯ ЛИЦ И ПРЕДМЕТОВ

Если запрашивающая Сторона просит установить местонахождение лиц или идентифицировать их либо предоставить сведения о предметах, находящихся в запрашиваемой Стороне, то запрашиваемая Сторона принимает все необходимые меры для исполнения запроса.

10

## СТАТЬЯ 15

### ВРУЧЕНИЕ ДОКУМЕНТОВ

1. Запрашиваемая Сторона делает все от нее зависящее для вручения документов в соответствии с запросом.

2. Запрашивающая Сторона передает любой запрос о вручении документа, предусматривающего явку лица в компетентный орган запрашивающей Стороны, в разумные сроки до назначенной даты явки.

3. Запрашиваемая Сторона направляет запрашивающей Стороне подтверждение о вручении документов в соответствии с порядком, указанным в запросе.

## СТАТЬЯ 16

### ОБЫСК И ВЫЕМКА

1. Запрашиваемая Сторона исполняет запрос о производстве обыска или выемки, а также о передаче какого-либо предмета запрашивающей Стороне, если в запрос включена информация, обосновывающая эти действия в соответствии с законодательством запрашиваемой Стороны.

2. Каждое должностное лицо запрашиваемой Стороны, на хранении которого находился изъятый предмет, при наличии просьбы удостоверяет подлинность предмета, его неприкосновенность и непрерывность хранения.

3. Запрашиваемая Сторона может потребовать у запрашивающей Стороны соблюдения условий, которые представляются необходимыми для защиты интересов третьих лиц в отношении передаваемого предмета.

## СТАТЬЯ 17

### ПЕРЕДАЧА ДОКУМЕНТОВ, ЗАПИСЕЙ И ДРУГИХ ПРЕДМЕТОВ

1. В случае, когда запрос о правовой помощи предполагает передачу документов или записей, запрашиваемая Сторона передает надлежащим образом заверенные копии последних, если запрашивающая Сторона прямо не попросит о передаче оригиналов; в таком случае запрашиваемая Сторона принимает все меры для исполнения запроса.

2. Поскольку это не противоречит законодательству запрашиваемой Стороны, она передает документы, записи и другие предметы в таком

виде или заверенные таким образом, которых может потребовать запрашивающая Сторона с целью признания таковых допустимыми доказательствами в соответствии с законодательством запрашивающей Стороны. В этих целях Центральные органы Сторон обмениваются в соответствии с пунктом 3 статьи 3 настоящего Договора информацией, касающейся того, что является допустимыми доказательствами согласно правовой системе каждой из Сторон. Документы, записи и другие предметы, переданные согласно запросу, направленному в соответствии с настоящим пунктом, не нуждаются в дальнейшем удостоверении подлинности.

3. Центральный орган запрашиваемой Стороны может потребовать, чтобы Центральный орган запрашивающей Стороны, как только это станет возможным, возвратил любые документы, записи и другие предметы, предоставленные ему в ходе исполнения запроса, направленного в соответствии с настоящим Договором.

## СТАТЬЯ 18

## ИМУЩЕСТВО, ПРИОБРЕТЕННОЕ ПРЕСТУПНЫМ ПУТЕМ, И ОРУДИЯ СОВЕРШЕНИЯ ПРЕСТУПЛЕНИЙ

1. Стороны в соответствии со своим законодательством оказывают друг другу помощь в розыске, аресте и изъятии имущества, приобретенного преступным путем, включая доходы от преступной деятельности или являющиеся ее результатом, а также орудий совершения преступлений с целью конфискации, возмещения вреда потерпевшим от преступлений, а также взыскания штрафов, наложенных в соответствии с постановлениями судов по уголовным делам.

2. Если Центральному органу одной из Сторон стало известно, что имущество, приобретенное преступным путем, и орудия совершения преступлений, которые могут быть предметом конфискации, находятся на территории другой Стороны, он может информировать Центральный орган другой Стороны с тем, чтобы эта Сторона могла принять надлежащие меры в соответствии с пунктом 3 настоящей статьи. Центральный орган, получивший эту информацию, уведомляет Центральный орган, предоставивший информацию, о предпринятых действиях.

