1

The Honorable Richard A. Jones

2

3

4

5

6

7        UNITED STATES DISTRICT COURT FOR THE
               WESTERN DISTRICT OF WASHINGTON
8                            AT SEATTLE

9

10   UNITED STATES OF AMERICA,              NO. CR11-0070RAJ

11                   Plaintiff
                                             **GOVERNMENT'S RESPONSE TO**
12                                           **DEFENDANT'S MOTION TO**
                                             **DISMISS THE INDICTMENT**
13                   v.

14   ROMAN V. SELEZNEV,

15                   Defendant.

16

17              **I.     INTRODUCTION AND SUMMARY ARGUMENT**

18          This Court should summarily deny defendant's motion without a hearing.  The

19   United States properly sought and obtained the assistance and cooperation of the

20   Maldivian government to bring defendant into custody for purposes of prosecution.  One

21   hundred and thirty years of controlling case law forecloses any argument for dismissal

22   because even a "forcible abduction . . presents no valid objection" to criminal jurisdiction

23   over a properly-charged defendant.  *Ker v. Illinois*, 119 U.S. 436, 444 (1886).

24   Furthermore, a district judge in Guam previously held an evidentiary hearing on this issue

25   shortly after defendant's apprehension.  The district judge correctly held that defendant's

26   allegations, even if accepted as true, do not meet the "extremely high standard" required

27

28

RESPONSE TO MOTION TO DISMISS INDICTMENT                    UNITED STATES ATTORNEY
Seleznev/CR11-0070RAJ - Page 1                              700 STEWART STREET, SUITE 5200
                                                           SEATTLE, WASHINGTON 98101
                                                           (206) 553-7970

1  for dismissal pursuant to an "outrageous conduct" defense.  *United States v. Smith,* 924
2  F.2d 889, 897 (9th Cir. 1991).

3      The entire premise of defendant's motion – that U.S. agents "abducted" or
4  "kidnapped" him without the consent or participation of Maldivian authorities – is flatly
5  contradicted by the record developed at the previous evidentiary hearing, and by a public
6  statement by the President of the Maldives making clear that his government fully
7  participated in the apprehension.  The record shows beyond any doubt that defendant's
8  apprehension and transfer to U.S. authorities was the result of a lawful Maldivian
9  government operation conducted at the request of the United States and in cooperation
10 with the U.S. Secret Service and the Diplomatic Security Service.  Defendant was neither
11 abducted nor kidnapped.  There was no misconduct on the part of U.S. authorities, let
12 alone misconduct of a "shocking and outrageous" nature.  Further, defendant's
13 suggestion that the United States somehow misled the Maldivian authorities is plainly
14 false:   the diplomatic note and the Red Notice, which were provided to the Maldivians
15 prior to the operation, accurately disclosed all background relevant to defendant's
16 apprehension, including the serious charges against him.  This background justifiably
17 persuaded the Maldivian authorities that they should participate in bringing this
18 international cybercriminal to justice.

19     The Ninth Circuit has repeatedly held that only the most egregious misconduct on
20 behalf of the government can support dismissal, and has repeatedly rejected "outrageous
21 conduct" claims—even finding a forcible abduction involving a pre-dawn raid by U.S.
22 Marshals, in which the defendant was allegedly beaten and burned with a stun gun
23 applied to his feet and genitals, was not so shocking and outrageous as to require
24 dismissal.  *United States v. Matta-Ballesteros*, 71 F.3d 754, 761-63 (9th Cir. 1995).
25 Indeed, no controlling decision has *ever* approved dismissal based on outrageous
26 government conduct.  This case, in which Maldivian authorities mindful of their domestic
27 law chose to assist the United States in bringing this defendant into custody, does not
28 involve any serious allegations regarding use of excessive force and obviously does not

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

present facts that meet any articulated standard for dismissal.  As Judge Tydingco-Gatewood, the district judge in Guam found, Seleznev's allegations of "misconduct" do not even approach "outrageous" conduct and, therefore, are insufficient to support dismissal.

There is no reason to hold a second evidentiary hearing, which would require witnesses, who spent weeks in Guam awaiting the last hearing, to travel to Seattle from Honolulu, Washington DC, and Chicago.  It is well established that an evidentiary hearing is inappropriate where, as Judge Tydingco-Gatewood found to be the case here, relief would be inappropriate even if the defendant's allegations were accepted as true. This is doubly true in this case, because an evidentiary hearing has already been held. For these reasons, and those stated in the government's separately filed response to defendant's discovery motion, defendant is not entitled to any additional discovery on this matter and, indeed, no additional discovery or hearing is necessary to support a conclusion that defendant's motion is simply frivolous.  Defendant's motion should be denied without any further hearings.

## II.      PROCEDURAL HISTORY

Defendant Roman Seleznev is charged in a Second Superseding Indictment with eleven counts of wire fraud, nine counts of causing intentional damage to protected computers, nine counts of obtaining information from protected computers, nine counts of possession of fifteen or more unauthorized access devices, and two counts of aggravated identity theft.  All of the charges stem from his involvement in a computer-hacking scheme that targeted retail point-of-sale (POS) systems throughout the world. The object of the scheme was to hack into the POS systems, steal credit card numbers, and then sell the stolen credit card numbers with the intent that the numbers would in turn be used for fraudulent transactions defrauding banks and merchants around the world. The indictment alleges that defendant operated this scheme remotely using a complex criminal infrastructure scattered around the world to attack his victims and traffic in the fruits of his crimes.

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

Defendant was originally charged by indictment in this district with computer crimes, bank fraud and aggravated identity theft in March 2011.  Subsequent to the return of the Western District of Washington indictment, on January 10, 2012, a grand jury in the District of Nevada returned another Indictment charging defendant with RICO and RICO conspiracy based on allegations similar to those outlined in the Seattle indictment. Defendant's Nevada charges also remain pending.

Prior to his apprehension on July 5, 2014, U.S. authorities explored and pursued multiple means to apprehend Seleznev and bring him into U.S. custody.  Defendant, a Russian national and the son of a member of the Russian parliament, maintained homes in Vladivostok, Moscow, and Indonesia.  Because neither Russia nor Indonesia has an extradition treaty with the United States, and because the Russian constitution prohibits the extradition of citizens to stand trial abroad, the government's efforts were geared toward apprehending defendant while he was travelling outside of Russia.

Efforts to apprehend Seleznev were further complicated by the fact that defendant, by design, rarely traveled to, or through, countries that had extradition treaties with the United States.  Indeed, the Russian government has issued multiple travel advisories to its citizens warning that if they believe they may be wanted on criminal charges in the United States, they should avoid travel to countries that might extradite them to the United States.[1]  Defendant, who is known to have conducted searches for indictments against him on this Court's ECF system, carefully heeded this advice.  Therefore, any effort to apprehend this defendant necessarily required seeking cooperation and assistance from a government that did *not* have an extradition treaty with the United States.

