```
 1              UNITED STATES DISTRICT COURT

 2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____

 4                              )
      UNITED STATES OF AMERICA,  )  Case No.
 5                              )  CR11-0070-RAJ
                    Plaintiff,   )
 6                              )  SEATTLE, WASHINGTON
      v.                        )
 7                              )  May 4, 2015
      ROMAN SELEZNEV,           )
 8                              )  Motion Hearing
                    Defendant.   )
 9    _____

10
                 VERBATIM REPORT OF PROCEEDINGS
11          BEFORE THE HONORABLE RICHARD A. JONES
                 UNITED STATES DISTRICT JUDGE
12    _____

13

14    APPEARANCES:

15

16    For the Plaintiff:      Norman McIntosh Barbosa
                              U.S. Attorney's Office
17                            700 Stewart Street
                              Suite 5220
18                            Seattle, WA  98101-1271

19

20

21    For the Defendant:      Russell V. Leonard
                              Dennis Carroll
22                            Federal Public Defender's Office
                              1601 5th Avenue, Suite 700
23                            Westlake Center Office Tower
                              Seattle, WA  98101
24

25
```

 1          THE COURT:  Good afternoon.  Please be seated.

 2          THE CLERK:  We are here in the matter of the United

 3   States versus Roman Seleznev, Cause No. CR11-70, assigned to this

 4   court.

 5      If counsel and the interpreters could please rise and make

 6   your appearances for the record.

 7          MR. BARBOSA:  Good afternoon, Your Honor.  Norman

 8   Barbosa on behalf of the United States.

 9          THE COURT:  Good afternoon.

10          MR. LEONARD:  Good afternoon, Your Honor.  Russell

11   Leonard and Dennis Carroll here today with Roman Seleznev.  We're

12   being assisted by two Russian interpreters, Linda Noble and Julia

13   Davidov.

14          THE COURT:  All right.  Thank you.  Thank you for being

15   here.

16      I want to give, first, my instruction to the interpreters.

17   If at any point in time you wish to shift -- I'm not sure if you

18   have determined by time segments, half hour, 15 minutes, or

19   whatever protocol that you wish to use -- just let the court

20   know, put your hand up to stop the proceedings, and I will stop

21   the parties so we can make the proper transition.

22      It appears that the court's communication system is somewhat

23   defective today.  It doesn't work as efficiently when we utilize

24   the headphone devices.  So the interpreter is going to be

25   speaking directly to the defendant.  It's not a problem for the

 1   court, but I want to make it easy for the interpreters.  So

 2   please let the court know when you need to transition.

 3       Will both of you agree to do that?

 4           MS. NOBLE:  Thank you, Your Honor.

 5           MS. DAVIDOV:  Yes.

 6           THE COURT:  And then we have the certifications from the

 7   two interpreters as well?

 8           MS. DAVIDOV:  Yes.

 9           MS. NOBLE:  Yes.

10           THE COURT:  Please stand and introduce yourself.

11           MS. NOBLE:  Sure.  Good afternoon, Your Honor.  Linda

12   Noble.  I'm state certified in Russian.  My oath with the state

13   is current and on file with the AOC.  And I am also sworn-in in

14   federal court.

15           THE COURT:  That's the part that was missing.  Thank

16   you.

17           MS. DAVIDOV:  Good afternoon, Your Honor.  For the

18   record, Julia Davidov, state certified in Russian.  My oath is

19   current and on file with the Administrative Office of the Courts,

20   and I'm also sworn-in in federal court.

21           THE COURT:  All right.  Thank you.

22       We are here today for the two defense motions, motions

23   regarding the discovery and the issue regarding witnesses to

24   testify at the motion to dismiss.  I believe those are the only

25   matters before this court, and essentially, a status conference

 1   in terms of what things will look like by way of evidence

 2   presentation for the motion to dismiss.

 3        Is that the extent of the government's understanding of the

 4   matters before this court?

 5              MR. BARBOSA:  Yes, it is, Your Honor.

 6              THE COURT:  Is that the defendant's understanding of the

 7   matters before this court?

 8              MR. LEONARD:  We agree, Your Honor.

 9              THE COURT:  Counsel for the defendant, it's your motion.

10   Let's start first with your discovery motion.

11        And, counsel, please know I have had the chance to not only

12   review your materials that you filed on both of these issues, but

13   I have just about completed the process of going through the

14   motion-to-dismiss materials.  But I can represent to you that I

15   have read the entirety of the transcript of the proceeding before

16   the judge in Guam.  So I am familiar with that as well.

17              MR. CARROLL:  Thank you, Your Honor.  We appreciate it.

18        And with the court's permission, I will be arguing the

19   discovery motion, and Mr. Leonard will be addressing the issue

20   regarding witnesses.

21        Regarding the discovery, the defense seeks discovery related

22   to the government's efforts to capture Mr. Seleznev in the

23   Maldives.  The defense, as the court knows, has moved to dismiss

24   the case based on the government's outrageous conduct in that

25   arrest.  And this is an important issue.  It's important to this

 1    case; it's important to my client; I think it's also important

 2    regarding the implications for U.S. law enforcement acting

 3    overseas.

 4        Regarding the motion to dismiss, the basic allegations are

 5    that Mr. Seleznev, a Russian citizen, was vacationing in the

 6    Maldives.  There, he was detained by U.S. Secret Service agents

 7    with at least some acquiescence, at least, of Maldivian police

 8    agents.  He was handcuffed by U.S. Secret Service agents,

 9    escorted through the airport by the U.S. Secret Service agents,

10    and forced to board a plane to Guam.

11        During that time when he was removed or captured in the

12    Maldives, he was not allowed to see a judge, he was not given any

13    sort of due process, he was not allowed to see a lawyer, nor was

14    he allowed to see or call the consulate, the Russian consulate,

15    until he arrived in Guam.

16        And we've asked for discovery broadly related to that, the

17    government's efforts.  And in my motion, I broke them down into

18    six different categories.  The first two the government has

19    objected to, and they broadly group those as work-product

20    requests, and I think that's true in many respects.  But I think

21    it's also helpful to break them down because, on the one hand,

22    we're asking for communications to the actual agents from U.S.

23    officials and, also, communications among the various law

24    enforcement agencies:  the Department of Justice, the State

25    Department, the U.S. Attorney's Office.  And I think it's

1    important to break it down because the communications to the

2    agents may implicate other issues, such as *Giglio* material or

3    impeachment material and things like that, particularly if the

4    agents were told that they should characterize the capture or the

5    arrest or the kidnapping of Mr. Slezenev in such a way to avoid

6    the legal implications regarding a possible defense motion to

7    dismiss for outrageous government misconduct.

8        The third area that is contested is the communications with

9    Russia that the Department of Justice has had in their efforts to

10   arrest/detain Mr. Seleznev.

11       Areas four through six are, basically, issues regarding the

12   government's communications with the Maldives or Maldivian

13   police and the government.  The government said that they have

14   complied with that request.  I included that in my memo just to

15   make sure that they have provided all of that and that they have

16   requested any such discovery from the relevant law enforcement

17   agencies and government agencies.

18       The government says that they have provided everything in its

19   possession.  We take them at their word, as long as they have

20   requested that information.

21       THE COURT:  Counsel, let me ask you a question.  What

22   relevance -- Because I think that's the biggest objection by the

23   government, as it pertains to what did or did not take place with

24   Russia.  The defendant was not arrested in Russia.  The defendant

25   is a Russian citizen, without question, based upon the

1    representation of the parties.  But what difference does it make

2    what took place regarding their attempts to communicate with

3    Russia; Russia's absence of an extradition agreement with the

4    United States?  I'm curious.  Because that's not really clear in

5    the briefing that you have provided to the court.

