**EXHIBIT 1**

AO 9 **FILED** (12/09) Search and Seizure Warrant
___ **ENTERED**
___ **LODGED**    **RECEIVED**

# UNITED STATES DISTRICT COURT

for the
Western District of Washington

<table>
<tr><td>In the Matter of the Search of<br><em>(Briefly describe the property to be searched<br>or identify the person by name and address)</em><br><br>FOUR (4) SUBJECT DEVICES currently stored at the<br>USSS Seattle Field Office located at<br>2101 4th Avenue, Seattle, Washington 98121</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No. MJ14-319</td></tr>
</table>

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ Western _____ District of _____ Washington _____
*(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A as well as the Affidavit of SA LaTulip, attached hereto and incorporated herein by reference.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the
property to be seized)*:
Please see Attachment B as well as the Affidavit of SA LaTulip, attached hereto and incorporated herein by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or
property.

**YOU ARE COMMANDED** to execute this warrant on or before    *August 11, 2014*
                                                                *(not to exceed 14 days)*

☐ in the daytime  6:00 a.m. to 10 p.m.    ☑ at any time in the day or night as I find reasonable cause has been
                                              established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property
taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the
place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an
inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Any U.S. Magistrate Judge in Western Dist. of WA                 .
                    *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay
of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be
searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30)*.
                                                     ☐ until, the facts justifying, the later specific date of _____

Date and time issued:    *28 July 2014*
                         *2:34 pm*                        _____
                                                              *Judge's signature*

City and state:    Seattle, Washington                   James P. Donohue, United States Magistrate Judge
                                                              *Printed name and title*

SW_0000154

AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

### Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

SW_0000155

AO 106 (Rev. 06/09) Application for a Search Warrant

FILED ENTERED
LODGED RECEIVED

**UNITED STATES DISTRICT COURT**

JUL 28 2014

for the
Western District of Washington

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                              DEPUTY

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

**FOUR (4) SUBJECT DEVICES currently stored at
the USSS Seattle Field Office located at
2101 4th Avenue, Seattle, Washington 98121**

)
)
)
)
)
)

Case No. MJ14-319

**APPLICATION FOR A SEARCH WARRANT**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Please see Attachment A as well as the Affidavit of SA LaTulip, attached hereto and incorporated herein by reference.

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized):*

Please see Attachment B as well as the Affidavit of SA LaTulip, attached hereto and incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C §§ 371; 1344; 1030(a)(2)(C), (a)(4), (a)(5)(A); 1029(a)(2) & (a)(3); 1028A(a)(1) | Conspiracy; Bank Fraud; Fraud and Related Activities in Connection with Computers; Access Device Fraud; Aggravated Identity Theft since January of 2007 |

The application is based on these facts:

Please see Affidavit of Special Agent Richard K. LaTulip, United States Secret Service (USSS), attached hereto and incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Richard K. LaTulip, Special Agent (USSS)
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 28 July 2014
_____
*Judge's signature*

City and state: Seattle, Washington

James P. Donohue, United States Magistrate Judge
*Printed name and title*

SW_0000156

<b>AFFIDAVIT</b>

STATE OF WASHINGTON     )
                        )     ss
COUNTY OF KING          )

I, Richard K. LaTulip, having been duly sworn, state as follows:

<b><u>INTRODUCTION AND AGENT BACKGROUND</u></b>

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of digital devices[1] or other electronic storage media,[2] hereinafter the "SUBJECT DEVICES" which are currently in law enforcement possession, and the extraction from those SUBJECT DEVICES of the information described in Attachment B.

2.      I am a Special Agent of the United States Secret Service ("USSS"), and have been so employed since August of 1998.  I am currently assigned to the Criminal Investigative Division, where I am a member of the Cyber Intelligence Section ("CIS").  In the course of my official duties, I have investigated cases involving access device fraud, bank fraud, check fraud, computer fraud, counterfeit currency and securities, identity theft, and threats against the President of the United States and other protectees of the USSS.

3.      Prior to joining the USSS, I served two years as a Federal Officer in the United States Border Patrol.  As part of my training with the USSS, I graduated from the Federal Law Enforcement Training Center ("FLETC") and USSS Special Agent Training Program where I received specialized instruction on investigating financial crimes.  In April 2004, I completed the Electronic Crimes Special Agent Program ("ECSAP") course.  Since

---

[1] "Digital device" includes any device capable of processing and/or storing data in electronic form, including, but not limited to: central processing units, laptop, desktop, notebook or tablet computers, computer servers, peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media, related communications devices such as modems, routers and switches, and electronic/digital security devices, wireless communication devices such as mobile or cellular telephones and telephone paging devices, personal data assistants ("PDAs"), iPods/iPads, Blackberries, digital cameras, digital gaming devices, global positioning satellite devices (GPS), or portable media players.

[2] Electronic Storage media is any physical object upon which electronically stored information can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  April of 2011, my duties have included computer forensics and investigating electronic

2  crimes. As a result, I received specific training in regards to computer forensics.

3      4.      I am a graduate of the Treasury Computer Forensics Training Program's

4  Preliminary/Basic Computer Evidence Recovery Training course at the FLETC; the

5  Advanced Computer Evidence Recovery Training course at the Homeland Security

6  Investigations Cyber Crimes Center ("C3"); and the AccessData Network Intrusion and

7  Malware Analysis course. I also hold CompTIA A+ Essentials certifications.

8      5.      The facts set forth in this Affidavit are based on my own personal knowledge;

9  knowledge obtained from other individuals during my participation in this investigation,

10  including other law enforcement officers; review of documents and records related to this

11  investigation; communications with others who have personal knowledge of the events and

12  circumstances described herein; and information gained through my training and

13  experience.

14      6.      Because this Affidavit is submitted for the limited purpose of establishing

15  probable cause in support of the application for a search warrant, it does not set forth each

16  and every fact that I or others have learned during the course of this investigation. I have set

17  forth only the facts that I believe are relevant to the issue of whether probable cause exists to

18  believe that evidence, fruits and instrumentalities of violations of Title 18, United States

19  Code, 371, Conspiracy; United States Code, Section 1344, Bank Fraud; 18 United States

20  Code, Sections 1030 (a)(2)(C), (a)(4), (a)(5)(A), Fraud and Related Activities in Connection

21  with Computers; 18 United States Code, Section 1029(a)(2), and (a)(3), Access Device

22  Fraud; and 18 United States Code, Section 1028A(a)(1), Aggravated Identity Theft will be

23  found on the SUBJECT DEVICES.

24      7.      This investigation involved searches of multiple e-mail accounts and

25  computers including computers controlled by those responsible for the criminal activity and

26  searches of victim computers infected with malware designed to facilitate the criminal

27  activity. The volume of electronic evidence is very substantial and produced many

28  investigative leads. The investigating agents were followed as many of the significant leads

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000158

1 | as time permitted and focused on those that seemed to be the most significant. This

2 | affidavit describes that that I believe are significant to establish or undercut probable cause,

3 | but it cannot describe everything.

4 | **IDENTIFICATION OF THE SUBJECT DEVICES TO BE EXAMINED**

5 | 8.      The SUBJECT DEVICES are:

6 | a.      Sony Vaio Ultrabook, Model SVD132A21V, S/N 545948270000188;

7 | b.      Apple iPad, Model A1430, S/N DMPJ6FCMDVGM;

8 9 | c.      Samsung cellular telephone, Model GT-S5830, S/N RDJB874288D, with SIM card, ICCID 897019913092713262; and

10 11 | d.      Apple iPhone, Model A1429, IMEI 013413008481871, with SIM card, ICCID 897019912120121315.

12 | 9.      The SUBJECT DEVICES are in the lawful possession of the USSS. The

13 | SUBJECT DEVICES were seized upon the apprehension of defendant ROMAN

14 | SELEZNEV in the Republic of the Maldives on July 5, 2014. Seleznev was initially

15 | detained at an airport in the Maldives by Maldivian authorities pursuant to an INTERPOL

16 | "red notice." After his detention, the Maldivian authorities transferred Seleznev into the

17 | custody of United States Secret Service agents at the airport and agents seized the

18 | SUBJECT DEVICES from SELEZNEV as described in further detail below. Following his

19 | arrest, the SUBJECT DEVICES were transported by one of the arresting agents to the USSS

20 | Seattle Field Office in Seattle, Washington.

21 | 10.     Mr. SELEZNEV was arrested pursuant to a Superseding Indictment, arrest

22 | warrant, and Interpol Red Notice issued based on the Superseding Indictment returned in

23 | this district. The Superseding Indictment charged him with five counts of bank fraud in

24 | violation of Title 18, United States Code, Section 1344, eight counts of intentional damage

25 | to a protected computer in violation of Title 18, United States Code, Section 1030(a)(5)(A),

26 | eight counts of obtaining information from a protected computer in violation of Title 18,

27 | United States Code, Section 1030(a)(2), one count of possession of fifteen or more

28 |

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000159

1  unauthorized access devices in violation of Title 18, United States Code, Section 1029(a)(3),

2  two counts of trafficking in unauthorized access devices in violation of Title 18, United

3  States Code, Section 1029(a)(2), and five counts of aggravated identity theft in violation of

4  Title 18, United States Code, Section 1028A. *See United States v. Roman Seleznev*, CR11-

5  0070RAJ. Mr. SELEZNEV is a citizen of Russia with no known ties to this country other

6  than his criminal activity directed at this country from abroad.

7       11.    The SUBJECT DEVICES are currently in storage at the USSS Seattle Field

8  Office at 2101 4th Avenue, Seattle, Washington 98121.  In my training and experience, I

9  know that the SUBJECT DEVICES have been stored in a manner in which their contents

10  are, to the extent material to this investigation, in substantially the same state as they were

11  when the SUBJECT DEVICES first came into the possession of the USSS.

12       12.    The warrant would authorize the forensic examination of the SUBJECT

13  DEVICES for the purpose of identifying electronically stored data particularly described in

14  Attachment B.

15                          **TERMINOLOGY**

16       13.    Because this affidavit includes references terms that may not be in common

17  use, those terms are defined herein as set forth below.  The criminal scheme outlined below

18  involves computer intrusions designed to steal payment card data (credit and debit card

19  data) as well as the trafficking and use of the stolen payment card data. The definitions

20  below related to this investigation comport with my training and experience in this unique

21  criminal underground, and comport with their use in the instant case.

