1              UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF WASHINGTON

3     _____

      UNITED STATES OF AMERICA,        )
4                                       )
              Plaintiff,                )   No. 2:11-cr-00070-RAJ
5                                       )
                                        )
6          vs.                          )   Seattle, WA
                                        )
7     ROMAN V. SELEZNEV,                )
                                        )   Jury Trial, Day 1
8             Defendant.                )   August 15, 2016
                                        )
9     _____

10              VERBATIM REPORT OF PROCEEDINGS
         BEFORE THE HONORABLE JUDGE RICHARD A. JONES
11                UNITED STATES DISTRICT COURT
      _____

12

13    APPEARANCES:

14    FOR THE PLAINTIFF:   NORMAN McINTOSH BARBOSA
                           U.S. Attorney's Office
15                         700 Stewart Street, Suite 5220
                           Seattle, WA 98101-1271
16                         norman.barbosa@usdoj.gov

17                         C. SETH WILKINSON
                           U.S. Attorney's Office
18                         700 Stewart Street, Suite 5220
                           Seattle, WA 98101-1271
19                         seth.wilkinson@usdoj.gov

20                         HAROLD W. CHUN
                           U.S. Department of Justice
21                         1301 New York Avenue NW, Suite 600
                           Washington, DC 20005
22                         harold.chun@usdoj.gov

23

24

25

```
 1   FOR THE DEFENDANT:    JOHN HENRY BROWNE
                           Law Office of John Henry Browne
 2                         108 South Washington Street, Suite 200
                           Seattle, WA 98104
 3                         johnhenry@jhblawyer.com

 4                         EMMA SCANLAN
                           Law Office of John Henry Browne
 5                         108 South Washington Street, Suite 200
                           Seattle, WA 98104
 6                         emma@jhblawyer.com

 7

 8
     Andrea Ramirez, CRR, RPR
 9   Official Court Reporter
     United States District Court
10   Western District of Washington
     700 Stewart Street, Suite 17205
11   Seattle, WA 98101
     andrea_ramirez@wawd.uscourts.gov
12
     Reported by stenotype, transcribed by computer
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                                                    Page No.

3    Government Opening Statement                       166

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA vs. Seleznev, 8/15/16

```
1              THE COURT:  The law requires all prospective jurors
2    be placed under oath.  So at this time, I ask each of you to
3    please raise your right hand to be placed under oath by the
4    in-court deputy.
5         (In-court deputy administers oath to prospective jurors)
6              THE COURT:  Please be seated.
7              THE CLERK:  We are commencing a jury trial in the
8    matter of the United States vs. Roman Seleznev, Cause
9    Number CR11-70, assigned to this court.
10             THE COURT:  Good morning, ladies and gentlemen of the
11   jury.  My name is Judge Richard Jones.  I'm one of the many
12   United States District Court judges, and I'd like to welcome
13   you to your service as jurors in this matter.
14        Now, before we begin, I'd like to share a common
15   experience that we all share as citizens of our community, and
16   that's the responsibility to serve as jurors.
17        Now, many of you probably think that as a trial judge,
18   that I would not have to serve as a juror.  Please know that
19   I've responded to jury summons at least five different times
20   over the course of my career, with three of those times as a
21   judge.  Each time I've shown up, and each time I've responded.
22        So I'm very sympathetic to some of the concerns that
23   jurors have about wasted time, not understanding what's going
24   on, and just being a little bit confused about what's happening
25   in the court.
```

USA vs. Seleznev, 8/15/16

1    You have my solemn promise that I will do everything that

2    I can to make sure that your time is used efficiently, and to

3    make sure that you understand what's taking place during the

4    course of the process.  And at the very end of the trial, I

5    will personally come back to the jury room and answer any

6    questions that the 12 of you, that are ultimately selected to

7    serve on this trial, will have.  And I'll come back to the jury

8    room and answer those questions for you.

9    So between now and then, we have some work to do.  And the

10   first part of that work is to select a jury.  So again, thank

11   you for your service, and thank you all for being here.

12   Now, one of the important things is that you're able to

13   hear what is going on, and that you can understand what's going

14   on.  If at any point in time you can't hear me, or you can't

15   hear one of the lawyers, of any questions asked or any

16   statement that's made in court, even during trial, I want you

17   to raise your hand, and just let me know, and get our

18   attention.

19   Particularly during jury selection, if you can't hear

20   what's being said, because sometimes jurors in the front will

21   speak softly, or sometimes jurors in the back will speak

22   softly, we have a universal sign that we use.  That's to just

23   start waving your hand like crazy.  And you'll get my

24   attention, and I'll make sure that people speak up.  So I'll

25   let you know in advance, I don't want to embarrass you, but if

USA vs. Seleznev, 8/15/16

1   I need to have you speak up, at the appropriate time, I will do

2   that.

3       Now, one of the first things I want to make sure is that

4   everyone's had a chance to see the video and read the juror

5   handbook.

6       Is there anybody here who has not seen the video or read

7   the juror handbook?  It appears that everyone has.

8       Now, having reviewed those materials, I'm pretty sure that

9   you're now aware that the first task is for the Court to select

10  a jury.  An impartial jury of 12 people will be selected to

11  serve in this case.  Now, we'll ultimately expand that number

12  to 15, because we need some alternates, but I'll explain that

13  to you in a few minutes.

14      So I suspect that you have a few questions that I want to

15  answer for you.  How was I selected?  Why did I get chosen?

16  You were randomly selected out of the community.  Now, I've

17  been called a number of times.  I used to think that somebody

18  had my number and just kept cycling it around and around to

19  make sure I got on a jury.  And if you had curiosity, no, I've

20  never served.  For some strange reason, I get in the room, and

21  I'm excused.  I can't control that, and I don't take it

22  personally.

23      But you were selected at random from the community.  Once

24  you came to the courthouse, in the order in which you came to

25  this courtroom, you were again randomly selected by computer.

USA vs. Seleznev, 8/15/16

```
1   So there's no special identification of you as a particular
2   person to serve on the jury, or anything else.
3       So what's your role?  Your role is separate from mine.
4   You're the fact-finder.  You'll make the ultimate determination
5   of guilt or innocence in this case.
6       My role, as a trial judge, is to essentially serve as the
7   trial referee.  I'll manage the case, I'll make rulings on any
8   legal issues that need to be made, I'll give you jury
9   instructions at the appropriate time, and I will manage the
10  essentials of what takes place during the course of the trial.
11  And the lawyers have the opportunity to act in the roles that
12  they serve today, and that will be explained to you as the case
13  progresses.
14      So what tools do you need?  The only tools that you need
15  to worry about will be notebooks.  And those notebooks will be
16  provided to you, with instruction, at the appropriate time.  So
17  you don't need to worry about notes right now.  You don't need
18  to take notes right now.  But I'll give you those notebooks at
19  the right time.
20      Now, what can I consider as a juror?  All the evidence you
21  are to consider will be presented to you during the course of
22  the trial.  Everything that you need to listen to, or hear, or
23  take into consideration in making determinations will come from
24  evidence submitted or from witnesses who testify.  And that
25  means that you're prohibited from doing any other type of
```

USA vs. Seleznev, 8/15/16

1   research to find out about the case.

2        As a matter of fact, some of you may think, "Well, what

3   happens if a question comes up about a term?  Can I look that

4   term up in the dictionary?"  I'll let you know that I've

5   excused jurors in the past because they thought it was their

6   responsibility to go out and look up terms, or do some research

7   in the law library, to help better educate other jurors.

8   That's completely prohibited.  No independent research.  That

9   means reading any news articles, using any resource to enhance

10  your understanding about the case, and also prohibits you from

11  using the internet.

12       Now, since I raised the topic of internet, it is improper

13  for you to comment on or update your status on any social

14  networking site regarding any specific aspect of your jury

15  service, and certainly about this case.  This includes

16  Facebook, Twitter, and any of the social networking sites.

17  Also, blogging on the topic of jury service, the justice

18  system, or any aspects of the case is completely inappropriate.

19       Now, does any juror believe that you are so deeply

20  connected to doing research on the internet that you've lost

21  all control, and essentially lost your mind to the internet,

22  and couldn't avoid connecting to the internet over the course

23  of the trial?  Anybody that connected?  I'm glad we're all

24  still of common decent minds.

25       Let's talk about the schedule now.  Now, jurors are often

USA vs. Seleznev, 8/15/16

```
1    curious about, "Well, what's the schedule going to look like
2    for the duration of the trial?"  We will be in session Monday
3    through Friday.  Next Friday, which is August 26, we will be in
4    session only in the morning.  That's from 9:00 until noon.  So
5    this week, every day this week, from 9:00 until 4:30, and next
6    week we will be in session Monday through Thursday, full days,
7    and only half a day on Friday.
8         Now, we do take breaks during the trial.  We'll take a
9    break at 10:30, for 15 minutes, and then we'll take another
10   break at noon.  That's a full hour and a half.  And then we'll
11   take a break at 2:45, for 15 minutes, and then we'll go until
12   4:30.
13        Now, I'm pretty strict on the time limits.  And I expect
14   you to be here, and I expect the lawyers to be here, and I
15   certainly will be here.  Because if one of you or one of us
16   isn't here, the case can't go forward.  And you may think,
17   "Well, if I'm just a couple minutes late, no big deal."  Well,
18   it is a big deal, because that's being disrespectful to the
19   time of everyone else.  And I want to be efficient, as I
20   mentioned before, of everyone's time.
21        Also, at 4:30, you can expect that we'll stop.  Unless
22   it's the completion of a witness's testimony who can't come
23   back the next day, we'll stop at 4:30.  So you can pretty much
24   count that you'll be able to leave and depart and have rides or
25   arrangements made at that time.
```

USA vs. Seleznev, 8/15/16

1   So with that, let me formally introduce the parties,

2 because there are several people in this courtroom that you

3 have no idea who they are.

4   This is the matter of the United States against Roman

5 Seleznev.  This is a criminal case.  The government is

6 represented by three Assistant United States Attorneys.  They

7 are Norman Barbosa, Seth Wilkinson, and Harold Chun.

8   Counsel, would each of you please identify yourselves for

9 the benefit of the jury?

10    MR. BARBOSA:  Good morning.  My name is Norman

11 Barbosa.  I'm an Assistant United States Attorney, one of the

12 prosecutors assigned to this case.

13    MR. CHUN:  Good morning.  My name is Harold Chun.

14 I'm also a prosecutor on this case.

15    MR. WILKINSON:  Good morning, everyone.  My name is

16 Seth Wilkinson, and I'm also an Assistant U.S. Attorney.

17    THE COURT:  Thank you.  Please be seated.

18   The defendant, Roman Seleznev, is represented by his

19 lawyers, John Henry Browne and Emma Scanlan.

20   Counsel, will the two of you please introduce yourselves,

21 as well as the individuals at counsel table?

22    MR. BROWNE:  Good morning, everyone.  Obviously, I'm

23 John Henry Browne, because I'm a man, and she's a woman.  And

24 this is Emma Scanlan.  We are both attorneys, and we

25 represent -- would you stand up, Roman -- Roman Seleznev.  And

USA vs. Seleznev, 8/15/16

1  the two people sitting to his right are court-certified

2  interpreters.

3         THE COURT:  Thank you.

4      And again, with emphasis for the interpreters, if I'm

5  going too fast at any point in time, or if any lawyer or any

6  person is speaking too fast, I want both of you to know, just,

7  again, wave your hand and let me know so I can make sure that

8  we slow down, so that Mr. Seleznev understands what is taking

9  place.

10     Also, if there's a transition between the interpreters,

11 please ask the Court to halt, Counsel, and I will stop

12 whoever's speaking, including myself, so that the transition

13 can take place.

14     Is that understood by all parties?

15         INTERPRETER:  Yes, Your Honor.

16         THE COURT:  Also, you probably are curious about who

17 are the people in front of me.  To my left is one of my law

18 clerks, Emily.  She's incredibly bright.  She assists me

19 throughout the trial.  In front of me is Victoria.  She's the

20 in-court deputy.  You will be spending a lot of time with her,

21 escorting you, as well as managing the trial exhibits.  And to

22 my right is our court reporter, who's very fast and very

23 efficient, but she does one thing:  She records the spoken

24 word, which means if you answer a question "uh-huh" or

25 "huh-uh," she can't record that.  So when we're asking

USA vs. Seleznev, 8/15/16

1   questions, please give us audible answers that can actually be

2   recorded.  Otherwise, we'll have to call somebody out and have

3   you explain, that's a "yes" or a "no."

4       Now, let's get back to the charges in this case.  The

5   government has obtained an indictment from the grand jury

6   charging the defendant, Roman Seleznev, with the following:

7   Eleven counts of wire fraud, nine counts of intentional damage

8   to a protected computer, nine counts of obtaining information

9   from a protected computer, nine counts of possession of 15 or

10  more unauthorized access devices, and two counts of aggravated

11  identity theft.

12      Now, please remember, the indictment is simply a

13  description of the charges made by the government against the

14  defendant.  The indictment is not evidence of anything.

15      The defendant has entered pleas of not guilty to the

16  charges, and he's presumed innocent unless and until he is

17  proven guilty beyond a reasonable doubt.

18      The burden of proof is completely upon the government.

19  And the defendant always has a right to remain silent, and the

20  defendant never has to prove innocence or present any evidence.

21      Now, in a few minutes, I'm going to start asking you a

22  series of what we call general questions.  Those are questions

23  from the bench, questions that I'll ask each of you.  Now,

24  these questions are not designed to embarrass you, or to pry

25  into your private affairs, or to just be plain-old nosey.  But

USA vs. Seleznev, 8/15/16

1    it's necessary for us to ask these types of questions so that

2    we can explore what information you have, and give the lawyers

3    the opportunity to make the best selection of those jurors who

4    are best suited to serve in a trial.

5         Now, each of you probably think, "I'm the perfect person

6    to sit on any trial.  I'm completely unbiased.  I make the best

7    decisions on the planet.  And I never make mistakes in life."

8    Well, we know that that's not a reality.  We all come into life

9    with certain biases and preconceived ideas as we walk into this

10   courtroom this morning.  And our whole goal is to try and find

11   out who's best suited, not necessarily a perfect juror, but

12   those jurors who are best suited to serve in this case.  There

13   may be reasons, because of our unique backgrounds, our

14   experiences, or the things that have happened to us in life,

15   that make us not best suited to serve in this case.  And that's

16   why this case has the opportunity for questions to be asked of

17   you.

18        Now, I'll ask the beginning questions.  And after that,

19   I'll let the lawyers ask questions for about 30 minutes or so.

20   Please make sure that you keep your voices up, when you're

21   answering the questions, so that everyone can hear what's being

22   said.

23        Now, you may have thought that jury selection works where

24   the lawyers start with Juror Number 1, and they ask you a host

25   of questions, and they go to Juror Number 2.  Well, that

USA vs. Seleznev, 8/15/16

```
 1   probably works still well on TV, any litany of TV shows that
 2   they have.  We don't use that style frequently anymore.  I
 3   won't say that they don't use it at all.  Every once in a
 4   while, we do.  But for the most part, we use a more comfortable
 5   style.  When the lawyers start asking questions, they may ask
 6   Juror Number 4, "Have you ever had to assess credibility of a
 7   witness?  And if you did -- or of a person -- how do you weigh
 8   credibility?"  And Juror Number 4 would answer those questions.
 9   And if they say, "Does everybody agree or disagree with Juror
10   Number 4," that's a proper way, and proper factors to consider
11   in deciding credibility, and then ask other people to
12   volunteer.
13       So if you think you can sit and hide behind the juror in
14   front of you, and remain motionless, and no one is going to ask
15   you questions, forget it.  That's not going to happen.  You
16   have five very good lawyers in this courtroom, and their goal
17   is to get information from every one of you so that they can
18   find out, again, who's best suited to serve on this case.
19       Now, during the course of jury selection, the lawyers will
20   have a chance to ask -- or challenge jurors for cause.  That
21   means they have to give me an explanation or a reason why a
22   particular juror should be excused.  I'll make that decision,
23   and the lawyers will make those types of requests outside of
24   your presence.
25       Now, the lawyers also have the right to challenge jurors
```

1    by way of what's called peremptory challenges, where they don't

2    have to give me a reason, but they'll receive sheets of paper,

3    and they'll go through and mark those jurors who they think are

4    not best suited to serve on this case.  When that process is

5    completed, then I'll select 15 jurors.  Twelve will hear the

6    case.  Three will be alternates.  You'll find out at the end of

7    the case if you're an alternate, which ensures that everybody

8    is going to pay complete attention throughout the entirety of

9    the trial.  I know you're going to do that anyway, but we use

10   that process so that people don't know who's going to be on and

11   who's not going to be on.

12        Now, I ask that you answer the questions "yes" if you

13   think the answer is probably yes, you're not quite sure, just

14   out of an abundance of caution.  And then the lawyers will have

15   a chance to ask follow-up questions.

16        Now, again, if there's a question that I ask you, or the

17   lawyers ask you, that you think is going to cause you some

18   embarrassment, please let the Court know.  And then what we can

19   do is, you won't have to answer the question in front of all of

20   the other jurors, but you will have to step to the sidebar, and

21   myself, the lawyers, and the court reporter will step to the

22   side, and we'll take care of the question and issue that's been

23   raised and answer the question that way.  That way, it avoids

24   having to excuse all the other jurors in the courtroom.

25        So with that, all of you have juror cards, so we're going

USA vs. Seleznev, 8/15/16

1    to do a test run.  If you have a juror card, please hold it up

2    right now.  That's pretty simple.  Please put your cards

3    facedown.

4         Now, when I ask a question, we're going to record the

5    numbers.  Once the court reporter records your number, put your

6    card facedown.

7         Now, Victoria is pretty quick on the draw, which means

8    that if you're playing with your hair, or mustache, or face, or

9    anything like that, she's going to call your number.  And about

10   a half an hour after I finish asking questions, somebody is

11   going to ask you a question, and you're going to say, "I didn't

12   answer that question."  We may call your number because of

13   that.  So once she calls your number, put your number facedown.

14   So with that, let's begin the process.

15        This trial is expected to last up to 15 days, including

16   the week of August 29 -- concluding the week of August 29.  We

17   will have only half a day of trial on Friday, August 26.  The

18   projected trial length is based upon what the attorneys have

19   told me.  Remember, there's no time limit on the amount of time

20   that jurors are in deliberation.

21        Also, so that you know, you may have seen on TV, again, or

22   read in books, where jurors are deliberating until 1:00 or

23   2:00 in the morning.  We don't do that.  We start

24   deliberations -- you start, just like a regular trial day,

25   9:00, with breaks and recess, lunch, and you stop at 4:30.  So

USA vs. Seleznev, 8/15/16

1   if that allays any concern that you're going to be deliberating

2   into the wee hours, that's not going to happen.

3       Now, I understand that you all have been prescreened,

4   which means there's been some communication with you about the

5   length of the trial.  But sometimes, between that prescreen and

6   your actual appearance at trial, things happen.

7       So with the projected amount of trial, is there any juror

8   who suspects that they could not serve as a juror because of a

9   genuine and true hardship?  If so, please raise your cards.

10          THE CLERK:  Juror Numbers 2, 11, 12, 27, 29, 32, 55,

11  and 56.  And once I call your number, you can put your number

12  down.

13          MR. BROWNE:  What was the last number?  I'm sorry.

14          THE CLERK:  Fifty-six.

15          THE COURT:  Okay.  So not quite that easy.

16      We'll start with Juror Number 2.  Juror Number 2, if you

17  could give me a little bit of an explanation or summary of the

18  nature of your hardship.

19          JUROR:  Should I stand?

20          THE COURT:  No.  Just do keep your voice up.

21          JUROR:  I believed, when I initially filled out the

22  questionnaire, that my employer would cover my salary during

23  jury duty.  I found out that's incorrect.  It will cost me

24  roughly $1,000 a week in lost wages, after loss of salary, and

25  then added what the jury duty will pay.  And it's going to

USA vs. Seleznev, 8/15/16

1    create a bit of a hardship for my family to lose $3,000 this

2    month.

3              THE COURT:  Thank you, sir.

4        Any follow-up questions by the government?

5              MR. CHUN:  No, Your Honor.

6              THE COURT:  Any follow-up questions by the defense?

7              MR. BROWNE:  No, Your Honor.

8              THE COURT:  Thank you.

9        Next is Juror Number 11.

10             JUROR:  I've been undergoing oral surgery, and I've

11   been taking medication that I fear will kind of impede my

12   judgment.

13             THE COURT:  And when did you have the surgery?

14             JUROR:  A couple days ago.  And then I have another

15   one scheduled for later on this week, mid-week.

16             THE COURT:  Okay.  And when -- what time is your

17   surgery scheduled for this week?

18             JUROR:  Roughly 10:00 a.m.

19             THE COURT:  And this is something that's really

20   critically necessary at this time?

21             JUROR:  It pertains to my health, yes.  And I also

22   have plans to travel out of state mid-September.

23             THE COURT:  And are you currently taking medication?

24             JUROR:  Yes, sir.

25             THE COURT:  And is it affecting your ability to

USA vs. Seleznev, 8/15/16

```
 1   understand what's taking place now?
 2          JUROR:  I understand what's going on, yeah.  Just a
 3   little loopy, that's all.
 4          THE COURT:  A little drowsy at all?
 5          JUROR:  Not drowsy.
 6          THE COURT:  All right.  Thank you, sir.
 7       Follow-up questions by the defense?
 8          MR. BROWNE:  No, Your Honor.  Thank you.
 9          THE COURT:  Follow-up questions by the government?
10          MR. CHUN:  No, Your Honor.
11          THE COURT:  Next is Juror Number 12.
12          JUROR:  Your Honor, my collective bargaining
13   agreement through my union ensures that I get paid for two
14   weeks of jury duty.  If it went any further than that, as the
15   breadwinner in my family, I have three children, a girlfriend,
16   I wouldn't have a full paycheck coming in.
17          THE COURT:  Thank you, sir.
18       Follow-up questions by the government?
19          MR. CHUN:  No, Your Honor.
20          THE COURT:  By the defense?
21          MR. BROWNE:  No, Your Honor.
22          THE COURT:  Thank you.
23       Next is Juror Number 27.  Number 27, good morning.
24          JUROR:  Good morning.  If the trial lasts a full four
25   weeks and then we were to start deliberations, I would have a
```

USA vs. Seleznev, 8/15/16

```
 1   problem with that, because I have travel reservations to leave
 2   the state on September 11.  So if it went the whole four weeks
 3   that was said in the jury summons, I would then be unavailable
 4   for the deliberations.
 5              THE COURT:  We've modified that time period.
 6   Originally, it was four weeks.  Now the lawyers are telling me
 7   it's 15 days.  So we're talking about concluding the trial
 8   somewhere around the week of August 29.
 9         So is that okay for you?
10              JUROR:  I think so, yeah.
11              THE COURT:  Okay.  Thank you, again.
12         Follow-up questions by the defense, first?
13              MR. BROWNE:  No, Your Honor.  Thank you.
14              THE COURT:  By the government?
15              MR. CHUN:  No, Your Honor.
16              THE COURT:  Thank you, Juror Number 27.
17         Next, Juror Number 29.
18              JUROR:  Yes, Your Honor.  I'm an adult family home
19   operator.  I am taking care of an elderly and vulnerable adult.
20   And they need me every day in my adult family home.
21              THE COURT:  And how many adults do you have at your
22   home now?
23              JUROR:  I have four adult family homes, and I have 20
24   vulnerable and elderly people.
25              THE COURT:  And do you have any assistants that help
```

USA vs. Seleznev, 8/15/16

1   you?

2           JUROR:  I have assistants, but sometimes they call in

3   sick, and they have problem in their family.  And any time I

4   don't want to just let my elderly people just not taken care

5   of.

6           THE COURT:  And are those individuals currently being

7   cared for, at this time, by your assistants?

8           JUROR:  Yes, Your Honor.

9           THE COURT:  Have your assistants identified any

10  particular problems, health-wise or lifestyle-wise, that would

11  prohibit them from helping you for the next two weeks?

12          JUROR:  No.  No, Your Honor.

13          THE COURT:  So right now, everything's okay.

14          JUROR:  Yes, Your Honor.

15          THE COURT:  Okay.  So unless there was an emergency,

16  you could continue to stay on the jury.

17          JUROR:  Yes, Your Honor.

18          THE COURT:  Okay.  Thank you.

19      Follow-up questions by the government, first?

20          MR. CHUN:  No, Your Honor.

21          MR. BROWNE:  No, Your Honor.

22          THE COURT:  Thank you.

23      Next is Juror Number 32.

24          JUROR:  I'm scheduled to start a new job next Monday.

25  And I'm worried if trial goes more than a week or two past

USA vs. Seleznev, 8/15/16

```
1    that, that I wouldn't be starting a new job.

2            THE COURT:  Have you had any communication with your

3    new prospective employer?

4            JUROR:  Not yet.  I was going to do that after I

5    found out if I was serving this afternoon.

6            THE COURT:  Okay.  All right, then.  We'll hold on

7    that for right now.

8        Follow-up questions by the defense, first?

9            MR. BROWNE:  No, Your Honor.  Thank you.

10           THE COURT:  By the government?

11           MR. CHUN:  No, Your Honor.

12           THE COURT:  All right.  Next is Juror Number 56.

13           JUROR:  I recently just got newly employed.

14           THE COURT:  If you could stand, I can't hear you.

15           JUROR:  I recently got newly employed.  I'm a dietary

16   aid at a senior community.  And we're short-staffed.  And

17   being, like, being newly employed, I don't want to risk, you

18   know, not showing up to work, or not being able to go.

19           THE COURT:  Have you had any contact with your

20   employer?

