1          UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON
   _____
3
UNITED STATES OF AMERICA,        )
4                                )
              Plaintiff,         )   No. 2:11-cr-00070-RAJ
5                                )
                                 )
6         vs.                    )   Seattle, WA
                                 )
7   ROMAN V. SELEZNEV,           )
                                 )   Jury Trial, Day 2
8             Defendant.         )   August 16, 2016
                                 )
9   _____

10          VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE JUDGE RICHARD A. JONES
11             UNITED STATES DISTRICT COURT
   _____
12

13   APPEARANCES:

14   FOR THE PLAINTIFF:    NORMAN McINTOSH BARBOSA
                           U.S. Attorney's Office
15                         700 Stewart Street, Suite 5220
                           Seattle, WA 98101-1271
16                         norman.barbosa@usdoj.gov

17                         C. SETH WILKINSON
                           U.S. Attorney's Office
18                         700 Stewart Street, Suite 5220
                           Seattle, WA 98101-1271
19                         seth.wilkinson@usdoj.gov

20                         HAROLD W. CHUN
                           U.S. Department of Justice
21                         1301 New York Avenue NW, Suite 600
                           Washington, DC 20005
22                         harold.chun@usdoj.gov

23

24

25

```
 1   FOR THE DEFENDANT:      JOHN HENRY BROWNE
                             Law Office of John Henry Browne
 2                           108 South Washington Street, Suite 200
                             Seattle, WA 98104
 3                           johnhenry@jhblawyer.com

 4                           EMMA SCANLAN
                             Law Office of John Henry Browne
 5                           108 South Washington Street, Suite 200
                             Seattle, WA 98104
 6                           emma@jhblawyer.com

 7


 8
     Andrea Ramirez, CRR, RPR
 9   Official Court Reporter
     United States District Court
10   Western District of Washington
     700 Stewart Street, Suite 17205
11   Seattle, WA 98101
     andrea_ramirez@wawd.uscourts.gov
12
     Reported by stenotype, transcribed by computer
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2                                                    Page No.

3    Defense Opening Statement                           204

4    Witness:  DAVID IACOVETTI
       Direct Examination by Mr. Barbosa                 210
5      Voir Dire Examination by Mr. Browne               237
       Direct Examination by Mr. Barbosa                 238
6      Voir Dire Examination by Mr. Browne               247
       Cross Examination by Mr. Browne                   258
7      Redirect Examination by Mr. Barbosa               271

8    Witness:  ANDREI MEDVEDEV
       Direct Examination by Mr. Wilkinson               274
9
     Witness:  DAVID DUNN
10     Direct Examination by Mr. Barbosa                 281

11

12

13                       E X H I B I T S

14   Exhibit 1.14                                        295

15   Exhibit 1.1                                         342

16   Exhibit 2.1                                         358

17   Exhibit 2.2                                         358

18   Exhibit 2.3                                         358

19   Exhibit 4.5                                         368

20   Exhibit 4.4                                         370

21   Exhibit 4.8                                         372

22   Exhibit 4.9                                         372

23   Exhibit 4.10                                        372

24   Exhibit 4.12                                        374

25   Exhibit 4.11                                        375
```

| 1 | Exhibit 6.1 | 380 |
| 2 | Exhibit 6.2 | 383 |
| 3 | Exhibit 6.3 | 392 |
| 4 | Exhibit 6.3A | 392 |
| 5 | Exhibit 6.4 | 402 |
| 6 | Exhibit 6.5 | 407 |
| 7 | Exhibit 6.13 | 409 |
| 8 | Exhibit 6.7 | 431 |
| 9 | Exhibit 6.6 | 435 |
| 10 | Exhibit 6.17 | 437 |
| 11 | Exhibit 6.9 | 438 |
| 12 | Exhibit 6.9A | 438 |
| 13 | Exhibit 6.10 | 438 |
| 14 | Exhibit 6.10A | 438 |
| 15 | Exhibit 6.14 | 440 |
| 16 | Exhibit 6.14A | 440 |
| 17 | Exhibit 12.1 | 220 |
| 18 | Exhibit 12.2 | 224 |
| 19 | Exhibit 12.10 | 234 |
| 20 | Exhibit 12.4 | 236 |
| 21 | Exhibit 12.5 | 237 |
| 22 | Exhibit 12.6 | 239 |
| 23 | Exhibit 12.7 | 239 |
| 24 | Exhibit 12.6A | 240 |
| 25 | Exhibit 12.7A | 240 |

1    Exhibit 12.9                                    243

2    Exhibit 12.8                                    249

3    Exhibit 12.8A                                   258

4    Exhibit 12.6B                                   281

5    Exhibit 12.7B                                   281

6    Exhibit 15.5                                    394

7    Exhibit 15.14                                   404

8    Exhibit 15.4                                    411

9    Exhibit 15.2                                    414

10   Exhibit 16.10                                   352

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA vs. Seleznev, 8/16/16

1          THE CLERK:  We are resuming our jury trial in the

2   matter of the United States vs. Roman Seleznev, Cause

3   Number CR11-70, assigned to this court.

4          THE COURT:  Good morning, ladies and gentlemen of the

5   jury.

6      As you recall, yesterday we closed the first day of trial

7   with the government presenting their opening remarks.  I now

8   invite you to give your undivided attention to Mr. John Henry

9   Browne, as he gives his opening remarks on behalf of

10  Mr. Seleznev.

11     Counsel?

12         MR. BROWNE:  Good morning, Your Honor.  Good morning,

13  everybody.  Good morning.

14     Well, you're probably going to be happy to hear that I'm

15  only going to probably talk to you about five or ten minutes.

16     As the judge explained to you, a couple times now, a

17  defendant in a criminal case has no obligation to make an

18  opening statement.  You're going to hear me emphasize that word

19  a few times, "statement," until the close of the government's

20  case, or now.  In fact, I was thinking about not doing it until

21  later, but I decided to go ahead and make a few remarks this

22  morning.  I hope you don't think the time involved in these

23  remarks has anything to do with the quality of these remarks.

24     So the first thing that's really important, first of all,

25  it's really -- Judge Jones has not given you your notebooks.

USA vs. Seleznev, 8/16/16

1   And one of the reasons for that is because of the next thing

2   I'm going to tell you is -- which is really important -- is

3   what attorneys say or do is not evidence.  What we say is not

4   evidence.  I don't think we can stress that more.

5       Yesterday, counsel for the government gave a presentation.

6   And a couple of times during that presentation, the evidence

7   will show that there were some errors, seemingly meaningless

8   errors.  But the evidence in this case is going to show you

9   that, for instance -- I don't have the graphic in front of me,

10  but you'll remember it.  And believe me, by the time this is

11  over, you're going to see it a lot, the graphic of the

12  computers and the servers and all that.  He said, pointing at

13  the HopOne server, "And here's the 11-digit number."  Well, I'm

14  not the best at math, but I looked at it, and it's a 9-digit

15  number.  And that's what the evidence will show you.

16      And what you're going to learn in this trial and -- it's

17  going to be a lot of technical testimony, lots.  That's why if

18  you do feel like taking notes, it's probably a good idea.  But

19  of course, as the judge said, that's up to you completely.

20      There's going to be a lot of technical evidence in this

21  case.  And a simple mistake like that, in a case when you're

22  having supposed experts testifying about sophisticated computer

23  tracking information, making a mistake as to whether a number

24  is nine numbers or 11 numbers, the evidence will show you, is

25  pretty huge.  The evidence will show you that that is not 11.

USA vs. Seleznev, 8/16/16

1    It's nine.  And there will be some other errors.  That's why

2    what we say is not evidence.  What we say is based on what we

3    think.  You see all the books over there.  You can see how much

4    information there is in this case.  Not to scare you, but

5    there's a lot of information in this case.

6        Another example why what we say is not evidence is,

7    yesterday there was some remark that there was an e-mail

8    request to purchase an airplane ticket from Vladivostok to

9    Bali.  But when you see that evidence, you'll realize that's

10   not true.  It's an airline ticket that goes from Bali to

11   Singapore.  It's just the -- the detail in this case is going

12   to be excruciating, but really important.

13       The other thing -- I'm almost done, actually -- I wanted

14   to tell you is, when the judge asked the government to read off

15   the witness list, there was a lot of names, as you recall, and

16   then asked us, and Ms. Scanlan got up and mentioned the name of

17   Eric Blank, who is -- may testify.  Because as you've been

18   told, the defense has no burden to put on a case whatsoever.

19       If we choose to, we may call Eric Blank.  He's an expert,

20   law enforcement background, recognized expert throughout the

21   United States, if not the world.  And he's an expert in

22   computer specifics.  The reason I mention that is because this

23   case, more than many, is -- involves the cross examination of

24   the government's witnesses.

25       What is the defense case?  This is an opportunity, as the

USA vs. Seleznev, 8/16/16

1    judge says, to make remarks, not argument.  And I don't intend

2    to argue or point fingers or anything.  The purpose of this is

3    to make a statement.  And the statement is, the defense case in

4    this trial will be almost exclusively the cross examination of

5    the government's witnesses and their testimony concerning very

6    technical matters.

7        So the last thing, I'll just say it again -- and then I

8    won't say it again -- evidence comes from the witness stand and

9    anything that Judge Jones admits, the physical evidence.

10   That's where evidence comes from, not from my mouth, not from

11   counsel's mouth.  And the fact that you don't have your

12   notebooks is a really good example of that.

13       Then the last thing I want to tell you is, this is going

14   to be not a really long trial, because all of us in here have

15   been in a lot longer trials, but it's going to be a rather long

16   trial, and it's going to be very, very technical in many ways.

17       So I just want to thank you for all of us, in advance.

18   Because doing this is your civic duty, and a lot of people

19   don't do that and get out of jury service any way they can.

20   And we're very, very grateful that you've taken time out of

21   your lives to do this very important matter, which is being

22   watched closely by the whole world.

23       So I really thank you for your attention.  That's really

24   all I wanted to say.  I wasn't going to say anything.  I

25   decided that I would.  Thank you very much.

1          Thank you, Your Honor.

2              THE COURT:  Thank you, Counsel.

3          Members of the jury, your notebooks and pens will be

4    passed out at this time.

5          And just a word of caution, if at any point in time you

6    run out of paper or need additional pens, you're not expected

7    to wait until the break or recess.  Just merely raise your

8    hand, and we'll make that accommodation immediately.

9          One other thing I want to explain to you, you can see that

10   you have monitors in front of you.  During the course of the

11   trial -- I'll wait until the notebooks are passed out.

12         Okay.  Everyone has their government-issued pens and

13   paper.  Now you're ready to go.

14         I want to explain to you about how the monitors work.

15   During the course of the trial, I fully expect that there's

16   going to be quite a bit of evidence that's going to come

17   through the government showing a document to a witness on an

18   overhead.  And then it's available for the witness to see, and

19   I can see it, and the lawyers can see it, but you can't see it.

20         The way the process works is, a document is marked for

21   identification, then it's shown to a witness.  There may be

22   some preliminary testimony about the document to establish the

23   foundation for that document to be admitted.  Once either side

24   offers an exhibit then the Court has to make a firm ruling that

25   says, "It's admitted."  Once it's admitted, then the lawyers

USA vs. Seleznev, 8/16/16

```
1    will probably -- should be asking the Court for permission to
2    publish to the jury.  Once that permission is granted, only
3    then do they display the document or exhibit before you.
4         So don't be troubled by the fact that a witness is being
5    examined about a document that's not on your monitor.  Until
6    it's formally admitted, only then will you be allowed to see
7    the exhibit at that point in time.  Sometimes I'll see jurors
8    looking or waving their hands saying, "We can't see it."
9    There's a reason you can't see it.  Once it's admitted, then
10   you will be able to see it.
11        Counsel for the government, call your first witness.
12             MR. BARBOSA:  Thank you, Your Honor.
13        The United States calls Deputy Assistant Director David
14   Iacovetti.
15             THE COURT:  Please step forward, sir.
16        DAVID IACOVETTI, having been duly sworn, was examined and
17   testified as follows:
18             THE CLERK:  Have a seat.
19        If you could please state your first and last names, and
20   spell your last name for the record.
21             THE WITNESS:  David Iacovetti.  That's
22   I-A-C-O-V-E-T-T-I.
23             THE COURT:  You may inquire.
24             MR. BARBOSA:  Thank you, Your Honor.
25
```

IACOVETTI – Direct (by Mr. Barbosa)

1                          DIRECT EXAMINATION

2     BY MR. BARBOSA

3     Q    Good morning, Mr. Iacovetti.

4          Could you tell the jurors where you work?

5     A    Sure.  Good morning.  I work for the United States Secret

6     Service, in Washington, D.C.

7     Q    And where are you currently stationed?

8     A    Currently stationed at the Division of Technical

9     Development and Mission Support.

10    Q    And what is your job with the United States Secret

11    Service?

12    A    I'm the deputy assistant director that would be in charge

13    of the grounds of the White House, the Vice President, anything

14    technical that has to do with protection.

15    Q    Where were you -- what was your job prior to that?

16    A    Prior to that, I was in the Government Public Affairs

17    Department.

18    Q    How long have you been working for the United States

19    Secret Service?

20    A    Approximately 31 years, sir.

21    Q    Can you explain for the jurors what the primary missions

22    of the Secret Service are?

23    A    Sure.  So the primary mission of the Secret Service, back

24    in 1865, when we were created, was to combat counterfeit.  At

25    that time, about 30 percent of all the money in circulation was

IACOVETTI – Direct (by Mr. Barbosa)

1  counterfeit.  Then, in 1901, after assassination, they gave

2  Secret Service a jurisdiction to protect the President or any

3  other of the protectees at this time.  So we have a dual

4  mission of protection and investigation.

5  Q    Thank you.

6       Your investigative mission, has that expanded beyond

7  counterfeiting?

8  A    It has.  In the mid-'80s, it expanded to more financial

9  based, cyber, computer based.

10 Q    And when you use the word "cyber," what do you mean by

11 that?

12 A    Any computer fraud, computer-aided investigations as it

13 involves any financial institution or credit card.

14 Q    So why did the Secret Service become involved in the

15 investigation of cybercrime?

16 A    With the passing of that law and the creation of

17 electronic crimes task forces, that's one of the major

18 investigations the Secret Service is involved in.

19 Q    How long have you been stationed in Washington, D.C.?

20 A    Approximately one year this time.

21 Q    With your prior job just before this position, were you

22 also in D.C.?

23 A    I was.

24 Q    Where were you stationed prior to moving to

25 Washington, D.C.?

IACOVETTI – Direct (by Mr. Barbosa)

1    A    Prior to Washington, D.C., I was the special agent in

2    charge of the Honolulu office.

3    Q    What does it mean to be the special agent in charge?

4    A    So I would be in charge of all the investigations and

5    protection in Honolulu and also the district, which stretches

6    out over to -- covers Asia-Pacific, all the way over to

7    Afghanistan, and then down under, Australia, New Zealand; so

8    all of Asia-Pacific.

9    Q    Did you have regional offices throughout that area?

10   A    I did.  I had offices in, at that time, Beijing, Hong

11   Kong, Bangkok, Guam, and Sydney.

12   Q    You said your geographic area for the Honolulu office

13   included the entire Pacific region.

14        Does that involve working with foreign nations also?

15   A    It does, yes, sir.

16   Q    Does that include the Maldives?

17   A    It did, sir.

18   Q    How long did you serve as special agent in charge of the

19   Honolulu field office?

20   A    Approximately three years.

21   Q    And where were you before that?

22   A    Before that, I was in Washington, D.C., as the special

23   agent in charge of the Technical Security Division.

24   Q    And prior to that job, was there a point where you --

25   A    Prior to that job, I spent three years as the special

IACOVETTI – Direct (by Mr. Barbosa)

1    agent in charge of the Seattle Field Office.

2    Q    So that brings us back to this area.

3    A    Yes.

4    Q    What geographic region were you responsible for when you

5    were the special agent in charge of the Seattle Field Office?

6    A    So the Seattle Field Office, under it was the state of

7    Washington, the state of Oregon, half of Idaho, Montana, and

8    the state of Alaska.

9    Q    And was your headquarters for that region here in Seattle?

10   A    Yes.  It was headquarters here, with satellites office in

11   Portland, Spokane, Missoula, and Anchorage.

12   Q    How many agents did you have employed here in Seattle?

13   A    I probably had about 16 agents at that time.

14   Q    Did you also have task force officers?

15   A    We did.  We had an electronic crimes task force, which was

16   made up of local Secret Service agents and then law enforcement

17   folks from outlying communities with local police.

18   Q    Did those task force officers include any officers from

19   the Seattle Police Department?

20   A    It did, yes, sir.

21   Q    I'd like to draw your attention to mid-2010, early 2011.

22        Are you familiar with the Seattle investigation of

23   Defendant Roman Seleznev?

24   A    I am, yes, sir.

25   Q    Were you still working at the Seattle Field Office when

IACOVETTI – Direct (by Mr. Barbosa)

1  that investigation began?

2  A    I was, yes, sir.

3  Q    Who was the lead investigator on that case?

4  A    So the lead investigator was Detective Dave Dunn, with the

5  Seattle Police Department.

6  Q    And do you recall approximately how far before your

7  departure from Seattle that investigation began?

8  A    So I think it started about eight or nine months before I

9  departed, with the case out of the Spokane office, I think, was

10  the first notification.

11  Q    Okay.  So for that last eight or nine months of your time

12  in Seattle, were you responsible for supervising the electronic

13  crimes task force and Detective Dunn?

14  A    Yes, sir.

15  Q    So did you know the general nature of the allegations and

16  the investigation that was being conducted?

17  A    I knew the general investigation, and Detective Dunn would

18  refer to it as track2.  That was the name I knew it.

19  Q    Without going into specifics, what was the general nature

20  of this investigation?

21  A    That businesses were -- their servers were hacked, some

22  malware was placed on it, wherein an individual from the

23  outside was able to gain access into their servers and gain

24  credit card numbers.

25  Q    Were you directly involved in the investigation back in

IACOVETTI – Direct (by Mr. Barbosa)

1   2010/2011?

2   A    Absolutely not.

3   Q    After you left Seattle, did you become involved in the

4   Roman Seleznev investigation again, sometime around the summer

5   of 2014?

6   A    Yes.  I then became aware, with a phone call from our

7   headquarters, saying that they --

8            MR. BROWNE:  Objection, Your Honor.

9            THE COURT:  Sustained.

10  BY MR. BARBOSA

11  Q    What led to your involvement in the case in 2014?

12  A    A call from my headquarters, sir.

13  Q    What was the nature of your call?

14           MR. BROWNE:  Objection.

15           THE WITNESS:  The nature of the call was --

16           THE COURT:  Not the content.  You can't testify as to

17  what someone else told you.  You can testify as to, as a result

18  of that communication, what took place.

19      So to that extent, the objection is sustained.  Otherwise,

20  please continue, Counsel.

21           MR. BARBOSA:  Your Honor, I am offering this not for

22  the truth of the matter asserted, clearly.  It's to explain why

23  he took steps that he took, without context as to what he was

24  asked to do.  And also, these are requests to do something, as

25  opposed to assertions.  I think these do come in for that

IACOVETTI – Direct (by Mr. Barbosa)

1   matter.

2          MR. BROWNE:  First of all, you know, I object to the

3   speaking objections, and I believe that was.

4      I think it's hearsay.  I don't think it meets any of the

5   exceptions to the hearsay rule.  I renew my objection.

6          THE COURT:  All right.  The objection is noted.

7      Ladies and gentlemen of the jury, the testimony of the

8   witness has been objected to on grounds that it's hearsay, in

9   other words, that someone else told the witness something.

10  That's properly sustained.  However, the Court will overrule

11  the objection, and the testimony the agent will give you will

12  not be offered for the truth of the statement that was made to

13  him, but only for the purpose of providing context, as an

14  explanation of why he took certain actions or why he did

15  certain things.

16     So with that, please continue, Counsel.

17  BY MR. BARBOSA

18  Q    Why were you contacted?

19  A    I was contacted by my office to render assistance in this

20  investigation.

21  Q    What type of assistance were you asked to provide?

22  A    I was asked to provide assistance in locating Mr. Seleznev

23  in the Maldives.

24  Q    When you were contacted about him -- when was this,

25  approximately?

IACOVETTI – Direct (by Mr. Barbosa)

1   A    Late June 2014.

2   Q    Okay.  Was there a U.S. arrest warrant for Mr. Seleznev at

3   that point?

4   A    There was, sir.

5   Q    Why were you asked to assist with him -- with locating him

6   in the Maldives?

7            MR. BROWNE:  Your Honor, I object.  Why?  That

8   necessarily involves hearsay.  I don't want to say any more.

9            THE COURT:  Same ruling.  Please continue.

10  BY MR. BARBOSA

11  Q    Why were you asked -- were you asked to go to the

12  Maldives?

13  A    Yes.  I was asked to go to the Maldives and supervise an

14  operation with the location of Roman Seleznev.

15  Q    Did you have reason to believe he was there?

16  A    We did have reason to believe he was in the Maldives.

17  Q    Okay.  So why was your office contacted about this?

18  A    My office was contacted -- as I said, the region which I

19  supervised covered all the way over to Afghanistan.  And with

20  the Maldives being off the coast of India, that was under my

21  jurisdiction.

22  Q    So what were you asked to do in support of this trip to

23  the Maldives?

24  A    I was asked to coordinate with the embassy in Sri Lanka,

25  which is the government -- official government entity that

IACOVETTI – Direct (by Mr. Barbosa)

1    covers the Maldives, and the Maldivian government to coordinate

2    the location.

3    Q    Okay.  And were you expecting to take him into custody,

4    Mr. Seleznev?

5    A    With working with the Maldivian authorities.

6    Q    Okay.  If you were able to take Mr. Seleznev into custody,

7    what were you supposed to do next?  Where were you going to

8    take him?

9    A    To Guam, sir.

10   Q    Why were you going to take him to Guam?

11   A    It was the first U.S. territory that could be reached in

12   flight from the Maldives.

13   Q    And you mentioned that you were asked to coordinate with

14   the embassy in Sri Lanka.

15        Who, specifically, were you coordinating with there, and

16   who else was involved in the operation, from the U.S.

17   government side?

18   A    So from the U.S. government side was a Department of State

19   special agent by the name of Mark Smith, who worked in the Sri

20   Lanka Embassy.

21   Q    Thank you.

22        Was there anybody else from the Secret Service involved?

23   A    There was a special agent who worked in the Bangkok

24   office, under my supervision.  His name was Special Agent Dan

25   Schwander.

IACOVETTI – Direct (by Mr. Barbosa)

1    Q    Why was the State Department involved in this operation?

2    A    As it was a diplomatic effort between the government of

3    the Maldives and the Sri Lankan Embassy.

4    Q    And did you personally eventually travel to the Maldives

5    as part of this operation?

6    A    I did, sir.

7    Q    Was it typical for you, as a special agent in charge, to

8    take part personally in an arrest operation?

9    A    Not normally in an arrest operation, but they had asked me

10   to go to finalize the plans and to supervise the operation.

11   Q    So when did you leave Hawaii?

12   A    I left Hawaii on July 2.

13   Q    And is there a time difference between Honolulu and the

14   Maldives?

15   A    I think about 14 hours.  I'm sorry.  I'm not exactly sure.

16   Q    Do you recall what day it was when you arrived in the

17   Maldives?

18   A    I arrived in the Maldives on July 4, in the afternoon.

19   Q    How long did it take you to get there?

20   A    I think it took me about 27, 28 hours of direct transit.

21   Q    I'm going to show you, but not publish, what's been marked

22   as Government's Exhibit 12.1, which is three pages.

23        Do you recognize that exhibit?

24   A    It's not on the screen.  Do I have to hit the power

25   button?

IACOVETTI – Direct (by Mr. Barbosa)

1   Q    It's not on the screen in front of you?

2   A    Yes, it's on.

3        It appears to be an aerial photograph of what I consider

4   Male, or the Maldives.

5   Q    And does that fairly and accurately represent the islands

6   that you traveled to in July of 2014?

7   A    It does, sir.

8             MR. BARBOSA:  Move to admit and publish, Your Honor.

9             THE COURT:  The particular exhibit, just 12.1?

10            MR. BARBOSA:  Yes --

11            MR. BROWNE:  No objection, Your Honor.

12            MR. BARBOSA:  -- just 12.1.

13            THE COURT:  12.1 is admitted.

14                  (Exhibit 12.1 was admitted)

15  BY MR. BARBOSA

16  Q    How big were these islands?

17  A    Not very large, sir.

18  Q    Had you ever been there before?

19  A    I had not.

20  Q    Geographically, can you explain where these islands are

21  located?

22  A    Sure.  It's off the southern eastern tip of India, in the

23  Indian Ocean.

24  Q    When you arrived in the Maldives, were you carrying a

25  weapon?

IACOVETTI – Direct (by Mr. Barbosa)

1    A    I was not.

2    Q    Do you typically carry a weapon on duty?

3    A    I normally carry one on duty, but I normally do not travel

4    commercially, to a foreign country, with a firearm.

5    Q    I see.

6         So when you arrived in the Maldives, what did you do after

7    getting there?

8    A    After arriving there, I was transported via a police boat

9    to the government compound on the island of Male, to meet with

10   the Maldivian officials and police.

11   Q    And did you also meet with your colleagues from the U.S.

12   government?

13   A    I did.

14   Q    And where was the meeting with the Maldivian authorities?

15   A    In their headquarters building, in the city of Male.

16   Q    How long did you meet with them that day?

17   A    I think we met with them for about two, two-and-a-half

18   hours, best of my recollection.

19   Q    Did you provide any information to the Maldivians about

20   Mr. Seleznev?

21   A    We did.

22   Q    What type of information did you provide?

23   A    We gave them a copy of the indictment from the Western

24   District of Pennsylvania from -- dated back in 2011.

25   Q    What did you do after that meeting -- sorry.  Just a

IACOVETTI – Direct (by Mr. Barbosa)

1   follow-up question about the copy of the indictment.

2        Was that from the Western District of Washington?

3   A    Yes.  What did I say?  I'm sorry.

4   Q    I think you may have said "Pennsylvania."

5   A    I'm sorry.  I apologize.

6   Q    Have you worked in a number of different locations?

7   A    Yes, I have.  I apologize.

8   Q    What did you do after the meeting with the Maldivians?

9   A    After the meeting, we departed their vehicle, went back to

10  the hotel, which is on a little separate island, and just

11  worked on our operational plan for the next morning.

12  Q    What was the basics of your operational plan?

13  A    The basics of our operational plan was that the Maldivian

14  authorities were going to work with us to meet Mr. Roman

15  Seleznev upon the arrival of his float plane from the hotel in

16  which he was staying, then go from there to see if they could

17  identify him properly by his passport, and then take him to

18  what I would call the tourist police station, to talk to him.

19  Q    Did you know when he was going to be leaving the Maldives?

20  A    We had information that he was going to depart the

21  Maldives on July 5.

22  Q    Was that the next morning after you arrived?

23  A    That was the next morning, sir, yes.

24  Q    What happened the next morning, July 5?

25  A    So July 5, early in the morning, probably 7:00 a.m., we

IACOVETTI – Direct (by Mr. Barbosa)

1    met with the Maldivian police counterparts, Mr. Schwander, and

2    Mr. Mark Smith, from the State Department.

3    Q    Approximately what time of morning was that?

4    A    That was approximately 7:00/7:30 that we met up and

5    discussed the final operational plan.

6    Q    And we'll discuss that a little bit more in a moment.

7         What did you do after meeting up with the Maldivian law

8    enforcement and your colleagues at 7:30?

9    A    We divided up, and myself and the lead Maldivian police

10   officer went to meet the arrival of the float plane that we had

11   information that Roman Seleznev would be on.

12   Q    You mentioned a final plan for the operation.

13        Who came up with this plan?

14   A    The Secret Service, the State Department, and the

15   Maldivian government.

16   Q    I'm going to now show you what's been marked as

17   Government's Exhibit 12.2, which is a series of photographs.

18   And I'll move through these for you to review.

19        If you could just tell me if you recognize those.

20   A    I do.

21   Q    How do you recognize those?

22   A    I was either in them or at that scene at the time, sir.

23   Q    Were these all taken on July 5?

24   A    They were.

25   Q    Do these photographs fairly and accurately depict the

IACOVETTI – Direct (by Mr. Barbosa)

1    events that took place at the airport in the Maldives on

2    July 5?

3    A    They do, sir.

4         MR. BARBOSA:  The government offers Exhibit 12.2 and

5    requests permission to publish.

6         THE COURT:  Any objection?

7         MR. BROWNE:  I know, Your Honor, just let me look --

8    no objection, Your Honor.  Thank you.

9         THE COURT:  12.2 is admitted.

10             (Exhibit 12.2 was admitted)

11   BY MR. BARBOSA

12   Q    We're looking at Page 1 of Exhibit 12.2 now.

13        Who is this on the first page of Exhibit 12.2?

14   A    That's myself and the supervisory Maldivian police

15   arriving on the bus from the float plane to the general

16   airport.

17   Q    Okay.  Is that the supervisor who came up with the plan?

18   A    It was.

19   Q    So what was the plan, specifically, for taking

20   Mr. Seleznev into custody?

21   A    The specific plan was to view him exit the bus, gather his

22   luggage.  He was going to then proceed to the departure area,

23   in which you have to pass through tourist police or immigration

24   police.  And at that time, once identified, they were going to

25   ask him to go to the tourist police, or immigration police

IACOVETTI – Direct (by Mr. Barbosa)

1   station, which is about a minute's walk away from the arrival

2   area.

3   Q    And what was the plan for you taking custody of

4   Mr. Seleznev?

5   A    The plan was for them to positively identify him.  If that

6   was done, we were told that the Maldivians were going to expel

7   him, and we were going to take him into custody at that time.

8   Q    What were you going to do after you took him into custody?

9   A    We had a plane waiting there for him in which we were

10  going to take him to Guam for processing.

11  Q    Was that a commercial flight?

12  A    It was not.

13  Q    What was it?

14  A    It was a private jet that we had arranged for, sir.

15  Q    When you say "we"?

16  A    Sorry, the United States Secret Service.

17  Q    Was there any discussion about what to do with any luggage

18  or other personal items he might be carrying?

19  A    Yes.  The plan called for Mr. Dan Schwander and the

20  Maldivians to search the luggage, in the police station, while

21  we were waiting.

22  Q    This photograph on Page 1 of Exhibit 12.2, you explained,

23  is after the float plane.

24       Where were Agents Schwander and Smith while you waited for

25  the float pane to arrive?

IACOVETTI – Direct (by Mr. Barbosa)

1  A     So when I was waiting with the Maldivians for the float

2  plane, Special Agent Dan Schwander was actually in the tourist

3  police station, and Special Agent Mark Smith was in the arrival

4  area, where this picture would have been taken.

5  Q     When did the float plane arrive, approximately?

6  A     I think the float plane arrived just after 10:00 a.m.

7  Q     And did you see Mr. Seleznev when it arrived?

8  A     I did, sir.

9  Q     How did you know what he looked like?

10  A     From a copy of his photo that we had.

11  Q     Where was he when you first saw him?

12  A     Exiting the float plane.

13  Q     Do you see Mr. Seleznev in the courtroom today?

14  A     I do.

15  Q     Could you identify him?

16  A     Yes.  Sitting in the shirt, white shirt, next to the

17  attorney.

18  Q     Was there anyone with him in the Maldives when you first

19  saw him?

20  A     There was.  There was a small female child and an adult

21  female.

22  Q     What did Mr. Seleznev and his companions do after they got

23  off the seaplane?

24  A     After they got off the seaplane, they transited through an

25  open area onto a transit bus.

IACOVETTI – Direct (by Mr. Barbosa)

1    Q    What did you do?

2    A    Followed him on the bus and sat on the first row.

3    Q    Did this gentleman on -- in the photograph with you, on

4    the first page of Exhibit 12.2, did he come with you?

5    A    Yes.  He sat across the aisle, in the other seat in the

6    first row.

7    Q    Turning to Page 2 of Exhibit 12.2, who is this in the

8    photograph here?

9    A    I know him as Roman Seleznev.

10   Q    Where was this photograph taken?

11   A    This was taken at the arrival of the transit bus from the

12   float plane to the general airport.

13   Q    When you saw him, was he carrying anything with him?

14   A    Just a blue bag.

15   Q    Is that the blue bag that is on his shoulder in this

16   photograph?

17   A    Yes, sir.

18   Q    Where was his other luggage?

19   A    His other luggage was being transported over.  So the

20   adult female and child departed off and went to the restroom,

21   and Mr. Seleznev waited in that area where that picture was

22   taken, for his luggage to arrive.

23        MR. BARBOSA:  And, Your Honor, I forgot to ask to be

24   sure that the record reflected that the witness did identify

25   Mr. Seleznev in the courtroom.

IACOVETTI – Direct (by Mr. Barbosa)

```
 1              THE COURT:  Please continue.
 2    BY MR. BARBOSA
 3    Q     When you got to the terminal, what did Mr. Seleznev do?
 4    A     He smoked a cigarette while waiting for the luggage to
 5    arrive.
 6    Q     What did you do?
 7    A     I just stayed in the area and watched.
 8    Q     So now turning to Page 3 of Exhibit 12.2, is that
 9    Mr. Seleznev?
10    A     That is.
11    Q     What were you doing at this point?
12    A     Just observation.
13    Q     And is that the same blue bag that you'd seen earlier?
14    A     It is, sir.
15    Q     Did you approach Mr. Seleznev at any point?
16    A     Not at this time, no, sir.
17    Q     Moving on to Page 4 of Exhibit 12.2, who is the woman in
18    the photograph?
19    A     That is the female that accompanied him off of the float
20    plane and sat with him on the transit bus.
21    Q     Did you contact her at any point during this?
22    A     I did not, sir.
23    Q     What happened after you see them here, outside the
24    terminal?
25    A     Approximately maybe three or four minutes later, their
```

1    luggage came, in which Mr. Seleznev picked it up, put it on a

2    dolly, and then headed towards the entrance to the airport and

3    met up back with the adult female and the female child.

4    Q    What happened when they went into the entrance to the

5    airport?  What did you see?

