1                    UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF WASHINGTON

3    ─────────────────────────────────────────────────────────

     UNITED STATES OF AMERICA,      )
4                                   )
                 Plaintiff,         )   No. 2:11-cr-00070-RAJ
5                                   )
                                    )
6          vs.                      )   Seattle, WA
                                    )
7    ROMAN V. SELEZNEV,             )
                                    )   Jury Trial, Day 4
8                Defendant.         )   August 18, 2016

9    ─────────────────────────────────────────────────────────

10               VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE JUDGE RICHARD A. JONES
11                 UNITED STATES DISTRICT COURT

     ─────────────────────────────────────────────────────────
12

13   APPEARANCES:

14   FOR THE PLAINTIFF:    NORMAN McINTOSH BARBOSA
                           U.S. Attorney's Office
15                         700 Stewart Street, Suite 5220
                           Seattle, WA 98101-1271
16                         norman.barbosa@usdoj.gov

17                         C. SETH WILKINSON
                           U.S. Attorney's Office
18                         700 Stewart Street, Suite 5220
                           Seattle, WA 98101-1271
19                         seth.wilkinson@usdoj.gov

20                         HAROLD W. CHUN
                           U.S. Department of Justice
21                         1301 New York Avenue NW, Suite 600
                           Washington, DC 20005
22                         harold.chun@usdoj.gov

23

24

25

```
 1   FOR THE DEFENDANT:    JOHN HENRY BROWNE
                           Law Office of John Henry Browne
 2                         108 South Washington Street, Suite 200
                           Seattle, WA 98104
 3                         johnhenry@jhblawyer.com

 4                         EMMA SCANLAN
                           Law Office of John Henry Browne
 5                         108 South Washington Street, Suite 200
                           Seattle, WA 98104
 6                         emma@jhblawyer.com

 7


 8
     Andrea Ramirez, CRR, RPR
 9   Official Court Reporter
     United States District Court
10   Western District of Washington
     700 Stewart Street, Suite 17205
11   Seattle, WA 98101
     andrea_ramirez@wawd.uscourts.gov
12
     Reported by stenotype, transcribed by computer
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         I N D E X

 2                                                    Page No.

 3   Witness:  JOHN SZYDLIK
         Direct Examination by Mr. Chun                687
 4       Voir Dire Examination by Ms. Scanlan          709
         Direct Examination by Mr. Chun                720
 5       Voir Dire Examination by Ms. Scanlan          753
         Direct Examination by Mr. Chun                755
 6       Cross Examination by Ms. Scanlan              771
         Redirect Examination by Mr. Chun              783
 7
     Witness:  DAVID MILLS
 8       Direct Examination by Mr. Barbosa             787
         Voir Dire Examination by Mr. Browne           855
 9       Direct Examination by Mr. Barbosa             856
         Cross Examination by Mr. Browne               861
10       Redirect Examination by Mr. Barbosa           881
         Voir Dire Examination by Mr. Browne           889
11       Redirect Examination by Mr. Barbosa           890
         Re-Cross Examination by Mr. Browne            893
12       Redirect Examination by Mr. Barbosa           897

13   Witness:  MICHAEL FISCHLIN
         Direct Examination by Mr. Wilkinson           898
14

15

16                       E X H I B I T S

17   Exhibit 9.1                                       720

18   Exhibit 9.2                                       720

19   Exhibit 9.3                                       720

20   Exhibit 9.4                                       720

21   Exhibit 9.5                                       720

22   Exhibit 9.7                                       720

23   Exhibit 9.8                                       720

24   Exhibit 9.9                                       720

25   Exhibit 9.12                                      722
```

| | | |
|---|---|---|
| 1 | Exhibit 9.14 | 722 |
| 2 | Exhibit 9.15 | 722 |
| 3 | Exhibit 9.17 | 722 |
| 4 | Exhibit 9.19 | 722 |
| 5 | Exhibit 9.21 | 722 |
| 6 | Exhibit 9.23 | 722 |
| 7 | Exhibit 9.25 | 722 |
| 8 | Exhibit 9.11 | 723 |
| 9 | Exhibit 9.10 | 730 |
| 10 | Exhibit 9.20 | 750 |
| 11 | Exhibit 10.1, Pages 1-10 | 760 |
| 12 | Exhibit 10.2 | 760 |
| 13 | Exhibit 10.8 | 760 |
| 14 | Exhibit 10.3 | 776 |
| 15 | Exhibit 13.40 | 827 |
| 16 | Exhibit 13.1 | 840 |
| 17 | Exhibit 13.1A | 840 |
| 18 | Exhibit 13.2 | 841 |
| 19 | Exhibit 13.2A | 841 |
| 20 | Exhibit 13.3 | 842 |
| 21 | Exhibit 13.3A | 842 |
| 22 | Exhibit 13.4 | 844 |
| 23 | Exhibit 13.4A | 844 |
| 24 | Exhibit 13.5 | 845 |
| 25 | Exhibit 13.5A | 845 |

1   Exhibit 13.9                                    850

2   Exhibit 13.10                                   856

3   Exhibit 13.10A                                  856

4   Exhibit 13.11                                   858

5   Exhibit 13.11A                                  858

6   Exhibit 13.47                                   890

7   Exhibit 13.33                                   907

8   Exhibit 16.13, Pages 1 and 2                    755

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA vs. Seleznev, 8/18/16

1        THE CLERK:  We are resuming our jury trial in the

2    matter of the United States vs. Roman Seleznev, Cause

3    Number CR11-70, assigned to this court.

4        THE COURT:  Good morning, Counsel.

5      Something to take up?

6        MS. SCANLAN:  I just simply wanted to make the Court

7    aware regarding the first witness today.

8        THE COURT:  And that is?

9        MS. SCANLAN:  Agent Szydlik.

10       THE COURT:  Okay.

11       MS. SCANLAN:  The documents that he's introducing

12   from Liberty Reserve, there is not a 902 certification for

13   those, because they were servers from outside the country that

14   were seized in a separate investigation and taken into the

15   custody of the Secret Service.

16     So as I understand it, the government's plan is to lay the

17   foundation for all of these exhibits with the jury here and the

18   witness on the stand.  I simply wanted to point out that that's

19   the current plan, and that they haven't already been

20   authenticated, because I think there's going to be some issues

21   during the testimony.

22       THE COURT:  All right.  Are there issues that we need

23   to address before he comes on the stand?

24       MS. SCANLAN:  I don't think that I can, because I'm

25   not exactly sure what he's going to say to authenticate the

USA vs. Seleznev, 8/18/16

1   exhibits.  I've talked to the government as much as possible.

2   They did give me an exhibit list last night.  And I've asked

3   them general questions about what is in the exhibits, so we've

4   gotten that far, how they were created.  But I don't really

5   know what he's going to say in terms of the authentication

6   piece.

7            THE COURT:  I'll treat this as a heads-up, then.

8            MS. SCANLAN:  Thank you, Your Honor.

9            THE COURT:  Anything to take up, from the government?

10           MR. BARBOSA:  No, Your Honor.  Thank you.

11           THE COURT:  Let's bring the jury in.

12       And will Agent Szydlik be the first witness?

13           MR. BARBOSA:  Yes.

14                (Jury enters the courtroom)

15           THE COURT:  Counsel for the government, call your

16   next witness.

17           MR. CHUN:  The United States calls Secret Service

18   Agent John Szydlik.

19           THE CLERK:  Please raise your right hand.

20       JOHN SZYDLIK, having been duly sworn, was examined and

21   testified as follows:

22           THE CLERK:  If you could please state your first and

23   last names, and spell your last name.

24           THE WITNESS:  John Szydlik.  Last name is spelled

25   S-Z-Y-D-L-I-K.

SZYDLIK – Direct (by Mr. Chun)

```
1                THE COURT:  You may inquire.
2                     DIRECT EXAMINATION
3   BY MR. CHUN
4   Q    Good morning, Agent Szydlik.
5   A    Good morning.
6   Q    How are you employed?
7   A    I'm a special agent with the United States Secret Service.
8   Q    And how long have you been with the Secret Service?
9   A    Since December 2007.
10  Q    And what is your current role with the Secret Service?
11  A    I'm a criminal investigator in our cyber intelligence
12  section.
13  Q    And how long have you been there?
14  A    Coming up on three years now.
15  Q    And where were you stationed before that?
16  A    Syracuse, New York.
17  Q    What was your role there?
18  A    I was an Electronic Crimes Task Force investigator.
19  Q    And can you explain what type of work you did as -- at
20  your Syracuse office?
21  A    So in Syracuse, I was a member of the Electronic Crimes
22  Task Force with members of local law enforcement.  We
23  investigated a variety of crimes that affected either financial
24  infrastructure, or other crimes involving electronic angles or
25  aspects.
```

SZYDLIK – Direct (by Mr. Chun)

1   Q    And what are your current duties in your office now?

2   A    So currently, I investigate cybercrime for our agency,

3   which kind of focuses on major cybercrimes, as well as

4   obtaining and -- obtaining cybercrime intelligence.

5   Q    And what did you do before joining the Secret Service?

6   A    Prior to joining the Secret Service, I was a captain in

7   the United States Army, military police.

8   Q    Now, in becoming a Secret Service agent, what training

9   have you received?

10  A    So all agents go through what's called the Special Agent

11  Training Course and the Criminal Investigator Training Program,

12  CITP, which is in FLETC, in Glynco, Georgia.  It's a DHS-led

13  program, a Department of Homeland Security-led program.  And

14  then SATC is our Secret Service introductory course at our

15  academy in Maryland.

16  Q    And what types of things do you learn at both those

17  trainings?

18  A    The CITP program certifies us to be basic criminal

19  investigators, teaches you legal aspects of federal

20  investigations, as well as the kind of techniques, tactics, and

21  procedures to conduct those.

22       And then the Secret Service Academy, we focus primarily on

23  the investigations under the jurisdiction of the Secret

24  Service, as well as protection for our protectees.

25  Q    Now, you've mentioned that you were both on the Electronic

SZYDLIK - Direct (by Mr. Chun)

1   Crimes Task Force, as well as in the Cyber Section now.

2        Have you received any specialized training for those

3   current roles?

4   A    I have.  So we have a basic investigations for computer

5   crimes program that most Secret Service agents take.  After

6   that, I received a network intrusion response agent training

7   course.  I've had a network intrusion point-of-sale course,

8   which is hacking incidents tailored towards computer networks

9   that process credit card data.

10  Q    Have you received any training on money laundering cases?

11  A    So as far as specific training in our academy, yes.

12  Q    And do you receive on-the-job training, as well?

13  A    I do.

14  Q    And what types of trainings are those?

15  A    So we attend cyber conferences.  We attend workshops with

16  other agencies that investigate crime.  We have virtual --

17  VTCs, video training courses, and other things kind of

18  routinely.

19  Q    And do you actually conduct any trainings or speaking

20  engagements yourself?

21  A    Yes.  So I'm an instructor for our -- for cybercrime

22  investigations for both our basic agents coming through our

23  SATC course; and then for our more advanced network intrusion

24  response courses, I teach cybercrime investigations to them, as

25  well.

SZYDLIK – Direct (by Mr. Chun)

1   Q    Do you do any speaking engagements outside of the

2   government?

3   A    Yes.  I attend, you know, several conferences, usually

4   annually, where I speak on cybercrime investigations on behalf

5   of the Secret Service.  So the National Chief of Police

6   Conference, the Association of Financial Crimes Investigators,

7   and kind of, like, other bank meetings, I've talked at

8   frequently.

9   Q    And how often are you conducting these trainings?

10  A    Probably once or twice a month.

11  Q    Now, what type of cases do Secret Service agents focus on?

12  A    So our specified jurisdiction are crimes that affect the

13  financial infrastructure, to include counterfeiting, crimes

14  involving electronic wires or transfers with the electronic

15  payment system.

16  Q    Would that include banks?

17  A    Yes.

18  Q    Credit unions?

19  A    Yes.

20  Q    Online banking systems?

21  A    Yes.

22  Q    And through your experience with these investigations,

23  have you become familiar with how the banking system works?

24  A    Yes.

25  Q    How about the online banking system?

SZYDLIK – Direct (by Mr. Chun)

1    A    Yes.

2    Q    And are you aware, when individuals conduct login activity

3    onto online bank accounts, whether those logins are captured by

4    banks?

5    A    Yes, I am, and they are.

6    Q    How are those captured?

7    A    So when you interact with a banking website, the banking

8    website automatically captures a variety of login details.  And

9    the details which are captured are usually specific to what's

10   set up by that bank.  But generally, it's IP addresses and

11   other kinds of information.

12   Q    Would it also record the date and time?

13   A    Yes.

14   Q    Now, are those done by a computer or person?

15   A    Computer.

16   Q    And similarly, are you aware how online transactions are

17   obtained?

18   A    Yes.

19   Q    And how are those recorded?

20   A    Again, those are automatic.  When a transaction is created

21   by the user or through some other process, it's automatically

22   logged.

23   Q    How are you -- how do you know this?  How do you know

24   these things are logged automatically?

25   A    So from, I guess, experience, as well as prior

SZYDLIK - Direct (by Mr. Chun)

1  investigations into, you know, crimes affecting these kind of

2  wire transfers.

3  Q    When you talk about prior experience, have you worked

4  directly with banks?

5  A    Yes.  I've worked a number of investigations where

6  victims' accounts have been taken over, fraudulently accessed,

7  and wires have been effected from their account to some other

8  location.  And part of the routine of that investigation is to

9  review the logs and review transaction logs, or review IP logs

10  and review the transaction logs.

11  Q    Now, are you familiar with what Liberty Reserve is?

12  A    I am.

13  Q    What is it?

14  A    Liberty Reserve is a e-currency system that was around

15  from 2007 to 2013.

16  Q    How are you familiar with it?

17  A    I'm familiar with it because the Secret Service, in part,

18  had a criminal investigation into the service, as well as our

19  review of records obtained from Liberty Reserve.

20  Q    And why were you looking at Liberty Reserve, specifically?

21  A    So the Secret Service was investigating for money

22  laundering and other kind of base crimes.  And then I've looked

23  at it for my own investigations, as well as to provide

24  assistance to other law enforcement agents who are

25  investigating crimes.

SZYDLIK – Direct (by Mr. Chun)

1   Q    Was Liberty Reserve popular with cyber criminals?

2   A    It was.

3   Q    Why?

4   A    Well, for a variety of reasons.  Liberty Reserve was

5   popular because it was kind of, like, an internet-based

6   currency, so you could effect transactions with anybody around

7   the world.  Also, Liberty Reserve was popular for money

8   laundering and other kind of illicit transactions, because

9   there was really no regulating authority that was responsible

10  for overseeing it, and there were no records kept on its

11  customers, kind of allowing, I guess, members of the underworld

12  to effect transactions with little or no oversight.

13  Q    Did it operate much like a traditional bank?

14  A    Very much so, yes.

15  Q    I guess something akin to PayPal?

16  A    Correct.

17  Q    An online bank?

18  A    Yes.

19  Q    Do you know what country it was based in?

20  A    It was located in Costa Rica.

21  Q    And is it still operating?

22  A    No, it's not.

23  Q    Why not?

24  A    In 2013, U.S. -- or, well, government agents of several

25  governments effected a seizure of the Liberty Reserve

SZYDLIK – Direct (by Mr. Chun)

1    infrastructure and arrest of its primary operators.

2    Q    Was the Secret Service involved in that investigation?

3    A    It was.

4    Q    Specifically, was the group you work for now, CIS, part of

5    that investigation?

6    A    It was.

7    Q    And did Liberty Reserve keep records as part of their

8    business?

9    A    They did.

10   Q    And did the Secret Service obtain a copy of those records?

11   A    We did.

12   Q    How did the Secret Service obtain a copy of those records?

13   A    So in 2013, pursuant to a mutual legal assistant request

14   to Costa Rica, Costa Rican authorities seized the servers used

15   to run Liberty Reserve.

16   Q    Was U.S. law enforcement present during the seizure?

17   A    They were.

18   Q    And have you received the seized Liberty Reserve records?

19   A    I have.

20   Q    And what type of data do those records contain?

21   A    So generally, there were approximately 5.5 million user

22   accounts associated with Liberty Reserve, and totaling around,

23   I think, $8 billion in transactions.  Those records included

24   registration information for individual users, as well as

25   transaction history, and then also kind of, like, IP records or

SZYDLIK – Direct (by Mr. Chun)

1   IP logs for individual customers.

2   Q    And did those all record dates and times, as well?

3   A    They did.

4   Q    Now, while Liberty Reserve was operational, did you ever

5   use it?

6   A    I did.

7   Q    Why?

8   A    In an undercover investigation where I was purchasing

9   stolen credit cards from a target I was investigating.

10  Q    Could you explain how you go about registering for an

11  account, or how you went about registering for an account at

12  Liberty Reserve?

13  A    So you just go to Liberty Reserve -- or I just went to the

14  Liberty Reserve website and opened an account on there.

15  Q    And what type of information did you have to enter to open

16  an account?

17  A    They wanted basic account details, like, your name,

18  address, occupation, phone number, e-mail address, and a couple

19  other kind of, like, details.

20  Q    So they asked for your name?

21  A    Yes.

22  Q    Did you have to input a real name?

23  A    No.  I mean, there was no verification.

24  Q    Did you have to enter your address?

25  A    Yes.

SZYDLIK – Direct (by Mr. Chun)

1  Q    And was there a verification system for that?

2  A    No.

3  Q    What about your date of birth?

4  A    Yes.

5  Q    And was there a verification system for that?

6  A    No.

7  Q    Did it ask you for your occupation?

8  A    Yes.

9  Q    And did it verify that in any way?

10 A    No.

11 Q    How about e-mail, did it ask for an e-mail address?

12 A    Yes.

13 Q    And did that matter if that was real?

14 A    Yes, because there was some automated e-mails that would

15 be sent to the e-mail account you list, to include the initial

16 registration e-mail.

17 Q    And so when you say "initial registration e-mail," what do

18 you mean?

19 A    So when you create the account, you receive an automated

20 e-mail basically telling you that -- the next steps you have to

21 do to fully activate your account.

22 Q    Did it ask for a phone number?

23 A    It did.

24 Q    Did that have to be real?

25 A    No.

SZYDLIK - Direct (by Mr. Chun)

1    Q    Did it ask you a recovery question?

2    A    Yes.

3    Q    What is a recovery question?

4    A    So if you become locked out of your account, the recovery

5    question is kind of, like, something that you can use to talk

6    to the administrators of the site to get access back to your

7    account.

8    Q    And did it ask for your display text?

9    A    Yes.

10   Q    And what is a "display text"?

11   A    So it's kind of, like, an anti-phishing technique, or

12   scamming technique, where Liberty Reserve asks you the display

13   text.  When you go onto your account, or log into your account,

14   you would see that display text, and you would know that you're

15   logging into the legitimate Liberty Reserve site versus, you

16   know, some other kind of made-up site just to steal your

17   credentials or information.

18   Q    And all of this data we just talked about, your name,

19   address, date of birth and so on, who entered that information?

20   A    I did.

21   Q    So you, the user?

22   A    Yes.

23   Q    Now, upon registering an account, did you receive any

24   notification back?

25   A    I received an automated e-mail to the e-mail I gave them.

SZYDLIK – Direct (by Mr. Chun)

1   Q    How do you know it was automated?

2   A    Because it happened instantaneously with me registering.

3   It possessed other kind of, like, basic characteristics of

4   automated e-mails, like, "noreply," kind of,

5   @libertyreserve.com.

6   Q    So you register for an account.  How do you load money

7   onto a Liberty Reserve account?

8   A    So to load money onto a Liberty Reserve account, you had

9   to find and use, basically, a third-party exchange service.

10  And an exchange service is -- there are several of them online

11  and throughout the world.  But they convert one form of

12  currency to another.  So specifically, you could send this

13  exchange service a wire, Western Union, a MoneyGram payment, or

14  some other thing, and they would convert that to Liberty

15  Reserve and credit your account with it.

16  Q    So you went through a third party?

17  A    Yes.

18  Q    And did you ever load money into your account?

19  A    I did.

20  Q    And did you then ever make purchases with your account?

21  A    Yes, I did.

22  Q    And when you made purchases, were there any records of

23  those transactions?

24  A    Yes.  So Liberty Reserve retained records of the

25  transactions.

SZYDLIK – Direct (by Mr. Chun)

1   Q    As a user, could you see your own transactions in your

2   account?

3   A    Yes, I could.

4   Q    And did you ever look at your transactions?

5   A    I did.

6   Q    And were you able to review whether those transactions

7   were correct or incorrect?

8   A    Yes, they were accurate.

9   Q    And how quickly would those transactions show up in your

10  account?

11  A    Immediately.

12  Q    And based on that, does that tell you whether they are

13  automatic or done by a person?

14  A    Automatic.

15  Q    Now, after obtaining Liberty Reserve records, did you

16  check the details of your own account?

17  A    I did.

18  Q    Did you check it for accuracy?

19  A    Yes.

20  Q    Did you check your registration information?

21  A    I did.

22  Q    Your login dates and times?

23  A    Yes.

24  Q    The IP address that you used?

25  A    Yes.

SZYDLIK - Direct (by Mr. Chun)

1    Q    The dates and times of your transactions?

2    A    Yes.

3    Q    The account numbers involved in those transactions?

4    A    Yes.

5    Q    The transactions themselves?

6    A    Yes.

7    Q    And did you check the amounts, as well?

8    A    Yes.

9    Q    For transactions, were you able to leave comments with

10   your transactions?

11   A    So there was an option to enter a text in the memo field,

12   whenever you conducted a transaction.

13   Q    What would the memo be?  What was that for?

14   A    So it could be -- a field could be entered in the memo --

15   or a text could be entered in the memo field for a variety of

16   reasons.  Sometimes the user would just put their name or what

17   their -- so generally, the person receiving the funds, they're

18   only going to see the user account number and display name.

19   And that may not match completely with what they know that

20   person to be, or who they know that person to be.  So sometimes

21   you'll see in the memo they'll put their real name or what that

22   person would know them by, as well as comments on what the

23   payment's for.  Sometimes there's automated -- or a certain

24   code that would be entered if it was to gain access to a

25   particular website or service.

SZYDLIK – Direct (by Mr. Chun)

1    Q    And so you checked all of these details of your

2    transactions and records?

3    A    Yes.

4    Q    Were they accurate?

5    A    They were.

6    Q    Did you ever verify other accounts?

7    A    I did.

8    Q    What other types of accounts?

9    A    So I verified other agents' undercover accounts.  I've

10   verified cooperating defendants' accounts.  And I've verified

11   other targets of investigations' accounts.

12   Q    Now, specifically, to other law enforcement accounts, how

13   did you verify those?

14   A    So I look at the records, and I would compare that to --

15   with the investigator, and they would say it's correct or not.

16   Q    And were they correct?

17   A    Yes.

18   Q    You just mentioned cooperating defendants.

19        How would you verify the accounts for cooperating

20   defendants?

21   A    So through the process of the investigation, we'd identify

22   Liberty Reserve accounts of defendants.  And afterwards, once

23   we -- for whatever reason, we interviewed the defendant, and

24   they were cooperating, gave us information about their account,

25   they would verify the information and who they were conducting

SZYDLIK - Direct (by Mr. Chun)

1   transactions with.

2   Q    And were your verifications accurate?

3   A    They were.

4   Q    Did you ever check the records against ongoing

5   investigations?

6   A    I did.

7   Q    How would you go about doing that?

8   A    So several different ways.  During investigations, we'll

9   obtain records, what -- sometimes e-mail content, records from

10  illicit services, or other locations, and we can verify those

11  against the Liberty Reserve accounts.  So, for instance, if we

12  had -- several occasions we've obtained content from e-mail

13  accounts.  And in there, we'll see automated generated Liberty

14  Reserve e-mails, or we will see criminals conducting

15  transactions using Liberty Reserve, and those would match with

16  the actual Liberty Reserve records.  We've seen people purchase

17  services online, whether they're separate crime forums or

18  purchasing credit card data or something to that effect, and

19  those records would match with Liberty Reserve records that we

20  obtained from the database.

21  Q    You say "match."  So were these records accurate?

22  A    Yes.

23  Q    Now, showing you Exhibit -- previously admitted

24  Exhibit 6.19, do you see a Liberty Reserve account on there?

25  A    Yes.

SZYDLIK - Direct (by Mr. Chun)

1   Q    Would you please read that into the record?

2   A    It's U9614915.

3   Q    And did you check to see if that account existed?

4   A    I did.

5   Q    Does it?

6   A    Yes.

7   Q    And showing you what's been previously marked as 6.15,

8   another e-mail from the rubensamvelich account, do you see a

9   Liberty Reserve account listed there?

10  A    Yes.  It's U0045772.

11  Q    And did you verify whether that account exists?

12  A    I did.

13  Q    Did you also verify whether or not it was the same e-mail

14  that was associated with that account?

15  A    I did, and it was.

16  Q    And did the date of the e-mail correspond with the

17  database, or the records?

18  A    It did.

19  Q    Now, 6.15 is actually several pages.

20       Going to Page 2, could you please explain what you see

21  here?

22  A    So this is an auto-generated Liberty Reserve e-mail

23  account sent to the rubensamvelich@yahoo.com account.  And as

24  kind of, like, an anti-fraud detection measure, Liberty Reserve

25  basically automatically determined that the account was being

1   accessed from a different location than it normally was.  And

2   here it lists the, IP 66.36.240.69.  And the country location

3   in the United States is the different kind of location.  And

4   to -- as, like, an anti-fraud kind of verification technique,

5   it sends this e-mail to the account and says, you know, if this

6   is actually your login, then verify it with this PIN number

7   that they provided.

8   Q    Now, did you check the Liberty Reserve records to see if

9   there was a record of this e-mail being sent?

10  A    Yes.

11  Q    Did you check the date of the e-mail?

12  A    Yes.

13  Q    What else did you verify on this e-mail?

14  A    So the IP address matched the records, as well as the

15  verification PIN.

16  Q    So you found all of that in the Liberty Reserve records?

17  A    Yes.

18  Q    Going to the next page, Page 3, showing you a similar

19  e-mail, did you also check this e-mail?

20  A    Yes.

21  Q    And what did you find?

22  A    Same -- a match for date, the e-mail address, the IP

23  address, which is 66.36.240.69.  And the verification PIN

24  matched.

25  Q    And what about the next page?

SZYDLIK - Direct (by Mr. Chun)

```
1    A      Likewise, same date from the Liberty Reserve records.  The
2    e-mail address was in the Liberty Reserve records.  The IP
3    address, 66.235.184 --
4          MS. SCANLAN:  Your Honor, I object at this point.
5    The witness is testifying based on records that at this point
6    are essentially hearsay.
7          THE COURT:  The records have been admitted, Counsel.
8          MS. SCANLAN:  It's not my understanding that those
9    records have been admitted.  This exhibit has been admitted,
10   Your Honor -- I'm being unclear -- but the actual records he's
11   testifying about are not admitted, currently.
12         THE COURT:  All right.  Well, the witness is
13   permitted to testify about the document or exhibits that have
14   been received in evidence at 6.15.
15      So Counsel, are your questions as to the records that are
16   associated with this exhibit?
17         MR. CHUN:  Yes, Your Honor.  I'm just asking -- I'm
18   laying foundation of the accuracy of the records, the Liberty
19   Reserve records.
20         THE COURT:  All right.
21         MS. SCANLAN:  I'm sorry, Your Honor.  The records
22   that they're speaking of are not the records in or associated
23   with this exhibit.  It's an entirely different set of exhibits
24   that have not yet been offered.
25         THE COURT:  All right.  We're going for foundation at
```

SZYDLIK – Direct (by Mr. Chun)

1   this point in time, Counsel.  So at this time, the objection is

2   overruled.  You may certainly offer it once again, once those

3   records are offered, if they, in fact, are offered.

4        Please proceed.

5            MR. CHUN:  Thank you, Your Honor.

6   BY MR. CHUN

7   Q    Page 5 and Page 6 would be the next two pages.

8        Did you check those, as well?

9   A    Yes.

10  Q    And what did you find?

11  A    The records matched with the date, e-mail address, IP

12  address, 66.36.240.69, as well as the verification PIN.

13  Q    Okay.  And why do you use the Liberty Reserve records now?

14  A    So it's a great criminal investigations tool.  We've seen,

15  time and time again, that people involved in cybercrime use

16  Liberty Reserve, and we can kind of trace the funds and who

17  they were interacting with by making payments to -- by

18  reviewing the records.

19  Q    How often are you using or querying the records for

20  Liberty Reserve?

21  A    Pretty much every day when I'm in the office.

22  Q    And for about how long now?

23  A    I've been in my role for three years, so approximately --

24  approximately three years, so right around then, that long.

25  Q    So how many times would you say you've queried the

SZYDLIK - Direct (by Mr. Chun)

1   database, or the Liberty Reserve database?

2   A    I've probably reviewed over thousands of Liberty Reserve

3   records.

4   Q    And about how many different accounts have you looked at?

5   A    Again, probably over a thousand.

6   Q    Have you ran any queries where you had results that you

7   came up -- that you believe were inaccurate?

8   A    No, I haven't.  I've never seen any that are -- that I

9   knew were inaccurate or they appeared inaccurate.

10  Q    Did Liberty Reserve have an interest to keep accurate and

11  timely records?

12  A    It's -- yeah.  It's basically the underpinning of all

13  these financial or e-commerce systems, is people have to trust

14  the accuracy of the transactions and the records.  Otherwise,

15  they won't use the service.

16  Q    And do other Secret Service agents come to you when they

17  have questions about Liberty Reserve records?

18  A    Yes.

19  Q    Are you one of the U.S. Secret Service's custodians for

20  these Liberty Reserve records?

21  A    Yes.

22  Q    Now, in regards to this case, did you review records for

23  accounts tied to Defendant Roman Seleznev?

24  A    I did.

25  Q    How did you go about doing that?

SZYDLIK – Direct (by Mr. Chun)

1   A    So our Seattle agents provided me with several of the

2   e-mail addresses, Liberty Reserve account numbers, that came up

3   in the investigation.  I queried those.  And then also from

4   querying those, I was able to identify other Liberty Reserve

5   accounts which appeared connected.

6   Q    And how many accounts did you find?

7   A    Eight.

8   Q    And in regards to the eight accounts, what type of

9   information did you find?

10  A    So we had the registration records, IP logs, and

11  transaction records for all of those accounts.

12  Q    Showing you what's been marked as Exhibit 9.1 through 9.5,

13  as well as 9.7 through 9.9 --

14          MR. BROWNE:  What was the first one?  I've got it.

15          MR. CHUN:  9.1 would be the first one.

16          MR. BROWNE:  Thank you.

17  BY MR. CHUN

18  Q    Have you looked at those?

19  A    Yes.

20  Q    Do you recognize them?

21  A    I do.

22  Q    What are they?

23  A    They are the registration records for the eight accounts I

24  found.

25  Q    Did you pull these records yourself?

SZYDLIK – Voir Dire (by Ms. Scanlan)

1   A     I did.

2   Q     And are they an accurate copy of the records you pulled

3   from the Liberty Reserve records?

4   A     They are.

5           MR. CHUN:  Your Honor, the United States moves to

6   admit Exhibits 9.1 through 9.5, and 9.7 through 9.9.

7           THE COURT:  Any objection?

8           MS. SCANLAN:  May I inquire?

9           THE COURT:  You may.

10                    VOIR DIRE EXAMINATION

11  BY MS. SCANLAN

12  Q     Good morning.

13  A     Good morning.

14  Q     Were you present when the servers were seized in Costa

15  Rica?

16  A     No.

17  Q     Exactly how many Liberty Reserve account records have you

18  verified?

19  A     I couldn't give you an exact number but -- I'm trying to

20  think.  I would probably say close to a hundred now.

21  Q     Have you interviewed or interacted with the people who

22  kept these records in the course of this business?

23  A     No.

24  Q     You indicate in your testimony that one of the reasons

25  cyber criminals like Liberty Reserve is because there was no

1    customer records.

2         What do you mean by that?

3    A    So, I mean, one of the things is, you don't have to

4    supply, like, your accurate passport, Social Security number,

5    or any other, like, your customer records, that banks

6    traditionally collect.

7    Q    So these are records that were seized by a different

8    government; correct?

9    A    Correct.

10   Q    Given to someone else in the United States government.

11   A    Yes.

12   Q    And then given to you.

13   A    Yes.

14   Q    And now you have them --

15   A    Yes.

16   Q    -- obviously.

17        Okay.  But you really can't say anything, from your

18   firsthand knowledge, about how those records were stored by the

19   Liberty Reserve people, or how they verified it internally

20   during the time they were making the records; is that correct?

