1          UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON

3    ─────────────────────────────────────────────

    UNITED STATES OF AMERICA,        )
4                                    )
            Plaintiff,               )   No. 2:11-cr-00070-RAJ
5                                    )
                                     )
6        vs.                         )   Seattle, WA
                                     )
7    ROMAN V. SELEZNEV,              )
                                     )   Jury Trial, Day 6
8            Defendant.              )   August 22, 2016

9    ─────────────────────────────────────────────

10           VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE JUDGE RICHARD A. JONES
11              UNITED STATES DISTRICT COURT

    ─────────────────────────────────────────────
12

13   APPEARANCES:

14   FOR THE PLAINTIFF:    NORMAN McINTOSH BARBOSA
                           U.S. Attorney's Office
15                         700 Stewart Street, Suite 5220
                           Seattle, WA 98101-1271
16                         norman.barbosa@usdoj.gov

17                         C. SETH WILKINSON
                           U.S. Attorney's Office
18                         700 Stewart Street, Suite 5220
                           Seattle, WA 98101-1271
19                         seth.wilkinson@usdoj.gov

20                         HAROLD W. CHUN
                           U.S. Department of Justice
21                         1301 New York Avenue NW, Suite 600
                           Washington, DC 20005
22                         harold.chun@usdoj.gov

23

24

25

```
 1   FOR THE DEFENDANT:    JOHN HENRY BROWNE
                           Law Office of John Henry Browne
 2                         108 South Washington Street, Suite 200
                           Seattle, WA 98104
 3                         johnhenry@jhblawyer.com

 4                         EMMA SCANLAN
                           Law Office of John Henry Browne
 5                         108 South Washington Street, Suite 200
                           Seattle, WA 98104
 6                         emma@jhblawyer.com

 7


 8
     Andrea Ramirez, CRR, RPR
 9   Official Court Reporter
     United States District Court
10   Western District of Washington
     700 Stewart Street, Suite 17205
11   Seattle, WA 98101
     andrea_ramirez@wawd.uscourts.gov
12
     Reported by stenotype, transcribed by computer
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

I N D E X

2
                                                        Page No.

3   Witness:  CESARE JOHN SARETTO
      Direct Examination by Mr. Wilkinson             1147
4     Cross Examination by Mr. Browne                 1159

5   Witness:  BOB KERR
      Direct Examination by Mr. Chun                  1164
6
    Witness:  CHRISTOPHER FORSYTHE
7     Direct Examination by Mr. Barbosa               1170

8   Witness:  DIANE COLE
      Direct Examination by Mr. Wilkinson             1180
9     Cross Examination by Mr. Browne                 1184

10  Witness:  JOE ANGELASTRI
      Direct Examination by Mr. Wilkinson             1187
11
    Witness:  MEGAN WOOD
12    Direct Examination by Mr. Barbosa               1192
      Cross Examination by Ms. Scanlan                1205
13    Redirect Examination by Mr. Barbosa             1211
      Re-Cross Examination by Ms. Scanlan             1211

14

15

16

E X H I B I T S

17  Exhibit 15.17                                     1178

18  Exhibit 16.6                                      1203

19

20

21

22

23

24

25

USA vs. Seleznev, 8/22/16

```
 1          THE CLERK:  We are resuming our jury trial in the
 2   matter of United States vs. Roman Seleznev, Cause
 3   Number CR11-70, assigned to this court.
 4          THE COURT:  Good morning.  Counsel, the parties
 5   apparently want to talk to me about scheduling and also about
 6   16.6.
 7      So let's hear, first, about scheduling.
 8          MR. WILKINSON:  Your Honor, as I noted in my e-mail
 9   to the Court yesterday, in getting ready for today's schedule,
10   we came to find that things -- we expect things to move very
11   quickly today.  We also have one witness who is scheduled to
12   testify today who was injured, I think, on Friday, and so isn't
13   going to be able to make it today.
14      We had planned seven witnesses for today.  We now have
15   six.  I don't know that I've ever gotten through that many
16   witnesses in a day.  But as we sat down yesterday and kind of
17   worked through it, we figured out that it really is going to
18   end early in the day.  And our best expectation is that it
19   would end around the lunch hour.  We have three other witnesses
20   who are unavailable today who are available tomorrow morning.
21      And so I guess we're asking the Court's indulgence, and
22   it's not something that we wanted to do, but to take a break in
23   the afternoon, after we complete this testimony, finish up our
24   case in the morning, and we'll still be on the schedule that
25   we'd originally anticipated, of resting tomorrow morning.
```

USA vs. Seleznev, 8/22/16

1   And I do want to say, we don't -- we understand that the

2   jury has to travel back and forth, and it's something we put a

3   lot of thought into.  But things just broke in a way we didn't

4   expect this time.

5   THE COURT:  Okay.  All right.  And counsel for the

6   defense, there's an issue regarding one of the exhibits?

7   MR. BROWNE:  I'm sorry, Your Honor.  I couldn't hear

8   you.

9   THE COURT:  There's an issue regarding one of the

10  exhibits, or you do wish to --

11  MR. BROWNE:  Well, actually, I do have an issue about

12  one of the exhibits, but I also have another matter that I can

13  talk about, briefly.

14  THE COURT:  Sure.

15  MR. BROWNE:  I believe the first witness this morning

16  is going to be CJ Saretto, who was the previous owner of the

17  Broadway Grill.  And the memorandum of the interview that was

18  done with him indicates that, for instance, he paid $15,000 for

19  a forensic analysis of his computer.  He was not compliant --

20  if you recall, back -- way when the start of trial began, there

21  was some discussion about what's called PCI DSS, which is a

22  system you have in your computer so it can't be hacked; and

23  that if you don't have that, then Visa, or the banks, or

24  whoever, fines you.  And so that also happened to him, that he

25  was fined.

1    And then he claims that there was press attention -- the

2    reason I'm telling you all this in advance, Your Honor, is so

3    it can make it clear is, I'm not sure it's relevant to anything

4    in the indictment that this gentleman -- I think it's relevant,

5    certainly, that he did not have the necessary software to

6    prevent the hacking, but I'm not sure it's relevant how much it

7    cost him for a forensic examination, and that he ultimately

8    closed his business and filed for bankruptcy.  I could see how

9    that could be relevant at sentencing, but I don't see how that

10   would be relevant at trial, those matters.

11        THE COURT:  Have you talked to the government to see

12   if they're going to solicit that type of testimony?

13        MR. BROWNE:  Well, I assume they were, since they

14   gave us a memo to that extent.

15        MR. BARBOSA:  We definitely will.  And it's a

16   sentencing element of the crime that we are required to prove

17   to the jury in terms of the loss.

18        THE COURT:  You need to speak in the microphone,

19   Counsel.

20        MR. BARBOSA:  Your Honor, under 18 U.S.C. 1030, we

21   have to prove these losses to the jury as a sentencing element,

22   in order to make this a felony crime.  I'm trying to turn to

23   the exact section -- 1030 defines loss --

24        THE COURT:  Just one second, Counsel.

25        Which subsection, Counsel?

1      MR. BARBOSA:  I'm looking for that right now, Your

2    Honor.  It's a rather dense section.  I apologize.  Here we

3    are.

4      It is 1030(c)(2) -- sorry (c)(4)(A)(i), an offense under

5    subsection (a)(5)(B) which does not occur after a conviction

6    for another offense under this section, if the offense caused

7    loss to one or more persons during any one-year period, and for

8    purposes of an investigation, prosecution, or other proceeding

9    brought by the United States --

10            THE COURT:  Counsel, Counsel --

11            MR. BROWNE:  Too fast.

12            THE COURT:  That's not going to work.  You need to

13    start over again.

14            MR. BARBOSA:  Loss to one or more persons during any

15    one-year period, aggregating at least $5,000 in value.

16      So this is a sentencing factor that the government is

17    required to prove.  And the term "loss" is defined later in the

18    statute, under (e)(10) -- or sorry, (e)(11).  The term

19    "loss" --

20            THE COURT:  Just a second, Counsel.  Let me catch up

21    with you.

22            MR. BARBOSA:  Certainly.

23            THE COURT:  Okay.  I'm with you.

24            MR. BARBOSA:  Means any reasonable cost to any

25    victim, including the cost of responding to an offense,

USA vs. Seleznev, 8/22/16

1  conducting a damage assessment, and restoring data program,

2  system, or information to its condition prior to the offense,

3  and any revenue lost, cost incurred, or other consequential

4  damages incurred because of interruption of services.

5      In a 1030 case, it is simply beyond argument that this

6  type of testimony is inherently relevant to the charges in the

7  case.

8          THE COURT:  Let me ask you this, Counsel.  Is that a

9  sentencing factor, or is that a component of the element of

10  proof?

11          MR. BARBOSA:  Your Honor, it's in the verdict form.

12  It's a factor that the jury must find in order to allow the

13  Court to sentence the defendant as a felony crime.  Without a

14  special verdict on these, the crimes would be a misdemeanor.

15          THE COURT:  All right.  Mr. Browne?

16          MR. BROWNE:  Your Honor, I just don't think that they

17  meet that for the threshold.  And the proposed testimony, I

18  believe, based on the memorandum that they gave us -- for

19  instance, that he filed bankruptcy -- and there's also an

20  indication in this memorandum that one of his servers at the

21  restaurant was alleged to have actually copied credit card

22  numbers.  And that was one of the reasons why the business sank

23  in the neighborhood, because that rumor was running around the

24  neighborhood.  I just think that's much more prejudicial than

25  probative.

1    I think he could certainly testify that he bought the

2    business -- apparently, he bought the business, and this

3    software that was -- and hardware that was utilized was not up

4    to par.  He has a degree in computer science, this gentleman.

5    And so he redid it, but he didn't do -- he wasn't compliant

6    with the banks' requirements of the type of software that would

7    prevent hacking.  So that's what caused a lot of the financial

8    damage to him.  So I just -- I think it's more prejudicial than

9    probative.  I don't think it's necessary for the threshold the

10   government needs to prove.

11       And I have another matter, once you rule on that, Your

12   Honor.

13          MR. BARBOSA:  Your Honor, and I'd just point out,

14   this isn't a *Franke* (phonetic) issue.  The government must

15   prove this to the jury.  To the extent defense would like to

16   attempt to blame the victim argument, that he was at fault for

17   this hack, that's something they can argue to the jury.  I

18   don't believe it would be very compelling.  But it is not a

19   factor that in any way excludes Mr. Saretto's testimony that

20   this had an impact on his business.

21          THE COURT:  And Counsel, do you believe that the

22   filing of the bankruptcy is a necessary component of the

23   definition of loss?

24          MR. BARBOSA:  Other consequential damages incurred

25   because of interruption of service is specifically included in

USA vs. Seleznev, 8/22/16

```
 1    the definition of loss.  The cost to him, as a result of the
 2    damage to his business reputation, and the damage to his entire
 3    business, are inherently part of the impact that the government
 4    must establish.
 5              MR. BROWNE:  May I just briefly respond?
 6         Your Honor, I believe the $5,000 threshold that they're
 7    talking about, to turn this into a felony, is the loss to the
 8    banks and the credit card companies, under the statute and
 9    under the indictment.
10              THE COURT:  Where does it say that, counsel?
11              MR. BROWNE:  I left the indictment in the other room.
12         May I have a minute?
13              THE COURT:  Certainly.
14              MR. BARBOSA:  And I would point out, that only
15    applies to the wire fraud affecting a financial institution.
16    We do have to establish the impact on financial institutions
17    for the wire fraud counts.  The hacking charges, however, it
18    has to be aggregated loss to the computer hacking victims.
19              MR. BROWNE:  May I just finish, Your Honor?
20              THE COURT:  Yes.
21              MR. BROWNE:  Your Honor, I believe -- and perhaps
22    I'm -- we should get you a copy of this memorandum, of the
23    interview.  But I believe the collateral consequences of this,
24    the bankruptcy, so on and so forth -- we had another witness
25    coming up, maybe we want to talk about it now too, where -- who
```

USA vs. Seleznev, 8/22/16

