1                    UNITED STATES DISTRICT COURT

2                  WESTERN DISTRICT OF WASHINGTON

3    _____

     UNITED STATES OF AMERICA,      )
4                                    )
              Plaintiff,             )   No. 2:11-cr-00070-RAJ
5                                    )
                                     )
6         vs.                        )   Seattle, WA
                                     )
7    ROMAN V. SELEZNEV,              )
                                     )   Jury Trial, Day 7
8             Defendant.             )   August 23, 2016

9    _____

10                 VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE JUDGE RICHARD A. JONES
11                  UNITED STATES DISTRICT COURT
     _____

12

13   APPEARANCES:

14   FOR THE PLAINTIFF:    NORMAN McINTOSH BARBOSA
                           U.S. Attorney's Office
15                         700 Stewart Street, Suite 5220
                           Seattle, WA 98101-1271
16                         norman.barbosa@usdoj.gov

17                         C. SETH WILKINSON
                           U.S. Attorney's Office
18                         700 Stewart Street, Suite 5220
                           Seattle, WA 98101-1271
19                         seth.wilkinson@usdoj.gov

20                         HAROLD W. CHUN
                           U.S. Department of Justice
21                         1301 New York Avenue NW, Suite 600
                           Washington, DC 20005
22                         harold.chun@usdoj.gov

23

24

25

```
 1   FOR THE DEFENDANT:    JOHN HENRY BROWNE
                           Law Office of John Henry Browne
 2                         108 South Washington Street, Suite 200
                           Seattle, WA 98104
 3                         johnhenry@jhblawyer.com

 4                         EMMA SCANLAN
                           Law Office of John Henry Browne
 5                         108 South Washington Street, Suite 200
                           Seattle, WA 98104
 6                         emma@jhblawyer.com

 7


 8
     Andrea Ramirez, CRR, RPR
 9   Official Court Reporter
     United States District Court
10   Western District of Washington
     700 Stewart Street, Suite 17205
11   Seattle, WA 98101
     andrea_ramirez@wawd.uscourts.gov
12
     Reported by stenotype, transcribed by computer
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    I N D E X

2                                              Page No.

3   Witness:  STEVEN BUSSING
      Direct Examination by Mr. Wilkinson          1220
4
    Witness:  CHRISTOPHER DOYLE
5     Direct Examination by Mr. Barbosa           1226
      Cross Examination by Mr. Browne             1230
6
    Witness:  SIDNEY FANAROF
7     Direct Examination by Mr. Wilkinson          1232

8   Witness:  ERIC BLANK
      Direct Examination by Ms. Scanlan           1240
9     Cross Examination by Mr. Chun               1281
      Voir Dire Examination by Ms. Scanlan        1305
10    Cross Examination by Mr. Chun               1306
      Redirect Examination by Ms. Scanlan         1310
11    Re-Cross Examination by Mr. Chun            1315

12  Witness:  OVIE CARROLL
      Direct Examination by Mr. Chun              1322
13    Voir Dire Examination by Ms. Scanlan        1328
      Direct Examination by Mr. Chun              1328
14    Voir Dire Examination by Ms. Scanlan        1332
      Direct Examination by Mr. Chun              1332
15    Voir Dire Examination by Ms. Scanlan        1335
      Direct Examination by Mr. Chun              1335
16    Voir Dire Examination by Ms. Scanlan        1344
      Direct Examination by Mr. Chun              1344
17    Voir Dire Examination by Ms. Scanlan        1347
      Direct Examination by Mr. Chun              1348
18    Voir Dire Examination by Ms. Scanlan        1355
      Direct Examination by Mr. Chun              1356
19    Cross Examination by Ms. Scanlan            1368

20

21

22                  E X H I B I T S

23  Exhibit 18.1                                  1328

24  Exhibit 18.2                                  1332

25  Exhibit 18.3                                  1333
```

| | | |
|---|---|---|
| 1 | Exhibit 18.4 | 1334 |
| 2 | Exhibit 18.5 | 1335 |
| 3 | Exhibit 18.6 | 1338 |
| 4 | Exhibit 18.8 | 1341 |
| 5 | Exhibit 18.9 | 1344 |
| 6 | Exhibit 18.10 | 1347 |
| 7 | Exhibit 18.11 | 1350 |
| 8 | Exhibit 18.12 | 1356 |
| 9 | Exhibit 18.13 | 1358 |
| 10 | Exhibit 18.17 | 1363 |
| 11 | Exhibit 106 | 1270 |
| 12 | Exhibit 114 | 1265 |

13

14

15

16

17

18

19

20

21

22

23

24

25

BUSSING – Direct (by Mr. Wilkinson)

```
 1            THE CLERK:  We are resuming our jury trial in the
 2   matter of the United States vs. Roman Seleznev, Cause
 3   Number CR11-70 assigned to this court.
 4            THE COURT:  Counsel for the government, please call
 5   your next witness.
 6            MR. WILKINSON:  The United States calls Mr. Steve
 7   Bussing.
 8            THE COURT:  Please step forward, sir.
 9            THE CLERK:  Please raise your right hand.
10       STEVEN BUSSING, having been duly sworn, was examined and
11   testified as follows:
12            THE CLERK:  Have a seat.
13       If you could please state your first and last names, and
14   spell your last name for the record.
15            THE WITNESS:  It's Steven Bussing, B-U-S-S-I-N-G.
16            THE COURT:  You may inquire.
17            MR. WILKINSON:  Thank you, Your Honor.
18                           DIRECT EXAMINATION
19   BY MR. WILKINSON
20   Q    Good morning, sir.
21   A    Good morning.
22   Q    Can you tell the jury what you do for a living?
23   A    My wife and I own a pizza place in Duvall, Washington.
24   Q    And what's the pizza place called?
25   A    Red Pepper Pizzeria.
```

BUSSING – Direct (by Mr. Wilkinson)

1    Q    Where is Duvall, Washington?

2    A    It's east of Bellevue and Redmond.

3    Q    How long have you been running Red Pepper Pizza?

4    A    About five-and-a-half years.

5    Q    And how many employees does the restaurant have?

6    A    We have about 28.

7    Q    I'm going to ask you some questions about your business a

8    couple years ago, in 2014.

9         Was the business accepting credit cards at that time?

10   A    Yes, we were.

11   Q    And did you have a point-of-sale system that allowed you

12   to do that?

13   A    Yes, we did.

14   Q    About how many cards were you processing daily at that

15   time?

16   A    On a guess, it's probably 100, give or take.

17   Q    And I take it you have software that allowed the

18   point-of-sale system to run?

19   A    Yes.

20   Q    In the event that maintenance needed to be done, or it

21   needed to be fixed, who was responsible for performing that

22   maintenance?

23   A    I would call a helpline that we contracted for, with the

24   POS company, which was 24 hours, to do any maintenance issues.

25   Q    Okay.  And would they access the computer by coming to

BUSSING – Direct (by Mr. Wilkinson)

1   your restaurant, or would they do it remotely?

2   A    They would do it remotely.

3   Q    At some point in time, did you see -- or witness anything

4   that led you to believe that your point-of-sale system had been

5   compromised?

6   A    Yeah.  One morning, I came in and noticed that the cursor

7   was moving around on the screen of the back-office computer.

8   And when I noticed that, somebody was trying to open up a web

9   browser and download something.  And then I literally pulled

10  the plug, at that point.

11  Q    Is that something you'd ever seen before?

12  A    Correct.

13  Q    It was not something you'd ever seen before?

14  A    That's correct.  I hadn't seen that before.

15  Q    Okay.  Did anyone have your permission to be in there,

16  moving the cursor around?

17  A    No, they did not.

18  Q    So you said you pulled the plug of the machine.

19       What did you do next?

20  A    I then called the POS support line to determine if they

21  had been accessing it, for some reason.  And they assured me

22  that they had not, and they wouldn't without our express

23  permission.

24  Q    At some point in time, did you learn that credit card

25  numbers had actually been obtained from your computer that way?

BUSSING - Direct (by Mr. Wilkinson)

1  A    Yeah.  Right along in that same time frame, the credit

2  card processor, Heartland, had contacted us and said that --

3            MR. BROWNE:  Objection, Your Honor.

4            THE COURT:  Sustained.

5  BY MR. WILKINSON

6  Q    After you spoke with the credit card processor, did you

7  understand that the system had actually been compromised?

8  A    Yes.  They told us that there were a number of cards that

9  had --

10            MR. BROWNE:  Objection.

11            THE COURT:  Sustained.

12  BY MR. WILKINSON

13  Q    So you said you pulled the plug.

14       Did you do anything to switch your system immediately,

15  after you saw the cursor moving around?

16  A    Yeah.  It was in that day or two that we went to the

17  credit card terminal as the exclusive point where we would

18  enter credit card information, which was a dial-up connection,

19  over the phone line.

20  Q    And how did that work for you, for your business, compared

21  to having the point-of-sale system?

22  A    Well, we had to -- instead of using three terminals to

23  process credit cards, we had that one single point, which

24  caused a lot of congestion with dealing with customers, having

25  to put them on hold and so forth.

BUSSING - Direct (by Mr. Wilkinson)

1  Q    What did you do with the point-of-sale system once you
2  took it down?
3  A    Well, we immediately got into the process with the POS
4  provider to get a new system, so that we would have everything
5  that was current.  That system was about three years old, but
6  we wanted to make sure that we weren't going to be compromised
7  any longer and there was no vulnerabilities.
8  Q    Were you planning to upgrade your system before this
9  happened?
10 A    Not specifically, no.
11 Q    So as a result of this, sounds like you did upgrade your
12 system?
13 A    Yes.  We put a rush on it and got it installed in the --
14 within a two-week period, I believe it was.
15 Q    And how much did it cost you to upgrade the system?
16 A    The actual cost of the system itself was in the
17 neighborhood of $12,000.
18 Q    At some point, were you contacted by law enforcement about
19 viewing your point-of-sale system?
20 A    Yeah.  After we had -- did the upgrade, I had the old
21 system stored at my house.  And the Secret Service had come and
22 asked if they could analyze those computers.
23 Q    And did you agree to let them analyze it?
24 A    Yes.
25 Q    And do you remember the name of the agent?

BUSSING - Direct (by Mr. Wilkinson)

1    A    Agent Fischlin, I believe.

2             MR. WILKINSON:  No further questions for this

3    witness.

4             THE COURT:  Cross examination?

5             MR. BROWNE:  No questions.

6             THE COURT:  Any objection to this witness being

7    excused, by the government?

8             MR. WILKINSON:  No, Your Honor.

9             THE COURT:  By the defense?

10            MR. BROWNE:  No, Your Honor.

11            THE COURT:  Thank you, sir.  You're excused.  You may

12   step down.

13        Counsel, next witness?

14            MR. BARBOSA:  The government calls Chris Doyle.

15            THE COURT:  Please step forward, sir, all the way to

16   the front of the courtroom.

17            THE CLERK:  Please raise your right hand.

18        CHRISTOPHER DOYLE, having been duly sworn, was examined

19   and testified as follows:

20            THE CLERK:  Have a seat.

21        If you could please state your first and last names, and

22   spell your last name for the record.

23            THE WITNESS:  Christopher Doyle, D-O-Y-L-E.

24            THE COURT:  You may inquire.

25   ////

DOYLE – Direct (by Mr. Barbosa)

| | |
|---|---|
| 1 | DIRECT EXAMINATION |
| 2 | BY MR. BARBOSA |
| 3 | Q    Good morning, Mr. Doyle. |
| 4 | A    Good morning. |
| 5 | Q    Where do you work? |
| 6 | A    I own an Irish pub on the coast of Washington. |
| 7 | Q    How long have you been on the coast of Washington? |
| 8 | A    About five years. |
| 9 | Q    Where were you living before that? |
| 10 | A    Seattle. |
| 11 | Q    Did you have different employment then? |
| 12 | A    I did.  I was a chief operating officer for a restaurant |
| 13 | pizza company. |
| 14 | Q    What restaurant pizza company? |
| 15 | A    MAD Pizza. |
| 16 | Q    And you said there were four of those? |
| 17 | A    Four locations. |
| 18 | Q    Where were those located? |
| 19 | A    Madison Park, First Hill, South Lake Union, and Starfire. |
| 20 | Q    And -- |
| 21 | A    In Renton. |
| 22 | Q    Where is the Starfire location? |
| 23 | A    It's located in the soccer complex, down in Renton, |
| 24 | Washington. |
| 25 | Q    And the First Hill location and the others, are those in |

DOYLE – Direct (by Mr. Barbosa)

1   Seattle?

2   A    They are.

3   Q    MAD Pizza, did your business accept credit cards?

4   A    We did.

5   Q    How did you accept credit cards?  What type of system?

6   A    We had a swiper through our POS.

7   Q    Were you familiar with the type of POS system you had at

8   MAD Pizza?

9   A    Firefly, by Phoenix.  Or Phoenix, by Firefly.

10  Q    How did that work at each of your locations?  What did it

11  consist of, in terms of the system and the architecture; do you

12  recall?

13  A    Well, we had two systems per location.  Madison Park had

14  three, actually, because delivery was pretty big down there.

15  And, you know, it's your standard touchscreen, connected to a

16  modem.

17  Q    Did you have computer servers in the business?

18  A    We did.

19  Q    And terminals at the registers?

20  A    Correct.

21  Q    How was that system serviced if you had problems with it?

22  A    Well, typically, it was done through the -- you know, on

23  the phone and through the internet, by the help desk.

24  Q    When you say through the internet, how would your --

25  A    Well, they would dial into the system remotely.

DOYLE – Direct (by Mr. Barbosa)

1   Q    Okay.  Do you know approximately how many credit card

2   transactions you were processing at each of your locations on a

3   day-to-day basis?

4   A    Gosh, probably running about 70 percent.  I mean, it would

5   just be a total guess, but I would probably say, you know, a

6   hundred or more.

7   Q    I'd like to draw your attention to late 2010, early 2011.

8        Did you learn that your business had been the victim of a

9   point-of-sale intrusion?

10  A    I did.

11  Q    How did you learn about that?

12  A    My operations manager called me at the office and said the

13  Secret Service and the FBI were at the door, and they wanted

14  in.  We hadn't quite opened yet.

15  Q    Okay.  What did you do in response to that?

16  A    I came down to South Lake Union to speak with them.

17  Q    And what happened after that?  What did you learn?

18  A    They told me that --

19            MR. BROWNE:  Objection, Your Honor.

20            THE WITNESS:  They told me --

21            MR. BROWNE:  Objection.

22            THE COURT:  Sustained.

23  BY MR. BARBOSA

24  Q    How many locations were impacted?

25  A    Four.

DOYLE – Direct (by Mr. Barbosa)

1   Q    What did you have to do in response to these intrusions?

2   A    Well, we had to allow them to copy our hard drives, and

3   then we had to send them off to a forensic scientist lab, one

4   of 11 that they gave us a choice of, to have those analyzed,

5   and then have them wiped clean and then sent back to us.

6   Q    Did you send your drives, your systems, for all four of

7   your locations?

8   A    We did.

9   Q    And do you recall who or what company you hired to do

10  that?

11  A    I don't.

12  Q    Do you recall the cost of that?

13  A    It was about $21,000.

14  Q    For the four locations, total?

15  A    Four locations.

16  Q    Were there any other costs associated with the intrusions?

17  A    We got fined from Visa and MasterCard, $10,000 from Visa,

18  about 7,000 –– or $4,000 from MasterCard.

19  Q    Were there any other impacts on your business?

20  A    Well, we got some negative press, certainly.  KIRO News

21  showed up at one of the restaurants and ––

22             MR. BROWNE:  Objection.

23             THE WITNESS:  –– you know, we were interviewed ––

24             THE COURT:  Just one second.

25         Grounds, Counsel?

DOYLE – Cross (by Mr. Browne)

1             MR. BROWNE:  Relevancy.

2             THE COURT:  It's overruled.

3             THE WITNESS:  So, I mean, that wasn't flattering.

4    What kind of impact it had, I'm not sure.  It was really more

5    of a situation where, you know, those funds were going to be

6    used for upgrading restaurants, helping employees.  We couldn't

7    do that.

8             MR. BARBOSA:  No further questions, Your Honor.

9             THE COURT:  Cross examination?

10            MR. BROWNE:  Yes, Your Honor.

11                       CROSS EXAMINATION

12   BY MR. BROWNE

13   Q    Good morning, sir.

14   A    Good morning.

15   Q    So you were -- just to make this clear, you were fined --

16   or the business you were working for then, you don't work for

17   them anymore?

18   A    I don't.

19   Q    Okay.  Were fined for not being PCI compliant?

20   A    Well, apparently, that is the case, but that -- we

21   understood that we were PCI compliant.

22   Q    I understand.

23   A    Right.

24   Q    But once it was determined you were not, that's where the

25   fines come in from MasterCard and Visa; right?

DOYLE – Cross (by Mr. Browne)

1   A    Well, I don't know if those were the exact words that were

2   used to me, but -- because I went through our processing

3   company, Gravity, that helped me through that whole process.

4   We didn't have an attorney.  So I guess that is probably

5   correct.

6   Q    So the hacking, or whatever happened, brought this matter

7   to your attention somehow.  And then there was a fine, because

8   you weren't PCI compliant.  It wasn't the hacking that caused

9   the fine.  It was the fact that you were not PCI compliant.

10       Or is that a really complicated question?

11  A    Well, it's not that complicated.  But, you know,

12  regardless if we were PCI compliant or not, we were hacked.

13  Q    Okay.  I understand that.  So I think that's a "yes" to my

14  question.

15       The new system was PCI compliant?

16  A    The new system.  We kept the same system.  We had backup

17  hard drives that we were able to use.  And once we got hacked,

18  we contacted the company, and they had an upgraded VPN router

19  that we had to purchase to the tune of about 1,200 bucks per

20  restaurant.

21  Q    Okay.  How many restaurants, again?

22  A    Four.

23  Q    Thank you, sir.  That's all I have.

24  A    You're welcome.

25             THE COURT:  Redirect?

FANAROF – Direct (by Mr. Wilkinson)

```
 1              MR. BARBOSA:  No, Your Honor.  Thank you.

 2              THE COURT:  Any objection to this witness being

 3    excused, by the government?

 4              MR. BARBOSA:  No, Your Honor.

 5              THE COURT:  By the defense?

 6              MR. BROWNE:  No, Your Honor.

 7              THE COURT:  Thank you, sir.  You may be excused.

 8         Counsel for the government, your next witness?

 9              MR. WILKINSON:  The United States calls Sid Fanarof.

10              THE COURT:  Please step forward, sir, all the way to

11    the front of the courtroom.

12              THE CLERK:  Please raise your right hand.

13         SIDNEY FANAROF, having been duly sworn, was examined and

14    testified as follows:

15              THE CLERK:  Have a seat.

16         If you could please state your first and last names, and

17    spell your last name for the record.

18              THE WITNESS:  Sidney Fanarof, F-A-N-A-R-O-F.

19              THE COURT:  You may inquire.

20              MR. WILKINSON:  Thank you, Your Honor.

21                        DIRECT EXAMINATION

22    BY MR. WILKINSON

23    Q    Good morning, sir.

24    A    Good morning.

25    Q    What do you do for a living?
```

FANAROF – Direct (by Mr. Wilkinson)

1  A    I'm president of ZPizza Corporation and founder of ZPizza

2  International Corporation.

3  Q    How long have you been running ZPizza?

4  A    Thirty years.

5  Q    How many pizza restaurants are associated with ZPizza?

6  A    At one time, we had 90 franchise stores.  And I own -- and

7  ZPizza owned five stores, as well, personally.

8  Q    Do you own five today?

9  A    Yes.

10  Q    In 2010, did you also own five?

11  A    I owned, actually, six.

12  Q    And where are the stores that you own located?

13  A    Orange County.

14  Q    Orange County, California?

15  A    Yes.

16  Q    How many employees did your stores have?

17  A    About 70 to 80 at the time.

18  Q    And were you accepting credit cards at that time?

19  A    Yes, I was.

20  Q    Through a point-of-sale system?

21  A    Yes, I was.

22  Q    And how was maintenance performed on that system?  Was it

23  done by people coming off site, or services accessing it from

24  off site [sic]?

25  A    Services off site.  It was all done through the POS

FANAROF - Direct (by Mr. Wilkinson)

1  company, where they would update and handle that type of

2  service.

3  Q    Okay.  So would they remotely access the computers?

4  A    Yes, correct.

5  Q    Do you remember the name of the POS company that would

6  provide that service?

7  A    It changed, but I think it was Firefly or Revention, or

8  something like that.

9  Q    Turning your attention to early 2011, did you learn that

10  the point-of-sale system had been compromised?

11  A    Yes, I did.

12  Q    And how did you learn that, and without going into the

13  specifics of what anyone told you as what was the source of the

14  information?

15  A    It came through my corporate office.  We got a memorandum

16  there from, I believe, the Firefly company, itself, stating it

17  and --

18           MR. BROWNE:  Objection, Your Honor.

19           THE COURT:  Sustained.

20      Next question?

21  BY MR. WILKINSON

22  Q    Were there costs to your business as a result of this

23  compromise?

24  A    Yes.

25  Q    And did one of those involve having to perform an audit?

FANAROF – Direct (by Mr. Wilkinson)

1   A    Yes, it did.

2   Q    And was the audit something you did voluntarily, or was it

3   something you were required to do?

4   A    Required.

5   Q    Who paid for the audit?

6   A    Personally, yeah.

7   Q    And how much did it cost?

8   A    It was, I believe, $5,500 per store, so it was about

9   $30,000 for the audit.

10  Q    Were any fines imposed on your stores?

11  A    Yes.  Approximately, I think, somewhere around

12  30-something from Visa and MasterCard.  It was a settlement.

13  Q    Did you also incur legal fees responding to this?

14  A    Yes.

15  Q    And how much were the legal fees?

16  A    Maybe somewhere around $5,000.

17  Q    At some point, did it become public that your stores had

18  been intruded into?

19  A    Yes.

20  Q    And did that have any effect on your business?

21  A    Yes.

22  Q    And how would you generally describe that?

23  A    Well, it was customers calling, who were concerned; and

24  following that, people reluctant to use credit cards in our

25  stores.  And I don't know what the bottom line of that was.

```
 1   But for a while, it was fairly strenuous with customers --
 2   there was an article in the local paper that came out.
 3   Q    Generally, how would you describe sort of the overall
 4   cumulative effect of all of this on your business?
 5   A    Well, the effect on the business was horrendous.  Because
 6   not only did I incur thousands upon thousands of dollars in
 7   costs, it happened at a time where there was another litigation
 8   going on, which I prevailed in, that was sort of frivolous, but
 9   so it -- the overwhelming thing was, I had a nervous breakdown.
10   And to this day, I can't stand -- four years I was gone --
11            MR. BROWNE:  I'm sorry, sir, to interrupt you.
12        I'm going to object on relevancy grounds.  We talked about
13   this.
14            THE COURT:  I think we did cover this, Counsel.
15            MR. WILKINSON:  Yes, Your Honor --
16            THE COURT:  Objection is sustained.
17            MR. WILKINSON:  Okay.  No further questions, Your
18   Honor.
19            THE COURT:  Cross examination?
20            MR. BROWNE:  Nothing, Your Honor.
21            THE COURT:  Any objection to this witness being
22   excused, by the government?
23            MR. WILKINSON:  No, Your Honor.
24            THE COURT:  By the defense?  Counsel?
25            MR. BROWNE:  I'm sorry.  I was talking to
```

1    Ms. Scanlan.  I apologize, Your Honor.

2        No, there is no objection.

3            THE COURT:  Thank you, sir.  You may step down.

4    You're excused.

5        Counsel for the government?

6            MR. BARBOSA:  Your Honor, the government rests.

7            THE COURT:  Counsel for the defense?

8            MS. SCANLAN:  Your Honor, if we may take a brief

9    recess before we call our first witness?

10           THE COURT:  Okay.  Members of the jury, we'll take

11   our first recess this morning while we engage in the transition

12   between counsel for the government presenting their case and

13   counsel for the defense.

14       Please rise.

15                     (Jury exits the courtroom)

16           THE COURT:  Counsel, just from a scheduling

17   standpoint, approximately how much time do you think that your

18   witness will --

19           MS. SCANLAN:  About an hour.

20           THE COURT:  About an hour?  And any idea, Counsel, on

21   cross examination?

22           MR. CHUN:  Probably about the same, Your Honor.

23           THE COURT:  Okay.  So it looks like we'll be able to

24   finish -- now, do you expect rebuttal testimony?

25           MR. CHUN:  Likely, Your Honor.

1         THE COURT:  And approximately how much time for

2    rebuttal testimony?

3         MR. CHUN:  Just on the the direct portions, Your

4    Honor, an hour to an hour and a half.

5         THE COURT:  Okay.  So it looks like we'll occupy a

6    full day today, with determining jury instructions this

7    afternoon, as we previously discussed last week.  And we'll do

8    closing remarks first thing tomorrow morning.

9       Does that appear to be a fair goal for today?

10        MR. BARBOSA:  Absolutely.

11        THE COURT:  Counsel for the defense?

12        MR. BROWNE:  Yes, Your Honor.

13        MS. SCANLAN:  Yes, Your Honor.

14        THE COURT:  We'll be in recess.

15        MR. WILKINSON:  Your Honor, one quick thing, the last

16   witness, I hadn't intended to elicit this testimony, but he did

17   volunteer the statement about having an emotional breakdown.  I

18   don't know whether the defense would like an instruction to

19   disregard it.  We wouldn't object to it, at this point.

20        MR. BROWNE:  No.  As a matter of fact, to

21   Mr. Wilkinson's credit, we talked about that before he took the

22   stand.  And counsel was not going to ask him that question, but

23   I had a feeling the witness was going to get it out, one way or

24   another, anyway.  I don't want to highlight it at all.

