1            UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF WASHINGTON

3    _____

     UNITED STATES OF AMERICA,        )
4                                     )
              Plaintiff,              )   No. 2:11-cr-00070-RAJ
5                                     )
                                      )
6         vs.                         )   Seattle, WA
                                      )
7    ROMAN V. SELEZNEV,               )
                                      )   Jury Trial, Day 8
8             Defendant.              )   August 24, 2016
                                      )
9    _____

10            VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE JUDGE RICHARD A. JONES
11              UNITED STATES DISTRICT COURT
     _____

12

13   APPEARANCES:

14   FOR THE PLAINTIFF:    NORMAN McINTOSH BARBOSA
                           U.S. Attorney's Office
15                         700 Stewart Street, Suite 5220
                           Seattle, WA 98101-1271
16                         norman.barbosa@usdoj.gov

17                         C. SETH WILKINSON
                           U.S. Attorney's Office
18                         700 Stewart Street, Suite 5220
                           Seattle, WA 98101-1271
19                         seth.wilkinson@usdoj.gov

20                         HAROLD W. CHUN
                           U.S. Department of Justice
21                         1301 New York Avenue NW, Suite 600
                           Washington, DC 20005
22                         harold.chun@usdoj.gov

23

24

25

```
 1   FOR THE DEFENDANT:     JOHN HENRY BROWNE
                            Law Office of John Henry Browne
 2                          108 South Washington Street, Suite 200
                            Seattle, WA 98104
 3                          johnhenry@jhblawyer.com

 4                          EMMA SCANLAN
                            Law Office of John Henry Browne
 5                          108 South Washington Street, Suite 200
                            Seattle, WA 98104
 6                          emma@jhblawyer.com

 7


 8
     Andrea Ramirez, CRR, RPR
 9   Official Court Reporter
     United States District Court
10   Western District of Washington
     700 Stewart Street, Suite 17205
11   Seattle, WA 98101
     andrea_ramirez@wawd.uscourts.gov
12
     Reported by stenotype, transcribed by computer
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    I N D E X

2                                              Page No.

3    Government Closing Argument                1423

4    Defense Closing Argument                   1454

5    Government Rebuttal Argument               1475

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA vs. Seleznev, 8/24/16

```
 1              THE CLERK:  We are resuming our jury trial in the
 2    matter of the United States vs. Roman Seleznev, Cause
 3    Number CR11-70, assigned to this court.
 4              THE COURT:  Good morning, ladies and gentlemen of the
 5    jury.
 6         Each of you should have in your possession now a copy of
 7    the Court's final jury instructions.  These are your
 8    instructions.  Feel free to mark them up in any way that you
 9    believe appropriate.  You can underline them.  You can circle
10    particular juror numbers [sic].  The lawyers may make reference
11    to juror numbers -- to jury instruction numbers.  So again,
12    you're free to take these home, as well.  So when you're
13    educating other people about your experiences as a juror,
14    you'll have these to share with the experience.
15         So with that, I'd ask that you follow along with me, now,
16    as I read the jury instructions.
17         Members of the jury, now that you have heard all of the
18    evidence, it is my duty to instruct you on the law that applies
19    to this case.  A copy of these instructions will be available
20    in the jury room for you to consult.
21         It is your duty to weigh and to evaluate all the evidence
22    received in the case, and in that process to decide the facts.
23    It is also your duty to apply the law as I give it to you to
24    the facts as you find them, whether you agree with the law or
25    not.  You must decide the case solely on the evidence and the
```

1  law, and must not be influenced by any personal likes or

2  dislikes, opinions, prejudices, or sympathy.  You will recall

3  that you took an oath promising to do so at the beginning of

4  the case.

5      You must follow all these instructions and not single out

6  some and ignore others.  They are all important.  Please do not

7  read into these instructions, or into anything I may have said

8  or done, any suggestion as to what verdict you should return.

9  That is a matter entirely up to you.

10      A defendant in a criminal case has a constitutional right

11  not to testify.  You may not draw any inference of any kind

12  from the fact that the defendant did not testify.

13      Proof beyond a reasonable doubt is proof that leaves you

14  firmly convinced the defendant is guilty.  It is not required

15  that the government prove guilt beyond all possible doubt.

16      A reasonable doubt is a doubt based upon reason and common

17  sense, and is not based purely on speculation.  It may arise

18  from a careful and impartial consideration of all the evidence,

19  or from lack of evidence.

20      If after a careful and impartial consideration of all the

21  evidence, you are not convinced beyond a reasonable doubt that

22  the defendant is guilty, it is your duty to find the defendant

23  not guilty.  On the other hand, if after a careful and

24  impartial consideration of all the evidence, you are convinced

25  beyond a reasonable doubt that the defendant is guilty, it is

1   your duty to find the defendant guilty.

2       The evidence you are to consider in deciding what the

3   facts are consists of:  One, the sworn testimony of any

4   witness; two, the exhibits received in evidence; and three, any

5   facts to which the parties have agreed.

6       In reaching your verdict you may consider only the

7   testimony and exhibits received in evidence.  The following

8   things are not evidence, and you may not consider them in

9   deciding what the facts are:

10      1)  Opinions, statements, objections, and arguments by the

11  lawyers are not evidence.  The lawyers are not witnesses.

12  Although you must consider a lawyer's questions to understand

13  the answers of a witness, the lawyer's questions are not

14  evidence.  Similarly, what the lawyers have said in their

15  opening statements, closing arguments, and at other times is

16  intended to help you interpret the evidence, but it is not

17  evidence.  If the facts as you remember them differ from the

18  way the lawyers state them, your memory of them controls.

19      2)  Any testimony that I have excluded, stricken, or

20  instructed you to disregard is not evidence.  In addition, some

21  evidence was received only for a limited purpose.  When I have

22  instructed you to consider evidence in a limited way, you must

23  do so.

24      3)  Anything you may have seen or heard when the Court was

25  not in session is not evidence.  You are to decide the case

1   solely on the evidence received at the trial.

2        Evidence may be direct or circumstantial.  Direct evidence

3   is direct proof of a fact, such as testimony by a witness about

4   what that witness personally saw or heard or did.

5   Circumstantial evidence is indirect evidence; that is, it is

6   proof of one or more facts from which you could find another

7   fact.

8        You are to consider both direct and circumstantial

9   evidence.  Either can be used to prove any fact.  The law makes

10  no distinction between the weight to be given to either direct

11  or circumstantial evidence.  It is for you to decide how much

12  weight to give to any evidence.

13       In deciding the facts in this case, you may have to decide

14  which testimony to believe and which testimony not to believe.

15  You may believe everything a witness says, or part of it, or

16  none of it.

17       In considering the testimony of any witness, you may take

18  into account:  One, the witness's opportunity and ability to

19  see or hear or know the things testified to; two, the witness's

20  memory; three, the witness's manner while testifying; four, the

21  witness's interest in the outcome of the case, if any; five,

22  the witness's bias or prejudice, if any; six, whether other

23  evidence contradicted the witness's testimony; seven, the

24  reasonableness of the witness's testimony in light of all the

25  evidence; and eight, any other factors that bear on

USA vs. Seleznev, 8/24/16

