The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
For the Western District of Washington

| | |
|---|---|
| UNITED STATES OF AMERICA ) | No.: 2:11CR00070RAJ-001 |
| ) | |
| v. ) | **SENTENCING MEMORANDUM** |
| ) | |
| ROMAN SELEZNEV, ) | |
| Defendant. ) | |

Defendant ROMAN SELEZNEV by and through counsel, respectfully submits this memorandum in support of a non-Guidelines sentence.

## I.   HISTORY AND CHARACTERISTICS OF DEFENDANT

Mr. Seleznev was born in 1984 in Vladivostok, Russia to Valery Seleznev and Irina Seleznev (nee Goroshenko). His entire life was a series of tragic events. Mr. Seleznev's parents were divorced when he was two years old. After divorce Mr. Seleznev lived with his mother in a small apartment, which was shared with four other families. They were very poor at that time and his mother could barely support them. Mr. Seleznev struggled to watch his mother's indigence. Nothing seemed to work for Mr. Seleznev during his younger age. Still, this ordeal taught him to be strong and to rely on himself. When Mr. Seleznev was 17 years old his mother died from alcohol poisoning at age 40. She was an alcoholic and sometimes drank for several days straight. After her death Mr. Seleznev was left on his own – there was no one to even help him bury his mother. It is hard to convey his feelings at that time – teenager totally alone facing

a hostile world with no family or role models to guide him.  Nevertheless, with a hope of a better life he found the power within himself to fight for survival. That struggle eventually paid off as Mr. Seleznev was able to keep and maintain his mother's apartment, graduate high school and enrolle in college.

Although he was considered a bright student in college, where he was studying advanced mathematics and computer science, he was forced to drop out after being unable to make enough money to support himself. Mr. Seleznev found a job at a small computer store, however, the salary did not even cover his rent. It was at this time that Mr. Seleznev turned to the Internet in an attempt to earn extra income.  Unfortunately, without any positive guidance or financial support Mr. Seleznev became involved with cybercriminals, eventually becoming one himself.

In 2008, Mr. Seleznev married Svetlana Zharova and shortly thereafter had a daughter, Eva, who is now seven years old**.**   In 2009 robbers broke into his apartment and tortured him all night to force him to reveal location of his money. To protect his family Mr. Seleznev temporarily moved to Bali, Indonesia.  In Bali Mr. Seleznev quit all criminal activity, and on the Internet announced to his associates that "I am done. I am out from selling stolen credit cards." Unfortunately, at that time, he was not strong enough to keep that promise.

Soon he faced another challenge. In 2011, Mr. Seleznev went to Morocco to reunite with his father. On April 28, 2011, Mr. Seleznev was very badly injured when a suicide bomber blew himself up inside a local café, in Marrakesh, Morocco.  Twenty people died in this terrorist act. Mr. Seleznev suffered massive head injuries and half of his skull was blown off.  While in a coma he was flown back to Russia on an emergency flight for what turned out to be many surgeries and a long recovery which is still ongoing today.  Due to severity of the trauma doctors were skeptical that Mr. Seleznev will survive.  His wife and father were told it was likely he

would be "a vegetable on life support." That day, Mr. Seleznev's wife returned home and filed for divorce. Mr. Seleznev was deeply hurt by his wife's actions, she betrayed him at the time he needed her most, causing him deep emotional pain which only worsened his medical condition.

While Mr. Seleznev was in coma and close to death his father asked a priest to baptize him. Incredibly, two weeks later Seleznev awoke from the coma. Mr. Seleznev was hospitalized from May of 2011 through the end of 2012, he never fully recovered from his injuries and according to his medical records continues to suffer from them to this day.

In 2013, Mr. Seleznev became engaged to Anna Otisko, she has a four-year-old daughter, Anastasia, whom Mr. Seleznev hopes to adopt. Prior to Mr. Selezenv's arrest they lived together as a family. Anna and her daughter love him and pledged to wait for him until his release and return to Russia. Anna has been supporting him from the time of his arrest. Mr. Seleznev's father has been fully supporting his son from the very beginning of this case – he stood by him and provided him with much needed emotional support.

The defendant was arrested in the Maldives on July 5, 2014. He has been detained since his arrest.