3. Сторона, которая осуществила арест, изъятие или конфискацию имущества, приобретенного преступным путем, и орудий совершения преступлений, распоряжается ими в соответствии со своим законодательством. Эта Сторона передает такое имущество полностью

12

или частично, а также доходы, поступившие от его продажи, другой Стороне, в том числе для целей конфискации и возмещения ущерба (включая возврат законным владельцам), поскольку это разрешено ее законодательством, и до пределов, которые она сочтет необходимыми, а также в тех пределах времени и в соответствии с теми условиями, какие она сочтет приемлемыми.

## СТАТЬЯ 19

## КОНСУЛЬТАЦИИ

Центральные органы Сторон во взаимосогласованные сроки проводят консультации в целях содействия наиболее эффективному применению настоящего Договора.

## СТАТЬЯ 20

## СФЕРА ПРИМЕНЕНИЯ

Настоящий Договор применяется ко всем запросам, поступившим после его вступления в силу, даже если соответствующие действие или бездействие имели место до этой даты.

## СТАТЬЯ 21

## ИНЫЕ ПРАВОВЫЕ ОСНОВЫ СОТРУДНИЧЕСТВА

Положения настоящего Договора не препятствуют любой из Сторон в осуществлении сотрудничества и в оказании помощи согласно положениям иных применимых международных договоров и соглашений, а также в соответствии со своим законодательством и практикой.

## СТАТЬЯ 22

## ВСТУПЛЕНИЕ В СИЛУ И ПРЕКРАЩЕНИЕ ДЕЙСТВИЯ

1. Настоящий Договор подлежит ратификации и вступает в силу с даты обмена ратификационными грамотами, который состоится в возможно короткие сроки.

13

2. При вступлении в силу настоящего Договора утрачивает силу Соглашение между Правительством Соединенных Штатов Америки и Правительством Российской Федерации о сотрудничестве по уголовно-правовым вопросам, подписанное 30 июня 1995 года.

3. Любая из Сторон может прекратить действие настоящего Договора путем направления другой Стороне по дипломатическим каналам письменного уведомления о своем намерении прекратить его действие. Прекращение действия настоящего Договора происходит по истечении шести месяцев с даты получения такого уведомления.

Совершено в _Москве_    «_17_» _июне_    199_9_ года в двух экземплярах, каждый на английском и русском языках, причем оба текста имеют одинаковую силу.


**ЗА СОЕДИНЕННЫЕ**                    **ЗА РОССИЙСКУЮ**
**ШТАТЫ АМЕРИКИ**                     **ФЕДЕРАЦИЮ**

N  3729/gca

Москва, « 22 » сентября 1999 года

Ваше Превосходительство,

Имею честь подтвердить получение Вашей ноты № LES/063 от 17 июня 1999 года, касающейся Договора между Российской Федерацией и Соединенными Штатами Америки о взаимной правовой помощи по уголовным делам, подписанного 17 июня 1999 года, следующего содержания.

«Ваше Превосходительство,

Имею честь сослаться на подписанный сегодня Договор между Соединенными Штатами Америки и Российской Федерацией о взаимной правовой помощи по уголовным делам (далее «Договор»).

ЕГО ПРЕВОСХОДИТЕЛЬСТВУ
ГОСПОДИНУ ДЖ.КОЛЛИНЗУ
ЧРЕЗВЫЧАЙНОМУ И ПОЛНОМОЧНОМУ ПОСЛУ
СОЕДИНЕННЫХ ШТАТОВ АМЕРИКИ
В РОССИЙСКОЙ ФЕДЕРАЦИИ