The government engaged in discussions with several countries in furtherance of its efforts to apprehend Seleznev.  In April 2011, the government asked the Court's

---

[1] *See* David M. Herszenhorn, *Russia Issues Travel Warning to Its Citizens About United States and Extradition*, N.Y. Times, Sept. 2, 2013, available at http://www.nytimes.com/2013/09/03/world/europe/russia-issues-travel-warning-about-united-states.html; *Foreign Ministry concerned over US 'hunt' for Russian citizens in foreign countries,* Russia Today, April 11, 2014, available at http://rt.com/politics/russia-sanctions-foreign-travel-840/

1  permission to share copies of the Superseding Indictment with the Korean Ministry of

2  Justice for the purpose of seeking Seleznev's provisional arrest and extradition based on

3  information that Seleznev had in the past traveled through Korea.[2]  *See* Dkt. #11, 12.  In

4  January 2012, the government asked the Court for permission to share the Superseding

5  Indictment with Thailand and Indonesia in hopes of supporting requests for his

6  apprehension in either of those countries.[3]  *See* Dkt. #19, 21.  In October 2012, the

7  government returned to the Court for permission to share additional documents with

8  Korean officials who had expressed an interest in prosecuting Seleznev in Korea and then

9  extraditing him to the U.S.  *See* Dkt. #22, 23.  Representatives of the Secret Service and

10  the Department of Justice held meetings with officials in Korea to discuss the case.  In

11  December 2012, the government notified the Court of meetings between the Secret

12  Service and Indonesian officials in furtherance a request for defendant's expulsion from

13  Indonesia and transport to another jurisdiction.  *See* Dkt. #26, 27.  Secret Service agents

14  and prosecutors also worked with Australian officials in an effort to obtain an Australian

15  arrest warrant, which may have allowed defendant to be extradited from Indonesia to

16  Australia, and possibly from there to the United States.  None of these efforts were

17  successful.

18       As discussed in detail below, defendant was apprehended in the Maldives on July

19  5, 2014.  Following his apprehension, Seleznev was transported directly to the nearest

20  U.S. District Court, which is in Guam, for his initial appearance.  That appearance was

21  held on July 7, 2014, at which time Seleznev refused appointment of counsel from the

22  Federal Public Defender's Office and requested private counsel.  (Dkt. 32 Rule 5(c)(3)

23  Documents, Attachment 1, Docket at 4, entry 4) (hereinafter Guam Dkt. [entry #]).  The

24  Court continued the initial appearance and scheduled an identity hearing for July 22,

25  2014.  *Id.*  In anticipation of that hearing, the government flew three agents to Guam to

26  testify in support of the identity hearing.

27

28

[2] The U.S. and Korea have an extradition treaty that entered into force in 1999.
[3] The U.S. and Thailand have an extradition treaty that entered into force in 1991.

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 5

1    On July 18, 2014, however, Seleznev filed a motion to continue the Rule 5 hearing
2    and requested a briefing schedule to address a motion to dismiss the indictment based on
3    lack of personal jurisdiction.  Guam Dkt. #10.  Defense counsel argued that the
4    circumstances of Seleznev's apprehension constituted "outrageous government
5    misconduct" and that the Guam court should dismiss the charges against him and/or
6    divest itself of jurisdiction over the case.  *Id*.  The government opposed the continuance
7    and argued that any motions to dismiss should be raised once Seleznev was before this
8    Court.  Guam Dkt. #11.  Seleznev, however, chose to pursue his motion to dismiss in
9    Guam.  He argued that the motion "must be determined prior to conducting the Rule 5
10   hearing" and insisted that his arguments would be waived if not addressed in Guam.
11   Guam Dkt. #13 (Defendant's Motion to Discharge and Release Defendant at 7-9).

12       Over the following two weeks, while the Secret Service agents waited in Guam for
13   the evidentiary hearing, the court received briefing from both parties regarding the
14   District of Guam's jurisdiction over Seleznev, its jurisdiction to hear Seleznev's motion
15   to dismiss, as well as the merits of that dismissal motion.  Guam Dkt. #12, 16.  On July
16   31, 2014, Chief Judge Frances M. Tydingco-Gatewood held a hearing on defendant's
17   motion to dismiss and heard testimony from Special Agent Daniel Schwandner of the
18   United States Secret Service regarding the circumstances of defendant's apprehension.
19   Defense was provided a full opportunity to cross examine Special Agent Schwandner
20   (Attachment 1 - Transcript of Proceedings before the Honorable Frances Tydingco-
21   Gatewood, District of Guam, July 31, 2014 (hereinafter "Guam Transcript")).  For
22   purposes of making her decision, Judge Tydingco-Gatewood accepted all of defendant's
23   allegations regarding the circumstances of the apprehension as true, and found that none
24   of them amounted to shocking or outrageous conduct that would support dismissal of the
25   indictment.  (Guam Transcript at 56, 62-63, 68-69).  Accordingly, the court denied
26   Seleznev's motion to dismiss and proceeded to conduct a Rule 5 identity hearing that
27   same day.  At the conclusion of the Rule 5 hearing, the Court ordered Seleznev removed
28   to the Western District of Washington.  Guam Dkt. #40.  The court later entered a written

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  order summarizing her finding that, even assuming all of Seleznev's allegations are true,

2  the government's conduct was "not shocking and outrageous."  (Attachment 2 - Guam

3  Dkt. #44).

4       **III.    FACTS RELATED TO DEFENDANT'S APPREHENSION**

5  **A.    Overview**

6       As Judge Tyndingco-Gatewood found, the facts defendant has alleged are

7  insufficient to support a finding of shocking or outrageous conduct.  Nonetheless, the

8  government sets forth the following facts to correct the many inaccuracies and falsehoods

9  in defendant's motion.  The facts as set forth below demonstrate that defendant's

10  apprehension and arrest were the result of a perfectly appropriate diplomatic request for

11  assistance from a cooperative foreign government and that U.S. authorities acted

12  appropriately and professionally in their coordination with Maldivian officials.

13  **B.    Request to and Prior Consultation With Maldivian Authorities**

14       On July 1, 2014, the Secret Service received information that Seleznev was

15  vacationing in the Maldives[4] through July 5, 2014.  (Guam Transcript at 86; Attachment

16  3 – Report of Special Agent Mark Smith at 2; Attachment 4 - Report of Special Agent

17  Daniel Schwandner at 2).  The Service immediately began coordinating with the

18  Department of State Regional Security Office in Colombo, Sri Lanka, which, they

19  learned, had good relations with the Maldivian government.  Because the United States

20  has no formal extradition treaty with the Maldives, the Department of State, along with

21  officials from the Department of Justice Office of International Affairs, in consultation

22  with the Secret Service, decided to ask the Maldives via diplomatic note if it would use

23  its domestic law to detain Seleznev based on the existence of, and information in, the

24  U.S. indictment and arrest warrant, expel him from the Maldives, and turn him over to

25  U.S. authorities.  (Guam Transcript at 86, 111-114; Attachment 3 at 3; Attachment 4 at

26  2).  On July 2, 2014, Special Agent Mark Smith with the Department of State Diplomatic

27

28     [4] The Maldives is an island nation in the Indian Ocean approximately 370 miles south-west of India and 470 miles south-west of Sri Lanka.

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 7

1   Security Service (DSS) presented this plan to the Maldives Police Commissioner, who

2   tentatively approved, but explained he would need the approval of the Attorney General

3   of the Maldives.  (Attachment 3 at 3; Defendant's Exhibit 8 at 2).

4        The following day, July 3, 2014, the Department of State transmitted an official

5   diplomatic note requesting the assistance of the Maldives in the "removal of Russian

6   citizen ROMAN VALEREVICH SELEZNEV. . . to the United States by way of

7   deportation, expulsion, or other means available under the laws of the Maldives."