6              MR. CARROLL:  Well, I think that there are two responses

7    to that.  First, Your Honor, the standard for the motion to

8    dismiss is whether the government acted outrageously.  And I

9    think one of the things that we would look at, such as in Title

10   III, warrants to do wiretaps, the government there has a duty to

11   exhaust all other possibilities.

12       And here, I think, looking at what steps they took to garner

13   the cooperation of Russia, Mr. Seleznev's home country where he's

14   a citizen, would go to the outrageousness of the government's

15   conduct.

16       I think, secondly, the government has indeed all but waived

17   any issues regarding its communications with Russia.  The

18   government, on the one hand, in the response to our motion to

19   compel discovery, says, oh, that's not relevant, but in its

20   response to our motion to dismiss, the government has said, oh,

21   but we have tried, we have tried to get him through Russia, we

22   have notified the Russian authorities, and look what happened.

23   It looks like, at least to the government, that he changed up.

24   He changed his nicknames, and he changed his modus operandi.  And

25   to that extent, the government has waived any claim that it's not

1    relevant.

2        They have also waived any claim of privilege regarding that.

3    The government can't, on the one hand, argue to this court, in

4    response to our motion to dismiss, trust us, but then fail and

5    refuse, in fact, to provide any discovery regarding this

6    information that they're asking you to rely on in denying our

7    motion to dismiss.

8        And the same is true regarding the internal documentation and

9    approvals and planning that took place between the agents and the

10   Department of Justice and the Secret Service and the State

11   Department.  The government, in opposition to our motion, has

12   basically said, trust us, we got all the approvals that were

13   necessary to go forward with this operation.  But then in

14   response to our motion for discovery, they have said, you can't

15   have it.  And so they can't, on the one hand, argue that the

16   court should rely on their assurances, but then on the other hand

17   say, we're not going to give you any discovery regarding it.

18   And, therefore, the court should order that they provide

19   discovery on those things that they're asking the court to

20   consider in regards to the motion to dismiss.

21       THE COURT:  Counsel, how do you get past the mandates of

22   16 (a)(2) where it cross-references and specifically identifies

23   what's protected?  And it specifically identifies memoranda or

24   other internal government documents made by an attorney for the

25   government or other government agents in connection with

 1    investigating or prosecuting the case.

 2        So this crosses over not only to the portion of the motion

 3    that you are going to cover, but it also covers the portion over

 4    which witnesses will testify.  I believe that would cover

 5    Mr. Olson, the DOJ attorney.  So I'm not asking you to cross over

 6    into the boundary of your co-counsel's area of argument, but in

 7    the area that you are arguing, how do you get past 16(a)(2)?

 8            MR. CARROLL:  Well, three things, Your Honor.  First,

 9    they have waived the issue.  They have asked the court to rely on

10    their assurances that they have gotten approval.  And we're just

11    asking for the discovery related to that.

12        Secondly, Rule 16 is not meant to be the minimum or the

13    ceiling for the discovery.  It's not meant to put any limitation

14    on this court's authority to order additional discovery.  As I

15    pointed out in my motion, the courts have long held that Rule 16

16    just sets forth the bare minimum that the government is required

17    to do, and the courts have the authority to order additional

18    discovery as necessary for each particular case.

19        And there are situations where courts have ordered

20    work-product type discovery.  A *Batson* challenge requires the

21    government to reveal its strategy, its analysis for jury

22    selection.  And the *Armstrong* case, which the government cites as

23    proof that they can never be ordered to reveal work product, in

24    fact does not say that.  It just says that the defense has an

25    initial prima facie burden to meet before a court can order this

1    work-product information.  But it is clear from that line of

2    cases that courts do have the ability to order that type of

3    information if a prima facie case has been made.  And if the

4    court is inclined to impose that prima facie burden on us, I

5    would suggest we have already met it through the testimony that

6    was provided in Guam, where the Secret Service agent was directly

7    involved in the arrest of Mr. Seleznev.  They're the ones that

8    handcuffed him, acting outside of their jurisdiction, forced him

9    on a plane to come to the United States.

10        In the U.S. Supreme Court, in *Brady* and in subsequent cases,

11   particularly *Agurs*, the court has broadly held that the defense

12   is entitled to discovery that tends to be favorable to the

13   defense.  And this could be information that would be favorable

14   to the defense.

15        Now, if the court is inclined, it could conduct an in-camera

16   review.  That would balance some of the protections of the work-

17   product privilege while also assuring the court that there isn't

18   favorable material within those documents.  But, certainly, there

19   are situations where it's been ordered.  And even if you look at

20   the cases that involved litigation regarding these *Ker-Frisbie*

21   claims, this outrageous government misconduct, the cases cited by

22   the government include information that is very similar and

23   exactly the same as what we are seeking.

24        If you look at the *Struckman* case, the Ninth Circuit case,

25   the beginning of the opinion describes an e-mail to the

 1    Department of Justice trial attorney from the Regional Security

 2    officer summing up their plan and why are they choosing to

 3    execute a provisional arrest warrant in that case, and their plan

 4    to revoke the defendant's visa, and all of the legal

 5    ramifications that would follow, and why they would pursue that

 6    goal; basically so the guy couldn't lawyer-up in Panama and try

 7    to get a defense lawyer to slow things down and try to stay

 8    there.

 9          Also, the case there outlines an e-mail to the prosecutor

10    where they're basically saying, hey, a defense lawyer has been

11    sniffing around in Canada, trying to act on this person's

12    immigration claims.  And so there, those were facts that were

13    discussed by the Ninth Circuit, they were clearly disclosed in

14    the course of the evidentiary hearing in that case, and they were

15    deemed relevant by the court in its analysis of the *Ker-Frisbie*

16    claim.

17          Likewise, in *Alvarez-Machain*, the U.S. Supreme Court case,

18    when you look back at the district court opinion, it includes

19    negotiations with representatives of the Mexican government and

20    their efforts to get the defendant, as well as efforts by the

21    DEA, to, basically, put out a bounty to anyone in Mexico who can

22    bring this guy to the United States and to capture and transport

23    him.  And all of that information was brought out in the

24    evidentiary hearing.  It was deemed relevant and important for

25    the court's decision.

1          And the defense here is in kind of a bind.  You know, we're

2     being asked to comment on why this is so important without the

3     government telling us what's there.  So they are, on the one

4     hand, hiding behind the privilege and saying we haven't made the

5     case for it.  And that happens from time to time in various

6     situations.  But I think the court should be careful in keeping

7     that in mind, the position that the defense is in and the

8     limitations that the defense has in these situations, where we're

9     just asking for it, they have got it, and we have no other way of

10    getting it.  And the court rules do provide exceptions where work

11    product can be obtained if there's no other reasonable means

12    necessary for us to get that kind of information.  And under

13    these facts and under these claims, I think it would be

14    appropriate in this case.

15         And I don't have anything else to add unless the court has

16    any other questions.

17              THE COURT:  Well, let me ask you this question,

18    counsel -- the court hasn't, obviously, ruled on what I'm going

19    to do or which witnesses I'm going to allow to testify at the

20    hearing -- but if the court were to consider allowing a more

21    expansive approach and letting more witnesses than what the

22    government has proffered that they will allow to testify,

23    wouldn't the proper procedure be for examination to take place,

24    where these witnesses are subject to cross-examination, so that

25    you have some semblance of an idea of what might be out there by

1    way of discovery before you ask the court to open the vault and

2    just give you everything, when the court has some reservations as

3    to whether or not you have even established a prima facie case to

4    warrant the court granting your request?

5         MR. CARROLL:  For some of these witnesses, such as

6    Olson, the government has said, we're not going to make him

7    available, we're going to assert a work-product privilege to

8    anything that this witness would have to say.  So, you know, in

9    some ways, we're trying to promote judicial economy by raising

10   these issues with the court ahead of time so people don't maybe

11   necessarily have to travel from Washington, D.C. or elsewhere to

12   this court, so we have some idea of the scope of what we would be

13   allowed to pursue.