22       14.    A **"server computer"** (or **"computer server"** or **"server"**) is a computer that

23  typically links other computers together, or serves information to other computers.  There

24  are numerous functions that are commonly assigned to servers, which include: storing e-

25  mails, storing files, hosting websites, storing databases and creating gateways to the Internet

26  for a group of computers for a business. Computer servers can also be used to route Internet

27  traffic.

28

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 4

SW_0000160

15.     **Internet Protocol ("IP") Address.**  An IP address is a unique number assigned to a computer or server. An IP address is comprised of four numbers, separated by periods. The number sets can be any number from 1 to 255, with the result that a valid IP address can range from 1.1.1.1 to 255.255.255.255. While the IP address assigned to any given computer on the Internet can change over time, at any given time, an IP address will resolve to only one unique location (a computer or server).  An IP address is akin to a telephone number for each computer/server on the Internet.  There are two primary types of IP addresses: "static" and "dynamic."  A static IP address is an IP address that is continuously assigned (or "resolves to") the same computer.  Static IP addresses are commonly used by businesses and companies that host web content or that need to route traffic in a specific way, so that they need not constantly change their computer settings. Individual consumers can choose to obtain a static IP address.  A dynamic IP address is an address that changes.  Typically, home computer users have dynamic IP addresses assigned to them during the times they are online.  Since many home computers are not continuously connected to the Internet, they do not need an address while they are not connected. Consequently, their Internet Service Provider ("ISP,") which owns and controls a finite number ("block") of IP addresses, only assigns an IP address from their group of the same during the time that customer is online, and therefore then in need of an IP address.

16.     **Malware.**  Malware is malicious computer code running on a computer. Relative to the owner/authorized user of that computer, malware is computer code that is running on their system that is unauthorized and present on the system without their consent. Malware can be designed to do a variety of different things, including logging every keystroke on a computer, stealing financial information or "user credentials" (passwords or usernames), or commanding that computer to become part of a network of "robot" or "bot" computers known as a "botnet." In addition, malware can be used to transmit data from the infected computer to another destination on the Internet, as identified by an IP address. Often, these destination IP addresses are computers that are controlled by cyber criminals.

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000161

17.   **Carding Forum**. "Carding forums" are websites where those engaged in the exploitation of compromised credit card accounts can exchange information about obtaining, selling, trading and using compromised accounts. Cyber criminals engaged in computer intrusions designed to steal information from Point-of-Sale ("POS") computer systems often market stolen credit card numbers and related information on carding forums. In many instances, the cyber criminals responsible for stealing the credit card data will advertise the sale of the stolen credit cards on their own purpose-built carding forums. Carding forums facilitate the buying and selling of the compromised accounts and also help those engaged in access device fraud with services related to the theft and use of stolen access devices. Services offered on carding forums often include services designed to check stolen cards to determine if they are still active, services for recruiting others willing to engage in cash out activity, and other credit card fraud related activities. Those who engage in access device fraud and participate in the carding forums are commonly known as "carders" amongst law enforcement and the criminal underground. Carding forums are similar to online bulletin boards, in that they are websites that support communications surrounding a particular topic or area of interest. The carding forum sites have various pages devoted to selling cards, credit card track data information, sale of plastic for making cards, fake ID's, and other areas of special interest for people involved with credit card theft and fraud. Users can post and answer questions as well as send private messages back and forth. Many of these forums are hosted in countries that do not cooperate with U.S. law enforcement. Carding forums are also sometimes referred to as "dump shops" in the carding community.

18.   **Base**. Carders often refer to a particular batch of stolen access device numbers from a particular compromised merchant as a "base." Bases are often named after the area of the country from which the cards were stolen and allow carding forum operators to keep track of the particular batches of stolen cards they are trafficking on their sites.

19.   **First-Hand Base**. First-hand base refers to bases that were obtained through compromises of merchant systems facilitated by the carding forum operator.

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000162

20.   **Dump**.  The term "dump" is frequently used in the carding community to refer to the data that is extracted from the victim merchant by the malware planted on the victim's computers or point of sale systems. This data typically comes from the magnetic stripe on the back of credit and debit cards. Buyers of stolen credit card information or "dumps" will typically receive the dumps in a text file.  The "dumps" are typically compiled by hackers who have stolen the data from merchants who accept credit cards from customers for payment.  The merchants may be any business that accepts credit and or debit cards for payment, whether the merchant is a typical brick-and-mortar business or an online business. Hackers will typically steal the data from merchants by installing malware on the POS systems of vulnerable merchants.  In some instances, hackers will install malware on a merchant's Internet site or internal computer system to steal credit card accounts.  In other instances, a hacker may install malware on the merchant's POS equipment, allowing the hacker to steal credit card accounts from typical brick-and-mortar businesses.

21.   **Tracks**.  Tracks are a reference to the three tracks of data contained on the magnetic stripe on the back of a typical payment card.  Track 1 typically contains information such as the primary account number, the card holder's name, the expiration date and the card verification value or card verification code.  Track 2 typically contains the account number and expiration date as well as some discretionary data, but no letters unlike Track 1 which contains the account holder's name.  Track 3 is a discretionary track that typically contains no information, but banks may include information such as a frequent shopper account number for a credit card associated with a particular merchant (for example a Costco associated American Express account may have the account holder's Costco membership number on Track 3).

22.   **Checker**.  A "checker" is a service frequently offered on carding forums that automatically validates whether the cards within any base or dump are valid. Buyers of stolen cards may purchase the checking service from the forum operator or an affiliated criminal, and the operator of the checker service will use the cards for small dollar purchases to verify the card is still active.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000163

1    23.    **BINs**. Bank Identification Number. BIN numbers are the first six digits of a

2    credit or debit card number and are issued by Visa and MasterCard to individual banks.

3    BINs are the primary method that carding forums use to identify bases of stolen cards for

4    sale. Buyers of stolen credit cards often prefer BINs in their geographic region because the

5    use of stolen cards from other geographic areas is more likely to trigger automated fraud

6    detection systems.

7    24.    **Hacking Forum**. Hacking forums, like carding forums, are similar to online

8    bulletin boards, in this case for people interested and involved in hacking.  The hacking

9    forums similarly have various pages where users can post and answer questions on specialty

10    areas such as SQL injections (a type of hacking attack), computer vulnerabilities, botnets,

11    and other issues related to computer hacking.  The members of these forums also use them

12    to advertise various services that they provide, including, for example, distributed denial of

13    service ("DDoS") attacks.

14    25.    **Nickname or "nic."**  People who use the hacking and carding forums

15    typically are identified in their communications exclusively by their online "nic" (online

16    nickname or screen name). A computer hacker or retailer of stolen financial information

17    relies on his nic to establish his reputation (or street "cred") within the underground

18    community.  The established history of a nic provides other hackers a level of trust with

19    regard to their communications and dealings. Because of the illegal nature of their activity,

20    hackers typically are very suspicious of law enforcement attempts to infiltrate their forums.

21    Within the forums, hackers (using their nics) will often praise or complain about other

22    forum members (by their nics) who have performed well, or inadequately, in their dealings.

23    This often includes posting conversations that they may have had elsewhere, including on

24    other chat programs or over e-mail. If a person has an established nic with a good reputation

25    for delivering goods and services, other hackers and criminals are much more likely to

26    transact business with and transfer money to the person with that nic.  As a result, there is

27    status and also economic value to a nic. I know from my training and experience that nics

28    are jealously guarded and protected for those reasons. As a result, evidence of a particular

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 cybercriminals various nics may be found on digital devices and electronic storage media
2 used over many years.

3      26.    **RAM** ("Random Access Memory") is a type of memory used by a computer
4 when the computer is powered on. RAM retains information about currently open
5 connections, running programs and processes as well as a host of other information that is
6 directly related to the current usage of the computer at that exact moment in time. RAM is
7 not a part of the hard drive, rather it is a chip or series of chips that are inserted into the
8 computer and that need power to retain data. When a computer is powered off, the data in
9 RAM is erased and is not recoverable with standard forensic tools.

10      27.    **Communications Port**. In addition to communicating by IP address,
11 computers also track communications by port number. Port numbers allow a computer to
12 direct incoming Internet traffic to the correct application. For example, data traffic to an
13 Internet browser may be directed to Port 80, where it will then be passed on to the browser
14 and eventually used to create the web page that the user sees. E-mail traffic may be
15 delivered on Port 110 where the data information is then passed on to the e-mail program
16 and used to construct the e-mail message that a user views. One port of particular interest in
17 this case is Port 3389. This port is used by Microsoft Terminal Services. This is more
18 commonly known as Remote Desktop Connection, and offers the ability to connect to a
19 computer remotely.

20      28.    **Port Scanning**. Port scanning is the use of automated tools to scan an entire
21 range of IP addresses for open Ports. Generally, a computer only keeps open the ports that
22 are in use. For example, if a user is only browsing the web, Port 80 may be the only open
23 port. If computer hackers see other open ports, it may give them the opportunity to attack
24 that computer and take control. For example, if they are scanning a computer and see that
25 Port 3389 is open, they may try to take control of the computer through a variety of attacks
26 against the Remote Desktop Application.

27      29.    **Brute Force**. A brute force attack is a password attack that uses lists of words
28 in various combinations to try and crack passwords. The tools used for brute force attacks

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | are automated and can often be very high in volume using hundreds of thousands or millions
2 | of combinations to attempt to guess the correct password.

3 |      30.    **Batch File**. Advanced computer users often type programs from the
4 | command line, rather than using a computer mouse and the Graphical User Interface
5 | ("GUI") used by most basic and intermediate users. Command line usage can be used to
6 | change or view computer settings and also to execute computer programs. Using the
7 | command line can be cumbersome and some commands can be hundreds of keystrokes
8 | long. If a command is off by even one character, the command will not work. Users can
9 | create a script called a batch file. A batch file is a small file that contains a specific
10 | command line expression. An example would be for a person who had a printer that
11 | constantly malfunctioned. An advanced user could open the command line and tell the
12 | computer to reset the printer. If the printer repeatedly had malfunctions, the user could
13 | create a batch file and place that file on the desktop. The next time the printer
14 | malfunctioned and every time thereafter, the users would just need to double click on the
15 | batch file and it would automatically execute the command. This saves time because the
16 | user does not need to open a command prompt and type a long command.