21           JUROR:  Yes.

22           THE COURT:  About service as a juror?

23           JUROR:  Yes.  I didn't check my e-mails, to be

24   honest, until Saturday, when I was informed I had to be here,

25   so I couldn't really do much.  I don't really know.  I just
```

USA vs. Seleznev, 8/15/16

```
1    don't want to risk my job.
2              THE COURT:  Okay.  But you're okay for today?
3              JUROR:  Yeah.  For today, I'm fine.
4              THE COURT:  All right, then.  We'll revisit that
5    topic at the appropriate time.  Thank you.
6         Follow-up questions by the government on Juror Number 56?
7              MR. CHUN:  No, Your Honor.
8              THE COURT:  By the defense?
9              MR. BROWNE:  No, thank you.
10             THE COURT:  Thank you.
11        That covers all the jurors who have expressed some concern
12   regarding hardship.
13        Juror Number 55?
14             JUROR:  Yeah.  I'm in the process of moving right
15   now, and I need to be out by the 30th of August.  So if this
16   goes on, I can't really move and be here at the same time.
17             THE COURT:  And have you started the moving process?
18             JUROR:  Yes, sir.
19             THE COURT:  And how far are you into the moving
20   process?
21             JUROR:  We've got some boxes moved, and then some
22   furniture.  But we're about halfway done.
23             THE COURT:  And how many people are involved in the
24   moving process?
25             JUROR:  Just my wife and I.
```

USA vs. Seleznev, 8/15/16

```
 1              THE COURT:  And is this -- are these -- some of that
 2     activities things that you could do in the evening hours?
 3              JUROR:  It depends.  Like, I live in Bellingham.  So
 4     if I'm here, and then I drive all the way home, it would be
 5     really late at night, and it could disturb my neighbors.  If
 6     this was, like, a month later, or earlier, I'd have no issue
 7     doing this.  Just this month is kind of hard for me.
 8              THE COURT:  Since you're leaving, you're really
 9     concerned about your neighbors and making noise?
10              JUROR:  My new neighbors, I'm worried about them.
11              THE COURT:  New neighbors, okay.  That's a different
12     ballgame.
13         All right.  Follow-up questions by the defense, first?
14              MR. BROWNE:  No, Your Honor.
15              THE COURT:  Follow-up questions by the government?
16              MR. CHUN:  No, Your Honor.
17              THE COURT:  Now, I think that covers all the hardship
18     issues.  With that, we'll proceed to the next question.
19         Is there any health issue, and I'm talking about physical
20     problems or persistent physical aggravation or other problem,
21     that would make it difficult for you to sit as a juror?  Such
22     things as back pain, migraines, et cetera.  And I'll also let
23     you know, if it's a back issue, and you need to stand and
24     stretch, we can make accommodations for that.  I frequently
25     take stretch breaks during the course of the trial.  If it's
```

USA vs. Seleznev, 8/15/16

1   something that you do need to stand up, and it's beyond the

2   stretch breaks that I would allow, I could have you sit on one

3   of the end seats, and give you permission to stand and stretch

4   and move around, just in that location, to make an

5   accommodation of that nature.

6        Other than that, are there any other particular jurors

7   that would need special accommodation, or have any health issue

8   that needs to be brought to the Court's attention?  I see no

9   response.

10       Do any of you have any family emergencies needing your

11  immediate attention that would cause you to not be able to

12  concentrate on the proceedings in court?  I see no response.

13       Do any of you need special accommodation to allow you to

14  concentrate on the proceedings in court for an extended period

15  of time?  I see no response.

16       I know the one juror that indicated the concern regarding

17  the oral surgery, and I'll note that.

18       Next question:  The Court has previously introduced the

19  Assistant United States Attorneys, Norman Barbosa, Seth

20  Wilkinson, and Harold Chun.  Does anyone know the Assistant

21  United States Attorneys?  I see no response.

22       Does anyone know anyone that works in the United States

23  Attorney's Office in the city of Seattle or in Tacoma?  Juror

24  Number 20.

25       And does anyone know anyone that works in any United

USA vs. Seleznev, 8/15/16

1   States Attorney's Office anywhere in the country?  I see no

2   response.

3        The Court previously introduced the defendant and his

4   attorneys, John Henry Browne and Emma Scanlan.  First, does

5   anyone know Mr. Seleznev?  I see no response.

6        Does anyone know either of his attorneys, John Henry

7   Browne or Emma Scanlan?  I see no response.

8        Now, as you're aware, I'm the trial judge in this matter.

9   Does anyone personally know me?  I see no response.

10       Now, in this case, the defendant is accused of the

11  following:  11 counts of wire fraud, nine counts of intentional

12  damage to a protected computer, nine counts of obtaining

13  information from a protected computer, nine counts of

14  possession of 15 or more unauthorized access devices, and two

15  counts of aggravated identity theft.  Is there anything about

16  the nature of the case or the charges that would cause any

17  prospective juror to start into the trial with any bias or

18  prejudice, either one way or another?

19            THE CLERK:  Juror Number 55.

20            THE COURT:  The fact that Roman Seleznev is charged

21  with the crime is not evidence that he is guilty of the crimes

22  charged.  Is anyone unwilling to accept and abide by this rule

23  of law?  I see no response.

24       You'll also be instructed that the defendant, Roman

25  Seleznev, is presumed innocent until proven guilty.

USA vs. Seleznev, 8/15/16

1   Mr. Seleznev has no obligation to testify, present evidence, or

2   prove his innocence.  The entire burden to prove Mr. Seleznev

3   is guilty beyond a reasonable doubt is upon the government.  Is

4   anyone unwilling to accept and abide by this rule of law?  I

5   see no response.

6        Is there anyone who has a quarrel with these principles of

7   law?  I see no response.

8        Does anyone believe that if a person is charged with a

9   crime, they're more likely than not to have committed that

10  crime?  I see no response.

11       Have any of you heard of this case or the defendant, Roman

12  Seleznev, before today?

13            THE CLERK:  Juror Numbers 1, 15, 27, and 55.

14            THE COURT:  Have any of you seen or heard any

15  television or radio news reports, or read anything in the

16  newspapers about this case?

17            THE CLERK:  Juror Numbers 1, 15, 27, 23, 47, and 55.

18  I'm sorry, and Number 50, as well.

19            THE COURT:  Does anyone know anything about this case

20  or the defendant, Roman Seleznev, from any source besides the

21  media?  I see no response.

22       Has anyone personally formed an opinion about Roman

23  Seleznev's innocence or guilt, as a result of anything they

24  have heard, read, or seen?  I see no response.

25       Has anyone discussed this case or talked about the

USA vs. Seleznev, 8/15/16

1    defendant with anyone, or expressed any opinions about

2    Mr. Seleznev's guilt or innocence?  I see no response.

3        I will now have counsel for the government list all the

4    witnesses that are expected or might be called to testify.

5    Please raise your card if you believe that you know any of

6    these witnesses.

7        And counsel for the government, please take your time.

8        And if you recognize a name, or if it sounds like a name

9    that you think that you recognize, that's close enough to act

10   out of an abundance of caution.  So just hold up your card

11   immediately after you hear the name.  You don't have to wait

12   until counsel reads all of the witnesses' names.

13       So Counsel, if you'd read slowly.

14           MR. WILKINSON:  The government may call the following

15   witnesses:  Joe Angelastri, of City News Stand; Steven Bussing,

16   of Red Pepper Pizza; Tim Chen, of DomainTools; Diane Cole, of

17   Casa Mia Pizzeria; Chris Doyle, formerly of MAD Pizza;

18   Detective David Dunn, formerly of the Seattle Police

19   Department; Special Agent Michael Fischlin, formerly of the

20   U.S. Secret Service; Sid Fanarof, of ZPizza; Jay Field, of

21   Village Pizza; Chris Forsythe, formerly of Boeing Employees

22   Credit Union; Ruth Gebhard; Mr. Matt Geiger; Detective Chris

23   Hansen, of the Seattle Police Department; Special Agent David

24   Iacovetti, of the U.S. Secret Service; Mr. Bob Kerr, of Grand

25   Central Baking; David Knoernschild, spelled

USA vs. Seleznev, 8/15/16

```
1    K-N-O-E-R-N-S-C-H-I-L-D; Special Agent Brad Leopard, of the
2    U.S. Secret Service; Andrei Medvedev, court-certified
3    interpreter; Special Agent David Mills, of the U.S. Secret
4    Service; Richard Noel, of the Federal Deposit Insurance
5    Corporation; CJ Saretto, formerly of Broadway Grill; Special
6    Agent John Szydlik, S-Z-Y-D-L-I-K, of the U.S. Secret Service;
7    Jason Winship, of the National Credit Union Association;
8    Special Agent Keith Wojcieszek, W-O-J-C-I-E-S-Z-E-K, of the
9    U.S. Secret Service; and Meagan Wood, of the U.S. Secret
10   Service.
11           THE COURT:  I saw no response for each of the
12   witnesses called.
13       I'll now have counsel for the defendant list all the
14   witnesses that are expected or might be called to testify.
15   Again, same rules as far as raising your cards.
16       Counsel?
17           MS. SCANLAN:  The defense may call Eric Blank, of
18   Blank Law and Technology.
19           THE COURT:  I see no response.
20       Do any of you know anyone who works in the legal system as
21   either a judge, lawyer, clerk, probation officer, paralegal, et
22   cetera?
23           THE CLERK:  Juror Numbers 8, 15, 17, 19, 20, 28, 36,
24   37, 38, 34, 41, 42, 30, 45, 52, and 53.
25           THE COURT:  Are any of you criminal defense -- are
```

USA vs. Seleznev, 8/15/16

 1    any of you a criminal defense lawyer or employed by a criminal

 2    defense lawyer or law firm?  I see no response.

 3        Are any of your relatives a criminal defense lawyer or

 4    employed by a criminal defense lawyer or law firm?

 5              THE CLERK:  Juror Numbers 20 and 41.

 6              THE COURT:  Are any of your close friends a criminal

 7    defense lawyer or employed by a criminal defense lawyer or law

 8    firm?  I see no response.

 9        Are any of you a prosecuting attorney or employed by a

10    prosecuting attorney's office?  I see no response.

11        Are any of your relatives a prosecuting attorney or

12    employed by a prosecuting attorney's office?  I see no

13    response.

14        Are any of your close friends a prosecuting attorney or

15    employed by a prosecuting attorney's office?  I see no

16    response.

17              THE CLERK:  Juror Number 15.

18              THE COURT:  I'm sorry.

19        Next question:  Have any of you served as a juror in a

20    criminal or civil case or as a member of a grand jury in either

21    federal or state court?

22              THE CLERK:  Juror Numbers 24, 27, 28, 31.

23    Twenty-four, I think I got you.  Juror Numbers 40, 41, 47, 54,

24    and Juror Number 1.

25              THE COURT:  Now, those jurors that just answered

USA vs. Seleznev, 8/15/16

1    affirmatively, did any of you serve as a foreperson in that

2    trial?  I see no response.

3        Have any of you ever been a witness before in any court

4    proceeding?  In other words, you came into court, were placed

5    under oath and actually testified.  I'm not talking about a

6    deposition.  I'm talking about actually coming into court and

7    testifying as a witness.

8            THE CLERK:  Juror Numbers 10, 41, and 56.

9            THE COURT:  Does anyone know any of the other jurors

10   from any contact other than your meeting this morning?

11           THE CLERK:  Juror Numbers 53, 55, and 46 -- I'm

12   sorry, 16.

13           THE COURT:  Fifty-three, 55, 46 and --

14           THE CLERK:  Sixteen, not 46.

15           THE COURT:  Juror Number 53, please hold your card

16   up.

17       Juror Number 53, which other juror do you know?

18           JUROR:  Fifty-five, Jeremy Scott.

19           THE COURT:  And keep your voice up.  How do you guys

20   know each other?

21           JUROR:  We work together at T-Mobile.

22           THE COURT:  How close do you guys work together?

23           JUROR:  We talk about once a month.

24           THE COURT:  And do you ever socialize?

25           JUROR:  Not really.

USA vs. Seleznev, 8/15/16

```
1              THE COURT:  Have you had any outside contact with
2    Juror Number 55, other than maybe once a month?
3              JUROR:  No.
4              THE COURT:  Is it always restricted to work?
5              JUROR:  Yes.
6              THE COURT:  Do you feel that you could be able to
7    serve as a juror and think independently, and not feel that you
8    had to rule or vote the same way that Juror Number 55 did, just
9    because you guys talk once a month?
10             JUROR:  Yes.
11             THE COURT:  Do you think that you'd be able to think
12   independent?
13             JUROR:  Yes.
14             THE COURT:  Any concerns or hesitations about that?
15             JUROR:  No.
16             THE COURT:  Do you think that he'd be mad at you if
17   you didn't rule or vote the same way?
18             JUROR:  No.
19             THE COURT:  Would you care?
20             JUROR:  No.
21             THE COURT:  Juror Number 55, I hate to be harsh, but
22   the same questions of you.
23             JUROR:  Same answers.
24             THE COURT:  Okay.  Juror Number -- thank you, both of
25   you.
```

USA vs. Seleznev, 8/15/16

1       Juror Number 16?

2               JUROR:  I can't remember -- you're from Boeing.

3               JUROR:  Oh, right here.  Now I recognize you.

4               THE COURT:  Okay.  You guys are having a great

5       conversation, but we need to know what's going on.

6       Juror Number 16, you know -- which juror is it?

7               JUROR:  Twenty-three.

8               THE COURT:  And how do you know Juror Number 23?

9               JUROR:  We worked together, and we've only interacted

10      a couple of times.

11              THE COURT:  And how often have those couple of times

12      been?

13              JUROR:  Probably eight months ago and then a couple

14      months ago.

15              THE COURT:  Any socialization outside the office?

16              JUROR:  No.

17              THE COURT:  Is it always about business?

18              JUROR:  Yes.

19              THE COURT:  Any reason that you feel that you'd be

20      obligated to vote the same way that he would, if you were back

21      in the jury room?

22              JUROR:  No.

23              THE COURT:  Do you feel that you'd always be able to

24      think and act independently?

25              JUROR:  Yes.

USA vs. Seleznev, 8/15/16

```
1              THE WITNESS:  Do you feel that you'd have any
2    concerns about him being upset with you, if you didn't follow
3    along with his determinations?
4              JUROR:  No.
5              THE COURT:  All right.  Juror Number 23, same
6    questions.
7              JUROR:  Same answers.
8              THE COURT:  Any hesitation whatsoever?
9              JUROR:  No.
10             THE COURT:  Thank you.
11        Next question:  Have any of you, your close friends, or
12   relatives ever been a litigant or party in a court hearing or
13   proceeding?
14             THE CLERK:  Juror Numbers 8, 16, 17, 20, 31, 36, 38,
15   41, 46, and Juror Number 4, and Juror Number 24.
16             THE COURT:  Now, of those jurors that just answered
17   affirmatively, was there anything about that experience that
18   would preclude you from being able to be fair and impartial in
19   this criminal case?  I see no response.
20        Before I ask any other questions, why don't we all just
21   stand and stretch.
22        All right.  Please be seated.
23        I'll let you know that I use the "rule of pop" on stretch
24   breaks.  What that means, if I stop hearing body parts pop,
25   then I know that you've stretched sufficiently, and we'll have
```

USA vs. Seleznev, 8/15/16

1    you sit down and continue.

2         Other than for minor traffic offenses and dissolutions,

3    have any of you had to appear in court for any reason?

4              THE CLERK:  Juror Numbers 2, 6, 8, 13, 19, 41, 43,

5    56.  And we have a hand up from Juror Number 55.

6              JUROR:  Can you repeat the question?

7              THE COURT:  Certainly.  Other than for minor traffic

8    offenses and dissolutions, or divorces, have any of you had to

9    appear in court for any reason?

10             THE CLERK:  Add Juror 53 and Juror Numbers 9, 11,

11   and 6.

12             THE COURT:  Have you, a relative, or a close friend

13   ever been accused, rightly or wrongly, with committing a

14   criminal offense?

15             THE CLERK:  Juror Numbers 8, 12, 13, 19, 24, 25, 26,

16   31, 33, 35, 38, 41, 46, 53, 56, and 11.

17             THE COURT:  Of those just answering that question

18   affirmatively, I'm going to ask the following three questions.

19        First, if so, do you believe that the police and/or the

20   prosecution officials conducted themselves improperly in any

21   way?

22             THE CLERK:  Juror Number 8.

23             THE COURT:  And again, that same group of jurors, do

24   you have any resentment toward the government based on that

25   incident?  I see no response.

USA vs. Seleznev, 8/15/16

1          And the third of the series of questions, would anything

2     about that experience prevent you from serving as a fair and

3     impartial juror in this case?  I see no response.

4          This is a general question for all.  Have any of you ever

5     had a particularly positive experience with any law enforcement

6     personnel, either local, state, or federal?

7               THE CLERK:  Juror Numbers 2, 8, 12, 13, 14, 15, 11,

8     17, 24, 27, 31, 34, 33, 42, 46, 51, 53, 55, 56, and 11.

9               THE COURT:  Now, the counterpart to that is, have you

10    had a particularly negative experience with any law enforcement

11    personnel, either local, state, or federal?

12              THE WITNESS:  Juror Numbers 2, 4, 15, 24, 28, 41, 46,

13    53, and 56.

14              MR. BROWNE:  What was the last one?

15              THE CLERK:  Fifty-six.

16              MR. BROWNE:  Thank you.

17              THE COURT:  Have any of you had a particularly

18    positive experience with the United States Secret Service?  I

19    see no response.

20         Have any of you had a negative experience, or do you hold

21    strong opinions about the United States Secret Service that

22    would prevent you from being fair and impartial in this case?

23    I see no response.

24         Have you, a relative, or a close friend ever worked for

25    the United States Secret Service?  I see no response.

USA vs. Seleznev, 8/15/16

1      Have you or any of your relatives or close friends been

2  involved in any lawsuit involving the federal government?   I

3  see no response.

4      And we'll strike Components A and B to those two

5  questions.

6              THE CLERK:  Oh, Juror Number 8.

7              JUROR:  Possibly.

8              THE COURT:  All right.  Put down Juror Number 8.

9      And then the follow-up question for you, Juror Number 8,

10  if so, was the dispute resolved to your satisfaction?

11              JUROR:  Yes.

12              THE COURT:  Next question:  This is a general

13  question, have any of you had a negative experience with, or do

14  you hold strong opinions about the United States government,

15  that would prevent you from being fair and impartial in this

16  case?  I see no response.

17      Have any of you ever been the victim of a property or

18  theft crime?

19              THE CLERK:  Juror Numbers 2, 3, 8, 11, 13, 15, 18,

20  19, 22, 24, 25, 26, 27, 28, 31, 34, 35, 36, 38, 41, 42, 44, 46,

21  47, 48, 49, 50, 51, 52, 53, 55, 56, and Juror Number 20.

22              THE COURT:  Do any of you know anyone who has been

23  the victim of a property or theft crime?  Let's do it this way.

24  Let's reverse that question.

25      Is there anyone here who does not know someone who has

USA vs. Seleznev, 8/15/16

```
1    been the victim of a property or theft crime?  That's the
2    number we'll record.
3              THE CLERK:  Juror Numbers 5 and 6.
4              THE COURT:  Do any of you have any particular
5    familiarity with credit -- I'll read it again.
6       Do any of you have any particular familiarity with credit
7    card companies, other than the fact that you may possess a
8    credit card?
9              THE CLERK:  Juror Numbers 2, 37, and 41.
10             THE COURT:  Do any of you have particular familiarity
11   with banks, other than the fact that you may have a bank
12   account?
13             THE CLERK:  Juror Number 52.
14             THE COURT:  Do you have any specialized training,
15   education, or experience in the following areas?  So again,
16   this is directed at you, personally.
17      Do you have any specialized training or education or
18   experience in the following areas:  Law?
19             THE CLERK:  Juror Number 38.
20             THE COURT:  Next area:  Computer science.  That's
21   computer forensics, engineering, programming, et cetera.
22             THE CLERK:  Juror Numbers 2, 5, 15, 26, 31, 32, 38,
23   43, 47, and 50.
24             THE COURT:  Next category:  Law enforcement.
25             THE CLERK:  Juror Numbers 2, 12, and 34.
```

USA vs. Seleznev, 8/15/16

1          THE COURT:  Next category:  Criminal investigations.

2     No response.

3        Next category:  Electronic data security.

4          THE CLERK:  Juror Numbers 2, 26, 37, 38, and 47.

5        We have a question from Juror Number 20.

6          THE COURT:  Juror Number 20?

7          JUROR:  A couple of questions ago, about the area of

8     computer science --

9          THE COURT:  Yes.

10          THE WITNESS:  -- you also mentioned engineering.

11        Is that computer science engineering or engineering in

12     general?

13          THE COURT:  Which one do you have background in?

14          JUROR:  Engineering.

15          THE COURT:  Okay.  Then we'll count that as an

16     answer.  Thank you.

17          THE CLERK:  So we'll add 46 and 1 to that, and 36.

18          THE COURT:  And there's a question?

19          JUROR:  I had a question on the law.

20          THE COURT:  Yes.

21          JUROR:  I was a -- I helped in a law office as a

22     teenager, you know, 40 years ago.

23        So does that count for the law?

24          THE COURT:  What type of things were you helping

25     doing?

```
1              JUROR:  Typing contracts.
2              THE COURT:  Okay.  Then we'll take that as an answer.
3       And you are Juror Number?
4              JUROR:  Eight.
5              THE CLERK:  Another question from Juror Number 30.
6              THE COURT:  Yes?
7              JUROR:  I taught basic computer skills.
8              THE COURT:  All right.  We'll take that as a yes.
9       And you're Juror Number 30.
10             THE CLERK:  Question from Juror 37.
11             JUROR:  I'll add my name to the law, legal
12      information.
13             THE COURT:  Okay.  We'll go back to the categories:
14      National security.
15             MR. BROWNE:  I'm sorry, Your Honor.
16      What was the juror's number?
17             THE CLERK:  Thirty-seven.
18             MR. BROWNE:  Thirty-seven.  Thank you.
19      Thank you, Your Honor.
20             THE COURT:  Okay.  The next:  National security.
21             THE CLERK:  Juror Numbers 2 and 9.
22             THE COURT:  Now, the last series of questions was
23      asking about your personal experience.  This category is
24      different.  They don't all cover the same areas.
25          This question is, do you have any family members or
```

1    friends with specialized training, education, or experience in

2    the following areas?  So again, we're trying to get if you have

3    family members or friends with specialized training.

4         Law?

5              THE CLERK:  Juror Numbers 2, 8, 12, 15, 16, 19, 20,

6    29, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 52, 53, 56, and

7    Juror Number 15.

8              THE COURT:  Next is computer science; computer

9    forensics, engineering, or programming.

10             THE CLERK:  I think we had a question.

11             THE COURT:  I'm sorry.  Let's take care of the

12   question.

13        Juror Number?

14             JUROR:  Forty-six.  I'd be national security, as

15   well.  Sorry.

16             THE COURT:  Okay.  Just one second.  Thank you, sir.

17             THE CLERK:  We have another question from Juror

18   Number 9.

19             JUROR:  When I just answered to national security, it

20   was actually pertaining to family, not myself.  I got that

21   wrong.

22             THE COURT:  Okay.  We'll take it up there, and we'll

23   put you down under having family members.

24             THE CLERK:  Juror Number 8?

25             JUROR:  In the law, the person is deceased in the

USA vs. Seleznev, 8/15/16

```
1    immediate family.
2         Are you asking about immediate family or extended?
3              THE COURT:  Well, if you had any family, that would
4    cover the same thing.
5              JUROR:  Okay.
6              THE COURT:  Now, again, what some of you are doing,
7    in terms of things are popping in your minds a couple questions
8    down the road, that's okay.  I mean, that's a natural
9    occurrence, natural phenomenon.  I don't want you to sit there
10   and burn in your seat, thinking that somebody is going to come
11   in and do something wild to you because of the fact that you
12   didn't answer that question right away.
13        If you think of an answer that comes to your mind, and
14   say, "I forgot to volunteer that," it's okay to share the
15   information a couple questions down the road.  That's just a
16   natural part of the process of how our memories and mind work.
17        So there's another question.  And your number?  17?
18              JUROR:  Family member, for law.
19              THE COURT:  Okay.  Thank you.
20              JUROR:  Have we gotten there yet?
21              THE COURT:  We've covered that.
22              JUROR:  I have a question, Your Honor.
23              THE COURT:  Your number?
24              JUROR:  Number 42.
25              THE COURT:  You'll need to stand up.  I'm having a
```

USA vs. Seleznev, 8/15/16

1   hard time hearing you.

2          JUROR:  Forty-two.  My ex-husband, who I've been

3   divorced from for about 45 years, was an attorney.  He's

4   retired.  So that was my association.

5          THE COURT:  All right.  We'll note that.

6       Another question.  Your number, sir?  Fifty-one?

7          JUROR:  You could add me on the technology.  I didn't

8   know if you were going to get more specific, or if it was,

9   like, a general.

10          THE COURT:  So add you on technology for you,

11   personally?

12          JUROR:  Yeah, personally.

13          THE COURT:  Okay.

14          THE CLERK:  Juror Number 11.

15          JUROR:  Computer science, personal computer science

16   skills.

17          THE COURT:  Okay.  Thank you.  We'll add that.

18       There was another question I saw.  See, I'm pretty quick.

19   If you have your hand on your chin, I think that's a question.

20       All right, then.  Now we'll continue back with the

21   questions.

22       So again, this is family members or friends in computer

23   science, computer forensics, engineering, or programming.

24          THE CLERK:  Juror Numbers 1, 2, 3, 4, 5, 6, 11, 13,

25   15, 20, 22, 23, 26, 28, 32, 34, 35, 36, 37, 38, 40, 43, 44, 45,

USA vs. Seleznev, 8/15/16

1   46, 47, 50, 51, 52, 54, 55, 56.  I'm sorry, not 54.  It was 53.

2   I misread that.  And 12.

3        THE COURT:  Again, family and friends in law

4   enforcement.

5        THE CLERK:  Juror Numbers 2, 12, 13, 14, 16, 24, 28,

6   34, 45, 47, 48, 51, 53, 41, 55, 56, and Juror Number 1.

7        THE COURT:  Criminal investigations?  No response.

8        THE CLERK:  Juror Number 37.

9        THE COURT:  Electronic data security?

10       THE CLERK:  Juror Numbers 2, 26, 34, 36, 37, 38, 45,

11   46, 47, and 51.

12       THE COURT:  National security; I think we have Juror

13   Number 9 already down.

14       THE CLERK:  Two, 9, 16, and 46.

15       THE COURT:  Next question, general question:  Have

16   any of you or anyone you know been the victim of identity theft

17   or had charges made to your credit card that were not yours?

18    Let's do it this way.  Is there anyone here who has not

19   been the victim of identity theft or had charges made to their

20   credit card that was not theirs?  That's the one we'll record.

21       THE CLERK:  Juror Numbers 10, 11, 15, 17, 19, 31, 33,

22   35, 43, 44, 45, 49, and 54.

23       THE COURT:  Next question:  Have any of you been the

24   victim of credit card fraud?

25       THE CLERK:  Juror Numbers 2, 3, 4, 5, 8, 13, 18, 20,

USA vs. Seleznev, 8/15/16

1  24, 28, 34, 36, 38, 40, 41, 50, 51, and 52.

2           THE COURT:  Do any of you have --

3           THE CLERK:  We have a question, Juror Number 40.

4           JUROR:  Does credit card fraud refer to somebody

5  using your card -- like, somebody making charges on your card?

6           THE COURT:  Yes.

7       Next question:  Do any of you have particular

8  familiarity -- particular familiarity with computer hacking?

9           JUROR:  I have a question about that.

10          THE COURT:  Yes.

11          JUROR:  I worked at the University of Washington,

12 with a lot of people there who were in security.  And I learned

13 from them, so I don't know how to answer that question.

14          THE COURT:  We'll take your number down, out of an

15 abundance of caution.  Your number is?

16          THE CLERK:  That's Juror 38.

17      And then I would add Juror Numbers 2, 11, and 47.

18          JUROR:  Is this you personally?

19          THE CLERK:  And we have a question from 3.

20          THE COURT:  Yes.

21          JUROR:  Is this you personally?

22          THE COURT:  Yes.

23      Next question:  Do you have any particularly strong

24 feelings, either positive or negative, about computer hacking,

25 at least to the extent that it would affect your ability to be

USA vs. Seleznev, 8/15/16

```
1    fair and impartial?  I see no response.
2        Have you or anyone you know been the victim of computer
3    hacking?
4            THE CLERK:  Juror Numbers 2, 15, 20, 28, 36, 38, 41,
5    26, 46, 47, 52, and 55.  And we have a question from Juror
6    Number 14 -- 13.
7            JUROR:  Does that pertain to anything more than just
8    getting a virus on your computer, or something like that?
9            THE COURT:  What experience have you had?
10           JUROR:  I've gotten viruses on my computer.
11           THE COURT:  All right.  We'll just record that, but
12   that's not the specific question the Court was asking.
13           JUROR:  I have a question too.
14       Hacking, so when there's, like, the data breaches at
15   Target, et cetera, do those count?
16           THE COURT:  Yes.
17           THE CLERK:  We'll add Juror Numbers 5, 8, 13, 1, 34,
18   55.  And we have a question from Juror Number 38.
19           JUROR:  Do phone scams count, where someone calls in
20   and gets ahold of your computer through the telephone?
21           THE COURT:  No.  We're not going to cover that one.
22           JUROR:  Okay.  Then take me off that.  I'm sorry.
23           THE COURT:  All right.  The lawyers can record that,
24   but that's not an answer responsive to that particular
25   question.
```

USA vs. Seleznev, 8/15/16

1    Next question:  Do any of you have any particular
2    familiarity with network or internet security?
3          THE CLERK:  Juror Numbers 2, 26, 31, 38, 41, 43, 46,
4    47, 51, and 13.
5          THE COURT:  Have any of you, a close friend, or
6    relative had a computer infected with malware or a computer
7    virus?
8    Okay.  Let's change this question.  Have any of you not
9    had a computer infected with malware or a computer virus?  And
10   this would include friends or relatives.
11         THE CLERK:  Juror Numbers 15 and 49.
12         THE COURT:  Next question:  Do any of you, or your
13   family members, or close friends work in the restaurant
14   industry?
15         THE CLERK:  Juror Number 1 has a question.
16         JUROR:  Is that currently or at any time?
17         THE COURT:  Currently.
18         THE CLERK:  Juror Numbers 2, 3, 4, 11, 12, 13, 17,
19   19, 20, 21, 22, 25, 29, 32, 39, 41, 46, 51, 53, 55, and 56.
20         THE COURT:  Are any of you, or relatives, or close
21   friends currently employed, or have been previously employed,
22   by any of the following businesses:
23    Broadway Grill, in Seattle, Washington?  No response.
24    Grand Central Baking Company, in Seattle, Washington?
25         JUROR:  I have a question about that one.

USA vs. Seleznev, 8/15/16

1           THE COURT:  Your Juror Number?

2           JUROR:  Four.  Our restaurant gets our bread from

3    Grand Central, but I don't really have any personal affiliation

4    or contact with them.

5           THE COURT:  This is Grand Central Baking Company, in

6    Seattle.

7           JUROR:  Yes.

8           THE COURT:  Next is MAD Pizza, in Seattle and

9    Tukwila, Washington.  No response.

10       Next is Village Pizza, in Anacortes, Washington.  No

11   response.

12       Next is Casa Mia Italian Pizzeria, in Yelm, Washington.

13   No response.

14       Red Pepper Pizza, in Duvall, Washington.  No response.

15       Schlotzky's Deli, in Coeur d'Alene, Idaho.  No response.

16       City News Stand locations in Illinois or -- we'll start

17   with that one.  City News Stand locations in Illinois.  No

18   response.

19       Or ZPizza locations in California, Montana, and Virginia.

20           JUROR:  Did you say "Zeek"?

21           THE COURT:  No.  "Z," just the letter "Z."  No

22   response.

23       Next question:  Do any of you read, speak, or understand

24   the Russian language?

25           THE CLERK:  I'm sorry.  What was that?  Juror

USA vs. Seleznev, 8/15/16

```
 1   Number 19.  Thank you.
 2              THE COURT:  Do any of you have any moral, religious,
 3   or philosophical beliefs that would prevent you from returning
 4   a verdict against another person in a criminal case?
 5              THE CLERK:  Juror Number 38.
 6              JUROR:  I haven't really been able to do my jury
 7   duty, but I do feel very strongly that I don't have the right
 8   to judge other people.
 9              THE COURT:  Thank you, sir.
10      Next question:  As a juror in a criminal case, your
11   obligation would be to listen to the evidence and from that
12   determine the facts, according to the law as given to you by
13   the Court.  You must follow the Court's instructions on the
14   law, even if you disagree with them.
15      Is there anyone who would be unable or unwilling to follow
16   the Court's instructions if you thought the law was unwise or
17   wrong?  I see no response.
18      Can you think of any reason that would prevent you from
19   being able to render a fair and impartial verdict in this case?
20   I see no response.
21      Now, we're close enough to our morning recess.  But before
22   we do that, I'd like to have a brief sidebar conference with
23   the lawyers, before I let you take your break.
24      Now, what that means is that in lieu of having all of you
25   go out, and me having a conference with the lawyers, and then
```

USA vs. Seleznev, 8/15/16

```
1    having you all come back and let you know we're going to take a

2    break, I'm going to let you stand in place.  I'm going to have

3    the lawyers and the court reporter come to the side.  I'll

4    confer with them, briefly.  And then I'll let you take your

5    break, because I may have some additional instructions to you

6    at that point in time.

7         Counsel?

8         (The following proceedings were heard at sidebar)

9              THE COURT:  Counsel, first of all, the hardships.

10   Juror 2, he's the gentleman that has -- he's going to lose

11   $3,000 this month if he serves on the jury.

12        Any objection to Number 2 being excused?

13             MR. BROWNE:  He should be.

14             THE COURT:  Okay.  Number 2 is excused.

15        Number 4 has oral surgery, had it, will have it again

16   later this week.

17             MR. CHUN:  I thought that was 11.

18             THE COURT:  Yes, 11.  Any objection?

19             MR. BROWNE:  No.

20             THE COURT:  Eleven is excused.

21        Next is the collective bargaining agreement, gets paid for

22   two weeks.

23             MR. BROWNE:  Number 12.

24             THE COURT:  Number 12.  Any objection to him being

25   excused?
```

USA vs. Seleznev, 8/15/16

```
1              MR. WILKINSON:  No.