6    A    I observed them walking up to two Maldivian tourist

7    police.  They appeared to hand them their passport, at which

8    time the tourist police escorted them to the police station.

9    Q    Do you know approximately what time that was, how long it

10   had taken from the float plane arrival to the tourist police

11   beginning to escort them to the police station?

12   A    I think they arrived at the entrance about 10:20 a.m.

13   Q    I'll just ask to be careful of -- wait for the entire

14   question, for the court reporter's convenience.

15   A    Yes.

16   Q    Where were you, Agent Schwander, and Agent Smith when the

17   Maldivian police took them to the police office?

18   A    Agent Schwander was inside the police office.  Agent Mark

19   Smith was directly behind him, behind Mr. Seleznev.  And I was

20   behind Mr. Smith.

21   Q    Did you follow them into the police office?

22   A    I did follow them into the police office, sir.

23   Q    Turning to Page 5 of Exhibit 12.2, where was this

24   photograph taken?

25   A    That was taken inside the tourist police station.

IACOVETTI – Direct (by Mr. Barbosa)

1    Q    Who is the gentleman in the green shirt?

2    A    The gentleman in the green shirt is Special Agent Dan

3    Schwander.

4    Q    Who are the two gentlemen in the background?

5    A    Those are the Maldivian tourist police.

6    Q    Are they the same officers who brought him to the police

7    office?

8    A    They are.

9    Q    Who is sitting down, looking up at Agent Schwander?

10   A    Mr. Seleznev.

11   Q    Were you in the room while this was going on?

12   A    Yes.  I was standing right behind that little knee wall,

13   or half wall, in the picture.

14   Q    Did Agent Schwander talk to Mr. Seleznev?

15   A    He did, yes, sir.

16   Q    What did he tell Mr. Seleznev?

17   A    He identified --

18            MR. BROWNE:  Objection, Your Honor.

19            THE COURT:  Counsel?

20            MR. BARBOSA:  Same -- it is not offered for the truth

21   of the matter asserted.

22            THE COURT:  All right.  The objection is overruled.

23        Please continue.

24            THE WITNESS:  Special Agent Schwander identified

25   himself as a Secret Service agent and identified Agent Mark

IACOVETTI – Direct (by Mr. Barbosa)

1   Smith as a State Department agent.

2   BY MR. BARBOSA

3   Q    Agent Schwander has some papers in his hands.

4        Did he show these to Mr. Seleznev?

5   A    Yes.  He explained that he had a copy, and presented that

6   copy to Mr. Seleznev, of the 2011 indictment from the Western

7   District of Washington.

8   Q    How did Mr. Seleznev react?

9   A    The only thing I remember him saying is -- asking a

10  question, if there was a extradition treaty with the Maldives.

11  Q    How was Mr. Seleznev's demeanor?

12  A    Calm.

13  Q    What did you do after Agent Schwander presented the

14  indictment to Mr. Seleznev?

15  A    Agent Schwander and Agent Mark Smith and the Maldivian

16  tourist police went through their luggage.  I asked

17  Mr. Seleznev to empty his pockets, and we placed those contents

18  on the coffee table in the picture.

19  Q    Did you review the contents of the blue computer bag that

20  we had seen earlier?

21  A    We did.

22  Q    What was in that bag?

23  A    A Sony tablet/laptop, a second phone, a second passport,

24  some papers, cash, credit cards.

25  Q    Let's talk a little bit about the Sony laptop.

IACOVETTI – Direct (by Mr. Barbosa)

1        How closely did you examine that laptop while you were
2   still in the police station?
3   A    I did not closely examine it while in the police station,
4   sir.
5   Q    Did you notice anything particular about it?
6   A    Other than I had never seen a computer like that before.
7   Other than that, no, sir.
8   Q    What was unusual about it?
9   A    It looked like a tablet, but appeared to be a laptop.
10  Q    Did you turn it on?
11  A    I did not.
12  Q    Did you try to operate the computer in any way?
13  A    Not in any manner, sir.
14  Q    About how long did you look at it while you were there in
15  the police office?
16  A    Maybe ten seconds.
17  Q    Did you count the cash or inventory any of the other items
18  at this point?
19  A    No, sir.
20  Q    What did you do with the personal items that you found on
21  Mr. Seleznev?
22  A    Placed them back in the blue bag and kept them with me.
23  Q    After you finished placing the items back in the bag and
24  taking them, what happened next?
25  A    The Maldivian tourist police escorted Mr. Seleznev,

IACOVETTI – Direct (by Mr. Barbosa)

1   Mr. Schwander, Mark Smith, and myself to a VIP lounge area, for

2   processing the passports.

3   Q    How long did the passport processing take?

4   A    Probably ten minutes, 12 minutes.

5   Q    Where did you go from there?

6   A    From there, we were transported via a small bus out to the

7   private plane.

8   Q    Do you recall about what time you got on the airplane?

9   A    I think maybe two or three minutes after 11:00.

10  Q    And what time did you take off?

11  A    11:17, we were wheels up, sir.

12  Q    About how much time had passed since you first saw

13  Mr. Seleznev at the float plane dock and you took off for Guam?

14  A    Approximately one hour.

15  Q    I'm showing you what's been marked as Government's

16  Exhibit 12.10 on the overhead.  This is two photographs.

17       Do you recognize those photographs?

18  A    I do, sir.

19  Q    How do you recognize those?

20  A    Those were the -- those are pictures of the inside of the

21  plane, sir.

22  Q    Do they fairly and accurately depict how things appeared

23  on the flight to Guam on July 5?

24  A    They do, sir.

25       MR. BARBOSA:  Government offers Exhibit 12.10 and

IACOVETTI – Direct (by Mr. Barbosa)

1   asks permission to publish?

2             THE COURT:  Any objection?

3             MR. BROWNE:  No objection.

4             THE COURT:  It's admitted.  You may publish.

5                   (Exhibit 12.10 was admitted)

6   BY MR. BARBOSA

7   Q    Looking at Page 1 of Exhibit 12.10, can you describe what

8   we're looking at here?

9   A    Certainly, sir.  You're looking at a photo from the rear

10  of the plane, forward.

11  Q    How long was the flight?

12  A    The flight to Guam was approximately 11 hours.

13  Q    What was the paperwork here on the table in the

14  foreground?

15  A    So that paper is our inventory -- evidence inventory

16  forms.  And that is Mr. Schwander, sitting at the table.

17  Q    What are those evidence inventory forms for?

18  A    For chain of custody for evidence, sir.

19  Q    And what was displayed on the screen in front of

20  Mr. Seleznev?

21  A    That was the GPS routing from us, from the Maldives to

22  Guam.

23  Q    Turning to Page 2 of Exhibit 12.10, can you describe what

24  we're looking at here?

25  A    Yes, sir.  That's a picture of probably about mid-plane,

IACOVETTI – Direct (by Mr. Barbosa)

1    looking towards the rear of the plane and the rear compartment,
2    with Mr. Dan Schwander in the green shirt.  And I was actually
3    in the back of that with the evidence, sir.
4    Q    And are these some of the same inventory sheets we see
5    here on the table, on the right-hand side?
6    A    Yes, sir.
7    Q    So how did you go about doing the inventory of
8    Mr. Seleznev's personal belongings?
9    A    So what we did was, I took out everything in the blue bag
10   and laid it from end to end.  In that picture to the left is a
11   couch/bed.  I laid it out from right to left and by types of
12   items so that we could inventory.
13   Q    I'm showing you what's been marked as Government's
14   Exhibit 12.4.
15        Do you recognize that?
16   A    I do, sir.
17   Q    How do you know that?
18   A    It was a picture of the evidence while it was laid out.
19   Q    Does that fairly and accurately represent what you just
20   described?
21   A    Yes, it does.
22            MR. BARBOSA:  The government offers Exhibit 12.4.
23            MR. BROWNE:  No objection.
24            THE COURT:  It's admitted.  You may publish.
25            MR. BARBOSA:  Permission to publish?

IACOVETTI – Direct (by Mr. Barbosa)

1            THE COURT:  You may.

2                 (Exhibit 12.4 was admitted)

3  BY MR. BARBOSA

4  Q    So what do we see here in this picture, in Exhibit 12.4?

5  A    So from left to right, some various cords, connectors,

6  transiting paperworks, his cigarettes, miscellaneous paperwork,

7  receipts from airlines, four credit cards, two cell phones, an

8  iPad, the Sony computer, two passports, Russian dollars and

9  U.S. dollars.

10 Q    Can you describe the inventory process, what type of

11 information you record?

12 A    Just make, model, serial numbers.  If it's a credit card,

13 credit card number, bank issuer, just details so you can later

14 identify and keep a chain of custody of that item.

15 Q    In regards to the laptop, did you have to open the

16 computer or otherwise manipulate it to find the serial number?

17 A    I believe the serial number was between the two pieces, so

18 I believe we had to open it up to get the serial number off.

19 Q    And we see some cash here in this photograph.

20      Did you count the cash?

21 A    We did, sir.

22 Q    How much cash was -- how much U.S. cash was he carrying?

23 A    In excess of $7,200, U.S. cash, and I believe 128,000 in

24 Russian.

25 Q    I'd like to look at some of the items you see.

IACOVETTI – Voir Dire (by Mr. Browne)

1           MR. BARBOSA:  May I approach, Your Honor?

2           THE COURT:  You may.

3  BY MR. BARBOSA

4  Q    Can you take those items out and review them real quickly,

5  and let me know if you recognize them?

6  A    Yes, sir, I recognize them.

7  Q    How do you recognize them?

8  A    By the names on the cards and the inventory sheet that's

9  stapled to the outside, sir.

10          MR. BARBOSA:  Government offers Exhibit 12.5.

11          MR. BROWNE:  Your Honor, may I just ask a question in

12  voir dire?

13          THE COURT:  Yes.

14                    VOIR DIRE EXAMINATION

15  BY MR. BROWNE

16  Q    Good morning, sir.

17  A    Good morning, sir.

18  Q    Are those the credit cards?

19  A    Yes, sir, they are.

20  Q    Is that all that's in there, is the credit cards?

21  A    I believe that's all that's in here.  That's all that's in

22  here right now, sir.

23          MR. BROWNE:  No objection, Your Honor.

24          THE COURT:  12.5 is admitted.  You may publish.

25              (Exhibit 12.5 was admitted)

IACOVETTI – Direct (by Mr. Barbosa)

1                    DIRECT EXAMINATION

2    BY MR. BARBOSA

3    Q    So those are physical exhibits you had in your hand.  I

4    brought up a photograph.

5         Are those the same, in the photograph, that we're using to

6    display for the jury?

7    A    Yes, sir, they are.

8    Q    Now I'm going to bring up Exhibits 12.6 and 12.7.

9              MR. BARBOSA:  May I approach again, Your Honor?

10             THE COURT:  You may.

11   BY MR. BARBOSA

12   Q    Do you recognize those?

13   A    I do, sir.

14   Q    How do you recognize Exhibits 12.6 and 12.7?

15   A    Again, by the items themselves, backed up by the inventory

16   sheet.

17   Q    Okay.  Are Exhibits 12.6 and 12.7 in the same or

18   substantially the same condition as when you seized them from

19   Mr. Seleznev?

20   A    They are, sir.

21   Q    Are those the same passports that Mr. Seleznev presented

22   to the Maldivian police officials?

23   A    May I open?

24   Q    Certainly.

25   A    Yes, sir.  One is the exact one presented to the Maldivian

IACOVETTI – Direct (by Mr. Barbosa)

1   authorities.

2   Q    And the other one, what was that?

3   A    Again, I would explain this as an internal document for

4   Russia, rather than an external.  It's almost like a driver's

5   license.

6   Q    Was that the one you found in his bag?

7   A    This was the one in his bag, yes, sir.

8           MR. BARBOSA:  The government offers Exhibits 12.6 and

9   12.7.

10          THE COURT:  Counsel, are you offering just the

11  individual exhibit or the subparts of 12.6?  In other words,

12  there's 12.6A, B, 12.7.

13          MR. BARBOSA:  Sorry.  Just 12.6.  I'm going to go

14  over the sub-exhibits, which are photographs and translations.

15          THE COURT:  Just 12.6 and 12.7.

16          MR. BROWNE:  We had a previously ruling from the

17  Court on this.  Subject to that ruling, we would make our

18  standing objection.

19          THE COURT:  Objection is overruled.  12.6 and 12.7

20  are admitted.  You may publish.

21             (Exhibits 12.6 and 12.7 were admitted)

22  BY MR. BARBOSA

23  Q    Did you also photograph or have somebody else photograph

24  the passports?

25  A    We did, sir.

IACOVETTI – Direct (by Mr. Barbosa)

1   Q    I'm going to show you Exhibits 12.7A –– I'll bring them

2   both up so you can look at them at the same time –– 12.6A, on

3   the overhead.

4        In preparation for trial, did you go over these

5   photographs to confirm?

6   A    I did, sir.

7   Q    Do you recognize these photographs?

8   A    I do, sir.

9   Q    Both series, in 12.7A and 12.6A?

10  A    Yes, sir.

11  Q    And are those accurate photographs of the passports –– the

12  physical passports that you have there in your hand?

13  A    Yes, sir.

14          MR. BARBOSA:  Government offers 12.6A and 12.7A.

15          THE COURT:  Any objection to 12.6A and 12.7A?

16          MR. BROWNE:  Same.

17          THE COURT:  The Court overrules those objections.

18  12.6A and 12.7A are admitted.

19              (Exhibits 12.6A and 12.7A were admitted)

20  BY MR. BARBOSA

21  Q    And have these also been translated?

22  A    Yes, sir, they have.

23  Q    Have you seen those translations?

24  A    I have seen copies of the translations, yes, sir.

25  Q    Showing you 12.6B and 12.7B, do you recognize those?

IACOVETTI – Direct (by Mr. Barbosa)

1    A    Yes, sir, I do.

2         MR. BARBOSA:  The government offers these

3    conditionally.  We do expect the interpreter to testify as the

4    next witness.

5         THE COURT:  Subject to the conditional admission,

6    Counsel, same objection?

7         MR. BROWNE:  Well, actually, I have a different

8    objection.

9        If they're just being proposed, at this point, as a

10   foundation for the next witness, I don't have any problem.  But

11   I don't think it should be admitted until we have testimony

12   from the translator.

13        THE COURT:  All right.  That will be sustained,

14   Counsel.  So they're marked for identification, but they're not

15   admitted at this point in time.  This is only a foundational

16   question.

17        MR. BARBOSA:  No publishing at this point, then?

18        THE COURT:  No publishing at this point.

19        MR. BARBOSA:  Fair enough.

20   BY MR. BARBOSA

21   Q    Bringing up 12.7A, which has been admitted, on the screen

22   in front of you, Page 21 -- and if you could turn to that in

23   the original exhibit too, it's easier to read -- does that list

24   the defendant's name?

25   A    It does, sir.

IACOVETTI – Direct (by Mr. Barbosa)

1   Q     In English?

2   A     It does, sir.

3   Q     And his date of birth, did you go over those?

4   A     Yes.  It says, "Given name:  Seleznev, Roman,"

5   7/23/1984 for date of birth, and then Passport

6   Number 640410831.

7   Q     Does it also include the issue date and the expiration

8   date?

9   A     Yes.  Issue date would be December 31, 2009.  Date of

10  expiry, December 31, 2014, sir.

11  Q     Did you also seize paper documents from Mr. Seleznev?

12  A     Yes, sir, we did.

13  Q     I'm showing counsel Exhibit 12.9.  And I'll bring that up

14  to you in just a moment.

15         THE COURT:  Counsel, while you're doing that, members

16  of the jury, if you'd like to stand and stretch right now,

17  please take advantage of it.

18         MR. BARBOSA:  May I approach?

19         THE COURT:  Yes.

20      Please be seated.

21  BY MR. BARBOSA

22  Q   If you could take a moment to look at the items in the bag

23  marked Exhibit 12.9.

24  A     May I open the bag, sir?

25  Q     Absolutely.

IACOVETTI – Direct (by Mr. Barbosa)

1        Do you recognize those items?

2    A    I do, sir.

3    Q    How do you recognize them?

4    A    These would be the items that we seized out of the blue

5    bag, from Mr. Seleznev.

6    Q    So they were in the blue bag when you seized them?

7    A    They were, sir.

8    Q    Are they in the same condition as when you seized them

9    from Mr. Seleznev?

10   A    Yes, sir.

11            MR. BARBOSA:  Government offers Exhibit 12.9.

12            THE COURT:  Any objection?

13            MR. BROWNE:  No, Your Honor.

14            THE COURT:  12.9 is admitted.

15                  (Exhibit 12.9 was admitted)

16            MR. BARBOSA:  Permission to publish?

17            THE COURT:  Granted.

18   BY MR. BARBOSA

19   Q    I have scans of the same exhibits on the overhead in front

20   of you now.

21        What did you find in terms of paper documents on

22   Mr. Seleznev?

23   A    Transit receipts from airlines, from airline reservations,

24   purchase of tickets, and travel documentation, sir, along with

25   a key card to a hotel in the Maldives.

IACOVETTI – Direct (by Mr. Barbosa)

1    Q    Thank you.

2         Let's focus on the first page.  And I know they may get

3    out of order, as you have the physical ones, but I'll show you

4    the first page on the overhead.

5         Where was this airline reservation sent to?  What e-mail

6    address?

7    A    A mail.ru e-mail address.  And it's R-O-M-A-R-I-O-G-R-O-1.

8    Q    Moving through these documents, most of these are in

9    Russian; is that correct?

10   A    They are, sir.

11   Q    Did you recognize any of the destinations listed in any of

12   these -- sorry.  Go ahead.

13   A    Yes.

14   Q    Where were they for?

15   A    For Male.

16   Q    Is that the airport where you took Mr. Seleznev into

17   custody?

18   A    Male is the airport in the Maldives, yes, sir.

19   Q    You mentioned some other items that you found on him.

20        What else was there?

21   A    Again, transit airline documents; receipt stubs from

22   Vladivostok International Airport, in the name "Roman

23   Seleznev"; and other transiting documents, sir.

24   Q    Did you also find hotel keys?

25   A    We did, sir.

IACOVETTI – Direct (by Mr. Barbosa)

1   Q    What were those for?

2   A    For the Atmosphere Hotel, in the Maldives.

3   Q    Turning to Page 20, is that the hotel key you're referring

4   to?

5   A    That is, sir.

6   Q    Were you familiar with that hotel?

7   A    I am, sir.

8   Q    How?

9   A    It's a hotel that's in part of the archipelagos off of the

10  island of Male.

11  Q    I'm going to turn your attention to Page 19 of

12  Exhibit 12.9.

13       What is this?

14  A    I believe that's his customs for the arrival in the

15  Maldives, sir.

16  Q    Possibly departure?

17  A    I'm sorry.  The departure, June 21.

18  Q    And this stamp, when was that?  Was that his arrival?

19  A    Yes.  That's his arrival card into Male.

20  Q    And at the bottom of this, is this signed?

21  A    It is, sir.

22  Q    Did the defendant indicate a passport number on there?

23  A    He did, sir.

24  Q    Did that match the passport that you seized?

25  A    It does, sir.

IACOVETTI – Direct (by Mr. Barbosa)

1    Q    I want to turn to the laptop computer you discussed a

2    moment ago.

3              MR. BARBOSA:  I'm going to show Exhibit 12.8 to

4    counsel.

5         May I approach, Your Honor?

6              THE COURT:  You may.

7    BY MR. BARBOSA

8    Q    I've now handed you Government's Exhibit 12.8.

9         Do you recognize that, if you could take a look at it?

10   A    I do, sir.

11   Q    How do you recognize it?

12   A    Again, from the computer and the log sheet that

13   accompanies it, sir.

14   Q    Is this the same laptop computer you seized from

15   Mr. Seleznev?

16   A    Yes, sir.

17   Q    Where was it when you first saw it?

18   A    In the blue bag that was carried by Mr. Seleznev.

19   Q    And did you inventory the serial number from that laptop

20   that is marked as Exhibit 12.8?

21   A    Yes, sir.

22   Q    Where is the serial number located on it?

23   A    It's located in between the -- there's a service tag

24   number.

25   Q    Okay.  Is this the same computer?

IACOVETTI – Voir Dire (by Mr. Browne)

1   A    Yes, it is, sir.

2   Q    And is it the same or substantially the same condition as

3   when you seized it?

4   A    It is, sir.

5          MR. BARBOSA:  The government offers Exhibit 12.8.

6          THE COURT:  Any objection?

7          MR. BROWNE:  Yes, Your Honor.

8       May I ask questions?

9          THE COURT:  Yes.

10         MR. BROWNE:  You know what I probably would rule on

11  that objection [sic], but I will ask some questions.

12         THE COURT:  You may.

13         MR. BROWNE:  Should I stand here?

14         THE COURT:  You can stand there, Counsel, as long as

15  you keep your voice up.

16                   VOIR DIRE EXAMINATION

17  BY MR. BROWNE

18  Q    Hello, again.

19  A    Hello, again, sir.

20  Q    That's Exhibit 12.8; correct?

21  A    I'm sorry, sir?

22  Q    Exhibit 12.8; correct?

23         MR. BARBOSA:  Does it have an exhibit sticker on it

24  that says 12.8?

25         THE WITNESS:  I do not see -- I see a 14-108 on it,

IACOVETTI – Voir Dire (by Mr. Browne)

1    sir.

2              MR. BARBOSA:  Maybe flip it over.

3    BY MR. BROWNE

4    Q    I think it's on the back.

5    A    I've got it.  Yes, sir.

6    Q    You've got it?

7    A    Sorry.

8    Q    Is it 12.8?

9    A    It is, sir, 12.8.

10   Q    Okay.  And since you had that in your possession way back

11   when, in the Maldives and on the airplane, which we'll talk

12   about in a bit, it's been in many other hands; correct?

13   A    Define "many," please, sir.

14   Q    More than five?

15   A    I don't know that for certain, sir.

16   Q    In any event, it's been -- since you last saw it, it's

17   been handled by other people; correct?

18   A    Well, there's a log on the form that should carry forward

19   with this item.

20   Q    Okay.  So is that a yes -- let's just stick with one

21   person.

22        It's been handled by somebody more than you since it was

23   seized from Mr. Seleznev; correct?

24   A    Yes, sir.

25   Q    Okay.  And is there anything on Exhibit 12.8 that

IACOVETTI – Voir Dire (by Mr. Browne)

1    identifies that you actually had possession of it?  Are your

2    initials, or anything like that, on there?

3    A    On the computer itself, sir?

4    Q    Yes.

5    A    No, sir.

6         MR. BROWNE:  Your Honor, the objection is, there

7    needs to be a better foundation.

8         THE COURT:  Counsel, I suspect that you're going to

9    have other individuals cross-reference the same item?

10        MR. BARBOSA:  Items from it, not the physical item.

11   Well, they'll handle the physical item.

12        The witness has testified that it has the same serial

13   number.  The physical exhibit has been properly identified, I

14   believe.

15        THE COURT:  All right.  The objection is noted.  It's

16   overruled.  12.8 is admitted.

17                  (Exhibit 12.8 was admitted)

18   BY MR. BARBOSA

19   Q    So can you show the --

20        MR. BARBOSA:  May the witness display the laptop for

21   the jurors now?

22        THE COURT:  You may.

23   BY MR. BARBOSA

24   Q    Can you show the jurors how you open that computer up?

25   A    So it's -- I thought it was a laptop, but it can open up.

IACOVETTI – Voir Dire (by Mr. Browne)

1    And then I don't know, actually, where the release is, so I
2    don't want to pull it -- oh, there it is.  So it actually has a
3    built-in keyboard.  So at first, I thought it was an iPad.  And
4    then after getting it on the airplane, noticed that it was more
5    of a laptop.
6              MR. BROWNE:  Agent, you're trailing off voice-wise.
7    You need to use the microphone.
8              THE WITNESS:  Sorry.
9              MR. BROWNE:  Thank you.
10   BY MR. BARBOSA
11   Q    When you inventoried the laptop computer that you're
12   handling there, was it powered on or off?
13   A    It -- initially, it appeared as it did now, with the
14   screen being black.
15   Q    Did that change at any point?
16   A    It did when I placed it on the couch, in the previous
17   exhibit.
18   Q    Is that Exhibit 12.4, that was already admitted?
19   A    Yes, sir.
20   Q    Is that -- so in the kind of middle bottom, is that the
21   same laptop that we're talking about?
22   A    It is, sir.
23   Q    So what happened when you placed it here on the couch?
24   A    I believe I bumped it on the arm or the pillow to the left
25   in that picture.  And at that time, the computer went on.

IACOVETTI – Voir Dire (by Mr. Browne)

1   Q    And when you say "the computer went on," what did you see?

2   A    The screen lit up, and it appeared to be -- I'll call it

3   an abstract rainbow design appeared.

4   Q    How long did the screen display?

5   A    Probably about 60 seconds.

6   Q    What did you do when you saw the screen turn on?

7   A    I left it alone.

8   Q    Did you try and turn it off?

9   A    I did not.

10  Q    Why not?

11  A    A rule -- or a golden rule, I'll say, with evidence, or

12  electronic evidence, is to leave it in the state that you take

13  possession of it.

14  Q    Did you write any reports about the screen coming on?

15  A    I did not, sir.

16  Q    Did you tell anyone about it having displayed?

17  A    I did.

18  Q    Who?

19  A    I told Mr. Schwander, Special Agent Schwander.  And I also

20  told Special Agent Mike Fischlin, when I delivered the computer

21  to the Seattle Field Office.

22  Q    After you completed the inventory, what did you do with

23  the computer?  Where did you put it?

24  A    I put it back in the blue bag.

25  Q    Did you do anything to make sure the screen wouldn't come

1   on again?

2   A     I did.

3   Q     What did you do?

4   A     I actually asked the flight attendant for a bottle of

5   water.  And I removed the cap, the plastic cap, from that

6   bottle, and taped it over the button on the side that I believe

7   I touched, that lit up the computer.

8   Q     Could you show the jurors the button you were trying to

9   cover up?

10  A     So I believe it was the button on the side.  I believe

11  that was the one.  I'm still not certain if that is.  But I

12  believe that's what I touched that lit the screen.  So I put

13  the cap of the bottle over it, asked the flight attendant for

14  tape, and I put it over in an "X" pattern so that it wouldn't

15  go on mistakenly while it was in the blue bag.

16  Q     Are there other buttons on that computer that you've since

17  found?

18  A     There are.  There's a window button on the front, a touch

19  button.

20  Q     Did you try and cover that one up?

21  A     I did not.

22  Q     Did you look to see if the laptop had any indications that

23  it could be capable of accessing a cellular network?

24  A     I did not, sir.

25  Q     Did you look to see if it had a SIM card?

IACOVETTI – Voir Dire (by Mr. Browne)

```
 1    A    I did not, sir.

 2    Q    Do you know what a SIM card is?

 3    A    I do, sir.

 4    Q    What is a SIM card?

 5    A    It's the device that allows either a computer or laptop to

 6  gain access to a wireless network for communication purposes.

 7    Q    So you didn't see whether it had one?

 8    A    I did not, sir.

 9    Q    Do you know what a Faraday bag is?

10    A    I do, sir.

11    Q    Did you place the laptop in a Faraday bag?

12    A    I did not.

13    Q    Why not?

14    A    I did not have a Faraday bag with me, sir.

15    Q    So after you've inventoried it, taped a bottle cap over

16  the power button, what did you do with it after that?

17    A    Placed it in the blue bag, placed it behind the seat in

18  the airplane.

19    Q    And did it stay there for the rest of the flight?

20    A    It stayed there for the remainder of the flight, sir.

21    Q    How long was that flight?

22    A    Approximately 11 hours.

23    Q    Did you or anyone else ever remove it from the bag during

24  that flight?

25    A    No, sir.
```

IACOVETTI - Voir Dire (by Mr. Browne)

1  Q    After you arrived in Guam, what did you do with all the
2  physical evidence you seized?
3  A    It stayed with me, sir.
4  Q    How long were you in Guam?
5  A    Forty-eight hours, maybe.
6  Q    Do you recall what time of day it was when you arrived in
7  Guam?
8  A    We arrived 2:45 -- 2:45-ish a.m., on July 6.
9  Q    What day of the week was that; do you remember?  Was that
10  on a weekend?
11  A    I believe it was on a weekend, sir.  I'm not certain.
12  Q    The first business day you're in Guam, did you escort
13  Mr. Seleznev to the courthouse for an initial appearance?
14  A    Yes, on the 7th.
15  Q    What did you do with the computer and other evidence while
16  you were in that court?
17  A    While I was in court, it was locked up in the United
18  States Secret Service Field Office that was in a federal
19  courthouse in Guam.
20  Q    Same courthouse where Mr. Seleznev appeared?
21  A    Yes.
22  Q    Did you have an office in that building?
23  A    Yes.
24  Q    Why did you have an office in the Guam Field Office?
25  A    I'm sorry.  It was in a different federal -- I'm sorry,

IACOVETTI – Voir Dire (by Mr. Browne)

1  sir.  It's in a different field.  The field office is located
2  in a different building than the courthouse that Mr. Seleznev
3  appeared.
4  Q    I see.  Okay.
5  A    I'm sorry.
6  Q    So where did you leave the computer when it wasn't in your
7  custody?
8  A    In the United States Secret Service Field Office.
9  Q    Okay.  And was that field office secured?
10 A    It is, alarms, cameras, bulletproof glass, bulletproof
11 doors.  Yes, sir.
12 Q    Did anyone else have access to that evidence or the laptop
13 while it was outside of your presence?
14 A    They did not.  It's my office when I'm there in Guam, sir.
15 Q    At some point while you were in Guam, did you have an
16 agent with computer forensic experience look at the computer?
17 A    We did.  Agent Lam, from our Los Angeles Field Office.
18 Q    Did you see whether he turned the computer on?
19 A    He did not, sir.
20 Q    And were you with him at all times when he looked at it?
21 A    Yes.
22 Q    Did he operate the computer in any way?
23 A    He did not.
24 Q    Did anyone try and manipulate the buttons or the screen or
25 anything about the computer?

IACOVETTI – Voir Dire (by Mr. Browne)

```
 1   A      No, sir.

 2   Q      How did the computer get back to Seattle?

 3   A      I hand-carried it from Guam to Seattle, sir.

 4   Q      When you say you hand-carried it, was it out of the bag or

 5   in the bag?

 6   A      In the blue bag, with the rest of the evidence.

 7   Q      Where was the bag while you traveled?

 8   A      With me.  It was at my feet, in the airplane seat.

 9   Q      When did you arrive in Seattle?

10   A      5:00 a.m. on July 8.

11   Q      How long had you been traveling at that point?

12   A      Probably 20 hours.

13   Q      So did you have the computer in your possession the entire

14   time from basically when you seized it in the Maldives until

15   you got to Seattle?

16   A      Absolutely, sir.

17   Q      What did you do with it when you got to Seattle?

18   A      I landed at the airport approximately 5:00, 5:30 a.m.  Was

19   met by Special Agent Mike Fischlin.  He transported me to the

20   Seattle Field Office of the United States Secret Service.

21   Q      And did you give it to him?

22   A      Yes.  We laid out all the evidence on the conference room

23   table, and I turned it over to his possession.

24   Q      Was that the extent of your handling of the computer until

25   now?
```

IACOVETTI – Voir Dire (by Mr. Browne)

1    A    Yes.

2    Q    You mentioned you also seized an iPhone from Mr. Seleznev.

3    I'm going to show you Exhibit 12.8.

4             MR. BROWNE:  Twelve-point what, Counsel?  Eight?

5             MR. BARBOSA:  Sorry.  12.8A.

6             MR. BROWNE:  Okay.  Thank you.

7             MR. BARBOSA:  May I approach, Your Honor?

8             THE COURT:  You may.

9    BY MR. BARBOSA

10   Q    Can you take a look at 12.8A and tell me if you recognize

11   that?

12   A    Yes, sir.

13   Q    How do you recognize that?

14   A    I believe it's the iPhone that Mr. Seleznev had in his

15   possession, that was inventoried.

16   Q    Why do you believe it's the same iPhone?

17   A    It's on the inventory sheets from the plane and then the

18   Seattle Field Office, sir.

19   Q    So it has the same serial number you recorded --

20   A    Yes, sir.

21   Q    -- during your inventory?

22   A    Yes, sir.

23   Q    Okay.  Is that the same iPhone, then, that you seized from

24   Mr. Seleznev in the Maldives?

25   A    Yes.  It's the iPhone that's in the picture, sir.

IACOVETTI – Cross (by Mr. Browne)

1                   MR. BARBOSA:  Government offers Exhibit 12.8A.

2                   MR. BROWNE:  No objection, Your Honor.

3                   THE COURT:  12.8A is admitted.

4                        (Exhibit 12.8A was admitted)

5    BY MR. BARBOSA

6    Q    Did you also transport this to Seattle and turn it over to

7    Agent Fischlin?

8    A    I did, sir.

9                   MR. BARBOSA:  No further questions, Your Honor.

10                  THE COURT:  Cross examination?

11                  MR. BROWNE:  Do you want me to go ahead and start?

12                  THE COURT:  Yes.

13                       CROSS EXAMINATION

14   BY MR. BROWNE

15   Q    Good morning, sir.

16   A    Good morning, sir.

17   Q    So I'll just start with some questions about the beginning

18   of your testimony; okay?

19   A    Yes, sir.

20   Q    You don't have any jurisdiction in the Maldives; right?

21                  MR. BARBOSA:  Objection, Your Honor.

22                  THE COURT:  That's sustained, Counsel.

23   BY MR. BROWNE

24   Q    Did you say on direct examination that your

25   jurisdiction --

IACOVETTI – Cross (by Mr. Browne)

1          MR. BARBOSA:  Objection again, Your Honor.

2          THE COURT:  Counsel, if it's in response to the

3   question the government asked, the defense is entitled to ask

4   follow-up questions.  To that extent, the government's

5   objection is overruled.

6   BY MR. BROWNE

7   Q    You testified on direct that your jurisdiction -- that was

8   the word you used -- extended to Afghanistan; correct?

9   A    That's the word you say I used.  It would be my area of

10  operation, would be that of Southeast Asia, sir.

11  Q    So that doesn't necessarily mean you have jurisdiction in

12  someplace like the Maldives; right?