21   A    That's correct.

22             MS. SCANLAN:  I would object to the foundation for

23   these exhibits, Your Honor.

24             THE COURT:  Counsel for the government?

25             MR. CHUN:  Your Honor, I believe the witness has

1    testified in full about how he's verified these records and

2    used these records over the past three years.  He's run

3    thousands of queries over thousands of accounts.  He's also had

4    an undercover account, which he has tested.  He has looked at

5    other people's accounts, including cooperating defendants and

6    other law enforcement.  He's aware of those.

7         Additionally, these records, to begin with, Your Honor,

8    are machine generated, and therefore are not hearsay.

9              THE COURT:  And Counsel, which particular hearsay

10   exception are you applying?

11             MR. CHUN:  For 9.1 through 9.9, skipping 9.6, we'd

12   actually be admitting these, Your Honor, as party opponent

13   statements.  These are the registration logs.  And they would

14   be machine generated, as well.

15             THE COURT:  Anything further?

16             MS. SCANLAN:  Yes, Your Honor.  I don't think that --

17             THE COURT:  Let's excuse the jury.

18        Members of the jury, we'll have you go out.

19                  (Jury exits the courtroom)

20             THE COURT:  Any objection to the witness remaining on

21   the --

22             MS. SCANLAN:  No, Your Honor.

23             THE COURT:  All right.  Ms. Scanlan?

24             MS. SCANLAN:  Your Honor, I don't think this witness

25   or Mr. Chun are qualified to say, at this point, that this

1    record is machine generated.  They haven't interviewed the

2    people who have created this record, they don't know who they

3    are, they haven't talked to them.  So they can make that

4    assumption, but they don't actually have firsthand knowledge of

5    that as a fact.

6        The other problem is that having these admitted as an

7    admission of a party opponent, at this point, is highly

8    problematic.  The witness has testified that you can enter

9    whatever information you want, and it's not verified.  So you

10   can just type in your name, whatever you want to put in there,

11   and get your Liberty Reserve account.  So that doesn't really

12   shore up the idea that these are admissions of a party

13   opponent.

14       And we also don't know, because Liberty Reserve people

15   aren't here, we have no idea if for these particular records

16   this information, 9.1, skipping 9.6, through 9.9, that this

17   information was entered by a user where and at what time.  We

18   can guess that information from the agent's experience with the

19   records after the fact, but that doesn't authenticate the

20   foundation for the records, these records, as they are here

21   now.  He can't authenticate these records because later on he

22   matched a different set of records to somebody else's account.

23           THE COURT:  When you say "later on," what are you

24   referring to, Counsel?

25           MS. SCANLAN:  I'm referring to the witness's

1    testimony that after the records were seized by the Costa Rican

2    government and given to the U.S., he then took the records

3    later and started saying, "Okay.  This undercover agent used

4    this account number, so I'm going to go look at these records

5    and see if it matches."  That's what he was talking about.  And

6    so the idea they're using is that that authenticates, that

7    checking process for 100 accounts, authenticates these hundreds

8    of thousands of records.  And what I'm saying is that it

9    doesn't.  It's, like, a backwards process.  You've got to start

10   from the beginning.  How was the record created?

11              THE COURT:  Okay.  Counsel for the government?

12              MR. CHUN:  Your Honor, what counsel is saying is that

13   only the creator of a records system or an employee that would

14   use it would be able to lay foundation for business records or

15   records of this sort.  And we would just disagree, Your Honor.

16   We did point out, in our trial brief, an example of an agent

17   laying foundation.

18       Here, you have an agent who has used it personally and

19   then, for now years on end, used it on a regular basis,

20   verifying the accuracy, Your Honor.  We would contend that at

21   this point, Agent Szydlik actually is much more familiar with

22   how these records work than Liberty Reserve employees actually

23   were.  Because again, these are automated online banking system

24   records.  I don't see a scenario where an employee would have

25   regularly been querying accounts just to verify their accuracy,

```
 1   since they are not typing these in themselves manually, based
 2   upon how quickly responses are coming back over the internet,
 3   or logging in the IP information.  The agent has talked about
 4   his experience working with banks and how those things are
 5   tracked.  IP accounts or transaction data is all done by
 6   machines.
 7        In regards to the authentication, Your Honor, even 901(9)
 8   talks about evidence describing a person or system in showing
 9   that it produces an accurate result.  I believe we have shown
10   that through this witness.  And additionally, based on
11   authentication here, Your Honor, we're just getting to the
12   point where it is what it purports to be, that I believe we
13   have reached that.  These are records from the Liberty Reserve
14   database.
15        In regards to not having spoken to employees of Liberty
16   Reserve, I believe we can ask the witness if he is familiar
17   with that investigation and if he's read reports from those
18   investigations, and if anything there would change his mind
19   about the validity of these records.
20             THE COURT:  Ms. Scanlan, let me ask you this
21   question.  Under 901(9), specifically, it identifies that
22   authentication under this rule is established by foundational
23   evidence which describes the process or system, and which shows
24   that the process or system produces an accurate result.
25        Now, what have you shown that would indicate that the
```

1    process or system that's been described, some direct evidence

2    and some by circumstantial evidence, that's not an accurate

3    result, in terms of what the agent's testified to, to establish

4    a foundation?

5              MS. SCANLAN:  I don't know what we've shown.  I would

6    say, Your Honor, that I don't think the government has shown

7    that this system is accurate based on this witness's testimony.

8         So, for instance, the cases where an agent has

9    authenticated bank records, for instance, like, a Wells Fargo

10   investigation, that agent is on the scene at Wells Fargo,

11   interacting with the system, seeing how the records are kept,

12   and taking that information and laying a foundation for it

13   later.

14        Now, I know it's going to come up that we didn't brief

15   this, but I will say that I --

16             THE COURT:  That was my next question, counsel.  You

17   can tell by the look on my face.

18             MS. SCANLAN:  Yes, Your Honor.  I'm getting familiar

19   with it.

20        But we didn't know -- I can't tell from this what this

21   witness was going to say about these records.  And so it's very

22   hard to know -- this is why I brought it up earlier today,

23   because I didn't know how exactly he was going to connect these

24   five steps to get to him having these records.  I don't know if

25   he was there or not when they seized the servers.  I actually

1    thought he was a part of that investigation, until today.  So

2    this is kind of new information that he's about five steps

3    removed from the people -- they had Secret Service agents they

4    could have called, who were there when the server was seized,

5    who verified where the server went, who looked at the records.

6    But those people aren't here.

7            THE COURT:  Let me ask you a question, Counsel.

8        Did you interview this witness before trial?

9            MS. SCANLAN:  No.

10           THE COURT:  Have you had access to these business

11   records before trial?

12           MS. SCANLAN:  Yeah, I have the records.

13           THE COURT:  And you've known that these were Liberty

14   Reserve records; correct?

15           MS. SCANLAN:  Yes.

16           THE COURT:  And the government identified, in their

17   trial brief, an issue regarding the offering of this type of

18   evidence; is that not correct?

19           MS. SCANLAN:  They did.

20           THE COURT:  So wouldn't that have put you on notice

21   that, if you were going to challenge that, that you could have

22   either brought it up as a motion in limine, or something could

23   have been addressed pretrial, so we don't have to deal with it

24   at this point in time?

25           MS. SCANLAN:  Your Honor, I will tell you, I

considered that at the point that we were looking at this

pretrial.  But the decision that we made, rightly or wrongly,

is that we did not have enough information about what this

witness was going to say about these records.  I know the -- I

knew the records were here.  I know that he's a witness.  I

had -- I didn't know -- I was -- if we had written a brief, I

would have written a brief about him being present in Costa

Rica when the servers were seized.  But he wasn't even there.

There's a limit to the amount of information we have

pretrial.  It is not in my interest to waste this Court's time,

so I apologize if the decisions that we have made do not line

up with what the Court believes we should have done.  But to

me, they made perfect sense, considering the kind of

information we had regarding the authentication of these

records.

THE COURT:  All right.  Well, based upon the record

that's been made, Counsel, and what's been submitted by the

government, the Court's satisfied that there's been a minimal

threshold showing for the admissibility.  If you have specific

case authority that you want to present to the Court later, the

Court would reconsider this determination.  But at this point

in time, the government has established a basic foundation,

some by direct evidence, by the witness's own personal

experience, some circumstantial evidence, in terms of what he's

done by way of investigations of other informants, other

```
 1    agents, to establish circumstantially the reliability of the
 2    record.  There's been no clear indication of the absence of
 3    trustworthiness, other than the fact that it went from the
 4    Costa Rican government to the United States government, then
 5    directly to Secret Service hands.
 6         So putting all that together, Counsel, the Court believes
 7    that sufficient foundation has been established.  No sufficient
 8    basis has been established that there's a lack of
 9    trustworthiness or sufficient authentication of that.  So I'm
10    going to permit it, Counsel, but I'll certainly give you the
11    opportunity to ask for reconsideration, if you can point to
12    specific case authority, based upon the facts and circumstances
13    before this Court, that would justify exclusion of the
14    evidence.
15                   MS. SCANLAN:  Yes, Your Honor.
16                   THE COURT:  Okay.
17                   MR. CHUN:  And Your Honor, just so we don't run into
18    this again in a few minutes, the government will next move to
19    admit Exhibits 9.12 through 9.26.  Those are IP logs and then
20    transaction records.
21                   THE COURT:  And the source of those, also from
22    Liberty?
23                   MR. CHUN:  Yes, Your Honor.  Everything is from
24    Liberty Reserve.
25                   THE COURT:  Same argument going to be made, Counsel?
```

```
 1              MS. SCANLAN:  Yes, Your Honor.

 2              THE COURT:  Any variation or change?

 3              MS. SCANLAN:  There's no variation on the defense

 4   argument, that's correct, regarding the Liberty Reserve

 5   records.

 6              THE COURT:  Okay.  All right.  Then the Court will be

 7   making the same ruling on the admissibility of 9.12 through

 8   9.16.

 9              MR. CHUN:  And Your Honor, just for clarity of the

10   record, for those records, those are also machine generated,

11   based on the agent's foundation, so they would not be hearsay.

12   But even if they were hearsay, we believe we've laid a

13   sufficient foundation that Agent Szydlik has met the 803(6)

14   requirements.

15              THE COURT:  You still have to establish the

16   foundation, Counsel, as you go through the witness's testimony.

17              MR. CHUN:  I will be moving shortly, Your Honor, just

18   that he had pulled those and reviewed them to be accurate.

19              THE COURT:  He still has to testify to that, Counsel.

20              MR. CHUN:  Yes, Your Honor.

21              THE COURT:  Just out of curiosity, Counsel, so that I

22   can avoid this in the future, what look is it that the Court

23   has?  Because I've been accused of being a sphinx, at points in

24   time, where people can't tell what I'm thinking.  So I'd like

25   to get back to that point, Counsel.
```

SZYDLIK – Direct (by Mr. Chun)

```
1              MS. SCANLAN:  I don't know if I should say a single
2    word about that, Your Honor.
3              THE COURT:  Probably a wise move, Counsel.
4         Let's bring in the jury.
5                   (Jury enters the courtroom)
6              THE COURT:  Counsel for the government, please
7    proceed.
8              MR. CHUN:  Your Honor, the United States now moves to
9    admit Exhibits 9.1 through 9.5, and 9.7 through 9.9.
10             THE COURT:  Subject to the objections noted by
11   counsel and addressed by the Court in the conference outside
12   the presence of the jury, those exhibits are all admitted.
13             MR. CHUN:  Thank you, Your Honor.
14       (Exhibits 9.1 through 9.5 and 9.7 through 9.9 were admitted)
15                     DIRECT EXAMINATION
16   BY MR. CHUN
17   Q    For the eight accounts you referenced, Agent Szydlik, did
18   you also examine the IP data?
19   A    Yes, I did.
20   Q    Showing you what's been marked as 9.12, 9.14, 9.15, 9.17,
21   9.19, 9.21, 9.23, and 9.25, and I think you may need a new --
22   do you have all of those in that binder there?
23   A    No.  It just goes to 9.14.  I'm sorry, nine point --
24   Q    9.12, .14, .15, .17, .19, .21, .23, .25, at some point,
25   just the odd ones.
```

1    A    Okay.

2    Q    Have you reviewed those?

3    A    Yes.

4    Q    Do you recognize them?

5    A    I do.

6    Q    What are they?

7    A    They are the IP transaction -- or excuse me -- IP logs for

8    the eight accounts.

9    Q    And did you pull those records yourself?

10   A    I did.

11   Q    Are they an accurate copy of what was in the Liberty

12   Reserve records?

13   A    Yes.

14   Q    Now, showing you what's been marked as 9.13, .16, .18,

15   .20, .22, .24, and .26 -- and some of those are quite big.  You

16   might actually need another binder.

17   A    I don't think the even ones are in here.

18   Q    Yeah.  The even ones aren't in there.  Are they --

19          THE COURT:  I'd ask if you wanted to stretch, but I

20   think you were in there for a while, so I'm not sure you need

21   that right now.

22        Counsel, I have some missing exhibits, as well.

23          MR. CHUN:  Your Honor, at this time we'd move to

24   admit just 9.12, .14, .15, .17, .19, .21, .23, and .25.

25          THE COURT:  Those are different, Counsel.

SZYDLIK - Direct (by Mr. Chun)

1              MR. CHUN:  It was the first batch I moved to admit,
2    Your Honor.
3              MR. BROWNE:  Could you say it again, slower?
4              MR. CHUN:  Sorry.  9.12, .14, .15, .17, .19, .21,
5    .23, and .25.
6              MR. BROWNE:  Thank you.
7              THE COURT:  Same objection as previously noted by
8    defense?
9              MS. SCANLAN:  Your Honor, I believe so, as soon as I
10   can figure out which ones we're looking at.
11        Yes, Your Honor.  Same objection.
12             THE COURT:  Same ruling.  Those exhibits are
13   admitted.
14                  (Exhibits 9.12, 9.14, 9.15, 9.17, 9.19,
15                   9.21, 9.23, and 9.25 were admitted)
16   BY MR. CHUN
17   Q    Now, Agent Szydlik, did you make a summary exhibit of
18   these eight accounts?
19   A    I did.
20   Q    And showing you on the screen what's been marked as 9.11,
21   do you recognize that?
22   A    I do.
23   Q    What is it?
24   A    It is the, kind of, summary exhibit of the eight accounts
25   I created.

SZYDLIK – Direct (by Mr. Chun)

1          MR. CHUN:  Move to admit Exhibit 9.11, Your Honor.

2          THE COURT:  Any objection?

3          MS. SCANLAN:  Your Honor, I have the same objection

4    to the foundation for the records themselves.  I don't have an

5    objection to the nature of the summary exhibit.

6          THE COURT:  Objection is overruled.  9.11 is

7    admitted.

8                    (Exhibit 9.11 was admitted)

9          MR. CHUN:  Thank you, Your Honor.

10   BY MR. CHUN

11   Q    Now, since it is a little large, focusing on just the

12   first three columns, what are we looking at here?  What is the

13   summary you created?

14   A    So for the eight accounts, I took the registration

15   information, the total incoming transaction amount -- or

16   transaction amount, as well as the total sum of incoming funds.

17   And then I -- going through the IP logs, I took the -- I

18   extracted the IPs that were in common with the other eight

19   accounts, and I listed them here.

20   Q    And for the common IP logs on the bottom, what does that

21   represent?

22   A    So for any of the eight accounts, when they had IPs that

23   matched one of the other eight accounts, I would list those

24   there.

25   Q    Okay.  So how -- I see that, you know, on this 772

SZYDLIK - Direct (by Mr. Chun)

1    account, or ending in 772, the first column, it's almost all
2    the way down, but in the 915 column, the top part is blank.
3        How are these organized?
4    A    I guess to make it a little bit easier on the eyes, I
5    tried to make the matching IPs on the same row as the other
6    matching IPs.
7    Q    And then on the top part, above the IP addresses, what's
8    the information contained there?
9    A    So it's the basic registration information for the Liberty
10   Reserve accounts.  And then below that is the -- some of the
11   transaction totals.
12   Q    Okay.  So what's the e-mail address for the account ending
13   in 772?
14   A    It's rubensamvelich@yahoo.com.
15   Q    And so what does that e-mail represent?
16   A    So this is the account's -- e-mail associated with the
17   account.
18   Q    And what about the registration date?
19   A    It was registered on March 10, 2010.
20   Q    And the name and the address?
21   A    Dmitriy Melnik.
22   Q    And the phone number and birthday?
23   A    Phone number is 62 85739716781.  And the date of birth is
24   November 28, 1972.
25   Q    And earlier, you testified about account recovery

SZYDLIK - Direct (by Mr. Chun)

1   questions.

2        What is it here, for account ending in 772?

3   A    Mother's maiden name.

4   Q    And what was the answer here?

5   A    Goroshenko.

6   Q    And then earlier, again, you testified about display text.

7        Do you see it here?

8   A    Yes.  It's, "Who are you, my darling?"

9   Q    And so who entered all this information?

10  A    It would be the user, the account holder.

11  Q    And that would be true of all eight accounts?

12  A    Yes.

13  Q    And below that it says "incoming transaction account."

14       What is that?

15  A    This is for the transaction logs.  I calculated the total

16  amount of incoming transactions, and I listed it there.  And I

17  added the total amount of incoming funds and added it -- or I

18  listed it there.

19  Q    Okay.  And so for the 772 account, or ending in 772, what

20  was the incoming transaction count?

21  A    26,789.

22  Q    And how much money entered that account?

23  A    $11,085,716.64.

24  Q    And then for the 915 account, what was the transaction

25  count?

SZYDLIK – Direct (by Mr. Chun)

1   A     It was 41,893.

2   Q     And what was the amount of money for that account?

3   A     $6,801,254.45.

4   Q     Now, going back to the common login IP addresses, so I see

5   the first one matching up would be 178.177.137.183.

6         What does matching IPs tell you?

7   A     So when you have a matching IP, I think there are

8   around -- there are approximately four billion IP addresses.

9   So whenever you see a matching IP, investigatively, that tends

10  to show that the -- in this respect, that the accounts were

11  accessed from either the same machine or network.

12  Q     And is that based on your training and experience?

13  A     Yes.

14  Q     Now showing you what's been marked as 9.10, do you

15  recognize that?

16  A     Yes.

17  Q     And this is a five-page exhibit, I believe.

18        Do you recognize this?

19  A     Yes.

20  Q     What are they?

21  A     So this is -- these are screenshots of the transaction

22  records for the Liberty Reserve -- for Liberty Reserve

23  accounts.

24  Q     Do you know who created these?

25  A     I did.

SZYDLIK - Direct (by Mr. Chun)

1   Q     Are they a fair and accurate representation of the
2   screenshots you took?
3   A     Yes.
4               MR. CHUN:  Your Honor, the United States moves to
5   admit 9.10.
6               THE COURT:  Any objection?
7               MS. SCANLAN:  Your Honor, may I just ask a question
8   regarding the format of the exhibit?
9               THE COURT:  Certainly.
10              MS. SCANLAN:  The -- my inquiry is whether the
11  highlighted -- the actual highlighting itself is intended as a
12  portion of the exhibit.  It's on the paper copy.
13              MR. CHUN:  And the answer is, it is, Your Honor.
14              THE COURT:  So what's boxed in blue, is what you're
15  referring to?
16              MS. SCANLAN:  Yes, Your Honor.
17              THE COURT:  All right.
18              MS. SCANLAN:  Besides our general foundational
19  exhibit [sic], the only other objection I would have to this
20  exhibit is that I don't think that the highlighting of these
21  particular pieces of evidence is appropriate to go to the jury
22  as a substantive exhibit.
23              THE COURT:  Is there some particular reason, Counsel,
24  why a portion of the document has to be highlighted?
25              MR. CHUN:  Your Honor, I can ask the witness why he

SZYDLIK - Direct (by Mr. Chun)

1    was highlighting.

2              THE COURT:  Certainly.

3    BY MR. CHUN

4    Q    Agent Szydlik, is there a reason why you highlighted

5    portions of this exhibit, all five pages?

6    A    Yes.  So this one, I was, I guess, calling attention to

7    the specific transaction in the row.

8    Q    Without reading the details, just --

9              THE COURT:  Okay.

10   BY MR. CHUN

11   Q    And so was this screenshot to capture the highlighted

12   portion?

13   A    Yes.

14             MR. CHUN:  Your Honor, we'd move to admit.

15             THE COURT:  I guess the question I had, Counsel, did

16   he put the highlighting on there?  Because it's a document that

17   appears he generated himself; correct?

18             MR. CHUN:  Yes, Your Honor.

19             THE COURT:  Then why is there a need to have a

20   portion of it highlighted, as opposed to having the raw data

21   being available for the jury?  You can point that out to the

22   jury, but not necessarily come in as substantive evidence with

23   the highlight.

24             MR. CHUN:  Your Honor --

25             THE COURT:  I'm just not sure what -- the necessity

SZYDLIK – Direct (by Mr. Chun)

1    of going to the jury room with the highlighted portion.

2              MR. CHUN:  The screen capture, Your Honor, is with

3    the highlight.  We actually don't have these, at the moment,

4    without the highlights, because the transaction records

5    themselves are thousands of pages long.  And so he was just

6    grabbing portions.

7              MS. SCANLAN:  May I make a suggestion?

8              THE COURT:  Certainly.

9              MS. SCANLAN:  I would just suggest that perhaps we go

10   forward, and the government uses these exhibits as they are, as

11   demonstrative exhibits, and then provides another copy as

12   substantive evidence later.  He can do the screenshot that

13   doesn't have the highlighting.

14             THE COURT:  Let me ask this, how many pages of this

15   document --

16             MR. CHUN:  It's five pages long, Your Honor.

17             THE COURT:  I understand that.  But I'm trying to

18   say, how many highlighted portions?

19             MR. CHUN:  Each page has one portion, Your Honor.

20             THE COURT:  Members of the jury, the Court's going to

21   do the following.  I'm going to overrule the objection as to

22   the admissibility, but I'll instruct the jury to disregard the

23   highlighted portion.  Counsel can make reference to that to

24   assist the witness, in terms of his testimony, as an aid to the

25   witness.  But for your consideration, you can -- should

SZYDLIK - Direct (by Mr. Chun)

1   consider the document as a whole, as opposed to the

2   highlighting being substantive evidence.

3        So with that, it's overruled.  9.10 is admitted.  Please

4   continue.

5                    (Exhibit 9.10 was admitted)

6   BY MR. CHUN

7   Q    Agent Szydlik, what are we looking at in 9.10?  What is

8   this?

9   A    So specifically --

10  Q    And I'm going to focus your attention on your highlighted

11  portion.

12       Could you explain why you took this screen capture?

13  A    Okay.  So the -- it was a screenshot of the transaction

14  records for the account U0045772.  And from -- again, like,

15  that's a lot of records that came up that surpassed one page.

16  So specifically, though, this one transaction, that was just

17  focused in on, was of interest to the investigation.

18  Q    And could you explain what this -- in your training and

19  experience, what does this transaction here mean?

20  A    So this transaction was going from the -- the U0045772

21  account is the sender.  It was sending funds to what's called

22  an exchanger account, WMC, so $4,379.  And so, in essence, the

23  account was accepting $4,379 to be exchanged to some other kind

24  of currency.  And from reading the memo with the exchanger,

25  because this is similar to undercover payments I made to

SZYDLIK – Direct (by Mr. Chun)

1    exchangers, you list the --

2              MS. SCANLAN:  Objection.  Hearsay.

3              THE COURT:  Based upon what he's done?

4              MS. SCANLAN:  Yes, Your Honor.  The witness just said

5    "from reading the memo," et cetera, et cetera.

6              THE COURT:  That's sustained as to what someone else

7    told him.

8         Ask another question, Counsel, what he relied upon.

9              MR. CHUN:  I believe the memo is what he's looking at

10   on the screen, Your Honor, on the exhibit.

11   BY MR. CHUN

12   Q    Based on your training and experience, could you please

13   explain what this transaction you've highlighted is?

14   A    Okay.  So it's a payment going from the U0045772 account

15   to the exchanging account, WMC.  It's $4,379, sent on June 10,

16   2010.  And it's asking a Western Union wire to be sent to Roman

17   Seleznev, as a payee, to the country of Indonesia, in the city

18   of Denpasar.

19   Q    Turning to Page 2 of 9.10, focusing again on your

20   highlighted portion, could you explain what this is?

21   A    This is a payment from Dr. Dradd, on September 12, 2010.

22   Sixty-nine dollars is sent to this account, U0045772.  And it

23   says, "To track2," which is a card vending site.  And it says,

24   "From Kirillos."  Sorry.  That's not very visible.

25   Q    Going to Page 3 of this same exhibit, what do we see here?

SZYDLIK – Direct (by Mr. Chun)

1    A    It's a payment on August 14, 2010, from Malalbalde, to the

2    Testov account, U9614915, in the amount of $100.  And in the

3    memo text it says, "Wanna buy dumps.  Send amount to my

4    balance, bulba.cc."

5    Q    In your training and experience, what's a "dump"?

6    A    A dump is a black market term for credit card data in the

7    format it's found on the magnetic stripe of a credit card.

8    Q    Turning to Page 4, what do you see here?

9    A    Transaction on June 8, 2010, from this John Smith account

10   to the Testov account, for $70.  And the memo text says

11   "bulba.cc."

12   Q    And lastly, turning to Page 5, could you please explain

13   what we see here?

14   A    Payment on August 31, 2010, from Malalbalde to the Testov

15   account, in the amount of $400.  The memo text says, "Wanna buy

16   dumps.  I need to transfer to my balance."

17   Q    Now, in reviewing these accounts, specifically accounts

18   ending in 772 and ending in 915, in your training and

19   experience, did you draw any conclusions about these two

20   accounts?

21   A    Yes.  So both accounts had transaction logs that were

22   consistent with Liberty Reserve accounts used to accept

23   payments for card vending sites, or credit card vending sites,

24   specifically in this case track2 and bulba.cc.

25   Q    And which Liberty Reserve account was associated with

SZYDLIK – Direct (by Mr. Chun)

1    track2?

2    A    U0045772.

3    Q    And then which Liberty Reserve account was associated with

4    bulba.cc?

5    A    U9614915.

6    Q    Now, showing you what's been previously admitted as

7    Exhibit 3.31 and Exhibit 9.11, Page 2, do you see any common IP

8    addresses there?

9    A    I do.

10   Q    Which one?

11   A    115.69.219.82.

12   Q    And in your training and experience, what does that common

13   IP address mean?

14   A    It would signify that the same device, or from the same

15   network, were used to access both of these.

16   Q    And continue to look at previously admitted Exhibit 3.31,

17   which is HopOne login records, and looking at 9.11, Page 4,

18   again, do you see a common IP address there?

19   A    I do.

20   Q    And again, what would that common IP address indicate, in

21   your training and experience?

22   A    It would signify the same device or same computer network

23   was used to access both.

24   Q    And could you go ahead and read the name on that account?

25   A    This one is "Give Me Group."

SZYDLIK - Direct (by Mr. Chun)

1    Q    And the e-mail address?

2    A    E-mail address is romariogro1@mail.ru.

3    Q    And what's the name of the individual?

4    A    Roman Seleznev.

5    Q    And could you read the address, please?

6    A    Ostryakova 26 kv 113 Vladivostok, Primorye 69003.

7    Q    And what was the phone number?

8    A    495 6516588.

9    Q    Now, looking at Exhibit 6.11, Page 3, previously admitted

10   e-mail, the registration of the HopOne server, do you see an IP

11   address listed there?

12   A    Yes.

13   Q    And do you see a common IP address listed for account

14   ending in 772?

15   A    Yes.

16   Q    And what would that IP address be?

17   A    66.36.240.69.

18   Q    And comparing 6.11, Page 3, to account ending in 959, do

19   you see a common IP address there?

20   A    Yes.

21   Q    And what would that address be?

22   A    66.36.240.69.

23   Q    And leaving out 9.11 and changing it to Exhibit 6.2, which

24   is the login records for rubensamvelich@yahoo.com, do you see a

25   common IP address there?

SZYDLIK - Direct (by Mr. Chun)

1    A    I do.

2    Q    And what IP address is that?

3    A    66.36.240.69.

4    Q    Now, against those four different items, the common IP

5    addresses, in your training and experience, what does that tell

6    you?

7    A    It signifies that the same device or computer network were

8    used to access them.

9    Q    Now turning to Exhibit 6.11, previously admitted -- this

10   is Page 1 of 6.11, previously admitted e-mail from

11   rubensamvelich regarding the HopOne registration -- and

12   comparing that with Exhibit 9.17, and what is 9.17?

13   A    It's user IP history for the Liberty Reserve account,

14   U0045772.

15   Q    And do you see a common IP address there?

16   A    Yes.

17   Q    And what IP would that be?

18   A    66.235.184.36.

19   Q    And keeping 9.17 on the screen and going back to the login

20   records for the rubensamvelich account, of 6.2, do you see a

21   common IP address there again?

22   A    Yes.

23   Q    What IP address would that be?

24   A    66.235.184.36.

25   Q    And again, in your training and experience, what do these

SZYDLIK - Direct (by Mr. Chun)

1  common IP addresses tell you?

2  A    Signify that the same device or computer network was used

3  to access both accounts.

4  Q    And bringing up Page 2 of Exhibit 6.11, again, e-mail from

5  the rubensamvelich Yahoo! account registering the HopOne

6  account, and comparing it with Exhibit -- continuing on 9.17,

7  which you have previously stated is the login records for

8  account 772, do you see a common IP address here again?

9  A    Yes.

10  Q    And what address would that be?

11  A    66.36.228.124.

12  Q    Okay.  Now, keeping 9.17 up, and going back to 6.2, which

13  was the logins for the rubensamvelich account, do you see that

14  same address?

15  A    Yes.

16  Q    And where would that be?

17  A    It's the 66.36.228.124, in both.

18  Q    And now moving to Exhibit 5.2, which was the IP

19  registration login for boookscafe, comparing it to 9.17, which

20  was the IP logins for the 772 account related to the bulba

21  website, do you see similar IP address there?

22  A    Yes.

23  Q    And what would that be?

24  A    So two IPs, 209.160.72.91 and 66.36.228.124.

25  Q    And sorry.  I said -- the 772 account is linked to which

SZYDLIK - Direct (by Mr. Chun)

```
 1  website, which carding website?
 2  A     Can you zoom out?  Sorry.
 3  Q     Was that to the track2 website?
 4  A     Oh.  Yes, track2.
 5  Q     And so you have them matched there with also the
 6  rubensamvelich account, shown as 6.2, and the --
 7            MS. SCANLAN:  Objection.  Leading.
 8            THE COURT:  It is leading, Counsel.  Rephrase.
 9  BY MR. CHUN
10  Q     What do these connections across rubensamvelich,
11  boookscafe, as well as the Liberty Reserve account, tell you?
12  A     They would signify that all of the accounts were accessed
13  from the same device or computer network.
14  Q     Now, looking at the 772 account, there on 9.11, could you
15  read out the e-mail address that was registered for that
16  account?
17  A     Rubensamvelich@yahoo.com.
18  Q     And showing you what's been marked as -- previously
19  admitted as 4.5, Page 3, do you see a common e-mail address
20  there?
21  A     Yes.
22  Q     And what is that e-mail address?
23  A     Rubensamvelich@gmail.com.  Well, so the -- excuse me.  The
24  top -- or the rubensamvelich part is the same.
25  Q     And then what is Exhibit 4.5?
```

SZYDLIK – Direct (by Mr. Chun)

```
1    A    It's a domain report on track2.name.
2    Q    And continuing on, looking at Exhibit 9.17, which is the
3    IP logins for the 772 account, in comparison with the
4    rubensamvelich, 6.2, account, do you see IP addresses there
5    that are similar?
6    A    Yes.
7    Q    And how many do you see right there that are similar on
8    both sides?
9    A    Eight.
10   Q    And turning to Page 2 of that same rubensamvelich account,
11   and turning to Page 2 of 9.17, second page of logins for the
12   track2, 772, account, do you see one more highlighted there?
13   A    Yes.
14   Q    And what IP address is that?
15   A    89.149.223.210.
16   Q    And again, based on your training and experience, what do
17   all these IP addresses matching up, in both the Liberty Reserve
18   account related to track2 as well as the rubensamvelich
19   account, tell you?
20   A    It means the accounts were accessed using the same device
21   or computer network.
22   Q    Showing you what's been previously marked as Exhibit 6.15,
23   and comparing it with 9.17, Page 36, which is the IP records
24   for account 772, related to the track2 website, earlier in your
25   testimony, do you remember stating that you verified these?
```

SZYDLIK - Direct (by Mr. Chun)

1    A    Yes.

2    Q    Could you walk us through what this shows?

3    A    So the left, 9.17.036, are the IP logs for the Liberty

4    Reserve account, 20045 -- excuse me -- U00 --

5    Q    Sorry.  Showing you Page 2 of 6.15, what are we seeing

6    here?