```
1   claims to have had a lot of emotional problems and health
2   problems because of what happened to his business.  And I'm --
3   so this is coming up -- will be coming up through some of these
4   victims.  So I understand what the government is saying.  I
5   don't think it's necessary, and I think it's more prejudicial
6   than probative.
7              THE COURT:  All right.  The Court has reviewed the
8   specific statutory language, and the Court doesn't find that
9   the defense objection is supported by the definitions as
10  provided in the statute.  The Court agrees with the government
11  that these are necessary components that the government must
12  prove in order to establish the loss to the hacking victims.
13      There are two separate entities, the bank institutions and
14  the individual victims.  We're talking about the individual
15  victims, and Mr. Saretto is testifying as an individual victim.
16  So for that component, that's a necessary element -- a
17  necessary component that the government must prove.  The Court
18  believes that the type of loss, as you've defined it from the
19  memorandum, fits within the statutory definition.
20      Now, more prejudicial than probative, obviously, any type
21  of testimony that shows that there's a loss is going to be
22  prejudicial.  But under the definition of 403, whether or not
23  it's substantially more prejudicial, the Court can't find that,
24  that under these circumstances, it would support exclusion of
25  the evidence.  For those reasons, the Court will deny the
```

1    defense objection.  The witness is permitted to testify.

2         And counsel for the government, with some direction to

3    you, the Court's going to permit you to have these witnesses

4    testify in these categories.  But if it starts to go far afield

5    in terms of how far these losses are going, then the Court is

6    going to pull the reins back in and be much more restrictive.

7    Counsel is certainly entitled to interpose an objection, if

8    they believe it's going too far afield.  He's identified

9    specific categories in his proffer to the Court.  If it goes

10   far beyond that -- and again, I haven't seen this memorandum --

11   then the Court will possibly consider reconsidering how far I'm

12   going to let you go.

13              MR. BARBOSA:  Understood, Your Honor.

14              THE COURT:  All right.  Now, there's another

15   individual, Counsel?

16              MR. BROWNE:  There are more individuals who have that

17   sort of testimony.  I will just deal with that on -- as they

18   testify, and make objections when I feel it's appropriate.

19              THE COURT:  Okay.

20              MR. BROWNE:  And I believe Ms. Scanlan has one other

21   matter.

22              THE COURT:  All right.  Thank you.

23        Ms. Scanlan?  Ms. Scanlan, you can stay at counsel table

24   and make your argument.

25              MS. SCANLAN:  Okay.  It's just about -- the Court

 1    came out and indicated we were going to talk about Summary

 2    Exhibit 16.6.

 3              THE COURT:  Correct.

 4              MS. SCANLAN:  So my concern is that the government

 5    has indicated, in their briefs regarding this issue, that they

 6    would like to establish the foundation for this exhibit with

 7    Ms. Wood on the stand, in front of the jury.  And my concern is

 8    that the amount of testimony it's going to take to get to the

 9    point of establishing a foundation for that exhibit is such

10    that, even if the Court decided to sustain the defense

11    objection to the exhibit, that it's not a proper summary

12    exhibit, because it's not based on records that are kept in the

13    ordinary course of business, at that point the jury will have

14    known so much about the alleged loss amount, and all of the

15    underlying records and victims that go with that, that the

16    prejudice of that exhibit is already out, without the exhibit

17    being admitted.

18        So I would ask that the government establish the

19    foundation for that exhibit outside the presence of the jury.

20              THE COURT:  And when is this witness expected to

21    testify?

22              MR. BARBOSA:  Probably late this morning.

23        Your Honor, I will say, I do not plan to ask Ms. Wood a

24    great deal of questions about the foundation for the underlying

25    records, because that would be cumulative of the other

USA vs. Seleznev, 8/22/16

1    testimony that's already been established.  Detective Dunn

2    established the business records foundation for the underlying

3    records without any objection or cross examination as to those

4    records.  He testified at length about how credit card

5    companies, credit card brands, collect the type of information

6    that Ms. Wood analyzed.  He testified at length about how they

7    are required to report -- how banks are required to report data

8    on unauthorized charges to the card brands.  He explained how

9    the card brands and regulations require this type of data to be

10   collected; that they maintain this and collect it in the

11   ordinary course of business.  He explained how they go about

12   using that data to examine fraud trends; properly allocate

13   charges between merchants, cardholders, banks, and others; and

14   to assess fines, like the ones that some of these merchants

15   have suffered.

16       Ms. Wood will testify about receiving the information from

17   the card brands and how she went about analyzing it.  I don't

18   think that testimony is in any way unnecessarily prejudicial.

19   And the other testimony, in terms of where the government

20   obtained the card numbers that were submitted to the card

21   brands, that has also already come in without objection or

22   cross examination.  The agents, Dunn, Fischlin, and Mills, all

23   testified at length about how they submitted numbers found on

24   the servers and the defendant's laptop and some of the victim

25   machines to the card brands, and then passed on that loss

USA vs. Seleznev, 8/22/16

1    information.

2         So, frankly, I think we have already established a

3    foundation without objection, and Ms. Wood can proceed with

4    introducing -- or beginning to explain her analysis of the

5    numbers.

6              MS. SCANLAN:  May I?

7              THE COURT:  Yes.

8              MS. SCANLAN:  It's true that we haven't objected to

9    Detective Dunn's generalized testimony that he collected credit

10   card numbers and sent them to financial institutions, and also

11   to card issuers.  He offered a very generalized level of

12   testimony about what he did to supply that information.  And

13   then he offered generalized testimony about what card issuers

14   and financial institutions do when there's fraud reported.  He

15   has not laid a foundation for the underlying records that were

16   created by the financial institutions and the card issuers.

17        Many of those records, for instance, the records from

18   Capital One, these are not raw account records for each

19   fraudulent or alleged-to-be-fraudulent transaction.  It is a

20   summary Excel exhibit that's created in a report format in

21   response to a subpoena.  It may be based on transaction fraud

22   records that are created for another purpose, but the record

23   that Ms. Wood's testimony relies on is not a business record.

24   It's created for litigation.  That's the thing that I think

25   they need to establish beforehand, is that these actual records

1    are records kept in the ordinary course of business.  And

2    nobody has done that up to this point.

3             THE COURT:  Have you interviewed Ms. Wood, Counsel?

4             MS. SCANLAN:  No.

5             THE COURT:  Have you seen any reports of how these

6    records were amassed or assembled?

7             MS. SCANLAN:  Yes.

8             THE COURT:  Which records have you reviewed?

9             MS. SCANLAN:  So I believe the government filed much

10   of our correspondence regarding this exhibit with their brief

11   regarding this issue, which outlines some of it.

12       But, for example -- and I have all of these -- we reviewed

13   the records supplied by Chase Bank; the Broadway Grill CPP

14   file; the Navy FCU files; the MasterCard -- what's called the

15   MasterCard raw data response, which is interesting in and of

16   itself, because these are not -- and this is what all of that

17   communication goes to, that's actually filed in the record.

18   These are not the underlying account records.  These are

19   summations that are created by financial institutions.

20       So there were multiple requests by the defense for what

21   records underlie these exhibits, and those have not been

22   produced.  So this is what's considered the raw record.  And

23   our position is that these are not records kept in the ordinary

24   course of business.

25             THE COURT:  Okay.

1        MR. BARBOSA:  May I respond, Your Honor?

2        THE COURT:  Yes.

3        MR. BARBOSA:  Detective Dunn did go into the details

4   of how the card brands maintain those records, at length.  And

5   I point out, first, several of the records that Ms. Scanlan

6   just referenced are not the underlying records.  And we have

7   repeatedly explained that to defense counsel.  Records directly

8   from the banks are not the source of this summary exhibit, only

9   records provided by the card brands.  And the card brands, as

10  Detective Dunn explained, have these records because they

11  receive it from the banks, which becomes their business record,

12  unquestionably.  It's kind of beyond any dispute that credit

13  card brands would maintain this kind of data.

14       What Ms. Scanlan's objection goes to is that the format of

15  how they produced their business records is something she does

16  not agree with.  Effectively, I think a good analogy would be,

17  if you looked at the Court's docket as a business record of

18  what happened in a particular case, Ms. Scanlan's objection is

19  that you couldn't use that to show what happened unless you

20  admit every underlying pleading.

21       The card brands did not provide us with every receipt that

22  was signed or typed up at a particular merchant, to support the

23  credit card charges.  What they provided us was their

24  databases, their Excel spreadsheets.  And Detective Dunn

25  testified about that.  They provided their Excel spreadsheets

USA vs. Seleznev, 8/22/16

1   that record all this information.  Not surprising that in this

2   day and age, with this volume of data, these massive

3   corporations would not retain every shred of paper that is

4   recorded in their business records.

5           THE COURT:  And Counsel, is there any dispute, or is

6   there any issue regarding the fact that this type of data was

7   kept in the ordinary course of business?

8           MR. BARBOSA:  There just isn't.  Detective Dunn has

9   already testified about that.  And he's unquestionably a

10  qualified witness.  He is not only extraordinarily experienced

11  based on his law enforcement experience, as he testified, he

12  was also employed by one of the largest financial services

13  companies providing back-end support, this very type of data

14  analysis and retention that the card brands are doing.

15          THE COURT:  All right.  Anything further?  If there's

16  nothing further?

17          MS. SCANLAN:  I'm sorry, Your Honor.  If I may?

18          THE COURT:  Yes.

19          MS. SCANLAN:  I think perhaps it would be helpful,

20  just before the Court makes a decision, to actually look at

21  what the record is that's produced by the card issuer.

22          So these are the MasterCard raw data records.  So when you

23  look at this -- and this is not -- and to go back to Detective

24  Dunn, Detective Dunn did not testify specifically about what

25  was done by card issuers in this case, for these records.  He

USA vs. Seleznev, 8/22/16

1    offered a generalized level of testimony about what card

2    issuers do.  And that's not the same thing.

3        This record, which is the raw data record for MasterCard,

4    is not a record kept in the ordinary course of business in

5    terms of the account records for the transactions.  This is a

6    report.  I would also indicate that --

7            THE COURT:  And, Counsel, where would the source of

8    this data come from in order to generate this type of report?

9            MS. SCANLAN:  As I understand it, the source of this

10   data is -- well, Detective Dunn -- it's always been

11   communicated to us, and it's been the understanding, that

12   Detective Dunn sent the credit card numbers to the card issuers

13   and the financial institutions.  Now, he testified to something

14   which is quite different, which is that he sent them the common

15   point-of-sale and asked for the records connected to that

16   business.  That is a whole different thing than sending them

17   the credit card numbers.  So I don't know if he did both, or

18   one or the other of those.

19       My understanding of what the underlying records for this

20   is is the consumer fraud reports.  So an individual account

21   holder -- that's how you'd figure out what this common source

22   is.  They flag, or the financial institution flags, a

23   fraudulent transaction on a particular account holder's card.

24   If all of those people's fraudulent transactions, they all went

25   to the Broadway Grill a week prior, then that becomes flagged

USA vs. Seleznev, 8/22/16

```
 1    as a potential source of the taking of those credit card
 2    numbers.  So those are the records underlying this report.  But
 3    those records aren't produced to back this up.  It's just this.
 4    So this is not the same thing as those underlying business
 5    records.
 6         I would also say, in terms of having Ms. Wood introduce
 7    that exhibit, that summary exhibit has loss amounts from an
 8    untold number of businesses that have not been testified about.
 9    There are probably 200 individual businesses that underlie
10    those loss amounts.  And no one has testified about the
11    consumers who may have used a credit card there, who later had
12    fraudulent transactions.  So the --
13              THE COURT:  Doesn't that go more, Counsel, to weight,
14    as opposed to admissibility, in that that's a subject that's
15    more proper for cross examination, as opposed to exclusion or
16    preclusion of evidence?
17              MS. SCANLAN:  I think it can.  Parts of that go to
18    weight.  But part of it goes to just the actual foundation
19    threshold relevance of a lot of that information.
20         If you haven't established in the forefront that these
21    loss amounts have anything to do with this case, then why
22    should that information come in front of the jury?  Why should
23    they be told that it's $170 million in loss when they haven't
24    been told anything about any of those businesses?  I mean, I
25    don't see why you get to just introduce that without anything
```

1    that's supporting it.

2            THE COURT:  Okay.  Thank you, Counsel.

3            MR. BARBOSA:  Your Honor, I want to correct a couple

4    things, because that record is very inconsistent with what is

5    actually happening and what has actually already been

6    established in the testimony.

7        Detective Dunn explained very clearly -- and I know there

8    was a lot of testimony, but I'm the one that outlined it and

9    brought it out through him.  He explained that he submitted

10   both the numbers that he seized, and he also told the card

11   brands what were the common points of purchase.  The card

12   brands returned information based specifically on the numbers

13   that were found in the defendant's possession on the HopOne

14   server, the 2Pac server, the Ukraine server, and his laptop.

15   They returned additional information that did not tie back to

16   specific numbers found in defendant's custody.

17       That will not, and is not, part of the summary.  That --

18   all of that loss, if not tied directly to a number in

19   defendant's possession, has been excluded from the chart, from

20   the summary.  That equaled another $27 million, but it is not

21   part of the $169 million summary.  I just wanted that to be

22   very clear because -- especially for the appellate record.  We

23   are not submitting loss figures that do not have a clear,

24   direct tie to the defendant.

25           THE COURT:  All right.  The Court's going to rule as

USA vs. Seleznev, 8/22/16