25        THE COURT:  If you want, I can -- I usually ask,

```
1    Counsel, if you want the Court to strike testimony, tell the
2    jury to disregard it, but I look for counsel to do two things:
3    One, to object, and move to strike.  So if I only hear the
4    first part, which is "objection," without "move to strike,"
5    then there's no damage at that point.  But if you don't want
6    the instruction, you don't want the curative instruction from
7    the Court, I won't give it.
8        Ms. Scanlan is shaking her head "no."  I'm assuming
9    Mr. Browne is agreeing with her.
10               MR. BROWNE:  I usually do.
11               THE COURT:  All right.  We'll be in recess.
12                         (Recess)
13                (Jury enters the courtroom)
14               THE COURT:  Counsel?
15               MS. SCANLAN:  Your Honor, the defense calls Eric
16   Blank.
17               THE COURT:  Please have him step forward.
18               THE CLERK:  Please raise your right hand.
19        ERIC BLANK, having been duly sworn, was examined and
20   testified as follows:
21               THE CLERK:  Have a seat.
22        If you could please state your first and last names, and
23   spell your last name for the record.
24               THE WITNESS:  It's Eric Blank, Eric with a "C,"
25   B-L-A-N-K.
```

BLANK – Direct (by Ms. Scanlan)

```
1                    THE COURT:  You may inquire.
2                         DIRECT EXAMINATION
3    BY MS. SCANLAN
4    Q    Good morning, Mr. Blank.
5    A    Hi.
6    Q    What is your current occupation?
7    A    I'm an attorney with a firm called Blank Law + Technology.
8    Q    Is that a firm that you own?
9    A    It is.
10   Q    What does Blank Law + Technology do?
11   A    We do computer forensics and document management
12   investigations for governments and companies across the United
13   States.
14   Q    How long have you been doing that with this business?
15   A    Since April 15, 2001.
16   Q    And what are the types of clients you have?  You said
17   something about government agencies.  Can you describe that?
18   A    Well, so our clients are primarily large corporations.
19   And by governments, I mean cities and counties, some state
20   governments.  I've done some work on the federal side for the
21   Department of Defense.  And in terms of the corporations, you
22   know, Boeing, Microsoft, Yahoo!, AOL, companies like that, that
23   hire us to come in and do investigations when they have some
24   kind of computer-related crisis.
25   Q    And what would be an example of a typical investigation
```

BLANK - Direct (by Ms. Scanlan)

1  that your company is asked to do for a corporate client?

2  A    Well, say -- so recently, for example, for a city down in

3  California, there was an allegation that a review of an

4  employee had been fabricated and placed on the supervisor's

5  computer.  And so the investigation was, could we tell whether

6  or not that document was, in fact, fabricated, and sort of been

7  slipped onto the supervisor's computer or not.

8  Q    Have you ever worked as a special master?

9  A    Yes, I have.

10  Q    And what is a "special master" in the context of your

11  work?

12  A    It's when the parties -- usually, the parties, but in

13  other words, the parties to the lawsuit, or sometimes the Court

14  without the parties really wanting the Court to do that,

15  instruct me to undertake some investigation on behalf of the

16  Court.  So where I take on the position as a neutral, I'll do

17  an investigation and then report back to the judge.

18  Q    Have you ever been appointed as a special master within

19  this district or this courthouse?

20  A    Yes.

21  Q    How many employees do you currently have?

22  A    Twenty-three, including myself.

23  Q    You said that you're an attorney.

24       What is your training in computer forensics?

25  A    Well, I was -- I grew up as the computer person.  I was

BLANK – Direct (by Ms. Scanlan)

1   the -- my junior high school's first computer lab aid.  And I

2   took a lot of computer classes in high school.  I was part of a

3   Massachusetts Institute of Technology special program they had

4   to get people into the computer business.  I built computers,

5   back in the days where you used to build computers, instead of

6   buy them at stores.  I built computers for clients while I was

7   in college.  I did the same thing after college, when I was a

8   police officer in Washington, D.C.  And that's my background in

9   computers.

10  Q    Do you have any certifications in the computer forensic

11  area?

12  A    I have taken or taught all of the courses related to the

13  major computer forensics tools.  So AccessData's, what they

14  call Computer Forensics Toolkit, which is what was used in this

15  case.  I've worked with that since 2001.  I think I took their

16  forensics boot camp in 2003.  And I've taken a number of other

17  computer forensics courses like that, where the manufacturers

18  will put on seminars.  I've been certified by Microsoft.

19       I had a business, until the end of 2014, that was a

20  cybersecurity e-mail security business.  It was the North

21  American distributor for Google.  And as part of being involved

22  with that company, we -- I and others in my company had to go

23  down to Google, and also to Intel, which they bought McAfee,

24  which was another company, and get trained on the emerging

25  issues of cybersecurity and threats across e-mail, and

BLANK – Direct (by Ms. Scanlan)

1    spoofing, and web filtering and protection, and so forth.  So

2    I've had quite a bit of continuing training.

3    Q    What was that company called?

4    A    One is Google, which is a big company, called Alphabet

5    Now.

6    Q    Sorry.  What was the company called that you had, that did

7    that work?

8    A    Oh, I'm sorry.  It was called TestudoData, like the Roman

9    shield wall.

10   Q    And TestudoData, you were talking about the training that

11   you did in relation to that position.

12        What did your company do for Google and for those

13   businesses that you just mentioned?

14   A    Google had a distribution model where they employed –– or

15   contracted, actually, with TestudoData to work with Google's

16   resellers in North America who were reselling Google Message

17   Security, Google Message Continuity, and other products that

18   eventually became folded in to what we now call Google Apps for

19   Business.  In other words, if you were a person, you wouldn't

20   buy directly from Google.  You would buy from a reseller.  The

21   reseller would buy from TestudoData.

22   Q    So before 2001, when you started Blank Law + Technology,

23   what was your profession?

24   A    I was an associate and then a partner at a law firm here

25   in Seattle called Riddell Williams.

BLANK – Direct (by Ms. Scanlan)

1    Q    And did you handle cases involving electronic data

2    litigation as an attorney?

3    A    Yes.  Now you see software is in everything.  But at that

4    time, the cases were Party A has paid Party B to build software

5    to run a product that will build a prosthetic foot, and they

6    have a dispute over how much of the product has been built, how

7    much of the software has been built.  And so you have to

8    undertake an effort to get all that software back and determine

9    what's been built or not built; so very complicated software

10   cases.

11   Q    And prior to being an attorney for that firm, and law

12   school, what was your profession?

13   A    Police officer, Washington, D.C.

14   Q    I'm going to ask you now about the proper handling of

15   electronic evidence.

16        What steps should be taken to secure a laptop computer

17   that's seized, before you image it?

18   A    Well, the first and most important rule always, really in

19   seizing any evidence, but in computer evidence in particular,

20   is to freeze it as you get it.  Don't let any changes occur, to

21   the extent you possibly can.  There are always a few

22   exceptions.  But to the extent you possibly can, don't let that

23   laptop or phone or tablet or desktop or server or whatever,

24   don't let it keep making changes.  Stop the changes so that you

25   can ascribe or impute the contents of that computer to the

BLANK – Direct (by Ms. Scanlan)

1   person from whom you took it, and also so that it doesn't

2   overwrite files that are beyond our forensic ability to recover

3   them.  Because although computer forensics is pretty amazing,

4   in terms of what you can recapture, it's not perfect.  It's an

5   imperfect science.

6   Q    So you want to freeze the item in the state that it's in

7   at the time that you seize it?

8   A    Right.

9   Q    Okay.

10  A    Normally, the process for that is to make an image, or

11  bit-for-bit electronic copy, of whatever that device has that

12  stores files.  Usually, we say hard drives, with a computer,

13  but it could be a solid-state drive, or a flash drive on a

14  phone, and so forth.  So once you have made an image of it, a

15  forensically correct image, using tools, then you're okay,

16  because then you know you've got that snapshot.  So it's the

17  interval between getting the thing and making --

18          MR. CHUN:  Your Honor, objection.  Narrative.

19          THE COURT:  It is a narrative, Counsel.  Let's ask

20  another question.

21  BY MS. SCANLAN

22  Q    So why is this -- why is this so important, that we not

23  have any of these changes?  Why do we care about that?

24  A    Well, we care both offensively and defensively; in other

25  words, offensively, because we want to make sure that we get

BLANK - Direct (by Ms. Scanlan)

1    everything that that computer had on it at the time we got it,

2    and not have it lose anything.  And on the defensive side, we

3    want to be able to have that information be reliable; so just

4    as you wouldn't take a notepad, and seize the notepad, and then

5    leave it in a room, come back three hours later, you wouldn't

6    know, had things been added to the notepad?  How would you

7    know?

8        It's exactly the same with a computer.  So you freeze it

9    so that you can be absolutely sure that the data on there is

10   reliable and can be ascribed to the person from whom you took

11   it.  And that's not just me.  That's the basic starting-off

12   rule of computer forensics.

13   Q    You said so that you don't lose anything from the device.

14       How do you lose things from a computer or tablet or an

15   electronic item that you've seized?

16   A    Well, computers, especially these days, are continuously

17   operating and continuously connecting to the world.  And when

18   they do so, they write to files, and they will overwrite

19   previously deleted items, or they'll make changes to files that

20   might be significant in terms of what those files tell us about

21   the computer's -- where the computer's been and what it's

22   doing.  So these changes occur even if no human does anything.

23   These changes will keep on occurring, if you don't stop them

24   from happening.

25   Q    What does it mean that a file overwrites another file?

BLANK - Direct (by Ms. Scanlan)

1   A    Well, once a file is deleted, because computers -- if you

2   think back to the dawn of computers, it's a lot of work for a

3   computer to actually have to erase, scrub over, a deleted file.

4   There would be no reason for it to do that.  Instead, it simply

5   flags that file as deleted, meaning that when you look for it,

6   the flag alerts the program that you're using to look for it

7   that, "Oh, that's a deleted file.  Ignore it."  But the file is

8   still there and can be seen easily with forensic software.

9        The downside is that, as time goes on, since that file is

10  deleted --

11            MR. CHUN:  Objection.  Same objection, Your Honor.

12            THE COURT:  Same ruling, Counsel.  Let's ask another

13  question.

14  BY MS. SCANLAN

15  Q    So you were just talking about how -- why we -- what

16  overwriting is.

17       So when a file is deleted, then what happens -- how is

18  it -- what is the overwrite process?

19  A    Once a file has been marked for deletion, the normal

20  operation of a computer will, sooner or later -- and this

21  depends on how the computer operates -- overwrite that file,

22  meaning to actually put new zeros and ones on top of the zeros

23  and ones that were there in the deleted file.  Then the deleted

24  file becomes fragmented and is harder to recover.  And

25  eventually, it's gone altogether.

BLANK – Direct (by Ms. Scanlan)

1    Q    So what is –– what's encryption?

2    A    Encryption is a method of making files unreadable to a

3    person who doesn't have an encryption key.

4    Q    Can you encrypt an entire computer?

5    A    Yes.  That's called "whole disk encryption."

6    Q    So if you seize, or you take into your custody, a laptop

7    that you're concerned that's encrypted, that's on when you

8    seize it, what are –– what do you do with that computer from

9    the time that you seize it, if you're worried that it's

10   encrypted?

11   A    So if it was encrypted, the only thing that you're going

12   to get –– if you can't get past the encryption, and oftentimes

13   you can't –– the only thing that you're going to be able to get

14   is what's in RAM, the live memory that's on the actual surface

15   of the motherboard, as opposed to on the hard drive.  That RAM,

16   if you can capture it, might actually have the encryption

17   password.

18   Q    So what do you do to –– what do you do with that?

19   A    So if you do a –– it's called a "live RAM capture."  You

20   use software to try to grab the RAM, and then you analyze the

21   RAM, and you look to see if there are words that look like

22   passwords.  And you try those out and see if –– usually, you

23   try them out on an image –– and try them out and see if they

24   work and get through the encryption.

25   Q    Can you turn the battery off, or turn the computer off,

BLANK – Direct (by Ms. Scanlan)

1    before you try and do that, if something is encrypted?

2    A     The whole difference between RAM and the actual storage is

3    that RAM requires an electric current to be passing through it,

4    in order to retain memory.  So once the electric current stops

5    flowing, the RAM dissipates forever.  And turning the power off

6    turns -- that means there's no electric current.

7    Q     So do you need to leave it on, then, or can you turn it

8    off?

9    A     If you're going to do a live RAM capture, you should leave

10   it on, not turn it off.

11   Q     So is there an importance to when you try to do this live

12   RAM capture?  So does it matter if you try to do it immediately

13   after you seize it or a month after you seize it?

14   A     Yes, it does matter.

15   Q     Why does that time frame matter?

16   A     RAM is volatile, meaning it's constantly changing and

17   moving.  And that's where the computer is doing all its

18   thinking.  Grabbing it as soon as possible gives you your best

19   chance at getting the password or any other data that's in RAM.

20         Also, back at the beginning of this, I said how important

21   it is to take a snapshot of the computer as it exists right

22   now.  The longer you wait, the longer you're violating that

23   first basic rule, which is, don't let the computer be changed.

24   So grab it right away for those two reasons.

25   Q     So if you leave it on, and you don't grab it right away,

BLANK – Direct (by Ms. Scanlan)

1    is the computer still making changes while it's on?

2    A    Yes.

3    Q    When –– what's the purpose of a Faraday enclosure?

4    A    Faraday enclosures are designed to block radio

5    transmissions.

6    Q    So in the context of a computer where you're concerned

7    that it might be encrypted, so you're going to leave it on,

8    would you use a Faraday enclosure in that circumstance?

9    A    Well, if the computer has any kind of wireless capability,

10   you put it inside a Faraday enclosure until you've neutralized

11   its wireless capability.  That's just very common practice.

12   And Faraday enclosures –– I mean, it sounds fancy and

13   technical, but it's just grounded metal.  We have, in my

14   office, used metal trash cans that are just put on a cement

15   floor.  That works perfectly well.  You don't have to buy some

16   fancy thing.

17   Q    So in theory, you could use anything like that, that's

18   metal, and just put it over a laptop?  Would that work?

19   A    Yeah, and ground it.

20   Q    And ground it.  What does that mean?

21   A    Connect it to the earth with something that conducts

22   electricity, like metal.

23   Q    So back in the summer of 2014, was your firm using Faraday

24   enclosures for laptops?

25   A    We had been, at that point, using Faraday enclosures for

BLANK – Direct (by Ms. Scanlan)

1   laptops and phones for years and years, yes.

2   Q    So the idea of a Faraday enclosure for a laptop, was that

3   breaking-edge, new stuff in 2014, or had it been around?

4   A    I think "Faraday" is a term from World War II.  It's a

5   very old idea.  Sort of the tinfoil hat thing is also the

6   Faraday idea.  So the idea of a Faraday enclosure is not new.

7   And the idea that a phone uses a radio signal -- like a cell

8   phone tower, that's a radio signal -- is also not new.  So

9   people have been using Faraday enclosures in computer forensics

10  since as long as we've had cell phones; so that's since the

11  '90s.

12  Q    What about Faraday enclosures for laptop computers?

13  A    Yeah, well, laptop computers, when they have wireless,

14  that's a radio signal, different frequency than a cell tower.

15  I guess I'm not -- I don't understand why you would treat it

16  any differently.  It's a walkie-talkie.  Keep it from receiving

17  signals, whether it's a desktop, which can have wireless cards

18  in them, or a server or a laptop or a tablet or a phone.  If

19  it's got wireless capability, don't let it talk.  That's

20  just -- that's elementary.

21  Q    Was that elementary in 2014, or just now?

22  A    No.  In 2000, it was elementary.  The first wireless

23  computers came out a decade and more before 2014.  So, yes, you

24  want to -- some computers had little mechanical on-off

25  switches, with a little radio tower, for, like, the original,

BLANK – Direct (by Ms. Scanlan)

1    like, ThinkPads from 2007, for example.  So you could just push

2    that switch that turns off its wireless antenna.  You could do

3    that, instead of an enclosure.  But if it doesn't have that,

4    which most don't have it anymore, yeah, stop it from receiving

5    radio signals.

6    Q    So let's talk about Windows 8 and Windows 8 Pro.

7         First of all, what's the difference between Windows 8 and

8    Windows 8 Pro?

9    A    I think you mean Windows 8.1, which came out a year later

10   than Windows 8.

11   Q    Okay.

12   A    Windows 8 is the next version of a Microsoft operating

13   system.  It followed Windows 7.

14   Q    And when did Windows 8 come out; do you know?

15   A    Yeah.  Windows 8 was announced at the Consumer Electronics

16   Show the first week of January 2011.  I was at that show.  It

17   came out to early users later that year, and was released for

18   general consumption, meaning that you really couldn't buy a

19   computer anymore that didn't have it preloaded on it, in the

20   early fall of 2012.  And Windows 8.1 came out a year later.

21   Q    And what's the difference between Windows 8.1 and —— or

22   Windows 8 and Windows 8.1 Pro?

23   A    There is not —— there's no operational difference between

24   8.1 and 8.1 Pro.  They just have different settings and

25   different capabilities.  It's a more expensive version of

BLANK - Direct (by Ms. Scanlan)

1   Windows 8.1, is all.

2   Q    So at what point -- so it came out around fall 2012.  At

3   what point were the forensic tools available to analyze

4   Windows 8 operating systems?

5   A    So Windows 8 had been -- unlike other operating systems

6   where people flee from them, and move to them at the last

7   possible moment, Windows 8 was highly anticipated.  And a lot

8   of people, including my shop, moved to Windows 8 before its

9   general release; unlike, say, Windows 10, where people had to

10  be forced to sign up for Windows 10.  So Windows 8 was popular

11  and good.

12       The forensics tools do tend to lag behind a little bit, so

13  I don't know exactly.  But I think certainly FTK would have

14  been on top of it.  And I can remember working with Forensics

15  Toolkit in 2012 on Windows 8 machines, so a couple months.

16  Q    So in July of 2014, was it unusual to encounter a computer

17  with a Windows 8 operating system within the field of computer

18  forensics?

19  A    No.  Not in my experience, no.

20  Q    So was that -- you said --

21  A    Can I just add something to that?

22       The reason I want to say that is because the -- Windows 8

23  was the first version of Windows that was -- popularized this

24  using the new touchscreen technology.  So all the salespeople

25  in the world, who tend to be involved in a lot of lawsuits, all

BLANK – Direct (by Ms. Scanlan)

1    wanted Windows 8, because that's how they would -- they're out

2    in the field on their laptops that now have touchscreen

3    capability.  That's what Windows 8 brought.  So most cases were

4    immediately Windows 8 cases, because that -- if you had any

5    kind of computer interest or skill, you wanted to leave your

6    mouse and get on a touchscreen.  If you were waiting tables, or

7    a salesperson, or walking a factory floor, you wanted a

8    touchscreen, and that was Windows 8, not Windows 7.

9    Q    So if your company took custody of a computer with

10   Windows 8 in the summer of 2014, would you have been familiar

11   with the operating system at that point in time?

12   A    Yes.

13   Q    Were you -- is that unusual, within the field, just to

14   your company, or is that a pretty general --

15   A    I'm comfortable saying that's pretty general.  I mean, we

16   all -- I go to all these training things.  I mean, Windows 8,

17   as I said, was highly anticipated.  So you moved into Windows 8

18   because that's what everyone was excited about showing up,

19   because it meant, suddenly, like, you could use a Surface

20   tablet with Windows 8 on it.  So it was -- and so I'm not

21   saying that hypothetically.  I mean, I worked, in 2014, on a

22   lot of Windows 8 machines.

23   Q    And what is "Connected Standby" or "InstantGo"?

24   A    Connected Standby came out with Windows 8, and InstantGo

25   was how it was re-branded with Windows 8.1.  Most of us, the

BLANK – Direct (by Ms. Scanlan)

1   people that I interact with, we still say "Connected Standby."

2   It's just the preferred term.  Connected Standby makes your

3   computer act like a phone.

4   Q    And what do you -- what do you mean it makes your computer

5   act like a phone?

6   A    Well, we're all familiar with a cell phone.  The screen is

7   dark, but you can still receive a call, or it will chime when

8   e-mail arrives.  That's because your phone is sleeping, using

9   the minimal power, so it has 48 hours of sleep time.  But it's

10  not really sleeping.  It's on the timer.  And when the timer

11  goes off, every 60 seconds or every 30 seconds, it wakes up

12  long enough to say, "Hey, can I connect to a network?"  "Am I

13  connected to a network?"  "Am I receiving e-mails or texts or

14  incoming phone calls?"  And you can even ping the connected

15  standby machine and get it to wake up remotely.  That's how

16  your phone, which is dark, gets a phone call.  And so with

17  Connected Standby on Windows 8, you could do exactly the same

18  thing with your computer.

19  Q    Okay.  So for the cell phone thing, specifically, you

20  can -- if a phone is in Connected Standby -- and is the screen

21  dark or on?

22  A    Dark.

23  Q    Okay.  So it's dark.  Can you send data to that phone in

24  that state?

25  A    Well, the answer is, yes, but it's first going to wake it

BLANK – Direct (by Ms. Scanlan)

1   up, although the screen may not turn on.  So data, like an

2   e-mail, an e-mail, when your phone's in that state, everyone's

3   got a cell phone that goes "ping" when you just got an e-mail.

4   The screen doesn't necessarily light up.  You can set it to do

5   that.  But the screen may stay dark, but your phone will ping.

6   You just had data pushed to your phone, even though it's in

7   sleep mode, Connected Standby mode.  And that's an example of

8   data arriving on the phone.

9   Q    And how about a laptop, is it the same or different?

10  A    It's exactly the same.  These days, phones tend to both

11  connect to the radio network, which is the cell phone network,

12  and they're also available to connect, of course, to the

13  wireless networks, like at Starbucks.  With computers,

14  computers can connect to those wireless networks, but they have

15  to have special extra hardware to connect to phone networks.

16  Q    So if a computer wants to connect to a phone network, and

17  it has a SIM card, will that SIM card allow it to do that, to

18  have that radio capability?

19  A    A SIM card with the hardware, yes.  A SIM card is the

20  subscriber identification module.  It is what turns your

21  computer into, actually, a phone, and you can send and receive

22  phone calls, not Skype calls, but actually phone calls from the

23  SIM card.

24  Q    When did you first see laptops that had this Connected

25  Standby capability?

BLANK - Direct (by Ms. Scanlan)

1   A    Windows 8.  But that -- sorry.  Built in came with

2   Windows 8.  But the idea of people using their laptops and

3   having Connected Standby-type features, we started seeing those

4   in 2007.  But you had to buy -- it didn't come preloaded.  You

5   had to buy what we'd now call an "app" for that.

6   Q    So Connected Standby was built in in Windows 8.

7        And when did Windows 8 come out, again?

8   A    It was pre-release in 2011 and general release in October,

9   I think, of 2012.

10  Q    What precautions should be taken when you take custody of

11  a laptop that has Windows 8 and Connected Standby capabilities?

12  A    Treat it like a phone.  Block the wireless signal.  Make

13  your image of it, your bit-for-bit electronic copy, as quickly

14  as possible.

15       When I say "make the image," most of us will make two or

16  more images, so then you've got perfect replica copies.  And if

17  something goes wrong, you've got backup.  So make this backup,

18  this forensic backup, as quickly as possible.  And while you're

19  doing that, stop it from connecting, either because there's

20  some piece of hardware you can disconnect, or putting it in a

21  radio-blocking cage, like a Faraday enclosure.

22  Q    That process that you just talked about, is that new to

23  2016, or is that commonly known in the summer of 2014?

24  A    It's commonly known in the summer of 2014 and earlier.

25  Q    Now, switching over, we've heard a lot about event logs.

BLANK – Direct (by Ms. Scanlan)

```
1        What is an event log on a computer?
2   A    An event log is a document, like a Word file or a text
3   file, where the computer writes down what it's doing or what
4   has happened.  And most computers have many different kinds of
5   event logs.
6   Q    And what's a "SRUM journal"?
7   A    SRUM is just a power usage monitor.  It's -- the big
8   competition is to preserve battery power.  So the System
9   Resource Usage Monitor just tells you what's causing power to
10  drain, so you can fiddle with it and try to make your computer
11  last longer.
12  Q    So event logs, are event logs on there for computer
13  forensic people, like you, to look at, generally, or for
14  diagnostic purposes?
15  A    They're for diagnostic purposes.  We use them in computer
16  forensics all the time, but they're not built for that purpose.
17  Q    Why are they there for diagnostics purposes?  What does
18  that mean?
19  A    Well, take the SRUM journal.  Everyone can understand
20  that -- if you don't understand why your friend's laptop goes
21  five hours before the battery dies, and your laptop goes three
22  hours, one way to help diagnose that might be to pull up the
23  SRUM and take a look at what's using power.  And, oh, it turns
24  out that you forgot you're connecting to this USB drive, that
25  you should probably disconnect when you're not using it,
```

BLANK – Direct (by Ms. Scanlan)

1   because it's killing an hour of your laptop time.  So that's

2   user diagnostics.

3       Network diagnostics, many of these devices connected to

4   each other will refer to each other's event logs to determine

5   what they're supposed to do next, which is why, if you have

6   problematic event logs, you can have cascading problems across

7   the whole system, because everyone will rely on the faulty

8   event log.  And that happens commonly.

9   Q    So these event logs, can they be changed or edited by a

10  person?

11  A    Yeah.  In recent years, Microsoft has made an effort to

12  have them not be changeable, not for computer forensics

13  purposes, but because people tend to try to solve problems by

14  just taking the danger signals -- so if I have a computer, and

15  my printer is not working, my printer might be referring to an

16  event log to do something wrong.  So why don't I fix my printer

17  by deleting a line item or changing a line item in my

18  computer's event log, to help me diagnose the printer problem.

19  That usually causes more harm than good.  And so Microsoft has

20  made an effort to stop people from being able to do that.  But

21  the people who want to do it will do it.  And so it's not hard

22  to change event logs.

23  Q    How do you change -- how do you change an event log?

24  A    Well, at the end of the day, they're just, like, how do

25  you change a text file or a Word document?  You open it up, you

BLANK – Direct (by Ms. Scanlan)

1    make the changes you want to make, and then you "save as," and

2    you overwrite the prior one, and, voila, changed event log.

3    It's just a document with lines.

4    Q    So some of these -- do some of these event logs track

5    whether a user is currently logged on or doing things on the

6    computer?

7    A    Some do.  There are security event logs.  There are

8    wireless connection logs.  Some apps create their own event

9    logs to tell you what they're doing.  So, yes.

10   Q    So those event logs that -- you mentioned the security

11   event log.  There's the wireless connectivity log; right?

12   A    Right.

13   Q    Those ones that are recording user interaction, are -- can

14   you edit those ones?

15   A    Yes.  There's no -- they're all in the same format.  The

16   computer uses the same processor, the same software, to write

17   to various logs.

18   Q    So if you look at those logs for a particular computer,

19   and you don't see evidence the user is interacting, does that

20   mean absolutely, a hundred percent, that that event didn't

21   happen?

22   A    No, it doesn't.  And, I mean, we see this kind of --

23   computer forensics relies on surprise.  You need to know that

24   the person whose computer you're looking at doesn't know that

25   you're coming, because they can make all these changes.  And

BLANK - Direct (by Ms. Scanlan)

1   you'll never -- without -- so that's the human part of this.

2   Without this careful preservation of the computer, and the

3   chain of custody, you lose your human part of it, and you're

4   just looking at an event log.  How do you know it hasn't been

5   changed?  You don't.  It's rare that it's changed, because

6   usually you've surprised the person.