```
1    believability.
2         The weight of the evidence as to a fact does not
3    necessarily depend on the number of witnesses who testify.
4    What is important is how believable the witnesses were and how
5    much weight you think their testimony deserves.
6         A separate crime is charged against the defendant in each
7    count.  You must decide each count separately.  Your verdict on
8    one count should not control your verdict on any other count.
9         You are here only to determine whether the defendant is
10   guilty or not guilty of the charges in the indictment.  The
11   defendant is not on trial for any conduct or offense not
12   charged in the indictment.
13        Translations of Russian documents have been admitted into
14   evidence in this trial.  Whether the translations are accurate
15   translations of the non-English portions of the documents, in
16   whole or part, is for you to decide based on the evidence
17   presented to you.  In considering whether a translation
18   accurately describes the meaning of the document, you should
19   consider any testimony presented to you regarding how and by
20   whom the translation was made, as well as any testimony
21   disputing the translation of any words in the translation.  You
22   may consider the knowledge, training, and experience of the
23   translator, if called as a witness.
24        Although some of you may speak the Russian language, it is
25   important that all jurors consider the same evidence.
```

1  Therefore, you should not consider your own understanding of

2  the Russian language in evaluating the accuracy of the

3  translation admitted into evidence.

4      The indictment charges that the offenses alleged in

5  Counts 1 through 40 were committed on or about a certain day.

6      Although it is necessary for the government to prove

7  beyond a reasonable doubt that the offenses were committed on a

8  date reasonably near the dates alleged in the indictment, it is

9  not necessary for the government to prove that the offenses

10  were committed precisely on the dates charged.

11      During the trial, certain charts and summaries were shown

12  to you in order to help explain the evidence in the case.

13  Those charts and summaries were not admitted in evidence, will

14  not go into the jury room with you.  They are not themselves

15  evidence or proof of any facts.  If they do not correctly

16  reflect the facts or figures shown by the evidence in the case,

17  you should disregard these charts and summaries, and determine

18  the facts from the underlying evidence.

19      Other charts and summaries have been admitted in evidence.

20  These charts and summaries are only as good as the underlying

21  supporting material.  You should, therefore, give them only

22  such weight as you think the underlying material deserves.

23      You have heard testimony from various witnesses who

24  testified to opinions, and the reasons for their opinions.

25  This opinion testimony is allowed because of the education or

1    experience of this witness.  Such opinion testimony should be

2    judged just like other testimony.  You may accept it or reject

3    it, and give it as much weight as you think it deserves,

4    considering the witness's education and experience, the reasons

5    given for the opinion, and all the other evidence in the case.

6        You have heard testimony from witnesses who testified to

7    both facts and opinions and the reasons for those opinions.

8        Fact testimony is based on what the witness saw, heard, or

9    did.  Opinion testimony is based on the education or experience

10   of the witness.

11       As to the testimony about facts, it is your job to decide

12   which testimony to believe and which testimony not to believe.

13   You may believe everything a witness says, or part of it, or

14   none of it.  Take into account the factors discussed earlier in

15   these instructions that were provided to assist you in weighing

16   the credibility of witnesses.

17       As to the testimony about the witness's opinion, this

18   opinion testimony is allowed because of the education and

19   experience of this witness.  Opinion testimony should be judged

20   just like other testimony.  You may accept it, all of it, part

21   of it, or none of it.  You should give it as much weight as you

22   think it deserves, considering the witness's education and

23   experience, the reasons given for the opinion, and all the

24   other evidence in the case.

25       The defendant is charged in Counts 1 through 11 of the

1  indictment with wire fraud.  In order for the defendant to be

2  found guilty of that charge, the government must prove each of

3  the following elements beyond a reasonable doubt:

4       First, the defendant knowingly participated in or devised

5  a scheme or plan to defraud, or a scheme or plan for obtaining

6  money or property by means of false or fraudulent pretenses,

7  representations, or promises;

8       Second, the statements made or facts omitted as part of

9  this scheme were material; that is, they had a natural tendency

10  to influence, or were capable of influencing, a person to part

11  with money or property;

12       Third, the defendant acted with the intent to defraud;

13  that is, the intent to deceive or cheat;

14       Fourth, the defendant transmitted, or caused to be

15  transmitted, by wire communication in interstate or foreign

16  commerce, writings, signs, or signals to carry out or attempt

17  to carry out an essential part of the scheme.  A wire

18  communication is in interstate or foreign commerce if it goes

19  across a state line or national border.

20       In determining whether a scheme to defraud exists, you may

21  consider not only the defendant's words and statements, but

22  also the circumstances in which they are used as a whole.

23       A wire transmission is caused when one knows that the wire

24  transmission will be used in the ordinary course of business,

25  or when one can reasonably foresee such use.

1        The following chart sets forth the dates of the alleged

2   acts of wire fraud.  You may refer to this chart during your

3   deliberations.

4        Count 1:  Date, August 6, 2010; transmission of malware

5   outside the state of Washington to a computer belonging to Mad

6   Pizza, Madison Park, in Seattle, Washington.

7        Count 2:  Date, August 7, 2010; transmission of malware

8   from outside the state of Washington to a computer belonging to

9   Mad Pizza, First Hill, in Seattle, Washington.

10        Count 3:  August 9, 2010; transmission of malware from

11   outside the state of Washington to a computer belonging to Casa

12   Mia Italian Pizzeria Restaurant, in Yelm, Washington.

13        Count 4:  August 28, 2010; transmission of malware from

14   outside the state of Washington to a computer belonging to Mad

15   Pizza, South Lake Union, in Seattle, Washington.

16        Count 5:  October 4, 2010; transmission of malware from

17   outside the state of Washington to a computer belonging to

18   Grand Central Baking Company, in Seattle, Washington.

19        Count 6:  October 22, 2010; transmission of malware from

20   outside the state of Washington to a computer belonging to

21   Broadway Grill, in Seattle, Washington.

22        Count 7:  November 2, 2010; transmission of malware from

23   outside the state of Washington to a computer belonging to Mad

24   Pizza Starfire, in Tukwila, Washington.

25        Count 8:  December 15, 2010; transmission of malware from

1   outside the state of Washington to a computer belonging to Mad

2   Pizza, South Lake Union, in Seattle, Washington.

3       Count 9:  December 23, 2010; transmission of stolen credit

4   card data from Village Pizza, in Anacortes, Washington, to a

5   server controlled by defendant outside the state of Washington.

6       Count 10:  January 10, 2011; transmission of stolen credit

7   card data from Mad Pizza Starfire, in Tukwila, Washington, to a

8   server controlled by the defendant outside the state of

9   Washington.

10      Count 11:  October 26, 2013; transmission of malware from

11  outside the state of Washington to a computer belonging to Red

12  Pepper Pizzeria, in Duvall, Washington.

13      An intent to defraud is an intent to deceive or cheat.

14      An act is done knowingly if the defendant is aware of the

15  act and does not act through ignorance, mistake, or accident.

16  The government is not required to prove that the defendant knew

17  that his acts or omissions were unlawful.  You may consider

18  evidence of the defendant's words, acts, or omissions, along

19  with all the other evidence, in deciding whether the defendant

20  acted knowingly.

21      The jury may find the term "financial institution" in the

22  verdict form.  The term "financial institution" means:  One, an

23  insured depository institution of the Federal Deposit Insurance

24  Act; or two, a credit union with accounts insured by the

25  National Credit Union Share Insurance Fund.

1      A defendant's act of wire fraud affects a financial

2  institution if his or her acts of wire fraud caused a new or

3  increased risk of loss to the financial institution.

4      If you decide that defendant was a member of a scheme to

5  defraud, and that the defendant had the intent to defraud, the

6  defendant may be responsible for other co-schemers' actions

7  during the course of and in furtherance of the scheme, even if

8  the defendant did not know what they said or did.

9      For the defendant to be found guilty of the offense

10  committed by a co-schemer in furtherance of the scheme, the

11  offense must be one that the defendant could reasonably foresee

12  as a necessary and natural consequence of the scheme to

13  defraud.

14      The defendant is charged in Counts 12 through 20 of the

15  indictment with intentional damage to a protected computer.  In

16  order for the defendant to be found guilty of that charge, the

17  government must prove each of the following elements beyond a

18  reasonable doubt:

19      First, the defendant knowingly caused the transmission of

20  a program, information, code, or command to a computer;

21      Second, as a result of the transmission, the defendant

22  intentionally impaired, without authorization, the integrity of

23  a program, system, or information;

24      And third, the computer was used in or affected interstate

25  or foreign commerce or communication.

1       The following chart sets forth the dates of the alleged

2   acts of damage to a protected computer.  You may refer to this

3   chart during your deliberations.

4       Count 12:  Date, August 6, 2010; Mad Pizza, Madison Park,

5   Seattle.

6       Count 13:  August 7, 2010; Mad Pizza, First Hill, Seattle.

7       Count 14:  Date, August 9, 2010; Casa Mia Italian Pizzeria

8   Restaurant, in Yelm.

9       Count 15:  August 28, 2010; Mad Pizza, South Lake Union,

10   Seattle.

11       Count 16:  September 13, 2010; Village Pizza, in

12   Anacortes.

13       Count 17:  October 4, 2010; Grand Central Baking Company,

14   Seattle.

15       Count 18:  October 22, 2010; Broadway Grill, Seattle.

16       Count 19:  November 2, 2010; Mad Pizza Starfire, in

17   Tukwila.

18       Count 20:  October 26, 2013; Red Pepper Pizzeria, in

19   Duvall.

20       The defendant is charged in Counts 21 through 29 of the

21   indictment with unlawfully obtaining information from a

22   protected computer without authorization.  In order for the

23   defendant to be found guilty of that charge, the government

24   must prove each of the following elements beyond a reasonable

25   doubt:  First, the defendant intentionally accessed without

1    authorization a computer; and second, by accessing without

2    authorization a computer, the defendant obtained information

3    from a computer that was used in or affected commerce or

4    communication between one state and other states, or between a

5    state of the United States and a foreign country.

6         The following chart sets forth the dates of the alleged

7    acts of unlawfully accessing a protected computer.  You may

8    refer to this chart during your deliberations.

9         Count 21:  August 6, 2010; Mad Pizza, Madison Park,

10   Seattle.

11        Count 22:  August 7, 2010 -- let me begin again.

12        Count 21:  Beginning date is August 6, 2010.  End date is

13   2/15/2011.  That's Mad Pizza, Madison Park, Seattle.

14        Count 22:  Beginning date is August 7, 2010.  Ending date

15   is February 15, 2011.  That's Mad Pizza, First Hill, Seattle.

16        Count 23:  Beginning date is August 9, 2010, to

17   February 23, 2011; Casa Mia Italian Pizzeria Restaurant, in

18   Yelm.

19        Count 24:  August 28, 2010, through February 1, 2011; Mad

20   Pizza, South Lake Union, Seattle.

21        Count 25:  September 13, 2010, through March 26, 2011;

22   Village Pizza, Anacortes.

23        Count 26:  October 4, 2010, through December 1, 2010;

24   Grand Central Baking Company, Seattle.

25        Count 27:  October 22, 2010, through October 27, 2010;

1    Broadway Grill, in Seattle.

2         Count 28:  November 2, 2010, to February 1, 2011; Mad

3    Pizza Starfire, Tukwila.

4         Count 29:  October 26, 2013, through May 1, 2014; Red

5    Pepper Pizzeria, in Duvall.

6         The defendant is charged in Counts 30 to 38 of the

7    indictment with possession of 15 or more unauthorized access

8    devices.  In order for the defendant to be found guilty of that

9    charge, the government must prove each of the following

10   elements beyond a reasonable doubt:

11        First, the defendant knowingly possessed at least 15

12   unauthorized access device at the same time;

13        Second, the defendant knew that the devices were

14   unauthorized;

15        Third, the defendant acted with the intent to defraud;

16        And fourth, the defendant's conduct in some way affected

17   commerce between one state and other states, or between a state

18   of the United States and a foreign country.

19        An unauthorized access device is any device that is lost,

20   stolen, expired, revoked, canceled, or obtained with intent to

21   defraud.

22        The following chart sets forth the dates of the alleged

23   possession of access devices for each victim.  You may refer to

24   this chart during your deliberations.

25        Count 30:  The date is August 6, 2010; Mad Pizza, Madison

USA vs. Seleznev, 8/24/16

1   Park, Seattle.

2        Count 31:  August 7, 2010; Mad Pizza, First Hill, Seattle.

3        Count 32:  August 9, 2010; Casa Mia Italian Pizzeria

4   Restaurant, in Yelm.

5        Count 33:  August 28, 2010; Mad Pizza, South Lake Union,

6   Seattle.

7        Count 34:  September 13, 2010; Village Pizza, in

8   Anacortes.

9        Count 35:  October 4, 2010; Grand Central Baking Company,

10  Seattle.

11       Count 36:  October 22, 2010; Broadway Grill, Seattle.

12       Count 37:  November 2, 2010; Mad Pizza Starfire, Tukwila.

13       Count 38:  October 26, 2013; Red Pepper Pizzeria, in

14  Duvall.

15       An access device means any card, plate, code, account

16  number, electronic serial number, mobile identification number,

17  personal identification number, or other telecommunications

18  service, equipment, or instrument identifier, or other means of

19  account access, that can be used alone or in conjunction with

20  another access device to obtain money, goods, services, or any

21  other thing of value, or that can be used to initiate a

22  transfer of funds.

23       A credit card number is an access device.

24       A person has possession of something if the person knows

25  of its presence and has physical control of it, or knows of its

1    presence and has the power and intention to control it.

2        More than one person can be in possession of something if

3    each knows of its presence and has the power and intention to

4    control it.

5        The defendant is charged in Counts 39 and 40 of the

6    indictment with aggravated identity theft.  In order for the

7    defendant to be found guilty of that charge, the government

8    must prove each of the following elements beyond a reasonable

9    doubt:

10       First, the defendant knowingly transferred, possessed, or

11   used without legal authority a means of identification of

12   another person;

13       Second, the defendant knew that the means of

14   identification belonged to a real person;

15       And third, the defendant did so during and in relation to

16   the crime of wire fraud or possession of 15 or more

17   unauthorized access devices.

18       An access device, as defined in Instruction Number 25, is

19   a means of identification.

20       Count 39 charges the defendant with aggravated identity

21   theft in connection with a credit card number ending in the

22   digits 5719, belonging to a person with the initials D.K.

23       Count 40 charges the defendant with aggravated identity

24   theft in connection with a credit card number ending with the

25   digits 2897, belonging to a person with the initials R.G.

USA vs. Seleznev, 8/24/16

1       A defendant may be found guilty of wire fraud, intentional

2   damage to a computer, obtaining information from a computer

3   without authorization, possession of 15 or more unauthorized

4   access devices, or aggravated identity theft, even if the

5   defendant personally did not commit the act or acts

6   constituting the crime, but aided and abetted in its

7   commission.  To prove a defendant guilty of aiding and

8   abetting, the government must prove beyond a reasonable doubt:

9       First, the crime of wire fraud, intentional damage to a

10  computer, obtaining information from a computer without

11  authorization, possession of 15 or more unauthorized access

12  devices, or aggravated identity theft was committed by someone;

13      Second, the defendant aided, counseled, commanded,

14  induced, or procured that person with respect to at least one

15  element of the crime;

16      Third, the defendant acted with the intent to facilitate

17  the crime;

18      And fourth, the defendant acted before the crime was

19  completed.

20      It is not enough that the defendant merely associated with

21  the person committing the crime, or unknowingly or

22  unintentionally did things that were helpful to that person, or

23  was present at the scene of the crime.  The evidence must show

24  beyond a reasonable doubt that the defendant acted with the

25  knowledge and intention of helping that person commit wire

1  fraud, intentional damage to a computer, obtaining information

2  from a computer without authorization, possession of 15 or more

3  unauthorized access devices, or aggravated identity theft.

4      A defendant acts with the intent to facilitate the crime

5  when the defendant actively participates in a criminal venture

6  with advance knowledge of the crime and having acquired that

7  knowledge when the defendant had a realistic opportunity to

8  withdraw from the crime.

9      When you begin your deliberations, elect one member of the

10  jury as your foreperson, who will preside over the

11  deliberations and speak for you here in court.

12      You will then discuss the case with your fellow jurors and

13  reach agreement, if you can do so.  Your verdict, whether

14  guilty or not guilty, must be unanimous.

15      Each of you must decide the case for yourself, but you

16  should do so only after you have considered all of the

17  evidence, discussed it fully with the other jurors, and

18  listened to the views of your fellow jurors.

19      Do not be afraid to change your opinion if the discussion

20  persuades you that you should.  But do not come to a decision

21  simply because other jurors think that it is right.

22      It is important that you attempt to reach a unanimous

23  verdict, but, of course, only if each of you can do so after

24  having made your own conscientious decision.  Do not change an

25  honest belief about the weight or effect of the evidence simply

USA vs. Seleznev, 8/24/16

1    to reach a verdict.

2        Because you must base your verdict only on the evidence

3    received in the case and on these instructions, I remind you

4    that you must not be exposed to any other information about the

5    case or to the issues it involves.  Except for discussing the

6    case with your fellow jurors during your deliberations, do not

7    communicate with anyone in any way, and do not let anyone else

8    communicate with you in any way about the merits of the case or

9    anything to do with it.  This includes discussing the case in

10   person, in writing, by phone or electronic means, via e-mail,

11   text messaging, or any internet chat room, blog, website, or

12   other feature.  This applies to communicating with your family

13   members, your employer, media or press, and the people

14   involved.  If you are asked or approached in any way about your

15   jury service or anything about this case, you must respond that

16   you've been ordered not to discuss the matter, and to report

17   the contact to the Court.

18       Do not read, watch, or listen to any news or media

19   accounts or commentary about the case, or anything to do with

20   it.  Do not do any research, such as consulting dictionaries,

21   searching the internet, or using any reference materials.  And

22   do not make any investigation or in any other way try to learn

23   about the case on your own.

24       The law requires these restrictions to ensure the parties

25   have a fair trial based upon the same evidence that each party

1    had an opportunity to address.  A juror who violates these

2    restrictions jeopardizes the fairness of these proceedings, and

3    a mistrial could result that would result in the entire trial

4    process to start over.  If any juror is exposed to any outside

5    information, please notify the Court immediately.

6         Some of you have taken notes during the trial.  Whether or

7    not you took notes, you should rely on your own memory of what

8    was said.  Notes are only to assist your memory.  You should

9    not be overly influenced by your notes or those of your fellow

10   jurors.

11        The punishment provided by law for this crime is for the

12   Court to decide.  You may not consider punishment in deciding

13   whether the government has proved its case against the

14   defendant beyond a reasonable doubt.

15        A verdict form has been prepared for you.  After you reach

16   unanimous agreement on a verdict, your foreperson should

17   complete the verdict form, according to your deliberations,

18   sign and date it, and advise the courtroom deputy that you're

19   ready to return to the courtroom.

20        If it becomes necessary during your deliberations for you

21   to communicate with me, you may send a note through the

22   courtroom deputy, signed by any one of you, or more.  No member

23   of the jury should ever attempt to communicate with me except

24   by a signed writing, and I will respond to the jury concerning

25   the case only in writing, or here in open court.