## II.     OFFENSE CONDUCT

The defendant was convicted after trial on multiple counts: 18 U.S.C. §1343 (wire fraud), 18 U.S.C. §1030(a)(5), 18 U.S.C. §1030(c)(4)(B)( Intentional Damage to a Computer); 18 U.S.C. §1030 (Obtaining Information from a Protected Computer); 18 U.S.C. §1029(a)(3)(Access Device Fraud); 18 U.S.C. §1028A(a)(1)(Aggravated Identity Theft).

## III.    GUIDELINES CALCULATION

The Supreme Court has made it clear that a district court "should begin all sentencing

3

proceedings by correctly calculating the applicable Guidelines range," which is the "starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 457 (2007).

Pre-Sentence Report and Sentencing Recommendations state the total offense level of 43, criminal history category I, and recommend the total term of imprisonment of 324 months (27 years) with $169,884,585 restitution.

### IV. MR. SELEZNEV SENTENCE

In light of the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005) and its progeny such as Rita v. United States, 551 U.S. 338 (2007), Gall v. United States, 552 U.S. 38 (2007), and Kimbrough v. United States, 552 U.S. 85 (2007), the basic framework for sentencing now settled. First, the Court must determine the now-advisory Sentencing Guidelines range. Gall v. United States, 552 U.S. at 46. Second, the Court must undertake its overarching statutory charge to impose a sentence that, considering "the nature and circumstances of the offense and the history and characteristics of the defendant," is "sufficient, but not greater than necessary":

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §§ 3553 (a), 3553 (a)(1),(2). Third, the Court should also consider "the kinds of sentences available . . . any pertinent Sentencing Commission policy statement the need to avoid

4

unwarranted sentence disparities among similarly situated defendants . . . and, where applicable, the need to provide restitution to any victims of the offense." United States v. Cavera, 550 F.3d 180, 188-89 (2d Cir. 2008), cert. denied, 556 U.S. 1268 (2009)(citations omitted); 18 U.S.C § 3553(a)(6). United States v. Davila-Gonzalez, 595 F.3d 42, 46 (1st Cir. 2010)("[A] sentencing court ordinarily should begin by calculating the applicable guideline sentencing range; then determine whether or not any departures are in order; then mull the factors delineated in 18 U.S.C. § 3553(a) as well as any other relevant considerations; and, finally, determine what sentence, whether within, above, or below the guideline sentencing range, appears appropriate.")

As the Guidelines "are not the only consideration," the district court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Gall v. United States, 552 U.S. at 49-50 (footnote and internal citations omitted)(emphasis added).

The Guidelines should not be given more or less weight than any other factor. See United States v. Carty, 520 F.3d 984, 991 (9th Cir.), cert. denied, 553 U.S. 1061 (2008). See also Nelson v. United States, 555 U.S. 350, 352 (2009)*(per curiam)* ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.") (emphasis in original). A court "must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." Cavera, 550 F.3d at 189. As a result, a sentencing court is "generally free to impose sentences outside the recommended range." United States v. Sanchez, 517 F.3d 651, 660 (2d Cir. 2008)(a district court has broad latitude to "impose either a Guidelines sentence or a non-Guidelines sentence."); United States v. Daidone, 124 Fed. Appx. 677, 678 (2d Cir. 2005)(as the Guidelines are no

longer mandatory, a departure is no longer necessary in order for the sentencing court to impose a sentence below the Guidelines range). The Court's overall goal should be to impose a reasonable sentence, see, e.g., United States v. Guzman, 287 Fed. Appx. 956, 957 (2d Cir. 2008), and when considering the sentencing factors outlined in § 3553(a), "the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances." United States v. Jones, 460 F.3d 191, 195 (2d Cir. 2006).

To be sure, the Guidelines range as determined by the Court, although not mandatory is an important factor for the Court to consider. However, "[i]t is important, too, to realize that departures are an important part of the sentencing process because they offer the opportunity to ameliorate, at least in some aspects, the rigidity of the Guidelines themselves. District judges, therefore, need not shrink from utilizing departures when the opportunity presents itself and when circumstances require such action to bring about a fair and reasonable sentence." United States v. Gaskill, 991 F.2d 82, 86 (3rd Cir. 1993). "The Guidelines are not a straightjacket for district judges." United States v. Cook, 938 F.2d 149, 152 (9th Cir. 1991). The Sentencing Guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom." United States v. Milikowsky, 65 F.3d 4, 9 (2d Cir. 1995). Finally, the United States Supreme Court has noted "[i]t has been uniform and constant the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Koon v. United States, 518 U.S. 81, 113 (1996).