г.Москва

В связи с Договором мое Правительство отмечает, что во время его обсуждения делегация Соединенных Штатов согласилась исключить из пункта 1 статьи 4 свое предложение по включению специальной ссылки на «политические преступления» в качестве основания для отказа в оказании правовой помощи по Договору. Действуя таким образом, Соединенные Штаты принимали во внимание точку зрения российской делегации относительно того, что термин «политические преступления» не используется в российском законодательстве, и что пункт 1(2) статьи 4 Договора содержит достаточно оснований для отказа в исполнении запросов об оказании правовой помощи в случаях, рассматриваемых Соединенными Штатами в качестве «политических преступлений». Пункт 1 (2) статьи 4 разрешает каждой из сторон отказать в оказании правовой помощи в случае, если исполнение запроса нанесло бы ущерб «безопасности или иным существенным интересам» запрашиваемой Стороны. Тем самым я подтверждаю, что с точки зрения Соединенных Штатов, пункт 1 (2) статьи 4 является достаточным основанием для озабоченности в этой области, и что Соединенные Штаты будут соответствующим образом применять данный Договор.

Еще раз примите, Ваше Превосходительство, уверения в моем весьма высоком уважении.»

3

Имею честь сообщить, что Российская Сторона разделяет понимание относительно пункта 1(2) статьи 4 Договора, изложенное в вышеуказанной ноте.

Примите, Ваше Превосходительство, уверения в моем весьма высоком уважении.

А. Авдеев

N <u>4289/DCA</u>

Министерство Иностранных Дел Российской Федерации свидетельствует свое уважение Посольству Соединённых Штатов Америки и, ссылаясь на свою ноту № 3729 от 22 сентября с.г. относительно пункта 1 (2) статьи 4 Договора между Российской Федерацией и Соединёнными Штатами Америки о взаимной правовой помощи по уголовным делам, имеет честь просить читать последнее предложение первого абзаца второй страницы упомянутой ноты следующим образом: «Тем самым я подтверждаю, что, с точки зрения Соединённых Штатов, пункт 1 (2) статьи 4 является достаточным для снятия озабоченности в этой области и что Соединённые Штаты будут соответствующим образом применять данный Договор».

ПОСОЛЬСТВУ
СОЕДИНЁННЫХ ШТАТОВ АМЕРИКИ

г. Москва

2

Министерство пользуется случаем, чтобы возобновить Посольству уверения в своем высоком уважении.



Москва, 20 октября 1999 года

# EXHIBIT 21

**CIN**

| | |
|---|---|
| **From:** | SPO |
| **To:** | CID |
| **Cc:** | ISD; SEA; DAY; CLB; MOS; CIN; SPO |
| **Subject:** | CT 775.300 (410-775-9446-S) Schlotzsky's Deli (Cont'd/Request for IOD) |
| **Attachments:** | |

**Sent:** Wed 9/15/2010 2:39 PM

U. S. SECRET SERVICE INVESTIGATIVE REPORT

```
FROM:  SPOKANE RESIDENT OFFICE            FILE:    410-775-9446-S
TO  :  CRIMINAL INVESTIGATIVE DIVISION    X-REF:   202-768-22869-S
INFO:  ISD                                SEIZURE: N/A
       SEATTLE FIELD OFFICE
       DAYTON RESIDENT OFFICE
       COLUMBUS RESIDENT OFFICE
       MOSCOW RESIDENT OFFICE
       CINCINNATI FIELD OFFICE
```

SUBJECT:  REPORT OF CONTINUING INVESTIGATION/REQUEST FOR IOD

ACTUAL LOSS:  $146,199.64       POTENTIAL LOSS:  $TBD

```
CASE TITLE:          SCHLOTZSKY'S DELI
CASE TYPE:           775.300 (NETWORK INTRUSION - Private)
SECONDARY TYPES:     848.910; 848.920; 848.930; 770.100
CONTROLLING OFFICE:  SPOKANE RESIDENT OFFICE
REPORT MADE BY:      CASE SA JAMES BRANHAM (509) 353-2532
DATE CASE OPENED:    5/13/10
PREVIOUS REPORT:     OPENING REPORT - 6/8/10
REPORTING PERIOD:    6/9/10 - 9/13/10
STATUS:              CONTINUED
```

SYNOPSIS:

Schlotzsky's Deli in Coeur d'Alene, ID, has been identified as the point of compromise for credit card fraud utilizing accounts belonging to people living in the Pacific Northwest.