8   (Attachment 5 - Diplomatic Note at 1 (emphasis in original)).  The diplomatic note

9   informed the Maldives government that Seleznev was wanted to stand trial in United

10  States District Court for the Western District of Washington based on the charges

11  contained in the March 2011 Superseding Indictment and summarized the charges and

12  penalties.  *Id.*  The diplomatic note also summarized the essential facts of the

13  investigation, provided a detailed history and description of Seleznev including his

14  Russian passport number and date of birth, and included copies of the indictment and

15  arrest warrant.  *Id.* at 3-4.  Finally, the diplomatic note indicated that if Maldivian

16  authorities were willing to assist the United States in this matter, U.S. agents were

17  available to escort Seleznev to the United States.  *Id.* at 4.

18       Secret Service Special Agent Daniel Schwandner and Honolulu Field Office

19  Special Agent in Charge (SAIC) David Iacovetti traveled to the Maldives on July 3rd,

20  and July 4th respectively to coordinate with DSS Special Agent Smith, who also arrived

21  on July 4, 2014.  (Attachment 3 at 3; Attachment 4 at 2; Guam Transcript at 86, 111-

22  112).  On July 4, 2014, the agents met with Maldivian officials who confirmed through

23  immigration records that Seleznev had been in the Maldives since June 21st and told the

24  agents Seleznev was expected to depart through the main airport in Male on July 5, 2014.

25  (Guam Transcript at 113-116; Attachment 6 - Photo of Immigration Record; Attachment

26  4 at 2).  The Maldivian officials also indicated they were consulting with their attorney

27  general's office and other authorities regarding how to proceed and whether they could

28  expel Seleznev based on the U.S. indictment and arrest warrant.  (Guam Transcript at

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    116-117).  The U.S. agents did not participate in the Maldivian decision-making process

2    or advise the Maldivian authorities on how to effectuate Seleznev's detention, expulsion

3    or deportation.  (Guam Transcript at 116-117, 121-122).

4            At approximately 4:00 p.m. local time on July 4, the Maldivian authorities

5    contacted DSS Special Agent Smith and told him they were waiting on a court order or

6    warrant. (Attachment 7 - E-mail 7-4-14 3:56 pm Maldives Local Time).[5]  Later that

7    evening, around 8:00 p.m. local time in the Maldives, the Maldivian authorities told

8    Special Agent Smith a warrant would be done at 9:00 p.m.  (Attachment 8 - E-mail 7-4-

9    14 8:03 pm Maldives Local Time).  However, at approximately 1:30 a.m. on the morning

10   of July 5, 2014, the Maldivian authorities contacted Special Agent Smith and told him

11   that they needed an Interpol Red Notice in order to turn over Seleznev.  (Guam Transcript

12   at 117; Attachment 3 at 3).  Secret Service in Washington D.C., contacted their Interpol

13   liaison and arranged for Interpol to issue a Red Notice at approximately 10:00 p.m.

14   eastern standard time July 4, 2014 (7:00 a.m. July 5, 2014 in the Maldives).  (Guam

15   Transcript at 117-119; Attachment 3 at 3).

16           At approximately 8:30 a.m., Maldives local time on July 5, 2014, Special Agents

17   Smith, Schwandner and Iacovetti met again with Maldivian officials at the Male airport.

18   (Attachment 4 at 2).  During that meeting, the Maldivian officials confirmed they would

19   expel Seleznev based on the Red Notice and turn him over to the U.S. agents and told the

20   agents that this decision was formally approved by their government officials.  (Guam

21   Transcript at 121-123; Attachment 4 at 2).  The Maldivian officials did not indicate

22   whether they had obtained a domestic warrant or whether they had sought authority from

23   any Maldivian court.  (Guam Transcript at 117, 130-131).  Maldivian officials indicated

24   they would detain Seleznev and turn him over based on the Red Notice provided they

25   could confirm his identity when he arrived at the airport.  (Guam Transcript at 121-122).

26

27   ─────────────────────

28   [5] The time stamp on the copies of the e-mails in attachments 7 and 8 reflect the twelve hour difference between Maldives local time and Pacific Standard Time where the native file versions of these e-mails were converted to Adobe .pdf copies for discovery.

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 9

## C.    The Apprehension

At approximately 10:00 a.m., Seleznev arrived via sea plane at the Male airport and boarded a shuttle bus from the float plane terminal to the main airport terminal. (Guam Transcript at 122-123; Attachment 4 at 2).  Maldivian police officials and SAIC Iacovetti maintained surveillance of Seleznev on the bus as it traveled to the terminal and watched Seleznev get off the bus and approach the terminal.  (Guam Transcript at 122-123; Attachment 9 - Photographs of Seleznev).

As Seleznev entered the main terminal at approximately 10:30 a.m., Maldivian police stopped him and asked for his identification.  (Guam Transcript at 123; Attachment 3 at 3, Attachment 4 at 2).  After confirming his identity matched the Red Notice, the Maldivian police detained him and escorted him to the airport police station. (Guam Transcript at 123; Attachment 3 at 3; Attachment 4 at 2).

When they arrived in the airport police station, Seleznev was asked to sit on the couch.  Maldivian officials told the agents that they were confident Seleznev matched the description in the Interpol Red Notice.  (Guam Transcript at 91).  They notified Seleznev that he was being expelled from the Maldives based on the Red Notice, and presented defendant to Special Agents Schwandner, Iacovetti and Smith.  (Guam Transcript at 91-92; 123-124; Attachment 4 at 3).  After Seleznev acknowledged his name, Special Agent Schwandner introduced himself, explained who he was and why he was there, and showed Seleznev a copy of the U.S. indictment and arrest warrant.  (Guam Transcript at 91-92; Attachment 4 at 3; Attachment 10 - Photograph of Seleznev in Police Station). Special Agent Schwandner explained to Seleznev that he was going to be transported to the U.S. to answer the charges in the indictment.  (Attachment 4 at 3).  The Maldivian authorities also searched Seleznev's luggage and turned over various items of evidence including Seleznev's laptop computer and his iPhone to the U.S. agents.  (Attachment 4 at 3).

Maldivian authorities instructed the U.S. agents that they and Seleznev would be escorted by four Maldivian police officers to the departure hall for immigration

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   processing, with Agents Schwandner and Smith handling Seleznev.  (Guam Transcript at

2   124).  Before they left the police station, Special Agent Schwandner asked the Maldivian

3   officials if he could handcuff Seleznev for officer safety.  (Guam Transcript at 124-125).

4   Maldivian officials remained in control of the operation throughout the time the agents

5   and Seleznev were in the airport.  (Guam Transcript at 124).  The U.S. agents took no

6   actions without the consent or authorization of Maldivian officials.  *Id.*

7        At approximately 10:50 a.m., the agents, Maldivian authorities and defendant left

8   the police station and proceeded to the VIP departure lounge for immigration processing

9   with Seleznev in handcuffs.  (Guam Transcript at 131-132; Attachment 4 at 3).  At the

10  VIP departure lounge, Maldivian officials stamped Seleznev's passport for departure and

11  then escorted the U.S. agents and Seleznev to a chartered jet that U.S. authorities had

12  arranged for the operation.  (Guam Transcript at 131-132; Attachment 11 - Seleznev

13  Passport at 12; Attachment 4 at 3).  The agents and Seleznev boarded the plane at

14  approximately 11:05 a.m.  The flight left the ground at approximately 11:20 a.m. in route

15  for Guam.  (Guam Transcript at 134; Attachment 4 at 3, Attachment 3 at 3).