14        And, frankly, if they provide some of the information to us

15   and we were able to look at it, maybe we would say, never mind,

16   we don't want this person as a witness.  But in the interest of

17   caution, we have asked that he be a witness for the hearing,

18   without us knowing exactly what it is that is in those memos.

19        THE COURT:  Well, counsel, let me ask you, what value

20   would it be for you to bring a witness out here to testify,

21   that's a DOJ attorney, and for that witness to say and represent

22   to you that he can't answer that and claim attorney-client

23   privilege?

24        MR. CARROLL:  Exactly my point, if the court would

25   uphold that privilege.  That's why we're asking the court to rule

 1    on the privilege issue ahead of time.

 2          THE COURT:  All right.  Well, one of the things I'm

 3    going to ask counsel is that you give the court some proffer,

 4    some semblance of an idea, of what it is that you would ask the

 5    DOJ lawyer, to the extent that you feel comfortable in sharing

 6    that information with the court, so that I have an idea of how

 7    expansive an approach that you plan on taking if that witness is

 8    allowed or permitted to testify.

 9        Anything further, Mr. Carroll?

10          MR. CARROLL:  No, Your Honor.

11          THE COURT:  All right.  Thank you, counsel.  You may be

12    seated.

13        Counsel?

14        And counsel for the government, you can do both arguments at

15    the same time.

16          MR. LEONARD:  Thank you, Your Honor.

17        May it please the court, with respect to the court's last

18    inquiry, perhaps I will answer that first, related to Mr. Olson.

19        Mr. Olson is quoted, at one of the government's

20    attachments -- it's Attachment C to its response -- as having,

21    essentially, authorized this operation, provided the legal

22    authorization for the operation.  But he did it with some

23    provisos or caveats, and I think that that's extremely important,

24    at least according to the discovery we have been provided.

25    Again, all we have is, basically, a secondhand reference to an

1   e-mail as quoted in the agent's report.  So Olson got back to us

2   and said that the operation would be lawful and authorized,

3   basically, so long as the host country relies on its domestic

4   immigration law to enable them to act.  So the DOJ lawyer is

5   saying that as long as the host country's laws are being followed

6   related to immigration, then he is providing, essentially, legal

7   cover or approval for the operation.

8        Well, that's something that we would certainly be interested

9   in inquiring about, is what additional -- certainly, that

10  condition -- any additional conditions that would be imposed by

11  the Department of Justice on the actions of its agents that were

12  not stated in the agent's report and summary of Olson's approval.

13  And that certainly is a relevant inquiry, in that if agents were

14  given instructions by the Department of Justice that authorized

15  the propriety of this operation that included some limitations or

16  some conditions, and they blew past them on the ground in

17  kidnapping our client, it should be fair game for counsel to ask

18  questions about and of great importance in helping the court

19  decide about this issue.

20       I guess there are kind of three categories of government

21  agent witnesses that we would ask the court to allow us to call,

22  and the government has already conceded two of these, I guess,

23  types of witnesses.

24       I suppose the easiest witnesses or the most obvious witnesses

25  to Mr. Seleznev's kidnapping, or what the government would like

1    to call -- I guess they don't want to call it an arrest; they

2    want to call it a detention.  The most obvious and direct

3    witnesses related to that are the three agents that were on the

4    ground.  So this is Agent Mark Smith, diplomatic security from

5    the State Department, and then Agent Schwandner and Agent

6    Iacovetti, both of whom are Secret Service agents.  So those were

7    the three U.S. agents present in the Maldives at the airport who

8    handcuffed my client and forced him to get on a jet.

9         Their behavior in conducting that operation is central to

10   this motion.  This is like the agents -- or the officers that

11   were present for a traffic stop.  The government is claiming it

12   had authority to stop that car and arrest that person.  Well, we

13   should be allowed to call the people who were there, who were

14   eyewitnesses to what other agents did, perhaps to what Maldivian

15   authorities did/said, what level of support and assistance they

16   received from those authorities or didn't receive from those

17   authorities.

18        Of those three witnesses, the government is indicating to us

19   that they will call Agent Smith, Agent Mark Smith.  And what

20   we're hearing now is that Agent Smith was the agent most in

21   charge of this operation, who perhaps had the most contact with

22   Maldivian authorities in supervising this operation.  So they

23   just want to call one of the three.  And I will parenthetically

24   note that Agent Schwandner had previously been called as a

25   witness in Guam and examined by Mr. Seleznev's lawyers at the

 1    time.

 2        Again, we would assert that it's essential for us to be able

 3    to question all three witnesses.  We certainly agree with them

 4    that Agent Smith is central here, but Agents Schwandner and

 5    Iacovetti are equally important because of the role that I have

 6    described.

 7        With respect to Schwandner, the agent who testified in Guam,

 8    the government's position is that, well, it's just duplicative,

 9    Leonard; your client has already had a chance to cross-examine

10    this gentleman.  Certainly his lawyer at the time was allowed to

11    cross-examine him with what information he had at the time, but

12    we have since received additional information.  So additional

13    reports have been disclosed in discovery.  Granted, they're not

14    voluminous reports, but nonetheless, we now have more information

15    than my client's former attorneys about this agent, what he said,

16    what he's written, what he purports to have done.  And no lawyer

17    for Mr. Seleznev has had the ability to question him based on

18    this additional information.  And so Mr. Carroll and I would ask

19    the court to allow us to do that.

20        With respect to the third witness in that first group, David

21    Iacovetti, also a Secret Service agent, although he was present

22    in the Maldives at the evidentiary hearing, the government chose

23    not to call him.  So no lawyer has questioned him under oath, as

24    far as I know.  I don't know if he was ever called before the

25    grand jury.  But in any event, we have not had an opportunity to

1    examine him under oath with respect to this issue, his behavior,

2    his observation of other officers' actions, or his interaction

3    with Maldivian police or other Maldivian authorities.

4        So it seems to be that those three agents are -- It's clear

5    that we should be hearing from them, I would assume, then.

6        The second, I guess, grouping of agents appears to be

7    uncontested.  So this is Mr. Lashinsky, or Agent Lashinsky.  He's

8    an Assistant Regional Security Officer for the Department of

9    State.

10       On July 3rd, he sent the diplomatic note to the Maldivian

11   consulate or the Maldivian authorities from the U.S. consulate in

12   Colombo.  And so we had initially asked that he be made

13   available.  The government said they weren't going to, but then

14   they had some further conversation with him, and we were advised,

15   after that conversation, that they do intend to call him as a

16   witness.  And I gather -- I won't speak for my learned

17   opponent -- but I gather from their papers that it's because he

18   did have significant interaction with the Maldivian authorities

19   in asking for their assistance, trying to secure their

20   assistance, hearing back from them that a warrant was being

21   sought from a Maldivian judge, that that warrant was on the way,

22   and apparently getting the bad news that that warrant had either

23   been denied or it was not going to be as forthcoming as initially

24   planned.

25       Whether there's additional information that Mr. Lashinsky or

1   Agent Lashinsky has to offer, we don't know.  I had understood

2   from the conversations -- Let me just say that although we are

3   worried about, in general, transparency in any prosecution and in

4   ensuring that we have full discovery, I guess I appreciate the

5   lines of communication that exist between our respective

6   functions, and so we have had frequent discussions with counsel

7   about these issues.  Nonetheless, I was hopeful that we would

8   receive some additional written reports by Agent Lashinsky based

9   on that renewed conversation between the U.S. Attorney's Office

10  and him just in the last week or so.  We have not received word

11  to that effect.  But, nonetheless, it appears uncontested that he

12  is a relevant witness.  So we're glad that he's being called by

13  the government.