17 | **SUMMARY OF THE INVESTIGATION**

18 |      31.    The Seattle Office of the USSS began investigating the Internet nickname of
19 | "Track2" in May of 2010. Track2 had been identified as a prolific carder responsible for
20 | operating carding websites that trafficked in thousands of stolen access devices. During the
21 | investigation, it was determined that the nickname ("nic") Track2, as well several other
22 | prominent nics in the underground carding community, belongs to ROMAN V.
23 | SELEZNEV. Agents investigating the case determined that SELEZNEV was responsible
24 | for network intrusions or computer hacks at over 100 businesses between 2009 and early
25 | 2011. The investigation also revealed that SELEZNEV is responsible for the sale of
26 | hundreds of thousands of stolen credit card numbers.

27
28

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000166

32.     Between April of 2010 and March of 2011, the following businesses were hacked by Roman Seleznev.  This list is not all inclusive and is only a small sampling of the businesses that have been hacked.

       a.      Broadway Grill, Seattle, Washington

       b.      Mad Pizza, 1263 Thomas Street, Seattle, Washington

       c.      Mad Pizza, 1321 Madison Street, Seattle, Washington

       d.      Mad Pizza, 4021 E. Madison Street, Seattle, Washington

       e.      Mad Pizza, 14800 Starfire Way, Seattle, Washington

       f.      Grand Central Baking Company, Seattle, Washington

       g.      Village Pizza, Anacortes, Washington

       h.      Casa Mia Italian Restaurant, Yelm, Washington

       i.      Active Networks, Frostburg, Maryland

       j.      Phoenix Zoo, Phoenix, Arizona

       k.      City News Stand, Chicago, Illinois

       l.      Latitude Bar, New York, New York

33.     Numerous court orders and warrants were served as part of this investigation. Those court orders have included search warrants for e-mail accounts, computer servers and business records from various providers.  The cumulative information from those records and searches revealed that ROMAN V. SELEZNEV was the computer hacker behind the network intrusions listed above, as well as the marketing and sale of hundreds of thousands of credit card numbers stolen from the victim businesses. As of July 2014, the major credit card issuers affected by these breaches had reported the following losses tied to SELEZNEV's criminal activities:

       a.      American Express reported a loss of $2,590,695.48;

       b.      MasterCard reported a loss of $14,617,755;

       c.      Visa reported a loss of $17,033,711.16

Approximately 345,000 compromised cards have been linked to this case.

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000167

1    34.    In March 2011, a grand jury sitting in this district returned a Superseding

2 Indictment charging SELEZNEV with bank fraud, computer crimes, access device fraud

3 and aggravated identity theft. Because SELEZNEV is a citizen and resident of Russia – a

4 country that will not extradite its own citizens to the United States – agents have been

5 attempting to locate SELEZNEV while he was traveling to a country that might extradite

6 him or expel him and allow the United States to take him into custody. On July 5, 2014,

7 SELEZNEV was located in the Republic of the Maldives and at the request of the United

8 States Government he was expelled based on an Interpol Red Notice. Agents of the USSS

9 took him into custody and transported him to the nearest United States territory in Guam,

10 where he had an initial appearance. At the time of his arrest, agents seized the SUBJECT

11 DEVICES.

12    35.    Although the crimes outlined in the Indictment occurred between 2009 and

13 2011, the Secret Service believes SELEZNEV had been active in the credit card fraud

14 community for several years prior to the crimes in the Indictment and that he remained

15 active in the carding community up to his arrest and may have been responsible for

16 operating new carding websites that continued to market stolen access devices through the

17 date of his arrest. Agents believe that after 2011, SELEZNEV may have adopted a new

18 online nic as "2PAC" and was operating a new carding forum using this name that marketed

19 large volumes of stolen access devices. Therefore, evidence of his involvement in these

20 new crimes may be located on the SUBJECT DEVICES. In addition, I believe the

21 SUBJECT DEVICES may also contain evidence that may tie SELEZNEV to accounts,

22 computers, and other evidence that show he is the person identified by the following online

23 nics:  Track2, nCuX, Bulba, bandysli64, smaus, Zagreb, shmak and the alias names Roman

24 Ivanov and Ruben Samvelich. These nics and alias names were all associated with

25 SELEZNEV's crimes charged in the Indictment. Because I know that computer hackers

26 often use the same nics and alias names for many years, there is probable cause to believe

27 that SELEZNEV is still using some or all of those nics and alias names and that evidence of

28 his use of those identities may be located on the SUBJECT DEVICES.

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000168

1

## THE INVESTIGATION

2  **D.     Computer Intrusion of Restaurant in Coeur D'Alene, Idaho**

3       36.     In May of 2010, Detective David Dunn, a member of the United States Secret

4  Service ECTF, responded to a reported computer intrusion ("hack") at a restaurant in Couer

5  D'Alene, Idaho. He forensically examined the restaurant's computer system, and

6  discovered evidence that malware, specifically, malware in the form of keystroke logging

7  software, had been installed on the computers that were used by the restaurant to process

8  customer credit cards. Det. Dunn discovered that suspicious malware had also been

9  installed on the restaurant's server. Based on his review of the malware, Det. Dunn learned

10  that the restaurant customers' credit card data was being transmitted from the business'

11  server to an IP address located in Russia. The IP address in Russia that was coded into the

12  malware was 188.120.225.66.

13       37.     Through his forensic examination, Det. Dunn located three district "pieces" of

14  malware on the computer, which were named: "Kameo.exe," "Shmak2.exe," and

15  "RemComSvc.exe." Review of the infected server showed that once the suspect had

16  compromised the server, he had downloaded the malware from a website with the name

17  "Shmak.fvds.ru." Det. Dunn noted, in particular, that the suspect had manually typed this

18  address into the compromised computer, after he had assumed control of the computer.

19  Based on his training and experience, Det. Dunn believed this method of computer

20  intrusion, with the hacker manually typing a website name, was uncommon.

21       38.     Det. Dunn subsequently learned that the website, Shmak.fvds.ru, was still

22  hosted at IP address 188.120.225.66 on January 5, 2011. This meant that, over six months

23  after the malware had been installed on the computer in Idaho, the server in Russia hosting

24  the malware was still active and at the same IP address that had been coded into the original

25  malware.

26       39.     In addition to locating the malware, Det. Dunn also found evidence related to

27  how the suspect gained control of the business' computer in order to install the malicious

28

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  software. While reviewing log files from the computer, he found entries that showed errors

2  in connecting to the computer via communications Port 3389 - more commonly known as

3  the "Remote Desktop Connection" port. This error coincided with the installation of the

4  malware and is an indication that Remote Desktop hacking was used to gain access to the

5  computer system.

6  **B.    Arrest of Suspects in Springfield, Ohio, and Discovery of Stolen Credit Card**

7  **Information**

8       40.    In June of 2010, police officers in Springdale, Ohio, arrested suspects who

9  were in possession of credit card account numbers that had been stolen as part of the May

10  2010 hack of the Idaho restaurant's computers. During the arrest, officers seized a computer.

11  A warrant to search the computer was obtained in the Hamilton County, Ohio, Court of

12  Common Pleas. The computer was processed by the USSS in Ohio. Det. Dunn requested a

13  copy of the computer image to attempt to determine the source of the credit card data that

14  was authorized to be seized under the Hamilton County Warrant. Based on his review of the

15  image, Det. Dunn learned that the local subjects in Ohio had been communicating online

16  with another person using the "ICQ" instant messaging ("chat") program.

17       41.    The ICQ number of the person with whom they were communicating was

18  554716101. USSS investigators learned that this ICQ number belonged to the ICQ nic,

19  "TRACK2.NAME." USSS investigators also learned that "TRACK2.NAME" was both an

20  ICQ nic as well as the website address for a website that was used by the person with the

21  online nic, "Track2," to sell stolen financial information. The ICQ chats stored on the

22  computer seized in Ohio showed that the Ohio suspects had chatted online with Track2 and

23  that Track2 directed them to the website named, "www.bulba.cc," as a website from which

24  they could purchase credit card account numbers.

25       42.    Further forensic examination of the computer from Ohio showed that the local

26  subjects had used their computer subsequently to visit www.bulba.cc, and that it was the

27  source of the stolen credit card numbers found in their possession at the time of their arrest.

28  **C.    Computer Intrusion of Broadway Grill Restaurant in Seattle, Washington**

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000170

43.     In October of 2010, the Boeing Employees' Credit Union ("BECU") noted a large increase in fraud-related activity stemming from cards that had been used at a particular restaurant in Seattle, Washington. They made a report to the USSS Seattle Field Office, and based on that information, Det. Dunn contacted the Broadway Grill, a restaurant located at 314 Broadway Ave E, Seattle, Washington. After reviewing the company's computer system, he confirmed that the system had been hacked. Det. Dunn determined that an unknown person had gained unauthorized access to the computer server for the business. This server had been used to store unencrypted credit card data. After gaining access to the server, the suspect had then installed malware that transmitted data from the server, to another computer server with an IP address located in the Ukraine. Det. Dunn's review revealed the hacker had stolen approximately 33,000 credit card numbers that he transmitted to the server in the Ukraine in a text file.

44.     A review of the malware used in the infection revealed that there was an IP address that had been programmed into the malware, namely, the IP address 188.95.159.20. The manner in which the malware was coded was very similar to the malware that had been installed on the computers and server of the Idaho restaurant.  In both cases the systems were manually infected, meaning that the hacker gained full remote control of the computer systems and installed the malware needed to obtain the credit card information. In this case, the malware that was stealing the credit card numbers was named, "DTCA.exe."  Within the software code for DTCA.exe, there were references to other software programs, including, kameo.exe, the malware from the Idaho restaurant hack.  A review of the infected server at the Broadway Grill showed that once the computer had been compromised, the suspect had downloaded the malware from the website, Shmak.fvds.ru.