2              MS. SCANLAN:  No.

3              MR. CHUN:  Twelve or Number 5?

4              THE COURT:  I have that as 12.

5              MR. BARBOSA:  Twelve, yeah.

6              THE COURT:  It's the CBA person.

7          The next is 27.  She said if she -- if it goes beyond

8    9/11.  That's not going to be --

9              MR. BROWNE:  I don't see any problem with that.

10             THE COURT:  We'll keep her.

11         Twenty-nine is the adult family home care operator.

12             MR. BROWNE:  I couldn't quite understand all of her

13   responses.  Sounds like unless there's an emergency, she's

14   okay.

15             MR. WILKINSON:  Sounded like she's fine.

16             THE COURT:  I think we'll keep her.

17         Juror Number 32 starts a new job next Monday.

18         Any objection to excusing 32?

19             MR. BROWNE:  No.

20             THE COURT:  From the government?

21             MR. WILKINSON:  No.

22             THE COURT:  Thirty-two will be excused.

23         Fifty-six, newly employed, any objection to her being

24   excused?

25             MR. CHUN:  No.
```

USA vs. Seleznev, 8/15/16

```
1            THE COURT:  Fifty-six is excused.
2       Juror Number 55 doesn't want to wake up his neighbors in
3  Bellingham.
4       Any objection to excusing him?
5            MR. WILKINSON:  No.
6            THE COURT:  I've got one other question.  I've got a
7  concern, in response to Question Number 13, that question,
8  "Have any of you seen or heard any television or radio news
9  reports, or read anything in the newspapers about the case?"
10 There's one, two, three, four, five, six, seven jurors that
11 responded.  I prefer to ask them individual voir dire
12 questions, bring them back, let the other jurors wait in the
13 jury room, so we don't have to worry about them tainting other
14 jurors about any answers that they may provide.
15      Any objection to that?
16            MS. SCANLAN:  No.
17            MR. BROWNE:  We were going to suggest that.
18            THE COURT:  Then I have 1, 15, 27, 23, 47, 55, and
19 50.
20      Do you have anything different from that?
21            MR. BROWNE:  One, 15, 27, 55 --
22            THE COURT:  No.  23, 47, 55, and 50.
23      We're going to take our break.  We'll bring those
24 individuals up.
25            MR. BROWNE:  And ask them questions -- I'm sorry.
```

USA vs. Seleznev, 8/15/16

1          THE COURT:  We'll bring those individuals up.  Then
2     we'll bring the others up at the appropriate time, after we
3     finish them.
4          MR. BROWNE:  I just -- I didn't mean to interrupt.
5        There's a number of people who have connections with
6     Boeing.  And all Boeing employees are members of the Boeing
7     credit union, which is a victim in this case.  And there's a
8     witness listed to testify for the Boeing credit union.  So I
9     think, at some point, we're going to have to bring that up as
10    to whether we can just challenge all of them.  Because if
11    they're a member of BECU, then they've been victimized.
12         THE COURT:  Well, let me ask, do you plan on offering
13    evidence about Boeing Employees Credit Union as a victim?
14         MR. CHUN:  Quite a bit.
15         MR. WILKINSON:  I wasn't aware that every employee of
16    Boeing is a member.  Are you sure that's true?
17         MR. BROWNE:  Automatically.
18         MR. BARBOSA:  Additionally, that would exclude every
19    JPMorgan Chase credit card holder.  I think that's just false.
20    We don't have any reason to believe that they, specifically,
21    were victims, just because they were a member of a bank.
22         THE COURT:  Let's do it this way.  Counsel, this
23    should have been a proposed general question.  I'll let you
24    formulate your general question at the break.  You can give it
25    to the Court, and we'll look at it so we can at least explore

USA vs. Seleznev, 8/15/16

```
1   who's been a member, if the fact that they're a member would
2   affect their ability to be fair and impartial.  I think that's
3   the easiest way to resolve it.
4       Any challenge to that proposal?
5               MS. SCANLAN:  No.
6           THE COURT:  Okay.  Then that's what we'll do.
7               (End of proceedings heard at sidebar)
8           THE COURT:  All right.  Ladies and gentlemen, we
9   started off the questions with me asking about hardships.
10  These jurors are excused for hardship, which means that when
11  you take your break, you should go to the first floor, check
12  with the jury room, and let them know that you've been excused
13  from this case.  I believe that if you're excused from this
14  case, you've satisfied your obligation for jury service.  They
15  may have another case for you to go out on.  I don't think that
16  that's the case, but I don't make that call.  I can only
17  control what happens in this courtroom.
18      So please report to the jury room.  Let them know that
19  you've been excused, and they will give you further
20  instructions from there.
21      So if your number is called, raise your card, and you will
22  be excused.  I'm not going to have you stand up right now, but
23  you will follow the instructions I've given you.
24      First excused for hardship is Juror Number 2.  Thank you,
25  sir.  Next will be Juror Number 11.  Thank you, sir.  Next will
```

USA vs. Seleznev, 8/15/16

1    be Juror Number 12.  Thank you, sir.  Next will be Juror

2    Number 32.  Thank you, sir.  Next will be Juror Number 56.

3    Good luck on the job.  Same with 52.  And I'm sorry, 32 and 56.

4    And the last is Juror Number 55.  Let's keep the noise down.

5          Now, we're going to take our break at this point in time.

6    I want the following jurors -- you'll be coming back up

7    separate from the other jurors.  So I'll let the other jurors

8    know, your break is going to be a little bit longer, because I

9    have to ask some jurors some follow-up questions to the

10   exclusion of the other jurors.

11         So those jurors are the following.  So if I call your

12   number, raise your card:  Juror Number 1, Juror Number 15,

13   Juror Number 27, Juror Number 23, Juror Number 47, Juror

14   Number 55.

15               THE CLERK:  We're excusing 55.

16               THE COURT:  You're already excused, sir, so you don't

17   have to come back up.  Juror Number 50.

18         All right.  When Victoria comes down to bring you up, or

19   they ask the special group to come up, it's just those jurors

20   who will be coming back up to the courtroom.

21         Victoria, maybe you want to take them back in the jury

22   room here.

23               THE CLERK:  Yes.

24               THE COURT:  If your number was called, just stay

25   here.  Victoria will take you back in the jury room.  You'll

USA vs. Seleznev, 8/15/16

```
1    take your break in the jury room, and the others will take your
2    break on the first floor.
3         Mr. Browne?
4              MR. BROWNE:  Your Honor, did you excuse 56 for
5    hardship?  I just didn't --
6              THE COURT:  Fifty-six was excused.
7         Fifty-six, you got that information; right?
8              JUROR:  Uh-huh.
9              THE COURT:  Okay.  All right.  So with that, we'll
10   take our recess at this time.
11                       (Recess)
12             THE COURT:  Counsel, let me get to the jurors first,
13   then we'll take up the questions that have been proposed by the
14   defense, because I want to maximize our time with the jurors.
15        So let's bring in, first, Juror Number 1.
16        Counsel, standard process, I'll ask the preliminary
17   questions.  It's always my practice to rotate with counsel.
18   So, for example, Juror Number 1, we start first with the
19   government, follow up.  When we get to Juror Number 15, I'll
20   start with the defense, just so you know what's coming.
21             MR. BROWNE:  Your Honor, just so you know, I don't
22   know if you know, there was a long article in The Times this
23   morning.
24             THE COURT:  I did.  I saw it.
25             MR. BROWNE:  And then KOMO apparently did a
```

USA vs. Seleznev, 8/15/16

1    television thing this morning.  I just thought you might know.

2    That might help you.

3          THE COURT:  I'm not going to ask them -- I'm not

4    going to suggest things for them to read, Counsel.

5       All right.  So we'll begin with Juror Number 1, first.

6              (Juror Number 1 enters the courtroom)

7          THE COURT:  Good morning.

8          JUROR:  Good morning.

9          THE COURT:  How are you today?

10         JUROR:  Good.

11         THE COURT:  And you are Juror Number 1?

12         JUROR:  One, yes.

13         THE COURT:  Juror Number 1, the reason I've asked

14   you, and the other jurors in the jury room, is to ask you some

15   follow-up questions about what you may or may not have seen.

16   I'll ask the question again, to refresh your memory, about what

17   questions you answered affirmatively.

18      And the question reads as follows:  Have any of you seen

19   or heard any television or radio news reports, or read anything

20   in the newspapers about this case?  And you responded "yes."

21      Could you share with us what you've heard, read?

22         JUROR:  Most recently, this morning, *The Seattle*

23   *Times* article on this case.  And I'd heard it, radio, probably,

24   read it in the newspaper, previously, a few other times,

25   mentioned, in the past year or so.

USA vs. Seleznev, 8/15/16

1          THE COURT:  And as you come into court, did that

2     cause any particular bias for you, knowing that this is a case

3     that involves something that you read something about?

4          JUROR:  I was a little concerned.

5          THE COURT:  Go ahead.

6          JUROR:  That it was fresh in my memory.

7          THE COURT:  Now, one of the things we ask jurors to

8     do is make their decisions of guilt or innocence based upon the

9     facts and evidence presented in court, and to exclude, or

10    strike out from your mind, any other thoughts, considerations,

11    or things that you may have read outside the courtroom.

12       Do you think that that's something that you can do?

13         JUROR:  I think it is.

14         THE COURT:  Was there anything about which you read

15    that caused any particular prejudice against the defendant to

16    believe that he has to be guilty, if it's in the newspaper?

17         JUROR:  Not that he has to be, but I consider it a

18    serious offense.

19         THE COURT:  And would you hold the government to its

20    burden and responsibility, that they'd have to prove the

21    defendant's guilt by proof beyond a reasonable doubt?

22         JUROR:  Yes.

23         THE COURT:  And that would apply for every single

24    count?

25         JUROR:  Yes.

```
 1              THE COURT:  And if the government failed in their

 2    obligation or duty, would you have any problem returning a

 3    verdict of not guilty?

 4              JUROR:  No problem.

 5              THE COURT:  Follow-up questions, first by the

 6    government.

 7              MR. CHUN:  Just briefly, Your Honor.

 8         The Court just asked if you would have any prejudice,

 9    based on the media article, towards the defendant.

10         I'd like to ask the same.  Is there anything that, from

11    reading that article, prejudices you towards the government --

12    or against the government?

13              JUROR:  No.

14              MR. CHUN:  Would you hold the government to a higher

15    standard, based on something you've read in the paper?

16              JUROR:  No.

17              MR. CHUN:  No further questions, Your Honor.

18              THE COURT:  Mr. Browne?

19              MR. BROWNE:  Thank you, Your Honor.

20         Good morning.  I had a little difficulty hearing what you

21    said, to begin with.  But I think you said that you -- because

22    of reading the article, you had some concern.

23         Is that the word you used?

24              JUROR:  Yes.

25              MR. BROWNE:  That you might not be fair.  And that,
```

USA vs. Seleznev, 8/15/16

1    obviously, is of concern to us.

2            JUROR:  Uh-huh.

3            MR. BROWNE:  So how are you going to deal with your

4    concern?

5            JUROR:  I have to base it on what evidence is

6    presented to me, except it comes as a shock in reading it in

7    the paper, and all of a sudden realizing that this may be the

8    case, and it was.  So I think I can separate out what is

9    presented to me and what I have to base my judgment on.

10           MR. BROWNE:  So, I mean, I think it's really good

11   that you -- first of all, this whole process of voir dire,

12   you'll see, requires everybody to be honest.  So the fact that

13   you told us you're concerned is really good.  And it sounds to

14   me like what you're saying is that you acknowledge you have

15   that concern, but you can decide this case based totally on the

16   evidence and the law.  And that concern will be put in a little

17   box somewhere else; right?

18           JUROR:  Correct.

19           MR. BROWNE:  And have you been on a jury before?

20           JUROR:  Yes, I have.

21           THE COURT:  So you know that might be necessary with

22   personal knowledge, or opinions, or anything?

23           JUROR:  Yes.

24           MR. BROWNE:  Okay.  Thank you, Your Honor.

25           THE COURT:  Thank you.

USA vs. Seleznev, 8/15/16

1          Juror Number 1, I'll have you go back to the jury room.
2     Thank you for your answers, and thank you for volunteering that
3     information in the first place.  Thank you.
4                    (Juror Number 1 exits the courtroom)
5          THE COURT:  Anything to take up as it relates to
6     Juror Number 1?
7          MR. BROWNE:  I'm sorry, Your Honor.  I was talking to
8     Ms. Scanlan.
9          THE COURT:  Anything to take up about Juror Number 1?
10         MR. BROWNE:  No, Your Honor.
11         MR. CHUN:  No, Your Honor.
12         THE COURT:  All right.  We'll keep Juror Number 1.
13     Next is Juror Number 15.
14                 (Juror Number 15 enters the courtroom)
15         THE COURT:  Good morning, sir.
16         JUROR:  Good morning.
17         THE COURT:  And you are Juror Number 15?
18         JUROR:  Yes, I am.
19         THE COURT:  Juror Number 15, the reason I brought you
20     back in separately is because you answered one particular
21     question that I wanted to ask questions in private, to the
22     exclusion of other jurors.  I'll refresh your memory by reading
23     the question to you.
24         And that question reads as follows:  Have any of you seen
25     or read -- have any of you seen or heard any television or

USA vs. Seleznev, 8/15/16

1  radio news reports, or read anything in the newspapers about

2  this case?  And you answered "yes."

3      Can you tell me what you've heard?

4          JUROR:  There was a little piece on it on NPR this

5  morning.  And I just have a vague recollection of the initial

6  media reports on this, but nothing beyond what I either read in

7  the newspapers or heard on the radio.

8          THE COURT:  Anything about what you heard that would

9  affect your ability to be fair and impartial in this case?

10         JUROR:  I don't believe so.

11         THE COURT:  Do you think you could set aside anything

12  that you may have read, and make your decisions based upon the

13  facts and evidence presented in this case?

14         JUROR:  Absolutely.

15         THE COURT:  And do you believe that you'll be able to

16  hold the government to its burden of proof that requires them

17  to prove beyond a reasonable doubt that the defendant is guilty

18  of any charges against him?

19         JUROR:  Yes.

20         THE COURT:  And any reservation about that at all?

21         JUROR:  No.

22         THE COURT:  Follow-up questions, first by the

23  defense?

24         MR. BROWNE:  Thank you, Your Honor.

25      I have no further questions.  Thank you, sir.  Thank you

USA vs. Seleznev, 8/15/16

```
1    for telling us about it.
2                THE COURT:  Thank you.
3         Government?
4                MR. CHUN:  No questions, Your Honor.
5                THE COURT:  Thank you, Juror Number 15.  You did
6    exactly what you're supposed to do by following up with that
7    information.  Thank you.
8                JUROR:  Thank you.
9                   (Juror Number 15 exits the courtroom)
10               THE COURT:  Any challenge of Juror Number 15?
11               MR. BROWNE:  None from the defense, Your Honor.
12               MR. CHUN:  No, Your Honor.
13               THE COURT:  Okay.  All right.  We'll bring in Juror
14   Number 27.
15               THE CLERK:  Do you want 23 first?
16               THE COURT:  Pardon?
17               THE CLERK:  Do you want 23 first?
18               THE COURT:  Twenty-three.  You're correct.
19                  (Juror Number 23 enters the courtroom)
20               THE COURT:  Good morning, sir.  Have a seat right
21   there.
22               JUROR:  Okay.
23               THE COURT:  Number 23, good morning.
24               JUROR:  Good morning.
25               THE COURT:  Follow-up questions.  You answered a
```

USA vs. Seleznev, 8/15/16

```
1    question.  I'll read the question to you to refresh your
2    memory.  And this is the reason why you're here.
3        Have any of you seen or read any television or radio news
4    reports, or read anything in the newspapers about this case?
5    And you indicated "yes."
6        Could you tell me what you've heard or read?
7            JUROR:  Yeah.  I heard, on the way here, jury
8    selection, trial, here in Seattle, for the case.
9            THE COURT:  And was there a particular station that
10   you were tuning in to?
11           JUROR:  KIRO, 97.3.
12           THE COURT:  Anything more than just that?
13           JUROR:  No.
14           THE COURT:  Do you have any understanding of -- have
15   you read anything else, other than what you may have heard on
16   the radio on the way here?
17           JUROR:  No, sir.
18           THE COURT:  Anything about what you heard on KIRO
19   that would affect your ability to be fair and impartial in this
20   case?
21           JUROR:  No.
22           THE COURT:  Do you think you can make your
23   determinations of guilt or innocence based upon the facts as
24   presented in this case?
25           JUROR:  Yes.
```

USA vs. Seleznev, 8/15/16

1            THE COURT:  And do you think that you could hold the

2     government to its burden of proof that would require them to

3     prove every single element of each charge by proof beyond a

4     reasonable doubt?

5            JUROR:  Yes.

6            THE COURT:  And if the government failed to present

7     that type of evidence to satisfy you, that the -- that you'd

8     have any difficulty returning a not-guilty verdict?

9            JUROR:  No.

10           THE COURT:  Follow-up by the government?

11           MR. CHUN:  Nothing further.  Thank you, Your Honor.

12           THE COURT:  Follow-up by the defense?

13           MR. BROWNE:  Nothing further.  Thank you, sir.

14           THE COURT:  Thank you, Juror Number 23.  You can go

15    back to the jury room.  I'll confer with the lawyers.  Thank

16    you, sir.

17               (Juror Number 23 exits the courtroom)

18           THE COURT:  Anything to take up on Juror Number 23?

19           MR. CHUN:  No, Your Honor.

20           MR. BROWNE:  No, Your Honor.

21           THE COURT:  Thank you.  Twenty-seven?

22               (Juror Number 27 enters the courtroom)

23           THE COURT:  Counsel, just to get you -- good morning.

24     You are Juror Number 27?

25           JUROR:  I'm Juror Number 27.

USA vs. Seleznev, 8/15/16

1          THE COURT:  Number 27, thank you.

2      First of all, I want to refresh your memory about why

3  you're in here.  And that's in response to this question:  Have

4  any of you seen or heard any television or radio news reports,

5  or read anything in the newspapers about this case?  And you

6  indicated "yes."

7      Can you tell us what you've heard or read about?

8          JUROR:  I hadn't heard anything prior to today.  But

9  I read *The Seattle Times* this morning and saw the article

10  about -- stating that the trial was going to start this week.

11          THE COURT:  Okay.  Anything about what you read that

12  would affect your ability to be fair and impartial in this

13  case?

14          JUROR:  I don't believe so.

15          THE COURT:  When you say you don't believe so, is

16  there any reservation or hesitation that you have about that?

17          JUROR:  No.

18          THE COURT:  Now, the government has a responsibility

19  of proving the defendant guilty by proof beyond a reasonable

20  doubt.

21      Do you believe that you'll be able to hold the government

22  to their burden of proof?  And if they fail to meet that

23  burden, by proving the defendant guilty beyond a reasonable

24  doubt, would you have any problem returning a verdict of not

25  guilty?

USA vs. Seleznev, 8/15/16

1              JUROR:  I'd have no problem.

2              THE COURT:  All right.  Follow-up questions by the

3     defense?

4              MR. BROWNE:  No, Your Honor.  Thank you.

5              THE COURT:  By the government?

6              MR. CHUN:  No, Your Honor.

7              THE COURT:  Thank you, Juror Number 27.  Appreciate

8     your responses.

9                 (Juror Number 27 exits the courtroom)

10             THE COURT:  Any challenge?

11             MR. CHUN:  No, Your Honor.

12             THE COURT:  Let's bring in Juror Number 47.

13                (Juror Number 47 enters the courtroom)

14             THE COURT:  Good morning, sir.  Please have a seat.

15        Good morning, Juror Number 47.  The reason I've asked you

16    to come out separately from the other jurors is because of an

17    answer that you provided.  And I'll refresh your memory with

18    the question.  It reads as follows:  Have any of you seen or

19    read any television or radio news reports, or read anything in

20    the newspapers about this case?  And you answered "yes."

21        Could you tell me what you may have heard?

22             JUROR:  When I was waiting for the bus, to come in

23    here today, I was listening to NPR, and they just mentioned

24    that the trial was starting today.  And I normally wouldn't

25    have probably picked it up.  But I heard it, and I was, like,

USA vs. Seleznev, 8/15/16

1    "I wonder if that's where I'm heading?"

2              THE COURT:  Have you heard anything about the case

3    beyond that?

4              JUROR:  Not beyond that, no.

5              THE COURT:  Anything about what you heard that would

6    affect your ability to be fair and impartial?

7              JUROR:  No.

8              THE COURT:  And do you think that you could hold the

9    government to its burden of proof, that they'd have to prove

10   the defendant guilty by proof beyond a reasonable doubt?

11             JUROR:  Yes.

12             THE COURT:  And if the government failed in any

13   respect to prove the defendant guilty by proof beyond a

14   reasonable doubt, would you have any hesitation in returning a

15   verdict of not guilty?

16             JUROR:  No, I wouldn't have any hesitation.

17             THE COURT:  Okay.  Thank you, sir.

18        Follow-up questions by the government?

19             MR. CHUN:  No, Your Honor.

20             THE COURT:  By the defense?

21             MR. BROWNE:  No, Your Honor.  Thank you.

22             THE COURT:  Thank you, Juror Number 47.

23             (Juror Number 47 exits the courtroom)

24             THE COURT:  Any challenge for 47?  Government?

25             MR. CHUN:  No, Your Honor.

USA vs. Seleznev, 8/15/16

1           THE COURT:  Defense?

2           MR. BROWNE:  (Shakes head)

3           THE COURT:  Okay.  Thank you.  Last is 50.

4      Counsel, I was going to tell you, I'm going to see how far

5  we go.  So I'm going to try and get both sides of voir dire

6  this morning.  If we can't, we'll just go and see where we are.

7           (Juror Number 50 enters the courtroom)

8           THE COURT:  Good morning, sir.  Please be seated.

9  Sir, you are Juror 50?

10          JUROR:  Yes, I am.

11          THE COURT:  I wanted to refresh your memory of a

12 question, and that's the reason why we have you here, is the

13 following:  Have any of you seen or read any television or

14 radio news reports, or read anything in the newspapers about

15 this case?  And you answered "yes."

16     Could you share with us what you heard or read?

17          JUROR:  A few weeks ago, I believe that on TV,

18 national -- I mean, I believe it's KIRO TV, so it's our local

19 Channel 7.  I believe that I read or heard about the news, this

20 particular case.

21          THE COURT:  And what exactly do you recall that you

22 heard?

23          JUROR:  The name of the defendant, the name of the

24 person, and the computer stuff that was going on.

25          THE COURT:  Do you remember anything else, other than

USA vs. Seleznev, 8/15/16

1    just a general recollection?

2            JUROR:  I build computers.  And, I mean, I've worked

3    with people who bring me their infected computers.  So it's

4    always been very interesting how these people do it.

5            THE COURT:  And after hearing that, have you had

6    conversations with other people, since you're in the business?

7            JUROR:  No, not really.

8            THE COURT:  No conversations?

9            JUROR:  No.

10           THE COURT:  And have you felt the need to volunteer

11   information to other people about, "Hey, I read about this or

12   heard about this on the radio"?

13           JUROR:  No.

14           THE COURT:  Have you discussed with anyone anything

15   about this case?

16           JUROR:  No.

17           THE COURT:  Do you have any particular bias coming

18   into the case because of what you read?

19           JUROR:  I don't think so.

20           THE COURT:  Do you think you could be fair and

21   impartial in this case?

22           JUROR:  I believe so.

23           THE COURT:  Do you think you could set aside anything

24   that you may have heard in the newspaper, or read, and make a

25   decision based upon the facts and evidence as presented in this

USA vs. Seleznev, 8/15/16

1    case?

2              JUROR:  Yes.

3              THE COURT:  And the government has the

4    responsibility, or burden, of proving the defendant's guilt by

5    proof beyond a reasonable doubt.  And if the government failed

6    in their burden, do you think that you could return a verdict

7    of not guilty?

8              JUROR:  Yes.

9              THE COURT:  Any hesitation or reservation about that?

10             JUROR:  No.

11             THE COURT:  Do you bring any biases or prejudices,

12   that you're aware of, against the defendant or the government

13   because of what you heard about the case?

14             JUROR:  No.

15             THE COURT:  Follow-up questions by the defense?

16             MR. BROWNE:  No.

17             THE COURT:  By the government?

18             MR. CHUN:  No, Your Honor.

19             THE COURT:  Thank you, Juror Number 50.  Appreciate

20   your responses.

21                  (Juror Number 50 exits the courtroom)

22             THE COURT:  Defense first.  Any challenge?

23             MR. BROWNE:  No, Your Honor.

24             THE COURT:  Government have any challenge?

25             MR. CHUN:  No, Your Honor.

USA vs. Seleznev, 8/15/16

1         THE COURT:  All right.  That appears to have

2    exhausted all of the jurors that raised questions.

3       I'm going to bring all of them in together and instruct

4    them not to discuss with any other jurors what we've talked

5    about here, because I don't want them to go out and possibly

6    taint or contaminate anybody else's thought processes, or

7    suggest they should go out and read anything.  So let's bring

8    those jurors back in so we can take care of that right now

9    collectively.

10         MR. BROWNE:  Your Honor, the discussion we had about

11    the question, Ms. Scanlan sent you a draft.

12         THE COURT:  We're going to get to that.

13         MR. BROWNE:  May I ask, it's apparent that you're

14    going to rely on us to do voir dire on a number of -- a lot of

15    the jurors answered questions affirmatively, that we would need

16    to ask questions of.  For instance, knowledge of the legal

17    system, there's 18.  But then it gets down to victims of

18    property crime were over 40.  And victims of identity theft

19    were over 40.  And I don't see, if you were leaving us --

20    leaving it up to us to get into those issues with the jurors, I

21    don't see how I could do that in 30 minutes.  I think I would

22    need at least 45.

23         THE COURT:  All right.  Well, I'll tell you what,

24    Counsel.  Let's see how you do with the 30 minutes the Court's

25    given you.  And if you need additional time, based upon the

USA vs. Seleznev, 8/15/16

1    types of questions that you're asking, then the Court will

2    consider allowing additional time.

3         So with that, we'll be bringing the other jurors up.

4    We'll start with the government.  We'll probably take a recess

5    at that point.  But again, it depends on how much time we've

6    used.

7              MR. BROWNE:  I just wanted to alert you.

8              THE COURT:  Okay.  That's fine.  But again, Counsel,

9    it's how you use your time.  You're not the type of lawyer,

10   that I recall, that asks questions about your favorite license

11   plate, what magazines you subscribe to.  If you're asking

12   questions like that, which you haven't asked in the past, then

13   I can tell you, there won't be any more time allowed.

14        Let's bring in those jurors collectively.

15             (Jurors who were individually questioned

16                       enter the courtroom)

17             THE COURT:  Okay.  To all the jurors who I just asked

18   individual questions of, I'd ask that you not share or disclose

19   to any other juror the fact that we had this discussion, or the

20   facts of what we discussed, or the fact that you've read

21   anything or heard anything about it in the newspaper.  So

22   bottom line, don't talk about what we talked about here outside

23   the presence of the other jurors, and don't share any thoughts.

24   Does anybody have any problem with that?

25        Okay.  Now we can bring the balance of the other jurors

USA vs. Seleznev, 8/15/16

1    in.

2        Now, there's some folks that are in some of the seats.

3    We're going to need some of those seats for the jurors.  So I'd

4    ask if you'd step outside those seats, unless you're a juror,

5    because we may need some of those seats to accommodate the

6    jurors.  If not, you can take your position back, but I want

7    the jurors to be able to have their seats first.

8                    (Jury enters the courtroom)

9        THE COURT:  Good morning, again.  Please be seated.

10       Thank you, members of the jury, for your patience.  We had

11   to take care of some matters and ask follow-up questions with

12   some of your colleagues.

13       The Court has just an additional series of questions I

14   would like to ask, and then I'll turn it over to counsel for

15   the government to begin their opportunity of examining the

16   jurors.

17       And the first question is:  Are you a member of the Boeing

18   Employees Credit Union, or BECU?

19           THE CLERK:  Juror Numbers 1, 13, 15, 16, 20, 21, 22,

20   23, 24, 35, 38, 43, 45, 46, 48, and 51.

21           THE COURT:  For those that answered the last question

22   in the affirmative, the following questions apply to you:  In

23   this case, the government has accused Mr. Seleznev of taking,

24   selling, and/or using the credit card numbers of BECU members,

25   without their permission.  Does knowing that cause you to

USA vs. Seleznev, 8/15/16

```
 1   question whether you can be fair and impartial in this case?  I
 2   see no response.
 3        Next question of the same group of individuals:  Have any
 4   of you had your BECU credit card used without your permission,
 5   by someone else?
 6              THE CLERK:  Juror Number 13.
 7              THE COURT:  And the last question, to put it another
 8   way, has your BECU credit card or debit card had charges on it
 9   that were not authorized by you?
10              THE CLERK:  Juror Number 13.
11              THE COURT:  With that, you'll be pleased to know that
12   I'm not going to ask you any more questions.  But now we'll
13   begin with counsel for the government having the opportunity to
14   ask questions.
15        But before we do that, I received a note from my in-court
16   deputy that indicated Juror Number 34 thinks he recognizes the
17   name of a potential witness.
18        Juror Number 34, what name and which witness do you
19   believe that you might recognize?
20              JUROR:  The name "Chen."
21              THE COURT:  Okay.  And counsel for the government,
22   would you read that name again and the position they hold?
23              MR. WILKINSON:  The name is Tim Chen.  And he is the
24   CEO of a local company called DomainTools.
25              JUROR:  That's a different person.
```

USA vs. Seleznev, 8/15/16