13  A    No, sir.

14  Q    Did you have a search warrant?

15  A    I did not, sir.

16  Q    Did Mr. Seleznev give you consent to take his items?

17  A    No, sir, he did not.

18  Q    You remember one of the other agents -- Mr. Seleznev

19  saying to one of the other agents a question, "Is there an

20  extradition treaty with the Maldives," something like that?

21  A    Yes, sir, something like that.

22  Q    To the best of your memory, that's what was said?  I'm

23  sorry.  I talked over you.

24  A    Yes.  To the best of my memory, that's --

25  Q    Was that answered?

IACOVETTI – Cross (by Mr. Browne)

1    A    It was not answered, sir.

2    Q    There was no extradition process.

3    A    Not that I know of, sir.

4    Q    Now, let's talk a little bit about -- because I'm sure

5    everybody doesn't know what a Faraday bag is.  I do.  You do.

6         A Faraday bag is a device named after --

7              MR. BARBOSA:  Objection, form of the question.  He's

8    describing what a Faraday bag is, as opposed to asking a

9    question.

10             THE COURT:  Let's ask a question, Counsel.

11   Sustained.

12             MR. BROWNE:  Sure.

13   BY MR. BROWNE

14   Q    Is a Faraday bag named after somebody named Faraday?

15   A    I don't have that knowledge, sir.

16   Q    Okay.  What is a Faraday bag?

17   A    A Faraday bag is a -- usually a foil-like bag that allows

18   you to put devices that have wireless access -- the wired bag,

19   or the aluminum bag, the metal bag, blocks any of those

20   receptions from getting to the device after placed in the bag.

21   Q    And the importance of a Faraday bag is that if an

22   electronic device has a SIM card in it, it would prevent

23   wireless --

24             MR. BARBOSA:  Objection, again, form of the question.

25             MR. BROWNE:  The purpose of the bag?

IACOVETTI – Cross (by Mr. Browne)

1              THE COURT:  It's overruled, Counsel.  But be mindful
2    not to testify in the form of the question.
3              MR. BROWNE:  Of course not.  Sorry, if I did.
4    BY MR. BROWNE
5    Q    A Faraday bag would prevent wireless communication with
6    whatever device was in it.
7    A    Yes, sir.
8    Q    And that's particularly important, obviously, if not only
9    important, for electronic devices that have SIM cards.
10   A    Yes, sir.
11   Q    And do you still have the computer up there?
12   A    I do, sir.
13   Q    Okay.  Now, did you know, at the time, there was a SIM
14   card in there?
15   A    I did not, sir.
16   Q    Okay.  Do you know that now?
17   A    I do, sir.
18   Q    Okay.  Can you point -- because I know there's a little
19   port on there.  Can you point to the ladies and gentlemen of
20   the jury where the SIM card port is on Exhibit --
21   A    If I can find it again.  I wasn't the one that identified
22   it.
23   Q    I can help you find it, if you can't.
24   A    Yeah.  I actually don't know where it is, and I think it
25   may be covered.

IACOVETTI – Cross (by Mr. Browne)

1    Q    Look on the back, sir.

2    A    So I -- I'm not certain where it is, sir.  I'm sorry.

3              MR. BROWNE:  May I approach, Your Honor?

4              THE COURT:  You may.

5              MR. BROWNE:  May I take the exhibit, Your Honor?

6              THE COURT:  You may.

7              MR. BROWNE:  Your Honor, may I confer with

8    Ms. Scanlan for a moment?

9              THE COURT:  You may.

10   BY MR. BROWNE

11   Q    Now, there are also Faraday boxes; are there not?

12   A    There are, sir.

13   Q    Okay.  And are you a forensic expert on computers?

14   A    I am not a forensic expert, no, sir.

15   Q    And that wasn't a criticism.  That's not your field of

16   expertise.

17   A    It is not, sir.  I'm a supervisor.

18   Q    But clearly you knew, when you went to the Maldives, that

19   you were investigating an allegation of a cybercrime; correct?

20   A    Yes, sir.

21   Q    And cybercrimes normally always involve computers; right?

22   A    Normally, sir.

23   Q    But you did not bring a Faraday bag with you?

24   A    I did not, sir.  I had maybe two hours' notice that I was

25   leaving for the Maldives.

IACOVETTI – Cross (by Mr. Browne)

1   Q    Okay.  And if an electronic device has a SIM card in it,

2   and that device is turned on, it can communicate with outside

3   sources; correct?

4   A    While it was on the plane?

5   Q    Yes.

6   A    I don't know if that's possible, sir.

7   Q    We'll have somebody else answer that question.

8   A    Okay.

9   Q    But when you -- you actually accidentally, I believe,

10  turned it on; right?

11  A    It came out of hibernation on the plane, after we were

12  wheels-up.

13  Q    But you actually bumped on something, and then the screen

14  came on -- the screen saver came on; right?

15  A    Yes.  That generic rainbow, yes.

16  Q    So you believe it was on?

17  A    I would call that hibernation, not on, sir.

18  Q    With the screen saver or without the screen saver?

19  A    I would -- I would say a hibernation screen, sir.

20  Q    Okay.  But the reason you asked for the bottle cap to put

21  over the button that you thought was the on-and-off button is,

22  you were concerned that somebody might -- it might, on its own,

23  turn on or turn off?

24  A    Well, as I had spoke, I had never seen a Sony Vaio laptop

25  of this nature.  I wasn't sure what it was.  I wasn't sure how

IACOVETTI – Cross (by Mr. Browne)

1    to turn it on, how to turn it off.  So I put the bottle cap

2    over what I believe made it go out of hibernation.

3    Q    I'm -- I'm having trouble with that.

4         "Out of hibernation," what do you mean?

5    A    Out of sleep mode.

6    Q    Once again, we've established you're not an expert on

7    computer forensics; right?

8    A    Yes, sir.

9    Q    All right.  You get this computer.  While you were on the

10   airplane, there's some touching of it, in some way or another,

11   and the screen lights up.

12        Can we go that far?

13   A    Yes, sir.

14   Q    You don't know what that means, whether that's on or

15   hibernation.  You don't know that; do you?

16   A    No.

17   Q    And in an exercise of caution, which makes perfect sense,

18   you put the bottle cap over something you thought might be an

19   on-and-off button.

20   A    Yes, sir.

21   Q    Am I right so far?

22   A    Yes, sir.

23        MR. BROWNE:  Okay.  Excuse me, one moment, Your

24   Honor.

25        May I, Your Honor?

IACOVETTI – Cross (by Mr. Browne)

1           THE COURT:  Yes.

2   BY MR. BROWNE

3   Q    I don't know how we can miss it, but apparently -- do you

4   see that, the big arrow?

5   A    Oh, yes.

6   Q    If you actually push on that, there's a SIM card in there?

7   You can go ahead and do that.

8   A    Yes.

9   Q    Okay.  Would you point that out?  Let me get out of the

10  way.  Would you point that out to the ladies and gentlemen of

11  the jury?

12  A    So there's a slot in the back, along this ridge.

13  Q    And did you determine there was a SIM card in there?

14  A    There is.

15  Q    Okay.  Now -- I think you can leave that there.  Thank

16  you, sir.

17       Were you the agent in charge of this case?

18  A    Can you repeat that, please?

19  Q    Were you the agent in charge of this case?

20  A    At what time, sir?  Sorry.

21  Q    Well, let's say when you came back to Seattle.  You

22  brought the computer back to Seattle; right?

23  A    Yes.

24  Q    At that time, were you in charge of the case?

25  A    No, sir.

IACOVETTI – Cross (by Mr. Browne)

1    Q    Okay.  Did you ever request that that SIM card be examined

2    to determine what was on it?

3    A    I didn't know there was a SIM card in there, sir, as I

4    previously stated.

5    Q    So I guess the answer is, no, you didn't do that.

6    A    I did not know there was a SIM card in it, sir.

7    Q    So you never requested, obviously -- it's an obvious

8    question.

9         When the computer was in Guam, in the office that you've

10   described, it was not in a Faraday bag either; was it?

11   A    It was not, sir.

12   Q    And this is a United States Secret Service office in Guam?

13   A    Yes, sir.

14   Q    And Guam, by the way, is a U.S. protectorate; right?

15   A    I believe so.

16   Q    So you do have jurisdiction in Guam.

17   A    Yes, sir.

18   Q    Did you inquire of other Secret Service agents or staff

19   whether they had a Faraday bag?

20   A    No, sir, I did not.

21   Q    Were you concerned that if the computer was indeed on, it

22   was communicating with other computers while it was in your

23   office?

24   A    At that point in time, sir, as I said, I did not know it

25   had a SIM card in the computer.

1              THE COURT:  Counsel, is this a convenient time to
2     take the morning break?
3              MR. BROWNE:  Sure.
4              THE COURT:  Members of the jury, we'll take our
5     morning recess.  It is 10:30.
6                        (Jury exits the courtroom)
7              THE COURT:  Counsel, just for the benefit of counsel,
8     so you always know, I will always ask, before we take a break,
9     is there anything to take up before we take the recess?  This
10    is the proper time to take it, as opposed to having the jury
11    come back when I come back and say, "Your Honor, there's a
12    matter we want to take up."
13         So I'm asking now, counsel for the government, anything to
14    take up?
15             MR. BARBOSA:  No, Your Honor.
16             THE COURT:  Counsel for the defense?
17             MR. BROWNE:  No, Your Honor.
18             THE COURT:  We'll be in recess.
19                           (Recess)
20                     (Jury enters the courtroom)
21             THE COURT:  Counsel, you may continue your cross
22    examination of the witness.
23             MR. BROWNE:  Thank you, Your Honor.
24    BY MR. BROWNE
25    Q    Hello, again.

IACOVETTI – Cross (by Mr. Browne)

1    A    Hello, again, sir.

2    Q    So Agent Lam, he's a Secret Service agent?

3    A    Yes, sir.

4    Q    And was the first contact you had with him in this case in

5    Guam?

6    A    Yes, sir.

7    Q    Okay.  And do you know –– I don't know the answer –– do

8    you know whether Agent Lam is an expert on computer forensics?

9    A    I don't know that, sir.

10   Q    So, but from your testimony, I understand that Agent Lam

11   did something with the computer when you were in Guam; right?

12   A    I don't think he did anything with the computer.

13   Q    What did you observe?

14   A    I observed him more looking at the phones, sir.

15   Q    Okay.  I'm sorry.  I thought you said in your direct

16   testimony that he had some contact with the computer.

17   A    He did.  It was on the conference room table in my office,

18   along with the other electronic items, sir.

19   Q    Did he actually touch it?

20   A    He may have, sir.

21   Q    Okay.  Now, that's an interesting computer in that the

22   screen –– I can see why you thought it was a –– an iPad, or

23   something, because the screen comes up and sits like this,

24   right, on the computer?

25   A    Well, I found out later, yes, sir.

IACOVETTI – Cross (by Mr. Browne)

1    Q    And then so that's when the screen is visible, obviously,

2    is when it's taken up and put like that; correct?

3    A    So --

4    Q    You can just show us.  I don't think it's on now.

5    A    The screen is visible -- this is the way -- in the state

6    of which I observed it when I had taken possession of it from

7    Mr. Seleznev.

8    Q    Right.

9    A    On the plane, when it was being inventoried and I had to

10   try to locate a serial number for the form --

11   Q    Right.

12   A    -- what I did was exactly what I did here in court, is I

13   kind of opened it -- I think you can kind of open it sideways

14   and see the serial number.  I did not fully extend -- I didn't

15   know how to open it.  So if you kind of just open it, you can

16   see the serial number, and nothing else is visible, to include

17   the SIM card.

18   Q    Okay.  Could you open it the way, though, if you wanted to

19   use it?  Could you just show us?  Because it's an unusual --

20   A    I think --

21   Q    Or do you know how to do that?

22   A    Well, I did when you brought it over.

23   Q    Okay.  Younger people know how to do that.

24        Could you just set it down for a second?

25   A    Yes, sir.

IACOVETTI – Cross (by Mr. Browne)

1   Q    So you did not see Agent Lam do that?

2   A    I did not.

3   Q    Okay.  Does Agent Lam still work for the Secret Service,

4   as far as you know?

5   A    I believe so.

6   Q    Okay.  Now, we've identified one -- I think it's an

7   iPhone, one cellular phone, Exhibit 12.8A; correct?

8   A    Yes, sir, 12.8A.

9   Q    Okay.  Now, your testimony is that was taken from

10  Mr. Seleznev's possession in the Maldives; correct?

11  A    Yes, sir.

12  Q    Okay.  And there was another phone also; correct?

13  A    Yes, sir.  I believe a Samsung.

14  Q    Okay.  Now, was that phone on when you took it from

15  Mr. Seleznev, or do you remember?

16  A    The screen was not lit, sir.

17  Q    Well, that doesn't mean whether it's on or not.

18       You don't know whether it was on or not?

19  A    I do not.

20  Q    Okay.  And one of the purposes of a Faraday bag is to put

21  something like an iPhone in the Faraday bag, which would

22  prevent it from communicating also, correct, assuming there's a

23  SIM card in it?

24  A    Yes.  Assuming there's a SIM card, a Faraday bag blocks

25  communication via wireless.

IACOVETTI – Redirect (by Mr. Barbosa)

1    Q    Yeah.  I think we've gone over that.  Thank you.

2         Is that an iPhone?  I think it is; right?

3    A    I believe it is.

4    Q    Does it have a little apple on the back?

5    A    It does.

6    Q    Did you have a search warrant to go into Mr. Seleznev's

7    computer at any time?

8    A    Did I?

9    Q    Yes.

10   A    No, sir.

11   Q    Did you have a search warrant to go into Mr. Seleznev's

12   phone at any time?

13   A    No, sir.

14   Q    You didn't even have a search warrant to take them into

15   your custody; did you?

16   A    No, sir.

17            MR. BROWNE:  Thank you very much, sir.

18            THE WITNESS:  You're welcome, sir.

19            MR. BROWNE:  Thank you, Your Honor.

20            THE COURT:  Redirect?

21                      REDIRECT EXAMINATION

22   BY MR. BARBOSA

23   Q    Did you need a search warrant to take those?

24   A    Not to the best of my knowledge, sir.

25   Q    Why not?

IACOVETTI – Redirect (by Mr. Barbosa)

1   A    The Maldivian authority turned over that equipment and
2   evidence to us.
3   Q    Did you see the SIM card that Mr. Browne found for you
4   before today?
5   A    I believe in the last court hearing, in this courtroom, it
6   was identified, sir.
7   Q    Okay.  Was that in June?
8   A    In June.  Prior to that, no, sir.
9   Q    And I should say, in June of 2016?
10  A    Yes, sir.
11  Q    So not at any time during the trip to the Maldives, your
12  transport through Guam, or delivering it to Seattle?
13          MR. BROWNE:  Your Honor, I'm going to object to the
14  leading question.
15          THE COURT:  It is leading, Counsel.  Sustained.
16  BY MR. BARBOSA
17  Q    Did you see it at any time during your trip to the
18  Maldives?
19  A    No, sir.  I had never seen the computer fully extended to
20  where that was visible.
21  Q    Did you see it any time during your trip to Guam?
22  A    Absolutely not.
23  Q    Did you see it any time during your transport to Seattle?
24  A    Absolutely not.
25  Q    When was the first time you saw the SIM card?

IACOVETTI – Redirect (by Mr. Barbosa)

1   A    In court, in June of 2016.

2   Q    Why couldn't you see it, again?

3   A    It is not visible unless the computer is fully extended,

4   which I did not do in the plane -- or excuse me.  I did not

5   need to do to get the serial number.

6   Q    You mentioned you didn't have a search warrant to look

7   through the computer or the iPhone; is that right?

8   A    That's correct, sir.

9   Q    So did you look through the computer or the iPhone?

10   A    Absolutely not, sir.

11          MR. BARBOSA:  No further questions, Your Honor.

12          THE COURT:  Re-cross?

13          MR. BROWNE:  No, Your Honor.

14          THE COURT:  Any objection to this witness being

15   excused, by the government?

16          MR. BARBOSA:  No, Your Honor.

17          THE COURT:  By the defense?

18          MR. BROWNE:  No, Your Honor.

19          THE COURT:  Thank you, sir.  You're excused.

20      Counsel, please call your next witness.

21          THE WITNESS:  Thank you, Your Honor.

22          MR. WILKINSON:  The United States calls Andrei

23   Medvedev.

24          THE COURT:  Please step forward, sir.

25          THE CLERK:  Please raise your right hand.

MEDVEDEV – Direct (by Mr. Wilkinson)

```
1        ANDREI MEDVEDEV, having been duly sworn, was examined and
2   testified as follows:
3            THE CLERK:  Have a seat.
4        If you could please state your first and last names, and
5   spell both for the record.
6            THE WITNESS:  Yes.  My first name is Andrei, and my
7   last name is Medvedev.  And the spelling is A-N-D-R-E-I,
8   M-E-D-V-E-D-E-V.
9            THE COURT:  You may inquire.
10           MR. WILKINSON:  Thank you, Your Honor.
11                           DIRECT EXAMINATION
12  BY MR. WILKINSON
13  Q    Good morning, sir.
14  A    Good morning.
15  Q    Can you tell us how you are presently employed?
16  A    I am currently a freelance court interpreter.
17  Q    How long have you been a court interpreter?
18  A    I've been doing that since 2010.
19  Q    And in what languages do you serve as a court interpreter?
20  A    I do it in Russian and Ukranian languages.
21  Q    Are you fluent in Russian?
22  A    Yes, I am.
23  Q    How did you become fluent in Russian?
24  A    I grew up in Ukraine, in the city of Kiev, where Russian,
25  I would say, is the most common spoken language.
```

MEDVEDEV – Direct (by Mr. Wilkinson)

1   Q    And how long did you live in Kiev?

2   A    Until I was 17.

3   Q    And over that period of time, did you regularly speak

4   Russian in your day-to-day life?

5   A    Yes, I did.  I also had my -- a part of my schooling in

6   Russian.

7   Q    And at some point in time, did you move to the United

8   States?

9   A    Yes, I did, when I was 17.

10  Q    And can you describe your educational background in the

11  United States?

12  A    I attended and graduated from the University of

13  Washington.

14  Q    And what did you major in?

15  A    That was in economics.

16  Q    Have you obtained any certifications that allow you to

17  interpret or translate in court?

18  A    Yes, I have.  I am Washington state certified court

19  interpreter in the Russian language, and I'm also registered in

20  the Ukranian language.

21  Q    How many court proceedings have you interpreted or

22  translated during your career?

23  A    It would be hard to calculate to give you a precise

24  number, but I would imagine it's at least hundreds, probably

25  over a thousand.

MEDVEDEV – Direct (by Mr. Wilkinson)

1    Q    Were you asked by the U.S. Attorney's Office to translate

2    trial exhibits for this case?

3    A    Yes, I was.

4    Q    And what language were the original trial exhibits that

5    you were translating them from?

6    A    So they had been partly in Russian and partly in English.

7    Q    And were you asked to translate them into English?

8    A    Yes.

9    Q    I'm calling up Exhibit 17.3.

10        Is Exhibit 17.3 a list of the exhibits that you worked

11   with in this case?

12   A    Yes.

13        MR. WILKINSON:  Your Honor, the government would ask

14   permission to display this list for demonstrative purposes.  We

15   won't be offering it into evidence.

16        THE COURT:  Any objection, for demonstrative purposes

17   only?

18        MR. BROWNE:  No, Your Honor.

19        THE COURT:  It's admitted for demonstrative purposes.

20   Just to make sure the jury understands what that means,

21   "demonstrative" means it's admitted for purposes of serving as

22   an aid to assist the witness in their testimony.  A

23   demonstrative exhibit will not be coming back to the jury room.

24   So I want to make sure there's a clear distinction between the

25   two.

1        Please continue, Counsel.

2   BY MR. WILKINSON

3   Q    Okay.  Just to remind the jury, is this a list of all the

4   documents that you translated in this case?

5   A    Yes.

6   Q    And on the first column here, is that the trial exhibit

7   number?  There's a number there?

8   A    I think so, yes.

9   Q    Okay.  And then there's another number next to that, which

10  usually is the same number, but it has an "A" next to it.

11       Is that the Russian version of the translation -- excuse

12  me -- the English version?

13  A    Yes, it is.

14  Q    And then is there a description column next to it?

15  A    Yes.

16  Q    And did you go through all of these exhibits, one by one?

17  A    Yes, I did.

18  Q    And did you either translate each one or confirm for each

19  one that the English version was an accurate translation of the

20  Russian original?

21  A    That's right.  I did.

22  Q    How much time did you spend on this project?

23  A    I think it was over 100 hours.

24       MR. WILKINSON:  Your Honor, the government would move

25  to conditionally admit all of the translations -- so it would

MEDVEDEV – Direct (by Mr. Wilkinson)

1    be the exhibit numbers in the second column there -- under

2    Rule 104(b).  And it will be conditional upon the admission of

3    the corresponding Russian exhibit.

4              THE COURT:  Any objection, Counsel?

5              MR. BROWNE:  No.

6              THE COURT:  All right.  Those exhibits are all

7    admitted as proposed by the government.

8              MR. BROWNE:  Your Honor, I'm sorry.  My understanding

9    is they'd be admitted provisionally --

10             THE COURT:  Conditional admit.

11             MR. BROWNE:  Thank you.

12   BY MR. WILKINSON

13   Q    There's a word here on -- it's about ten rows down,

14   S-M-A-U-S.  Do you see that word?

15   A    Yes, I do.

16   Q    Is that a word that you encountered, from time to time, as

17   you reviewed all of these documents?

18   A    Yes.  I've seen it multiple times.

19   Q    Can you pronounce the word?

20   A    Smaus.

21   Q    Is that a common Russian word?

22   A    Not that I know of, no.

23   Q    Have you ever heard it used in Russian?

24   A    No.

25   Q    And I want to ask you about one other word.  And I'll

MEDVEDEV – Direct (by Mr. Wilkinson)

1   spell it for you, O-C-H-K-O, Ochko.

2   A    Yes.

3   Q    Is that a word that you encountered as you reviewed the

4   Russian documents?

5   A    Yes.  I've seen it multiple times.

6   Q    Okay.  And is that a word that you have seen in Russian

7   before?

8   A    Yes.

9   Q    And can you tell us what the meanings of it -- meaning or

10  meanings --

11  A    Well, it would have multiple meanings.  It would have a

12  meaning of a Russian blackjack, a card game.  It could also

13  mean a point, a game point.  And it could also mean a butthole,

14  and also a toilet seat.

15          MR. WILKINSON:  No further questions for this

16  witness.

17          THE COURT:  Cross examination?

18          MR. BROWNE:  No.

19          THE COURT:  Any objection to this witness being

20  excused, by the government?

21      Counsel?

22          MR. WILKINSON:  Not from the government.

23          THE COURT:  By the defense?

24          MR. BROWNE:  No, Your Honor.

25          THE COURT:  Thank you, sir.  You may step down.

MEDVEDEV – Direct (by Mr. Wilkinson)

1    You're excused.

2         Counsel, your next witness?

3         MR. BARBOSA:  Your Honor, the government calls

4    Detective David Dunn.

5         THE COURT:  Please step forward.  Please step

6    forward, sir.

7         THE CLERK:  Please raise your right hand.

8    DAVID DUNN, having been duly sworn, was examined and

9    testified as follows:

10         THE CLERK:  Have a seat.

11    If you could please state your first and last names, and

12    spell your last name for the record.

13         THE WITNESS:  David Dunn, D-U-N-N.

14         THE COURT:  You may inquire.

15         MR. BARBOSA:  Thank you, Your Honor.

16    Before I proceed with my examination of this witness, I

17    would offer Government's Exhibits 12.6B and 12.7B, which are

18    the translations of the internal passport and the international

19    passport, that Mr. Medvedev just confirmed.  They were

20    conditionally admitted under Agent Iacovetti.

21         THE COURT:  Any objection to that, Counsel?

22         MR. BROWNE:  Just the same objection, Your Honor.

23         THE COURT:  All right.  The objection is overruled.

24    Conditional limitation has now been lifted.

25              (Exhibits 12.6B and 12.7B were admitted)

DUNN – Direct (by Mr. Barbosa)

```
 1                          DIRECT EXAMINATION
 2   BY MR. BARBOSA
 3   Q    Good morning, Mr. Dunn.  Could you tell the jury where
 4   you're employed?
 5   A    I'm currently employed in two different places.  The first
 6   is with a company called Kroll, and the second is with the
 7   Seattle Police Department.
 8   Q    Let's talk about your employment with Kroll.
 9        What type of business does Kroll engage in?
10   A    Kroll engages in a number of different businesses.  They
11   do large-scale e-discovery, so trolling through data for legal
12   lawsuits; cyber incident response, so they do response to
13   computer hacking and network intrusion cases.  They do data
14   recovery from failed hard drives.  They have an identity theft
15   notification service that they offer to companies, if they've
16   been breached, to notify their clients, and a couple other
17   smaller businesses.
18   Q    What are your duties with Kroll?
19   A    I'm the deputy chief information security officer.  So I'm
20   internal security for the company and all of its computers and
21   servers.  And I specifically manage the incident response team,
22   the threat intelligence team, the vulnerability management
23   group, security architecture, and threat research.
24   Q    Where is Kroll located?
25   A    Kroll is headquartered in New York City.
```

DUNN – Direct (by Mr. Barbosa)

1    Q    Do they have other offices?

2    A    Yes.

3    Q    Where?

4    A    They have approximately 30 offices across the globe; in

5    the U.S., primarily in Tennessee, Los Angeles, and southern

6    Minnesota, Minneapolis; London, Germany, Norway, Sweden, Middle

7    East, Asia.

8    Q    Worldwide, it sounds like.

9    A    Yes.

10   Q    How long have you been with Kroll?

11   A    I've been with Kroll since February of this year.

12   Q    Where were you employed prior to joining Kroll in

13   February?

14   A    A company called FIS Global.

15   Q    What is FIS Global?

16   A    FIS Global is the world's largest financial services

17   technology provider, which means they run or provide some sort

18   of technology service to about 14,000 different banks and

19   credit unions across the globe.

20   Q    What type of technology services are those?

21   A    So they offer credit card processing, core banking, fraud

22   detection.  Any service that a bank could conceivably need is

23   something that could be purchased from FIS.

24   Q    And what was your job with FIS?

25   A    I was the vice president in charge of the global incident

DUNN – Direct (by Mr. Barbosa)

1   response team and the threat intelligence team.

2   Q    What did that involve?

3   A    So I managed multiple teams, both located in the U.S. as

4   well as overseas, to respond to any incidents within the Global

5   FIS infrastructure, so tens of thousands of servers and the

6   workstations for about 40,000 different employees.  So I

7   managed the teams that dealt with anything that went wrong with

8   those devices from a security perspective.  And I was also in

9   charge of the threat intelligence team, which was actively

10  looking for cyber threats that could impact the FIS business.

11  Q    Okay.  You've mentioned incident response in relation to

12  both of your jobs.

13       What do you mean by "incident"?

14  A    So when a cybersecurity event, be it a malware incident or

15  a computer hack, occurs within the network or on a computer or

16  server, a response is conducted by the incident response team.

17  They look at the computer hard drive, they look at network

18  connections, and determine what happened, how it happened,

19  what's the scope.  So is this the only device that was

20  impacted, or were additional computers impacted?  And then what

21  type of information was potentially disclosed, if it was a bad

22  actor that tried to steal data.

23  Q    You also mentioned threat intelligence in relation to your

24  FIS Global work.

25       What type of threat intelligence were you responsible for

DUNN – Direct (by Mr. Barbosa)

1   collecting?

2   A    So we were responsible for actively looking for cyber

3   threats that could impact a business.  For example, there was a

4   time when computer hackers were attacking banks with what's

5   called a "denial of service attack."  And they would do that

6   for either an extortion payment, or to cover up some other

7   fraudulent activity that they were trying to do against the

8   bank.  So my team was responsible for tracking that,

9   determining if the subjects were likely to attack us or one of

10  our clients, and make sure that we were prepared for that

11  incident.

12  Q    You mentioned that FIS Global had a role in credit card

13  payment processing.

14       Did you monitor threat intelligence related to credit card

15  activity?

16  A    Yes.

17  Q    What type of threat intelligence?

18  A    We specifically worked with the credit card brand, so

19  Visa, MasterCard, American Express, and Discover, as well as

20  other financial sector partners, to identify common points of

21  purchase or places that we suspected had been breached and

22  stolen cards could potentially be originating from.  And then

23  we also looked at banking malware, so what type of malware was

24  impacting the consumer, banking computers, so that we could try

25  to identify that malicious activity coming into our network, to

DUNN – Direct (by Mr. Barbosa)

1   basically stop -- even if the system was infected, we could

2   stop a wire transfer or bank transfer from going out.

3   Q    How long did you work for FIS Global?

4   A    I was with FIS for three years.

5   Q    Has any of your work in the private sector, either with

6   FIS Global or Kroll, touched upon this case?

7   A    No.

8   Q    So you mentioned another job, currently, that you have

9   with the Seattle Police Department.

10       What is that job?

11  A    So I served as a Seattle police officer for 12-and-a-half

12  years, and I left in February of 2013.  In August of 2014, I

13  was brought back to the Seattle Police Department as a

14  strategic adviser and a part-time detective to assist with this

15  case, as well as others, to provide guidance and expertise.  So

16  I was given my badge and my gun back, and I just work as a

17  part-time detective.

18  Q    What did you -- you said you worked, I think, for 12 years

19  for the Seattle Police Department.

20       When did you first start working there?

21  A    I was hired by the Seattle Police Department in May of

22  2000.

23  Q    When did you become a detective?

24  A    I became a detective in April of 2006.

25  Q    And at some point, did you begin working with the Secret

DUNN – Direct (by Mr. Barbosa)

1    Service?

2    A    Yes.

3    Q    When was that?

4    A    In October of 2006, I went from conducting forensic --

5    computer forensic investigations for the Seattle Police

6    Department, and I was transferred to work on the U.S. Secret

7    Service Electronic Crimes Task Force.  So I began working out

8    of the Secret Service Field Office in October of 2006.

9    Q    Can you tell the jury what the Electronic Crimes Task

10   Force is?

11   A    Sure.  So it's a task force model, meaning that multiple

12   different agencies contribute to the task force.  The Secret

13   Service hosts it, meaning that they provide the infrastructure,

14   the physical space, the desks, the phones, the computer

15   connections.  And then local agencies from Seattle, King

16   County, Shoreline, Bellevue, all participate in the task force,

17   and we use our sort of collective investigative ability to

18   combat cybercrime that's impacting the Pacific Northwest.

19   Q    What are the primary activities that the task force

20   members engage in?

21   A    So there's two primary activities.  The first is to

22   provide computer forensic support to our respective agencies.

23   So we may do computer forensic investigations in support of a

24   homicide case, or in support of a sexual assault case, or any

25   other unit within the department.  That's kind of one function.

DUNN – Direct (by Mr. Barbosa)

1  And then the other function is to act as the primary

2  investigators for computer hacking and network intrusion

3  investigations.

4  Q    How long were you originally with the -- does that also go

5  by the acronym ECTF?

6  A    Yes.

7  Q    How long were you with the ECTF?

8  A    I was with the ECTF from October of 2006 until I left the

9  first time in February of 2013.

10  Q    What's your educational background?

11  A    I have a bachelor of arts from the Washington State

12  University and an associate from Seattle Central Community

13  College.

14  Q    So turning your attention to the time period of 2010

15  through 2013 when you left -- originally left employment with

16  SPD, were you involved in the investigation of the defendant,

17  Roman Seleznev?

18  A    Yes.

19  Q    Without going into specific details at this point, could

20  you describe, in general terms, the nature of your

21  investigation?

22  A    Sure.  Beginning in May of 2010, I responded to a network

23  intrusion at a restaurant in Coeur d'Alene, Idaho, that had

24  been impacted by computer malware that was stealing credit card

25  numbers.  I began investigating that case through the summer,

DUNN – Direct (by Mr. Barbosa)

1   including determining where the cards were being sold online.

2   As it progressed through the fall of 2010, I identified

3   additional victim businesses that were impacted by the same

4   type of malware, located in the city of Seattle; obtained

5   search warrants for e-mail accounts and other core process for

6   records; and then ultimately was able to identify subjects

7   involved -- hackers involved in the case, and ultimately

8   obtained an indictment.

9   Q   Did your investigation also involve conducting computer

10  forensic examinations?

11  A   Yes.

12  Q   On different types of devices?

13  A   Yes.

14  Q   What types of devices did you examine?

15  A   I examined computers, like typical PC.  I examined

16  computer servers, both within the victim businesses, as well as

17  servers that had been located and were part of the

18  infrastructure used as part of the network intrusion.

19  Q   And you mentioned an indictment had been returned.

20      Was the investigation still open when you left the

21  Electronic Crimes Task Force in 2013?

22  A   Yes.

23  Q   After you left in 2013, how did you end up back on the

24  ECTF?

25  A   In July of 2014, one indicted person was arrested.  And in

DUNN – Direct (by Mr. Barbosa)

1    preparation for trial, I was brought back to assist with that.

2    Q    Before we go into the more intricate details of your

3    investigation, I'd like to discuss some of your training and

4    experience.  And you've talked about both computer forensics

5    examinations and investigating computer hacking and the network

6    intrusions.

7         So let's start with investigating hacking and network

8    intrusions.  What type of training have you had to conduct

9    these types of investigations?

10   A    My training in computer forensics began in September of

11   2005.  I attended approximately five weeks of specialized

12   computer training.  It was offered through Edmonds Community

13   College, specifically for law enforcement, to teach computer

14   forensics.  That -- it was a part-time course, consisted of

15   five total school weeks.  And that carried me through the first

16   quarter in 2006.  That was my basic computer forensics

17   training.

18        In April -- I'm sorry.  In August -- late July and August

19   of 2006, I was sent to the U.S. Secret Service basic computer

20   evidence recovery school.  So that was a five-week course that

21   was held in Maryland and Virginia, for local law enforcement,

22   to teach, again, the basic fundamentals of computer forensics

23   and digital evidence collection.