7    A    So on Page 2 of 6.15 is a Liberty Reserve e-mail to

8    rubensamvelich@yahoo.com.  And again, it's saying that they

9    detected a different IP or login location.  And they gave the

10   different IP as 66.36.240.69, in the country of U.S.  And it

11   asked them to use this verification -- or the account holder to

12   use a verification PIN.

13   Q    And then do you see that same information in 9.17?

14   A    Yes.

15   Q    Now, going to Page 3 of 6.15, which is also another

16   verification e-mail, and going to Page 43 of 9.17, what do you

17   see here?

18   A    It's another automated Liberty Reserve e-mail to the

19   rubensamvelich@yahoo.com e-mail account.  And it says, again,

20   accessing from a different IP location -- or location.  And it

21   gives the IP address as 66.36.240.69, country of U.S.  And it

22   gives a verification PIN.

23   Q    And does that information match?

24   A    Yes.

25   Q    In regards to the time here, is the time exactly the same,

SZYDLIK - Direct (by Mr. Chun)

1    or is there a difference?

2    A    There's a three-hour difference.

3    Q    And why is that?

4    A    So when you access -- the server could be located in a

5    different time zone from the e-mail account.

6    Q    And so was it always three hours' difference, in your

7    experience?

8    A    In reviewing these, yes.

9    Q    And showing you 6.15.004 and 6.15.005 and 6.15.006, were

10   those all similar type verification e-mails?

11   A    Yes.

12   Q    Did you verify all of those against the IP logs?

13   A    Yes.

14   Q    Did they match?

15   A    Yes.

16   Q    Now, turning your attention to Exhibit 9.11, focusing on

17   ending -- account ending in 915, do you see that on the left

18   side of the screen?

19   A    Yes.

20   Q    In comparing that to Exhibit 6.19, would you please read

21   the top of Exhibit 6.19?

22   A    The -- from the message body or from the --

23   Q    The message body, I apologize.

24   A    "It's not my account.  I didn't enter it.  My account is

25   U9614915.  I never use any other accounts.  Please pay my

SZYDLIK - Direct (by Mr. Chun)

1    money."

2    Q    And did you find that account on 9.11?

3    A    Yes.

4    Q    And down below for common login IP addresses, do you see

5    any there?

6    A    Yes.

7    Q    How many did you find that were similar to other of the

8    eight accounts that you found?

9    A    Six.

10   Q    And this 915 account, through your investigation, was

11   related to which carding website?

12   A    This one was bulba.cc.

13   Q    Now, looking at the registration information on

14   Exhibit 9.2, which is related to account ending in 959, and

15   comparing it with previously admitted Exhibit 16.2, Page 2, was

16   a chat with uBuyWeRush.  And that is very hard to see.

17        Just on the left side, could you go ahead and read the

18   e-mail address associated with the 959 account?

19   A    It's regmails22@mail.ru.

20   Q    Do you see that e-mail anywhere in this chat between

21   uBuyWeRush and nCuX111?

22   A    Yes.

23   Q    Would you go ahead and read the two lines at the bottom

24   there?

25   A    So uBuy -- on February 13, 2007, uBuyWeRush sends nCuX111

SZYDLIK - Direct (by Mr. Chun)

1    a message and says, "e-mail?"  And then in response, nCuX111

2    says, "regmails22@mail.ru and boookscafe@yahoo.com."

3    Q    And also on that same exhibit -- sorry -- above that,

4    could you go ahead and read the three lines that were in that

5    chat?

6    A    On February 13, 2007, uBuyWeRush sends a message to

7    nCuX111 saying, "I need the following, complete shipping

8    details."  NCuX111 responds, "Okay."  And then he further

9    states -- the account holder further states, "Name - Roman

10   Seleznev.  Address - Ostryakova 26 kv 113.  City - Vladivostok.

11   Country - Russia."

12              THE COURT:  Counsel, why don't we take our morning

13   recess.

14              MR. CHUN:  Yes, Your Honor.

15                    (Jury exits the courtroom)

16              THE COURT:  Anything to take up, counsel for the

17   government?

18              MR. CHUN:  No, Your Honor.

19              THE COURT:  Counsel for the defense?

20              MS. SCANLAN:  Yes.

21              THE COURT:  Ms. Scanlan?

22              MS. SCANLAN:  I just wanted to make clear for the

23   record, at this point, that the defense would object to

24   highlighting on any of the other exhibits going forward.  Most

25   of the exhibits up to this point, that the government has, we

SZYDLIK - Direct (by Mr. Chun)

1   get a copy that has highlights on it, which is nice, so we can

2   see what they're going to demonstrate, but then they take it

3   off before it goes to the jury.  So if there's any other

4   exhibits that have highlights that are a permanent part of the

5   exhibit, I'd like to know what they are, and then we would

6   object to that highlighting of the substantive exhibits.

7           THE COURT:  On the exhibits that are going back to

8   the jury, including the ones that are now displayed, 16.2,

9   Page 2, and 16.2 -- they're both the same -- is that a

10  highlight that's going to go back to the jury room?

11          MR. BARBOSA:  No.  That was an exhibit I admitted

12  yesterday.

13      And I'd just point out, Your Honor, if a witness was

14  testifying, we could ask them to take out a highlighter and

15  highlight an original exhibit.  That's kind of common practice

16  in trial.  Most of our exhibits are not highlighted in the

17  originals.  We were just thumbing through, Mr. Wilkinson and I.

18  We did find a few that have highlight in the originals.  And I

19  believe they are embedded in screenshots that were produced

20  years ago, so it's going to be very difficult to remove.

21      If the Court wishes to instruct the jury that highlighting

22  is not substantive evidence, I think that would cure any

23  problem.  You've seen the density of this information.  Some of

24  the code, for example, those page file datas, they're nearly

25  impossible to read without highlighting.  And I probably should

SZYDLIK – Direct (by Mr. Chun)

1    have asked Detective Dunn to take out an actual highlighter and

2    put some highlighting on them so the jury can just see them.

3    There's no prejudice from that kind of highlighting on any

4    exhibit.

5        All that being said, very few of our original exhibits are

6    highlighted.  And I think, at the most, the Court should simply

7    instruct the jury, if there's highlighting in an exhibit,

8    that's not substantive evidence.

9            THE COURT:  Counsel, I think the Court's done that

10   with one of the past exhibits.  And again, if you believe it's

11   a highlight that draws some undue attention to a particular

12   exhibit, let the Court know, and I'll instruct the jury of how

13   they should receive the evidence.

14       I think counsel's observation is correct, that oftentimes

15   witnesses will mark up an exhibit, mark up a diagram or chart,

16   and then that chart goes back to the jury room, or a document

17   that they actually create in court.  So that's not an unusual

18   practice in court, certainly not the first time that someone's

19   marked up an exhibit that's gone back as substantive evidence,

20   particularly if the witness testifies about what they've done

21   and why.  So I don't think that there's a degree of prejudice

22   to warrant exclusion.

23       So your observation is noted.  Let the Court know, and

24   I'll instruct the jury at the proper time about receiving the

25   evidence.

SZYDLIK – Direct (by Mr. Chun)

```
1              MS. SCANLAN:  Yes, Your Honor.
2              THE COURT:  If there's nothing further, we'll be in
3    recess.
4                          (Recess)
5                  (Jury enters the courtroom)
6              THE COURT:  Counsel, please continue your
7    examination.
8              MR. CHUN:  Thank you, Your Honor.
9    BY MR. CHUN
10   Q    Agent Szydlik, looking at Exhibit 9.11, focused on account
11   ending in 741, on the left-hand of the screen, could you go
12   ahead and read the e-mail address there?
13   A    Romariogro -- I think that's a "1," -- @mail.ru.
14   Q    And looking at previously admitted Exhibit 12.9, which was
15   travel records taken from defendant, could you look at the
16   e-mail address there?
17   A    Romariogro1@mail.ru.
18   Q    Are those the same?
19   A    Yes.
20   Q    And looking at "name" on that travel record, could you
21   read that?
22   A    "Roman Seleznev."
23   Q    And does that match the name of the account ending in 741?
24   A    It does.
25   Q    And just for clarity, where was that travel record for, in
```

SZYDLIK - Direct (by Mr. Chun)

1   12.9A?

2   A    It was from Moscow to Maldives.

3   Q    Now, keeping 9.11, focused on account ending in 741, on

4   the screen, and turning to previously admitted Page 3.19, which

5   is page file data from HopOne server, do you see an e-mail

6   address there?

7   A    Yes.

8   Q    What e-mail address is that?

9   A    That's romariogro1@mail.ru.

10  Q    And are those the same?

11  A    They are.

12  Q    And looking at 3.23, which is another page file data taken

13  from HopOne, do you see the same e-mail address there.

14  A    Yes.

15  Q    Now, turning your attention to Exhibit 4.5, Page 58, which

16  is the DomainTools registration records for track2.name, the

17  website, and comparing that to 9.11, focused on account ending

18  in 741, do you see a phone number on the registration

19  information for Liberty Reserve record for account ending in

20  741?

21  A    Yes.

22  Q    What's that phone number?

23  A    4956516588.

24  Q    Do you see that same phone number anywhere on the

25  track2.name domain records?

SZYDLIK - Direct (by Mr. Chun)

1   A    Yes, on the registrant phone entry.

2   Q    Are those exactly the same?

3   A    The "Whois" record has the Russian country code "+7" on

4   it.  But otherwise, yes.

5   Q    And what's the e-mail address listed in the "Whois"

6   record?

7   A    It's rubensamvelich@yahoo.com.

8   Q    And what domain was this for, again?

9   A    Track2.name.

10  Q    And then looking on the left-hand side, for the Liberty

11  Reserve record, what's the real name this is registered in?

12  A    The name it's registered in is Roman Seleznev.

13  Q    And what's the address?

14  A    Ostryakova 26 kv 113, Vladivostok, Primorye 69003.

15  Q    And so the phone numbers on these two documents match?

16  A    Yes, with the country code on the other.

17  Q    Now, turning your attention to -- so looking at account

18  ending in 723, on Exhibit 9.11, do you see what name that

19  account is in?

20  A    Yes.

21  Q    What name is that in?

22  A    Roman Seleznev.

23  Q    And what's the address there?

24  A    Ostryakova 26-113, Vladivostok, Primorye Krai, 690000.

25  Q    And the date of birth?

SZYDLIK - Direct (by Mr. Chun)

1    A    July 23, 1984.

2    Q    And do you see a common login IP address, there in the

3    summary chart?

4    A    Yes.

5    Q    Going to account ending in 380 on the summary chart, 9.11,

6    do you see what name that account is in?

7    A    Yes.

8    Q    What name?

9    A    Roman Seleznev.

10   Q    And what address?

11   A    Ostryakova 26-113, Vladivostok, Primoryi Krai 690000.

12   Q    And going to -- on the summary chart, 9.11, looking at

13   account ending in 588, do you see what name that account is in?

14   A    Yes.

15   Q    And what name is that?

16   A    Roman Seleznev.

17   Q    And what's the address there?

18   A    Ostryakova 26-113, Vladivostok, Primoryi Krai 690000.

19   Q    And what's the date of birth there?

20   A    July 23, 1984.

21   Q    Is that the same date of birth you saw for account ending

22   in 723?

23   A    Yes.

24   Q    And looking at account ending in 588, on Exhibit 9.11,

25   again, do you see common login IP addresses there?

SZYDLIK – Direct (by Mr. Chun)

1   A    Yes.

2   Q    Now, comparing that record with 12.6B, previously admitted

3   as the translation of defendant's internal passport, could you

4   read the name there?  Do they match?

5   A    Yes.

6   Q    And what about the dates of birth?

7   A    Both are July 23, 1984.

8   Q    And the addresses, or the place of birth there?

9   A    Vladivostok City.

10  Q    And comparing it with -- moving on to -- back to the

11  summary, focusing on the last account of your summary, account

12  ending 156, could you tell us what the name of that account

13  was?

14  A    2Pac.

15       MR. CHUN:  One moment, Your Honor.  I apologize.

16       THE COURT:  Members of the jury, if you'd like to

17  stretch, please feel free to do so.

18       Please be seated.

19  BY MR. CHUN

20  Q    In the binders up there, showing you what's been marked as

21  9.20, is a one-page exhibit.

22       Do you have it there?

23  A    Yes.

24  Q    Do you recognize it?

25  A    Yes.

SZYDLIK – Direct (by Mr. Chun)

1    Q    What is it?

2    A    It's the transaction history for the 2Pac Liberty Reserve

3    account.

4    Q    And did you pull that record?

5    A    I did.

6    Q    Is that an accurate version of what you pulled?

7    A    Yes.

8              MR. CHUN:  Your Honor, the United States moves to

9    admit Exhibit 9.20.

10             MS. SCANLAN:  Same objection, Your Honor.

11             THE COURT:  Same ruling.  It's admitted.  It's

12   overruled.

13                  (Exhibit 9.20 was admitted)

14   BY MR. CHUN

15   Q    Could you explain what we're seeing here?

16   A    So this is the detailed transaction records for the 2Pac

17   Liberty Reserve account.

18   Q    And looking at this record, do you see a reference to any

19   accounts that were also on your summary chart, in 9.11?

20   A    Yes, two.

21   Q    What's one of them?

22   A    The first is the Testov account.

23   Q    And could you point out where that is?

24   A    It's on the top line there.

25   Q    And what is that transaction showing?

SZYDLIK – Direct (by Mr. Chun)

1   A    So it's showing, on February 17, 2013, $9,930 were sent to

2   this 2Pac account.

3   Q    And you said there were two accounts you saw that were on

4   your summary chart.

5        What's the other one?

6   A    The U0045772.

7   Q    And where is that?

8   A    It's on the row starting on April 2, 2013.

9   Q    And what does that transaction tell you?

10  A    The U0045772 sent the 2Pac account $718.

11  Q    And in your training and experience, what was the

12  significance of these transactions?

13  A    Specifically, the first one is, when we do a Liberty

14  Reserve account analysis, is what we would call a "seeder

15  payment," where a payment occurs immediately after the account

16  is established, receiving funds.  And so one of the things that

17  we rely on to link accounts together is this first payment.

18  Because it's so easy to set up accounts, there's no cost or

19  anything, we typically see people that we're investigating have

20  multiple accounts.  And they'll transact funds in between those

21  accounts.  And when they create a new account, they'll -- we

22  sometimes will see funds come from another account that they

23  control.  And usually, the -- I guess the indicators of that

24  are when the payment comes right after the account is created.

25  Q    Now, currently, as a special agent with the Secret

SZYDLIK – Direct (by Mr. Chun)

1   Service, or during your time as a special agent with the Secret

2   Service, have you investigated credit card fraud?

3   A   Yes.

4   Q   And are you familiar with 2Pac.cc?

5   A   I am.

6   Q   What is it?

7   A   It was a credit card vending website, illegal credit card.

8   Q   And how are you familiar with it?

9   A   So I was investigating it from 2013 to 2014.

10  Q   Showing you what's been marked as Exhibit 16.13, do you

11  recognize that?

12  A   Yes.

13  Q   What is it?

14  A   That is a forum post from the cybercrime forum omerta.cc.

15  And this is an advertisement -- a vendor advertisement for --

16  so the post is made by 2Pac, who is a member of omerta.cc.

17  Q   Without going into details of that, is this a fair and

18  accurate representation of what you saw in this forum?

19  A   Yes.

20          MR. CHUN:  United States moves to admit

21  Exhibit 16.13.

22          THE COURT:  Any objection, Counsel?

23          MS. SCANLAN:  Your Honor, one moment, please.

24          MR. CHUN:  And the exhibit is four pages long, Your

25  Honor.

SZYDLIK – Voir Dire (by Ms. Scanlan)

1              MS. SCANLAN:  May I inquire?

2              THE COURT:  You may.

3                        VOIR DIRE EXAMINATION

4    BY MS. SCANLAN

5    Q    I just want to make sure I understood.

6         What is this?  We're looking at a screenshot from

7    omerta.cc; is that right?

8    A    Correct.

9    Q    And then there is a thread with a bunch of different

10   e-mails and, looks like, comments by different users; is that

11   right?

12   A    Yes.

13   Q    So you're not attributing all of the text on this document

14   to the 2Pac user; is that correct?

15   A    Correct.

16             MS. SCANLAN:  I would object to this, as a large

17   portion of this exhibit as hearsay, and the exhibit itself, in

18   terms of the text, does not establish that these people are

19   co-conspirators.

20             THE COURT:  Counsel, is there some other exception?

21             MR. CHUN:  Your Honor, it goes to the nature of this

22   exhibit.  I mean, they're in a common gathering place, pushing

23   a single criminal activity.  We would say they're

24   co-conspirator statements, Your Honor, because it's a forum

25   discussing carding.

SZYDLIK – Voir Dire (by Ms. Scanlan)

```
 1              THE COURT:  That's too broad, Counsel.  The objection
 2    is sustained at this time.
 3              MR. CHUN:  Would that be for the entire exhibit, or
 4    just for portions, Your Honor?
 5              THE COURT:  Well, the sheet -- the page that's on --
 6    in front of me right now, Counsel --
 7              MR. CHUN:  Yes, Your Honor.
 8              THE COURT:  -- Page 4, that one.
 9              MR. CHUN:  The United States will move to admit
10    Pages 1 and 2, Your Honor.
11              THE COURT:  Let's go to Page 2.
12              MR. CHUN:  This is Page 1, and this would be Page 2,
13    Your Honor.
14              THE COURT:  All right.  Objection to Pages 1 and 2,
15    Counsel?
16              MS. SCANLAN:  May I inquire, briefly?
17              THE COURT:  Yes.
18    BY MS. SCANLAN
19    Q    As to Page 1, is it your understanding that this content
20    is all listed by 2Pac?
21    A    Yes.
22    Q    And is the same true for Page 2?
23    A    Yes.  I think they're the same page.
24    Q    Oh, you're right.  They are the same page.  Oh, no,
25    they're not, slightly different.
```

SZYDLIK - Direct (by Mr. Chun)

1           MS. SCANLAN:  I have no objection to Pages 1 and 2.

2           THE COURT:  Okay.  Page 1 and 2 of 16.13 are

3    admitted.

4           (Exhibit 16.13, Pages 1 and 2, were admitted)

5           MR. CHUN:  Thank you, Your Honor.

6                      DIRECT EXAMINATION

7    BY MR. CHUN

8    Q    Could you please explain what we're seeing here, Agent

9    Szydlik?

10   A    So this is a post on the omerta.cc forum.  The post was

11   made on September 25, 2013, at 9:00 p.m., 9:07 p.m.  And it was

12   created by 2Pac, who is a member of omerta.cc.  He has a status

13   of "vendor of dumps," which is -- on cybercrime forums is a --

14   means he's a vetted, authorized seller of credit card data,

15   stolen credit card data.  It shows that person joined in

16   September of 2013.  They have 217 posts.  And they have a

17   reputation of "2."

18   Q    Could you explain what omerta.cc is?

19   A    So omerta.cc is a -- what we call a cybercrime forum.

20   It's a website where people can register accounts.  And they

21   typically go there to advertise, solicit different -- a variety

22   of cybercrimes, as well as, kind of, like, form partnerships

23   with other members on the forum, and discuss different topics

24   relating to cybercrime, and sometimes relating to general

25   stuff.

SZYDLIK - Direct (by Mr. Chun)

1    Q    And you said this is an advertisement?

2    A    Correct.

3    Q    Can you just kind of walk us through what we see in the

4    body of the post?

5    A    So in the body of the post, it has the subject heading, or

6    the message heading, "2Pac, the first market of dumps.  All

7    sellers in one place."  And then from there, the body of the

8    message says, "Dumps market."  And it gives the website,

9    2Pac.cc.  "Attention:  We are glad to present you our newest

10   service.  All dump sellers in one place.  Easy but powerful

11   search.  Discounts.  Friendly support accessible online 24

12   hours a day, 7 days a week.  Always fresh dumps with frequent

13   updates.  More than one million Track 2 in database.  Instant

14   dump delivery.  Minimum payment is $10.  Language is English

15   and Russia.  We don't keep any logs and IP addresses of our

16   customers."

17   Q    And to stop you there, in your training and experience,

18   what would be the significance of a statement like, "We don't

19   keep any logs and IP addresses of our customers"?

20   A    So as a customer, a prospective customer, I think it would

21   give you more trust and kind of -- of the website, that they're

22   not cops; or that if something did happen and they were --

23   their services were taken down, that your transactions on the

24   website wouldn't be traced back to you.

25   Q    Could you then continue explaining what's in the body

SZYDLIK - Direct (by Mr. Chun)

1    here, under "terms of service"?

2    A    So terms of service for customers, "Market works 24 hours

3    a day, 7 days a week.  Registration is free for customers and

4    sellers.  Sellers require to contact with our support via

5    ICQ" -- and it gives an ICQ number, 6924112 -- "or Jabber -

6    2Pac@linuxlovers.at."

7    Q    What is "Jabber," in your training and experience?

8    A    Jabber is an instant messaging service.

9    Q    So a way to chat online?

10   A    Correct.

11   Q    And if you could continue on?

12   A    "Replace of dumps (full refund to account balance) in 12

13   hours.  Only for hold/call and pickup."

14   Q    In your training and experience, what does that mean?

15   A    So a variety of credit card selling services, they add an

16   extra feature, what's called "dumps checking."  And so a buyer

17   of credit card data, once they purchase a card number, they can

18   check it using this card checking service, to see if the

19   account is still valid.  And if it's not, then they can ask for

20   a refund, and will usually get it, be able to buy another

21   account.

22   Q    Could you please continue explaining what's on this page?

23   A    "We accept Perfect Money, Paymer, Bitcoin, Western Union,

24   MoneyGram, Lesspay as payment.  Minimum amount for Bitcoin and

25   Perfect Money is $10 plus five percent.  Paymer, Lesspay

SZYDLIK - Direct (by Mr. Chun)

1    (without limits or commission).  Western Union, MoneyGram

2    minimum is $300 - drop and fee.  Ask the support."

3    Q     And Perfect Money, Paymer, Bitcoin, Western Union,

4    MoneyGram, Lesspay, what are they?

5    A     They're all e-currencies, or wire services, with Western

6    Union and MoneyGram.

7    Q     And I see the code there "BTC."  What does that stand for?

8    A     It's the abbreviation for Bitcoin.

9    Q     And what about "MG"?

10   A     It's the abbreviation for MoneyGram.

11   Q     Do you see Liberty Reserve listed there in that list?

12   A     No.

13   Q     Do you know why?

14   A     Liberty Reserve was taken offline at this point.

15   Q     And then if you could just go on and read the last

16   paragraph.

17   A     "For sellers:  We invite sellers, hackers, and owners of

18   dumps bases.  You get the 50 percent share of income from

19   selling of your base.  That is much more than you can earn from

20   selling your base through other seller.  We have advanced stats

21   on your base.  Minimum base size is a thousand dumps, minimum

22   valid at least 80 percent.  You receive your income via Perfect

23   Money or Bitcoin."

24   Q     And what does that mean regarding the minimum base size,

25   in your training and experience?

SZYDLIK – Direct (by Mr. Chun)

1    A    So if I'm a hacker, and I steal credit card data or dumps

2    from –– and I want to sell it to 2Pac, for him to then vend it

3    to customers, or sell it to customers, I have to give him at

4    least a thousand dumps, and 80 percent of those have to be

5    valid cards.  So they'll check a percentage of them.  And if at

6    least –– you know, if they check ten cards, eight of them have

7    to come back as being valid cards, and not having been shut off

8    due to fraud or some other reason.

9    Q    What was the significance of seeing this post, to you as

10   an investigator?

11   A    So, one, it is the –– this is a vending website, or it's a

12   website to sell stolen credit card data.  Two is, as a verified

13   dumps vendor, or verified vendor of dumps on Omerta, that means

14   that it's –– it would be a good quality website from which to

15   buy credit card data.

16   Q    Okay.  Showing you what's been marked as 10.1, do you have

17   those in a binder in front of you?

18   A    Yes.

19   Q    Could you go in and flip through the first ten pages of

20   those?  When you finish with that, if you can look at

21   Exhibit 10.2.  It is also a multi-page exhibit.  And then if

22   you finish looking at that, you can look at 10.8, as well.

23        Do you recognize all of those?

24   A    Yes.

25   Q    How?

SZYDLIK – Direct (by Mr. Chun)

1    A    So the first two exhibits are of the 2Pac.cc website.  And
2    then the last, 10.8, is also exhibits of the 2Pac.cc website,
3    as well as ICQ conversation logs I've had.
4    Q    Are they a fair and accurate representation of the 2Pac
5    website?
6    A    Yes.
7              MR. CHUN:  United States moves to admit
8    Exhibits 10.1, just the first ten pages, 10.2, and 10.8.
9              MS. SCANLAN:  No objection.
10             THE COURT:  All right.  As offered, they are all
11   admitted.  And again, 10.1 is only the first ten pages.
12             MR. CHUN:  Yes, Your Honor.
13      (Exhibits 10.1, pages 1–10; 10.2; and 10.8 were admitted)
14   BY MR. CHUN
15   Q    Showing you what's been marked as 10.2, could you explain
16   what we're looking at here?
17   A    This is the sign-in page for 2Pac.cc.
18   Q    And looking at the next page of 10.2, what is that?
19   A    This is -- once you're already in the 2Pac.cc website,
20   this is a page that you could request to buy multiple credit
21   cards -- or excuse me, search for multiple credit cards.
22   Q    All right.  Could you walk us through what we're seeing
23   here, in 10.2, Page 2?
24   A    So the fields on this site that you're allowed to search
25   by are "BIN," which is the bank identification number.  And a

SZYDLIK - Direct (by Mr. Chun)

1    lot of customers of credit card vending sites, they prefer
2    certain kind of credit card numbers, or credit card types.  And
3    so usually, those are separated by the BIN, which is the first
4    six numbers of a credit card account.  So you would put those
5    in there, if you want to search by a specific BIN.  "Carrier,"
6    "type," "brand," they all kind of go towards, like, if you like
7    MasterCard, Visa, or something like that you want to search by.
8    "Bank" is the issuing bank.  "Country" is the -- would be the
9    account holder country and state.
10        And then below that is the "base" and "seller."  So
11   2Pac.cc had kind of a unique feature, that instead of -- it
12   separated cards that you could purchase based on what the
13   source of the cards were.  So --
14   Q    In your training and experience, what is a "base"?
15   A    A base is -- so a base is a group of credit -- stolen
16   credit card data.  And it's kind of, like, when credit card is
17   brought to the -- stolen credit card data is brought to the
18   market, they don't kind of just meter it out, one by one.  They
19   like to bring it out as one base, or the vendors like to bring
20   it out as kind of, like, one group, or one base.  And the
21   reason is, is, when credit cards start being used fraudulently
22   at restaurants or shops, banks catch on to the fact that these
23   cards are being used fraudulently, and then they'll quickly
24   determine what the source of the cards -- where the stolen
25   cards were.

SZYDLIK - Direct (by Mr. Chun)

1        So if a bank determines that a merchant appears to have

2    been the common point of purchase, or the place the cards were

3    hacked from, they will adjust their risk index or block --

4    straight-out block all the cards that were used there at this

5    time frame.  And so when they do that, the other cards that

6    were removed from -- or hacked from that business would be

7    inactive.

8        So for vendors of credit card data, for them to kind of

9    get the most money of their -- to get the most money for the

10   cards, they know they need to kind of push them out as one

11   group; so that way, the market is kind of all using those cards

12   as quickly as possible.  That way, they're -- you know, if they

13   do it from six months after the cards were hacked, the chances

14   of them being blocked or stopped by the banks for fraud are

15   significantly higher than if it's done within, like, the first

16   72 hours.

17   Q    And what's the "seller"?

18   A    The seller in this is -- again, so 2Pac.cc did a -- kind

19   of unique thing where, instead of just offering cards, it would

20   say, these cards came from this seller, or this hacker.

21   Q    And what about "expire this month"?

22   A    So when you -- again, the credit card data, you can see

23   the expiration date; so sometimes people will prefer cards that

24   expire the month -- that month.

25   Q    And "have zip"?

SZYDLIK – Direct (by Mr. Chun)

1   A     That would be the zip code for -- associated with the

2   account.

3   Q     And "Track 1"?

4   A     Track 1 would be -- so a "dump" is typically Track 2 of a

5   credit card, the data on the magnetic strip of a credit card.

6   Track 1 is unnecessary to conduct a transaction, so it's not

7   always included when you purchase stolen credit card data.  But

8   Track 1 does include the cardholder's name, so sometimes that's

9   preferred by counterfeit credit card manufacturers and users.

10  So that's the extra field where you could ask for Track 1.

11  Q     And showing you the bottom of that page, what are we

12  seeing here?

13  A     So here, you're seeing -- so here, you're seeing results

14  of the search; you see the different BINs, 21502, 37972, so on.

15  You see a quantity of cards that are available, the price per

16  card.  You see the seller.  In this case, it's Burger and

17  Plutus and Oday, and then the base; so the bases were named.

18  Q     And have you purchased credit cards from 2Pac.cc?

19  A     Yes.

20  Q     And is this what you would see when you go to the website

21  to buy a card?

22  A     Yes.

23  Q     Going to Page 3 of the exhibit, is this similar to what we

24  saw a moment ago?

25  A     Yes.

1   Q    And the same on Page 4?

2   A    Yes.

3   Q    Showing you what's 10.1, Page 4, what are we seeing here?

4   A    So as soon as you log in, you kind of get transferred

5   to -- this is the news page.  And it kind of -- the

6   administrators of the website will list news.  In this case,

7   they generally would list new bases that were for sale.

8   Q    And what is the very -- moving to 10.8.  So talk us

9   through your investigation of 2Pac.cc.

10       What steps did you take on the site?

11  A    So you mean when I purchased cards?

12  Q    Go ahead --

13  A    Sorry.  You mean when I made purchases from 2Pac.cc?

14  Q    Correct.

15  A    So the first thing I did was, I registered an account on

16  2Pac.cc.  And then the next step is you have to load your

17  account with funds so you can make further -- or make

18  purchases.  So I registered an account, and then I sent funds

19  to the 2Pac.cc administrator, so put a balance on my account.

20  Q    Okay.  Showing you 10.8, Page 1, can you explain what

21  we're seeing here?

22  A    I was using ICQ, which is an instant messenger, to talk to

23  the administrators at 2Pac.cc.  I told them what my username

24  is; and then I asked if I could get a MoneyGram drop, which is

25  the name of somebody I could send money to.  And once they

1    received those funds, my account would have been credited.

2    Q    So what is the response back from -- well, what do you

3    say?

4    A    I say, "Hey, bro, can I get MG drop?"

5    Q    And what did you mean by "MG," when you wrote that?

6    A    MoneyGram.

7    Q    And what is MoneyGram?

8    A    It's a wire service.

9    Q    And then what was the response back from 2Pac?

10   A    So it says, "$300 minimum payment by MoneyGram."  The

11   commission -- and gives commission of $300 to $499, plus

12   nine percent fee; $500 to $999 is a six percent fee; $999 to

13   $5,000 is a five percent fee.  And then it gives drop info,

14   which is, first name is Siarhei; last name is Pleskatsevich; of

15   Moscow, Russia.

16   Q    The top part where it says "commission" and "minimum

17   payment" and "fee," what is that?

18   A    So receiving MoneyGram is kind of, like, a manual process.

19   You have to go to a MoneyGram, kind of, like, teller to pick up

20   the funds.  Sometimes you can get it done at a bank account.

21   But it still, I guess, requires some labor to get the funds.

22   So they usually will put a minimum payment fee, so that way,

23   like, for every $20 purchase you're not sending them to the

24   MoneyGram store to get more cash.

25   Q    And just so I understand, you're sending money to fund

SZYDLIK – Direct (by Mr. Chun)

1   what?

2   A    This would be to put, like, a balance on my 2Pac.cc

3   account, so then I could apply a purchase of credit cards

4   towards that balance, and it would be deducted.

5   Q    So you would put money onto a 2Pac account, which then you

6   could purchase from?

7              MS. SCANLAN:  Objection.  Leading.

8              THE COURT:  It is leading, Counsel.

9   BY MR. CHUN

10  Q    Why would you fund a 2Pac account?

11  A    So I put money on there so I could make purchases against

12  it.

13  Q    When you make a purchase, where would that money be

14  deducted from?

15  A    It would be deducted from my 2Pac.cc funds.

16  Q    On the bottom portion of that, it says "drop info," is

17  what you just read.