```
 1   follows.
 2        The Court is not convinced that the defense has
 3   established a sufficient basis to exclude this type of
 4   testimony.  I think the Court's already indicated to counsel
 5   that much of the objection goes to weight, as opposed to
 6   admissibility.
 7        The Court also looks at the fact that the government has
 8   carved out, from the offering in Exhibit 16.6, that component
 9   that's not directly tied to the defendant's laptop and computer
10   when seized.  The Court is satisfied that if there was any
11   prejudice, it would be as a result of the -- what the
12   government's characterized as 27,000 additional -- a
13   significant amount of money that would have been added, but it
14   was excluded based upon what's not tied directly to the
15   defendant's computer.
16        The Court is, therefore, satisfied that Detective Dunn has
17   established a sufficient foundation to what was sent to the
18   banks, what was provided to the banks -- provided by the banks
19   is tied directly to the defendant's conduct, based upon the
20   evidence that's presented.
21        So the Court will deny the defendant's objection.  The
22   government's permitted to use 16.6 as proposed.
23        Anything else to take up before we bring in the jury?
24             MS. SCANLAN:  Your Honor, I would ask that the
25   MasterCard records that I handed forward be kept in the record
```

1   as a sealed exhibit, due to the nature of the information

2   that's throughout that record.

3            THE COURT:  That's fine.  Let me check, Counsel.

4        Are there -- I saw that there were amounts --

5            MR. BARBOSA:  I should point out, also, for the

6   record, that this is not the basis of the summary.  This

7   appears to be a summary itself.  The summary document is based

8   on the actual card-by-card transaction records.  And this is

9   simply MasterCard's own summary.

10           THE COURT:  Okay.  Again, the basis of the Court's

11  ruling was based upon what was directly tied to individuals, as

12  opposed to what counsel has proposed by way of MasterCard.

13       But, nonetheless, I will permit this to be a part of the

14  record, if defense needs to make this a part of the record.  So

15  we'll have this marked for identification as Government's

16  Exhibit --

17           MR. BARBOSA:  Defense exhibit.

18           THE COURT:  Defense Exhibit 113.  And it will be

19  filed under seal.

20       And these are MasterCard records; correct?

21           MS. SCANLAN:  Yes, Your Honor.

22           THE COURT:  Counsel, just so that we're clear, our

23  record doesn't go up to the reviewing court.  Exhibits are

24  returned back to counsel.  The reason I had it marked for

25  identification was so that we preserve the record of what you

USA vs. Seleznev, 8/22/16

 1    presented to the Court.  So even though it's filed under seal,

 2    that's only on a temporary basis.  Because once the trial is

 3    over, I expect the government to come collect all their

 4    exhibits, and I expect the defense to collect their exhibits.

 5    So if there is an appeal, then it's up to you to determine what

 6    you want to submit for the record.  I just don't want to

 7    mislead anybody in terms of what we're holding on to and what

 8    we're going to keep.

 9              MS. SCANLAN:  I got it.  Thank you.

10              THE COURT:  Anything else to take up before we bring

11    in the jury?

12              MR. BARBOSA:  Nothing from the government, Your

13    Honor.

14              THE COURT:  From the defense?

15              MS. SCANLAN:  No.

16              THE COURT:  Okay.  Let's bring in the jury.

17         Thank you, Counsel, for taking care of that before the

18    jury comes in.

19                    (Jury enters the courtroom)

20              THE COURT:  Good morning.  And I'd like to welcome

21    all of you back to court and thank you for your continued

22    support in being able to assist the parties in their resolution

23    of the issues now before you.

24         I also want you to know that we started exactly at 9:00.

25    We had some issues that we had to deal with.  Because I don't

SARETTO – Direct (by Mr. Wilkinson)

1  think that you should believe that we were out here just

2  exchanging social pleasantries for the last half hour.  When

3  you're in there, we're out here working.  That's what we have

4  been doing so it makes it more efficient of your time so that

5  you don't have to go in and out multiple times.  So we covered

6  several different issues and several different witnesses'

7  testimony.  And that's all been resolved now.  So as the

8  testimony comes in, hopefully you won't have to be excused.

9        So with that, Counsel, please call your next witness.

10           MR. WILKINSON:  The United States calls CJ Saretto.

11           THE COURT:  Please step forward, sir.

12           THE CLERK:  Please step forward.

13        CESARE JOHN SARETTO, having been duly sworn, was examined

14  and testified as follows:

15           THE CLERK:  Please state your first and last names,

16  and spell your last name for the record.

17           THE WITNESS:  Cesare John Saretto.  Last name is

18  S-A-R-E-T-T-O.

19           THE COURT:  You may inquire.

20           MR. WILKINSON:  Thank you, Your Honor.

21                     DIRECT EXAMINATION

22  BY MR. WILKINSON

23  Q    Good morning, Mr. Saretto.

24  A    Good morning.

25  Q    Can you tell us what you do for a living, presently?

SARETTO – Direct (by Mr. Wilkinson)

1   A    I'm the vice president of program management for a
2   software technology firm called Change Healthcare.
3   Q    And where is that located?
4   A    Our headquarters is in Nashville, Tennessee.  We're a
5   U.S.-based firm, so offices everywhere.
6   Q    Do you live in Nashville?
7   A    I do, yes, sir.
8   Q    Do you hold any degrees in computer-related fields?
9   A    I do.  I have a master's and a bachelor's in computer
10  science.
11  Q    Where did you live before you lived in Tennessee?
12  A    I lived here in Seattle for 14 years.
13  Q    And what was your primary employment while you lived here?
14  A    I worked at Microsoft Corporation for the entirety of the
15  14 years.  When I left, I was a group program manager working
16  on video games.
17  Q    Were you also a small business owner?
18  A    I was, for three years.
19  Q    And what was the name of the business?
20  A    The Broadway Grill, on Capitol Hill.
21  Q    When did you purchase Broadway Grill?
22  A    We purchased and took possession June 1 of 2010, I
23  believe.
24  Q    And at the time you purchased the business, how long had
25  Broadway Grill been operating?

SARETTO – Direct (by Mr. Wilkinson)

1   A    I'm not sure of the exact count, but we're looking at

2   something along 20 years or so.

3   Q    You mentioned it was on Capitol Hill; is that right?

4   A    Yes, sir, Broadway and Thomas.

5   Q    What kind of food did it serve?

6   A    Sort of American fare, steaks, hamburgers, french fries,

7   fried chicken, fusion.

8   Q    How many employees did you have?

9   A    We averaged about fifty-ish employees on payroll at a

10  time.

11  Q    Did you accept payment by credit card?

12  A    Yes, all major credit cards.

13  Q    And about -- can you give us a sense of about how many

14  credit cards you'd process a day, as a business?

15  A    It's hard to say; in the hundreds, less than a thousand.

16  Q    Did you have a point-of-sale system that allowed you to

17  process them?

18  A    We did, a restaurant manager point-of-sale system.

19  Q    Now, you mentioned that you have a background in

20  computers.

21       Did your expertise include point-of-sale systems?

22  A    It did not.  I know an awful lot about point-of-sale

23  systems today.  But when I took control of the restaurant, no,

24  sir, I did not have any idea.

25  Q    Did you hire a company to help you out when maintenance or

SARETTO - Direct (by Mr. Wilkinson)

1    service problems came up?

2    A    The system came with the restaurant.  And there was a

3    company called Applied SBC, which is a local company.  That is

4    the retailer of a system called Restaurant Manager, which is

5    the point-of-sale system that we used.  And so that

6    relationship was in place when we took control of the business,

7    and they maintained the system for us.

8    Q    And when you say that they maintained it, would they

9    always come on site when something needed to be done, or did

10   they sometimes access the computer from off site?

11   A    I actually never met the guy.  His name is Sam Gillis.

12   But we've only corresponded in e-mail.  And he remotely

13   administered the system.

14   Q    So did that mean that you had a remote desktop capability

15   that allowed him to remote in?

16   A    Yes.  He would remote desktop into the machine and control

17   it that way.

18   Q    You mentioned that when you bought the business, it came

19   with the point-of-sale system, that you sort of took it over.

20        At the time you purchased the business, did you have

21   reservations at all about the system?

22   A    Well, the front-of-house system -- if you've ever had

23   experience with a point-of-sale system, you know that they're

24   just touchscreens.  You touch them, stuff happens, you order

25   items off menus.  It looked fairly modern.  I didn't have any

SARETTO - Direct (by Mr. Wilkinson)

1    reservations about it.

2         However, once we took control of the business, once I saw

3    the back-office system, it looked like it was a decade old.

4    Couldn't, kind of, get the business intelligence I wanted; very

5    difficult to run reports.  So I just thought there has to be a

6    newer version of this thing.  I found out I was maybe three

7    major versions behind.  So I called Sam, and I asked him to

8    give me a quote for an upgrade.  That was probably within the

9    first, I don't know, three or four weeks of operation.

10   Q    And did that upgrade happen before October of 2010?

11   A    No, it didn't.  It's sort of amazing.  If you're not

12   buying a new system, I guess maybe they're not so incented

13   [sic] to get back to you about things like that.  But once we

14   were breached, he was real quick to respond and get that

15   upgrade in place.

16   Q    So you just mentioned you got breached.  Let's move along

17   to that.  Let's focus on the period of October 2010, now.

18   A    Okay.

19   Q    Did you learn, during that period of time, that you had

20   been breached?

21   A    I did learn -- I believe it was -- I can't remember the

22   exact date.  Sometime in early-ish October, I received a phone

23   call from Chase Paymentech, who's our merchant card processor.

24   And they informed us --

25             MR. BROWNE:  Objection, Your Honor.  Hearsay.

SARETTO - Direct (by Mr. Wilkinson)