7   Q    But you can't -- can you know for sure?

8   A    No.  And we see this just in our daily lives.  I mean, I

9   recently saw the head of the FBI say you can't be sure what's

10  happened to this computer, because it's just not something

11  you'd expect to be able to figure out, one way or the other.

12  Well, why not?  Why doesn't he just look at the event logs?

13  Answer:  That's not a trustworthy way to depend on a computer.

14  Q    I think we may have talked about this, but can a laptop

15  that has a SIM card connect to a radio network when it's in

16  some kind of standby mode?

17  A    Connected Standby, yes.  That's its whole purpose.  It

18  will connect to whatever network -- the SIM card is a

19  network-specific, like Verizon or AT&T Wireless, so you get a

20  SIM card that's in that network.  So that SIM card will give

21  you permission to connect to anybody in that network.

22  Q    Does it give you -- can it give you that permission even

23  if -- give the computer the permission even if the user is not

24  logged on?

25  A    Yes, of course, just like a phone, works exactly the same

BLANK – Direct (by Ms. Scanlan)

1    as a phone.  It will log on to trusted cell phone networks.

2    And by default, if it's a Verizon Wireless SIM card, it trusts

3    all Verizon cell towers, all "X" thousand of them across the

4    country, and any carrier that Verizon trusts.

5    Q    Did you examine a copy of the drive that was found in the

6    Sony Vaio laptop in this case?

7    A    Yes.  I was given a forensic image by the government.

8    Q    And that forensic image, do you know -- how was that

9    created?

10   A    The image is a bit-for-bit electronic copy.  I don't

11   recall -- I think they used FTK Imager, which is a perfectly

12   fine forensic toolkit imager, which is a software program that

13   allows you to make a copy.  It's perfectly legitimate.  We all

14   use that.  There are other things that work, as well.  But you

15   know it's a perfect copy because you compare -- you compare

16   your copy to the original, using a hash procedure, and it tells

17   you the same thing, and we trust it.

18   Q    And once you received this image, what did you do to

19   conduct your examination?

20   A    I used Forensic Toolkit to index what we call -- which

21   means build a total library of all the data on the computer,

22   including deleted files and fragmentary files, and files that

23   you wouldn't normally see using programs.  And once I've done

24   that, I can search and look at the various files.  I can sort

25   them.  I can run word searches.

BLANK – Direct (by Ms. Scanlan)

1   Q    And did you find anything of note in your examination of

2   this laptop?

3   A    Yes.

4   Q    What was that?

5   A    That many thousands of files had had their metadata, that

6   is, information about the files, changed after this computer

7   was seized.

8   Q    And what's your understanding of when this computer was

9   seized?

10  A    Sometime on July 5, 2014.

11  Q    So you saw changes to the metadata that were after that?

12  A    Yes.

13  Q    What kinds of changes?

14  A    There were changes to file access dates, and there were

15  changes to file modification dates.

16  Q    And what's an "access date"?

17  A    An access date is a piece of information associated with a

18  file that tells you when the file was last touched.  What

19  causes it to change varies from program to program.  It might

20  have been opened, printed.  It could be changed, but doesn't

21  have to be, and so forth.

22  Q    Can that -- can access logs be changed by the computer

23  itself, without a user?

24  A    They can be, because apps themselves can change access

25  dates, yes.

BLANK - Direct (by Ms. Scanlan)

1    Q    And can access dates also be changed by user interaction?

2    A    Yes.

3    Q    So these files that you saw with changed access dates --

4    can you take a look at Exhibit 114?

5    A    Okay.

6    Q    Take a look at that.  Do you recognize that?

7    A    Yes.

8    Q    What is it?

9    A    This is a condensed -- and by condensed, I don't mean it's

10   missing files.  I mean that it -- in Forensic Toolkit, you get

11   a lot of information about each file, sometimes a hundred, 120.

12   So if you look at this document, it could be 120 columns over,

13   hard to print.  So here, I've just shown the file name, the

14   access date, and the modified date.  But this is a document I

15   created.

16   Q    And what does it depict?  So it has those columns.  What

17   is it telling us?

18   A    I went into FTK and pulled up all files on the computer

19   sorted by access date, from most recent to least recent.  And

20   then I cut off the ones that were prior to the computer being

21   seized.  So these are all the access dates of files that were

22   changed after the computer was seized by the government.

23   Q    And is that an accurate record of that information?

24   A    Yes.

25            MS. SCANLAN:  The defense moves to admit Exhibit 114.

BLANK – Direct (by Ms. Scanlan)

1          THE COURT:  Any objection?

2          MR. CHUN:  No, Your Honor.

3          THE COURT:  114 is admitted.

4                (Exhibit 114 was admitted)

5          MS. SCANLAN:  Permission to publish?

6          THE COURT:  Granted.

7    BY MS. SCANLAN

8    Q    This may be a little hard to see, but we're using the

9    document camera today.

10         So what are we –– what is this?  What is this?  What is

11   this column here, starting with "name"?

12   A    Left column is the name of the file.  Those are –– it's ––

13   the next column is the access –– last access date.  And this is

14   a spreadsheet.  It is sorted by access date.  So you'll see the

15   names are not in alphabetical order, but the access dates are

16   in reverse chronological order, so most recent to least recent.

17   And then the next, Column C, is the modification date from most

18   recent to least recent.

19   Q    Okay.  Can you see that okay, in terms of those column

20   names on the screen?

21   A    I've got it.  I'm looking at them ––

22   Q    Look at your screen.

23   A    Okay.  I'm looking at my screen.

24   Q    Can you see these okay?

25   A    Yes.

BLANK – Direct (by Ms. Scanlan)

1    Q    Sort of?

2    A    Yes.

3    Q    All right.  Not all the technology is perfect here.

4         But here we have -- this is the "name" file; right?

5    A    Yes.

6    Q    And then these are the access dates, over here?

7    A    Correct.

8    Q    And so this column, are you saying that all of these dates

9    in this column are after July 5?

10   A    Yes.

11   Q    How many pages is this?

12   A    Sixty-one.

13   Q    And how many files are we talking about?

14   A    Somewhere in the neighborhood of 3,000 files, which is a

15   lot.

16   Q    Now, these changes in access dates on these files, is

17   there any way to know whether these are caused by user

18   activity, for sure, or system activity?

19   A    In my opinion, having done a lot of work into this, these

20   can only be caused by some kind of user activity, not by system

21   activity.

22   Q    Why is that?

23   A    Well, because I'm very familiar with Connected Standby.

24   And I guess I should say, I'm -- I get to this by looking at

25   what the government said about this, which was nothing.  And

BLANK – Direct (by Ms. Scanlan)

1   that made me wonder, how can I try to explain all of these
2   files?  Because it's kind of hard to miss them.  There are
3   thousands and thousands and thousands.
4   Q    Wait.  Hold on.  Before you go on, what do you mean the
5   government said nothing?
6   A    Well, the government had a report about their forensic
7   examination, and they said a few files, a few registry files,
8   had been changed.
9   Q    Are these registry files?
10  A    No.  Actually -- sorry.  Some of them are; two, three,
11  four of them are.
12  Q    So there's two, three, four of these 3,000 files that are
13  registry files?
14  A    Right.
15  Q    Are the rest of them a few registry files?
16  A    No one would think that these are registry files.
17  Q    Okay.  And then I interrupted.
18       So you said it was your opinion that this is caused by
19  user activity.  Why is that?
20  A    So one of my reasons was that I haven't had the computer.
21  I've had an image of the hard drive on the computer.  So I
22  don't know firsthand, where's the computer been?  Who's been
23  touching it?  Who's been opening it?  Who's been accessing it?
24  Who's it been talking to?  I don't know anything but what I can
25  see from the solid-state drive.

BLANK – Direct (by Ms. Scanlan)

1      But I do know how Connected Standby works.  And Connected

2    Standby is meant to preserve battery life, allow your phone or

3    computer to not drain battery.  Thousands and thousands of

4    files being accessed, whatever is happening to them, takes a

5    lot of battery power.  A computer in Connected Standby is not

6    going to modify or access all of these files.  So that -- I

7    throw that out.

8      So if the computer is just sitting there, normally it will

9    go into a Connected Standby state.  So if it's doing all this

10   work, and we know that, if it's left alone, it would go into

11   Connected Standby, and we know that Connected Standby would not

12   result in thousands and thousands of files being accessed, we

13   conclude user activity.  Or I conclude that this is some kind

14   of user activity.  What user activity, I can't tell.

15   Q    Do you know how long the laptop was left in this condition

16   before it was imaged?

17   A    I think it's around 23 days.

18   Q    Does that seem like a normal period of time to you to wait

19   to image a computer that's in Connected Standby mode?

20   A    If I took 23 days to image a computer, I would not have

21   any clients.  And in addition, it's not a normal time.  It

22   should be done emergency quickly.  That's why we have all these

23   portable imaging devices that we take with us to the scene, so

24   we can do it, boom, right there.

25   Q    Oh, so, like, the portable imaging devices, like the live

BLANK - Direct (by Ms. Scanlan)

1    image that Detective Dunn did on some of the business

2    point-of-sale systems?

3    A    Right.  Because these businesses, they're in business.

4    They can't let you take their computer away for three weeks,

5    then come back and say, "Okay.  Go ahead.  You're back in

6    business."  Every minute -- you take someone's cell phone away,

7    every ten minutes they want to know when they're going to get

8    their cell phone back.  So once you get the image done, they

9    can get their cell phone back.  Imagine taking 23 days before I

10   return your cell phone.

11   Q    Did you have a chance to look at the frequency of

12   different dates for these 3,000 files?

13   A    I did, and I made some graph as part of my analysis.

14   Q    Can you look at Defense Exhibit 106, please?  It's in the

15   notebook.

16   A    I see it.

17   Q    Okay.  What is it?

18   A    This is -- as me trying to understand what's going on with

19   this computer, I just took this same spreadsheet and, using

20   Excel, turned it into a graph to show me, if you just take the

21   days, does that tell me anything about the pattern of activity.

22        And I'd just like to say one thing.  If you look at the

23   very end, August --

24   Q    Hold on.  Nobody can see it yet.  So right now, we're just

25   identifying what it is.

BLANK – Direct (by Ms. Scanlan)

1        So this is a graph you created?

2   A    Right.

3   Q    Is this an accurate representation of the file activity

4   you saw on this computer?

5   A    Yes.  If you went through these 61 pages, you could

6   reconstruct this graph by hand.

7             MS. SCANLAN:  Defense moves to admit Exhibit 106.

8             MR. CHUN:  No objection, Your Honor.

9             THE COURT:  Is that for substantive or illustrative?

10            MS. SCANLAN:  Substantive.

11            THE COURT:  Objection is noted -- strike that.

12  Government has no objection --

13            MR. CHUN:  No objection, Your Honor.

14            THE COURT:  106 is admitted.

15                 (Exhibit 106 was admitted)

16            MS. SCANLAN:  Permission to publish?

17            THE COURT:  Granted.

18  BY MS. SCANLAN

19  Q    Okay.  Another one of my ELMO features.

20       What are we looking at here?

21  A    So this is the bar graph from Excel of the dates in 2014

22  post-seizure of the computer, so the 7/5/2014 dates, those are

23  7/5 dates after the computer was seized.

24  Q    What's the last date?

25  A    The last date is August 1.  And that's what I wanted to

BLANK – Direct (by Ms. Scanlan)

1   point out, is that because -- if you look at the little tiny

2   number there, it actually says "3."  But you don't -- the bar,

3   it's such a tiny number that you don't get any little blue

4   graph.

5   Q    So on the August 1 date?

6   A    Yes, on the August 1 date.

7   Q    Okay.  So that has -- you can't really see it right here.

8   It has three file changes; right?

9   A    Because if you look at this prior exhibit, there are three

10  dates from August 1.

11  Q    And then this date with the big column in the middle,

12  what's that date?

13  A    July 13.

14  Q    And how many files had access date changes on that day?

15  A    1,800-some.

16  Q    Is it unusual that a computer that's in Connected Standby

17  would have a spike like this, in the access date changes?

18  A    If you mean would a computer in Connected Standby suddenly

19  decide, after sitting there, to access nearly 2,000 files,

20  that's not just unusual, that's just -- that's not how

21  Connected Standby works.

22  Q    Okay.  So in terms of -- when we say "routine system

23  activity," is that what we're talking about, where the computer

24  is doing it itself, without a user?

25  A    Right.

BLANK – Direct (by Ms. Scanlan)

1   Q    Okay.  So would a computer that was showing this pattern

2   of file activity, is this something you would generally ascribe

3   to routine system activity?

4   A    No.  There's some kind of user interaction.  A human being

5   did something to cause this computer to do something else.

6   Q    What about antivirus activity?

7   A    In the old days, antivirus would -- you always suspect

8   antivirus.  Because in the old days, antivirus used to change

9   last access dates.  But it drove the industry crazy.  And by

10  2009/2010, that wasn't happening anymore.  This is McAfee.

11  It's one of the first things I checked.  This is McAfee

12  Antivirus.  I am overfamiliar with McAfee Antivirus.  This is

13  not McAfee Antivirus activity.

14  Q    And let's back up a little bit.

15       What is McAfee Antivirus?

16  A    It is an application that opens, without changing the

17  modification date or the access date, files to inspect them to

18  see if they have viruses, and then packages them back together,

19  pastes back the original open access date, and goes on to the

20  next file.

21  Q    Okay.  So -- and what is your experience with McAfee?

22  A    In -- from 2005 to 2014, I sold about $50 million of it.

23  So I've had -- every problem McAfee Antivirus could have, my

24  shop has experienced, and had to endure.

25  Q    Have you ever seen this kind of file activity caused by

BLANK – Direct (by Ms. Scanlan)

1  that antivirus program?

2  A    Well, yeah, prior to 2009.

3  Q    How about after 2009?

4  A    No.  Yeah, prior to 2009, McAfee would literally go

5  through and change all your last access dates; so that when you

6  went into Word, it would show your last access date was

7  whatever the antivirus looked at, which was just crazy.  But

8  after 2009, as we all know from using computers today, if you

9  go into Word, and you go to your recent files, it doesn't show

10  you what was recently scanned by an antivirus.  It shows you

11  what you recently accessed.  So after 2009, no, antivirus

12  doesn't change last access dates.

13          THE COURT:  Counsel, it's 10:45.  Why don't we take

14  our morning break at this time.

15                  (Jury exits the courtroom)

16          THE COURT:  Counsel for the defense, anything to take

17  up?

18          MS. SCANLAN:  No, Your Honor.

19          THE COURT:  Counsel for the government?

20          MR. CHUN:  No, Your Honor.

21          THE COURT:  We'll be in recess.

22                      (Recess)

23                  (Jury enters the courtroom)

24          THE COURT:  Counsel, you may continue your direct

25  examination of the witness.

BLANK – Direct (by Ms. Scanlan)

1          MS. SCANLAN:  Thank you, Your Honor.

2   BY MS. SCANLAN

3   Q    Mr. Blank, we were talking about this laptop.

4        Does this -- the laptop that we're talking about, that you

5   looked at the image of, did it have a SIM card?

6   A    Yes.

7   Q    Is the SIM card something you get a copy of when you get

8   the forensic image of the computer?

9   A    No.  It's a piece of hardware that attaches to the

10  computer.  It's a little chip.

11  Q    Do you know when everybody figured out that this thing had

12  a SIM card?

13  A    I know when I figured it out.

14  Q    When was that?

15  A    Back in June of this year.

16  Q    And where were you?

17  A    Here, in this courtroom.

18  Q    Prior to that time in June when we had the SIM card

19  revelation, I'll call it, had you personally examined the

20  actual computer?

21  A    No.  I only had access to the image the government had

22  given me.

23  Q    Do you know what company supports that SIM card?

24  A    Yeah.  It's MegaFon, which is not -- it's spelled a little

25  bit different.  It's F-O-N, for phone.  It's the largest

BLANK – Direct (by Ms. Scanlan)

1   Russian telecom company.

2   Q    They're not in Seattle; right?

3   A    Well, no, they're not.

4   Q    Do you know if they have a partnership with Verizon?

5   A    Yeah.  They're part of the CCA, the Competitive Carrier

6   Alliance, which allows companies to roam onto other networks.

7   And their roaming partner in the U.S. is Verizon.

8   Q    Verizon Wireless, like the Verizon that has a store, like,

9   three or four blocks from here?

10  A    Yeah.  Verizon, like the one that has 50,000 towers in the

11  U.S., yes.

12  Q    So what does it mean that these are part of the -- what

13  did you call it, the CCA network?

14  A    It just means that if you fly in from Russia, and you have

15  a Russia MegaFon SIM card, and you get off the plane, if you

16  haven't told your phone not to, as has happened to some of us

17  when we go to Mexico, for example, your phone will start

18  roaming locally on Verizon.  Your Russian phone, with the

19  Russian SIM card, will work just fine here in the U.S.  It will

20  trust and connect to the Verizon network, as a roaming partner.

21  Q    Now, you're talking about cell phones; right?

22  A    I'm talking about anything that has a SIM card.  The SIM

23  card doesn't care whether it looks like a phone or laptop or

24  desktop, or you're carrying around a big server.  This same

25  thing would apply to a cell phone; but, yes, also to a laptop

BLANK - Direct (by Ms. Scanlan)

1   or tablet, including this laptop.

2   Q    So a laptop -- so are you saying that a laptop with a SIM

3   card from MegaFon can connect to the Verizon trusted network in

4   Seattle?

5   A    Of course, yes.

6   Q    And can it do that in Connected Standby, or only when a

7   user is interacting with it?

8   A    Connected Standby, the operative word is "connected."  And

9   it will try to connect to trusted networks.  With a SIM card

10  and MegaFon, it will trust MegaFon's network, and it will trust

11  all of MegaFon's partner carriers.  It will just trust them.

12  So you can drive along the highway, and even though you're

13  going from tower to tower to tower, you can have an

14  uninterrupted cell phone conversation, uninterrupted e-mail,

15  uninterrupted web surfing over MegaFon or their roaming

16  partner, Verizon network.

17       So specifically what I'm saying is, this laptop, on, or in

18  Connected Standby, brought to Seattle, would be expected to

19  connect to the Verizon network here, just normally, without any

20  user action at all.

21  Q    So if it had been -- if the laptop with the SIM card was

22  in some sort of Faraday enclosure or trash can, was grounded,

23  or whatever you want to call it, would it be able to do that?

24  A    No.  It blocks the radio signal.  It's like being in a

25  tunnel.

BLANK - Direct (by Ms. Scanlan)

1    Q    But if it's not in any of those things, then that's when

2    it's capable of making this connection?

3    A    Yeah.  Not just capable, but it will, unless told not to,

4    try to make those connections.  It will try.

5    Q    Now, are you familiar with the wireless -- not just --

6    okay -- whatever the log is, the connectivity log, that records

7    a SIM card or a radio network laptop's connection with a

8    wireless network?

9    A    Yes.  It's one of those logs we talked about earlier.

10   Q    And is this one of the logs that can be changed, or is it

11   something that is inalterable?

12   A    It's a text file, and it can be changed for all kinds

13   of -- it can be changed easily.

14   Q    So let's just be clear.  Are you saying that that

15   particular log on this computer was changed?

16   A    No.  I don't know.

17   Q    So you don't know -- we don't know, one way or the other,

18   whether it was changed or not?

19   A    That's right.  And that's what I'm -- what I'm saying is,

20   I'm talking about reliability.  I'm not saying what happened.

21   I don't know.  All I've got is an image of the hard drive of

22   this computer.  I don't know what the computer was or wasn't

23   doing.  I don't know.

24   Q    So in terms of the reliability of this computer, or the

25   evidence that's taken out of this computer, what is your

BLANK – Direct (by Ms. Scanlan)

1    opinion about that?  I mean, how reliable is the stuff that's

2    on this computer?

3    A    My opinion is that the computer was handled in -- you

4    don't get the thousands and thousands of access date changes

5    without mishandling the computer.  It's the basic principle of

6    computer forensics that you secure the evidence, secure its --

7    just like any other evidence, secure the computer; prevent it

8    from being changed, and prevent the possibility of change.

9         It did get changed.  And we know, because the SIM card was

10   discovered years later, that there's even more possibility of

11   change than we see just from the hard drive itself.  There's

12   also this -- the fact that it's a walking-around phone.

13        So those two things, and all of my training and

14   experience, lead me to my opinion, which is that this laptop,

15   the data on it, is unreliable, from a computer forensic

16   standpoint.

17   Q    So what about -- the government's taken a group of files

18   that don't have changed access dates and said, "These are the

19   files we're using."  What about those files?  Those ones that

20   don't have changed access dates, are they a separate set of

21   evidence that is reliable?

22   A    No.  I mean, in computer forensics, when you're trying to

23   see if someone's tampered with a computer or not, or maybe the

24   computer tampered with itself -- I mean, that's always a

25   possibility, that something's wrong -- you don't just look at

BLANK – Direct (by Ms. Scanlan)

1   the files you can find, that you can prove something changed.

2   Once you find unexplained changes after the seizure date, if

3   you can't explain those changes -- and some changes do happen.

4   There are, even in this case, some changes that I think are

5   well explained.

6        But when you have the thousands and thousands of changes,

7   and nobody even mentions them, they're not even brought up, and

8   then when they are brought up, there's no explanation, then

9   everything is suspect.  Because it just means that we don't

10  know what happened to the rest of the files, just because we

11  can't see the changes.

12  Q    What are the well-explained file changes?

13  A    I thought, initially -- when I read the report of the

14  government on working with the laptop, initially, there was

15  talk about bumping the computer, and it came back on

16  accidentally.  And I think -- look, I've been in computer

17  forensics for a long time.  You're not supposed to bump the

18  laptop.  You're not supposed to make it turn back on.  But

19  those things do happen.  And if you can explain them, then it

20  corrects the problem.

21       So I thought, and I think I said in my, you know, original

22  report, that I find that persuasive.  So, okay, that's three

23  files out of 3,000.  Why don't you even mention the rest of

24  them?

25  Q    So the three files out of 3,000, is that the thing we saw

BLANK - Direct (by Ms. Scanlan)

1    at the end of the graph, on August 1?

2    A    Yes.  Like I said, it's not ideal.  I just want to be

3    clear.  Computer forensics is somewhat forgiving.  You just

4    need to explain your mistakes.  When you explain your mistakes,

5    okay.  But to have mistakes and have them not be explained,

6    everybody gets suspicious.

7    Q    Have you heard the explanation that this is operating

8    system activity or antivirus activity that's causing these file

9    changes?

10   A    I have.

11   Q    So just to be clear, do you agree with that explanation,

12   or not?

13   A    No.  It doesn't make any sense.  It doesn't -- just from a

14   practical point of view, no computer that's sleeping is going

15   to be doing all this work.  It's going to have to have been

16   woke up at some point.  And if it was doing all this work, why

17   isn't it doing it every day?  Why does it do a lot of work on

18   one day and almost no work the other day?  That doesn't make

19   any sense that that's just how this computer operates.  It's

20   not supported by anything.

21   Q    And how many hours would you say you've put into this

22   case?

23   A    Two-hundred-fifty.

24   Q    Are you compensated for that time?

25   A    Yes.

BLANK – Cross (by Mr. Chun)

1    Q    Is the compensation that you receive dependent on what
2    your opinion is?
3    A    No.
4    Q    So if you say something we don't like, do you still get
5    paid?
6    A    That's a different question.  Not always.  I have been --
7    but, I mean, my concern is that what I say allows me to be
8    hired in the next case.  So I'm sorry to be so frank, but
9    that's my -- I need -- I'm not going to put myself somewhere
10   where it hurts my reputation as a computer expert.  And it's
11   not -- this case is not worth it to me, neither is any case.
12   Q    What does that mean?
13   A    It means that what I say is not --
14            MR. CHUN:  Objection, Your Honor.  Vouching.
15            THE COURT:  It is, Counsel.  Sustained.
16            MS. SCANLAN:  I have nothing further.
17            THE COURT:  Cross examination?
18            MR. CHUN:  Thank you, Your Honor.
19                        CROSS EXAMINATION
20   BY MR. CHUN
21   Q    Good morning, Mr. Blank.
22   A    Hi.
23   Q    Are you still an attorney?
24   A    Yes.
25   Q    Are you still licensed?

BLANK – Cross (by Mr. Chun)

1   A     Yes.

2   Q     Do you still practice law?

3   A     I say yes.

4   Q     And in this case, have you reviewed the reports?

5   A     Which reports?

6   Q     Agent reports.

7   A     Yes.  I've reviewed a number of reports, yes.

8   Q     Forensic examination reports?

9   A     Yes.

10  Q     You've reviewed the forensic image of the defendant's

11  laptop?

12  A     Yes, I have.

13  Q     Now, being both a forensic examiner and an attorney,

14  that's one of your marketing points.

15        It's because you know how to be an advocate?

16  A     I'm sorry?

17  Q     It's a question.

18  A     Oh, okay.  I think that it's helpful to -- not so much the

19  advocacy part, but I think it's important to know the law and

20  be able to understand how the law connects to the facts.  I

21  think it's been useful over the years, yes.

22        Also, I deal with extremely sensitive information.  And I

23  think it makes clients more comfortable, knowing they have some

24  of the protections that an attorney can provide them.

25  Q     And you put this in your report, that you've personally

BLANK - Cross (by Mr. Chun)

1   both worked as an examiner and an advocate; correct?

2   A     Yes.

3   Q     And in your report, you use the word "advocate," not

4   "attorney"; right?

5   A     Okay.  Yes.

6   Q     And you write your report to that, because --

7              MS. SCANLAN:  Objection.  I'm going to object to

8   questions about the report.  He can ask a question and impeach

9   with the report, but I'm not sure about the questions directly

10  about what's in the report.

11             THE COURT:  That's overruled.  I'll make a

12  determination based on a question-by-question basis, Counsel.

13  But the general global objection, that's overruled.

14        Please continue.

15  BY MR. CHUN

16  Q     And you write your reports as advocacy pieces; correct?

17  A     I guess I don't really know how to answer that.  I mean, I

18  think it's fair to say that I'm hired by a side, and I try to

19  help that side.  But I don't say stuff that's not defensible.

20  I guess -- is that enough of an answer?

21  Q     For example, in your March 1 report, you say, "According

22  to the investigating agency, Mr. Seleznev had a laptop"; isn't

23  that right, paraphrasing?

24  A     That's correct.  That makes sense.  I'm explaining where I

25  got the information from.

BLANK – Cross (by Mr. Chun)

1  Q    You didn't believe he has a laptop?

2  A    No.  I believe he had a laptop.

3       Oh, I see.  No, I'm not saying it in some sarcastic tone.

4  I'm just explaining where I got the information from, in terms

5  of how do I know that he had a laptop, because the

6  investigating agency tells me.

7  Q    So you've reviewed the discovery, and so you're familiar

8  with this picture?