```
 1        If you send out a question, I will consult with the
 2   lawyers before answering it, which may take some time.  You may
 3   continue your deliberations while waiting for the answer to any
 4   question.  Remember that you're not to tell anyone, including
 5   me, how the jury stands, numerically or otherwise, on any
 6   question submitted to you, including the question of the guilt
 7   of the defendant, until after you've reached a unanimous
 8   verdict or have been discharged.
 9        Members of the jury, if you'd like to stand and stretch at
10   this time, please do so.
11        Please be seated.
12        Ladies and gentlemen of the jury, I now ask you to give
13   your undivided attention to Mr. Barbosa, who represents the
14   United States, as he gives his closing remarks.
15        Counsel, you may proceed.
16        MR. BARBOSA:  Thank you, Your Honor.
17        1.7 million credit cards, folks.  1,700,000 credit card
18   tracks; those stolen credit card numbers, along with U.S.
19   federal court criminal record searches for defendant's true
20   name and his hidden names, bulba and 2Pac, two days before he
21   was caught in the Maldives; and his password cheat sheet with
22   the logins and passwords, the credentials for his entire
23   criminal underground infrastructure, those are the credentials
24   he used for the servers to steal credit cards, the credentials
25   for his domains where he sold these credit cards, and his
```

1    e-mail accounts used to manage his criminal enterprise, all
2    used for nearly a decade to orchestrate his hacking and credit
3    card trafficking scheme.  Those three pieces of evidence were
4    sitting on a laptop computer, this computer, that was in that
5    bag, strapped over his shoulder, when Secret Service agents
6    picked him up in the Maldives.
7         Those three pieces of evidence, the 1.7 million credit
8    cards, his court record searches, and his password cheat sheet,
9    tell you just about everything you need to know in this case.
10   Those three pieces of evidence alone show that this defendant,
11   Roman Seleznev, was running a massive scheme to hack
12   point-of-sale systems, steal millions of credit cards, and sell
13   those stolen credit cards on underground carding forums and
14   automated vending sites.
15        And they didn't just magically appear on this laptop.
16   1.7 million credit cards weren't planted there by some
17   super-hacker.  They didn't jump onto this computer over a dead
18   wi-fi connection nearly 7,500 miles away from its last
19   connection in the Maldives.  And they sure weren't loaded over
20   a cellular connection that hadn't been used since June 18, when
21   defendant left Moscow for his island vacation.  That evidence
22   was on defendant's laptop because he put it there.  He was
23   carrying those credit card numbers because he is one of the
24   most prolific credit card traffickers in history.  He was
25   carrying those credit card numbers because stolen credit card

1    track data is his stock in trade.

2        For nearly a decade, this defendant has been stealing from

3    merchants and banks all over the world, 3,700 different banks,

4    and merchants right here in downtown Seattle, like the Broadway

5    Grill; making tens of millions of dollars running this criminal

6    enterprise, all behind a keyboard in Vladivostok, Russia, and

7    Bali, Indonesia; hiding his true identity behind a series of

8    nics that you heard about over the last several days, that

9    became notorious amongst law enforcement, but truly revered in

10   the underground world of carding.

11       This defendant was the only trusted vendor on carder.su,

12   one of the world's largest carding forums.  And no doubt, as he

13   sat behind that keyboard, he was feeling untouchable, comforted

14   in the knowledge that he couldn't be extradited from Russia to

15   face justice, and hoping that the Maldives, without an

16   extradition treaty, wouldn't turn him over when he went on

17   vacation.

18       I'm going to spend the next 30 minutes or so talking about

19   how this scheme worked, the law that will guide you when you're

20   deliberating on the charges, and how the evidence that you've

21   seen fits in with those charges.  Most of the time, we're going

22   to be talking about the e-mail accounts, the servers, and the

23   domains that you've seen on this infrastructure chart that

24   we've been referring to throughout the trial.  And I'm going to

25   spend much of my time talking about how all the evidence in

1  this case points to one person, the defendant, as the hacker

2  behind these accounts, these servers, and domains, and the

3  keyboard, in the upper left-hand corner, where these attacks

4  were launched.

5      But before we go into the evidence in more detail, I want

6  to start with a quick review of how this scheme worked.  You've

7  heard a flood of evidence over the last several days.  It came

8  in in some dense pieces of material, code, and the long

9  testimony from Detective Dunn.

10      So I want to turn back to this infrastructure chart and

11  talk to you specifically about Counts 1 through 11 of the

12  indictment.  Those are the charges of wire fraud affecting a

13  financial institution.

14      And the wire fraud charges, much like this infrastructure

15  charge, can provide you with a road map to all of the other

16  counts in this case; a road map of the charges of intentional

17  damage to a protected computer, in Counts 12 through 20;

18  obtaining information from a protected computer, in Counts 21

19  through 29; possession of 15 or more unauthorized access

20  devices, in Counts 30 through 38; and the two counts of

21  aggravated identity theft, in Counts 39 and 40.  All of those

22  other counts flow from the wire fraud scheme that is charged in

23  Counts 1 through 11.  Because those charges, the wire fraud

24  charges, encompass defendant's entire scheme outlined on this

25  map.

USA vs. Seleznev, 8/24/16

1      The wire fraud charges describe how, sitting behind the
2  computer in the upper left-hand corner, defendant launched his
3  attacks on victims all over the world; how sitting behind this
4  keyboard in Vladivostok, or Bali, or the Maldives, defendant
5  would launch port scans, looking for vulnerable point-of-sale
6  networks.  Those port scans are the scans of wide swaths of the
7  internet that Detective Dunn explained to you, where the
8  defendant would look for a specific open door, a port, 3389,
9  that he knew small businesses all over the world used for
10  remote access to service their point-of-sale systems.  He knew
11  this was a vulnerability in their systems that he could attack,
12  using widely known and common passwords from the point-of-sale
13  industry.
14      From there, the wire fraud charges explain how defendant's
15  scheme involved reaching out to his malware server, in the
16  lower left-hand corner, the "shmak" and "smaus" server, to pull
17  down his malicious code over the internet, over the wires, onto
18  the victims' computers, in the center of the chart.  The
19  charges in the wire fraud counts also explain how defendant
20  configured that malware to scoop up all of the credit card data
21  and transmit that data over the internet, again over the wires,
22  to defendant's dump collection servers, over here in the lower
23  right-hand corner.
24      These dump servers, the Ukraine server, the HopOne server,
25  and even the shmak and smaus server, at times, were the servers

1    that the defendant rented and configured to receive the stolen

2    data.  From there, the wire fraud charges describe how

3    defendant would harvest the numbers, pick them up from his dump

4    collection servers, and post them for sale on his vending

5    sites, track2, and bulba, in the upper right-hand corner of the

6    chart.

7         Finally, the wire fraud charges describe how defendant did

8    this all with the intent that his customers would use those

9    stolen credit cards at merchants throughout the world, with the

10   intent to defraud the merchants and the issuing banks by

11   falsely claiming that these were legitimate credit cards, that

12   they were authorized to use these credit cards, even though

13   they fully knew that these had been stolen, and weren't

14   authorized.

15        That's the essence of the wire fraud charges.  So let's

16   talk a little bit about the law that should guide you as you

17   deliberate on the charges in this case.

18        There are a total of 40 counts in this case.  And it's a

19   lot.  And as the Court has instructed you, it's your job to

20   consider each charge separately.  But even though you have to

21   consider all 40 counts separately, there are just five

22   instructions that tell you what you must find in order to

23   convict the defendant of each of the sets of charges.  Those

24   instructions set forth the elements of each crime that is

25   charged.

USA vs. Seleznev, 8/24/16

```
1        As you go back to the jury room and begin looking over the

2   charts of the charges, generally what you'll find is that

3   there's one count of each crime -- with the exception of the

4   aggravated identify theft, there's one count of each crime,

5   wire fraud, intentional damage to protected computers,

6   obtaining information from a protected computer, and possession

7   of 15 or more unauthorized access devices, from each of the

8   victim businesses that was impacted.

9        The only exceptions are the wire fraud counts for Mad

10  Pizza Starfire and South Lake Union.  There are two counts each

11  of wire fraud for those locations, one for the transmission of

12  the malware to their systems, and one for the transmission of

13  the stolen data back out to one of the dump collection servers.

14       The instruction that lays out the elements for wire fraud,

15  that you have in your packet of instructions there, is

16  Instruction 16.  And I will shorten it a little bit with the

17  instructions that you have there.

18       And what that provides is that to find the defendant

19  guilty of wire fraud, you need to find the defendant [sic]

20  proved four elements beyond a reasonable doubt:

21       First, the defendant knowingly participated in or devised

22  a scheme or plan to defraud by means of false statements,

23  pretenses, representations, or promises;