The court may impose a sentence outside the guidelines range if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into

consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C § 3553(b)(1).

In this case, a non-guidelines sentence is more than appropriate for several reasons.

First, even the Guidelines themselves indicate that "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." Application Note 20 (C) to U.S.S.G. §2B1.1. It should be noted that although the concept of a downward departure has been rendered obsolete by United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), the Court may consider Application Note 20(C) when analyzing the § 3553(a) factors. See United States v. Rosen, 726 F.3d 1017, 1027 (7th Cir. 2013); United States v. Burgos, 2015 U.S. Dist. LEXIS 144141, *13, n.7 2015 WL 6447766 (N.D. Ind. Oct. 23, 2015).

The circumstances in our case are particularly applicable for downward departures or variances considerations.  Specifically, the calculated loss amount of $1.2 billion is substantially overstates the seriousness of the offense especially in light of the fact that the jury found that the actual loss to victims flowing directly from the defendant's conduct is $169,418.843.54.  The latter amount is approximately 9 times less that the former one.  Thus, imputing to the defendant the loss amount of $1.2 billion would substantially overstates the seriousness of the offense.  It should be noted that even that "lower" amount of $169,418.843.54 is extremely speculative and uncertain as the government completely failed to independently verify that amount, the fact that was conceded at the trial by a United States Secret Service Agent Megan Wood. See Exhibit 1 at 1209-10.

Also, whatever Mr. Seleznev actually gained as a result of his activities, that number

pales in comparison with $1.2 billion. Therefore, a downward departure, variance or consideration under 3553(a) factors of the proper offense level is warranted in this case since the offense level determined under U.S.S.G. §2B1.1 substantially overstates the seriousness of the offense.

Second, it is held that a variance from the Guidelines is warranted where there is a vast discrepancy between the intended loss and the realistic possibility of loss. United States v. Rosen, 726 F.3d 1017, 1027 (7th Cir. 2013). Courts have described four scenarios in which a loss determination may significantly overstate the severity of the offense. One is particularly relevant to our case. Where sentencing is based largely or solely on intended loss, a lower sentence may be warranted under the "economic reality" principle. See United States v. McBride, 362 F.3d 360, 375 (6th Cir. 2004); United States v. Stockheimer, 157 F.3d 1082, 1089 (7th Cir. 1998)(same); United States v. Corry, 206 F.3d 748, 751 (7th Cir. 2000)(noting that if the loss amount significantly overstates the seriousness of a defendant's conduct, this is "an encouraged basis for departure.").

In Stockheimer, for example, "the intended loss was determined to be $80 million, yet the defendants' take was perhaps $ 200,000." The court found that this evidence provided a "persuasive basis for the district court to consider a downward departure on the basis of the variance between the intended loss and the realistic possibility of such a loss. An $ 80 million loss may seriously overstate the seriousness of [the] offense." 157 F.3d at 1091.

In United States v. Roen, the court concluded that a nine level departure was appropriate since "this departure largely, although not completely, discounted the dramatic increase in offense level based on intended loss. It was not appropriate to treat this as a $1.2 million fraud

8

case when defendant's take was only $19,000." United States v. Roen, 279 F. Supp. 2d 986, 992, 2003 U.S. Dist. LEXIS 15752, *19-20 (E.D. Wis. 2003).

In United States v. Onyesoh, 674 F.3d 1157 (9th Cir. 2012), defendant was convicted of violating 18 U.S.C. § 1029. He appealed the 46-month sentence imposed by the United States District Court for the Central District of California. The issue on appeal was whether the government had to prove the usability of an expired credit card number in order for a district court to enhance a sentence. Defendant's 46-month sentence for violating 18 U.S.C. § 1029 was reversed, and the case was remanded as the government had to prove the usability of an expired credit card number by a preponderance of the evidence in order for a district court to enhance a sentence under U.S.S.G. § 2B1.1(b)(1).

In our case, the realistic possibility of a much smaller loss warrants a significant variance from the Guidelines range since there is no proof that all or even substantially all 2.4 million cards are "usable," i.e., unexpired, not stolen or otherwise canceled by either a customer or a financial institution. Therefore, unless the Government can provide "some proof of usability," the full enhancement under U.S.S.G. § 2B1.1(b)(1) is not warranted. The Government has to satisfy that burden of proof before the court can consider the proposed amount of loss.