The fraudulent activity occurred both domestically and foreign with an updated known fraud loss of $146,199.

Investigation continues into identifying the potential source of the breach and a possible vendor selling the credit card dumps. The possible vendor has been identified as a result of an ongoing case in the Cincinnati Field Office (FO).

The United States Attorney's Office (USAO), District of Idaho, has been briefed on the case and has agreed to open a case for the issuance of court orders and Grand Jury subpoenas to further the investigation and for possible prosecution in the District of Idaho.

Case continued pending further investigation.

DETAILS OF INVESTIGATION:

Reference is made to the previous report in this case, dated 9/10/10, written by RAIC David Deetz, Moscow RO, responding to an Investigation Other District (IOD) request.

USSS_CINCINATTI_0000011

Reference is made to the Report of IOD, dated 7/30/10, written by SA Mike
McClelland, Columbus RO.

Reference is made to the Memorandum Report, dated 7/20/10, written by SA Kevin
Dye, Cincinnati FO, regarding the cross referencing of this case with an
investigation being conducted by the Cincinnati FO.

Reference is made to the multiple communications between the Spokane RO the
Criminal Investigative Division (CID), Moscow RO and the Seattle FO concerning
this investigation.

This case originated in the field with a duty call, on 5/5/10, from Fiserv who
advised Schlotzsky's Deli in Coeur d'Alene, ID had been identified as the point of
compromise in ongoing credit card fraud.

On 5/21/10, Task Force Officer (TFO) Detective Dave Dunn, ECTF Seattle FO,
provided me with a copy of his forensic analysis of the Point of Sale Systems
(POS) for Schlotzsky's.  In summary, TFO Dunn found the process Kameo.exe running
on the POS system and it was attempting to contact IP address 188.120.225.66.
Through his forensic analysis TFO Dunn concluded the Kameo.exe was placed on the
POS system on 4/1/10 at approximately 7:33am.  Also through analysis TFO Dunn was
able to determine the true name of the Kameo.exe process was "keywordsniffer.exe."

A hard copy of this report has been retained in the office case file.

On 7/14/10, I was contacted by SA Kevin Dye, Cincinnati FO, concerning the state
arrests of individuals who were purchasing items using stolen credit card
numbers.  SA Dye advised he had contacted the issuing banks on four (4) credit
card numbers recovered during his investigation and they were compromised at
Schlotzsky's Deli.  SA Dye advised they recovered a laptop computer and a credit
card encoder during the arrest.

On 7/20/10, RAIC David Deetz, Moscow RO, reported the Russian Federal Security
Service (FSB) was continuing to provide assistance in this case but requested
additional information concerning the IP address resolving back to Russia.
On 7/28/10, TFO Dunn received a preliminary copy of the forensic report completed
by the Cincinnati FO relating to the aforementioned case.  TFO Dunn provided the
following information related to this report:
*On 07/28/2010, I received the preliminary forensic report from the USSS CIN
office.  In reviewing that report, there were two files that appeared to be unique
in the way that they were named.  Those files were, "order---3186.txt" and "order-
--3187.txt" These appeared to be an automated naming convention that may have come
from an online credit card dumps vendor.*
*I contacted SA Ron Smalley at CIS regarding the  naming of these files and asked
if there were any known online vendors who were using this format. SA Smalley
researched this for me and advised that there was a vendor, who goes by the online
nickname of "Track2" and he uses this naming convention.*

On 8/4/10, I obtained a copy of the forensic analysis report completed by
SecurityMetrics Inc from Schlotzsky's owner Steve Cord.  Mr. Cord was required by
VISA to have the independent forensic audit completed per his merchant agreement
with VISA.  A copy of the forensic report will be retained in the case file.

On 8/16/10, RAIC David Deetz, Moscow RO, requested additional information in order
to complete the IOD request.  The requested information was provided by TFO Dunn
to RAIC Deetz in order to fulfill the request to the FSB.