16       The flight to Guam took approximately 11 hours.  (Guam Transcript 134).  During

17  the flight, Seleznev's handcuffs were removed and he was provided with a comfortable

18  leather seat similar to first class seating on commercial flights.  (Attachment 12 -

19  Photograph of Seleznev on Charter Flight).  The charter crew served Seleznev an in-flight

20  meal of filet mignon.  Seleznev has not alleged any physical or mental abuse occurred

21  during any of the events described above.  (Guam Dkt. #13-1, Attachment 13 -

22  Declaration of Roman Seleznev).

23       Upon arrival in Guam, SAIC Iacovetti executed the arrest warrant and noted that

24  defendant was detained in the Maldives by Maldivian authorities and turned over to U.S.

25  agents for transport to Guam.  (Attachment 14 – Warrant for Arrest).  Agent Iacovetti

26  then allowed Seleznev to call his father using his cellular telephone.  Seleznev told his

27  father he had been taken into custody in the Maldives, that he had been taken to the

28  United States, he was safe and he had his medications.  The same day defendant was

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 11

taken into custody, the Secret Service provided the Russian Consulate with a Consular Notification of the apprehension.  Attachment 16.

## IV.    ARGUMENT

**A.    The Circumstances of Apprehension Do Not Affect the Court's Jurisdiction.**

Seleznev argues that this Court lacks personal jurisdiction over him because of the manner in which he was brought to the United States.  But "[i]t is well-established that jurisdiction over a defendant is not impaired by the fact that he was brought within the jurisdictional territory of the court against his will."  *United States v. Shi*, 525 F.3d 709, 724 (9th Cir. 2008).  This rule, known as the *Ker-Frisbie* doctrine, provides that even "forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offense, and presents no valid objection to his trial in such court."  *Ker v. Illinois*, 119 U.S. 436, 444 (1886); *see also Frisbie v. Collins*, 342 U.S. 519, 522 (1952) ("the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction'").  Thus while defendant's characterization of his apprehension as a "kidnapping" or "abduction" is belied by the facts, the *Ker-Frisbie* doctrine provides that even if his allegations were true, his motion must be denied.

The Ninth Circuit has also made clear that, in application, the *Ker-Frisbie* doctrine precludes a personal jurisdiction challenge when a foreign national is abducted from a foreign nation at the encouragement of United States officials, *United States v. Lovato*, 520 F.2d 1270, 1271 (9th Cir. 1975); *see also United States v. Alvarez-Machain*, 504 U.S. 657, 669-70 (1992), or even when United States law enforcement directly participates in the forcible abduction of a foreign national on foreign soil.  *Matta-Ballesteros*, 71 F.3d at 761-63; *United States v. Cotten*, 471 F.2d 744, 746-48 & n.4 (9th Cir. 1973).  The *Ker-Frisbie* doctrine thus makes clear that, subject to the two exceptions discussed below, the circumstances surrounding defendant's apprehension cannot support

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

dismissal of the indictment regardless of the level of U.S. participation in defendant's apprehension.

**B.      No Exceptions to the *Ker-Frisbie* Doctrine Apply to this Case.**

The *Ker-Frisbie* doctrine has only two exceptions.  *See United States v. Struckman*, 611 F.3d 560 (9th Cir. 2010).  The first exception applies when the transfer of the defendant violates an express provision of an extradition treaty.  *Alvarez-Machain*, 504 U.S. at 664.  This exception, however, is available only when an applicable "extradition treaty contains an explicit provision making the treaty the exclusive means by which a defendant's presence may be secured."  *Id.*  The second exception to the *Ker-Frisbie* doctrine applies when the government's conduct in securing the defendant's presence "is so shocking and outrageous 'as to violate the universal sense of justice'" and, therefore, amounts to a due process violation requiring dismissal.  *Struckman*, 611 F.3d at 573 (quoting *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991)); *see also United States v. Anderson,* 472 F.3d 662, 667 (9th Cir. 2006)).  Neither exception applies here.

**1.      No Extradition Treaty Applies in this Case**

The first exception to the *Ker-Frisbie* doctrine applies only to extraditions from countries with which the United States has entered into extradition treaties explicitly providing the exclusive means of removal from those countries.  *See Alvarez-Machain*, 504 U.S. at 662 (where no treaty expressly prohibits abduction from a country, "the rule in *Ker* applies and the court need not inquire as to how the defendant came before it").  There is no extradition treaty between the United States and the Maldives—much less one that provides an exclusive means of removal.  Accordingly, this exception is not applicable.

Because defendant was in the Maldives at the time of his apprehension, the existence of an extradition treaty between Russia and the United States is irrelevant.  However, because defendant complains at length in his brief about the government's failure to extradite him from Russia, several points need to be made.  First, Article 61 of

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 13

the Russian Constitution *forbids* extradition from Russia of Russian citizens, so

extradition from Russia was plainly not an option here.  Second, even setting the Russian

Constitution aside, there is no extradition treaty between the United States and Russia.

While the Russian government and the United States have entered into a Mutual Legal

Assistance Treaty (MLAT), the MLAT does not provide for extradition.  *See* Treaty with

Russia on Mutual Legal Assistance in Criminal Matters, Article 21.[6]  MLATs, including

the Russian MLAT, are mechanisms for obtaining evidence, not for extradition.  *See id* at

Article 1, Section 4 (the treaty "is intended solely for cooperation and legal assistance

between the parties"); *In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.*, 634

F.3d 557, 564 (9th Cir. 2011).  Moreover, the Russian MLAT is, by its own terms, not

mandatory.  *See* Treaty with Russia on Mutual Legal Assistance in Criminal Matters,

Article 1; *In re Grand Jury Subpoena*, 646 F.3d 159, 165 (4th Cir. 2011) (finding that

MLAT was "not the exclusive means for the government to obtain documents from a

party located in [a foreign] country").

Finally, the United States *did* in fact seek Russian assistance in its investigation of

Seleznev.  That experience caused US officials to believe that further coordination with

the Russian government would jeopardize efforts to prosecute this case.  On May 19,

2009, agents with the Secret Service met with representatives of the Russian Federal

Security Service (FSB) in Moscow, and presented substantial evidence of defendant's

computer hacking activities.  Agents provided the FSB with defendant's online alias

names, including his primary alias at that time (nCuX), and information that they

believed nCuX's true name was Roman Seleznev of Vladivostok, Russia.  Just one month

later, on June 21, 2009, nCuX notified his co-conspirators on multiple online criminal

forums that he was going out of business.  Shortly after that, nCuX completely

disappeared from the Internet.  Defendant then began establishing new online identities

---

[6] Although the U.S.-Russia MLAT has provisions for the transfer of persons already in custody for testimony or
other purposes, such transfers may only occur if the person to be transferred consents.  MLAT Article 12.  Because
Seleznev was not in custody in Russia and never would have consented to his own transfer to the United States the
treaty could not have been used to secure his appearance here.

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 14

including Track2 and Bulba around September 2009.  The close relation in time between the disclosure to the Russian government that nCuX was Roman Seleznev, and Seleznev's subsequent decision to abandon that nickname, along with defendant's father's known ties to the Russian government, caused authorities to conclude that further efforts to coordinate with Russian officials presented too much risk to the investigation.