14      I guess I would say I don't know if we have discovered the

15  universe of U.S. agents who had other contacts with Maldivian

16  authorities beyond these three who were on the ground and

17  Mr. Lashinsky who was back in Colombo.  I don't know.  The State

18  Department doesn't share information with me on a routine basis.

19  I don't have a security clearance.  You know, why would they,

20  unless they were ordered to by a court?  So that agent is

21  important, clearly, by agreement.

22      Finally, we have the other agents that we have listed.  This

23  is Mike Fischlin, who is the case agent; John Marengo, a special

24  agent who received a tip in the case; and Jeffrey Olson.

25      And I guess we listed Agent Fischlin, the case agent, because

1    I guess I have a sense that, being the case agent, he's perhaps

2    someone who is most aware of the investigation, is likely to have

3    additional information that could be of assistance to the court

4    and the parties in resolving any issues.

5             THE COURT:  He testified in Guam, correct?

6             MR. LEONARD:  He did, Your Honor.  It was really,

7    solely, as -- the court probably has a better recollection of

8    this than I -- it was really related to identity, that issue that

9    was before the court, and also, I guess, the basis for the belief

10   that there's probable cause that a crime had been committed, the

11   support for the indictment itself.

12            THE COURT:  That was the primary purpose of the hearing,

13   though?

14            MR. LEONARD:  Certainly identity was the issue there, so

15   his testimony related to that.

16       Whether Agent Fischlin can provide additional information

17   about the operation on the ground in the Maldives beyond these

18   four others that we have identified, I don't know the answer to

19   that, frankly, Your Honor.  But it seems to me, as the case

20   agent, it would be helpful to have him available.  I believe he's

21   stationed here in Seattle, and so I just don't see what the

22   difficulty is for having that particular agent here.

23       Now, with respect to Marengo and Olson, we have spoken of

24   Olson's relevance earlier, in follow-up to Your Honor's questions

25   of my co-counsel, Mr. Carroll.  Again, if this is an operation

1    that has been approved, not carte blanche, but with some

2    reservations and some express conditions, to us, to my mind, that

3    is exactly what we should be asking about here and trying to

4    ascertain as to whether agents were given conditions and then

5    violated them, decided not to follow them, when it became

6    untenable to follow them from their perspective, and still get

7    their man.

8        Our perspective is that those agents were there to get him.

9    They were there to get him, just about no matter what.

10           THE COURT:  Well, counsel, again, how do you get past

11   the question of attorney-client communications and work product

12   as it relates to investigation or prosecution?  Because just what

13   you shared with the court sounds remarkably like investigative

14   work that would appear to be protected under 16(a)(2).

15           MR. LEONARD:  Well, Mr. Carroll has said it as well as I

16   could, just in terms of the exceptions that are available with

17   respect to Rule 16, *Brady*.  But I guess what I would say is that

18   this doesn't sound like investigation.  This sounds like someone

19   who is saying that here are the rules that you need to follow in

20   order to engage in this very unusual operation.  I think we can

21   all accept this is something this is not routinely undertaken by

22   the U.S. government and U.S. agents.

23           THE COURT:  So if counsel is giving an agent legal

24   advice as to what's within or outside the boundary of law, you

25   are saying that that's subject to disclosure, subject to

1    discovery?

2          MR. LEONARD:  I think it becomes relevant not simply

3    because they waived it, the issues, but because if the testimony

4    is such that that legal advice was not followed, was either

5    ignored, abandoned, that certainly is a privilege -- the

6    privilege shouldn't cover violations of the directives of the

7    Department of Justice lawyer to agents in conducting an

8    operation.

9          I suppose that, you know --

10          THE COURT:  Isn't a remedy for that, counsel, corrective

11    action as opposed to discovery?  I mean, I'm trying to keep

12    things within the boundaries of where they're supposed to be.

13    And if an agent hasn't followed the directive, does that fit in

14    the rubric of what you are entitled to receive by way of

15    discovery, or is that sanctions for discipline in another area of

16    corrective action?

17          MR. LEONARD:  I think it could be both, Your Honor.

18          And with respect to the relevance to the issue before the

19    court, in the defense's motion to dismiss, it clearly is relevant

20    that an agent has acted in the outrageous fashion as follows:  He

21    was told by his government lawyer that he should do this the

22    right way, this way, with these conditions, and then he did it a

23    different way.

24          THE COURT:  Now, counsel, do you have any evidence,

25    based upon either cross-examination or any discovery or any

 1   written report that you have received or any communication that

 2   the government has provided up to this point, that would indicate

 3   that any law enforcement officer -- not just the ones in category

 4   three -- that any law enforcement officer did not follow the

 5   directives of either a lawyer or the Department of Justice or one

 6   of these other entities' specific directives or parameters or

 7   limitations on what they could and could not do in the arrest of

 8   your client?

 9           MR. LEONARD:  We believe that Maldivian immigration law

10   was not followed in expelling Mr. Seleznev from the Maldives.

11   They did not follow the process whereby a person in the Maldives

12   is formally expelled under their immigration law.

13           The court probably has seen in the transcript of the

14   Maldivian hearing discussion about the various ways in which

15   someone can be excluded from the Maldives or sent out of the

16   Maldives, and we believe that they didn't follow that process.

17   His visa was stamped in exactly the same way that the agents'

18   visas were stamped in leaving the country.  He was not formally

19   expelled by Maldivian authorities pursuant to their law.  There's

20   a whole separate process, as we understand it, that would have

21   been engaged in doing that.  And that's just related to

22   immigration law.

23           Had he been processed as an arrestee or a detainee by

24   Maldivian officials, he would have been delivered to a Maldivian

25   judge, he would have been given the right to counsel, he would

1    have had an opportunity to request and receive the assistance of

2    his consulate.  And it's our belief that, in effect, that's what

3    was happening, he was being arrested.  Instead of being delivered

4    to Maldivian legal authorities, he was treated just like a

5    tourist, his visa was stamped, but not like most tourists, he's

6    in handcuffs, and he is spirited onto a plane involuntarily by

7    U.S. agents.

8        So with respect to Olson, again, we think he is central to

9    understanding whether these agents acted in an outrageous fashion

10   in failing to follow the dictates of Maldivian law in processing

11   Mr. Seleznev's exit.  And they did that for a reason.  If they

12   had delivered him to Maldivian authorities, he wouldn't have been

13   released to them, and he would have been subject to Maldivian

14   legal process.  And there's no extradition treaty between the

15   Maldives and the U.S.  Again, in order for them to get their man,

16   they had to do this in the way that they did.

17       With respect to Mr. Marengo, Mr. John Marengo -- he's the

18   final person on the list, I guess, the third list of agents that

19   I have identified -- his sole connection, it appears, is to have

20   received the tip that Mr. Seleznev was in the Maldives.  I

21   understand the government resists this.  You know, it's

22   confidential information in the nature of a tip.  And

23   Mr. Barbosa, I'm sure will ask, you know, what basis I have for

24   wanting this information; that I'm on a fishing expedition.  You

25   just don't know what the relevance is of information that you do

1  not have.  And that's where we are.  You know, if this tip

2  involves some communication between U.S. agents and the Maldives,

3  then I think that that's something we need to know about.  What

4  is the tip?  And I guess I'm not necessarily asking for the

5  tipster's name and address, although that may well be relevant,

6  depending on the nature of this information.  But this is the

7  shell game that we, unfortunately, feel like we're facing here,

8  Your Honor.

9       And with all due respect to my opponent's willingness to talk

10  to us and be open with us, we now feel like we have gotten to a

11  place where we can't resolve these issues amicably, and we need

12  the court's intervention.

13       Not unlike our position with respect to Mr. Olson, the court

14  has the ability to review materials in camera without it being

15  disclosed, and certainly helping us determine whether there's

16  relevant information through the use of the court's supervisory

17  powers here.  We believe, at the very least, that step needs to

18  be taken.