45.     Just as in the case of the Idaho restaurant hack, the intruder had manually typed the web address shmak.fvds.ru into the computer browser in order to download the malware to the server.  The use of this identical and relatively unique modus operandi indicates that the suspect who downloaded the malware onto this computer in Seattle,

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000171

1   Washington, was likely the same suspect who downloaded the malware to the computer

2   belonging to the Idaho restaurant.

3        46.    The log files on the Broadway Grill computer were more inclusive and Det.

4   Dunn was able to locate log files indicating that, not only were there Remote Desktop

5   Connection errors; there were, in addition, log file records indicating that the suspect had

6   attempted to execute a brute force attack on the remote desktop application for this

7   computer.

8        47.    Credit card account numbers stolen from the Broadway Grill, in Seattle, just

9   like those stolen from the Idaho restaurant, were used within days to make fraudulent

10  purchases all over the world.  Based on his training and experience, Det. Dunn knew that in

11  order for stolen credit card information to be harvested and used in this manner so quickly,

12  the person/s in possession of such information must use established criminal enterprises and

13  computer networks to distribute the stolen data for sale and criminal use.

14       48.    As part of his investigation, Det. Dunn received information related to a

15  number of different computer intrusions across the country. He found that DTCA.exe,

16  Kameo.exe, RemComSvc.exe, and Shmak2.exe were part of a family of malware that was

17  designed to steal financial information.  A commonality across these intrusions was that the

18  computers were compromised manually.  Det. Dunn was able to download different

19  versions of these pieces of malware directly from the server located at Shmak.fvds.ru. On

20  January 11, 2011, the server was still hosting malware.

21  **D.**    **Other Information Developed by Law Enforcement Regarding the Internet nic**

22  **of "Track2," and His Carding Forum Websites, www.bulba.cc and www.track2.name**

23       49.    As noted above, evidence on the computer of the individuals arrested in Ohio

24  in possession of credit card numbers stolen during the hack of the Idaho restaurant indicated

25  that they had obtained those stolen credit card numbers from a website named,

26  "www.bulba.cc," and that they had been directed to that site during an ICQ chat with a

27  person using the ICQ number associated with the ICQ nic, 'TRACK2.NAME." USSS

28  investigators learned that "TRACK2.NAME" is an ICQ nickname, but also the website

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 16

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000172

1  address for a website used by the person with the online nic, "Track2," to sell stolen
2  financial information. The USSS identified the www.track2.name website, as well as the
3  www.bulba.cc website, as "carding forums" associated with Track2. Based on a review of
4  the carding sites, the USSS found that www.bulba.cc served as a carding forum for newer
5  members who had not yet established themselves in the stolen credit card community,
6  whereas www.track2.name was a private site accessible by only select individuals. Both
7  www.track2.name and www.bulba.cc were administered by the same person, who used the
8  online name of "Track2."

9      50.    For example, USSS agent Keith Wojcieszek personally chatted with Track2
10  via ICQ. During their conversation, Track2 told Special Agent Wojcieszek that the credit
11  card data for purchase on the www.track2.name website was the same credit card data that
12  was for sale on the www.bulba.cc website. In addition, Special Agent Wojcieszek reviewed
13  posts from another carding forum, "www.CRDSU.su," which was the largest
14  Russian/English credit card and hacking forum known to exist by the USSS at that time.
15  Special Agent Wojcieszek and Det. Dunn both saw that Track2 was discussed on that forum
16  as the exclusive vendor of the credit card track data sold there. There was even a specific
17  post by the preeminent hacker "BadB," who was another known prolific credit card seller, in
18  which BadB expressed his displeasure with the fact that Track2 controlled a monopoly as
19  the vendor of card data on the www.CRDSU.su carding forum site.

20      51.    Based on his training and experience, Det. Dunn knew that carding forums
21  such as www.track2.name and www.bulba.cc functioned as marketplaces where visitors, by
22  becoming members through online applications, have their choice of large volumes of stolen
23  financial information. He knew, as well, that signing up for www.bulba.cc was similar to
24  signing up for an online e-mail account. A user provides an e-mail address, an ICQ number,
25  and chooses a user ("profile") name. Once an account has been established, the user funds
26  the account through e-currency sites such as Liberty Reserve. Det. Dunn knew that carding
27  forum sites such as www.track2.name and www.bulba.cc have been investigated in other
28  USSS cases, and that these sites are noteworthy for the "command and control" position

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  their members have in being consumers of some of the most significant compromises of
2  financial data known to the USSS.

3        52.     USSS agents learned during the course of this and other investigations that the
4  www.track2.name website was generally available to "veteran" users and contacts of
5  Track2, as well as those willing to pay a $1,000 registration fee. The exclusive nature of this
6  site had been verified by Special Agent Wojcieszek, and Det. Dunn. Those who were new or
7  unwilling to pay the $1,000 fee were directed to visit the www.bulba.cc website, and to
8  purchase stolen credit card numbers from that site, instead.

9        53.     On August 27, 2010, Det. Dunn visited both the www.track2.name and the
10 www.bulba.cc websites and found that the logon screens for both track2.name and bulba.cc
11 were nearly identical. The only difference was that www.track2.name had a blue
12 background and www.bulba.cc had a magenta background.

13       54.     Det. Dunn reviewed the domain registration information for
14 www.track2.name and found that it was registered to "Alexy Davydov" with an e-mail
15 address of, rubensamvelich@yahoo.com and a telephone number of 495 6516588.  Based on
16 his training and experience, Det. Dunn believed it was very unlikely that a person would use
17 their real name to register a site such as this; but that the person would likely use a valid e-
18 mail address.  In the event that there was a technical problem with the site and the hosting
19 company needed to contact the site owner, the hosting company would need to have some
20 way to reliably make that contact.  Det. Dunn also reviewed the domain registration
21 information for www.bulba.cc and found that it was registered to "Valentin Chinakov" with
22 an e-mail address of "bulbacc@yahoo.com."

23       55.     On September 16, 2010, Special Agent Wojcieszek obtained a federal search
24 warrant in the Eastern District of Virginia from the Honorable Ivan D. Davis.  That warrant
25 included the contents of several e-mail accounts as of that date, including,
26 rubensamvelich@yahoo.com, as well as two other Yahoo! e-mail accounts that had been
27 identified during the investigation as accounts related to Track2.  Both Special Agent
28

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000174

1  Wojcieszek and Det. Dunn reviewed the records that were received in response to the search
2  warrant of the rubensamvelich@yahoo.com account.

3  **E.     Evidence From September 16, 2010, Search of rubensamvelich@yahoo.com**
4  **Account**

5        56.     Based on a review of the contents of the rubensamvelich@yahoo.com account
6  as of September 16, 2010, Special Agent Wojcieszek and Det. Dunn determined that the
7  account was used primarily in the furtherance of a criminal scheme to steal and sell credit
8  card account numbers, online.  That evidence included the following, by way of example:

9        57.     The rubensamvelich@yahoo.com account included several e-mails pertaining
10 to accounts at Liberty Reserve.  Liberty Reserve was an online e-currency company which
11 allowed users to anonymously transfer money between accounts. There was no identity
12 verification with Liberty Reserve accounts. Liberty Reserve was the preferred method of
13 payment for stolen financial data on the website, www.bulba.cc.  The e-mails included an e-
14 mail on March 18, 2010, from abuse@help.libertyreserve.com detailing an earlier complaint
15 made by rubensamvelich@yahoo.com in which his Liberty Reserve account was referenced
16 as U0045772.  Another e-mail dated October 1, 2010, from admin@mutualtrustfinance.com
17 indicates rubensamvelich@yahoo.com uses Liberty Reserve account number U9614915.
18 An e-mail that same day, October 1, 2010, from invest@approvedinvest.com also indicates
19 rubensamvelich@yahoo.com is associated with the Liberty Reserve account U9614915.  An
20 e-mail dated October 5, 2010, from goldexchangeltd@gmail.com details numerous
21 payments made to Liberty Reserve account U0045772.

22       58.     The rubensamvelich@yahoo.com account included e-mails pertaining to the
23 rental of, and payment for, servers throughout the world, including three servers located in
24 Virginia, with IP addresses:  66.235.184.36, 66.36.240.69, and 66.36.228.124.  Special
25 Agent Wojcieszek subsequently swore an affidavit for a search warrant for those three
26 servers, which was authorized by the Honorable T. Rawles Jones, Jr., Eastern District of
27 Virginia, on January 19, 2011.  The search of those servers, in turn, revealed significant
28 evidence of criminal conduct, as further described below.

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 19

SW_0000175

59.   Many of the e-mails in the account addressed the owner of the account as "Roman Ivanov." Based on this investigation, Det. Dunn knew that Track2 communicated with several people using this name. In the instances in which this was done, however, it was in connection with payment in some kind of electronic currency. Using electronic currency does not require the use of a legitimate name.

60.   There was one e-mail in the rubensamvelich@yahoo.com account from PayPal, Inc., that referred to the account holder as, "Roman Seleznev." The use of the name on the PayPal account is a much stronger indication that this is the account holder's true name because PayPal conducts a more in-depth account verification process, and Pay Pal accounts are typically linked to traditional bank accounts that likewise involve more in-depth identity verification. Therefore, the use of false identities and stolen credit cards is less likely in connection with a PayPal account.

**F.   Evidence From January 20, 2011 Search Warrant for the HopOne Servers**

61.   Based on numerous e-mails located within the rubensamvelich@yahoo.com e-mail account, Det. Dunn learned that Track2 had leased three servers from HopOne Internet Corporation located in McLean, Virginia. In addition, evidence obtained from the malware located on a compromised computer from a victimized business showed that the malware placed on the compromised computer was uploading data to one of these servers at HopOne. On January 19, 2011, a search warrant was issued in the Eastern District of Virginia authorizing a search of the servers. That warrant was executed on January 20, 2011.

62.   A forensic review of the HopOne servers by both Det. Dunn and Special Agent Wojcieszek revealed the following pieces of information, among others:

63.   The web history from the HopOne server with the IP address 66.36.240.69 showed the user logging into the website, www.carder.biz using the nic of "bulbacc." www.carder.biz was a well-known carder and hacking forum.