```
1               THE COURT:  Okay.  Thank you.  So with that, counsel
2    for the government, your time begins now.
3               MR. CHUN:  Thank you, Your Honor.
4         Good morning, ladies and gentlemen.  My name is Harold
5    Chun, and I am one of the prosecutors who will be presenting
6    this case.  This morning there's a few questions I want to ask
7    and a few topics I want to go over.
8               And so, as you can tell from the judge's questions and the
9    charges that have been read, the case involves computers.  And
10   for many people today, computers and the internet are a daily
11   part of life.  But I know not everybody loves computers.  In
12   fact, I have a cousin who, other than using e-mail at work, she
13   doesn't have a computer at home, she doesn't have internet
14   access at home, and she doesn't carry a cell phone.  So when
15   you ask her why this is, she just says she doesn't really like
16   computers that much.  She says trying to learn new technology,
17   as it advances all the time, gives her a headache.  And she
18   just is completely happy not needing technology in that way.
19              Now, I'd like to ask, by a show of hands, is there anyone
20   here that feels similarly about computers, the internet, or
21   technology, where it seems more hassle than the value added?
22         Juror Number 25 and 38.
23         Mr. Shepard, why don't you go ahead and tell me.
24              MR. BROWNE:  Sir, I'm sorry.  There's another person
25   that raised their hand.  Sorry.
```

USA vs. Seleznev, 8/15/16

1              MR. CHUN:  Mr. Shepard?

2              JUROR:  Yes.

3              THE COURT:  Why don't you go ahead and tell me what

4     it is about computers you don't like.

5              JUROR:  Just the general -- that every time I turn it

6     on, it seems like it barks back at me.  I've been around

7     computers for quite a while in school.  And they're useful, but

8     I just don't use them that much.

9              THE COURT:  Would you say keeping up to date with new

10    computers or new phones and new operating systems is just a lot

11    of work?

12             JUROR:  Especially my cell phone, yeah.

13             MR. CHUN:  Is it Mr. Cordova that also raised your

14    hand?  And what is your feeling about it, Mr. Cordova?

15             JUROR:  Well, I deal with computers every day at

16    work.  But every time I seem to get on there, it doesn't seem

17    to recognize me.

18             MR. CHUN:  So your work computer gives you problems.

19             THE COURT:  Sir, you have to -- if you'd start over

20    again.  We can't hear you up here.  Stand up and it helps

21    project your voice.

22             JUROR:  At work, I deal with computers every day.  It

23    seems like every time I log on, the computer doesn't recognize

24    me, and I have to get the IT to help me get back to where I was

25    three days ago.

USA vs. Seleznev, 8/15/16

1          THE COURT:  And your juror number?

2          JUROR:  Twenty-eight.

3          MR. BROWNE:  Your Honor, may we request that

4   juror numbers be used?  I don't want to be impolite name-wise,

5   but I can't keep track unless we use the numbers.

6          THE COURT:  That's appropriate.

7      And before any juror answers a question, you need to state

8   "Juror Number 5," "Juror Number 16," just so the record is

9   always completely clear who's speaking.  We're not being

10  impersonal, but in order to get a proper record.

11     Thank you, Counsel.

12          MR. CHUN:  I believe there was one more, Juror

13  Number 38.

14          JUROR:  I have a love-hate relationship with

15  computers.  I use them all the time.  But, for example, I don't

16  have an active cell phone.  I just refuse to deal with that.  I

17  appreciate what they do, but I try to use them as little as

18  possible.

19          MR. CHUN:  So you try to avoid technology, if at all

20  possible?

21          JUROR:  It's really hard to avoid technology.  I use

22  it every day, but -- you know what I mean.

23          MR. CHUN:  Yes.  Thank you very much.

24     Now, I'd like to go to the very flip side of this.  And I

25  know there's a lot of people here in information technology,

USA vs. Seleznev, 8/15/16

1   and such.  But who here, by show of hands, would consider

2   themselves tech savvy, or perhaps a computer geek?  And I use

3   that term of endearment.  I think a lot of people would say

4   that about me.

5       All right.  So we'll start with Juror Number 15.  What is

6   your experience with computers?

7           JUROR:  I'm a self-taught programmer.  I started my

8   own software company in the early '90s, and made my living

9   through the early aughts doing contract programming, technical

10  writing, and consulting.

11          MR. CHUN:  And I believe it was Juror Number 13?

12          JUROR:  I've built two of my own computers over the

13  last ten years or so.

14          MR. CHUN:  Okay.  And building computers, that's a

15  hardware thing.  Are you familiar with software?  Do you code

16  at all, or anything of that sort?

17          JUROR:  No.

18          MR. CHUN:  Also in the box, were there other hands?

19  Juror Number 5?

20          JUROR:  I'm an application developer by trade; also

21  self-taught programmer for leisure.

22          MR. CHUN:  And as an app developer, are you involved

23  on the security side of your programming, as well, or no?

24          JUROR:  Not on the security side, no.

25          THE COURT:  And I know there were several hands, so

USA vs. Seleznev, 8/15/16

1   we'll go in broad strokes.

2       Over on this side Juror Number 38, again, who doesn't like

3   computers?

4           JUROR:  Part of the reason I don't like computers is,

5   I was hardware/software troubleshooting for a long time.  I

6   also worked at the University of Washington --

7           THE COURT:  Sir, your voice is starting to trail off.

8   So for you, and for other jurors, please remember you've got to

9   project this way and keep your voice up.  So if I'm gesturing

10  like this, that means raise your voice.  Thank you.

11          MR. CHUN:  We'll start with Juror Number 50?

12          JUROR:  I build/fix computer hardware and software

13  for my hobby.

14          THE COURT:  And you say for your hobby.  How long

15  have you had this hobby?

16          JUROR:  Fifteen years.

17          MR. CHUN:  And do you do any of this for work, as

18  well, or just generally hobby?

19          JUROR:  (Nods head)

20          MR. CHUN:  And I believe Juror Number 51?

21          JUROR:  I work in IT, information technology, as my

22  whole career, both personal, help people with technology, and

23  as I have a corporate site.

24          MR. CHUN:  Can you explain what you do for IT

25  consulting, what specifically?

USA vs. Seleznev, 8/15/16

```
1              JUROR:  On the personal side, anything -- people get
2    malware on their computer, help them out, family members and
3    friends.  Unfortunately, I'm on speed dial for a lot of people
4    for that.  And then I've been contracting at Microsoft for the
5    last eight years, both on Windows and Windows server.
6              MR. CHUN:  And you say you're contracting for
7    Microsoft.  What do you do for Microsoft?
8              JUROR:  Lab manager, data center manager.
9              MR. CHUN:  Thank you.  And Juror Number 53?
10             JUROR:  I don't know if I'm a computer geek, but I
11   work at T-Mobile customer service and technical support, so I
12   help with troubleshooting phones.  And so I'm usually pretty up
13   to date with Android, in particular.  IOS throws me a bit.  But
14   Android, I'm pretty familiar with.  And I like working on my
15   computer, from time to time, but I haven't taken any classes or
16   anything.
17             MR. CHUN:  So more phone stuff for work and then kind
18   of hobbyist at home?
19             JUROR:  Yeah.  I've changed my graphics card, once or
20   twice.
21             MR. CHUN:  Do you play games?  Is that why?
22        And then on this section of the room, starting with Juror
23   Number 26.
24             JUROR:  I'm a server and application administrator
25   for Costco Wholesale.
```

USA vs. Seleznev, 8/15/16

1          MR. CHUN:  And as a server administrator, what are
2     you doing for Costco?
3          JUROR:  Installing software, making sure that patches
4     are up to date, keeping it running, basically.
5          MR. CHUN:  Okay.  Juror Number 30?
6          JUROR:  I had taught basic computer skills in Office
7     to students.  And I think I started with Windows 3.1.  And up
8     to date on everything, built computers.
9          MR. CHUN:  Do you still teach?
10          JUROR:  I do not teach right now.
11          MR. CHUN:  When did you teach, time-wise?
12          JUROR:  From 1992 to 2005.
13          MR. CHUN:  And were you teaching --
14          THE COURT:  '92 to what?
15          JUROR:  2005.
16          THE COURT:  Keep your voice up, please.
17          MR. CHUN:  Were you teaching at a school, or where
18     were you teaching?
19          JUROR:  I taught with Edmonds Community College, and
20     I taught at one of the prisons in Monroe, in corrections.
21          MR. CHUN:  Thank you.
22       Juror Number 31?
23          JUROR:  I'm the assistant administrator for a local
24     municipality.
25          MR. CHUN:  And as assistant administrator -- for

1    Kirkland, I believe?

2              JUROR:  Yes.

3              MR. CHUN:  What do you do?

4              JUROR:  I'm not in the IT department.  I'm supported

5    by IT.  But I support the staff that uses our particular

6    software, and I have access to people's codes and can access

7    things that other people cannot.

8              MR. CHUN:  Would you say you have -- do you

9    understand, like, the actual computer programming code, or the

10   networking, how to run the system --

11             JUROR:  I understand more from the application part,

12   not necessarily the code part.  But I am aware of, you know,

13   BCI compliance and the types of things that we need to keep

14   secure, credit card numbers, things like that.

15             MR. CHUN:  Thank you.

16         Juror Number 46?

17             JUROR:  So I used to be tech support for Nintendo,

18   doing wi-fi, like, on people's -- supporting customer products.

19             THE COURT:  Keep your voice up, sir.

20             JUROR:  Oh, sorry -- supporting customer products.

21   And then after that, I was also an engineer for Boeing.  And

22   there, we would develop applications for our ERP system so that

23   the entire enterprise can actually stay communicated, and all

24   of our requirements met.  So it's just a giant database that we

25   had to author.

USA vs. Seleznev, 8/15/16

```
1              MR. CHUN:  And that's -- you're at Boeing currently;
2    correct?
3              JUROR:  No.  I work for another company called
4    Aviation Tech Support Services.
5              MR. CHUN:  Are you programming there?
6              JUROR:  No.  I'm actually working on the aircraft
7    directly, so no computers there.
8              MR. CHUN:  Number 47?
9              JUROR:  I have a bachelor's degree in computer
10   science.  The last 20 years I've been working in the software
11   industry, mostly as a programmer.
12             MR. CHUN:  Sorry, mostly in?
13             JUROR:  As a programmer.
14             MR. CHUN:  And what type of programs do you program?
15             JUROR:  Currently, I work for Starbucks, on their
16   mobile order and pay application, on the Android side.
17             MR. CHUN:  And was there anyone else who would
18   consider themselves tech savvy?  Juror Number 43?
19             JUROR:  I do a lot of programming, mostly for, like,
20   hobby, so interfacing with hardware or, like, robotics.
21             MR. CHUN:  And what about for work?
22             JUROR:  For work, I'm a repair technician.  It
23   doesn't necessarily apply.  Like I said, it's mostly for hobby.
24             MR. CHUN:  Thank you.
25         And Juror Number 44?
```

USA vs. Seleznev, 8/15/16

```
 1                JUROR:  I have a B.A. in digital media, so I use a
 2      lot of software, very familiar with HTML.  I built my own
 3      computer.  But other than that, I'm not -- I mean, I wouldn't
 4      call myself --
 5                THE COURT:  Keep your voice up.  We can't hear you.
 6                JUROR:  I'm sorry.
 7                THE COURT:  We can't hear you.
 8                JUROR:  Just that I've built my own computer.  I'm
 9      familiar with some software.
10                MR. CHUN:  And I believe you're in the healthcare
11      industry.
12           Do you use any of this at work?
13                JUROR:  Yes.  I am a marketing program coordinator.
14      So we use Microsoft, Outlook, any Microsoft products,
15      SharePoint.
16                MR. CHUN:  Thank you very much.
17           The next thing I'd like to talk about -- and I believe it
18      only applies to one juror.  I believe it's Juror Number 19.
19           Earlier you were asked if anyone spoke Russian, and I
20      believe you raised your hand.  How did you learn to speak
21      Russian?
22                JUROR:  I took Russian in high school and lived in
23      St. Petersburg, in 1999.  But I really speak it poorly, at this
24      point.  I'm not --
25                MR. CHUN:  It's not something you've kept up?
```

USA vs. Seleznev, 8/15/16

```
1              JUROR:  No.

2              MR. CHUN:  It wasn't something that was spoken at

3    home, growing up?

4              JUROR:  No.

5              MR. CHUN:  Can you still read and write Russian, to

6    any degree, or has it kind of all faded?

7              JUROR:  I can read haltingly, but not well.

8              MR. CHUN:  Thank you.

9         Juror Number 8, earlier you raised your hand saying that

10   you've had a bad experience with law enforcement.  I don't want

11   to go into the details of that, but --

12             JUROR:  It wasn't my --

13             MR. CHUN:  Is that experience something that would

14   shade how you view the evidence in this case from law

15   enforcement?

16             JUROR:  It wasn't law enforcement.  It was regarding

17   a district attorney's office.

18             MR. CHUN:  Okay.  And in your experience with the

19   DA's office, is there anything about that incident that would

20   affect your view of the case here today?

21             JUROR:  No, I believe not.  I believe I can be

22   impartial and fair.

23             MR. CHUN:  And so your experience there was very

24   localized?

25             JUROR:  It was very localized, yes.
```

USA vs. Seleznev, 8/15/16

1          MR. CHUN:  And then there was a larger show of hands

2     before, when the judge asked if people had had -- or friends or

3     families had negative interactions with law enforcement.  Could

4     I see those hands again, just one more time?

5          All right.  And we'll start with Juror Number 4.  Without

6     going into the details of that, is there something about that

7     experience that would affect your ability to sit on this jury

8     here today?

9          JUROR:  Not that I believe, no.

10          MR. CHUN:  Who was it related to?

11          JUROR:  Myself.  It was local police, back in upstate

12     New York.  And it was racially profiling kind of stuff.

13          MR. CHUN:  The next hand was to Juror Number 24.

14     Again, without going into details, is there anything about that

15     experience that would affect you here?

16          JUROR:  No.

17          MR. CHUN:  Was that personally to you, or to a family

18     member or friend?

19          JUROR:  It was personally toward me.

20          MR. CHUN:  And how long ago was that?

21          JUROR:  Thirty-five years ago.

22          MR. CHUN:  And Juror Number 25?

23          JUROR:  Just a friend of mine got caught with a

24     submachine gun 50 years ago.  And it didn't affect me at all.

25          MR. CHUN:  And Juror Number 38?

USA vs. Seleznev, 8/15/16

```
1              JUROR:  I'm not sure how I answered this earlier, but
2    my sister is in and out of court all the time, so has a lot of
3    issues with the law.
4              MR. CHUN:  And Juror Number 41?
5              JUROR:  My grandson had an adverse interaction with
6    law enforcement about 14, 15 years ago.
7              MR. CHUN:  Is there anything about that interaction
8    that would affect you here today?
9              JUROR:  No.
10             MR. CHUN:  And Juror Number 38, your relationship
11   with your sister --
12             JUROR:  Is not as strong as it should be; so, no.
13             MR. CHUN:  Is there anything what she's said that
14   provides negative influence to you from it, toward law
15   enforcement?
16             JUROR:  I don't personally have any issues, but I do
17   hear it from her, yes.
18             MR. CHUN:  And would, then, that affect you, even
19   if -- perhaps even subconsciously?  But I see you smirk, and
20   therefore I wanted to ask.
21             JUROR:  No, I don't think so.  I don't think it would
22   affect me personally.
23             MR. CHUN:  And Juror Number 53?
24             JUROR:  Yeah, I did have a negative experience, but I
25   think the officer was just having a really bad day.  I got
```

USA vs. Seleznev, 8/15/16

1   pulled over for speeding, and he was screaming at me.  But that

2   was pretty isolated.  It's not going to impact me.

3            MR. CHUN:  Okay.  Thank you.

4       Lastly, Juror Number 28?

5            JUROR:  Yeah.  I've been pulled over a number of

6   times.  I ride a motorcycle, so the police tend to -- I guess

7   they think I'm in some kind of a gang, or something.  I don't

8   know.

9            MR. CHUN:  Perhaps you were going too fast.

10           JUROR:  I'm too old to be going fast.  I've been

11  followed quite a bit on foot.  You know, I'm pretty old.  They

12  just follow me around town.

13           MR. CHUN:  And does that, then, give you a negative

14  impression of law enforcement from that?

15           JUROR:  I think they've got better things to do with

16  their time than follow me.

17           MR. CHUN:  Because, I guess, of that experience,

18  because it sounds like it's actually happened numerous times,

19  maybe, over, you know, quite a period of time, has that slanted

20  you, perhaps, a little bit against law enforcement, to be a

21  little wary of them?

22           JUROR:  Well, I mind my own business.  I try to keep

23  out of trouble, but they seem to find me.

24           MR. CHUN:  And, I guess, because they're coming to

25  find you, in that sense, do you feel a little bit apprehensive

USA vs. Seleznev, 8/15/16

```
1    of law enforcement?

2              JUROR:  After I went to City Hall and complained,

3    they quit following me.  I don't fault them on their job.  I

4    still think they've got better things to do with their time

5    than follow me around.

6              MR. CHUN:  Thank you.

7         And lastly, Juror Number 46?

8              JUROR:  October 1999, I was arrested from my school

9    for wearing a mask on Halloween.  And that was a really

10   negative experience.  However, just recently, another law

11   enforcement saved my puppy from getting hit by a car on I-5.

12   So that helped realign me, I think.

13             MR. CHUN:  And I think I've covered now everybody.

14        Now, I have to note that, as we talk about this, everybody

15   has mentioned an experience with local law enforcement or the

16   DA's office.  Has anyone had any experience with federal law

17   enforcement, which would be, here, the Secret Service, but I'll

18   include that broadly to include the FBI, the DEA, and other

19   federal agencies?

20             JUROR:  Does Border Control count?

21             MR. CHUN:  Sure.

22             JUROR:  I was detained in December, coming into

23   Miami.

24             THE COURT:  Juror Number?

25             JUROR:  Fifteen.
```

USA vs. Seleznev, 8/15/16

1              MR. CHUN:  And based on that experience, has that

2       affected your view of law enforcement?

3              JUROR:  No, not based on that experience.

4              MR. CHUN:  Based on other experiences?

5              JUROR:  It was -- I mean, it was -- they were rude

6       and provided no explanation, but --

7              MR. CHUN:  And Juror Number 34?

8              JUROR:  Yes.  My contacts were incidental.  You

9       mentioned the Secret Service, and I forgot what was asked

10      earlier.

11             THE COURT:  Sir, you have to keep your voice up.

12             JUROR:  I'm sorry.  I was working as a bank teller,

13      probably 35, 40 years ago, and discovered counterfeit bills and

14      had a brief contact with the Secret Service in that situation.

15             MR. CHUN:  And was there anything about that contact

16      that would affect you here today?

17             JUROR:  No.  I barely remember it.

18             MR. CHUN:  Okay.  And I think that covers everybody

19      on that topic.

20          The next thing I'd like to talk about is evidence.  And as

21      this trial goes along, you will hear, and the judge will

22      instruct you, that there are two types of evidence.  There's

23      something called direct evidence, and there's circumstantial

24      evidence.  And the judge will tell you that direct evidence is

25      proof of a fact based on something that you see, you hear, or

USA vs. Seleznev, 8/15/16

1    you observe yourself.  And that would be direct, whereas

2    circumstantial evidence would be proof of a fact that's

3    indirect evidence.  It's proof of one or more facts based on

4    another fact.

5         And to kind of simplify that, I'd like to give you an

6    example.  So I'm married.  And my wife, she really likes

7    shopping.  And so there are days where I'll take her shopping.

8    Usually, I've screwed something up, and so I'll say, "All

9    right.  We'll go to the mall."  And we'll go in and out of

10   stores.  And I'll watch her convince herself that she has

11   bought stuff at great sales and great deals, as she does it.

12   And that's direct evidence.  I am watching her go shopping.

13   Does everybody understand that?

14        Now, circumstantial evidence, I'll tell you, there are

15   days where I'll come home, and I'll walk into our living room,

16   and there will be bags on the ground.  And those bags will say

17   "Macy's," and "Gap," and "Old Navy."  And when I look in those

18   bags, they will have clothes, tags still on them, and perhaps

19   even receipts in that bag.  Now, ladies and gentlemen, I didn't

20   see her go shopping that day.  But I can tell you, I know she

21   went shopping.  And that would be circumstantial evidence.

22        Now, I'd like to ask the larger group, based on that

23   example, is there somebody here who thinks, "That's not enough.

24   I wouldn't be convinced that she went shopping"?

25        And we'll go, again, through the room.  Juror Number 7,

USA vs. Seleznev, 8/15/16

1   what would give you hesitation about that?

2           JUROR:  I would ask the question, is there any other

3   way the shopping bags would be there, with or without receipts?

4   Is this typical of the shopping she would do?  Are there any

5   other irregularities there?  Is there a piece of a purchased

6   article, or not purchased article, in the collection of

7   articles, that came from another source?  We don't know.  So

8   I'd throw some flags there.

9           MR. CHUN:  And Juror Number 8?

10          JUROR:  Did you say the receipts were in the

11  packages?

12          MR. CHUN:  They were in the bags with the clothes.

13          JUROR:  Oh, the receipts are?

14          MR. CHUN:  Yes.

15          JUROR:  So you could verify the dates.  Because I

16  thought, well, maybe she was taking it back.

17      Is there anyone else in the house?  So I would consider

18  that circumstantial until you knew other facts.

19          MR. CHUN:  Any other jurors on this side?  Juror

20  Number 13?

21          JUROR:  Yeah, I would -- like, did you see the

22  receipt that had her card number or something like that on it?

23  Was there somebody else in the house?

24          MR. CHUN:  So let me ask you, let's say I picked up

25  the receipt, and I saw it was dated for the same day, and it

USA vs. Seleznev, 8/15/16

1   had the last four digits of her credit card.

2        Would that satisfy you at that point in time?

3           JUROR:  If the stuff's in your house, I would assume.

4   At that point in time, I'd probably assume a criminal is not

5   going to steal your wife's card and then bring the stuff to

6   your house, I guess.

7           MR. CHUN:  Thank you.

8        This third of the room, Juror Number 22, would you be

9   hesitant, as well?

10          JUROR:  Yeah, just the fact that it's there doesn't

11  necessarily prove that it was your wife that went and purchased

12  the goods and had put them there.

13          MR. CHUN:  And I do see I'm slowly coming to time.

14  If I could see the show of cards, again, for people who would

15  feel that way about the scenario.  And I'll call out numbers.

16  Juror Number 1, 18, 20, 27, 42, 43, 44, 45, 46, and Juror

17  Number 54.

18       Is there anybody that I did not call out right now?

19          MR. BROWNE:  Could you repeat the question?  What was

20  the question that prompted the cards?

21          MR. CHUN:  The question was how they felt about this

22  scenario, and if they would need more evidence.

23       And Juror Number 28.

24       Now, for everybody who had their hands up right now, is

25  there anybody here who feels circumstantial evidence just

USA vs. Seleznev, 8/15/16

1    wouldn't be sufficient to prove a fact?  And so --

2              JUROR:  How are you defining "prove"?

3              MR. CHUN:  That you could attest that that actually

4    happened.  And that would be Juror Number 37.

5              JUROR:  Could you repeat that, please, what you just

6    said, the question?

7              MR. CHUN:  Are there people here who believe that

8    circumstantial evidence would just never be enough?  Juror

9    Number 28, Juror Number 22, Juror Number 24, Juror Number 37.

10        And for those people who have questions about

11   circumstantial evidence, what you will hear from the Court is

12   that, under the law, evidence, direct or circumstantial, is all

13   the same.  And it's up to each one of you to assess how much

14   weight there is.  But I ask this question, because a lot of the

15   times our understanding of law comes from the media or

16   television.  And a lot of times circumstantial evidence is

17   demonized, because it sounds, well, circumstantial.

18        And so for the people I called out, you're saying that for

19   circumstantial evidence, that would be insufficient, even if

20   the Court instructed you that that is the same as direct

21   evidence, and it's up to you?

22             MR. BROWNE:  Your Honor, I object.  He's talking

23   about the law and --

24             THE COURT:  Counsel, I'll sustain the objection, but

25   I will direct counsel to be mindful, Counsel, of anticipating

USA vs. Seleznev, 8/15/16

1  any particular instruction this Court will be giving to the

2  jury.

3          MR. CHUN:  Yes, Your Honor.

4          THE COURT:  Please continue.

5          MR. CHUN:  Is there anybody here -- again, I'll ask

6  the last question -- that just wouldn't be comfortable finding

7  a fact based on circumstantial evidence?  Juror Number 22.

8      Is there anyone that joins in with Juror 22?  And

9  Juror Number 28.

10     Now, the last thing I'd like to talk about is the burden.

11 The burden of proof in this case is on the government.  The

12 Court has told you that already.  And that is a burden the

13 government takes very seriously.  The buck stops here.  It's on

14 us.  And we embrace that burden.

15     And as you know, this case may go two weeks, perhaps into

16 a third week.  And there may be a point in time, as jurors,

17 you'll think, "I've seen enough evidence.  I wish they would

18 stop."  And yet the government may keep going.  And it's

19 because it's our burden.

20     Is there anybody here who would hold it against the

21 government that we would continue on with our case and perhaps

22 take up more of your time than you believe is necessary?

23     Seeing no hands, I'd like to just thank you in advance.

24 We really appreciate your time, and we'll be conscientious.

25 And we are aware that we're taking you out of your lives for

USA vs. Seleznev, 8/15/16

1   this, and we thank you for your service.

2         No further questions, Your Honor.

3         THE COURT:  Thank you, Counsel.

4         Members of the jury, we're going to take our afternoon

5   break.  But before we take our break, I want to give you an

6   instruction of law.  As I mentioned to you previously, during

7   the course of the trial, I will be giving you instructions.

8   It's part of my job as a trial manager, trial referee.

9         So please abide by the following:  We are about to take

10  our first break.  Remember, until the trial is over, do not

11  discuss this case with anyone, including your fellow jurors,

12  members of your family, people involved in the trial, or anyone

13  else, and do not allow others to discuss the case with you.

14  This includes discussing the case on the internet, chat rooms,

15  or through internet blogs, internet bulletin boards, e-mails,

16  or text messaging.

17        If anyone tries to communicate with you about the case,

18  please let me know about it immediately.

19        Do not read, watch, or listen to any news reports or other

20  accounts about the trial or anyone associated with it,

21  including any online information.

22        Do not do any research, such as consulting dictionaries,

23  searching the internet, or using other reference materials, and

24  do not make any investigation about the case on your own.

25        Finally, keep an open mind until all the evidence has been

USA vs. Seleznev, 8/15/16

1    presented and you've heard the arguments of counsel, my

2    instructions on the law, and the views of your fellow jurors.

3        If you need to speak with me about anything, simply give a

4    signed note to the clerk to give it to me.

5        Now, you may recall that some of the questions I asked you

6    about earlier, in my questioning of the jury, had general

7    questions about have you heard or read anything about this

8    case.  If, by chance, you see or hear anything about this case,

9    you're specifically instructed by this Court to immediately

10   stop reviewing, listening, or considering it.  It's very

11   important that you keep your mind free of any taint.  You can

12   talk about anything else on the planet while you're on this

13   jury, and while we're going through the process of selecting a

14   jury, but you can't talk about what we've discussed in the case

15   so far.

16       Also, many of you provided a lot of different answers to

17   questions.  It's improper for you to go outside that jury room,

18   or outside this courtroom, and say, "Hey, you answered the

19   question as follows."  That's improper.  The lawyers and the

20   Court need to receive the benefit of all communications that

21   you have about your understanding about facts, how you weigh

22   evidence, how you view evidence.  We need to have that in open

23   court; so no discussion whatsoever.

24       Now, one last thing, when you go out, you may see the

25   lawyers, or you may see me, in the hallways or coming into the

USA vs. Seleznev, 8/15/16

1   courtroom.  Please do not try and have any contact with us

2   whatsoever.  We're trying to maintain the appearance of

3   fairness in this case.  If another juror were to see you

4   talking to one of the lawyers from the government, or me in a

5   line, in the security line, that would look a little bit odd.

6   Or if one counsel from one side or the other side were to look

7   and see you having conversation with the other side, that

8   causes a problem with the appearance of fairness.  It's not

9   that we're unfriendly people here.  It's just that we need to

10  maintain a balance and an appearance of fairness at all times.

11      So if you see us, please don't approach us.  We won't

12  approach you.  We won't even try and acknowledge you in any

13  way.  When the case is over, again, I'll come back and talk to

14  you in the jury room.  But until the case is over, please, no

15  communication with anybody in the court.

16      Also, you'll be directed to report -- Victoria?

17          THE CLERK:  They should report to the first floor, at

18  1:20, and then we'll bring them up as a group.

19          THE COURT:  Okay.  1:20, be in the room downstairs,

20  the jury room, on the first floor.  You'll be brought up as a

21  group.

22      Please don't come up to this floor on your own.

23  Oftentimes, there are witnesses that you can't identify by

24  sight, that may be connected to this case.  And we don't want

25  you to hear any inadvertent communication between the lawyers

USA vs. Seleznev, 8/15/16

1   and any prospective witness.

2        So that's all the preliminary instructions I have to give

3   to you at this point in time.  But before you go to lunch, I

4   want each and every one of you to know, that on behalf of the

5   Court, on behalf of the parties, we deeply appreciate the work

6   that you've done so far and your attention and willingness to

7   serve as jurors in this case.

8        Have a good lunch.  We'll see you all at 1:20, and up here

9   at 1:30.  Have a good lunch.

10                  (Jury exits the courtroom)

11       THE COURT:  Before we break, Mr. Browne, you

12  specifically asked for additional time.  I'll let you know,

13  just for the record, the government used 29 minutes and 27

14  seconds of their time.  The Court will see where you are at 30

15  minutes.  If I don't stop you, that means you're making

16  sufficient progress to justify the additional time, up to a

17  maximum of 45 minutes; okay?

18           MR. BROWNE:  Thank you, sir.

19           THE COURT:  All right.  We'll be in recess.

20                      (Recess)

21                  (Jury enters the courtroom)

22           THE COURT:  Ladies and gentlemen of the jury, we'll

23  now begin with counsel for the defense's opportunity to ask you

24  questions in voir dire.

25       Counsel, your time begins now.

USA vs. Seleznev, 8/15/16