24        Beyond that, I've attended numerous other computer

25   forensic-related courses, specifically at the National Computer

DUNN – Direct (by Mr. Barbosa)

1    Forensic Institute, in Hoover, Alabama.  I've attended network

2    intrusion training, which is a three-week course specifically

3    to teach about investigating network intrusions.  I've attended

4    Macintosh forensics training.  I attended advanced computer

5    forensics training at the National Computer Forensics

6    Institute.  I've attended Linux forensics training, which is a

7    specific type of operating system.  I've attended point-of-sale

8    intrusion training, specific to payment system breaches.  I've

9    received specific training on different computer forensic

10   tools.

11   Q    Does your training in relation to computer forensics and

12   computer network intrusions -- are those similar, or are there

13   different aspects of those two?

14   A    They're similar in that they -- the topics are very

15   closely related.  The computer forensics is specifically

16   related to obtaining computer drive evidence and examining that

17   data, so examining the information that's specifically on the

18   computer hard drives.  The network intrusion aspect of it is --

19   more has to do with how data flows within the network, the

20   connections that computers make with each other, and kind of

21   building the bigger picture of an actual hacking event.

22   Q    What type of network intrusion cases have you

23   investigated?

24   A    I've investigated a number of different types of network

25   intrusion investigations, including other point-of-sale

DUNN – Direct (by Mr. Barbosa)

1   investigations, other than this one.  I've investigated credit
2   card forums and credit card vending sites.  I've investigated
3   distributed denial of service attacks, so attacks that would
4   prevent legitimate internet traffic from getting to a business.
5   I've investigated banking malware-related cases.
6   Q    Why does the Secret Service Electronic Crimes Task Force
7   focus on financial cases such as point-of-sale?
8   A    So the original mission of the Secret Service was to
9   protect the financial sector of the U.S., so they -- that's why
10  they have a counterfeiting mission.  It was to sort of make
11  sure that the currency was not devalued, that it remained safe.
12  As part of that mission, it was expanded to include electronic
13  payment instruments, and so the Secret Service continues to
14  focus on maintaining the health and security of the banking
15  sector.
16  Q    Can you explain what a point-of-sale system is and what it
17  consists of?
18  A    Sure.  So a point-of-sale, also known as a retail
19  point-of-sale system, is the computer network that is located
20  in many businesses across the world.  And what it consists of
21  is a computer terminal that the cashier or retail employee uses
22  at the -- what's called the "front of the house," so the
23  computer that a consumer and the retail person would interact
24  with.  And then typically, there is a back-of-house server, or
25  a server that's located, like, in a manager's office.

DUNN - Direct (by Mr. Barbosa)

1        When a consumer swipes their credit card or gives it to

2   the employee to swipe the credit card, it's done at the

3   point-of-sale terminal.  And then that information is

4   transmitted via computer network to the back-of-house server,

5   which is in that back office, ultimately for processing.

6   Q    Would it help you visualize this for the jury if you had a

7   diagram of how this works?

8   A    Yes.

9   Q    I'm going to show you what's been marked as Government's

10  Exhibit 17.5.

11       Would that help you describe things for the jurors?

12  A    Sure.

13  Q    Just a moment.

14       MR. BARBOSA:  The government would offer Exhibit 17.5

15  as a demonstrative exhibit only.

16       THE COURT:  Any objection, Counsel?

17       MS. SCANLAN:  No objection.

18       THE COURT:  17.5 is admitted for demonstrative

19  purposes only.

20  BY MR. BARBOSA

21  Q    Using this diagram that is now on the screen for you and

22  the jurors, can you explain what you just went over, in terms

23  of how the point-of-sale system is typically set up?

24  A    So in this diagram, we have four point-of-sale terminals.

25  So in a typical retail establishment, you would have a number

DUNN – Direct (by Mr. Barbosa)

1   of different checkout areas where a person can make their

2   purchase, and there would be a point-of-sale terminal at each

3   of those checkout areas.

4       To make your purchase, the card gets swiped.  Typically,

5   there's, like, a magnetic card reader that's attached to either

6   the side, the top, or the bottom of the screen.  The card gets

7   swiped, and then that data gets transmitted via the network to

8   the back-of-house server on the back of -- which is the device

9   in the middle, the computer tower.  The computer tower then

10  communicates through a modem to the internet, and the credit

11  card processing process takes place.  Cards are -- the

12  transaction is validated or approved or declined.

13  Q    Is the data encrypted as it is traveling between these

14  points at the business?

15  A    Typically, within the business, the data is not encrypted.

16  It's not encrypted until it gets transmitted out of the

17  business.

18  Q    And what would a system like this be typical for?  Is this

19  what you would see at a major retailer, with chains all over

20  the country?

21  A    So you could see this everywhere from a small retail

22  establishment, with just one or two point-of-sale terminals, to

23  your major retailers.  Obviously, a major retailer would be

24  more complex, because they would have more point-of-sale

25  terminals.  They might have two back-of-house servers to help

DUNN – Direct (by Mr. Barbosa)

1   assist with the load.  But the general network diagram would

2   look something like this.

3   Q    Approximately how many point-of-sale intrusion

4   investigations have you participated in?

5   A    Around 600.

6   Q    And what types of businesses do you typically respond to,

7   or did you typically respond to, in your work?  Let's focus on

8   your work with law enforcement and Secret Service.

9   A    So typically, I responded to small franchise-type

10  restaurants and small retail businesses.

11  Q    I'm going to show you -- have you taken photographs of

12  some of the systems that you've examined specifically as part

13  of this case?

14  A    Yes.

15  Q    I'm going to show you on the overhead what's been marked

16  as Government's Exhibit 1.14, which is a series of five

17  photographs.

18       Do you recognize these?

19  A    Yes.

20  Q    How do you recognize these?

21  A    These are images that I took during this investigation, at

22  a restaurant located in Seattle.

23  Q    And are those at various locations?

24  A    Yes.

25  Q    Do they all accurately reflect how the system appeared

DUNN – Direct (by Mr. Barbosa)

1   when you went to examine them?

2   A    Yes.

3           MR. BARBOSA:  Government offers Exhibit 1.14.

4           MS. SCANLAN:  No objection.

5           THE COURT:  1.14 is admitted.

6               (Exhibit 1.14 was admitted)

7   BY MR. BARBOSA

8   Q    Turning to Page 1 of Exhibit 1.14, can you explain for the

9   jurors what we're looking at?  And you can reference the

10  diagram.

11  A    So these are two point-of-sale terminals that are located

12  at MAD Pizza restaurant that was on Madison Avenue, in Seattle.

13  So what you're looking at here are the touchscreen monitors

14  that the cashier would use.  On the right-hand side of the

15  monitors, you can see, like, a black rectangle.

16  Q    In this area that I've highlighted?

17  A    Yes.  That's the magnetic card reader.  So that's where

18  the card gets swiped.  And from there, the data gets

19  transmitted to the point-of-sale computer.

20  Q    Turning to Page 2 of Exhibit 1.14, what do we see here?

21  A    So these are a number of point-of-sale terminals, as well

22  as the back-of-house server for that particular business.  They

23  didn't have a manager's office, so they were just kind of

24  shoved underneath the main counter.

25  Q    Do you recall where this was located at?

DUNN – Direct (by Mr. Barbosa)

1   A     This was also at the MAD Pizza on Madison Avenue, on First

2   Hill.

3   Q     Turning to Page 3, do you recognize this?

4   A     Yes.

5   Q     Where is this at?

6   A     That's the third terminal at that same MAD Pizza location.

7   Q     Moving on to Page 4, what's on this computer?

8   A     That's the computer tower, covered in flour, underneath

9   that screen at the MAD Pizza on First Hill.

10  Q     Finally, Page 5, I don't know if this is even oriented

11  correctly.

12  A     This is upside down.

13  Q     Okay.  So what do we have here?

14  A     So the picture is upside down.  But if you look at the

15  bottom of the picture, you see a metal rack.  That metal rack

16  is holding a computer tower, which is the point-of-sale system

17  for the MAD Pizza that was in Madison Park.  Then there's an

18  old CRT monitor that was attached to it, as well.  And then

19  there's the keyboard that's just sitting on the ledge below it.

20  Q     These setups that we've seen in Exhibit 1.14, are those

21  typical of the type of systems you would see at smaller

22  businesses?

23  A     Yes.

24  Q     How might a system like this get hacked?

25  A     So most of these systems are installed by a third party.

DUNN - Direct (by Mr. Barbosa)

1    So when you go to open up a business, you contract with a
2    point-of-sale vendor who's going to sell you this point-of-sale
3    system.  Many of those vendors specialize in a specific type of
4    merchant.  So you may have one that specifically does recycling
5    centers.  You may have one that does pizza shops.  You may have
6    one that does rental -- tool rental places.
7        So you would find a person that sells a point-of-sale
8    system for the type of business that you're in.  And then you
9    would pay them, and they would install -- either ship you or
10   come out and install this system.  Those systems are typically
11   imaged identically.  So a system located in Seattle,
12   Washington, is going to have the same computer image as one in
13   Portland, Oregon, or Los Angeles, California.
14       Inevitably, some of those systems will go down.  They'll
15   break.  They're computers, and sometimes bad things happen.
16   And the systems very often will have the ability for the vendor
17   who sold the system to remotely connect to that system to fix
18   that problem.  So in the fast-serve restaurant business,
19   approximately 70 percent of all transactions --
20           MS. SCANLAN:  Your Honor, I object.  This is a
21   narrative.
22           THE COURT:  It is a narrative, Counsel.  Let's get
23   back to questions.
24   BY MR. BARBOSA
25   Q    Do small businesses like this typically have on-site IT

DUNN - Direct (by Mr. Barbosa)

1    staff?

2    A    No.

3    Q    What would they do in order to fix problems that come up

4    with their point-of-sale system?

5    A    Call their vendor that they purchased it from.

6    Q    How do the vendors provide that type of service?

7    A    Remotely.

8    Q    Can you explain how they would provide that type of

9    service remotely?

10   A    Sure.  The vendor would have a remote application

11   installed on the customer system, and they would connect

12   remotely to that system, via the internet, to attempt to fix

13   it.

14   Q    Does that provide any method of intrusion that could be

15   exploited by hackers?

16   A    Yes.

17   Q    How might a hacker exploit that method of access?

18   A    Typically, those systems require just a username and

19   password to gain access.  So if you know the internet address

20   for the system, and you know the IP address and the username

21   and the password, you can log in remotely.

22   Q    How could one go about identifying systems that have that

23   remote access on them?

24   A    There are tools that will allow somebody to scan large

25   sections of the internet for specific computer ports that are

DUNN – Direct (by Mr. Barbosa)

1   used for remote connections.

2   Q    What is that scanning process known as?

3   A    Just -- it's known as scanning.  So that's --

4   Q    Scanning for?

5   A    Scanning for --

6   Q    Port scanning?

7   A    It's port scanning.

8   Q    What is a port?

9   A    So different computer applications that are connected to

10  the internet talk on what's called a port.  And a port tells

11  the operating system what to do with the information that's

12  coming into the computer.  So Port 80 is the internet port, the

13  unsecured internet port.  So if information comes in on

14  Port 80, your computer knows to give that information to your

15  web browser.  If it comes in on, say, Port 3389, it knows

16  that's an attempt at a remote desktop connection, and to give

17  that information to the remote desktop application.  And there

18  are many different ports that have many different uses.

19  Q    That particular port, 3389, related to remote desktop

20  applications, is that a port that you have seen used for remote

21  servicing at point-of-sale systems?

22  A    Yes.

23  Q    And could one go about identifying open Port 3389 through

24  this process of port scanning that you just talked about?

25  A    Yes.

DUNN – Direct (by Mr. Barbosa)

1   Q    Okay.  Can you describe how that port scanning process

2   works and what it would provide to the hacker?  How would

3   somebody execute that type of a scan?

4   A    So there are specific tools that will allow a computer

5   hacker to scan wide ranges of the internet, so tens of

6   thousands of unique IP addresses at a time.  And they can

7   specifically inquire to each computer, or each IP address,

8   "Will you accept a connection on Port 3389?"  And most

9   computers will say no; right?  Most of our consumer-level

10  computers don't accept remote desktop connection.  But some

11  will.  Some that are accessed remotely for various reasons will

12  say, "Yes, I'm willing to accept a connection on Port 3389."

13  So the first thing you do is the scan.

14  Q    Once somebody finds those open ports, what would you do to

15  access the remote program?

16  A    So once you conducted the scan and you had one or more IP

17  addresses that were willing to accept that connection, you

18  could then use another tool to try a list of common usernames

19  and common passwords to see if you are able to guess them

20  correctly.  It's called a dictionary attack.

21  Q    If that dictionary attack is successful, what would the

22  next step in the hacker's process be?

23  A    So if your dictionary attack is successful, that means

24  that you had a correct username and a correct password.  You

25  would then use the remote desktop application and connect

DUNN – Direct (by Mr. Barbosa)

1   remotely to that system.  And you would be presented with the

2   desktop from the remote system.

3   Q    What would this -- what level of control would this

4   provide to the hacker in terms of the victim's point-of-sale

5   system?

6   A    Complete control.

7   Q    Where would the hacker then need to install the malware?

8   And I'm going to bring up Exhibit 17.5, again, for your

9   reference.

10  A    On the back-of-house server, or on one of the

11  point-of-sale terminals.

12  Q    And what would that -- what would a hacker typically

13  install on these systems in order to steal credit card data?

14  A    Some form of malicious software that was designed to look

15  for and save credit card track information.

16  Q    So as part of your work with the ECTF, as well as your

17  private sector employment, have you become familiar with how

18  credit cards work?

19  A    Yes.

20  Q    Have you had any training related to credit card payment

21  processing?

22  A    Yes.

23  Q    And are you familiar with the types of data contained on a

24  physical credit card?

25  A    Yes.

DUNN – Direct (by Mr. Barbosa)

1   Q    Again, would it help you to demonstrate that for the jury

2   if you had a demonstrative exhibit?

3   A    Yes.

4           MR. BARBOSA:  The government would offer Exhibit 17.1

5   as just a demonstrative exhibit.

6           THE COURT:  Any objection?

7           MS. SCANLAN:  Is it just on one page?

8           MR. BARBOSA:  Let me double-check.  I believe so.

9   Yes.

10          MS. SCANLAN:  No objection.

11          THE COURT:  17.1 is admitted for demonstrative

12   purposes.

13   BY MR. BARBOSA

14   Q    So let's look at the top half here, the front of a sample

15   credit card.

16       Can you explain what type of information is contained on

17   the face of the credit card?

18   A    Sure.  So you have the background of the credit card,

19   which is the bank branding, tells you who issued the card.  The

20   large numbers, there's 16 of them.  That's what's called the

21   PAN, or the personal account number.  The first six digits of

22   the personal account number, so the 4000 12, is referred to as

23   a bank identification number, or a BIN.  That is a number that

24   is unique to an individual financial institution.  So every

25   card issued by a certain bank will have a BIN that's issued to

DUNN – Direct (by Mr. Barbosa)

1    that bank.  So you would never have 4000 12 issued by both,

2    say, Bank of America and Chase.  Only one of them could issue

3    those types of cards.

4    Q    The first number, the "4," does that identify anything in

5    particular?

6    A    Sure.  The first number indicates what type of card it is.

7    Four is Visa.  Five is MasterCard.  Six is Discover.  And three

8    is American Express.

9    Q    So looking at the back of the card, what is on the back of

10   the card?

11   A    So you have the -- a magnetic stripe, with what are called

12   three tracks available.

13   Q    Is that the black line?

14   A    That's the black line.

15   Q    Okay.

16   A    Signature area; and then you'll have the card number and

17   then what's called the card verification value, which is the

18   "123" at the very end.

19   Q    What is contained on the black stripe, the magnetic

20   stripe?

21   A    There's three pieces of information.  There's Track 1,

22   Track 2 and Track 3.

23   Q    Let's go over those individually.

24        What's Track 1 contain?

25   A    So Track 1 contains the personal account number, so that

DUNN - Direct (by Mr. Barbosa)

1   16-digit number.  There's what's called a separator, an equals

2   sign.  And then there's the card expiration date.  There's

3   what's called a card service code that tells where the card can

4   be used geographically.  There's a different card verification

5   value, and then there's some additional discretionary data for

6   the bank.

7   Q    What does Track 2 carry?

8   A    Track 2 carries the same information.  It also includes

9   the ability to encode the cardholder's name.

10  Q    And finally, Track 3, is that used?

11  A    Track 3 is rarely used.  I've only seen Track 3 used on

12  one occasion, and that's with Costco American Express.  They

13  use Track 3 to encode the Costco number, personal number for

14  the shopper.

15  Q    And then is the actual 16-digit credit card number written

16  on the card, also, on the back?

17  A    Yes.

18  Q    What are the final three numbers?

19  A    So that's the card verification value.  That's that

20  three-digit number that you input when you make an online

21  purchase.

22  Q    As to the magnetic stripe, how would you be able to read

23  the data on that?

24  A    So there are a number of different hardware tools that are

25  available.  They're called magnetic stripe readers.  So that

DUNN – Direct (by Mr. Barbosa)

1   magnetic stripe reader that's on the side of a point-of-sale

2   terminal reads it and gives the information to the

3   point-of-sale application.  But you can also buy handheld

4   magnetic stripe readers that you can plug into a computer and

5   read the data that way, as well.

6   Q    I'd like to show the witness Exhibit 17.2, just for

7   demonstrative purposes.

8         THE COURT:  Members of the jury, if you want to stand

9   and stretch real quick.

10        Please be seated.  Please continue, Counsel.

11        MR. BARBOSA:  Thank you, Your Honor.

12  BY MR. BARBOSA

13  Q    The courtroom deputy has provided you with Demonstrative

14  Exhibit 17.2 in front of you.

15        Do you see that?

16  A    Yes.

17  Q    What is that?

18  A    This is an MSR206 magnetic card reader/writer.  So this

19  can both read magnetic stripe data as well as encode magnetic

20  stripe data onto a card.

21  Q    And can you show that to the jurors?

22  A    There's the slot where the card runs through.  Inside

23  that, there are magnetic reader heads that interact with the

24  stripe.  And it connects to a computer.

25  Q    And does that require certain software to operate?

DUNN - Direct (by Mr. Barbosa)

1   A    Yes, it does.

2   Q    How would you go about using one of those?

3   A    So if you were to read a card or if you were to encode a

4   card?

5   Q    Let's start with read a card.

6   A    So if you want to read a card, you would connect this

7   device to a computer.  And using special software, you could

8   scan the card, and it would display what the track information

9   from that card was.

10  Q    How would you go about encoding a card?

11  A    So using, again, specialized software, you would type in

12  the information that you wanted encoded onto the card.  And

13  then once you would type in the information you wanted encoded,

14  you would then swipe the magnetic card through the

15  reader/writer, and it would encode that data on the card.

16  Q    So turning back to Exhibit 17.1, our sample credit card

17  for Mr. Smith, that data that you just talked about from the

18  magnetic stripe, does that have any value to it?

19  A    Yes.

20  Q    Why is that information valuable?

21  A    Because that information can be encoded on -- stolen

22  information can be encoded on another card and used to make

23  purchases.

24  Q    Do you have any prior experience with how that stolen

25  information or data is sold on the internet?

DUNN - Direct (by Mr. Barbosa)

1   A     Yes.

2   Q     What type of experience?

3   A     I've investigated credit card vending sites.  I've

4   investigated credit card forums.  I've analyzed credit card

5   forums and vending site database files.  I've convicted other

6   point-of-sale hackers.

7   Q     Have you personally reviewed these types of credit card

8   vending sites and credit card forums?

9   A     Yes.

10  Q     What is a carding forum?

11  A     So a carding forum is an internet website where people

12  engaged in credit card fraud, so the selling and purchasing of

13  stolen card information and then the tactics and techniques to

14  do that, will gather to discuss how they do things, as well as

15  to advertise -- vendors will advertise their services and

16  either sell directly from the site, or advertise websites where

17  people can go to purchase the information.

18  Q     Are carding forums open to the public?

19  A     No.

20  Q     How do you get to a carding forum?

21  A     So to get to a carding forum, you'd have to know where the

22  website is, and then you would have to register for access to

23  the forum.

24  Q     Have you done that before?

25  A     Yes.

DUNN – Direct (by Mr. Barbosa)

1   Q    In an undercover capacity?

2   A    Yes.

3   Q    What does a carding forum typically look like when you

4   visit it on the internet?

5   A    Typically, it's pretty rudimentary, as far as websites go.

6   It's usually just a screen with a list of different topics that

7   people are currently discussing.  You would click on a topic,

8   and you could read about it.  They'll sometimes have

9   advertisements on the side or the top, for premium vendors who

10  have paid for that advertising space.

11  Q    If you join a carding forum, how do you identify yourself

12  on the forum?

13  A    Utilizing a nickname, also referred to as a "nic."

14  Q    Let's talk about vending sites.

15       What is a vending site?

16  A    A vending site is a website that's specifically devoted to

17  the sale of stolen financial information.

18  Q    Okay.  And how do they differ from carding forums?

19  A    So a vending site is going to be more sophisticated in the

20  way that you interact with the site.  A vending site will list

21  what cards are for sale, and it's a more automated process.

22  You would select the cards you want to purchase, you would make

23  your payment to that site, and then that information would be

24  delivered to you automatically; as opposed to a carding forum,

25  where it's people commenting and talking about a specific

DUNN - Direct (by Mr. Barbosa)

1   topic.

2   Q    The data for sale on these sites, is this legitimate,

3   authorized data?

4   A    No.

5   Q    Why doesn't law enforcement just shut these sites down?

6   A    Many of the sites are hosted in countries where law

7   enforcement is not able to get them taken down.

8   Q    How do the buyers and sellers of the stolen credit card

9   data, who participate in these carding forums and vending

10  sites, how do they communicate, typically?

11  A    They typically communicate via private messages within the

12  carding site or via some type of messenger application.

13  Oftentimes, they use one called ICQ.

14  Q    What is ICQ?

15  A    It's an internet chat program originally owned by AOL --

16  it's now owned by somebody else -- where you can register for

17  an ICQ number.  And utilizing your ICQ number, you can chat

18  with people using the ICQ infrastructure.

19  Q    And why is that a form of chat software that is used in

20  the carding community; do you know?

21  A    It's just a legacy, for lack of a better term, old-school

22  chat application that's been around, and it's just widely

23  accepted by the, sort of, hacking community.

24  Q    Are there other forms of chat communications that hackers

25  and carders have begun using more recently in your experience?

DUNN - Direct (by Mr. Barbosa)

1   A    Yes.

2   Q    What types?

3   A    The common one they use now is called Jabber.  It's a more

4   decentralized chat program.  They'll also chat via mobile

5   applications.

6   Q    Do carders -- in your experience, do they also use more

7   traditional forms of communication, such as e-mail?

8   A    E-mail, Skype.

9   Q    You mentioned that folks typically identify themselves

10  using a nickname, or a nic.

11       What is -- based on your training and experience, is there

12  any value in a nic?

13  A    Yes.

14  Q    Why is there value in a nic?

15  A    There is inherent distrust when you're selling stolen

16  information.  So your nic is your reputation.  And if you have

17  a good reputation of selling quality stolen financial

18  information, meaning that the buyers are able to use it and buy

19  stolen laptops or buy whatever they need to buy, you're going

20  to have a good reputation, and you're going to drive sales.  If

21  you have a bad reputation, that you rip people off, you're not

22  going to drive sales.  So your reputation helps drive sales.

23  Q    Are there particular terms used in the carding community

24  to describe items that are sold in the market?

25  A    Yes.

DUNN – Direct (by Mr. Barbosa)

1   Q    What are some of the terms that you've come across, based

2   on your --

3   A    There's a number.  So there's "dumps," "foals," "cards,"

4   "CDV."  There's a bunch of different terms.  And there's terms

5   for everything.  There's terms for the way things get paid for.

6   Q    Let's talk about a few of those.

7        You mentioned "dumps."  What is a "dump"?

8   A    So a "dump" is a credit card that's being sold that

9   contains the full track information.

10  Q    The Track 2?

11  A    Track 2, Track 1, or both.

12  Q    Okay.  Do you also come across the term "bases"?

13  A    Yes.

14  Q    What does that mean?

15  A    So "base" is the database of cards.  So you -- when

16  somebody is vending stolen card numbers, they typically will

17  sell them as a base.  So they'll list 10,000 cards from a

18  specific base.  And that base will have a reputation, that,

19  hey, these cards are really good, and we're getting a high

20  validity off these cards.  Or it will have a bad reputation,

21  say, only 60 percent of these cards are working.  So the base

22  itself can have a reputation.  And typically, that reputation

23  degrades the older the base is.

24  Q    You discussed the BIN number, or bank identification

25  number, a little bit ago when we were looking at the sample

DUNN - Direct (by Mr. Barbosa)

1  credit card number -- or credit card.

2      Is that BIN number -- is that used in the marketing of

3  stolen credit card data?

4  A    Yes.

5  Q    How is it used?

6  A    It helps the card purchasers buy cards that they feel will

7  have a high likelihood of success.

8  Q    How does that help them?

9  A    So financial institutions have instituted things called

10  velocity controls.  And velocity controls prevent or flag

11  transactions that are suspicious based on geography.  So if I

12  am located in Seattle, Washington, right now, and I buy lunch

13  at a restaurant here, and in five minutes that exact same card

14  number is being used in person at a Best Buy on Long Island to

15  buy a MacBook, a velocity control is going to kick in and say,

16  "There's no way that Dave Dunn made it from Seattle to New York

17  in five minutes.  That's a suspicious transaction."  And

18  they'll either decline it, or they may call me to see if it's a

19  valid transaction.  It's a velocity control.

20      Bad guys know this, and so they don't want to buy cards

21  that are potentially located or being used simultaneously in a

22  different area.  So they'll try and buy cards near where they

23  believe the card was issued so that it would look less

24  suspicious for me to buy lunch now and then buy a laptop, say,

25  at the Apple store at U-Village in 15 minutes.

DUNN - Direct (by Mr. Barbosa)

1   Q    How much does stolen credit card data cost, typically, on

2   the internet?

3   A    It depends on a lot of factors, including the database

4   that it came from, the reputation of the hacker, and the type

5   of card.  But they can range -- for a good fresh card, the

6   range can be $20 to $50 per card.

7   Q    Okay.  Let's move away from carding for a little bit.

8        As part of your work in both law enforcement and the

9   private sector, have you developed experience with how the

10  internet operates --

11  A    Yes.

12  Q    -- at its kind of core?

13       Can you explain, in general terms, how computers

14  communicate over the internet?

15  A    Yes.  Computers communicate utilizing what are called IP

16  addresses and domain name records.  So IP addresses are the

17  phone numbers of the internet, for lack of a better term.

18  Every --

19  Q    Let me stop you for a minute.

20       You've used that acronym a number of times.  And I think

21  you were talking about IP addresses in relation to port

22  scanning; is that right?

23  A    Yes.

24  Q    What does "IP" stand for?

25  A    Internet protocol.

DUNN - Direct (by Mr. Barbosa)

1   Q    And what does an internet protocol address look like?

2   A    There are two versions, the most common version being IP

3   Version 4, is four sets of numbers.  So the numbers can be

4   anywhere from zero to 255, separated by a dot.  So, like,

5   101.101.101.101.  That's an IP address.  So each one of those

6   sets that are separated by a period has to be between zero and

7   255.

8   Q    How do computers use IP addresses to communicate across

9   the internet?

10  A    So every computer that is internet facing, meaning that

11  it's exposed to the rest of the World Wide Web, has a unique IP

12  address.  And there are large indexes with the major internet

13  service providers that know where those IP addresses are

14  located.  So if a computer in Seattle, Washington, wants to

15  talk to a computer in Los Angeles, California, it works through

16  internet IP records to find where the other computer's located,

17  and then communicates with it.

18  Q    Those internet indexes, are those available to the public

19  for routing of communications?

20  A    Yes.

21  Q    Is that -- so how does that impact how the internet

22  functions?  What if those aren't available?

23  A    The internet wouldn't function, because no computer would

24  know how to get to another computer.

25  Q    Are IP addresses useful to you in conducting your

DUNN – Direct (by Mr. Barbosa)

1  investigations?

2  A    Yes.

3  Q    How are they useful?

4  A    When we're investigating a case, and we're looking at

5  activity that's being generated from a specific computer or a

6  specific IP address, we can obtain records from the internet

7  service provider that owns that IP address to determine where

8  the computer is located and who may be operating it.

9  Q    You mentioned, also, I believe, domain records.

10       What is a domain?

11  A    So an IP address is the number.  The domain is the web

12  address.  So if we take CNN.com, for example.  CNN.com is the

13  domain for the website CNN.  That is mapped to an IP address.

14  So what happens, when I tell my computer that I want to go to

15  CNN.com, I make a request to what's called a domain name

16  server.  And I say, "Where is CNN.com?"  And that domain server

17  says, "CNN.com is over at that IP address, and here's how to

18  get there."  And then my computer connects.

19  Q    Are those records also publicly available?

20  A    Yes.

21  Q    What would happen if they weren't publicly available?

22  A    The internet wouldn't function.

23  Q    You already went over ports.  Why do computers use

24  different ports to communicate?

25  A    It enables separation of and security for the data that's

DUNN – Direct (by Mr. Barbosa)

1    coming into the computer.

2    Q    As part of your work in law enforcement in the private

3    sector, you also developed experience with computer servers.

4    A    Yes.

5    Q    Can you explain what a server is and differentiate it from

6    a typical personal computer that we might use?

7    A    So a server is typically an enterprise or, like, a

8    corporate-type device that serves a particular function.  So

9    you may have an e-mail server that serves up the e-mail for

10   your work e-mail.  You may have a web server that hosts a

11   website that you're going to visit.  You may have a file server

12   at work that hosts all the work product that you and your team

13   members are working on.

14        So a server has a specific function that it provides to a

15   corporate or an enterprise-level network; as opposed to a

16   personal computer, which is the device that we use to access

17   those servers.  So when we want to go on our personal computer

18   to CNN, we actually access a web server that's hosting CNN's

19   content.

20   Q    Do servers also have their own IP addresses?

21   A    Yes.

22   Q    Does a person using a server need to be physically present

23   in front of that server in order to utilize it?

24   A    No.

25   Q    Where are servers typically located?

DUNN – Direct (by Mr. Barbosa)

1   A    Servers are typically located in large warehouses.  So you

2   can either have what's called a co-location facility, where

3   multiple businesses will have all of their servers together in

4   the same warehouse.  Or for some larger businesses, they may

5   have their own server facilities.

6   Q    So if your server is co-located with a number of other

7   servers, does that give you access to everybody else's server?

8   A    No.

9   Q    What do you have access to when you are using or renting a

10  server in a location like that?

11  A    You have access to a console where you can remotely

12  connect to that server and administer it.

13  Q    When you say a console, do you mean a physical console?

14  A    No.  You get a virtual console.  So from your desktop, you

15  could access your server remotely.

16  Q    How would one go about accessing that?  What would you

17  need to access that server?

18  A    You would need a username, a password, and the IP address

19  or domain for where that server was located.

20  Q    How can a person go about obtaining access to a computer

21  server, to a service like that?

22  A    There are a number of companies that sell servers on

23  demand.  So if -- you can lease one for a period of hours,

24  days, months.

25  Q    Can a server be used for typical personal computing?

DUNN - Direct (by Mr. Barbosa)

1    A    It can, yes.

2    Q    How?

3    A    A server does have a web browser.  It does -- you can

4    install Microsoft Office on it, if you wanted to.  So it does

5    have the ability to function as a desktop computer, though it

6    typically doesn't because the cost of a server is usually

7    higher than a desktop computer.

8    Q    In your experience investigating network intrusion cases

9    and hacking, are servers used frequently?

10   A    Yes.

11   Q    How do you typically find them being used in these kind of

12   crimes?

13   A    Servers are used as part of the hacking scheme.  So they

14   can be used to stage hacking-related tools.  For somebody, they

15   can be used to launch scans, they can be used to launch

16   attacks, they can be used to collect stolen information.

17   Q    If you examine a server, what do you typically look for as

18   part of your investigation?

19   A    Typically, I would look for information related to what

20   that server was being used for.  So was it collecting stolen

21   information?  Was it hosting malicious software?  Was it doing

22   malicious activity related to scanning or brute forcing of

23   passwords?  Was the user using it as a personal computer, and

24   is there information related to who that person is?

25   Q    You testified that part of your work does involve

DUNN – Direct (by Mr. Barbosa)

1  conducting computer forensic examinations.

2       What portion of your work involved doing the actual

3  computer forensic examinations?

4  A    From, like, a percentage basis?

5  Q    Very rough guess on that.

6  A    At the very beginning, I was almost a hundred percent

7  focused on computer forensic investigations.  Towards the end

8  of my full-time law enforcement career, it was probably about

9  50/50, so halftime doing forensics and the rest of the time

10 doing the network intrusion cases, although the forensics was

11 often in support of my network intrusion cases.

12 Q    So when you were conducting your network intrusion cases,

13 did you typically do your own examinations?

14 A    Yes.

15 Q    Why is that?

16 A    Because I knew the case better than anybody else, so I

17 knew what to look for.

18 Q    You've gone over some of your training that you received

19 to become a computer forensics examiner, but do you have any

20 certifications related to your work as a computer forensics

21 examiner?

22 A    Yes.

23 Q    What certifications do you have?

24 A    So I'm a certified computer forensic examiner through

25 IACIS, which is the International Association of Computer

DUNN – Direct (by Mr. Barbosa)

1    Investigation [sic] Specialists.  It's a not-for-profit group

2    that certifies forensics.  I'm certified through Guide Software

3    as an EnCase certified examiner, which is one of the software

4    tools that I used for this investigation.  I'm a Certified

5    Information Security Systems [sic] Professional, or CISSP,

6    which is a certification on general computer and information

7    security.  And I also have a number of expired certifications,

8    including access data certified examiner, certified ethical

9    hacker.

10   Q    What is a certified ethical hacker?

11   A    It's a training course and certification on identifying

12   and investigating computer hacking activities, and what it

13   looks like.

14   Q    During the course of your career, has information in the

15   field of computer forensics changed over time?

16   A    Yes.

17   Q    Do you receive any continuing education related to

18   computer forensics?

19   A    Yes.

20   Q    How often?

21   A    Now every couple years.  During the -- my primary

22   investigative years, I would receive usually two to three weeks

23   of continuing education a year.