18       What is a "drop"?

19  A    So a drop is kind of the black market term for somebody

20  who you send payments to.  So it's used for MoneyGram, wires,

21  pretty much everything.

22             THE COURT:  Counsel, let's let the jury stand and

23  stretch.

24             MR. CHUN:  Yes, Your Honor.

25             THE COURT:  Please be seated.

SZYDLIK – Direct (by Mr. Chun)

1          Please proceed, Counsel.

2               MR. CHUN:  Thank you, Your Honor.

3    BY MR. CHUN

4    Q    You were explaining what a drop is?

5    A    Yes.  So it's the black market term for somebody who

6    receives payments, whether it's via wire or some other method.

7    Q    And how does that work?  How do you find a drop?

8    A    So both -- so banks, MoneyGram, Western Union, they also

9    have, you know, fraud detection methods and techniques in

10   place.  If they -- it's in their interest to prevent money

11   laundering.  And when they conduct analysis of their accounts,

12   or if they have accounts that are reported as money laundering,

13   they will attempt to block further transaction or payments to

14   the destination, to prevent money laundering.

15        So MoneyGram and Western Union, specifically, they can

16   detect activity which they would believe are illicit payments

17   to purchase credit cards or some kind of other online good.

18   And through their fraud detection techniques, they'll try to

19   shut off -- they'll block or ban somebody from receiving

20   further payments.  So as a result, in the credit card market,

21   especially, when -- drops continually change.  Because if you

22   use the same dropper person to receive the funds for too long,

23   MoneyGram or Western Union will block that person, and then the

24   funds will be stuck in limbo, so both the buyer and seller are

25   kind of out of the money.  And so what we'll see a lot of these

SZYDLIK – Direct (by Mr. Chun)

1    credit card vendors, or stolen credit card vendors, will do is,
2    they'll circulate or keep changing the persons that are
3    receiving the funds.
4    Q    And then moving on in this chat, what do you respond next?
5    A    So once he gives me the drop, I send a MoneyGram
6    transaction.  And one of the things you need to complete a
7    MoneyGram payment is the MoneyGram account number, which I send
8    MoneyGram numbers 46773952.  You have to tell them the amount
9    you're sending, which is $2,000.  And you also have to give
10   them the sender name and the sender location, which I say is
11   Sean Carter, from Brooklyn, New York.
12   Q    And what's the response?
13   A    He asks -- or the administrator asks, "What's my login on
14   the shop?"
15   Q    Looking at Page 2 of Exhibit 10.8, what is this?
16   A    So that's the -- after I made the -- or after I funded my
17   2Pac.cc account, I logged in.  And it shows me the news site,
18   which is where you're taken to as soon as you log in.  And then
19   it also shows my balance now is $1,900 -- excuse me, $1,904.77,
20   which is less the transaction fee that they charge for the
21   payment.
22   Q    And based on your training and experience, could you
23   explain what the first update here is?
24   A    So February 24, 2014, saying, "We have a great update of
25   South Africa."  So those are cards hacked from some kind of

SZYDLIK - Direct (by Mr. Chun)

1    South African location, or restaurant, or merchant.  They're

2    giving the -- the base name is toj_Africa, original Track 2.

3    They say the valid rate is 95 percent, which again means that

4    you would expect, if you purchased a hundred cards, 95 of those

5    would be valid cards that hadn't been shut off for fraud yet.

6    Q    And then moving to Page 3, just magnifying the top half,

7    what do we see here?  What are you doing here?

8    A    So I'm going through, and I'm selecting credit cards that

9    I want to purchase, and I'm putting them in my shopping cart on

10   the website.

11   Q    And so how would you go about doing that?

12   A    So when you're looking at the cards, you basically check

13   next to whatever credit card you want.  You say, "Add to my

14   shopping cart," and it will transfer it over.  And then this is

15   my shopping cart and the list of cards that are in it right

16   now, or at the time.

17   Q    And Page 4 of Exhibit 10.8, what are we looking at here?

18   A    Here, if I wanted to complete the transaction, I would hit

19   the "checkout" button.  Or I could go back to shopping, and

20   then the "check dumps" button says -- if I were to check that

21   and then hit the "checkout" button, it would automatically

22   check the cards I purchased to see if they were still valid or

23   not.

24   Q    And Page 5, again, just magnifying the top half, what do

25   we see here now?

SZYDLIK – Direct (by Mr. Chun)

1    A    So this is the completed purchase.  My account has been, I

2    guess, debited the funds of the purchase.  And it shows now the

3    full card number that I purchased, the seller, the base name,

4    the BIN, and the price for each card.  And the button on the

5    side allows me to download it, if I wanted to.

6    Q    Okay.  And so why are we seeing the full credit card

7    number here now?

8    A    So now, since I'm the owner of the cards, I have the full

9    credit card.  If they were to show you that before -- you know,

10   if they were to show that to you before, you could potentially

11   try to make purchases, financial institutions could see that,

12   and they could proactively block the accounts before they're

13   purchased.  So usually, they won't reveal that until after you

14   purchase.

15   Q    And what was your balance, then, afterwards?

16   A    $1,256.77.

17   Q    And Page 6 is what?

18   A    It's a continuation of the cards I purchased.

19   Q    And just going through the columns, could you just briefly

20   run through them, for the record?

21   A    So "item number," would be the unique item number assigned

22   to each card, or account.  "Seller" is the person that 2Pac.cc

23   is saying provided them the cards.  The "base" is the name of

24   the base, so in this case silver_ fresh_ big.  The "BIN" is the

25   bank identification number for the cards I purchased, which are

SZYDLIK – Cross (by Ms. Scanlan)

1   American Express, the price of which I purchased it at is $10.

2   Q    And what are we seeing here now, on Page 7?

3   A    So you can hit the "download" button.  This is the result

4   of me doing that.  And these would be what you would call the

5   "dump," which is the credit card number and extraneous data as

6   it is in Track 2 on the magnetic stripe of a credit card.  So

7   before, when you had just the credit card number, you couldn't

8   use that to create a counterfeit credit card.  This is what you

9   would -- this number and this format is what you would need to

10  create a counterfeit credit card, and is the dump.  It's Page 2

11  of the purchase.

12  Q    Just a continuation of the cards on Page 8?

13  A    Yes.

14  Q    And so after making this purchase, did you download all

15  this credit card information?

16  A    Yes.

17         MR. CHUN:  No further questions, Your Honor.

18         THE COURT:  Cross examination?

19      Members of the jury, if you want to stretch, again, during

20  the transition.

21      Cross examination?  You may inquire, Counsel.

22                      CROSS EXAMINATION

23  BY MS. SCANLAN

24  Q    When you were purchasing cards from 2Pac, did you use your

25  real name?

SZYDLIK – Cross (by Ms. Scanlan)

1   A      No.

2   Q      You used a nickname-type thing?

3   A      Correct.

4   Q      Otherwise known as a "nic"?

5   A      Yes.

6   Q      And did you have your own unique nic, or did you share it

7   with other users?

8   A      For me, specifically, I used my own.

9   Q      In your experience dealing with other people on these

10  forums, is it important to establish your nic, in terms of your

11  reputation?

12  A      It is, yes.

13  Q      Why is that?

14  A      So on forums, when you're dealing with people, you're

15  obviously acting anonymously, because you don't want people to

16  know your real name; so you create a nic, which, since you

17  don't have a name, kind of becomes your brand.  And you want to

18  use this -- you want to have -- establish your brand,

19  especially if you're a vendor, or somebody else who does

20  business on the forums, so people you interact with will know,

21  or have a decent amount of trust, that you are the person

22  that -- or I guess your reputation is tied to your brand.

23  Q      So is it analogous to, like, eBay, where you get a star,

24  and then it has your number of transactions and your percentage

25  of satisfaction as a user?

SZYDLIK - Cross (by Ms. Scanlan)

1   A     Yeah, similar to that.

2   Q     And 2Pac is one of these vendors who has a nic?

3   A     Correct.

4   Q     And the nic is "2Pac"?

5   A     Yes.

6   Q     For that person who's a vendor.

7   A     Yes.  So -- yes.  So typically, for people who offer

8   websites where they sell stuff on these forums, they will

9   have -- they'll sometimes create, like, a special nic for that

10  website.  So it will -- in this case, "2Pac" mirrors, largely,

11  the website name.

12  Q     "2Pac" is the nic that you also saw posting things on

13  various carding forums?

14  A     Yes.

15  Q     So I'm assuming it's your understanding that Mr. Seleznev

16  was arrested on July 4 or 5 of 2014?

17  A     Yes.

18  Q     And since that time, he has not been allowed access to the

19  internet; is that correct?

20  A     That's my understanding, yes.

21  Q     So he's arrested July 4 or 5; right?

22  A     Yes.

23  Q     And then on July 21 of that same year, 2014, so after the

24  arrest, someone with the "2Pac" nic logs on to verify.ru;

25  right?

SZYDLIK – Cross (by Ms. Scanlan)

1   A    I don't -- I guess I don't recall that.

2            MS. SCANLAN:  Your Honor, may I approach?

3            THE COURT:  Yes.

4        Let's have it marked, Counsel.

5            THE CLERK:  Defendant's Exhibit 110 is marked.

6            MS. SCANLAN:  May I approach the witness?

7            THE COURT:  Yes.

8   BY MS. SCANLAN

9   Q    I'm handing you what's been marked as Defense Exhibit 110.

10       Can you look at that silently, to yourself?

11  A    Yes.

12  Q    Did you have a chance to look at that?

13  A    I'm sorry --

14  Q    I'm sorry.  Go ahead.

15  A    Okay.

16  Q    Does that refresh your memory as to whether the "2Pac" nic

17  logged on to a forum on July 21?

18  A    Yes.

19  Q    And did the "2Pac" nic log on on July 21?

20  A    Yes.

21  Q    And was that after Mr. Seleznev was arrested?

22  A    Yes.

23  Q    So I'm showing you what's been admitted as Exhibit 10.1,

24  and this is Page 4 of that exhibit.

25       Do you see this?

SZYDLIK – Cross (by Ms. Scanlan)

```
1    A    Yes.
2    Q    Is it your understanding that these dates are kind of the
3    European date form, where the month is in the middle?
4    A    Yes.
5    Q    So this is July 8, 2014, at the top?
6    A    Correct.
7    Q    And the one below that is July 7?
8    A    Correct.
9    Q    And this is -- what are we -- these are updates from 2Pac?
10   A    Yes.  These are the news that are posted on the forum --
11   or excuse me -- on the card vending site, yes.
12   Q    So July 7 of 2014 is -- depending on whether you're in the
13   Maldives or here, is two to three days after Mr. Seleznev's
14   arrest; right?
15   A    Correct.
16   Q    So after that, 2Pac is posting that they have fresh dumps?
17   A    Yes.
18   Q    And then the next day, 2Pac says he, or she, or whoever,
19   is going on vacation?
20   A    Yes.
21   Q    Can you look at Exhibit 10.3, either on the screen or in
22   your notebook, please?
23   A    Yes.
24   Q    Are you familiar with it?
25   A    Yes.
```

SZYDLIK – Cross (by Ms. Scanlan)

1    Q    What is it?

2    A    It's –– again, it's updates from the 2Pac.cc website.

3    Q    And these are –– this is the same group of documents that

4    you pulled from the website?

5    A    I'm not sure if this one I pulled or not.

6    Q    Do you recognize this as being the same format as the

7    other exhibit?

8    A    Yes.

9              MS. SCANLAN:  The defense moves to admit

10   Exhibit 10.3.

11             THE COURT:  Any objection?

12             MR. CHUN:  No, Your Honor.

13             THE COURT:  10.3 is admitted.

14                  (Exhibit 10.3 was admitted)

15             MS. SCANLAN:  Permission to publish?

16             THE COURT:  Granted.

17   BY MS. SCANLAN

18   Q    Okay.  What's this?

19   A    So it's the news section, with the last entry being

20   August 8 of 2014.

21   Q    And it's the news section of the 2Pac website?

22   A    Yes.

23   Q    So these are –– so the last one here –– okay.  So

24   basically, all this entire page we're looking at, all of these

25   updates and this information from 2Pac, is after Mr. Seleznev

1    is arrested.

2    A     Correct.

3    Q     When he does not have access to the internet.

4    A     Correct.

5          MS. SCANLAN:  And can you put up 10.2, Page 8,

6    please?

7    BY MS. SCANLAN

8    Q     Is this kind of the same thing we've been talking about?

9    The ones on the top are 2Pac updates, but Mr. Seleznev, we're

10   assuming, is not on the internet; right?

11   A     Correct.

12   Q     Okay.  Let's talk about Liberty Reserve a little bit;

13   okay?

14   A     Okay.

15   Q     So Liberty Reserve, you enter your name, or whatever name

16   you want, but they don't verify that you're a real person.

17   A     Correct.

18   Q     Okay.  So I can put in whomever.  I can put in that I'm

19   Mickey Mouse, and they're not going to say, "No, you're not.

20   You're Emma"; right?

21   A     Correct.

22   Q     So these accounts, these Liberty Reserve accounts, all

23   this stuff we've been looking at, with the numbers, we've been

24   pointing out the ones that say "Roman Seleznev"; right?

25   A     Correct.

SZYDLIK – Cross (by Ms. Scanlan)

1    Q    But Liberty Reserve is not verifying that that is the
2    correct name for the person who's using that account; right?
3    A    That's correct.
4    Q    When you registered for your Liberty Reserve account, or
5    accounts, did you use a real address?
6    A    No.
7    Q    Did anyone let you know that, "Hey, this isn't real"?
8    A    No.
9    Q    So all these addresses in Vladivostok and all that,
10   Liberty Reserve, within that pattern of behavior, did not
11   verify those addresses; correct?
12   A    Correct.
13         MS. SCANLAN:  And can we look at Exhibit 9.11,
14   please, the one that has the "salitov.maxim"?
15   BY MS. SCANLAN
16   Q    This has previously been admitted.  It's Government
17   Exhibit 9.11.
18         Do you see this?
19   A    Yes.
20   Q    Or it's a piece of it; right?
21   A    Correct.
22   Q    We're looking at the account information for this Liberty
23   Reserve account ending in 915?
24   A    Okay.
25   Q    Is that right?

SZYDLIK – Cross (by Ms. Scanlan)

```
 1    A     Yes.
 2    Q     And this has this e-mail address on it, salitov.maxim?
 3    A     Yes.
 4    Q     And you're associating this account with bulba.cc; right?
 5    A     Yes.
 6    Q     And I just want to make sure we're all clear here; okay?
 7          Bulba.cc, what is that?
 8    A     So bulba.cc was a card vending website.
 9    Q     Okay.  Like the 2Pac card vending website is a card
10    vending website?
11    A     Correct.  It was in operation before that.
12    Q     So these are two different websites where somebody is
13    selling card dumps, or groups of credit cards that are taken
14    from other people.
15    A     Correct.
16    Q     Okay.  And there's this IP address list, right, at the
17    bottom?
18    A     Yes.
19               MS. SCANLAN:  And can we expand this out to the side?
20               MR. BARBOSA:  Which side?
21               MS. SCANLAN:  Both ways, just --
22               MR. BARBOSA:  A couple more?
23               MS. SCANLAN:  Yeah.
24               MR. BARBOSA:  Will that work?
25               MS. SCANLAN:  Yes, thank you.
```

SZYDLIK – Cross (by Ms. Scanlan)

```
1   BY MS. SCANLAN
2   Q    Okay.  So you've listed, conveniently, the IP addresses
3   where they go straight across; right?  So when they're the
4   same, they're on the same horizontal line as the exhibit?
5   A    Correct.
6   Q    So this one on the left, that's associated with the e-mail
7   rubensamvelich; right?
8   A    Correct.
9   Q    It's got all these IP addresses that are not in the next
10  one over; correct?
11  A    That's right.
12  Q    And then this one actually has an IP address that's also
13  not in the first one; right?
14  A    Yes.
15  Q    And then these other two -- so we have columns -- we have
16  the column that identifies what everything is, then these first
17  two columns we just talked about; right?
18  A    Yes.
19  Q    Then there's two more after that.
20  A    Yes.
21  Q    And these do not -- these -- some of these have different
22  IP addresses; correct?
23  A    So some of them have --
24  Q    Let me rephrase.  It would be easier; okay?
25  A    Okay.
```

SZYDLIK – Cross (by Ms. Scanlan)

1   Q     This is not a uniform set of IP addresses across these
2   four accounts.
3   A     Correct.  Correct.
4   Q     So an IP address -- you described this as -- you were
5   asked, kind of repeatedly, what it means that an IP address
6   matches another IP address found somewhere else; do you
7   remember that?
8   A     Yes.
9   Q     And you said an IP address is telling you that it's coming
10  from the same device or computer network.
11  A     Correct.
12  Q     Correct?
13        So, like, if you have, for instance, a computer in an
14  internet cafe, that has its own IP address, that's static;
15  right?
16  A     Yes.
17  Q     All the users on that computer, with that static address,
18  are going to have that same IP address; right?
19  A     That's correct.
20  Q     Okay.  So we can have a computer, or even a network of
21  computers; right?
22  A     Correct.
23  Q     Maybe even a small office?
24  A     Yes.
25  Q     That has one IP address.

SZYDLIK – Cross (by Ms. Scanlan)

1    A    Correct.

2    Q    So all these different people are sending communications.

3    And when you link them, you're looking at the same IP address.

4    A    Correct.

5    Q    So when you look at an IP address, it's not necessarily

6    telling you that there is this one person who's using this

7    connection; correct?

8    A    That's correct.

9              MS. SCANLAN:  Can you bring up 16.13?

10         Your Honor, may I have one moment?

11             THE COURT:  Certainly.

12         Members of the jury, if you want to stand and stretch.

13         Please be seated.

14         Counsel, please continue.

15   BY MS. SCANLAN

16   Q    Have you actually ever seen Roman Seleznev on a computer

17   as "2Pac"?

18   A    No.

19   Q    Have you ever seen Roman Seleznev on a computer as

20   "bulba"?

21   A    No.

22             MS. SCANLAN:  I have nothing further.

23             THE COURT:  Redirect?

24             MR. CHUN:  Briefly, Your Honor.

25

SZYDLIK – Redirect (by Mr. Chun)

1              REDIRECT EXAMINATION

2   BY MR. CHUN

3   Q    Agent Szydlik, in regards to your summary, the eight

4   accounts you pulled, and shown on Exhibit 9.11, did they all

5   list Mr. Seleznev's name?

6   A    No.

7   Q    Did you come to find those accounts through other means?

8   A    Yes.

9   Q    What types of analysis did you do to find those?

10  A    So e-mail addresses that were provided from our Seattle

11  investigators as relevant to the investigation, Liberty Reserve

12  accounts that they had found, and then by doing the cross

13  comparison of the account information.

14  Q    In your training and experience, do carding sites often

15  have just one person working it, or do they also have support

16  and assistance, also?

17  A    They usually have a support staff.

18  Q    And bringing up Exhibit 10.2, Page 2, already admitted in

19  evidence, so earlier -- could you explain, again, what the

20  "seller" is here?

21  A    Seller would be the person -- in this case, or the 2Pac.cc

22  case, would be the person that 2Pac.cc is saying is providing

23  them the cards.

24  Q    So does that mean this card -- 2Pac.cc only sells cards

25  that 2Pac provided, or other people?

```
 1              MS. SCANLAN:  Objection.  Outside the scope.
 2              THE COURT:  It's overruled.  Answer the question.
 3              THE WITNESS:  So in this case, it appears that
 4    they're saying that the cards are coming from other people.
 5              MR. CHUN:  No further questions, Your Honor.
 6              THE COURT:  Anything further, Counsel?
 7              MS. SCANLAN:  No, Your Honor.
 8              THE COURT:  Any objection to this witness being
 9    excused, by the government?
10              MR. CHUN:  No, Your Honor.
11              THE COURT:  By the defense?
12              MS. SCANLAN:  No, Your Honor.
13              THE COURT:  Thank you, sir, you may step down.
14    You're excused.
15         Members of the jury, we'll take our afternoon recess at
16    this time.  Please rise.
17                      (Jury exits the courtroom)
18              THE COURT:  Anything to take up?
19              MR. WILKINSON:  Just briefly, Your Honor.  We just
20    wanted to give the Court an update on scheduling, and identify
21    two scheduling issues.
22         So we're moving along pretty briskly, I think more briskly
23    than we expected.  At this point, our expectation is that we
24    will be resting probably Tuesday of next week, so that's
25    involved moving some witnesses forward.  We've had a few
```

1   limitations on what we can do because of travel plans, which

2   has two consequences I wanted to advise the Court of.

3        Number one is that our plan for this afternoon is to start

4   Special Agent Fischlin's testimony, and then interrupt that

5   testimony in the morning to allow some out-of-town witnesses to

6   testify, and then put Special Agent Fischlin back on the stand

7   later tomorrow.  I discussed that with defense counsel.  I

8   understand they don't have an objection, but just wanted to

9   make sure that was okay with the Court.

10            THE COURT:  Okay.  Is that accurate, Counsel?

11            MS. SCANLAN:  That's correct, Your Honor.

12            THE COURT:  Same rule applies, Counsel, with the

13   Court's expectation that you advise counsel of all the exhibits

14   or documents that you plan on offering, so that counsel is

15   prepared to address cross examination with that information.

16            MR. WILKINSON:  Yes, Your Honor.

17        And then the second sort of effect that all of this has is

18   that there is some possibility that we would run out of in-town

19   witnesses tomorrow, meaning that we would -- basically, our

20   presentation would end sometime early in the afternoon, or

21   mid-afternoon.  We could, you know, find a way to scramble on

22   that, but it would be difficult.  So -- and I guess we wanted

23   to get the Court's permission, or see if it would be okay, if

24   we adjourned somewhat early tomorrow, if we got through all of

25   our witnesses.

```
 1              THE COURT:  When you say "early," what are we talking
 2    about, Counsel?
 3              MR. WILKINSON:  Early afternoon.  Like, I would
 4    imagine 2:00 or 3:00, something like that.
 5              THE COURT:  Any protest from the defense?
 6              MS. SCANLAN:  No.
 7              THE COURT:  I don't think you'll see a protest from
 8    the jury either, Counsel, so it's not a problem with the Court.
 9    Thank you for the heads-up.
10              MR. BROWNE:  Is Agent Mills not testifying next?
11              MR. WILKINSON:  He is.  He's testifying next.
12              MR. BROWNE:  You said Fischlin.
13              MR. WILKINSON:  Fischlin will be after.
14              THE COURT:  Counsel, you can cover that later.
15         Counsel, anything else from the defense to take up?
16              MS. SCANLAN:  No, Your Honor.
17              THE COURT:  All right.  We'll be in recess.
18                           (Recess)
19              THE COURT:  Counsel, you may call your next witness.
20              MR. BARBOSA:  Thank you, Your Honor.  The government
21    calls Special Agent David Mills.
22         DAVID MILLS, having been duly sworn, was examined and
23    testified as follows:
24              THE CLERK:  Have a seat.  If you'd please state your
25    first and last names, and spell your last name for the record.
```

MILLS – Direct (by Mr. Barbosa)

1          THE WITNESS:  David Mills, M-I-L-L-S.

2          THE COURT:  You may inquire.

3                    DIRECT EXAMINATION

4   BY MR. BARBOSA

5   Q    Good afternoon, Mr. Mills.  Where are you employed?

6   A    I'm employed with the U.S. Secret Service, in Seattle,

7   Washington.

8   Q    How long have you been with the Secret Service?

9   A    Approximately 16 years.

10  Q    And what are your current duties with the Secret Service?

11  A    I'm currently assigned to the Electronic Crimes Task

12  Force.

13  Q    And you're stationed in Seattle; is that correct?

14  A    Yes.

15  Q    How long have you been stationed in Seattle?

16  A    Since July of 2011.

17  Q    And how long have you been on the Electronic Crimes Task

18  Force?

19  A    Since July of 2012.

20  Q    What are your duties on the Electronic Crimes Task Force

21  and with the Secret Service?

22  A    So currently, I'm assigned to the task force as a forensic

23  examiner, where I perform forensic exams for any cases that

24  come into our arena there.

25  Q    Do you conduct investigations, also?

MILLS - Direct (by Mr. Barbosa)

1    A    Yes.

2    Q    What type of investigations?

3    A    Primarily cybercrime investigations.

4    Q    What training did you receive to become a special agent

5    with the Secret Service?

6    A    So we start out with basic criminal investigative training

7    in Glynco, Georgia, for three months, after which you transfer

8    up to Maryland, to our special agent training course, where

9    that's approximately three more months, where we learn specific

10   Secret Service investigative training and also protective

11   training.

12   Q    What does your basic criminal investigative training

13   entail?

14   A    That entailed basic investigations of mostly financial

15   fraud, credit card fraud, counterfeit money cases, and the

16   like.

17   Q    Have you had additional training as part of your work on

18   the Electronic Crimes Task Force?

19   A    Yes.

20   Q    What portion of your work involves computer forensics

21   examinations?

22   A    I would say primarily the entire portion does involve

23   that.

24   Q    A hundred percent of your work, right now?

25   A    Pretty much, yes.

MILLS – Direct (by Mr. Barbosa)

1    Q    What type of training have you received in computer

2    forensics in order to do that work?

3    A    So we start out with a basic computer evidence recovery

4    training course.  That's a five -- approximately six-week

5    course in which we learn the basics of computer hardware and

6    architecture, and also how to image a machine.  And then after

7    that, I received additional training, advanced computer

8    evidence recovery training, as well, where we learn the -- how

9    to perform forensics on networks and servers.

10   Q    When did you go through basic computer evidence recovery

11   training?

12   A    That was in the summer of 2012.

13   Q    And when did you obtain advanced computer evidence

14   recovery training?

15   A    That was in the summer of 2014.

16   Q    Have you received any additional training in computer

17   forensics or cyber investigations?

18   A    Yes.  We do annual in-service training where we attend

19   courses one week out of the year, collectively, as agents, and

20   go through different classes and courses.  And I've also

21   received some training in additional network forensics from a

22   company called Mile Three.

23   Q    Have you had any training in mobile device examinations?

24   A    Yes.

25   Q    When was that?

MILLS - Direct (by Mr. Barbosa)

1   A    That was in the summer of 2015, last year.

2   Q    And do you conduct both mobile device examinations as well

3   as regular computer examinations?

4   A    Yes.

5   Q    Do you have any certifications in computer forensics?

6   A    Yes.  So as part of the basic training, you do receive a

7   basic EnCase certification, using the EnCase software.  I'm

8   also a Computer Technology Industry Association Certified

9   A-Plus Technician.  And there's also the certification that I

10  received as the -- from the Mile Three training, as far as

11  networks and server forensics.

12  Q    Since you've been examining computers and mobile devices,

13  beginning in 2012, has the field of computer forensics changed?

14  A    Yes.

15  Q    Has the information you needed to stay up to date on

16  changed?

17  A    Yes.

18  Q    How frequently does it change?

19  A    I would say it changes month by month.

20  Q    Do you receive any continuing education or training on the

21  job to keep up to date with these things?

22  A    Yes.  I would point to the aforementioned annual training,

23  the in-service training that we go to.

24  Q    What else do you use, in terms of resources, to keep up to

25  date on changes in the field of computer forensics?

MILLS – Direct (by Mr. Barbosa)

1   A     So I will access professional publications online and get

2   up to speed on the most recent hardware and forensic software

3   that is available.

4   Q     Focusing specifically on computers, as opposed to mobile

5   devices, are you trained in any particular types of computers

6   or operating systems?

7   A     Windows operating system.

8   Q     Are you trained in Apple Macintosh, or anything else?

9   A     No.

10  Q     So your focus is limited to Windows operating systems?

11  A     Yes.

12  Q     Approximately how many computer forensic examinations have

13  you conducted as part of your work with the Electronic Crimes

14  Task Force?

15  A     Approximately 49.

16  Q     What types of systems have those included?

17  A     Those have been workstations, actually desktop computers

18  and laptop computers, also some digital media, CD-ROMs and

19  thumb drives.

20  Q     Based on your training and experience, can you explain, in

21  general terms, what it means to conduct a computer forensic

22  examination?

23  A     Yes.  So computer forensics is basically the acquisition,

24  authentication, and reconstruction of computer data that has

25  been stored on computer media.  That could be a computer or

MILLS – Direct (by Mr. Barbosa)

1    other types of media.

2    Q    Have you testified before about computer forensics?

3    A    Yes.

4    Q    Can you describe, generally, the basic steps you take in

5    conducting a computer forensic exam?

6    A    So basically what you would do is take that piece of

7    evidence, or piece of digital media, that you have been

8    provided by the case agent, make sure that it has been

9    identified properly, that it is the actual piece of evidence

10   that you've been asked to examine.  You then make an exact copy

11   of that computer media, or an image of that computer media.

12   And then from that image, you would continue your examination,

13   preserving that original piece of evidence in its original

14   state.

15   Q    Do you make any record of your findings?

16   A    Yes.

17   Q    How do you go about recording your findings?

18   A    You would generate a computer forensics report.

19   Q    And do you take notes during the process, also?

20   A    Yes.

21   Q    Can you remind the jury what a forensic image is?

22   A    Sure.  So a forensic image is basically a bit-by-bit copy

23   of what is on the computer media that you're attempting to

24   examine.

25   Q    And how do you go about ensuring the integrity of the

MILLS – Direct (by Mr. Barbosa)

1   forensic image versus the original device?

2   A    So when you're generating the image from that computer

3   media, using –– you usually use a piece of software that runs

4   that process for you, the computer software will generate what

5   we call a "hash value."  And this value is run against that

6   image.  And then later, when it is finished imagining, it is

7   checked again, to make sure those hash values match.

8   Q    Do you use the same type of tools that Detective Dunn

9   described earlier in this case?

10  A    Yes.

11  Q    What types of tools are you typically using?

12  A    So for imaging, we –– I primarily use the program FTK

13  Imager.  And for examining that image subsequently, I mainly

14  use EnCase.

15  Q    I'd like to show you what's been previously admitted as a

16  demonstrative exhibit, 17.8.

17       Do you recognize this?

18  A    Yes, I do.

19  Q    What is this?

20  A    This is basically a screenshot of the EnCase forensic

21  software.

22  Q    So is that the same tool that Detective Dunn described

23  earlier?

24  A    Yes.

25  Q    What other tools might you use to examine a forensic

MILLS - Direct (by Mr. Barbosa)

1   image?

2   A    There's various tools.  The ones that I'm most accustomed

3   to using is EnCase.  We also use a piece of software called

4   Internet Evidence Finder, or IEF.

5   Q    What is that tool used for?

6   A    IEF is really good for examining the image for internet

7   history, chat history, and e-mail communications.

8   Q    Is that a tool commonly used in the computer forensics

9   industry?

10  A    Yes.

11  Q    Generally speaking, what are you looking for when you're

12  conducting a computer forensic examination?

13  A    Well, first of all, we would look for any items that are

14  relevant to the type of case that it's related to.  We would

15  look for items on the laptop of -- that would indicate dominion

16  and control, which means -- would tell us who actually owned

17  the laptop, or who it belonged to, who operated it.  We'd look

18  for e-mail communications, web history, images, documents that

19  may point us towards more the focus of the criminal activity.

20  Q    And do you look at the file attributes of evidence you

21  find on computers?

22  A    Yes.

23  Q    What is the purpose of examining the file attributes of

24  various files?

25  A    They tell us, actually, the -- several pieces of

MILLS - Direct (by Mr. Barbosa)

1    information, what the file name is.  They tell us when it was

2    created and when it was modified on the system.

3    Q    Do you ever look at timelines of items created on a

4    computer?

5    A    Yes.

6    Q    What is the purpose of looking at timelines of things

7    created on a computer?

8    A    Timelines can provide a good picture of sequential

9    timeline of when events occurred on the computer, when certain

10   commands were -- people logged into the computer, when certain

11   documents were created on the computer, when it was turned on

12   or turned off, et cetera.

13   Q    How is that useful to your forensic examinations?

14   A    It can give us more or less a good idea of when certain

15   criminal activity took place.

16   Q    And does that ever relate to who might have created

17   certain items on a computer?

18   A    Yes.

19   Q    How?

20   A    I'm sorry.  Could you say that question one more time?

21   Q    How might that relate to who may have created certain

22   items on a computer?

23   A    Well, if you have the basic details of the case, and as a

24   forensic examiner you understand the parameters of the case and

25   when certain things happened, you can look on that image for

MILLS – Direct (by Mr. Barbosa)

1   specific items that occurred around that same time.

2   Q    Are there any particular items you might look for in a

3   point-of-sale hacking investigation?

4   A    Yeah, absolutely.  There's quite a few.  We would look

5   primarily for any evidence of credit card numbers that have

6   been stored on that computer.

7   Q    Do you have tools to specifically look for credit card

8   numbers?