```
 1              THE COURT:  That's sustained, Counsel.
 2   BY MR. WILKINSON
 3   Q    Did you know, after speaking with Chase Paymentech, that
 4   you had been breached?
 5   A    I believed that we had been breached.
 6   Q    Did you do anything to investigate whether you had been
 7   breached?
 8   A    Yes, actually, quite immediately.  I was at work that day,
 9   at Microsoft.  I left work, because the restaurant was not
10   going to be able to function if we didn't switch over to using
11   modems to process credit cards.  Now, that's a complicated
12   situation in the 21st century.  But we had been instructed by
13   our merchant processor that we needed to get the machine off
14   the internet.  So we air-gapped it, and that's what we did.
15   And I went to Staples and bought a modem, which is actually
16   kind of a hard thing to do; installed it in the server, spent
17   the day trying to get credit card processing back online.
18   Q    Were you able to get it back online?
19   A    Yes, at a snail's pace.  So it's a fairly large
20   restaurant, seated 250-ish people at maximum capacity; so five
21   terminals and a bar, right, all these people trying to ring
22   things in.  You can imagine, every time someone swipes the
23   card, the computer in the back office is making that wailing
24   modem sound, that we remember from the '90s.  It was very
25   difficult to do business as a result of that.
```

SARETTO – Direct (by Mr. Wilkinson)

1    Q    During that period when you were still operating on the
2    modem, were there any particularly important events for your
3    business?
4    A    Yes, actually, there were.  The Broadway Grill was known
5    for its Halloween costume contest.  That seems like a strange
6    thing to be talking about, but that was the thing that we did
7    every year.  And it was the second-busiest day in terms of
8    volume, dollar volume, that we would experience in a year.  The
9    other one was Pride Sunday.  So that was a very difficult
10   operation to actually run on a modem.  It actually turned into
11   major chaos for us.
12   Q    So we talked about how you converted over to the modem.
13        Did you also look at your own existing point-of-sale
14   system to determine what had happened?
15   A    Yes.  Law enforcement had asked us not to modify the
16   system in any way, to tamper with any forensic evidence,
17   because they wanted to come take images of the machines.  So I
18   realized, after Halloween, we could not continue to operate in
19   this archaic model where we only had one telephone line to
20   process credit cards.
21        So myself and my minority owner, a friend of mine, also a
22   Microsoft employee, basically took it upon ourselves to do our
23   own, sort of, forensic analysis.  So we brought in a piece of
24   network gear that allowed us to isolate the back-office server
25   from the internet so that it appeared to be on the internet,

SARETTO - Direct (by Mr. Wilkinson)

1   but it could only actually talk to our merchant processor.  And

2   that was the only thing it could talk to.  That allowed us to

3   restore internet connectivity and to start sniffing packets of

4   what it was doing.

5       And what we discovered was that every time a credit card

6   was run through a terminal in the front-of-house, that track

7   data from the card, all of the Track 1 and Track 2 on the back

8   of the card that you would need to make a counterfeit copy of

9   the card, was being transmitted to a server in the Ukraine, or

10  at least the IP address was a registered IP in the Ukraine.

11  Q    Was there anything -- as part of your review of the

12  system, did you notice anything unusual about the way the

13  system was configured, the point-of-sale system was configured?

14  A    Yes, we did.  After we noticed that there was something

15  sending data, we very quickly isolated the Trojan that was on

16  the system, that was actually doing the sending.  As I

17  mentioned, we stopped the computer from actually being able to

18  send to the Russian -- or, I'm sorry -- the Ukranian address.

19  So none of the transmissions were making it through.  They were

20  being caught by our network device.  But we were then able to

21  take a look at what on the local system was sending that data.

22  We installed some debugging tools and found a Trojan that was

23  sending data out.  We were able to disable that Trojan so that

24  it couldn't continue to operate, and leave it around for the

25  forensics.

SARETTO – Direct (by Mr. Wilkinson)

1    We also, in the process, discovered that there was a plain

2    text file sitting on the server itself.  And that plain text

3    file had every credit card full magnetic stripe that had run

4    through that business for the preceding two years.  The

5    point-of-sale vendor, or somebody -- I have no idea who -- two

6    years prior had rebuilt the back-office server, and at that

7    time had turned on a debugging switch that allowed the system

8    to do this very dangerous thing of just writing all these

9    credit cards to a plain text file.  And we would later learn,

10   through the forensics reports, that, indeed, that that file was

11   sent outbound when the system was compromised in early October.

12       So in addition to taking every credit card that came

13   through, the hacker who had originally compromised the system

14   was able to gain a very large treasure trove of credit card

15   numbers, magnetic stripe data, as soon as he breached the

16   system.

17   Q   Do you know how many card numbers were in that particular

18   file?

19   A   It was north of 30,000.  I don't remember the specific

20   number.  I can tell you mine were included, because I was a

21   customer before I was the owner.

22   Q   As a consequence of the breach, were you required to

23   participate in any kind of audit?

24   A   Yes, two.  The actual law enforcement officers, Secret

25   Service and Seattle Police, showed up with the black vans and

SARETTO - Direct (by Mr. Wilkinson)

1   black cases.  And they shut us down for a day and imaged all of

2   our machines, took copies of our stuff, and left and turned

3   everything back on.  We were also required to undergo a PCI DSS

4   audit and certification.

5   Q    What is -- you said "PSI" or "PCI"?

6   A    PCI, Payment Card Industry -- and I couldn't tell you what

7   "DSS" means.

8   Q    But what did the audit involve?

9   A    We had to hire a forensic firm.  SecurityMetrics is the

10  one that we selected.  So we were given a sheet of approved

11  firms, by Paymentech, who's our merchant processor, or was our

12  merchant processor.  And we were told, "You need to pick one of

13  the folks on this list, and they need to come in and do a full

14  scan and audit of your systems.  And then you need to go

15  through a compliance certification program, to prove that your

16  system is fully secure.  And then after you've gone through

17  that, and you've proved that to us, and Visa, MasterCard,

18  American Express, and Discover, we'll decide how much we're

19  going to fine you.  And we'll also decide whether or not we'll

20  let you continue to process credit cards."

21  Q    Who paid the cost of that, of all those procedures?

22  A    That would be me.

23  Q    And how much did it cost to go through that process?

24  A    Somewhere in the order of $12,000 to $13,000.

25  Q    You just mentioned a minute ago that they would -- based

SARETTO - Direct (by Mr. Wilkinson)

1    on that, they would decide how much you would be fined.

2        Were you required to pay fines?

3    A    We were.  Visa levied a fine of $5,000.  MasterCard levied

4    a fine of another $2,500.  AmEx and Discover, I guess through

5    the goodness of their heart, decided we'd been beat up enough

6    and didn't actually fine us.

7    Q    Before this breach, was Broadway Grill profitable?

8    A    Yes.  The business was profitable.  It was -- we had

9    purchased it as an existing business, and we knew it was a

10   little bit of a turnaround, because it wasn't as profitable as

11   it had been in years past.  But it was a healthy, profitable

12   business.

13   Q    And how long had you been running the business before the

14   breach happened?

15   A    I believe it was about four months.

16   Q    Was the breach reported in the press?

17   A    Very heavily, yes.

18   Q    And describe, generally, how it was reported.

19       MR. BROWNE:  Excuse me, Your Honor.  I believe that

20   would be hearsay.

21       MR. WILKINSON:  Your Honor, it's not offered for its

22   truth.  It's to show the effect of the breach.

23       THE COURT:  That's sustained, Counsel.

24       Next question?

25   ////

SARETTO – Direct (by Mr. Wilkinson)

1   BY MR. WILKINSON

2   Q    Can you describe how the incident affected your

3   relationships with your customers?

4   A    A lot of our customers didn't trust us.  This was before

5   Target and Wal-Mart -- or sorry -- Target and Home Depot had

6   had their major breaches.  So I don't think folks understood

7   that a trustworthy business could be compromised.  There were a

8   lot of folks who were coming in who were very upset.  Being a

9   neighborhood restaurant that has a very approachable price

10  point, it wasn't like all of our customers were, you know,

11  charging it up on their platinum AmEx.  A lot of them were

12  using debit cards.  A lot of them lost access to the balance of

13  their checking accounts.  So there were some pretty angry folks

14  hitting us up, and the two banks kitty-corner to us, where most

15  of the folks -- a lot of our customers did business and banked.

16  Q    Did you see an effect on your sales after the breach?

17  A    Instantaneous, once it hit the news, in a very serious

18  way.  We saw somewhere on the order of 40 percent reduction in

19  gross revenue, pretty heavily, after the media picked it up.

20  Q    How did that affect your bottom-line profitability?

21  A    Restaurants run about 11 to 15 percent profitability.

22  Your large chains can do better than that.  But local small

23  businesses, that's about normal, industry average.  You take

24  40 percent of revenue out for a little while, and, you know,

25  you're running pretty healthily in the red for quite a

1    significant point of time.  And that resulted in sort of a
2    spiral for us.  So we just injected a bunch of capital into the
3    business, and then the business immediately goes red, and
4    stayed red for a long time.
5    Q    Was the business ever profitable again, after the breach?
6    A    No.  It sort of just resulted in, like, a spiral.  And
7    after keeping the business on life-support for about
8    two-and-a-half years after that, we just called it quits.
9    Q    And what do you mean by "called it quits"?
10   A    Walked away from the business, shuttered the doors, walked
11   away from the loan obligations, filed personal bankruptcies.
12   It was pretty devastating, actually.
13            MR. WILKINSON:  No further questions for this
14   witness.
15            THE COURT:  Cross examination?
16            MR. BROWNE:  Thank you, Your Honor.
17                          CROSS EXAMINATION
18   BY MR. BROWNE
19   Q    Good morning.
20   A    Good morning, sir.
21   Q    A couple -- not a lot of questions; all right?
22       When you purchased the business, it had been ongoing for
23   about ten years?
24   A    I believe longer than that, sir.
25   Q    Okay.  And so when you purchased the business, you also

SARETTO – Cross (by Mr. Browne)

1   purchased the hardware and the software, computer-wise;

2   correct?

3   A    Correct.  Yes, sir.

4   Q    And so the previous owners had not installed a PCI DSS

5   system?

6   A    I couldn't say what the previous owners had done.  They --

7   I can tell you that, when I purchased the restaurant, the

8   version of the point-of-sale software was no longer considered

9   PCI compliant.  PCI changes the rules -- as an industry,

10  changes the rules on a regular basis, enforcing higher and

11  higher security standards.  And the system, as it stood when we

12  purchased it, it turned out was not PCI compliant.  But that

13  wasn't something that I -- I didn't even know the acronym at

14  the time we purchased the restaurant.  So that wasn't something

15  I knew.  I found out.

16  Q    And just to recap, PCI compliant means that there is

17  software installed in a back-room server, or sometimes even on

18  a point-of-sale server, but this software that's installed,

19  that prevents hacking, basically; correct?

20  A    No, sir.  It doesn't prevent hacking.

21  Q    What -- I'm sorry.  Go ahead.  I interrupted you.

22  A    That's okay.  It employs a baseline of security

23  configuration that's considered acceptable from a security risk

24  mitigation perspective.  There's no such thing as preventing

25  hacking.

SARETTO – Cross (by Mr. Browne)

1    Q    Okay.  So the banks and the credit card companies require

2    this PCI DSS in order to do business with you, basically;

3    right?

4    A    They should require that you are processing transactions

5    using a PCI-certified point-of-sale system software.  That's

6    correct.

7    Q    And when the banks, or credit card companies, I guess,

8    determined that you weren't compliant, then there's fines

9    involved; right?

10   A    No.  Only if you're breached, there's fines involved.

11   Q    Okay.  Well, if you're breached, and they find that you're

12   not PCI compliant, then there could be fines?

13   A    Yes, that's correct.

14   Q    And in your case, that occurred.

15        And do you know -- I think you testified -- that the

16   credit cards that the Broadway Grill exported happened before

17   you owned it, also; correct?

18   A    The credit cards that would be exported in October of 2010

19   had been collected over a period of -- I don't remember the

20   exact dates, but something like two years --

21   Q    Yeah.

22   A    -- correct.  So they had been building up prior to our

23   purchase of the business.  That's correct.

24   Q    Right.  And I think you did testify to that on direct.  I

25   apologize for asking you again.

SARETTO – Cross (by Mr. Browne)

1    Now, interestingly, you were a customer at Broadway Grill
2    before you bought it?
3    A    Correct.
4    Q    And you used a credit card?
5    A    I did.  I used multiple of my own credit cards.
6    Q    And you found those when you were looking at what cards
7    were compromised?
8    A    Yes, I did find them in the log.
9    Q    I'm just curious, did you get notice from your bank that
10   your credit card had been compromised?
11   A    I definitely did on at least one of the cards.  My
12   personal American Express was canceled and reissued as a result
13   of -- they don't always tell you.  I don't remember what they
14   wrote in the letter.  But I remember that they canceled it and
15   reissued it not long after the breach.
16   Q    So as normal, the loss there was to American Express, not
17   to you personally, except for the hassle of getting a new card;
18   right?
19   A    In the case of the loss to me, the credit card holder?
20   Q    Yes.
21   A    Yes, that loss was borne by American Express.
22   Q    And you don't know if the person who installed the malware
23   is the person who took the entire credit card numbers.  You
24   don't know that, that it's the same person or entity.
25   A    I do not have any evidence to confirm that.  The report

SARETTO – Cross (by Mr. Browne)

1   that was done by SecurityMetrics did confirm that.  I do not

2   have -- I was not the one who did that forensics to make that

3   connection.

4   Q    Okay.  And what was the name of that company, again?

5   A    SecurityMetrics did the forensic assessment, and also

6   the -- I believe the law enforcement did their own assessment.

7              MR. BROWNE:  That's all I have.  Thank you.

8              THE COURT:  Redirect?

9              MR. WILKINSON:  No.  Thank you, Your Honor.

10             THE COURT:  Any objection to this witness being

11  excused, by the government?

12             MR. WILKINSON:  No, Your Honor.

13             THE COURT:  By the defense?

14             MR. BROWNE:  No, Your Honor.

15             THE COURT:  Thank you, sir.  You may step down.

16  You're excused.

17      Members of the jury, if you'd like to stand and stretch.

18             MR. CHUN:  The United States calls Bob Kerr.

19             THE COURT:  Please step forward, sir, all the way to

20  the front.

21             THE CLERK:  Please raise your right hand.

22      BOB KERR, having been duly sworn, was examined and

23  testified as follows:

24             THE CLERK:  Have a seat.

25      If you'd please state your first and last names, and spell

KERR – Direct (by Mr. Chun)

1   your last name for the record.

2            THE WITNESS:  My name is Bob Kerr, K-E-R-R.

3            THE COURT:  You may inquire.

4            MR. CHUN:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6   BY MR. CHUN

7   Q    Good morning, Mr. Kerr.

8   A    Good morning.

9   Q    Could you please tell the jury where you work?

10  A    I am the chief financial officer and one of the owners of

11  Grand Central Bakery.

12  Q    And where is Grand Central Baking located?

13  A    Our headquarters are in Portland, Oregon, but we have

14  locations all over Seattle and Portland.

15  Q    So somewhere in Seattle?

16  A    Yes.

17  Q    And how long have you worked there?

18  A    Twenty-three years.

19  Q    How did you start there?

20  A    It's a family business.  And one of my good friends was

21  part of the family, and I started off as the, kind of, numbers

22  and technology person.

23  Q    And drawing your attention to late 2010, early 2011, was

24  your business the victim of computer hacking?

25  A    Yes.

KERR – Direct (by Mr. Chun)

1    Q    And how did you learn about that?

2    A    Well, I was in Portland.  Rosemary Kennedy was in charge

3    of our cash register POS system back then.  She called me and

4    said the police had called her and –– either they had called or

5    come by.  I can't remember which –– and that we'd been

6    identified as a source for credit card fraud.  And so at that

7    point, I got involved in the whole process.

8    Q    Okay.  And so at that point, you became more involved?

9    A    Yes.  I mean, she was handling kind of –– I handled the

10   Portland –– at that time, five years ago, I handled the

11   Portland POS system.  She handled the Seattle.  So I kind of

12   got involved as a support for her.

13   Q    And do you remember who contacted you from law

14   enforcement?

15   A    I believe it was David Dunn.  It was –– at the time, I

16   wasn't quite sure if it was Seattle Police or Secret Service or

17   both.  I still don't really know.

18   Q    But you recall the name David Dunn ––

19   A    Yeah.

20   Q    –– being either Seattle Police ––

21   A    I believe I even talked to him, yeah.

22   Q    Or Secret Service?

23   A    Yeah.

24   Q    And back then, in late 2010, early 2011, what type of

25   point-of-sale system did you have?

KERR – Direct (by Mr. Chun)

```
 1   A    We used MICROS.

 2   Q    And did it accept credit cards?

 3   A    Yes.

 4   Q    And, I guess, specifically, which store was the victim of

 5   the computer hacking?

 6   A    It was our Pioneer Square location, which is our first

 7   location.

 8   Q    Here, in downtown Seattle?

 9   A    Yeah, downtown Seattle.

10   Q    And how were the computer and point-of-sale systems set up

11   at that time?

12   A    Well, at the front counter, we had two POS systems, which

13   are on the same network as the MICROS server, which lives in

14   the back office.  And we were doing internet processing.

15   Q    And back then, on a regular day, how many customers did

16   you see?

17   A    About 500.

18   Q    And what percentage of those would pay by credit card?

19   A    Probably about four out of five.

20   Q    About 80 percent?

21   A    80 percent.

22   Q    And because of this incident, did you incur any costs from

23   it?

24   A    Yes.

25   Q    What types of costs?
```

KERR – Direct (by Mr. Chun)

1   A    Well, first of all, the biggest cost was a fine we had to

2   pay Visa, for $5,000.  And then we had to -- we had to replace

3   our server.  We ended up closing -- we ended up not taking

4   credit cards, immediately, for four days.  Then we paid MICROS

5   to replace the server, to clean all our machines, you know,

6   wipe them, reinstall the operating systems.  We also did that

7   to all our office computers.  We had them taken away and

8   cleaned, so we had loaners.  So we paid for that.

9   Q    Do you remember the approximate amounts for these things?

10  A    Yeah.  Well, the Visa fee was $5,000.  The server was

11  about $1,600.  And we had to buy new dial-up credit card

12  machines, which I think were about $800 apiece, for two of

13  them.  The swat [sic], we paid our IT vendor to clean our

14  machines, I'm guessing, about $600.  I couldn't find the

15  receipt for that.  I think I got everything.  Of course, there

16  was a lot of my own time spent on the project, as well.

17  Q    What do you mean by your own time?

18  A    Well, coordinating all those things, you know, trying to

19  figure out what happened, coordinating all the different

20  vendors.  Of course, we had to go through the whole PCI

21  compliance, talking to Bank of America, who was our processor

22  at the time.  There was a lot of explaining and coordinating.

23  Q    And did you have any change in business following the

24  incident?

25  A    It's hard to say.  I mean, definitely there were people

KERR - Direct (by Mr. Chun)

1  walking in the door with their credit card in their hand

2  saying, "Hey, can I buy something?"

3          MR. BROWNE:  Objection, Your Honor.

4          THE COURT:  It's sustained.

5  BY MR. CHUN

6  Q    Without telling us what other people told you, did you

7  have any fallout in business?

8  A    I can't say for sure.  I mean, I don't have -- I don't

9  have the numbers to show that, because there are any kind of

10 number of variables that can affect sales in a week.

11 Q    Was there any period of time where you didn't take credit

12 cards at all?

13 A    Yes, for four days.

14 Q    So you were cash-only for four days?

15 A    Yeah.

16 Q    But prior to that, about 80 percent of your customers used

17 credit cards?

18         MR. BROWNE:  Your Honor, object to the leading

19 question.

20         THE COURT:  It is leading, Counsel.  Sustained.

21         MR. CHUN:  No further questions, Your Honor.

22         THE COURT:  Cross examination?

23         MR. BROWNE:  No, I don't have any questions, sir.

24 Thank you very much.

25         THE WITNESS:  Okay.  Thank you.