9  A    This is the first time I've seen that picture.

10 Q    He's carrying a laptop bag there?

11 A    I don't disagree with you.  I can't -- to be honest, I

12 don't even -- yeah, I've never seen the picture before.  I

13 don't disagree with what you're saying, but I can't tell what

14 he's carrying or -- in fact, I'm having a little trouble seeing

15 who that is --

16       THE COURT:  Counsel, to preserve the record, if you

17 could point to the exhibits.

18       MR. CHUN:  I apologize, Your Honor.  That would be

19 Exhibit 12.2, Page 2.

20 BY MR. CHUN

21 Q    And showing you now what's been admitted as 12.4, is that

22 a picture of the laptop there?

23 A    Oh.  I see a bunch of stuff, including what looks like a

24 laptop, yes.

25 Q    And showing you the bulk exhibit, Exhibit 12.8, which is

BLANK – Cross (by Mr. Chun)

1   the laptop, if it's up there.

2              MR. CHUN:  Ms. Ericksen, 12.8?

3              THE CLERK:  The laptop?

4              THE WITNESS:  This is the first time I've touched

5   this laptop.

6   BY MR. CHUN

7   Q    Looks like what's in the picture?

8   A    Yes.

9   Q    And so you believe that's the defendant's laptop?

10  A    I have no reason to doubt it.

11  Q    Another example of advocacy, in your report, you say, in

12  parentheses, in regards to Indonesia -- or in parenthetical --

13  "where Mr. Seleznev apparently traveled."

14            Were you not aware that he traveled to Indonesia?  Or do

15  you not believe it?

16  A    So when I write my reports, and I think -- I also was

17  trained to do this as a police officer -- I try to separate

18  what I've heard from what I know from personal observation or

19  facts.  So I realize -- I mean, maybe policing is not the best

20  place to learn to write reports, but that was always -- if you

21  get information from a third-party source, that's not something

22  I'm stating as fact.  It doesn't mean I'm disbelieving anyone.

23  But there are facts that I observe from my own eyes.  You'll

24  get those as facts.  Everything else, I'm going to tell you

25  where I got it from.  But I'm not trying to impugn anyone's

BLANK - Cross (by Mr. Chun)

1   report.

2   Q    And showing you what's been marked and previously admitted

3   as 12.7A, Page 21, you've reviewed the discovery and seen the

4   passport?

5   A    So I -- you say I've reviewed --

6            MS. SCANLAN:  Objection.  Relevance.

7            THE COURT:  That's sustained, Counsel.  Let's move

8   on.

9   BY MR. CHUN

10  Q    As a lawyer, you're aware that, when the government seizes

11  items, they need to first get a search warrant; correct?

12  A    Well, not necessarily.  I seized a lot of items without a

13  warrant when I was policing.

14  Q    Is it your testimony that without consent to -- of the

15  individual, the government can just go ahead and look through a

16  computer without a search warrant?

17  A    That's a different question.  That's not my testimony.

18  You asked if I could seize items without a warrant.  Yes, you

19  can.

20  Q    To search the computer, does the government need a search

21  warrant?

22  A    Yes.

23  Q    And that takes time?

24  A    Yes.

25  Q    And this computer, it was seized in the Maldives?

BLANK – Cross (by Mr. Chun)

1    A    I'm sorry –– apparently.  That's what I understand from
2    the government's reports, yes.
3    Q    And it traveled to Guam?
4    A    Yes.
5    Q    And then it came to Seattle?
6    A    Same basis for my understanding, from reading the reports,
7    yeah.
8    Q    All of that takes time?
9    A    Yes.
10   Q    Now, you talked about Connected Standby, and you initially
11   said –– or you have said it's to conserve battery; is that
12   right?
13   A    That's correct, yes.
14   Q    You said that's a primary goal of Connected Standby, is to
15   conserve battery.
16   A    I think that's fair.  Because you want the computer to be
17   not doing anything but just waiting for wireless signals, yes.
18   And that's the only reason –– why not just have it be totally
19   on all the time?  Because it's on battery, preserving battery.
20   Q    And that's why it's not going to be touching this file and
21   that file and creating all these changes, because it's trying
22   to save battery; is that your testimony?
23   A    That's fair, yes.
24   Q    But in Connected Standby, a computer actually can do a lot
25   of things; can't it?

BLANK – Cross (by Mr. Chun)

1    A     Yes, it can.

2    Q     It could play music?

3    A     That's not strictly -- from a technical sense, you can --

4    so in sleep mode is -- the computer is off.  It's just a way of

5    preserving the computer, being off.  And standby and sleep mode

6    are the same things.

7          In Connected Standby, you have a timer that allows you to

8    try to connect.  You can also set your computer up to run

9    various apps while everything else is turned off, including

10   music.  But you will not get the same battery performance, if

11   you play music while in Connected Standby.  And it can do other

12   things too.  You can have it --

13   Q     So the question was, can it play music while in Connected

14   Standby?

15   A     So the answer is, no.  Connected Standby, that's not --

16   Connected Standby is a specific mode feature.  It doesn't --

17   your question doesn't make sense.

18   Q     Are you saying it's in Connected Standby for 30 seconds,

19   and out of it to check, and then back in it again?  Is that

20   what you're saying?

21   A     Right.  Yes.  And so if it was trying to play music with

22   that being the only thing making it play music, the music would

23   be intermittently on, off, on, off, on, off.  That would not

24   work for anyone.  So with instructions to the computer, you can

25   say, "Turn everything off, but still play music."  But that's

BLANK – Cross (by Mr. Chun)

1    not a Connected Standby mode.  That is a "computer on" mode,

2    but trying to preserve battery power through other means.

3    Q    You can check e-mail while in Connected Standby?

4    A    Yes.

5    Q    It could apparently receive phone calls, you said?

6    A    Yeah.  The checking e-mails, that's the wireless

7    connection, is to see if I'm pushing files, so e-mails, text

8    messages, updates to other apps you have, like WhatsApp, you

9    know, all the social media, Facebook, all that stuff.

10   Q    System updates?

11   A    System updates will not get triggered by Connected

12   Standby, because that drains too much battery power.

13   Q    It can run during Connected --

14   A    If you separately schedule them to run, yes --

15   Q    Yes --

16        THE COURT:  Excuse me.  Excuse me.  Wait until the

17   question is asked.

18      And Counsel, wait until the witness has finished answering

19   his question.  It's causing total confusion for the court

20   reporter to be able to get it.  So please wait.

21      Ask another question.

22        MR. CHUN:  Yes, Your Honor.  I apologize.

23   BY MR. CHUN

24   Q    Antivirus can run during Connected Standby?

25   A    So I guess I would have to stick to my same answer, which

BLANK – Cross (by Mr. Chun)

1   is, Connected Standby is a specific feature of the computer.

2   If you're saying can an antivirus run when the computer is

3   asleep?  No.  The computer has to wake up to run antivirus.  It

4   can be told and scheduled to do so, to wake itself up and run

5   antivirus.  But that's not anything to do with this other thing

6   we're talking about, Connected Standby.

7   Q    So when a computer is in Connected Standby, it could

8   repeatedly wake up to do system activities; correct?

9   A    When the computer is asleep, it can repeatedly wake up to

10  do selected activities.  Connected Standby is a kind of

11  "unsleep."  But it's not -- it's not a mode that can do other

12  things.  The computer has to wake up to do the other stuff.

13       Does that make sense?

14  Q    So when it's in Connected Standby, it can repeatedly wake

15  up, is what your testimony is.

16  A    Actually, the mechanics of it are just, the computer is

17  asleep, but computers have a -- you know, they can keep time.

18  And they do that by having a little battery onboard.  So the

19  little watch battery, or what have you, is still running, and

20  it's attached to a timer.  And when the timer goes off, the

21  computer wakes up and says, "What" -- "Am I getting e-mail

22  push?" and so forth.  That's Connected Standby.  It can also

23  have timers for these other things you're talking about.

24  Q    So it could repeatedly wake up out of Connected Standby?

25  A    Yes.  A computer can wake up out of Connected Standby,

BLANK – Cross (by Mr. Chun)

1    yes.

2    Q    And it could repeatedly wake up to run system activities?

3    A    Yes.

4    Q    To run antivirus?

5    A    If scheduled, yes.

6    Q    To run system updates?

7    A    Again, if it's scheduled, yes.  It's not common, because

8    people would be angry if their computer updated itself and

9    drained all the battery power, when they were hoping to have

10   ten more hours.

11   Q    And earlier you testified that everybody was so excited

12   about Windows 8, that it was adopted so quickly; correct?

13   A    I don't think I said it quite that way.  But, yes, it was

14   much anticipated, Windows 8.

15   Q    The same operating system that Microsoft dropped in about

16   a year's time; is that right?

17   A    Yes.  Anticipation did not match the actual -- you know,

18   the -- how it actually turned out.

19   Q    And earlier you testified that about 3,000 or so files had

20   changed access dates; correct?

21   A    Correct.

22   Q    But of those files, only 274 or so were -- had modified

23   dates that were changed; is that right?

24   A    No.  That's -- I mean, they all have -- they all have

25   modified dates that are changed.  Even if the modified date is

BLANK - Cross (by Mr. Chun)

1   the same expiration date, it's going to have a modified date.

2   So all files have modified dates.

3   Q    Modified dates changed after July 5?

4   A    Oh.  Sorry.  How many, did you ask?

5   Q    Approximately 274.

6   A    Yes.  That sounds right to me, yeah.

7   Q    So not all 3,000 files were showing modified dates that

8   were changed after July 5.

9   A    That's correct.

10  Q    And you've reviewed that list of 3,000 or so files?

11  A    Well, yes.

12  Q    Can you point to any of the government's exhibits on that

13  list?

14  A    I don't know that I know what the government's using for

15  exhibits in this case.  My answer is no to that.  I don't know

16  what the government's using.

17  Q    And you've testified here that all the evidence on the

18  laptop is unreliable because of these changes; correct?

19  A    Well, my point is that, when you're in computer forensics,

20  you look for suspicious activity.  If it can't be explained,

21  you suspect everything, yes.

22  Q    And in your report, you actually give four theories that

23  you believe might have happened; true?

24  A    Four or more theories, yes.

25  Q    Perhaps live imaging went wrong?

BLANK - Cross (by Mr. Chun)

1   A    Yes.

2   Q    Perhaps copying from defendant's laptop to another device

3   was done by an agent?

4   A    I don't know who would have done it.  I don't know enough

5   about where the computer was.  But, yeah, I mean, user-type

6   activity that cause all these access dates to occur.  And I

7   gave some of my theories about how that might have happened.

8   Q    Or an agent just logged in and started looking at the

9   computer before it was imaged?

10  A    Yeah.

11  Q    Or that there was network access to this laptop, and that

12  somebody remotely logged in?

13  A    That's right, or pushed files to it, or it automatically

14  grabbed files.  All that stuff is not in my report, because I

15  didn't know about the SIM card until after I had written my

16  report.

17  Q    And these were your best reasons for these 3,000 access

18  date changes?

19  A    Well, I would say my favorite reason now would be the SIM

20  card.

21  Q    So your favorite reason is that somebody remotely logged

22  into this computer?

23  A    I think my favorite reason would be that the computer

24  connected to a network and pulled or pushed data in or out, and

25  that changed -- or tried to -- and that changed all these -- or

BLANK – Cross (by Mr. Chun)

1   connected to a network, and that's what helped change all these

2   system files.  But I don't know.  I'm just telling you what

3   I –– if I had to pick a favorite, I think that would be what I

4   would pick now.

5   Q    So let's talk about your theories, the first two,

6   unreliable live imaging or copying of files.

7         Copying a file would create –– or change access dates; is

8   that right?

9   A    Not if done forensically correctly.

10  Q    Moving a file?

11  A    Same answer.  I mean, there are ways to move files without

12  changing the dates, sure.

13  Q    These actions could change the dates.

14  A    They could change dates, but they shouldn't.  I mean, it's

15  even –– you don't have to be a computer forensics person.  You

16  can XCOPY –– it comes built in with Windows –– move files, and

17  they won't change their dates.

18  Q    Showing you what's been admitted as Government

19  Exhibit 13.5, would either of those theories explain this file

20  just showing up?

21  A    Oh, you mean the miraculous creation theory?

22  Q    It's your theory.  I'm asking you, would this –– would the

23  operating system have just created this file?

24  A    I don't think so, no.

25  Q    And looking at the dates of this, this was a receipt for

BLANK – Cross (by Mr. Chun)

1    when defendant was in the Maldives, right before he was

2    arrested?

3    A    Honestly, I can't -- I don't disagree with you, but I

4    can't read it very well.  But I don't disagree with what you're

5    saying.  I just don't -- please don't ask me to say what it

6    says.  I can't read any of the words.

7    Q    And showing you Government Exhibit 13.2, which is PACER

8    login records from a cached web page taken off the browser, the

9    operating system wouldn't just create that, based on your two

10   theories; would it?

11   A    No.  I don't think any of my theories would cause

12   documents to be created.  I should say, any of the theories

13   that you're referring to.  That's not what we're talking about.

14   Q    So these cached pages showing Page 2, based on the first

15   two theories, they wouldn't just show up.  The operating system

16   wouldn't just make them in that process.

17   A    That's right.

18   Q    And that would be true of 13.12C.  Credential -- that's a

19   password login file with defendant's logins and IDs, passwords,

20   Liberty Reserve accounts.

21        The operating system wouldn't just create those either;

22   would it?

23   A    None of my theories are that the operating system just did

24   anything.  I'm talking about user interaction.

25   Q    Going on to user interaction, your third theory was that

BLANK - Cross (by Mr. Chun)

1    an agent logged in and just started browsing what was on the
2    computer; correct?
3    A    Yeah, that's right, or trying to do some kind of -- trying
4    to try some passwords out and get through them, you know,
5    some -- yeah, something like that.  I don't know.  I'm just
6    offering some possibilities.
7    Q    And perusing a computer wouldn't create new files of
8    substance; correct?
9    A    That's right.
10   Q    And so it wouldn't have just created 1.7 million credit
11   card numbers; right?
12   A    That's right.
13   Q    Agents just looking at the computer were contained to that
14   computer; isn't that right?
15   A    That's correct.  I will continue to agree with you that
16   none of what you're talking about has anything to do with
17   creating any records on the computer.  It was trying to explain
18   why do we see thousands and thousands of access date changes,
19   and then what's next after that.
20   Q    And showing you Exhibit 13.10, credit card log files,
21   that's true for that, as well?
22   A    So -- true; that it doesn't get miraculously created, yes.
23   Q    And that's the same for 13.13, which is a script for the
24   website posdumps?
25   A    Yes.

BLANK - Cross (by Mr. Chun)

1   Q    Agents just perusing a computer, if that's your theory,
2   wouldn't have created this.
3   A    Well, I don't know what the agents did or didn't do.  But
4   my access date changes that I called attention to, they would
5   not -- unless they're these files, and I don't know, they
6   wouldn't be -- that wouldn't cause these files to appear, no.
7   Q    And you talk a lot about this computer connecting, whether
8   through SIM card or wi-fi; that in Connected Standby, it could
9   just connect to the internet; right?
10  A    That's the definition of Connected Standby, yes.
11  Q    That's your fear, that this computer just connected to the
12  internet?
13  A    That's the fear of anybody who seizes a connected device.
14  That's why we have Faraday enclosures.
15  Q    And that would involve connecting from the Maldives, to
16  Guam, to Seattle; correct?
17  A    I'm sorry.  I just don't follow.
18  Q    It would have connected in the Maldives, and it might have
19  connected -- you can answer.
20  A    Oh, that it would try to connect wherever it could
21  connect?  Yeah, I think a Connected Standby computer would try
22  to connect wherever it can connect, yes.
23  Q    And then try to connect in Guam?
24  A    Yeah.  I think anywhere it's on, in Connected Standby, by
25  definition, it's going to check and see if it has wireless

BLANK - Cross (by Mr. Chun)

1    connection capability.  Whether it could connect or not, I

2    don't know.

3    Q    And if the laptop is changing networks that it's on, it's

4    also changing its connecting IP address; correct?

5    A    Normally, yes.

6    Q    A wi-fi network in the Maldives would have a different

7    address than the one in Guam; yes?

8    A    I'm not -- I think you're generally right.  Of course, you

9    could get a hard IP that traveled around with the machine.  But

10   I think what you're saying is a fair guess, yes.

11   Q    And it would be different, again, in Seattle?

12   A    I would think so, yeah.

13   Q    And finding one computer in the world is very different

14   from scanning open ports on the internet; correct?

15   A    I don't understand that question.

16   Q    Finding -- the task of finding one individual computer,

17   somewhere in the world, is a different task from port scanning

18   open -- looking for open ports on the internet.

19   A    Those sound different to me.  So, yes, I agree.

20   Q    Are you familiar with what "port scanning" is?

21   A    Yes.

22   Q    Are you familiar that it's just pinging out into the

23   internet, checking for ports at different computers or

24   networks?

25   A    That's not what port scanning is.  Port scanning is

BLANK – Cross (by Mr. Chun)

1    interrogating a computer and asking it what ports it has and
2    what their status is.  If you're using it for nefarious
3    purposes, maybe you're port scanning times 10,000.  But port
4    scanning is used every day by network administrators.
5    Q    And that task is very different from finding one computer
6    somewhere in the world.
7    A    What do you mean by "finding one computer somewhere"?
8    That's the part I don't get.
9    Q    Your fear of this defendant's laptop is that somebody
10   remotely pushed files onto it and caused changes; right?
11   A    Yeah.  That would be the reliability fear, yeah.
12   That's -- all my training is, don't let it connect, because
13   changes might occur, either out or in.  Yeah.
14        But by that same connection, what you're saying doesn't
15   make any sense.  I mean, the computer could just as easily,
16   through all these scheduled things we've been talking about,
17   announce its location and availability.  And that's also very
18   common in networks.  In other words, the computer connects and
19   says, "Okay.  Here I am.  Push me data."  So you don't -- it's
20   not hard to find.  That's not the challenge.  Otherwise, we'd
21   never worry about that in any forensics case.  And we worry
22   about it in every forensics case.
23   Q    And SIM card aside, talking about wi-fi, when you say
24   "connecting to open wi-fi," you mean something without a
25   password.

BLANK – Cross (by Mr. Chun)

1  A    Yeah, I think that it's -- in my opinion, and there might

2  be someone who would disagree with me -- I think that the

3  default settings are going to be always:  You're only going to

4  connect to either open or trusted networks, and you're not

5  going to try to bust into an unknown, non-open network, that

6  you don't have a password to.

7  Q    And so that would exclude places like coffee shops that

8  have the password "Island Coffee"?

9  A    That would -- yeah, that would not be an open network, so

10 that would exclude any non-open network, yes.

11 Q    And it would exclude a hotel that makes you agree to terms

12 and services?

13 A    I don't -- I just can't answer.  I don't know.  It would

14 exclude any network that was not open, any wandering wi-fi

15 thing you can't connect to.  I totally agree with that.  We've

16 all experienced that.

17 Q    It needs a completely unprotected wireless network.

18 A    Well, it needs either a network -- on the wireless only.

19 We're not talking the SIM side -- either a wireless network

20 that it has connected to before, because it knows it will

21 reconnect, or it needs an open network.  I don't think that --

22 "open" and "unprotected" are not the same, but just "open"

23 meaning not password protected.

24 Q    And so your fourth theory about this computer was remotely

25 accessed by someone, you're stating that they planted evidence

BLANK – Cross (by Mr. Chun)

1   on it?

2   A    No, I'm not saying that.

3   Q    Now, your theory is that this computer remotely connected,

4   whether through SIM card or wi-fi.  That's your fear; correct?

5   A    Well, I mean, I guess you're using those two things

6   interchangeably.  It's my fear.  I don't think it's my theory.

7        I don't know what happened to this computer.  The reason I

8   give so many examples of issues that could have happened with

9   the computer is because I don't know.  And therefore, in my

10  opinion, the evidence is unreliable.  So the "fear" part, I

11  agree with you.  But this theory that, or this theory that, I

12  don't know.  I'm only working with the data the government gave

13  me.

14  Q    Isn't that what a theory is?

15  A    A fear?

16  Q    A theory is.

17  A    I'm -- I'm saying you're asking me a question where you're

18  saying the theory and the fear, as if they mean the same thing.

19  And to me, they mean two different things.

20        THE COURT:  Members of the jury, if you'd like to

21  stretch, please feel free to do so.

22  BY MR. CHUN

23  Q    Handing you -- do you recognize that?

24  A    I do.

25  Q    What is it?

BLANK - Cross (by Mr. Chun)

1   A     This is a report I created March 1 of this year, about my

2   analysis of the laptop.

3             MS. SCANLAN:  Do we have an exhibit number for this?

4             MR. CHUN:  And, Your Honor, the government would like

5   to mark this as Government Exhibit 22.

6             THE COURT:  All right.  Please continue.

7   BY MR. CHUN

8   Q     Mr. Blank, is that your report of your forensic

9   examination of defendant's laptop?

10  A     Yes, it is.  Yes, it is, to that point.  I mean, I did

11  some more work later.  But, yes, up to March 1, yes.

12  Q     That's where you put forth your -- the possibilities that

13  the agent logged in, or a hacker, or a remote connection

14  occurred?  Is that that report?

15  A     Yes.  That's where I was trying to come up with my

16  explanation for the thousands and thousands of access dates and

17  some of the possibilities associated with that, yes.

18  Q     Now, could you tell me the page number in your report

19  where you examine the forensic artifacts for last network

20  connection?

21  A     Is that in my report?

22  Q     That's what I'm asking you.

23  A     Oh, no.  I think all of that work occurred afterwards.

24  Q     So in writing your report, a theory that somebody may have

25  logged into this computer, you didn't actually look to see what

BLANK – Cross (by Mr. Chun)

1  the network connections showed?

2  A    I have looked at the network connections.  And honestly, I

3  don't remember if I looked at them before or after this report.

4  So I don't know.

5  Q    So you wrote the report without ever even looking at it on

6  the computer; is that your testimony?

7  A    Well, I think I made these possibilities.  And then I was

8  asked to continue working in order to determine whether or not

9  I could rule in or rule out these possibilities.  That's when I

10  would look at all these logs, and so forth.

11  Q    So you wrote the report about these theories without ever

12  even looking for the forensic artifacts on the laptop?

13  A    I think that's –– when you say "without ever," I mean, so

14  it's clear, that I did explore these theories later.  But did I

15  do this report on, I think, about –– I mean, I think I went

16  through this at the hearing.  I have a very good reason for

17  that.  So, yeah, you are correct.  I had a very good reason for

18  that.

19  Q    So your answer now is, you wrote this report about this

20  laptop without looking at the forensic artifacts for network

21  connections on the laptop.

22  A    And my answer is, that is correct, and I had a very good

23  reason for that.

24  Q    And the computer does have numerous places where it would

25  log the last connection; right?

BLANK – Cross (by Mr. Chun)

1    A    One hopes.  They're not infallible; but, yes.

2    Q    And as we talk about your report, on the last page, is

3    that your signature?

4    A    Yes.

5    Q    And so you made these conclusions about the laptop without

6    even looking at the forensics on the laptop.

7    A    Well --

8              MS. SCANLAN:  Objection.  Asked and answered.

9              THE COURT:  That's sustained, Counsel.

10             THE WITNESS:  Ask me.

11             THE COURT:  Sir, there's no question before you.

12        Next question?

13             MR. CHUN:  Yes, Your Honor.

14    BY MR. CHUN

15    Q    And you're aware that the network profile registry key

16    within the software registry hive shows the last connection?

17    A    Yes.

18             MR. CHUN:  I apologize, Your Honor.

19        May I approach, Your Honor?

20             THE COURT:  You may.

21             MR. BROWNE:  Counsel, are those exhibit numbers?

22             MR. CHUN:  It appears the paralegal labeled each one

23    for a specific person.

24    BY MR. CHUN

25    Q    Showing you what's been marked as Exhibit 18.1, isn't that

BLANK - Voir Dire (by Ms. Scanlan)

1   the network profile registry key from defendant's laptop?

2   A    Sorry.  In the book or on the screen?

3   Q    Either/or.  And that would be a two-page exhibit.

4   A    I see it.

5            THE COURT:  Counsel, is there a question?

6            MR. CHUN:  Yes, Your Honor.  I'll repeat it.

7   BY MR. CHUN

8   Q    Is that the network registry key within the software

9   registry hive from the defendant's laptop?

10  A    I believe so, yes.

11           MR. CHUN:  Your Honor, the United States moves to

12  admit Exhibit 18.1.

13           THE COURT:  Any objection?

14           MS. SCANLAN:  May I inquire?

15           THE COURT:  You may.

16                    VOIR DIRE EXAMINATION

17  BY MS. SCANLAN

18  Q    Mr. Blank, did you create this exhibit?

19  A    I did not.

20  Q    Do you know, then, whether this is actually the network

21  registry key for that laptop?

22  A    No, I don't.  I'm just trying to be cooperative.

23           MS. SCANLAN:  I would object to the admission of this

24  exhibit through this witness.

25           THE COURT:  Sustained, Counsel.

BLANK – Cross (by Mr. Chun)

1          Next question?

2                          CROSS EXAMINATION

3    BY MR. CHUN

4    Q    Earlier you testified, after writing your report, you went

5    back and looked at the forensics on the computer; correct?

6    A    Well, I don't think it's fair to say I didn't do any

7    looking at forensics on the computer.  You asked me did I look

8    at logs at the time of the report.  I told you that I had not,

9    for a good reason.  Those, I did look at later, yes.

10   Q    Do you recognize this log?

11   A    Well --

12              MS. SCANLAN:  I'm going to object.  This has not been

13   admitted.  It doesn't appear that it's going to be.

14              THE COURT:  The Court hasn't made that determination,

15   Counsel.  He's inquiring as to whether or not he had made a

16   subsequent determination in later reviewing.

17        So that objection is overruled.  The witness is permitted

18   to answer the question.

19              THE WITNESS:  I don't -- I don't -- I don't think

20   that it's not.  But I do about five computers a month, and I

21   can't tell.  I can't tell you.  I don't doubt what you're

22   saying, but I can't say that I recognize it.  I don't recognize

23   it and -- I just don't.  I can't say any more than that.

24   BY MR. CHUN

25   Q    Showing you 18.2, is that the network profile operation

BLANK - Cross (by Mr. Chun)

1    event log from the defendant's laptop?

2    A    My answer would be the same.  I mean, I don't doubt what

3    you're telling me, but how -- I don't know.

4    Q    And the network profile operation event log would log the

5    last network; correct?

6    A    Not necessarily.  They're not infallible.  They may be

7    instructed not to log it.  Sometimes computers want to forget

8    the network, because they don't want to connect automatically,

9    so they'll change the network log so that it forgets the login

10   that's normally done.  So the answer is, no.