24       Second, the false statements made as part of the scheme

25  were material, meaning they had a natural tendency to influence
```

USA vs. Seleznev, 8/24/16

1    someone to part with money or goods.  Presenting a credit card

2    tends to influence the recipient of that credit card to provide

3    you with goods or services.

4         Third, the defendant acted with the intent to defraud;

5         And fourth, as part of the scheme, the defendant used the

6    wires in interstate or foreign commerce.

7         I'm not going to go over each and every one of these

8    elements, but I do want to address a couple issues in this

9    instruction that you may wish to focus on.

10        First, what does it mean to participate in a scheme and

11   artifice to defraud, and act with the intent to defraud?  Well,

12   here it means this defendant participated in a scheme to

13   defraud in which he and his co-schemers, the people buying the

14   stolen credit cards from him, over and over again, intended to

15   fraudulently present those fake credit cards to obtain goods

16   and services, knowing that the credit card numbers were stolen

17   and unauthorized.  Keep in mind, defendant doesn't have to be

18   the person standing at the register who used these stolen

19   credit cards.

20        The Court has also instructed you in Instruction 21 that

21   if you find he was part of this scheme, he was responsible for

22   all of the fraud he intended to help facilitate.  And if you

23   have any question about whether he knew what was going on and

24   intended to help facilitate this fraud, the $169 million in

25   fraud losses tied to the cards he stole, or more specifically,

1    tied only to the cards that were found by law enforcement on

2    the servers they managed to get their hands on, that question

3    is answered by defendant's posdumps website.  That question is

4    answered by this self-styled tutorial, where he explains to his

5    customers, step by step, how to "make and use fake credit

6    card."  And where he politely reminds them, "Remember, this is

7    illegal way."  This is the tutorial where defendant teaches his

8    customers exactly how to use stolen credit cards, commit fraud,

9    where he advertises his dump shop, 2Paccc, and tells his

10   customers how to find the best dumps and make fake credit

11   cards.

12        And as if that wasn't enough, before he penned that

13   helpful tutorial on how to commit fraud the illegal way,

14   defendant had participated in carding forums like these,

15   carder.su, CardingPlanet, CardingWorld, Omerta, inFrauD, and

16   others, for years.  These carding forums are like defendant's

17   virtual clubhouses, where he would hang out with other carders

18   and plan their crimes, share ideas and tools, trade information

19   on how to hack point-of-sale systems, chat about how to commit

20   credit card fraud, and gossip about who has the best dumps.

21   That evidence shows defendant knew exactly what he was doing.

22   He knew exactly what his customers would do with these cards,

23   and it shows he was actively assisting his customers and

24   working with them to commit fraudulent purchases, because he

25   fully intended for them to use the fake cards and come back to

1   him for more.

2        What about that fourth element, the requirement the

3   defendant transmitted or caused the transmission of wires in

4   interstate or foreign commerce?

5        Well, here's the chart that Detective Dunn went over with

6   you when he was testifying about his review of all the victim

7   systems.  Each of these arrows represents wire transmissions

8   defendant used, either to plant his malware on a victim system,

9   or wire stolen credit cards from the victim system to one of

10  his dump collection servers.  And every one of these wires was

11  in interstate or foreign commerce.  Whenever defendant

12  installed his malware on a victim computer, he pulled it down

13  from his malware server in Russia, the shmak or smaus server,

14  up here on the top left corner.  Sometimes he sent the stolen

15  numbers back to the same server, like in the case of

16  Schlotzky's Deli, Grand Central Baking, and Mad Pizza, Madison

17  Park, where the arrow is going in both directions, representing

18  the malware coming down and the numbers heading back to the

19  server.  Other times, he'd send the stolen data to the Ukraine

20  server or the HopOne server.  But in every single instance,

21  whether it was the malware or the stolen numbers, these

22  internet signals were traveling over the wires in either

23  interstate or foreign commerce.

24       For the specific wire fraud transmissions, you have this

25  chart in Exhibit 1.15 that Detective Dunn prepared.  And this

1   will be back with you in the jury room, and is an exhibit that

2   was admitted.

3       This chart shows each of the times defendant transmitted

4   malware to one of the victim computers.  And it also provides

5   you the IP address and location for the dump collection server

6   the defendant was using.  And you'll also find, in the far

7   right column, it gives you a reference to the underlying

8   exhibit, the forensic artifacts and details that Detective Dunn

9   found on those victim systems.

10      For Counts 9 and 10, which allege the transmission of

11  stolen credit card data from Village Pizza and Mad Pizza

12  Starfire -- not the installation, so this is the other half of

13  the scheme.  Most of these are related to installation of

14  malware.  But for Counts 9 and 10, you have Detective Dunn's

15  explanation of how that malware operated; that during the

16  entire time that the malware was running on those victim

17  computers, it's transmitting stolen credit cards, daily.  So

18  those cards are encompassed in the time period between the

19  installation date and the mitigation date, when law enforcement

20  responds and the scheme is brought to an end.

21      Once you have found defendant guilty of any particular

22  count of wire fraud, you're also being asked to determine

23  whether each count affected a financial institution.  It's

24  somewhat comical in this case.  We have thousands of banks

25  involved.  But this is why you heard from the National Credit

1   Union Administration and the Federal Deposit Insurance

2   Corporation, as well as from Ms. Wood.  As you heard from them,

3   the scheme unquestionably targeted banks, merchants, 3,700

4   different banks and over $169 million in losses.

5       What about the other charges you have to decide on?  Well,

6   I told you earlier, the wire fraud charges in the

7   infrastructure chart are a road map to all of these other

8   charges.  That's because the other charges, the intentional

9   damage to a protected computer, the obtaining information from

10  a protected computer, possession of stolen credit card, and the

11  aggravated identity theft, they're all separate but equally

12  illegal parts of the wire fraud scheme.  To complete this wire

13  fraud scheme, that you see in Counts 1 through 11, defendant

14  took each of the steps that is charged in the other counts.

15      The intentional damage charges, in Counts 12 through 20,

16  hold him to account for his installation of the malware on the

17  victim systems.  The elements of that crime are set forth in

18  Instruction 22.  And those elements provide that to find him

19  guilty, first, you have to find that he knowingly transmitted

20  codes or commands to a computer without authorization.  Second,

21  as a result of the transmission, he intentionally impaired the

22  integrity of the victim's system or information, specifically,

23  their credit card data.  And third, the computer was used in or

24  affected interstate or foreign commerce or communications.

25      We'll talk about the effect on interstate or foreign

1    commerce in a minute, because it applies to several of the

2    counts.

3        But the first two elements of this crime go to the heart

4    of the defendant's scheme.  Every time the defendant took his

5    malware and installed it on one of these victim machines, he

6    established the first two elements of that crime, knowingly

7    transmitting code with the intention of impairing the integrity

8    of the system and the data located on it.

9        For the counts of intentional damage to a protected

10   computer, once you've found the defendant guilty of any one of

11   those counts, you also have a follow-up question.  You have to

12   consider whether the offense caused loss to one or more

13   persons, during a one-year period, aggregating $5,000 or more.

14       You heard from several of the victims in this case.  These

15   point-of-sale intrusions cost them thousands and thousands of

16   dollars.  For each of them, the combined cost of incident

17   response, private forensic investigations, legal fees, fines

18   from Visa and MasterCard, and the damage to their business

19   reputations cost well over $5,000.  When a small business like

20   this is hit by a point-of-sale intrusion, they are on the hook

21   for at least $5,000 to $10,000 in fines, upwards of $20,000 to

22   $30,000 in private forensic investigation costs.  And this

23   isn't even counting the damage to their business reputation or

24   the costs like replacing their computers.  It's just not

25   seriously debatable that these attacks always caused more than

1    $5,000 in damages.

2        The next set of counts is Counts 21 through 29, which

3    charged defendant with obtaining information from a protected

4    computer.  And those charges are related to defendant's theft

5    of the credit card data from the victim systems.

6        The elements of obtaining information from a protected

7    computer are in Instruction 23.  And they state that to find

8    the defendant guilty of these counts, you have to find, first,

9    that the defendant intentionally accessed a computer without

10   authorization; second, by accessing the victim's computer, the

11   defendant obtained information; and that the computer was used

12   in or affected interstate or foreign commerce communications.

13   Again, these charges go to the heart of the scheme.

14   Defendant's entire infrastructure was established for the sole

15   purpose of intentionally hacking into these victim systems and

16   obtaining information, information including the millions of

17   stolen credit cards he later sold on his vending site.

18       You will find that these counts, the obtaining information

19   counts, cover a time period between the installation and the

20   mitigation of the malware.  Because any time within that

21   period -- or the entire time within that period defendant is in

22   control of those systems and obtaining information on a

23   regular, rolling basis, numbers rolling in to his dump

24   collection servers through the operation of his malware.

25       For those counts, again, you have a follow-up question if

1    you find him guilty.  For those counts, you have to decide

2    whether the offense was committed for commercial advantage or

3    private financial gain.  And the answer to that question is

4    fairly obvious from the facts.  The purpose of this scheme was

5    not charity.  The purpose of setting up those Liberty Reserve

6    accounts that received nearly $17 million in proceeds from his

7    credit card sales was private financial gain.  It was all

8    designed to line his pockets with the proceeds of these stolen

9    goods.

10        That brings us to the possession of unauthorized access

11   device charges in Counts 30 through 38.  Those charges account

12   for the fact that once he installed his malware on each

13   victim's point-of-sale system, he is then in possession of

14   every credit card number that transits that system, hundreds of

15   credit cards, every day, at every victim he had.

16        The elements of that crime are in Instruction 24.  And

17   they provide that to find defendant guilty of those counts, you

18   must find, first, the defendant knowingly possessed at least 15

19   unauthorized access devices at the same time; second, the

20   defendant knew that the devices were unauthorized; third, the

21   defendant acted with the intent to defraud; and fourth, the

22   defendant's conduct in some way affected interstate or foreign

23   commerce.

24        For those counts, the first thing you need to know is

25   that, as the Court has instructed you in Instruction 25, credit

1    card numbers are access devices.  This could be rewritten as

2    unauthorized possession of credit cards.  And an unauthorized

3    access device is basically a stolen credit card, or one that

4    was obtained with intent to defraud.  And in this case, again,

5    the entire essence of this scheme is defendant's theft of these

6    credit cards with the intent that they be used to commit fraud.

7    So again, these elements just aren't reasonably in dispute.

8        You also need to note that possession is not limited to

9    physical possession of a card, plastic card.  The Court has

10   instructed you, in Instruction 25, that a person has possession

11   of something if the person knows of its presence and has

12   physical control of it, or knows of its presence and has the

13   power and intention to control it.

14       Here, defendant was planting malware, on each of these

15   victim systems, that gave him complete control over the credit

16   card data on those systems.  On any given day, he was in total

17   control of hundreds of credit card numbers for each victim he

18   had.  And as a result, he was in possession of 15 or more

19   credit cards.

20       I skipped over that interstate commerce element for all

21   three of those last ones.  Each of these charges, intentional

22   damage to a protected computer, obtaining information from a

23   protected computer, and possession of 15 or more unauthorized

24   access devices, carries this element of an impact on interstate

25   or foreign commerce or communications.  This is an element you

1   see in a lot of federal criminal statutes, and it gives the

2   Court jurisdiction over this case.  Each of those crimes

3   requires proof that the crime affected interstate commerce,

4   either because the computers that the defendant hacked were

5   used or affected -- used in or affected interstate or foreign

6   commerce, or the stolen credit cards he possessed in some way

7   affected interstate or foreign commerce.

8       And in this case, you heard testimony that the computers

9   the defendant hacked, these are small-business point-of-sale

10  systems that are being used to process credit card payments

11  over the internet, from banks all over the country, and from

12  global credit card brands, like American Express, Discover,

13  MasterCard, and Visa.  And the credit cards he stole came from

14  banks all over the country, from local credit unions, like

15  BECU, the Seattle Metropolitan credit card -- Credit Union --

16  all the way up to well-known national banks, JPMorgan Chase,

17  Wells Fargo, Bank of America.  And what this tells you is that

18  any business handling credit cards, in this day and age, is

19  connected to interstate or foreign commerce.  And as a result,

20  those credit card numbers and the computers that the defendant

21  was attacking are protected under federal law.

22      Finally, we have the two aggravated identity theft

23  charges.  And those are just a couple examples of defendant's

24  possession of the means of identification, the names and credit

25  card numbers, of just two of the millions of people whose

1   credit cards defendant stole over the years he operated his

2   criminal enterprise.

3       The elements of aggravated identity theft are in

4   Instruction 27.  And they provide that to find the defendant

5   guilty, you must find beyond a reasonable doubt that, first,

6   the defendant knowingly transferred, possessed, or used,

7   without legal authority, a means of identification of another

8   person; second, the defendant knew that the means of

9   identification belonged to a real person; and third, the

10  defendant did so during and in relation to another crime,

11  specifically, here, the wire fraud or the unauthorized

12  possession -- or excuse me -- or the possession of 15 or more

13  unauthorized access devices.

14      Count 39 is related to defendant's possession of

15  Mr. Knoernschild's name and BECU credit card number.  This was

16  the credit card account that Mr. Forsythe, the former BECU

17  security investigator, talked to you about, and introduced in

18  the exhibit from his records the credit card track data that

19  had been stolen from Broadway Grill as part of the counts in

20  the wire fraud.  This was one of the first hacks that started

21  Detective Dunn's investigation.

22      And Count 40 is a bookend to this case.  It's related to

23  defendant's possession of Ms. Gebhard's BECU credit card that

24  Agent Fischlin showed you was sitting on defendant's laptop

25  when he was picked up in the Maldives, the one that Agent

USA vs. Seleznev, 8/24/16

1    Fischlin was able to trace back to Red Pepper Pizzeria and find

2    in the malware log files, sitting on their computer in Duvall,

3    7,500 miles away.

4         Speaking of Red Pepper Pizzeria, during Agent Fischlin's

5    cross, defense suggested that you don't have any evidence that

6    the defendant stole the credit card numbers there.  This was

7    the hack that was traced directly to defendant's laptop

8    computer.  This was the hack that Agent Fischlin only

9    discovered after finding Ms. Gebhard's credit card number

10   sitting in the dump file on defendant's computer, with the

11   title Washington 1000 [sic], and hundreds of credit card

12   numbers with Western Washington zips and cities listed.  The

13   attack on Red Pepper Pizzeria used the same remote desktop

14   methodology seen throughout this case.

15        And if that wasn't enough to convince you that defendant

16   is responsible for the intrusion of Red Pepper Pizzeria, the

17   password he used for the malware at Red Pepper Pizzeria should

18   put that to bed for good.  Exhibit 1.10, this is from the

19   artifacts that Agent Fischlin found on the system at Red

20   Pepper.  And the password for that malware was "2pacsakur,"

21   defendant's hero, his nic at the time that he was picked up in

22   the Maldives.  That's defendant's work.  That's defendant's

23   signature.  He hacked Red Pepper Pizzeria and stole those

24   numbers just as surely as he hacked all the other victims in

25   this case.  And that's why the numbers from Red Pepper Pizzeria

USA vs. Seleznev, 8/24/16

1    were sitting on his computer over 7,500 miles away.

2         So that's all of the charges in this case.  And even

3    though they're all part of the overall wire fraud scheme, each

4    count addresses a separate illegal act by the defendant, and

5    each charge constitutes a separate criminal offense.

6         So let's talk a little bit about what else is not really

7    in dispute here.  Nobody can reasonably dispute that these

8    victims were hacked.  And the hacker responsible for stealing

9    all these credit card numbers, they were -- the hacker

10   responsible for that hack was stealing all the credit card

11   numbers.  And it's not really debatable that someone launched a

12   series of computer attacks that involved port scanning or open

13   point-of-sale networks.  You've seen that evidence repeatedly,

14   in the HopOne servers, with the port scanning tools.  You've

15   seen it in the rubensamvelich accounts, with abuse reports

16   recording port scanning.

17        Nobody can dispute that the shmak and smaus server was

18   planting malware on computers all over the world.  You've seen

19   the malware on the victims' computers.  That didn't come with

20   those systems.  The business owners sure didn't put it there.

21   That malware was put there by the hacker responsible for these

22   crimes.  The evidence you saw, the pieces of code that

23   Detective Dunn found on these systems, showed how that malware

24   was sending the stolen credit card numbers out to one of three

25   different servers throughout the course of this scheme.

USA vs. Seleznev, 8/24/16

1    And no one can reasonably dispute that these vending

2    sites, track2, bulba, and 2Pac, were selling millions of stolen

3    credit cards that trace back to victim merchants in this case.

4    Those sites are criminal on their face.  They don't even

5    pretend to be legitimate.

6    No one can reasonably dispute that all of this activity,

7    the hacking and credit card trafficking, traced to all this

8    cybercrime infrastructure you've seen in the infrastructure

9    chart over the past week and a half, you can't dispute that

10   this caused an enormous financial loss to thousands of banks

11   and merchants all over the country.  And the testimony you

12   heard from the victims demonstrates the damages it caused.

13   The only question you really have to answer in this case

14   is whether the defendant was the man sitting behind the

15   keyboard, responsible for all of this hacking and credit card

16   trafficking.  That comes down to the evidence you've seen tying

17   him to each of the nics that he used to run the scheme, each of

18   the pieces of infrastructure on this chart, the e-mail

19   accounts, the domains, and the servers that were used to

20   operate this scheme.

21   Time and again, that evidence consistently points to just

22   one person, across multiple sources of evidence.  It

23   consistently points to the defendant.  The defendant is the

24   person behind these nicknames:  NCuX, track2, bulba, and 2Pac.

25   These were the nics that the defendant hid behind.  These were

1  the nics that defendant had carefully crafted and cultivated

2  for years to build a reputation as one of the biggest and most

3  reliable sources of credit card data on the internet.  But

4  despite his best efforts to hide behind those nics and keep his

5  true identity out of the hands of law enforcement, he slipped

6  up.  And he slipped up repeatedly.

7      At the beginning of the trial, Mr. Wilkinson told you how

8  defendant left traces of his identity, digital fingerprints,

9  all over the crime scene in this case; how defendant left his

10  digital fingerprints on the infrastructure used to run his

11  enterprise, the e-mail accounts, the servers, and the domains

12  that he used to operate this entire scheme.  But unlike a

13  physical crime scene, where a defendant may leave a single

14  fingerprint, or maybe a partial fingerprint, Mr. Seleznev left

15  dozens of fingerprints.  He left them nearly everywhere he went

16  on the internet.

17      Before agents even opened up defendant's laptop and found

18  his stash of $1.7 million credit cards, before they discovered

19  his posdumps tutorial and the cheat sheet with the credentials

20  for all his criminal infrastructure, agents had traced every

21  piece of criminal infrastructure we've seen in this case to one

22  person by following defendant's digital fingerprints across the

23  internet.  He left them on the dump servers he used to collect

24  stolen goods.  As you saw in this exhibit from the HopOne

25  server, where defendant is buying an airplane ticket in his

USA vs. Seleznev, 8/24/16

1   true name, with his true date of birth, and the passport number

2   from the passport he was carrying when he was caught three

3   years later in the Maldives.

4        He left them in the e-mail accounts he used to manage his

5   credit card vending sites, like this PayPal receipt that

6   Detective Dunn found in the rubensamvelich account.  Remember,

7   the rubensamvelich account is the one used to manage the HopOne

8   server, as well as defendant's vending sites at the track2

9   domains.  And this receipt that Detective Dunn found didn't

10  just have defendant's name.  It had defendant's home address,

11  in Vladivostok, that was listed as his primary residence in the

12  passport he was carrying when he was taken into custody in the

13  Maldives.

14       And the flower orders for his wife and other internet

15  receipts found in the boookscafe account, this is the account

16  that defendant was using to manage the shmak and smaus server,

17  as well as his nCuX domains, earlier in his career.  And you'll

18  find in this receipt one of his phone numbers, ending in 5285,

19  the same phone number that shows up on his PayPal records in

20  his true name, Roman Seleznev, as well as on three accounts he

21  opened in one of his fake names, Roman Ivanov, and in the

22  Western Union records when he went to pick up a wire transfer

23  and presented his real passport, again with his real date of

24  birth and the same passport number that matched the one found

25  on him when he was arrested.

USA vs. Seleznev, 8/24/16