Third, the Government's attempt to accumulate multiple enhancement points is flawed. Particularly in this case, multiple enhancements impermissibly and prejudicially overlap resulting in double counting. In United States v. Lauersen, 348 F.3d 329 (2d Cir. 2003), consolidated and aff'd on reh'g, United States v. Lauersen, 362 F.3d 160 (2d Cir. 2004), cert. denied, 541 U.S. 1044, 158 L. Ed. 2d 735, 124 S. Ct. 2190 (2004), reh'g granted, cert. granted, judgment vacated and remanded on other grounds, 125 S. Ct. 1109, 160 L. Ed. 2d 988, 2005 U.S. LEXIS 970, 543 U.S. 1097 (2005), where doctor convicted of defrauding insurance companies

and government of more than one million dollars for unauthorized medical procedures, and where multiple enhancements for loss affecting financial institution and abuse of trust were overlapping and caused offense level to go to 33, the court held that "the cumulation of such substantially overlapping enhancements, when imposed upon a defendant whose adjusted offense level translates to a high sentencing range, presents a circumstance that is present 'to a degree' not adequately considered by the Commission...[and] permits a sentencing judge to make a downward departure." Id. at 344.

In United States v. Jackson, 346 F.3d 22, 26 (2d Cir. 2003), in credit card fraud case, the court explained that multiple overlapping enhancements can justify a downward departure— "although the enhancements imposed by the District Court are permissible, they are all little more than different ways of characterizing closely related aspects of Jackson's fraudulent scheme." In that case, Defendant's base level of 6 was increased 10 levels because his offense involved a large sum of money, another 2 levels because he carefully planned the activity, another 2 levels because he used sophisticated means, and another 4 levels because the scheme was extensive. Id. The court held that "even though these enhancements are sufficiently distinct to escape the vice of double counting, they substantially overlap. Most fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive." Id. In addition, the court noted that "a phenomenon of the Guidelines, graphically illustrated by this case, is that any one enhancement increases the sentencing range by a far greater amount when the enhancement is combined with other enhancements than would occur if only one enhancement had been imposed." Id.

In the case at bar, the following enhancements substantially overlap: U.S.S.G. §2B1.1(b)(2)(A)("If the offense involved 10 or more victims or resulted in substantial financial

hardship to one or more victims, the offense level is increased by two levels."); U.S.S.G. §2B1.1(b)(10)("If a substantial part of a fraudulent scheme was committed from outside the United States; or if the offense otherwise involved sophisticated means and the defendant intentionally engaged in the conduct constituting sophisticated means, the offense level is increased by two levels"); U.S.S.G. §2B1.1(b)(16)(A). ("If the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions the offense level is increased by two levels."); U.S.S.G. §2B1.1(b)(17)("If (A) the defendant was convicted of an offense under 18 U.S.C. §1030, and the offense involved an intent to obtain personal information, or (B) the offense involved the unauthorized public dissemination of personal information, the offense level is increased by two levels."); U.S.S.G 2B1.1(b)(18)(A)(ii) ("If the defendant was convicted of an offense under 18 U.S.C. §1030(a)(5)(A), the offense level is increased by four levels.").

As a result of these multiple enhancement, the offense level was increased by 12 levels. Cybercrime fraud of this scale cannot be accomplished without involved 10 or more victims, without sophisticated means, and without obtaining personal information; therefore these enhancement overlaps with the one that set forth the loss amount.  Thus, as a result of overlapping enhancements the offense level is prejudicially and artificially elevated. Therefore, a downward departure, variance or consideration under 3553(a) factors of the proper offense level is warranted.

Fourth, the overall tone of the applicable Guidelines in this case is impermissibly draconian. See, e.g., United States v. Redemann, 295 F. Supp. 2d 887 (E.D. Wisc. 2003)(in bank fraud case court noted that "[c]ourts have long recognized that where the sentence called for by the guidelines would result in punishment greater than necessary the court can depart downward"); United States v. Stockton 968 F.2d 715, 721 (8th Cir. 1992)(Bright, Senior Judge,