On 8/26/10, TFO Dunn received a copy of the imaged suspect drive in the Cincinnati

USSS_CINCINATTI_0000012



FO case.  After reviewing the imaged hard drive TFO Dunn provided the following analysis:

*On 08/26/2010 I began to conduct forensics on the drive from CIN. I spoke with SA Smalley at CIS who also provided me with the ICQ number for Track2, 554716101.*

*In reviewing the drive image, I located the two files, "order---3186.txt" and "order---3187.txt", and saw that they had dates stamps of 06/23/10 at 0850 AM.*

*I reviewed the internet history for this time frame to ascertain the origin for the dumps.  I found that the dumps were purchased from a website whose URL or address is www.bulba.cc. Just prior to going to the site, the CIN suspect was on the website, libertyreserve.com, most likely to fund his dump purchase.*

*The final dump file also likely came from bulba.cc. I found that on June 19 and 20, the suspect was talking about wanting to get his lr(Liberty Reserve) account straight so that he could deal with "bulba". He then deals with a subject who will exchange western union wired money for liberty reserve currency and on 06/19/2010 sends him $240 for conversion.*

*In researching the website, bulba.cc, I found that, on 08/26/10, the site was hosted on a Ukranian webserver at IP address, 213.186.112.132. I checked to see what other sites were hosted at that IP address, and found that the other site hosted at that IP was, www.track2.name. I visited the sites and found them to be identical, except for the colors used.*

On 9/9/10, I contacted the financial institutions that have previously been identified as the issuing bank on credit card numbers compromised in this case and requested updated fraud losses.  The following information was provided by affected institutions:


On 9/14/10, I served Federal Grand Jury subpoenas on AOL/ICQ and Yahoo! for records related to this investigation.

JUDICIAL ACTION:

On 9/8/10, TFO Detective Dave Dunn, Seattle ECTF, RAIC Kevin Miller and I met with AUSA's Mike Mitchell and Nancy Cook, District of Idaho, and presented the facts of this case.  AUSA Cook agreed to open a case and issue subpoenas for investigative leads.  AUSA Cook agreed to prosecution at the conclusion of the investigation if a suspect can be identified and apprehended.

On 9/10/10, I e-mailed AUSA Cook requesting subpoenas for AOL/ICQ #554716101 and Yahoo! E-mail addresses rubensamvelich@yahoo.com, bulbacc@yahoo.com, and bandysli64@yahoo.com.

On 9/14/10, I e-mailed AUSA Cook requesting a subpoena for Western Union documents related to the purchasing of credit card dumps by suspects in this case.

On 9/14/10, Legal Assistant P.J. Foster, USAO, delivered the requested subpoenas for AOL and Yahoo!.

SUSPECTS / DEFENDANTS:

LNU, FNU - SUSPECT
     AKA:       Track 2

```
RACE:      Unknown
SEX:       Unknown
DOB:       Unknown
SSN:       Unknown
FBI:       Unknown
SID:       Unknown
HT:        Unknown
WT:        Unknown
EYES:      Unknown
HAIR:      Unknown
1599:      Unknown
1599A:     Unknown
PHOTO:     Unknown
PRINTS:    Unknown
POB:       Unknown
DL/STATE:  Unknown
ADDRESS:   Unknown
EMAIL:     Unknown
DATABASE CHECKS: N/A
```

DATABASE SEARCHES CONDUCTED:

No database searches were conducted during this reporting period.

EXAMS:

ECSAP: 5/17/10 TFO Dunn, ECTF Seattle FO

EVIDENCE / CONTRABAND / PERSONAL PROPERTY:

No evidence has been inventoried at this time.

DISPOSITION:

Request for IOD:
The Moscow RO is requested to continue liaison efforts with the Russian Federal
Security Service and attempt to determine subscriber information for IP address
188.120.225.66.  The Moscow RO is further requested to obtain any information
which maybe useful in determining the origin of the compromise.

Case continued pending reporting of IOD's and further investigation.

SPOKANE          BRANHAM / MILLER

USSS_CINCINATTI_0000014