Unable to argue that the government violated any extradition treaty, Seleznev invites this Court to craft an entirely new exception to the *Ker-Frisbie* doctrine. Defendant proposes that this Court be the first to recognize a *Ker-Frisbie* exception that would effectively prohibit the apprehension of fugitives in every country that has *not* entered into an extradition treaty with the United States.  See Defendant's Motion to Dismiss at 14 - 18 (arguing that in the absence of an extradition treaty silent on the question of abduction, the United States must comply with local laws addressing kidnapping offenses).  Defendant's novel proposal need not detain the Court long.  This Court is bound by decades of settled Supreme Court and Ninth Circuit precedent defining the bounds of the *Ker-Frisbie* doctrine, and the Ninth Circuit has squarely held that a forcible abduction from a non-extradition country falls squarely within the doctrine's ambit.  *Cotton*, 471 F.2d at 746-48 & n.4; *accord United States v. Shibin*, 722 F.3d 233, 243-44 (4th Cir. 2013) (expressly rejecting the argument that *Ker-Frisbie* is limited to countries with extradition treaties with the United States).  Defendant's invitation to rewrite this settled precedent should be rejected.  Regardless, the Maldives exercised its authority under its domestic law, with the United States operating only under Maldivian control.

## 2. The Alleged Circumstances Of Seleznev's Apprehension Were Neither Shocking Nor Outrageous.

As discussed above, the second potential exception to the *Ker-Frisbie* doctrine concerns "shocking and outrageous" conduct so extreme as to violate the "universal sense of justice," therefore requiring dismissal under due process principles.  *Struckman*, 611 F.3d at 573.  In a close variation of this analysis, the Ninth Circuit has held that courts

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    may order dismissal of an indictment under their inherent supervisory powers in certain

2    cases where the defendant can "demonstrate governmental misconduct 'of the most

3    shocking and outrageous kind' so as to warrant dismissal." *Id.* (citing *United States v.*

4    *Valot*, 625 F.2d 308, 310 (9th Cir. 1980). Therefore, the inquiry under a due process

5    analysis or under the court's supervisory powers turns on the same "extremely high"

6    standard of shocking and outrageous government conduct. *Struckman*, 611 F.3d at 573.

7    The conduct at issue here does not meet that standard because it involved no physical

8    abuse or mistreatment, it was based on full disclosure and cooperation with local

9    authorities, and there was no effort by government agents to circumvent local process.

10
11
### a.    Defendant's apprehension was not an abduction or kidnapping and did not involve any physical or mental mistreatment.

12       The allegations in Seleznev's declaration fail to describe behavior on the part of

13   U.S. authorities (or any other authorities for that matter) that would constitute an

14   abduction, kidnapping, inappropriate behavior, or mistreatment of any kind necessary to

15   support a finding of misconduct, let alone "shocking and outrageous" misconduct.

16   Indeed, in *Matta-Ballesteros*, the Ninth Circuit found a forcible abduction with very

17   concerning and entirely different facts than those alleged by Seleznev was not so

18   shocking and outrageous as to require dismissal under the court's supervisory powers or

19   as a due process violation. *Matta-Ballesteros*, 71 F.3d at 762-64.

20       In *Matta-Ballesteros*, Honduran special forces aided by four U.S. Marshals

21   abducted the defendant from his home in a pre-dawn raid in which they placed a hood

22   over his head, bound his hands, and thrust him to the floor of a car operated by the

23   Marshals before driving him to a U.S. Air Force Base and secreting him out of the

24   country. *Id*. at 761. During the ride to the air force base and later on the flight to the

25   U.S., Matta-Ballesteros was also allegedly beaten and burned with a stun gun applied to

26   various parts of his body including his feet and genitals. *Id*. The Ninth Circuit, while

27   "deeply concerned by the actions" of the arresting agents, found that "it is clear in light of

28

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 16

1    recent Supreme Court precedent that the circumstances surrounding Matta-Ballesteros'

2    abduction do not divest this court of jurisdiction." *Id*. at 763.

3        The facts of this case do not even approach those that the *Matta-Ballesteros* court

4    found insufficient to justify dismissal.  Maldivian authorities exercising their domestic

5    law enforcement authority initially directed Selezenev without force to an airport police

6    office. (Guam Transcript at 123; Attachment 3 at 3, Attachment 4 at 2).  After detaining

7    Seleznev based on the Interpol Red Notice and confirming he matched the description in

8    the notice, Maldivian authorities presented Seleznev to U.S. agents.  The U.S. agents then

9    notified Seleznev of the charges against him.  Only then did  Maldivian officials turn him

10   over to the U.S. agents' custody.  (Guam Transcript at 91-92; 123-124; Attachment 4 at

11   3).  The agents are not alleged to have engaged in any physical or mental abuse of the

12   defendant.  The most severe behavior described in Seleznev's own description of the

13   apprehension involved pushing him to a couch, yelling, and an allegation that agents

14   "aggressively dangled" the indictment in front of his face.  (Guam Dkt. #13-1

15   [Declaration of Roman Seleznev]). Instead of the physical abuse that *Matta-Ballesteros*

16   allegedly endured on his flight to the U.S., Seleznev's flight involved a steak dinner on a

17   luxury private jet while he comfortably lounged in a large leather seat.  (*See* Attachment

18   12).

19            **b.       Defendant's apprehension was undertaken under the authority**
20                      **and direction of and with full participation of Maldivian officials**

21        Throughout his motion, defendant falsely claims that the Secret Service agents

22   acted on their own, outside the authority of, and without the participation of, Maldivian

23   officials.  (Defendant's Motion to Dismiss at 7, 20-22).  The evidence, however, shows

24   that Maldivian authorities were actively engaged throughout and that U.S. special agents

25   acted only under the Maldives' authority and with their permission.  Special Agent

26   Schwandner testified that Maldivian officials were in full control of the entire operation,

27   and that the U.S. agents acted only at the direction of the Maldivian police until the

28   moment their airplane left the ground.  (Guam Transcript at 91, 124-126). This is

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 17

1   corroborated by a photograph of Seleznev in the Maldivian airport police station, which

2   clearly shows two Maldivian police officers with the word "Police" on their blue

3   uniforms guarding Seleznev as Agent Schwandner speaks to him.  (*See* Attachment 10).[7]

4         The falsity of defendant's claim is further demonstrated by the evidence he

5   himself submitted in support of his motion in Guam, which includes statements from the

6   President of the Maldives immediately after Seleznev's apprehension.  The statement by

7   the Maldivian President explains that U.S. authorities were operating solely under

8   Maldivian authority and quotes the President saying that "[t]he arrest was made

9   according to due procedure, upon Interpol's notice, with their assistance . . . [and the

10  operation] was not done on the instructions of the US or any other party." (Attachment 17

11  (Guam Dkt#20) at 9).  Even defendant's witness, whom he claims provides support for

12  his motion, acknowledged the presence of "Maldives law enforcement officers" during

13  the operation.  (Defendant's Exhibit 11).  The witness's declaration totally fails to

14  support defendant's claim that Maldivian agents "did not participate in his abduction in

15  any way," (Defendant's Motion to Dismiss at 22) (Guam Transcript at 124-127).  The

16  fact that Maldivian officials voluntarily cooperated in delivering Seleznev to United

17  States law enforcement is further proof that no "shocking" or "outrageous" conduct

18  occurred.  *See, e.g.,United States v. Valot*, 625 F.2d 308, 309-10 (9th Cir. 1980).  Thus,

19  defendant's contrary arguments are without merit and should be rejected.