19       So that is the sum of the government agents that we have

20  identified.  And I will say that I don't know that we have gotten

21  to the bottom of it.  I do not know that.  And in part, that's

22  because, you know, you never know what you don't know.

23       So I would ask the court to allow us to call the witnesses

24  that we have been able to identify.

25            THE COURT:  All right.

1         MR. LEONARD:  Thank you.

2         THE COURT:  Thank you, counsel.

3     Counsel for the government?

4     Just one second here.

5         MR. BARBOSA:  May I proceed, Your Honor?

6         THE COURT:  You may.

7         MR. BARBOSA:  Thank you.

8     So we have two issues today, the motion to compel, as well as

9     the scope of the evidentiary hearing, if there's going to be an

10    evidentiary hearing.  And I want to strongly encourage the court

11    to consider that an evidentiary hearing isn't necessary.

12        I think your question to counsel a moment ago about whether

13    they had any evidence to support their theory is the key to the

14    problem here.  They don't have a cogent theory that would entitle

15    them to dismissal of the indictment, accepting everything that

16    the defendant has alleged.  I counted at least six times that

17    Mr. Leonard said, "We don't know"; "We don't know what we don't

18    know."  They don't have a theory.  And that is the classic

19    definition of a fishing expedition that the Supreme Court has

20    said that defense cannot go on unless they make a substantial

21    prima facie showing to support this discovery that they're

22    demanding, let alone an evidentiary hearing in which we haul

23    witnesses from all over the country, and at least one witness

24    from Sri Lanka, to come testify at a hearing that could last at

25    least a couple of days, if not more, depending on the scope of

1  how they wish to expand it.

2      We believe we have already produced more than enough

3  discovery.  In fact, we have produced discovery that we are not

4  required to produce under any standard.  The discovery we have

5  provided includes all of the agent reports regarding the planning

6  and execution of this operation.  There's only two.  There's a

7  Secret Service report and the report of Special Agent Smith, the

8  State Department agent.  We also provided a copy of the Interpol

9  Red Notice to the Maldives, which is the closest thing to an

10  international arrest warrant.  There is no such thing, as defense

11  pointed out.  That's the closest thing to an international arrest

12  warrant.  It's what the Maldives requested when they communicated

13  back to the United States what they wanted in order to cooperate

14  with our request that they turn him over.  And that described

15  accurately the nature of the charges against Mr. Seleznev and the

16  scope of this case.

17      We also provided all written communications between U.S. and

18  Maldivian law enforcement, and that includes the official

19  diplomatic note, again, describing, at length, the nature of the

20  charges and accurately describing the nature of the evidence

21  against Mr. Seleznev.  And we also disclosed all e-mail

22  communication between U.S. authorities and the Maldivian

23  authorities, which is very little.  It did not take a significant

24  amount of discussion.

25      There were a couple of phone conversations, at least a few,

1   between Special Agent Lashinsky, or Regional Security Officer

2   Lashinsky, and his Maldivian police counterparts.  And I believe

3   there was some communication between Special Agent Smith and his

4   Maldivian counterparts to, basically, arrange the logistics of

5   him coming there, as well as the on-the-ground communications.

6   But everything written has been disclosed.  And we also have

7   extensive testimony --

8           THE COURT:  Counsel, I want to clarify.  When you say

9   "everything written has been disclosed," is that an affirmative

10  representation that there are no other writings that could be

11  disclosed or that would be subject to in-camera review by the

12  court?

13          MR. BARBOSA:  Absolutely, between the Maldives and U.S.

14  law enforcement.  We have combed the e-mail boxes of everybody

15  involved in this, in the arrest operation.  Agent Smith, RSO

16  Lashinsky, Agent Iacovetti, Agent Schwandner.  Agents Iacovetti

17  and Schwandner had no communications with the Maldives

18  independent of Agent Smith.  Basically, on the ground.  They were

19  there for the meetings.

20      And that makes sense, because it's the State Department that

21  is responsible for communicating with foreign governments.  It

22  was the State Department's role in this operation to arrange the

23  cooperation of the Maldivian authorities.

24          THE COURT:  Are you also representing that there are no

25  written communications that have not been disclosed that were

1   prepared or authored by the State Department?

2          MR. BARBOSA:  By the State, yes.  The diplomatic note,

3   the written communication from the State Department.

4          THE COURT:  And there's nothing --

5          MR. BARBOSA:  The foreign communications are very

6   formal, yes.  There's nothing else, other than the e-mails, as I

7   said, that have been disclosed, and the diplomatic note.

8      And then we have the testimony of Special Agent Schwandner at

9   the hearing, which was extensive and subject to cross-

10  examination.  They engaged in this very fishing expedition in

11  Guam and got nowhere because, as the judge in Guam pointed out

12  repeatedly -- you mentioned you have read the transcript -- and

13  she was beating them up with, "Counsel, you don't have a theory

14  that provides you with relief, no matter what you say here, or

15  proof.  All of these allegations fail as a matter of law."  And I

16  think we're in the same boat now.

17         THE COURT:  But most of those conversations, counsel,

18  weren't those in the context of the shocking and outrageous

19  conduct?

20         MR. BARBOSA:  Yes.

21         THE COURT:  Okay.

22         MR. BARBOSA:  I mean, that's the only basis for

23  dismissal in a case like this.  That would be if the United

24  States engaged in some shocking and outrageous conduct, which has

25  been very, very narrowly defined.  At best, at best, there are

1   two exceptions:  Torture.  Not on the table.  All he's described

2   is the agent aggressively waving this indictment in front of his

3   face and maybe pushing him into a couch.  That is clearly not

4   torture under any reading of the case law.  So the only other

5   possible exception is this very narrow exception in the *Struckman*

6   case in the Ninth Circuit, which I pointed out is in dicta.  And

7   I would not concede that it's actually a valid exception.  We

8   would certainly wish to preserve that for appeal.  It's this

9   narrow exception for the remote possibility that what they call

10  "blatant lies" had somehow encouraged the foreign government to

11  cooperate in handing over the defendant.  They haven't alleged

12  any blatant lies either, or any lies whatsoever, which makes

13  sense, because if we look at the discovery we have produced,

14  which is extensive, we have all of the communications with the

15  Maldives, and they're fully forthright and consistent with the

16  facts of the case.  There's nothing even remotely misleading.

17      So there's no basis to believe that any misleading statements

18  were made to the Maldivian authorities, which runs them into a

19  wall in terms of their demand for discovery and their demand for

20  an evidentiary hearing.

21      On the discovery, we have to start with Rule 16.  While not

22  the only basis for discovery, the Supreme Court has pointed out

23  that there's no constitutional rights to discovery.  Rule 16 is

24  what governs it.  And in *Armstrong*, the court very clearly held

25  that Rule 16 does not entitle a defendant to discovery on these

1     types of independent claims of misconduct.

2         Rule 16 is limited to discovery that goes to the merits of

3     the case, things that are going to be introduced at trial;

4     defensive issues not related to the initiation of the

5     prosecution, or for, in this instance, the arrest.  And if you

6     look at *Armstrong* and the cases, as counsel pointed out, those

7     were discussing requests for access to discovery in *Batson*

8     challenges and selective prosecution claims based on matters that

9     go to the heart of our most cherished constitutional rights.

10        Here we have a defendant arrested in a foreign country, not

11    alleging that he was arrested based on his race or his gender or

12    anything that is protected under our Constitution.  At best, he

13    is alleging violations of foreign law that, under controlling

14    Supreme Court precedent, cannot entitle him to the relief that

15    he's requesting.

16        So under *Armstrong*, he has to come forward, and his burden is

17    to come forward with a substantial prima facie showing of some

18    misconduct that would entitle him to relief.  As we have seen,

19    they have not settled on a theory of what that misconduct can be.