64.   Det. Dunn found a batch file or, in other words, a piece of code on the computer, that when executed would port scan an entire range of IP addresses. When

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 20

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    issued, the command would automatically scan over 65,000 IP addresses, checking to see if
2    Port 3389 was open. As noted above, port 3389 is related to Remote Desktop Protocol.
3    Remote Desktop hacking was the primary method used to gain unauthorized access to the
4    protected computer systems referenced in this affidavit.

5         65.    Det. Dunn found Internet history showing that someone using the servers had
6    downloaded a program called "Pack4.exe." This program was downloaded from the web
7    address of www.Shmak.fvds.ru. This is the same website that was hosting all of the malware
8    from all of the intrusions that Det. Dunn had investigated in this case at that time.  It is also
9    the same server to which many of the stolen credit card numbers had been sent.

10        66.    Det. Dunn found a folder containing over 11,000 full credit card numbers.
11   The folder name was an IP address, 216.220.245.18.  This is the IP address of Day's
12   Jewelers in Waterville, Maine.

13        67.    Det. Dunn found two different ICQ accounts that were being used from one of
14   these servers. One of the ICQ account numbers was 33333.  This number is known by the
15   USSS to be the ICQ of the nic, "nCuX." "nCuX" is, in turn, known to the USSS to be a
16   vendor of stolen credit cards, who disappeared from most public forums in July, 2009, at
17   around the same time that Track2 began to sell numbers.

18        68.    Det. Dunn found web history in the deleted portions of one of the HopeOne
19   server's showing a person by the name of Roman Seleznev had purchased airline tickets for
20   himself and others, including an adult female and a young child also using the last name
21   Seleznev. Another web page found in the web cache for one of the HopOne servers included
22   airline reservations for Roman Seleznev with his date of birth and passport number, for a
23   flight from Indonesia to Singapore.

24        69.    Det. Dun located Internet history from March 14, 2010, showing that the e-
25   mail address "boookscafe@yahoo.com" was used to purchase a product from the website,
26   track2.plati.ru. The product was software called, "Track2 audio creator."  Based on his
27   training and experience, Det. Dunn knew that some credit card readers store credit card
28   track data as an audio file that needs to be converted from audio to numeric digits.

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 21

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000177

70. Det. Dunn saw e-mails from the rubensamvelich@yahoo.com e-mail account, indicating that this account had continued to be active into January of 2011, and was being used to manage the HopOne servers in Virginia that were the subject of the January 20, 2011, search warrants.

**G.     Information Further Linking the nic nCuX to Track2 and Roman Seleznev**

71. Records obtained from the e-currency site "e-gold" show that the name Roman Seleznev appeared in an e-gold account associated with nCuX. These records were obtained by the USSS in conjunction with a federal Indictment returned in a money laundering case involving e-gold in the Middle District of Florida.

72. Det. Dunn also viewed the online WebMoney profile associated with the nic nCuX (ID 448435754034) and saw that the name Roman V. Seleznev was associated with that profile.

73. Media seized in conjunction with the arrest of Caesar Carranza (nic ubuywerush) in the Eastern District of New York revealed Skype chats between ubuywerush and nCuX. Those chats showed that on February 13, 2007, nCuX111 purchased an MSR206 magnetic card reader from ubuywerush and sent the following details:

> Name: Roman Seleznev
> Address: Ostryakova 26 kv 113, Vladivostok, Russia
> E-mail: regmails22@mail.ru, boookscafe@yahoo.com

74. In these chats, ubuywerush tells nCuX111 that he is going to send the information to complete the purchase to the Yahoo e-mail address of boookscafe@yahoo.com.

**H.     Information Regarding Additional Activity of Track2**

75. In November of 2010, Det. Dunn established an undercover account on www.bulba.cc. Det. Dunn observed that credit card numbers were sold on the website by Bank Identification Number ("BIN") numbers.

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 22

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000178

76.     On November 15, 2010, Det. Dunn downloaded the BIN list of available cards from the site. He found that there were thousands of stolen credit card numbers being sold on the site. Included in the list were 31 cards with BIN's from BECU. Det. Dunn observed that most of the BIN's being sold were from large, multi-state banks with only a few local banks listed.

77.     Det. Dunn logged onto www.bulba.cc over a dozen times and the BIN lists that he had copied during those visits represented around 100,000 stolen credit card tracks. Those BIN lists were downloaded over a period of less than two months.

78.     On January 12, 2011, Det. Dunn logged into www.bulba.cc and found that Track2 was advertising 30,000 credit cards that had been uploaded that morning to the site and were for sale. Det. Dunn reviewed the BIN information for these cards and found that they belonged to U.S. based financial institutions, primarily in the State of Texas.

79.     On January 20, 2011, Det. Dunn noted that Track2 had a number of BECU cards for sale on his website www.bulba.cc. He contacted BECU to ask if they had identified any recent points of compromises in the Seattle area. They advised Det. Dunn that the Grand Central Baking Company located at 214 First Avenue S, Seattle, Washington, had been identified as a possible point of compromise. Det. Dunn immediately went to the business and obtained a forensic image of their server. He found a deleted copy of the malware from the Kameo family on the drive. Det. Dunn also determined that the malware had been downloaded onto the server in October of 2009. As in the other two intrusions that he responded to, the suspect manually downloaded the malware from shmak.fvds.ru.

80.     On February 1, 2011, Det. Dunn responded to Mad Pizza, a business located at 1263 Thomas Street, Seattle, Washington. A review of the server seized in Virginia in conjunction with information received from BECU indicated that this was a likely point of compromise related to this case. Det. Dunn obtained a forensic image of the server, and a review of that server revealed that two different variations of the malware had been installed on the server. In August of 2011, DTCA.exe was installed. That version of the malware uploaded credit card data to IP 188.95.159.20, the same IP address as the Broadway Grill

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 23

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000179

1  intrusion. In December of 2010, the malware was replaced with a newer version, which

2  uploaded stolen credit card data to IP 66.36.240.69, the IP address in Virginia where the

3  servers had been seized pursuant to the warrant issued in the Eastern District of Virginia.

4  Additionally, Det. Dunn obtained the IP address from Mad Pizza.  That IP address matched

5  6 files on the seized Virginia server. The six files contained stolen credit card information.[3]

6      81.     In February of 2011, Det. Dunn received additional information about

7  compromised business victims in the Seattle, Washington locale.  He went to all of these

8  businesses, obtained images of their infected network computers, and conducted forensic

9  examinations on the same.  The businesses and his findings, respectively, based on those

10  examinations, are as follows:

11      a)     Mad Pizza restaurant, First Hill location, Seattle, Washington.  This business
              was hacked and malware installed on its POS computer system on October 22,
12             2010. The malware was downloaded from the server, shmak.fvds.ru.
13

14      b)     Mad Pizza restaurant, Madison Park location, Seattle, Washington.  This
              business was hacked and malware installed on its POS computer system on
15             August 26, 2010. The malware was downloaded from the server,
              shmak.fvds.ru.
16

17      c)     Casa Mia Italian restaurant, Yelm, Washington. This business was hacked and
              malware installed on its POS computer system on August 9, 2010. The
18             malware was downloaded from the server, shmak.fvds.ru.
19

20      82.     On March 10, 2011, records were received from eBay/PayPal for the accounts

21  associated with the e-mail address of rubensamvelich@yahoo.com.  This is the account that

22  was used to register the website www.track2.name.  This account was also used to manage

23  servers used to receive and transmit stolen financial data in this case.  A total of four

24  accounts were located that were associated with that e-mail account.  Three of the PayPal

25  accounts listed the account holder name as Roman Ivanov, a name which the USSS became

26  to recognize as a known alias of Roman Seleznev.  Those three accounts all listed the

27  _____

28  [3] The server seized in Virginia stored the stolen credit card numbers in files which were named according to the IP
    address of the victim server from which the credit card data was stolen.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000180

1   contact number as, +7 79024835285. The fourth account listed the account owner as Roman

2   V. Seleznev. The date of birth listed was July 23, 1984, and it listed the same phone number,

3   +7 79024835285, on the accounts with the name Roman Ivanov. The address listed for the

4   Roman V. Seleznev PayPal account was,

5           Roman Seleznev

6           Ostryakova 26 kv 113

7           Vladivostok, Primorye

8           690003

9           Russia

10   At the time of Roman Seleznev's arrest on July 5, 2014, agents seized his internal Russian

11   passport which listed the same address as the one above found in the PayPal account.

12   **I.      Evidence From February 2011 Search of E-Mail Accounts**

13          83.     On February 3, 2011, a search warrant, authorizing the search of the e-mail

14   accounts, rubensamvelich@yahoo.com and boookscafe@yahoo.com was authorized by

15   Magistrate Judge James P. Donohue, Western District of Washington. The content from

16   those accounts was received and a review of that information revealed the following

17   information.

18          a)  An e-mail dated September 19, 2009, from sale@defencer.ru to the boookscafe
19              account. This e-mail was addressed to Roman Seleznev of Vladivostok, Russia,
20              and included phone number +79024835285. This is the same phone number
                associated with e-mails located in the rubensamvelich e-mail account pursuant to
21              earlier search warrants. The e-mail pertained to a product that was purchased
22              from the website www.defencer.ru, which was to be shipped to Roman Seleznev.

23          b)  E-mails dated September 1, 2008; June 15, 2009; and December 8, 2009, from the
24              Russian social network site, www.vkontakte.ru to the boookscafe account. The e-
                mails were sent to Roman Seleznev.
25
26          c)  E-mails beginning on December 12, 2009, and ending in February 11, 2011, to
                the boookscafee account showing the lease and use of the server, "smaus.fvds.ru,"
27              aka "shmak.fvds.ru." This server was statically located at IP address
28              188.120.225.66. This is the IP address for the server which hosted all of the

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 25

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000181

malicious software discovered in this case, and to which many of the stolen credit card numbers were transmitted.

d) E-mails dated September 3, 2006; September 4, 2006; and September 18, 2006, to the boookscafe account from a realtor in Thailand which included listings of condominiums for sale. The content of the e-mails indicated that Roman Seleznev was interested in purchasing a vacation home in Thailand;

e) An e-mail dated August 19, 2010, that showed the boookscafe account was receiving the bill for the virtual server smaus.fvds.ru, aka shmak.fvds.ru, located at IP address 188.120.225.66. This is the same address that many of the victim businesses transmitted data to and the same IP that hosted the malware;

f) Numerous e-mails to the rubensamvelich account from Carder.su and CRDsu.su, two well know carding forums during that time period, including the contents of private messages sent to TRACK2 via those forums;

g) Numerous e-mails to the rubensamvelich account indicating that rubensamvelich@yahoo.com repeatedly used the nickname smaus and variations of that name including smaus123; smaus1234; and smaus321;

h) An e-mail dated March 10, 2010 to the rubensamvelich account from exchangezone.com that revealed rubensamvelich@yahoo.com registered on that site using the nickname Zagreb;

i) Numerous e-mails to the rubensamvelich account in which rubensamvelich@yahoo.com lists his telephone number as 79024835285;

j) An e-mail dated April 16, 2010, from wmlight@webmoney.ru to the rubensamvelich account regarding WMID 818405696206;

k) Numerous e-mails to the rubensamvelich account that indicate rubensamvelich@yahoo.com repeatedly used the password "ochko123" for accounts with various online services.