```
1          MR. BROWNE:  Good afternoon, everybody.  In federal
2     court, we're glued to the podium.  So if you can't hear me,
3     which is rare, somebody raise your hand; okay?
4          The first thing I just kind of wanted to say, as an aside,
5     is that, Mr. Chun, the people in my family who buy too much is
6     the men.  So I don't know if that was, you know, intended to go
7     one way or another on that.
8          The purpose of voir dire, as the judge has told you, I
9     believe, is to determine whether you could be fair,
10    open-minded, and whether you will follow the two critical
11    principles, which is, proof beyond a reasonable doubt and the
12    presumption of innocence.  That's pretty much it.
13         This method of picking a jury, as the judge explained to
14    you, is actually -- used to be called the Donahue method, but
15    now nobody remembers who Phil Donahue was, so we call it the
16    Oprah method.  And the reason I'm telling you that is -- and I
17    think the judge explained it well -- the only way it works is
18    if you participate.  In other words, if Juror Number 2 says
19    something -- just using you as an example, says something
20    and -- what's your number, sir?
21         JUROR:  Thirty-three.
22         MR. BROWNE:  And you have some response, or you
23    thought she was saying something you didn't agree with, you
24    really need to raise your hand.  Or if somebody else says
25    something that you agree with or don't disagree with, you need
```

1    to raise your hand, because the only way this works is for you

2    to do that.

3         And I will give you an example.  In a case I did a few

4    years ago, the last question I asked during voir dire, which is

5    the last question I'm going to ask you, I promise, is, "Is

6    there anything more we need to know about you?"  So the last

7    question -- I asked that last question in a case, and this

8    30-year-old person raised his hand, and he said, "Yes.  I don't

9    believe in the presumption of innocence."

10        Now, could we all agree that would be important for all of

11   us to know?  I see some nods, yes.  And if he hadn't have said

12   that, we would have never known.  I've had cases where my

13   clients were African-Americans.  And people have -- would raise

14   their hand, and said, "I'm sorry, and I hate to admit it, but

15   I've got some racial problems."  Would we have known that if he

16   hadn't raised his hand?  No.  Was it important to know?  Yes.

17   That's why the only way this works is for you to participate.

18   And I know some of you are much shier than others, and some of

19   you not shy at all, probably.  But if you feel you need to say

20   something, you really need to raise your hand; okay?

21        Let's talk a little bit about the presumption of innocence

22   and proof beyond a reasonable doubt, just a little bit.  And

23   I'd like to have a dialogue.  And if whoever would like to

24   raise their hand and volunteer, that would be great.  If not,

25   I'll pick on somebody.

USA vs. Seleznev, 8/15/16

```
 1        Do you all, as a group and individually, do you think that
 2   applying the presumption of innocence requires an effort?  Can
 3   I see a hand from somebody who will help me with this?  Does it
 4   require an effort to apply the presumption of innocence?
 5        Yes.  Your number, ma'am?
 6             JUROR:  Forty-two.
 7             MR. BROWNE:  And I think you're going to need to
 8   speak up.
 9             JUROR:  Yes, I do.  You said -- would you repeat the
10   question so --
11             MR. BROWNE:  Yes.  Does applying the presumption of
12   innocence, and also proof beyond a reasonable doubt, does that
13   require an effort on the part of a juror?  And you said, "Yes."
14             JUROR:  Well, it does, because it means you have to
15   just eliminate any prejudices you have and just assume that
16   someone could be innocent, no matter how guilty it looks.
17   That's the basis of our jury system.
18             MR. BROWNE:  Thank you, Juror Number 43?  Is that
19   your number?
20             JUROR:  Forty-two.
21             MR. BROWNE:  Forty-two, sorry.
22        Did you all hear that?  She said, yes, it requires an
23   effort.
24        Does anybody disagree with that?  I have a limited amount
25   of time so -- yes, sir, Number 37?  Sorry to call you by
```

USA vs. Seleznev, 8/15/16

1    numbers.

2            JUROR:  That's fine.  I think that it's kind of the

3    starting point.  It doesn't take a lot of effort.  It's just

4    the starting point of presumption of innocence, and then it's

5    the plaintiff's side to prove that -- they have the burden of

6    proving guilt.

7            MR. BROWNE:  Okay.  Let me illustrate it with an

8    example.  And, please, anybody who has any opinions about this,

9    this is really critical.  So if you have an opinion, raise your

10   card; okay?

11       Let me use an example.  Most of you are too young, but in

12   1984, in Seattle, in what we used to call Chinatown, now we

13   call the International District, there was a massacre.  It was

14   called the Wah Mee massacre.  Thirteen people were killed.

15   Does anybody remember that?  Okay.

16       The next day -- we used to have two newspapers, in those

17   days.  The next day, the *PI* and *The Times* had pictures of two

18   guys they arrested for this massacre.  Now, how many of you

19   would have picked up the newspaper, opened it up, seen their

20   pictures, and said, "Oh, I'm going to presume them innocent"?

21   Anybody?  I'm still talking about the effort that it requires

22   to follow these rules.

23       You look interested in the question, sir.  Can I get your

24   number, in the black shirt?

25           JUROR:  The reason I looked interested --

USA vs. Seleznev, 8/15/16

```
 1              THE COURT:  Juror number, first.
 2              MR. BROWNE:  Thirty-four, Your Honor.
 3              JUROR:  As you posed that, I thought, "I'm not going
 4    to make any assumptions about this."
 5              MR. BROWNE:  When you read it in the paper?
 6              JUROR:  Yeah, when I read it in the paper.
 7              MR. BROWNE:  What do you think most people did?
 8              JUROR:  They probably --
 9              MR. BROWNE:  Glad they caught him.
10              JUROR:  Yeah.
11              MR. BROWNE:  Yes, Number 31.  Great.  Thank you for
12    volunteering.  Thirty-one, Your Honor.
13              JUROR:  I think it takes patience.
14              MR. BROWNE:  Patience.
15              JUROR:  Patience.  Because some things can appear
16    overwhelming, but you have to have patience to hear it out.
17    There may be something coming down the pipeline that is going
18    to totally change your mind.
19              MR. BROWNE:  All right.  Juror Number 31 says it
20    requires patience, which, actually, the judge has reminded you,
21    three or four times already, that you can't make up your mind
22    until the whole case is over.
23              JUROR:  But it does take an effort.
24              MR. BROWNE:  Exactly.  I mean, yes, I think you're
25    right.
```

1    Because, you know, a lot of people -- we walk around in
2    this society believing that a lot of our constitutional rights
3    are self-executing.  And I think I can throw a question out,
4    "How many people believe that's true?" and most people, in
5    potential jurors, would say, "No, I need to make an effort at
6    this."  It's just not automatic.  That's the only point I'm
7    trying to make.
8    But, you know, there's another way to do it, and it sounds
9    really silly.  And I've never done it with Judge Jones, but I
10   hope I can do it.  And that is -- because I'm still trying to
11   focus on the effort, presumption of innocence and truth beyond
12   a reasonable doubt; okay?  So this is -- and please bear with
13   me, because it sounds kind of silly; all right?
14   Let's assume the bad news is, you all have to be lawyers.
15   That's the bad news.  This is a game; okay?  But there's a
16   reason, you'll see, and you'll see, and it's not a long one.
17   You all have to be lawyers.  And you can only be three things
18   as lawyers.  One is, you can be prosecutors.  Two is, you can
19   be defense lawyers.  And three, you can be a judge.  And
20   believe me, I'm not writing anything down.  There's no right or
21   wrong answer.
22   How many of you would want to be prosecutors?  Honestly,
23   doesn't matter.  Okay.  How many would like to be defense
24   lawyers?  Anybody?  A few.  How many would like to be the
25   judge?  All right.

USA vs. Seleznev, 8/15/16

1        So let me -- this is why I did it.  How many of you want

2   to be Roman Seleznev?  How many of you want to be the

3   defendant?  Nobody?  Why not?

4        Juror next to -- you're 34; aren't you?  The gentleman --

5   that gentleman.  You're 38 -- are you 39?  Would you want to be

6   in that chair?

7             JUROR:  I would not.

8             MR. BROWNE:  Why not?

9             JUROR:  It's a bad place to be.

10            MR. BROWNE:  Why?

11            JUROR:  There's a lot of bad repercussions that can

12   come from it; or very good, I suppose; but not looking at a

13   great opportunity, I would say.

14            MR. BROWNE:  Anybody else want to chime in on that,

15   why you wouldn't want to be -- yes, Juror Number 8?

16            JUROR:  Because I'd be afraid --

17            MR. BROWNE:  You have to keep your voice up, even

18   though you're sitting right next to the court reporter.

19            JUROR:  I would be afraid that the jurors would not

20   presume me innocent.  And, you know, it's important to listen

21   to all the facts.  That's why the media -- you know, I can't

22   prosecute someone in the media.  You never have all the facts.

23            MR. BROWNE:  Juror Number 8 said she would be afraid,

24   if she were sitting in that seat, that the jurors would not

25   listen to her, and would just assume that he's in that seat

USA vs. Seleznev, 8/15/16

1    because he did something wrong.

2         Yes, Juror Number 18?

3         JUROR:  I was just going to say, I think it's a

4    position of great vulnerability.

5         MR. BROWNE:  Vulnerability, right.  Kind of

6    everything is out of your control.  That's why we have the law.

7    And that's why we have jurors who are unbiased.

8         All right.  So I think I beat that enough.  And I really

9    thank you for that little game we played.  But it really does

10   help, I think, you know, demonstrate how you really do need to

11   make an effort.

12        Can I just see the cards of people who have been on juries

13   before?

14        Let me just choose somebody randomly.  Juror Number 41,

15   back there, was it a criminal case or a civil case?

16        JUROR:  Criminal case.

17        MR. BROWNE:  Okay.  You probably know, going through

18   all that, it takes an effort; doesn't it?

19        JUROR:  It did.

20        THE COURT:  And it takes effort to apply the

21   principles, as well as the facts, as well as the law.  It takes

22   an effort.

23        JUROR:  Yes.

24        MR. BROWNE:  It's a lot of work.

25        JUROR:  And I have to confess, I wasn't entirely

USA vs. Seleznev, 8/15/16

1    successful at it.

2             MR. BROWNE:  Well, that happens.  That doesn't mean

3    the system failed, by the way.

4       Anybody else been on a jury over here?  Juror Number 7?

5             JUROR:  Yes.

6             MR. BROWNE:  Did you think it took an effort for you

7    to apply the principles of proof beyond a reasonable doubt and

8    the presumption of innocence?

9             JUROR:  There was some effort.  Two trials, both

10   trials were --

11            MR. BROWNE:  Were they criminal cases?

12            JUROR:  Yes.  And both trials -- we carefully weighed

13   out the evidence and went back through it and came to a mutual

14   conclusion, without any heated debate.  Everybody was treated

15   civilly.  And I was very favorably impressed.

16            MR. BROWNE:  You've been on two?

17            JUROR:  Two, yes.

18            MR. BROWNE:  And they were both criminal?

19            JUROR:  Yes.

20            MR. BROWNE:  Well, you know how much work it is,

21   then.

22            JUROR:  Oh.

23            MR. BROWNE:  And I assume you took your job very

24   seriously.

25            JUROR:  Yes.

1              MR. BROWNE:  There's -- thank you.

2         Does anybody else want to say anything about that, before

3    I go on to another subject?

4         Okay.  There was an interesting response from two of

5    you -- three of you, but one of them is not here anymore.

6    Juror Number 2 is not with us anymore, I don't think.

7         Okay.  Juror Number 9 and Juror Number 46.  Okay.  I'll

8    get to you in a second, if you don't mind.

9         Juror Number 9, maybe you can't talk about this.  But you

10   said that you have some experience as national security.

11             JUROR:  Not myself --

12             MR. BROWNE:  Are you allowed to talk about it?

13             JUROR:  No.  I actually clarified -- that was -- I

14   have a family member.

15             MR. BROWNE:  And can we find out what he or she does?

16             JUROR:  He works for Naval Intelligence.

17             MR. BROWNE:  That's all I need to know.

18        How close are you?

19             JUROR:  Not very.  It's my second cousin, my mom's

20   first cousin.

21             MR. BROWNE:  Juror Number 46, you also answered that

22   affirmatively.

23        Do you feel free talking about it?

24             JUROR:  I'm not allowed to talk too much about it.

25   All I can really say is, I was an engineer for military

USA vs. Seleznev, 8/15/16

1    projects for Boeing.

2              MR. BROWNE:  You had security clearance, then?

3              JUROR:  ITAR.

4              MR. BROWNE:  So that was you, personally?

5              JUROR:  Yes.

6              JUROR:  I have a question.

7              THE COURT:  Yes, Juror Number?

8              JUROR:  Sorry.  Number 20.

9              MR. BROWNE:  Number 20.

10             JUROR:  So I also have worked at Boeing in a

11   classified program.

12             MR. BROWNE:  Okay.  I mean, that's -- that's

13   really -- you answered that question correctly.  And so we're

14   done with that subject, I think.

15        Then, I don't know how I'm going to do this in the limited

16   amount of time I have, but I'll do the best I can.  Let me

17   count, first.  Seventeen of you indicated that -- and it might

18   have been more, because I might have not been able to write

19   them down.  Somebody was talking kind of fast -- but were the

20   victims of credit card fraud, of some kind or another.  Juror

21   Number 2 is not here anymore, so that makes it 16.

22        Juror Number 3, you were, unfortunately.  How long ago was

23   that?

24             JUROR:  About a year or so ago.

25             MR. BROWNE:  Did it -- I mean, sometimes it creates a

USA vs. Seleznev, 8/15/16

1    major headache.  Sometimes it's just --

2              JUROR:  No.  My credit card company stopped it right

3    away.  They just had noticed charges coming in from another

4    country and immediately deactivated my card and reimbursed me

5    for all the funds.

6              MR. BROWNE:  So, basically, you got a new credit

7    card, and it didn't cost you anything out of your pocket.

8              THE COURT:  Excuse me.  Is that a "yes" or "no"?

9              JUROR:  No.

10             THE COURT:  Okay.  Thank you.  I knew I'd get

11   somebody.

12             JUROR:  Sorry.

13             MR. BROWNE:  So some people have -- I'm sure we're

14   going to get to it.  Somebody in here has probably had a major

15   headache when that happens, where you have to get a new -- but

16   yours was run-of-the-mill kind of thing, I guess.

17             JUROR:  Yeah.

18             MR. BROWNE:  Four?  Do you want to tell us about it?

19             JUROR:  They bought a soccer jersey from some

20   website --

21             MR. BROWNE:  A what?

22             JUROR:  A soccer jersey.

23             MR. BROWNE:  A soccer jersey?

24             JUROR:  Yeah.

25             MR. BROWNE:  With some team that you don't support?

USA vs. Seleznev, 8/15/16

1              JUROR:  I'm not a fan of soccer at all.

2              MR. BROWNE:  That was a clue.

3         Did you do anything other than just have to have your

4    credit card changed?

5              JUROR:  Yeah, just called and said there was a

6    strange charge.

7              MR. BROWNE:  Juror Number 5?

8              JUROR:  Mine was similar --

9              MR. BROWNE:  Sorry, a little louder.

10             JUROR:  Mine was similar.  Just a couple of charges I

11   didn't recognize, and my credit card company immediately

12   reimbursed me.  It was a minor situation.

13             MR. BROWNE:  So it wasn't a major pain.  It was just

14   a pain.

15             JUROR:  Yeah.

16             MR. BROWNE:  Okay.  Six has been a lucky guy, because

17   he hasn't had it.

18        Eight, you had a credit card account --

19             JUROR:  A few years ago, credit card was used in

20   Australia.  And I think my company called me and canceled and

21   reissued my card.  It was pretty simple.

22             MR. BROWNE:  Once again, you got a new credit card

23   out of it --

24             JUROR:  Yeah.

25             MR. BROWNE:  -- and it didn't cause a major headache.

USA vs. Seleznev, 8/15/16

```
1              JUROR:  And prior to that, I had something else
2   happen at one of those stores like TJ Maxx.  And there was --
3   yeah, so, again, they contacted me and reissued the card.
4              MR. BROWNE:  So you worked it out.
5              JUROR:  Yeah.  And that was, like, five years ago.
6              MR. BROWNE:  Thirteen?  Yes, sir, I know I was going
7   to get to you one time or another.
8       What happened to you?
9              JUROR:  I think I was asleep, and I got a call from
10  my bank, saying that somebody in Spain had used my card.
11             MR. BROWNE:  In Spain?
12             JUROR:  Yeah.  They spent a few hundred dollars,
13  like, 400, or something like that.
14             MR. BROWNE:  So you got a new credit card?
15             JUROR:  Yeah.
16             MR. BROWNE:  That was pretty much the extent of it?
17             JUROR:  Yeah.  And then the Target thing a few years
18  ago.
19             MR. BROWNE:  I can't hear you, sir.
20             JUROR:  The Target --
21             MR. BROWNE:  Oh, you were part of the Target hacking
22  system thing.
23             JUROR:  Yeah.
24             MR. BROWNE:  Oh, that's right.  You raised your hand
25  for that too.
```

USA vs. Seleznev, 8/15/16

```
1              JUROR:  That was more of a pain, because I didn't
2     have a card for, like, a week.
3              MR. BROWNE:  I just want to make sure I wrote you
4     down for that, also.  Yeah, I did.
5         That was more of a pain; but didn't cost you anything.
6              JUROR:  Not financially, no.
7              MR. BROWNE:  Just a pain.
8              JUROR:  Yeah.
9              MR. BROWNE:  Shop at Target a lot?
10             JUROR:  No.  No --
11             MR. BROWNE:  Well, you didn't need the card for a
12    week.
13             JUROR:  -- like, I hadn't shopped at Target for five
14    years.
15             MR. BROWNE:  Are you -- what was your number?
16    Thirteen?
17             JUROR:  Thirteen.
18             MR. BROWNE:  Eighteen.  I'm going to pass on you.
19    You've been lucky.  Nothing with you.
20        Eighteen is -- hi.
21             JUROR:  Hi.
22             MR. BROWNE:  What happened?
23             JUROR:  Multiple times I've had charges from England,
24    or wherever, strange places.  I've probably gone through four
25    cards now.
```

USA vs. Seleznev, 8/15/16

```
 1              MR. BROWNE:  Oh, it's happened to you four times?
 2              JUROR:  Yes, both with my work and my personal.  But
 3      it hasn't cost me anything out of pocket.
 4              MR. BROWNE:  Did it -- I mean, some people
 5      actually -- I don't know if anybody here -- maybe I should just
 6      ask.  Some people actually get new identities and things,
 7      because their identity is stolen, stolen.  That didn't happen,
 8      obviously.
 9          And you didn't lose anything out of pocket?
10              JUROR:  No.
11              MR. BROWNE:  And it was something that you didn't
12      have to put more than an hour or so into, total?
13              JUROR:  A couple each time, so, you know.
14              MR. BROWNE:  Did you catch it, or did the banks catch
15      it?
16              JUROR:  I caught it one time, and the banks caught
17      it.
18              MR. BROWNE:  So you're probably the best example.
19      Now I can ask.  Nobody likes that.  So this case is about
20      allegations like that.
21          Do you think you can be fair?
22              JUROR:  I think I can be fair.
23              MR. BROWNE:  Twenty?
24              JUROR:  Yes.
25              MR. BROWNE:  What happened to you?
```

USA vs. Seleznev, 8/15/16

1          JUROR:  My credit card was used by an unauthorized

2     user, and I got a call from the bank that told me --

3          THE COURT:  Your voice is trailing off.

4          JUROR:  -- have you been purchasing this and that,

5     and this business and that business, and I said, "No."  And

6     they issued me a new credit card.

7          MR. BROWNE:  Did that just happen once?

8          JUROR:  It has -- I think, yeah.  That's all I

9     remember, one time.

10          MR. BROWNE:  You have a very unusual last name too;

11     right?

12          JUROR:  I am.

13          MR. BROWNE:  Yeah.  But -- so somebody still used

14     your credit card -- was it on more than one occasion?

15          JUROR:  They used the same credit card, when it was

16     stolen, the number was stolen, on multiple purchases.  But

17     that's the only time that I remember it's happened to me.

18          MR. BROWNE:  I guess I should have asked everybody

19     this.  But anyway, was your card physically stolen?

20          JUROR:  No.  It was the number.

21          MR. BROWNE:  And you were made -- didn't cost you

22     anything out of pocket?

23          JUROR:  No.  It was a lot of inconvenience, though.

24          MR. BROWNE:  A lot of what?

25          JUROR:  Inconvenience.

USA vs. Seleznev, 8/15/16

```
 1              MR. BROWNE:  Oh, I'll bet.
 2         So same question I asked the previous juror.  I mean, this
 3    case involves allegations like that, stressing the word
 4    "allegations."  Do you think you can still be fair?
 5              JUROR:  Yes.
 6              MR. BROWNE:  Good.  I like the definitiveness of
 7    that.  That's easy.  I don't have to ask you any other
 8    questions if you just say, "Yes."  If you say, "I think so,"
 9    then I'll have to ask more questions.  That's a warning.
10         So after Number 20, we have 21.
11              JUROR:  Right here.
12              MR. BROWNE:  Yes, over there.
13              JUROR:  The same thing happened to me, just my bank
14    called me up and said there was charges being made in South
15    Carolina.  And I had my card so --
16              MR. BROWNE:  And one occasion?
17              JUROR:  Yes.
18              MR. BROWNE:  And minor inconvenience?  Major
19    inconvenience?
20              JUROR:  Just minor.  I mean, it was nothing.
21              MR. BROWNE:  So we don't need to worry about your
22    objectivity in this case?
23              JUROR:  No.
24              MR. BROWNE:  "No" is good too, by the way.
25         And you're 20?
```

USA vs. Seleznev, 8/15/16

```
 1                    JUROR:  I'm 21.
 2                    MR. BROWNE:  Twenty-eight?  Yes, sir.  What happened?
 3                    JUROR:  Same thing.  Bank called and said that the --
 4      somebody was trying to charge dental work in Minnesota.
 5                    MR. BROWNE:  Dental work?
 6                    JUROR:  Yeah, $2,000 worth of dental work on my card.
 7                    MR. BROWNE:  That's interesting.  Somebody must have
 8      been pretty desperate.
 9                    JUROR:  Yeah.
10                    MR. BROWNE:  I mean, I can see buying a car, or a new
11      pair of shoes, but not teeth.
12                    JUROR:  I've had it, like, two times, that I know of.
13                    MR. BROWNE:  On the same card?
14                    JUROR:  On the same card, but I canceled the card.
15                    MR. BROWNE:  You canceled the card?
16                    THE COURT:  Sir, your voice is trailing off.  We
17      can't hear -- Mr. Browne?  Mr. Browne?  We can't hear anything
18      that's being said.
19                    MR. BROWNE:  Yes, sir?
20                    THE COURT:  We can't hear anything that the juror is
21      saying.  We can't hear anything that the juror is saying.  You
22      guys are having a great conversation, but we can't hear it.
23          Would you repeat your last answer, sir?
24                    JUROR:  It was a minor inconvenience.  I canceled the
25      credit card, so I don't have that credit card anymore.
```

USA vs. Seleznev, 8/15/16

```
 1              THE COURT:  Thank you.
 2              MR. BROWNE:  Thank you.
 3         Thirty-four?  Yes, sir?
 4              JUROR:  Yes.
 5              MR. BROWNE:  What happened?
 6              JUROR:  My credit card has been changed three or four
 7    times.  And in one of those instances, it was an attempt to
 8    steal identity.  And that's probably the most frustrating,
 9    because we were in California, on a trip, and that card had to
10    be canceled, obviously.
11              MR. BROWNE:  While you were on vacation?
12              JUROR:  While we were on vacation.
13              MR. BROWNE:  How did they try to steal your identity?
14              JUROR:  Well, what happens is, many of these
15    companies, credit card companies, will mail you a statement.
16    They will also mail you, once a month, an opportunity to
17    transfer all of your debt to their card.  And I didn't realize
18    that someone could break into the mailbox, take that, and then
19    claim they were me, and go --
20              MR. BROWNE:  And get a new card.
21              JUROR:  So for me, the most frustrating aspect is
22    just the lost time.  In every case, the banks have been very
23    good about making sure that I'm not out any money, but it's
24    frustrating to change everything.
25              MR. BROWNE:  Under the law, the banks have no choice.
```

USA vs. Seleznev, 8/15/16

1   But I don't know about good.  They have no choice.  But I'm
2   happy for you.
3       Would that be of concern for me, that this happened to
4   you, given the nature of this case?
5           JUROR:  I don't think so.  I mean --
6           MR. BROWNE:  There's -- I knew somebody was going to
7   say, "I don't think so."  It's like, assuming I was married, I
8   went and said, "Hey," to my wife, "do you love me?" and she
9   says, "I think so," I would probably have a few more questions;
10  right?
11      So you say, "I don't think so," and you really need to --
12  all jurors need to say -- because, you know, you could never be
13  totally, a hundred percent certain about how fair you're going
14  to be; right?
15          JUROR:  I misunderstood your question.  I thought you
16  were asking me, "My name's Browne.  Your name's Browne.  What
17  happens if I get something in the mail, in my mailbox, and my
18  identity is stolen?"
19          MR. BROWNE:  Oh, yeah.  Okay.  Then I don't think I
20  made my question very clear.  So we're good.
21      Okay.  And your number was what, sir?
22          JUROR:  Thirty-four.
23          MR. BROWNE:  And we have 36.  What happened?
24          JUROR:  About a year ago, I checked my credit card
25  statement, and I had a charge for a restaurant in Michigan.

USA vs. Seleznev, 8/15/16

1   This is after a week or so of vacation, but I never visited the

2   Michigan area.  So I called the credit card company, and they

3   sent a new card within a couple of weeks.

4           MR. BROWNE:  Did they ever tell you where your card

5   was compromised?  I mean, like, if you used it at a gas

6   station, and it was compromised there, or you used it at

7   Macy's, and it was compromised there?

8           JUROR:  No.  They never said anything specific.

9           MR. BROWNE:  They didn't figure it out.

10      You actually caught it, yourself; right?

11          JUROR:  Yeah.  They did not call me.  I checked my

12  statement, myself.

13          MR. BROWNE:  There's a good lesson.

14      Was it a lot of money?

15          JUROR:  For the restaurant that it was, yes.  It was,

16  coincidentally, a pizza place.  It was a $200 charge.

17          MR. BROWNE:  So, I mean, that's one of the

18  allegations in this case.

19          JUROR:  Yes.

20          MR. BROWNE:  Is that going to -- should I worry about

21  that with you?

22          JUROR:  No.

23          MR. BROWNE:  All right.  And you're 36; right?

24          JUROR:  Yes.

25          MR. BROWNE:  Thirty-eight?

USA vs. Seleznev, 8/15/16

```
1              JUROR:  Yes.  My story is very similar to Number 34.
2    I've had my card stolen a few times now.
3              MR. BROWNE:  Not literally stolen.
4              JUROR:  No, not literally.  I'm sorry.  Just the
5    number.
6         The first time, it was a -- somebody had made charges on
7    my account for a pornographic site.  And it clearly wasn't me.
8    So I actually called up the bank.  The bank had me call the
9    site to get the charges taken off, which I don't know if that's
10   common anymore, but that's what happened that time.
11             MR. BROWNE:  So who caught it?  You caught it?
12             JUROR:  I caught it, the first one.
13             MR. BROWNE:  And you say it's happened three times or
14   two times?
15             JUROR:  I think it's three or four.
16             MR. BROWNE:  And have you, like this gentleman, or
17   somebody who actually tried to have their identity stolen
18   [sic], that didn't happen?
19             JUROR:  Actually, one time somebody was going around
20   to different shops, like Target or whatever else, and they were
21   apparently using -- this is what I was told, anyway --
22   apparently using an ID with my picture on it.  Again, that
23   didn't really affect me.  In the end, they took care of it.
24             MR. BROWNE:  So as soon as you got a new credit card,
25   things were cool?
```

USA vs. Seleznev, 8/15/16

```
1              JUROR:  Yeah.  I haven't had any problems with that
2    card for a long time.  It was the same card each time.
3              MR. BROWNE:  And did you ever figure out where it had
4    been compromised?  I mean, like, at a Target or -- because, you
5    know, Target was hit.
6              JUROR:  In that case, I was just using that as an
7    example.  Target wasn't one of the shops.  But it was, like, a
8    bunch of shops downtown.
9              MR. BROWNE:  In Seattle?
10             JUROR:  In Seattle.  That particular one was in
11   Seattle.  Some of the other ones were in other states, that I
12   can't recall.
13             MR. BROWNE:  Well, somebody got compromised in Europe
14   already.
15         And are you 36?
16             JUROR:  I'm 38.
17             THE COURT:  You're 38.  Okay.
18         Forty?
19             JUROR:  It was a very similar --
20             MR. BROWNE:  Hi.  We haven't talked to you very much.
21             JUROR:  It was a very similar scenario.  But it was
22   about ten years ago, and my credit card company called me about
23   a purchase that they thought looked suspicious.  And they asked
24   me if I had the card in my possession, and I didn't.  And I had
25   last used it at a Macy's downtown.  So I think at some point it
```

USA vs. Seleznev, 8/15/16

1   was mislaid, or stolen.

2           MR. BROWNE:  Oh, so that one was actually stolen,

3   maybe.

4           JUROR:  So in that case, the card actually was

5   stolen.  And it was not a big deal, because they simply just

6   cleared the charges and issued me a new card.

7           MR. BROWNE:  So they called you before you realized

8   the card was missing.

9           JUROR:  Yeah.  Several thousand dollars' worth of

10  charges had been run up within, like, a three-hour period.  And

11  that's not my pattern, so they caught it immediately, and

12  contacted me.  And the first thing they asked is if I had the

13  card.  And I looked in my wallet, and I didn't have the card.

14  So that's when I realized it was a problem.

15          MR. BROWNE:  I always leave them in the debit

16  machine, because I forget about it.

17          JUROR:  I think I might have left it on the counter.

18  I don't really know.

19          MR. BROWNE:  So that's not a problem with this case,

20  that experience?

21          JUROR:  No.  And it was ten years ago too.  I've been

22  really lucky since then.  So, no, it would not be.

23          MR. BROWNE:  You're forty; right?

24          JUROR:  Uh-huh.

25          MR. BROWNE:  Forty-one, sir, what happened?

USA vs. Seleznev, 8/15/16

1          JUROR:  Last year I had my credit card number used

2    electronically, on a couple of occasions, while traveling in a

3    foreign country.

4          MR. BROWNE:  When you were in the foreign country?

5          JUROR:  Yes.  And there were small, nominal amounts.

6    I suspect it was trying to see if it would be successful or

7    not.  And we had those charges reversed, and then were issued a

8    new card.  And then about three years ago, my identity was

9    stolen, and someone fraudulently filed an electronic tax return

10   to get my tax return.  And so I have to then do paper filings

11   since then.

12         MR. BROWNE:  Now, that's a pain.

13         JUROR:  Yeah.  But it was not --

14         MR. BROWNE:  Now the IRS knows about you.

15         JUROR:  No, it's not a monetary thing.  It was more

16   inconvenient.  Still is.

17         MR. BROWNE:  But that does sound like it was

18   aggravating, I would assume.

19         JUROR:  Yes.

20         MR. BROWNE:  Should I worry about that?

21         JUROR:  No.

22         MR. BROWNE:  Okay.  Thank you, sir.  You're 40?

23         JUROR:  Forty-one.

24         MR. BROWNE:  Fifty-one, yes, sir?

25         JUROR:  I had an issue with someone using my AmEx

USA vs. Seleznev, 8/15/16