24   Q    What types of computer systems have you been trained to

25   examine?

DUNN – Direct (by Mr. Barbosa)

1  A    All flavors of the Windows operating system, from

2  Windows 95 all the way through Windows 7.  I've -- Windows

3  Server, Macintosh, Linux, cell phones.

4  Q    Approximately how many computer forensic examinations have

5  you conducted in your career?

6  A    Over a thousand.

7  Q    So based on your training and experience, can you explain

8  what it means, what are the basic steps of a computer forensic

9  examination?

10  A    So the initial step is to identify the computer evidence

11  that needs to be seized and examined.  So the first part is the

12  collection of that evidence.  And depending on what type of

13  case it is, different collection methods could be used.  But

14  the first part is to create a forensically sound computer

15  image, meaning you get a bit-for-bit copy of the computer hard

16  drive.

17  Q    What is a forensic -- sorry -- a forensic image?

18  A    It means that you get an exact copy of the computer that

19  you're looking at.  Every bit is the same.

20  Q    So why do you make a forensic image?

21  A    Because you need that for the integrity of the

22  investigation.  You don't want anything to change.  You want to

23  be able to look at it exactly as it was, in that state.

24  Q    Do you ever examine the actual original evidence?

25  A    No.

DUNN – Direct (by Mr. Barbosa)

1   Q    Do you go about manipulating the computer and digging

2   through it as if you were at the workstation?

3   A    The only time you would do something like that would be,

4   say, on a point-of-sale investigation, you would capture the

5   computer memory.  So you would have to interact with the

6   computer for a short period of time to capture the computer

7   memory, and then take your computer image.

8   Q    So how do you go about making a forensic image?

9   A    So depending on if you could power the computer down or

10  not, if you can power it off, you would just turn the computer

11  off; or if it was already off, you would remove the computer

12  hard drive from the system.  And then utilizing what's called a

13  forensic write blocker, you would create an image of that drive

14  utilizing specialized computer software.  And that write

15  blocker prevents writes, or changes, to the drives.

16  Q    What software do you use to make the forensic image?

17  A    Typically, I would use either FTK Imager or EnCase.

18  Q    And is that forensic software that's used commonly in the

19  field?

20  A    Yes.

21  Q    What do you do to make sure the image is the same as the

22  original source evidence?

23  A    So when you're making your computer forensic image, the

24  software is creating a hash value, or a fingerprint of the data

25  on that drive, as you're making your image.  So once the image

DUNN – Direct (by Mr. Barbosa)

1  has been made, once it's done, you have that fingerprint of the

2  image.  When you begin to examine the image, you hash that

3  image again to make sure that that fingerprint is the same,

4  that you're looking at exactly the same device.  If one number

5  on that entire hard drive changes, the fingerprint won't be the

6  same.

7  Q    After you obtain the forensic image, how do you go about

8  examining the forensic image?

9  A    So the forensic image is examined using specialized

10 forensic software.  In my case, I typically would use EnCase.

11 Q    Again, is that software typically used in the field?

12 A    Yes.

13 Q    Does the forensic software that you use to conduct your

14 examinations, does it show you the data the same way we see it,

15 day-to-day, on our personal computers?

16 A    No.

17 Q    How does it display the information?

18 A    It displays the information in lists of files.  So it will

19 give you a tree structure showing the folders and how they fit

20 within that tree structure.  And then you can view it many

21 different ways.  You can look at every file.  You can look at

22 specific files.

23 Q    I brought up an exhibit.  Would it help to show a sample

24 screen from your software?

25 A    Yes.

DUNN – Direct (by Mr. Barbosa)

1              MR. BARBOSA:  Okay.  The government offers
2    Exhibit 17.8 for demonstrative purposes.  This is not specific
3    to the case.
4              THE COURT:  Any objection?
5              MS. SCANLAN:  No objection.
6              THE COURT:  It's admitted for demonstrative purposes
7    only.
8         Counsel, it's almost 12:00, so let's finish this one area
9    of examination.
10   BY MR. BARBOSA
11   Q    What are we looking at here, on Exhibit 17.8?
12   A    This is the main screen on EnCase.  On the left-hand side
13   you see the tree.  So you see the disk image name is at the
14   very top, TDurden.  And then we're looking at the "C" drive, or
15   the primary operating system drive.  And this shows all the
16   folders that are directly off of the "C" drive, so the program
17   files, Windows, the user accounts.
18        The next pane over, where we just have that one line, the
19   TDurden line, if you were to click on any one of these folders,
20   it would list out all of the files that were located in that
21   folder and any of its sub-folders.
22   Q    And what is the field down here for?
23   A    So depending on what you're looking at, say it was a Word
24   document, you could view what the contents of the Word document
25   are.  If it was any other file, you could look at the actual

DUNN - Direct (by Mr. Barbosa)

1   computer code for that file.  So that can be used a number of

2   different ways.

3          THE COURT:  Members of the jury, it's 12:00.  We'll

4   take our break.

5      Please rise.

6                  (Jury exits the courtroom)

7          THE COURT:  Counsel for the government, anything to

8   take up?

9          MR. BARBOSA:  No, Your Honor.

10          THE COURT:  Defense?

11          MR. BROWNE:  No, Your Honor.

12          THE COURT:  Have a good lunch.

13                  (Recess)

14          THE COURT:  Counsel, I wanted to bring a matter to

15   your attention that was brought to the Court's in-court deputy.

16   Apparently, Juror Number 5 just realized that he's had some

17   familiarity -- or he does have some familiarity with one of the

18   alleged victims in this case.  And I believe it's --

19          THE CLERK:  Village Pizza, in Anacortes.

20          THE COURT:  Village Pizza, in Anacortes.  And

21   apparently, it didn't dawn on him yesterday, as we were going

22   through this process, that, apparently, it's down the street in

23   from his family's business, that he's familiar with, and that

24   there are employees that he's familiar with that work in the

25   MAD Pizza facility.  And he wanted to bring that to the Court's

DUNN - Direct (by Mr. Barbosa)

1     attention.

2          I have not had any communication, obviously, with that

3     juror.  The only information we have right now is what I've

4     shared with you that was provided to the in-court deputy.

5          I think the proper thing to do with this information is to

6     bring Juror Number 5 out and conduct additional voir dire

7     examination of him to the extent of if that would affect his

8     ability to be fair and impartial, if he had any discussions

9     with anybody about the nature and scope of the investigation,

10    and if he could avoid having any further communications with

11    anyone there, or has anyone had any inquiries with him.

12         Let me hear from the government regarding the Court's

13    proposal.

14              MR. BARBOSA:  I think that sounds appropriate, Your

15    Honor.

16              THE COURT:  Counsel for the defense?

17              MS. SCANLAN:  We agree.

18              THE COURT:  All right.  Bring him out.

19              MR. BARBOSA:  Should the witness stay on the stand?

20              THE COURT:  Actually, the witness should leave.

21    Sir, if you'd step down?

22              THE WITNESS:  Yes, Your Honor.

23              (Juror Number 5 enters the courtroom)

24              THE COURT:  Good afternoon, Juror Number 5.

25    You've shared some information with the in-court deputy.

DUNN - Direct (by Mr. Barbosa)

1   And first of all, I want to tell you, you did exactly what the
2   Court would expect you to do.  As I mentioned yesterday during
3   the course of voir dire, sometimes when we get into a trial, or
4   sometimes there's conversations, then all of a sudden a light
5   comes on, and you realize there's more information in your mind
6   or in your memory than you perhaps recalled immediately.  And
7   so sharing information that you shared with the deputy is
8   exactly what we would expect you to do.  So you haven't done
9   anything wrong, for starters.
10       Now, if you could share with the parties exactly what you
11  shared with the in-court deputy, that would be helpful.
12          JUROR #5:  Yeah.  So I didn't catch earlier on that
13  the Village Pizza was in Anacortes, which is actually where I'm
14  from.  And my family business is just a few businesses down.
15  So I've actually met the owners.  My parents know the owners
16  pretty well, also.  So I just didn't know if that had any
17  implication.
18          THE COURT:  And when you say your parents know, how
19  about your relationship with the owners of that business?
20          JUROR #5:  I've met them, but that's about it.
21          THE COURT:  Have you had any conversations with them?
22          JUROR #5:  No, not for a few years.
23          THE COURT:  What's your best recollection of how long
24  it's been since the last time you had communication?
25          JUROR #5:  Probably in 2014, I would say.

DUNN - Direct (by Mr. Barbosa)

1          THE COURT:  And what types of things would you

2     discuss when you would have conversation with them?

3          JUROR #5:  We were just at a chamber of commerce

4     meeting for businesses in Anacortes.

5          THE COURT:  There wasn't any discussion about any of

6     the activities that have been referenced so far in this case;

7     have there?

8          JUROR #5:  No.

9          THE COURT:  The biggest concern the Court has is what

10    impact that might have upon your ability to be fair and

11    impartial.

12        Does the fact that your family knows the owner, or the

13    fact that you grew up in Anacortes, would that affect your

14    ability to be fair and impartial in your deliberations or

15    consideration of the evidence in this proceeding?

16         JUROR #5:  No.

17         THE COURT:  And do you have any reservations or

18    hesitation about that?

19         JUROR #5:  I do not.

20         THE COURT:  Would that take away from the

21    responsibility or requirement that the government has to prove

22    their case beyond a reasonable doubt?

23         JUROR #5:  No.

24         THE COURT:  If they failed to do that, would you have

25    any difficulty returning a verdict of not guilty?

1          JUROR #5:  No.

2          THE COURT:  And has anyone contacted you from

3    Anacortes, either family, friends, relatives about the nature

4    of this case?

5          JUROR #5:  They have not, no.

6          THE COURT:  Have you had any discussion or

7    communication with anyone about this type of activity taking

8    place in the Anacortes community or any particular businesses?

9          JUROR #5:  No, I have not.

10         THE COURT:  Okay.  I'll let the government ask

11   follow-up questions.

12         MR. BARBOSA:  No questions, Your Honor.

13         THE COURT:  Counsel for the defense, follow-up

14   questions?

15         MS. SCANLAN:  No, Your Honor.

16         THE COURT:  Okay.  Juror Number 5, I specifically

17   direct -- I'm going to confer with counsel.  But I want to make

18   sure that you not discuss what you shared with the Court with

19   the other jurors.  And if you go back in the jury room and

20   someone asks you what happened, tell them to ask the judge.

21   And I'm sure that they're not going to do that.  Because they

22   don't need to know what we discussed.  But just tell them

23   you're under court order not to discuss why I brought you out

24   here.

25         JUROR #5:  Okay.  I understand.

DUNN - Direct (by Mr. Barbosa)

1          THE COURT:  Thank you, sir.

2          JUROR #5:  You're welcome.

3               (Juror Number 5 exits the courtroom)

4          THE COURT:  Counsel for the government, anything to

5    take up regarding Juror Number 5?

6          MR. BARBOSA:  No, Your Honor.

7          THE COURT:  Defense?

8          MS. SCANLAN:  No, Your Honor.

9          THE COURT:  Okay.  Let's bring the full jury in.

10      Counsel, have your witness return to the witness stand.

11               (Jury enters the courtroom)

12          THE COURT:  Counsel for the government, you may

13    continue your direct examination of the witness.

14          MR. BARBOSA:  Thank you, Your Honor.

15    BY MR. BARBOSA

16    Q    When we broke for lunch, you were testifying about your

17    computer forensics examination experience and the actual

18    process of conducting a computer forensic exam.  I'd like to

19    talk some more about making the forensic image.

20         You referenced taking the hard drive out of the computer.

21    Are there any instances where you don't take the hard drive out

22    of the computer in order to conduct -- to make a forensic

23    image?

24    A    Yes.

25    Q    When would you do that?

DUNN – Direct (by Mr. Barbosa)

1    A    So in instances with server operating systems, you will

2    oftentimes image those live, a production server, so they're in

3    use at that time.  And a business can't afford for that server

4    to go down, so you'll make what's called a live image.  So you

5    make that bit-for-bit copy of the server while it's up and

6    running.

7         In instances where you're concerned that encryption may be

8    involved, you would make a live image of the device, the

9    concern being that if the power was removed from the hard

10   drive, it would be encrypted.  And without the encryption

11   password or key, you wouldn't be able to gain access to the

12   device again.

13   Q    How would this live imaging process help you in terms of

14   getting around encryption?

15   A    So if you have a machine that's live, and you can access

16   the desktop, you can utilize forensic tools to make that live

17   image before the encryption is applied when the device is

18   powered off.

19   Q    You referred to servers, also, and businesses.

20        Have you conducted these types of live examinations?

21   A    Yes.

22   Q    And has that included point-of-sale intrusion

23   investigations?

24   A    Yes.

25   Q    What about other computers, non-servers, personal

DUNN – Direct (by Mr. Barbosa)

1    computers?  Have you done live examinations of personal

2    computers?

3    A    I've done live examinations of personal computers.  And

4    another reason would be if you want to capture memory.  The

5    running processes on a system, you have to do that live, as

6    well.

7    Q    How do you conduct the write-blocking process in those

8    instances?

9    A    You're not able to write-block the drive, because it's

10   currently up, the operating system is functioning.  So the way

11   that you address that is you use sterilized media, meaning that

12   you take a completely clean and wiped hard drive with you, you

13   bring your known and trusted tools with you, and that's it.

14   Nothing else touches the machine that you're going to be

15   imaging, with the exception of your clean hard drive and your

16   forensic tools.

17   Q    So back to the forensic image, you discussed the hash

18   value and how that helps you assure the integrity.

19        Can you explain again, what is a hash value?

20   A    So a hash value is basically a math algorithm that is run

21   against the data.  And at the -- once the algorithm has been

22   run against the entirety of the data, you come up with a unique

23   fingerprint; or it's a long string of numbers and letters that

24   are unique to that specific set of data.

25   Q    So do you conduct a hash value for both the original

DUNN – Direct (by Mr. Barbosa)

1    source and the copy you've made?

2    A    Correct.

3    Q    Is that what you compare to each other?

4    A    Yes.

5    Q    Moving on to reviewing the forensic image, we had just

6    started talking about Exhibit 17.8, the demonstrative example

7    of your EnCase forensic tool.  And you discussed a few of these

8    areas here.

9         Can you discuss, in general, what else this tool allows

10   you to do when conducting your examination?

11   A    Sure.  You can do keyword searches across the entirety of

12   the drive for specific words that you want to look for.  You

13   can write what are called "expressions" to look for patterns.

14   So you could look for a credit card track data pattern, because

15   they have a consistent pattern to them.  You can sort and look

16   at just all of the pictures on the computer.  You could look at

17   just events that occurred during a specific time frame.

18   Q    I'll ask a few questions in there.

19        So what parts of this EnCase forensic tool that we're

20   looking at would assist you in conducting some of these exams?

21   A    At the top there's a condition tab that would allow you to

22   set a condition.  So, for example, you could set a condition to

23   look for just executable files, just programs.

24   Q    Why would you look for that type of file?

25   A    If you were trying to narrow down certain applications or

DUNN – Direct (by Mr. Barbosa)

1   malware that might be present on the system, you would just

2   want to look at the executables.

3   Q    You mentioned timelines, also.  Is that one of the

4   features here?

5   A    Yes.

6   Q    What would you use the timeline feature for?

7   A    When you're examining a machine, you may find a particular

8   piece of malware that was placed on the computer at a certain

9   date and time.  And you can use the timeline function to view

10  other activity that occurred on that drive at that same time,

11  so to help you determine how the hack may have occurred, other

12  files that may have been placed on the drive, files that may

13  have been taken off or deleted.

14  Q    What are the time stamps that you use to base that

15  timeline from?

16  A    The timelines come from the master file table, which is a

17  part of the Windows operating system.

18  Q    And what does the master file table tell you?

19  A    It tells you a lot of information about the actual file,

20  so when the file was created, when it was last written, when it

21  was last accessed, if it's been deleted.  There are a number of

22  different things that it can tell you, where the file is

23  currently stored on the drive.

24  Q    Do you rely more heavily on some of the dates in the

25  master file table than others?

DUNN - Direct (by Mr. Barbosa)

1    A    Yes.

2    Q    Which dates do you rely on?

3    A    The file created and the last written time are the most --

4    are the ones that I rely on the most.

5    Q    Why are those the ones you rely on the most?

6    A    The last accessed file time can be changed by automatic

7    processes.  For example, an antivirus scan against the drive

8    can change an access time, because the file was accessed for

9    the antivirus scan to run.  It's not indicative that the file

10   was touched by a user, but more of an automated process.

11   Q    What are the other dates?

12   A    The other dates have to do with when a file was actually

13   manipulated.  So if a file was last written to, say, a Word

14   document, then that means somebody was actually typing on that

15   document or making some form of change to it.

16   Q    Generally speaking, what do you look for when you're

17   conducting a computer forensic examination?

18   A    Evidence of the crime and the information listed in the

19   warrant.  If there's a warrant or if there's consent,

20   information related to the incident I'm investigating.

21   Q    Do you look for information related to who was using the

22   computer?

23   A    Yes.

24   Q    How do you go about looking for that type of information?

25   A    It depends on if it's the victim computer or belongs to

DUNN – Direct (by Mr. Barbosa)

1   somebody that I'm investigating.  But you would look at files

2   that the user created.  You would look at internet history that

3   was conducted with the device; pictures that may be stored on

4   the device; data that may have been deleted, previously stored

5   on the device.

6   Q    You mentioned internet history.  What types of internet

7   history do you look for in relation to identifying who's using

8   the device?

9   A    People that may be accessing personal e-mail accounts,

10  making online purchases, making travel reservations, any

11  activity that could lead to information regarding the user.

12  Q    Do you look for communications, or evidence of

13  communications, when you're conducting your computer forensic

14  exams?

15  A    Yes.

16  Q    What type of communications do you look for?

17  A    E-mail, instant messaging logs, chat logs.

18  Q    When conducting a point-of-sale hacking investigation, are

19  there particular items that you look for?

20  A    Yes.

21  Q    What?

22  A    Specifically, I'm looking for the type of malware that's

23  located on the system, the date and time that the system was

24  infected, information related to how the system became

25  infected, any information related to the behavior of the

DUNN – Direct (by Mr. Barbosa)

1   malware once it was installed on the system.

2   Q    Do you look for credit cards?

3   A    We do.

4   Q    Do you have any particular tools to look specifically for

5   credit cards?

6   A    There are tools to look specifically for credit cards.  I

7   have an expression that I've written that finds them for me.

8   Q    And when you say an "expression" that you've written --

9   A    It's a computer script that I have that specifically looks

10  for the credit card patterns.

11  Q    This is a tool that you created?

12  A    Yes.

13  Q    What is the role of a search warrant in conducting a

14  computer forensic exam?

15  A    A search warrant gives the examiner authorization to

16  examine the device.

17  Q    So let's turn to the specifics of your investigation in

18  this case.  I'd like to draw your attention to May of 2010.

19       Were you asked to examine a computer system in

20  Coeur d'Alene, Idaho?

21  A    Yes, I was.

22  Q    How did this come to your attention?

23  A    I received a call from the Secret Service Spokane office.

24  They had identified a likely business that had been hacked.

25  And they didn't have the forensic resources available in

DUNN – Direct (by Mr. Barbosa)

1  Spokane to deal with the intrusion, so they called me and asked
2  if I'd be willing to travel from Seattle and help them with
3  their investigation.
4  Q    How is a business identified as a potential point-of-sale
5  compromise?
6  A    Through the financial institutions, they monitor fraud
7  transactions that are occurring on their client cards.  And
8  they identify what are called common points of purchase.
9  Q    What does it mean to identify common points of purchase?
10 A    So they take all the fraud transactions that are occurring
11 during a certain time frame, and they look to try to determine
12 if there's a common business that all of those cardholders went
13 to that might indicate that that business had been breached.
14 Q    So did you go to Coeur d'Alene?
15 A    Yes, I did.
16 Q    What did you do -- what was the business name?  I can't
17 remember.
18 A    Schlotzky's Deli.
19 Q    And did you go to Schlotzky's?
20 A    Yes.
21 Q    What did you do when you visited Schlotzky's Deli in Coeur
22 d'Alene?
23 A    I first obtained consent from the owner to image the
24 computer systems at his business.  And then I proceeded to
25 capture memory, as well as take live forensic images of the

DUNN – Direct (by Mr. Barbosa)

1   back-of-house server, as well as the point-of-sale terminals in
2   the business.
3   Q    How did you go about conducting that live exam and
4   capturing the memory?
5   A    So utilizing sterilized media, so a clean hard drive in an
6   external case and a forensic CD that had my tools on it, I
7   inserted the CD.  The first thing I did was run a program to
8   capture the memory from the devices.  Once I captured the
9   memory, I then ran FTK Imager, which is a program you can run
10  off the disk to create an image of the hard drive and save it
11  to the external drive that I had brought.
12  Q    Did you look at any of the evidence while you were still
13  there?
14  A    I waited until I got to the field office about an hour
15  later.
16  Q    What did you learn?
17  A    That there was malware running, on a number of the systems
18  there, that was stealing credit card information.
19  Q    Did you look to see whether that system at Schlotzky's
20  Deli had any connections outside of their network?
21  A    Yes, I did.
22  Q    How did you do that?
23  A    I captured RAM, which is a type of memory on the system.
24  And I used a tool called Volatility to look for connections
25  from the system to external IP addresses.

DUNN – Direct (by Mr. Barbosa)

1   Q    What did you find?

2   A    I found that there was a connection to an IP address that

3   was in Russia.

4   Q    How were you able to determine that that IP address was in

5   Russia?

6   A    Utilizing what's called a "Whois Lookup," which is

7   synonomous to a phone book for IP addresses, I was able to

8   determine that the IP address belonged to an internet service

9   provider in Russia.

10  Q    Based on your training and experience, did that lead to

11  any conclusions, in your mind, about the Schlotzky's Deli

12  system?

13  A    That in conjunction with some other information I found in

14  RAM, it did.

15  Q    What was the other information you found in RAM?

16  A    I found a process that was running in memory called

17  "kameo."  And when I extracted the memory segments from the

18  kameo application and searched them, I found a large number of

19  credit card numbers in those memory segments.

20  Q    So what was your opinion as to what had occurred on the

21  Schlotzky's Deli system?

22  A    That the kameo malware had been installed, that it was

23  harvesting credit card numbers, and then transmitting them to

24  the server in Russia.

25  Q    What did you do next?

DUNN - Direct (by Mr. Barbosa)

1  A    I wrote up a description of what I had found.  I talked

2  with the Secret Service agents and supervisors in Spokane and

3  offered to assist them further with the investigation.  And

4  then I drove back to Seattle.

5  Q    Okay.  Once you drove back to Seattle, did you conduct

6  further examination of the forensic image you had taken?

7  A    Yes.

8  Q    Did you examine the event logs from Schlotzky's Deli's

9  computer?

10  A    Yes.

11  Q    What are event logs?

12  A    Event logs are log files that are on the computer that

13  note when certain events happen on a computer.  They're

14  diagnostic in nature, not something that your average user

15  would need, but it's a diagnostic log.

16  Q    What type of event logs do you typically review?

17  A    The security event log, the application event log, and the

18  software event log.

19  Q    Are those always the same on every computer system?

20  A    Yes.

21  Q    What can you learn from the event log?

22  A    You can learn who was logged into the system.  You can

23  learn what processes or applications are running on the system.

24  You can see if remote access attempts were made into the

25  system.  There's many, many, many different things that can be

DUNN – Direct (by Mr. Barbosa)

1    logged in the event logs.

2    Q    So in preparing for trial, did you make copies of the

3    files and forensic artifacts that you located during your exam?

4    A    Yes, I did.

5    Q    How did you make those copies?

6    A    I extracted them from the forensic software and put them

7    into a report.

8    Q    I'm showing you what's been marked as Government's

9    Exhibit 1.1.  It's three pages.

10        Do you recognize this?

11   A    Yes.

12   Q    I'll go through all three pages.

13        How do you recognize this exhibit?

14   A    These are screenshots from the forensic image that I took

15   from Schlotzky's Deli in my examination.

16   Q    Do these screenshots fairly and accurately represent the

17   files and forensic artifacts you found on the Schlotzky's Deli

18   system?

19   A    Yes.

20            MR. BARBOSA:  The government offers Exhibit 1.1.

21            THE COURT:  Any objection?

22            MS. SCANLAN:  No objection.

23            THE COURT:  1.1 is admitted.

24                (Exhibit 1.1 was admitted)

25            MR. BARBOSA:  And may I just publish upon its

DUNN - Direct (by Mr. Barbosa)

1   admission, Your Honor?

2            THE COURT:  You may, Counsel.

3   BY MR. BARBOSA

4   Q    Turning your attention to Page 1 of Exhibit 1.1, can you

5   explain for the jurors what this shows us?

6   A    Sure.  So this shows six different files and one folder

7   that were located on the Schlotzky's Deli back-of-house server.

8   Q    Are these all the files that were on the computer?

9   A    No.

10  Q    Why did you select these particular files?

11  A    Because these were the files associated with the hacking

12  of the system.

13  Q    And how did you determine that these were the files

14  associated with the hacking?

15  A    By my analysis of the RAM from the system, I had already

16  determined that kameo was malicious software that was stealing

17  credit card numbers.  Based on the fact that it was created on

18  the device on April 1, 2010, I then examined other activity

19  that occurred in and around that time, and came up with this

20  list of malicious files.  This also matched with information we

21  received from financial institutions related to when the

22  compromised cards had recently been used at Schlotzky's.

23  Q    Is there any particular reason why you included the last

24  access dates on this exhibit?

25  A    Just additional context.

DUNN – Direct (by Mr. Barbosa)

1   Q    Could you tell the jurors -- there's several files here,

2   in addition to the kameo one.

3        What were the other files related to?  Did you examine

4   them?

5   A    Yes.

6   Q    Let's go through those.  What is "shmak"?

7   A    So shmak2 and kameo are both the pieces of malware that is

8   designed to steal credit card numbers.  So that's the actual

9   malicious application that was on the machine.

10  Q    Moving on to "sc.exe," what is that?

11  A    That's "service create dot exe."  What that does is,

12  that's the persistence mechanism that was used to make sure

13  that if the system was turned off and turned back on, that

14  kameo would start up again.  So a service is a way --

15  installing something as a service is a way to ensure that that

16  will happen.

17  Q    Why does this have a file created date of 1979?

18  A    It's actually a Microsoft application.  And so based on

19  how that was moved over from the other system that was

20  connected to this, it's not uncommon to see that July 31, 1979,

21  date.

22  Q    Moving to Page 2 of Exhibit 1.1 -- just a moment.  I'll

23  try and focus in on this a little bit better.

24       What are these snippets that we have here?  Looks like

25  hieroglyphics to most of the people in the courtroom.

DUNN – Direct (by Mr. Barbosa)

1    A    So this was some of the code that was visible in plain

2    text at the end of the kameo executable and the shmak

3    executable.  So I can explain more in detail.

4    Q    Yeah, let's go through that.  So there's a couple of

5    things highlighted here, and I assume these were not

6    highlighted on the computer itself.

7    A    No.

8    Q    What is the purpose of highlighting these items?

9    A    Just to make it easier for us to see, because it's

10   pretty --

11   Q    So drawing your attention to this "HTTP" line, what is

12   that?

13   A    So that is the location for where the stolen card numbers

14   were going to be transmitted and the PHP script that would be

15   called on the remote server.

16   Q    All right.  So let me slow you down a little bit.

17        How do you know that that is where the cards are being

18   sent to?

19   A    Based on the fact that I also reviewed RAM and saw an open

20   connection to that IP address.

21   Q    And you referred to a "PHP script."

22   A    Yes.

23   Q    What does that mean?

24   A    PHP is a type of computer coding that allows interaction

25   with a remote website.

DUNN – Direct (by Mr. Barbosa)

1   Q    And what did this tell you, based on your training and
2   experience?
3   A    That the malware was going to contact that IP address, and
4   specifically the ftm.php script on that remote server.
5   Q    And what would it do with the data that it had collected?
6   A    Once it contacted the remote server, which was running
7   PHP, it would then transmit the stolen credit card numbers to
8   that script for the server to then process remotely.
9   Q    So are these two different pieces of malware?
10  A    No.
11  Q    Why are there two different files here?
12  A    Just named them differently.
13  Q    And when had those been placed on the computer, based on
14  your exam?
15  A    April 1, 2010.
16  Q    Okay.  Were these pieces of malware operating the same,
17  then?
18  A    Yes.
19  Q    Could you summarize for the jurors what your opinion is,
20  based on your training and experience, as to how the kameo and
21  shmak malware was functioning on Schlotzky's Deli system?
22  A    The malware was installed on the system.  It was
23  monitoring those systems for -- specifically for credit card
24  numbers.  Once it had identified credit card numbers, it stored
25  them for a period of time and then transmitted them to the

DUNN – Direct (by Mr. Barbosa)

1   remote server as it collected them.

2   Q    And that remote server, is this the IP address for it we

3   see on Page 2 of Exhibit 1.1?

4   A    Yes.

5   Q    And where was that remote server?

6   A    Russia.

7   Q    Was the kameo and shmak malware well known at this time,

8   in May of 2010?

9   A    No.

10  Q    Based on your training and experience, what did that tell

11  you about the malware?

12  A    That it was very unique, and that it was not what we would

13  consider a commodity-based malware.  It was assigned a very

14  specific purpose and would only be installed on systems that

15  were processing credit cards.

16  Q    Would this have been detected by antivirus scanners?

17  A    It was not at the time.

18  Q    Why not?

19  A    Because in order for antivirus to generate signatures for

20  malware, they have to have first seen a piece of malware from

21  that family.  And because this malware was so new and so

22  sparingly deployed, they hadn't seen it, and there were no

23  signatures.

24  Q    Turning to Page 3 of Exhibit 1.1, what is this?

25  A    This is from the system event log.

DUNN - Direct (by Mr. Barbosa)

1  Q    And why did you select this event from the system event

2  log?

3  A    This is the system event log from April 1, 2010, showing

4  that there was an RDP connection that had disconnected at

5  4:42 a.m., the same time frame as when the malware arrived on

6  that system.

7  Q    And what port would this RDP connection have been over?

8  A    3389.

9  Q    Is that the same port that you had discussed earlier, when

10  you were explaining how ports are used?

11  A    Yes.

12  Q    Based on your training and experience, did this lead to

13  any conclusions about how the malware had been planted on the

14  system?

15  A    Yes.

16  Q    What was that conclusion?

17  A    That the system had been accessed remotely, that that

18  remote user had been -- copy and pasted the malicious software

19  onto that system, had installed it, and was then collecting it

20  at the server in Russia.

21  Q    So moving on in your investigation, at some point after

22  you examined the Schlotzky's Deli system, did you learn that

23  some of the compromised accounts had been used in Cleveland,

24  Ohio?

25  A    Yes.

DUNN - Direct (by Mr. Barbosa)

1    Q    When was that?

2    A    In June of 2010.

3    Q    How did you learn about this?

4    A    The Secret Service agent in Spokane, who was working the

5    Schlotzky's case, notified me.

6    Q    What was the connection?  Why were you contacted about

7    this?

8    A    The subject in Cleveland had been arrested with card

9    numbers that had been originally used at Schlotzky's; so they

10   tracked back to that common point of purchase.  And that

11   subject had a laptop with him, and there was potentially

12   information on that laptop as to the source of those credit

13   card numbers.  So I was contacted to help determine who was

14   selling the stolen card numbers from Schlotzky's Deli.

15   Q    So did the agent in Cleveland provide you copies with any

16   of the evidence he had obtained?

17   A    Yes.

18   Q    Did this include some of the stolen credit card numbers?

19   A    Yes.

20   Q    How were they provided to you?

21   A    They were in a text file.

22   Q    Was there anything you found of interest in relation to

23   those text files?

24   A    Yes.

25   Q    What?

DUNN - Direct (by Mr. Barbosa)

1    A    The text files had a unique naming convention to them, or

2    appeared to be unique to me, machine-generated.

3    Q    What was unique about them?

4    A    Specifically, the text files were order, dash, an order

5    number, .txt.  And there were two of them, and they were

6    sequential.  And in viewing that, it appeared that they were

7    from a machine-generated process.

8    Q    And why did that get your attention?

9    A    It led me to believe that the cards had been purchased

10   from an automated vending site.

11   Q    At that point, did you seek any assistance from Secret

12   Service agents in D.C.?

13   A    Yes.

14   Q    And did you begin coordinating with them?

15   A    Yes.

16   Q    Did they have any information helpful to you, without

17   saying what the information was?

18   A    They did.

19   Q    Did you ask them for assistance in identifying these

20   particular orders?

21   A    Yes.

22   Q    How did that, if at all, focus your investigation?

23   A    They provided information on who they thought might be

24   selling card numbers using that naming convention.

25   Q    After that, did the agents in Cincinnati get you a full

DUNN – Direct (by Mr. Barbosa)

```
1    forensic image of the computer?

2    A    Yes, they did.

3    Q    And were you able to examine it?

4    A    Yes, I was.

5    Q    What were you looking for?

6    A    I was looking for the source of the stolen credit card

7    data, so internet-related activity, chat-related activity.

8    Q    What did you find?

9    A    I found all of that.

10   Q    Showing you what's been marked as Government's

11   Exhibit 16.10, which is two pages, do you recognize that?

12   A    Yes.

13   Q    How do you recognize it?

14   A    These are from a report that I created regarding my

15   examination of the computer hard drive from Cleveland.

16   Q    And are these forensic extracts from that hard drive?

17   A    Yes.

18   Q    Do they fairly and accurately represent the files and

19   forensic artifacts you found on the image of the drive from

20   Cleveland?

21   A    Yes, they do.

22            MR. BARBOSA:  The government offers Exhibit 16.10.

23            MS. SCANLAN:  Your Honor, if I may have one moment?

24            THE COURT:  You may.

25        Members of the jury, if you'd like to stand and stretch at
```

DUNN – Direct (by Mr. Barbosa)

1    this time.

2         Please be seated.

3         MS. SCANLAN:  Your Honor, the defense objects to the

4    admission of this exhibit, based on the hearsay contained in

5    the second page.