9   A    Yes.

10  Q    What types of tools do you have for that process?

11  A    Well, built into the EnCase forensic program, it actually

12  has the ability to look for specific credit card numbers, be

13  that Visa, MasterCard, or American Express, Discover.  We also

14  use a tool called Credit Card Finder, or CC Finder.  Those were

15  both used in this case.

16  Q    What other items might you look for in a credit card

17  vending case, or a carding case?

18  A    So I would look for items of dominion and control, items

19  that would point me to who the laptop actually belonged to.  I

20  would look to see if there was any pieces of malware that

21  potentially could be used to infiltrate point-of-sale

22  terminals.

23  Q    What about your review of internet history, that you

24  discussed earlier, does that play a role in a point-of-sale

25  hacking investigation?

MILLS – Direct (by Mr. Barbosa)

1   A    Absolutely.  We look for internet history, chat history,
2   even search history.
3   Q    What is the role of a search warrant in conducting a
4   computer forensic examination?
5   A    So a search warrant actually gives the examiner the
6   authority from the Court to examine that image, or that item.
7   And also contained in that -- usually in that search warrant,
8   you gain additional information as to the scope of what you're
9   able to search.
10  Q    You indicated that you examined computers on behalf of
11  other agents.
12       Is that when you are not the case agent assigned to the
13  investigation?
14  A    Yes.
15  Q    When you are examining a computer on behalf of another
16  case agent, do you consult with them?
17  A    Yes.
18  Q    What do you consult with them about?
19  A    We consult -- first, I would ask questions about the type
20  of case that it is, the type of -- the circumstances around the
21  criminal activity.  I would usually talk to that agent about
22  any search parameters, or any specific items they're looking
23  for, and the like.
24  Q    Turning your attention to the time period of July/early
25  August 2014, were you assigned to conduct a computer forensic

MILLS - Direct (by Mr. Barbosa)

```
1   examination on a computer seized from the defendant, Roman

2   Seleznev?

3   A    Yes.

4   Q    What specifically were you asked to examine?

5   A    It was a Sony Vaio laptop computer.

6   Q    On the table in front of you is what's previously been

7   admitted as Government's Exhibit 12.8.

8        Can you take a look at that, and tell me if you recognize

9   it?

10  A    Yes, I recognize it.

11  Q    How do you recognize that computer?

12  A    This is the Sony Vaio laptop that I was asked to examine

13  in this case.

14  Q    How do you know it's the same one?

15  A    I recognize it because of not just the features of it, but

16  also the specific evidence tag that's been affixed to the front

17  of the device.

18  Q    As part of your preparation for trial and your testimony

19  today, have you gone about comparing the serial number to the

20  inventory of that item?

21  A    Yes.

22  Q    And did they match?

23  A    They did.

24  Q    Did you -- when you first saw that computer, did you

25  examine the characteristics of it?
```

MILLS – Direct (by Mr. Barbosa)

1    A    Briefly, yes.

2    Q    Have you seen a computer like that before?

3         MR. BROWNE:  Sorry, Mr. Barbosa.

4    Your Honor, I think we need the time.  The question was

5    when he first examined the computer, and I think it's important

6    to know when that was.

7         THE COURT:  That's sustained.

8    Clarify, Counsel.

9    BY MR. BARBOSA

10   Q    When did you first see that computer?

11   A    Approximately July 9 of 2014.

12   Q    Had you seen a computer like that before?

13   A    No.

14   Q    What was different about that computer from others you had

15   seen?

16   A    So it differs from traditional laptops in that a

17   traditional laptop has a screen that just folds down on top of

18   the keyboard, and you don't see anything else on top of that.

19   This one, instead, has the screen actually on top, as a tablet

20   computer would, or an iPad, and the keyboard is actually hidden

21   underneath the screen itself.

22   Q    Had you ever conducted a computer forensics examination on

23   a computer like that?

24   A    No.

25   Q    Were there any stickers or labels on the computer that

MILLS – Direct (by Mr. Barbosa)

1   identified any characteristics about the operating system that
2   might be on that?
3   A    Yes.  There is a Windows 8 Pro sticker on the back cover
4   of the computer.
5   Q    At that time, early July 2014, had you conducted many
6   examinations of Windows 8 operating systems?
7   A    No.
8   Q    Were there any particular concerns you had about examining
9   a computer with a Windows 8 operating system?
10  A    Being that I hadn't examined one, I was wanting to attain
11  more information about that operating system.
12  Q    Was there any -- do you deal with encryption in your work
13  of conducting computer forensics examinations?
14  A    Yes.
15  Q    Was that a concern in this particular case?
16  A    Yes.
17  Q    Why was that a concern in this particular case?
18  A    This type of case deals with computer hacking, and so you
19  would think that the folks involved would be fairly
20  sophisticated.  So in these types of cases, the encryption is
21  definitely something that's always in the back of your mind.
22  Q    Does that computer have what is known as a "SIM card" in
23  it?
24  A    Yes, it does.
25  Q    Did you notice that SIM card, when you first saw it?

MILLS – Direct (by Mr. Barbosa)

1    A    First saw the computer?

2    Q    Yes, in early July of 2014.

3    A    No.  I didn't see it then.

4    Q    Do you know how Exhibit 12.8, the computer that you have

5    there, came into the possession of the Seattle Field Office?

6    A    Yes.  It was brought in by Deputy Assistant Director David

7    Iacovetti.

8    Q    And when was it received in the office?

9    A    The day before it came to our vault, or task force vault,

10   which I believe was July 8.

11   Q    And so it was received in the office July 8?

12   A    Correct.

13   Q    When did it come to your vault?

14   A    July 9.

15   Q    Where did you first see it?

16   A    In our vault, on July 9.

17   Q    And who had it at that point?

18   A    That's when Agent -- Special Agent Fischlin brought it in.

19   Q    What were you doing when you first saw the computer in

20   the -- so is this a separate vault from the main evidence

21   vault?

22   A    Yes.

23   Q    What's the -- what do you call your vault?  What is the

24   vault?

25   A    So our vault is technically called the "ECTF vault."

MILLS – Direct (by Mr. Barbosa)

1    Q    What were you doing when you saw the computer in the ECTF

2    vault?

3    A    I assisted Agent Fischlin in inventorying the device and

4    placing it on a shelf there, in the vault.

5    Q    And what is the process of inventorying the device?

6    A    So we would affix the -- our specific ECTF vault label on

7    the top of the device, or somewhere on the device.  And then we

8    would identify the markings, the serial number, make, and

9    model, and compare it with the Secret Service evidence

10   inventory sheet.

11   Q    Why do you verify the serial number again?

12   A    Just to make sure that this is, in fact, the device that

13   is inventoried on the sheet and we don't have any errors there.

14   Q    What do you check the serial number against?

15   A    The Secret Service inventory sheet that's attached to the

16   evidence envelope.

17   Q    Where is the serial number located on the computer marked

18   as Exhibit 12.8?

19   A    On this device, it's located behind the screen.

20   Q    Can you demonstrate that for the jurors, where it is, and

21   show them?

22   A    Sure.  So on this device, the serial number label is

23   actually located right here (indicating), on the bottom left of

24   the back of the screen.  You can barely see it there.

25   Q    Can you see the serial number without opening the screen

MILLS - Direct (by Mr. Barbosa)

1  up like you just did?

2  A    No.

3  Q    When you were verifying the serial number on the computer

4  on July 9, in the ECTF vault, did anything happen?

5  A    Yeah.  When we were manipulating the device, or attempting

6  to locate that serial number, I noticed that the screen came

7  on.

8  Q    And what did you see?

9  A    I saw what was -- I can describe as a Windows lock screen,

10 or it's a rainbow-colored screen, with a time and date.

11 Q    Did that cause you any concern?

12 A    Not necessarily.  It was just a surprise to us that it was

13 still on.

14 Q    Did you turn it off?

15 A    No.

16 Q    Why not?

17 A    Because with this type of case, when we realized it was

18 still on, we wanted to keep it in that state.  For the reasons

19 of encryption, we'd need to keep the device on in case we

20 needed to do a live image, so we could actually still obtain

21 that image without it being encrypted.  And we didn't have yet

22 a search warrant.  We didn't want to manipulate the device any

23 more than we had to.

24 Q    At that point, were you aware of that computer having been

25 powered on earlier in its -- in the time it had been in the

MILLS - Direct (by Mr. Barbosa)

1  custody of the Secret Service?

2  A    No.

3  Q    Was that the first time you became aware of the fact that

4  it would still have power on?

5  A    Yes.

6  Q    How long did the screen stay on?

7  A    It was only a few seconds.

8  Q    Did you push any buttons on the computer?

9  A    No, not at that time.

10 Q    Did you try and activate the keyboard, or do anything

11 else?

12 A    No.

13 Q    Were you concerned about leaving this device in a

14 powered-on state in the evidence locker?

15 A    No.

16 Q    Why not?

17 A    Well, we -- as is standard practice, we would leave any

18 device that way there because of the security of that locker.

19 We're not concerned about that.

20 Q    Do you always leave computers on, in every instance that

21 you're waiting to obtain a search warrant?

22 A    Not necessarily.

23 Q    What kind of things can a computer do when it is left

24 powered on?

25 A    Well, depending on the operating system, but computers

MILLS - Direct (by Mr. Barbosa)

1   will often perform background tasks while they're in sleep

2   mode, or hibernation mode.  Virus programs can run and still do

3   virus checks.  E-mail can be updated.  The machine could try to

4   update the operating system.

5   Q    Could a computer access the internet on its own?

6   A    No.

7   Q    Why not?

8   A    In my training and experience, a laptop would need to have

9   user interaction to actually connect to a wi-fi network.

10  Q    What do you mean by that, "user interaction to connect to

11  a wi-fi network"?

12  A    Well, it would mean that the user would have to have --

13  either previously or while he or she is at the laptop then,

14  would have to identify a network and actually physically

15  connect to that by clicking on a button, or a series of

16  buttons.

17  Q    What if it was a previously used network?

18  A    Previously used networks can be automatically connected

19  to, in some instances.

20  Q    What about a computer with a SIM card, like this one had?

21  A    In my experience, computers that have data -- or cellular

22  data capability, as this one did, would have to have had

23  interaction with a user.  Or in other words, a user would have

24  to open up a specific piece of software associated with the

25  brand of that SIM card and actually physically connect to a

MILLS – Direct (by Mr. Barbosa)

1   cellular network.

2   Q    What if it was within range of a cellular network that the

3   SIM card was specific for, could it possibly connect?

4   A    I'm not sure.  I don't know.

5   Q    Do you know where that computer was seized?

6   A    I do.

7   Q    Where?

8   A    In the Maldives.

9   Q    Do you know approximately how far that is from Seattle?

10  A    No; thousands of miles.

11  Q    After you verified the serial number and marked it with

12  the ECTF evidence number, what did you and Agent Fischlin do

13  with the computer?

14  A    We placed it there on a shelf in our evidence vault and

15  left it there until we had our search warrant.

16  Q    Is that evidence vault locked?

17  A    Yes.

18  Q    How is it secured?

19  A    So the door -- the evidence vault has a digital

20  combination lock, as well as a keypad entry, and a separate

21  alarm that is dedicated to that vault.

22  Q    Who has access to that vault?

23  A    Myself, Agent Fischlin, and the supervisors in the office.

24  Q    Is there any control of how you get in and out of that

25  vault?

MILLS - Direct (by Mr. Barbosa)

1    A    Yes.

2    Q    What is that?

3    A    We have a log sheet that's taped -- or placed on the

4    outside of the door.

5    Q    What about wider access to the office itself, is the

6    office open to the public?

7    A    No.  So access is controlled by key card and keypad.

8    Q    How many doors would -- how many secured entries would

9    somebody have to get through to get into the evidence vault?

10   A    Well, they would have to get through the door to our lab

11   and then -- so that's one -- and then the actual lab itself, so

12   two -- or the vault, excuse me.

13   Q    Is the evidence vault secure from wireless connections or

14   cellular connections in any way?

15   A    No.

16   Q    Are there methods of securing a device from wireless or

17   cellular connections?

18   A    Yes.

19   Q    What are those methods?

20   A    Typically, we use either a device called a Ramsey box,

21   which is a physical, hard case, hard-shell box, and a -- or a

22   Faraday bag.

23   Q    What is a Faraday bag?

24   A    A Faraday bag is a small bag -- they make them in various

25   sizes now -- that shields -- made out of material, usually

MILLS – Direct (by Mr. Barbosa)

1  metallic material, that would shield a device from any wireless

2  signal.

3  Q    At that time, did you have a Faraday bag or Ramsey box, I

4  believe you stated; is that correct?

5  A    Yeah.

6  Q    Did you have one that would fit that computer?

7  A    Perhaps the Ramsey box.  I'm not sure of the dimensions.

8  But we did not have a Faraday bag that would fit it, no.

9  Q    Had you ever used a Faraday bag for a laptop?

10 A    No.

11 Q    Why not?

12 A    It was not standard practice to do that because, in our

13 training and experience, laptops do not have the capability to

14 automatically connect to a cellular network.

15 Q    Why didn't you put it in a Ramsey box, if you might have

16 had one?

17 A    We just didn't believe that it was possible for that to

18 happen.

19 Q    What do you typically use Faraday bags for?

20 A    They're typically used for cell phones.

21 Q    And what is the primary reason for putting a cell phone in

22 a Faraday bag?

23 A    So cell phones are different than, say, a computer like

24 this, whereas cell phones are constantly connected to a

25 cellular network and receive data signals, back and forth.  So

MILLS – Direct (by Mr. Barbosa)

1   a Faraday bag is very useful in cutting off that device from

2   the cellular network that it belongs to.

3   Q    What might happen if a cellular phone -- take, for

4   example, the iPhone, marked Exhibit 12.8A, in front of you --

5   still has a cellular connection?

6   A    Well, first of all, we'd be concerned that a user might

7   remotely try to wipe that device.  That function is

8   specifically -- or especially evident in iPhones; or just

9   concerned that any other type of data would be modified in any

10  way.

11  Q    Is that concern about the device being wiped, have you

12  ever run into that happening in an investigation?

13  A    I've seen that happen, not in any investigation I've

14  personally had, but in others, yes.

15  Q    Is there a similar concern with a suspect wiping a laptop?

16  Is that a common occurrence?

17  A    No.

18  Q    How long did the computer remain in the vault?

19  A    It was there until approximately July 30.

20  Q    Why didn't you examine it earlier than July 30?  Or why

21  did it remain in the vault so long?

22  A    At that time, the case agent hadn't yet obtained a search

23  warrant.

24  Q    Why not?

25  A    There was a lot of things going on, at that time, after

MILLS – Direct (by Mr. Barbosa)

1    the defendant was apprehended.  The case agent, Mike Fischlin,
2    had to travel --
3              MR. BROWNE:  Your Honor, sorry.  One, I think it's
4    more than responsive; and two, it involves hearsay.
5              THE COURT:  It does to some extent, Counsel.  Let's
6    clarify and narrow it down.
7    BY MR. BARBOSA
8    Q    Do you know where the agent was in July of 2014?
9              MR. BROWNE:  Your Honor, I would just say, which
10   agent?
11   BY MR. BARBOSA
12   Q    Agent Fischlin, the case agent.
13   A    Yes.
14   Q    Where was he?
15   A    So he was in Seattle and in Guam, as well.
16   Q    Why was he in Guam?
17   A    At that time, he was attending the identity hearings for
18   the defendant.
19   Q    Was he the original case agent on this investigation?
20   A    No.
21   Q    Do you know how long he had been assigned to it?
22   A    In my -- to my recollection, it was only a few months.
23   Q    During that time, between July 9 and July 30, 2014, did
24   you take any steps to prepare or educate yourself in advance of
25   this examination?

MILLS – Direct (by Mr. Barbosa)

1    A     Yes.  I went online and actually did some research,

2    personally, into this specific make and model of laptop.  I

3    also looked at documentation concerning the Windows 8 operating

4    system and how it functioned.  And we also purchased a like

5    laptop, a similar model, from a local retail store here in the

6    Seattle area.

7    Q     What was the purpose of purchasing a similar model?

8    A     I wasn't familiar with the form factor or the –– this

9    device, and so we wanted to be absolutely certain how we would

10   attempt to make the image.  We became aware that it had a

11   solid-state hard drive.  I had not examined one up to that

12   point, so obtaining a like model and being able to look at that

13   model extensively would give me more knowledge.

14   Q     What type of research did you do with the sample computer?

15   A     So what I did was, I disassembled it and located –– and

16   verified that it did have a solid-state hard drive.  We

17   actually looked up specs, and such, for that solid-state hard

18   drive, and ended up successfully imaging that disk drive.

19   Q     How did you successfully image the sample drive?

20   A     So we were able to find a solid-state drive adapter.

21   Q     Let me ask you, when did you find that solid-state

22   adapter?

23   A     It was approximately July 30, we discovered that.

24   Q     Right around the same time you began your exam of

25   Exhibit 12.8?

MILLS - Direct (by Mr. Barbosa)

1    A    Correct.
2    Q    When you did your initial tests on the sample machine,
3    were you able to remove the solid-state drive from the
4    computer?
5    A    Yes.
6    Q    Did you have an adapter when you first tried to image it?
7    A    No.
8    Q    What were you -- how would you image it, if you couldn't
9    get an adapter?
10   A    We attempted to do what we call a "live image," at that
11   point.
12   Q    And for the jury's understanding, what does a solid-state
13   drive look like, versus a typical hard drive?
14   A    So a typical hard drive contains moving parts within
15   itself.  It has spinning platters and needle, almost like a
16   record player, so to speak, if you saw it.  And a solid-state
17   drive has no moving parts.  It just has a series of microchips.
18   It looks like what we call a stick of RAM memory.  It's very
19   small and thin.
20   Q    Okay.  So you indicated that you first didn't have an
21   adapter in order to do your imaging, or your test imaging.
22        Why did you have to do a live image when you didn't have
23   the adapter?
24   A    Well, we would -- since I didn't have the adapter, a live
25   image would give me the opportunity to still obtain a

MILLS - Direct (by Mr. Barbosa)

1   successful image from that computer, or we had hoped.

2   Q    What does the adapter do that makes it easier than doing a

3   live image?

4   A    Yeah.  The adapter allows me -- would allow the examiner

5   to plug in that solid-state drive and then hook that up to the

6   traditional interface that we have with our write blocker,

7   which we'd then be able to do a traditional image at that

8   point.

9   Q    What supplies power to the solid-state drive when you're

10   doing your imaging process through an adapter?

11   A    The write blocker supplies the power.

12   Q    So if you don't have an adapter, and the drive is still in

13   the device, what supplies power?

14   A    The device itself.

15          THE COURT:  Counsel, why don't we take a stretch

16   break.

17       While we're doing that, can I have a brief sidebar,

18   Counsel?

19          MR. BROWNE:  Sorry, Your Honor?

20          THE COURT:  A brief sidebar, Counsel?

21          MR. BROWNE:  Sure.

22       (The following proceedings were heard at sidebar)

23          THE COURT:  Counsel, I have concerns about your Juror

24   Number 6.  He's been sleeping.  I've noticed sleeping this

25   morning and also sleeping this afternoon.  I wanted to bring it

MILLS - Direct (by Mr. Barbosa)

```
 1   to the parties' attention so you make your own independent
 2   observations.  But it's causing growing concern for the Court.
 3       If it doesn't address itself, or correct itself, then the
 4   Court's going to have to consider whether or not we should
 5   either bring that particular juror out and make further
 6   inquiry, of if there's something going on that's causing him
 7   failing to stay awake, or something that's distracting him.
 8   I'm not sure if anybody has made the same observation.
 9               MR. BROWNE:  We noticed it.  I tried to make --
10               THE COURT:  You have to say something affirmatively.
11               MR. BROWNE:  I know, but I didn't want to embarrass
12   him.  I've been in this situation before.  I'm sure you have
13   too.
14               THE COURT:  I think we need to do something.
15               MR. BROWNE:  I'm not sure that he's always sleeping
16   when he looks like he's sleeping.
17               MR. WILKINSON:  Sometimes he's taking notes, I think.
18               THE COURT:  I'm trying to give him the benefit of the
19   doubt, but I'm just bringing it to everybody's attention, all
20   of you, and then we'll take another assessment as we progress
21   through the balance of the trial.
22               MR. BROWNE:  Good idea.  Thank you.
23                   (End of proceedings heard at sidebar)
24               THE COURT:  You may proceed, Counsel.
25               MR. BARBOSA:  Thank you, Your Honor.
```

MILLS - Direct (by Mr. Barbosa)

1   BY MR. BARBOSA

2   Q    Approximately when did you receive a warrant to search the

3   computer?

4   A    That would have been July 28 of 2014.

5   Q    When did you check the computer out of the Electronic

6   Crimes Task Force vault to begin your examination?

7   A    July 30.

8   Q    And what did you do when you first checked the computer

9   out of the ECTF vault?

10  A    I took it to my workstation in our ECTF lab, and I plugged

11  it into power.

12  Q    Where is your ECTF lab located in relation to the vault?

13  A    It's directly adjacent to it.

14  Q    Okay.  Is the ECTF lab secure in any fashion?

15  A    Yes.  It's secured in the same fashion, with key card

16  lock, PIN lock, and a digital combination lock.

17  Q    And is that within the greater office space of the overall

18  Secret Service?

19  A    Yes.

20  Q    Once you took it to your workstation, did you see if it

21  still had power on?

22  A    I did not notice that it had power on, at that point, no.

23  Q    What did you do?

24  A    So I put it in -- took it to my workstation, and I

25  inserted the AC power cord.

MILLS - Direct (by Mr. Barbosa)

1  Q   Why did you insert an AC power cord to the computer?

2  A   I believed at that time it may have possibly -- the

3  battery may have died.  I wanted to give it power, because we

4  still hadn't, number one, received an adapter for the hard

5  drive, so we were anticipating, at that point, doing --

6  attempting a live image of the computer, in which it would need

7  power.

8  Q   Is that normal to plug a device -- an evidence item --

9  computer evidence item into power like you did?

10 A   No.

11 Q   When did you obtain this adapter?

12 A   The adapter was obtained with -- it was the same adapter

13 that came with that test computer.

14 Q   So you already had the adapter the entire time?

15 A   Oh, I'm sorry.  The power adapter or the --

16 Q   Sorry.  The adapter that allowed you to do an examination

17 other than a live exam.

18 A   Oh, I'm sorry.  Yeah.  The solid-state drive adapter was

19 obtained on July 31.

20 Q   Okay.  What was the next time you worked on the computer?

21 A   August 1.

22 Q   What did you do first?

23 A   So what we did -- what I did, at that time, was, since I

24 had the solid-state adapter, I began to disassemble the device

25 to access the solid-state hard drive.

MILLS – Direct (by Mr. Barbosa)

1   Q    And how did you go about disassembling the device, if you
2   could explain using Exhibit 12.8 as an example?
3   A    Sure.  So what I did -- and I practiced this on the test
4   machine -- I started to remove the back panel of the device
5   here.  There's several screws that are actually hidden.  You
6   had to remove some of the trim pieces to actually get to the
7   screws.  But you begin removing that back panel by removing
8   screws, and then accessing it there.
9   Q    Did anything happen, as you were going about removing the
10  screws to disassemble the device?
11  A    Yes.  So I was manipulating it further.  I noticed that
12  the actual screen came on, again, as it had before.
13  Q    What did you see this time?
14  A    The same rainbow-colored screen, with the date and time.
15  Q    Did you see whether the computer had gone through a full
16  startup?
17  A    No.
18  Q    Did it appear to have gone through a full startup?
19  A    No.
20  Q    How long did the screen display?
21  A    Until I depressed the power button and turned it off.
22  Q    And when you say "turned it off," did you put it to sleep,
23  or did you completely power this down?
24  A    No.  I turned it off, completely powered it down.
25  Q    Either of these instances when you saw the screen came on,

MILLS – Direct (by Mr. Barbosa)

1    either on July 9 or August 1, when you were going to begin your

2    exam, did you record that in your notes or your reports?

3    A    Yes.

4    Q    Why?

5    A    Because it was an unusual occurrence, so I wanted to make

6    sure those were documented, those events were.

7    Q    What did you do after turning the power off?

8    A    So then I continued with the disassembly of the device, or

9    the back cover, at least.  I removed the hard drive, that

10   solid-state drive, and attached it to the adapter we had just

11   received the day before.  And then I began to image that

12   solid-state hard drive.

13   Q    Had you done anything earlier, while you were

14   disassembling it, to power it up?  Had you intentionally, or

15   even accidentally, in your recollection, pressed the power

16   button?

17   A    No.

18   Q    Based on your training and experience, what did the fact

19   that the computer screen came on, on August 1, after you had it

20   plugged into power -- what did that tell you about the state of

21   the operating system?

22   A    That it was still basically on, and perhaps in a

23   hibernation or sleep mode.

24   Q    So let's talk about your imaging.  You plugged it into

25   your write blocker; is that correct?

MILLS - Direct (by Mr. Barbosa)

1    A    Correct.

2    Q    Did you obtain a successful image of the solid-state

3    drive?

4    A    Yes.

5    Q    Did you examine any other forensic artifacts on the

6    computer itself?

7    A    So while I was imaging, I did power the device on, at that

8    time, and accessed the bios.

9    Q    What is the purpose of accessing the bios?

10   A    The bios is -- on Windows-based computers is the basic --

11   stands for "basic input output system."  It's basic software

12   that's contained on the motherboard of the computer, that

13   contains very basic functions.  It also contains date and time

14   information.

15   Q    What information -- sorry.  What information were you

16   looking for in the bios?

17   A    Actually, date and time is something that we verify.

18   Q    And what did you find there?

19   A    We found that it was set to a Moscow time zone.

20   Q    Were you able to verify that the image was an exact copy

21   of the original solid-state drive from Exhibit 12.8?

22   A    I'm sorry.  Could you repeat that?

23   Q    Were you able to verify the integrity of the image?

24   A    Yes.

25   Q    How did you do that?

MILLS – Direct (by Mr. Barbosa)

1   A    I checked the text file that is generated by FTK Imager.

2   It generates the hash value of that image and then the check

3   value, which is -- which would be the same hash value.  And I

4   made sure those were exactly the same.

5   Q    Those are the hash value from the copy and the original?

6   A    Correct.

7   Q    And they matched?

8   A    Yes.

9   Q    How long did it take to create the forensic image?

10  A    I believe it was a little more than an hour.

11  Q    When did you begin your examination of the forensic image?

12  A    Immediately thereafter.

13  Q    Did you consult with Agent Fischlin on what to look for as

14  part of your exam?

15  A    Yes.

16  Q    In general, what were you looking for in this particular

17  computer forensic examination?

18  A    We wanted to try to find -- or Agent Fischlin was

19  interested in finding any types of files that contain credit

20  card numbers, also any files that contain images or documents.

21  Q    Did you conduct any keyword searches?

22  A    Yes, we did.

23  Q    Do you recall any particular keywords you were looking

24  for, as part of this exam?

25  A    Yes.

MILLS - Direct (by Mr. Barbosa)

1   Q    Which ones do you recall?

2   A    I recall "smaus," "ochko," and we also used the

3   defendant's names, first and last names.

4   Q    So were there others, possibly?

5   A    Yes, many more.

6   Q    Do you recall every one of them?

7   A    No.

8   Q    Did you look for communications?

9   A    Yes, we did.

10  Q    And did you review internet history during this

11  examination?

12  A    Yes.

13  Q    Can you describe, generally, what you found on the

14  computer?

15  A    Generally, we found -- first of all, we found large

16  amounts of -- large text files containing thousands and

17  thousands of credit card numbers.  We also found images that

18  had the defendant on them, photographs.  We found images of the

19  defendant's passports.  And we also found communications,

20  chats, and e-mails.  We also found web history.

21  Q    What was the nature of the web history and the chat

22  communications?

23  A    The web history, we noted, specifically, that he had

24  accessed many carding websites.

25  Q    Did you review the internet search history?

MILLS - Direct (by Mr. Barbosa)

1   A    Yes.

2   Q    What was the nature of the internet search history you

3   found?

4   A    From what I remember, that was also related to carding

5   websites.

6   Q    As you located items of interest to the case agent, did

7   you do anything to flag those items for his further review?

8   A    Yes.

9   Q    How do you do that?

10  A    So within the EnCase software, you're -- it allows you to

11  bookmark certain files and -- where you can identify those and

12  create a report at a later date for the case agent.

13  Q    As you went about your examination, did you continue to

14  consult with Agent Fischlin, as you followed up through the

15  course of the exam?

16  A    Yes.

17  Q    What kind of things did you follow up with him on?

18  A    Followed up on a lot of the different pieces of

19  information regarding the credit card numbers, the -- all the

20  large -- what we call the "dump files" that were discovered on

21  that computer.

22  Q    Once you had flagged all the files you believed were of

23  investigative interest, did you make your findings available to

24  Agent Fischlin?

25  A    Yes.

MILLS - Direct (by Mr. Barbosa)

1  Q    How did you provide your findings and items of interest to
2  Agent Fischlin?
3  A    I generated a forensic examination report.
4  Q    And what does a forensic examination report consist of?
5  A    Well, it's a document -- Word document, basically, that
6  supplies various pieces of information, specifically, in this
7  case, description of the item that I examined, its
8  characteristics.  I mentioned the warrant that was provided to
9  me.  I identified the different software and hardware tools
10  that I use, and provide some photographs, which identifies the
11  item itself.  And then I go category by category into the
12  individual evidence pieces of -- or excuse me -- items or files
13  that I find of interest.
14  Q    Are these reports done in an electronic format, or is it
15  useful in just a paper copy?
16  A    Both.
17  Q    What is the electronic nature of the report?
18  A    The electronic nature is a Word document, and it -- I'm
19  able to embed hyperlinks to additional reports, so basically,
20  like, an attachment.
21  Q    Do you also hyperlink to the actual items of evidence?
22  A    Yes.
23  Q    If Agent Fischlin needed additional information about
24  particular files, would you assist him with follow-up requests?
25  A    Yes.

MILLS - Direct (by Mr. Barbosa)

1   Q      Did he have follow-up requests?

2   A      He did.

3   Q      What type of follow-up requests?

4   A      We continued to look for items of dominion and control,

5   such as documentation and other images that would tie that

6   device to the defendant.

7   Q      And did you also go about examining logs and event logs as

8   part of your review?

9   A      Yes.

10  Q      As part of your preparation for trial, did you work with

11  Agent Fischlin to prepare a number of exhibits from the items

12  you found on the computer?

13  A      Yes.

14  Q      So are you familiar with all of the files and forensic

15  artifacts that Agent Fischlin will be offering as exhibits?

16  A      Yes.

17  Q      Did you also review the metadata for all of the files and

18  forensic artifacts that will be offered as exhibits?

19  A      Yes.

20  Q      Can you explain what metadata is?

21  A      Metadata is actually very detailed data that's embedded in

22  the file, that contains the file name; contains the path or the

23  location of that file on the hard disk of the computer;

24  contains dates when the file was created, accessed, and even

25  modified.

MILLS - Direct (by Mr. Barbosa)

1   Q    Where are those file data, or that metadata?  Where is
2   that typically stored on a computer?
3   A    It's stored on the master file table of the hard disk
4   drive.
5   Q    And what is the master file table?
6   A    It basically tells -- assists the operating system in
7   locating those files on the computer.
8   Q    Do you rely on certain items of metadata more often than
9   others?
10  A    Yes.
11  Q    Which items do you rely on, primarily?
12  A    Within that metadata, we rely on the file path, the file
13  name, and those access dates.
14  Q    What about the last written dates?
15  A    Last written, as well, yes.
16  Q    Which dates do you rely on more heavily than others?
17  A    File created and last written.
18  Q    Why?
19  A    We tend -- the last written date really tells you when the
20  file was last changed.  File created, obviously, tells you when
21  it was -- when the file was created.  The last access date
22  doesn't tell you when the file was changed, but tells you, just
23  basically, when it was accessed by the operating system.
24  Q    Can it tell you when it was accessed by a user, also?
25  A    Yes.

MILLS - Direct (by Mr. Barbosa)

1   Q    What types of things might affect last access dates on a
2   file metadata?
3   A    It could be virus scanning by a virus -- antivirus
4   program.
5   Q    What else?
6   A    It could be the operating system itself just doing checks,
7   routine maintenance on itself, to make sure that device is up
8   and ready to go.
9   Q    Could it also reflect when somebody simply opens up a
10  file?
11          MR. BROWNE:  Your Honor, object to leading questions.
12          THE COURT:  It is leading, Counsel.  It's sustained.
13  BY MR. BARBOSA
14  Q    What else could it affect?
15  A    It could affect when a file is opened or touched by a
16  user.
17  Q    Did you pull all of the metadata for each of the exhibits
18  that Agent Fischlin plans to offer in this case?
19  A    Yes.
20  Q    And did you also prepare a summary of all those -- all
21  that metadata information for each of the exhibits?
22  A    Yes.
23  Q    And is it easier to review that in a summary form than the
24  entire master file table list?
25  A    Yes.