```
 1          THE COURT:  Any objection to this witness being
 2   excused, by the government?
 3          MR. CHUN:  No, Your Honor.
 4          THE COURT:  By the defense?
 5          MR. BROWNE:  No, Your Honor.
 6          THE COURT:  Thank you, sir.  You may step down and be
 7   excused.
 8      Members of the jury, if you'd like to stretch, please feel
 9   free to do so.
10      Next witness, Counsel?
11          MR. BARBOSA:  The government calls Chris Forsythe.
12          THE COURT:  Please step forward, sir, all the way to
13   the front.
14          THE CLERK:  Please raise your right hand.
15      CHRISTOPHER FORSYTHE, having been duly sworn, was examined
16   and testified as follows:
17          THE CLERK:  Have a seat.
18      If you could please state your first and last names, and
19   spell your last name for the record.
20          THE WITNESS:  First name is Christopher.  Last is
21   Forsythe, F-O-R-S-Y-T-H-E.
22          THE COURT:  You may inquire.
23          MR. BARBOSA:  Thank you, Your Honor.
24   ////
25   ////
```

FORSYTHE – Direct (by Mr. Barbosa)

|   |   |
|---|---|
| 1 | DIRECT EXAMINATION |
| 2 | BY MR. BARBOSA |
| 3 | Q    Good morning, Mr. Forsythe. |
| 4 | A    Good morning. |
| 5 | Q    Could you tell the jury where you work? |
| 6 | A    I currently work at Visa. |
| 7 | Q    How long have you been employed at Visa? |
| 8 | A    Just over a year. |
| 9 | Q    What's your job title there? |
| 10 | A    I am a senior risk management analyst in the payment fraud |
| 11 | instruction team. |
| 12 | Q    And where did you work before moving to Visa? |
| 13 | A    I was at FIS Global. |
| 14 | Q    How long were you there? |
| 15 | A    I was there for about a year. |
| 16 | Q    What did you do with FIS Global? |
| 17 | A    My title was IT security analyst, and I handled |
| 18 | investigations into credit card fraud and other related |
| 19 | activities. |
| 20 | Q    Where did you work before FIS Global? |
| 21 | A    I was at BECU, Boeing Employees Credit Union. |
| 22 | Q    How long were you employed by BECU? |
| 23 | A    About six years. |
| 24 | Q    What did you do at BECU? |
| 25 | A    I investigated crimes of credit card fraud, counterfeit |

FORSYTHE – Direct (by Mr. Barbosa)

1   cards, ATM skimming, ID theft, account takeovers, check

2   forgery, any loss to the credit union through fraud.

3   Q    And did you work with law enforcement as part of that

4   work?

5   A    Yes, I did.

6   Q    Who did you work with primarily in law enforcement?

7   A    I worked heavily with Detective Dave Dunn, of the Seattle

8   Police Department.

9   Q    What was your job title there?

10  A    I was a security risk specialist.

11  Q    What is Boeing Employees Credit Union?  What type of

12  credit union is it?

13  A    We are a local credit union, based in Washington.

14  Q    And who can become a member of that credit union?

15  A    Anyone who lives, works, or worships in the state of

16  Washington, or is a Boeing employee.

17  Q    Is BECU federally insured?

18  A    Yes, it is.

19  Q    Who are they federally insured by?

20  A    NCUA.

21  Q    Does Boeing Employees Credit Union issue credit cards to

22  their customers?

23  A    Yes, we do.

24  Q    What types of credit cards do they issue?

25  A    They issue Visa credit cards.

FORSYTHE – Direct (by Mr. Barbosa)

1    Q    Do they issue debit cards, also?

2    A    Yes.

3    Q    What types of debit cards?

4    A    Those are under the MasterCard brand.

5    Q    And what's the difference between those two types of cards

6    that were issued by BECU?

7    A    The Visa credit cards can be used without a PIN, and

8    swiped.  They're based off of a credit limit, of sorts.  The

9    debit MasterCards are tied to a checking account, and are

10   typically used at ATMs, with a PIN number.

11   Q    Can the debit MasterCards also be used similar to a credit

12   card?

13   A    Yes, they can be used without a PIN.

14   Q    How could they be used in that way?

15   A    It's an accessibility option that the -- just the

16   requirements that allowed that certain -- only certain

17   transactions, such as ATMs, or other -- if a merchant requires

18   it, there's a PIN.  But you can go to the grocery store and use

19   it without a PIN, if the merchant doesn't need it, or if the --

20   if it's not required.

21   Q    What type of data from a debit card is used to make a

22   non-PIN transaction?

23   A    There's the credit card number and other name that's on

24   the data itself, and also track data, as we call it.

25   Q    And where is that track data stored?

FORSYTHE – Direct (by Mr. Barbosa)

1   A    That's stored on the magnetic stripe, on the back of the

2   card, on the black strip.

3   Q    As part of your work with BECU, did you investigate

4   reports of unauthorized charges on your customers' credit and

5   debit cards?

6   A    Yes, I did.

7   Q    How did you typically learn about those unauthorized

8   charges?

9   A    We will learn about those through various means, through

10  our fraud detection systems, where we would get reports of

11  transactions that our fraud monitoring company had detected; or

12  whether an account holder called in to BECU, letting us know

13  that they had fraud on the account.  Those are the main ways we

14  determine fraud, or came across fraud.

15  Q    What did you do when you received reports of unauthorized

16  charges?

17  A    When we -- sorry.  When we received reports of the fraud,

18  we went back through and analyzed the account holder's purchase

19  history, where they lived, the type of transactions they did,

20  to determine if we can find a common merchant where the account

21  holder had gone, where their data may have been stolen from.

22  Q    And when you say a "common merchant," what would you be

23  comparing a particular cardholder's unauthorized charges with

24  in terms -- in order to find a commonality?

25  A    We would be looking at a fraud pattern.  So we may be

FORSYTHE – Direct (by Mr. Barbosa)

1    looking at where the card was used, like, for fraud, if they

2    were used in a particular state.  We also would look at, if we

3    have several account holders that live in the same geographic

4    area, we might look at those closer, because they're within the

5    same particular region.

6    Q    If unauthorized charges are made on a customer's debit or

7    credit card, who bears the loss from that transaction?

8    A    In those cases, BECU bears the loss.

9    Q    Why does BECU bear the loss on that?

10   A    We do not have coverage for fraud losses.

11   Q    And why doesn't the customer have to accept the fraud

12   losses?

13   A    That is part of the Visa/MasterCard brands, the zero

14   liability.  The cardholder does not take loss for fraud.

15   Q    You mentioned trying to determine where the card was

16   compromised, and comparing to other accounts.

17        How do you go about determining that point of compromise?

18   A    Typically, I will go into our transaction system, and I

19   will pull -- or download the account holder's card history for

20   particular time frames, so anywhere between a couple of days

21   upwards of six months, and review the account history.  And

22   I'll do that for multiple account holders at the same time.

23   Q    And what are you looking for?

24   A    I'm looking for a common merchant that all of the account

25   holders may have used.

FORSYTHE – Direct (by Mr. Barbosa)

1  Q    What might prompt you to begin conducting that type of

2  analysis, that common-point-of-compromise analysis?

3  A    If we have an influx of fraud on multiple accounts, and we

4  notice that there's a tie, where the account holders use their

5  card and where they live, we'll look at that, as well, from a

6  pattern standpoint.

7  Q    You mentioned working with law enforcement.

8       How often would you share this common-point-of-compromise

9  analysis with law enforcement?

10 A    It would be on a regular basis.

11 Q    Drawing your attention to October of 2010, did you report

12 a potential point-of-sale compromise at the Broadway Grill to

13 Seattle Detective David Dunn?

14 A    Yes, I did.

15 Q    What led you to make that report?

16 A    We had received multiple reports of fraud on account

17 holders' cards.  And we had done an analysis on the accounts

18 and determined that the account holders had all used Broadway

19 Grill.

20 Q    What was the volume of fraud on the charges you were

21 seeing, that you believed were tracing back to Broadway Grill?

22 A    I don't remember my initial number that I reported.

23 Q    Was it out of the ordinary?  Was this a typical case for

24 you?

25 A    Yes, it was pretty typical, with the volume of fraud we'd

FORSYTHE – Direct (by Mr. Barbosa)

1    seen that there was a spike in activity, that we had seen.

2    Q    What type of information did you provide to Detective

3    Dunn?

4    A    We provided the name of the account holder, if we had a

5    release from the account holder; the transaction when the

6    account holder used the card at Broadway Grill; and also the

7    fraudulent transactions that the account holder had reported,

8    or were attempted.

9    Q    Over the next several months following that compromise,

10   did Detective Dunn ask you to conduct any additional

11   common-point-of-compromise analysis?

12   A    Yes.

13   Q    Did you identify any additional merchants?

14   A    We –– there was additional CPP that Detective David Dunn

15   had notified us of ––

16         MS. SCANLAN:  Objection.  Hearsay.

17   BY MR. BARBOSA

18   Q    The question I was asking was, did you identify any

19   additional points of compromise, based on the numbers Detective

20   Dunn provided you?  Are you having trouble with ––

21   A    Not that I can recall.

22   Q    As part of your work with BECU, what else did you do with

23   the information about fraud losses that you investigated?

24   A    Once we had received a report of fraud on an account, we

25   reported those unauthorized transactions to either MasterCard

FORSYTHE – Direct (by Mr. Barbosa)

1   or Visa, through the systems that we had, to let them know

2   there was fraud.

3   Q    Why did you do that?

4   A    It was part of our agreements with the card brands, that

5   we let them know what fraud occurred on what card, report the

6   transactions to them.

7   Q    Turning back to Broadway Grill, specifically, did

8   Detective Dunn ask you to provide loss information for credit

9   card numbers specific to that breach?

10   A    Yes.

11   Q    And how did you go about producing that information?  What

12   was the source of the information, the loss information that

13   you provided to him?

14   A    That information came from cardholder fraud reports that

15   we had received.

16   Q    And are those fraud reports and information that you

17   received in the ordinary course of BECU's business?

18   A    Yes, it is.

19   Q    And is the information contained in those records entered

20   at or near the time of the events recorded?

21   A    Yes, it is.

22   Q    Did you rely on those records as part of your day-to-day

23   work at BECU?

24   A    Yes, I did.

25   Q    I'm going to show you what's been marked as Government's

FORSYTHE – Direct (by Mr. Barbosa)

1    Exhibit 15.17.

2         Do you recognize this?

3    A    Yes, I do.

4    Q    And did you review this in preparation for trial, again?

5    A    Yes, I did.

6    Q    And how do you recognize this?

7    A    This appears to be a document that I prepared for

8    Detective David Dunn, containing unauthorized transactions that

9    occurred on an account holder.  That was a MasterCard account.

10             MR. BARBOSA:  Government offers Exhibit 15.17.

11             THE COURT:  Any objection?

12             MS. SCANLAN:  No objection.

13             THE COURT:  15.17 is admitted.

14                  (Exhibit 15.17 was admitted)

15   BY MR. BARBOSA

16   Q    So what does this record show us?

17   A    This record shows us here that, on various dates in

18   October of 2014, this particular card in question, ending in

19   5719, had transactions attempted, and also successful, it

20   appears to be, in Canada.

21   Q    And what was the name for that account?

22   A    The name that we had on record was David Knoernschild.

23   Q    What was the total amount of unauthorized charges you

24   found on Mr. Knoernschild's account?

25   A    Based off the number here, off the bottom, was $1,199.59.

FORSYTHE – Direct (by Mr. Barbosa)

1   Q    Was this the only loss that you found related to the

2   Broadway Grill numbers that Detective Dunn provided you?

3   A    No.  We had several others.

4   Q    Do you recall what the total was, for just the numbers

5   that Detective Dunn provided from Broadway Grill was?

6   A    I believe –– from the numbers that I provided to Detective

7   Dave Dunn, I believe the loss that I had tallied was about

8   $79,000, that was successful.  And I believe there was an

9   attempt –– there were attempts at an amount of about $88,000.

10  Q    And did he provide you additional numbers, throughout the

11  course of his investigation, from other points of compromise;

12  do you recall?

13  A    Not that I can recall.

14          MR. BARBOSA:  No further questions, Your Honor.

15          THE COURT:  Cross examination?

16          MS. SCANLAN:  I have no questions, Your Honor.

17          THE COURT:  Any objection to this witness being

18  excused, by the government?  Counsel?

19          MR. BARBOSA:  No, Your Honor.

20          THE COURT:  Any objection to this witness being

21  excused, by the defense?

22          MS. SCANLAN:  No, Your Honor.

23          THE COURT:  Thank you, sir.  You may step down.

24  You're excused.

25       Members of the jury, if you'd like to stand and stretch.

COLE – Direct (by Mr. Wilkinson)