11   Q    Showing you 18.3, isn't that the WLAN autoconfig

12   operational event log from the defendant's laptop?

13   A    I mean, you tell me.  So I want to -- I'm giving you the

14   same answer, which is, I don't doubt what you're telling me,

15   but I don't know.  There's not enough information on here for

16   me to tell that, one way or another.

17   Q    Mr. Blank, did you review evidence before testifying -- or

18   before coming to testify here today?

19   A    No.  Well, that's actually -- of course, I did, but not

20   recently, if that's what you mean.

21   Q    And you didn't review the forensic artifacts on the

22   defendant's laptop?

23   A    Not since our hearing in June.

24   Q    And showing you what's already been admitted,

25   Exhibit 13.47, do you recognize that as the software registry

BLANK – Cross (by Mr. Chun)

1   hive key for cellular connections?

2   A    It doesn't look like that to me.

3        Am I looking at the right one?

4   Q    Could you just go ahead and read what it says, on the

5   right side?

6   A    Yeah.  This is not a format that I look at this stuff in.

7   That says, type:  "Reg_SZ"; and the data:  "MegaFon RUS."

8   Q    And do you see the date that it says it was last

9   connected?

10  A    I do.

11  Q    And what would that date be?

12  A    Tuesday, 17 June 2014.

13  Q    And that's before the defendant was arrested; correct?

14  A    That's my understanding, yes.

15  Q    Now, going back to that March 1 report that you wrote,

16  could you please show me the forensic artifacts you listed in

17  there for the last time a person logged into the computer?

18  A    So, I mean, relying on that information from the wireless

19  log?  That's not referenced in this report, for a good reason.

20  Q    Does your March 1 report indicate any forensic artifacts

21  showing the last time a user logged on to it?

22  A    I don't believe so, no.

23  Q    It doesn't list any?

24  A    I'm sorry?

25  Q    It doesn't list any artifacts?

BLANK – Cross (by Mr. Chun)

1    A    Showing login, I don't think so.

2    Q    But a computer does keep track of that; correct?

3    A    A computer does keep all kinds of logs, yes.

4    Q    And you didn't think it was important to put that in your

5    report?

6    A    I think it was very important to put in my report.  I

7    think it's something that should go in every report, whenever

8    possible.  And so -- that's my answer.

9    Q    If you could flip to Government Exhibit 18.6.

10   A    Okay.  I'm there.

11        MR. CHUN:  One moment, Your Honor.  I apologize.

12   BY MR. CHUN

13   Q    Moving on from that exhibit, showing you what's been

14   marked as Government Exhibit 18.11, do you recognize that as a

15   system resource user manual from the defendant's laptop?

16   A    No.  I've never seen this document before, in paper.

17   Q    So you've never seen the SRUM logging activity from

18   defendant's laptop?

19   A    I've never seen the SRUM in paper.  I've looked at it on

20   the screen, but I didn't -- I'm kind of a paper conserver, and

21   I didn't print it out.  So I don't recognize the document.  And

22   that's my answer.

23   Q    Does the paper record the activities indicated on the

24   screen that you saw it on?

25   A    The SRUM log is kept in a different format.  If this is

BLANK – Redirect (by Ms. Scanlan)

1    SRUM data, and I have no reason to doubt that it is, someone

2    has very nicely compressed it and put it into a nice format,

3    where it fits on the pages, which is a nice thing to do, but it

4    means it looks different than a SRUM log that I would see.

5    Q    And earlier you had testified that you had spent about 250

6    hours on this case?

7    A    Yes.

8              MR. CHUN:  No further questions, Your Honor.

9              THE COURT:  Redirect?

10                        REDIRECT EXAMINATION

11   BY MS. SCANLAN

12   Q    You were asked some questions about how long it takes to

13   get a search warrant; do you recall that?

14   A    Yes.

15   Q    Have you ever gotten a search warrant in less than 23

16   days?

17   A    Yes.

18   Q    Have you ever gotten a search warrant in less than two

19   hours?

20   A    Yeah.  There's always somebody on call.  You wake some

21   poor judge up at 2:00 in the morning, and get a search warrant

22   in 30 minutes.

23   Q    And then there was a lot of questions about whether this

24   system -- the operating system would create certain files; do

25   you recall that?

BLANK – Redirect (by Ms. Scanlan)

1    A    Yes.

2    Q    So we looked at some examples of that, right, up on the

3    screen, different files, and then there was questions about

4    whether the operating system could create those files?

5    A    Right.

6    Q    Are you saying somewhere that this computer operating

7    system created these files?

8    A    No, I'm not saying that.

9    Q    And is an operating system creating a file the same as a

10   file being sent to a computer?

11   A    No.

12   Q    Is it possible that a computer that is not protected in a

13   Faraday enclosure, and has this radio connectivity, wireless

14   connectivity, is receiving files?

15   A    Of course; or file changes to the files already on there,

16   or sending files off, and all that kind of activity.  When we

17   receive an e-mail, we don't say the operating system created

18   the e-mail.  We say it received it through a wireless

19   connection.

20   Q    But to be clear, are you saying that that definitely

21   happened in this case?

22   A    No, I'm not.  I don't -- I don't know what definitely

23   happened.  My focus has been, okay, from a computer forensics

24   standpoint, we have rules.  And the rules were broken here.

25   Don't trust this data, because all kinds of things could have

BLANK – Redirect (by Ms. Scanlan)

1    happened.  And I stand with the -- you know, the head of the

2    FBI, saying, "Look, under these circumstances, you can't tell

3    whether something has happened or not."  And that's -- I think

4    he's totally right.  I agree with him.  I think the computer

5    forensics world agrees with him.  And so I consider this to be

6    unreliable.

7    Q    Was the SIM card on this computer discovered by the Secret

8    Service, with the arrow, before or after you wrote your report?

9    A    After.

10   Q    Did you start looking into the possibility of that radio

11   network connection before or after the Secret Service found the

12   SIM card with the arrow?

13   A    I just -- I don't remember.  I remember it being, like,

14   one of the possibilities that was discussed, but I don't

15   remember.

16   Q    So you were asked questions about different logs, and SRUM

17   journals, and that kind of thing; do you remember that?

18   A    Yes.  I'm sorry.  I just remembered that.

19        So the -- no, the SIM -- the whole SIM issue was a big

20   deal from the beginning.  Because this computer, when it came

21   out, that was kind of touted, this whole Connected Standby, use

22   it for stuff.  So the possibility of SIM was a concern from the

23   beginning.  So I'm going to change my last answer.

24   Q    Okay.  So the SIM card was a concern from the beginning.

25        But to your knowledge, in March of 2016, when you wrote

BLANK - Redirect (by Ms. Scanlan)

1   this report, did you know that this computer had a SIM card?

2   A    No.

3   Q    And had you examined the actual computer at that point, in

4   March?

5   A    Yes, I -- I had not examined the actual computer at that

6   point, no.

7   Q    Do you have the computer there now?

8   A    I think so.  I mean -- I don't mean to be difficult.

9   Again, a computer was handed to me.  I guess I'm just believing

10  it's the computer.

11  Q    Have you got that exhibit -- Exhibit 12.8, do you have

12  that, in your hands?

13  A    Yes.

14  Q    Are you looking for the exhibit sticker?

15  A    No, just looking at it.

16  Q    Is that the first time that you've actually handled that

17  computer?

18  A    Yes.  Sorry.  I'm sorry.  Go ahead.

19  Q    So the -- we had all these -- moving on to the logs; okay?

20  A    Yes.

21  Q    You were asked questions about different logs and this

22  journal thing, and whether there was information in it; right?

23  A    Yes.

24  Q    And when you saw on this exhibit -- did you see on the

25  exhibit when they were pointing out the last connection was

BLANK – Redirect (by Ms. Scanlan)

1    June 17; do you recall that?

2    A    Right -- okay.  Yes, is that -- I'm not sure that's the

3    right date.  But, yes, the -- yes.

4         The one with the MegaFon on it?

5    Q    Right.  Was the connection date before the laptop was

6    seized?

7    A    It's kind of a giveaway that there was a SIM card, the

8    fact that the connection refers to a telecom company.

9         Sorry.  What was the question?

10   Q    Was that connection date before it was seized on July 5?

11   A    Yes.

12   Q    That log that you were looking at -- and we've talked

13   about this before, but I just want to be clear with that

14   specific example -- is that something that can't be changed?

15   A    Oh, it can absolutely be changed.  It is, in many ways, as

16   difficult to change as a Word document, or WordPad, or, you

17   know, notebook-type document.  It is just lines of plain text

18   that you can edit to your heart's content with an editor tool,

19   and editor tools are widely available.  And it's done for --

20   it's not just hackers that have these things.  It is done for

21   legitimate reasons, for administrative purposes.

22   Q    So the fact that that exhibit shows the last connection

23   date before July 5, does that tell you that this information on

24   this computer is reliable?

25   A    No.  The -- absolutely not.  So does that mean that I

BLANK – Re-Cross (by Mr. Chun)

1  should say, "Okay.  Well, therefore, no more investigation is

2  necessary, because, look, a log says the last connection was

3  prior to July 5"?  That would be terrible work on my part.

4  Absolutely, that does not change the reliability question.

5        In fact, given that it has Connected Standby, it has a SIM

6  card, you have to wonder why is that the last connection?  I

7  mean, it really last connected weeks before July 5?  That's

8  odd.  So it makes me question the log even more.

9              MS. SCANLAN:  I have nothing further, Your Honor.

10             THE COURT:  Further cross?

11             MR. CHUN:  Yes, Your Honor.

12             THE COURT:  How much do you have, Counsel?

13             MR. CHUN:  Maybe about five minutes, Your Honor.

14             THE COURT:  All right.  Let's go ahead and finish

15  this witness.

16             MR. CHUN:  Yes, Your Honor.

17                       RE-CROSS EXAMINATION

18  BY MR. CHUN

19  Q    Just to be clear, you're not saying that the director of

20  the FBI told you that the forensics of this laptop were

21  unreliable; right?

22  A    He was speaking of another computer, correct.

23  Q    And even though you didn't know this laptop had a SIM

24  card, you knew it had wi-fi; yes?

25  A    Yes.  You can't have Connected Standby without a way to be

BLANK – Re-Cross (by Mr. Chun)

1   connected.

2   Q    So there was still a reason to look for network

3   connections?

4   A    Yeah.  And I did.

5   Q    Did you ever ask to come and look at the laptop?

6   A    Yes, I did.  I wanted to run a bunch of hardware tests on

7   it.

8   Q    And another individual with the defense team came and

9   looked at it; correct?

10  A    That's my understanding, yes.  But to be clear, not anyone

11  from my shop.

12  Q    You can alter access dates also; true?

13  A    Yes.  And, in fact, a lot of programs that we use every

14  day actually do change the access dates.  They just change them

15  back, at the end, so that it looks unchanged.  But the actual

16  mechanism is access date gets changed, something happens,

17  access date gets changed back.

18  Q    You can purposefully alter those, also.

19  A    Yeah, that's true.

20  Q    And so what you're saying is that the log files could have

21  been altered.

22  A    Yeah.  Of course they can, yes.

23  Q    The few log files that connect to –– that show wi-fi

24  connections.

25  A    Yeah, I think they absolutely could be, yes.

BLANK - Re-Cross (by Mr. Chun)

1    Q    And same with the SIM card?

2    A    What do you mean by that?  The SIM card --

3    Q    The log with the SIM card, that would indicate the use of

4    a SIM card.

5    A    Yeah.  I think that shows up on this computer as part of

6    the wireless connection log.

7    Q    So you believe somebody could have gone back and altered

8    those, but wouldn't have bothered with 3,000 access dates?

9    A    That's the trick in computer forensics.  If you catch one

10   little mistake, because people aren't perfect about making

11   changes, then it makes -- and that's exactly -- you've just

12   told me the reason why we have all these protections in

13   computer forensics, because people do try to change stuff all

14   the time.  And you only get little pieces of clues that it's

15   been changed.  And that's why, then, okay, what else was

16   changed?  Who knows?  Because they could have gone and done a

17   lot of other stuff.  You just don't know.  So that's why, when

18   you find unexplained, suspicious items, you have to mistrust

19   the whole thing.  And that is really lesson number one in

20   computer forensics.

21   Q    And the 3,000, they would have missed; but the few, they

22   didn't?

23   A    Well, how do you know it's a few?

24   Q    The few log files.

25   A    Oh, if you're just going to change log files, there are

BLANK – Re-Cross (by Mr. Chun)

1   routines that you can just -- that will address just log files.
2   So that could just be one project, really, is to change log
3   files, if that's what you want to do.
4   Q    And isn't it true that the last time the MegaFon network
5   was connected to was in June, is possibly because that was the
6   last time it was connected to?
7   A    But my testimony is that, in my opinion, I don't trust or
8   rely on that log file that you're referring to.  So I don't
9   agree that we can agree that that was the last connection.
10               MR. CHUN:  No further questions, Your Honor.
11               THE COURT:  Further redirect?
12               MS. SCANLAN:  No, Your Honor.
13               THE COURT:  Any objection to this witness being
14   excused, on behalf of the defense?
15               MS. SCANLAN:  Yes.
16               THE COURT:  You are objecting?
17               MS. SCANLAN:  I am.
18               THE COURT:  You're not excused, sir.  You may be
19   subject to recall.
20        Members of the jury, we'll take our afternoon recess.  And
21   to make sure that you have a full afternoon recess, we'll
22   resume at 1:40 this afternoon.  Have a good lunch.
23                    (Jury exits the courtroom)
24               THE COURT:  Please be seated.
25        Counsel for the defense, what's the next step for your

1    case?

2         MS. SCANLAN:  Your Honor, the defense will rest.

3         THE COURT:  And, Counsel, I just want to inquire to

4    ensure the defendant understands that he has a constitutional

5    right to testify.

6         Mr. Seleznev, I want this to be interpreted.  I know that

7    you waived the opportunity for some portion, significant

8    portion of the trial, but I want to make sure you understand,

9    so the interpreter is going to be doing a word-for-word

10   translation.

11        Sir, I want to make sure that you understand that at this

12   point in the case you have the right to testify.

13        Do you understand that, sir?

14        THE DEFENDANT:  I understand.

15        THE COURT:  And have you had the opportunity to

16   consult with counsel regarding your right to testify in this

17   case?

18        THE DEFENDANT:  Yes, I did.

19        THE COURT:  And based upon your communication with

20   your lawyers, is it your desire that you wish to waive your

21   right to testify in this case?

22        MR. BROWNE:  I think the word "waiver" is -- may I

23   just --

24        THE COURT:  Certainly.

25        MR. BROWNE:  Your Honor, may I -- we've had this

1  discussion numerous times with my client.  And I think he's

2  choosing not to testify.  He knows he has an opportunity to.

3           THE COURT:  I'll rephrase it, Mr. Seleznev.

4  Disregard the last question about waiving.

5       You have the opportunity to testify in your case.

6       Do you understand that?

7           THE DEFENDANT:  Yes, I do.

8           THE COURT:  And you understand that you would have

9  the right to get on the witness stand, be placed under oath,

10  the same as all the other witnesses, and provide testimony on

11  your own behalf.

12       Do you understand that, sir?

13           THE DEFENDANT:  Yes, I do.

14           THE COURT:  And have you discussed your right to

15  testify in this case with your lawyers?

16           THE DEFENDANT:  Yes, I have.

17           THE COURT:  And have you elected not to testify in

18  this case, after conferring with your lawyers?

19           THE DEFENDANT:  Yes, I have.

20           THE COURT:  Is anyone forcing you to make that

21  decision?

22           THE DEFENDANT:  No.

23           THE COURT:  Is that a decision that you reached based

24  upon your own conclusion that you wish not to testify?

25           THE DEFENDANT:  Yes.

```
 1              THE COURT:  So no one's pressuring you in any way?

 2              THE DEFENDANT:  No.  No one is pressuring me.

 3              THE COURT:  Has anyone promised you anything if you

 4    don't testify?

 5              THE DEFENDANT:  No.

 6              THE COURT:  Counsel, are you aware of any reason why

 7    the Court should not make a determination that your client is

 8    knowingly, intelligently, and voluntarily waiving his right not

 9    to testify in this case?

10              MR. BROWNE:  No, Your Honor.

11              THE COURT:  All right.  Counsel, the defense will

12    necessarily have to rest their case in front of the jury,

13    obviously, after lunch.

14         And counsel for the government, will you be putting on

15    rebuttal testimony?

16              MR. BARBOSA:  Yes, we will, Your Honor.

17              THE COURT:  And the witness that will be providing

18    rebuttal testimony?

19              MR. BARBOSA:  Ovie Carroll.

20              THE COURT:  Then if nothing further, anything to

21    bring up, by the defense?

22              MR. BROWNE:  No, Your Honor.

23              THE COURT:  By the government?

24              MR. BARBOSA:  No, Your Honor.

25              THE COURT:  We'll be in recess.  We'll see you at
```

CARROLL – Direct (by Mr. Chun)

1    1:40 this afternoon.

2                        (Recess)

3                   (Jury enters the courtroom)

4         THE COURT:  Counsel for the defense?

5         MR. BROWNE:  Yes, Your Honor.  The defense rests.

6         THE COURT:  Counsel for the government, any rebuttal

7    evidence or testimony?

8         MR. CHUN:  Yes, Your Honor.  The United States calls

9    Ovie Carroll.

10        THE COURT:  Please have him step forward.

11        THE CLERK:  Please raise your right hand.

12        OVIE CARROLL, having been duly sworn, was examined and

13   testified as follows:

14        THE CLERK:  If you could please state your first and

15   last names, and spell both for the record.

16        THE WITNESS:  First name is Ovie, O-V-I-E, and the

17   last name is Carroll, C-A-R-R-O-L-L.

18        THE COURT:  You may inquire.

19                       DIRECT EXAMINATION

20   BY MR. CHUN

21   Q    Mr. Carroll, how are you employed?

22   A    Currently the senior executive for the Department of

23   Justice, in charge of the cybercrime lab.

24   Q    And how long have you held that position?

25   A    Ten years and eight months.

CARROLL - Direct (by Mr. Chun)

1    Q    And what do you do in that position?

2    A    I'm in charge of the Department's cybercrime lab that

3    consults with all prosecutors across the country on high-level,

4    high-technology cases.

5    Q    And what did you do before that?

6    A    Before that, I was a special agent in charge of the

7    Technical Crimes Unit for the Postal Inspector General's

8    Office.  And there we did all the intrusion cases, computer

9    hacking, any high-level computer forensics.  And then I was

10   also in charge of the technical services section, which was the

11   body wires and covert cameras.

12   Q    And how long were you there for?

13   A    Five years.

14   Q    And before that?

15   A    Before that, I was special agent in charge of the

16   Air Force Office of Special Investigations, Washington Field

17   Office, where we did all the computer hacking or computer

18   intrusion cases across the world that affected any Department

19   of Defense or Air Force matters.

20   Q    And in your current role, you just said you were a senior

21   executive; is that right?

22   A    That's correct.

23   Q    What does that mean?

24   A    Well, that's -- my pay grade is senior executive, and I'm

25   the senior adviser to Department of Justice officials.  When

CARROLL - Direct (by Mr. Chun)

1    the Attorney General or Deputy Attorney General have a

2    high-technology case, and they need to understand the

3    technology, or have a question about it, I'm their senior

4    adviser inside the Department of Justice.

5    Q    What training have you received to become a forensic

6    examiner?

7    A    I started 20-plus years ago in the Air Force.  They were

8    standing up the first-ever computer forensics operations for

9    any federal law enforcement agency.  And I had done some

10   computer work that they felt I was skilled to do it, and they

11   asked me to be one of the first people to stand up this agency.

12   Q    And, I guess, over your career, have you received other

13   training?

14   A    Yes.  I receive training yearly from a number of places,

15   to include vendor training, the SANS Institute, any of the

16   computer forensics training courses that are out there.

17   Q    And do you teach any computer forensic courses, yourself?

18   A    I do.  I teach computer forensic courses, both inside the

19   Department of Justice, as well as outside.  On the outside, on

20   a part-time basis, I'm an adjunct professor for the past eight

21   years with George Washington University, where I teach in their

22   master's program for high-technology crime.  I also am a

23   certified instructor and a coauthor for the SANS Institute for

24   a course called Advanced Windows Forensics Investigations.

25   Q    Sorry.  What is the SANS Institute?

CARROLL – Direct (by Mr. Chun)

1    A    The SANS Institute is a training organization that teaches

2    internationally all types of computer courses.  They started

3    years ago with security audit networking.  And over the past 15

4    or so years, they've expanded -- or 20 years, they've expanded

5    into computer forensics, hacking, WIPAC, penetration testing,

6    all types of computer-related courses.

7    Q    Are you a part of any professional organizations?

8    A    I am.  I am the -- on the federal advisory board for the

9    Organization of Scientific Area Committees.  I'm the task

10   chair, the task group chairman, for the Digital Evidence

11   Committee.  I'm also on the Scientific Working Group on Digital

12   Evidence Committee.

13   Q    And do you have any role with vendors of forensic tools?

14   A    I do.  I am one of -- on several federal advisory boards

15   for the large forensic tool software vendors, such as

16   AccessData, Magnet Forensics, et cetera.  And they routinely

17   will come to me, or bring me in, and show me new developments

18   that they're doing on their tools, ask what it is that the

19   community needs, where they can improve their product, et

20   cetera.  And this is an unpaid role.

21   Q    What tools does AccessData make?

22   A    They make several, but their primary tool is a tool called

23   FTK.  It stands for Forensics Toolkit.  That's one of the two

24   primary tools in the forensics community.  They also make FTK

25   Imager.  They have network monitoring tools and appliances that

CARROLL - Direct (by Mr. Chun)

1   they can put out there for intrusions.  They have mobile

2   forensics.  They have a number of tools.

3   Q    Now, in your career as a forensic examiner, how many

4   computers have you reviewed?

5   A    Hundreds or thousands in the last 20-plus years.

6   Q    And how many of those ran a Microsoft Windows operating

7   system?

8   A    I'd say in the mid-'90s, I think 90 percent of what we see

9   in the lab, over the last 20 years, have been some variant of

10  Windows, from Windows XP up through Windows 10.  We're starting

11  to see more Macs now.  But predominantly, it's been Windows.

12  Q    Would that include Windows 8?

13  A    Yes.

14  Q    And variations of Windows 8?

15  A    Absolutely.

16  Q    And that would include 8.1 or professional versions of 8

17  or 8.1?

18  A    Both the consumer versions, as well as the professional

19  versions of Windows XP, Windows 8, 8.1, and 10.

20  Q    Do you also teach classes on Windows 8 or variations of

21  it?

22  A    I do.  I teach that for both the Department of Justice, as

23  well as the SANS Institute and George Washington University.

24  Q    Did you review an image of defendant's laptop hard drive

25  in this case?

CARROLL – Direct (by Mr. Chun)

1    A    I did.

2    Q    And do you have, in your training and experience, an

3    opinion as to whether or not this -- someone would have

4    remotely logged into this computer after it was seized on

5    July 5?

6    A    I do have an opinion on that.

7    Q    What would that be?

8    A    There's no possibility that that happened.

9    Q    And how did you come to that opinion?

10   A    Well, by conducting an exam on the computer, Windows

11   computers, among other things, it records every network that

12   you ever connect to, when was the first time and when was the

13   last time.  And it has a number of different artifacts that

14   record what networks you connected to, sometimes the serial

15   number or the Mac address of the network that you received your

16   internet connection from.  And I reviewed all of the evidence

17   on the computer relating to what networks have been connected

18   to, and when, and this computer was not connected to any

19   network of any kind after July 5.

20   Q    Showing you what's been marked as Government Exhibit 18.1.

21   You have a binder up there, as well, if that's easier.

22   A    Okay.

23   Q    Do you recognize that?

24   A    I do.

25   Q    What is it?

CARROLL – Direct (by Mr. Chun)

1    A    It's a screenshot that I took.

2    Q    You created this yourself?

3    A    I did.

4    Q    Is it an accurate representation of the screenshot you

5    took?

6    A    Yes, it is.

7              MR. CHUN:  United States moves to admit 18.1.

8              MS. SCANLAN:  May I inquire?

9              THE COURT:  You may.

10                   VOIR DIRE EXAMINATION

11   BY MS. SCANLAN

12   Q    Mr. Carroll, this is a screenshot you took of what?

13   A    This is a screenshot that I took of the software registry

14   hive that came from the image of the defendant's computer.

15             MS. SCANLAN:  I have no objection.

16             THE COURT:  18.1 is admitted.

17                 (Exhibit 18.1 was admitted)

18                   DIRECT EXAMINATION

19   BY MR. CHUN

20   Q    Could you tell us, please, what we are looking at here?

21   I'm going to highlight that.

22   A    Sure.  So this is the network profiles registry key.  So

23   this is one of the forensic artifacts that tracks all the

24   networks that this computer ever connects to, when is the first

25   time it connected; when was the last time it connected, and how

CARROLL - Direct (by Mr. Chun)

1  it connected; did somebody plug in a network cable, or did they

2  connect over wireless network, et cetera.

3  Q    Could you tell us what the name of the last network was

4  called?

5  A    Yes.  The name of the last network was the Kanifushi.  You

6  see it highlighted here in blue.  Kanifushi was the last

7  network it was connected to.

8  Q    And going to Page 2 of the same exhibit, what are we

9  looking at here?

10 A    As you zoom in there, what you'll see is -- I'll let it

11 refresh.  There we go.  This, right here, is a 128-bit system

12 structure.  So this is a date, time, second, and millisecond of

13 the very first time that this computer ever connected to the

14 Kanifushi network.  And then the next line, the very last line,

15 is the very last time that this computer connected to the

16 Kanifushi network.

17        And what I did is, we have these programs -- this is a

18 program called DateDecode.  And this, right here, you'll see

19 that this shows the first time that that computer ever

20 connected.  You copy that 128-bit system structure, and that

21 shows you the first time that this system ever connected to the

22 Kanifushi network.

23 Q    And what date is that?

24 A    That was June 21, 2014, at 20:47.

25 Q    And what would be the next date shown there?

CARROLL - Direct (by Mr. Chun)

1   A     The next date is the last time it connected.  And you can
2   see that the last time this computer connected to the Kanifushi
3   network was July 3, 2014, at 21:55.
4   Q     And can you tell what type of connection it was connected
5   by?
6   A     Yes.  This, right here, you'll see, is a "NameType" value.
7   And this NameType value, right here, of 47, the hex value 47,
8   numerically 71, says that it connected over 802.11, or
9   wireless.
10  Q     So would that have shown something different had it been
11  a -- plugged in by a cable?
12  A     Sure.  If this would have plugged in through a network
13  cable onto the computer, that number would be 6.  So each way
14  that you connect to the internet, it has a different value.
15  Q     Would it have -- showing you what's previously been
16  admitted as 13.47, could you explain to us what we're seeing
17  here?
18  A     This is just another one of the network profiles registry
19  keys.  And this shows a different network.  The network name is
20  MegaFon RUS, as you can see right here.  And this shows the
21  first and then the last time that this computer connected to
22  the MegaFon RUS network, and how it connected.
23  Q     And looking at this, can you tell what type of connection
24  it was?
25  A     Yes.  As you can see right here, this shows 243, or hex

CARROLL - Direct (by Mr. Chun)

1    value F3, which shows that it was a cellular, or 3G/4G network

2    connection.