```
 1        Why is it the defendant's name, defendant's date of birth,
 2   his passport number, and his phone number, all of his digital
 3   fingerprints, not Roman Ivanov, not Romper Stomper, or some man
 4   named Alexey Davydov, or any one of defendant's other names?
 5   Why is it the defendant's name and true identifiers keeps
 6   popping up in all of the places tied to this criminal
 7   infrastructure?  It's there because these are his accounts.
 8   These are his servers and his domains.  His name keeps popping
 9   up everywhere because he's running this entire show.
10        But he didn't just leave digital fingerprints on these
11   crime scenes.  Unique usernames and passwords are today's
12   digital equivalent of a signature.  How many of you have that
13   go-to username and password that you put on random internet
14   sites that you have to go to, and you're sick of trying to come
15   up with a new and unique password for every single internet
16   store you go to?  Everyone has them.  We're told, "Stop using
17   the same username.  Stop using the same password."  But they're
18   difficult to remember.  Everyone has a go-to username.  The
19   defendant tried to use different usernames.  But just like
20   everyone else, he gets sick of making up new names and
21   passwords.
22        A few of defendant's usernames and passwords have been a
23   constant throughout his criminal career on the internet.  As
24   you go through the evidence in this case, you may notice that
25   defendant's career as a carder has three chapters.  They
```

1    correspond to his primary nics, nCuX, track2, bulba, and 2Pac.

2    NCuX generally covers the time period from about 2007 to 2009.

3    Track2 and bulba cover the time period from 2009 through

4    roughly 2012 or early 2013.  And 2Pac was the nic that the

5    defendant adopted in 2013 and kept through the date of his

6    arrest.

7        And while defendant changed those primary nics, the ones

8    he displayed for the world to try to keep distance from his

9    true identity, he consistently used three background or go-to

10   nics and passwords for his back-end accounts, his personal

11   internet browsing, the things he thought were hidden behind his

12   keyboard:  Smaus, ochko, shmak.  Those are defendant's go-to

13   usernames and passwords that he used to sign the digital crime

14   scenes in this case, over and over again.  Those three

15   accounts, especially smaus and ochko123, it's a thread that

16   runs through defendant's entire career.  Smaus and ochko123

17   show up all over this case, and they tie this defendant to the

18   infrastructure he's used since his days as nCuX, back in 2006,

19   all the way through the day of his arrest.

20       Look at this e-mail in Exhibit 5.15 from the boookscafe

21   account.  This is where defendant is talking to one of his

22   customers about his BIN list, when he's still operating as

23   nCuX.  And he's telling his customer to check out one of his

24   domains, nCuX.name.  If you look towards the bottom of this,

25   you'll notice he's named one of his BIN lists "smausBIN."  That

1   signature, smaus, along with the password ochko123, shows up

2   repeatedly in the boookscafe account for defendant's personal

3   internet accounts.

4        If you recall, the boookscafe account is an older account.

5   It had been in operation for a long time.  It had been opened

6   up in 2006.  And defendant began using it as early as 2007, in

7   the name nCuX.

8        This is Exhibit 16.2.  This is the chat with uBuyWeRush.

9   This is where defendant was talking to uBuyWeRush to order one

10  of these, an MSR206, our handy card reader and writer.  And you

11  see in this he listed his true name; his true address, same one

12  that shows up in his passport; and the e-mail address

13  boookscafe@yahoo.com, as early as February 2007.  Defendant

14  used that boookscafe account for years to run his credit card

15  trafficking enterprise as nCuX, before supposedly retiring in

16  2009.

17       He also used that e-mail account, the boookscafe account,

18  to manage the smaus and shmak server.  These receipts I have on

19  the screen now, these are from FirstVDS hosting.  You can find

20  them in Exhibit 5.11A.  They show the defendant managing the

21  smaus server, smaus.fvds.ru.  But even though defendant retired

22  his nCuX name, he never retired this server.  This is the

23  server where he kept his toolkit.  This is the server where he

24  hosted all his malware, the malware that he was pulling down

25  onto the victims' systems.

USA vs. Seleznev, 8/24/16

1     It's also the first server that Detective Dunn saw in this
2   case.  Remember his testimony about going out to Coeur d'Alene,
3   Idaho, in May of 2010, in response to Schlotzky's Deli, the
4   very first victim that Detective Dunn responded to.  And one of
5   the first things he noticed was that IP address,
6   188.120.225.66.  That same server is the server Detective Dunn
7   found in the internet history for several victim systems
8   pulling down the malware defendant used to scoop up credit card
9   track data.  But when Detective Dunn first saw it, it had been
10  renamed, shmak.fvds.ru.  Shmak is another one of defendant's
11  go-to usernames.  Not only did defendant rename the smaus
12  server to shmak, it's the name he used for some of the early
13  versions of his malware seen at Schlotzky's Deli.
14     Defendant's shmak username also shows up on other parts of
15  the infrastructure.  When Detective Dunn searched the HopOne
16  servers, one of the first things he noticed was the username
17  for that server, logging in from Indonesia, was also shmak.  An
18  internet history on the HopOne server tied it right back to the
19  shmak server in Russia, as defendant was surfing his malware
20  storage.
21     The shmak and smaus server, and its ties to HopOne, are
22  the bridge between defendant's days as nCuX and the emergence
23  of track2 and bulba.  And the HopOne server brings you full
24  circle to the rubensamvelich account.  That's the e-mail
25  account with the PayPal receipt, the one that defendant was

USA vs. Seleznev, 8/24/16

```
1    using to manage the HopOne server and the track2 vending sites.
2    These are the servers and the sites that defendant opened up in
3    2009 and 2010, after ditching his nCuX name and taking on the
4    persona of track2 and bulba.  What do we find there, in the
5    rubensamvelich account, but the same smaus and ochko123
6    password, over and over again, for personal internet accounts.
7         And tying it all together, in 2014, defendant's go-to
8    username, smaus, is the username he chooses for the laptop
9    strapped to his shoulder when he was caught on vacation in the
10   Maldives.  How many of you guessed the password for that
11   computer?  Agent Fischlin got it right on the very first try,
12   ochko123.  Of course he guessed it right.  It was everywhere.
13   It was the thread connecting defendant to all of the
14   infrastructure throughout this case.
15        That signature password and the smaus username ties
16   defendant to everything, his days as nCuX, the boookscafe
17   account, the rubensamvelich account, the HopOne server,
18   everything.  And it ties him to this laptop with all of the
19   incriminating evidence that Agents Mills and Fischlin found.
20   It opened up a flood of incriminating evidence that this
21   defendant is utterly desperate to avoid.
22        Mr. Blank would have you believe that all of this evidence
23   on defendant's laptop can't be trusted; that some super-hacker
24   planted 1.7 million credit cards and all this internet history,
25   carding forums, pages of user credentials for defendant's
```

1    criminal infrastructure; and that this super-hacker somehow

2    went about erasing the hundreds and hundreds, if not thousands,

3    of internet artifacts and forensic artifacts that would have

4    shown something like this had happened.

5        But Mr. Blank is an advocate.  He is an attorney, paid by

6    the defendant.  Without even looking at the forensic evidence

7    before writing his report, he claims this computer can't be

8    trusted.  Mr. Blank has sold his opinion to the highest bidder,

9    and his testimony is contradicted by all of the evidence in

10   this case.  He's brought you absolutely nothing to support this

11   opinion.  And he wants you to ignore a mountain of forensic

12   evidence that directly contradicts everything he said.  It's

13   based on pure speculation.

14       And the Court has instructed you, in Instruction Number 3,

15   that this just doesn't cut it.  Reasonable doubt is doubt based

16   upon reason and common sense.  It isn't based purely on

17   speculation.  And that's all that Mr. Blank has offered you,

18   speculation.  He wants you to ignore the security logs, ignore

19   the event logs, ignore all the registry keys, ignore the Volume

20   Shadow data that Mr. Carroll told you about.  All of the logs,

21   all of the databases, all of the evidence on this computer, and

22   everything you saw before that computer, shows that nothing was

23   wrong with this.  The evidence on that computer is inherently

24   trustworthy.  And the last person to ever log on to that

25   computer was this defendant, on July 5, 2014, right before he

1   was captured.

2        But, of course, the defendant wants you to ignore that

3   evidence.  It's the nail in his coffin.  That computer is

4   loaded with evidence of his crimes.  It shows his internet

5   history, browsing to all of these carding forums, hanging out

6   on some of the world's most notorious carding forums, and

7   advertising his own vending sites, 2paccc, the best dump

8   market.  It has defendant's banner ad for his newest vending

9   site, conveniently placed on his desktop within easy reach so

10  he could add it to any carding forum that advertises here.  And

11  it has cheat sheets with the passwords and usernames for his

12  entire criminal enterprise, going back to his days as bulba.cc,

13  including his Liberty Reserve account credentials, where he

14  received the millions of dollars in proceeds, and his carding

15  forum logins that he was using to advertise his goods.

16       And all of this evidence on the laptop is not only

17  corroborated by the fingerprints and digital signatures he left

18  throughout the crime scene over several years, it's also

19  corroborated by the defendant's iPhone.  Mr. Blank didn't say

20  anything about the iPhone.  And you've seen that, too, has the

21  references to smaus and ochko, as well as defendant's BTC,

22  Bitcoin, account, his preferred method of currency as 2Pac.

23       At the beginning of this trial, Mr. Browne told you that

24  the world is watching.  Darn right, the world is watching.

25  This defendant has been wreaking havoc all over the world for

```
 1   nearly a decade, hacking victims like Diane Cole, who had to
 2   pull out her own credit card to cover the payroll; and CJ
 3   Saretto, who had to shut down Broadway Grill and declare
 4   bankruptcy after defendant's attack on their point-of-sale
 5   system destroyed their business's reputation in the community.
 6   These were victims who thought they had done everything right,
 7   victims who thought their point-of-sale systems were secure,
 8   who had no idea that this defendant was prowling the internet
 9   at night, looking for unlocked doors he could barge through and
10   steal from their systems.
11        Members of the jury, the evidence in this case supports
12   only one conclusion.  The person behind these attacks is this
13   defendant, Roman Seleznev.  His digital fingerprints and
14   signatures scattered about the e-mail accounts, servers, and
15   domains used to run his enterprise that he was -- show that he
16   was the person behind the keyboard, who was acting as nCuX,
17   track2, bulba, and 2Pac, from 2007 through the day he was
18   arrested in 2014.  He was the person running one of the world's
19   largest credit card trafficking schemes, responsible for over
20   $169 million of credit card losses, thousands of banks and
21   merchants around the world.
22        Because all of the evidence in this case has consistently
23   pointed to one person behind the keyboard, we ask that when you
24   go back to the jury room, you return the only verdicts that are
25   supported by the evidence in this case, and that is guilty on
```

1     all 40 counts charged.

2          Thank you.

3          THE COURT:  Members of the jury, we'll take our

4     morning recess at this time.

5                    (Jury exits the courtroom)

6          THE COURT:  Counsel for the government, anything to

7     take up?

8          MR. BARBOSA:  No, Your Honor.

9          THE COURT:  Counsel for the defense?

10         MS. SCANLAN:  No, Your Honor.

11         THE COURT:  Just a reminder to all persons present,

12    there are no recordings that are authorized or allowed by this

13    Court.  The only authorized person to record anything that

14    takes place in this courtroom is the court reporter.  Anyone

15    else conducting such activity is engaging in illegal

16    operations.  So if you're doing that, you need to stop.

17         We'll be in recess.  Fifteen minutes.

18                         (Recess)

19                 (Jury enters the courtroom)

20         THE COURT:  Ladies and gentlemen, I now ask you to

21    give your undivided attention to Ms. Emma Scanlan, as she gives

22    her closing remarks on behalf of her client, Roman Seleznev.

23         Counsel, you may proceed.

24         MS. SCANLAN:  Thank you, Your Honor.

25         Good morning.  I just want to start by pointing out that

1    there seems to be a certain arrogance to the investigation and

2    the presentation of this case.  So there's a complete denial of

3    the fact that we are standing here today in what is commonly

4    known as real life.  It's not on the internet.  It's not on a

5    computer.  It's not digital.  It's the things that you can see,

6    hear, now.  Everything the government has shown you is outside

7    of where we stand right now.  And this is where you have to

8    make a decision.  This is where all of the judgments occur.

9        Remember the woman in the photo?  We keep seeing the

10   picture of the airport.  And you see Roman, and there's a woman

11   in the photo.  We didn't hear anything about anyone

12   interviewing her.  Did anybody ask her, "Hey, is Roman a

13   prolific hacker for all the world to see, or not?"  Not that we

14   know.  Why not?

15       We heard Agent Mills talk about Roman's ex-wife.  He

16   interviewed her.  We saw a picture of her.  She's not here.

17       And how about all these shadowy co-schemers, who are

18   somewhere, apparently, out in the world, where are they?  Who

19   are they?  Where are the things that tie us tangibly to the

20   truth of this case?

21       The government has said they started investigating Roman

22   sometime around 2010.  We heard some stuff about a nickname

23   that started in 2007.  So we're talking about the federal

24   government.  We're talking about the United States Secret

25   Service.  We don't have a single picture of Roman sitting in

USA vs. Seleznev, 8/24/16