concurring)(guideline sentence "have gone awry" with sentence of 20 years for first time meth offender and is "excessively long" and "greater than necessary" and "cannot be justified in a civilized society"); United States v. Andruska, 964 F.2d 640, 646-47 (7th Cir. 1992)(Will, Senior Judge, concurring)("the irrationality and draconian nature of the Guidelines sentencing process is again unhappily reflected in this case"); United States v. England, 966 F.2d 403, 410 (8th Cir. 1992)(Bright, J., concurring)(Although not illegal, the "draconian" sentences in this case "emanate from a scheme gone awry"); United States v. Harrington, 947 F.2d 956, 964 (D.C. Cir. 1991)(Edwards, J., concurring)(the guidelines "often produce harsh results that are patently unfair because they fail to take account of individual circumstances...."); United States v. Molina, 963 F.Supp. 213, 215 (E.D.N.Y. 1997) (commenting on "[t]he all-too-familiar harshness required by rigid federal Guidelines...and the depredations they wreak upon individual defendants and their families."); United States v. Cani, 545 F. Supp. 2d 1235, 1236, 2008 U.S. Dist. LEXIS 11087, *1 (M.D. Fla. 2008)(imposing the sentence recommended by the Guidelines would be too Draconian imposing non-Guidelines sentence of 60 months instead of recommended 262 to 327 months); United States v. Taylor, 2008 U.S. Dist. LEXIS 44618, *23, 2008 WL 2332314 (S.D.N.Y. June 2, 2008)(given the nature and circumstances of the offense and the history and characteristics of the Defendant, a sentence within the Guidelines range is draconian - imposing non-Guidelines sentence of 60 months instead of recommended 210 to 240 months' imprisonment).

In this case, although defendant's crimes are very serious, the guidelines sentence would be "draconian" in light of the nature and circumstances of the offense and the history and characteristics of Mr. Seleznev. It should be noted that this is a financial offense in which a large number of individuals and business mostly suffered relatively minor financial losses. No one

was killed or physically injured, no dangerous drugs were involved, United States' national security or financial stability was not jeopardized; usually only these types of crimes should warrant an extremely harsh sentence. In fact, no cybercriminal was ever sentenced to the proposed 27-year term. It would be a great injustice and totally inappropriate to sentence Mr. Seleznev to the proposed term. Thus, a downward departure, variance or consideration under 3553(a) factors of the proper offense level is warranted.

The court also should consider a downward departure based on the fact that Mr. Seleznev is a deportable alien. See, e.g., United States v. Segovia, 509 Fed. Appx. 7, 8 (D.C. Cir. 2013)(granted 6 months downwards departure because defendant was a deportable alien.). See also United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994); United States v. Mohammed, No. 10-4145, 2012 U.S. App. LEXIS 22908, at *42 (6th Cir. 2012)(acknowledging that defendant status as a deportable alien could be, in some cases, an appropriate basis for departure); United States v. Farouil, 124 F.3d 838, 847 (7th Cir. 1997).

Finally, a downward departure from the applicable sentencing guideline range is appropriate based on defendant medical/mental conditions. See, e.g., United States v. Gee, 226 F.3d 885 (7th Cir. 2000)(downward departure under §5H1.4 based on health not abuse of discretion where judge reviewed 500 pages of medical records and where judge concluded that "imprisonment posed a substantial risk to [defendant's] life"); United States v. Johnson, 71 F.3d 539, 545 (6th Cir. 1995)(downward departure possible for physician convicted of distribution of drugs and mail fraud based on his medical condition where defendant was a 65-year-old man who suffered from diabetes, hypertension, hypothyroidism, ulcers, potassium loss, and reactive depression); United States v. Streat, 22 F.3d 109, 112- 13 (6th Cir. 1994)(remanded to district court observing that court has discretion to depart because of defendant's "extraordinary physical

impairment"); United States v. Willis, 322 F. Supp. 2d 76, (D. Mass. 2004)(in tax evasion case downward departure granted to 69 year old from 27 months to probation with six months home confinement based upon inordinate number of potentially serious medical conditions, and was at age where such conditions would have invariably gotten worse in prison); United States v. Gigante, 989 F.Supp. 436 (E.D.N.Y. 1998)(despite vicious criminal past as Mafioso, downward departure granted from 262 months to 144 months because of advanced age (69) and bad heart); United States v. Roth, 1995 WL 35676, at *1 (S.D.N.Y. Jan. 30, 1995)(63-year-old defendant with neuromuscular disease had "profound physical impairment" warranting downward departure under the Guidelines).