        ***c.      US officials provided accurate information to the Maldivian
                    authorities.***

20

21

22        There is no evidence that U.S. officials made any misrepresentations to secure the

23  cooperation of Maldivian officials in defendant's expulsion.  Rather, the evidence shows

24  that the U.S. government presented a proper diplomatic request for assistance from the

25  Maldives in which it carefully described the charges and evidence against Seleznev and

26  requested his removal to the United States via whatever means available under the laws

27

28  ---
    [7] The government is submitting a copy of this exhibit in native (JPEG) format to provide the clearest possible image.
    Attachment 18.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  of the Maldives.  (*See* Attachment 5).  Notably, defendant does not contend the request

2  was incomplete or inaccurate in any way.

3       In light of the lack of an extradition treaty between the two governments, there

4  could be no more appropriate mechanism for securing defendant's custody than to

5  specifically ask Maldivian officials to act under their domestic authority and to provide

6  their cooperation exactly as occurred.  *See, e,g, Cotton*, 471 F.2d at 745-48.  Moreover,

7  given Russia's constitutional prohibition on extraditing its own citizens and this

8  defendant's history of avoiding travel to countries that have extradition treaties with the

9  United States, this type of apprehension operation was likely the only way Seleznev

10 could have been brought to justice.

11      Nonetheless, even had the agents engaged in some level of misrepresentations to

12 Maldivian officials, this too would be insufficient to support dismissal of the indictment

13 under binding Ninth Circuit precedent.  *See Struckman*, 611 F.3d at 573-576; *Anderson*,

14 472 F.3d at 667.  In *Struckman*, U.S. agents affirmatively lied to the Panamanian

15 government to secure that government's cooperation in expelling Struckman from

16 Panama and transfer to the United States.  Among other things, the U.S. agent

17 coordinating with the Panamanian officials falsely claimed Struckman had already been

18 tried, and falsely claimed Struckman was orchestrating a fraud scheme in Panama.  *See*

19 *Struckman*, 611 F.3d at 573-574.  The Ninth Circuit held that those allegations failed to

20 rise to the level of outrageous conduct necessary to support dismissal of the indictment.

21 *Id*.  Likewise, in *Anderson*, the Ninth Circuit found defendant's allegations that U.S.

22 agents had misled Costa Rican authorities regarding a purportedly unexecuted prison

23 sentence were insufficient to justify dismissal.  *Anderson,* 472 F.3d at 667.

### d.  *U.S. authorities did not engage in any efforts to circumvent the Maldivian judicial process.*

26      Similarly, there is no evidence that U.S. authorities engaged in any effort to

27 circumvent the Maldivian judicial process.  The Maldives' authorization and participation

28 in apprehending Seleznev began with a diplomatic request by the United States for

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 19

1   assistance from that country's domestic authorities.  As Agent Schwandner testified at the

2   hearing in Guam, the Maldivian law enforcement authorities did not involve U.S. agents

3   in the Maldives' decision making, the U.S. agents took no part in that process and those

4   agents had no knowledge of whether any Maldivian court or judicial official denied a

5   request for a warrant or court order.  (Guam Transcript at 117, 121-122, 130-131).

6   Therefore, the record simply fails to support defendant's claim that U.S. government

7   agents participated in any efforts to circumvent Maldivian process or ignore a judicial

8   order denying any purported arrest warrant request.  Indeed, there is not even any reliable

9   evidence supporting defendant's speculation that Maldivian officials were refused a

10  warrant.  On the contrary, while Maldivian officials may have discussed amongst

11  themselves the relative merits of obtaining a warrant or court order, and they may have

12  even met with a judge on this subject, they ultimately instructed the U.S. agents that the

13  proper method for securing Seleznev's custody was to present the Interpol Red Notice.

14  (Guam Transcript at 117, 121-122).  As Seleznev notes in his motion, a Red Notice is

15  "the closest instrument to an international arrest warrant in use today" and, as such, in the

16  absence of an extradition treaty that would support a formal provisional arrest warrant in

17  the host country, represents the most appropriate method of securing defendant's

18  detention in the Maldives.  (Defendant's Motion to Dismiss at 28).

19       Yet, just as allegations that U.S. agents engaged in deception of a foreign

20  government fail to support dismissal, allegations that U.S. agents circumvented foreign

21  judicial process also fail to support dismissal.  In *Anderson*, the defendant was attempting

22  to appeal an extradition order and an order depriving him of Costa Rican citizenship

23  through the Costa Rican judiciary.  *See Anderson*, 472 F.3d at 667.  While that process

24  was ongoing, the United States removed him "in the dead of the night" while his appeals

25  were still pending.  *Id*.  The Ninth Circuit rejected defendant's argument that the

26  government's circumvention of the Costa Rican judicial process constituted shocking and

27  outrageous conduct, finding that "nothing in this case amounts to outrageous conduct for

28  the purpose of obtaining personal jurisdiction over Anderson in the United States district

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 20

court." *Id.* Thus, as Judge Tydingco-Gatewood already found, defendant's motion fails even if his allegations regarding the purported denial of an arrest warrant by a Maldivian judge were true.

## C.  The Apprehension Did Not Violate Domestic or Foreign Law or International Treaties

The *Ker-Frisbie* doctrine permits dismissal only under the two specific exceptions discussed above, that is, when there is an exclusive extradition treaty or the government engages in shocking and outrageous conduct of an extreme degree.  Defendant's arguments that the apprehension violated various treaties, guidelines and laws therefore are insufficient to support his release, and are therefore irrelevant to this motion.  As discussed below, they are also unsupported by fact and law.

### 1.  Agents Acted Within Their Authority in Executing the Arrest Warrant

Defendant incorrectly argues that agents exceeded their authority by arresting him on foreign soil.  However, Special Agent Schwandner testified at the evidentiary hearing that he did not execute the arrest warrant until defendant's arrival in Guam.  (Guam Transcript at 120).  As he explained under cross examination, Maldivian Police authorities controlled the entire operation in the Maldives and he acted solely with their consent and at their direction.  (Guam Transcript at 121-125).  Regardless, the exact "when" and "where" of the execution of the U.S. warrant is not dispositive in any way here.

Special Agent Schwandner's testimony is supported by the record. The statement of the Maldivian President submitted by defendant maintains that "[t]he arrest was made according to due procedure, upon Interpol's notice, with their assistance . . . [and the operation] was not done on the instructions of the US or any other party." (Attachment 17 at 9).  Thus, to the extent defendant's detention in the Maldives constituted an arrest, it was solely the responsibility of Maldivian officials until the moment they left the Maldives.  This is consistent with the executed arrest warrant, which states that it was executed in Guam at 0241 hours on July 6, 2014.  (*See* Attachment 14).  Finally, SAIC

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 21

Iacovetti's notation clearly states that defendant was "detained in Maldives on 7/5/14 by police authorities pursuant to a Red Notice (Interpol) and released to the custody of US enforcement agents for transport back to Guam." *Id.* Thus, defendant's claim that his arrest violated the law governing the execution of arrest warrants and the Secret Service's enabling statute is unsupported by the facts.