20    All they can say is, we don't know what we don't know.  That

21    cannot be enough to support the expansive discovery request that

22    he's demanding, let alone the many witnesses that they're

23    requiring or demanding that we require come to court.

24        And I want to point out, this would not be the first court to

25    address these types of claims in this manner by accepting the

1  defendant's allegations as true, applying somewhat of a summary

2  judgment standard to it.  Several district courts have done this.

3  In fact, it has become, basically, the method of handling these

4  types of claims.  The district court in Guam did this.  And just

5  last May in *United States v. Al Libby*, a Southern District of New

6  York case -- and that's a court that sees a lot of cases like

7  this because of all the international prosecutions there -- the

8  court did the same thing and denied a motion to dismiss for

9  outrageous conduct in which the defendant there had alleged that

10 he had been kidnapped by U.S. Army Delta Force rangers.  Even

11 though the defendant was alleging that he was kidnapped with the

12 use of extreme physical and brutal force, bound, gagged, and

13 trussed up, and the soldiers used Taser-like weapons on him, the

14 court refused to hold an evidentiary hearing on that motion.

15 Likewise, in *U.S. v. Yousef,* which is another SDNY case that

16 defense has cited in their motion, the court denied a motion to

17 compel discovery and denied an evidentiary hearing under the same

18 theory; that accepting all of the allegations, they just didn't

19 get the defendant anywhere.

20         THE COURT:  Let me make sure, counsel.  In going through

21 the transcript, it almost appeared that it was teed up for an

22 evidentiary hearing or a subsequent evidentiary hearing based

23 upon what the judge was stating, indicating that, "Well, with the

24 discovery that you have," and statements to that effect.  So it

25 almost gave the appearance, I believe, that it caused the defense

1    to believe that you are going to get another opportunity in

2    another court, meaning Seattle, to raise these issues:  one, the

3    motion to dismiss, and, also, the discovery issues.

4           MR. BARBOSA:  I think that is a misreading of it.  And

5    you have to examine the context of where we're at.  That was a

6    very unusual proceeding.

7        We still take the position that the expansion of that

8    hearing, beyond a Rule 5 identity hearing, was way beyond the

9    bounds of what a Rule 5 or Rule 24 hearing, under the rules,

10   should be holding.  And so it was an odd hearing.  And as you can

11   see from the transcript, the court goes about ruling on the

12   motion, but then we end up having several hours of testimony on

13   it.

14       Yes, the court did say that Mr. Seleznev could raise this

15   when he gets to Washington, and we were saying that this is the

16   proper court to file his motion.  But filing your motion, making

17   your allegations, is a step before the court deciding that

18   there's some merit to them and they should have an evidentiary

19   hearing.  He should still have to meet some burden of alleging

20   some facts and providing that substantial prima facie showing

21   that entitled him to more than just filing the paper.  Just

22   alleging that the prosecution has committed misconduct or the

23   government has committed misconduct shouldn't entitle you to a

24   full-blown hearing and discovery, let alone discovery to, as you

25   pointed out, privileged documents.

1    I mean, we're not drawing a line here at documents or

2    discovery that just helps our case.  We're drawing the line very

3    far back at only clearly privileged discovery or completely

4    irrelevant discovery.  For example, the matters related to our

5    dealings with the Russian government just cannot have any bearing

6    on this hearing whatsoever.  We're not drawing it based on what

7    helps our case.  There's no *Brady* or *Giglio* information in any of

8    the other matters that they have requested.  We're just trying to

9    draw a principled distinction based on clear lines of privilege.

10   And I will just point out, because I have cited a couple of,

11   you know, Southern District of New York cases, not of any

12   precedential value here, but the Ninth Circuit has also applied

13   this similar standard of, accepting the defendant's allegations

14   as true, they still don't get relief.  And that was in

15   *Matta-Ballesteros*, which was a rather extraordinary case.  In

16   fact, while defendant said no court has refused to produce

17   discovery, it's actually the opposite.  No court has ever granted

18   discovery on these kind of matters.  Other courts have held

19   hearings on them, but there's been no litigation related to the

20   scope of discovery that those defendants were entitled to.  None

21   of those cases addressed discovery.

22   So when you compare this case to all of those that have come

23   before, with much, much more significant allegations of

24   government misconduct, primarily involving allegations of

25   torture, with allegations that are so much less compelling, it

1    just doesn't seem appropriate to grant discovery or the

2    evidentiary hearing.

3         To the extent we're going to have an evidentiary hearing, we

4    are prepared to bring two witnesses.  I apologize if counsel was

5    confused by our earlier conversation.  We're not conceding that

6    those witnesses are necessary, but we're willing to bring them.

7    What we need to know is, what is the scope of the hearing, what

8    are the legally relevant issues that the court wishes to address?

9    Because we need that in order to determine which witnesses we

10   should bring and to prepare those witnesses to address the right

11   issues.  But as I have indicated, I think the scope of this

12   hearing should be very narrow, because at best, at best, it seems

13   like the one potential for relief would be this claim or at least

14   the theory -- they haven't actually made a claim -- but the

15   theory that U.S. agents engaged in misconduct by misleading the

16   Maldivians.  And that should be limited to the officers or agents

17   who were responsible for actually communicating with the

18   Maldives.  And that's the two State Department employees.

19        The defendant, on the other hand, is demanding that we bring

20   in at least five other witnesses, potentially more, and that

21   includes a Justice Department attorney whose testimony would,

22   unquestionably, be privileged in this matter.  I don't believe

23   the factual disagreements that any of these other witnesses would

24   address are relevant to the court's determination.

25        And I think it's necessary to kind of go down the list of

1    what defense claims these witnesses would somehow address.  They

2    repeatedly refer to kidnapping.  That's his primary allegation.

3    In fact, most of what he's arguing here revolves around this

4    claim that the government kidnapped him from the Maldives and

5    that that is somehow conduct that shouldn't be condoned by the

6    court.  The problem with that theory is that, under the

7    *Ker-Frisbie* doctrine, the Supreme Court and the Ninth Circuit

8    have repeatedly found that kidnapping is okay, it is permissible.

9    Despite this clear precedent, they focus on claims, for example,

10   that the U.S. agents were, quote, personally and directly

11   involved in his kidnapping.  But the Supreme Court in

12   *Alvarez-Machain* and the Ninth Circuit in *Matta-Ballesteros*

13   addressed those exact same type of circumstances.

14        In *Alvarez-Machain*, which is the key case to review for

15   preparation of this hearing, the district court specifically

16   found that Alvarez-Machain's abductors were, quote, paid agents

17   of the U.S. Drug Enforcement Agency.  And the Supreme Court found

18   that that was perfectly okay, totally irrelevant to whether or

19   not he could have his case dismissed.

20        In *Matta-Ballesteros*, the Ninth Circuit found the personal

21   and direct involvement of the U.S. marshals in the defendant's

22   abduction equally irrelevant.  And in the *Yousef* case, which

23   defendant cites for the proposition that the court denied

24   Yousef's motion based on the fact that there wasn't enough

25   evidence that there were U.S. agents involved, the court actually

1   held, quote, the motion to dismiss fails as a matter of law,

2   taken as true every fact Yousef alleged and assuming that his

3   kidnappers were U.S. government agents.  He couldn't overcome the

4   *Ker-Frisbie* bar.  So, clearly, whether or not U.S. agents were

5   involved cannot be a relevant fact that we need to address.

6       The defendant also argues that it is somehow more outrageous

7   if the U.S. government kidnapped a person without the host

8   nation's consent and participation, so focusing on this issue of

9   whether or not the Maldives cooperated or not.  But *Alvarez*

10  controls here, too, because in that case Alvarez was forcibly

11  kidnapped from Mexico, and Mexican government officially

12  protested the kidnapping.  In fact, they submitted amicus briefs

13  on his behalf to the Supreme Court, and the court held, again,

14  not enough, that is not enough, unless there is a violation of

15  the express terms of an extradition treaty, which doesn't even

16  exist here.