**J.   Indictment**

84.    On March 16, 2011, a Grand Jury in the Western District of Washington returned a 29-count Superseding Indictment charging ROMAN V. SELEZNEV with:

Counts 1-5, Bank Fraud in violation of 18 USC 1344 & 2;

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 26

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000182

1   Counts 6-13, Intentional Damage to a Protected Computer in violation of 18 USC

2   1030 (a)(5)(A) & 1030 (c)(4)(B)(I) & 2;

3   Counts 14-21, Obtaining Information From a Protected Computer System in

4   violation of 18 USC1030 (a)(2) & 1030(c)(2)(B)(ii) & 2;

5   Count 22, Possession of Fifteen or More Unauthorized Access Devices in violation

6   of 18 USC 1029 (a)(2) & 1029(c)(1)(a)(I) & 2;

7   Counts 23 and 24, Trafficking in Unauthorized Access Devices in violation of 18

8   USC 1029(a)(2) & 1029(c)(1)(A)(I) & 2;

9   Counts 25-29, Aggravated Identity Theft in violation of 18 USC 1028A(a)(1) & 2.

10   85.   The Superseding Indictment was based upon network intrusions of numerous

11   businesses located in the Western District of Washington, the theft of credit card

12   information from those businesses, and the subsequent sale of those stolen credit card

13   numbers on the web sites, www.bulba.cc and www.track2.name, with the knowledge and

14   intent that they would subsequently be used fraudulently.

15   86.   SELEZNEV is also charged in a separate Indictment in the District of Nevada

16   with participating in a Racketeer Influenced Corrupt Organization ("RICO") and conspiracy

17   to engage in a RICO as well as two counts of possession of fifteen or more counterfeit and

18   unauthorized access devices.  That Indictment was returned on January 10, 2012, and is

19   related to SELEZNEV's use of the online nics Track2, Bulba and nCuX on the carding

20   forums Carder.su, Carder.info, Crdsu.su, Carder.biz, and Carder.pro which were all

21   controlled by the Carder.su organization.  The Las Vegas Indictment alleges that

22   SELEZNEV was a vendor in the Carder.su organization who sold "dumps" of stolen credit

23   card data, and that he advertised his own automated website on the Carder.su websites.

24   **K.   Large Sale of Credit Card Numbers**

25   87.   On April 6, 2011, Det. Dunn logged onto www.bulba.cc and saw that there

26   was a banner advertisement for the site. The banner stated,

27   Next Tuesday, 12 April biggest base ever!

28   1,000,000 (One Million) Dumps with Track2

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 27

SW_0000183

90% USA
10% Other countries
You asked?  You got it!  Hurry up, load your balance now to be in the first rows, who will get most delicious bins.

88.     On April 12, 2011, Det. Dunn began attempting to logon to the site, but his initial attempts were unsuccessful.  At one point a banner was posted on the site that stated:

We are very sorry, but when we Upload new base of 1 million dumps, our Server goes down.
So now we in process of buying more powerfull server for this base.  Please wait for a while Maybe 2-3 hours.

89.     Several hours later, Det. Dunn was able to logon to the site and found that over 747,000 credit card tracks were for sale. He purchased 16 of those tracks, all belonging to BECU. The tracks were immediately displayed on his computer screen.

90.     Between April 12, 2011 and April 18, 2011, over 92,000 credit card tracks were sold through the website. The combined sales prices for those tracks exceeded 2.4 million dollars.

91.     On April 28, 2011, Roman Seleznev and his wife Svetlana were injured in a blast at a café' in Marakesh, Morocco. Roman Seleznev's condition was initially listed in press reports as "grave," and he was medically evacuated to Moscow in the days following the explosion. Following this event, the activity on bulba.cc dropped for several months. Between April 28, 2011 and July 18, 2011, Det. Dunn continued to check the www.bulba.cc website for new credit card numbers. No new numbers were listed for sale. Based on the correlation between the date of SELEZNEV's injury and the decreased activity on bulba.cc, I believe the site was inactive because of SELEZNEV's injury.

92.     On July 18, 2011, Det. Dunn logged onto the site and found that there was a banner stating that 40,000 new stolen credit cards were going to be placed up for sale at 1800 hours Moscow time on July 19, 2011. He also found that sometime between July 5, 2011 and July 18, 2011, a new database of stolen numbers had been uploaded. Included with those numbers were 20 credit card numbers from BECU.

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000184

93.     On July 18, 2011, Det. Dunn purchased two credit card numbers belonging to BECU. He contacted BECU and was told that both numbers belonged to cardholders in Yelm, WA, and both cards were active, meaning that fraud transactions would have likely been successful.

94.     On July 18, 2011, Det. Dunn logged onto the hacker website, www.vendors.pro., and viewed an advertisement that had been posted by the user "Track2." The advertisement stated:

> Hi dear customers.  We glad to present our new shop of dumps!  We selling dumps only stolen by us! That mean we are the first hands owner! Instant activation of account!  Also instant delivery of stuff!  Http://track2.name

**M.     Emergence of 2pac.cc**

95.     As noted above, USSS agents noticed that sales on the website www.bulba.cc slowed after April of 2011.  Det. Dunn logged onto the site in late 2011, and located a notice indicating the site would be shut down on January 7, 2012.

96.     On September 25, 2013, a user with the nic "2pac" joined the carding forum Omerta.cc and posted an advertisement for 2pac.cc.  The advertisement's header contains the statement "2pac, the first market of dumps! All Sellers in One place!!!"  The advertisement goes on to say, "We invite sellers, hackers and owners of dumps bases! You get the 50% share of income from selling of your base, that is much more than you can earn from selling your base to other seller."  As noted above, the term "dump" is a term for stolen credit card track data that can be used to make counterfeit credit cards.

97.     Between January 2014 and July 2014, United States Secret Service agents made several purchases of dumps from the 2pac.cc website.  The agents determined that all of the purchased accounts had been stolen from merchants through various network intrusions of United States-based merchants.  It is estimated that 2pac.cc has had an inventory of thousands of dumps to this point based on the amount of accounts that are offered for sale.

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 29

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000185

98.     According to the public internet search function "WHOIS," the domain "2pac.cc" was registered on February 20, 2013.  The registrant for the website is listed as Garanin Evgenij of Penza, Russia with the registration email address jchow@bk.ru.  This same e-mail address (jchow@bk.ru) was identified in another USSS investigation as having been used to register the nic "2PAC" on the carding forum "verified.ru."  The site "verified.ru[4]" was created on April 10, 2013.

L.      **Data from Liberty Reserve Money Laundering Investigation**

99.     In May 2013, the online money transfer business Liberty Reserve, which was based in Costa Rica, was shut down as part of a joint investigation by the United States Secret Service, IRS Criminal Investigations, Homeland Security Investigations, the Judicial Investigation Organization in Costa Rica, and the United States Attorney's Office for the Southern District of New York.  As noted above, Liberty Reserve was an online e-currency company which allowed users to anonymously transfer money between accounts. Liberty Reserve was created, structured, and operated, to help users conduct illegal transactions anonymously and launder the proceeds of their crimes, and it emerged as one of the principal money transfer agents used by cybercriminals around the world to distribute, store, and launder the proceeds of their illegal activity.  As part of the investigation and prosecution of Liberty Reserve and it's operators, agents obtained a copy of Liberty Reserve's records and internal data base.  This transactional database contains data on Liberty Reserve such as user information, transactional history, IP history, and private messaging history (in some instances).

100.    As noted above, I believe Liberty Reserve account U9614915 is an account controlled by SELEZNEV because SELEZNEV received an e-mail at the rubensamvelich@yahoo.com account indicating that Liberty Reserve account U9614915 is his account. According to data from the Liberty Reserve database, the testov account, number U9614915, was registered with the e-mail account salitov.maxim@yandex.ru and

---

[4] Verified.ru was subsequently chanced to verified.cm

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 30

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000186

1    phone number, 62 85739716781.  This is an Indonesian telephone number and I know that

2    SELEZNEV has traveled to Indonesia and owns a home in Indonesia.  A review of the

3    transaction history for account U9614915 reveals it was used for trafficking in stolen credit

4    card data.  The Liberty Reserve data reveals U9614915 was used for more than 42,000

5    transactions between March 10, 2010 and February 17, 2013 and received approximately

6    $6,801,254.00.  Many of the memos related to the transactions contain direct references to

7    dumps trafficking.  For example, one memo states "please transfer $326 to my balance.

8    want buy dumps."

9         101.    A review of the Liberty Reserve data also reveals that account U9614915 sent

10   large transfers to another account tied to SELEZNEV.  Liberty Reserve account U8518741

11   was registered in October 2010, in the name of ROMAN SELEZNEV with an address in

12   Vladivostok, an e-mail address of romariogro1@mail.ru and the telephone number 495

13   6516588 which is the same telephone number used to register the domain track2.name.  This

14   account, number U8518741, received approximately $64,000.00 from account U9614915.