```
1   card for Expedia.  And they took care of it, sent me a new card
2   right away.  No issue there.  And then my Starbucks card got --
3   which I use the app on my phone.  And that got hacked, and they
4   bought, like, Starbucks gift cards.  That was a little bit of a
5   pain.  I didn't get any free coffee out of it.  But other than
6   that, it was taken care of.
7               MR. BROWNE:  Did you catch that, or did they catch
8   it?
9               JUROR:  Yeah, both times.
10              MR. BROWNE:  You caught it both times on your
11   statements?
12              JUROR:  Yeah.
13              MR. BROWNE:  So somebody actually stole your app on
14   your phone?
15              JUROR:  Well, what it is is, my credit card is linked
16   to there.  And so then the charges showed up on my credit card.
17   So I --
18              MR. BROWNE:  You must check your credit card often.
19              JUROR:  I try to.
20              MR. BROWNE:  Probably more now.  And are you 51?
21              JUROR:  Yes, sir.
22              MR. BROWNE:  Fifty-two, and then we're done.
23        Yes, ma'am?
24              JUROR:  Yeah.  I was part of the Target issue.  And
25   then two other times I've had issues with my credit card, where
```

USA vs. Seleznev, 8/15/16

1   they -- once the bank caught it.  They called.  There was all

2   these charges in Europe, and we were not traveling there.  So

3   they canceled the card and reissued a new one.  We didn't pay

4   for anything.  It was just a new card.  And then the second

5   time was, I caught it on my statement.  There was probably a

6   couple thousand dollars' worth of charges to places I don't

7   even know.  And I had the card.  I just -- I don't know how

8   they got the number and were using it.  So the bank refunded

9   all that, and it was just changing everything over, auto

10  payments and everything, to a new card.

11          MR. BROWNE:  But you caught it, yourself?

12          JUROR:  I caught the second one, yes.

13          MR. BROWNE:  Good reason to read statements.

14          JUROR:  Yes.

15          MR. BROWNE:  So should I worry about that in this

16  case?

17          JUROR:  No.

18          MR. BROWNE:  Thank you, everybody.  I think I went

19  through the numbers on that.  Because you're 52; right?

20          JUROR:  Yes.

21          MR. BROWNE:  And -- you look much younger.  Sorry.

22          THE COURT:  Apologize to her.

23          MR. BROWNE:  Does anybody have any issues -- you

24  know, identity theft has become a big deal.  It's in the

25  papers.  It's in magazines.  It's on TV.  Does anybody have any

USA vs. Seleznev, 8/15/16

1    really strong feelings about allegations of that, that would

2    impair your ability to be fair in a case like this, where

3    there's lots of charges?  Let's put it that way.  And I don't

4    mean money charges.  I mean criminal charges.  Does anybody

5    have such an issue about that?

6         It's one of the things I think that people don't blog

7    about, you know, not that I read blogs.  But anyway, I don't

8    think that it's, you know, like, something people blog about,

9    because the banks take care of the losses; right?  But does

10   anybody have a real potential deep problem with it?

11        Okay.  And then some of you were the victims of hacking.

12   May I just see -- somebody hold up a number, anybody.  I just

13   want to ask a question.  Yes, Juror Number 47.

14        You know, my 22-year-old and my 25-year-old always remind

15   me how much I don't know about computers; okay?

16        So hacking, somebody put a virus in your computer?

17             JUROR:  No.  It was a machine from work that we

18   were -- a bunch of us were developing on.  And I was

19   administering it, in my spare time, and someone hacked that

20   machine.

21             MR. BROWNE:  What does that mean to you?

22             JUROR:  They were hosting adult content on it.  They

23   had taken over part of the system for that.

24             MR. BROWNE:  Okay.  Anybody else who answered that

25   question?

USA vs. Seleznev, 8/15/16

```
1          What was your number, sir?  I forgot your number.
2               JUROR:  Forty-seven.
3               MR. BROWNE:  Okay.  Yeah, I wrote it down.
4          Who's 15?  Did you get hacked?
5               JUROR:  I was frequently a target of hacks, but
6     they -- my server, but they never actually successfully hacked
7     through.
8               MR. BROWNE:  And excuse me for my ignorance,
9     "hacking," to you, means?
10              JUROR:  Well, there were -- in this case, it was a --
11    it's a series of brute force attacks, where they are
12    essentially trying multiple passwords.
13              MR. BROWNE:  They're going after more than just one
14    person.
15              JUROR:  Well, it's automated.
16              MR. BROWNE:  And how did you catch it?
17              JUROR:  Well, I can see when it's happening.  There's
18    now much better security software that tends to filter out
19    these attempts.  They go after WordPress sites, and there are
20    some WordPress --
21              MR. BROWNE:  What kind of site?
22              JUROR:  WordPress, which is a common blogging
23    platform.
24              MR. BROWNE:  Sorry.
25              JUROR:  And because it's so common, there's a lot of
```

USA vs. Seleznev, 8/15/16

1   attacks trying essentially to get through and turn it into a

2   slave computer, slave server.  But now there's good software.

3              MR. BROWNE:  You're a writer; correct?

4              JUROR:  I am a writer.

5              MR. BROWNE:  So does that -- did somebody ever try to

6   hack your writing system?

7              JUROR:  Well, possibly.  Because I'm a political

8   blogger, and there were times where both the brute force

9   attacks and denial-of-service attacks would go after my site to

10  try to take it down.  And possibly it was random.  Possibly it

11  was politically motivated.

12             MR. BROWNE:  Was that a big nightmare?

13             JUROR:  It can be.  I lost a server company once,

14  because they didn't want to serve my site anymore.  It was

15  using too much of their resources.

16             MR. BROWNE:  Should I worry about that in this case?

17             JUROR:  No.

18             MR. BROWNE:  Well, I assume most of you follow the

19  news, such that it is these days.

20      Are people aware that just over this last weekend there

21  was a lot of news reports about Russia influencing Donald

22  Trump's adviser?  Do you know about this story?  And it was,

23  like, millions of dollars, supposedly.  And I'm not going to

24  talk politics; okay?  But there was a lot of coverage about it.

25             So -- and then also, obviously, Mr. Seleznev is Russian.

USA vs. Seleznev, 8/15/16

```
1    He's got two interpreters there.  And I don't know, personally,
2    anybody that's prejudiced against Russians, but I imagine there
3    are.  So do -- you know, I have to talk about it.  If my client
4    was black or Hispanic, I'd be asking the same question.  So --
5    and this is where it really does require -- because, you know,
6    maybe somebody had a bad experience.  Maybe somebody went to
7    Russia as a tourist, or something, and got harassed, or
8    something.  I don't know.  But this is one of those questions
9    where only you can provide the answer about whether you have
10   any concerns about being fair solely because Mr. Seleznev is
11   Russian.
12        You look like you're following the question, sir, with the
13   blue shirt on.  Can I see your number?  Any problem with you?
14             JUROR:  No, sir.
15             MR. BROWNE:  I can tell you're really thinking, which
16   is good.  I was wondering what you were thinking.
17             JUROR:  I'm always thinking, sir.
18             MR. BROWNE:  You're on the jury.
19        Okay.  Now -- yes?
20             JUROR:  I just want to say one thing.
21             THE COURT:  Juror number?
22             MR. BROWNE:  Eight.
23             JUROR:  As I walked into the jury room, the news was
24   on.  And one of the things that was on was Trump and something
25   about the Russians.  So I completely shut it out, because --
```

USA vs. Seleznev, 8/15/16

```
1              MR. BROWNE:  There's a TV in the jury room?
2              JUROR:  Yes.  So I just wanted to say that.  Yes, in
3    the assembly room.  It was right before -- you know, it was a
4    channel that hosts the Olympics.
5              MR. BROWNE:  That surprises me.
6         Are you talking about the big jury room downstairs?
7              JUROR:  Yeah.  Now, I didn't hear anything.  I got to
8    leave, coming in line.
9              MR. BROWNE:  I was not aware of that.
10        May I have one moment, Your Honor?  Because I think I
11   might be done.
12             THE COURT:  Yes.
13             MR. BROWNE:  All right.  Sorry, Your Honor, just a
14   few more questions.
15        A number of you answered the judge's question that you
16   have specialized training in computer stuff.  That's what I
17   call it, "computer stuff."
18        One -- two is gone already.  Five, you, sir, what kind of
19   specialized training?
20             JUROR:  Sequel programming, just real basic stuff
21   like that, coding.
22             MR. BROWNE:  Well, if you -- maybe I'll just --
23   because there's -- let's see.
24        You're five; right?
25             JUROR:  Yes.
```

1          MR. BROWNE:  So there's one, two, three, four, five,

2     six, seven, eight, nine of you.  So let me just ask the

3     question.

4          Specialized training in computers -- and I don't mean to

5     be patronizing -- do you know what forensics is?

6               JUROR:  Yes.

7               MR. BROWNE:  Is your training in forensics?

8               JUROR:  It's not that deep.

9               MR. BROWNE:  Sorry?

10              JUROR:  No, it's not.

11              MR. BROWNE:  It's more generalized?

12              JUROR:  It's more, like, creating programs versus

13    deep-diving into it.

14              MR. BROWNE:  Okay.  So the remaining -- I'll just

15    read off the numbers -- thank you, sir -- 19, 26, 31, 32, 38,

16    43, 47, and 50.

17         Any of those numbers I've just called out have any special

18    training in forensics?  And for those of you who don't know,

19    forensics are people who claim to be experts in -- claim to be

20    experts in computers, and "forensic" means they can come in and

21    testify in court, because, you know, forensics.  It's like CSI

22    for a computer; okay?

23         Do any of those numbers that I've just listed off have any

24    specialized forensic training in computers?  There's nothing

25    wrong if you do.  There's no right or wrong answer.

USA vs. Seleznev, 8/15/16

1          Yes, Number 26?

2              JUROR:  Broadly, I have a fairly good understanding

3     of what they're doing.  As to actually performing forensics on

4     a computer, I've never done it.  I just understand broadly what

5     they are doing.

6              MR. BROWNE:  Okay.  Well, that's a good answer.  See,

7     that's -- you know, he was taking the safe road.  Thank you.

8          So you're not -- you wouldn't call yourself a computer

9     forensic expert --

10             JUROR:  No.

11             MR. BROWNE:  -- but you know what they supposedly do.

12             JUROR:  Yes.

13             MR. BROWNE:  Do you know of computer experts that

14    disagree with each other?  Anybody have any problem with that?

15         Any of the other numbers I listed off have any forensic

16    training in computer?  Okay.  I'm just going to choose one,

17    randomly, so I don't use too much time.

18         Who's 50?  Okay.  Thank you, sir.  Oh, yes.  You work in

19    the medical field.

20             JUROR:  Yes.

21             MR. BROWNE:  But your hobby is computers.

22             JUROR:  Yes.

23             MR. BROWNE:  I have trouble with my phone, so I'm

24    just amazed that you have a hobby that's computers.  But you

25    don't look like a gamer.

USA vs. Seleznev, 8/15/16

```
1              JUROR:  No.

2              MR. BROWNE:  Okay.  So your specialized knowledge

3    is -- did you build your computer?

4              JUROR:  Yes.

5              MR. BROWNE:  So that's -- I think counsel asked,

6    that's -- you were -- that's hardware; right?

7              JUROR:  Yes.

8              MR. BROWNE:  So your specialty would be in hardware.

9              JUROR:  But I do also all the operating systems.

10             MR. BROWNE:  Would you say you were an expert in

11   forensics?

12             JUROR:  No.

13             MR. BROWNE:  And you know what that is, because

14   you're in the health field.

15             JUROR:  Yes.

16             MR. BROWNE:  All right.  Anybody else answer that?

17        Okay.  I promised you, and I promised the judge and

18   everybody else, I was going to ask that question.  You know, I

19   asked this question one time, believe it or not, and somebody

20   did raise their hand and said -- this is that question, "Is

21   there anything we need to know about your being fair?" -- and

22   somebody actually raised their hand and said, "Yeah.  I don't

23   like you."  Okay.  You know, so we work it through.  And he got

24   to stay on the jury, because he realized that liking me is not

25   a requirement.
```

USA vs. Seleznev, 8/15/16

1        But, I mean, the last question I have is, you know, really
2    search your hearts and your minds, you know, is there anything
3    we really need to know about whether you can be fair and
4    impartial in this case?  Because I'll guarantee you one thing,
5    whoever ends up on this jury is going to see a very
6    well-prepared trial.  Because everybody in this courtroom knows
7    what they're doing, including the judge, by far.  So whoever
8    ends up on the jury is going to see a well-done trial.
9        So now that I've said all that, anybody say, "I'm sorry.
10   I just can't do it"?
11       Yes, sir, Number 37?
12           JUROR:  I want to preface this, because I wanted you
13   to know, I don't believe that this would impair my judgment in
14   any way, but I did, for full disclosure, work for a global
15   trade association that was focused on cybersecurity and
16   e-commerce payments and card-not-present mobile apps.
17           MR. BROWNE:  What did you do for them?
18           JUROR:  I was the director of communications.  I'm
19   not a subject matter expert.
20           MR. BROWNE:  Is the name of that company a secret?
21           JUROR:  No.  It's Merchant Risk Council.
22           MR. BROWNE:  Merchant Risk Council.
23           JUROR:  Yes.
24           MR. BROWNE:  And you prefaced it by saying it
25   wouldn't affect you.

1          JUROR:  Not at all.

2          MR. BROWNE:  Okay.  But it is important for us to

3     know, yes.  Because we have to make decisions what jurors to

4     keep and what jurors not to keep, to a certain extent.  So that

5     was good.

6          Somebody else raised their card.  Forty-one, yes, sir.

7     What do we need to know?

8          JUROR:  Two things.  I had two occasions to work in

9     Russia on -- for a mediation firm, international mediation

10    firm.  Both occasions, which were a year apart, probably eight

11    years ago, maybe ten years ago, I encountered --

12          THE COURT:  Two minutes, Mr. Browne.

13          JUROR:  -- criminal elements while I was there,

14    related to the work that I was doing.  And I would worry that

15    that might affect my impartiality.  That was the first issue I

16    wanted to raise.

17          The second one is that, and -- more importantly, I

18    believe -- that I encountered media content about three weeks

19    ago, I believe --

20          MR. BROWNE:  Say that again?

21          JUROR:  Media content, in the local newspaper, about

22    two or three weeks ago, regarding a dispute that you're having

23    with a colleague.  And that left me with an impression that I

24    believe would make it difficult for me to be impartial.

25          MR. BROWNE:  Did you hear that, Your Honor?

USA vs. Seleznev, 8/15/16

```
 1              THE COURT:  I did.
 2              MR. BROWNE:  Okay.  There's been a follow-up on that
 3    story.
 4         But that's a perfect example of what we need to hear;
 5    okay?
 6         Anybody else?  And your number, again, sir?
 7              JUROR:  Forty-one.
 8              THE COURT:  All right.  Thank you, Counsel.
 9              MR. BROWNE:  I would have something to take up at
10    another time.
11              THE COURT:  All right.  Members of the jury, I'll
12    ask, at this point in time, if you'd just raise your cards.
13    Just hold your numbers up, just to give counsel the
14    opportunity, one final chance to make sure that their notes
15    correspond with your juror numbers.
16         Counsel, let me know when we can have the jurors put their
17    cards down.
18         Are you satisfied with your inspection, counsel for the
19    government?
20         Counsel for the defense?
21              MR. BROWNE:  Yes.
22              THE COURT:  You'll note that Juror 8 was back in a
23    different chair, but we'll realign that at the appropriate
24    time.
25         All right.  Thank you.
```

USA vs. Seleznev, 8/15/16

1        Now, my next question, without announcing any specifics,

2   does the government have a basis for any cause challenges,

3   without announcing any specifics?

4            MR. CHUN:  No, Your Honor.

5            THE COURT:  Without announcing any specifics, does

6   the defense have any basis for a cause challenge?

7            MR. BROWNE:  One.  I mean, not Juror Number 1.  One

8   challenge.

9            THE COURT:  Okay.  And may we take that up at a

10  sidebar, Counsel?

11           MR. BROWNE:  Yes.

12           JUROR:  Members of the jury, you can stand and

13  stretch in place.  You're not free to leave.

14       (The following proceedings were heard at sidebar)

15           THE COURT:  Okay.  I suspect this is regarding Juror

16  Number 41?

17           MR. BROWNE:  Yes.  And I would preface it by saying,

18  I can benefit from any humbling experience, and I've now been

19  humbled again.  But Juror Number 41 has basically said he can't

20  be objective because of me.

21       And also, what was the other thing?  Oh, he was involved

22  with some bad guys in Russia.

23           THE COURT:  Any objection to that?

24           MR. WILKINSON:  No.

25           THE COURT:  Forty-one is excused.

USA vs. Seleznev, 8/15/16

1        Any other cause challenges?

2              MR. BROWNE:  No, sir.

3              THE COURT:  Okay.

4                  (End of proceedings heard at sidebar)

5              THE COURT:  Please be seated.

6        Juror Number 41, sir, if you could raise your card?

7   You're excused, sir.  Thank you for your service.  Please

8   report back to the first floor.

9        Now what's going to happen, we'll now proceed to the

10  selection of the jury by way of the exercise of peremptory

11  challenges.  These are the challenges for which the lawyers are

12  not required to give the Court any reason or explanation.  Each

13  side has a designated number of jurors that they can excuse

14  without having to give any explanation to me.  The lawyers are

15  doing that at this point in time.

16       Once they've done that, they'll give me their sheets, and

17  those jurors with the 15 lowest numbers that are remaining,

18  other than their challenges, will serve as the jurors in this

19  case.  So we'll have the jury picked in a relatively short

20  amount of time.

21       So if you'd like to stand and stretch in place and

22  converse, please feel free to do so.  Please do not discuss

23  anything at all about this case.

24       Now, one other thing, if you're excused from this jury,

25  you're free to come and watch the trial.  There's no difficulty

USA vs. Seleznev, 8/15/16

1    whatsoever if you -- you're just watching the trial.  I ask

2    that if you do stay and watch the trial, if you do come back to

3    continue to observe the trial, that you not have any

4    conversation with any juror connected to this case.  Don't

5    approach them.  Don't even try and greet them, no contact

6    whatsoever.  Please don't share any thoughts that you have with

7    any existing juror.  So again, you're free to watch.

8         And if you are excused, I'd like to thank you, on behalf

9    of the Court and on behalf of the parties, for your willingness

10   to serve through this process of jury selection.  I also hope,

11   if you're not selected, that you have benefited from the

12   experience of having an in-depth experience in seeing how

13   jurors are actually picked, as opposed to what you see on

14   television, which usually is fiction, and it's based upon

15   commercials and other reasons why it doesn't have anything to

16   do with the reality of what we do in our justice system.

17        So please feel free to stand and stretch at this time.

18             MR. BARBOSA:  Your Honor, may I approach?

19             THE COURT:  Yes.

20             MR. BROWNE:  Are you done?  It's going to take us a

21   bit.

22             THE COURT:  That's fine.

23        Ready, Counsel?

24             MR. BROWNE:  Yes.

25             THE COURT:  All right.  Let's present it to the

USA vs. Seleznev, 8/15/16

1    Court.

2         Members of the jury, these will be the individuals who

3    will serve as the jurors in this case.  So if your number is

4    called, please hold your card up, once I call it, then place it

5    back down, to confirm that you are still present in the

6    courtroom, which will be the jurors that will serve.

7         First of all is Juror Number 4.  Next is Juror Number 5.

8    Next is Juror Number 6.  Next is Juror Number 7.  Next is Juror

9    Number 9.  Next is Juror Number 10.  Next is Juror Number 13.

10   Next is Juror Number 14.  Next is Juror 17.  Next is Juror 18.

11   Next is Juror 19.  Next is Juror 21.  Next is Juror Number 23.

12   Next is Juror Number 25.  And last is Juror Number 27.

13        Okay.  Now, would -- if your number was called, and you're

14   in the audience, would you please step forward?  If your number

15   was not called, and you're in the jury box, if you'd step out

16   of the jury box.  I'll ask everyone to please continue to

17   remain in the courtroom.

18        Counsel for the government, do you accept the jury as

19   presently impaneled?

20             MR. CHUN:  Yes, Your Honor.

21             THE COURT:  Counsel for the defense, do you accept

22   the jury as presently impaneled?

23             MR. BROWNE:  Yes, Your Honor.

24             THE COURT:  Members of the jury in the jury box, if

25   you'd please stand and raise your right hand to be placed under

1    oath by the in-court deputy.

2              (In-court deputy administers oath to the jury)

3              THE COURT:  Please be seated.

4        Now, we now have a jury selected to serve in this case.

5    All the other individuals that went through the jury selection

6    process, you're now officially excused.  The next thing that's

7    going to take place, just if you're curious, we're going to

8    take our afternoon recess, then I'm going to come back and read

9    preliminary jury instructions to the jury, and then we'll begin

10   with opening statements.  So if you're curious and you'd like

11   to stay, you're free to do that.  But again, please do not

12   converse with any other juror, from this time forward, until

13   after this case is completed.

14       Now, we'll take our formal break at this time, so you'll

15   have a new house for the next few weeks, and that will be to my

16   right.  My in-court deputy will escort you to that location.

17   So I'd ask that you please rise, and the other jurors and other

18   individuals who are in the courtroom are also to rise.

19       I'll ask the parties to remain.  We need to take up a

20   matter.

21              (Jury exits the courtroom)

22              THE COURT:  The other jurors are excused at this

23   time.

24       The Court received a communication from counsel for the

25   defense over the lunch hour.  And it was regarding Officer

USA vs. Seleznev, 8/15/16

1    Hansen's testimony that was -- apparently, some discussion was
2    provided or some communication was provided to the defense last
3    Thursday, I believe.  And it was a question regarding
4    communications with the defendant in the Maldives.
5        Let me hear first from counsel for the defense to
6    elaborate on the specifics of your observation or concern.
7            MS. SCANLAN:  Thank you, Your Honor.
8        As to Officer -- or Detective Hansen, we received an
9    e-mail from Mr. Chun on Thursday evening indicating that one of
10   the things Detective Hansen will be testifying about is his
11   investigation of the iPhone in this case; and that recently,
12   when he attempted to open the disk that has the forensic
13   examination, it had an error screen.  I think that's close
14   enough.
15       Okay.  So the government indicated that they were not
16   going to use the Apple forensic examination because of that,
17   because they don't know why the error screen occurred.
18           THE COURT:  Are you saying "error screen"?
19           MS. SCANLAN:  (Nods head)
20           THE COURT:  Okay.
21           MS. SCANLAN:  Like, a pop-up.
22           THE COURT:  Yes.
23           MS. SCANLAN:  So the alternative, apparently, is that
24   Officer Hansen is going to do the exact same evaluation, that's
25   already been done by Agent Fischlin, on the iPhone.  And then

USA vs. Seleznev, 8/15/16

1    as I understand it, the idea is, he's going to come and testify

2    about this examination that he's doing now.

3              THE COURT:  Are you talking about Hansen?

4              MS. SCANLAN:  Correct.

5         And I asked the government why Agent Fischlin can't

6    testify about -- so what they're saying, to be clear, is that

7    Officer Hansen is going to do the exact same thing Fischlin

8    did, and he's going to offer the exact same testimony.  But he

9    hasn't done it yet, and we don't have a report from him about

10   what he's doing.  So the objection is to having him testify

11   about any new work he's doing right now.  It's too late.  And

12   there's also no prejudice to the government, because they've

13   clearly said that Agent Fischlin, who's already written a

14   report, that we've already had people look at, that he can

15   testify about the exact same thing.

16             THE COURT:  So you're saying Agent Fischlin's

17   testimony would be cumulative -- or Hansen's testimony would be

18   cumulative, if allowed, in addition to your objection.

19             MS. SCANLAN:  It would, Your Honor, although I think

20   the idea from the government is that Fischlin would not testify

21   regarding that iPhone, and that Hansen would testify instead.

22   But Hansen hasn't even done this evaluation yet, so I just -- I

23   don't think that's fair.  We don't even know what he's doing

24   right now.

25             THE COURT:  Okay.  Thank you, Counsel.  I'll hear

USA vs. Seleznev, 8/15/16

1    from the government.

2              MR. CHUN:  Just to clarify, Your Honor, Officer

3    Hansen actually has already done his review.  And what he did

4    is, Agent Fischlin had pulled several photographs, as well as

5    screen shots of e-mails, from the defendant's iPhone.  Officer

6    Hansen just confirmed that those were also on the phone.  And

7    so his testimony will be to the iPhone only; that he observed

8    these pictures and e-mails on the telephone.

9              THE COURT:  So it's just confirmation.  Is that what

10   you're telling me?

11             MR. CHUN:  Yes, Your Honor.

12             THE COURT:  And is there some reason why Detective

13   Hansen is looking at exhibits on the eve of trial, Counsel?

14             MR. CHUN:  Your Honor, he went back to look at the

15   DVD provided to him by Apple, I think just to verify his own

16   report from before.  And when he did, he realized that an error

17   screen came out.  He doesn't remember this occurring

18   previously, when he first did his examination.  However, he

19   told us of it, and so we then told counsel of it.  And then our

20   strategic decision then was to not rely on evidence that had an

21   error screen pop up, since we don't know exactly what the cause

22   is, and just to rely on the examination of the phone itself.

23   And that's what he'll testify to, Your Honor.

24             THE COURT:  All right.  Thank you.

25             MS. SCANLAN:  May I say something else about that,

USA vs. Seleznev, 8/15/16

1    Your Honor?

2              THE COURT:  Yes.

3         MS. SCANLAN:  I'm just a little bit confused.  Maybe

4    Officer Hansen has now done what Mr. Chun has indicated.  But

5    the e-mail we received indicates that, quote, "Officer Hansen

6    will review the phone in a similar fashion to Agent Fischlin's

7    review of the iPhone, which you have received a report about

8    previously."

9         So whatever he's doing, as I understood it from this, he

10   is doing now, post-Thursday.  And I don't have any information

11   about that.

12             THE COURT:  All right.  It's a little bit confusing,

13   in terms of what's going on, who's on first, and not just a

14   baseball analogy.  And instead of the Court trying to interpret

15   what may or may not have happened, I'm going to require the

16   government to make Detective Hansen, or whatever title he has,

17   available to the defense so he can explain definitively exactly

18   what he's done, why he's waited until now, and exactly what

19   he's going to testify to.  If we have a continued problem, then

20   I'll ask counsel for the defense to bring it back to the

21   Court's attention.

22        Now, are you telling the Court that a report has been

23   generated?

24             MR. CHUN:  No, Your Honor.  No new report was

25   generated.

USA vs. Seleznev, 8/15/16

1          THE COURT:  Do you expect a new report to be

2     generated?

3          MR. CHUN:  No, Your Honor.

4          THE COURT:  Then what summary has been provided to

5     the defense at this point in time regarding Hansen's testimony?

6          MR. CHUN:  They were informed that he was taking

7     similar steps as to what Agent Fischlin did.  The telephone --

8     the iPhone, at this point in time, the password is known, and

9     so they were just reviewing the phone, Your Honor, through a

10    machine that takes screen shots.  I believe Officer Hansen will

11    say, you know, he actually did hand-scrolling and looked

12    through, just to confirm that the photographs that Agent

13    Fischlin had taken previously are actually on the phone itself.

14    And so he was just confirming the existence of approximately, I

15    don't know, 20 exhibits or so.

16          THE COURT:  All right.  Counsel?

17          MS. SCANLAN:  Your Honor, that's not sufficient

18    notice of what he's going to testify about.  He's testifying as

19    an expert.  And to say, at the last minute, that he's going to

20    testify about similar things to maybe some of the things Agent

21    Fischlin is testifying about, but we're not going to tell you

22    what they are, is insufficient.

23          THE COURT:  When is Hansen going to testify?

24          MR. CHUN:  He would be about the end of the week,

25    Your Honor.

USA vs. Seleznev, 8/15/16

1            THE COURT:  All right.  I'm going to go back to the

2    original determination by the Court.  You make Hansen available

3    immediately.  I want the defense to have the opportunity to

4    examine him to find out exactly what he's going to testify

5    about, cross reference the specific exhibits.  And you should

6    make that known to counsel before -- at the close of business

7    today, Counsel.  That shouldn't be a leap in the responsibility

8    to at least identify the exhibits.  The two of you can get

9    together and make arrangements on the availability of Hansen.

10        And then, Counsel, if you still have a problem after

11   you've interviewed Hansen, then bring it back to the Court's

12   attention.  I'll reserve ruling on the admissibility of the

13   testimony after counsel has had the opportunity to have that

14   conversation with Hansen.

15            MS. SCANLAN:  Yes, Your Honor.

16            THE COURT:  Anything else on this topic?

17            MR. CHUN:  No, Your Honor.

18            MS. SCANLAN:  No, Your Honor.

19            THE COURT:  Anything else to take up at this point in

20   time?

21            MS. SCANLAN:  Yes, Your Honor.

22            THE COURT:  All right.  Let me hear from you.

23            MS. SCANLAN:  If the Court recalls, at the pretrial

24   conference, the Court elected to reserve regarding the issue of

25   the admissibility of Mr. Seleznev's alleged statement made at

USA vs. Seleznev, 8/15/16

1   the time that he was taken into custody in the Maldives.  Since

2   that time, the defense has reviewed the testimony from the

3   evidentiary hearing that encapsulates when the statement was

4   made.

5       I have two concerns.  The first concern is that Agent

6   Schwander -- maybe Mr. Schwander, I don't recall which one --

7   who is the person who was actually speaking, according to the

8   hearing testimony, who was actually speaking to Mr. Seleznev in

9   the airport, he indicates in his testimony -- and can I -- if I

10  may, can I hand this up?

11              THE COURT:  Certainly.

12              MS. SCANLAN:  And I'll hand you -- this is a copy.

13              THE COURT:  Counsel, do you want to put it on the

14  overhead?  Is that easier?

15              MS. SCANLAN:  I'm sorry?

16              THE COURT:  Do you want to put it on the overhead, so

17  it's easier?

18              MS. SCANLAN:  I can.  Perhaps it might be easier

19  because -- okay.

20              THE COURT:  Bring it up.

21      All right, Counsel?

22              MS. SCANLAN:  Your Honor, what we're looking at is

23  the government's trial brief, in the portion that's highlighted

24  in yellow.  And I've given a copy to the government, as well.

25  So it's -- this is an excerpt of a trial brief, Page 25 of 47.

USA vs. Seleznev, 8/15/16

1    And it's Docket Number 370.

2              THE COURT:  Yes.

3              MS. SCANLAN:  The highlighted portion is what

4    apparently is going to be testified to regarding Mr. Seleznev's

5    statement, that, quote, "His immediate response was to protest

6    that the United States did not have authority to extradite him

7    from the Maldives."

8         Well, I went and looked at the hearing testimony, because

9    obviously we weren't present for that.  And if you look at the

10   highlighted portion of Schwander's testimony, which is Page 112

11   of the transcript of that hearing in December, he says that

12   Mr. Seleznev asked him a question, quote, "The question that he

13   asked me was, 'Is there an extradition treaty between the

14   United States and the Maldives?'"  Answer:  "I told him I was

15   unaware."

16        The first concern is that Mr. Schwander, Agent Schwander,

17   is not coming to testify at trial, so I'm assuming that this

18   testimony, the idea is that it's coming in through Agent

19   Iacovetti.  And it's not what the agent who was actually

20   talking to Mr. Seleznev indicates was said.

21        So if the testimony is going to be within the trial brief,

22   as opposed to what the agent on the scene, who was talking to

23   Mr. Seleznev, indicates happened, then the defense would

24   request a missing witness instruction regarding Agent

25   Schwander.

USA vs. Seleznev, 8/15/16