6         THE COURT:  Counsel for the government?

7         MR. BARBOSA:  Your Honor, these are offered as

8    statements of a party opponent.

9         THE COURT:  All right.  The objection is overruled,

10   based upon that proffer by the government.  16.10 is admitted.

11        And will it be subject to further connection, Counsel?

12        MR. BARBOSA:  Yes.

13        THE COURT:  Okay.

14        MR. BARBOSA:  Is that conditionally admitted or

15   admitted?

16        THE COURT:  No.  It's admitted.

17             (Exhibit 16.10 was admitted)

18   BY MR. BARBOSA

19   Q    Displaying for you Exhibit 16.10, Page 1, what is the

20   artifact we see on the top of Page 1 here?

21   A    So that shows the file path to the text file that

22   contained the credit card data.  So we see the order, 3186.txt,

23   and then the contents of that file, which starts with "438."

24   So that's a 16-digit Visa card number with the separator,

25   followed by the remainder of that track.  And then the second

DUNN – Direct (by Mr. Barbosa)

1   entry is for order 3187.txt, showing, again, another Visa

2   credit card number.

3   Q    Are these the automated order numbers you were referring

4   to earlier?

5   A    Yes, they are.

6   Q    What is the second half of Page 1 of Exhibit 16.10?

7   A    This is internet history that I extracted from that same

8   laptop.

9   Q    And why did you focus on this particular internet history?

10  A    For a number of reasons.  First, it shows the ICQ.com,

11  which is the web address for the ICQ application for

12  communication; Liberty Reserve, which was an online digital

13  currency company; as well as bulba.cc, which was a credit card

14  vending website.

15  Q    Based on your review of this exhibit, this internet

16  history, and your training and experience, what did this

17  internet history tell you?

18  A    That the Cleveland user had gone to bulba.cc and placed

19  orders for credit card numbers.  The order ID even matches the

20  text file number.

21  Q    Is that the highlighted portion, towards the bottom of the

22  page?

23  A    The very last; the 3186 matches the order, dash, 3186.txt.

24  Q    Moving to Page 2 of Exhibit 16.10, what is this, and where

25  did you find it?

DUNN – Direct (by Mr. Barbosa)

1    A    So this is from the ICQ chat logs that were on the system.

2    And these are conversations between the user of the computer

3    and the ICQ number 554716101.

4    Q    And had you seen that ICQ number elsewhere?

5    A    Yes.

6    Q    Who had identified themselves as using that ICQ number?

7    A    Track2.

8    Q    Okay.  So focusing on this first conversation, listed as

9    March 29, 2010, is that your annotation, the dates?

10   A    That's correct.

11   Q    I believe one of these is --

12   A    The very -- the second to the last, the March 5, 2010, is

13   actually May 5, 2010, as you can see by the dates farther over

14   to the left.  I just typed "March" instead of "May" on

15   accident.

16   Q    Okay.  So who is the speaker for the first line?

17   A    The speaker for the first line is the gentleman in

18   Cleveland.

19   Q    And then the second line would be?

20   A    Track2.

21   Q    Can you go through this conversation for the jury?

22   A    Sure.  So the Cleveland purchaser statement, "Hey, bro,

23   what is the new site?"  And then track2 responded,

24   "www.track2.name."

25   Q    Go ahead.  What was the next conversation about?

DUNN – Direct (by Mr. Barbosa)

1   A    On April 7, 2010, the Cleveland buyer, "Bro, what I have

2   to do to gain access to your site?"  And then track2 responded,

3   "Registration close."

4   Q    What did that mean, "Registration close"?

5   A    They're no longer accepting new users to that site.

6   Q    Did you ever try and visit the track2 site to see if it

7   was, in fact, closed to registration?

8   A    Yes.

9   Q    What did you find?

10  A    It was closed.

11  Q    The next conversation, what was the nature of that?

12  A    April 26, 2010, the Cleveland user, "Got any good dumps?"

13  Track2 responded, "Look in site."  The Cleveland user

14  responded, "Been trying to become member, but was told

15  registration was closed."  Track2 responded, "For register need

16  to pay 1,000 deposit."  And Cleveland user, "Come on, bro,

17  trying to get my money up, bro.  Have a little WM," which

18  stands for WebMoney, "but nothing."  Track2 then responded,

19  "It's your problem."

20  Q    At some point, did track2 direct this person to another

21  site?

22  A    Yes.

23  Q    Is that the next conversation?

24  A    Yes.

25  Q    Can you go through that?

DUNN – Direct (by Mr. Barbosa)

1    A    May 5, 2010, the Cleveland user states, "Need dumps," and

2    then, "Need dumps, sis."  And then track2 responds,

3    "www.bulbacc.  You can make account there.  It's our official

4    reseller."

5    Q    And then the final message from track2, what was that?

6    A    That was from track2, on June 6, 2010, "Tomorrow biggest

7    update of the year.  More than 100,000 dumps."

8    Q    And to clarify, when we went over the fact that the site

9    "track2" was closed for registration, does that mean it wasn't

10   operating anymore?

11   A    No.  It was operating.  It just wasn't accepting new

12   users.

13   Q    Approximately when was it that you examined the Cleveland

14   drive and found this connection between Schlotzky's and these

15   potential vending sites?

16   A    It would have been July 2010.

17   Q    So after you discovered that connection, did you start

18   researching these sites that we just saw in the chat?

19   A    Yes, I did.

20   Q    What type of information did you look for in relation to

21   the bulba and track2 sites?

22   A    In addition to visiting the sites and seeing what the

23   content was, I also looked at the domain registration

24   information, as well as the location for where the sites were

25   being hosted, so what IP address they were located at.

DUNN – Direct (by Mr. Barbosa)

1   Q    Let's talk, first, about your visits to the sites and what
2   you found there.
3        Did you take screenshots, pictures, of the websites, as
4   you visited them?
5   A    Yes, I did.
6   Q    Can you explain for the jury what a screenshot is?
7   A    So using an application on my computer, I'm able to take a
8   picture of what I see on the screen at that given time.
9             MR. BARBOSA:  Can the courtroom deputy provide the
10  witness with the binder with Exhibits 2.1 to 2.3?  I think it's
11  probably Volume 1.
12  BY MR. BARBOSA
13  Q    If you could look in the binders so I don't have to thumb
14  through each one of these, I'd like you to look at Exhibits 2.1
15  through 2.3.  So we're probably talking somewhere in the
16  neighborhood of 20 pages.
17       Just let me know once you've had a chance to look through
18  those.
19  A    Okay.
20  Q    Do you recognize all those?
21  A    Yes.
22  Q    How do you recognize those exhibits?
23  A    These are screenshots that I took from bulba.cc and
24  track2.name.
25  Q    Do they fairly and accurately show how the websites

DUNN – Direct (by Mr. Barbosa)

1   appeared when you visited them as part of your investigation?

2   A    Yes.

3            MR. BARBOSA:  Government offers Exhibits 2.1 through

4   2.3.

5            MS. SCANLAN:  Your Honor, the defense objects to the

6   admission of 2.3 on the grounds that it's hearsay, and the

7   government has not laid a foundation for any exception.

8            THE COURT:  One second, Counsel.

9        Counsel, on 2.3?

10           MR. BARBOSA:  Same reason for admission, Your Honor.

11  We believe these are statements of a party opponent.  They are

12  the bulba website.  We are also offering them as substantive

13  evidence.  They are effectively the crime scene.  This is the

14  website that exists.  This is what he saw.

15           THE COURT:  The objection is overruled.  2.1 through

16  2.3 will be admitted.

17            (Exhibits 2.1 through 2.3 were admitted)

18  BY MR. BARBOSA

19  Q    Let's start with Exhibit 2.1.  And this is just one page.

20       What is this that you have taken a screenshot of here?

21  A    This is the primary page that any user would have seen if

22  they had typed in "bulba.cc" and been directed there.  So this

23  is where you can either log in, if you already have a username

24  and password, or where you could register for a new account, if

25  you had not done so yet.

DUNN - Direct (by Mr. Barbosa)

1   Q    So is this the first landing page, when you arrive?

2   A    Yes.

3   Q    And the address shows "secure.bulba.cc."  Is that what you

4   had typed in, or did you --

5   A    No.  You would have been redirected to that.

6   Q    And there's a second tab open in your internet browser.

7        What is that?

8   A    That was the other site that I had open at that time,

9   which was track2.name.

10  Q    And the date appears in the lower right-hand corner.

11       Is this when you were doing this initial investigation?

12  A    Yes.

13  Q    Taking you to Exhibit 2.2, is that simply the other tab

14  you had open in your browser, at that point?

15  A    That's correct.

16  Q    So what do we see here?

17  A    This is the splash page, or landing page, for track2.name.

18  Q    Are they similar?

19  A    They were almost identical.

20  Q    Were you able to open accounts on either of these sites?

21  A    I was able to open an account on bulba.cc.

22  Q    Moving to Exhibit 2.3, let me bring this up on a single

23  screen.

24            MR. BROWNE:  Sorry, Mr. Barbosa.  Which exhibit did

25  you say?

DUNN – Direct (by Mr. Barbosa)

1           MR. BARBOSA:  2.3.

2    BY MR. BARBOSA

3    Q    And this is a total of 15 pages.

4         Starting with the first page, what did you see after you

5    were able to establish an account on bulba?

6    A    So after establishing an account and logging in, you would

7    then be taken to the main page for bulba.cc, where there would

8    typically be announcements posted for people to read.

9    Q    And this announcement on Page 1 of Exhibit 2.3, is that

10   typical of the announcements you saw when you visited the site?

11   A    Yes.

12   Q    Could you go over this for the jurors?

13   A    Sure.  Do you want me to explain it as I'm going through

14   it?

15   Q    Please, yeah.

16   A    "Update 17,000 fresh dumps.  Totally made, valid.  Very

17   high, 95 percent."

18   Q    Based on your training and experience and your experience

19   with carding investigations, what does this comment, "Totally

20   made," mean?

21   A    It means that they're very good.  So there's 17,000 unique

22   credit card tracks that are very good, with a 95 percent chance

23   that if you use them, they will work.

24   Q    Okay.  And further down, we have "Base New 65" -- sorry.

25   I'm not going to do that again.  I tried to focus in on that,

DUNN – Direct (by Mr. Barbosa)

1    and it did not work.

2         What is "Base New 65"?

3    A    So that's the name of the database that contains these

4    17,000 card numbers.

5    Q    And the comment, "Warning, today checker not work," what

6    is a "checker" in the carding industry?

7    A    So on some carding sites, there is what's called a

8    checker, which gives the purchaser the opportunity to check if

9    the card is still valid.  So you can pay sometimes a few

10   pennies or a quarter, and after you purchase a card, they'll

11   run it through another criminal service that verifies if the

12   card is going to be accepted through the card brands.  If it is

13   accepted, you keep the card.  If it's not accepted, most card

14   vending sites will replace it for you for free.

15   Q    Moving to Page 2 of Exhibit 2.3, there are a number of

16   tabs on the website.

17        Did you explore each of those, and can you tell the jurors

18   what -- where these would take you?

19   A    Sure.  So moving from left to right, "dumps," if you were

20   to click on "dumps," you would be provided with a screen where

21   you could search for specific credit cards that you wanted.  So

22   you could search by BIN number.  You could search by bank, and

23   as well as a number of other fields.  "Orders" were the orders

24   that you had made.  "Profile," you could add profile

25   information.  "Billing" had to relate to funding your actual

DUNN – Direct (by Mr. Barbosa)

1   account.  The "checker" service was what I spoke about earlier,

2   your ability to check those card numbers.  You could contact

3   support.  There was a support page where you could write

4   messages to the administrators of the account.  And then you

5   could sign out, log out.  The username, that was my undercover

6   username at the time.  And then a balance of zero, I didn't

7   have any money in my account at that time, and I had zero

8   checks available.

9   Q    The balance of the pages in Exhibit 2.3, are these

10  additional news updates that you found when you visited the

11  site?

12  A    They are.

13  Q    What did the bulba website accept for payment?

14  A    Online currencies and Western Union, typically.

15  Q    What types of online currencies?

16  A    Liberty Reserve, WebMoney, were the two primary.

17  Q    Were you familiar with these payment methods?

18  A    Yes.

19  Q    What is Liberty Reserve?

20  A    Liberty Reserve, at the time, was an online currency that

21  existed.  It was tied to the U.S. dollar, although not

22  sanctioned by any nation or state.  It was -- but it was

23  basically a banking system for people that didn't want to use

24  the traditional means.  It was very commonly used among

25  computer hackers.

DUNN – Direct (by Mr. Barbosa)

1    Q    During the course of your investigation, did you make any

2    undercover purchases through this site?

3    A    Yes.

4    Q    How did you go about making the purchases?

5    A    The first thing I did was contact the administrators on

6    the page to ask them where I could send a Western Union

7    transfer.  I was provided with Western Union transfer

8    information to Vietnam.  I then went to a Western Union and

9    sent money to that name.  And a few hours later, the money was

10   posted to my online account at the site.

11   Q    In your training and experience, was this method of using

12   Western Union to provide payment -- was that common in the

13   carding industry?

14   A    Yes.

15   Q    Was that a lead that you were able to follow up on?

16   A    Yes.

17   Q    What did that name lead to?  The name that you were

18   provided, was that helpful in your investigation?

19   A    The name that I transferred money to was not helpful, no.

20   Q    Why not?

21   A    It was what's called a "drop," or a "money mule," so

22   somebody whose job it is to collect Western Unions and then

23   forward them on to somebody else.

24   Q    Once you purchased cards, were you able to confirm whether

25   they were real credit cards?

DUNN - Direct (by Mr. Barbosa)

1    A     Yes.

2    Q     How did you go about doing that?

3    A     I specifically purchased cards from the Boeing Employees

4    Credit Union.  And then after purchasing those cards, I

5    provided them to the Boeing Employees Credit Union to validate

6    that they were legitimate cards.

7    Q     Did you receive records back on those cards?

8    A     Yes.

9    Q     So after you conducted your initial review of the

10   websites, did you put together a plan for investigating these

11   sites?

12   A     Yes.

13   Q     When was that, approximately?

14   A     That would have been in late summer of 2010.

15   Q     And what was your plan?  What were you going to look for?

16   A     Ultimately, to track down any information we could

17   regarding the infrastructure associated with the track2 and

18   bulba websites, as well as any other information we could find

19   from carding forums regarding the nicknames "track2" and

20   "bulba.cc."

21   Q     And what did you learn about the infrastructure?  What

22   information was available to you publicly about the -- these

23   websites?

24   A     So we could determine who had registered the websites, the

25   name they had provided, the e-mail address that they provided,

DUNN – Direct (by Mr. Barbosa)

1   and a telephone number that they had provided.  We could

2   determine who they registered the domains through.  We could

3   determine the IP address for where the sites were currently

4   being hosted.  We could –– through ICQ, we could determine

5   information related to the registered party for the ICQ

6   numbers.

7   Q    What was the goal as you identified IP addresses for the

8   domains or e-mail addresses used to register them?

9   A    Try and determine who was running the infrastructure for

10  the sites.

11  Q    And how would you do that?  How would you get ahold of

12  this information?

13  A    Through core process to various e-mail providers, internet

14  service providers, domain registration companies, any company

15  that had records related to what we were –– the information we

16  were finding.

17  Q    Were you continuing to work with agents in

18  Washington, D.C.?

19  A    Yes.

20  Q    Who did you work with primarily from D.C.?

21  A    Special Agent Keith Wojcieszek.

22  Q    And how did you coordinate your investigation with Keith

23  Wojcieszek?  Did you split up your duties?

24  A    We did split up the duties, yes.

25  Q    How did you divide the responsibilities?

DUNN - Direct (by Mr. Barbosa)

1   A     It depended on what things were occurring at that time.

2   Keith primarily focused on e-mail search warrants, and later on

3   on serving warrants for data that was located on the East

4   Coast.

5   Q     Did he also have access to historical information?

6   A     He did.

7   Q     Did you and Agent Wojcieszek conduct any research to

8   attempt to identify -- well, you just said that you looked into

9   the domain registrations.  Let me ask you about that.

10        How did you look into the domain registrations for these

11  websites?

12  A     So we conducted what's called a "Whois Lookup."

13  Q     What is a "Whois Lookup?"

14  A     So a Whois Lookup is basically querying the "who is," or

15  the phone book type information, for domain registration.  So

16  it's publicly available information to determine who to contact

17  regarding a domain or an IP address.

18  Q     And were you able to go -- to determine what the IP

19  addresses for these websites were?

20  A     Yes.

21  Q     What did you learn about the IP addresses for both bulbacc

22  and track2.name at that time?

23  A     That they were hosted together.  And they were the only

24  two websites that were hosted, and they were not hosted in the

25  U.S.

DUNN – Direct (by Mr. Barbosa)

1   Q    Do you know where they were hosted?

2   A    I believe they were in the Ukraine.

3   Q    Did you attempt to get ahold of those websites, or copies

4   of the servers?

5   A    Yes.

6   Q    Was that successful?

7   A    No.

8   Q    So we've gone over domain names and what they are, but I'm

9   going to have you take a look at Government's Exhibit 4.5.  We

10  talked about researching domain registration records.

11       Can you look at that, in the notebook in front of you,

12  Exhibit 4.5?

13  A    Do you want me to review the whole thing?

14  Q    Does it look -- you've reviewed it before; is that right?

15  A    Yes.

16  Q    Is that the same one?

17  A    Yes.

18  Q    Okay.  And what is it, specifically?

19  A    This is the domain report from DomainTools on the domain

20  name track2.name.

21  Q    And is that approximately over 90 pages; is that right?

22  A    That's correct.

23  Q    What type of information, without the specifics, is

24  contained in these reports?

25  A    The name of the registrant, their e-mail address, physical

DUNN – Direct (by Mr. Barbosa)

1   address that they had provided, phone number that they had
2   provided.
3   Q    And are these reports publicly available?
4   A    Yes.
5   Q    And are they generally relied upon by people in the
6   computer networking industry?
7   A    Yes.
8           MR. BARBOSA:  The government offers Exhibit 4.5.
9           THE COURT:  Any objection?
10          MS. SCANLAN:  Your Honor, the defense renews the
11  objection from the pretrial conference.
12          THE COURT:  The objection is noted.  It's overruled.
13  It's admitted.
14                  (Exhibit 4.5 was admitted)
15          MR. BARBOSA:  Thank you, Your Honor.
16  BY MR. BARBOSA
17  Q    All right.  I'm going to turn your attention to quite a
18  few pages into this, Page 86, Exhibit 4.5.
19       What was the date this registration check was completed?
20  A    March 3, 2010.
21  Q    Was that approximately around the time you were conducting
22  your investigation?
23  A    Yes.
24  Q    And do the records in the domain registration for
25  track2.name, in Exhibit 4.5, continue to update the domain

DUNN - Direct (by Mr. Barbosa)

1   registration records throughout your investigation?

2   A    Yes.

3   Q    So is this information consistent with what you saw

4   throughout your investigation?

5   A    Yes.

6   Q    When was the website track2.name registered?

7   A    It was registered on March 3, 2010.

8   Q    Is that highlighted about five lines down?

9   A    Yes.

10  Q    And who was the name listed as the registered owner of the

11  site?

12  A    Alexey Davydov.

13  Q    Does it tell you what e-mail address was used to register

14  it?

15  A    Yes.

16  Q    Where is that?

17  A    It's right there, rubensamvelich@yahoo.com.

18  Q    What parts of this information were you interested in?

19  A    The e-mail address.

20  Q    Why the e-mail address?

21  A    That's the manner in which the registrant will be

22  contacted in the event that there are abuse complaints or other

23  issues related to the domain.

24  Q    Does that -- is that used for billing, in your experience?

25  A    Yes.

DUNN – Direct (by Mr. Barbosa)

1    Q    Let's take a look at Exhibit 4.4.  Again, this is 50

2    pages.

3         If you could look at it and just confirm whether or not

4    that's another domain registration record that you recognize?

5    A    Yes, it is.

6              MR. BARBOSA:  Government offers Exhibit 4.4 under the

7    same exception.

8              MS. SCANLAN:  Your Honor, the defense has the same

9    objection.

10             THE COURT:  Same ruling.  4.4 is admitted.

11                  (Exhibit 4.4 was admitted)

12   BY MR. BARBOSA

13   Q    What is this for?

14   A    This is the domain report for the domain bulba.cc.

15   Q    And I should have highlighted this earlier.  There was a

16   similar page on the beginning of 4.5.

17        Is this a screenshot that's included with the domain

18   registration record?

19   A    DomainTools takes that screenshot as part of their

20   service.

21   Q    Turning to Page 48 of Exhibit 4.4, when was the bulba site

22   registered?

23   A    April 26, 2010.

24   Q    And what was the registration name and e-mail address

25   provided?

DUNN - Direct (by Mr. Barbosa)

1   A    Valentin Chinakov.  And the e-mail is bulbacc@yahoo.com.
2   Q    So during your investigation, did you pursue any process
3   to look at these e-mail accounts?
4   A    Yes.
5   Q    Did you also find sites with domain names similar to the
6   track2.name site?
7   A    Yes.
8   Q    Approximately how many?
9   A    I believe three or four others.
10  Q    And do you recall any of the names?
11  A    Track2.tv, track2vip.tv.  Just off the top of my head,
12  that's what I remember.
13  Q    And did you try and visit those sites to confirm if there
14  was any relation between them?
15  A    Yes.
16  Q    What did you find?
17  A    They were not up when I visited.
18  Q    So you didn't find them?
19  A    Yeah.
20  Q    Did you look into registration records for them?
21  A    Yes.
22  Q    Why did you look for registration records for those sites?
23  A    For the same reason I was looking at track2 and bulba.cc,
24  to try and determine and build out the infrastructure in the
25  investigation.

DUNN – Direct (by Mr. Barbosa)

1    Q    Did you find any similarities?

2    A    Yes.

3    Q    What were those similarities?

4    A    The registration addresses.

5    Q    Okay.  Can you take a look in the binders in front of

6    you -- and I won't bring these up on the overhead -- 4.8 to

7    4.10?

8    A    I don't have that binder.  I only go to 4.5.

9              THE COURT:  Members of the jury, if you want to stand

10   and stretch real quick?

11        Please be seated.

12        Counsel?

13             MR. BARBOSA:  Thank you, Your Honor.

14   BY MR. BARBOSA

15   Q    What are those exhibits, 4.8 through 4.10?

16   A    They are similar reports for track2.tv, track2vip.tv, and

17   track2.cc.

18             MR. BARBOSA:  The government offers Exhibits 4.8

19   through 4.10 under the same exception.

20             MS. SCANLAN:  Your Honor, the defense renews their

21   objection to all three of those exhibits.

22             THE COURT:  So noted.  4.8 through 4.10 are admitted.

23             (Exhibits 4.8 through 4.10 were admitted)

24   BY MR. BARBOSA

25   Q    I'm seeing these are pretty long.  Would it be more

DUNN – Direct (by Mr. Barbosa)

1   convenient to go over --

2          MR. BARBOSA:  I think 4.9 also.  Is that also

3   admitted?

4          THE COURT:  You said 4.8 through 4.10.  So the

5   "through" meant they're all included.

6          MR. BARBOSA:  Thank you.

7   BY MR. BARBOSA

8   Q    Would it be more convenient to review the information from

9   those reports in a summary form?

10  A    Yes.

11  Q    Okay.  And have you seen a summary of all the registration

12  information for those sites?

13  A    Yes, I have.

14  Q    I'm going to show you, on the overhead, what's been marked

15  as 4.12.

16         Do you recognize that?

17  A    Yes.

18  Q    What is it?

19  A    It's a summary of the registration date, registration

20  name, registration e-mail address, phone number, and street

21  address for the five domain names.

22  Q    And have you checked this against the registration records

23  admitted as 4.4, 4.5, and 4.8 through 4.10?

24  A    Yes, I have.

25  Q    Does it accurately represent the information in those

DUNN - Direct (by Mr. Barbosa)

1   records?

2   A    Yes, it does.

3            MR. BARBOSA:  Government offers Exhibit 4.12.

4            MS. SCANLAN:  Your Honor, the defense renews our

5   objection.  This is not a proper summary exhibit.

6            THE COURT:  Overruled.  4.12 is admitted.

7                 (Exhibit 4.12 was admitted)

8   BY MR. BARBOSA

9   Q    All right.  Could you highlight for the jury some of the

10  similarities you noticed?

11  A    Sure.  So three of the domain names have the same

12  registration e-mail address.  That would be track2.name,

13  track2.tv, and track2vip.tv.  They were all registered with

14  rubensamvelich@yahoo.com.  There are similar addresses for

15  track2.tv and track2vip.tv.  The phone number for track2.name

16  and track -- and bulbacc are very similar, with the exception

17  of the very last digit.  One has an "8," and the other has a

18  "1."

19  Q    You mentioned, also, looking at the IP addresses for these

20  sites.

21       What was the purpose of trying to locate the IP address?

22  A    To -- the ultimate goal would have -- if possible, to

23  seize the servers.

24  Q    And how did you go about figuring out what the IP address

25  was?

DUNN – Direct (by Mr. Barbosa)

1    A    Running a tool on my laptop, as well as searching through

2    domain records.

3    Q    I'm showing you what's been marked as Government's

4    Exhibit 4.11.

5         Do you recognize that?

6    A    Yes.

7    Q    What is it?

8    A    This is a reverse IP address lookup.  So basically, it

9    tells you what websites are hosted at a specific IP address.

10   Q    And is that information also publicly available?

11   A    Yes.

12   Q    And that's a two-page exhibit.

13        Does that have additional information on the second page

14   that's publicly available?

15   A    Yes.

16   Q    What type of information, without specifics, does this

17   provide you?

18   A    It shows that there are two sites that are hosted there,

19   bulba.cc and track2.name, as well as an anti-DDoS provider.

20            MR. BARBOSA:  The government offers Exhibit 4.11.

21            THE COURT:  Counsel?

22            MS. SCANLAN:  No objection.

23            THE COURT:  4.11 is admitted.

24                 (Exhibit 4.11 was admitted)

25   ////

DUNN - Direct (by Mr. Barbosa)

1   BY MR. BARBOSA

2   Q    So looking at Page 1 of 4.11, what is this showing you?

3   A    That those two sites are hosted at IP address

4   213.186.112.132.

5   Q    And the second page of this exhibit, what does it tell you

6   about that IP address and those sites?

7   A    That it's part of the Ukrtelecom, in Kiev, Ukraine.  And

8   that in addition to that, there's records related to

9   antiddos.biz.

10  Q    What did you learn about antiddos.biz?

11  A    That antiddos.biz provides distributed denial of service

12  protection for websites.

13  Q    Why would somebody use distributed denial of service

14  protection for a website like this?

15  A    Because their website was being attacked by a DDoS.

16  Q    How does -- based on your training and experience, how

17  does a DDoS protection service operate?  What does it provide

18  for the website?

19  A    They provide a number of different services, depending on

20  the type of DDoS.  There are many different DDoS attacks that

21  can be perpetrated against a website.  So the anti-DDoS

22  services mitigates those attacks.  They identify what kind of

23  attack is coming in, and then they utilize countermeasures to

24  get rid of the bad traffic and allow the legitimate users to

25  access the website.

DUNN – Direct (by Mr. Barbosa)

1   Q    Does the use of an anti-DDoS service have any impact on

2   the true location of the IP, or your analysis of the true

3   location of the IP address for the website?

4   A    Yes, it does.

5   Q    How?

6   A    Because the -- all traffic routed to the website is

7   proxied, or sent through the DDoS provider.  So the IP address

8   that you get is the IP address for the DDoS provider, not the

9   true location for the website.

10  Q    So what does that mean in terms of your ability to

11  identify the true location of the website?

12  A    That the only way to do that would be to contact the

13  anti-DDoS provider to get that information.

14  Q    And were you able to do that in this case?

15  A    No.

16  Q    Why not?

17  A    Because it's an anti-DDoS provider that's located in the

18  Ukraine.

19  Q    So after you and Agent Wojcieszek did this initial

20  research, looked at the IP address and found the registration

21  records, what did you do next?

22  A    We obtained core process for contents of the e-mail

23  addresses that we had identified that were located within the

24  U.S.

25  Q    And which e-mail addresses were those?

DUNN – Direct (by Mr. Barbosa)

1   A     Rubensamvelich@yahoo.com and bulbacc@yahoo.com.

2   Q     And to refresh, which of those related to which website?

3   A     So rubensamvelich@yahoo.com was used for track2.name.  And

4   bulbacc@yahoo.com was used for bulba.cc.

5   Q     When did you obtain these search warrants?

6   A     They were obtained in the fall of 2010.

7   Q     Which of you, Agent Wojcieszek or yourself, obtained the

8   search warrants?

9   A     The original search warrants were obtained by Agent

10  Wojcieszek.

11  Q     When you get a search warrant for an e-mail account, do

12  you actually go to Yahoo! and take the e-mails off their

13  servers?

14  A     No.

15  Q     How do you go about executing a search warrant for an

16  internet-based e-mail account like that?

17  A     The internet e-mail providers typically have a contact, a

18  legal process contact, who will accept search warrants, most

19  commonly by fax.  So you send a fax copy of the search warrant

20  to the provider, and then they return the results -- or the

21  contents of the mailbox and anything else specified in the

22  search warrant to you via CD or DVD, in the mail.

23  Q     How long does it usually take to receive the contents and

24  other information back?

25  A     It really depends on the provider, sometimes a month,

DUNN – Direct (by Mr. Barbosa)

1   sometimes a couple months.

2   Q    What do you do once you get the information?  And did you

3   say it comes on a disk?

4   A    Yes.

5   Q    What do you do once you get the disk back from Yahoo!?

6   A    You copy the contents of the disk so you can review it.

7   The disk gets placed into evidence, and then you review the

8   data.

9   Q    What did you look for in these accounts?

10  A    Information related to the infrastructure being used,

11  information related to the people involved in the case,

12  basically any information I could find regarding the theft and

13  sale of credit card numbers or any infrastructure necessary to

14  support them.

15  Q    Did you look for indications of who was using the

16  accounts?

17  A    Yes.

18  Q    In general, can you describe what you found in the

19  contents of the e-mail account rubensamvelich?

20  A    So in the account rubensamvelich, I found information

21  related to the lease of servers located both in the U.S. and

22  abroad.  I found registration records for websites associated

23  with it.  I found information related to other accounts, such

24  as PayPal, and others, that were included in the account.

25  Q    So in addition to the content of the account, you

DUNN – Direct (by Mr. Barbosa)

1   mentioned that Yahoo! sometimes provides other information.

2        What type of other information do they provide?

3   A    The account registration information, as well as IP

4   address information for the most recently -- the most recent

5   IPs that have been used to access the account.

6   Q    Can you take a look at Exhibit 6.1 and tell me if you

7   recognize that?

8   A    I do.

9   Q    This is two pages.  How do you recognize that?

10  A    That's the printout from the Yahoo! account management

11  tool that shows the registration information for the e-mail

12  account rubensamvelich@yahoo.com.

13       MR. BARBOSA:  The government offers Exhibit 6.1, Your

14  Honor.

15       THE COURT:  Any objection?

16       MS. SCANLAN:  Yes, Your Honor.  There's been no

17  foundation for this exhibit, at this point, as a business

18  record, with this witness.  There's been no foundation laid

19  through this witness for this exhibit.

20       THE COURT:  Counsel?

21       MR. BARBOSA:  The government is still offering this

22  under a 902 certification that the Court ruled on earlier.

23       THE COURT:  All right.  The objection is overruled

24  based on the Court's prior ruling.  That's 6.1.

25                 (Exhibit 6.1 was admitted)

DUNN – Direct (by Mr. Barbosa)

1           MR. BARBOSA:  Thank you.

2   BY MR. BARBOSA:

3   Q    What is this that we're looking at in Exhibit 6.1?

4   A    So this is the registration information for the account.

5   So we have the login name of rubensamvelich; that it's for the

6   Yahoo! mail property, or that service; the e-mail address,

7   rubensamvelich@yahoo.com.  There's a registration IP address

8   for when the account was created, the date that the account was

9   created, the full name for the account holder, the country and

10  zip code where the account holder says they're from, as well as

11  the birthday and gender that were provided by the account

12  holder.

13  Q    Are you familiar with how this information is supplied to

14  Yahoo!?

15  A    Yes.

16  Q    Who supplies the information in this record?

17  A    So it depends on which piece of information.  Some of it

18  is automatically generated, and some is provided by the user.

19  For example, the user uses the login and the Yahoo! mail name.

20  The registration IP and account created date are automatic

21  processes by Yahoo!, as part of creating the account.  The

22  account holder name, country, zip, birthday, and gender are all

23  provided by the user.

24  Q    Do you rely upon the name on an internet e-mail account to

25  identify the user?

DUNN - Direct (by Mr. Barbosa)

1    A    Not solely, no.

2    Q    Why not?

3    A    Because you can put anything in there.

4    Q    Moving to Exhibit 6.2, which is several pages long, six

5    pages, approximately, do you recognize that?

6    A    Yes.

7    Q    How do you recognize that?

8    A    These are the IP addresses that were provided by Yahoo!

9    for the most recent account logins to the rubensamvelich e-mail

10   account.

11   Q    And what does that mean, the IP addresses for the account?

12   A    So every time the user logged into the account, Yahoo!

13   recorded the IP address from where the user logged in from.

14   Q    And how is that information supplied?  Is that supplied by

15   the user?

16   A    No.  It's the information the Yahoo! servers captured when

17   the login session occurs.  So it's an automatic process.

18            MR. BARBOSA:  Government offers Exhibit 6.2.

19            THE COURT:  Defense?

20            MS. SCANLAN:  Your Honor, I just had a question

21   regarding the exhibit.

22        There was some highlighting on the exhibit, just now,

23   that's not currently present.  I'm wondering if that is

24   considered a portion of the exhibit, or not?

25            THE COURT:  Are those counsel's highlights?

DUNN – Direct (by Mr. Barbosa)

1          MR. BARBOSA:  This is my highlighting.  I can take it

2     off for now and highlight it later.

3          MS. SCANLAN:  Maybe I'm not being clear.  I guess my

4     inquiry was whether the idea is that it's going to be admitted

5     into evidence with the highlights, or not.