MILLS – Direct (by Mr. Barbosa)

1    Q    How many files might be in a master file table list?

2    A    Well, hundreds of thousands, potentially.

3    Q    I'm going to show you what's been marked as Government's

4    Exhibit 13.40.

5         Do you recognize that?

6    A    Yes, I do.

7    Q    How do you recognize this?

8    A    This is the table that was created by myself and Agent

9    Fischlin for the exhibits pulled from the laptop.

10   Q    And does it accurately reflect all of the file dates, for

11   each of the exhibits from the computer, that will be offered in

12   this case?

13   A    Yes.

14            MR. BARBOSA:  Government offers 13.40.

15            MR. BROWNE:  No objection, Your Honor.

16            THE COURT:  It's admitted.

17                 (Exhibit 13.40 was admitted)

18   BY MR. BARBOSA

19   Q    Let's use the first few entries on Exhibit 13.40 to

20   explain what information we have here.

21        Could you go through this, starting with the number column

22   on the left-hand side?

23   A    Sure.  The first item, Item Number 13.1, is an image of a

24   passport that was obtained from the laptop.

25   Q    And the number, is that the exhibit number corresponding?

MILLS - Direct (by Mr. Barbosa)

1   A    Yes.

2   Q    Okay.

3   A    And then to the right of that description is the file

4   created, last accessed, and last written dates.

5   Q    Again, what does the file created date tell you?

6   A    When the file was first created on that system.

7   Q    And the last access date?

8   A    When it was actually accessed or touched by the user --

9   Q    Or --

10  A    -- or the operating system.

11  Q    And the last written date?

12  A    That would be the last date that it was actually changed.

13           MR. BROWNE:  Actually, what?  I'm sorry.  I couldn't

14  hear that.

15           THE WITNESS:  Changed.

16  BY MR. BARBOSA

17  Q    Can the operating system change files?

18  A    No.

19  Q    Reviewing this entire exhibit, were any of the exhibits

20  that Agent Fischlin plans to offer in this trial changed after

21  the laptop was seized from the defendant, based on these dates?

22  A    No.

23  Q    Do you know when the defendant was taken into custody?

24  A    July 4 or 5 of 2014.

25  Q    And were any of these accessed at some point after he was

MILLS - Direct (by Mr. Barbosa)

1   taken into custody?

2   A     No.

3   Q     I'll turn your attention to 13.6.

4         Does this reflect a last access date?

5   A     Oh, excuse me.  Yes, it does.  It reflects a date after he

6   was apprehended, yes.

7   Q     And what is the description of that item?

8   A     That is an animated -- it says, "Animated 2Pac ad from the

9   defendant's desktop."

10  Q     Why might an item on the desktop of a computer show a last

11  access date at that time?

12  A     It could have been accessed by the antivirus software at

13  that time.

14  Q     Where was the computer at that time?

15  A     It was located in our ECTF vault.

16  Q     Had that file or any others, however, been changed?

17  A     No.

18  Q     Based on your training and experience, are all of the

19  exhibits -- or do you have an opinion as to whether the

20  exhibits from the computer, listed here in Exhibit 13.40, are

21  in the same condition as when the computer was seized from the

22  defendant?

23  A     I believe they are in the same condition.

24  Q     Why do you believe that?

25  A     Because that -- the device itself was -- after it was

MILLS - Direct (by Mr. Barbosa)

1  received at our office, was never moved, and it was never

2  touched by us -- or myself or anyone else until we had the

3  actual search warrant in hand.

4  Q    And do these dates inform your opinion in any way?

5  A    Yes, they do.

6  Q    Which dates inform your opinion in that regard?

7  A    The last written date.

8  Q    Looking specifically at 13.6, the animated 2Pac ad from

9  the desktop, was that saved in any other place on the computer?

10  A    Yes.

11  Q    Do you recall how many other places it was found?

12  A    I believe it -- I remember at least one.  I can't remember

13  exact -- the exact number, though.

14  Q    Okay.  And had those been changed, or that one, or any

15  others, been changed since defendant's capture?

16  A    I don't believe so.  I can't remember, though.

17  Q    Not exactly?

18  A    No, not exactly, no.

19  Q    Based on your training and experience, do you have any

20  reason to doubt the integrity of any of the exhibits listed

21  here in Exhibit 13.40?

22  A    No.

23  Q    Do you believe there is any reason to believe that they

24  were tampered with or altered in any fashion after defendant

25  was taken into custody?

MILLS - Direct (by Mr. Barbosa)

1    A    No.

2    Q    Could the computer itself have changed the substance of

3    any of these files on its own?

4    A    Not these exhibit files, no.

5    Q    What would be necessary in order to change the substance

6    of these files?

7    A    User interaction.

8    Q    Could any user have interacted with this computer during

9    the time it was in the Secret Service custody after defendant's

10   capture?

11   A    No.

12   Q    Could another user have remotely connected to this

13   computer and changed any of the exhibits?

14   A    No.

15   Q    How do you know that?

16   A    Because as I stated before, the computer could not have

17   been connected to any wireless network because it hadn't been

18   in the country before, so there was no known wireless networks

19   that it could --

20             MR. BROWNE:  Excuse me, Your Honor -- I'm sorry,

21   Agent, to interrupt you -- this is speculation.

22             THE COURT:  That's overruled, Counsel.  The answer

23   remains.

24        Let's confine remarks to personal knowledge.

25   ////

MILLS – Direct (by Mr. Barbosa)

1   BY MR. BARBOSA

2   Q    Is that based on your personal knowledge and review of the

3   forensic artifacts on that computer?

4   A    Yes.

5   Q    What type of evidence on the computer can tell you whether

6   or not it's connected to a remote connection?

7   A    That, we found in a couple of different places that we

8   rely upon, the registry files and also the event logs.

9   Q    Did you review those logs?

10  A    Yes.

11  Q    Were you able to determine when the computer had last

12  connected to, for example, a wireless network?

13  A    Yes.

14  Q    What did you find?

15  A    I discovered in the event logs that it had last connected

16  to a wireless network on July 4, 2014.

17  Q    And did it record the name of the wireless network it had

18  last connected to?

19  A    Yes.

20  Q    What was that name?

21  A    Kanifushi.

22  Q    Do you recognize the name Kanifushi?

23  A    Yeah.  Kanifushi was the name of the resort hotel where

24  the defendant was staying at, in the Maldives.

25  Q    I'm showing you what's been marked -- or admitted as

MILLS – Direct (by Mr. Barbosa)

1   Exhibit 12.9, Page 20.

2       Is that the name you saw in the last wireless connection

3   to this computer?

4   A    Yes, Kanifushi.

5   Q    Did this -- you mentioned this computer also had a SIM

6   card.

7       Did you look at that SIM card?

8   A    At the time of the exam?

9   Q    Have you looked at that SIM card at any point?

10  A    Yes.

11  Q    What did you find?

12  A    I found that it apparently contained --

13          MR. BROWNE:  Objection.  May I have just one moment?

14          THE COURT:  You may.

15          MR. BROWNE:  Your Honor, I don't want to do a

16  speaking objection.  But let me be abstract.  The discovery of

17  the SIM card wasn't until June, in this courtroom.  So we don't

18  have any reports or anything about the SIM card.

19          THE COURT:  All right.  Counsel, do you plan on going

20  into the details of any SIM card activity, or reports?

21          MR. BARBOSA:  I'm going to have him say what it says

22  on the physical SIM card.

23          MR. BROWNE:  That's fine.

24          THE COURT:  And with that, the objection is

25  overruled, unless it's withdrawn.

MILLS - Direct (by Mr. Barbosa)

1              MR. BROWNE:  I'll withdraw it.  That's fine.

2              THE COURT:  Please proceed.

3              THE WITNESS:  The SIM card contained writing that

4    indicated it was from a Russian cellular carrier.

5    BY MR. BARBOSA

6    Q    Which one was that?

7    A    I'd have to refresh my memory from the card itself.

8    Q    Do you want to look at it?

9    A    Sure.  Sure.  Thank you.

10             THE COURT:  Members of the jury, if you want to stand

11   and take a quick stretch break.

12        Ready?

13             THE WITNESS:  Yes.

14             THE COURT:  Please be seated.

15   BY MR. BARBOSA

16   Q    Have you had a chance to look at it?

17   A    Yes.

18   Q    What network was it?

19   A    MetaFon.

20   Q    MegaFon?

21   A    MegaFon, yes.

22   Q    Did you review event logs to determine whether or not it

23   had last -- when it had last connected to a cellular network?

24   A    Yes.

25   Q    What did you find?

MILLS – Direct (by Mr. Barbosa)

1    A    It last connected on or about June 17 of 2014.

2    Q    And what was the network that it had connected to over

3    cellular?

4    A    MegaFon Network.

5    Q    Was that the same one as on the SIM card?

6    A    Correct.

7    Q    Based on your review of everything on the computer,

8    including the event logs, do you have any concerns about the

9    integrity of the evidence, any evidence or any items found on

10   that computer?

11   A    No.

12   Q    So as part of your review using EnCase, did you find any

13   activity had occurred on the computer between the time it was

14   seized from the defendant and when you began your exam?

15   A    Yes.

16   Q    What did you find?

17   A    I found that there had been several files that had been

18   accessed.

19   Q    How many files, approximately?

20   A    Approximately 30,000 or so –– or it was –– no.  I can't ––

21   actually, I can't remember the exact –– it was in the

22   thousands, though.

23   Q    What did this show you about the file activity after the

24   computer had been seized?

25   A    It showed that the files had been accessed, mostly by the

MILLS – Direct (by Mr. Barbosa)

1    operating system, and possibly the antivirus software.

2    Q    How were you able to determine that?  Was there anything

3    in the master file table that told you what was doing the

4    various things?

5    A    Well, I was able to observe the last access dates that

6    were changed, that -- or that occurred after the defendant's

7    apprehension.

8    Q    Okay.  What was the nature of the file activity that

9    occurred after the defendant's apprehension?

10   A    Mostly, it dealt with the basic housekeeping items for

11   Windows, like updating.  It was attempting to update itself.

12   And there was some virus checks, as well, antivirus checks.

13   Q    Was it successful in updating itself?

14   A    No.

15   Q    Why not?

16   A    Because it wasn't connected to a wireless network.

17   Q    Based on your training and experience, do you have an

18   opinion as to whether any of this file activity was the result

19   of a human interacting with the computer, either at the

20   keyboard or remotely?

21   A    No.  That did not happen.

22   Q    Why do you believe that?

23   A    The -- no one accessed this device while it was in our

24   lab.

25   Q    So what was all this activity caused by, this thousands of

MILLS - Direct (by Mr. Barbosa)

1   possible file date changes?

2   A     It was the operating system, itself, accessing those

3   files.

4   Q     So I'd like to ask you some questions about your analysis

5   and some of the basic forensic artifacts you found.

6         Did you determine when the operating system had been

7   installed on this computer?

8   A     Yes.

9   Q     What did you learn?

10  A     I learned that approximately -- or a few months prior to

11  his apprehension in the Maldives, that the operating system had

12  been updated to Windows 8.1.

13  Q     Did you examine what user accounts existed on the

14  computer?

15  A     Yes.

16  Q     What is a user account?

17  A     A user account is -- it gives the -- is an operator -- or

18  excuse me, is a user -- excuse me -- an account that is created

19  on the device by a user, that allows that person access to the

20  device.

21  Q     How many user accounts were on the computer?

22  A     Three.

23  Q     What were they?

24  A     One was administration -- or the "admin" account, the

25  other was "guest," and the other one was "smaus."

MILLS – Direct (by Mr. Barbosa)

1   Q    How many logons were there for administrators; do you

2   recall?

3   A    I do not recall.

4   Q    Guest logons, were there any?

5   A    No, I don't believe there were.

6   Q    Had you seen the term "smaus" before?

7   A    Just in material related to the case.

8   Q    Were you able to determine what methods could be used to

9   logon to the smaus user account?

10  A    Yes.

11  Q    What were those?

12  A    We looked at registry files, as well as the event logs in

13  the computer itself.

14  Q    What were the various methods that somebody could log on

15  to the smaus user account?

16  A    Okay.  So the -- when we went -- the method that we were

17  aware of is that they had to physically type in a password on

18  the computer itself.

19  Q    Were you able to determine when the smaus user account had

20  last logged in?

21  A    Yes.

22  Q    When was that?

23  A    That was on July 4.

24  Q    Were there other logons related to the timing of the

25  installation of the operating system?

MILLS - Direct (by Mr. Barbosa)

1    A    Yes.

2    Q    What were those?

3    A    I believe those were back in May of 2014.

4    Q    Okay.  Did you also determine what the user had named the

5    computer?

6    A    Yes.

7    Q    What was that?

8    A    Smaus.

9    Q    You've discussed looking for items of dominion and

10   control.

11        Can you explain, again, what that means?

12   A    So items of dominion and control are actually -- it could

13   be a document or a -- an image or communication that would

14   indicate -- or tie that person to that device.

15   Q    I'm going to show you Government's Exhibits 13.1 and 13.1A

16   on the screen.

17        Do you recognize those?

18   A    Yes.

19   Q    How do you recognize those?

20   A    These are -- this is an image -- 13.1 is an image that we

21   pulled from the device.

22   Q    And what is 13.1A?

23   A    13.1A is the actual metadata that's associated with that

24   file.

25   Q    And those were both found on the laptop computer marked

MILLS – Direct (by Mr. Barbosa)

1    Exhibit 12.8?

2    A     Yes.

3          MR. BARBOSA:  Government offers Exhibits 13.1 and

4    13.1A.

5          MR. BROWNE:  No objection.

6          THE COURT:  They're admitted.

7            (Exhibits 13.1 and 13.1A were admitted)

8    BY MR. BARBOSA

9    Q     What do we have here?

10   A     So on the –– on 13.1, this is an image of the title page,

11   or picture page, of the passport, indicating it belonged to

12   Roman Seleznev.  And it has birth date and passport number on

13   that.  And on the left-hand side –– or on the right-hand side,

14   13.1A, this is the metadata that contains the actual file name,

15   in this case "mypassport.jpg," the path or the location of that

16   file on the hard drive of the computer, its created, written ––

17   file created, last written, and last accessed dates.

18   Q     How is the file name supplied?  Is that generated by your

19   forensic software?

20   A     No.  That would be input by the user.

21   Q     And what was the file name here?

22   A     Mypassport.jpg.

23   Q     And have you seen defendant's actual passport that has

24   been admitted as Exhibit 12.7, and has a photograph in

25   Exhibit 12.7A?

MILLS – Direct (by Mr. Barbosa)

1    A     Yes.

2    Q     Is that the same passport?

3    A     Yes.

4    Q     And 13.1, is that in the same condition as when that

5    computer was seized from the defendant at the time of his

6    arrest?

7    A     Yes.

8    Q     I'm now going to bring up Exhibit 13.2 and 13.2A.

9          Do you recognize these?

10   A     Yes, I do.

11   Q     How do you recognize Exhibits 13.2 and 13.2A?

12   A     This is also an image and this metadata that I obtained

13   from the the defendant's laptop.

14             MR. BARBOSA:  Government offers Exhibits 13.2 and

15   13.2A.

16             MR. BROWNE:  One second, Your Honor, please.

17             THE COURT:  Yes.

18             MR. BROWNE:  No objection.  Thank you.

19             THE COURT:  They're admitted.

20                (Exhibits 13.2 and 13.2A were admitted)

21             MR. BARBOSA:  Thank you, Your Honor.

22   BY MR. BARBOSA

23   Q     What do we have on the left?

24   A     13.2 is actually an image of a MasterCard in the name of

25   Roman Seleznev.

MILLS - Direct (by Mr. Barbosa)

1  Q    And what was the name of that file?

2  A    Mycreditcard.jpg.

3  Q    And had it been altered in any way since the defendant's

4  computer was seized from him?

5  A    No.

6  Q    Showing you now Exhibit 13.3 and 13.3A.  13.3 is two

7  pages.

8       Do you recognize that photograph?

9  A    Yes.

10 Q    How do you recognize these?

11 A    This is one of the photographs I obtained from the laptop.

12 Q    And is the metadata on -- in 13.3A?

13 A    Yes.

14 Q    Is that also two pages, showing for both photographs?

15 A    Yes, it is.

16      MR. BARBOSA:  Government offers Exhibits 13.2 and --

17 or 13.3 and 13.3A.

18      THE COURT:  Any objection?

19      MR. BROWNE:  No objection.

20      THE COURT:  They're admitted.

21      (Exhibits 13.3 and 13.3A were admitted)

22 BY MR. BARBOSA

23 Q    Do you recognize anybody in this photograph?

24 A    Yes.  I recognize the individual in the middle of the

25 other two individuals as Roman Seleznev.

MILLS - Direct (by Mr. Barbosa)

1    Q    And when was this file last written?

2    A    Last written date shows -- I believe that's a 5/31 of '14.

3    I'm sorry, written.  I'm sorry.  Excuse me.  Last written of

4    9/8 of 2013.

5    Q    And last accessed?

6    A    Last accessed was 5/31 of '14.

7    Q    And the second page, do you recognize anybody on the

8    second page of 13.3?

9    A    Yes.  I recognize the male as Roman Seleznev.

10   Q    And when was that last written and last accessed?

11   A    Last written date on that file was 9/8 of '13.  Last

12   accessed was 5/31 of '14.

13   Q    I'm just showing you 13.4 and 13.4A.

14        Do you recognize both of those?

15   A    Yes.

16   Q    How do you recognize both of these?

17            MR. BROWNE:  Counsel, I think there's just 13.4.

18            MR. BARBOSA:  I had 13.4A up earlier.

19            THE WITNESS:  Yes.  I obtained this photo from the

20   laptop, as well.

21   BY MR. BARBOSA

22   Q    And is 13.4A -- and if you need to look at it again, I can

23   bring it up.  But was that the metadata for the file?

24   A    Yes, it was.

25            MR. BARBOSA:  Government offers Exhibits 13.4 and

MILLS - Direct (by Mr. Barbosa)

1    13.4A.

2              MR. BROWNE:  No objection.

3              THE COURT:  Admitted.

4                   (Exhibits 13.4 and 13.4A were admitted)

5    BY MR. BARBOSA

6    Q    Do you recognize anyone in this photograph?

7    A    Yes.  I recognize the defendant, on the left, and the

8    female as his ex-wife, Romana -- I can't pronounce the last

9    name.

10   Q    Was that "Svetlana"?

11   A    Svetlana, yeah.

12   Q    How do you recognize her?

13   A    I actually met her in person.

14   Q    When was that?

15   A    That was in August or September of 2014.

16   Q    Now showing you Exhibit 13.5, and I'll show you 13.5A

17   also, do you recognize those?

18   A    Yes, I do.

19   Q    How do you recognize those?

20   A    This was an image of a document, in this case an invoice,

21   from the -- obtained from the computer.

22             MR. BARBOSA:  Government offers Exhibits 13.5 and

23   13.5A.

24             MR. BROWNE:  No objection.

25             THE COURT:  They're admitted.

MILLS – Direct (by Mr. Barbosa)

1                (Exhibits 13.5 and 13.5A were admitted)

2    BY MR. BARBOSA

3    Q    What was the invoice for?

4    A    This is an invoice for the Atmosphere Kanifushi Maldives

5    Resort, in the name of Mr. Seleznev.

6    Q    What was the date of that receipt?

7    A    It has the balance statement date of June 17, 2014.

8    Q    When did that relate to -- did that date come up earlier,

9    when you were discussing the SIM card?

10   A    Correct.  That was approximately the same time that the

11   last connection -- that the device was last connected to a

12   cellular network.

13   Q    Did you also review the forensic image of that computer to

14   search specifically for files with credit card numbers?

15   A    Yes.

16   Q    How did you go about looking for credit card numbers?

17   A    First of all, we looked for the text files that may

18   contain any large amounts of data.  We also used a -- the

19   function -- it's embedded in EnCase -- to look for credit card

20   numbers, or carve for those numbers, and search for them.  And

21   we used the CC Finder software, as well.

22   Q    What did you find?

23   A    We found approximately 1.7 million unique credit card

24   numbers on the computer.

25   Q    What do you mean by "unique credit card numbers"?

MILLS – Direct (by Mr. Barbosa)

1    A    Those would be non-duplicate numbers that were located on
2    the computer.
3    Q    Okay.  How many credit card numbers, total, had you found?
4    A    We found approximately 2.9 million.
5    Q    Why would there be duplicates of some of the credit card
6    numbers?
7    A    There were -- some of the files -- actual dump files that
8    we found, text files, were duplicated, I believe in the recycle
9    bin and in other places on the disk itself.
10   Q    How were the credit card numbers stored on the computer?
11   What type of files were they contained in?
12   A    They were predominantly stored in text files.
13   Q    Did they have any particular naming convention?
14   A    Yeah.  They were very unique.  A lot of them contained
15   names of individual states within the United States.
16   Q    How much data did they contain for each particular credit
17   card number?  Did you examine those?
18   A    Yes.  We were able to determine that most of them
19   contained track data, credit card numbers, and the name of the
20   card owner, account owner.
21   Q    Were you able to pull a list of all the files found on the
22   computer that contained credit card track data within them?
23   A    Yes.
24   Q    Showing you what's been marked as Government's
25   Exhibit 13.9, and if you could take a look at that in the

MILLS - Direct (by Mr. Barbosa)

1   binder in front of you.  It's a rather long exhibit, 33 pages.

2   Just confirm whether you recognize that.

3          THE COURT:  Counsel, after we complete this, we will

4   take our afternoon break.

5          MR. BARBOSA:  Certainly.  Thank you.

6          THE COURT:  Actually, Counsel, why don't we have the

7   witness inspect that exhibit through the course of the break,

8   so when we come back out, we're ready to go.

9          MR. BARBOSA:  Sounds good.

10          THE COURT:  We'll take our afternoon break at this

11   time.

12                  (Jury exits the courtroom)

13          THE COURT:  Counsel, please be seated.

14     Counsel, I'm not sure if you've made observations of Juror

15   Number 6, but I don't think it's -- can be questioned that this

16   juror has been sleeping most of the afternoon session.  There

17   was some observation by counsel for the government that perhaps

18   he was writing notes.  I think that's inconsistent with his

19   head bobbing up and down, and the fact that the Court's even

20   popped its microphone a couple of times to try to awaken the

21   juror, and that hasn't worked, as well.  And as a matter of

22   fact, on one of the stretch breaks, I think I woke him up at

23   that point in time.

24     That's the record that I would like to make.  Does the

25   government or the defense wish to supplement the Court's

MILLS - Direct (by Mr. Barbosa)

1   observations?  And again, my observation has been most of this

2   afternoon session, quite a bit this morning, before I brought

3   it to the parties' attention at the sidebar.

4       Any dispute, Counsel?

5       MR. WILKINSON:  No.  I would supplement it by saying

6   that I noticed the juror dropped his notepad one time because

7   he was falling asleep.

8       THE COURT:  Defense counsel have any reason to

9   dispute the Court's observation?

10      MR. BROWNE:  No, not at all, Your Honor.

11      I just want to say that there are people who look like

12  they're sleeping, who aren't.  So I don't know.  I'm a little

13  uncomfortable with it.  That's why I didn't want to say

14  anything.  But if counsel says he saw him drop his pad, then

15  that would be of concern to me.  I guess that's in the record

16  now too.  I have no reason to doubt counsel.

17      THE COURT:  Counsel, I'm in a position where I can

18  see the juror pretty much straightforward.  And I don't think

19  there's any dispute that he has been sleeping.  I know he has

20  been doing some note-taking, earlier in the trial.  But most of

21  this afternoon and quite a bit this morning, he has been

22  asleep, Counsel.

23      So this is the approach that the Court would like to take

24  so it doesn't cause disruption or tremendous amount of

25  embarrassment for the juror.  As opposed to calling him out

MILLS - Direct (by Mr. Barbosa)

1   right now, I'll have Victoria bring him out at the close of the

2   session this afternoon, 4:30, and I'll explain to him that

3   we've made our own personal observations, give him a chance to

4   maybe explain what's going on in his life.  If he chooses not

5   to, ask him if he'd feel more comfortable being excused from

6   the jury.  Then at that point in time, I'll make the

7   determination if he should be excused.

8        Any objection to that approach, by the government?

9             MR. BARBOSA:  No, Your Honor.

10            THE COURT:  Defense?

11            MR. BROWNE:  No, Your Honor.

12            THE COURT:  And I think that way, he doesn't have to

13   go back and explain to the jury he's been excused.  The jury

14   won't speculate why he's been excused.  They'll just have one

15   less of their members present tomorrow morning.

16        So if there's nothing else to take up, counsel for the

17   government?

18            MR. BARBOSA:  No.  Thank you, Your Honor.

19            THE COURT:  We'll be in recess.

20                         (Recess)

21                 (Jury enters the courtroom)

22            THE COURT:  Counsel, please continue your direct

23   examination.

24            MR. BARBOSA:  Thank you, Your Honor.

25   ////

MILLS – Direct (by Mr. Barbosa)

1   BY MR. BARBOSA

2   Q     During the break, did you have a chance to go over the

3   entirety of Exhibit 13.9?

4   A     Yes.

5   Q     Do you recognize that?

6   A     Yes, I do.

7   Q     How do you recognize this?

8   A     This is a part of the report that I generated detailing

9   the different credit card dump files that were located on the

10  computer.

11            MR. BARBOSA:  Government offers Exhibit 13.9.

12            MR. BROWNE:  No objection, Your Honor.

13            THE COURT:  It's admitted.

14                 (Exhibit 13.9 was admitted)

15  BY MR. BARBOSA

16  Q     So what do we have in Exhibit 13.9?  What are these files

17  that you've listed in here?

18  A     These are text files, each named differently, that

19  contained literally thousands of credit card numbers, or track

20  data.

21  Q     When you say "thousands," do you mean thousands, total, or

22  per each file?

23  A     Per file.

24  Q     And what was the naming -- could you go over some of the

25  names of the files you see on Page 1 here?

MILLS – Direct (by Mr. Barbosa)

1    A    Sure.  The top one is paymer48.txt; the third one down,

2    mammarussia.txt; Number 6 down, frontdesk.txt; and then the

3    seventh one, on the bottom, hotel.txt.

4    Q    Turning to Page 3, I'll highlight 18 through 22, what was

5    the naming convention you found here?

6    A    These had -- like, the first one, Number 18, pinnroadinn@,

7    the ampersand sign [sic], and what appears to be an IP address.

8    Q    And the next three or four of those?

9    A    Those are all similar, the ones on down the page.

10   Q    Could you read those, please?

11   A    Yes.  Number 19, pos@98.189.228.13.  Number 20 is

12   sam77@75.110.185.92.

13   Q    I'll take you to a couple more pages down.

14        You mentioned naming conventions involving state names; is

15   that correct?

16   A    Yes.

17   Q    Turn to Page 5.  What were the files you see on Page 5, 33

18   through 37?

19   A    These files contained either the abbreviations or actual

20   written names of states.

21   Q    And which states were involved here?

22   A    You see specifically New Jersey and New York, Washington,

23   Florida, and California.

24   Q    Continuing through, did you find other dump files named

25   with this similar naming convention?

MILLS - Direct (by Mr. Barbosa)

1    A     Yes.

2    Q     What other states?

3    A     So we saw Texas, as it shows here, Maryland, more for

4    California, New York.

5    Q     Did you find other geographic areas listed?

6    A     Yeah.  The bottom one there is Africa.

7              MR. BROWNE:  What page, Counsel?

8              MR. BARBOSA:  Sorry.  That was Page 6.

9              MR. BROWNE:  Thank you.

10   BY MR. BARBOSA

11   Q     Looking at the top of Page 7, what's the text file names

12   you see there?

13   A     This one, Number 46, is Argentina"; and 47, California.

14   Q     Did you find any dump files that appeared to be named

15   after other carders?

16   A     They did contain -- like, the Leeloo and shadowFRESH did

17   appear to contain names that would be similar to other carders.

18   Q     I'm going to scroll through a few of these pages.

19         Do you have another foreign dump file here, on Page 13?

20   A     Number 95 is named Canada.

21   Q     How many of these, total, did you find on defendant's

22   computer?

23   A     Approximately 246.

24   Q     How many pages did this list go?  Do you want me to just

25   move to the end?

MILLS - Direct (by Mr. Barbosa)

1   A     Yeah, sure.  Thirty-three pages, yes.

2   Q     Turning back to Page 5, showed us this file,

3   1000 Washington.txt.

4         Did you examine the contents of that file?

5   A     Yes.

6   Q     What was in it?

7   A     Track data for credit card -- that contained credit card

8   numbers.

9   Q     The title contains the state, Washington.

10        Did you examine the credit cards in there to determine

11  where they geolocated back to, or whether there was any common

12  point of compromises?

13  A     I turned those numbers over to Agent Fischlin, at the

14  time, and he performed that work.

15  Q     Turning your attention to Page 12, there's another file,

16  WA.txt.

17        Did you examine the contents of that file?

18  A     Yes.

19  Q     What did you find?

20  A     I found that it contained, also, several thousand credit

21  card numbers.

22  Q     I'm going to show you what's been marked as Government's

23  Exhibit 13.10, which is 311 pages.

24        You've reviewed that as part of your preparation for

25  trial?

MILLS – Direct (by Mr. Barbosa)

1           MR. BROWNE:  I was talking to co-counsel for a

2      moment.

3           Which item are we on now?

4           MR. BARBOSA:  13.10.

5           MR. BROWNE:  Thank you.  Sorry.

6      BY MR. BARBOSA

7      Q     That's 311 pages; is that right?

8      A     Correct.

9      Q     And did you have a chance to review that exhibit before

10     trial?

11     A     Yes.

12     Q     Do you recognize this file?

13     A     Yes.

14     Q     And is the metadata for that file contained in 13.10A,

15     that I'm showing you on the screen now?

16     A     Yes.

17     Q     Which file was that -- which file was contained in 13.10?

18     A     That is 1000 Washington.txt.

19     Q     And is that in the same condition as it was when it was

20     seized from Mr. Seleznev?

21     A     Yes.

22     Q     When the computer was seized?

23     A     Yes.

24           MR. BARBOSA:  Government offers Exhibits 13.10 and

25     13.10A.

MILLS - Voir Dire (by Mr. Browne)

```
 1              MR. BROWNE:  Your Honor, may I just voir dire,
 2   briefly?
 3              THE COURT:  You may.
 4                      VOIR DIRE EXAMINATION
 5   BY MR. BROWNE
 6   Q    Good afternoon.
 7   A    Good afternoon.
 8   Q    So 13.10 is 310 pages long?
 9   A    Correct.
10   Q    What is it?
11   A    What is the file?
12   Q    Yeah.
13   A    It is a text file that contains several thousand credit
14   card numbers.  And also, it contains additional data as to
15   where those accounts were actually physically located, or where
16   the account holder was located.
17              MR. BROWNE:  Okay.  And 13.10A is -- did you ask him
18   about that yet?
19              MR. BARBOSA:  Uh-huh.
20   BY MR. BROWNE
21   Q    13.10A, what is that?
22   A    13.10A is the actual metadata for that file.
23   Q    Okay.
24   A    1000 Washington.txt.
25   Q    So 13.10A is the metadata information for 13.10?
```

MILLS – Direct (by Mr. Barbosa)

1    A    Correct.

2            MR. BROWNE:  That's all I have, Your Honor.  I have

3    no objection.

4            THE COURT:  It's admitted, both of the exhibits.

5            (Exhibits 13.10 and 13.10A were admitted)

6            MR. BARBOSA:  Thank you, Your Honor.

7                        DIRECT EXAMINATION

8    BY MR. BARBOSA

9    Q    Let's focus -- well, first, the metadata, when was that

10   last written?

11   A    Last written date shows 3/6 of 2014.

12   Q    And it shows a file created date of 5/15/14.

13        How does that happen?

14   A    It's a function sometimes of Windows.  Sometimes those

15   numbers can get jumbled by the operating system itself.  It

16   appears from time to time.

17   Q    Can that be caused by moving a file from one source to

18   another?

19            MR. BROWNE:  Objection, Your Honor.

20            THE COURT:  It is leading, Counsel.  Sustained.

21   BY MR. BARBOSA

22   Q    How can that happen?

23   A    It can be attributed to if the file was moved from a

24   different computer, or copied from a different place and moved

25   onto the computer it was located on.