```
 1        Counsel, next witness?
 2             MR. WILKINSON:  The United States calls Diane Cole.
 3             THE CLERK:  Please come forward.
 4        Please raise your right hand.
 5        DIANE COLE, having been duly sworn, was examined and
 6   testified as follows:
 7             THE COURT:  Please be seated.
 8             THE CLERK:  If you'd please state your first and last
 9   names, and spell your last name for the record.
10             THE WITNESS:  Diane Cole, C-O-L-E.
11             THE COURT:  You may inquire.
12                        DIRECT EXAMINATION
13   BY MR. WILKINSON
14   Q    Good morning, Ms. Cole.
15   A    Good morning.
16   Q    Can you tell us where you're employed?
17   A    I am employed at Casa Mia, in Yelm, Washington.
18   Q    What is Casa Mia?
19   A    Casa Mia is a family-owned Italian restaurant.
20   Q    How long have you been employed at Casa Mia?
21   A    Fourteen years.
22   Q    And what is your job position there?
23   A    I am the manager and part owner.
24   Q    How long has Casa Mia been in business in Yelm?
25   A    Fourteen years.
```

COLE – Direct (by Mr. Wilkinson)

1   Q    And for those of us who don't know Yelm, where is Yelm?

2   A    Close to Olympia.

3   Q    How many employees does Casa Mia have?

4   A    We have from 20 to 25.

5   Q    And can you describe, generally, the clientele you serve?

6   A    It's a family restaurant, so families.

7   Q    Looking back to 2010, did Casa Mia accept payment by

8   credit card?

9   A    We did.

10  Q    And do you know about how many credit cards you'd process

11  in a typical day?

12  A    We have about 100, 100 to 150.

13  Q    And I take it you had a system for processing those cards?

14  A    We did.

15  Q    Is that a point-of-sale system?

16  A    We do.

17  Q    And what type of software did that system use?

18  A    It's Firefly.

19  Q    Did anyone on site at Casa Mia know how to do maintenance

20  on Firefly, or fix it, if something went wrong?

21  A    Well, we hired somebody to put it in for us.  They sold it

22  as super secure.  And we have online, and we can call them for

23  support.

24  Q    And so when you called them for support, would they come

25  to your restaurant to work on it, or would they do it remotely?

COLE – Direct (by Mr. Wilkinson)

1    A    They came to the restaurant to install it, so they were

2    there for a few days, actually, installing it.  And then if we

3    called, they could take control of it and do it on -- from

4    their point.

5    Q    And when you said a moment ago that you looked into it and

6    thought it was "super secure," what do you mean by that?

7    A    I mean, we -- when we were shopping for a point-of-sale,

8    we went to restaurant shows, and looked at all of them, and

9    chose that one based on the fact that it was -- secure was

10   really important to us.  So we spent a lot of time looking for

11   that and paid a lot of money for it.

12   Q    I want to turn, now, to February of 2011.

13        Did you learn, in that time period, that the system had

14   been compromised?

15   A    We did.

16   Q    How did you learn?

17   A    We learned that the -- two people had come in to take it

18   out, and said that it had been compromised.

19   Q    Okay.  And were the people who came in, were they law

20   enforcement officers?

21   A    They were, yeah.

22   Q    Do you remember who they were with?

23   A    I wrote it down.  They were -- well, the FBI -- I'm not

24   sure exactly who he was with.

25   Q    That's okay.  It was a law enforcement agent?

COLE – Direct (by Mr. Wilkinson)

1  A    It was law enforcement, yeah.

2  Q    Did this event of the computer being compromised result in

3  any costs to your business?

4  A    Yes, a lot of costs.

5  Q    Was there an audit that was required?

6  A    There was a forensic audit required, but we also pay for

7  an audit every year to remain safe, so we do that.  But then we

8  had to pay $7,000 to have a forensic audit, because we could no

9  longer use our credit card machine.

10  Q    And was that something that someone required you to do,

11  the $7,000?

12  A    Yes.

13  Q    Do you remember the name of the firm that conducted the

14  audit?

15  A    SecurityMetrics.

16  Q    Were you also required to pay any fines?

17  A    We were.  They took -- after we found out about it, the

18  next day, there was $2,500 just taken out of our account.

19  Q    And who had taken -- did you determine who had taken it?

20  A    The processor, First Data.

21  Q    Did that result in any immediate -- having that money

22  taken out of your account result in any immediate complications

23  to the business?

24  A    Yes.  We -- it was our payroll money, so we didn't have

25  the money for our payroll.  That was part of it.  And so we had

COLE – Cross (by Mr. Browne)

1    to use credit cards.  And that was just the first fine.  Then

2    there were more taken, also, after that, that they let us make

3    payments.  They took $500 a week after that.  So I would say it

4    resulted in $15- to $20,000 worth of costs.

5    Q    And in general, how would you describe the effect that all

6    of this had on your business?

7    A    Well, we weren't really making money, at the time, so it

8    had to all go on credit cards.  And it was a lot of stress.

9    And because -- and then customers found out, through a story

10   written on the newspaper, so that, of course, made them

11   nervous.  So I have no idea how many people didn't come in

12   because of that.

13            MR. WILKINSON:  No further questions for this

14   witness.

15            THE COURT:  Cross examination?

16            MR. BROWNE:  Thank you, Your Honor.

17                        CROSS EXAMINATION

18   BY MR. BROWNE

19   Q    Good morning.

20   A    Hi.

21   Q    Just a couple questions.

22   A    Okay.

23   Q    So the Firefly system was not secure, obviously; right?

24   A    Well, to our knowledge, it was secure.

25   Q    Well -- I'm sorry.  Go ahead.  I don't want to interrupt

COLE – Cross (by Mr. Browne)

1    you.  Finish your answer, please, if you want to.

2    A     Yeah.  To our knowledge, it was secure.  At the time, we

3    had no idea if it wasn't.

4    Q     Okay.  But you paid fines, because your point-of-sale

5    system was not compliant, and that's why you got fined; right?

6    A     As -- it was hard to really understand all of it, because

7    it was really hard to get anybody to exactly answer the

8    questions of why, but -- because we did pay every year for an

9    audit to make sure it was safe.  So we took all the measures

10   that we knew to make it safe.  So I'm not really sure,

11   actually, about that.

12   Q     Well, who did you pay the fine to?  Or who took the money

13   out of your account?

14   A     First Data.

15   Q     Sorry?

16   A     First Data, our processor.

17   Q     Okay.

18   A     Yeah, the processor.

19             MR. BROWNE:  That's all I have.  Thank you.

20             THE COURT:  Redirect?

21             MR. WILKINSON:  No.  Thank you, Your Honor.

22             THE COURT:  Any objection to this witness being

23   excused, by the government?

24             MR. WILKINSON:  No, Your Honor.

25             THE COURT:  By the defense?

COLE – Cross (by Mr. Browne)

1          MR. BROWNE:  No, Your Honor.

2          THE COURT:  Thank you.  You're excused.  You may step

3    down.

4       We'll take our morning recess at this time.

5               (Jury exits the courtroom)

6          THE COURT:  Counsel, anything to take up?

7          MR. WILKINSON:  No, Your Honor.

8          THE COURT:  Counsel for the defense?

9          MR. BROWNE:  No, Your Honor.

10          THE COURT:  We'll be on break.

11               (Recess)

12               (Jury enters the courtroom)

13          THE COURT:  Counsel, your next witness?

14          MR. WILKINSON:  The United States calls Mr. Joe

15    Angelastri.

16          THE COURT:  Please have him step forward.

17          THE CLERK:  Please raise your right hand.

18       JOE ANGELASTRI, having been duly sworn, was examined and

19    testified as follows:

20          THE CLERK:  If you could please state your first and

21    last names, and spell your last name for the record.

22          THE WITNESS:  Joe Angelastri, A-N-G-E-L-A-S-T-R-I.

23          THE COURT:  You may inquire.

24          MR. WILKINSON:  Thank you, Your Honor.

25    ///

ANGELASTRI – Direct (by Mr. Wilkinson)

1                          DIRECT EXAMINATION

2    BY MR. WILKINSON

3    Q    Good morning, sir.

4    A    Good morning.

5    Q    What do you do for a living?

6    A    I own City News Stand, in Chicago.

7    Q    What is City News Stand?

8    A    It's a retail store.  We sell newspapers and magazines;

9    two locations, one in the city and one in Evanston, Illinois.

10   Q    How long have you been in the newspaper business?

11   A    Since 1978.

12   Q    And have you owned that same business the whole time?

13   A    Yes, same business.

14   Q    Turning to the period starting in about 2010, in what ways

15   were you accepting payments from your customers?

16   A    We accepted credit cards and cash.

17   Q    And about how many credit cards would you process a day?

18   A    At each location, about a hundred.

19   Q    Do you have a point-of-sale system to process them?

20   A    Yes.  We used a store point-of-sale system called SQUARE

21   ONE.  We've been dealing with them since 1990.

22   Q    And I take it the point-of-sale system had software that

23   made it run?

24   A    Yes.

25   Q    And if something went wrong with the software, did you

ANGELASTRI - Direct (by Mr. Wilkinson)

1    personally know how to do maintenance on it, fix it, upgrade

2    it, things like that?

3    A    No.  That type of stuff was all outsourced, so that the

4    company provided all the point-of-sale software for us and all

5    the maintenance with it.

6    Q    And when they would do maintenance, would they come pay

7    your store a visit, or would they remotely access the computer?

8    A    They would -- the point-of-sale software would be

9    remotely -- they would do it remotely.  And then we had a local

10   company we used to work with the -- to maintain the PCs.

11   Q    When you purchased the system, did you look into whether

12   it was secure?

13   A    Well, way back when we purchased it, it was the

14   industry -- they were a large company -- I mean, a decent-sized

15   the company.  They worked with IBM.  And they did many

16   bookstores across the country, and there was never any problems

17   that we were aware of.

18   Q    So did you feel comfortable that it was a secure system

19   you were working with?

20   A    Yes.

21   Q    At some point in time, did you learn that the system had

22   been compromised?

23   A    Yes, we did learn, in 2010, that the -- that -- we got

24   some e-mails from our credit card processor, and they were

25   saying that we were a common point of --

ANGELASTRI – Direct (by Mr. Wilkinson)

1          MR. BROWNE:  Excuse me, Your Honor.  Hearsay.

2          THE COURT:  It is hearsay, Counsel.

3   BY MR. WILKINSON

4   Q    Did you understand, after that conversation, that your

5   system had been compromised?

6   A    Yes.

7   Q    Did you meet with members of law enforcement, police

8   officers, or people like that, to deal with it?

9   A    Yeah, it all happened fairly quickly.  First, we had to

10  identify that there was a problem.  So when the credit card

11  processor insisted on us doing an audit, they came right away,

12  the next day.  And they said it was definitely something going

13  on, and that there was fraud involved, and we should make

14  police reports.  So we did made police reports in Chicago and

15  Evanston.

16         MR. BROWNE:  It's hearsay.

17         THE COURT:  It is hearsay, Counsel.  Sustained.

18         MR. WILKINSON:  I'll withdraw the question.

19         THE COURT:  Just a second.

20     Members of the jury, disregard the response provided by

21  the witness to the extent he was relying on information told to

22  him by another individual.

23     Next question, Counsel?

24  BY MR. WILKINSON

25  Q    What steps did you take to respond after -- aside from

ANGELASTRI – Direct (by Mr. Wilkinson)

1   filing the police report, what did you do?

2   A    Well, first, we had the audit, and then we read all the

3   details in the audit.  And then they said, in order to continue

4   keep processing credit cards, we had to do certain steps.  One

5   was put in a firewall, and do a monthly scan.  And there was a

6   few other minor things, but we followed that.  And we gave it

7   to our contractors to also help us make sure we complied.

8   Q    You mentioned the audit.  I take it a third -- another

9   company was hired to do that audit?

10  A    Yes.  We hired Trustwave.  They gave us a list of three or

11  four companies, and we chose that one.

12  Q    Who paid for the audit?

13  A    I had to pay -- our business paid.  We had to pay for an

14  audit for both locations.  So it was just a little under

15  $10,000 for each audit.

16  Q    So what was the total cost you paid for the audits?

17  A    Total cost was $19,000.

18  Q    Were you also fined?

19  A    We were told we were going to be fined, but we didn't

20  actually get a fine.  The Global Payments, which was the bigger

21  processor, had another company involved, and somehow we were

22  never fined.

23  Q    Did you have -- at the time you had to pay the $19,000,

24  did you have that kind of money available in your business

25  account to pay it?

ANGELASTRI – Direct (by Mr. Wilkinson)

1  A    No, I didn't, so we had to use our line of credit.  And we
2  still actually owe money on that.  So it's taking quite a while
3  to pay that down.
4  Q    Were there any other ways in which this incident affected
5  your business?
6  A    I'm sure when it happened it took quite a bit of my time
7  to try to make this work again, try to get everything back
8  together.  We had to –– we no longer process the credit cards
9  on point-of-sale.  It was too big of a risk for it to happen
10 again.  So we use the small, old-fashioned devices, and
11 telephone lines, just to make it a hundred percent secure,
12 because it was too big of a hit for us to happen again.
13             MR. WILKINSON:  No further questions for this
14 witness.
15             THE COURT:  Cross examination?
16             MR. BROWNE:  No questions, Your Honor.
17       Thank you, sir.
18             THE COURT:  Any objection to this witness being
19 excused, by the government?
20             MR. WILKINSON:  No, Your Honor.
21             THE COURT:  By the defense?  Mr. Browne?
22             MR. BROWNE:  No.
23             THE COURT:  Thank you, sir.  You may step down.
24 You're excused.
25       Next witness, Counsel?

WOOD – Direct (by Mr. Barbosa)

1           MR. BARBOSA:  The government calls Megan Wood.

2           THE CLERK:  Please raise your right hand.

3       MEGAN WOOD, having been duly sworn, was examined and

4   testified as follows:

5           THE CLERK:  Have a seat.

6       If you could please state your first and last names, and

7   spell your last name for the record.

8           THE WITNESS:  Megan Wood, W-O-O-D.

9           THE COURT:  You may inquire.

10                          DIRECT EXAMINATION

11  BY MR. BARBOSA

12  Q     Good morning, Ms. Wood.

13        Could you please tell the jury where you're employed?

14  A     I'm employed with the U.S. Secret Service, Seattle Field

15  Office.

16  Q     And what are your duties with the Seattle Field Office?

17  A     I'm the investigative analyst, so I provide analytical

18  support for financial crime investigations.  So I do financial

19  analysis, database research, investigative research, call

20  analysis, phone record analysis, and other, like, visual aids.

21  Q     How long have you been with the Secret Service?

22  A     For eight years.

23  Q     And have you been employed in Seattle the whole time?

24  A     No.  I've been in Seattle for three-and-a-half years.

25  Q     Where were you before that?

WOOD – Direct (by Mr. Barbosa)

1   A    D.C.

2   Q    What did you do in D.C.?

3   A    I started as an investigative records technician.  I did

4   that for two years, in our Criminal Investigative Division, and

5   then I transferred to our Investigative Support Division.  And

6   I was an investigative analyst there for about three years.

7   Q    What type of training have you received to become an

8   investigative analyst?

9   A    I've taken multiple trainings, financial records

10  examination and analysis.  I attend annual analyst seminars,

11  where we go over tools and software and things like that.  I've

12  taken money laundering, mortgage fraud seminars, intel analysis

13  trainings.

14  Q    Have you also received on-the-job training?

15  A    Yes.

16  Q    What types of things have you learned in your day-to-day,

17  on-the-job work?

18  A    Well, I -- when we start as an analyst, we're given a

19  mentor.  So I kind of learned on the job in that sense, so any

20  kind of financial crime cases I'm working.  It really depends

21  on the case.

22  Q    What types of financial analysis do you do as an

23  investigative analyst?

24  A    Again, it depends on the case.  Sometimes it involves

25  taking raw data, like bank records, and putting them into a

WOOD - Direct (by Mr. Barbosa)

1   useable format, like Excel, in order to analyze it.  When I'm

2   working credit card fraud cases or check fraud cases, a lot of

3   it involves reaching out to the banks to gather loss

4   information and calculate fraud loss totals.

5   Q    Do you also work with the credit card brands in that

6   regard?

7   A    Yes.

8   Q    How often do you work with the credit card brands in that

9   regard?

10  A    I've worked with the brands for, I would say, five to ten

11  cases.

12  Q    What tools do you use in your work as an investigative

13  analyst?

14  A    Well, we have -- as far as financial analysis goes, mostly

15  Microsoft Excel and Access.  We also have a software called

16  Financial Investigative Software that analyzes bank records,

17  that kind of stuff.

18  Q    Did you participate in the analysis of evidence recovered

19  during the investigation of Roman Seleznev?

20  A    Yes, I did.

21  Q    Who did you work with on that investigation?

22  A    I worked with Special Agent Dave Mills and Special Agent

23  Mike Fischlin, as well as Detective Dave Dunn.

24  Q    When did you first begin working on this Roman Seleznev

25  investigation?

WOOD - Direct (by Mr. Barbosa)

1    A    I initially started working back in 2012.

2    Q    And what type of analysis were you asked to perform as

3    part of this case?

4    A    Mostly, the agents and investigators would provide me with

5    card numbers that were located on multiple sources, and I would

6    send those card numbers out to the card brands and request

7    fraud loss information.

8    Q    What type of fraud loss information were you requesting?

9    A    Any kind of fraudulent transactions that were associated

10   or reported for those cards.

11   Q    As part of that work, what type of records did you receive

12   back and review?

13   A    Mostly, they were spreadsheets.  And they'd include the

14   name of the financial institution, the card number, merchant

15   information, transaction information, like the date of the

16   transaction, as well as some of the card brands also included