3    Q    And going to Page 2 of the same exhibit, what do we see on

4    Page 2?

5    A    This is the network profiles operational event log.  So

6    Windows keeps a number of event logs, and this one records the

7    networks, just another artifact that's duplicative of what we

8    just saw.  And it records every time you connect to a network.

9    Q    And showing you Page 3 of the same exhibit, what do we see

10   here?

11   A    This is an event log.  We call it Event ID 10001, which

12   shows this is the last time that it disconnected -- that this

13   computer disconnected from the MegaFon RUS network.  So this is

14   showing it successfully disconnected.

15   Q    And also showing you previously admitted Exhibit 12.9A,

16   and this being a travel record for the defendant, could you

17   just compare the dates here for the jury, please?

18   A    The dates -- okay.  Thank you.

19        So the date here is listed as June 18, 2014.

20   Q    And looking at Exhibit 12.9A, when did the defendant leave

21   Russia?

22   A    It appears June 16.  Or I'm sorry, June 21.  There we go.

23   The e-mail was on June 16.

24   Q    Now showing you what's been marked as Government

25   Exhibit 18.2, do you recognize that?

CARROLL – Direct (by Mr. Chun)

1   A    I do.  It's a screenshot of an event log that I captured.

2   Q    Is that an accurate copy of the screenshot you captured?

3   A    It is.

4          MR. CHUN:  United States moves to admit 18.2, Your

5   Honor.

6          MS. SCANLAN:  May I inquire?

7          THE COURT:  You may.

8                    VOIR DIRE EXAMINATION

9   BY MS. SCANLAN

10  Q    Mr. Carroll, this is a screenshot you captured of an event

11  log from what?

12  A    From the defendant's image of his computer.

13         MS. SCANLAN:  No objection.

14         THE COURT:  18.2 is admitted.

15              (Exhibit 18.2 was admitted)

16                    DIRECT EXAMINATION

17  BY MR. CHUN

18  Q    What are we looking at here?

19  A    Here, we're looking at the Windows network profile

20  operational event log.  And Event ID 10000 represents when this

21  computer connected to a network.  And this is showing it

22  connected to the Kanifushi network on June 27, at 11:26 a.m.

23  Q    And the name of that network, again?

24  A    The Kanifushi network.

25  Q    And showing you what's been marked as Government

CARROLL - Direct (by Mr. Chun)

1    Exhibit 18.3, do you recognize that?

2    A    I do.  It's another screenshot that I took of the event

3    logs from the defendant's computer.

4    Q    Is that a fair and accurate copy?

5    A    It is.

6              MR. CHUN:  United States moves to admit Exhibit 18.3.

7              MS. SCANLAN:  No objection.

8              THE COURT:  18.3 is admitted.

9                   (Exhibit 18.3 was admitted)

10   BY MR. CHUN

11   Q    Mr. Carroll, could you please explain what we're seeing

12   here?

13   A    Sure.  This, right here, is an Event ID 10001, which shows

14   when this computer disconnected from the Kanifushi network.  So

15   you can see on 7/5, recorded at 5:37 p.m., that this computer

16   disconnected from the Kanifushi network.

17   Q    And was that the last connection, or was there a

18   subsequent connection?

19   A    No, that was the last connection of this computer.

20   Q    And showing you what's been marked as Government

21   Exhibit 18.4, do you recognize that?

22   A    I do.  It's another screenshot of an event log that I took

23   from the defendant's computer.

24   Q    Fair and accurate copy?

25   A    It is.

CARROLL - Direct (by Mr. Chun)

1              MR. CHUN:  United States moves to admit 18.4.

2              MS. SCANLAN:  No objection.

3              THE COURT:  It's admitted.

4                   (Exhibit 18.4 was admitted)

5    BY MR. CHUN

6    Q    Now, what are we looking at here?

7    A    This is just another event log.  Windows has 60-plus event

8    logs.  This particular event log is for the wireless LAN

9    operational.  So this only has to do with networks that you

10   connect to wirelessly.  And this event log, 8003, shows that

11   the computer had successfully disconnected from the Kanifushi

12   network.  And that was recorded on July 5, at 5:37 p.m.

13   Q    We've now looked at several logs.

14        Based on these logs we've looked at so far, what would be

15   your opinion of whether or not this computer connected to any

16   networks after July 5?

17   A    There's clear evidence that this computer did not connect

18   to any network after July 5.

19   Q    Showing you what's been marked as Exhibit 18.5, do you

20   recognize this?  And this is a multipage exhibit, if you want

21   to flip through it in the binder, please.

22   A    I do.  This is another screenshot that I took of the

23   defendant's computer.  And specifically what we're looking at

24   is the Windows update log.

25   Q    Is this a fair and accurate copy of the log you --

CARROLL – Direct (by Mr. Chun)

1   screenshot you took?

2   A    It is.

3         MR. CHUN:  United States moves to admit Exhibit 18.5.

4         MS. SCANLAN:  May I inquire?

5         THE COURT:  You may.

6                      VOIR DIRE EXAMINATION

7   BY MS. SCANLAN

8   Q    Mr. Carroll, do you see the red highlighting boxes on this

9   exhibit?

10  A    I do.  Here at the bottom?

11  Q    There's one on the bottom of Page 1, and there's some just

12  sort of throughout this document?

13  A    Yes, ma'am.

14  Q    Did you add those to the screenshot?

15  A    I did.

16        MS. SCANLAN:  With that noted, I have no objection.

17        THE COURT:  18.5 is admitted.

18             (Exhibit 18.5 was admitted)

19        MR. CHUN:  Thank you, Your Honor.

20                      DIRECT EXAMINATION

21  BY MR. CHUN

22  Q    Mr. Carroll, could you please tell us what we're looking

23  at here, in highlight at the bottom?

24  A    Sure.  As I mentioned, this is the Windows update log.

25  And Windows -- anytime that you're running Microsoft Windows,

CARROLL - Direct (by Mr. Chun)

1    it's routinely reaching out to Microsoft to see if there are

2    any updates that your computer needs.  And this is the log that

3    tracks -- every time it reaches out to Microsoft to try to see

4    if there are any updates, it records the state of the computer

5    and whether or not it was successful in reaching Microsoft.

6    Q    Looking at Page 2 of this exhibit, you have marked it with

7    a red box.

8         Could you please explain what we see here?

9    A    Sure.  I drew this red box around it to draw attention,

10   for the prosecutor, that this is the last instance in which

11   this computer reached out to check for updates with Microsoft

12   and had a network connection.  What you'll see right here is,

13   it says the network state is "connected."  And that was all, as

14   you can see right here, on July 5.  And this is a multipage

15   log.  And I looked through the entire log, and this is the very

16   last time that this computer had any network connection to

17   reach out to Microsoft.  All the subsequent entries in this log

18   shows that it reached out, and it did not have a network

19   connection; that the network state was disconnected.

20   Q    And turning to Page 3, what is the -- what have you

21   indicated there?

22   A    This red box here just indicates that, when it reached out

23   at 21:37, on July 5, that the network state was disconnected.

24   And again, throughout the rest of this log, every instance that

25   it tried to reach out to Microsoft, it recorded that it had no

CARROLL – Direct (by Mr. Chun)

1   network connection.

2   Q    And going to the last page of that exhibit, what do we see

3   there?

4   A    This is just the last entry in that log, saying that the

5   network connection was not detected.  Again, it tried to reach

6   out to Microsoft to see if there were any updates, and it just

7   has no network connection.

8   Q    And so looking at the first log, on July 5, and then all

9   the way to the end, what does that tell you?  What does that

10  exhibit tell you about the network connection?

11  A    Well, it just corroborates all the other forensic

12  artifacts that said this computer had no connection to the

13  internet after July 5.

14  Q    And that would be true to the end of the date that was

15  recorded?

16  A    Correct.

17  Q    And were there any logs after that?

18  A    After July 5?

19  Q    No, after the last page of the exhibit we just saw.

20  A    No.  That was the last log of that particular Windows

21  update log.

22  Q    Showing you what's been marked as Government Exhibit 18.6,

23  do you recognize that?

24  A    I do.  It's a screenshot that I took from the defendant's

25  computer.

CARROLL - Direct (by Mr. Chun)

1   Q    Fair and accurate copy?

2   A    It is.

3           MR. CHUN:  United States moves to admit 18.6, Your

4   Honor.

5           MS. SCANLAN:  No objection.

6           THE COURT:  It's admitted.

7                 (Exhibit 18.6 was admitted)

8   BY MR. CHUN

9   Q    And what are we looking at here?

10  A    This is an interesting log that Microsoft created in

11  Windows -- started using in Windows 8.  And it's called the

12  system resource usage monitor.  And what it's doing, it's

13  primarily designed for diagnostic purposes.  And it's

14  recording -- what you're seeing here is every application on

15  this computer that's running and who's responsible, what user

16  is responsible.  This is the user that's responsible for

17  running that application.  And then it shows here how it

18  connected to the internet.  And in this case, 802.11 is our

19  wireless connection.  And it tells what wireless network it was

20  connected to, which is the Kanifushi.  And then for each

21  application, it shows how much data came into the computer and

22  how much data left the computer.

23  Q    And what does the last -- last line of activity here on

24  this report tell you about the computer's connection to a

25  network?

CARROLL - Direct (by Mr. Chun)

1   A    The last network that it connected to, again, was the

2   Kanifushi network.  And it shows no connectivity after July 5.

3   Q    And the second page of this exhibit, what are we looking

4   at here?

5   A    This is the -- another table in that database called the

6   system resource usage monitor.  And this one is specifically

7   the network connectivity database.  And this, again, shows the

8   network that this computer was connected to, anytime it was

9   connected to a network.  And when that network connection

10  started is this last line; and then the connection time, how

11  long it was connected to that particular network.

12  Q    And what is the date and time of the very last connection

13  there?

14  A    The last connection is, again, on July 5, 2014, at 17:38.

15  Q    And comparing that to the second page of Exhibit 18.1,

16  what do we see how the times compare?  We'll zoom out in a

17  second.

18  A    Okay.  So this shows that the last time that this network

19  connection was established was July 5, at 17:55.  And if you go

20  to the other exhibit, remember I told you that this entry is

21  also the last time.  And here, you see that the last time was

22  21:55.  This is the difference between local time versus UTC,

23  or Greenwich Mean Time.  So this shows that both had the exact

24  same time, further just corroborates -- the nice thing about

25  Windows is, it records in multiple locations things that

CARROLL – Direct (by Mr. Chun)

1   happen.

2   Q     Do you know what "Connected Standby" is?

3   A     I do.

4   Q     What is it?

5   A     Connected Standby is a feature that was introduced in

6   Windows 8.  And it's really a software, but predominantly a

7   hardware feature.  It's on very few computers, right now,

8   because the computer itself has to actually have particular

9   components installed.  For instance, it has to have a low-power

10  RAM, DRAM.  This is the upper memory of the computer.  It

11  typically has to have a solid-state hard drive in Windows 8 or

12  8.1.  And it also has to have what they call "system-on-chip,"

13  so SoCs.  And these are chips that are on your computer

14  motherboard that basically can control certain things, like the

15  internet connection, and they're their own little environment.

16        And so Connected Standby allows a computer to go into --

17              MS. SCANLAN:  Objection.  Narrative.

18              THE COURT:  Let's ask a question, Counsel.

19  Sustained.

20  BY MR. CHUN

21  Q     What does a device need for it to have Connected Standby?

22  A     It has to have hardware components, to include solid-state

23  hard drive, system-on-chip hardware, and low-power DRAM, at a

24  minimum.

25  Q     Now, a computer on Connected Standby, will it connect to a

CARROLL – Direct (by Mr. Chun)

```
1   wireless network?

2   A    It can connect to previously known wireless networks.

3   Q    Will it connect to a previously unknown network?

4   A    No.  It's a security risk to connect to unknown networks.

5   Q    Having looked at the forensics on this laptop, do you have

6   an opinion as to whether this laptop would connect to an

7   unknown network?

8   A    This computer was configured not to connect to any unknown

9   network, only trusted networks.  That's the default setting.

10  Q    Showing you what's been marked as Exhibit 18.8, do you

11  recognize that?

12  A    I do.  It's a screenshot that I took from the defendant's

13  software registry hive.

14  Q    Fair and accurate copy?

15  A    It is.

16         MR. CHUN:  United States moves to admit 18.8, Your

17  Honor.

18         MS. SCANLAN:  No objection.

19         THE COURT:  18.8 is admitted.

20              (Exhibit 18.8 was admitted)

21  BY MR. CHUN

22  Q    What are we looking at here?

23  A    This is actually the registry entry, or the key, that you

24  could modify if you wanted your computer just to connect to any

25  open wi-fi.  And as you see, it's set as "default," which means
```

CARROLL – Direct (by Mr. Chun)

1   it will not connect to any open wi-fi.  If you wanted to walk

2   around, in a free Starbucks, with no password to connect, you

3   could change this entry, and that way your computer would

4   connect automatically.  But by default, these are set not to

5   connect to any untrusted or unknown network.

6   Q    And how is this computer configured?

7   A    As you can see, it's configured as "default."  It does not

8   connect to any untrusted, unknown network.

9   Q    Having gone through those exhibits, did you see any

10  forensic artifacts on this computer that indicated a wireless

11  connection after July 5?

12  A    Absolutely not.  There are no network connections after

13  July 5 at all.

14  Q    And does that tell you anything about the reliability of

15  evidence on this computer compared to its network activity?

16  A    Well, what it does is, it guarantees that there's no

17  chance that anybody could have remotely logged into this

18  computer, or manipulated the computer, because it had no

19  network connection.

20  Q    Now, how difficult would it be to change a log?

21  A    What kind of log?

22  Q    Let's just say one we saw earlier at 18.1, one of the

23  event logs.

24  A    To change the event log?  Well, you could possibly use

25  another program to edit the event log.

CARROLL – Direct (by Mr. Chun)

1   Q     And do you have an opinion as to whether or not this

2   computer has been tampered with to change all the forensic

3   artifacts relating to remote connections?

4   A     No.  There's absolutely no evidence to suggest that this

5   computer was manipulated in any way to change the artifacts, or

6   to do anything like that.

7   Q     And what brings you to that conclusion?

8   A     Well, there are a number of things.  As we just walked

9   through, you can see that every artifact is recorded in

10  multiple locations, registry entries, multiple event logs, et

11  cetera.  In addition to that, the event logs, although they

12  don't show on the screen, actually are recorded with a

13  sequential number.  So every single event log gets a sequential

14  number.  And that's how we can determine, if somebody changes

15  the date and time on their computer, the event logs will show

16  out of sequence with the date and time.  And so we've checked

17  the sequential numbering, and the integrity of all of the event

18  logs are intact, no tampering has been done.

19  Q     Did you also examine this laptop to see who the last user

20  logged in was?

21  A     I did.

22  Q     And showing you what's been marked as Government

23  Exhibit 18.9, do you recognize that?

24  A     I do.  It's a screenshot that I took of an event log off

25  of the defendant's computer.

CARROLL – Direct (by Mr. Chun)

1    Q    And this is a multipage exhibit.  Can you just thumb
2    through there?
3    A    Yes.
4    Q    Is this a fair and accurate copy of the screenshot you
5    took?
6    A    It is.
7              MR. CHUN:  United States moves to admit 18.9, Your
8    Honor.
9              MS. SCANLAN:  May I inquire?
10             THE COURT:  You may.
11                       VOIR DIRE EXAMINATION
12   BY MS. SCANLAN
13   Q    Mr. Carroll, I'm sorry, this is a screenshot of what, now?
14   A    This is a screenshot of the event logs from the
15   defendant's computer.  This is the security event log,
16   specifically.
17   Q    And the red highlighting is your additions?
18   A    Yes.
19             MS. SCANLAN:  No objection.
20             THE COURT:  18.9 is admitted.
21                   (Exhibit 18.9 was admitted)
22                       DIRECT EXAMINATION
23   BY MR. CHUN
24   Q    Mr. Carroll, so what are we looking at here?
25   A    On this page right here, you're looking at the

CARROLL – Direct (by Mr. Chun)

1   Event ID 4647, which shows the last time the user account

2   "smaus" logged off of this computer.  And this shows that the

3   user logged off on July 5, at 2:24 a.m.  And as you can see on

4   the bottom here, it says, "No further user-initiated activity

5   can occur."  The user is logged off.

6   Q    Okay.  And on the bottom of that page there, it says

7   "Security ID."

8        What is that?

9   A    The Windows computer doesn't always identify you by your

10  username, in this case "smaus."  It identifies you in a number

11  of forensic artifacts by your user security identifier, your

12  SID, which is what you're looking at.  There, it ends in 1001.

13  Q    Now, turning to Page 2 of this exhibit, what do we see

14  here?

15  A    This is just further up the list of that same event log.

16  And this is an event log showing a user logon.  And here, you

17  see the security identifier of "S-1-5-18."  And what that is is

18  the Windows desktop manager.  So anything that happens on a

19  Windows computer has to have permissions.  And so this is --

20  the system itself has its own permissions.  And so this is the

21  operating system doing something on the computer.

22  Q    And -- sorry.  You're looking at the Security ID to see

23  who the user is?

24  A    Yes.

25  Q    And going to Page 3 of this exhibit, what do we see here?

CARROLL – Direct (by Mr. Chun)

1  A     This is, I believe, the last event log in the security

2  event log, showing, again, a special logon by the operating

3  system.

4  Q     Now, going back to the first page of that exhibit, just

5  magnifying the top portion, I note that there are logons and

6  logoffs, heading upwards in this log, showing days of July 5th

7  and 6th, and onwards to July 11th you saw on Page 3.

8        Did you check all of those?

9  A     I did.

10 Q     What did you see when you checked all of those?

11 A     As I said, this shows that the user logged off.  And after

12 the user logged off, the computer was still powered on, and the

13 system was doing its system maintenance operations.  And so

14 these are indications of the system, not a user account,

15 actually conducting those operations.

16 Q     After the red box logoff here, did you see any other

17 person user logons?

18 A     There are no other user logons.

19 Q     So they were all by the system?

20 A     They were all by the system.

21 Q     And what does that tell you about the activity on this

22 computer?

23 A     It says that the computer remained powered on after the

24 user logged off, and the system was doing its typical

25 maintenance operations.

CARROLL – Voir Dire (by Ms. Scanlan)

1    Q    And showing you what's been marked as Exhibit 18.10, do
2    you recognize that?
3    A    I do.  It's a screenshot that I took of the SAM registry
4    hive off of the defendant's computer.
5    Q    Fair and accurate copy?
6    A    It is.
7              MR. CHUN:  United States moves to admit 18.10.
8              MS. SCANLAN:  May I inquire?
9              THE COURT:  You may.
10                        VOIR DIRE EXAMINATION
11   BY MS. SCANLAN
12   Q    Mr. Carroll, the information that's inside the red box,
13   did you add that information?
14   A    If you're talking about the very top box, that is my
15   writing, in red.  So anything that you see in red is my
16   writing.  And that shows where that SAM registry hive was on
17   the defendant's computer.  And then there are two other red
18   boxes, which I highlighted to bring the prosecutor's attention
19   to why I was doing this screenshot.
20             MS. SCANLAN:  No objection.
21             THE COURT:  18.10 is admitted.
22                  (Exhibit 18.10 was admitted)
23             MR. CHUN:  Thank you, Your Honor.
24   ////
25   ////

CARROLL – Direct (by Mr. Chun)

<div align="center">DIRECT EXAMINATION</div>

BY MR. CHUN

Q    Mr. Carroll, what do we see here, in 18.10?

A    As I mentioned, this is the SAM registry hive.  Every
Windows computer has a series of registry hives.  They're like
databases.  And the SAM registry hive has a list of every user
account on the system.  So this is what is checked when you log
on.  It looks there for your permissions to log on to that
computer, your password.  And this is showing the user account
"smaus," which is highlighted here, has a unique security
identifier of "1001."  And that account, smaus, is associated
with a Windows Live ID account of romariomail.ru [sic].

Q    Could you actually just spell that out?

A    R-O-M-A-R-I-O-G-R-O-L.

Q    Would that be a "1"?

A    Or "1," yes.

Q    @mail.ru?

A    @mail.ru.

Q    And so what would be the connection between smaus and that
e-mail address?

A    Starting with Windows 8.1, they wanted you to start
logging on to your computer with a Windows Live ID.  And so you
put in your e-mail address to get a Windows Live ID.  And what
this is is, for the user account smaus, which you see here,
this is the e-mail account that's registered with Microsoft for

CARROLL - Direct (by Mr. Chun)

1   that account name and that computer.

2   Q    And who would have set that connection up?

3   A    Whoever set up the computer, whoever set up this account

4   called "smaus."

5   Q    So the user of smaus would have tied it to the romario --

6            MS. SCANLAN:  Objection.  Leading.

7            THE COURT:  It is leading, Counsel.  Sustained.

8   BY MR. CHUN

9   Q    Would the user of smaus -- what connection would they have

10  made between that and the e-mail shown?

11           MS. SCANLAN:  I object.  This is beyond the scope.

12           THE COURT:  It's overruled.

13           THE WITNESS:  As I mentioned, Microsoft wants you to

14  have an e-mail account.  And so they ask for an e-mail account

15  name when you're setting up your user accounts on Windows 8 and

16  above computer systems.  And so the user that set up this

17  "smaus" set up an e-mail account of this e-mail in order to

18  establish an account on this computer.  And so that's how

19  Microsoft now ties activity to the smaus user account on that

20  computer.  It's a way Microsoft can better track our user

21  preferences.

22  Q    And turning to Page 2, what do we see here?

23  A    This is another screenshot of the software registry hive.

24  This is a different database, also called a software registry

25  hive.  And I took a screenshot of this just to show the full

CARROLL - Direct (by Mr. Chun)

1   user security identifier.  You can see there's the 1001 at the

2   end, that the SAM registry hive we just looked at shows.  And

3   this is just the full registry hive.  And what this registry

4   key also does, it says that this is the home directory of that

5   user, smaus.

6   Q   And now turning your attention to what's been marked as

7   18.11, do you recognize this?  I'll blow this up a bit so we

8   can see it.

9   A   Yes.  This is a screenshot that I took of the output of

10  the SRUM, the system resource usage monitor database --

11  Q   Do you recognize this?

12  A   I do.  It's a screenshot that I took off the defendant's

13  computer.

14  Q   Is it a fair and accurate copy?

15  A   It is.

16        MR. CHUN:  United States moves to admit 18.11, Your

17  Honor.

18        THE COURT:  Any objection?

19        MS. SCANLAN:  No objection.

20        THE COURT:  It's admitted.

21            (Exhibit 18.11 was admitted)

22  BY MR. CHUN

23  Q   And for the record, how many pages is this exhibit,

24  Mr. Carroll?

25  A   A lot.  It appears here about 175 pages.

CARROLL – Direct (by Mr. Chun)

1   Q    Is there numbering in the corner, right-hand corner there?

2   A    176, yes.

3            MR. CHUN:  Permission to publish, Your Honor?

4            THE COURT:  18.11 has been admitted.  You may

5   publish.

6            MR. CHUN:  Thank you, Your Honor.

7   BY MR. CHUN

8   Q    And what are we seeing here, at the top of this box here?

9   A    The system resource usage monitor -- we call it SRUM --

10  this database tracks every application that's running and which

11  user is responsible for running that application.  And it also

12  accounts for the energy usage, how much CPU power and energy is

13  that particular application using.  And that way, you can tell

14  what's draining your battery, or Microsoft can tell what's

15  draining your battery.

16       And so as we see here, in the highlight of red, the last

17  applications that were run, that were attributed to a user, as

18  opposed to the system, was the Tor, The Onion Router; and

19  Firefox.

20  Q    And you're gauging that based on which column there?

21  A    Well, this -- the fourth column here has the User ID of

22  which user was responsible for running the application.  In

23  Column 3 is the Application ID, or the application name, what

24  program was running.  And then Column 2 was the time that that

25  application was recorded by the SRUM database.

CARROLL – Direct (by Mr. Chun)

1    Q    And what user was that user ID associated with, the one
2    ending in 1001?
3    A    As we just saw, that was the smaus user account.
4    Q    And what about the user below that, the S-1-5- --
5    A    Eighteen.  That are all system -- this is the operating
6    system running those processes, again, doing system
7    maintenance, et cetera.
8    Q    And going to the very end of this exhibit, did you examine
9    this computer as to when the last user-engaged activity was?
10   A    I did.  And what we just saw on the 5th of July was the
11   last application that was run attributable to a user.
12   Everything after July 5 was actually the system running its
13   processes.
14   Q    And you know that, again, here highlighting the last
15   page -- what would that be based on?
16   A    It's based on the user identifier, the user that ran that
17   application.
18   Q    And that was true for all 175 pages in between, as well?
19   A    That's correct.
20   Q    Now, having looked at these exhibits regarding user login,
21   what is your opinion about the last time a user was logged into
22   this computer?
23   A    Well, it's clear, all the evidence shows that the last
24   user that was logged into the computer was smaus, and the last
25   time that user logged off was July 5, and no other user logged

CARROLL – Direct (by Mr. Chun)

1   on to this computer in any way after July 5.

2   Q    And in regards to the reliability of data on this

3   computer, what does that tell you?

4   A    The integrity of the computer is complete, solid.

5   Q    Now, earlier there was testimony from the defense witness

6   that this computer had approximately 3,000 files of access

7   dates after July 5.

8        Did you look into this?

9   A    I did.

10  Q    And did you also examine whether or not there were files

11  that were modified after July 5?

12  A    I did.

13  Q    And the testimony there was, there was about 274 files for

14  modification.

15       What did you find?

16  A    I saw roughly the same number, 273, 274, total files,

17  although many of those were zero files, or directories, so --

18  but about the same.

19  Q    And did you review each of those files?

20  A    I did.  I reviewed every one of them.

21  Q    And what conclusion did you draw, after reviewing each of

22  those files?

23  A    It was clear, through the review, that all of those were

24  system-related files; that the time stamps had been changed as

25  a result of system-related activity, maintenance activity,

CARROLL - Direct (by Mr. Chun)

1  antivirus running, et cetera.