```
 1    front of a computer.  Where is it?  We have all this time.  You
 2    know he's in the Maldives, for example.  That's not in Russia.
 3    We're not talking about extradition treaties.  Why don't you go
 4    and see if he's got his computer at the pool, and you can take
 5    a picture?  And that's the underlying arrogance of this case,
 6    is this idea that that's not necessary.  We don't need to do
 7    that.
 8         And so you see the diagrams.  We have the track2
 9    infrastructure diagram.  We've all seen it a bunch of times.
10    It has the shmak server.  It's got HopOne, all the arrows.  And
11    then on the top left-hand corner, there's a laptop.  And then
12    Mr. Barbosa kept telling you, "This is the defendant" --
13    point -- "sitting behind the laptop."  And everything that
14    we're looking at is a blank screen.  Here he is, sitting behind
15    the laptop.  And you're staring at a blank screen.  And that's
16    not enough.  That's not enough to have somebody sit here in
17    federal court, accused of crimes like this, that are this
18    serious.  And there's an arrogance to that that is not
19    acceptable.
20         So let's talk about what we're here -- what you're here to
21    decide.  You're here to decide if the government has proved
22    beyond a reasonable doubt that Mr. Seleznev is guilty of these
23    charged offenses.  We are not here to decide if he is track2.
24    We're not here to decide if he's bulba.  It's really important
25    in this case to separate out all of this stuff about these
```

1    e-mail addresses and these nicknames from what it is you're

2    actually here to do.  We are here to look at these counts for

3    each one, and make a decision.

4        Where do you start?  At the beginning of the trial, back

5    when the lawyers were talking to you, so it was -- who was it?

6    It was Mr. Browne and one of these guys.  There was this idea

7    about the presumption of innocence.  And everybody's heard

8    that.  We've all seen *Law & Order*.  And we talk about it all

9    the time, and it kind of becomes a concept where we all assume

10   that we know what that means.  And one of the jurors

11   acknowledged that, actually, if you're going to work with that,

12   that it takes an effort.  It's hard to start out thinking that

13   somebody is innocent.  And it's hard to maintain that thought

14   when you have lots of witnesses, and a whole bunch of them are

15   federal agents, and you've got lots of exhibits.

16       And as they highlighted in opening, and now in closing,

17   you have 40 counts.  The fact that you have 40 counts doesn't

18   make any one of those counts any more true.  You can charge

19   somebody with one crime, you can charge them with 40 crimes,

20   you can charge them with 200 crimes.  Each one is its own

21   individual consideration.

22       Roman -- we talked about this at the beginning, with the

23   presumption of innocence and the proof beyond a reasonable

24   doubt, he doesn't have to prove to you that he's innocent.

25   That's not how it works.  All of these people that come in here

 1    and tell you things for the government, that's their job.  It's

 2    also their job to make sure that you can understand what it is

 3    they're asking you to convict Roman of.

 4        So I was sitting around thinking about this yesterday,

 5    after we ended court, and I started making a chart.  Here are

 6    these 40 counts.  Now, what is the evidence that actually ties

 7    my client to each of these counts?  And I did this exercise for

 8    probably 20 minutes.  And then I crossed it all out, because I

 9    realized that that is not my job.  It's also not your

10    responsibility.  If you are confused about what evidence they

11    presented actually means he's guilty of a specific count, that

12    can be a reasonable doubt.  You don't have an obligation to go

13    back and tie it all together for them.  You don't have to go

14    back and take these nicknames, and these e-mail addresses, and

15    figure out what in the world they have to do with aggravated

16    identity theft.  That's not your job.

17        Let's talk about Detective Dunn.  We've had a lot of

18    people come in here.  Detective Dunn is the one who works for

19    the Seattle Police Department, and then also has a private job.

20    So he was one of the first witnesses.  He told you that Roman

21    was the victim of a bombing in Morocco on April 20 of 2011, one

22    of the victims of this incident.  And he was talking to you

23    about the bulba.cc website.  And he told you that it was his

24    understanding that Roman was very seriously injured, injured

25    such that he was incapacitated through December of that year;

USA vs. Seleznev, 8/24/16

1    so we're talking about April to December of 2011.  During that

2    time period, Detective Dunn logged on to bulba, and he saw all

3    of these different credit card tracks for sale.  In July, there

4    was first 40,000, and then there was a hundred thousand.

5        So did that make Detective Dunn wonder if he was right

6    about who his primary suspect was?  No.  Instead, what he did,

7    and what he told you he did, is that from August of 2011, right

8    after those tracks came up, until the end of the year, he just

9    stopped investigating.  And he stopped investigating, as he

10   said, because his primary suspect was in the hospital.  Well, I

11   would submit to you that that's not how you do it.  The idea of

12   this type of investigation is to figure out the truth, not to

13   start with your idea of what's true, and then make it all fit

14   on the back end.

15       Another example of this is Exhibit 16.12.  It would be

16   16.12.  One second.

17       Your Honor, may I have one moment?

18            THE COURT:  You may.

19       Members of the jury, if you'd like to stand and stretch,

20   please feel free to do so.

21            MS. SCANLAN:  Thank you.

22            THE COURT:  Please be seated.  You may continue.

23            MS. SCANLAN:  Okay.  This is one of these exhibits

24   that you will have back in the jury room.  So this is Summary

25   Exhibit 16.12.  It's one of the government's exhibits.

USA vs. Seleznev, 8/24/16

1      Now, this is more than just this one page.  It's this list
2    of all the businesses Detective Dunn said were sending credit
3    card data to the HopOne server.  But when we asked him about
4    this, did you -- I mean, "Where are you getting this?  Did you
5    verify this?"  He said he verified 20 of them.  So we have 600
6    businesses that are alleged here on this exhibit, 20 of which
7    are verified.  And it's kind of a continuing theme.  There are
8    other things in this case that I think -- I submit should give
9    you pause.  There are things that are neon signs pointing to
10   Roman, that maybe they're just a little too bright.
11      So you have Exhibit 5.14; okay?  So this is the e-mail
12   where -- he -- whoever, the boookscafe guy, is saying -- at the
13   top, it's highlighted, "I use it for illegal purposes."
14      Okay.  If you're one of the most prolific hackers in the
15   world, and you're super-sophisticated, are you really sending
16   e-mails to outside companies saying, "Hello, I'm doing
17   something illegal"?  I don't know.  But I'll tell you, they
18   don't know either.  Because I haven't heard anybody who went
19   and investigated, or talked to this Christopher person, who's
20   corresponding, supposedly, with Roman, "Hey, Christopher, are
21   you a real person?  Is this a real e-mail?"  No.  We're relying
22   so totally on the digital evidence that it seems there's no
23   need to actually go and figure out if some of this stuff is
24   true.
25      And we have the same thing with Exhibit 5.6.  This is the

 1   flower order receipt.  Mr. Barbosa was just talking to you
 2   about this one too.
 3       Okay.  We have a receipt that says flowers were sent to
 4   Svetlana, who is Roman's ex-wife.  Well, this is the company
 5   name, right, "sendflowers.ru."  Who verified that?  Who even
 6   tried to check and see if this is a flower company, or if this
 7   is a receipt?  Did we ask this company, "Did you send flowers
 8   on that day to anyone?"  No.  But why not?  This isn't an
 9   investigation that happened in 30 days.  As they keep
10   stressing, this is an investigation that occurred over four,
11   five, six years.  No one felt the need to verify any of this
12   information.
13       And it's the same thing with the posdumps website.  So you
14   just saw that a couple minutes ago.  And Mr. Barbosa was
15   telling you how remarkable it is that it says on there,
16   "Remember, this is the illegal way."  Well, something just
17   isn't fitting here.  So is he a sophisticated hacker, or is he
18   a total idiot, frankly?  Is he creating things and then just
19   saying, right there, on the internet, that they're illegal?  I
20   would submit to you you can't have it both ways.  Is it one or
21   is it the other?  So is this his, or is it not?  I don't know.
22       The other thing about what Detective Dunn told you is that
23   he told you that back to when Roman was injured, that time
24   period, that he was still communicating with somebody at
25   bulba.cc.  He was asked by the government who that was.  And he

USA vs. Seleznev, 8/24/16

1   said there were two parties, admin and support.  Well, as far

2   as I recall -- and trust your collective memories over mine --

3   but my recollection is that the government keeps saying that

4   Roman is admin.  So how is Detective Dunn talking to Roman when

5   he's saying that Roman is unavailable?  And who's going to

6   explain that?

7       How about the IP address for shmak or smaus, whatever it's

8   called?  So in that diagram, it's the one that they keep

9   telling you the malware came from to all these businesses.

10  Detective Dunn told you that he went on the internet, he got on

11  the server, he downloaded the malware, and it worked just fine.

12  So if this was malware that belonged to Roman, and it was just

13  his, it was just this group's, why is it so openly available?

14  Why isn't it protected by even a basic username and password?

15  We saw multiple websites in this case with username and

16  password login screens.  But this malware, that's supposedly

17  such a signature for this individual, is just readily

18  available.  You can just go and get it.

19      And I think part of what the government would tell you,

20  perhaps, is that this is the shadowy co-schemers; right?  This

21  is all the people that we have no idea who they are.  And

22  they're using it too, and so that makes him responsible for it.

23  But we have -- who are these people?  How can you ask to hold

24  someone responsible for something when you really have no idea

25  who they're saying did what, when?

1    You have an instruction, Instruction Number 21.

2  Instruction Number 21 is about this whole concept of the scheme

3  to defraud.  So these are all the co-schemers, whoever they may

4  be.

5    First, you have to decide -- at the outset of this

6  instruction that the judge has given you, you have to decide

7  first, before you start holding Roman responsible for what

8  these unnamed people did, you have to decide that he's a part

9  of a scheme with them.  I would submit to you that you don't

10  have enough information right now to make that decision.

11  There's been a lot of speculation, there's been a lot of

12  guesses, about what the connection between Roman and these

13  unnamed people is.  But the speculation of who it could be and

14  who it might be isn't in evidence.  There's no scheme that's

15  been proven here.

16    So Instruction 28 is kind of a similar situation.  This is

17  what we would call an instruction on aiding and abetting.  So

18  it's very similar to the scheme to defraud instruction, and

19  it's really the same issue.

20    This instruction is telling you that Roman can be

21  responsible for what other people did.  I would draw your

22  attention to what starts on Line 16.  The line numbers are over

23  on the left.  It's not enough the defendant merely associated

24  with the person committing the crime, or unknowingly or

25  unintentionally did things that were helpful to that person, or

USA vs. Seleznev, 8/24/16

1    was present at the scene of the crime.  The evidence must show

2    beyond a reasonable doubt that the defendant acted with the

3    knowledge and intention of helping that person commit these

4    offenses.

5         So just because you can link Roman to a website, and you

6    know that people on that website were doing a bad thing, that's

7    not aiding and abetting.  Showing an association, without more,

8    is not a crime.  You have to show what specifically this person

9    did; not just was he on the website, what did he do that aided

10   and abetted these other people?

11        And we don't know what he did or didn't do at this point.

12   We know he -- I'll give it to you.  He's associated with all of

13   these things, with these websites and the HopOne server.

14   They've clearly shown these kind of paths of association.  It's

15   not the same thing as committing a crime.  So you have to be --

16   that's part of what's difficult here.  You have to be careful

17   in this case.  Because you can show that somebody hangs out

18   with bad people, or goes on bad websites.  That doesn't mean

19   they transmitted malware on a particular day to the Broadway

20   Grill.  We have to separate those two things out and focus on

21   what he is charged with.

22        And speaking of the Broadway Grill, so the Broadway Grill,

23   Detective Dunn told you there was 32,000 credit card numbers

24   that were in a text file.  This text file was exfiltrated, or

25   taken away from, the Broadway Grill's server, and sent

 1  somewhere else by someone who was not allowed to be in that
 2  system.  Where did it go?  It went to a website called
 3  SendSpace.  When you look at your diagram they've been showing
 4  you, it's not on there.  There was absolutely no connection,
 5  whether association or not, between Roman and SendSpace.  So
 6  when they ask you to convict Roman of taking that and doing
 7  that, that should give you pause.  It's not that easy.
 8       So the government -- it makes a lot of easy sense to say
 9  all of this starts with the wire fraud counts.  If you look at
10  these, then it's like dominoes.  All these other things are
11  true, all the way down the line, all of these 40 counts.  But,
12  no.  They're each individual decisions.  So you have to decide
13  if that's enough to tie Roman to somebody sending credit card
14  numbers to SendSpace, or not.  There's no domino effect here.
15  Each one is an individual decision.
16       Agent Szydlik, he was one of the agents that came from
17  Washington, D.C.  So he talked to you a little bit about the
18  same sort of speculative co-schemers.
19       So if we look at Exhibit 10.3, now this -- you'll have
20  this, so I'm not going to make you read this.  This is another
21  one of those things that's really not explained.  So the
22  government has said that Roman is 2Pac.  Roman was arrested on
23  July 5 of 2014.  On July 21 of 2014, the agent told you, 2Pac
24  logs on to the carding forum verify.ru.
25       And he also told you that these nics -- so 2Pac is a

1    nickname, or "nic" -- are very valuable.  I think an analogy

2    for the value of that, for instance, would be that Microsoft

3    calls their operating system "Windows."  You can't open a

4    computer company and name your operating system "Windows,"

5    because that's their name, and they've built it as a brand, and

6    people trust it because of that branding.  And they've drawn

7    that analogy for these nics.  2Pac is a name that, apparently,

8    had weight in this particular community.  So it's not a name

9    that you can just adopt willy-nilly.  But here it is.

10        So Roman -- no one disputes that Roman has no access to a

11   computer at that point.  But here's 2Pac.  Now, the explanation

12   for this has been that there are co-schemers.  Who?  Who are

13   the co-schemers, and where are they?  I don't know.  So you can

14   speculate that it's a co-schemer.  You could also think that

15   perhaps it's just not Roman.  But either way, you don't know.