In our case, Mr. Seleznev was almost killed in a terrorist attack in Marrakesh, Morocco. See Exhibit 2. His medical diagnosis after the attack is as follows: "severe concomitant trauma. Severe craniofacial injury. Open etched fracture of the left temporal bone. Lamellar subdural hematoma on the left. Severe brain injury. Fracture of the outer wall of the left frontal sinus and the orbital edge. Hematosinus. Bruised chest. Bruised abdominal cavity without damage to internal organs. Open fracture of the distal phalanx of the 3rd finger on the right hand. Contused wounds of the scalp, face, Extremities." See Exhibit 3 at 1. It would be not an exaggeration to say that Mr. Seleznev was extremely close to dying.

He continues to have after-effects from the bombing. He is diagnosed with chronic seizure disorder (epilepsy). In fact, Mr. Seleznev's BOP Medical records indicate that he has suffered chronic headaches and seizures while being detained. See Exhibit 4 at 1, 10, 15. Specifically, Mr. Seleznev had a seizure on 5/14/15 when he "fall out of (bottom) bunk ~5 a.m., displayed seizure-like activity for a few minutes so cellmate pushed distress button. Per Staff-witness, patient not clearly responding to questions and commands so patient was moved to

Health Services for evaluation." Id. at 15.  In addition, similar symptoms were documented on 1/7/2015. Id. at 20.

Mr. Seleznev has a titanium plate covering approximately 30% of his skull.  Id. at 44. Mr. Seleznev has chronic deafness in his left ear and he does not hear well at all if sound is coming at him from that side.  Id.  According to medical experts who evaluated his post-traumatic conditions, there is a high risk of progressive impairment of his cognitive functions and he continuously needs to be monitored by specialized medical staff.  See Exhibit 5 at 2; Exhibit 6 at 1.  Mr. Seleznev also suffers from Hepatitis B.  See Exhibit 4 at 22.

These medical conditions mandate that the court show substantial leniency to him.  Simply put, a relatively reasonable sentence gives Mr. Seleznev a chance to survive; anything more than that would mean dying in jail.  Defendant's medical conditions clearly warrant either a downward departure, variance or should be considered as a mitigating factor by the court.

Mr. Seleznev has fully accepted responsibility for his crimes as stated in his letter to this court.  (Docket No. 459). He deeply regrets that his actions cause substantial financial losses to multiple victims.  He is extremely embarrassed and humiliated by his conduct.  Moreover, he wants to actively rectify the consequences of his criminal actions and to use his knowledge and experience to prevent new cyber-attacks perpetrated by others.  With that in mind, there has been ongoing discussion with the government to determine the best way he can assist in fighting cybercrime.  Mr. Seleznev has made significant and proactive efforts to establish cooperation with the government.  Over the past few months Mr. Seleznev has handed over to the government four laptops and six flash drives. In addition, he participated in a two-day proffer session. Most importantly, regardless of the sentence he receives, Mr. Seleznev is ready at any time to use his experience and skills in helping the government stopping cybercrime.

Furthermore, Mr. Seleznev stands ready to assist the government in selling his properties in Bali and to transfer funds in his Russian bank account, which otherwise are beyond the reach of United States authorities, to pay whatever available restitution to the victims. He truthfully disclosed his assets to the probation officer and wants to do whatever is necessary to compensate the victims for their losses.

Another sentencing factor, the need for deterrence and the need to protect the public from future crimes, 18 U.S.C. § 3553(a)(2)(B)(c), applies strongly in this particular case.

General or indirect deterrence focuses on general prevention of crime by making examples of specific deviants. The individual actor is not the focus of the attempt at behavioral change, but rather receives punishment in public view in order to deter other individuals from deviance in the future. As one court explained "when discussing general deterrence, the Sentencing Guidelines expressly refer to the need for 'a clear message [to] be sent to society.' U.S.S.G. ch. 4, pt. A, introductory cmt. United States v. Crespo-Ríos, No. 13-2216, 2015 U.S. App. LEXIS 8555, *14 (1st Cir. 2015). While incarceration increases the deterrent effect of a sentence on others, "interest in general deterrence could [not] only be served by incarceration." United States v. Prosperi, 686 F.3d 32, 48 (1st Cir. 2012).

Specific deterrence focuses on the individual in question. The aim of these punishments is to discourage the criminal from future criminal acts by instilling an understanding of the consequences.

Mr. Seleznev has been in jail since July 5, 2014. Almost three years of incarceration already serves as a powerful deterrence for Mr. Seleznev and sends a clear message that society, law enforcement and courts will not tolerate such conduct. Mr. Seleznev has learned from this experience and will never commit another crime.