Even had the United States executed its warrant on foreign soil, the only potential negative result would be offending the sovereignty of the relevant foreign country. However, the agents' conduct in taking custody of Seleznev in the Maldives was done with the full knowledge and approval of the Maldivian government, as reflected in the statement of the Maldivian President after the operation. If defendant was correct that federal law enforcement officers have no power to effect extraterritorial arrests even with the consent of the host country, this would mean that agents are effecting unlawful arrests every time they take custody of defendants following foreign extradition proceedings. This cannot be the law.[8]

### 2.      The Apprehension Did Not Violate DOJ Internal Guidance.

Seleznev also argues that his apprehension in the Maldives violated Department of Justice Guidelines contained in the United States Attorney's Criminal Resources Manual. (Defendant's Motion to Dismiss at 25-26). As an initial matter, the Criminal Resource Manual "does not create any substantive or procedural rights" that defendant may seek to enforce. *United States v. Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000). The Criminal Resource Manual is part of the United States Attorney's Manual which is designed as reference manual for federal prosecutors. USAM § 1-1.100. The manual expressly states that it "provides only *internal* Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural,

---

[8] Seleznev cites *Alvarez-Machain v. United States*, 331 F.3d 604, 641 (9th Cir. 2003 (en banc) *rev'd on other grounds sub nom, Sosa v. United States*, 542 692 (2004), as support for his claim that Rule 4(c)(2) prohibits executing arrest warrants outside the United States, but this citation is inapt. *Alvarez-Machain* involved a prior version of Rule 4(c)(2) that expressly limited service of arrest warrants to "any place in the United States." However, in 2002, Rule 4(c)(2) was amended to include its current language, which allows service of an arrest warrant "anywhere within the jurisdiction of the United States or anywhere else a federal statute authorizes an arrest.

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 22

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  enforceable at law by any party in any matter civil or criminal." *Id.* (emphasis added).

2  Therefore, even if defendant's allegation that agents violated the manual were true, this

3  fact standing alone would fail to rise to the level of a recognized statutory or

4  constitutional violation. *United States v. Montoya*, 45 F.3d 1286, 1295 (9th Cir. 1995).

5      In any case, the government did not violate any policy or provision of the Criminal

6  Resource Manual.  While the government has no obligation to produce documentation of

7  its internal consultations and deliberations, representatives of the Secret Service, the

8  United States Attorney's Office, and the other appropriate components of the Department

9  of Justice fully discussed the plan to apprehend Mr. Seleznev, and all necessary approvals

10  were obtained.

11      **3.      Agents Did Not Violate Maldivian Law**

12      There is absolutely no evidence to support defendant's claim that the agents

13  knowingly violated the law of the Maldives.  On the contrary, the agents had every

14  reason to believe that the Maldivian authorities were acting well within their own laws

15  and directed the U.S. agents accordingly.

16      As demonstrated by Agent Schwandner's testimony and the agents' after-action

17  reports, the Maldivian authorities' actions showed a careful and deliberate process of

18  deciding whether to expel Seleznev.  (Guam Transcript at 91-92, 113-117, 121-125).

19  Among other things, the record shows that in response to the United States request to the

20  Maldives to use its domestic law and provide cooperation and assistance in the

21  apprehension of Seleznev, the Maldivian authorities:  1) consulted with their attorney

22  general; 2) consulted with a Maldivian judge; 3) consulted with the Maldivian President,

23  and; 4) decided and provided specific advice to the United States that  an Interpol Red

24  Notice was a proper legal basis for expelling Seleznev from the Maldives.  Upon receipt

25  of the Red Notice, Maldivian officials notified the agents that they were satisfied this

26  would support Seleznev's expulsion as long as they confirmed he matched the description

27  in the warrant.  (Guam Transcript at 121-122).

28

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 23

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

Additionally, the Maldivian officials told the agents that this decision had been approved by their Attorney General and the President of the Maldives. (Guam Transcript at 122; Attachments 3 & 4). Before turning Seleznev over, the Maldivian officials carefully reviewed the description in the Red Notice before confirming Seleznev was the defendant described in the warrant. (Guam Transcript at 123-124, 131). It would be absurd to find that U.S. agents acting under assurances that the Maldivian President and Attorney General had approved the operation somehow "knowingly violated the law of the Maldives"—let alone engaged in shocking and outrageous misconduct.

Insofar as Seleznev alleges the Maldivian authorities violated their own domestic law by transferring him into United States custody, he has no remedy in this Court for any violation of Maldivian law. *See United States v. Covington*, 783 F.2d 1052, 1056 (9th Cir. 1985); *United States v. Maher*, 645 F.2d 780, 782 (9th Cir. 1981). United States law enforcement agents should not be required to second-guess the decision-making process of a foreign government – especially when that process appears to have involved such a careful analysis at the highest levels of the host nation. When viewed in light of the many other cases that have approved truly forcible abductions conducted over the objection of the host nation, the facts of this case simply cannot support a finding of misconduct. *See e.g., Alvarez-Machain,* 504 U.S. at 664-67.

### 4. Defendant Was Lawfully Expelled Consistent with the Interpol Red Notice.

The Interpol Red Notice requested the assistance of any foreign government that located Seleznev in effecting a lawful removal to the United States to face trial. That is exactly what happened in this case. *See* Defendant's Exhibit 19. As shown above, the U.S. agents were fully justified in their belief that the Maldivian authorities had done everything in their power to comply with local and international law during the course of their assistance. Maldivian officials' actions reflected a careful consideration of the U.S. request and their consultation with multiple levels and branches of their government demonstrated they were acting deliberately and within the bounds of their domestic

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 24

1   authority.  Nonetheless, even if the Government did violate the Red Notice, defendant has

2   no standing to personally enforce the terms of a Red Notice agreement.  *See United States*

3   *v. Yousef*, No. S3 08 Cr. 1213, 2011 WL 2899244 (S.D.N.Y. June 30, 2011) (defendant

4   lacked standing to argue that the government's alleged violation of the terms of a Red

5   Notice and Agreement to Extradite warranted dismissal of the indictment).  Once again,

6   in light of the numerous cases that have found no violation under much more severe

7   circumstances, defendant's allegations are clearly insufficient to support a finding of

8   misconduct.

9       **5.      The Secret Service Did Not Violate the International Covenant on Civil**
10               **and Political Rights**

11      The International Covenant on Civil and Political Rights also fails to support

12   dismissal of the indictment.  Defendant argues that the agents violated the ICCPR when

13   they "arrested him without authority under either United States law or the law of the

14   Maldives. . . ."  (Defendant's Motion to Dismiss at 31).  The record shows, however, that

15   U.S. agents were acting solely at the direction and discretion of Maldivian authorities.

16   Therefore, it is only the Maldivian authorities' actions in expelling Seleznev and turning

17   him over to the custody of U.S. agents based on the Interpol Red Notice that could

18   possibly have violated the terms of the ICCPR.  Such a violation could not constitute

19   shocking or outrageous conduct on the part of the U.S. agents, as they had no part in the

20   Maldivian process or decision making.  (Guam Transcript at 121-122).  Importantly,

21   there is no suggestion by any facts in the record that any government action by the United

22   States or the Maldives offended the ICCPR.  Therefore, this allegation is contradicted by

23   the record already developed in Guam.

24      Moreover, the Supreme Court has clearly held that only a violation of the express

25   terms of an extradition treaty establishing it as the exclusive means for the return of

26   fugitives may constitute an exception to the *Ker-Frisbie* doctrine.  *See Alaverez---*

27   *Machain*, 542 U.S. at 667-668.  Any other alleged violation of international law will not

28   suffice as an exception to *Ker-Frisbie*. *Id.*  Therefore, even assuming defendant's

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 25

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

expulsion from the Maldives constituted a violation of the ICCPR (which the United States denies), such a violation would not support dismissal of the indictment and does not constitute either shocking or outrageous conduct.