17      So when defense claims that circumventing another country's

18  legal system or running roughshod over their immigration, that it

19  could be outrageous conduct, that is not so, because kidnapping,

20  by its very nature, does violate the other country's judicial

21  process; it does violate international law.  It unquestionably

22  would violate Maldivian law.  But it doesn't matter under the

23  case law whether or not those things happened.  So he cannot get

24  a motion to dismiss based on that, which knocks out much of the

25  testimony that they are proposing we present, including any of

1    the testimony -- especially additional testimony from Agent

2    Schwandner or testimony from Agent Iacovetti.

3        The same thing applies to his theory that circumventing the

4    host nation's judicial process would be somehow outrageous

5    misconduct.  *Alvarez,* again, controls, because in *Alvarez* the

6    exact same thing happened.  This goes to their theory that the

7    government approached a Maldivian judge and asked for a warrant.

8    Well, in *Alvarez*, the United States approached the Mexican

9    government and asked for assistance in getting Alvarez out of the

10   country.  And when they didn't comply, when they didn't provide

11   assistance, the United States took matters into their own hands,

12   kidnapped him, and the Supreme Court held that was okay.  So,

13   again, that has been foreclosed by Supreme Court case law.

14       That leaves us with just the one possibility for looking into

15   whether or not the government misled Maldivian authorities.  I

16   want to make sure it's clear that all of the witnesses beyond the

17   two State Department employees had no communications or no

18   interaction with the Maldivians, with the exception of the

19   incidental contact that Agents Schwandner and Iacovetti would

20   have had on the ground.  But none of that contact was decisional.

21   It had nothing to do with the process of getting the cooperation

22   of the Maldivian authorities.  And, in fact, all of their

23   meetings without Smith present were after the Maldivians had

24   already informed the United States that they were willing to

25   cooperate.

1     So on all of that, we believe that a hearing is just

2  unnecessary, and the defendant hasn't made enough of a showing to

3  either require discovery or require an evidentiary hearing.  And

4  it's not that we're running away from these facts.  We have

5  provided extensive discovery related to it.

6     The only other matter I want to address is, there's a claim

7  that we waived our arguments against discovery by producing the

8  amount of discovery that we did produce.  As an initial matter,

9  counsel acknowledges we had an express agreement with prior

10 counsel that the limited production we were making would not

11 waive our arguments of privilege.  And on top of that, if you

12 were to hold that we have waived our privilege, waived our right

13 to object to further discovery, that would basically amount to

14 punishing the government for engaging in the very transparency

15 that they are saying we should be encouraging.  If we have to

16 stand firm always on every privilege, then it is going to be in

17 no one's best interests in getting matters like this addressed in

18 a more timely and efficient manner and fashion.

19     We are trying to be transparent.  The problem they have run

20 into is that the discovery they're getting just doesn't have the

21 answers they want, and that's because there was no misconduct.

22 None of this amounts to anything inappropriate.

23     So we would ask the court to, at the very least, limit it to

24 the two State Department witnesses, but we would very much

25 encourage the court to consider cancelling the evidentiary

 1    hearing.

 2          THE COURT:  All right.  Thank you, counsel.

 3      Counsel, any new or additional argument not previously

 4    presented to the court?

 5          MR. LEONARD:  Thank you, Your Honor.

 6      And because the government addressed, essentially, its

 7    request for reconsideration that we have a hearing at all, I

 8    would like to address that in brief, Your Honor.

 9          THE COURT:  Counsel, just save your argument.  We're

10    going to have a hearing.  But you can go on to the next issue.

11          MR. LEONARD:  With respect to the scope of the hearing,

12    Your Honor, the *Ker-Frisbie* doctrine has two exceptions, as we

13    have outlined in our papers:  failing to follow an extradition

14    process that is in place, and outrageous conduct, shocking and

15    outrageous conduct.

16      We argued in our brief on the motion to dismiss that we

17    believe the court should take a closer look at the failure-to-

18    follow-an-extradition-treaty prong.  This is a novel theory upon

19    which we are requesting the court to grant relief.  But, you

20    know, if there isn't an extradition treaty, that shouldn't mean

21    that the government gets to do whatever they want.

22      Our argument is, in the absence of an extradition treaty, the

23    government should revert to the law of the land on which they are

24    present:  the Maldivian legal system, its protections with

25    respect to detention, its protections with respect to

1    immigration.  And although the case law at this point doesn't

2    necessarily say that that's a basis for relief under the first

3    prong, we believe that that extension is a logical extension of

4    that prong, and we will be arguing that point to the court.

5         With respect to outrageous conduct, as counsel noted, there

6    are kind of two types of conduct that have been recognized as a

7    violation upon which relief may be granted.  The fact that there

8    are just two types of misconduct doesn't mean that there couldn't

9    be others recognized by the court.  It doesn't mean that those

10   were exclusive, that those are the only possible ways in which a

11   court could find conduct so outrageous as to warrant relief.  And

12   so the government points to those as if they're a limitation.

13   The case law doesn't make them a limitation.  It simply offers

14   them as examples, really, illustrative examples.

15        And we effectively concede that there isn't any torture here.

16   But with respect to blatant lies and other measures of

17   outrageousness, you know, Mr. Civille's words are ringing in my

18   ears, to a certain degree.  At the very least, we should be

19   thinking about this as what we want to be seen as a country and

20   the evolving standards of justice that I think we can all hope

21   for and aspire to.  And approving of agents committing felonies

22   in order to secure my client's presence in court is not my idea

23   of evolution in terms of the progress of the law and our

24   diplomatic approach to other countries in the world.

25        Nonetheless, that isn't the only issue here.  Again, the

1    court, in reading the cases, this is not an exclusive list.

2    Kidnapping being okay.  Well, I guess I think it shouldn't be.

3    And perhaps we are moving towards a world where we can reach

4    those kinds of conclusions through the rule of law, that

5    kidnapping shouldn't be okay.

6        So we do believe that there are layers of outrage here, not

7    simply what would be criminal conduct in the Maldives, but also

8    in disregard of the notions of the rule of law; communications

9    here or that there was some effort to secure the Maldivian

10   authority's legal approval, and yet that was abandoned.

11       So there's more here than simply a kidnapping, and we think

12   we should be able to explore that in detail with the witnesses

13   that we have outlined.

14       Thank you.

15            THE COURT:  All right.  Thank you.

16            MR. LEONARD:  I believe Mr. Carroll has a point or two

17   to make with respect to the motion to compel.

18            THE COURT:  All right.  Thank you.

19            MR. LEONARD:  Thank you.

20            THE COURT:  Mr. Carroll.

21            MR. CARROLL:  Thank you, Your Honor.

22       Just two points:  In my reply memo where I raised the waiver

23   issue, I explicitly said that I'm not arguing waiver because they

24   have disclosed this information.  I have raised waiver because

25   they have asked the court to rely on that information.  They

1    could have responded to our motion to dismiss by saying none of

2    this is relevant; you know, it doesn't matter whether we

3    consulted with -- tried to get him through Russia; it doesn't

4    matter whether we got approval.  Instead they're asking the court

5    to rely on that.  And that, I think, is where the waiver comes

6    in.

7        And, secondly, it is true that none of the courts that have

8    addressed the *Ker-Frisbie* claims specifically went to the issue

9    of discovery.  But I, again, would point to the *Struckman* case

10   where this very type of discovery was provided, this very type of

11   information was relied upon by the Ninth Circuit in its opinion.

12       Thank you.

13           THE COURT:  Thank you, counsel.

14           MR. BARBOSA:  Your Honor, one matter real quick on

15   *Struckman* that I forgot to point out, and counsel's reference to

16   it reminded me.  In *Struckman*, I think it's important to note

17   that in that case they actually had evidence of a false statement

18   to the Panamanian authorities.  Defense counsel did submit a

19   letter from the Regional Security Office to the Panamanian

20   authorities that misstated the nature of the charges.  And we

21   don't have that here.