15       102.    According to data from Liberty Reserve, account number U0045772 account

16   was also opened with the e-mail address rubensamvelich@yahoo.com - an e-mail account

17   known to be associated with SELEZNEV and also used to register the carding forum

18   track2.name.  Account number U0045772 was registered on March 10, 2010, in the name of

19   Dmitriy Melnik with an address in Moscow, Russia and the telephone number 62

20   85739716781, which is the same Indonesian telephone number used to register account

21   U9614915.  Messages in the Liberty Reserve data related to account U0045772 establish

22   this account was also associated with trafficking in dumps of stolen credit card data on the

23   carding site track2.name.  For example, in one conversation, another Liberty Reserve user

24   states specifically that "I was using track2.name site of urs. . . ." and asks for assistance with

25   his account.  A review of the transaction history for account U0045772 reveals the account

26   had over 28,000 transactions between March 10, 2010 and April 2, 2013, with

27   approximately 26,790 incoming transfers with a value of $11,085,716.64

28

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 31

SW_0000187

1

2    **L.    Arrest of Seleznev**

3         103.    On July 5, 2014, Roman Seleznev was apprehended at the Male International

4    Airport located in The Republic of the Maldives. At the time of his apprehension, Seleznev

5    was planning to depart the Maldives for Russia and was accompanied by his girlfriend and

6    her daughter. Seleznev was taken into custody by the USSS and transported to the United

7    States territory of Guam for an initial appearance. Several pieces of electronic media were

8    found to be on Seleznev's person and/or in baggage on an airport luggage cart he

9    maintained. The items were obtained by the USSS and transferred to the Seattle Field

10   Office.

11        104.    The devices seized from SELEZNEV included a Sony Vaio Ultrabook laptop

12   computer; model SVD132A21V, s/n 545948270000188 that he was carrying on his person

13   in a blue LaCoste computer bag. Agents also seized an Apple iPad, model A1430, s/n

14   DMPJ6FCMDVGM, in a red cover that was in the same blue LaCoste computer bag that

15   Seleznev was carrying on his person. Agents also seized an Apple iPhone, model A1429,

16   IMEI 013413008481871 with SIM card, ICCID 897019912120121315, which was located

17   in SELEZNEV's pant pocket. Finally, agents seized a Samsung mobile phone, model GT-

18   S5830, s/n RDJB874288D, with a SIM card, ICCID 897019913092713262, which was

19   located in a red bag on the airport luggage cart maintained by Seleznev. At the time of his

20   apprehension, SELEZNEV claimed the red bag and the Samsung mobile phone belonged to

21   his girlfriend. Even if this is the case, it is not uncommon for couples to use each other's

22   cellular phones and evidence may reside on the Samsung mobile phone. The SUBJECT

23   DEVICES were all transported to Seattle and preserved in a fashion that prevents any

24   changes to the data contained on the SUBJECT DEVICES.

25        105.    At the time of SELEZNEV'S apprehension he was also carrying a passport

26   with the same Vladivostok address listed on his Liberty Reserve account number U8518741

27   as well as an online travel reservation for his trip to the Maldives that had been sent to the e-

28

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 32

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000188

1   mail address romariogro1@mail.ru, which was used to register his Liberty Reserve account

2   number U8518741.

3   **M.   SELEZNEV'S RELATION TO 2PAC.CC**

4   105.   The e-mail address jchow@bk.ru which was used to register the domain

5   2pac.cc, was also used to register Liberty Reserve account U4208156 with the name

6   "2PAC" on February 17, 2013.  According to data seized during the Liberty Reserve

7   investigation, on that same day, February 17, 2013, the 2PAC Liberty Reserve account

8   received a transfer of $9,930 from SELEZNEV's Liberty Reserve account number

9   U9614915. On April 2, 2013, the 2PAC Liberty Reserve account received $718 from

10   SELEZNEV'S Liberty Reserve account number U0045772.  I believe based on my training

11   and experience that it is likely SELEZNEV or a close associate created the "2PAC" Liberty

12   Reserve account and funded it with other accounts controlled by SELEZNEV.  I also

13   believe that SELEZNEV or a close associate created the 2pac.cc domain after bulba.cc was

14   closed to continue carding forum activity.  Between the date of SELEZNEV's apprehension

15   on July 5, 2014, and July 21, 2014, the user with the nic "2PAC" did not make any posts on

16   the carding forum "verified.cm."  Prior to SELEZNEV's arrest, "2PAC" frequently posted

17   comments and/or content on the site.  Therefore, I believe it is likely that SELEZNEV was

18   the person using the nic "2PAC" and that someone may have assumed the nic on his behalf

19   now that he is in custody.  I also believe it is likely that the electronic media obtained from

20   SELEZNEV contains evidence pertaining to carding forums including 2PAC.cc and the nic

21   2PAC. SELEZNEV would need digital devices to navigate to and manage such domains and

22   to access forums related to carding.

23   **USE OF DIGITAL DEVICES AND ACCESS DEVICE FRAUD**

24   106.   As a result of my training and experience, I know that digital devices are often

25   utilized by individuals who engage in access device fraud.  Suspects engaged in access

26   device fraud will use computers, including laptop computers and other portable computers,

27   and transport those computers while conducting fraudulent activity.  In particular, a suspect

28

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 33

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  needs digital devices to access the Internet in order to navigate and manage carding forums.
2  Digital devices are further needed to store stolen credit card numbers; upload stolen cards to
3  a carding forum; download cards from a carding forum; and to communicate with customers
4  and associates on a carding forum through chat services, e-mail, and other means. As a
5  result, one form in which these items may be found is as electronic evidence stored on a
6  digital device.

7      107.  In addition, suspects often store large amounts of data on their computers.
8  This is so because access device fraud suspects cannot usually use all of the data they have
9  stolen at one time. In this particular case, the volume of data being stolen is rather large.
10  Therefore, I believe it is likely that much of that data is being stored on computers or other
11  electronic storage devices. Indeed, in other access device fraud investigations conducted by
12  my office, agents have recovered this very type of data from electronic media seized from
13  suspects who were operating a fraudulent scheme. Therefore, computers, and the use of
14  computers, are inextricably intertwined with access device fraud activity.

15      108.  In addition, I know based on my training and experience that those engaged in
16  debit/credit card fraud and similar financial crimes will use computers to, for example: a)
17  store stolen personal information, such as names, personal identification numbers, debit and
18  credit card account data, bank account information, and other such personal information,
19  commonly known as "profiles" for use in financially motivated crimes; b) re encode and
20  create counterfeit access devices using stolen personal information; c) correspond with
21  others who are engaged in similar activity via e mail, chat, bulletin boards, newsgroups,
22  instant messages, file transfers and other means; and, d) access e-mail accounts and other
23  online accounts, such as online banking, used in furtherance of criminal activity.

24      109.  Also as a result of my training and experience, I know that individuals
25  involved in debit/credit card fraud schemes often retain data related to the debit/credit cards
26  that they have stolen, and fraudulent account information such as passwords and account
27  numbers. This information is extremely valuable to these people because of the difficulty
28  involved in obtaining the data.

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 34

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000190

110.   Those involved in identity theft and financially motivated crimes also have been known to use online resources as a means of facilitating fraudulent activity, including services offered by Internet Portals such as Yahoo!, Google, and Microsoft, among others. Certain online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. These online storage accounts are often free but can involve a charge. Payment is almost always made via credit card, debit card, or other similar payment service.

111.   A subscriber assigned a free online storage account frequently can set up such accounts by providing limited identifying information. Any information provided is frequently fictitious in an attempt to preserve the anonymity of the user. Consequently, even if it is known that a person engaged in access device fraud is a subscriber of a free online storage service, the service provider frequently will have no records in that subscriber's name. Instead, the online service will only be able to identify files that are associated with a "login," or unique, user created identity the subscriber uses to "log on" to the online service. Digital devices used to access the online services, however, will often contain substantial evidence tying those devices to the use of particular online service accounts. Therefore, devices seized from a particular suspect may contain evidence tying that suspect to particular online service accounts.

112.   Evidence of an online storage account may take the form of passwords located in encrypted, archived or other files on the user's computer. Other evidence can also be found through unique software that may exist on a user's computer that has been developed by the online storage service. This unique software will frequently contain evidence not only of the existence of such accounts, but the login and password.

113.   As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmark" files. Digital

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 35

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000191

1  information can also be retained unintentionally, e.g., traces of the path (including, but not

2  limited to the IP address) of an electronic communication may be automatically stored in

3  many places (e.g., temporary files or ISP client software, among others).  In addition to

4  electronic communications, a computer user's Internet activities generally leave traces or

5  "footprints" in the web cache and history files of the browser used.  In other words, if a

6  computer user were to go to the website called WWW.USDOJ.GOV, a "footprint" in the

7  browser cache may be found pointing to that website, indicating that particular computer

8  was used to visit that website.  Therefore, a search of the SUBJECT DEVICES may lead to

9  evidence that will assist me in identifying online storage accounts for which I may be able to

10 obtain additional search warrants to locate further evidence in this case.

11        114.    Based on my training, experience, and research, I know that the SUBJECT

12 DEVICES have capabilities that allow them to serve as communication devices, Internet

13 browsers, computing devices, and electronic storage containers.  In my training and

14 experience, examining data stored on devices of this type can uncover, among other things,

15 evidence that reveals or suggests who possessed or used the devices.

16        **COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

17        115.    Based on my knowledge, training, and experience, I know that digital devices

18 and electronic storage media can store information for long periods of time.  Similarly,

19 things that have been viewed via the Internet are typically stored for some period of time on

20 the device used to access the Internet.  This information can sometimes be recovered with

21 forensic tools.

22        116.    There is probable cause to believe that things that were once stored on the

23 SUBJECT DEVICES may still be stored there, for at least the following reasons:

24        a.    Based on my knowledge, training, and experience, I know that

25 computer files or remnants of such files can be recovered months or even years after they
   have been downloaded onto a storage medium, deleted, or viewed via the Internet.

26 Electronic files downloaded to a storage medium can be stored for years at little or no cost.

27 Even when files have been deleted, they can be recovered months or years later using
   forensic tools.  This is so because when a person "deletes" a file on a computer, the data

28

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 36

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000192

1   contained in the file does not actually disappear; rather, that data remains on the storage
2   medium until it is overwritten by new data.

3         b.    Therefore, deleted files, or remnants of deleted files, may reside in free
4   space or slack space—that is, in space on the storage medium that is not currently being
    used by an active file—for long periods of time before they are overwritten. In addition, a
5   computer's operating system may also keep a record of deleted data in a "swap" or
6   "recovery" file.