```
 1              THE COURT:  All right.  Let me hear from counsel for
 2      the government.
 3          So just so I'm clear, Counsel, your request for resolving
 4      the issue is a missing witness instruction?
 5              MS. SCANLAN:  Yes, Your Honor.  Or perhaps
 6      clarification as to what is happening here and why there are
 7      two different things.
 8              THE COURT:  All right.  Counsel for the government?
 9              MR. BARBOSA:  Your Honor, I believe you've heard the
10      testimony from both Agent Schwander and Agent Iacovetti.  And
11      at the hearing -- I believe this was our December hearing --
12      both of them testified consistently that they believed that
13      Mr. Seleznev asked if there was an extradition treaty with the
14      Maldives.  The characterization or the phrasing of it in our
15      trial brief appears to be different than what the agents will
16      testify to.  Agent Iacovetti, I'm going to call him and have
17      him testify as to what he heard, he personally heard,
18      Mr. Seleznev say in reaction to being presented with the
19      indictment.  If his testimony is inconsistent with what he said
20      at the earlier hearing, or inconsistent with Agent Schwander's
21      testimony, that's proper impeachment for counsel to pursue on
22      cross examination.  I don't believe that it in any way
23      justifies a missing witness instruction.  Agent Iacovetti does
24      have personal knowledge of what was said.
25              THE COURT:  All right.  Thank you.
```

USA vs. Seleznev, 8/15/16

1          Anything further, Counsel?

2               MS. SCANLAN:  If the idea is that we can impeach

3     Agent Iacovetti with Agent Schwander's prior testimony, then I

4     don't have an objection to that.

5               THE COURT:  Well, first of all, it's premature for

6     the Court to even have on the table an issue regarding a

7     missing witness instruction.  That's something we deal with at

8     the end of trial.  If it's a question of what can be asked of

9     the witness, it depends on exactly what the witness is going to

10    testify about.  I don't know, until Agent Iacovetti actually

11    testifies.  If it's an issue at that point in time, we can

12    certainly revisit it.  But it's premature for the Court to give

13    any instruction to the jury.

14         Now, one thing I would also raise is, the Court, in the

15    pretrial conference, asked if the parties were going to be

16    giving -- or requesting of the Court to give limiting

17    instructions as certain evidence was coming in.  For example,

18    there was the testimony about, "The boss has been in a car

19    accident."  There was also representation by the government

20    that that wasn't offered for the truth.  I asked if counsel --

21    at that point in time, if there was a desire to have a limiting

22    instruction, I would expect the parties to provide that to the

23    Court.  I haven't seen it, so I'm just giving a heads up to the

24    parties.

25         If you want that limiting instruction to be communicated

USA vs. Seleznev, 8/15/16

1    to the jury, again, the burden is upon the parties to present

2    it to the Court; okay?

3            MR. BARBOSA:  Your Honor, I would just want to

4    clarify on the point about Agent Iacovetti's testimony.  I

5    don't believe he could be cross examined with Agent Schwander's

6    prior testimony.  He could be cross examined with his prior

7    testimony, but not with another witness's.

8            THE COURT:  I think counsel was being facetious, at

9    that point in time, Counsel, to see if you were going to bite.

10   Apparently, you did.

11           MR. BARBOSA:  I did.

12           THE COURT:  So I think the ruling from the Court

13   would also be obvious, that that certainly wouldn't be

14   permitted or tolerated.

15       So with that, I don't think there's any other issue that

16   needs to be addressed by the Court.

17       Ms. Scanlan, do you agree, on that topic?

18           MS. SCANLAN:  Yes, Your Honor.

19           THE COURT:  Anything further from the government?

20           MR. BARBOSA:  No, Your Honor.

21           THE COURT:  Mr. Browne, looks like you have another

22   one?

23           MR. BROWNE:  No.  I just wanted to inform the Court

24   that we intentionally have not provided the instruction you

25   were talking about.

USA vs. Seleznev, 8/15/16

1        THE COURT:  That's fine.  All right.  Again, I just

2    wanted to remind the parties of what the Court had requested.

3    If you choose not to exercise that option, that's your call.

4    We'll take our afternoon recess at this time, fifteen minutes.

5                            (Recess)

6                 (Jury enters the courtroom)

7        THE COURT:  Ladies and gentlemen, I advised you

8    previously that as the trial judge, that I'd be giving you

9    instructions of law that you must follow and abide by during

10   the course of the trial.  At this point in time, I'm going to

11   give you the preliminary instructions of law.

12       You are now the jury in this case, and I want to take a

13   few minutes to tell you something about your duties as jurors

14   and to give you some preliminary instructions.  At the end of

15   the trial, I will give you more detailed written instructions

16   that will control your deliberations.

17       When you deliberate, it will be your duty to weigh and to

18   evaluate all of the evidence received in the case, and in that

19   process, to decide the facts.

20       To the facts as you find them, you will apply the law as I

21   give it to you, whether you agree with the law or not.  You

22   must decide the case solely on the evidence and the law before

23   you, and you must not be influenced by any personal likes or

24   dislikes, opinions, prejudices, or sympathy.

25       Please do not take anything I may say or do during the

USA vs. Seleznev, 8/15/16

1   trial as indicating what I think of the evidence, or what your

2   verdict should be.  That is entirely up to you.

3       This is a criminal case brought by the United States

4   government.  The government charges the defendant with wire

5   fraud, intentional damage to a protected computer, obtaining

6   information from a protected computer, possession of 15 or more

7   unauthorized access devices, and aggravated identity theft.

8       The charges against the defendant are contained in the

9   indictment.  The indictment simply describes the charges that

10  the government brings against the defendant.  The indictment is

11  not evidence and does not prove anything.

12      The defendant has pleaded not guilty to the charges and is

13  presumed innocent, unless and until the government proves the

14  defendant guilty beyond a reasonable doubt.  In addition, the

15  defendant has the right to remain silent and never has to prove

16  innocence, or to present any evidence.

17      In order to help you follow the evidence, I will now give

18  you a brief summary of the elements of the crimes, which the

19  government must prove to make its case.

20      In order for the defendant to be found guilty of the crime

21  of wire fraud, Counts 1 through 11, the government must prove

22  each of the following elements beyond a reasonable doubt:

23      First, the defendant knowingly participated in or devised

24  a scheme or plan to defraud, or a scheme or plan for obtaining

25  money or property by means of false or fraudulent pretenses,

USA vs. Seleznev, 8/15/16

1   representations, or promises.

2        Second, the statements made or facts omitted as part of

3   the scheme were material; that is, they had a natural tendency

4   to influence, or were capable of influencing, a person to part

5   with money or property.

6        Third, the defendant acted with the intent to defraud,

7   that is, the intent to deceive or cheat.

8        Fourth, the defendant transmitted, or caused to be

9   transmitted, by wire communication, in interstate or foreign

10  commerce, writings, signs, or signals to carry out or attempt

11  to carry out an essential part of the scheme.  Wire

12  communication is in interstate or foreign commerce if it goes

13  across a state line or national border.

14       In order for the defendant to be found guilty of the crime

15  of intentional damage to a protected computer, Counts 12

16  through 20, the government must prove each of the following

17  elements beyond a reasonable doubt:

18       First, the defendant knowingly caused the transmission of

19  a program, information, code, or a command to a computer.

20       Second, as a result of the transmission, the defendant

21  intentionally impaired, without authorization, the integrity of

22  a program, system, or information.

23       And third, the computer was used in or affected interstate

24  or foreign commerce or communication.

25       In order for the defendant to be found guilty of the crime

1    of obtaining information from a protected computer -- that's

2    Counts 21 through 29 -- the government must prove each of the

3    following elements beyond a reasonable doubt:

4         First, the defendant intentionally accessed without

5    authorization a computer.

6         And second, by accessing without authorization a computer,

7    the defendant obtained information from a computer that was

8    used in or affected commerce or communication between one state

9    and other states, or between a state of the United States and a

10   foreign country.

11        In order for the defendant to be found guilty of the crime

12   of possession of 15 or more unauthorized access devices,

13   Counts 30 through 38, the government must prove each of the

14   following elements beyond a reasonable doubt:

15        First, the defendant knowingly possessed at least 15

16   unauthorized access devices at the same time.

17        Second, the defendant knew that the devices were

18   unauthorized.

19        Third, the defendant acted with the intent to defraud.

20        And fourth, the defendant's conduct in some way affected

21   commerce between one state and other states, or between a state

22   of the United States and a foreign country.

23        In order for the defendant to be found guilty of the crime

24   of aggravated identity theft -- that's Counts 39 and 40 -- the

25   government must prove each of the following elements beyond a

USA vs. Seleznev, 8/15/16

1   reasonable doubt:

2        First, the defendant knowingly transferred, possessed, or

3   used without legal authority a means of identification of

4   another person.

5        Second, the defendant knew that the means of

6   identification belonged to a real person.

7        And third, the defendant did so during and in relation to

8   the crime of wire fraud or access device fraud.

9        Proof beyond a reasonable doubt is proof that leaves you

10  firmly convinced that the defendant is guilty.  It is not

11  required that the government prove guilt beyond all possible

12  doubt.  A reasonable doubt is a doubt based upon reason and

13  common sense.  It is not based purely on speculation.  It may

14  arise from a careful and impartial consideration of all the

15  evidence or from lack of evidence.

16       If, after careful and impartial consideration of all the

17  evidence, you are not convinced beyond a reasonable doubt that

18  the defendant is guilty, it is your duty to find the defendant

19  not guilty.  On the other hand, if, after a careful and

20  impartial consideration of all the evidence, you are convinced

21  beyond a reasonable doubt that the defendant is guilty, it is

22  your duty to find the defendant guilty.

23       The evidence you are to consider in deciding what the

24  facts are consists of, one, the sworn testimony of any witness;

25  two, the exhibits which are to be received in evidence; and

1    three, any facts to which all the parties agree.

2        The following things are not evidence, and you must not

3    consider them as evidence in deciding the facts of this case:

4    One, statements and arguments of the attorneys; two, questions

5    and objections of the attorneys; three, testimony that

6    instructs you to disregard [sic]; and fourth, anything you may

7    see or hear when the court is not in session, even if what you

8    see or hear is done or said by one of the parties or by one of

9    the witnesses.

10       Some evidence is admitted for a limited purpose only.

11   When I instruct you that an item of evidence has been admitted

12   for a limited purpose, you must consider it only for that

13   limited purpose and for no other.

14       Evidence may be direct or circumstantial.  Direct evidence

15   is direct proof of a fact, such as testimony by a witness about

16   what that witness personally saw or heard or did.

17   Circumstantial evidence is indirect evidence; that is, it is

18   proof of one or more facts from which one can find another

19   fact.  You are to consider both direct and circumstantial

20   evidence.  Either can be used to prove any fact.  The law makes

21   no distinction between the weight to be given to either direct

22   or circumstantial evidence.  It is for you to decide how much

23   weight to give to any evidence.

24       There are rules of evidence that control what can be

25   received in evidence.  When a lawyer asks a question or offers

USA vs. Seleznev, 8/15/16

1    an exhibit into evidence, and a lawyer on the other side thinks
2    that it is not permitted by the rules of evidence, that lawyer
3    may object.  If I overrule the objection, the question may be
4    answered or the exhibit received.  If I sustain the objection,
5    the question cannot be answered, and the exhibit cannot be
6    received.  Whenever I sustain an objection to a question, you
7    must ignore the question and must not guess what the answer
8    would have been.
9        Sometimes I may order that the evidence be stricken from
10   the record, and that you disregard, or ignore, the evidence.
11   That means that when you are deciding the case, you must not
12   consider the evidence which I told you to disregard.
13       In deciding the facts in this case, you may have to decide
14   which testimony to believe and which testimony not to believe.
15   You may believe everything a witness says, or part of it, or
16   none of it.
17       In considering the testimony of any witness, you may take
18   into account, one, the opportunity and ability of the witness
19   to see, or hear, or know the things testified to; two, the
20   witness's memory; three, the witness's manner while testifying;
21   four, the witness's interest in the outcome of the case, if
22   any; five, the witness's bias or prejudice, if any; six,
23   whether other evidence contradicted the witness's testimony;
24   seven, the reasonableness of the witness's testimony in light
25   of all the evidence; and eight, any other factors that bear on

USA vs. Seleznev, 8/15/16

1    believability.  The weight of the evidence as to a fact does

2    not necessarily depend on the number of witnesses who testify

3    about it.

4        I'll now say a few words about your conduct as jurors.

5        First, keep an open mind throughout the trial, and do not

6    decide what the verdict should be until you and your fellow

7    jurors have completed your deliberations at the end of the

8    case.

9        Second, because you must decide this case based only on

10   the evidence received in the case and on my instructions as to

11   the law that applies, you must not be exposed to any other

12   information about the case, or to the issues it involves,

13   during the course of your jury duty.

14       Thus, until the end of the case, or unless I tell you

15   otherwise, do not communicate with anyone in any way, and do

16   not let anyone else communicate with you in any way about the

17   merits of the case or anything to do with it.  This includes

18   discussing the case in person, in writing, by phone or

19   electronic means, via e-mail, text messaging, or any internet

20   chat room, blog, website, or other feature.  This applies to

21   communicating with your fellow jurors, until I give you the

22   case for deliberation, and it applies to communicating with

23   everyone else, including your family members, your employer,

24   the media or press, and the people involved in the trial,

25   although you may notify your family and your employer that you

USA vs. Seleznev, 8/15/16

1   have been seated as a juror in the case.  But if you are asked

2   or approached in any way about your jury service, or anything

3   about this case, you must respond that you have been ordered

4   not to discuss the matter, and to report the contact to the

5   Court.

6        Because you will receive all the evidence and legal

7   instructions you properly may consider to return a verdict, do

8   not read, watch, or listen to any news or media accounts or

9   commentary about the case or anything to do with it.  Do not do

10  any research, such as consulting dictionaries, searching the

11  internet, or using other reference materials.  And do not make

12  any investigation or in any other way try to learn about the

13  case on your own.  The law requires these restrictions to

14  ensure the parties have a fair trial based upon the same

15  evidence that each party has an opportunity to address.

16       A juror who violates these restrictions jeopardizes the

17  fairness of these proceedings, and a mistrial could result that

18  will require the trial process to start over.  If any juror is

19  exposed to any outside information, please notify the Court

20  immediately.

21       At the end of the trial, you will have to make a decision

22  based on what you recall of the evidence.  You will not have a

23  written transcript of the trial.  I urge you to pay close

24  attention to the testimony as it is given.

25       If you wish, you may take notes to help you remember what

USA vs. Seleznev, 8/15/16

1    witnesses said.  If you do take notes, please keep them to

2    yourself until you and your fellow jurors go to the jury room

3    to decide the case.  Do not let note-taking distract you from

4    being attentive.  When you leave, your notes should be left in

5    the courtroom.  No one will read your notes.  Whether or not

6    you take notes, you should rely on your own memory of the

7    evidence.  Notes are only to assist your memory.  You should

8    not be overly influenced by your notes or those of your fellow

9    jurors.

10           Now, from time to time during the trial, it may become

11   necessary for me to take up legal matters with the attorneys.

12   And that would be done privately, either by having a conference

13   at the bench, or, when necessary, by calling a recess.  We will

14   do what we can to keep the number and length of these

15   conferences to a minimum.  I may not always grant an attorney's

16   request for a conference.

17           The next phase of the trial will now begin.  First, each

18   side may make an opening statement.  An opening statement is

19   not evidence.  It is simply an outline to help you understand

20   what that party expects the evidence will show.  A party is not

21   required to make an opening statement.

22           The government will then present evidence, and counsel for

23   the defendant may cross examine.  Then, if the defendant

24   chooses to offer evidence, counsel for the government may cross

25   examine.  After the evidence has been presented, I will

USA vs. Seleznev, 8/15/16

1    instruct you on the law that applies to the case, and the

2    attorneys will make closing arguments.  After that, you will go

3    to the jury room to deliberate on your verdict.

4         Ladies and gentlemen, those are the preliminary

5    instructions of law.  I ask that you follow them and abide by

6    each and every one of them.

7         At this point in time, we'll proceed by beginning the case

8    with opening remarks.  I ask that you give your undivided

9    attention to Mr. Wilkinson, as he gives his opening remarks on

10   behalf of the government.

11        Counsel, you may proceed.

12             MR. WILKINSON:  Thank you, Your Honor.

13        Members of the jury, Roman Seleznev, the defendant, was

14   the operator of a global internet business.  He collected

15   millions of dollars from customers around the world.  But those

16   customers didn't know him as "Roman Seleznev."  In fact, that

17   was a name that he took pains not to use.  Instead, they knew

18   him by made-up nicknames that he used in conducting his

19   business, "track2," "bulba," "2Pac," and "nCuX."

20        Why did Roman Seleznev use these made-up names instead of

21   his true name when he was running his business?  Because that

22   business was a criminal enterprise.

23        The evidence you will see in this trial will show you that

24   for seven years the defendant was one of the largest

25   traffickers in stolen credit card numbers in the world.  He

USA vs. Seleznev, 8/15/16

1   stole millions of credit card numbers, and he sold them on his

2   websites.

3        Now, the defendant operated his criminal enterprise from

4   behind a keyboard.  He operated it from behind a keyboard in

5   Vladivostok, Russia, and sometimes from Bali, Indonesia.  And

6   from behind that keyboard, he would hack or intrude into small

7   businesses' computer systems around the world, including

8   computer systems right here in Seattle, places like a pizza

9   restaurant and a bakery.

10       Once he got inside those computer systems, the defendant

11  would gather up the credit card numbers used by the customers

12  of those businesses, the people who had purchased pizza at

13  those restaurants, the people who had bought bread at those

14  bakeries.  And then the defendant would sell those credit card

15  numbers on websites he operated, websites that functioned like

16  Amazon.com for credit card fraud.  And the names of those

17  websites were the same as his nicknames that I mentioned:

18  track2, bulba, 2Pac, and nCuX.  You'll be seeing those names a

19  lot in this trial.

20       Roman Seleznev's customers would buy those credit card

21  numbers online, and then they would use them in stores to

22  commit fraud all over the world.  And the defendant made

23  millions with this business.

24       Now, the defendant thought that he could hide behind that

25  keyboard in Vladivostok.  He thought that he could hide behind

USA vs. Seleznev, 8/15/16

1    his nics --

2              MR. BROWNE:  Your Honor, I object.  This is argument.

3              THE COURT:  Counsel, it is crossing the border into

4    argument.  Please continue.

5              MR. WILKINSON:  Your Honor, the evidence -- ladies

6    and gentlemen of the jury, the evidence will show that he

7    thought that the people would never know, that law enforcement

8    would never find out, that he was the person behind track2 and

9    bulba and 2Pac.  But he was wrong.

10        What the defendant did not count on was this:  When a

11   person operates a criminal business online, they create the

12   risk of leaving true traces of their true identity behind,

13   digital fingerprints.  And if investigators can find those

14   digital fingerprints, put them together, they can discover who

15   is behind the nickname, who is behind the keyboard.

16        And in this trial, you will see that Roman Seleznev left

17   digital fingerprints all over the computer infrastructure that

18   he used when he operated his business.  He left digital

19   fingerprints all over the computers that were used to intrude

20   into victims all around the world.  He left digital

21   fingerprints all over the e-mail accounts that he used to

22   communicate for his criminal enterprise.  And he also left

23   evidence of his crimes on his personal laptop and his phone.

24        And so, the defendant is charged with 40 counts of

25   violating federal law by stealing and trafficking in credit

USA vs. Seleznev, 8/15/16

1    card numbers.  And this trial will be about exposing the

2    fingerprints that show that the defendant, Roman Seleznev, is

3    track2; that the defendant is bulba; that the defendant is

4    2Pac.

5        Now, before I get into the specifics of this case, I need

6    to tell you a little bit about credit card fraud and how it is

7    investigated.  You are going to hear testimony about an

8    underground community of people called "carders."  What's a

9    carder?  Carders are people in the business of stealing credit

10   card numbers, selling it online, and then using it to commit

11   fraud in stores.  That's carding.

12       Now, this comes as a surprise to a lot of people; that if

13   you wanted, when you went home today, you could get onto the

14   open internet, and you could buy as many stolen credit card

15   numbers as you want.  I'm not suggesting you do it, and

16   Judge Jones just instructed you not to do research.  But if you

17   wanted, you could.  And those cards would cost you between $5

18   and $15 a card, depending on the nature of the stolen card

19   number.  So you could buy those cards over the internet.  And

20   carders call those card numbers "dumps."  So you could get your

21   dumps.

22       And another thing you could buy over the internet is blank

23   credit card numbers.  And for about another hundred dollars you

24   could buy one of this.  It's called a "magnetic stripe reader,"

25   and it's used to encode stolen card numbers onto a blank credit

USA vs. Seleznev, 8/15/16

1    card.  And that's all you would need.  You would be ready to

2    commit credit card fraud.  And carders make all of that

3    possible.

4         One thing you will see about carders is, they stick

5    together.  They share ideas and tools.  They brag about how

6    many numbers they have stolen and the kind of businesses they

7    were able to hack into.  They gossip.  They gossip about each

8    other.  Which other carders are legit?  Whose numbers can you

9    count on to actually work in a store?  And which ones are

10   rippers, which ones will sell you a number that won't work for

11   fraud?  And all of this happens in online chat rooms called

12   "carding forums."  And you will be seeing some of the

13   conversations that happen in carding forums.

14        But of course, all of this, all the communications in

15   these carding forums, has to be anonymous.  If you got into a

16   carding forum and used your real name, you'd be charged with a

17   crime in no time.  So you've got to be anonymous.  But at the

18   same time, you've got to build a reputation.  If you're selling

19   card numbers online, you need people to know that you're legit,

20   that your card numbers work.  So carders solve this problem by

21   creating a "nic," an online identity that allows you to build a

22   brand, build your name, without revealing who you are.  And

23   getting away with carding is all about hiding behind that nic,

24   keeping a distance between your nic, on one hand, your

25   nickname, and your true identity, on the other.

USA vs. Seleznev, 8/15/16

1        Who are these carders hiding from?  Well, most of all,

2    they're hiding from the United States Secret Service.  Now,

3    you've probably heard mostly about the Secret Service because

4    they are the people charged with protecting the President.

5            MR. BROWNE:  Your Honor, I'm sorry, but that's

6    argument.

7            THE COURT:  It's overruled.  Please continue.

8            MR. WILKINSON:  But the Secret Service has another

9    mission.  And that is investigating credit card fraud.  And so

10   Secret Service agents, around the country and back in

11   Washington, D.C., are constantly following these carding

12   forums, trying to determine who the important carders are and

13   looking for clues about the true identities behind them.

14       And Secret Service agents also investigate fraud on the

15   ground.  When a business gets hacked, gets intruded into, they

16   go in, they take down the computer, and they look for clues.

17       Where do they look for clues, other than the places that

18   have been hacked?  They look at the carders' criminal

19   infrastructure.  Because to run a carding and hacking business,

20   you need an infrastructure, you need computers.

21       And one of the main things you need is servers.  A server

22   is just a big computer.  And generally, carders will rent

23   servers from a server company.  And you can think of a server

24   kind of like a storage locker.  It's off site.  You can get in

25   there when you want.  You can store what you want there, and

USA vs. Seleznev, 8/15/16

1    you can lock the door.  But it's a computer.

2        Carders use servers in their intrusions.  They use them to

3    launch the attacks, and they use them to store the stolen

4    credit card numbers that they receive.

5        Carders also need other pieces of computer infrastructure.

6    They need websites to communicate -- excuse me.  They need

7    e-mail accounts to communicate.  They have to set up websites

8    where they sell the card numbers.

9        And when those pieces of computer infrastructure, a server

10   or an e-mail account, are located in the United States, the

11   Secret Service can get copies of them.  They can get a search

12   warrant, just like in any other criminal investigation.  But in

13   this case, they're not searching a house, they're not searching

14   a car or a physical storage locker, they're searching a

15   computer.  But just like in other investigations, once they get

16   into that computer, they search the crime scene.  They search

17   for fingerprints.

18       What do I mean when I say "fingerprints," digital

19   fingerprints?  Well, just like other people, carders don't

20   always do a good job of maintaining that separation between

21   their nickname, their online identity, and their true identity.

22   They might be working on their carding software at one point

23   and take a quick break to do a personal task.  They might make

24   a personal purchase from a server, or use the e-mail account

25   for a personal reason.  Maybe the carder uses one of the

USA vs. Seleznev, 8/15/16

1    servers to book a plane ticket in his real name.  Maybe he uses
2    one of the e-mail accounts to buy flowers for his wife.  Or
3    maybe he uses his home address when he purchases one of these
4    and needs to have it delivered.  And if the Secret Service can
5    put together a few of those clues, sometimes they can identify
6    the carder, determine who is behind that keyboard.
7        So just as carders are trying to keep that separation
8    between their nic, on one hand, and their true identity, on the
9    other, the Secret Service is looking for connections between
10   the two.  And that is how cybercrime, computer crime, is
11   investigated.
12       So now to this case.  And there are really three parts to
13   this investigation.  And the first part of the investigation
14   begins in May of 2010.  And it begins right here in Seattle
15   with a Seattle Police Department detective named Detective
16   David Dunn.  Detective Dunn specialized in investigating
17   computer crimes.  And he was asked to join a Secret Service
18   task force.  Even though he was a Seattle police detective, he
19   was actually working out of the Secret Service offices.
20       And in May of 2010, Detective Dunn got a phone call.  A
21   deli over in Idaho, Schlotzky's Deli, had been hacked.  He was
22   asked to go over and take a look at it.
23       Now, when I say that the deli was "hacked," I mean that
24   someone had secretly gotten into the point-of-sale system, one
25   of these.  You have all seen them before.  They're the

1   computers that businesses have, that they use for processing

2   credit cards, taking payments.  So someone had gotten into this

3   system at Schlotzky's and was copying all the credit cards.

4        So Detective Dunn flew over to Idaho, and he looked at the

5   Schlotzky's point-of-sale system.  And when he got there, at

6   that very moment, he found that the computer, that computer in

7   Idaho, was communicating with a strange server in Russia, a

8   server the owner didn't know anything about.  So Detective Dunn

9   took that computer down, took it offline, and he looked at it.

10       What did he find?  Well, he found that someone, somewhere

11  in the world, had gotten into that deli computer.  They had

12  gotten into that deli computer, and they had planted malware on

13  it.

14       What is "malware"?  Maybe some of you haven't heard of it.

15  Malware is short for "malicious software."  It just means

16  software that someone else plants on your computer, intending

17  to do you harm.  A virus is malware.

18       But this particular malware worked by looking at that

19  point-of-sale system, scanning it for credit cards as they were

20  processed, and it gathered them all up into a computer file.

21  And every five minutes, it was sending those credit card

22  numbers out to the hacker over the internet.

23       So Detective Dunn came back to Seattle, and he got to work

24  trying to figure out who was behind the hack at Schlotzky's.

25  And through a break that you'll hear about, he learned that a

USA vs. Seleznev, 8/15/16

1    bunch of those credit card numbers, that had been stolen from
2    Schlotzky's, were sold online.  They were sold on a website
3    called "track2."  This is the website right here (indicating).
4    And he also learned that whoever was operating the track2
5    website had another website that looked just like it and
6    operated the same way.  It was called "bulba."
7        Now, Detective Dunn was actually able to get a membership
8    to the bulba website, and he was able to get onto the website
9    and purchase stolen credit cards.  And he purchased them on
10   this page here.
11       And you can see why I say this is basically Amazon.com for
12   credit card fraud.  This is what is called an "automated
13   vending website."  You can make selections.  Say you want Visa
14   cards from Washington state.  Say you want gold cards from New
15   Jersey.  You enter in your choices, you pay your money, and you
16   buy your credit cards.  And track2 was selling them by the
17   thousands.
18       Track2 was already on the radar of the Secret Service, at
19   this point.  There was a special agent back in Washington, D.C.
20   named Keith Wojcieszek, who you'll also hear from, who was
21   looking at track2 at the same time, following him in the
22   carding forums.  Special Agent Wojcieszek had also bought card
23   numbers on that bulba website.
24       And one reason Special Agent Wojcieszek was interested in
25   track2 was that he believed that track2 was the same person

USA vs. Seleznev, 8/15/16

1  behind another nickname, called nCuX.  NCuX had been a major
2  carder for years.  The Secret Service had been following him
3  too.  And when the Secret Service was investigating nCuX, he
4  disappeared, and track2 started selling cards at the same time.
5  So the Secret Service was investigating whether track2 might be
6  the same person as nCuX.  Special Agent Wojcieszek was
7  interested in track2, and so he and Detective Dunn teamed up to
8  investigate.  They got to work to determine who was behind the
9  nic.
10      Now, just as all this was going on, there was an increase
11  in credit card fraud in the Seattle area.  Banks have
12  investigators who are always watching the fraud numbers on the
13  cards they issue, seeing if the fraud rates go up and down.
14  And in October of 2010, one of the local credit unions, Boeing
15  Employees Credit Union, saw its numbers go up.  And the BECU
16  fraud investigator looked at those numbers, the ones that had
17  been used for fraud.  And what he found was a lot of them had
18  been used at the same local restaurant just before the fraud
19  was committed.  And he started to wonder whether that
20  restaurant might have been subject to a hack.  And this is the
21  restaurant, Broadway Grill, up on Capitol Hill.
22      The BECU investigator happened to know Detective Dunn, so
23  he called him up, and he told him his suspicions about Broadway
24  Grill.  Detective Dunn raced up to Capitol Hill with this clue.
25  And he looked at the Broadway Grill point-of-sale system.  And

USA vs. Seleznev, 8/15/16

1   what he found was almost identical to what he had seen across

2   the mountains at Schlotzky's earlier that year.  Someone had

3   intruded into the computer.  Someone had planted the same type

4   of malware on the Broadway Grill machine, and they had used the

5   same computer in Russia in the course of the attack.  So

6   Detective Dunn believed that it had to be the same intruder,

7   and he believed that that intruder was track2.

8       Now, by looking at these computers, Broadway Grill and

9   Schlotzky's, Detective Dunn and Special Agent Wojcieszek were

10  able to put together a map of the criminal infrastructure that

11  the hacker was using in his plan.  They were able to figure out

12  exactly how he did it.  And you're going to see the actual

13  computer evidence that they discovered that led them to figure

14  all of this out.  And you'll see that the infrastructure

15  changed in some ways over time.

16      But here is basically how it worked.  We have a

17  point-of-sale system sitting here.  Say that's Schlotzky's or

18  Broadway Grill.  We have a hacker up here.  He could be

19  anywhere in the world, but he's sitting behind a keyboard.  And

20  he starts scanning the internet for open ports.

21      What is an open port?  Think of an open port like an open

22  door on your computer to the internet.

23      Now, why would a business have an open door to the

24  internet?  Why would they want that?  If you're a small

25  business, like a restaurant, you don't have on-site IT.  You

USA vs. Seleznev, 8/15/16

1   don't have on-site people that come in and fix your computer.

2   And when your point-of-sale system goes down over the lunch

3   hour, you've got a line out the door, you need someone to be

4   able to remote in and fix your computer from off site.  You

5   need an open port to do that.  Now, typically, these computer

6   systems have a password in them, but the hacker has got a

7   program, computer program, that will break that.

8        So now, the hacker is into that point-of-sale system.

9   It's like he's sitting right there in the restaurant.  He can

10  make that computer do whatever he wants, even though he could

11  be anywhere in the world.  And what he wants that point-of-sale

12  system to do is go to his storage locker, this server over

13  here.

14       Now, notice two things about this server down here.

15  Number one, it's got an 11-digit number associated with it.

16  That's called an "IP address."  Computers have unique IP

17  addresses that will allow you to determine where they are.  And

18  Detective Dunn and Special Agent Wojcieszek were able to

19  determine the IP address of this computer, and they were able

20  to determine that it was somewhere in Russia.  They were also

21  able to determine what the user of that server had named it.

22  And he had named it "shmak," and then he changed the name to

23  "smaus."  But we'll be referring to it mostly as the "smaus"

24  server.

25       So the victim point-of-sale system reaches out to this

USA vs. Seleznev, 8/15/16

1    computer, pays a visit to the storage locker.  And what does it
2    do?  He tells the victim computer to download some software,
3    malware, onto the victim point-of-sale system, from the server.
4    So now there's this malware sitting on the server, and the
5    hacker logs out.  He leaves.  Now the malware does the work.
6        And what this malware does is, it scans the point-of-sale
7    system as credit cards are processed by that computer.  And
8    when it finds a credit card, it rolls them into a file, and it
9    sends them out over the internet to the hacker.
10       Where did it send them?  It sent them to this server over
11   here, the HopOne server.  Notice, again, an 11-digit number.
12   Detective Dunn and Special Agent Wojcieszek were able to
13   identify this specific computer where all these numbers were
14   going.  Turned out, it was in Virginia.  Turned out, it was
15   also called "HopOne," and that's the name of the company that
16   the hacker had rented the server space from.
17       So now the hacker has all of these credit card numbers
18   rolled up onto one place.  He has them all stashed in a storage
19   locker.  And what does he do?  He offers them for sale on his
20   websites.  Track2 and bulba, those are the same two websites we
21   looked at a minute ago.
22       So now they've got a map of the infrastructure, and that
23   is the end of the first part of the investigation.  Now they
24   know what the crime scene is.  And in the second part of the
25   investigation, the investigators looked at each of these

USA vs. Seleznev, 8/15/16

1   elements of infrastructure to dust for fingerprints, to figure

2   out who was behind that keyboard in the upper left of the

3   screen.

4        So what did they find?  Well, let's start with the

5   servers.  I mentioned this one down in the left, the smaus

6   server, was in Russia.  They couldn't get ahold of it.  We'll

7   come back to it later, but they weren't able to get that

8   server.

9        But what about this one on the right?  This server, like I

10  mentioned, they got lucky.  This server was located in

11  Virginia.  Remember, this is the one where all the card numbers

12  are stashed.  It was located just a few miles away from Special

13  Agent Wojcieszek's office, back in Virginia.  So they got a

14  search warrant for this server, and they got -- they were able

15  to copy it and look at it.

16       And what did they find?  Well, sure enough, it was a crime

17  scene, 170,000 stolen credit card numbers sitting on that

18  server.  There were tools, software, things like that, for use

19  in hacking.  And then included in those 170,000 stolen credit

20  card numbers were more numbers from businesses in Washington

21  state, places like MAD Pizza, in Seattle; Grand Central Baking,

22  in Seattle; places like Village Pizza, up in Anacortes; or Casa

23  Mia pizzeria, down in Yelm.  So they found a lot of evidence of

24  fraud.

25       But what did they find in the way of fingerprints at this

USA vs. Seleznev, 8/15/16

1    crime scene?  Well, one thing they focused on was that server's
2    internet history.  They wanted to know what the user of that
3    machine was doing when he wasn't carding.  What was he using it
4    for?  And what they found was, the user of the machine was also
5    using it to make some purchases.  And the name of the purchaser
6    was Roman Seleznev.

7        For example, on the internet history, they found this
8    receipt from the Russian version of eBay, Roman Seleznev's name
9    on it.  Also, they found the user of the server had bought a
10   plane ticket, bought a plane ticket for Roman Seleznev.  And it
11   didn't just have his name, it had his date of birth and his
12   passport, as well; a flight from Vladivostok, Russia, to Bali,
13   Indonesia.

14       But that was just one part of the computer infrastructure.
15   What else did they find?

16       Now, I said that that other server, the smaus server, down
17   on the left, was in Russia.  They couldn't get their hands on
18   that.  But they were able to get the e-mail account that was
19   used to manage that server.  When you rent a server, like the
20   HopOne server, the smaus server, you need an e-mail account to
21   pay your rent, to manage the server, to keep it up and running.
22   And in this case, this server was managed by a Yahoo! e-mail
23   account with the address boookscafe@yahoo.  Now, that server
24   was in Russia, but Yahoo! is an American company, so the agents
25   were able to get a search warrant and get a copy of that

USA vs. Seleznev, 8/15/16

1    boookscafe e-mail account.

2         What did they find in there?  Again, they found a crime

3    scene, e-mails containing invoices for this server that was

4    used to host the malware, e-mails about buying and selling

5    dumps.  Remember, I mentioned that Special Agent Wojcieszek

6    suspected that track2 was the same person behind another

7    nickname, nCuX.  Well, they found all kinds of e-mails in there

8    to and from nCuX about carding as well.  So it was a crime

9    scene.

10        But what did they find there in terms of fingerprints?

11   They found e-mails showing that Roman Seleznev had used this

12   same account to set up a social networking page.  They found

13   this e-mail showing that Roman Seleznev had made a purchase.

14   He purchased a microphone and had it delivered to one of his

15   apartments in Vladivostok, Russia.  They found e-mails to Roman

16   Seleznev confirming a purchase for flowers that he had made to

17   his wife.

18        They also found something else very interesting.  The user

19   of the boookscafe e-mail account had used that account to join

20   other web groups.  He had listed it as his web address.  He'd

21   joined things like an online poker club.  He joined a gaming

22   club.  And when he joined those sites, he put down boookscafe

23   as his e-mail address.  When he did that, those websites, the

24   gaming website, the poker website, sent confirmation e-mails to

25   the boookscafe account.  And those contained the password and

USA vs. Seleznev, 8/15/16

1    the login that he'd used when he joined these sites.

2         Now, just like other people, the user of this account had

3    go-to passwords.  He had passwords that he used over and over

4    again.  And it turned out that in this case, the passwords were

5    "smaus" and "ochko."  Now, remember those two words, because

6    you'll be seeing them a lot in this trial, and we'll be coming

7    back to those.

8         What other e-mail accounts did the investigators get?

9    There was another Yahoo! account with the address "bulbacc."

10   And this was the account used to set up the bulba website, one

11   of the two websites that was used to sell stolen credit cards.

12   Now, this one didn't have many e-mails in it.  There were

13   receipts for that bulba website.  They were able to determine

14   that whoever was using that site was using it from that HopOne

15   server.  That's the computer they were using to access it.  And

16   that was the same server, remember, where the defendant's

17   travel arrangements had been saved, where his purchases had

18   been.  There were no e-mails in this account directly linking

19   to any particular person.

20        But there was a third e-mail account,

21   rubensamvelich@yahoo.com.  This was the website -- or excuse

22   me -- the e-mail account used to set up the HopOne server, the

23   server where the stolen credit card numbers were stored.  And

24   it was used to set up the track2 website where stolen credit

25   card numbers were sold.

USA vs. Seleznev, 8/15/16

1        What was in there?  Again, this account, another crime

2    scene; e-mails to and from track2 about carding; receipts for

3    leasing the HopOne server.

4        And who was the person, the real person, also using that

5    e-mail account?  Roman Seleznev.  Here's an e-mail from PayPal,

6    addressed to Roman Seleznev, with his address of his apartment

7    in Vladivostok, Russia.

8            THE COURT:  Counsel, why don't we let the jury just

9    stand and stretch just for a second.

10       Members of the jury, if you'd like to stand and stretch at

11   this time, please feel free to do so.

12       All right.  Members of the jury, same rule that we applied

13   earlier today.  I don't hear anything, so please be seated.

14       Counsel, please continue.

15           MR. WILKINSON:  Thank you, Your Honor.

16       One more thing about this rubensamvelich Yahoo! account,

17   the user of this account had also joined other web groups on

18   the internet.  He'd set up a day trading account.  He had

19   joined adult chat rooms.  And again, the user of this account

20   had used those same go-to passwords, smaus and ochko.  And

21   we'll come back to that.

22       But at this point, Detective Dunn and Special Agent

23   Wojcieszek had found Roman Seleznev's fingerprints all over the

24   crime scene.  Nearly every piece of computer infrastructure

25   pointed back to Roman Seleznev.  So in March of 2011, he was

1    charged, here in Seattle, with federal fraud and credit card

2    crimes, and a warrant was issued for his arrest.

3        And that brings me to the third part of this story,

4    because the Secret Service had an arrest warrant, but they

5    couldn't go knock on Roman Seleznev's door and arrest him.  He

6    was in Russia.  Russia does not extradite its citizens to the

7    United States.  It doesn't send them here to stand trial.  So

8    they didn't have an immediate way to bring him to trial.

9        And while that warrant was still out, in 2012, track2

10   disappeared from the internet.  Bulba disappeared from the

11   internet, websites taken down, not doing business anymore.  And

12   it looked like maybe Roman Seleznev had retired.

13       But in early 2013, a major new carder came out of nowhere

14   onto the internet.  And the carder's name was "2Pac," after

15   Tupac Shakur, the musician.  And he started advertising on the

16   same carding forums where track2 had advertised.  These are

17   some of his ads.

18       Now, like track2, his website was an automated credit card

19   vending website.  And if you think that looks a little bit

20   familiar, you're not alone.  Secret Service agents were

21   interested to know whether "2Pac" was the same person as

22   "track2."  So they started investigating this, started looking

23   for evidence of links between the two, and found things; for

24   example, that when 2Pac set up his initial financial account,

25   the account was funded with money from track2.

USA vs. Seleznev, 8/15/16

1      But while they were still looking into these things, in

2   July of 2014, the Secret Service learned an important piece of

3   information.  And what they learned was, Roman Seleznev was on

4   vacation in the Maldives.  The Maldives are a small island

5   nation in the Indian Ocean.  He was scheduled to fly back to

6   Russia on July 5.  And the Maldives does not have an

7   extradition treaty with the United States.  They don't have a

8   formal agreement.  But U.S. agents called the Maldivians, and

9   they told them about Roman Seleznev, and they asked for help.

10  And the Maldivians agreed to hand Mr. Seleznev over to the U.S.

11  authorities.

12      So the Secret Service agents jumped on a plane, and they

13  flew over to the Maldives.  And within a few days of learning

14  this information, they were there on site.  And on the morning

15  of July 5, 2014, they went to the airport, the day when Roman

16  Seleznev was scheduled to fly back to Russia.  And they waited.

17  There he is (indicating).

18      Now, notice that Mr. Seleznev is carrying something.  He's

19  carrying a computer bag.  And a little bit after 10:00 a.m., on

20  July 5, the agents apprehended Mr. Seleznev, and they brought

21  him back to Seattle.  And they also brought that computer back

22  to Seattle.

23      What did they do once they got back here?  They got a

24  warrant, a search warrant for that computer.

25      What did they find?  Well, they found some of the things

USA vs. Seleznev, 8/15/16

1   you would expect to find on any computer:  Roman Seleznev's

2   games, Roman Seleznev's music, pictures of him with his

3   friends, pictures of him with a girlfriend.

4        You know what else they found?  They found 1.7 million

5   stolen credit card numbers, 1,700,000 credit card numbers.  A

6   credit card is three-and-a-half inches long.  And if you

7   started laying these down on I-5, headed north, 1.7 million

8   credit cards would get you all the way to Bellingham, 80 miles,

9   three-and-a-half inches at a time.  That's how many card

10  numbers were on that computer, on that one particular day, when

11  the defendant was traveling back from vacation; 1.7 million

12  people who had eaten at the wrong restaurant, bought bread at

13  the wrong bakery, and their personal information was sitting on

14  that man's computer.  In fact, 2Pac's whole carding business,

15  Roman Seleznev's whole carding business, was sitting on that

16  computer.

17       And let me just mention a few things.  Roman Seleznev's

18  online chats -- for those of you who don't chat, a "chat" is

19  like a text message, except it's over the computer.  What did

20  Roman Seleznev chat about?  He chatted about buying and selling

21  dumps under the name of "2Pac."  Here's just one example:

22  "Hello.  It's the owner of 2Pac.  You want to sell through my

23  shop?"

24       What else did they find?  The computer was set up with

25  what's called a "hosts file."  It was specially configured so

USA vs. Seleznev, 8/15/16

1    that he could easily and quickly connect to the 2Pac website

2    whenever he wanted; those 2Pac ads that we looked at a minute

3    ago, sitting on the desktop of his computer, within easy reach,

4    so he could grab them every time he wanted to put one on a

5    carding forum.

6         But one of the most incriminating things that they found

7    on that computer was Roman Seleznev's password cheat sheet.

8    Think about it.  With all of the passwords that we create in

9    our accounts every day, nobody can remember them all.  We've

10   got to write them down.  Roman Seleznev was a computer guy, and

11   he stored his passwords in a computer file on his laptop.

12        What was on that cheat sheet, what kind of passwords?  The

13   password for the 2Pac website.  Passwords that allowed him to

14   log on to carding forums as "2Pac."  Passwords for the

15   financial accounts where he received payments for the dumps

16   that 2Pac sold.

17        But that cheat sheet didn't just have passwords for 2Pac.

18   And this is where the investigation came full circle, because

19   Roman Seleznev still had passwords on there from his old days

20   as track2, his old days as bulba.

21        Remember, there were three Yahoo! accounts.  Two of them

22   had e-mails reflecting purchases by Roman Seleznev.  Remember,

23   there was one of them, bulbacc@yahoo.com, that I said there

24   were no direct ties in that one, back to Roman Seleznev.  Guess

25   what?  Four years later, the login and password for that

USA vs. Seleznev, 8/15/16

1   account was sitting on Roman Seleznev's laptop, through the

2   same e-mail account used to set up the bulba website.

3        Guess what else was in that account?  Mr. Seleznev also

4   had go-to passwords, passwords he used over and over again,

5   that showed up in this login and password cheat sheet.

6        What were Mr. Seleznev's go-to login and passwords?  Some

7   of you have probably already guessed, "smaus" and "ochko," the

8   same passwords that were used on those Yahoo! accounts, used to

9   manage the track2 criminal infrastructure.

10       One other thing that they found on Roman Seleznev's

11  computer, two days before his arrest, when he was getting ready

12  to leave the Maldives, he did some online research.  And he

13  wasn't researching restaurants.  He wasn't researching rental

14  cars.  He went onto the website of the U.S. federal courts,

15  like this one, and he searched for criminal cases.  He searched

16  for criminal cases filed against him.  He searched for criminal

17  cases using his last name, Seleznev.  And you know what else he

18  searched for?  Criminal cases filed against his nics, his alter

19  egos, bulba, 2Pac.  He ran searches to see if they had been

20  charged with crimes.

21       Now, the charges in this case were not public at that

22  time, so they didn't come up in response to his search.  But

23  what does the fact that he ran those searches tell you?  The

24  evidence will show that it was his guilty conscience.  The

25  evidence will show that it was his knowledge of the crimes he

USA vs. Seleznev, 8/15/16

1   had committed and his fear that one day he would be brought

2   here to be held accountable for his crimes.  So that is why

3   we're here.

4       So the defendant is charged with 40 different counts of

5   violating federal law.  He's charged with 11 counts of wire

6   fraud; nine counts of doing damage to a protected computer;

7   nine counts of obtaining information from a protected computer;

8   nine counts of possessing unauthorized access devices, which

9   just means credit cards; two counts of aggravated identity

10  theft.

11      Now, some of these charges require the government to prove

12  some pretty specific facts, and Judge Jones just read you

13  instructions talking about some of them.  For example, we'll

14  need to prove that certain banks are federally insured; that

15  certain international wire transmissions occurred; that certain

16  local businesses, or other people, were harmed, and that they

17  were harmed in the amount of more than $5,000.  And you'll hear

18  from some of those victims, and you'll hear the way the

19  defendant's conduct affected them.

20      But if you find yourself wondering why, at times, we're

21  spending time on some of these very specific things, please

22  know that, when you're instructed on the law at the end, it

23  will make sense, and you'll see that there's a reason for all

24  of this.  But most of this case will be about exposing those

25  digital fingerprints, showing you the fingerprints that show

USA vs. Seleznev, 8/15/16