6          THE COURT:  What I have before me, Counsel, which is,

7     I believe, a duplicate of what's before the witness, there are

8     no highlights.  So that's the exhibit that will be admitted for

9     purpose of the jury's consideration.  Counsel may highlight

10    that for purpose of examination, but it's not admitted in that

11    format.

12        So any continuing objection?

13          MS. SCANLAN:  No, Your Honor.

14          THE COURT:  All right.  With that, 6.2 is admitted.

15                    (Exhibit 6.2 was admitted)

16          MR. BARBOSA:  All right.

17          THE COURT:  Counsel, it's 2:45.  Would it be a good

18    time to take our afternoon break?

19          MR. BARBOSA:  Absolutely.

20          THE COURT:  Members of the jury, we'll take our

21    afternoon break.

22                    (Jury exits the courtroom)

23          THE COURT:  Counsel for the government, anything to

24    take up?

25          MR. BARBOSA:  One matter.  I'd like to ask if we

DUNN - Direct (by Mr. Barbosa)

1    could use Exhibit 17.7, which is a demonstrative exhibit.  I'm

2    just about to go further into discussions of the

3    infrastructure, and that exhibit would help the witness in

4    doing his testimony.  It's a large board.  I can actually show

5    it for counsel.

6              THE COURT:  Has counsel seen it?

7              MS. SCANLAN:  No.

8              MR. BARBOSA:  Yes, they have.

9              MR. WILKINSON:  It was an exhibit used in opening

10   statement.

11             THE COURT:  Do you have any objection to --

12             MS. SCANLAN:  I haven't seen the board, Your Honor.

13             THE COURT:  Okay.

14             MR. BARBOSA:  It's the same thing, just bigger.

15             MS. SCANLAN:  As a demonstrative exhibit?

16             MR. BARBOSA:  As a demonstrative.

17             MS. SCANLAN:  I have no objection to that.

18             THE COURT:  You have to make a formal offering in

19   front of the jury, Counsel.

20             MR. BARBOSA:  Okay.

21             THE COURT:  Anything else to take up, by the

22   government?

23             MR. BARBOSA:  Just can I leave it up here so I don't

24   have to walk back and forth?

25             THE COURT:  Sure.

DUNN – Direct (by Mr. Barbosa)

1    Anything else to take up, by the defense?

2              MS. SCANLAN:  No, Your Honor.

3              THE COURT:  Counsel for the government, I want to let

4    you know that I'm going to interrupt about every 25 minutes

5    just for a break for the jury, I think for obvious reasons.

6              MR. BARBOSA:  I need the break too.  I appreciate it.

7              THE COURT:  We'll be in recess.

8                         (Recess)

9                    (Jury enters the courtroom)

10             THE COURT:  Counsel, you may continue your direct

11   examination of the witness.

12             MR. BARBOSA:  Thank you, Your Honor.

13   BY MR. BARBOSA

14   Q    So we were looking at Exhibit 6.2 when we stopped for the

15   afternoon break.  And I've highlighted Page 1, or focused in on

16   the bottom of Page 1, these IP addresses.

17        What's the source of the information?  Where does this

18   come from?

19   A    This came from Yahoo! business records.

20   Q    What are these records?  What is it showing you?

21   A    Showing the IP addresses that were most recently used to

22   access the rubensamvelich e-mail account.

23   Q    And do you use these in conducting your investigations?

24   A    Yes.

25   Q    How do you use them?

DUNN – Direct (by Mr. Barbosa)

1   A     Researching these IP addresses can lead to information
2   related to where the computer that was accessing the e-mail
3   account is physically located.
4   Q     So these IP addresses toward the bottom of Page 1 of
5   Exhibit 6.2, are there any shown here that you were able to
6   identify at some point in your investigation?
7   A     Yes.
8   Q     Which one?
9   A     The three that start with "66."
10  Q     And what's that full address?
11  A     66.36.240.69, 66.235.184.36, and 66.36.228.124.
12  Q     Were you able to identify those servers and where they
13  were located?
14  A     Yes.
15  Q     Do those IP addresses, that have been used to log in to
16  the rubensamvelich account, did they come up elsewhere in your
17  investigation?
18  A     Yes.
19  Q     Would it help you to explain to the jury how these IP
20  addresses and the e-mail accounts, and the other infrastructure
21  that you've discussed, relate to each other, to use a diagram?
22  A     Yes.
23        MR. BARBOSA:  The government offers Exhibit 17.7 as a
24  demonstrative exhibit, the board that's on display now.
25        MS. SCANLAN:  No objection.

DUNN - Direct (by Mr. Barbosa)

1           THE COURT:  17.7 is admitted for demonstrative

2    purposes only, and you may publish.

3           MR. BARBOSA:  May the witness approach the exhibit?

4           THE COURT:  You may.

5    BY MR. BARBOSA

6    Q    And I'll just advise you to be a little careful.  The

7    stand there is slightly touchy.

8    A    Okay.

9           THE COURT:  Let's make sure, first of all, that all

10   members of the jury are in a position to see this.  Otherwise,

11   we can -- the jurors have indicated no, Counsel.

12       If you'd like, you can have it moved a little bit closer.

13          MR. BARBOSA:  Certainly.  I can help you.

14          THE COURT:  Can defense counsel see it?

15          MR. BROWNE:  Yes.

16          MS. SCANLAN:  Yes, Your Honor.

17          MR. BROWNE:  We have a copy.

18          THE COURT:  Now, are the jurors in a position to see

19   the exhibit?

20          JUROR:  Not the very, very bottom.

21          MR. BARBOSA:  We may need to highlight it.  I can

22   bring it up on the overhead too.

23          THE COURT:  Let's put it in two places, Counsel.

24          MR. BARBOSA:  Sure.

25   ////

DUNN – Direct (by Mr. Barbosa)

BY MR. BARBOSA

Q    All right.  So we've been going over the rubensamvelich
account, and you talked about some domain records earlier.
     Can you explain for the jurors how the rubensamvelich
account ties in to your investigation, using the Exhibit 17.7?

A    So within the rubensamvelich e-mail account, there were
records related to the leasing of servers, specifically a
number of servers at a HopOne data center, located in McLean,
Virginia.  One of those servers, the primary one in the case,
had IP address 66.36.240.69.

Q    Is that the one you saw, just moments ago, in Exhibit 6.2,
the login records?

A    Yes.

Q    So it was also logging into the rubensamvelich account?

A    Right.  So this server was logging into rubensamvelich,
and it was also being leased from the e-mail account
rubensamvelich.

Q    Okay.  Going back up to the rubensamvelich account, what
was it related to?

A    So rubensamvelich was related to the track2.name domain
registration records, so the site that was vending the stolen
card data.

Q    And, now, in the lower left-hand corner, what is the
server down there?

A    So there was a server located at IP address

DUNN – Direct (by Mr. Barbosa)

1    188.120.225.66.  This server was located in Russia.  And that

2    was the server that was used to download the malicious software

3    onto the victim point-of-sale server.  So once the hacker had

4    gained access to the point-of-sale server, he would direct the

5    web browser to this server to download the malware, whether it

6    be -- there were three versions of the malware -- primary

7    versions of the malware.  Schlotzky's just had one of the

8    three.

9    Q    And was that server used for any other purpose besides

10   just downloading the malware?

11   A    It also received stolen card numbers.

12   Q    Okay.  So moving back to -- let's go back to the right

13   side of this Exhibit 17.7, the HopOne server that you

14   identified based on the login IPs.

15        Based on your training and experience, did you draw any

16   conclusions as to how that server fit into your investigation?

17   A    So the HopOne server filled multiple roles in the

18   investigation.  It was used as a collection point for stolen

19   credit card numbers.  So one of the pieces of malware would

20   direct the stolen card numbers to this IP address.  This server

21   was also used to scan large ranges of IP addresses for

22   Port 3389, to see if there were servers that would be

23   vulnerable to an attack.  And then the server was also used

24   almost as a personal computer, to browse the web and to view a

25   number of various websites.

DUNN - Direct (by Mr. Barbosa)

1    Q    Okay.  So now let's move back to rubensamvelich.  You were

2    talking about your review of that account.

3         Again, why was the registration e-mail address for the

4    track2.name site -- why was that something you were focused on

5    in the registration records?

6    A    It's the most valid piece of information that you're going

7    to get off a registration.

8    Q    Why is that?

9    A    Typically, you would have to create an account with a

10   company that will register IP addresses.  They'll send you a

11   confirmation e-mail to confirm that you have a valid e-mail

12   address.  And so -- and people will provide valid e-mail

13   addresses so they can address any kind of abuse complaints or

14   other issues related to the site, billing, everything.

15   Q    Is that why you focused your investigative efforts on that

16   account?

17   A    Yes.

18   Q    Okay.  So if you could go ahead and take your seat again.

19        When we reviewed the subscriber records for the

20   rubensamvelich account that were in Exhibit 6.1, you saw the

21   name "Mr. Romper Stomper."

22   A    Yes.

23   Q    Did you find any other names that the account holder used

24   to send and/or receive e-mails in that account?

25   A    Yes.

DUNN – Direct (by Mr. Barbosa)

1    Q    What were some of those names?

2    A    Roman Seleznev, Roman Ivanov.  There were a couple others

3    in there, as well, but those are the two off the top of my

4    head.

5    Q    What about the name of the e-mail account?

6    A    Oh, yeah, rubensamvelich, of course.  Sorry.

7    Q    Were there any nics used?

8         MR. BARBOSA:  And let me ask, can Juror Number 15 see

9    the witness?  If we need to move that board, I can do it.

10        JUROR:  Yes.

11   BY MR. BARBOSA

12   Q    All right.  I'm going to show you what's been marked as

13   Government's Exhibit 6.3 and 6.3A, the translation.

14        Do you recognize those?

15   A    Yes.

16   Q    How do you recognize those?

17   A    These are e-mails that were sent from PayPal to the

18   rubensamvelich@yahoo account.

19   Q    And is the first page of 6.3 -- is that an exhibit in

20   Russian?

21   A    That's correct.

22   Q    So this has also been translated?

23   A    Yes.

24        MR. BARBOSA:  The government offers Exhibit --

25   actually, let me ask a few more questions.

DUNN – Direct (by Mr. Barbosa)

```
1    BY MR. BARBOSA
2    Q    So without describing the contents of these e-mails -- you
3    mentioned it was a PayPal e-mail -- can you describe the nature
4    of that e-mail from PayPal?
5    A    It was a welcome e-mail to an account holder.
6    Q    When someone opens a PayPal account, who supplies the
7    PayPal account information?
8    A    The person that's opening the account.
9    Q    So what is the source of the information in a welcome
10   e-mail?
11   A    That's automatically generated from PayPal, based on the
12   information that had been submitted by the user.
13   Q    And based on the information submitted by the user who
14   opened the account?
15   A    That's correct.
16            MR. BARBOSA:  Government offers Exhibits 6.3 and
17   6.3A.
18            MS. SCANLAN:  No objection.
19            THE COURT:  6.3 and 6.3A are admitted.
20              (Exhibits 6.3 and 6.3A were admitted)
21   BY MR. BARBOSA
22   Q    So is the exhibit on the right-hand side, 6.3A, is that
23   just simply a translation of the exhibit you found?
24   A    Yes, it is.
25   Q    And where was this, again?
```

DUNN – Direct (by Mr. Barbosa)

1  A    This was in the rubensamvelich@yahoo e-mail account.

2  Q    And who was it addressed to?

3  A    "Welcome, Roman Seleznev."

4  Q    Did it provide any other identifying information for the

5  person it was addressed to?

6  A    Yes.

7  Q    What was that?

8  A    It provided the e-mail address, as well as a physical

9  address.

10  Q    I'm going to show you what's been marked as Government's

11  Exhibit 12.6 and admitted as 12.6B, the translation of

12  Mr. Seleznev's internal passport.

13       Is that the same address?

14  A    Yes, it is.

15  Q    Turning your attention to the second page of Exhibit 6.3,

16  what did this e-mail address?

17  A    This is from PayPal to Roman Seleznev, the subject being,

18  "You have added a credit card."  And it says, "Hello, Roman

19  Seleznev.  On September 22, 2009, the credit card ending in

20  8729 was added to your PayPal account.  Thanks, PayPal."

21  Q    What is the significance of adding a credit card account

22  to a PayPal account?

23  A    There's two primary reasons you would do that.  One would

24  be to help verify your account, and then the second would be so

25  that you could use that as a payment source for PayPal

DUNN – Direct (by Mr. Barbosa)

1    transactions.

2    Q    Were you able to obtain any records from PayPal related to

3    this account?

4    A    Yes.

5    Q    Showing you Government's Exhibit 15.5, do you recognize

6    that?

7    A    Yes.

8    Q    How do you recognize Exhibit 15.5?

9    A    It's the account information that was provided by PayPal.

10   Q    And that's a four-page exhibit.

11        Does it contain information related to the PayPal

12   purchases and other details?

13   A    Yes, it does.

14        MR. BARBOSA:  Government offers Exhibit 15.5 under a

15   902 certification.

16        MS. SCANLAN:  No objection.

17        THE COURT:  15.5 is admitted.

18             (Exhibit 15.5 was admitted)

19   BY MR. BARBOSA

20   Q    Turning your attention to the upper left-hand corner, what

21   user information did PayPal have on record for this account?

22   A    First name of Roman, middle name "V," last name Seleznev,

23   date of birth, July 23, 1984, e-mail rubensamvelich@yahoo.com.

24   Q    And did the account holder provide any other identifying

25   information that's down in the lower --

DUNN – Direct (by Mr. Barbosa)

1    A    There's a telephone number.

2    Q    What about the address?

3    A    And there's an address.

4    Q    What I've highlighted now, towards the bottom of the page?

5    A    Yes.

6    Q    Was that the same address you'd seen in the passport

7    translation?

8    A    Yes.

9    Q    Turning to Page 2, did you see the credit card number that

10   had been referenced in the e-mail receipt you found in the

11   rubensamvelich account?

12   A    Yes.

13   Q    Is that the "8729" number?

14   A    That's correct.

15   Q    Did finding this PayPal record have any significance to

16   your investigation?

17   A    Yes.

18   Q    Why?

19   A    PayPal records are -- carry more validity than the other

20   records we'd seen up to this point in the case.

21   Q    Why is that?

22   A    PayPal is a regulated entity, so it falls under a number

23   of financial regulations that e-mail providers and others

24   don't.  So they have customer rules, verification steps, that

25   are required and are checked for validity.

DUNN – Direct (by Mr. Barbosa)

1   Q    What about this comment on the right-hand column,
2   "Personal Russian, unverified"?
3   A    So as part of the PayPal process, you can have a verified
4   account.  What that means is that they will submit a small
5   charge to an account that you have, and then you can -- so they
6   may make a charge, like, $2.17.  They don't tell you the exact
7   amount for the charge.  And then you go back to the site, and
8   you say: Hey, I can access this account online.  I know it was
9   $2.17.  And you can verify that you do have control and access
10  to that card.
11  Q    Does that decrease your reliance on this exhibit at all?
12  A    No.
13  Q    I'm going to show you -- well, actually -- sorry.  Moving
14  back to Exhibit 15.5, this phone number that was in the PayPal
15  records, did you find that anywhere else in your investigation?
16  A    Yes.
17  Q    Now I'm going to show you what's been marked as
18  Government's Exhibit 6.4.
19       Do you recognize this?
20  A    Yes.
21  Q    And this is a multi-page exhibit.  How do you recognize
22  Exhibit 6.4?
23  A    This is a series of e-mails from a company called
24  NuSphere, who was offering distributed denial service
25  protection.

DUNN – Direct (by Mr. Barbosa)

1    Q    And did you find these in the rubensamvelich account?

2    A    Yes, I did.

3            MR. BARBOSA:  Government offers Exhibit 6.4.

4            MS. SCANLAN:  One second.

5            THE COURT:  Yes.

6            MS. SCANLAN:  Counsel, all the pages?

7            MR. BARBOSA:  All pages.

8            MS. SCANLAN:  Your Honor, this exhibit contains

9    communications between whoever the account holder is, of

10   rubensamvelich, and this company.  It appears other people -- I

11   think this is hearsay.  I would object to the admission of this

12   exhibit.

13           THE COURT:  Just one second, Counsel.

14      Counsel for the government?

15           MR. BARBOSA:  Your Honor, primarily this consists of

16   statements of a party opponent, for example, "This is my phone

17   number," and other comments such as that.  The responsive

18   e-mails from the other party are only for context, not offered

19   for the truth of the matter asserted.  The username and

20   password, there's no truth in them.  They're just simply items

21   that are located in the crime scene.

22           THE COURT:  All right.  Counsel for the defense, can

23   you point to any particular aspects of the entirety of 6.4 that

24   serve as a basis for your objection?

25           MS. SCANLAN:  Your Honor, the first page of 6.4

DUNN – Direct (by Mr. Barbosa)

1    consists entirely of an e-mail from someone else, who has not

2    been identified, and we don't know the validity of this

3    communication or if this is an accurate rendition of this

4    information.  I think to say that this isn't offered for the

5    truth is a little confusing, considering what's actually sent

6    from a company is a username and a password, not from the

7    account holder, rubensamvelich.

8           MR. BARBOSA:  To the extent that Page 1 is offered,

9    that is also machine-generated information, as the witness has

10   testified, so it's simply not hearsay.  It's not a statement of

11   a person.  And a username and password carry no assertion or

12   statement.  They don't mean anything.  They're simply a word

13   that is found in the account.

14          THE COURT:  Any other particular locations, Counsel,

15   that you can point out to the Court?

16          MS. SCANLAN:  Yes.  One, I'm not sure how we know

17   that Page 1 is machine generated.  As to Page 2, there's a

18   communication from an actual person at this company who has not

19   been identified.  We don't know who that is.

20          THE COURT:  That's on Page 2?

21          MS. SCANLAN:  Yes, Your Honor.

22          THE COURT:  Bates Stamp 41?

23          MS. SCANLAN:  Yes.  Page 3 has the same kind of

24   thing, another -- this is not a machine-generated e-mail.  This

25   is an e-mail to someone else.  I don't know if Page 4 is

DUNN — Direct (by Mr. Barbosa)

1   machine generated or not.  I don't see any evidence that it is.

2   Page 6 is not machine generated.  They're e-mails from someone

3   we don't know, to this account holder.  I don't think these are

4   business records, Your Honor.

5              THE COURT:  All right.  Counsel, I'll give the

6   government an opportunity to establish foundation as it relates

7   to Bates Stamp 22.  That's 6.4, for ease of reference.  Because

8   I know the witness previously testified that they were machine

9   generated in a global fashion, but not to the specifics of that

10  particular exhibit page, Counsel.  I would also note that on

11  Page 2, again, same question, I'm not sure if sufficient

12  foundation has been established to show that that's machine

13  generated.  You'll certainly be entitled to ask further

14  questions.  And the Court also has concerns and will sustain

15  the objection as it relates to Page 6, because that appears not

16  to indicate that that's machine generated, unless you can

17  provide additional foundation.

18             MR. BARBOSA:  Your Honor, Page 6 is a statement of

19  the party opponent at the top.  The bottom part is not offered

20  for the truth.  It actually doesn't have anything of important

21  relevance.  It's the statement of the defendant -- or statement

22  of party opponent that is important on Page 6.  I can lay a

23  foundation for the machine generated.

24             THE COURT:  Why don't you do that, Counsel.  You can

25  make another offering, and the Court will make a determination

DUNN – Direct (by Mr. Barbosa)

1   at that point in time.

2   BY MR. BARBOSA

3   Q    Are you familiar with how these types of receipts are

4   created by a company such as NuSphere?

5   A    Yes.

6   Q    Does a person sit behind a keyboard and type out sign-in

7   receipts like these?

8   A    No.

9   Q    How do you know that?

10  A    Because I've never seen somebody do that in that fashion.

11  It's much more -- it's easy to script this out to make it occur

12  automatically.  The formatting looks like it's automatically

13  generated.  The content and contact information at the bottom

14  appears to me to be machine generated.

15  Q    And are these the typical kind of messages you see in

16  internet businesses when providing receipts?

17  A    Yes.  Additionally, it's not from a person's e-mail

18  account.  It's from a generic sales account.

19            MR. BARBOSA:  Government offers 6.4 again.

20            THE COURT:  Any other objections, Counsel?

21            MS. SCANLAN:  Your Honor, I'm not sure I understand

22  which page the witness is testifying about, at this point.

23            THE COURT:  I took that as a global statement as to

24  all six pages that were provided.

25            MS. SCANLAN:  Yes, Your Honor.  I would renew our

 1   objection.  I don't think -- one, generalized knowledge that he

 2   has seen e-mails of this nature from different businesses does

 3   not mean that he knows that these e-mails themselves are

 4   machine generated from this company.  And in addition, some of

 5   these are very obviously not machine-generated e-mails.

 6          THE COURT:  Do you want to point out one,

 7   specifically, Counsel?

 8          MS. SCANLAN:  Page 2.

 9          MR. BARBOSA:  Your Honor, I can address this.  We are

10   not offering this for the truth of the matter asserted.  It is

11   a request for something to which the party replied.  So what we

12   are offering this for is the party opponent's statement.

13          THE COURT:  All right.  The Court will make the

14   following determination.

15      Ladies and gentlemen of the jury, I'm going to admit 6.4

16   as offered by the government.  You will note that there are

17   communications that come from other individuals.  And you'll

18   see, for example, on Page 2, there's a reference to a Sergey,

19   S-E-R-G-E-Y, Gitman.  And you'll see the same applies on

20   Page 3, and the same applies on Page 6.

21      The components of that statement that make reference to

22   that person are not offered for the truth.  It's only for

23   purposes of explaining the basis of the communication.  The

24   Court will allow the balance of the testimony to come in, and

25   you may consider it in its entirety otherwise.

DUNN – Direct (by Mr. Barbosa)

1        So the objection is overruled.  6.4 is admitted.

2                    (Exhibit 6.4 was admitted)

3            MR. BARBOSA:  Thank you, Your Honor.

4   BY MR. BARBOSA

5   Q    Who are the parties to this e-mail series?

6   A    The e-mail account rubensamvelich@yahoo.com and the

7   NuSphere.com company.

8   Q    What is NuSphere?

9   A    It's a company that provides distributed denial of service

10  protection.

11  Q    And is that the attack that you described earlier in your

12  testimony?

13  A    Yes.

14  Q    So turning to Page 2 of Exhibit 6.4, what did the

15  rubensamvelich account holder tell NuSphere about his phone

16  number?

17  A    He provides a phone number of +7902 -- I'll start again --

18  +79024835285.  And it states, "This is my phone number."

19  Q    Is that the same phone number you found in the PayPal

20  record?

21  A    Yes.

22  Q    Turning back to Page 1 of Exhibit 6.4, do the username and

23  password listed in this e-mail come up elsewhere in your

24  investigation?

25  A    Yes.

DUNN – Direct (by Mr. Barbosa)

1   Q    What were those?

2   A    The username of track221 or track2, or a variation of

3   that, was very common.  And the password ochko123 was also very

4   commonly used throughout the investigation.

5   Q    Turning to Page 6 of Exhibit 6.4, what did the user of the

6   rubensamvelich account say to the NuSphere Corporation?

7   A    "What that mean, I am in Russia now.  I live in Moscow.

8   My billing address also Moscow, and now I am in other part of

9   Russia.  Any problems?  If yes, just return my money to the

10  card.  I'm very disappointed of your service.  Bye."

11  Q    Did you contact NuSphere to obtain business records from

12  them?

13  A    Yes.

14  Q    Showing you what's been marked as Government's

15  Exhibit 15.14, which is two pages long, do you recognize that?

16  A    Yes.

17            MR. BROWNE:  15.14?

18            MR. BARBOSA:  Yes.

19            MR. BROWNE:  Thank you.

20            MR. BARBOSA:  The government offers those, again

21  under a 902 certification.

22            THE COURT:  Counsel?

23            MS. SCANLAN:  Your Honor, if I may have just one

24  moment?

25            THE COURT:  You may.

DUNN – Direct (by Mr. Barbosa)

1        Members of the jury, if you'd like to stretch, feel free
2    to do so at this time.
3        Please be seated.
4            MS. SCANLAN:  Your Honor, the defense has no
5    objection.
6            THE COURT:  15.14 is admitted.
7                (Exhibit 15.14 was admitted)
8    BY MR. BARBOSA
9    Q    Turning your attention to the NuSphere records, Page 1,
10   Exhibit 15.14, do they have the same phone number on record?
11   A    Yes, it does.
12   Q    Was there anything else in the billing records they had
13   for the rubensamvelich NuSphere account that you had seen
14   elsewhere in your investigation?
15   A    The "Roman Ivanov" name was there.
16   Q    What about this address?
17   A    It was also seen.
18   Q    Where had you seen that before?
19   A    Off the top of my head, I can't remember.
20   Q    Okay.  Let me draw your attention to Exhibit 4.12.
21   A    That's right.  It was for the account registration for --
22   I believe it was track2vip.tv and track2.tv.
23   Q    So the same street address, but not number and apartment?
24   A    Right.
25   Q    Now I'm going to show you what's been marked as

DUNN – Direct (by Mr. Barbosa)

```
 1    Government's Exhibit 6.5.
 2         Did you find other e-mails related to DDoS protection
 3    services?
 4    A    Yes.
 5    Q    Do you recognize Exhibit 6.5?  This is a much longer
 6    exhibit.  It's 22 pages, so you may want to look at it in the
 7    binder.
 8    A    This is which one?
 9    Q    6.5.
10    A    I need that binder.  You said 6.15?
11    Q    6.5, sorry.
12    A    I go from 6.22 to 7.1.
13    Q    Oh, sorry.  You may need another binder.
14              MR. BROWNE:  You can use ours, if you want.
15              MR. BARBOSA:  We'll use the originals.
16         May I approach, Your Honor?
17              THE COURT:  Yes.
18              THE WITNESS:  Okay.  My math's not on point today.  I
19    apologize, Your Honor.  Okay.
20    BY MR. BARBOSA
21    Q    Do you recognize that?
22    A    Yes.
23    Q    How do you recognize it?
24    A    These were records -- these are records that were found in
25    the rubensamvelich@yahoo e-mail account from Prolexic.
```

DUNN – Direct (by Mr. Barbosa)

1   Q    Was this an e-mail that had contained an attachment also?

2   A    Yes.

3   Q    And is the e-mail and the attachment included in this

4   exhibit?

5   A    Yes.

6        MR. BARBOSA:  Government offers Exhibit 6.5.

7        MS. SCANLAN:  Your Honor -- I'm sorry.  The defense

8   objects as to 6.5 as to the communications that are not from

9   the e-mail account holder.

10       THE COURT:  They're not from the e-mail --

11       MS. SCANLAN:  I apologize.  So there's two people

12  corresponding in this exhibit.

13       THE COURT:  Right.

14       MS. SCANLAN:  One of whom is the account holder.

15       THE COURT:  Correct.

16       MS. SCANLAN:  Who the government has offered as a

17  party opponent.

18       THE COURT:  Correct.

19       MS. SCANLAN:  The other is not.  And we believe the

20  communications from that party are hearsay.

21       THE COURT:  And counsel for the government?

22       MR. BARBOSA:  Same response as Exhibit 6.4.  They're

23  only offered for context.  They explain the responses from the

24  party opponent.

25       THE COURT:  Members of the jury, they'll be offered

DUNN – Direct (by Mr. Barbosa)

1    for that limited purpose and that purpose only, and for no

2    other reason.

3         6.5 will be admitted.

4                    (Exhibit 6.5 was admitted)

5    BY MR. BARBOSA

6    Q    So turning to Page 2 of 6.5, did the user provide a phone

7    number and information about what he was looking for?

8    A    Yes.

9    Q    What?

10   A    So the user provided a phone number of +79024835285,

11   e-mail address of rubensamvelich@yahoo.com, and specifically in

12   the message stated, "Hello, my site www.track2.tv is under very

13   big DDoS attack.  Now my DDoS protection from blacklotus.net,

14   but they can't do anything to protect me already 24 hours.  I

15   very interested in your services.  I need 100 percent guarantee

16   if you can protect me from DDoS, because I also lose so much

17   money.  Thanks you.  I would prefer to be contacted by e-mail."

18   Q    So does Prolexic offer similar services to what NuSphere

19   offers?

20   A    Yes.

21   Q    What name did the rubensamvelich account holder use when

22   dealing with Prolexic?

23   A    Roman Ivanov.

24   Q    Now showing you what's been marked as Government's

25   Exhibit 6.13, which is three pages, do you recognize these

DUNN – Direct (by Mr. Barbosa)

1   three e-mails?

2   A    Yes.

3   Q    How do you recognize these three e-mails?

4   A    These are e-mails between Black Lotus Communications,

5   another DDoS provider, and rubensamvelich@yahoo.com.

6   Q    Did any of these e-mails appear to be automatically

7   receipts?

8   A    Yes.

9   Q    Which ones?

10  A    The very first one.

11  Q    What tells you that that was automatically generated?

12  A    Based on the fact that it's from a support e-mail address,

13  not from a user account, and the fact that it only contains the

14  e-mail address and registration password, and no further

15  details.

16  Q    All right.  The other two e-mails are two pages.

17       What do they include?  What type of information, without

18  going into the specifics?

19  A    That they were specifically addressed to -- one was from

20  Mr. Seleznev to them, with specific comments.  And the second

21  one was from them to him, with answers.

22            MR. BARBOSA:  The government offers Exhibit 6.13 with

23  the same conditions as 6.4 and 6.5.

24            MS. SCANLAN:  Your Honor, the only objection I have

25  is to 6.13, Page 3, which is the e-mail from Black Lotus

DUNN – Direct (by Mr. Barbosa)

1    Communications support to the rubensamvelich e-mail account.

2                   THE COURT:  The Court will sustain the objection on

3    Page 3 from the section that will be "Roman" down.  That will

4    not be admissible.  Otherwise, 6.13 is admitted.

5                          (Exhibit 6.13 was admitted)

6                   MR. BARBOSA:  Just a moment, Your Honor.

7                   THE COURT:  It appears the proper redaction has been

8    made.  You can make the offer once again, Counsel.

9                   MR. BARBOSA:  Thank you, Your Honor.  And we will

10   need to redact the original exhibit in the binders before they

11   go to the jury.

12                  THE COURT:  That's fine.

13   BY MR. BARBOSA

14   Q    All right.  Let's turn to Page 1, first.

15        Do you see any passwords that you've seen elsewhere in

16   your investigation?

17   A    Yes.  The ochko123.

18   Q    Turning to Page 2, who is this message from?

19   A    This is from rubensamvelich@yahoo.com.

20   Q    And can you go over the message?

21   A    Sure.  It's to Black Lotus.  And the content is "web proxy

22   setup," is the subject.  "I already paid by WebMoney, domain

23   name www.track2.tv and track2.tv.  No SSL or other

24   certificates, only 80 port.  Proxy must redirect to

25   IP91.205.40.10.  I waiting ASAP, because my site on DDoS

DUNN – Direct (by Mr. Barbosa)

1   attack.  Thanks you."

2   Q    You had gone over the IP address for track2 earlier as an

3   IP starting with "213."

4        What does this, "Proxy must redirect to IP," tell you?

5   A    The true source IP address for the sites was 91.205.40.10.

6   Q    Turning to Page 3 of Exhibit 6.13, who was this e-mail

7   from and to?

8   A    From rubensamvelich@yahoo.com.

9   Q    And what was the subject of this?

10  A    "Reference ticket ID 144705.  Backend of track2.tv not

11  responding."

12  Q    And what did rubensamvelich tell Black Lotus?

13  A    "Please disable permanent ban after multiple blocks.  I

14  have high-skilled administrator.  He on ICQ.  I can give you

15  his ICQ to speak."

16  Q    What would "administrator" be, in your training and

17  experience, in this circumstance?

18  A    So the first part of the e-mail addresses the fact that

19  the way this was configured, they would permanently block IP

20  addresses that they saw multiple times.  So he wanted them to

21  stop doing that, because he did want his administrator to be

22  able to get in, and his administrator had been blocked.  And

23  then the second one is that he has somebody who is helping him

24  with the sites, and that he is available to chat with them.

25  Q    Did you contact Black Lotus to see if you could get

DUNN – Direct (by Mr. Barbosa)

1   records from them?

2   A    Yes.

3   Q    Showing you what's been marked as Exhibit 15.4, do you

4   recognize that?

5   A    Yes.

6   Q    How do you recognize this exhibit, which is four pages

7   long?

8   A    These are records that have been provided by Black Lotus.

9        MR. BARBOSA:  The government's offering 15.4 under a

10  902 certification.

11       THE COURT:  Counsel, you had a conversation with

12  defense counsel.  I didn't hear it.  I'm not sure if the court

13  reporter heard it.

14       MR. BARBOSA:  Sorry.  Government is offering 15.4

15  under a Rule 902 certification.

16       THE COURT:  Let me hear from the defense.

17       MS. SCANLAN:  Your Honor, if I may just take a look

18  at it, briefly?

19       THE COURT:  You may.

20     If you'd like to stand and stretch?

21     Please be seated.

22       MS. SCANLAN:  The defense has no objection to this

23  exhibit.

24       THE COURT:  15.4 is admitted.

25              (Exhibit 15.4 was admitted)

DUNN – Direct (by Mr. Barbosa)

1   BY MR. BARBOSA

2   Q    Okay.  Turning to Page 2 of Exhibit 15.4, what do these

3   records reflect in terms of the services that Black Lotus was

4   providing for the rubensamvelich account?

5   A    That they had Black Lotus, their elite proxy, for the

6   domain track2.tv, and that it had a dedicated Black Lotus IP

7   address.

8   Q    Between these three sets of records related to DDoS

9   protection, why were these important to you in your search

10  through the rubensamvelich account?

11  A    It showed that his infrastructure was under constant

12  attack.  It provided information related to where the servers

13  that hosted the sites were also physically located.  It also

14  provided information on his true identity, through the phone

15  number that was associated, as well as other methods of

16  payment.

17  Q    Turning to Page 3 of the exhibit, you mentioned methods of

18  payment.