MILLS - Direct (by Mr. Barbosa)

1    Q    And when does it show this was last accessed?

2    A    5/15 of '14.

3    Q    Moving back to 13.10, is this the contents of the file?

4    A    Yes.

5    Q    All right.  What do we have here?

6    A    So if you look at that first line, what you have there is

7    a 14 -- excuse me -- 16-digit credit card number, in this case,

8    a Visa number; an equals sign, followed by additional track

9    data, miscellaneous numbers; and for an account in Richland,

10   Washington; and it has a zip code after that.

11   Q    And this was the 1000 Washington file; is that right?

12   A    Yes.

13   Q    And do these all have a Washington zip code and city

14   listed in them?

15   A    Yes, they do.

16   Q    Again, how many pages was that?

17   A    311.

18   Q    All of credit card data?

19   A    Correct.

20   Q    I'm going to now show you Exhibits 13.11 and 13.11A.

21        Do you recognize those?

22   A    Yes, I do.

23   Q    How do you recognize these?

24   A    This is another text file, named WA.txt, that was pulled

25   from the laptop.

MILLS – Direct (by Mr. Barbosa)

1          MR. BARBOSA:  Government offers 13.11 and 13.11A.

2          MR. BROWNE:  Your Honor, I'm not sure the witness has

3     spoken about 13.11A.

4     BY MR. BARBOSA

5     Q    What is 13.11A?

6     A    13.11A is the actual metadata that is associated with

7     13.11.

8          MR. BARBOSA:  Government offers Exhibits 13.11 and

9     13.11A.

10         THE COURT:  Any objection, Counsel?

11         MR. BROWNE:  No, Your Honor.

12         THE COURT:  They're both admitted.

13         (Exhibits 13.11 and 13.11A were admitted)

14    BY MR. BARBOSA

15    Q    What was the title of this file?

16    A    WA.txt.

17    Q    And what did you find in the contents of the file, 13.11?

18    A    This file contained several thousand American Express

19    numbers, that you could see there, starting with the number

20    "3," followed by the cardholder name, as well.

21    Q    Was that approximately 59 pages long?

22    A    Yes.

23    Q    Looks like 59 is a blank page; is that correct?

24    A    I'm sorry?

25    Q    Fifty-nine is a --

MILLS - Direct (by Mr. Barbosa)

1   A    Blank page, correct.

2   Q    Okay.  Were some of these not American Express cards?

3   A    Correct, they were.

4   Q    What other banks did you see?

5   A    These appear to be JPMorgan MasterCard, the 55751, toward

6   the top.

7   Q    What else?

8   A    And -- yeah, the Discover card, JPMorgan Chase.  You have

9   a Discover card there, toward the bottom of that screen.

10  Q    Do you also see Citibank in here?

11  A    Correct; Citibank, USAA, Union Bank, and again, Chase.

12  Q    FIA Card Services?

13  A    Yes, that's correct.  There's Barclays, as well.

14  Q    Do you see Boeing Employees Credit Union here, on Page 55

15  of that exhibit?

16  A    That's correct.

17  Q    Did you find a number of Boeing Employees Credit Union

18  cards in these?

19  A    Yes, we did.

20  Q    Total, how many credit card numbers did you find in all of

21  these credit card dump files?

22  A    Total, we found 2.9 million.

23  Q    And how many unique cards?

24  A    1.7, approximately; 1.7 million.

25  Q    When you find credit card numbers during a point-of-sale

MILLS – Direct (by Mr. Barbosa)

1   hacking investigation like this, do you have any procedures to

2   notify the card brands and cardholders?

3   A    Yes, we do.  We utilized, usually, one or more of our

4   analysts in our offices to make direct contact with MasterCard,

5   Visa, and American Express, and the other card brands, to check

6   regarding these cards and see if they've been reported and

7   flagged for fraud.

8   Q    Did you do that in this case?

9   A    Yes.

10  Q    Who was the analyst that worked on it?

11  A    That would be Megan Wood.

12       MR. BARBOSA:  I have no further questions, Your

13  Honor.

14       THE COURT:  Cross examination?

15       MR. BROWNE:  Thank you.

16  May I just inquire of counsel for a moment?

17       THE COURT:  You may.

18  Members of the jury, if you want to stretch, feel free to

19  do so.

20  Please be seated.

21  Mr. Browne, ready?

22       MR. BROWNE:  Yes, sir.

23       THE COURT:  You may inquire.

24       MR. BROWNE:  Thank you, Your Honor.

25

MILLS – Cross (by Mr. Browne)

```
 1                        CROSS EXAMINATION
 2   BY MR. BROWNE
 3   Q    Good afternoon.
 4   A    Good afternoon.
 5   Q    We have met before; have we not?
 6   A    Pardon me?
 7   Q    We've met before; have we not?
 8   A    Yes, sir.
 9   Q    In June, in this very courtroom; right?
10   A    Yes, sir.
11   Q    And it wasn't until that day that you knew there was a SIM
12   card in that computer; correct?
13   A    That's correct.
14   Q    And you're an expert in forensics?
15   A    I'm considered an expert, yes, sir, by the Court.
16   Q    Well, I can see the SIM card from here, when you put it on
17   the table.
18        How did you miss that?
19   A    It was an omission by my part, and just didn't see it at
20   that time, when I had the laptop in my possession.
21   Q    Can you hold that computer up and show the ladies and
22   gentlemen of the jury the little arrow that points to the SIM
23   card?
24   A    Sure (indicating).
25   Q    There is an arrow there; correct?
```

MILLS - Cross (by Mr. Browne)

1    A    Yes, there is.

2    Q    Now, while we're talking about the SIM card that you

3    didn't find until you were in court until June, have you

4    analyzed the contents of the SIM card?

5    A    No, I have not.

6    Q    What could be contained on a SIM card?

7    A    SIM cards typically maintain subscriber information.  And

8    it could contain contact information for -- if it was actually

9    a cellular phone.

10   Q    Well, wouldn't -- could not the SIM card tell you whether

11   someone remotely accessed that computer while it was in a

12   non-secure position in the vault?  Couldn't the SIM card help

13   you with that?

14   A    I'm not aware of that information being on a SIM card, no.

15   Q    We'll come back to that; okay?

16   A    Okay.

17          MR. BROWNE:  Can you pull up, gentlemen -- thank

18   you -- 13.11A?  It's not on my screen.

19   BY MR. BROWNE

20   Q    By the way, Agent Mills, during the course of my

21   questioning, will you please keep in mind that I know very

22   little about computers?

23   A    Understood.

24   Q    Okay.  So I'm going to ask you some routine questions in a

25   bit.

MILLS – Cross (by Mr. Browne)

1        But 13.11A, you were just talking about that.  And it was

2    the metadata for 13; correct?

3    A    Correct.

4    Q    And clearly, this is not accurate; right?  It says, "last

5    written January 9, 2014"; right?

6    A    Correct.

7    Q    And it says "created May 15, 2014"; correct?

8    A    Correct.

9    Q    That's impossible.

10   A    Not if you consider that the file had been transferred

11   onto that machine at that time.

12   Q    But you don't know; do you?  That simply doesn't make any

13   sense; does it?

14   A    It does in -- I've seen that happen before, yes.

15   Q    You would agree, and I think in your report that you wrote

16   about this case, you go through a lot of steps to make things

17   certain that they're accurate; right?

18   A    Yes.

19   Q    Okay.  So it's very important, particularly in this

20   technical area, that things are accurate and reliable; correct?

21   A    Yes.

22            MR. BROWNE:  Okay.  So let's go to -- Counsel, if

23   you'll help me -- 13.10A.  Now -- thank you, Counsel.

24   BY MR. BROWNE

25   Q    13.10A seems to have the same unreliability to it;

MILLS – Cross (by Mr. Browne)

```
1    correct?
2              MR. BARBOSA:  Objection.  Argumentative.
3              THE COURT:  Sustained.
4         Rephrase the question, Counsel.
5              MR. BROWNE:  Sure.
6    BY MR. BROWNE
7    Q    I'll just ask a straight question.
8         File created on May 15, 2014; correct?
9    A    Yes.
10   Q    And last written on March 6, 2014?
11   A    Yes.  That's possibly because the --
12   Q    Wait a minute.  Let me ask you a question.
13   A    Sure.
14   Q    March comes before May?
15   A    Yes.
16   Q    Okay.  Let me change subjects here, because I, and maybe
17   some of the other members in the courtroom, don't know computer
18   things that much.
19        When you talk about a "form factor," what do you mean?
20   A    I'm basically describing the physical characteristics of
21   the device.
22   Q    All right.  And I believe we keep using -- the experts
23   keep using the term "write blocker."  That's "write" as in
24   W-R-I-G-H-T [sic], not R-I-G-H-T; correct?
25   A    Correct.
```

MILLS – Cross (by Mr. Browne)

1    Q    So a "write blocker" is like writing; correct?

2    A    Correct.

3    Q    And what is a write blocker?

4    A    A write blocker is a physical device, most likely --

5    usually a physical device that resides in between the device

6    that you are imaging and the computer that you're using to

7    image that device.

8    Q    Okay.  Jumping into another subject, you gave us a very

9    large number for files that were last modified or last accessed

10   after Mr. Seleznev was no longer able to access the computer;

11   correct?

12   A    Yes.

13   Q    It was a large number.

14   A    Yes.

15   Q    I think you gave us 30,000.

16   A    Yeah.  I think that's what I said, yeah.

17   Q    Okay.  Now, you made a bunch of charts in this case, and

18   summaries; correct?

19   A    Yes.

20   Q    Did you make a chart of those last modified/last accessed

21   dates that were made after Mr. Seleznev was no longer able to

22   make them?  Did you make a chart of that?

23   A    No.

24        MR. BARBOSA:  Your Honor, objection.

25   Mischaracterizes evidence.  The last modified date is not on

MILLS - Cross (by Mr. Browne)

1    any of those exhibits.

2              MR. BROWNE:  Your Honor, I don't like speaking

3    objections -- I would object to speaking objections.

4              THE COURT:  So noted, Counsel.  Objection is

5    overruled.

6         Next question?

7              MR. BROWNE:  Thank you.

8    BY MR. BROWNE

9    Q    Now, the United States Secret Service Electronic Task

10   Force office in Seattle does not have a Faraday bag?

11   A    We have Faraday bags for cellular telephones.

12   Q    You don't have one big enough to fit that?

13   A    Not at the time that we had this device, no.

14   Q    You do now.

15   A    We actually have now, yes.

16   Q    And the task force involves many other police agencies;

17   right?

18   A    Yes, sir.

19   Q    Did you ask the other police agencies if they had a

20   Faraday bag?

21   A    No.

22   Q    Now, go over it again, briefly.

23        A Faraday bag would prevent any outside intrusion into

24   either a cellular phone or a computer, if it has a SIM card;

25   right?

MILLS – Cross (by Mr. Browne)

1    A    Yes.

2    Q    So, for instance, in this case, however, the cell phone --

3    could you give me the exhibit number?  It's right in front of

4    you.

5    A    12.8A.

6    Q    Thank you, sir.

7         The cell phone was not put into a Faraday bag either; was

8    it?

9    A    Not to my knowledge, no.

10   Q    My cell phone is in my briefcase over there, and it's

11   turned off; right?  Okay?  This is a foundation question.

12   A    Okay.

13   Q    So in a sense, a statement.

14        So it is still working.  There's information coming into

15   it; correct?

16   A    Did you say it was turned off?

17   Q    Yes.

18   A    Well, if it's in an "off" state, it would not be working.

19   Q    I'm sorry?

20   A    If it was powered off, it would not be connected to a

21   network.

22   Q    Well, when I turn it on, there's, like, 36 new e-mails, so

23   that happens while it's off; correct?

24   A    I'm not familiar with your particular cell phone, sir.

25   Q    It's an iPhone.

MILLS – Cross (by Mr. Browne)

1   A     I'm not familiar with your phone, sir.

2   Q     Okay.  If you had known that the computer in this case had

3   a SIM card in it, would you have bought a Faraday bag?

4                MR. BARBOSA:  Objection.  Asks for speculation.

5                THE COURT:  That's allowed.  You may answer the

6   question.

7                THE WITNESS:  In this particular instance, I did not

8   see the need, because I knew -- if I had known that that SIM

9   card was in there, I still did not -- wouldn't have believed

10  that it could have connected by itself to a network.

11  BY MR. BROWNE

12  Q     All right.  We heard some testimony in this trial that

13  Agent Iacovetti -- do you know who that is?

14  A     Agent Iacovetti, yes.

15  Q     I don't think I pronounced that correctly.  How did you

16  say it?

17  A     Iacovetti.

18  Q     Iacovetti, all right.  That he placed a bottle cap over

19  the on-and-off button of the computer.

20        Did you know that?

21  A     Not until after the fact.

22  Q     Well, what does that mean?  Didn't you see it when you saw

23  the computer?

24  A     No, I did not.

25  Q     What happened to the bottle cap that was over the

MILLS – Cross (by Mr. Browne)

1    on-and-off button?

2    A    I couldn't answer that.

3    Q    Did Agent Iacovetti tell you that the computer had gone

4    on, on the airplane?

5    A    Not me, no.

6    Q    Would that be important for you to know?

7    A    Potentially, though we –– it didn't affect my exam,

8    necessarily, the process that I went along and did the exam.

9    Q    Well, let's talk a little about encryption.

10        If a –– and there was already testimony, and I think you

11   already testified today, that people who you suspect of being

12   involved in criminal activity involving credit cards, you

13   suspect they may have encrypted computers; correct?

14   A    Correct.

15   Q    So what happens to a computer if it's encrypted and you

16   turn it off?

17   A    Then that computer basically becomes a brick.  You would

18   not be able to image it.

19   Q    I like that analogy.

20        It becomes useless; right?

21   A    Uh-huh.

22   Q    Yes?  You have to answer audibly for the court reporter.

23   A    Oh, I'm sorry.  Yes.

24   Q    Now, and please don't take any of this as criticism; okay?

25   I'm just going to ask you some questions.

MILLS - Cross (by Mr. Browne)

1        The vault in the Secret Service office has a log; correct?
2    A    Yes.
3    Q    And when you went in there on July 9, you did not sign
4    into the log.
5    A    Into the log?
6    Q    Yes.
7    A    Correct.
8    Q    You did not.
9    A    I did not.
10   Q    And when you went into the vault on July 28, you did not
11   sign into the log.
12   A    I'd have to review that record.
13   Q    All right.  We'll get to that.
14       When you entered into the vault -- and once again, and I
15   appreciate your honesty on that, you testified that the vault
16   is not secure from electronic communications; correct?
17   A    Correct.
18   Q    So when you went into the vault on the 9th, you went in
19   with Agent Fischlin, I believe.
20   A    That's correct.
21   Q    And that's when the computer went on again.
22   A    The screen came on at that point.  We noticed that it came
23   on.
24   Q    Keep in mind, when my screen comes on, it usually means my
25   computer is on; would that be correct?

MILLS - Cross (by Mr. Browne)

1   A    Yes.

2   Q    All right.  And how did that accidentally happen?

3   A    We -- at the time, I was manipulating the device to

4   find -- to find the serial number.  And I believe, at that

5   point, just moving the device, or moving the screen up in a way

6   that I had to so I could read that serial number, it woke it

7   up.

8   Q    Well, could you do that right now for us?

9   A    I can move the screen, yes.

10  Q    And does it turn on?

11  A    No.  Not this device, no.

12  Q    Well, that is allegedly Mr. Seleznev's computer; right?

13  A    That is.

14  Q    And you have a power cord for it; right?

15  A    Not here, no.

16  Q    I didn't say here.

17       Your testimony was that you had a power cord for that.

18  A    We had it after we had obtained the test device.

19  Q    Great.  Sure.

20  A    Yes.

21  Q    At one point, you plugged that -- the alleged computer

22  belonging to Mr. Seleznev, you plugged into the power.

23  A    Correct.

24  Q    And we now know that, prior to your doing that, the

25  computer came on at least twice.  We know that now.

MILLS - Cross (by Mr. Browne)

1    A    Yes, correct.

2    Q    Now, you -- the computer in front of you has notation on

3    it that indicates that the operating system is

4    Windows 8-point-something; right?

5    A    8 Pro.

6    Q    8 Pro.

7    A    Yes.

8    Q    And at the time, in July, when you were examining this,

9    you didn't have a lot of experience with that.

10   A    I did not have experience with Windows 8 Pro, no.

11   Q    Do you know when Windows 8 Pro came out?

12   A    I'm not sure of the year.  I believe it was in -- sometime

13   in 2013 or 2014.

14   Q    And you spend a hundred percent of your time working on

15   computer forensics?

16   A    Yes, I do.

17   Q    Okay.  So you actually had to do some research on the

18   internet about Windows 8-point-Pro [sic]; correct?

19   A    Yes, I did.

20   Q    And then you also went out and bought a similar computer.

21   A    Yes.

22   Q    Do you happen to have that computer with you today --

23   A    No, I don't.

24   Q    -- the sample one?

25   A    No --

MILLS – Cross (by Mr. Browne)

1   Q    Sorry.  I apologize.  I talked over you.

2        No?

3   A    No, I do not.

4   Q    I don't want to do that.

5        Did the sample computer have a SIM card in it, or do you

6   know?

7   A    It did not have a SIM card in it.

8   Q    So it wasn't the same as the exhibit in front of you?

9   A    Not with that feature, no, it was not the same.

10  Q    Are you certain about that, that it did not have a SIM

11  card in it?

12  A    Yes, I am.

13  Q    Have you checked it?

14  A    Yes.

15  Q    Where is it now?

16  A    It is currently in our office, field office.

17  Q    Changing subjects again, IP addresses are not specific or

18  unique; are they?

19  A    They can be.

20  Q    But as Ms. Scanlan pointed out with a previous witness,

21  and I think you were --

22            MR. BARBOSA:  Objection.  Beyond the scope of direct.

23  He did not testify about IP addresses.

24            THE COURT:  Let's hear the entire question, Counsel.

25            MR. BROWNE:  Should I go on to another question?

MILLS - Cross (by Mr. Browne)

```
 1                THE COURT:  No.  Ask the entire question so I can
 2    make a determination --
 3    BY MR. BROWNE
 4    Q    IP addresses --
 5                MR. BROWNE:  I'm sorry, Your Honor.  I didn't mean to
 6    interrupt.
 7    BY MR. BROWNE
 8    Q    IP addresses are not unique or specific.
 9                THE COURT:  You may answer that question.
10                THE WITNESS:  I know that they can be very unique and
11    specific.
12    BY MR. BROWNE
13    Q    Right.  But if you go to someplace where there's internet
14    wireless, everybody there is going to have the same IP address,
15    that's using it; right?
16    A    It could happen.  I can't say for sure on that.
17    Q    Well, were you here when Agent --
18                MR. BARBOSA:  Objection.  Again, beyond the scope of
19    his direct.
20                MR. BROWNE:  That's all right.  I'll leave that
21    alone.  I'll withdraw it, Your Honor.
22                THE COURT:  Thank you.
23    BY MR. BROWNE
24    Q    And I think you testified -- and correct me if I'm
25    wrong -- that as an expert, it's always in the back of your
```

MILLS - Cross (by Mr. Browne)

1   mind, in situations like this, that the computer you're dealing
2   with might be encrypted.
3       You used that word, that term; correct?
4   A   Yes.
5   Q   Now, you say that the reason you went into the vault on
6   July 9 with, now we know, Agent Fischlin, was to check the
7   serial number; correct?
8   A   That's correct.
9   Q   Well, the serial number is on the evidence bag; isn't it?
10  A   That's correct.
11  Q   And the computer was in the evidence bag; right?
12  A   That's correct.
13  Q   Did you do anything else, other than check the serial
14  number and turn it on?  Did you do anything else to it?
15  A   We did not.
16  Q   The purpose of securing a mobile device -- let's talk
17  about that which is a cell phone -- in a Faraday bag would be
18  to prevent communications with -- somebody communicating with
19  the phone; correct?
20  A    Yes.
21  Q   Same would be true of a computer with a SIM chip in it;
22  correct?
23  A    Well, a device cannot connect -- to my knowledge, from
24  training and experience, it cannot connect, unless the user has
25  direct interface with that device, to a cellular network.

MILLS – Cross (by Mr. Browne)

1    Q    But you have no information as to what state this computer

2    was in when it was taken from Mr. Seleznev in the Maldives; do

3    you?  You don't have any information as to what shape it was in

4    then; do you?

5    A    What shape it's in?

6    Q    You don't know if it was connected to anything at that

7    point.  You don't know anything about what happened in the

8    Maldives; right?

9    A    I know that its last connected date to any wireless

10   network was on July 4, which was the wi-fi network at the

11   Kanifushi Resort.

12   Q    Well, sir, is 13.10A still in front of you?

13   A    Yes, sir.

14   Q    So we know that last written dates can be wrong; right?

15           MR. BARBOSA:  Objection.  Argumentative.

16           THE COURT:  It's sustained, Counsel.  You can

17   rephrase that.

18   BY MR. BROWNE

19   Q    The dates can be wrong, as far as file created, last

20   written, and last accessed.  Those dates can be wrong even in

21   the metadata; correct?

22   A    Well, the last connection date for the Kanifushi wi-fi was

23   found in a system event log.  Those dates are very reliable.

24   The dates that you see here on 13.10A, associated to the

25   1000 Washington.txt file, concern a file itself, which can be

MILLS - Cross (by Mr. Browne)

1    different if the file was copied or pasted into a different

2    computer or device.

3    Q    Okay.  Now that you've said that, do you remember my

4    question?

5    A    You'll have to restate it, sir.

6    Q    Okay.  Referring to 13.10A, file created, last written,

7    and last access dates, even in the metadata can be wrong;

8    correct?

9    A    I wouldn't characterize them as wrong, no.

10   Q    Well, there are 12 months in a year; right?

11   A    Correct.

12   Q    For those of you concerned about me, I know my shoelace is

13   open, so don't worry about it.

14        Have you ever dealt with iPads?

15   A    No, sir.

16   Q    No?

17   A    No.

18   Q    Okay.  You spend a hundred percent of your time on

19   computer forensics, but you haven't dealt with iPads?

20   A    No.

21   Q    Is that because it's Mac?

22   A    I'm sorry?

23   Q    Is that because it's an Apple product?

24   A    I am certified to do mobile device products -- excuse

25   me -- mobile exams on mobile devices, such as an iPad, but I

MILLS – Cross (by Mr. Browne)

1   have never done one of those yet, an exam on one yet.

2   Q    Do you –– well, I don't know if you know that –– can an

3   iPad be remotely accessed if it has a SIM card in it?

4   A    I can't answer that.

5   Q    You don't know?

6   A    I don't know.

7   Q    Changing subjects, you did not need Agent Fischlin to get

8   a search warrant; did you?

9   A    Well, I was not the case agent.

10  Q    I understand that.

11  A    That's right.

12  Q    Just listen to my question.

13       You did not need him to get a search warrant; did you?

14  A    Not necessarily, no; not me, personally.

15  Q    At one point, did you think the battery had died in this

16  computer?

17  A    After I took it out of the vault to examine it on July 30,

18  I had suspected that it might have died.

19  Q    And that –– you found out that was not true.  Because when

20  you –– what was the date, again?

21  A    July 30.

22  Q    On July 30, it came on again; right?

23  A    Right.  But I had plugged –– no.  Actually, it didn't come

24  on until, I believe it was, August 1, when I started the

25  examination.

MILLS – Cross (by Mr. Browne)

1    Q    Okay.  So then did you plug it in on July 30?

2    A    July 30, yes.

3    Q    So that's when you plugged it in?

4    A    Correct.

5    Q    Okay.  And you could turn the computer in question on with

6    an on-and-off button; correct?  There's an on-and-off button.

7    A    You could, yes.

8         MR. BROWNE:  May I have one moment with Ms. Scanlan,

9    Your Honor?

10        THE COURT:  You may.

11   Members of the jury, if you'd like to stand and stretch.

12   Please be seated.

13        MR. BROWNE:  Thank you, Your Honor.

14   BY MR. BROWNE

15   Q    If a computer that's encrypted loses power, it becomes a

16   brick also.

17   A    Yes.

18   Q    So if you turn it off, or it loses power, it becomes a

19   brick; right?

20   A    Yes.

21   Q    When you took it out on July 30, you left it on your desk,

22   outside of the vault; correct?

23   A    That's correct.

24   Q    What's the purpose of the vault?

25   A    The vault was to keep it in a secure location.

MILLS - Cross (by Mr. Browne)

1   Q    Keep it what?

2   A    In a secure location.

3   Q    And I think we went through this.

4        You testified in June in this case; right?

5   A    Yes, sir.

6   Q    We went through this then.  I mean, your desk is in an

7   area where there are other people?

8   A    It is in a lab where other forensic examiners do work,

9   yes.

10            MR. BROWNE:  One moment, Your Honor.

11  BY MR. BROWNE

12  Q    So if you're concerned about encryption, or losing

13  whatever information is on the computer because of encryption,

14  why did you let it lose power?

15  A    Well, I didn't know that it had encryption.  That's kind

16  of a chance that you take in any case that you have a computer

17  that may or may not have encryption.  You just don't know until

18  you actually get in to examine that device.

19  Q    All right.  I'm a little confused now.  Because in cases

20  like this, you said in the back of your mind you always have

21  concern that it's encrypted; right?

22  A    Yes.

23  Q    And if you let it lose power, it loses the encryption;

24  right?

25  A    It becomes encrypted.

MILLS – Redirect (by Mr. Barbosa)

1   Q    Sorry.  Thank you.

2   A    Yes.

3   Q    Thank you very much.

4   A    You're welcome.

5           MR. BROWNE:  Thank you, Your Honor.

6           THE COURT:  Redirect?

7                         REDIRECT EXAMINATION

8   BY MR. BARBOSA

9   Q    Mr. Browne asked you about how you missed that SIM card.

10      Did you make that computer available to defense counsel

11  for review?

12  A    Yes.

13  Q    Were you there when defense counsel came to your office?

14  A    Yes.

15  Q    Who came to your office?

16  A    If I remember correctly, that was Ms. Scanlan and another

17  individual that they had hired to come and examine the laptop.

18  Q    Did you watch them the entire time?

19  A    Yes.

20  Q    Had the SIM card been discovered, at that point?

21  A    No.

22  Q    Did either of them remove the SIM card during their exam

23  of the device?

24  A    No.

25  Q    Mr. Browne asked you if examining the SIM card could

MILLS – Redirect (by Mr. Barbosa)

1    determine whether or not it had accessed a cellular network.

2         What other things can you do to determine whether or not

3    it had accessed a cellular network since Mr. Seleznev's

4    capture?

5    A    You can examine the event logs of the computer.

6    Q    And did you say whether you had examined the event logs,

7    when you were testifying earlier?

8    A    Yes.

9    Q    And what did you find in regards to cellular connections?

10   A    I discovered, in one of the event logs, that the last time

11   the cellular -- or the SIM card or the cellular data connection

12   was made was approximately June 17 of 2014.

13        MR. BARBOSA:  Your Honor, I'm going to show the

14   witness what we're going to mark as Exhibit 13.47.

15        MR. BROWNE:  Your Honor, we need a minute to look at

16   it.  We just got it.

17        THE COURT:  Yes.

18        MR. BARBOSA:  May I approach?  I have a copy for the

19   Court, also.

20        THE COURT:  Yes.

21        MR. BROWNE:  Mr. Barbosa, may we chat with you a

22   minute?

23        MR. BARBOSA:  Sure.

24        THE COURT:  Members of the jury, if you want to stand

25   and stretch during this time period.

MILLS – Redirect (by Mr. Barbosa)

1         MR. BROWNE:  Your Honor, before we go –– may I talk?

2         THE COURT:  Please be seated.

3         MR. BROWNE:  Your Honor, before we go any further ––

4    what is the number on this?

5         MR. BARBOSA:  It's going to be marked as

6    Exhibit 13.47.

7         MR. BROWNE:  13.47?

8         THE COURT:  14.7 or 13.47?

9         MR. BARBOSA:  13.47.

10        MR. BROWNE:  Your Honor, I'm –– just for the record,

11   just got this now.  I think I know what it is.  But I don't

12   think it's proper rebuttal so ––

13        THE COURT:  Why don't we take this up outside the

14   presence of the jury.

15     Members of the jury, if you'd go back to the jury room.

16             (Jury exits the courtroom)

17        THE COURT:  Any objection to the witness remaining?

18        MR. BROWNE:  It's fine with me.

19     Do you want me to go first?

20        THE COURT:  Let me hear what the objection is,

21   Counsel.

22        MR. BROWNE:  Thank you, Your Honor.

23     Your Honor, proposed Exhibit 13.47 was, first of all, just

24   handed to us less than five minutes ago.  On direct

25   examination, Mr. Barbosa went through in detail about the SIM

1    card and whether there was any information as to when it was

2    last connected, or whatever.  He should have used this exhibit

3    then.  He's never provided this exhibit before.  He can't

4    backdoor it through redirect.  That's it.

5                THE COURT:  Okay.  Thank you.

6          Counsel for the government?

7                MR. BARBOSA:  First, defense counsel has had this

8    since June in this format.  Defense counsel has also had an

9    image of the computer, which contains this event log, and has,

10   as we have all heard –– has had a forensic expert carefully

11   examine it.  So it's had this data throughout their time on the

12   case.

13         In terms of whether or not this is proper redirect, yes,

14   Agent Mills did testify as to the fact that the last connected

15   date on a MegaFon network was June 17.  And on cross,

16   Mr. Browne has suggested that he is not testifying truthfully

17   by cross examining him on whether or not he could have found

18   evidence of the last connection on the SIM card itself.  And so

19   this is to show that there are other sources of information for

20   that that he has reviewed.

21               THE COURT:  Okay.

22               MR. BROWNE:  May I respond?

23               THE COURT:  Yes.

24               MR. BROWNE:  Your Honor, first of all, I don't think

25   this exhibit has anything to do with what Mr. Barbosa just

MILLS - Redirect (by Mr. Barbosa)

1   said, but I just got it.

2        And the problem is, you know -- I know you run a tight

3   courtroom, and we really all like that.  This was never marked

4   as an exhibit.  The fact that we have this in three terabytes

5   of discovery, we're supposed to know?

6        So he lost his opportunity to utilize this.  First of all,

7   I don't think he could have even utilized it on direct, because

8   he hasn't given it to us or made it an exhibit.  And it's

9   not -- it's his witness.  If he was withholding the exhibit

10  because he was using it for cross examination of one of our

11  witnesses, then that would make sense.  But he can't withhold

12  exhibits for his own witness, and then pull them out on

13  redirect, when we haven't seen them.

14            THE COURT:  All right.  Well, Counsel, there's no

15  dispute, first of all, from the defense that this wasn't a

16  document that was turned over.  And I accept, Counsel, that

17  this is a high-volume document production case.  That's not in

18  dispute.  I think the record clearly supports that.

19       The witness did testify in terms of when it was last

20  connected, on the direct examination, but there was extensive

21  cross examination of an impeaching nature as to the reliability

22  of the witness's testimony as to the last date connected.

23       This document, from the government's offering -- I'll use

24  these words -- would appear it's an effort to try and

25  rehabilitate the witness's credibility with the fact that on

MILLS - Redirect (by Mr. Barbosa)

1    the section that's encoded in the box where it says "DC code,"

2    and there's a red arrow that points to it, it says the date and

3    time of date last connected would go back to June 17, 2014.

4         So the Court will rule that it would be admissible as an

5    effort to rehabilitate the witness, based upon the cross

6    examination, as to the accuracy or reliability of the witness's

7    testimony on direct examination.  So for those reasons, the

8    government will be permitted to use 13.47.

9         Anything further?

10              MR. BROWNE:  No, Your Honor.

11              MR. BARBOSA:  Nothing from the government.

12              THE COURT:  Bring in the jury.

13         Is there an issue about highlighting, Counsel?

14              MR. BROWNE:  Yes, there is.

15              THE COURT:  I'll give the same instruction to the

16    jury, if there's highlighting -- with the blue and the red

17    arrow; correct?

18              MR. BARBOSA:  I believe this is a function of the

19    event log viewer.  When you select that particular event, it

20    then displays below.  I could ask the witness to clarify that.

21    BY MR. BARBOSA

22    Q    Is that correct?

23    A    That is correct.

24              MR. BARBOSA:  So that highlighting is in the

25    original.