17   customer information.

18   Q    Moving back, what was the source of the credit card

19   numbers for which you sought loss records?

20   A    They came from various servers, as well as a laptop

21   computer.

22   Q    Do you recall which servers and laptop computer?

23   A    Yes.  It was the HopOne server, the Ukranian server, 2Pac

24   server, as well as a system recovered from Red Pepper Pizzeria

25   and Broadway Grill.  And I believe it was the defendant's

WOOD – Direct (by Mr. Barbosa)

1   laptop.

2   Q    What credit card brands did you contact in order to

3   request loss information?

4   A    It was Visa, MasterCard, American Express, and Discover.

5   Q    And why did you ask the card brands for records, instead

6   of going straight to each issuing bank?

7   A    Well, there were a large volume of card numbers.  And so

8   it wouldn't be realistic to reach out to the banks, because

9   there were thousands and thousands of banks.  So it's easier to

10  go through the card brands.

11  Q    How did you go about requesting the information from the

12  credit card brands?

13  A    Usually, I would just e-mail them to find out what the

14  procedure is, as far as requesting loss on card numbers.

15  Q    And how did you -- did you then send them the numbers?

16  A    Yes.  So I would send them the list of card numbers.

17  Q    I'd like to talk about the type of information and how

18  that information was provided to you.

19       What did you receive, not going into specifics, but what

20  was the nature of the data you received back from the card

21  brands?

22  A    They were usually in spreadsheets with raw transactional

23  data.

24  Q    And what was the volume of the transactional data you were

25  receiving back from the card brands?

WOOD - Direct (by Mr. Barbosa)

1  A     It was over a million or so records, total.

2  Q     Did the card brands provide information on each individual

3  unauthorized charge on each account for which they had records?

4  A     Most of them did, yes, I believe.

5  Q     How -- if they didn't, what type of information would you

6  receive?

7  A     If they didn't, I believe some of them may have just

8  provided the card number and the total amount of fraud,

9  possibly.  But I believe most of them had the individual

10 transactions.

11 Q     Did you receive all of the records at once?

12 A     No.

13 Q     Over what time period were the records from the card

14 brands received?

15 A     They were, I guess -- initially, back in 2012, there were

16 some results that we received from Visa and MasterCard and

17 AmEx.  And then the additional data was between 2014 and 2016.

18 Q     How many credit card numbers, total, did you ask the card

19 brands to provide records for?

20 A     There were around 2.9 million unique card numbers.

21 Q     When the records came back, did some of the card numbers

22 have records of multiple unauthorized charges?

23 A     Yes.

24 Q     In total, across all four card brands, approximately how

25 many lines of data did the records you received back from the

WOOD – Direct (by Mr. Barbosa)

1   card brands total up?

2   A    Over a million.

3   Q    After you received all these records, did you review the

4   information to determine the total amount of losses?

5   A    Yes.  I compiled all the data together to do that.

6   Q    How did you go about compiling all the data together?

7   A    Well, I created a template in Excel so that there would be

8   a consistent, uniform format to move the data into so I could

9   perform analysis.  So basically, as I would receive results, I

10  would transfer the data into my template that I created, and

11  then totaled it that way.

12  Q    Did you use -- was Excel the only tool you used?

13  A    No.  I used Excel, initially, and then I ended up

14  eventually moving it into Access, because it was so large.  And

15  Access also allows you to cross-reference data and do a little

16  bit more analysis.

17  Q    Did you use pivot tables?

18  A    Yes.

19  Q    What are pivot tables?

20  A    Pivot tables are an Excel functionality.  So when you have

21  a large volume of data, it allows you to condense it so that it

22  is easier to understand.

23  Q    And what did you use pivot tables for?

24  A    I used it to summarize the amount of fraud loss per

25  financial institution.  So each of those banks listed would

WOOD - Direct (by Mr. Barbosa)

1   make up multiple transactions and card numbers.

2   Q    You mentioned at one point you moved from Excel to Access.

3        Why was that?

4   A    Because it was so -- it was such a large volume.  Excel, I

5   think, only allows just about a million records, and it went

6   over that threshold, so it was just easier to work with the

7   data in Access.  Access can handle a larger volume of data.

8   Q    Okay.  What type of information did you move into the

9   Access database from the underlying records?

10  A    The names of the financial institution, the card numbers,

11  the amount of fraud, and the source of fraud, as well as notes

12  that I made.

13  Q    What type of notes did you keep?

14  A    Well, I kept notes for anything -- when I was

15  cross-referencing the data, if I found any duplicates, or

16  something that I thought should have been removed, I would just

17  make note of it.

18  Q    Did you have to do any additional research beyond what the

19  credit card brands provided in order to fill in the identifying

20  information for issuing banks?

21  A    Yes.  There were -- a couple of the responses were

22  received that didn't include the bank names, so I did a BIN

23  search to identify the issuing bank.

24  Q    What is a "BIN search"?

25  A    A BIN search -- so BINs are the first six digits, usually,

WOOD – Direct (by Mr. Barbosa)

1    of a credit card number, and that's what tells you what issuing

2    bank issued the card.

3    Q    And is that publicly available information?

4    A    Yes.

5    Q    Did you review the records from the card brands to make

6    sure none of the records they provided were for numbers that

7    didn't match up with your sources of credit card numbers, the

8    servers you identified and other computers?

9    A    Yes.

10   Q    How did you go about doing that?

11   A    I used Microsoft Access, and I would run queries.  When I

12   received the responses from the banks, I would run them across

13   the original sources that I knew they were supposed to have

14   come from to make sure that they all -- that they would all

15   match up.

16   Q    What did you do if you found numbers that didn't come back

17   to one of the original evidence items?

18   A    I removed them.

19   Q    Why did the card brands provide loss records for cards

20   that weren't on one of the original sources of evidence?

21   A    My understanding is, Detective Dunn, when he was initially

22   working this case, found --

23              MS. SCANLAN:  Objection.  This is based on hearsay.

24              THE COURT:  That's sustained, Counsel.

25   ////

WOOD – Direct (by Mr. Barbosa)

1  BY MR. BARBOSA

2  Q    Did you ask the card brands, at any point during this

3  case, to provide information on common points of compromise?

4  A    I'm sorry.  Can you repeat the question?

5  Q    Did you ask the card brands, at any point, to provide

6  additional losses related, not specifically to card numbers on

7  the servers or computers, but to just the merchants that they

8  had identified as being breached?

9  A    I did not, but I understand that that's what happened --

10            MS. SCANLAN:  Objection.

11            THE COURT:  That's sustained.

12 BY MR. BARBOSA

13 Q    Did you include any losses in your summary that were not

14 tied directly to numbers found on one of the original sources

15 of evidence?

16 A    No.  They're not included in the summary.

17 Q    Did you find any instances in which the card brands

18 provided duplicate loss records?

19 A    Yes.  There were some instances of that.

20 Q    What did you do when you found duplication of the same

21 card number loss?

22 A    Those were removed, as well.

23 Q    So after you sorted all the data from the card brands, did

24 you create exhibits to summarize the data received from them?

25 A    Yes.

WOOD – Direct (by Mr. Barbosa)

1   Q    Can you take a look at Exhibit 16.6?  And actually, I

2   should probably have you look at the original.

3          MR. BARBOSA:  Thank you, Ms. Ericksen.

4   BY MR. BARBOSA

5   Q    This is an 88-page exhibit.  Have you had a chance to

6   review that in your preparation for trial?

7   A    Yes.  I created it.

8   Q    Does that accurately summarize all of the data that you

9   analyzed using Excel and Access and your other tools?

10  A    Yes, it is.

11  Q    How did you go about verifying the accuracy of the summary

12  in Exhibit 16.6?

13  A    Well, I guess it goes back to the initial start of me

14  doing my analysis.  I made sure I cross-referenced everything

15  and made sure everything could be verified back to a source and

16  there was no duplication.  And this exhibit summarizes that.

17  Q    Do your tools electronically calculate these numbers, or

18  do you hand calculate the totals?

19  A    No.  Excel would sum up -- or Access would sum up the

20  total.

21          MR. BARBOSA:  The government offers 16.6.

22          MS. SCANLAN:  Same objection as previously

23  articulated.

24          THE COURT:  Based upon the Court's prior

25  determination, the objection is overruled.

WOOD – Direct (by Mr. Barbosa)

 1          16.6 is admitted.

 2                    (Exhibit 16.6 was admitted)

 3    BY MR. BARBOSA

 4    Q    Turning to the first page of Exhibit 16.6, can you explain

 5    what information is summarized here?

 6    A    Yes.  So it lists the name of the financial institution

 7    and then the total amount of fraud loss that was reported from

 8    that institution.

 9    Q    For each line in this summary, Exhibit 16.6, what are the

10    underlying records you reviewed from the credit card brands?

11    A    The underlying records would be the transactional

12    information, all the fraudulent transaction information; so

13    card numbers, merchant information, and amounts.

14    Q    So how many lines -- let me turn to Page 19, Line 794.

15          Do you see the entry for Chase Bank, JPMorgan?

16    A    Yes.

17    Q    Using that as an example, what would the volume of

18    underlying records be for this entry for $15,110,556?

19    A    So that would recommend multiple card numbers and multiple

20    transactions, thousands, probably.

21    Q    Moving to the last page of Exhibit 16.6, how many total

22    banks were involved in your summary?

23    A    Over 3,700.

24    Q    Moving to Page 3, was Alaska Federal Credit Union one of

25    those?  Do you see that on the highlighted section?

WOOD – Direct (by Mr. Barbosa)

1    A    Yes, they were.

2    Q    What was their loss?

3    A    $47,781.93.

4    Q    Turning to Page 14, Line 586, do you see Boeing Employees

5    Credit Union?

6    A    Yes.

7    Q    What was their total loss that you had records for?

8    A    $355,504.52.

9    Q    Turning to Page 55, we're going to go down to Line 2332,

10   was Navy Federal Credit Union one of the credit unions that had

11   losses related to the numbers you reported?

12   A    Yes.

13   Q    What was their loss?

14   A    $4,063,455.64.

15   Q    Did you find a number of national banks, also, that had

16   losses reported?

17   A    Yes.

18   Q    Turning to Page 20, Line 828, do you see Citibank there?

19   A    Yes.

20   Q    What was their loss?

21   A    $10,846,467.93.

22   Q    What was the total loss for all of the 3,700-plus banks?

23   A    It was $169,418,843.54.

24        MR. BARBOSA:  No further questions, Your Honor.

25        THE COURT:  Cross examination?

WOOD – Cross (by Ms. Scanlan)

| | |
|---|---|
| 1 | CROSS EXAMINATION |
| 2 | BY MS. SCANLAN |
| 3 | Q    Good morning. |
| 4 | A    Good morning. |
| 5 | Q    Okay.  Let's talk about the underlying -- I just hit |
| 6 | something -- let's talk about the underlying records for your |
| 7 | summary; okay? |
| 8 | A    Okay. |
| 9 | Q    You received lists of credit card numbers from Detective |
| 10 | Dunn; correct? |
| 11 | A    Yes. |
| 12 | Q    And then also, perhaps, from Agent Mills and Agent |
| 13 | Fischlin? |
| 14 | A    Yes. |
| 15 | Q    You submitted those credit card numbers to the card |
| 16 | issuers? |
| 17 | A    To the card brands and the issuers.  I mean, AmEx and |
| 18 | Discover are the issuers, as well. |
| 19 | Q    So when we're saying that, we're talking about AmEx, |
| 20 | Discover, Visa, and MasterCard? |
| 21 | A    Yes. |
| 22 | Q    So you submitted the records to the four of them; correct? |
| 23 | A    Correct. |
| 24 | Q    And then they provided you back with fraudulent |
| 25 | transactions for those account numbers. |

WOOD – Cross (by Ms. Scanlan)

1   A    Correct.

2   Q    And what limitations did you tell them regarding the time

3   frame?

4   A    Well, it depended on the card numbers that were provided

5   to me, but I would always ask the agents what the time frame is

6   for the fraud.

7   Q    Okay.  So what's the time frame for the losses, for

8   example, for -- how about the last one, Zions First National

9   Bank?  All these losses, what's the time frame and the source

10  of this?

11  A    I would have to look back at my records to give the

12  definite time frame.

13  Q    Do you know what the source of this information is?

14  A    The source of the information, it would have came from

15  Visa, MasterCard, Discover, or American Express --

16  Q    How about -- I'm sorry.  Are you done?

17  A    Uh-huh.

18  Q    How about the source of the fraudulent transaction records

19  for this financial institution, where did that come from?

20  A    From their internal -- the source -- I'm sorry.

21       Can you repeat the question?

22  Q    Yeah.  So the records you initially get from law

23  enforcement, for this financial institution, Zions, where did

24  those come from; do you know?

25  A    The Zions -- if it came from Visa or MasterCard, Zions

WOOD – Cross (by Ms. Scanlan)

1   would have reported that fraud directly to them.

2   Q     So other way.  So let me make sure I'm being fair; okay?

3         You submitted a group of credit card account numbers to

4   these four card-issuing entities; correct?

5   A     Correct.

6   Q     So for this loss for this financial institution, that's

7   approximately $42-, $43,000, the credit card numbers that you

8   submitted to get this figure for Zions, where did they come

9   from?

10  A     Oh, where did the card numbers come from that I submitted

11  to them?

12  Q     Correct.

13  A     They would have came from one of the various sources that

14  I mentioned, so either one of the servers or the laptop

15  computer.

16  Q     Do you know which one?

17  A     I don't.  I don't know which one for that exact.  I'd have

18  to go back into my records to say which one.

19  Q     Is that the same answer for all of these?  So if I ask you

20  about the first one, so 121 Financial Credit Union, this loss

21  amount, $4,161, can you tell us where we're getting this from?

22  So where's the credit card numbers coming from that support

23  this amount?

24  A     Yes, I could, if I had my master -- I have a master

25  database which lists every card number with loss, as well as

WOOD - Cross (by Ms. Scanlan)

1    the source it came from.

2    Q    But while we're looking at this, in terms of helping us

3    figure this out, you don't know; is that right?

4    A    No, I can't say for sure.

5    Q    Okay.  So for the credit card numbers that, for instance,

6    were taken from databases you understand were at Red Pepper

7    Pizzeria, at some point -- are we on the same page?

8    A    Yes.

9    Q    What are the parameters that you gave the card issuers

10   regarding fraudulent transactions for those account numbers?

11   A    I would -- the parameters for what kind of data I was

12   requesting back?

13   Q    Yeah.  So, for instance, you can have a credit card that's

14   used at Red Pepper Pizzeria, right, and then it can have

15   fraudulent transactions coming from any number of sources.

16        So what did you do to limit it to fraudulent transactions

17   that would be associated with that breach?

18   A    Well, I mean, I was provided card numbers that were

19   associated with the Red Pepper Pizzeria breach.  I would submit

20   that to the card brands and request any fraudulent transaction

21   information for those card numbers during a certain time frame.

22   Q    For what time frame?

23   A    I would have to look back in my records.  Like I said,

24   cards were coming from so many different sources, I had

25   different time frames for different card numbers.

WOOD – Cross (by Ms. Scanlan)

1  Q    So for the transactions that you submitted for Red Pepper

2  Pizzeria, for instance, there could be fraudulent transactions

3  in there that the source of that is not this breach; right?

4  There could be John Doe's credit card number, that somebody

5  took his credit card and did a fraudulent transaction, that has

6  nothing to do with that.  You wouldn't know; right?

7  A    Potentially, yes.

8  Q    So what did you do to avoid having that sort of thing

9  happen, where there's a fraudulent transaction that's being

10  attributed here that really has nothing to do with this?  What

11  were the steps taken to avoid that?

12  A    Well, I know a lot of the card brands, they can do their

13  own analysis to see where the common point of compromise was.

14  Q    Sure.  But what did you do to avoid that?  You gave them

15  credit card numbers, asked for information, they gave you

16  information back.

17       What did you do to make sure that that's the information

18  that goes with this breach?

19  A    I didn't specifically verify that.

20  Q    You indicated that some of the card issuers sent you back

21  individual account records; is that correct?

22  A    Yes.

23  Q    And some of them did not?

24  A    Well, I believe they all did.  I'd have to look back,

25  again, at my records.  But most of them provided individual

WOOD – Cross (by Ms. Scanlan)

1    transactional information for each card number.

2    Q    Did you verify that those transactions were fraudulent,

3    with the account holders?

4    A    No, I did not.

5    Q    And in terms of these -- all these financial institutions

6    that are listed here, right, you indicated that some of this

7    information regarding which institution it is you got all off

8    these records that tell you what string of BIN numbers go with

9    what financial institution; right?

10   A    Correct.

11   Q    Did you request records from all of these places to verify

12   that you had the correct amounts for each of these financial

13   institutions?

14   A    Did I reach out to the individual banks to verify?

15   Q    Correct.

16   A    No.

17   Q    Okay.  So these -- just so I understand, so all of these

18   financial institutions, these 3,715, you have not verified with

19   them that this is the right amount for their loss; right?

20   A    No.  I'm going off what the card brands were reported from

21   them.

22   Q    But you didn't check with them to see if that's correct?

23   A    No.

24         MS. SCANLAN:  May I have one moment, Your Honor?

25         THE COURT:  You may.

WOOD - Re-Cross (by Ms. Scanlan)