2  Q    And what about in regards to the 3,000 or so files with

3  last access dates after July 5?

4  A    I reviewed all those, also; had the same conclusion, that

5  all of those files are a result of, typically, your antivirus.

6  Your Windows indexes your computer so when you're doing

7  searches it knows where your files are.  And this type of

8  activity can cause the last access time to be updated.

9  Q    Now, are access dates often used by forensic examiners?

10  A    No.

11  Q    Why not?

12  A    Well, all of your forensic training programs will tell you

13  that the last access date has too many variables that affect

14  the last access date to render any real opinion.  This is a

15  perfect example, is, when antivirus runs, it's touching all

16  those last access dates.  And a last access date doesn't mean

17  that file was even opened.  It just means the system, or

18  something, touched that file.

19      And starting in Windows Vista, Microsoft actually turned

20  off updating of last access dates on all consumer versions.

21  Only the professional Windows, Windows 8 Professional,

22  Windows 10 Professional, only the professional editions have

23  last access dates even turned on.  Microsoft just quit updating

24  them.

25  Q    And based on your training and experience, do you have an

CARROLL - Voir Dire (by Ms. Scanlan)

1    opinion as to what caused the file access dates of these 3,000

2    or so files to change after July 5?

3    A    Absolutely.  In looking at all the activity on the

4    computer, what programs were running, and temporal analysis, it

5    was clear that all the last access dates that were touched were

6    a result of antivirus and standard system maintenance-type

7    functions, indexing, et cetera.

8    Q    Showing you what's been marked as Government

9    Exhibit 18.12, do you recognize that?

10   A    I do.  It's a screenshot that I took of the USN journal,

11   off of the defendant's computer.

12   Q    Fair and accurate copy?

13   A    It is.

14            MR. CHUN:  United States moves to admit 18.12.

15            MS. SCANLAN:  May I inquire?

16            THE COURT:  You may.

17                     VOIR DIRE EXAMINATION

18   BY MS. SCANLAN

19   Q    Mr. Carroll, what is the highlighting in orange?

20   A    The highlighting in just orange, or red, also?

21   Q    Let's just talk about orange, first.

22   A    The highlighting in orange were my highlights showing the

23   Windows -- I'm sorry -- the McAfee Antivirus log files being

24   updated.

25   Q    How about the highlighting in red?

CARROLL - Direct (by Mr. Chun)

1   A    Also the McAfee Antivirus log files updating.  As your

2   antivirus is running, it's updating log files so it can

3   remember what it's doing.

4   Q    What's the difference between the red and orange

5   highlighting here?

6   A    Defense forensic experts had suggested that the -- there

7   was foul play because of the last access times.  And what this

8   showed is, there were some specific files in the recent

9   directory that had the last access times updated.  And in red

10  shows that about 60 seconds before those files had a last

11  access time stamp change, the Microsoft -- or excuse me -- the

12  McAfee Antivirus log was updated in 120 seconds after.  So it

13  was consistent with the antivirus program running.

14  Q    I'm sorry.  What was the difference between the red and

15  the orange?

16  A    Before and after.

17              MS. SCANLAN:  Thank you.

18       I have no objection to this exhibit.

19              THE COURT:  18.12 is admitted.

20                  (Exhibit 18.12 was admitted)

21                     DIRECT EXAMINATION

22  BY MR. CHUN

23  Q    Mr. Carroll, what are we looking at here?

24  A    So as I said, this is the user -- I'm sorry -- the USN

25  journal log.  And this is sort of, like, Microsoft's black box.

CARROLL – Direct (by Mr. Chun)

1   It's trying to record files that are touched on the system so
2   applications can keep track of which files may need updating,
3   or antivirus run, et cetera.
4       And what we're looking at here is, highlighted in red are
5   the Microsoft service -- Microsoft -- I'm sorry -- the McAfee
6   service hosts log file.  So all of these are McAfee service
7   hosts log files.  As you can see here, they're being updated
8   just prior to the recent directory files access times being
9   updated.  And then in orange, you see it being -- the log files
10  being updated again by McAfee.
11  Q   And what does this log, then, tell you about the activity
12  on this computer after July 5?
13  A   Well, it just shows that the antivirus program is running,
14  scanning files.
15  Q   And how does that affect your opinion as to changes in the
16  last access dates?
17  A   Well, it's just proof that that's what was happening, is
18  that this was one of the maintenance operations that were
19  happening by the operating system, not by a user, that caused
20  those last access times to be updated.
21  Q   And now showing you what's been marked as 18.13, do you
22  recognize that?
23  A   I do.  It's a screenshot of the output of the SRUM
24  database application resource log, off of the defendant's
25  computer.

CARROLL – Direct (by Mr. Chun)

1   Q    Fair and accurate copy?

2   A    It is.

3          MR. CHUN:  United States moves to admit 18.13, Your

4   Honor.

5          MS. SCANLAN:  No objection.

6          THE COURT:  It's admitted.

7                   (Exhibit 18.13 was admitted)

8   BY MR. CHUN

9   Q    And what are we -- sorry about that.  What are we looking

10  at here?

11  A    So as I said, the SRUM database is tracking all the

12  applications that are running and which user account is

13  responsible for running that application.  And this is after

14  the 5th, when the user logged off.  And what you can see is

15  just multiple instances where the McAfee Antivirus program is

16  running.  And again, it just further corroborates that the

17  antivirus program was running and was responsible for the

18  updates of the last access times of the files.

19  Q    And this would be -- and then what is that -- what's your

20  opinion in regards to this as to activity on this computer

21  after the 5th?

22  A    Again, it just further confirms, another artifact that

23  confirms, there was no user interaction, because you see that

24  this is the system actually running the McAfee Antivirus

25  program, and that further confirms that the antivirus program

CARROLL - Direct (by Mr. Chun)

1    was running and checking those files.

2    Q    Now, if you could go ahead and turn to Exhibit 13.40.   And

3    you might need a new binder for that.   And this was previously

4    admitted.

5              THE COURT:   Counsel, let's let the jury take a quick

6    stretch break.   I know we've got ten more minutes before the

7    break.

8              MR. CHUN:   Yes, Your Honor.

9              THE COURT:   Please be seated.

10   BY MR. CHUN

11   Q    Looking at 13.40, could you go ahead and scan this list

12   for -- this is the government's trial exhibits from the

13   computer.   Could you go ahead and scan the list for last access

14   dates occurring after July 5?   It might be easier in the

15   binder.

16   A    Okay.

17   Q    And do you see any with a date after July 6?

18   A    I see one, it looks like, here.

19   Q    And which exhibit would that be?

20   A    This would be Line Number 13.6, right here.

21   Q    And looking at 13.6A, if you could just go ahead and read

22   what that is there, in the description.

23   A    "Animated 2Pac ad from desktop."

24   Q    And looking at 13.6A, which is the metadata for that, were

25   you asked to examine the computer for this file?

CARROLL – Direct (by Mr. Chun)

1   A    I was.

2   Q    And for the integrity of this file?

3   A    I was.

4   Q    What did you look for?

5   A    I looked for the existence of that file on the computer.

6   Q    And how did you do that?

7   A    With our forensic software, FTK, I examined, looking

8   exactly for that file.

9   Q    And what did you do next?

10  A    Well, I found the -- that particular file in the current

11  operating system.  But Windows has this feature called Volume

12  Shadow Copies.  And what that is is, Windows takes a snapshot

13  of your computer, every once in a while.  And typical Windows

14  computers will have at least three or four snapshots of your

15  computer.  So if something bad happens, you can roll back to a

16  previous date.  And these are called Volume Shadow Copies.

17       And what I did is, I looked --

18  Q    I'm sorry.  Let me stop you.

19       A shadow -- or Volume Shadow Copy?

20  A    Uh-huh.

21  Q    So what, specifically, is a Volume Shadow Copy?

22  A    A Volume Shadow Copy is that snapshot in time of files on

23  your computer system.

24  Q    And so that would be from when?

25  A    Well, there were, I believe, four different snapshots, or

CARROLL - Direct (by Mr. Chun)

1    four different Volume Shadow Copies on the defendant's
2    computer.
3    Q    And how does that relate to your search of integrity for
4    this file?
5    A    Well, the nice thing about Volume Shadow Copies is, they
6    are a snapshot of the file.  And so one of the things that I
7    will do, particularly in cases like this where someone
8    misinterprets a last access date being updated, you can go back
9    to a Volume Shadow Copy.  You can find that exact file, in the
10   Volume Shadow Copies, prior to that last access date being
11   updated.  You can actually check that file.  There's a
12   cryptographic hash value that you can get.  It's a digital
13   fingerprint for every file.  And you can check to see if that
14   file -- exactly the same -- and you can see that it was exactly
15   the same as the one that had the date/time stamp after July 5.
16   Q    And were you able to find that one banner?
17   A    Yes.
18   Q    And how did you compare that they were the same?
19   A    Again, there's -- not to get too technical, but there's
20   this mathematical algorithm that you can run against any file
21   or data stream.  And it gives you a digital fingerprint, a long
22   alphanumeric value, that says, "This is the digital fingerprint
23   of this file."  If anything in that file is changed, even so
24   much as an extra space or a period on that file, that value,
25   that digital fingerprint, will be radically different.

CARROLL - Direct (by Mr. Chun)

1        And so I did a hash -- that's what they're called.  The
2   digital fingerprints are called a "hash."  I did a hash of the
3   banner on the current operating system.  And then I found that,
4   also, in Volume Shadow Copies, those previous snapshots in
5   time, did a hash of that file in the Volume Shadows Copies, and
6   they were identical.  They were exactly the same.
7   Q    And were those Volume Shadow Copies from before July 5?
8   A    They were.
9   Q    And was that the only trial exhibit, on that list you saw
10  from defendant's laptop, that had a date of July 6 or after?
11  And you can go back to -- if you like, it was 13.40.
12  A    I looked at a number of files.  I did a random sampling of
13  a number of files that had last access dates after July 5,
14  found all those files in Volume Shadow Copies --
15             MS. SCANLAN:  Objection.  This is nonresponsive.
16             THE COURT:  It's overruled on those grounds, Counsel.
17             THE WITNESS:  Found all of those files in Volume
18  Shadow Copies, and all were exactly the same, which just proves
19  definitively, because of the digital fingerprint, nothing was
20  changed in those files.
21  BY MR. CHUN
22  Q    Showing you what's been marked as 18.17, what are we
23  looking at here?
24  A    This is a snapshot --
25  Q    I'm sorry.  Do you recognize it?

CARROLL – Direct (by Mr. Chun)

1    A     I do.

2    Q     Fair and accurate copy of a snapshot you took?

3    A     It is.

4          MR. CHUN:  United States moves to admit

5    Exhibit 18.17.

6          MS. SCANLAN:  No objection.

7          THE COURT:  It's admitted.

8               (Exhibit 18.17 was admitted)

9    BY MR. CHUN

10   Q    And this is very hard to see, because the text is small,

11   so let's go column by column.

12        What are we looking at here, Mr. Carroll?

13   A    Okay.  This first column is the name of the files.  This

14   is just a small number of the name of files that I looked at.

15   And you can see that the first entry, e-dump24.txt.lnk, was in

16   the current directory.  So this is the active directory of the

17   computer.  And then I found that exact same file in a Volume

18   Shadow Copy.  This is a snapshot.  And I did this on every one

19   of these files.  You see these files in the current.  The first

20   listing will be the current location, the active computer.  And

21   the second entry is that same file in a Volume Shadow Copy.

22   Q    Now, moving to the next columns over -- I'll do the next

23   three -- what do we see in these columns?

24   A    Remember I told you that a hash value is a digital

25   fingerprint?  So this first column has a heading of "SHA1."

CARROLL – Direct (by Mr. Chun)

1  That is the digital fingerprint for that –– each of those

2  files.  And you can see the digital fingerprint in each is

3  exactly the same.  So the one that was on the current computer,

4  digital fingerprint was this.  And then the Volume Shadow Copy,

5  the digital fingerprint was this.  And then these next two

6  columns that you see here are the created and accessed date.

7  Q    So for that first one, it shows an access date of July 13;

8  is that correct?

9  A    That was the –– that was correct.  That's on the active

10 hard drive, the computer.

11 Q    And then what's that date below it?

12 A    The below is the last access date of that same exact file

13 on that snapshot, that Volume Shadow Copy.

14 Q    And the matching SHA1 columns, then, tell you what about

15 those two files?

16 A    That those two files are an exact duplicate of each other,

17 no modifications, no changes whatsoever occurred to the

18 contents of those files.

19 Q    And just to show, what would be the last column of that

20 exhibit?

21 A    The last column, every file has a creation, modified, and

22 access date.  And this is just the modified date column.

23       THE COURT:  Counsel, it's 2:45.  Is this a convenient

24 time to take a recess?

25       MR. CHUN:  Yes, Your Honor.

CARROLL – Direct (by Mr. Chun)

1              THE COURT:  Members of the jury, we'll take our

2    afternoon break.

3                      (Jury exits the courtroom)

4              THE COURT:  Counsel for the government, anything to

5    take up?

6              MR. CHUN:  No, Your Honor.

7              THE COURT:  Defense, anything to take up?

8              MS. SCANLAN:  No, Your Honor.

9              THE COURT:  We'll be at recess.

10                          (Recess)

11                  (Jury enters the courtroom)

12             THE COURT:  Counsel, you may continue your direct

13   examination of the witness.

14             MR. CHUN:  Thank you, Your Honor.

15   BY MR. CHUN

16   Q    We were just talking about Shadow Volume Copies [sic].

17        How easy would it be to plant a file inside a Shadow

18   Volume Copy?

19   A    No.

20   Q    What do you mean?

21   A    No, it would not be easy.

22   Q    How difficult would it be?

23   A    It would be very difficult.  I don't know of a way to

24   plant a file on a Volume Shadow Copy.

25   Q    And earlier we had heard testimony that it would be easy

CARROLL - Direct (by Mr. Chun)

1  to remotely log in and push files onto the defendant's laptop

2  and then hide its tracks, by editing logs and such.

3       Do you agree with that opinion?

4  A    No, not at all.

5  Q    Why not?

6  A    Well, as we just saw, for every action that's on a Windows

7  computer there are multiple forensic artifacts that are

8  created.  To start off with, the computer would have to be

9  connected to a network.  And it's clear, there's no doubt, that

10 this computer was never connected to a network after July 5.

11 So that's the first thing.  So that eliminates anybody logging

12 on.

13      But then even if somebody tried to plant something on his

14 computer, again, there would be multiple forensic artifacts to

15 show that that actually happened.

16 Q    And is your examination looking for those things?

17 A    Yes.  Our examination is looking for any anomalies,

18 whether the integrity of the computer is pristine, is there

19 anything to suggest that the evidence shouldn't be trusted.

20 And no evidence was on the computer to suggest that.

21 Q    And earlier there was also testimony that 3,000 changes of

22 an access date was so much volume it could only indicate

23 somebody up to nefarious activities, or some issue.

24      Do you agree?

25 A    No, not at all.

CARROLL – Direct (by Mr. Chun)

1  Q    What is your opinion about 3,000 or so last access dates

2  changing?

3  A    Well, if we start with the premise that no forensic

4  examiner really attributes anything to the last access time,

5  because, as we're all trained, there are far too many variables

6  that affect the last access time to render an opinion, the

7  evidence on the computer clearly shows that the last access

8  time changed were a result of typical system maintenance

9  processes, antivirus, there was a spy hunter, all these

10 programs are running.  We saw through numerous forensic

11 artifacts that every application and every process that was

12 running after July 5 was not the result of a user.  It was the

13 result of the system; again, just further evidence that this is

14 maintenance.  This is standard system maintenance.  So, no,

15 that's just not possible.

16 Q    Does 3,000 seem like a number that's too large for file

17 access dates changing when a system is in Connected Standby?

18 A    No.  It's relatively consistent.

19 Q    And having examined this computer as a whole, what is your

20 opinion about its reliability?

21 A    There's no evidence on this computer anywhere to suggest

22 that the reliability is in question.  The computer is intact.

23 The integrity of the files are intact.  Not only that, but I

24 did verification of numerous files in Volume Shadow Copies,

25 just on the chance that some file may have been planted,

CARROLL – Cross (by Ms. Scanlan)

1    looking at the hash value, that digital fingerprint, all the

2    same in each Volume Shadow Copy.  There's just no evidence to

3    suggest or even support that suggestion, by any competent

4    forensic examiner.

5              MR. CHUN:  No further questions, Your Honor.

6              THE COURT:  Cross examination?

7                        CROSS EXAMINATION

8    BY MS. SCANLAN

9    Q    Mr. Carroll, you work for the Department of Justice;

10   correct?

11   A    Yes, ma'am.

12   Q    And the -- one of the divisions of the Department of

13   Justice is the U.S. Attorney's Office?

14   A    Yes, ma'am.

15   Q    And the U.S. Attorney's Office would be the prosecuting

16   agency in this case; correct?

17   A    Correct.

18   Q    Are you ever hired as an expert by criminal defense

19   attorneys?

20   A    I've been asked, but I can't take outside employment

21   without authorization from the Department of Justice; so, no.

22   I conduct training with defense attorneys, but not hired as an

23   expert.

24   Q    Okay.  You run a lab; right?

25   A    I do.

CARROLL – Cross (by Ms. Scanlan)

1    Q    Do you have an evidence vault?

2    A    I do.

3    Q    And do you put the evidence in the vault when you're not

4    examining it?

5    A    Well, the nice thing about our lab is, we don't typically

6    receive actual evidence.  We only receive copies.

7    Q    So what goes in your vault, then?

8    A    On those rare occasions where perhaps an investigative

9    agency can't image a hard drive, they have a special piece of

10   equipment, if they send that to us, that will go in when we're

11   not with it.

12   Q    And what are the protocols for access to your vault?

13   A    There's multi-factor authentication, so you have to swipe

14   in -- first of all, you have to get into our building, get past

15   the guards, swipe into our floor, then swipe into our office,

16   then swipe into the evidence room, PIN codes to make sure that

17   nobody has your card.  So there's a number of hoops that you

18   have to jump through.

19   Q    Is there a vault log?

20   A    Yes.

21   Q    What's a vault log?

22              MR. CHUN:  Objection, Your Honor.  Scope.

23              THE COURT:  It's overruled.  I'll permit some

24   latitude.

25              THE WITNESS:  A vault log?

CARROLL – Cross (by Ms. Scanlan)

```
1    BY MS. SCANLAN
2    Q    Yes.
3    A    It's just a log of who enters and exits.
4    Q    Do you have one of those for your vault?
5    A    Ours is automated, because it's all electronic; so, yes.
6    Q    So does it record everyone who enters and exits the vault
7    log?
8    A    It records who enters.  We don't swipe out of the log.
9    Q    You just swipe in?
10   A    Yes, ma'am.
11   Q    And you're aware that there were people who entered and
12   exited the vault log where this laptop was kept, in this case,
13   without writing it down in a vault log; correct?
14   A    I've heard some discussion about it, but I'm not exactly
15   sure about that.
16   Q    These event logs; right?
17   A    Yes.
18   Q    Okay.  So just a basic yes-or-no question, can they be
19   altered?
20   A    A yes or no, I have to go with yes.
21   Q    Okay.  And the McAfee Antivirus program that was running
22   on the laptop, you're familiar with that?
23   A    I am.
24   Q    That can run when a user is using the computer; correct?
25   A    Correct.
```

CARROLL – Cross (by Ms. Scanlan)

```
1              MS. SCANLAN:  I have nothing further.
2              THE COURT:  Any redirect?
3              MR. CHUN:  No, Your Honor.
4              THE COURT:  Any objection to this witness being
5    excused, by the government?
6              MR. CHUN:  One moment, Your Honor.  Could we have one
7    moment, Your Honor?
8              THE COURT:  You may.
9              MR. CHUN:  No objection, Your Honor.
10             THE COURT:  All right.  Any objection by the defense?
11             MS. SCANLAN:  No, Your Honor.
12             THE COURT:  Thank you, sir.  You're excused.  You may
13   step down.
14        Counsel for the government, any additional rebuttal
15   evidence or testimony?
16             MR. CHUN:  No, Your Honor.
17             THE COURT:  Anything further from the defense?
18             MS. SCANLAN:  No, Your Honor.
19             THE COURT:  All right.  Ladies and gentlemen of the
20   jury, your work today has come to an end.  And as I mentioned
21   yesterday, we need to have a conference regarding jury
22   instructions so that when you come in tomorrow morning at 9:00,
23   you'll receive a copy of the jury instructions.  And I'll be
24   reading the jury instructions to you, and then we'll begin with
25   the closing remarks after that.
```

1    So we need to have you go and enjoy the balance of the

2    day, and we'll see you all tomorrow morning, ready to go at

3    9:00 a.m.  Have a good evening.

4                    (Jury exits the courtroom)

5        THE COURT:  Did each of the parties receive their

6    copy of the Court's proposed jury instructions?

7            MR. WILKINSON:  We have, Your Honor.

8            MS. SCANLAN:  Yes, Your Honor.

9        THE COURT:  All right.  Counsel, we're going to go

10   over those at this time.  My law clerk went to go get my copy.

11   I mistakenly left it, after the break.

12       But, nonetheless, there's only two questions that I have

13   for the parties.  Are there any exceptions with respect to the

14   instructions as proposed by the Court?  Are there any

15   exceptions with respect to the Court's failure to give any

16   proposed instructions; same question for both sides.

17       So with that, counsel for the government, any exceptions

18   with respect to the instructions as proposed by the Court?

19           MR. WILKINSON:  Yes, Your Honor.

20           THE COURT:  All right.  Let me hear them.

21           MR. WILKINSON:  Your Honor, the first issue pertains

22   to proposed Instruction Number 10.

23           THE COURT:  Let me catch up with you.

24           MR. WILKINSON:  This is the pattern instruction for

25   404(b) evidence.  The government has not offered 404(b)

1    evidence during this case.  The defense took the position in a

2    pretrial pleading that some of the evidence was 404(b)

3    evidence.  The Court denied that motion, at Docket 396, and

4    specifically found that the evidence was not other -- evidence

5    of other acts implicating 404(b).  So we believe that

6    instruction is not necessary.

7                    THE COURT:  Okay.

8                    MR. WILKINSON:  Next one is Instruction 21.

9                    THE COURT:  Let me catch up with you.

10                   MR. WILKINSON:  And for this, we would propose the

11   addition of some prefatory language, which is as follows --

12                   THE COURT:  And do you have a draft copy that you

13   could give the Court, Counsel?

14                   MR. WILKINSON:  I can write one out.  It's not too

15   long.  But I could write one out.

16                   THE COURT:  Let me hear what your proposed changes

17   are.

18                   MR. WILKINSON:  "If you find the defendant guilty of

19   any count of wire fraud, you will then be asked to determine if

20   that act of wire fraud affected a financial institution."

21                   THE COURT:  Just a second.  Okay.

22                   MR. WILKINSON:  The reason for that is that we're

23   defining "financial institution" in that instruction.  But

24   since that doesn't relate to any element that's otherwise

25   explained, I think the jury will be left to wonder why we're

1   defining financial institution.  So this just gives them some

2   context of why they need to know what it means.

3           THE COURT:  I think, from the defense perspective --

4   I'm not trying to take their thunder away on that issue -- but

5   the concern the Court has with your proposal is, that's

6   language that's typically found in a verdict form, as opposed

7   to being included in the body of the jury instructions.  I

8   don't want to have suggestions as to what the jury has already

9   done in the content of the jury instructions, because that

10  appears to suggest that the Court has an opinion.  It may be a

11  vague reference to a finding.  But nonetheless, it says, "If

12  you find the defendant guilty..."  That type of language

13  shouldn't be in a jury instruction preceding an instruction.

14  It's more appropriate in a verdict form.  But your exception is

15  noted.

16      Next one?

17          MR. WILKINSON:  Thank you, Your Honor.

18      The next one is Item 26, Instruction 26.

19          THE COURT:  Let me catch up with you.  Okay.  I'm

20  with you.

21          MR. WILKINSON:  And the Court had put a note on this

22  instruction that it needs to be reconciled with the verdict

23  form.

24          THE COURT:  Correct.

25          MR. WILKINSON:  So the issue here is that the

1    indictment –– this is the possession count –– the indictment

2    described a range of time when the defendant possessed 15 or

3    more access devices.  The instruction, however, says that –– it

4    requires the jury to find that the defendant possessed the

5    access devices at the same time.  And it was our thought that

6    it would be confusing to the jury to provide a range of time,

7    and then tell them that they have to find this happened at a

8    certain point in time.

9         And so our proposal was just to take out –– change it from

10   a range into a specific date, and take out the end date, and so

11   just have the begin date be the date that is charged, or that

12   they need to find.  And that's consistent with the –– that was

13   the instruction we proposed and also the –– what we had

14   proposed for the verdict form.

15                THE COURT:  Okay.  Next one?

16                MR. WILKINSON:  The next item is Number 27.

17                THE COURT:  Okay.

18                MR. WILKINSON:  This is the definition of access

19   device.  We would propose the addition of a sentence at the end

20   that says, "A credit card is an access device."  This is

21   clearly an accurate statement of the law.  And we'd direct the

22   Court to *U.S. vs. Onyesoh*, O–N–Y–E–S–A–H, [sic], at 674 F.3d,

23   1157, Page 1159.  It's a Ninth Circuit opinion from 2012.

24        And the statutory definition is there, but we think that

25   this leaves the jury to interpret the law.  And where the Court

1    can provide direct guidance on what the law is, we think it's

2    appropriate that it do so, and that the jury not be left to

3    interpret the statute.

4          THE COURT:  Counsel, if you look on Line 3, that

5    reads, "An access device means any card."

6       Would that not necessarily include credit card?  Or does

7    that appear to be redundant, if the Court adds the language

8    that you're suggesting?

9          MR. WILKINSON:  I mean, it doesn't specifically say a

10   "credit card."  "Credit card" is the term we've been using.  It

11   also doesn't specify the card number, I don't believe.

12      So it just says "any card," and we've been talking about

13   card numbers.  We think it's clearer guidance.  And it's

14   clearly accurate, so I don't think there's any reason not to do

15   it.