16   We don't know what the answer is to that.  And these are the

17   types of things that should give you pause when you look at

18   this case.

19        And it's the same thing -- we talked to that agent a

20   little bit about IP addresses, in general.  So he said, quite

21   honestly, that an IP address can connect to a particular

22   computer or an entire network of computers.  We talked to him

23   about internet cafes.  So if I sit down in an internet cafe, on

24   a computer, and I get up, Mr. Barbosa sits down right after me,

25   he gets up, you can't tell which one of us did what, just the

1    fact that we were at the same IP address.

2         That's another issue.  An IP address is not a digital

3    fingerprint.  An IP address is a location of a computer or an

4    entire network.  That's why it might have been important to

5    actually connect Roman to a keyboard.  That's why it is

6    important to recognize that when we say Roman is at that

7    keyboard, what we're looking at is a blank screen.  Because an

8    IP address is really not enough to identify an individual

9    person.

10        Let's talk about Mr. Fischlin in the context of the Red

11   Pepper Pizzeria.  So there's so many agents -- he's the agent

12   who came here, who recently left the Secret Service and went to

13   the postal inspection office.  He's the one who went to Red

14   Pepper Pizzeria, to the guy's garage, and took the servers and

15   looked at those.  So that is Counts 11, 20, 29, 38, and 40.

16        Mr. Barbosa mentioned, and I think he's correct, that the

17   defense position is that there was no evidence that Roman had

18   anything to do with taking the credit card numbers off of that

19   server.  So Mr. Fischlin came here, and he told you that the

20   malware that was installed in the Red Pepper Pizzeria system is

21   called Perfect Keylogger.  It's not called kameo, or dtca, or

22   dtca2, or any of those.  It's something called Perfect

23   Keylogger.  He also told you that that malware is commercially

24   available.  So in other words, you can just buy it.  That's the

25   malware that was seen on the Red Pepper Pizzeria system.  Then

1   somehow the credit card numbers got off of that system and went

2   to wherever they were going.  And he acknowledged that he can't

3   say how that happened.  Well, if he can't tell you how that

4   happened, then I would submit you can't really convict Roman of

5   doing that.

6        Now, Mr. Barbosa said, "Sure you can, because there's

7   credit card numbers on the HopOne server."  Well, that's proof

8   that there's credit card numbers on the HopOne server.  Yep.  I

9   agree with that.  That is not evidence -- again, separating out

10  the counts -- that someone took credit cards off of Red Pepper

11  Pizzeria's system and sent them somewhere.

12       So when you look at all these counts by the victim

13  business, make sure you separate it out, please, exactly what

14  is alleged in each count to have happened.  Because there's

15  different varying things going on here, in terms of what proves

16  each of these charges.

17       Megan Woods [sic].  Megan Woods was the data analyst from

18  the Secret Service.  So Ms. Woods does not appear to be an

19  accountant.  So I'm going to acknowledge that.  But -- so she

20  took, at the instruction of someone else, I'm sure, all of

21  these credit card numbers that the agents and the detectives

22  sent her, and she sent them all to Visa and MasterCard and

23  Discover and AmEx, and they sent back a bunch of information.

24  And then there was a decision made about what financial

25  institutions that went with.  But she told you, no one verified

USA vs. Seleznev, 8/24/16

 1    any of that.

 2         So Mr. Barbosa is talking about these 3,300 financial

 3    institutions.  Well, maybe.  No one has verified any of that

 4    information.  And the excuse for that was that there isn't

 5    time.  There hasn't been time in the last four years, before

 6    you accuse somebody of 1.7 -- or however -- $170 million in

 7    loss, of perhaps verifying the accuracy of that information.

 8         Or how about the credit card account holders themselves?

 9    There was kind of an insinuation that it's ridiculous that

10    somebody could try to contact all those people.  Okay.  How

11    about a sampling of them?  How about you call 100 of them?

12    "Hey, I see that there's a credit card transaction here with

13    your name on it.  Is this a fraudulent transaction?  Did this

14    happen to you?"  That's not beyond the pale of what we should

15    expect from our federal law enforcement.

16         Okay.  Counts 12 through 20 are the intentional damage to

17    a protected computer.  So, first of all, you might want to ask

18    yourself if these are protected computers.  So what we've heard

19    from everyone is that these computers have vulnerabilities.

20    And it's not -- I'm not blaming Mr. Saretto, or the Casa Mia

21    owner for this.  That's not what we're here to do.  What I'm

22    saying is that their systems were vulnerable.  They weren't up

23    to code for what -- the protections they needed to have to take

24    these credit cards.

25         And all of those fines -- and when you're asked to find

USA vs. Seleznev, 8/24/16

1   this $5,000 or more for each of them, they were fined this

2   money, not because somebody took their credit cards, but

3   because their systems weren't compliant.  I am certainly not

4   saying that what happened to them is fair or deserved because

5   of that.  Nobody is going to stand here and tell you that.  I

6   am saying that before you convict somebody for a certain sum of

7   money, you need to decide why those fines were assessed.  And

8   were they assessed because somebody took credit card numbers,

9   or were they assessed because these businesses aren't

10  compliant?  It's a decision that you need to make.  But I would

11  submit to you that really what we know is that they had

12  vulnerabilities; and that because this happened, they had to

13  fix them.

14      The last major thing I want to talk to you about is the

15  laptop.  So I would guess that some of you have been wondering

16  why we keep going on and on and on about the laptop.  And it's

17  because, when you're the person sitting in that chair, you have

18  a right to expect that the people who are making you sit there

19  are doing their jobs correctly.  It's not nitpicking to say

20  that you should handle electronic evidence in the correct way.

21  But it didn't happen here.

22      So we all heard about the dual missions of the Secret

23  Service, I think four or five times.  So we have the mission of

24  protection.  So they protect executives, et cetera, the

25  executive branch, the President.  Then we have essentially

1    cybercrimes.  That is one of their two specialties.  So when we

2    go through and we perhaps criticize what they did in this case,

3    let's keep in mind that we're not criticizing a small, local

4    police department.  I'm not expecting that the police

5    department in Duvall use a Faraday enclosure, in 2014, to seize

6    a laptop.  What we are expecting is that the United States

7    Secret Service, who specializes in these types of offenses,

8    would do this correctly.

9         Agent Iacovetti seemed like a nice guy.  He's the one who

10   came here.  He was sent to the Maldives to get Roman and get

11   all of Roman's stuff.  He didn't bring a Faraday enclosure.  He

12   didn't bring one for the laptop.  He also told you he didn't

13   bring one for the iPhone.  Now, the Faraday enclosure issue is

14   not limited to what Mr. Blank says.  Detective Dunn told you

15   that that is a regular course of business thing that one uses.

16   They didn't turn it off.  They also didn't plug it in.

17        So Agent Mills gets the laptop over here in Seattle, with

18   Fischlin.  And they are looking for the serial number for the

19   third time, for some reason, and it comes on.  And they tell

20   you that they're worried about encryption.  Okay.  They're

21   worried about encryption.  So we heard multiple people describe

22   what you do.  If you're worried a computer is encrypted, then

23   you want to make this image or copy of its drive before it

24   turns off.  But they both told you it turned on.  It was in the

25   vault, the vault that they hadn't signed in and out of, and

1    they just left it there for 23 days.

2         So these live images, this is not rocket science, in 2014,

3    in this field.  These live images need to be done quickly to be

4    accurate.  Why?  Because you are putting people on trial based

5    on what is on these computers.  It's important.  It's like

6    preserving a crime scene with the tape, same idea.  And it's

7    just as important as that concept.  But they just left it

8    there.  And in the meantime, all of these things happened.

9         Now, we say that's important, because it affects the

10   integrity of the investigation.  Detective Dunn tells you that

11   any changes to a computer drive before you image it, he --

12   those are his words -- affects the integrity of the

13   investigation.

14        Now, Mr. Carroll tells you, "Don't worry.  There's nothing

15   wrong with this computer.  Doesn't matter that they did this,

16   because I can tell you definitively that there's nothing wrong

17   with it."  Well, Mr. Carroll works for the Department of

18   Justice; and so do they.  And they have an opinion, a vested

19   opinion, about this computer and how it was handled.  And I

20   would -- I wonder why the government keeps saying that

21   Mr. Blank's opinion is that somebody imported all these files,

22   because Mr. Blank kept repeatedly telling you that he doesn't

23   know.  The point of his testimony is that we have no idea what

24   was going on here.

25        We know there's a SIM card.  As of June, we know this.  We

1    know that it has this connectivity capability.  We know -- and

2    Mr. Carroll says the log says there was nothing connected.  We

3    also know these logs can be edited.  So essentially, we have,

4    right now, a whole bunch of confusing information about what

5    happened to this laptop, and a whole bunch of people with

6    different opinions.

7         And this is where it's important to remember whose

8    responsibility it is to make this make sense for you.  Because

9    it's not Roman's.  If that's a piece of evidence, and it's

10   handled in this way, then you need to decide if that handling

11   alone is enough to give you pause; if it's enough to make you

12   wonder why in the world they gave this laptop to an agent who,

13   at that point, had done less than 40 forensic examinations?

14   This is the Secret Service.  Fischlin had done over 500;

15   Szydlik and the entire department he comes from in Washington

16   D.C., probably thousands.  But for some reason, this decision

17   is made to give this laptop to essentially this poor guy, who

18   really doesn't have the experience to be doing this.  He's

19   never, at this point, seen a computer with Windows 8.  There's

20   been no dispute that Windows 8 had been out for a couple of

21   years before all of this went down.  It's not his fault that he

22   hadn't seen it, but it is the fault of this investigation that

23   he is put in that position.  And it's not something that you

24   can rely on.

25        One more thing before we sum it all up and I'm done.  The

USA vs. Seleznev, 8/24/16

1    last two counts, 39 and 40, which are the aggravated identity

2    theft, where are those people?  So one of the things they need

3    to prove is that they're real people.  But they didn't come

4    here.  So on a basic level, you know, they identify who they

5    are, we know their names, but they're not here at the trial.

6    So is that enough to show that -- if you even assume that Roman

7    did this, is that enough to show that he knows it's a real

8    person, when we don't even know?  It's not.  So those two are

9    kind of the separate, outlier issue.

10          Essentially, what we have is an investigation and a

11   presentation that is really built on the arrogance of digital

12   evidence.  And that's not enough.  It's not good enough when

13   you ask somebody to stand trial for charges like this.

14          At the end of the day, I ask you to consider everything

15   really carefully.  I know that you will.  There's a massive

16   amount of information.  But the decision that you make is

17   final.  So take your time.  If you make a decision, and you

18   decide tomorrow that maybe, you know, it does matter that the

19   thing sat there for 23 days, you don't get to change your mind.

20   This is it.

21          And I would submit to you that at this point, with what we

22   know, and with essentially a blank screen sitting behind this

23   computer, we don't know enough to be confident beyond a

24   reasonable doubt that Roman is guilty of these charges.  And if

25   we don't know, or we're confused, or we don't necessarily see

 1    the connection between some of the counts and all of these

 2    nicknames, then the thing to do is to find him not guilty.

 3         Thank you.

 4         THE COURT:  Members of the jury, if you'd like to

 5    stand and stretch, this is an opportunity to do so.

 6         Ladies and gentlemen of the jury, the government carries

 7    the burden of proof in this case.  And because of that, they

 8    have the opportunity to respond to the defense arguments by way

 9    of what's called "rebuttal argument."  I now invite you to give

10    your undivided attention to Mr. Harold Chun, as he gives his

11    rebuttal argument on behalf of the United States.

12         Counsel, you may proceed.

13         MR. CHUN:  Thank you, Your Honor.

14         American Express, they should be proud.  Because the

15    defendant took, "Don't leave home without it," to the next

16    level, carrying 1.7 million credit cards in his laptop as he

17    travels.  I could see why he wants to shy away from that

18    computer.  But it's his, taken from him, from his laptop bag.

19    You saw that.  But I'll come back to the laptop.

20         First, let's talk about how Ms. Scanlan started her

21    argument:  No picture in front of the computer, him sitting in

22    Vladivostok, Russia, typing on his computer.  The government

23    doesn't have it.  We agree.  The government doesn't have it.

24    But you know what we do have?  Showing you what's been marked

25    as Government Exhibit 14.5.  We have a photo that the defendant

1    took of his own screen, as he chats, as 2Pac, about carding,

2    taken from his iPhone, seized from him.

3        Mr. Blank didn't testify about the iPhone, on the iPhone.

4    You know how else we know that's his iPhone?  Because on that

5    same phone was a picture of his passport and a picture of him

6    taking selfies with that phone, the one there, and another one

7    there.  Same phone, him, holding it, taking a photo.  On that

8    same phone, him, typing, as 2Pac.  That's a picture of him on

9    his computer.

10       Now, Ms. Scanlan talks about association, co-schemers.

11   How do we know he's working with someone?  Well, the evidence

12   has borne it out.  We have seen throughout this case that he is

13   working with other people.

14       Starting with Exhibit 2.13, Ms. Scanlan said, "Well, the

15   website was still up after the bombing."  Well, let's be clear.

16   What does this show?  It says, well, the admin is saying you

17   need to wait.  They don't have numbers at that point.

18       Then moving on to Exhibit 10.3, after his arrest, what

19   happens?  The boss, in a car accident.  Someone working?  But

20   you know who's here?  The boss, sitting right there.

21       And how else do we know he has people working with him?

22   6.13, Page 3, as he e-mails on this infrastructure as Romper

23   Stomper, he tells them, "I have a high-skilled administrator."

24   He's telling other people he has people working for him, but

25   he's the boss.

1    Now, I'm not even going to entertain, actually, the

2  argument that did -- Detective Dunn didn't call all the

3  hundreds of businesses, because it's laughable in the same

4  sense that -- defense crossing about not calling all near