While in jail Mr. Seleznev received a diploma for Paralegal/Legal Assistant Studies with Honors, Advanced Paralegal Certificate in Criminal Studies, English as a Second Language and completed over 15 Bible Study courses. See Exhibit 7. He also has studied for a degree in Hotel and Restaurant Management in Stratford Career Institute and American Hotel and Lodging Educational Institute. In addition, Mr. Seleznev is planning to enroll into an accredited undergraduate program with a goal of earning a Bachelor's Degree in Business Administration. His eagerness for new skills and education clearly show that he has truly become a new person and will never return to his criminal past.

Mr. Seleznev developed a strong bond with his fiancé Anna and her daughter Anastasia. He is also close with Anna's family and not long before his arrest was finally able to establish a relationship with his father's family. As documented in multiple support letters they love and miss him very much. Yelena Rodionova, Mr. Seleznev father's wife, writes "We all keep hoping to see him again soon. Roman has three little brothers: Mikhail (16yo), Petr (6yo) and Artem (2yo). Mikhail and Petr extremely miss their elder brother, and Artem has never even seen him. For younger brothers Roman is an example of a person who will always come to help, share his happiness and love with the family." See Exhibit 8. Mihail Seleznev, his step-brother, states that "I am extremely proud of Roman. He is a warm-hearted, kind and caring brother. Everybody who has known him treat him as a reasonable, knowledgeable, and reliable person. He always bears responsibility for his words and actions. He is a role model for me." Id.

In other support letters Mr. Seleznev is characterized as a "kind-hearted and compassionate," "modest and positive," "unselfish" and "loyal friend," "a very honest and honorable person," "a very responsible and caring father," "very kind, open-hearted and thoughtful." Id. Anastasia has been writing letters and drawing cards for him as she is waiting

17

for him to come back home. As her mother, Anna Otisko states in her letter:

> For me, as a single mother with a child, Roman became a solid rock and support. He did not fear to accept someone else's child. On the contrary, he became a real dad to my daughter. His care and attention won the heart of the 4-year old girl, and it has been already for 3 years as she has been waiting for her dad.  People even do not have such amazing relationships with their own children, and a child cannot be deceived. She knows that her dad Roma is the best dad in the world. Roman loves sincerely and knows how to be loyal.

Id.  Natalia Taran describes Mr. Seleznev's relationship with Anastasia as follows:

> Roman did not fear someone else's child and immediately found a common language with the little girl. I saw how responsible and open he was towards my niece and her child, and how he was caring and attentive to them. Roman was always concerned about the little girl and supported her in every endeavor. He took her to the kindergarten and bought medication and toys for her. She started calling him dad and often kissed and hugged him. My motherly heart was filled with joy for the children. Their loving hearts were together, and it seemed that all life hardships were far behind for Roman. Roman became part of our family, and he himself found a home, a family, a wife, a child and a meaning of life.

Id.   Yelena Malik writes that Anastasia "has become so much attached to Roman that he has become her true beloved dad. Roman gave the little girl all that kindness, attention and care that she had not received from her own father. There is no single day when she doesn't remember about their strolls and conversations. She is still sleeping with the teddy bear that Roman gave her, and wishes every night that Roman would come back soon."  Id.

As the Supreme Court recently reiterated, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  Pepper v. United States, 131 S. Ct. 1229, 1239-40 (2011)(quoting Koon v. United States, 518 U.S. 81, 113, 116 S. Ct. 2035, 135 L.

18

Ed. 2d 392 (1996).  Mr. Seleznev's personal characteristics and the circumstances of the case strongly favor the imposition of a non-guideline sentence.

## CONCLUSION

For all these reasons, Mr. Seleznev respectfully requests that the Court impose a non-guidelines sentence.  A sentence which would be sufficient, but not greater than necessary to achieve the goals and dictates of 18 U.S.C. § 3553.

Dated: April 14th, 2017

                                          Respectfully submitted,

                                          /s/ Igor Litvak
                                          Igor Litvak, Esq.
                                          NY Bar No. 5109749
                                          The Litvak Law Firm, PLLC
                                          1701 Avenue P
                                          Brooklyn, New York 11229
                                          Office: (718) 989-2908
                                          E-Mail: Igor@LitvakLawNY.com

**Certificate of Service**

I hereby certify that I caused the above document to be served on counsel of record for the Government by filing it via the Court's CM/ECF system on April 14th, 2017.

>                        Igor Litvak, Esq.
>                        *Attorneys for Defendant*