Finally, as a general principle of international law, individuals do not have standing to challenge violations of international treaties in the absence of a protest by a sovereign treaty signatory. *See Matta-Ballesteros v. Henman*, 896 F.2d 255, 263 (7th Cir. 1990); *United States v. Rosenthal*, 793 F.2d 1214, 1232 (11th Cir. 1986); *United States v. Hensel*, 699 F.2d 18, 30 (1st Cir. 1983). A treaty will be construed as creating enforceable private rights only if the treaty expressly or impliedly provides a private right of action. *Edye v. Robertson*, 112 U.S. 580, 598-99 (1884). Multilateral treaties do not confer such rights on private individuals. *See Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 937 (D.C. Cir. 1988) (United Nations Charter does not confer rights on private individuals). The IICPR is such a treaty, and it was ratified by the United States "on the express understanding that it was not self-executing and so did not itself create obligations enforceable in federal courts." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004). Thus, Seleznev has no recourse under the ICCPR and it may not ground any argument for dismissal of his indictment.

**D.    Defendant's Apprehension is a Model of Effective International Law Enforcement Cooperation.**

Far from weakening the United States' image on the global stage, Seleznev's apprehension shows that cybercriminals will be brought to face justice and cannot hide behind keyboards in distant countries. Defendant's apprehension and prosecution is the result of excellent investigative work and sends a clear message to cybercriminals that those who deliberately target U.S. citizens and businesses from overseas are not immune from prosecution in the United States. The recent growth in international cybercrime requires a concerted effort to identify, arrest, and prosecute those like Seleznev who are

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 26

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  imposing massive costs upon the economy of the United States.[9]  The Department of

2  Justice has identified cybercrime as one of the key priority areas and noted that

3  cybercrime is one of the greatest threats facing our country with enormous implications

4  for our economic prosperity and public safety.[10]  Aggressively pursuing the apprehension

5  of major cybercriminals like Seleznev in coordination with our international law

6  enforcement partners does not weaken the United States' image.  Quite to the contrary,

7  acting with speed and decisiveness in close cooperation with foreign officials as the

8  Secret Service did in this case, strengthens that image and shows the world that the

9  United States will not stand by while criminals like Seleznev leave a trail of victims in

10  the United States and around the world.

11        Because Seleznev's apprehension and transfer to U.S. custody was a lawful

12  operation that does not even resemble a kidnapping, nothing the U.S. agents did would

13  justify the behavior defendant suggests other countries may engage in as retribution.

14  Particularly important are the clear request to the Maldives that it use it domestic law to

15  assistant with the apprehension of defendant and the Maldives' decision that the

16  presentation of the Interpol Red Notice would lawfully ground their delivery of defendant

17  to U.S. authorities for the ensuing U.S. arrest.  Defendant's suggestion that this operation

18  puts U.S. citizens "at increasingly greater risk of retribution or similar action" is based on

19  the same false premise that he was kidnapped which undermines every argument he

20  makes.  (Defendant's Motion to Dismiss at 32).  There was no kidnapping or abduction.

21  Defendant's apprehension was executed with the cooperation of Maldivian officials

22  based on an official diplomatic request and proper Interpol Red Notice.  Nothing

23  inappropriate or unlawful took place.  Therefore, Seleznev's  hyperbolic fears of foreign

24  retribution should be dismissed.

25

26

27  [9] *See* Chris Strohm, *Cybercrime Remains Growth Industry With $445 Billion Lost*, BloombergBusiness, June 9,
2014, available at http://www.bloomberg.com/news/articles/2014-06-09/cybercrime-remains-growth-industry-with-
28  445-billion-lost
[10] *See* Department of Justice Priority Areas, available at http://www.justice.gov/usao/priority-areas/cyber-crime.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2

## V.    THE COURT SHOULD DECLINE
## TO HOLD AN EVIDENTIARY HEARING.

3      The Court should not hold a second evidentiary hearing because defendant has not

4  alleged facts sufficient to support his claim for dismissal.  An evidentiary hearing is

5  necessary only where a defendant's motion identifies disputed material facts which, if

6  proven, would support the defendant's claim for relief.  *United States v. Howell*, 231 F.3d

7  615, 520 (9th Cir. 2000); *United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980)

8  (evidentiary hearing required only where "the moving papers allege facts" that would

9  "enable the court to conclude that relief should be granted if the facts alleged are

10  proved").  Where relief would be inappropriate even under the facts alleged by the

11  defendant, the court should deny the request for a hearing.  *Howell*, 231 F.3d at 520.  In

12  addition, holding multiple hearings to repeatedly address the same issue is inconsistent

13  with basic notions of judicial economy.  *United States v. Lummi Tribe*, 235 F.3d 443, 453

14  (9th Cir. 2000) (law of the case doctrine promotes "efficient operation of court affairs").

15      A second hearing would be waste of judicial and party resources.  While the

16  parties may dispute certain issues related to the apprehension (such as whether defendant

17  was pushed to the couch or asked to sit down) relief would not be appropriate even under

18  defendant's view of the facts.  Those facts have been properly developed in the

19  evidentiary hearing and in the parties' written submissions.  Defendant had a full

20  opportunity to cross examine SAIC Iacovetti at the evidentiary hearing in Guam.  A

21  second evidentiary hearing would require Special Agents Iacovetti, Smith and

22  Schwandner to travel to Seattle at public expense.  Because the motion is clearly legally

23  insufficient, even under the facts advanced by defendant, such a hearing would serve no

24  purpose.

25      For these reasons, the government respectfully requests that the Court deny

26  defendant's motion without argument or an evidentiary hearing.  To the extent the Court

27  is considering an evidentiary hearing, the government respectfully requests that the Court

28  hold a hearing to address whether such a hearing is truly necessary.

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 28

# VI.    CONCLUSION

Defendant is inviting this Court to become the first in the nation to invalidate a prosecution based on the circumstances of an overseas apprehension.  The record, however, shows that defendant's apprehension and transfer to the United States was a lawful and appropriate operation that did not involve misconduct, let alone shocking and outrageous misconduct.  The circumstances of defendant's apprehension simply pale in comparison to the circumstances the Ninth Circuit has repeatedly found insufficient to support dismissal of an indictment.  With such a total absence of shocking or outrageous conduct, this case cannot be the first in the nation to be dismissed in contravention of the Supreme Court's long-established *Ker-Frisbie* doctrine.  Because the record was fully developed during the hearings in Guam, and defendant's allegations are so clearly insufficient to merit dismissal of the indictment, defendant's motion should be denied without further hearings.

DATED this 13th day of April, 2015.

Respectfully submitted,

ANNETTE L. HAYES
Acting United States Attorney

*s/ Norman Barbosa*
NORMAN BARBOSA

*s/ Seth Wilkinson*
SETH WILKINSON
Assistant United States Attorneys

700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Email:  Norman.Barbosa@usdoj.gov
Email:  Seth.Wilkinson@usdoj.gov

/s/ Ethan Arenson
ETHAN ARENSON
Trial Attorney

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 29

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

<u>CERTIFICATE OF SERVICE</u>

2

3      I hereby certify that on April 13, 2015, I electronically filed the foregoing with the

4  Clerk of Court using the CM/ECF system which will send notification of such filing to

5  the attorney of record for the defendant.

6

7                                              *s/Janet K. Vos*
                                               _____
8                                              JANET K. VOS
                                               Paralegal Specialist
9                                              United States Attorney's Office
                                               700 Stewart Street, Suite 5220
10                                             Seattle, Washington 98101-1271
                                               Phone: (206) 553-7970
11                                             Fax:   (206) 553-0755
                                               E-mail:  Janet.Vos@usdoj.gov
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESPONSE TO MOTION TO DISMISS INDICTMENT
Seleznev/CR11-0070RAJ - Page 30