22       As to the scope of the hearing, I would just suggest that if

23   we are going forward with the two agents from the State

24   Department, I would propose that the government call them in

25   direct and that the defense cross them.  This would avoid

1   potential *Touhy* problems in terms of the defense getting approval

2   to call them from the State Department, which could be somewhat

3   complicated.

4        Thank you.

5            THE COURT:  All right.  Counsel, the court is going to

6   make the following determinations.  First I will rule on the

7   motion to compel.

8        The motion to compel lists six different categories of

9   information.  I will note, first of all, that Footnote 1 on the

10  Document Entry No. 130, page 3, regarding Requests 4 through 6,

11  that the defense indicates that that information has been

12  provided.  And my reading of that footnote would suggest to the

13  court that that's a concession by the defense that the discovery

14  has been provided, but they only make the request out of an

15  abundance of caution.  The court doesn't believe that further

16  action is required by the court.  The court is satisfied that,

17  based upon the representation of the government and the

18  concession of the defendant, that the request for additional

19  discovery as it relates to Requests 4 through 6 are denied.

20       Request No. 3 relates to the Mutual Legal Assistance Treaty.

21  The court finds that that's irrelevant for a number of reasons.

22  First, the defendant was not arrested in Russia.  The defendant

23  was clearly arrested in the Maldives.  Second, the MLAT -- for

24  the court reporter, that is M-L-A-T -- is not an extradition

25  treaty.  It's only a vehicle to provide assistance in obtaining

1    evidence and testimony.  And, third, Article 61 of the Russian

2    constitution prohibits extradition of its citizens.  And the

3    discovery sought by the defense regarding utilization of the MLAT

4    for assistance in collecting evidence in Russia for purposes of

5    the subject investigation is irrelevant.  Therefore, the motion

6    for additional discovery as it relates to Request No. 3 is

7    denied.

8         Request No. 2, the request, on its face, clearly appears to

9    this court to be communication between the attorney representing

10   the United States Attorney's Office, the Department of Justice,

11   and the Office of Internal Affairs.  The court rules that such

12   disclosures are clearly work product, exempt pursuant to

13   16(a)(2), and also, the court believes that Request No. 2

14   should be denied.

15        This leaves merely Request No. 1.  As currently drafted,

16   first of all, the court notes the request is overbroad as it

17   seeks production far beyond what the defendant is entitled to.

18   The court concludes the same ruling that relates to Request

19   No. 2 will equally apply to Request No. 1, and it is denied.

20        The essence of relevant discovery has already been produced

21   to the defendant.  No case authority by the defendant supports

22   the extent of this discovery as required or requested.

23        The *Armstrong* decision, while relevant, does not reach the

24   scope of discovery requested by the defendant, and the

25   circumstances are significantly different from the facts as

1   presented before this court.

2       This puts us to the next and the last question, the ruling on

3   additional witnesses.

4       Now, first of all, some of these witnesses that counsel

5   requests do not reside in the United States.  Strike that.  Do

6   not reside in the Seattle area, and it requires significant

7   travel.

8       Is there any objection to any of these remaining witnesses,

9   not the other two the government has already indicated,

10  testifying by way of video testimony?  Counsel for the defense?

11          MR. LEONARD:  No, we would have no objection to that,

12  Your Honor.

13          THE COURT:  All right.  Then other than the two

14  witnesses identified by the government, the other witnesses will

15  be permitted to testify by video.

16      That means, counsel, we probably won't have the evidentiary

17  hearing in this courtroom.  We don't have the capabilities to

18  make that happen in this courtroom.  It will be on a different

19  floor.  You can check with the in-court deputy.  We can make

20  arrangements.

21          MR. BARBOSA:  Your Honor, I can affirm to the court that

22  we will bring those witnesses because of the importance of this

23  hearing to the Secret Service.  All of those agents would

24  absolutely travel for this testimony.

25          THE COURT:  All right.  Then I will go through the

1  witnesses and identify who will be testifying and who will not be

2  testifying.

3       Lashinsky, L-a-s-h-i-n-s-k-y, and Special Agent Mark Smith

4  are the two identified that the government plans to call.  They

5  will be required to testify.

6       As it relates to Schwandner, who testified in Guam, and

7  Iacovetti, who was never examined by the defense or counsel, both

8  will testify or at least be available.

9       Again, the court has no objection if you wish to make those

10  witnesses available for testimony by way of video testimony.

11       The court would note that the basis for the court's

12  determination for some of these witnesses, including these last

13  two, is that discovery was provided subsequent to the hearing

14  that took place in Guam.  These witnesses were not examined as it

15  relates to any discovery that was provided.  Now, it may not

16  relate to the testimony they offered, but nonetheless, the

17  defense should be entitled to examine these witnesses with the

18  additional discovery.

19       The next witness is Jeffery Olson, the Department of Justice

20  trial attorney.  The court will sustain the objection by the

21  government lawyer.  The court has not been satisfied by any

22  proffer by the defense of any theory or justification to support

23  invading the attorney-client privilege or work-product privilege.

24  The court is satisfied that the limitations of Rule 16(a)(2)

25  certainly preclude testimony or evidence as it relates to the

 1    investigation or prosecution of the case.

 2        Special Agent John Marengo, M-a-r-e-n-g-o, there's no

 3    indication he had any interaction with the Maldivian authorities,

 4    and the defense has not proffered to the court any justification

 5    to show that he had any contact with Maldivian authorities.

 6    Counsel for the government has provided the defense with written

 7    discovery, written communications, the extent of all

 8    communications that were taking place as Mr. Seleznev was

 9    arrested, and there's no indication that he had any contact or

10    communication which would support him being examined.  So to that

11    extent, that request is denied.

12        I believe the last one is Fischlin, F-i-s-c-h-l-i-n.  He

13    testified in Guam, but it was before discovery, so the court will

14    permit Fischlin to be examined by the defense as well.

15        Again, the government is permitted to call these witnesses as

16    part of their case in chief, but nonetheless, the defense will

17    have the opportunity for cross-examination.

18        I believe that covers all the witnesses who have been

19    identified by the defense.

20        And Iacovetti was I-a-c-o-v-e-t-t-i, Fischlin is

21    F-i-s-c-h-l-i-n, and Marengo is M-a-r-e-n-g-o.

22        Any further clarification on the court's ruling as it relates

23    to these witnesses?

24            MR. BARBOSA:  Just in terms of order of presentation,

25    you referred to it as the government's case in chief.  Should I

1   assume that we will present testimony first?

2            THE COURT:  Yes, counsel.

3            MR. BARBOSA:  Okay.  And the burden of proof lays with

4   the defense, I take it?

5            THE COURT:  That is correct.  I don't think the defense

6   is raising any challenges to burden of proof.  Is that correct,

7   counsel?

8            MR. LEONARD:  Not that I'm aware of, from my review of

9   the case law, Your Honor.

10            THE COURT:  All right.  Anything further, counsel?

11            MR. LEONARD:  We will simply note our objection to the

12   court's ruling related to the other witnesses.

13            THE COURT:  That's fine.

14            MR. LEONARD:  Thank you, Your Honor.

15            THE COURT:  The objection stands.

16       Anything else, counsel?

17            MR. BARBOSA:  No, Your Honor.

18            THE COURT:  Anything further from the defense?

19            MR. LEONARD:  Nothing at this time, Your Honor.

20            THE COURT:  All right.  We will be at recess.

21                 (Proceedings adjourned.)

22                 C E R T I F I C A T E

23     I certify that the foregoing is a correct transcript from the

24   record of proceedings in the above-entitled matter.

25                      *Nickoline Drury*
                       Nickoline Drury, Court Reporter