7         c.    Wholly apart from user-generated files, computer storage media—in
    particular, computers' internal hard drives—contain electronic evidence of how a computer
8   has been used, what it has been used for, and who has used it. To give a few examples, this
9   forensic evidence can take the form of operating system configurations, artifacts from
    operating system or application operation, file system data structures, and virtual memory
10  "swap" or paging files. Computer users typically do not erase or delete this evidence,
11  because special software is typically required for that task. However, it is technically
12  possible to delete this information.

13        d.    Similarly, files that have been viewed via the Internet are sometimes
14  automatically downloaded into a temporary Internet directory or "cache."

15        117.   *Forensic evidence.* As further described in Attachment B, this application
16  seeks permission to locate not only electronically stored information that might serve as
17  direct evidence of the crimes described on the warrant, but also forensic evidence that
18  establishes how the SUBJECT DEVICES was used, the purpose of its use, who used it, and
19  when. There is probable cause to believe that this forensic electronic evidence might be on
20  the SUBJECT DEVICES because:

21        a.    Data on the storage medium can provide evidence of a file that was
    once on the storage medium but has since been deleted or edited, or of a deleted portion of a
22  file (such as a paragraph that has been deleted from a word processing file). Virtual memory
23  paging systems can leave traces of information on the storage medium that show what tasks
    and processes were recently active. Web browsers, e-mail programs, and chat programs
24  store configuration information on the storage medium that can reveal information such as
25  online nicknames and passwords. Operating systems can record additional information,
    such as the attachment of peripherals, the attachment of USB flash storage devices or other
26  external storage media, and the times the computer was in use. Computer file systems can
27  record information about the dates files were created and the sequence in which they were
    created.
28

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 37

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000193

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

118. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**PAST EFFORTS TO OBTAIN ELECTRONICALLY STORED INFORMATION**

119. I have not made any past efforts to search the SUBJECT DEVICES.

**SEARCH TECHNIQUES**

120. Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for will permit imaging or otherwise copying all data contained on the SUBJECT DEVICES, and will specifically authorize a review of the media or information consistent with the warrant.

121. In accordance with the information in this affidavit, law enforcement personnel will execute the search of the SUBJECT DEVICE/S pursuant to this warrant as follows:

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 38

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**a. Securing the Data**

      i. In order to examine the ESI in a forensically sound manner, law enforcement personnel with appropriate expertise will attempt to produce a complete forensic image, if possible and appropriate, of the SUBJECT DEVICES.[5]

      ii. Law enforcement will only create an image of data physically present on or within the SUBJECT DEVICES. Creating an image of the SUBJECT DEVICES will not result in access to any data physically located elsewhere. However, SUBJECT DEVICES that have previously connected to devices at other locations may contain data from those other locations.

**b. Searching the Forensic Images**

      i. Searching the forensic images for the items described in Attachment B may require a range of data analysis techniques. In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant, and law enforcement may need to conduct more extensive searches to locate evidence that falls within the scope of the warrant. The search techniques that will be used will be only those methodologies, techniques and protocols as may reasonably be expected to find, identify, segregate and/or duplicate the items authorized to be seized pursuant to Attachment B to this affidavit.

      ii. These methodologies, techniques, and protocols may include the use of a "hash value" library to exclude normal operating system files that do not need to be further searched. However, because the evidence I am seeking does not have particular known hash values, agents will not be able to use any type of hash value library to locate the items in Attachment B.

///

///

----

[5] The purpose of using specially trained computer forensic examiners to conduct the imaging of digital devices or other electronic storage media is to ensure the integrity of the evidence and to follow proper, forensically sound, scientific procedures. When the investigative agent is a trained computer forensic examiner, it is not always necessary to separate these duties. Computer forensic examiners often work closely with investigative personnel to assist investigators in their search for digital evidence. Computer forensic examiners are needed because they generally have technological expertise that investigative agents do not possess. Computer forensic examiners, however, often lack the factual and investigative expertise that an investigative agent may possess on any given case. Therefore, it is often important that computer forensic examiners and investigative personnel work closely together.

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 39

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000195

## REQUEST FOR SEALING

122.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the much of the information in this affidavit is relevant ongoing investigations.  For example, the Liberty Reserve transactional database contains evidence that is related to numerous ongoing investigations and prosecutions. In addition, the information related to the investigation of 2pac.cc is related to an ongoing investigation. Although SELEZNEV is currently in custody and will be receiving discovery related to this prosecution, many of his cohorts in the carding underground are still at large and may be the subjects of other investigations.  Disclosure of the information in this affidavit could have a serious negative impact on those investigations or the ability to conduct new investigations.  Based upon my training and experience, I have learned that cyber criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other cyber criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Therefore, disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

//

//

//

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 40

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SW_0000196

1

## CONCLUSION

2          123.    I submit that this affidavit supports probable cause for a search warrant

3     authorizing the examination of the SUBJECT DEVICES described in Attachment A to seek

4     the items described in Attachment B.

5

6

7                                           RICHARD K. LATULIP
                                            Special Agent
8                                           United States Secret Service

9

10    Subscribed and sworn to before me this ___28th___ day of July 2014.

11

12

13                                          JAMES P. DONOHUE
                                            United States Magistrate Judge
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF SA RICHARD LaTULIP
USAO#2010R01388 - 41

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## ATTACHMENT A

The items to be searched are:

a.      an Apple iPhone, model A1429,  IMEI 013413008481871; with nano SIM card, ICCID 897019912120121315;

b.      a Sony Vaio Ultrabook laptop computer, model SVD132A21V, s/n 545948270000188 / service tag J50052KB;

c.      an Apple iPad, model A1430, s/n DMPJ6FCMDVGM;

d.      a Samsung mobile phone, model GT-S5830, s/n RDJB874288D;  with a SIM card, ICCID 897019913092713262.

The SUBJECT DEVICES are currently in storage at the USSS Seattle Field Office at 2101 4th Avenue, Seattle, Washington 98121.  This warrant authorizes the forensic examination of the SUBJECT DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

## Items and Information to be Seized

1.      All records or information on the SUBJECT DEVICES described in Attachment A that relate to violations of Title 18, United States Code, Sections 371, Conspiracy; 1344, Bank Fraud; 1030 (a)(2)(C), (a)(4), (a)(5)(A), Fraud and Related Activities in Connection with Computers; 1029(a)(2), and (a)(3), Access Device Fraud; and 1028A(a)(1), Aggravated Identity Theft since January of 2007, specifically:

a.      Any lists of credit and or debit card numbers and associated data such as expiration dates and/or Card Verification Value ("CVV") numbers;

b.      Any records or information related to the operation of, or participation in, carding forums;

c.      Any records or information related to the malware DTCA.exe, Kameo.exe, RemComSvc.exe, Pack4.exe, and Shmak2.exe;

d.      Any malware designed to facilitate access device fraud, computer intrusions, and/or the theft or personally identifiable information;

e.      Any records or information related to the following IP addresses: 188.120.225.66; 188.95.159.20; 66.235.184.36; 66.36.240.69; 66.36.228.124;

f.      Any records or information related to the e-mail addresses rubensamvelich@yahoo.com; boookscafe@yahoo.com; bulbacc@yahoo.com; bandysli64@yahoo.com; jchow@bk.ru; regmails22@mail.ru; romariogro1@mail.ru; salitov.maxim@yandex.ru

g.      Any records or information related to the use of the online nicknames: Track2; nCuX, Bulba, smaus, shmak, Zagreb, and/or 2pac;

h.      Any records or information related to the use of the alias names:  Roman Ivanov and/or Ruben Samvelich;

i.      Any records or information related to the websites: track2.name; bulba.cc; shmak.fvds.ru; 2pac.cc; verified.ru; carder.su, carder.info, crdsu.su, carder.biz, and/or carder.pro;

j.      Any records or information related to the use of the telephone numbers 79024835285, 62 85739716781, and/or 495 6516588  ;

k.      Any records or information related to the use of the password "ochko123"

l.      Any records or information related to the Liberty Reserve accounts: U4208156; U9614915; U0045772; U8518741

m.      Any records or information related to the WebMoney account ID's 448435754034 and/or 818405696206;

n.      Any records or information that may identify bank accounts, virtual currency accounts such as Bitcoin, Dogecoin or other financial accounts controlled by Roman Seleznev;

o.      Any records or information related to money transfers;

p.      Any address books and/or contact lists;

q.      Any records or information related to the trafficking, possession or use of stolen access device numbers;

r.      Any records or information related to the use of terminology used in the access device fraud community (also known as the carding community) such as "bases," "dumps," "checkers" and/or "BINs"

s.      Any records or information relating to Roman Seleznev's travel between January 2007 and July 2014;

t.      Any records or information that may identify other subscriber details including linked e-mail accounts and remote storage accounts; contact lists; call detail logs (incoming, outgoing, missed, etc); SMS, MMS and any other category of text messages; chat logs; e-mails (sent, received, saved, deleted, etc); photos; videos; sound recordings; and user accounts;

u.      Any passwords, password files, test keys, encryption codes or other information necessary to access the SUBJECT DEVICES;

v.      Any records or information showing where a device had been, including but not limited to GPS logs, locations, maps, and wireless networks;

w.     Any records or information related to computer attacks on point-of-sale systems;

x.     Any records or information related to computer hacking, including DDoS, SQL injection attacks, social engineering, php injection attacks, brute force, port scanning and other forms of computer hacking and attacks;

y.     Any records or information related to computer activity that can be used in the furtherance of computer hacking, including records or information related to Proxy Servers, TOR (The Onion Router) networks and other means of IP address obfuscation and masking;

z.     Any records or information related to remote access or remote connections to computer systems or networks;

aa.    Any records or information related to the use of VPN; or remote desktop applications;

bb.    Any records or information related to software and/or "malware" tools, for hacking computers, obtaining credentials, capturing keystrokes, and/or accessing credit card information;

2.     Evidence of user attribution showing who used or owned the SUBJECT DEVICES at the time things described in this warrant were created, edited, or deleted, such as logs, registry entries, phonebooks, contacts lists, saved usernames and passwords, documents, pictures/photographs, and browsing history;

3.     Records of Internet Protocol addresses used;

4.     Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.