```
1    that Roman Seleznev is track2; that Roman Seleznev is bulba;

2    and that Roman Seleznev is 2Pac.  And based on that evidence,

3    we will ask you to return a verdict of guilty on all counts.

4          Thank you for your attention.

5          THE COURT:  Counsel for the defense, will you be

6    giving an opening or reserving opening?

7          MR. BROWNE:  Your Honor, my understanding of your

8    schedule is that you stop pretty promptly?

9          THE COURT:  We will stop at 4:30.

10         MR. BROWNE:  4:30, correct?

11         THE COURT:  Yes.

12         MR. BROWNE:  May I just confer with counsel --

13         THE COURT:  Certainly.

14         MR. BROWNE:  -- and answer that question tomorrow

15   morning, and I'll e-mail you and counsel shortly?

16         THE COURT:  That's fine.

17      Members of the jury, we're going to come to our close of

18   the first day of trial -- you can be seated, Counsel.

19      And I'd like to thank all of you for serving as jurors in

20   this case.  And if counsel chooses not to give opening remarks,

21   I'll give you your notebooks.  I don't want you to think I've

22   forgotten to give you notebooks.  Those notebooks will not be

23   given until both sides have had the opportunity to give opening

24   remarks.  Then you'll get them.  You already received an

25   instruction on note-taking.
```

USA vs. Seleznev, 8/15/16

1     Second, we will start the trial tomorrow at 9:00.  We'll

2   have a full day, with the two breaks, as well as lunch, as I

3   previously indicated, so we'll be back on our normal schedule

4   tomorrow.

5     Now, I've given you the same instruction repeatedly about

6   not reading, viewing, or inspecting anything that might come

7   up.  Even if it's not about this case -- you're not supposed to

8   look at that anyway -- even if it's on a related topic, please

9   don't yield to any temptation to go there.  Just don't review

10  it, or inspect it, or look at it in any way.  If a news report

11  comes on, turn your TV off or turn the channel.  There's more

12  than enough other things that you can look at, other than

13  things to do about this case.

14    And last, the biggest temptation you'll have will be

15  tonight.  You've been now seated on a jury.  I've already

16  instructed you that it's okay to let your employer and family

17  know that you've been seated on the jury, and nothing further.

18  Most of the people that you will tell that you are not supposed

19  to talk about the case will leave you alone and stop there.

20  But there's a small percentage of people that are just plain

21  nosey and want to know what's going on, and they'll keep

22  bothering you or pestering you about, "Well, just give me a

23  little bit.  Just tell me a little something.  Is it this case,

24  or is it this case," or start to share their experiences with

25  something to do with something that they've -- that's happened

USA vs. Seleznev, 8/15/16

```
 1   in their life in the past.  Don't yield to that.
 2        Now, if those people are just so nosey that they won't
 3   leave you alone, you tell them to call me, and I'll take care
 4   of the problem for you.  I've been on the bench for a long
 5   time, and I haven't received one call yet.
 6        You have a good evening.  We'll see you all tomorrow
 7   morning, ready to go at 9:00 a.m.  Have a good evening.
 8             MR. BROWNE:  Your Honor, we have one matter to take
 9   up with the Court.
10             THE COURT:  That's fine.
11        Members of the jury, you're excused.
12                       (Jury exits the courtroom)
13             THE COURT:  Please be seated.
14        Mr. Browne?
15             MR. BROWNE:  Thank you, Your Honor.
16        I'm very concerned about one of the -- a number of things,
17   but one of the things I was concerned about in counsel's
18   opening statement was his statement that, one, there's no
19   extradition treaty with the Maldives, between the United
20   States -- I want to make sure the door is closed, Your Honor --
21   there's no extradition treaty between the United States and the
22   Maldives, which I believe you granted the motion in limine on
23   that that was made by the government.
24        And I believe more problematic is counsel said that the
25   Maldivian -- if that's the correct way of saying it --
```

USA vs. Seleznev, 8/15/16

1   officials gave permission to the United States to allow the

2   United States basically to kidnap Mr. Seleznev.  He said that

3   in his opening.

4       Now, how are they going to prove the Maldives officials

5   gave permission to the United States to allow Mr. Seleznev to

6   be snatched out of the Maldives, without calling somebody from

7   the Maldives?  I mean, that's -- so I'm very concerned.  First

8   of all, they seem to have violated their own motion in limine,

9   which I think clearly opens the door to the whole kidnapping

10  scenario.  And then I'm also concerned about how are they going

11  to prove -- first of all, we don't think it's true -- how are

12  they going to prove that the Maldivian officials gave

13  permission to the United States to basically violate

14  international law and our own principles, without using

15  hearsay?

16      So Ms. Scanlan and I will think about this over the

17  evening and whether we think it's a basis for a mistrial or

18  not, but I'm quite concerned.  So I just want to let you know.

19          THE COURT:  Thank you, Counsel.

20      Government wish to respond?

21          MR. WILKINSON:  Yes, Your Honor.

22      As far as violating the order in limine, the Court's order

23  in limine prohibited characterizing the circumstances of

24  apprehension as a kidnapping or otherwise in violation of

25  international law.  It didn't say that the parties couldn't

USA vs. Seleznev, 8/15/16

1    give some explanation of the circumstances surrounding that.

2    We believe that the jury needs to understand -- I mean, there

3    was a warrant out for four years, and there needs to be some

4    explanation of why that was not immediately executed.  And then

5    there needs to be some description of how the defendant was

6    apprehended.  We've discussed this with the Court at the

7    pretrial conference, and it was my understanding that that was

8    permitted.

9         The second point is about how we seek to prove that

10   permission was granted.  I think the language in opening was

11   that the Maldivian authorities had agreed to cooperate.  I'm

12   pretty certain the word I used was "authorities."  And we will

13   be offering testimony -- and it's not something we're going to

14   belabor at all.  It's just something we wanted to give some

15   context for the jury.  And we will be offering testimony that

16   the U.S. authorities met with Maldivian police officers before

17   the operation, that they did it together, and that it was, you

18   know, with their understanding and consent.

19        THE COURT:  All right.  Any further argument,

20   Counsel?

21        MR. BROWNE:  Your Honor, I just don't know if you

22   need or want to hear any more from me.

23        But how does that occur without using hearsay, the second

24   part of that?  First part of that I don't agree with either.  I

25   thought you were quite clear in your rulings that we weren't

USA vs. Seleznev, 8/15/16

1    going into whether there is an extradition treaty or there

2    isn't an extradition treaty.

3        Counsel clearly told the jury that the United States took

4    this illegal action with the permission of the Maldivian

5    authorities.  He said that.  How are they going to prove that

6    without hearsay?  First of all, it's not true, I don't think.

7    Secondly, how could you do that without hearsay?  They can't

8    say, "I met with" -- I mean, he's suggesting that one of the

9    agents says, "Well, we sat down with a Maldivian official."

10   Okay.  That's not hearsay.  Then what?  "As a result of that,

11   we kidnapped Mr. Seleznev," which implies that there was some

12   permission given by somebody who's not being called as a

13   witness?

14       We're concerned about it, Your Honor.  You know, it just

15   occurred.  I was very surprised to hear it, actually.  And

16   Ms. Scanlan and I would just like to discuss it a little more.

17   I just wanted to bring it to your attention.

18            THE COURT:  Counsel, here are the Court's preliminary

19   thoughts so that you have more to discuss this evening with

20   Ms. Scanlan.  And I have the order that the Court specifically

21   issued.  And the Court would first note that -- I'll read it to

22   you, because it's very short.  It's one paragraph.  "The Court

23   has reviewed the materials related to the government's motion

24   in limine regarding defendant's kidnapping allegations.  The

25   defendant has elected not to respond to this motion.  The Court

1    finds that the motion, Docket 359, should be granted.  The

2    Court hereby excludes all evidence and argument that defendant

3    was kidnapped or otherwise apprehended in violation of

4    international law."  So the Court's order is very specific and

5    precise in terms of what was prohibited.

6         Now, as it relates to what the government's allowed to

7    offer by way of evidence, certainly the government is not

8    permitted to go into offering what Maldivian authorities said

9    when they were in contact with Secret Service agents in the

10   Maldives.  That's clearly not permitted.  They're permitted,

11   however, to indicate that they were in the Maldives.  As a

12   result of their contact with Maldivian authorities, the

13   defendant was taken into custody; but again, no specific

14   testimony as to what Maldivian authorities have said beyond

15   that.

16        I don't think there's any contest from the government that

17   you're not offering any specific statements that were made by

18   Maldivian authorities.  And the Court will be very controlling

19   as to any extensive detail, because the whole purpose of that

20   motion in limine was to not go into the area or examination

21   about kidnapping.  The government's not permitted to volunteer

22   extensive information.  If the defense objects at that time,

23   that you believe the door's open, you don't have to say, "The

24   door's open," but certainly you could do that outside the

25   presence of the jury, as long as you've preserved your

USA vs. Seleznev, 8/15/16

1    objection at the proper time.

2         But I don't think there's anything more that the Court

3    needs to do at this time, other than to put the government on

4    notice that what's tolerated and permitted by way of that

5    circumstance being what I've already indicated.

6         Counsel, if you have an additional motion or argument to

7    make to the Court after the Court's given you this guidance,

8    you can certainly bring it to my attention tomorrow morning.

9              MR. BROWNE:  Thank you, sir.

10             THE COURT:  Anything else to take, up by the

11   government?

12             MR. WILKINSON:  No, Your Honor.

13             THE COURT:  By the defense?

14             MR. BROWNE:  No, Your Honor.

15             THE COURT:  Have a good evening.  See you all

16   tomorrow morning.

17                       (Adjourned)

18                  (End of requested transcript)

19                        *   *   *

20        I certify that the foregoing is a correct transcript from

21   the record of proceedings in the above matter.

22

23   Date:  8/15/16                    /s/ Andrea Ramirez

24                            _____

25                            Signature of Court Reporter