19       What method of payments did you see here?

20  A    Liberty Reserve.

21  Q    And what was the importance of Liberty Reserve or the

22  WebMoney reference to your investigation?

23  A    It just gave us another investigative track that we could

24  follow from the perspective of those specific accounts.  It

25  also showed that he was using payment methods that are commonly

DUNN – Direct (by Mr. Barbosa)

1    associated with the underground economy.

2    Q    Turning to Page 4 of Exhibit 15.4, what name did the

3    rubensamvelich account user use when dealing with Black Lotus?

4    A    Roman Ivanov.

5    Q    And the phone number, was that anywhere near the phone

6    number you had seen before?

7    A    Yes.

8    Q    What -- how far off was it?

9    A    It was off by just one digit.  I think the last is a "2,"

10   instead of a "5."

11   Q    So when dealing with all three of these DDoS protection

12   services related to the track2 domains, we see that

13   rubensamvelich was using the name Roman Ivanov.

14              MS. SCANLAN:  Objection.  Leading.

15              THE COURT:  It is leading, Counsel.

16   BY MR. BARBOSA

17   Q    Did you attempt to follow up on the name Roman Ivanov?

18   A    Yes.

19   Q    Any other names that you attempted to follow up on?

20   A    Roman Seleznev.

21   Q    How did you go about trying to follow up on those names?

22   A    We looked for Western Union records related to those

23   names.

24   Q    Why did you ask Western Union to provide you with records?

25   A    Number one, from bulbacc we knew that Western Union was a

DUNN – Direct (by Mr. Barbosa)

1   method of payment that he was willing to accept.  It's very

2   commonly known —— commonly used payment mechanism to transfer

3   monies around the globe.  Secret Service had a relationship

4   with Western Union for obtaining those records.

5   Q    What did you ask Western Union to provide you with?

6   A    All records and transfers related to those two names,

7   Roman Ivanov and Roman Seleznev.

8   Q    Did you include any other names that had come up in your

9   investigation?

10  A    Liudmila Bochkareva.  I can't pronounce it.

11  Q    Okay.  We'll try and get some spelling for the court

12  reporter later.

13       I'm showing you what's been marked as Government's

14  Exhibit 15.2.

15       Do you recognize this exhibit?  It's six pages long.

16  A    Yes.

17  Q    How do you recognize that?

18  A    These are records that were provided by Western Union.

19            MR. BARBOSA:  Government offers Exhibit 15.2 under a

20  902 certification.

21            MS. SCANLAN:  No objection.

22            THE COURT:  15.2 is admitted.

23                 (Exhibit 15.2 was admitted)

24  BY MR. BARBOSA

25  Q    So we now have this on the screen in front of us.  There's

DUNN - Direct (by Mr. Barbosa)

1    quite a few names.

2         What format did Western Union provide this record in?

3    A    It was an Excel spreadsheet.

4    Q    And what kind of information did they provide?

5    A    The date that the wire transfers were sent, the payee

6    name, the city, the amount, the payee's date of birth, the

7    payee's identification number, the ID place of issue, the date

8    of issue, expiration, telephone number.

9    Q    Did -- how many pages of data was this?

10   A    Six.

11   Q    What were you looking for in these six pages of

12   Western Union records that you obtained?

13   A    Anything that linked back -- linked those names to

14   anything else in the rest of our case.

15   Q    Okay.  Were you looking for specific connections to the

16   rubensamvelich account?

17   A    Rubensamvelich account, the phone numbers that we'd seen,

18   the names that we'd seen, geographical locations that we had

19   seen.

20   Q    Did you find any links between entries for Roman Ivanov

21   names and the other items that you had looked at?

22   A    No.

23   Q    Did you find any links between any of the names and the

24   rubensamvelich account?

25   A    Yes.

DUNN – Direct (by Mr. Barbosa)

1   Q    What kind of links?

2   A    We found links between the name "Roman Seleznev" and the

3   phone number that we had seen.

4   Q    Turning your attention to Exhibit 15.2A, do you recognize

5   this?

6   A    Yes.

7   Q    How do you recognize that?

8   A    This is a summary of the four transfers with the payee

9   name "Roman Seleznev" that were related to the case.

10  Q    So is this a summary, or is this just the data taken out

11  of that larger spread --

12  A    It's just the data taken out of the larger spreadsheet.

13           MR. BARBOSA:  Government offers Exhibit 15.2A.

14           THE COURT:  Any objection?

15           MS. SCANLAN:  Is it offered for demonstrative

16  purposes?

17           MR. BARBOSA:  No.  This is a substantive exhibit.

18           MS. SCANLAN:  I would object to this as a substantive

19  exhibit.

20           THE COURT:  Counsel, let me ask the government, if

21  15.2A is extracted from 15.2, isn't that cumulative?

22           MR. BARBOSA:  Well, we can look at 15.2, but we'll

23  have to go through one line at a time, through six pages of

24  data.

25           THE COURT:  For the four entries?

DUNN – Direct (by Mr. Barbosa)

1              MR. BARBOSA:  Yeah.

2              THE COURT:  All right.  Are you offering it as

3     cumulative [sic]?

4              MR. BARBOSA:  I believe it's substantive evidence,

5     because it is the exact same data, so it's not actually a

6     summary.  It's just only the entries for that particular name.

7     It could, I guess, technically be considered a summary in the

8     terms of it does offer the data in a more easy-to-review

9     format.

10             THE COURT:  All right.  Counsel, if you want to offer

11    it as an illustrative or demonstrative exhibit, I'll permit it

12    under those grounds.  Otherwise, it's overruled.  But I will

13    permit you to use 15.2A as a demonstrative exhibit, so it will

14    not be going back to the jury room.

15    BY MR. BARBOSA

16    Q    So are these lines, these four lines that we see in 15.2A,

17    are they in the larger exhibit, 15.2?

18    A    Yes.

19    Q    You just need to thumb through each of the pages to find

20    these?

21    A    That's correct.

22    Q    Okay.  So what was the commonality you found between these

23    four "Roman Seleznev" entries and other records you'd seen in

24    your investigation?

25    A    Primarily the name, as well as the telephone number

DUNN – Direct (by Mr. Barbosa)

1    associated with the account.  And then the pay agent city

2    linked back to some IP addresses that we had seen, as well.

3    Q    Did all four of these entries contain a similar ID number?

4    A    Yes.

5    Q    Okay.  What -- in total, what data is excerpted in 15.2A,

6    the demonstrative?

7    A    So we have the date that the transfers were sent, the

8    payee's name, the pay agent city, the recording amount in

9    currency, the payee's date of birth for one of the entries, the

10   ID type, the ID number, the place of issue, the issue date, and

11   the expiration date for the ID, and then one also has a phone

12   number.

13   Q    I'll see if I can focus in on this.  Bear with me for a

14   minute.

15        Bringing up what's been previously admitted as

16   Exhibit 12.7A, Page 21.  And let me know if you can't see that.

17   I can bring these up individually, but I have 15.2A on the

18   left.

19        Is that the same ID number as found in the passport seized

20   from Mr. Seleznev at the time of his arrest?

21   A    Yes, it is.

22   Q    And does it also have an expiration date, or an issue

23   date, in some instances, for the passport?

24   A    In one instance, it does have that, yes, for the issue

25   date.  It has expiration for all of them.

DUNN – Direct (by Mr. Barbosa)

1    Q    And did those match the passports seized from the

2    defendant?

3    A    Yes.

4    Q    Again, the phone number, what did that match you'd seen

5    elsewhere?

6    A    It matched the records from the rubensamvelich e-mail

7    account, specifically, that had been provided to some of the

8    DDoS providers, as well as the PayPal records.

9    Q    Moving back to the e-mails you found in the rubensamvelich

10   account, did you find any other instances of the "smaus" or

11   "ochko" username or password combinations in that account?

12   A    Yes.

13   Q    You have, in the binder in front of you, Exhibits 6.7,

14   6.8, and 6.8A.  Can you tell me if you recognize those?

15   A    You said 6.7 through 6.8?

16   Q    6.7 through 6.8A.

17   A    Yes.  Yes, I recognize these.

18   Q    Let's start with 6.7.  I'll go through this individually.

19        6.7 is approximately 20 pages long.  What is the nature --

20   without going into the specifics, what is the nature of the

21   e-mails that are included in Exhibit 6.7?

22   A    The registration information and communications between

23   rubensamvelich@yahoo.com and approvedinvest.com.

24   Q    And there's 20 pages to that.  I'd like you to go through

25   these.

DUNN – Direct (by Mr. Barbosa)

1      Are there similar -- again, without going into the

2   specifics of what they are, I'd like to know the nature of

3   these e-mails.  What type of e-mails are they?

4   A    The first one includes a login and password.  The second

5   one includes a statement about the username for the account

6   holder.  The third one, again, includes the account holder

7   username.  The fourth one is an automatic e-mail to --

8   regarding a recent transaction attempt and includes a username.

9   Q    Are several of these automatic e-mails?

10  A    Yeah.  The majority of the ones towards the back are all

11  automatic, state, "This is an automatic e-mail to inform you."

12  Q    Based on the nature of the e-mails and the content, do

13  they appear to be machine generated?

14  A    All except for the bottom half of this Page 2.

15            MS. SCANLAN:  Your Honor, if I may just show

16  government counsel my copy, I just want to make sure we're

17  looking at the same thing.

18            THE COURT:  Certainly.

19      Members of the jury, if you'd like to stretch, please feel

20  free to do so.

21      Ready, Counsel?

22            MS. SCANLAN:  Yes, Your Honor.

23            THE COURT:  All right.  Are we on the same page of

24  the same exhibit, Counsel?

25            MS. SCANLAN:  We are on the same page of the same

DUNN – Direct (by Mr. Barbosa)

1   exhibit, Your Honor.  I'm objecting to 6.7.  These -- the

2   e-mail --

3          THE COURT:  Just to be clear, 6.7, which particular

4   pages?  Because the witness has testified that some portions

5   are automatically or machine generated.  So I want to be very

6   specific and precise.

7          MS. SCANLAN:  Yes, Your Honor.  We are not objecting

8   to the first page, which is just labeled "6.7," otherwise known

9   as "Yahoo! 1373."

10          THE COURT:  Okay.

11          MS. SCANLAN:  We are objecting to the second portion

12   of Page 2 of 6.7, which is the second e-mail.  There's a "from"

13   e-mail, and then there's one below it.  We're objecting to the

14   one below it.

15          THE COURT:  Can you tell me where it begins, Counsel?

16   You don't have to read the whole thing.

17          MS. SCANLAN:  Yes, Your Honor.  From "invest at

18   approvedinvest.com."

19          THE COURT:  Okay.  I'm with you.

20          MS. SCANLAN:  To Page 4, the entirety of Page 4,

21   hearsay objection.  And I would note, it's not the same company

22   as what's on Page 1 of 6.7.  Same objection for 6.7, Page 6.

23   This is also a different company than was on the first page.

24   Page 8, same objection.

25      Page 10, Page 12, Page 14, Page 15 is a third "from," so

DUNN – Direct (by Mr. Barbosa)

1  this is -- there are now three different senders of e-mails.  I

2  would also object to the relevance of Page 15 for the top of

3  it, subject matter.

4      Page 16 is another e-mail from an unidentified business

5  that's not the same as the prior pages.  Same objection to

6  Page 17.  Page 18 is the same objection, Page 19 and Page 20.

7          THE COURT:  Counsel for the government?

8          MR. BARBOSA:  Your Honor, we're offering these only

9  for the username and password indicated in here, which is a

10  statement of party opponent.  As the witness has already

11  explained, these are user generated, and then the receipt is

12  bounced back to them from the company with which he's -- the

13  user is dealing with.

14      To the extent exhibits in 6.7 have party opponent

15  statements, they come in under that, as not hearsay.  The

16  remainder of these e-mails are not at all -- the content of

17  them is completely irrelevant and not offered for the truth of

18  the matter asserted.  The only thing of import is the username

19  that repeatedly shows up in the account.

20          MS. SCANLAN:  Your Honor, I would object, also, that

21  a number of these, Page 20, Page 17 --

22          THE COURT:  Counsel, why don't we excuse the jury so

23  that we can get this exhibit clarified, and not have a running

24  speaking objection between the two parties.

25      Members of the jury, I'm going to have you go back to the

 1    jury room so we can get this resolved.

 2                    (Jury exits the courtroom)

 3              THE COURT:  Any objection to the witness remaining?

 4              MS. SCANLAN:  No, Your Honor.

 5              THE COURT:  All right, Counsel.  Part of the concern

 6    I have, counsel for the government, is that there are several

 7    of these, as counsel has pointed out, without going back and

 8    saying individually, that they're all from different companies.

 9    And I don't know that the witness has gone as far to say that

10    all the ones that were objected to were all machine generated,

11    because some of these appear to come from -- well, they do

12    appear to be from different companies.  And I don't know that

13    he's testified with sufficient foundation to establish that

14    he's familiar with these particular companies to be able to

15    identify that that would lead him to the conclusion, based upon

16    training and experience, that these are machine generated.

17              MR. BARBOSA:  We could go through each one.  This

18    should have probably been subject to a motion in limine before

19    the deadline.  Counsel has had these since February of this

20    year.

21         But the government can offer testimony on each exhibit,

22    individually.  I believe this witness is qualified to testify

23    based on the content and appearance of these exhibits.  This is

24    something that comes in under Rule 104, and the government's

25    burden here is only to show authenticity, which is less than a

DUNN – Direct (by Mr. Barbosa)

1   preponderance.  We have to show what it purports to be.  And

2   that can be done without reference to the rules of evidence.

3        We can definitely go through these.  Many of them actually

4   indicate that they are automatically generated.  I'm trying to

5   find one, in particular, right now.

6             THE COURT:  Well, for example, "08" says, "This is an

7   automatic e-mail."

8             MR. BARBOSA:  Exactly.  Almost all of them have this,

9   for example, Page 4, "This is an automatic e-mail."

10            THE COURT:  All right.  Counsel for the defense?

11            MS. SCANLAN:  Your Honor, I would ask, unfortunately,

12   that if they're lumped together like this, that these -- this

13   is not one exhibit.  These are all separate individual things.

14       And so, for instance, like, Page 17, the defense has an

15   objection to the content of this e-mail being admitted.

16   Whether it's for the truth or not, it's prejudicial to

17   Mr. Seleznev.

18            THE COURT:  How is it prejudicial, Counsel?

19            MS. SCANLAN:  It's an e-mail from LivePimpin to

20   rubensamvelich, who they are saying is the party opponent.  And

21   if you look at the e-mail address of the verification process

22   that's copied in and the information that e-mail address -- I

23   don't see the relevance of that to -- if this is really all

24   about usernames and passwords, then the rest of this

25   information isn't necessary to the government's case.

DUNN – Direct (by Mr. Barbosa)

1          THE COURT:  Counsel?

2          MR. BARBOSA:  I don't really have a problem with

3     redacting some of this information out.  I think that the

4     prejudice to the defendant, in a case where he's charged with

5     stealing $170 million, is pretty minimal.  But if that is -- if

6     the Court thinks that would be appropriate, I don't believe we

7     have any objection to excluding the e-mail address for the

8     sender.

9          THE COURT:  Okay.  I think that's appropriate,

10    Counsel.  Because again, part of what the government's

11    characterizing, as well, is lifestyle.  And there are certain

12    exhibits that come before the Court that show the defendant in

13    various positions, various countries, volumes of money,

14    currency in his possession.  And I think the characterization

15    of a website such as LivePimpin and then the website that says

16    www.fucktheprincess.com is certainly potentially prejudicial to

17    the defendant.  It's not a question of the degree of prejudice.

18    It's a question of prejudicial information.  I find that that

19    would be substantially more prejudicial than probative.  So the

20    Court will sustain the objection in that regard.

21        So the document can come in, but you need to make certain

22    redactions, Counsel.

23          MS. SCANLAN:  And Your Honor, the defense has the

24    same objection to Page 15 regarding the content.

25          THE COURT:  Just a second.  Let me catch up with you.

DUNN – Direct (by Mr. Barbosa)

1      All right.  Counsel, the specific objection to what
2  portion?
3          MS. SCANLAN:  Page 15 is from the "adult community."
4  And then it's talking about performances, quote, "If you want
5  to see something a little more hardcore, you can enter XXX chat
6  with the performers.  The XXX chat is billed at a premium rate
7  that is determined by each performer."
8          THE COURT:  All right.  Counsel for the government,
9  any other basis to have that admissible?
10          MR. BARBOSA:  No.
11          THE COURT:  All right.  Then the Court will direct
12  that you redact that portion, as well.  And again, we're
13  talking about a specific line that says "adult community," and
14  we're talking about the specific line that begins, "If you want
15  to see something a little bit more hardcore"; so it's just
16  those two lines, as well as the "adult community" reference.
17      Counsel for the defense, any other specifics?
18      Also, Counsel, let's strike "adult community," which is
19  the last line on that same page.
20          MS. SCANLAN:  Page 16, is from CamBooth.com.  It has
21  the same line, "If you want to see something a little more
22  hardcore, you can enter XXX chat with the performers.  The XXX
23  chat is billed at a premium rate that is determined by each
24  performer."
25          THE COURT:  Counsel, I can accept your argument as it

DUNN – Direct (by Mr. Barbosa)

1    relates to "something a little more hardcore."  But "CamBooth"

2    is such an innocuous term, I don't find that that's anywhere

3    close to something like "LivePimpin," or the other references

4    that were noted.

5        So I'll direct the government to redact the same line that

6    begins, "If you want to see something a little more hardcore."

7    But other than that, I don't see anything else that warrants

8    the degree of prejudice that you've claimed.

9        Any other specific pages, Counsel?

10            MS. SCANLAN:  Your Honor, Page 20.

11            THE COURT:  Did we cover 17?

12            MS. SCANLAN:  Yes.  That's the "LivePimpin" page.

13            THE COURT:  Okay.  All right.  Then that one's -- the

14    Court's directed the redactions on that one.

15        And then 20?

16            MS. SCANLAN:  "If you're craving a more intimate

17    encounter, that's our specialty.  Our video stars are" --

18            THE COURT:  What paragraph, Counsel?

19            MS. SCANLAN:  I'm sorry, Your Honor.  It's

20    paragraph -- well, after the usernames, it's one, two, three,

21    four, five.

22            THE COURT:  Okay.

23            MS. SCANLAN:  So, "If you're craving a more intimate

24    encounter, that's our specialty.  Our video stars are here to

25    please and perhaps tease you.  Check out who's live right now."

DUNN – Direct (by Mr. Barbosa)

1   I do think that the average reader is going to understand what
2   that is about in the context of this e-mail.
3        And the same objection as to the pictures at the bottom of
4   the e-mail, which include -- I believe that's a woman's breast,
5   through a keyhole.
6                THE COURT:  Okay.
7                MS. SCANLAN:  And with the exception of the automated
8   e-mails, the ones that say that they're automated, I renew our
9   hearsay objection regarding the rest of them.
10               THE COURT:  On 20, the Court will direct the
11  government to make the redaction, "Do you desire some more
12  intense imagery?" those two lines.  The next one, "If you're
13  craving a more intimate encounter," the Court will direct the
14  government to -- actually, Counsel, I'm not sure of the
15  relevance of the bottom portion of that.  Everything below,
16  "Enjoy some of our exclusive features below," a live cam spy,
17  and the photographs, as well as the keyhole imagery, that
18  should be redacted, as well.
19               MR. BARBOSA:  How about we just redact everything
20  below, "Why wait?  Login now"?  That may be the safest.
21               THE COURT:  Okay.  That's easier.  That's fine with
22  the Court.
23       All right.  I think the Court's ruled on all the defense
24  objections.
25       And counsel for the defense, if you're aware of any other

DUNN - Direct (by Mr. Barbosa)

1    objections like this -- because I agree with the government.

2    These types of redactions, the offering -- you've had these

3    exhibits for a period of time -- could have been done sometime

4    before, so we don't have to have these delays during the course

5    of trial to address these particular objections.  I'm not

6    saying they're not valid objections, but these are things that

7    we shouldn't be wrestling with in front of the jury for

8    protracted periods of time.

9         So if you have any more, with counsel letting you know

10   which witnesses are going to testify, you can look at these

11   exhibits over the evening hours to make sure that you can bring

12   it to the Court's attention at the beginning of the day, so

13   that we don't have to have interruptions during trial to

14   address this.

15        So counsel for the government, if you want to go through

16   these exhibits with the jury present, you'll have the

17   opportunity to do so.  For those that there are no objection

18   which the Court sustained, you can show those images or have

19   the witness testify to them.  But for those that require

20   redaction, since you don't have to do the redactions right now,

21   just show those portions which the Court has permitted; okay?

22             MR. BARBOSA:  I do want to make sure that -- we have

23   about 20 minutes.  I just want to make sure nothing else that

24   we are about to try and admit will require additional issues.

25             6.8A, I don't believe that has anything problematic.

DUNN – Direct (by Mr. Barbosa)

1          MS. SCANLAN:  No.  And Your Honor, if the government

2    could identify the exhibits it intends to admit the following

3    day, then I will go through them in advance.

4          THE COURT:  Well, I'll leave that to the parties,

5    after we break for the day, to do that.  But I think, Counsel,

6    that would help speed it up for the government, as well.

7          MR. BARBOSA:  The next ones are the iTunes receipts,

8    6.6.

9          MR. BROWNE:  What was that one?  I'm sorry.

10         MR. BARBOSA:  6.6.  6.17 is the next exhibit after

11   that.  And --

12         THE COURT:  Counsel, we're not recording this.  So if

13   you two want to have a conversation about what you're going to

14   be offering, that's fine.  But the court reporter is instructed

15   not to record those communications.

16                        (Off the record)

17         THE COURT:  Counsel, have you gone through the

18   balance of the exhibits that you plan on offering for, say, the

19   next 15 minutes?

20         MR. BARBOSA:  I think I've gotten through the rest of

21   the day here.

22         THE COURT:  Counsel for the defense, do you have any

23   particular objections that we can deal with now?

24         MS. SCANLAN:  Did you just take that piece out of the

25   iTunes charges?

DUNN – Direct (by Mr. Barbosa)

1           MR. BARBOSA:  Yes.

2           MS. SCANLAN:  No, I don't have any objection.

3           THE COURT:  Okay.  Let's bring in the jury.

4                    (Jury enters the courtroom)

5           THE COURT:  Thank you, members of the jury.  We've

6    gone through the exhibits that will be offered for the balance

7    of the day, so we shouldn't have any additional interruptions.

8    Thank you.

9           MR. BARBOSA:  Thank you.

10   BY MR. BARBOSA

11   Q    Detective Dunn, we were talking about Exhibit 6.7.

12          MR. BARBOSA:  The government now offers 6.7 with the

13   conditions as we just went over.

14          THE COURT:  All right.  Any objections now, Counsel?

15          MS. SCANLAN:  Your Honor, I understand the Court's

16   ruling, but we still object on the hearsay basis.

17          THE COURT:  Overruled on those grounds.  Otherwise,

18   6.7 is admitted, subject to the Court's rulings.

19                    (Exhibit 6.7 was admitted)

20   BY MR. BARBOSA

21   Q    Detective Dunn, can you explain -- this is 20 pages of

22   e-mails.  What did you -- why did you select these 20 e-mails

23   to highlight as exhibits?

24   A    These were e-mails that were sent to the

25   rubensamvelich@yahoo.com, from various providers of internet

DUNN – Direct (by Mr. Barbosa)

1    websites, and they all contained a similar login name and

2    password.

3    Q    Why did that get your attention?

4    A    People tend to become creatures of habit when it comes to

5    usernames and passwords.  So it, again, linked those usernames

6    and passwords to the user.

7    Q    So starting with Page 1, what was this username and

8    password that you began to focus on?

9    A    The login was "smaus1" and password of "ochko123."

10   Q    Page 2, do you see that again?

11   A    Yes.

12   Q    Can you just read these in as we go through?

13   A    "My username is smaus1."

14   Q    Page 3?

15   A    Username smaus1.

16   Q    And that's from the user of the account to --

17   A    That's from the user of the account to approvedinvest.com.

18   Q    Page 3?

19   A    This is an automatic e-mail from help@lalibcosupport.com,

20   with a username of smaus123.

21   Q    Page 6?

22   A    This is another e-mail from lalibcosupport to username

23   smaus123.

24   Q    Page 7?

25   A    Again, one from lalibcosupport to username of smaus321.

DUNN – Direct (by Mr. Barbosa)

1    Q    Page 10?

2    A    Another one from that same e-mail address to a username

3    smaus321.

4    Q    Twelve?

5    A    Another one from lalibcosupport.com to username smaus321.

6    Q    Looks like you had at least one more from lalibcosupport.

7         Moving on to Page 15, what is this?

8    A    This is from another provider, wcbilling.com.  The

9    username is smaus1234, the password of ochko123.

10   Q    Page 16?

11   A    Another one from webcams.com to username smaus123,

12   password of ochko123.

13   Q    Page 17?

14   A    From another e-mail account to rubensamvelich, with the

15   username of smaus123 and a password of ochko123.

16   Q    Eighteen?

17   A    Another one from support@InsidePro.com with a username of

18   ruben123 and a password of ochko123.

19   Q    Nineteen?

20   A    One from info@ -- I can't read the whole e-mail address --

21   but a username of zagreb123235 with a password of ochko123.

22   Q    And finally, the last one?

23   A    Is an e-mail from iFriendsV2 support with an assigned

24   username of alabus1 with a password of ochko123.

25   Q    Did you look for these username and password combinations,

DUNN - Direct (by Mr. Barbosa)

1    including the few that we saw that were slight variations,

2    "ruben" and "zagreb," at other points in your investigation?

3    A    Yes.

4    Q    Did you find them anywhere else as you conducted your

5    investigation?

6    A    Yes.

7    Q    Where?

8    A    The username "smaus" was used extensively throughout the

9    infrastructure.  So the server hosting the malware had a domain

10   name of smaus.fvds.ru.  The "smaus" name showed up repeatedly

11   throughout the investigation, as well as the "ochko123"

12   password.

13   Q    Did you also find receipts for iTunes purchases in the

14   rubensamvelich account?

15   A    Yes.

16   Q    Showing you what's been marked as Government's

17   Exhibit 6.6, which is three pages long, do you recognize that?

18   A    Yes.

19   Q    How do you recognize those?

20   A    These are iTunes receipts that were in the

21   rubensamvelich@yahoo.com account.

22   Q    And are these automated receipts, based on the content?

23   A    Yes.

24   Q    How do you know?

25   A    All iTunes receipts are automated.

DUNN – Direct (by Mr. Barbosa)

```
1              MR. BARBOSA:  Government offers 6.6.

2              MS. SCANLAN:  No objection.

3              THE COURT:  6.6 is admitted.

4                    (Exhibit 6.6 was admitted)

5    BY MR. BARBOSA

6    Q    Why did you focus on these iTunes receipts?

7    A    For a number of reasons.  Apple would have records related

8    to the device -- potentially have records related to the device

9    that the user had.  They were U.S.-based accounts that were

10   used to make these purchases, as well as the specific apps

11   could provide some context as to the user and their behavior.

12   Q    I've highlighted the first page.

13        What were the purchases that you focused on here?

14   A    The purchase I most focused on was "Tupac Greatest Hits."

15   Q    Was that a focus during the original investigation, in

16   2010?

17   A    No.

18   Q    When did that come up?

19   A    That came up after Mr. Seleznev's arrest.

20   Q    Turning to the second page, anything in here that you

21   focused on?

22   A    The Item Number 2 and 3, the Luxe Bali City Guides mobile

23   edition and the Bali Traveler applications.

24   Q    Why did these draw your attention?

25   A    We had a number of indications of travel to Bali, as well
```

DUNN – Direct (by Mr. Barbosa)

1    as IP addresses that returned to the Denpasar, Bali, Indonesia

2    area.

3    Q    Was that also something showing up in the Western Union

4    records?

5    A    Yes.

6    Q    When you say IP addresses that return to the Denpasar,

7    Indonesia, area, what do you mean?

8    A    So we found IP addresses both from the rubensamvelich

9    e-mail account, as well as IP addresses located within the

10   HopOne server that resolved back to Indonesia.

11   Q    And when you say "located within the HopOne server," what

12   do you mean?  By logging in or --

13   A    There were logins, yes.

14   Q    And is that the server in the lower right-hand corner of

15   the Exhibit 17.7?

16   A    That's correct.

17   Q    These are addressed to Anna Chamot.  Who is that?

18   A    She's an elderly woman who lives in the Washington, D.C.

19   area.

20   Q    And finally, Page 3 of this exhibit, the iTunes receipts

21   in the rubensamvelich account, anything in here that you

22   focused on?

23   A    The voice changer applications, Fake-a-Call, and the

24   translation applications.

25   Q    I'm going to show you Exhibit 6.17.  Do you recognize

DUNN – Direct (by Mr. Barbosa)

1   this, which is one page?

2   A    Yes.

3   Q    Did you find that, also, in the rubensamvelich account?

4   A    Yes.

5   Q    And was this an automated e-mail, also?

6   A    Yes.

7           MR. BARBOSA:  Government offers Exhibit 6.17.

8           MS. SCANLAN:  No objection.

9           THE COURT:  It's admitted.

10                   (Exhibit 6.17 was admitted)

11   BY MR. BARBOSA

12   Q    What was the subject of this e-mail?

13   A    "Review of your order required, multi-password recovery,

14   share-it! Order Number 348102785."

15   Q    Based on your training and experience, do you know what

16   the multi-password recovery tool is?

17   A    Yes.  It's a tool for trying to recover passwords.

18   Q    Switching gears a little bit, you described domain

19   registration records.

20           Did you find anything in the e-mail accounts, related to

21   the domain registration records, that had drawn your attention

22   to the rubensamvelich account?

23   A    Yes.

24   Q    What did you find?

25   A    The receipts for the registration of –– registration of a

DUNN – Direct (by Mr. Barbosa)

1   number of different web domains associated with the nic
2   "track2."
3   Q    Can you look, in the binders in front of you, at
4   Exhibits 6.9 through 6.10A?
5   A    Okay.
6   Q    Do you recognize those?
7   A    Yes.
8   Q    What's the nature of those exhibits in 6.9 through 6.10A?
9   A    It's the account creation for WebNames.ru, which is a
10  Russian-based domain name registrar, as well as for the
11  registration of a number of domain names.
12  Q    And were those all in the rubensamvelich account?
13  A    Yes.
14          MR. BARBOSA:  Government offers Exhibits 6.9 through
15  6.10A.
16          MS. SCANLAN:  No objection.
17          THE COURT:  They're all admitted.
18           (Exhibits 6.9 through 6.10A were admitted)
19  BY MR. BARBOSA
20  Q    All right.  Let's first look at Exhibit 6.9A, which is the
21  translation of the original in 6.9.
22       When was this dated?
23  A    September 10, 2009.
24  Q    Did that match up with the domain registration records you
25  reviewed earlier?

DUNN – Direct (by Mr. Barbosa)

1    A    Yes.

2    Q    So what was this for?

3    A    For the domain registration to track2.tv.

4    Q    Is that what I've highlighted here?

5    A    Yes.

6    Q    So did this confirm that this account was being used to

7    manage the domain?

8    A    Yes.

9    Q    Moving on to 6.10A, what do we have here?

10   A    So this is for the registration to the actual WebNames.ru

11   portal.  So this is to gain access to their portal to then

12   register names, so with a login of track2 and password of

13   smaus123.

14   Q    What is WebNames.ru?

15   A    So WebNames.ru is a Russian-based domain name registrar,

16   so a company that can register domain names.

17   Q    And do you recognize the login or password here?

18   A    Yes.

19   Q    What are they?

20   A    Track2 and smaus123.

21   Q    Moving on to the second page of Exhibit 6.10A, what is

22   this e-mail here?

23   A    It's for the domain registration for track2.name.

24   Q    Is that one of the alternate websites that you had

25   referred to?

DUNN - Direct (by Mr. Barbosa)

1   A    Yes.

2   Q    And if you move on to Exhibit 6.14, do you recognize this

3   exhibit, which is just one page?

4   A    Yes.

5   Q    And there's the translation, 6.14A.

6        How do you recognize this?

7   A    This is in an e-mail from HostTracker showing the daily

8   statistics for the website track2.tv.

9            MR. BARBOSA:  Government offers Exhibits 6.14 and

10  6.14A.

11           MS. SCANLAN:  No objection.

12           THE COURT:  They're both admitted.

13               (Exhibits 6.14 and 6.14A were admitted)

14  BY MR. BARBOSA

15  Q    What is this e-mail about?

16  A    This shows that the overall up-time, or availability, for

17  the website track2.tv was 99.9 percent, meaning that throughout

18  the previous 24-hour period, the site was pretty much up the

19  entire time and available to customers.

20  Q    And based on your training and experience, what is the

21  purpose of a HostTracker report?  Why would somebody want

22  something like this?

23  A    It's so that a website owner can ensure and validate that

24  his site is available to clients.  So if you saw something

25  under 99.9 percent, then there may be an issue with your web

DUNN – Direct (by Mr. Barbosa)

1   hoster, or a DDoS attack, or something else going on.

2   Q    And had you seen indication that these sites were under

3   DDoS attack?

4   A    Yes.

5        MR. BARBOSA:  Your Honor, I'm about to move into a

6   new section.  I don't know if the Court wants me to keep going

7   right now?  I'm happy to.

8        THE COURT:  We'll break at this time.

9   Members of the jury, have a good evening.  Again, same

10  instructions that you received yesterday about not reading

11  anything, same goals and objectives to keep your mind free of

12  all taint of outside influences.

13  So have a great evening.  The weather straightened out.

14  It's about 80-plus degrees.  We'll see you all tomorrow morning

15  at 9:00 a.m.  Have a good evening.

16                  (Jury exits the courtroom)

17       THE COURT:  Counsel for the government, anything to

18  take up?

19       MR. BARBOSA:  No, Your Honor.  Thank you.

20       THE COURT:  Counsel for the defense?

21       MS. SCANLAN:  No, Your Honor.

22       THE COURT:  Have a good evening.  See you all

23  tomorrow morning at 9:00.

24                  (Adjourned)

25

1                    (End of requested transcript)

2                         *    *    *

3          I certify that the foregoing is a correct transcript from

4     the record of proceedings in the above matter.

5

6     Date:  8/16/16                    /s/ Andrea Ramirez

7                                       _____

8                                       Signature of Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25