MILLS - Redirect (by Mr. Barbosa)

```
1              THE COURT:  In the original.  Let's establish that
2    foundation in front of the jury, then.
3              MR. BARBOSA:  Certainly.
4              THE COURT:  And if not, based upon the witness's
5    answer, I'll instruct the jury with a limiting instruction.
6                   (Jury enters the courtroom)
7              THE COURT:  Good afternoon, for, I think, the ninth
8    time this afternoon.  Please be seated.
9         Counsel for the government, please continue your
10   examination.
11             MR. BARBOSA:  Thank you, Your Honor.  I'll try to
12   wrap up fairly quickly.
13   BY MR. BARBOSA
14   Q    What is Exhibit 13.47?
15   A    This is an event viewer log of the network profile
16   event -- event log.
17   Q    And what does this event log record for you?
18   A    This records any network connection, specifically cellular
19   data connections, with the device.
20             MR. BARBOSA:  Government offers Exhibit 13.47.
21             MR. BROWNE:  Your Honor, I believe there needs to be
22   further testimony on the foundation regarding the highlighting
23   and the arrow.
24             THE COURT:  That's correct, Counsel.  Let's cover
25   that.
```

MILLS – Redirect (by Mr. Barbosa)

1   BY MR. BARBOSA

2   Q    The highlighting in this exhibit, where does that come

3   from, especially Page 2?

4   A    In the event viewer program or window, that is

5   automatically produced when you arrow up and down along that

6   list of events, or you use your cursor.  So it's produced by

7   the program itself.

8   Q    So does the top pane, with the highlighting, show the log

9   you're looking at, in the bottom pane?

10  A    That's correct.  The highlighted version -- or excuse

11  me -- the bottom pane would contain that detail of the

12  highlighted pane -- the highlighting.

13          MR. BROWNE:  Counsel -- I'm sorry, Your Honor.

14      On the proposed exhibit, on Page 2, there's red.  Do you

15  see the red?

16          THE COURT:  Yes.

17          MR. BROWNE:  I'm confused as to what that is, or why

18  it's red.

19  BY MR. BARBOSA

20  Q    Can you explain what the red commentary is?

21  A    That's UTC, or Greenwich Mean Time marker.

22  Q    And is that the time that this log is written in?

23  A    That's correct.

24  Q    Okay.  So that would be a notation; is that correct?

25  A    That's correct.

 1            MR. BARBOSA:  That probably does need a limiting

 2    instruction, including on Page 3, Your Honor.

 3            THE COURT:  Any other objections, Counsel?

 4            MR. BARBOSA:  And the red arrow.

 5            THE COURT:  Any other objections?

 6            MR. BROWNE:  May I just voir dire, briefly?

 7            THE COURT:  Yes.

 8                      VOIR DIRE EXAMINATION

 9    BY MR. BROWNE

10    Q    I could be completely wrong on this, but my understanding

11    is, the red rectangle that has UTC with parentheses in it is

12    added -- has been added by someone.  It's not original.

13        Is that correct?

14            MR. BARBOSA:  That's what I just said.

15            MR. BROWNE:  Exactly what you just said?

16            MR. BARBOSA:  Yes.

17            MR. BROWNE:  Okay.  Thank you, Your Honor.

18            MR. BARBOSA:  I agree with your request to limit --

19            MR. BROWNE:  Your Honor, my objection stands, the one

20    that you ruled on when the jury was out.

21            THE COURT:  All right.  The Court will overrule the

22    objection by the defense.

23        Members of the jury, Exhibit 13.47 will be admitted.  You

24    may accept the exhibit as substantive evidence as it relates to

25    every other component of the exhibit, except as it relates to

MILLS - Redirect (by Mr. Barbosa)

1    the red arrow and the UTC that appears upon Page 2 and through

2    the document.  Otherwise, 13.47 is admitted.

3                    (Exhibit 13.47 was admitted)

4            THE COURT:  Please continue.

5                       REDIRECT EXAMINATION

6    BY MR. BARBOSA

7    Q    Mr. Browne asked you if examining the SIM card can

8    determine when it had connected to a cellular network.

9         What other methods can you use to determine when the

10   computer connected to a cellular network?

11   A    You could use the event logs, which are contained in the

12   device.

13   Q    And is that event log shown in Exhibit 13.47?

14   A    Yes.

15   Q    Turning to the first page of Exhibit 13.47, where do we

16   see reference to the last connection on a cellular network?

17   A    The lower right pane shows that the last date and time

18   that the device connected to the MegaFon Rus cellular

19   connection -- or cellular network was Tuesday, June 17, 2014.

20   Q    And where is the reference to MegaFon?

21   A    That's in the top right pane, under profile name and

22   description.

23   Q    Page 2, is this just another part of that same log or a

24   different log?

25   A    This is -- yeah.  This is the event viewer log, again

MILLS - Redirect (by Mr. Barbosa)

1   showing the network profile event log.

2   Q    And what does this tell you about when it was last

3   connected?

4   A    The bottom pane shows that the last connected date was

5   July -- or excuse me -- June 17 of 2014.

6   Q    And the third page, does it show the disconnected date?

7   A    Yes, it does.

8   Q    When is that?

9   A    That shows the disconnected date of June 18, 2014.

10  Q    I'd like to have you highlight that on the original.

11          MR. BARBOSA:  May I approach with a highlighter?

12          THE COURT:  You may.

13  BY MR. BARBOSA

14  Q    Could you please highlight those for the jurors, as I've

15  done on the display copy?

16          MR. BROWNE:  What are you highlighting?

17          MR. BARBOSA:  The same things that are highlighted on

18  the copy displayed for you now.

19  BY MR. BARBOSA

20  Q    And when were those dates in relation to defendant's

21  arrest?

22  A    That was, looks like, a couple weeks prior to his arrest.

23  Q    Is that prior to his arrival in the Maldives?

24  A    Yes.

25  Q    Have you finished highlighting that?

MILLS – Redirect (by Mr. Barbosa)

1    A    Yes.  I would note that I did --
2         MR. BROWNE:  Objection, Your Honor.  There's no
3    question.
4    BY MR. BARBOSA
5    Q    Have you highlighted other portions of that?
6    A    Yeah.  I did highlight "disconnected," up above the logged
7    date, on Page 3.
8    Q    I'll bring up my copy.
9    A    Okay.
10   Q    Is that what I'm pointing to now on the overhead?
11   A    Go up.  Where it says "network disconnected," just above
12   there, I did highlight that word, "disconnected."
13   Q    What is that?  Is that the status of the connection?
14   A    Correct.
15   Q    So moving on back to Exhibit 13.10A and the file created
16   date two months after the last written, are these dates wrong?
17   A    No.
18   Q    Why aren't they wrong?
19   A    They accurately -- they can accurately reflect when the
20   file was last -- when it was actually moved onto that machine.
21   The created date could signify that it was last accessed and
22   moved onto that machine on May 15, 2014.
23   Q    And when was that in relation to the operating system
24   having been updated on the machine?
25   A    That was approximately around the same time, in May.

MILLS - Re-Cross (by Mr. Browne)

1    Q    Based on your review, did you form an opinion as to --
2    based on your review of the forensic image, did you form an
3    opinion as to how old that computer was, and had been in use?
4    A    I believe it had been purchased the year prior, in 2013.
5    Q    Okay.  And the update was in -- when?
6    A    May of 2014.
7    Q    Okay.  Was this computer encrypted?
8    A    No.
9    Q    And why did you wait for Agent Fischlin to get a search
10   warrant?
11   A    I didn't have any authority, prior to that, to look at
12   this computer or manipulate it in any way.
13            MR. BARBOSA:  No further questions, Your Honor.
14            THE COURT:  Re-cross?
15                        RE-CROSS EXAMINATION
16   BY MR. BROWNE
17   Q    It will be quick.
18        So how many hours, total, have you had in computer
19   forensic learning?  Just guess.  I'm sure it's a lot.
20   A    Learning?  Including my initial training, I would say
21   there would be maybe four -- 300, 400 hours, possibly.
22   Q    Okay.  And Mr. Barbosa asked you whether Ms. Scanlan came
23   to look at the computer; right?
24   A    Yes.
25   Q    And you didn't tell her about the SIM card, because you

MILLS - Re-Cross (by Mr. Browne)

1   didn't know about it; right?

2   A    That's correct.

3   Q    Do you know if she has 400 hours of expertise in computer

4   forensics?

5   A    I do not.

6   Q    Going back to the exhibit that was just utilized, 13.47,

7   do you have that in front of you?

8   A    Yes.

9   Q    Thank you.  Would you please explain to me --

10           MR. BROWNE:  And I don't know, can we bring it up on

11   the screen, sir?

12           MR. BARBOSA:  Which one?

13           MR. BROWNE:  The new one, 13.47.  Oh, it's not in

14   there?

15           MR. BARBOSA:  We've got to put it up on the overhead.

16   Going back to the old-school days.

17   BY MR. BROWNE

18   Q    Okay.  Everybody see that?

19        Okay.  This date, last connected, that says "reg_binary,"

20   do you see that?

21   A    Yes.  The bottom one, where the arrow is pointing --

22   Q    No; where the arrow begins -- where the line begins.

23        Do you see that?

24   A    Yes.

25   Q    07 06 00 0 --

MILLS – Re-Cross (by Mr. Browne)

1    A    Yes.

2    Q    Do you see that?

3    A    Yes.

4    Q    Okay.  How is that consistent with June 17, 2014?

5    A    Are you talking about -- are you referring to those

6    individual digits?

7    Q    Yeah.

8    A    I believe, from my experience, that's -- those are

9    displayed in hexadecimal language.  It's a computer language.

10   Q    It's not the same date; is it?

11   A    Well, no.  That's not displayed in date form.  It's in

12   hexadecimal form, which a computer will interpret into a date

13   form.

14   Q    All right.  Then could we go to Page 2, please?

15   A    Okay.

16   Q    That's the one that's up?  Oh, sorry.  I apologize.

17        I just got this, so -- the exhibit in itself, entirely,

18   13.47, purportedly relates to the use of the internet through

19   the SIM card; right?

20   A    Yes.

21   Q    All right; purportedly.

22        So you said that the exhibit shows that the last date

23   accessed was June 17; correct?

24   A    That's the date that it actually connected, yes, last

25   connection date.

MILLS – Re-Cross (by Mr. Browne)

1   Q    The very next page says, "last date connected, June 18";

2   doesn't it?

3   A    June 18 shows "network disconnected."

4   Q    Okay.  That would be the last time it was accessed.  So we

5   have a conflict between just one day, I understand that, but --

6   A    Well, it was connected on the 17th, and then it was

7   disconnected on the following day, the 18th.

8           MR. BROWNE:  Your Honor, a juror has raised his hand.

9           JUROR:  He's talking about a page that's not on the

10   screen yet.

11          THE COURT:  I was leaving that to counsel's

12   discretion.  He was asking a question, but he hasn't changed it

13   on the overhead.

14          MR. BROWNE:  Thank you, Your Honor.  Getting too used

15   to computer.  There we go.

16      And I think my pen won't even show up on this.

17   BY MR. BROWNE

18   Q    6/17/2014; right?

19   A    Yes, sir.

20   Q    And you testified that that was the last date it was

21   accessed; correct?

22   A    That it was actually connected to the cellular network.

23   Q    And then on the next page it says June 18; right?

24   A    Correct.

25          MR. BROWNE:  Thank you.

MILLS — Redirect (by Mr. Barbosa)

1            THE COURT:  Redirect?

2                    REDIRECT EXAMINATION

3  BY MR. BARBOSA

4  Q    Who was with Ms. Scanlan when they came to look at the

5  computer?

6  A    I believe his name was Randall Karstetter.

7  Q    And what was his purpose there?

8  A    He was, I believe, contracted by the -- her firm to

9  examine the laptop computer.

10           MR. BARBOSA:  Thank you.  Nothing further.

11           THE COURT:  Anything further, Counsel?

12           MR. BROWNE:  No, Your Honor.

13           THE COURT:  All right.  This is the case agent, so

14  he's not excused from the case, obviously.  He can return back

15  to his seat.

16      Now, Counsel, I don't have the original for the in-court

17  deputy.

18      Who has the original?

19           MR. BARBOSA:  The agent does.

20           THE COURT:  Next witness, Counsel?

21           MR. WILKINSON:  The United States calls Special Agent

22  Mike Fischlin.

23           THE COURT:  Members of the jury, if you want to stand

24  and stretch while the witness comes in.

25  ////

FISCHLIN – Direct (by Mr. Wilkinson)

1      MICHAEL FISCHLIN, having been duly sworn, was examined and
2  testified as follows:
3           THE CLERK:  Please have a seat.
4           THE COURT:  Please be seated.
5           THE CLERK:  Counsel, would you like me to leave these
6  items up here with this witness?
7           MR. WILKINSON:  He'll need the phone, which I think
8  is 12.8A.
9           THE CLERK:  If you could please state your first and
10  last names, and spell your last name for the record.
11           THE WITNESS:  Sure.  My name is Michael Fischlin.
12  Last name's spelled F-I-S-C-H-L-I-N.
13           THE COURT:  You may inquire.
14           MR. WILKINSON:  Thank you, Your Honor.
15                          DIRECT EXAMINATION
16  BY MR. WILKINSON
17  Q    Good afternoon, Agent Fischlin.
18  A    Good afternoon.
19  Q    Could you tell us where you are employed?
20  A    I'm employed by U.S. Postal Inspection Service as an
21  inspector assigned to the Seattle Division Headquarters.
22  Q    And what are your job responsibilities for the U.S. Postal
23  Inspection Service?
24  A    I'm assigned to a mail theft team.  So in particular, I
25  work in court cases of mail theft and subsequent fraud that

FISCHLIN – Direct (by Mr. Wilkinson)

1   often happens in such cases.

2   Q    How long have you been an agent with the U.S. Postal

3   Inspection Service?

4   A    I've been an inspector for just over two months now.

5   Q    And where did you work immediately before that?

6   A    For the U.S. Secret Service.

7   Q    How long did you work with the U.S. Secret Service?

8   A    For approximately 14 years, with the last eight being as a

9   special agent assigned to the Seattle Field Office.

10  Q    What else did you do before you became a special agent in

11  Seattle?

12  A    I was a U.S. Secret Service uniformed division officer,

13  assigned to the White House.

14  Q    And so eight years as a special agent in Seattle?

15  A    Correct.

16  Q    And what did your job responsibilities include during that

17  period?

18  A    Well, for the last four years at the Seattle Field Office,

19  I was a member of the U.S. Secret Service Electronic Crimes

20  Task Force, in Seattle.  As a result, I was trained in computer

21  forensics.  I spent a lot of my time conducting forensics exams

22  of electronic media.  I also investigated cases, financial

23  crimes, threats against the President, Vice President, and

24  other protectees of the Service.

25       And then we also have a twofold mission.  So I helped with

FISCHLIN – Direct (by Mr. Wilkinson)

1   the protective mission, at times, supporting protection for the

2   President and Vice President, and others, when they come to

3   Seattle.  And sometimes I'd be required to travel out of state.

4   Q    What kind of training did you receive to be a special

5   agent?

6   A    To be a special agent with the U.S. Secret Service, I

7   completed a training course at the Federal Law Enforcement

8   Training Center.  That was several months in length.  After

9   that, I went to the James J. Rowley Training Center, which is

10  held in Beltsville, Maryland -- that's a Secret Service

11  training center -- for several more months.  So in total,

12  approximately seven to eight months of basic training for the

13  Secret Service.

14  Q    You mentioned that a lot of your work involved analysis of

15  computers; is that right?

16  A    It did, for my last four to five years with the Secret

17  Service.

18  Q    And did you receive training particular to forensic

19  analysis?

20  A    I did.

21  Q    And can you tell us about that?

22  A    Sure.  Well, I completed the Basic Computer Evidence

23  Recovery Training Course at the Cybercrime Center -- at the

24  Federal Law Enforcement Training Center.  I completed the

25  Advanced Computer Evidence Recovery Training Course at the

1    Cybercrime Center.  I completed the Point-of-Sale

2    Investigations Training Course that was held at the Secret

3    Service Training Center, but presented by Trustwave.  I

4    completed the Basic Mobile Device Examiner Training Course,

5    held by the Secret Service at the University of Tulsa.  I

6    completed training and guidance on software, EnCase forensic

7    software, and also received training in using AccessData

8    Forensic Toolkit computer software.

9    Q    How many devices would you say that you have examined over

10   the course of your career?

11   A    Approximately 530.

12   Q    And you mentioned that you left the Secret Service a few

13   months ago.

14        Was there a particular reason for that?

15   A    Yes.  With the Secret Service, just part of the career

16   track, there's several required moves.  And it's no longer

17   desired to move.  I would have been facing a move to

18   Washington, D.C. in the near future, and that just was nothing

19   that was conducive to my life right now.  I wanted to stay

20   here.  And Postal Inspection Service allowed me the stability

21   to stay here, if I like, for my career.

22   Q    During your time in Seattle, were you asked to work on the

23   investigation of Roman Seleznev?

24   A    Yes.

25   Q    And what were your -- what was your responsibilities or

FISCHLIN – Direct (by Mr. Wilkinson)

1    your role in that investigation?

2    A    I became the case agent in approximately February of 2014.

3    Q    What is a case agent?

4    A    It would be the primary investigator on the case, or

5    managing the case, writing investigative reports, and more.

6    Q    Who was the original case agent?

7    A    That was Detective David Dunn.

8    Q    So you stepped in to fill his role later?

9    A    I did.  In between us was another special agent, Kirk

10   Arthur.  But David Dunn had started the investigation in

11   Seattle.

12   Q    And what was the status of the investigation at the time

13   you became case agent?

14   A    It was an active and open case, but the Service was

15   waiting to see if we could identify what are the -- if the

16   defendant would end up going somewhere we could apprehend him.

17   So it was just a waiting game and trying to see if there would

18   be somewhere we could actually arrest him, since there was an

19   arrest warrant out for him.

20   Q    After the defendant was arrested, did you become aware

21   that a computer was seized in connection with the arrest?

22   A    Yes.

23   Q    And was there an examination of that computer?

24   A    Yes.

25   Q    Who conducted the actual examination?

FISCHLIN – Direct (by Mr. Wilkinson)

1  A     That was Special Agent David Mills.

2  Q     And what was your role in that examination?  Did you

3  provide him with any guidance?

4  A     Yes.  I helped him forming search terms to facilitate the

5  search of the computer.  Also provide guidance; if he'd find

6  something that may be of interest, he could ask me.  My desk,

7  within our forensic lab, was right across from him, so he could

8  ask any questions that he may have.  Again, if he'd find

9  potential evidence of interest, he could ask me for

10 clarification.  So I was right there to assist, if needed.

11 Q     Is that typical Secret Service practice, to have a person

12 other than the assigned case agent perform the actual forensic

13 review?

14 A     I'd say most often, that's most often the case.  It's not

15 prohibited from a case agent doing the exam.  But most often,

16 case agents aren't trained in computer forensics.  So that

17 would be the reason.

18 Q     In your case you are, though?

19 A     I am.

20 Q     What sorts of things -- I realize it's a broad question --

21 but can you tell us generally what sorts of things you asked

22 Special Agent Mills to look for as part of the exam?

23 A     Sure.  So it was a pretty lengthy list.  One of the main

24 things would be credit card numbers.  That was something of

25 interest.  There was a variety of nicknames and e-mail accounts

FISCHLIN – Direct (by Mr. Wilkinson)

1    that we wanted him to search for; items that may help establish

2    dominion and control, so photos and documents in the subject's

3    name, or of the subject.  So there's a wide range of things,

4    but those are a few.

5    Q    When you say nicknames, what are some of the nicknames you

6    asked him to look for?

7    A    One is pronounced "seek," nCuX; track2; bulba;

8    rubensamvelich; and others.

9    Q    And so after you sort of generated this list of things to

10   look for, did that -- did his search generate a set of

11   documents for you to review?

12   A    Yes.

13   Q    And did you review the results of those searches?

14   A    I did.  I reviewed the results of his complete exam.

15   Q    Okay.  In the course of that process, did you take a look

16   at the metadata of the documents that were returned, to get a

17   sense of when they had most recently been modified?

18   A    Yes.

19   Q    Okay.  And are you familiar with the exhibits that you're

20   going to be testifying about today and in this trial?

21   A    Yes.

22   Q    And were any of those exhibits modified in any way after

23   the date of the defendant's arrest?

24            MS. SCANLAN:  Objection.  I can't tell what we're

25   talking about.

FISCHLIN – Direct (by Mr. Wilkinson)

```
 1              THE COURT:  Let's clarify, Counsel.
 2   BY MR. WILKINSON
 3   Q    What item do you look at on a computer to determine when a
 4   file was last changed?
 5   A    There's a certain time stamp we can look at, "entry
 6   modified" or "last written," so it can be referred to as
 7   either.  It's a time stamp that can tell us the last time that
 8   the file was changed.
 9   Q    Okay.  And so did you look at that for all of the exhibits
10   you're going to be testifying about?
11   A    Yes.
12   Q    And for any of them, were they changed after the date of
13   the defendant's arrest?
14   A    No.
15   Q    Did the process that Special Agent Mills go through [sic]
16   allow you to look at the computer and sort of experience it the
17   way that a user would experience it?
18   A    No.
19   Q    And why not?
20   A    Well, a traditional forensic review gives you the data on
21   the computer, but you don't really see it as a user of the
22   computer would.  You don't see the desktop as a general user of
23   the computer would, if you booted it up.  So it's a slightly
24   different view.  You see the data, but not with the exact same
25   experience.
```

FISCHLIN – Direct (by Mr. Wilkinson)

1  Q    Were you interested to see, as part of your investigation,

2  how the user of Mr. Seleznev's computer would have experienced

3  it when he turned it on?

4  A    Yes.

5  Q    And so did you go through a process to create -- recreate

6  that?

7  A    I did.

8  Q    What did you do?

9  A    So the Secret Service had already purchased a very -- the

10 same make and a very similar model laptop as that that was

11 found in the defendant's possession.  So as a result, we bought

12 a solid-state drive that was the same capacity as the one in

13 the defendant's computer.  We were then able to take a copy of

14 the image of his computer and put that on the solid-state drive

15 we purchased.  Then we were able to put that solid-state drive

16 within the same make and close-model Sony laptop that we'd

17 purchased, and then boot it up.  And then we could see it as a

18 user would see it.

19 Q    Did you find that that process was effective?

20 A    Yes, very.

21 Q    Did it allow you to go into the computer and look around?

22 A    It did.

23 Q    And just to be clear, when you were logging on and looking

24 on the computer, you weren't looking at the actual device

25 itself -- let me ask that a little bit differently.

FISCHLIN – Direct (by Mr. Wilkinson)

1    Were you looking at the device itself, or were you looking

2  at the copy you had made?

3  A    No.  It was a copy.

4  Q    As you logged on and navigated around, did you take

5  snapshots of what you saw?

6  A    I did.  I took digital photographs with a camera.

7  Q    And I'm displaying Exhibit 13.33 for you.

8       Have you reviewed 13.33?

9  A    Yes.

10 Q    And is that a collection of the snapshots that you

11 reviewed -- that you took as part of this process?

12 A    Yes.

13 Q    Do they clearly -- do they accurately reflect what you saw

14 as you navigated around the computer?

15 A    Yes.

16           MR. WILKINSON:  The United States offers 13.33.

17           THE COURT:  Any objection?

18           MS. SCANLAN:  I've looked at these, but can you just

19 flip through --

20           MR. BROWNE:  Here it is.

21           MS. SCANLAN:  No objection.

22           THE COURT:  13.33 is admitted.

23                (Exhibit 13.33 was admitted)

24 BY MR. WILKINSON

25 Q    So what are we looking at here?

1    A    So upon booting, the, I'll use the term, "copy" of

2    defendant's laptop, this was the first screen that I saw, which

3    was a Windows 8 splash screen.  I thereafter photographed it.

4    Q    Okay.  And what happened next?

5    A    I then had to swipe, perform a swipe action.  And then I

6    came to another screen, which allowed two options to log in.

7    One was via a Microsoft account, an e-mail address.  And the

8    second was via biometrics, in particular, facial recognition.

9    Q    When you say -- and we're looking at the second page of

10   the exhibit now.  Is this the screen you just referenced?

11   A    It is.

12   Q    And there are two boxes here.  What do those two boxes

13   signify?

14   A    So the box to the left, that would be the option to log in

15   via the Microsoft account.  And the option to the right would

16   be the option to log in via biometrics, or facial recognition.

17   Q    And was the Microsoft account associated with a particular

18   e-mail address?

19   A    Yes.  It was romariogro1@mail.ru.

20   Q    Is that an e-mail address that you've become familiar with

21   in other parts of the investigation?

22   A    Yes, it is.  Well, for one, it was found on documents

23   recovered from the defendant when he was apprehended, and then

24   also had been located by previous investigators in the

25   investigation, in particular, on the HopOne server, on travel

FISCHLIN – Direct (by Mr. Wilkinson)

1  reservations or itineraries.

2  Q    Which of these items did you select?

3  A    I opted for the logging in via the Microsoft account.  The

4  facial recognition, I don't think would have worked for me, so

5  I did the romariogro1@mail.ru.

6  Q    We're going to the third page of the exhibit.

7       Is this the next thing you saw after you selected

8  romariogro?

9  A    It is.  It allowed me to enter a password to log into the

10  account.

11  Q    Okay.  It looks like there's a reflection on the screen.

12       Is that you, taking the picture there?

13  A    That is me.

14  Q    Okay.  What's it asking for here?

15  A    It was asking for a password.

16  Q    Did you know the password at that point?

17  A    No.

18  Q    Did you go through any process to try and determine what

19  the password was?

20  A    I guessed it, basing that decision on a password that was

21  frequently identified by numerous -- in numerous times by

22  previous investigators in the investigation.  In particular, it

23  had been noted that a password of "ochko" was often used, so I

24  opted for "ochko123," which I heard was a password that had

25  been used in the past, and it worked.  It immediately logged me

FISCHLIN – Direct (by Mr. Wilkinson)

1   in.

2   Q    Was that your first guess?

3   A    It was.

4   Q    Okay.  So you entered "ochko123."  And can you remind the

5   jury where the "ochko123" had showed up in the investigation

6   before?

7   A    Yes.  Well, it had been found numerous times within what I

8   would refer to as a user credential, or cheat sheet file, found

9   on the defendant's laptop.  So numerous times in that file I

10  had seen that password pop up.  And then again, previous

11  investigators had also mentioned it as being found within

12  e-mail that had been recovered, in particular, for

13  registrations of different accounts.  So it had been a commonly

14  used password, so that's why I opted to give that my first

15  shot.

16  Q    So we're skipping now to the fourth page of the exhibit.

17       Is this what you saw after you entered the password?

18  A    It is.

19  Q    And what did you do next?

20  A    I selected the desktop app, which would be the top left

21  there, so I could see the desktop of the computer.

22  Q    Is this the item that says "Vaio"?

23  A    Yes.

24  Q    Okay.  And we're going to the fifth page.

25       Is this the next thing that you saw?

FISCHLIN – Direct (by Mr. Wilkinson)

1    A     It is.  That would be the desktop.

2    Q     And I want to zoom in on the lower right-hand portion of

3    the screen.

4          What is the black -- or the box that's labeled "gift.jpg"?

5    A     That file is banner.gif, and it was an animated file, once

6    it was selected.

7    Q     I'm actually asking you about the one up to the left

8    there, that says "gift.jpg."

9    A     Oh, yes.  That was an image, or a photograph.

10   Q     What was it a photograph of?

11   A     In this case, it looked like a generic image of, like,

12   Visa cards, gift cards.

13   Q     And next to that, there's another image there.

14         What was that an image of?

15   A     It is an image of a magnetic stripe reader/writer.  And

16   it's titled MSR206, which is a type of magnetic stripe

17   reader/writer.

18         MR. WILKINSON:  Ms. Ericksen, could you pass the

19   witness Exhibit 17.2, which is the plastic device there?  Yeah,

20   thank you.

21         THE COURT:  Counsel, we're almost at 4:30, so let's

22   use this as the last area of examination.

23   BY MR. WILKINSON

24   Q     You've been handed the exhibit.

25         Can you tell us what that is?

1    A      It is an MSR206, magnetic stripe reader/writer.

2    Q      And so was the image on the desktop there just a picture

3    of that device?

4    A      Yes.  Of a similar device, yes.

5             MR. WILKINSON:  Your Honor, would you like me to stop

6    there, or continue for another two minutes or so?

7             THE COURT:  Why don't we stop here, Counsel.

8        Members of the jury, we're going to take our recess at

9    this point in time.  And what I'll do tomorrow, because we have

10   a full day again tomorrow, is, at the conclusion of tomorrow,

11   I'm going to give you an update exactly where we are, based

12   upon the lawyers' projections of what's left in the case.  I

13   know that in past experience jurors are always a little bit

14   anxious about where are we in the case.  We've had a few

15   witnesses testify.  We heard the lawyers read kind of a long

16   list of witnesses, and where exactly are we in the case?  I'll

17   answer that question for you tomorrow, before you leave.  So

18   have a good evening.

19       I'd ask Juror Number 6 if you could just stay, sir.  I

20   want to ask you a couple questions.

21                       (Jury exits the courtroom)

22             THE COURT:  Please be seated.

23       Juror Number 6, this has been a real challenging case, as

24   I know you know, because you've been here since we've been

25   here.  And one of the things that we need to make sure we have

```
1    is a juror that can focus and stay attentive and alert

2    throughout the case.  And we've had some observations -- we pay

3    attention to what all the jurors are doing, so I'm not singling

4    you out.  And one of the things I've noticed is, you had a

5    little bit of difficulty, today and the last couple days,

6    staying alert.

7              JUROR:  Yes.  I've been spending some extra time with

8    my grandson.

9              THE COURT:  Okay.

10             JUROR:  His mom and him are going into treatment --

11             THE COURT:  If you could keep your voice up, sir?

12             MR. BROWNE:  Could he just repeat it?

13             JUROR:  I've been spending time with my grandson,

14   because he's going to be going into treatment with his mom.

15   He's three-and-a-half years old, and I'm not going to be able

16   to see him for a couple weeks.

17             THE COURT:  Sir, let me ask you this:  Would it be

18   easier for you if we were to excuse you, as one of the

19   alternates?  We'll still have two backup jurors.  But this

20   seems like it's complicating your life doubly, compared to the

21   other jurors.  And we want to make sure that Mr. Seleznev has a

22   fair trial.  And to make sure he has a fair trial, we can't

23   afford for any of the jurors to miss, essentially, any part of

24   the trial.

25             So based upon my observations and some observations by the
```

1   lawyers, I think I'm going to exercise the discretion of

2   allowing you to be excused from the jury.  But before you go,

3   sir, I want you to know, your service is deeply appreciated.

4   You knew what your circumstances were, and yet you committed to

5   serve as a juror, and we appreciate the time that you served on

6   this jury.  I can only imagine the difficulty of trying to fill

7   two hats at the same time.  And, first of all, I'd like to

8   compliment you for what you're doing.  And it's admirable, from

9   the bench, that you're serving in that capacity.

10          So thank you for your service as a juror, sir.  And thank

11  you for the work that you're doing with your family, because

12  that's the number one priority.  I know it is for me, and I

13  suspect it is for you, as well.  So thank you, sir, but you

14  will be excused.

15                  JUROR:  Okay.  Thank you.

16                  (Juror Number 6 exits the courtroom)

17                  THE COURT:  Counsel for the government, anything to

18  take up?

19                  MR. BARBOSA:  No, Your Honor.  Thank you.

20                  THE COURT:  Counsel for the defense, anything to take

21  up?

22                  MS. SCANLAN:  No, Your Honor.

23                  THE COURT:  Have a good evening.  See you in the

24  morning.

25                  MR. BROWNE:  Your Honor, actually, I do have one

1    question, which is kind of silly, but let me make the story

2    short.  One of my first trials was in front of Julius Hoffman,

3    in Chicago, and he sent me home because I had a brown suit on,

4    not a blue suit or black suit.

5        I seem to have run out of my black suits.  Is it okay if I

6    wear a nice sport coat tomorrow?

7            THE COURT:  You want me to answer that question,

8    Mr. Browne?

9            MR. BROWNE:  I know your attire -- you would prefer a

10   suit, is what you're saying?

11           THE COURT:  No.  Counsel, you can dress appropriately

12   for court.

13           MR. BROWNE:  That was just a true story.

14           THE COURT:  As long as you're not coming to court

15   with a leather jacket and open-collar shirt --

16           MR. BARBOSA:  Can I wear pajamas?

17           MR. BROWNE:  I vote for that.

18           MR. BARBOSA:  Just kidding.

19           THE COURT:  Have a good evening.  See you guys

20   tomorrow.

21                       (Adjourned)

22

23

24

25

 1                    (End of requested transcript)

 2                          *    *    *

 3        I certify that the foregoing is a correct transcript from

 4    the record of proceedings in the above matter.

 5

 6    Date:  8/18/16                        /s/ Andrea Ramirez

 7                                    _____

 8                                    Signature of Court Reporter

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25