```
 1              MS. SCANLAN:  Thank you.  I have nothing further.
 2   Thank you.
 3              THE COURT:  Redirect?
 4                     REDIRECT EXAMINATION
 5   BY MR. BARBOSA
 6   Q    So why didn't you call all 2.9 million cardholders?
 7   A    Well, that's not a very realistic thing to do.
 8   Q    What about the 3,700 banks, slightly smaller number?
 9   A    Again, yeah, not enough time in the day.
10              MR. BARBOSA:  No further questions, Your Honor.
11                    RE-CROSS EXAMINATION
12   BY MS. SCANLAN
13   Q    How long have you been assigned to this case?
14   A    I initially started working it in 2012, so four years or
15   so.
16   Q    The last four years?
17   A    Uh-huh.
18   Q    Okay.  So over the last four years, it wasn't realistic
19   for you to check this information before you came up with this
20   $170 million loss total?
21   A    Well, no, because a lot of the data I just received a few
22   months ago.  Like another 50 million or so, I just received a
23   few months ago.  So, no, I wasn't able to verify all that.
24   Q    But what about the stuff you received in 2012, did you
25   verify that?
```

WOOD – Re-Cross (by Ms. Scanlan)

 1    A    No, because we were going off data provided from the card

 2    brands.

 3              MS. SCANLAN:  Okay.  I have nothing further.

 4              THE COURT:  Further redirect?

 5              MR. BARBOSA:  No, Your Honor.  Thank you.

 6              THE COURT:  Any objection to this witness being

 7    excused?

 8              MR. BARBOSA:  No, Your Honor.

 9              THE COURT:  By the defense?

10              MS. SCANLAN:  No, Your Honor.

11              THE COURT:  Thank you.  You may step down.  You're

12    excused.

13         Counsel for the government, you previously indicated to

14    the Court that upon completion of the witnesses who will

15    testify this morning, the next witness availability would not

16    be until tomorrow morning; is that correct?

17              MR. BARBOSA:  That's correct, Your Honor.  I

18    apologize.

19              THE COURT:  And the witnesses, according to -- my

20    records indicate that there are three witnesses remaining to

21    testify; is that correct, Counsel?

22              MR. BARBOSA:  Yes, Your Honor.

23              THE COURT:  And the government's expected to rest

24    sometime tomorrow before noon; is that correct?

25              MR. BARBOSA:  Absolutely.  I think our last three

 1   witnesses will be quite short.

 2           THE COURT:  Okay.  Ladies and gentlemen of the jury,

 3   the Court's going to give you another gift, and that means that

 4   you get to go home now, or go and do whatever you want.  You

 5   don't have to go home.  It's not an order of the Court.

 6       But I do appreciate you coming in this morning.  The

 7   government has given the Court the current update.  We're still

 8   on track to be exactly what I represented to you last Friday,

 9   to finish the government's part of the case by tomorrow, and

10   then we'll continue with the case from there.

11       And I believe the defense is calling one witness; is that

12   correct, Counsel?

13           MR. BROWNE:  Yes, Your Honor.

14           THE COURT:  So that gives you the most current update

15   that I have.

16       What we'll also need to do is finalize jury instructions.

17   We're feverishly working on that right now, as we speak.  And

18   as soon as that's completed, then we'll be doing jury

19   instructions, closing argument, and then you'll begin your

20   formal deliberations.  So that's my projection of what's left

21   for the balance of the trial.  We're on track.

22       And have a great day.  See you all tomorrow morning, at

23   9:00 a.m.

24                   (Jury exits the courtroom)

25           THE COURT:  Counsel for the government, have you

1    checked on the availability, and can you represent to the Court

2    that the -- even the injured juror -- strike that -- injured

3    witness will be available tomorrow morning?

4              MR. BARBOSA:  The injured witness, I need to check in

5    with him again.  If he's not available tomorrow, we will go

6    without him.  I don't want to delay things any further, if he

7    is unable to travel.  But I'm going to check in with him as

8    soon as we --

9              THE COURT:  And how far would he have to travel?

10             MR. BARBOSA:  He's only coming from Ocean Shores.

11   And I'm going to offer as many options as we can.  I haven't

12   told the agent, but I may be sending him to go pick him up, if

13   that might help.

14             THE COURT:  And counsel for the defense, is your

15   witness local, or is he coming from out of town?

16             MR. BROWNE:  Mt. Vernon.

17             THE COURT:  Any difficulty with your witness being

18   here tomorrow afternoon, or at least in the morning session?

19             MS. SCANLAN:  I have him scheduled to be here at

20   11:00.  If he needs to be here before that, I can talk to him.

21   But that's what time he's planning on being here.

22             MR. BARBOSA:  I think probably earlier, even if we

23   had everybody.  Just victim testimony, as we've seen this

24   morning, it takes approximately 15 minutes each.  And we have

25   three.

1           MS. SCANLAN:  He can probably be here.  I'll have him

2      come at 9:00.

3           THE COURT:  That's perfect.

4      Anything else to take up?

5           MR. BARBOSA:  No.  Thank you for your patience, Your

6      Honor.

7           THE COURT:  All right.  Counsel, just so that you

8      know before you leave, we're working on the jury instructions.

9      If we get the packet finished today, we'll e-mail them to you

10     as quickly as possible, so that you should expect them sometime

11     today, hopefully.  I just wanted to give you an update where we

12     are.

13      Have a good day.

14                          (Adjourned)

15                    (End of requested transcript)

16                        *    *    *

17      I certify that the foregoing is a correct transcript from

18     the record of proceedings in the above matter.

19

20     Date:  8/22/16                    /s/ Andrea Ramirez

21                          _____

22                          Signature of Court Reporter

23

24

25