16         THE COURT:  Okay.

17         MR. WILKINSON:  And then the last issue is on

18   Instruction 29 --

19         THE COURT:  Let me catch up with you.  All right.

20         MR. WILKINSON:  -- Line 12.  It currently states, "An

21   access device is a means of identification."  And just for

22   clarity, we would propose inserting a clause that would say,

23   "An access device," and then the insertion is, "as defined in

24   Instruction 27," "is a means of identification," just so that

25   the jury knows where to look if they want to understand what an

```
1   access device is.

2              THE COURT:  Okay.

3              MR. WILKINSON:  And that's all we have.

4              THE COURT:  Okay.  So that covers both categories of

5   questions the Court proposed as far as exceptions?

6              MR. WILKINSON:  It does, Your Honor.

7              THE COURT:  Thank you, Counsel.

8        And, Counsel, as far as the verdict form, you'll note that

9   the Court had two forms of the verdict form.

10       Any objection to the verdict form as proposed by the

11  Court?

12             MR. WILKINSON:  No, Your Honor.

13             THE COURT:  All right.  Thank you.

14       Counsel for the defense, your exceptions?  Again, two

15  different categories.

16             MS. SCANLAN:  And, Your Honor, did the Court wish to

17  hear from the defense regarding the government objections?

18             THE COURT:  Yes, certainly.

19             MS. SCANLAN:  As to -- and I think this is the only

20  one I didn't write down the number for -- is it 10, which is

21  the 404(b) instruction?

22             THE COURT:  That's correct.

23             MS. SCANLAN:  The jury heard and saw evidence of

24  multiple other acts that could be considered bad acts, or other

25  crimes.  For instance, there was all the pictures of the money,
```

1    that were introduced by the government.  There were people

2    testifying from other businesses.

3        Now, I know that there was a whole discussion pretrial

4    about whether those are other acts.  But it's still the defense

5    position, especially in light of the testimony through trial,

6    that there hasn't been a sufficient connection between those

7    other businesses and the charged counts for it to be anything

8    other than other acts evidence in this particular case.  So we

9    would agree with the insertion of that instruction.

10       Instruction 21, I think the Court essentially said what

11   the defense objection is to this.  It's the same objection that

12   we had for the government's instructions in regards to the

13   language the government wants to add about finding somebody

14   guilty, and putting it in the middle of this instruction.  So

15   the defense objection, at that time, stands, which is that it

16   goes in the verdict form.

17            THE COURT:  Okay.

18            MS. SCANLAN:  Instruction 26 with the date ranges --

19   well, actually, backing up, Instruction 26, in general, I would

20   object to the insertion of the language "access device fraud,"

21   at the end of Line 3, beginning of Line 4.  So the actual --

22   the offense is the unlawful possession of 15 or more access

23   devices.

24            THE COURT:  Wait a second, Counsel.  Which one?

25            MS. SCANLAN:  I apologize, Your Honor.  It's the end

1    of Line 3, beginning of Line 4.

2            THE COURT:  Okay.

3            MS. SCANLAN:  This insertion of "access device fraud"

4    was done by the government, in their proposed instruction, and

5    it's not a part of the -- that's not part of the definition of

6    the offense.  The offense is the unlawful possession of 15 or

7    more access devices.  So I think having it categorized in the

8    instruction as "access device fraud" is essentially a comment

9    on what the nature of the offense is.

10       And then we have the date ranges.  As far as I understand

11   it, they charged this as the possession being over this period

12   of time.  And so it seems a little unfair now to come back and

13   say, "No, it's not this period of time.  We're electing this

14   one day."  It's not "on or between."  It's, "These are the

15   dates when the possession occurred."  I'm not sure we get to

16   change that now.  For one thing, they're inconsistent,

17   obviously.  But to change it now is prejudicial to the defense.

18           THE COURT:  And how so, Counsel?

19           MS. SCANLAN:  Well, the way that it's been charged,

20   the government needs to prove the possession, as I believe

21   Mr. Wilkinson just said, during this time period, so over --

22   this continuous possession over these date ranges.  That's how

23   they've charged it.  That's how they've presented it.  And so

24   to go back now and elect one of those dates for each count, at

25   the end of the trial, changes the nature of what needs to be

proved.

THE COURT: Okay.

MS. SCANLAN: Instruction 29.

THE COURT: Just one second. Let me catch up with you. Okay.

MS. SCANLAN: This -- for one, the -- Line 11 has the term "access device fraud" again. I think it would be much clearer if this stated the actual title of the offense, rather than this new title.

THE COURT: Which should be, according to the defense?

MS. SCANLAN: Possession of 15 or more unauthorized access devices.

THE COURT: Okay.

MS. SCANLAN: The government suggested that the access device definition should refer back to the other instruction. I would suggest that the access device definition does not need to be in this instruction. It's defined elsewhere. So we don't need to define it and then re-refer the jury to another definition.

THE COURT: Okay.

MS. SCANLAN: As for -- so that was the government's issues.

As for the defense exceptions, Instruction Number 6 --

THE COURT: Let me go back, Counsel.

```
1              MS. SCANLAN:  The defense has proposed the insertion
2    of language from the comment to the Ninth Circuit Model Jury
3    Instruction 1.5.
4              THE COURT:  So it's Instruction Number 6, again?
5              MS. SCANLAN:  Yes.  So 1.5 and 3.8, both being the
6    direct and circumstantial evidence instruction.
7              THE COURT:  Yes.
8              MS. SCANLAN:  The language that was suggested by the
9    defense is on Page 3 of Docket 378.  The comments suggest that
10   this language may be appropriate to give an example of the
11   difference between circumstantial and direct evidence.  It's a
12   paragraph.  But it's essentially the whole thing about the
13   sidewalk being wet and the rain.
14             THE COURT:  Let me ask you a question, Counsel.
15        You and Mr. Browne are very well-versed and experienced in
16   criminal practice; correct?
17             MS. SCANLAN:  Uh-oh.  Okay.
18             THE COURT:  All right.  "Okay" doesn't answer the
19   question.
20        Yes?
21             MS. SCANLAN:  Yes.
22             THE COURT:  Now, have you seen any other court, other
23   than the ones cited, where it's not mandatory, but it's
24   optional language, or another court that you've tried a case
25   in, has given the alternative instruction with an example of
```

1    what circumstantial evidence would be?  Usually that's reserved

2    for the lawyers, to give examples.  And I could give you a

3    laundry list of examples of what lawyers have given me about

4    what's circumstantial evidence, from the rain, the snow, and

5    they go on and on.  You've probably used some of these.  I know

6    Mr. Browne has.

7        So have you ever seen another case, Counsel, where that

8    alternate language has been used?

9            MS. SCANLAN:  My answer, Your Honor, is, I have never

10   suggested it before, so I don't know what those other courts

11   would have done with it.

12           THE COURT:  Have you ever seen or heard of another

13   court giving that alternative language that you suggested,

14   proposed to the Court, in the instructions; yes or no?

15           MS. SCANLAN:  No.

16           THE COURT:  Okay.  Let's move forward.

17           MS. SCANLAN:  All right.

18           THE COURT:  Next exception, Counsel?

19           MS. SCANLAN:  Instruction Number 15.

20           THE COURT:  Okay.  All right.

21           MS. SCANLAN:  So this is the instruction regarding

22   the use of an undercover agent.

23           THE COURT:  Okay.

24           MS. SCANLAN:  The comments that are below the

25   instruction are correct, that the defense objected to this

1    instruction.  And I would stand by that, because this did not

2    become an issue in this case.  So this instruction is

3    appropriate when the defense essentially tries to insinuate,

4    through cross examination or testimony, that the agent should

5    not behave in this way.  But that's not what happened here.

6         So at this point now, we're just essentially telling the

7    jury that it's okay that they did this, even though no one has

8    disputed that fact.  And that is why the comments suggest there

9    are specific areas when this instruction is appropriate.  And

10   this would not be one of those; so entrapment, when entrapment

11   is an issue, or when it's raised that there's improper

12   undercover conduct.

13            THE COURT:  And just so we're on the same page,

14   Counsel, the reason the Court was considering including it is

15   because there was some communication earlier, and testimony by

16   witnesses, where they were serving, so to speak, in an

17   undercover capacity, attempting to purchase -- or did, in fact,

18   purchase -- credit cards using government funds.  So we're on

19   the same page, that that was the evidence before the Court.

20            MS. SCANLAN:  Yes, Your Honor.  We're on the same

21   page that that was the evidence.  What I'm saying is that this

22   instruction, from our perspective, is only appropriate when

23   that evidence is in some way questioned in an entrapment

24   scenario, or when the defense suggests that what they did as

25   undercover agents is inappropriate.

```
 1              THE COURT:  Okay.  I got you.  Let's go to the next
 2   one.
 3              MS. SCANLAN:  Number 18.
 4              THE COURT:  Okay.
 5              MS. SCANLAN:  The government has added language to
 6   the model instruction here.  And that language is repeated in
 7   Instruction 18.  So it starts on Line 22, at the very end of
 8   that line, and then goes to the end of Line 25.
 9              THE COURT:  "It does not matter whether," that line?
10              MS. SCANLAN:  Yes.  This is additional information
11   the government has suggested be added to this instruction.  And
12   I don't think this is a necessary or appropriate addition to
13   the model instruction.
14       And then, of course, in terms of Instruction 18, 24, 25,
15   and 26, the defense objects to the use of these charts.
16              THE COURT:  And you don't dispute that those are a
17   part of the indictment; correct, Counsel?
18              MS. SCANLAN:  Correct.
19              THE COURT:  Okay.
20              MS. SCANLAN:  So the dispute is that this invites the
21   jury to decide all of these counts as one issue.  So instead of
22   separating them out and really showing, essentially in a paper
23   form, that these are all separate offenses they have to decide
24   on, when you have a chart with all the counts, and each of the
25   allegations for the counts like this -- you know, the idea is,
```

1   you go in, and you make a decision about all of these, and then

2   you flip to the next one.  That's the objection.

3        THE COURT:  Well, let me ask you this, Counsel.  The

4   Court has given Instruction -- and I'll give you the exact

5   number -- Number 8, which is, "A separate crime is charged

6   against the defendant in each count.  You must decide each

7   count separately.  The verdict on one count should not control

8   your verdict on any other count."  And the next is Number 9,

9   "You're here only to determine whether the defendant is guilty

10  or not guilty of the charges in the indictment.  And the

11  defendant's not on trial for any other conduct or offense not

12  charged in the indictment."

13       So doesn't that address any concern you have, Counsel,

14  that the jury would possibly blend all these charges together,

15  and not make separate determinations?

16       MS. SCANLAN:  It doesn't, Your Honor.  I think,

17  obviously, that instruction is helpful on that front.  But the

18  melding of the counts, as opposed to having them individually

19  laid out, is essentially another comment on the grouping of the

20  evidence and the counts.

21       THE COURT:  So you suggest that the Court should have

22  a separate instruction for each one of these counts?

23       MS. SCANLAN:  Correct.

24       THE COURT:  Counsel, have you seen, in the case of

25  *United States vs. Jinian*, J-I-N-I-A-N -- and the reason I cited

1    that case, Counsel, for the benefit of the parties, is because,

2    as I read through that case, there did not appear to be any

3    concern expressed by the Court when there was a consolidation

4    of the charges.  I think that particular paragraph in that case

5    even talks about the same format that the government used.

6        Are you aware of any other cases where there's a

7    prohibition on consolidation in the fashion as proposed by the

8    government?

9            MS. SCANLAN:  No.  But I would note that my

10   understanding, in that case, is that the defense didn't raise

11   that as an objection.

12           THE COURT:  I understand that.  But I'm indicating

13   that there was no concern expressed by the Ninth Circuit by the

14   fact that that was done in that format, whether raised by the

15   defense or not.

16           MS. SCANLAN:  Okay.

17           THE COURT:  All right.  Let's go to the next one,

18   Counsel.

19           MS. SCANLAN:  Instruction 30, Your Honor.

20           THE COURT:  Okay.  Let me catch up with you.

21       Okay.  I'm with you.

22           MS. SCANLAN:  So this instruction is for aiding and

23   abetting.  I don't think there has been a threshold showing of

24   Mr. Seleznev aiding or abetting the acts of anyone else.

25       So some of the witnesses, some of the agents, have

1     testified that they believed there were other people involved.

2     So they believed that support was not the same person as the

3     administrator, on one of the websites, for example.  Or they

4     believed that, although they think Mr. Seleznev is, I think it

5     was, bulba, the other people who did stuff -- or track2 --

6     after his arrest, those are other people who are involved in

7     the same thing.

8          But to aid and abet, we need evidence that Mr. Seleznev

9     actually aided, counseled, commanded, induced, or procured

10    someone to do something.  And there really hasn't been any

11    testimony about the relationship, or any alleged relationship,

12    between Mr. Seleznev and these mysterious, I think as Detective

13    Dunn called them, "co-conspirators."  So it's not just enough

14    to say that there might have been more people.  There has to be

15    some actual threshold showing that he was doing things that

16    would constitute aiding and abetting.

17         The other separate issue, if the Court chooses to give

18    this instruction, is, Line 27 refers to, "The government is not

19    required to prove precisely which defendant actually committed

20    the crime."  And in the context of this case, I mean,

21    obviously, this instruction is normally used in cases with

22    co-defendants.  But we don't have co-defendants, so I think

23    this is going to be very confusing.

24              THE COURT:  Okay.

25              MS. SCANLAN:  We take no other exceptions to the jury

```
 1    instructions.  We did take exception to the verdict forms.
 2             THE COURT:  Okay.  Let me hear the exceptions to the
 3    verdict form.
 4             MS. SCANLAN:  The defense has suggested, as the Court
 5    is aware, a different format of verdict form for this, where
 6    the counts are not all consolidated onto verdict forms that
 7    are, again, grouped by type of offense.  So -- and
 8    specifically, that the -- essentially the special verdict
 9    findings, so regarding the financial institution, for instance,
10    on Counts 1 through 11, that those special verdicts should be
11    separate verdict forms from the verdict on the substantive
12    count.
13        I think we also suggested -- we did -- a different form of
14    language regarding -- yes -- regarding the special verdict
15    inquiries.  So it's Docket 378, Page 14.
16             THE COURT:  Page 14?
17             MS. SCANLAN:  Yes, Your Honor.
18             THE COURT:  That's the last page; right?  Okay.
19             MS. SCANLAN:  I apologize.  Page 14 of the exhibits,
20    so 378.1.
21             THE COURT:  Oh, I'm sorry.
22        So what's your question, Counsel?  What's your point?
23             MS. SCANLAN:  This -- 378.1 is the language that was
24    suggested by the defense for the special verdict forms --
25             THE COURT:  Okay.
```

1           MS. SCANLAN:  -- which starts with, you know, if you

2     find the defendant not guilty of this particular offense, of

3     Count 1, then you leave the special verdict form blank.  So it

4     starts with that idea.  And then if you found the person

5     guilty, then you go on to make a decision about the second

6     question.

7           THE COURT:  Okay.

8           MS. SCANLAN:  I also think it's somewhat unusual to

9     have the guilty -- have the guilty on the left and the not

10    guilty on the right.  I don't have an example of that.  I would

11    just say that I've never seen it formatted that way.  Usually,

12    the not guilty would be the first choice, and the guilty is the

13    second.

14          THE COURT:  I agree with that, Counsel.  I think

15    that's traditionally what this Court's done.  So we'll make

16    that change without having any question about it.

17          MS. SCANLAN:  And then I know there's a lot of

18    counts.  But we are, again, just making an exception to the

19    format of the verdict forms in terms of the grouping of the

20    counts, but also the grouping of the substantive verdicts with

21    the special verdicts.  And that's it.

22          THE COURT:  Okay.  All right.  Thank you, Counsel.

23        Counsel for the government, do you wish to respond to any

24    of the things noted by counsel for the defense?

25          MR. WILKINSON:  Yes, Your Honor.

1        On the 404(b) evidence, Instruction 10, defendant raises

2   two issues that they believe are 404(b).  One is just the

3   pictures of money.  Pictures of money is not an act.  It's just

4   pictures of money.  So I don't think that there's any theory

5   under which that would qualify as 404(b).

6        And then the second item was the other businesses that

7   were not charged in the indictment -- or listed as specific

8   counts.  And that was the exact topic of the Court's order that

9   I referenced earlier.  So that clearly does not qualify.

10             THE COURT:  Okay.

11             MR. WILKINSON:  Instruction 26, which is the issue

12   about the possession charge, the defense indicates that it

13   would somehow make our job easier, or kind of lower our burden,

14   to limit it to a single date.  And I think that the opposite is

15   true.  As -- if we were to treat it as a period of time, the

16   way the instruction reads, as long as the defendant possessed

17   those credit cards at some point in time within that period,

18   whether it be two weeks or two months, the jury would be able

19   to find the defendant guilty.  We are confining ourselves to a

20   reasonable period, to, you know, the date that's noted in

21   there, and then, as the instructions say, a reasonable time

22   around that.  So it makes our obligation harder.  We're,

23   nonetheless, you know, proposing it, just for clarity's sake.

24        There's no issue of unfairness here, because the

25   indictment provided notice, as it's required to do, to the

```
 1    defendant, of the period of time we were talking about.  And we
 2    are just narrowing our focus, rather than broadening it.
 3          THE COURT:  Do you see any issue, Counsel, between --
 4    any inconsistency between what was charged in the indictment,
 5    which is an on-or-about date, or a range of dates, and the
 6    specifics of what the government's now proving?  Because the
 7    defense says, well, now there's prejudice, because we were
 8    preparing one defense one way, and now the government
 9    spring-loads on us and says, we're only going on one particular
10    date.
11          MR. WILKINSON:  I think if we'd gone the opposite
12    way, if we'd said we have to prove that you did it on
13    December 10, and now we were trying to expand the period of
14    time, there would be a risk of prejudice.  Since we're
15    narrowing the focus, we're charging something that was a date
16    that was charged, we're just not trying -- we're just basically
17    stripping back dates that were also charged.  So I don't see
18    how there could be any prejudice there.  If anything, it would
19    be helpful to the defense.
20          THE COURT:  Okay.
21          MR. WILKINSON:  On Instruction 29, the issue about
22    the title and the use of "access device fraud," we're fine with
23    that change.  We don't see a problem with that.  So we would
24    agree with changing that to "possession of access devices,"
25    rather than "access device fraud."
```

1        THE COURT:  Okay.

2        MR. WILKINSON:  Then on the defendant's exceptions, a

3   few that we'd like to respond to.  On Number 15, regarding --

4        THE COURT:  Just one second.  Okay.

5        MR. WILKINSON:  -- regarding the use of undercover

6   agents, it's clearly an issue in this case.  We've had, I

7   think, at least three witnesses testify that they participated

8   as undercover agents.  There was some questioning that --

9   about -- where counsel asked the agent, "Were you using a fake

10  name" or a false name, something along those lines, "when you

11  were doing this?"  We kind of -- we took that to mean that that

12  might be implying that the agent was doing something improper.

13      I'd say, at a minimum, if the Court's not going to get --

14  give the instruction, we'd ask that there be a commitment from

15  the defense that they're not going to argue in closing that the

16  agents somehow behaved improperly by using undercover names.

17      MS. SCANLAN:  I will make that commitment, Your

18  Honor.  We're not going to make that argument.

19      THE COURT:  All right.  Then, based on that

20  concession, Counsel, do you need to include or keep the

21  Instruction Number 15?

22      MR. WILKINSON:  No.  That's fine to remove that.

23      THE COURT:  Based upon a stipulation from the

24  defense, the Court will strike from the instructions

25  Instruction Number 15.

1              MR. WILKINSON:  On Instruction 18, the wire fraud

2      instruction, there, I think, are two exceptions there.  One is

3      some additional language that we had proposed about the scheme

4      needing to be successful, and the wires not needing to contain

5      false statements.  I don't think defense is disagreeing that

6      that's an accurate statement of the law.  And the law in

7      support of that is cited at Page 14 of our trial brief.  It's

8      the Supreme Court's *Neder* decision, N-E-D-E-R.

9          With respect to the second exception there, which is to

10     the charts, we offer -- we use these charts now really as a

11     matter of routine, just for clarity, where there are multiple

12     counts like this.  And I think that's reflected in the fact, as

13     I understand it, the jury had asked the Court whether they'll

14     be provided with a chart.  And I think that just reflects the

15     need, when you have 40 counts, to try and categorize things

16     these ways.  So I think there's an important benefit of doing

17     it this way.

18             THE COURT:  Just to make sure, that communication was

19     shared with both sides.

20             MS. SCANLAN:  Yes, Your Honor.

21             THE COURT:  Okay.

22             MR. WILKINSON:  The second point -- so I guess the

23     objection here, though, is that the charts somehow cause the

24     jury to consider everything all together, and doesn't -- not

25     view the counts separately.  The Court's already noted that

1  there's an instruction that expressly directs them to consider

2  each count separately.

3      In addition to that, the verdict form separates out each

4  count, so they have to mark each one separately.  So I don't

5  think that leaves any questions about that.  And on top of

6  that, I think the fact that the chart has discreet items

7  actually makes visually clear that each one of these is a

8  specific item.  We have Count 1.  We have Count 2.  We have

9  Count 3.  We have Count 4.  So the notion that somehow this

10  conflates all the counts, I think doesn't make a lot of sense.

11            THE COURT:  Okay.

12            MR. WILKINSON:  With respect to aiding and abetting,

13  which is Instruction 30, we do believe that instruction is

14  appropriate here.  There's been extensive testimony that there

15  were others in the organization, that the defendant has people

16  who support him and help him out.  So the question is whether a

17  reasonable jury could find that, with some of these acts, you

18  know, one of the wires, perhaps, could it have been one of his

19  support people who actually did the wire, caused the wire to

20  happen, as part of the defendant's enterprise.  And I think the

21  jury could reasonably conclude that and could, therefore, find

22  an aiding and abetting instruction is appropriate.

23            THE COURT:  Okay.

24            MR. WILKINSON:  Lastly, on the verdict form, the

25  defendant has objected to the use of -- or wants to separate

1    out the counts from the special verdict forms, or the special

2    verdict questions.

3         We have 40 counts here.  Many of these counts ask separate

4    questions.  I think it's important, to help this jury, that we

5    try to make this as clear as possible.  And separating

6    everything out so that they have to go through a

7    decision-making process once, and then go back and revisit each

8    count, 40 counts, I think is going to be really onerous for the

9    jury.  And so we propose that we group things together by

10   count.  I think it makes sense that way, and I can't see what

11   the prejudice would be of grouping them together.

12        And then I guess the last issue was the addition of

13   additional language about, if you find the defendant not

14   guilty, then you should leave this entry blank; and then if you

15   find the defendant guilty, then you should answer the question

16   about the financial institution, or whatever it is.  That seems

17   fair and appropriate, and we wouldn't object to that.

18             THE COURT:  I'll make that affirmative determination

19   now, that that will be included.

20             MR. WILKINSON:  No further responses.

21             THE COURT:  All right.  Counsel, then, you can see

22   the instructions that will be coming out to the parties as the

23   Court's final determination.  I've made some preliminary

24   rulings on some of the jury instructions so that you know

25   exactly where the Court stands.  I'll go back in and take under

1    advisement the arguments that you've made.  I'll go back and

2    look and see if there's any particular cases.  Government

3    counsel -- I think it was the *Neder* decision that the

4    government pointed out.  And there's also one that was pointed

5    out, the *Onyesoh*, 674 F.3d 1157.  So if there's any other cases

6    that were cited by the parties or cross-referenced in the trial

7    briefs, the Court will go back and revisit those.  Nonetheless,

8    counsel, you'll receive the jury instructions from the Court in

9    the next couple hours so that you'll know exactly what the

10   instructions are this evening.

11       We'll begin tomorrow morning, without any other

12   interruptions, and begin tomorrow morning with me reading the

13   instructions to the jury.  Each member of the jury will receive

14   their own copy of the jury instructions, with some preliminary

15   statements about theirs to keep or mark and do whatever they'd

16   like to do, and then we'll go right into closing arguments.

17       Now, the thing that would be helpful for the Court, you're

18   not bound to this, but it's helpful for scheduling, is, I need

19   to know who will be giving closing remarks and approximate

20   times.

21       Counsel for the government, who will be giving closing

22   remarks?

23           MR. BARBOSA:  Your Honor, I'll be giving closing

24   remarks.  And I believe approximately 45 minutes to one hour.

25           MR. BROWNE:  Excuse me.  Is rebuttal going to be by

```
1   someone else?

2           THE COURT:  Just a second, Counsel.  Mr. Browne, we

3   haven't gotten that far.

4       So counsel for the defense, who will be giving closing

5   remarks?

6           MS. SCANLAN:  I will, Your Honor.  I would say about

7   45 minutes.

8           THE COURT:  And then, counsel for the government, who

9   will be giving rebuttal?

10          MR. CHUN:  That would be me, Your Honor.  And 15

11  minutes, Your Honor.

12          THE COURT:  Again, Counsel, you're not tied to this,

13  by any means.  It just helps me for scheduling.

14      And I'll also let you know, I'll try and give you a pretty

15  wide range of opportunity to complete your remarks before the

16  jury without having to break for breaks and recesses.  I hope

17  that we can get through closing arguments by the government and

18  the Court reading the instructions -- because I always budget a

19  half an hour for me, and if you're going to stay within 45

20  minutes to an hour, we should be close to the 10:30 time period

21  and take our break around that time.

22      If it looks like you're starting to go much past the break

23  time, I may ask, "Counsel, how much more time do you need to

24  complete your closing remarks?"  I'll apologize in advance if

25  that breaks your flow of thought.  But you should know your
```

1    case well enough so that a brief interruption shouldn't destroy
2    your opportunity to continue.
3         Counsel for the defense, same thing would apply.  I would
4    suspect that we'd be able to get your closing remarks in from
5    the afternoon -- from the morning break, and certainly before
6    lunch.  And we may go into the lunch hour if counsel for the
7    government represents that rebuttal is only going to be 15
8    minutes.
9         So I suspect, Counsel, we'll be able to get everything
10   done tomorrow morning on a good note, to finish the case, and
11   the jury will begin deliberations.  Again, they deliberate
12   until 4:30, and we'll have further discussions about what the
13   Court expects the parties to do.
14        Now, it might be helpful -- as a matter of fact, it would
15   be helpful, is, tonight, before you leave, because you've got a
16   little bit more than half an hour before we recess, to inspect
17   the jury exhibits.  Because I'm going to ask you again tomorrow
18   to inspect the exhibits to ensure that only the admitted
19   exhibits will go back to the jury room.  The burden is upon the
20   parties to go through your list.  If it's different from the
21   Court's, you can certainly let the in-court deputy know that.
22   She'll certainly bring it to my attention.
23        Other than that, I have no other comments.
24        Counsel for the government, anything else?
25             MR. BARBOSA:  No, Your Honor.  Thank you.

```
 1            THE COURT:  Counsel for the defense, anything else?

 2            MR. BROWNE:  No, Your Honor.

 3            THE COURT:  We'll be in recess.  Have a good evening.

 4                           (Adjourned)

 5                     (End of requested transcript)

 6                         *    *    *

 7       I certify that the foregoing is a correct transcript from

 8  the record of proceedings in the above matter.

 9

10  Date:  8/23/16                      /s/ Andrea Ramirez

11                           _____

12                           Signature of Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25
```