5  three million customers.  Is that what the government needed to

6  do to prove this case?

7    And the defendant saying, "This is the illegal way," in an

8  e-mail, he wouldn't be too clever to do that?  Well, obviously

9  he doesn't care, because he puts it on posdumps, which is a

10  website for the public, to teach them about how to buy credit

11  cards and use them for fraud.  And he taglines it, "This is the

12  illegal way."  He wants people to know.

13    And this talk about not having follow up for flower

14  receipts from a flower shop in Russia, what would you find in

15  contacting a flower shop in Russia, other than the receipt,

16  which is already in the e-mail account tied to this case?

17  Flowers were sent, under a name that they would record it.  An

18  online purchase would have an online receipt.

19    And that brings me to Broadway Grill.  You heard the agent

20  testify that SendSpace was used to exfiltrate this data.  Well,

21  if you look at the timing of when that occurs, it times up

22  perfectly when that intrusion occurs.  You know that somebody

23  hacks into this machine, downloads their malware.  And at the

24  same time, they find a stash of 30,000 credit cards in the

25  clear, and they export it right out.  You don't need to know

USA vs. Seleznev, 8/24/16

1   who SpendSpace was.  It's a website.  But they used SendSpace

2   to take it out.

3       Red Pepper Pizza.  Defense counsel mentions, "How do you

4   know the credit cards from Red Pepper Pizza were taken by him?"

5   Well, you know just from the malware, the secretly hidden

6   malware with the password 2pacsakur.  That's him.  But if

7   that's not enough, Agent Fischlin told you Ruth Gebhard, the

8   victim, Count 40, who he talked to, a real person, said -- or

9   Agent Fischlin said that card was taken from Red Pepper Pizza.

10  Where is it found again?  On defendant's laptop.  Examine the

11  evidence.  Common sense tells you how it got from Point A to

12  Point B.  It's because he took it.

13      And this belief or attempt to blame the victims for not

14  protecting their systems, and therefore, you know, they almost

15  had it coming to them, or, you know, that's why they were

16  fined.  I think it was best summed up, actually, by Mr. Doyle,

17  when asked by Mr. Browne, wasn't it basically his fault.  He

18  said, "No.  It's because I got hacked."  That's not what he

19  signed up for.

20      And that brings me to the computer, the laptop.  You heard

21  a lot of testimony yesterday about the integrity of this

22  laptop.  And first you heard from the forensic examiner for the

23  defense, their forensic advocate, the same forensic examiner

24  who said he wrote his forensic report without reviewing the

25  forensics on the computer.  Let me say that again.  He wrote

1   his report without examining the forensics on the laptop.

2   That's like writing a book report without reading the book

3   first.  That's what he did.

4        And then what did he tell you that report said?  Well, he

5   said it's a possibility that the agent mishandled evidence.

6   It's a possibility that some unknown person remotely logged on

7   and planted evidence.  Possibilities, theories, that's what

8   Mr. Blank had.  In short, he had pure speculation.  That's what

9   he had.  The only thing he was certain about, the fact that he

10  couldn't recognize the forensic exhibit shown to him on the

11  stand, and that he couldn't tell you if any of the government's

12  trial exhibits were affected by this at all.  He didn't know.

13  That, we know for certain.

14       And then you heard from Mr. Carroll, who took the stand.

15  And what he told you was, he examined that computer thoroughly.

16  And what he found was that it was reliable, and that he found

17  no issues with its integrity.  And then he didn't just offer

18  that opinion.  He showed you exhibit after exhibit, artifact

19  after artifact, proving consistently across the operating

20  system, nobody's ever logged into this computer after the

21  defendant was arrested, and the computer never connected to any

22  network wi-fi or cellular after the defendant was arrested.

23  Those are the artifacts he showed you.

24       And in regards to the file dates changing, the access

25  dates, he told you, while that computer was sitting in a Secret

USA vs. Seleznev, 8/24/16

1    Service vault, awaiting the case agent to get a search warrant,

2    the case agent who was in Seattle and had to fly to Guam for a

3    court hearing, the computer did what computers do, routine

4    system stuff.  Antivirus ran.  Windows update ran.  Program

5    updates ran on its own.

6        Mr. Carroll didn't stop there.  He then told you that he

7    examined the government's trial exhibits and found exactly one

8    file that had an access date after the defendant's arrest.  And

9    he told you it wasn't a created date.  It wasn't a modified

10   date.  It was an access date.  And he said access dates aren't

11   routinely used by forensic examiners, because too many factors

12   can make them change.

13       But he didn't even stop there.  He then went on to tell

14   you, that one exhibit, the 2Pac banner from the laptop, he was

15   able to reach into a Shadow Volume Copy on that computer and

16   archive from a prior date before defendant's arrest, when the

17   laptop was in his possession; and from that archive, he pulled

18   out that file, compared it to the government's trial exhibit,

19   and he said they were identical.  That's computer forensics.

20       And that brings me to my last point.  We talk about the

21   laptop, and that might be fresh in your memory, because it just

22   happened yesterday.  But this trial has been going on for days

23   and days.  And you have heard evidence prior to Mr. Blank's

24   speculation about the laptop.  And the question is, did anyone

25   have a doubt that HopOne, the Ukraine server, shmak.fvds,

1    bulbacc, track2.name, romariogro, rubensamvelich, that all of

2    these weren't controlled by him?  No.  The evidence from all of

3    these places match up.  You saw smaus.  You saw ochko.  You saw

4    IP address after IP address connect.  It wasn't just one cafe

5    and another cafe.  You had an IP address from Indonesia, all

6    the way out to McLean, Virginia, touching e-mail addresses,

7    servers, all parts of the infrastructure.  That's a common web.

8    That's not coincidence.  It's because it's the defendant

9    connecting to those sites.

10        What else did you see?  You saw his name.  You saw his

11   date of birth.  You saw his Vladivostok addresses.  You saw his

12   telephone number.  You saw his passport ID.  These things kept

13   popping up over and over again on different pieces of that

14   infrastructure.  All of that, evidence collected from different

15   servers, from different e-mail addresses, over different years,

16   spanning years of time, they all matched up.  And that's what

17   led to his arrest when he was in the Maldives.  That's what led

18   there, the Secret Service to him there.

19        And what did they find when they got there?  They found

20   his actual passport, with the number that matched the Western

21   Union records, that matched the travel records found in HopOne.

22   They found his iPhone, littered with evidence of smaus, ochko,

23   romariogro.

24        And his statement upon being confronted by law

25   enforcement, he asked the question, "Does the United States

1    have an extradition treaty with the Maldives?"  Who asks that?

2    He did.  That's what he asked.

3        And then that brings us back to the laptop; 1.7 million

4    credit card numbers; a script of posdumps on it that says,

5    "This is illegal way"; federal court record searches for his

6    nicknames, bulba, 2Pac; and his password credential list.

7        His password credential list, Exhibit 13.12C, Page 13,

8    that credential list connecting him to criminal forums,

9    connecting him to Liberty Reserve accounts, and connecting him

10   to an identity he long abandoned, bulba; bulbacc@yahoo.com and

11   the password, sitting right there on that credential list;

12   right below that, the Liberty Reserve account you heard

13   testimony about, ending in 915; the Liberty Reserve account

14   that received almost $7 million from the bulbacc website; and

15   then right above that, bringing it right back to the present

16   time, just a few lines above, 2Pac, the site he was running at

17   the time he was arrested.

18       Ladies and gentlemen, to be clear, that laptop, that was

19   just frosting on the cake.  The evidence before it all had

20   built it up to that point.  And everything after that, at his

21   arrest, that laptop, that just coated it.  And the cherry on

22   top, the password for it was ochko123.  You can't make stuff

23   like that up.

24       Ladies and gentlemen, go examine all the evidence, and

25   return the only verdict that is consistent with it all, guilty

USA vs. Seleznev, 8/24/16

1    of all counts.

2         Thank you.

3         THE COURT:  Ladies and gentlemen of the jury, at this

4    point in time, as the Court shared with you at the beginning of

5    the trial, only 12 of you go back and actually deliberate.  And

6    so we must now separate two of you.

7         Now, when you came to the court, you were summoned by a

8    computer, so you came in a random fashion.  When you were

9    brought to this courtroom, the order in which you were selected

10   to come to the courtroom was done by computer.  But at this

11   point in time, we go back to the old, traditional way of

12   selecting jurors to serve as the alternates.  And that's to go

13   back to the old jury box, where we have numbers in that box,

14   and we'll pull two numbers.  And the order in which you're

15   selected will be the order in which you might be called back to

16   serve as substitute or alternate jurors.  So I'd ask the

17   in-court deputy, at this point in time, to identify the jurors

18   who will serve as the alternates.

19              THE CLERK:  Juror Number 8.

20              THE COURT:  Number 8.

21              THE CLERK:  And Juror Number 15.

22              THE COURT:  All right.  You can stay in place for

23   right now.

24        For the two jurors that are excused, the following

25   instruction will apply to you.  You will still be a member of

1   this jury.  Although you will be separated from the jury for

2   purposes of the deliberations, you may be subject to recall if

3   for any reason one of the other jurors is unable to continue to

4   go forward in their service as a juror.  So in that regard, the

5   same restriction and direction that you received from me in the

6   past about not discussing the case with anyone, not sharing

7   with anyone your thoughts about the case, and certainly not

8   giving anyone any information how you would have voted or

9   deliberated in this case.  So the prohibitions on silence for

10  you talking about this case will continue.  If you're called

11  back, you will be called back in the order in which the Court

12  announced.  So please make sure that when you leave, you leave

13  the in-court deputy with all numbers to be in contact with you.

14       I will let you know that it's my understanding that the

15  jury will be taking lunch in the jury room, so that they won't

16  be separated and walking around and enjoying lunch between

17  12:00 and 1:30.  They'll be back in the jury room.  So we need

18  to have your access information for that time period.  Their

19  breaks will also be taken in the jury room.  They will not be

20  separated until 4:30, at which time they would break for the

21  evening.  As I shared with you at the beginning of the trial,

22  we don't deliberate into the late evening hours.  We stop at

23  4:30 and begin again at 9:00, with the same expectations to

24  continue until the jury has made determinations in this case.

25       So for the two jurors, I do want to thank you deeply for

USA vs. Seleznev, 8/24/16

1    your service.  I want to thank you for returning to this court

2    every single day, and for your attention and the service that

3    you provide and that you granted as jurors.  It's what we

4    expect of our jurors, and you fulfilled your responsibility up

5    to this point in time.

6         To the other members of the jury, you'll go back and begin

7    your deliberations.  I will also let you know that all of the

8    admitted exhibits will come back to the jury room.  And just to

9    make sure that you understand what I mentioned before, if the

10   exhibit was marked for identification, or if it was a

11   demonstrative or an aid for a witness, those type of exhibits

12   will not come back to the jury room.  Only those offered and

13   admitted by the Court will come back.

14        Please rise and go back to the jury room and begin your

15   deliberations.

16                  (Jury exits the courtroom)

17        THE COURT:  Counsel, we're going to take our break at

18   this point in time.  I've already identified what we're going

19   to do as far as the jury over the lunch hour.

20        I do ask that you make sure that all of you have your

21   contact numbers provided to the in-court deputy.  That's cell

22   numbers, direct lines at work, so that if we need to reach you,

23   we can reach you.  And we expect you to return back to this

24   court 15 to 20 minutes after a call from this court.

25        Now, if we do have jury questions, it's never been my

1    practice to play hide-the-ball from the lawyers.  If we receive

2    a question from the jury, the in-court deputy will contact you

3    and read the question to you over the telephone so that you can

4    begin formulating your response to the jury question, and make

5    your recommendations in open court.  That will always take

6    place.

7        For Mr. Seleznev, any questions or anything that takes

8    place while this case is pending will always be done in open

9    court.  I will not consult with the lawyers in this case

10   without you being present.  So if there's a jury question,

11   although we read the jury question to the lawyers over the

12   phone, that question will not be answered until everyone is

13   back in this courtroom, including yourself.

14       So with that, Counsel, please make sure that we can get in

15   contact with you so that we can reach you at the appropriate

16   time.

17       Anything to take up?  Mr. Browne?

18       MR. BROWNE:  Just one question, your Honor.  When we

19   were going through the exhibits yesterday, I noticed that there

20   are two or three DVDs.

21       If -- does the jury have the ability to look at those in

22   the jury room, or would you bring them in here to do that, if

23   they wanted to see it?

24       THE COURT:  It's the latter, Counsel.  This Court

25   never sends any equipment back to the jury room.  So if there's

USA vs. Seleznev, 8/24/16

1  a desire or need to view any exhibits in that format or

2  fashion, we would bring them back into the courtroom.  I

3  suspect that they would ask what they would like to look at,

4  and we can play the entirety of the DVD, or whatever portion is

5  appropriate or necessary.  But it will be done in open court.

6  No equipment will go back.

7              MR. BROWNE:  Would you want us there for that?

8              THE COURT:  Absolutely, Counsel.  You'd be coming

9  back.  Again, nothing will take place without the parties' and

10  Mr. Seleznev's presence.

11      Any other questions or matters to take up, counsel for the

12  government?

13              MR. BARBOSA:  No, Your Honor.  Thank you.

14              THE COURT:  Counsel for the defense?

15              MR. BROWNE:  No, Your Honor.

16              THE COURT:  We'll be in recess.

17                         (Adjourned)

```
 1                  (End of requested transcript)

 2                        *    *    *

 3        I certify that the foregoing is a correct transcript from

 4   the record of proceedings in the above matter.

 5

 6   Date:  8/24/16                      /s/ Andrea Ramirez

 7                                _____

 8                                Signature of Court Reporter

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```