UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

---

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )   No. 2:11-cr-00070-RAJ
                                 )
                                 )
       vs.                       )   Seattle, WA
                                 )
ROMAN SELEZNEV,                  )
                                 )   Sentencing
            Defendant.           )   April 21, 2017

---

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JUDGE RICHARD A. JONES
UNITED STATES DISTRICT COURT

---

APPEARANCES:

FOR THE PLAINTIFF:     NORMAN McINTOSH BARBOSA
                       U.S. Attorney's Office
                       700 Stewart Street, Suite 5220
                       Seattle, WA 98101-1271
                       norman.barbosa@usdoj.gov

                       C. SETH WILKINSON
                       U.S. Attorney's Office
                       700 Stewart Street, Suite 5220
                       Seattle, WA 98101-1271
                       seth.wilkinson@usdoj.gov

                       HAROLD W. CHUN
                       U.S. Department of Justice
                       1301 New York Avenue NW, Suite 600
                       Washington, DC 20005
                       harold.chun@usdoj.gov

```
1   FOR THE DEFENDANT:    IGOR LITVAK
                          The Litvak Law Firm PLLC
2                         1701 Avenue "P"
                          Brooklyn, NY 11229
3                         Igor@LitvaklawNY.com

4


5
    Andrea Ramirez, CRR, RPR
6   Official Court Reporter
    United States District Court
7   Western District of Washington
    700 Stewart Street, Suite 17205
8   Seattle, WA 98101
    andrea_ramirez@wawd.uscourts.gov
9
    Reported by stenotype, transcribed by computer
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

USA v. Seleznev, 4/21/17

```
 1          THE CLERK:  We are here for sentencing in the matter
 2    of the United States vs. Roman Seleznev, Cause Number CR11-70,
 3    assigned to this court.
 4       If counsel and the probation officer and the interpreter
 5    could all please rise and make your appearances for the record.
 6          MR. BARBOSA:  Good morning, Your Honor.  Norman
 7    Barbosa, Seth Wilkinson, and Harold Chun, on behalf of the
 8    United States.
 9          THE COURT:  Good morning.
10          MR. LITVAK:  Good morning, Your Honor.  Igor Litvak,
11    on behalf of Roman Seleznev.
12          THE COURT:  Good morning.
13          THE INTERPRETER:  Good morning, Your Honor.  Linda
14    Noble, certified Russian interpreter, previously sworn in this
15    court.
16          THE COURT:  Good morning.
17          MR. COWAN:  Good morning, Your Honor.  Rick Cowan,
18    from the U.S. Probation Office.
19          THE COURT:  Good morning.  Thank you.
20       We are here for the sentencing of Mr. Seleznev.  And it's
21    this Court's standard practice to begin a sentencing proceeding
22    by identifying all the documents that I received and reviewed.
23    And those documents include the following:  The presentence
24    report prepared by Mr. Cowan, and that includes attachments and
25    a victim impact statements notebook.  I've also reviewed the
```

USA v. Seleznev, 4/21/17

```
1   government's sentencing memorandum with Exhibit A, in DVD form,
2   and supplemental sentencing memorandum.  I've also reviewed the
3   defendant's sentencing memorandum with exhibits; the
4   defendant's written statement to the Court; the defendant's
5   motion to seal, which I signed and present now for filing; and
6   the defendant's verdict form.
7        Counsel for the government, are you aware of any
8   additional documents that I did not state for the record?
9            MR. BARBOSA:  Your Honor, I believe defense also
10  submitted a supplemental.
11           THE COURT:  I've seen that one as well.
12           MR. LITVAK:  Yes, thank you.
13           THE COURT:  Any other documents from the government's
14  perspective?
15           MR. BARBOSA:  No, Your Honor.
16           THE COURT:  And I take it that you've had the
17  opportunity to review the presentence report?
18           MR. BARBOSA:  Yes, I did.
19           THE COURT:  And it's my understanding also that there
20  are no outstanding objections that require resolution by the
21  Court as far as the government's concerned.
22           MR. BARBOSA:  That's correct.
23           THE COURT:  Counsel for the defendant, are you aware
24  of any additional documents that I did not state for the
25  record?
```

USA v. Seleznev, 4/21/17

1          MR. LITVAK:  No, I'm not.

2          THE COURT:  And it's also my understanding that there

3   are no outstanding objections that require resolution by the

4   Court.

5          MR. LITVAK:  That's correct, Your Honor.

6          THE COURT:  Sir, you may be seated.

7          MR. BARBOSA:  My apologies, Your Honor.  My

8   co-counsel reminded me, we did object to one guideline -- lack

9   of a guideline enhancement, the leadership enhancement.

10          THE COURT:  Okay.  Counsel, that will be addressed by

11   the Court.

12      Do you wish to make further argument on that beyond your

13   written submission?

14          MR. BARBOSA:  We'll rest on our written submission,

15   Your Honor.

16          THE COURT:  With that, Counsel, I'll now announce my

17   conclusions as to the appropriate offense level and criminal

18   history category.  For these calculations, I've used the 2016

19   guidelines manual, and my calculations are as follows.

20      This case involves multiple counts of conviction.

21   Therefore, grouping rules will be applied to the following

22   counts as indicated.  Counts 1 through 10, wire fraud, will be

23   grouped and scored in accordance with Guideline Section

24   3D1.2(d).  Counts 12 through 19, intentional damage to a

25   computer, will be grouped and scored in accordance with

USA v. Seleznev, 4/21/17

```
 1   Guideline Section 3D1.2(d).  Counts 21 through 29, obtaining
 2   information from a protected computer, will be grouped and
 3   scored in accordance with Guideline Section 3D1.2(d).
 4   Counts 30 through 38, access device fraud, unlawful possession
 5   of access devices, will be grouped and scored in accordance
 6   with Guideline Section 3D1.2(d).  However, by statute,
 7   Counts 39 and 40 are not a part of the group and require a
 8   24-month sentence that must be served consecutive to all the
 9   other counts.
10        So I begin with this grouping as follows.  The guidelines
11   for all offenses can be grouped in accordance with Guideline
12   Section 2B1.1.  This is because several of the offenses in this
13   group have a statutory maximum sentence of 20 years.  The base
14   offense level is, therefore, 7.
15        Next, the Court goes through a series of specific offender
16   characteristics which have also been calculated for the
17   guidelines.
18        The evidence produced at trial showed that the defendant
19   stole data from 2.4 million credit cards.  Per Application
20   Note 3F, special rules are allowed in loss calculations in
21   certain cases involving stolen or counterfeit credit cards and
22   access devices.  In accordance with this application, the Court
23   adopts that as represented or suggested by the government.
24   That will be $500 per access device to determine the loss
25   amount by applying the multiplication of 2.4 million by $500.
```

1   The loss amount for scoring purposes is thus $1.2 billion.

2   Therefore, the loss was more than $500 million, and the offense

3   level is thus increased by 30.

4       The next specific offense characteristic is in accordance

5   with the Guideline Section 2B1.1(b)(2)(A).  This directs the

6   Court to add two levels if the offense involved ten or more

7   victims or resulted in substantial financial hardship to one or

8   more victims.  The Court finds that the evidence is

9   overwhelmingly supportive of this addition and modification.

10      The next offense characteristic is in accordance with

11  Guideline Section 2B1.1(b)(4).  And this directs the Court to

12  apply an upward adjustment of two levels because the offense

13  involved receiving stolen property, and the defendant was in

14  the business of receiving and selling stolen property, thus the

15  addition of two levels.

16      The next offense characteristic is in accordance with

17  Guideline Section 2B1.1(b)(10), which calls for an upward

18  adjustment of two levels because in substantial part, a

19  fraudulent scheme was committed from outside of the United

20  States, and the defendant engaged in conduct constituting

21  sophisticated means.  The Court also notes that this offense

22  involves a sophisticated means as it involved extensive

23  computer hacking, the operation of several overseas websites,

24  and several online identities.  This is the basis for the

25  two-level upward adjustment.

USA v. Seleznev, 4/21/17

1          The Court also looks at the additional calculation of

2    Guideline Section 2B1.1(b)(16)(A), which calls for a two-level

3    upward adjustment if the defendant derived more than $1 million

4    in gross receipts from one or more financial institutions.   In

5    this case, 3700 banks suffered actual loss.   The evidence

6    showed that the defendant received a commission of $17,000,000

7    from Liberty Reserve alone as a result of this offense.

8    Therefore, a two-level adjustment is applied.

9          The Court then looks at Guideline Section 2B1.1(b)(17) and

10   applies an additional two-level adjustment as the defendant was

11   convicted under Title 18, United States Code, Section 1030.

12   And this offense involved an intent to obtain personal

13   information, and the offense involved the unauthorized public

14   dissemination of personal information.   The defendant was

15   convicted of this offense, and it centered on both elements.

16   Thus, the two-level upward adjustment is made.

17         The last adjustment is in accordance with Guideline

18   Section 2B1.1(b)(18)(A)(ii).   This calls for a two-level

19   increase as the defendant was convicted of intentional damage

20   to a computer.   Therefore, the four-level upward adjustment is

21   applied.

22         There is no adjustment for victim-related adjustment.

23         The government has sought the Court's adjustment for four

24   levels because of the defendant's role in the offense.   The

25   Court agrees with the probation officer's estimation that it's

 1    unclear exactly who was involved in the process and operation.

 2    Therefore, no adjustment is made for role in the offense.

 3         The Court then looks to whether or not there was an

 4    obstruction of justice in the prosecution of this case based

 5    upon the defendant's conduct.  The Court finds that a two-level

 6    upward adjustment is made as the defendant has been found, in

 7    court by this judge in previous hearings, to have made

 8    untruthful remarks during testimony in court proceedings.  That

 9    warrants the two-level upward adjustment.  This gives us a

10    total offense subtotal of 55.  There are no Chapter 4

11    enhancements.

12         The Court does not find that the defendant qualifies for

13    acceptance of responsibility.  The defendant was convicted

14    following a jury trial.  He made no statement consistent with

15    admitting culpability and expressing remorse until after his

16    conviction.  The Court recognizes that the defendant has

17    provided this Court with a detailed statement and letter, but

18    the Court finds that the timing of that letter and the

19    communications did not meet this Court's expectation.

20    Therefore, no adjustment will be made for acceptance of

21    responsibility.

22         The Court also notes that under Guideline

23    Section 2B1.1(b)(11), a two-level increase for trafficking in

24    unauthorized access devices should be applied.

25         Based upon all these calculations, the total offense level

USA v. Seleznev, 4/21/17

1   is 55.  However, the offense level will be treated as 43,

2   because that's the maximum under the guidelines, which calls

3   for a sentence of life.  Therefore, the Court will treat this

4   as having a total offense level of 43.

5       The defendant has a criminal history category of one;

6   supervised release range, one to three years; probation range,

7   he's not eligible; and a fine range of $25,000 to $250,000.

8       Counsel for the government, subject to your objections and

9   requests, do you have any dispute or challenge to the Court's

10  calculations?

11          MR. BARBOSA:  A couple, briefly, Your Honor.

12      First, 2B1.1(18), the enhancement for a conviction for

13  1030(a)(5), calls for a four-level enhancement, as opposed to

14  two.  And I believe the Court had noted just a two-level

15  increase for that.

16          THE COURT:  2B1.1(b)(18), Counsel?

17          MR. BARBOSA:  Correct.

18          THE COURT:  That is correct.  That should be four.

19  That's what I have in my notes.

20          MR. BARBOSA:  And as I stated just moments ago, we do

21  believe that a four-level leadership enhancement should apply.

22  I would like the Court to consider my recommendation as I make

23  my comments to the Court in relation to our sentencing

24  recommendation.  I think the leadership enhancement is truly

25  the essence of this crime, and is weaved throughout the entire

1    case.  Mr. Seleznev's role in this criminal enterprise, and his

2    leadership in the carding community, I think goes to the very

3    essence of this case.  And I would like the Court to keep an

4    open mind on that particular enhancement as I make my comments

5    to the Court later, in respect to my recommendation.

6              THE COURT:  Let me ask you a question, Counsel.

7         With the way in which the guidelines max out, does the

8    addition of the four levels make any difference in the ultimate

9    calculation for the guidelines?

10             MR. BARBOSA:  No.  But I do believe that it's very

11   important in terms of the 3553(a) factors.  And those factors

12   do play off of the sentencing guidelines, and I think an

13   appropriate sentencing guideline calculation is just the

14   starting point.  And because the nature of his leadership role

15   is so important to the ultimate sentence and what is

16   appropriate in this case, I would just ask the Court to keep an

17   open mind on that.  As you said, the guidelines here are well

18   off the charts, and it doesn't matter in terms of the numbers

19   and just the mathematical calculations, but the feel of this

20   case is very much one of leadership.

21             THE COURT:  Well, Counsel, the Court will certainly

22   take into consideration your arguments now as well as your

23   arguments in just a few minutes.

24             MR. BARBOSA:  Thank you.

25             THE COURT:  Counsel for the defense, do you wish to

USA v. Seleznev, 4/21/17

1   respond to the Court's calculations?

2              MR. LITVAK:  Your Honor, we have no objection to the

3   calculations of the Court.

4              THE COURT:  Thank you, sir.

5              MR. LITVAK:  Thank you.

6              THE COURT:  We're going to proceed in the following

7   order.  First, I'll hear from counsel for the government

8   regarding the government's recommendation.  I'll then hear from

9   probation to see if Mr. Cowan has any additions or

10  modifications of his sentencing recommendation.  Defense

11  counsel will be the last person to address the Court before

12  Mr. Seleznev speaks, if he so desires.

13      Counsel for the government, your recommendation?

14              MR. BARBOSA:  Thank you, Your Honor.

15      As we said in our sentencing memo, this is truly an

16  unprecedented prosecution.  For 15 years, defendant's entire

17  adult life, he broke into payment systems at hundreds of

18  businesses all over the world.  He stole millions of credit

19  cards.  Over 2.9 million unique credit cards were found in his

20  possession.  And that amount, found just directly in his

21  possession, almost certainly massively understates the total

22  number of credit card numbers the defendant stole over the

23  course of his career.

24      The losses tied to just those known cards caused over

25  $169 million in actual fraudulent charges.  That is a

1    staggering loss amount that exceeds any fraud loss that this

2    courthouse has ever seen before by millions, tens of millions

3    of dollars.  Those losses impacted over 3700 different banks

4    around the world, from large, well-recognized banks, like Chase

5    and Bank of America, to small, local banks and credit unions,

6    like First Community Bank of the Ozarks, Boulder Municipal

7    Employees Credit Union, and our own local Boeing Employees

8    Credit Union.  And these losses are a direct result of this

9    defendant's computer hacking empire.

10        Defendant's status as a leader of organized cybercrime

11   supports the government's recommendation of 30 years in prison.

12   He was no low-level street fraudster.  He wasn't even a

13   mid-level criminal.  This defendant was a market leader in the

14   international underground criminal carding community.

15        Over the course of a decade, he built a reputation in the

16   carding community, and he became revered in the Russian

17   organized cybercrime world.  When he went on vacation, the

18   carding world noticed immediately.  When he was unavailable,

19   they knew what was going on.  They relied on him for a steady

20   stream of stolen credit cards.  And when he wasn't around, the

21   carding community and the carding forums erupted with

22   discussion about that, because he was the go-to guy in the

23   community for the best dumps available.

24        He was truly a market titan, the Jeff Bezos of stolen

25   credit cards.  His automated vending sites, that we saw in the

1   trial, helped grow the market for stolen credit card data.

2   That was a unique innovation that he pioneered.  And over the

3   years, he became so well known and respected in the carding

4   community that when he opened his last vending site, 2paccc, he

5   was trusted by other prominent hackers to fence their stolen

6   credit card data.  And that came from some of the largest

7   breaches of the last ten years, including Target, Home Depot,

8   Nieman Marcus, Michael's, and many others.

9        And this defendant didn't only streamline the supply for

10  stolen credit card data, his posdumps website was a webinar on

11  how to commit credit card fraud.  And that helped stimulate the

12  demand for stolen credit cards by teaching literally thousands

13  of other fraudsters how to steal from banks worldwide.

14       And to be clear, the defendant had no qualms about the

15  criminal nature of his activities.  We're talking about a man

16  with the audacity to post a tutorial on the open internet --

17  this wasn't hidden behind some firewall, or something that

18  needed to be vouched into -- where he explicitly was training

19  people on what was, quote, "the illegal way" to earn hundreds

20  of thousands of dollars through fraud.

21       The victim impact from all of this activity was also

22  massive.  The businesses defendant attacked were often

23  devastated by the impact.  These were, as you heard, by

24  defendant's design, small businesses, like pizza shops and

25  newsstands, that were ill-equipped to fight back against

USA v. Seleznev, 4/21/17

```
 1    Mr. Seleznev.  And the victims he attacked weren't corporate

 2    giants.  They were hardworking individuals, operating on very

 3    tight profit margins in the restaurant business.

 4         His attacks yanked away their ability to make a living.

 5    They had to pay significant fines to the card brands, sometimes

 6    over a hundred thousand dollars.  They had to hire private

 7    forensic investigators at a cost of tens of thousands of

 8    dollars.  And in many instances, their business reputations

 9    were damaged beyond repair.  Some, like the Broadway Grill,

10    were forced out of business entirely as a result of this.  And

11    others, like the Houston Zoo, had to divert precious resources

12    away from planned upgrades to their facilities to the cost of

13    incident response and remediation.  And business owners like

14    Sid Fanarof, who testified at the trial, described how they

15    were broken down by the stress of responding to this to the

16    point of a nervous breakdown.  And this was just a very small

17    sampling of the victims that were impacted by defendant's

18    crimes.  He affected people like this all over the country and

19    all around the world.

20         The losses tied to the banks were also incredible.  The

21    largest victim banks in this case lost over $10 million each.

22    These are losses that the entire community bears in the form of

23    higher banking fees and just the cost of doing business.  It's

24    truly the type of crime that impacts the entire community and

25    has effects across the entire economy.
```

USA v. Seleznev, 4/21/17

1      And while defendant's -- while defendant's victims were

2    getting hammered by his attacks, defendant reveled in his

3    success.  This is a case that was driven by old-fashioned greed

4    and ego.  I have some photos I'd like to go over here.  We've

5    seen some of these before.  But I think it's important to

6    highlight what motivated this defendant.

7      He was making millions and millions of dollars off his

8    hacking.  And he was living like a mob boss.  While he

9    carefully avoided countries that might extradite him to the

10   United States, he was traveling to high-end resorts around the

11   world, and he frequently took his crew with him.  He and his

12   buddies were buying up high-end sports cars.  And in videos and

13   photographs from his cell phone, we've seen him and his friends

14   driving these cars around the streets of Vladivostok, in

15   Moscow, like they owned the road.

16     In several other photos and videos from his phone, we saw

17   that his crew treated him like a Tony-Soprano-style mob boss.

18   In a nod to the Sopranos, they even commissioned a painting of

19   Roman as Napoleon, just as Mr. Soprano had had done in an

20   episode of the TV show.

21     As track2 and bulba, the midpoint of his career, which

22   represents just three years of his decade-long career, he

23   profited nearly 18 million dollars through a single payment

24   service, Liberty Reserve.  That doesn't even account for the

25   proceeds from other payment services, like WebMoney and

USA v. Seleznev, 4/21/17

 1   Bitcoin, or from his days as nCuX, or the money he made

 2   operating 2paccc.  Using that money, he bought homes in Bali,

 3   Indonesia; Vladivostok, Moscow.  And the last resort he stayed

 4   at in the Maldives was a private beach resort that we see here

 5   that cost over $1,400 a night.  He had a $20,000 hotel bill

 6   before he was captured.

 7        Defendant behaved like the quintessential mobster, and he

 8   was throwing money around without a care, on the backs of small

 9   businesses all over the United States.  And while he waltzed

10   around in luxury, he did so knowing that corrupt officials in

11   his own country would tip him off if he was in danger of being

12   captured.

13        We've had this case before you for nearly three years.

14   And I think defendant's conduct throughout the case truly

15   demonstrated a disregard for the truth and further supports the

16   government's recommended sentence.  He engaged in a strategy of

17   delay and obstruction from the very beginning of this case in

18   Guam, holding up his transfer to this district for nearly a

19   month.

20        And his strategy worked in some ways.  As we stated at the

21   motion to continue, back in May of 2016, at least one important

22   witness became unavailable to the government.  We still don't

23   know exactly what happened with the defendant's ex-wife.  As

24   the Court is aware, she provided valuable information to the

25   government, and we did intend to call her as a witness.

USA v. Seleznev, 4/21/17

 1   Shortly before the May 2016 trial date, she told government
 2   agents that she was scared of the defendant and his father and
 3   deathly afraid of going back to Russia because of that.  Yet
 4   immediately after that conversation with government agents, she
 5   unexpectedly flew back to Russia, and has not been heard from
 6   since spring of 2016.  Defendant claims he had absolutely
 7   nothing to do with this, but we just don't know.  What we do
 8   know from his conversations with his father is that they were
 9   aware of the fact that she was a witness, they discussed it
10   frequently, and were very concerned about her testimony.

11       In addition to potential witness tampering, defendant
12   engaged in repeated instances of obstruction through false
13   testimony at pretrial hearings.  The Court has already found
14   him not credible in at least two prior hearings.  Among other
15   things, he lied when he testified about how agents treated him
16   during his arrest.  He claimed they physically abused him,
17   while, in fact, they treated him with kid gloves.  As the Court
18   noted, they gave him a steak dinner on the flight to Guam.  Or
19   swearing under oath that his lawyers never gave him a
20   translated copy of the proffer agreement, when lawyers produced
21   the translation to the Court and both of them testified that
22   they had provided it to him.

23       Your Honor, the sentence in this case is also important to
24   deter other cyber criminals around the world.  You've seen a
25   lot of testimony in this case about the difficulty of solving

1   computer intrusions.  Suspects are hidden behind multiple

2   layers of anonymity on the internet.  Evidence is often located

3   in multiple jurisdictions around the world.  And some of those

4   jurisdictions will not cooperate with U.S. law enforcement.

5   Defendants like Mr. Seleznev have the ability to hide in

6   countries that will not cooperate with U.S. law enforcement or

7   extradite them to face justice.

8       As the Court saw through the testimony of Detective Dunn

9   and other government experts, these investigations can only be

10  successful with the leadership of extraordinarily talented

11  investigators.  Those resources are very hard to come by.  When

12  folks like this aren't available, the internet is literally in

13  jeopardy.  So when law enforcement succeeds in capturing a

14  top-tier cyber criminal like this defendant, the sentence needs

15  to be sufficient to make others think twice about launching

16  cyber attacks against our community.

17      The sentence also needs to be sufficient to protect the

18  public from future crimes of this particular defendant.

19  Defendant's history and characteristics show a very high

20  likelihood of recidivism.  He had multiple opportunities to

21  stop these crimes, but every time he returned to hacking, and

22  every time he got better at it and committed more serious

23  crimes.  There's every reason to believe that if given a

24  lenient sentence, defendant would return to the same criminal

25  enterprise that made him rich.  And once released back to

USA v. Seleznev, 4/21/17

1   Russia, he will be completely beyond the reach of U.S. law

2   enforcement.  So this sentence must also serve to protect the

3   public from a defendant who could act with impunity if he were

4   released.

5       Now, the Court is required to consider other sentences

6   imposed in similar cases, to the extent possible.  But as we

7   noted in our sentencing memo, Mr. Seleznev's case stands out as

8   unique in several aspects.  Unlike many past cyber criminals,

9   this defendant made no genuine effort to cooperate until the

10  very last minute, long after the information he had was of

11  significant use to the government.  And unlike some of the

12  other major carders sentenced in the past, none were so

13  prolific for such a long time and in such a brazen way as this

14  defendant.  And no other case has involved a defendant like

15  Mr. Seleznev, who not only failed to accept responsibility, but

16  actively sought to obstruct the trial process for over two

17  years.

18      Finally, defendant's stature in the cybercrime community,

19  his reputation and his skills as a major organized crime

20  leader, distinguishes him from most other defendants and calls

21  for a much more significant sentence than seen in other cases.

22  So we believe that the government's recommended sentence does

23  avoid any unwarranted sentencing disparity.

24      Defendant now claims that he only went to trial based on

25  his attorneys' bad advice.  That is complete nonsense.  For the

1   last two years, as you've seen, the defendant has spoken to his

2   father frequently on recorded jail calls.  And throughout his

3   case, his conversations with his father revealed his attorneys

4   were uniformly encouraging him to try and strike a deal.  Every

5   time his attorneys suggested that he should try and strike a

6   deal, the defendant accused them of being lazy or ineffective

7   and demanded a trial.

8       As a result, he's gone through six sets of attorneys,

9   which is just astonishing.  Only the Court knows all of the

10  reasons that defendant cited for firing his attorneys; we were

11  excluded from those hearings.  But what we do know is that in

12  his conversations with his father, he was not complaining about

13  his attorneys' failure to negotiate a plea agreement.  He was

14  complaining they were too focused on exactly that, and that he

15  wanted to go to trial.  It was his choice to try and obstruct

16  this process and delay this process for two years, nobody

17  else's.

18      Defendant's plea for leniency based on his medical

19  impairments is likewise unsupported by the record.  He clearly

20  suffered serious injuries in 2011.  But all of the evidence

21  that we have seen, including his appearances in court and the

22  records that defense counsel submitted, suggest that he has

23  fully recovered, and any lingering concerns, including

24  seizures, are adequately controlled by medication at the FDC.

25  The records show that the one significant seizure he had in May

USA v. Seleznev, 4/21/17

1    of 2016 -- or May of 2015, excuse me -- came immediately

2    following him firing his attorneys on the eve of his motion to

3    dismiss, and he had refused to take his medication that day.

4    The medical notes from the FDC suggested concerns that he may

5    have even faked that seizure.

6         Most importantly, defendant may have had a better argument

7    in this regard if he had actually stopped hacking after his

8    injury in 2011.  But we know he didn't.  As soon as he

9    recovered, he returned to carding, built his enterprise even

10   further, and became more successful.

11        As far as defendant's offer of cooperation is concerned,

12   it's truly just too little too late.  As the Court is aware,

13   defendant had an opportunity to cooperate in 2014.  He

14   explicitly refused to provide helpful information.  As he sat

15   across the table from myself and Mr. Wilkinson, he repeatedly

16   said that he knew information about major players in the

17   cybercrime world.  But when asked specifically, "Who are they?

18   What can you tell us?" he affirmatively told us, "I'm not going

19   to give you that information.  I think this is a negotiation,"

20   and he shut down that meeting.  He stuck with that position for

21   another two years.

22        Now, we're nearly three years out from his arrest.  A lot

23   of the information that he has is stale.  Some of it is beyond

24   the statute of limitations.  And we had told him, at the time

25   in 2014 -- and we emphasized this repeatedly through counsel --

USA v. Seleznev, 4/21/17

1    that if he wanted to cooperate, he needed to do so quickly.

2         This should really be a message to other hackers who are

3    in custody or facing extradition to the United States:  If you

4    want to cooperate in cybercrime, you need to do so immediately.

5    Cybercrime information disappears very quickly.  These

6    investigations move fast.  So defendants who sit on valuable

7    information for nearly three years are not of assistance to the

8    United States.

9         The defendant also says he's ready to start paying

10   restitution by selling his properties in Bali, transferring his

11   funds from Russian bank accounts.  That is the very first

12   mention we have heard of any efforts to pay back his victims.

13   And as the Court heard earlier in this case, defendant claimed

14   he didn't have any money and needed court-appointed counsel.

15   At the end of this sentencing, he will still remain in control

16   of those properties and any funds he may have, and we still

17   don't have the ability to get our hands on those funds.  He's

18   taken no active steps to do so prior to this sentencing.

19        A couple of housekeeping notes on the restitution and

20   forfeiture.  The restitution has been adjusted to reflect

21   losses from Victim C.J. Saretto.  I presented that to

22   Mr. Litvak.  He had no objection.  So I'll give you the final

23   total restitution amount to state at the pronouncement of

24   judgment.  It is $169,905,166.49.

25        We also have prepared a proposed order of forfeiture --

USA v. Seleznev, 4/21/17

1          THE COURT:  Counsel, let's clarify on the victim

2    businesses.

3       Is that $465,742.95?

4          MR. BARBOSA:  Just a moment, Your Honor.

5       On the businesses, it has gone up to $486,000 --

6          THE COURT:  Just a second.  Okay.

7          MR. BARBOSA:  -- 322.95.

8          THE COURT:  Is it your understanding that there's no

9    dispute by defense?

10          MR. BARBOSA:  Correct.

11          THE COURT:  Please continue.

12          MR. BARBOSA:  I've also presented a proposed

13    forfeiture order in the amount of $17,886,971.  That is for the

14    Court's signature and pronouncement as part of the sentence.

15    Mr. Litvak has reviewed that and has no objection, I believe,

16    too.  That represents the amount of proceeds the defendant

17    earned from this crime through Liberty Reserve.  It is not by

18    any means a complete calculation of all the proceeds he may

19    have earned, but it is the one solid record that we have as

20    admitted at trial.

21       I'd like to also briefly address the pending charges in

22    Las Vegas and Atlanta.  The potential for additional time in

23    those cases should have no bearing on this case.  At this

24    point, the outcome of those cases is purely speculative.  We

25    don't know what may happen.  And I think the Court should

USA v. Seleznev, 4/21/17

1    sentence defendant here based solely on this case.  If and when

2    defendant is convicted in Las Vegas or Atlanta, those

3    sentencing judges will obviously be aware of this record and

4    can take that into account as appropriate.

5        In conclusion, Your Honor, the government's

6    recommendation, while serious, as probation points out, is a

7    substantial variance downward from the guidelines.  The

8    guidelines call for life here.  Defendant's crimes impacted

9    nearly every district in the United States as well as dozens of

10   other countries.  The statutory maximum penalties for all of

11   the counts for which defendant was convicted allow for up to

12   519 years.

13       And I mention this both to underscore the seriousness of

14   the offenses of conviction, but also to point out that

15   statutory maximums rarely have anything to do with the actual

16   sentence a defendant faces.  This is important in international

17   hacking cases, because foreign observers often mistakenly or

18   misleadingly report that the United States is trying to send

19   low-level hackers to jail for life.  We are not asking for a

20   life sentence.  Thirty years is a very long sentence, but

21   defendant will be in his fifties when he is released.  And it

22   is far from unreasonable in light of the extraordinary nature

23   and circumstances of this case.

24       We believe a 30-year sentence is truly necessary to

25   reflect the seriousness of this offense, to deter others from

1    engaging in similar conduct, and to prevent this defendant from

2    engaging in future criminal conduct.

3         Thank you.

4              THE COURT:  Thank you, Counsel.

5         Probation?  Mr. Cowan?

6              MR. COWAN:  Thank you, Your Honor.

7         I've listened to Mr. Barbosa's presentation, and I've

8    certainly read all of Mr. Litvak's filings and memoranda, and

9    I've interviewed Mr. Seleznev.  I don't have anything to add to

10   our written materials.

11        Our sentence is one that protects the public.  It is a

12   just sentence.  It takes into account all of the 3553(a)

13   factors.  And it is also a sentence that is far below the

14   guidelines.  A 27-year total sentence is our recommendation.

15   And as Mr. Barbosa just concluded, that is -- if we were to

16   recommend a life sentence, as the guidelines suggest, this

17   would be a 60-plus-year sentence.  And that's not our

18   recommendation.  We are taking into account Mr. Seleznev's

19   letter to the Court, his massive injuries, his health problems.

20   And I think this recommended sentence strikes a balance between

21   all of those factors.

22             THE COURT:  Thank you, sir.

23        Mr. Litvak?

24             MR. LITVAK:  Your Honor, Mr. Seleznev is extremely,

25   extremely sorry about his conduct and for the crimes he has

USA v. Seleznev, 4/21/17

```
 1   committed.  There are no words to describe how bad he feels for
 2   what he has done.  Watching his victims' testimony during the
 3   trial, he wanted to cry afterwards, having come face-to-face
 4   with the suffering he's inflicted.  He's extremely embarrassed
 5   and ashamed, and he has fully accepted responsibility for his
 6   actions and stands ready to accept punishment of this Court.
 7        The Court must now to decide what is the appropriate
 8   sentence while considering a number of factors, including
 9   multiple statutes, now advisory guidelines, and its own sense
10   of fairness.  Your Honor, I firmly believe that the sentence
11   recommended by the Department of Probation or the U.S.
12   Attorney's Office is a sentence that a civilized society should
13   not and will not accept as a just and fair punishment.
14        It's undisputed that the crimes Mr. Seleznev's committed
15   are very, very serious.  He has caused financial hardship to
16   countless of people and businesses.  However, a 27- or 30-year
17   sentence, considering all the circumstances in this case,
18   including his physical condition, is completely inappropriate.
19        Mr. Seleznev was a young man who has already suffered a
20   lot during his short life.  He was born in a period of a lot of
21   change in Russia, a period of political globalization, which
22   was also followed by economic degradation.
23        When he was two years old, his parents divorced, and he
24   was left in the care of his mother, who was an alcoholic and
25   barely earned enough to support them.  They lived in extreme,
```

USA v. Seleznev, 4/21/17

1    extreme poverty, in the beginning sharing a small apartment

2    with a number of other families.  He did not have a

3    relationship with his father at the time, who already lived in

4    Moscow, and rarely saw him since the divorce.

5          When he was 17, he came home to discover his mother, dead,

6    in the bathtub.  She was 40 years old.  His mother's death left

7    him completely alone in a hostile world, a 17-year-old

8    teenager, with no parents, no financial support, and on the

9    verge of losing his home.

10         It's this desperate situation, combined with a lack of

11   economic opportunity or any assistance from social services, is

12   what led Mr. Seleznev to get involved in the hacking

13   underworld.  There, he found an outlet.  By associating with

14   people who he did not know, and who did not know him or know

15   his pain, allowed him to forget his own pain.

16         And those people had tremendous impact on him.  Without

17   his parents or any other positive influence, he eventually

18   became a hacker himself.  I mention these things, Your Honor,

19   because I strongly believe that each person is a product of his

20   or her environment.  It shapes our decisions and actions.  And

21   it has rarely been more true than in Mr. Seleznev's case.

22   Numerous studies have shown that lack of family structure

23   negatively impacts one's development.  And I'm certain that had

24   Mr. Seleznev been raised in a loving, stable home, he never

25   would have gotten involved in any criminal activity.

USA v. Seleznev, 4/21/17

1    It was not until his mid- to late twenties that

2    Mr. Seleznev established a relationship with his father.  By

3    then, Mr. Seleznev was already married and had a young

4    daughter.  However, in 2009, he faced another challenge when he

5    was robbed and tortured in order to reveal the location of his

6    money.  Fearing of the same for his family and wanting to start

7    a new life, a life free of crime, Mr. Seleznev went to live in

8    Indonesia, where for a period of time he completely stopped all

9    of his criminal activity.  Unfortunately, few months later,

10   after being unable to find a legitimate source of income, he

11   returned to a life of crime.

12       In addition, his wife, who he thought at the time was the

13   only person who truly cared and loved him, expected a

14   comfortable lifestyle, and Mr. Seleznev feared losing her if he

15   was no longer able to provide that.

16       Your Honor, there's been a lot of speculation that the

17   Russian government told Mr. Seleznev he was wanted by the

18   Secret Service.  It was mentioned in the recent filings as well

19   as an article in the *New York Times*.  However, I want to say on

20   his behalf, it's completely not true.  No Russian government

21   official ever told him that he was wanted in the United States.

22       The reason why he stopped his criminal activities in 2009,

23   as I already mentioned, was because he was tortured and robbed,

24   and he was concerned for his safety and going to start a new

25   life in a new place.  The narrative that has been created in

| | |
|---|---|
| 1 | the public is that Mr. Seleznev is a rich, spoiled son of a |
| 2 | Russian parliament member, and therefore is untouchable in |
| 3 | Russia.  Although the Russian people and the Russian government |
| 4 | deeply, deeply care about his welfare and are doing everything |
| 5 | they can to support him, the narrative of a rich, spoiled boy |
| 6 | who is protected by the Russian government is just not true and |
| 7 | unfair.  As I mentioned before, it was not until his late -- |
| 8 | his mid- to late twenties that Mr. Seleznev established a |
| 9 | relationship with his father, who by then was already a member |
| 10 | of the Russian parliament. |
| 11 | Mr. Seleznev may have bragged in a few e-mails and a few |
| 12 | chats that he had supposed FSB connections, Russian law |
| 13 | enforcement connections, but he did that because he believed it |
| 14 | would raise his profile among his hacking peers, when, in |
| 15 | reality, nothing further could be from the truth.  He had no |
| 16 | FSB connections.  Nobody told him that he was wanted in the |
| 17 | U.S.  And besides referring to two chats with unclear meaning, |
| 18 | the government has presented no other evidence to corroborate |
| 19 | that theory. |
| 20 | The government, in its sentencing memo, points out that |
| 21 | Mr. Seleznev waited until after sentencing -- I'm sorry -- |
| 22 | until after the trial to accept responsibility.  However, I |
| 23 | think it's important to remember that he was brought to a |
| 24 | country where he's never been to, and where he knew no one. |
| 25 | It's an understatement to say that he was extremely scared and |

1    confused.  He did not know who to believe and trust.  He had an

2    army of attorneys who were giving him conflicting information,

3    and most of whom did not speak his native language.  It was in

4    this unfortunate environment that Mr. Seleznev made the wrong

5    decision to fight this case.

6        I mention that, Your Honor, because I think it's important

7    to convey the reasons for the decisions he made in this case,

8    because I believe they're important for the Court to consider,

9    and explain in big part why this case ended with a trial, and

10   not a plea.

11       Your Honor, when I met Mr. Seleznev for the first time,

12   before I really had a chance to say anything, he immediately

13   told me that he wanted to accept full responsibility for his

14   crimes.  To me, it was evident that he was not just doing it in

15   an opportunistic moment, but because he fully understood and

16   accepted his guilt.  To that effect, Mr. Seleznev, with my

17   help, arranged for four laptops and six flash drives to be

18   brought from Russia, which I then turned over to the

19   government.

20       What's more, Mr. Seleznev wants to actively rectify the

21   consequences of his crimes and use his knowledge and experience

22   in preventing future cyber attacks.  There have been

23   discussions with the government to determine the best way he

24   can help in that regard.  Mr. Seleznev has made significant and

25   proactive efforts to establish cooperation with the government.

1   And besides turning over his four laptops and flash drives, as

2   was already mentioned in recent filings, he also participated

3   in a two-day proffer session where he was completely honest and

4   forthcoming.  He had no reason to lie at those proffers.  Most

5   important that regardless of the sentence he receives today, he

6   stands ready to assist the U.S. government in eradicating this

7   type of crime.

8       Besides accepting full responsibility and sincerely

9   apologizing for his actions, Mr. Seleznev wants to pay as much

10  restitution to his victims as possible.  And therefore, he

11  disclosed all of his personal and real estate assets with the

12  idea of selling them and helping the government to take control

13  of them and sell them so the victims can be paid back to the

14  extent possible.  As I already pointed out in my sentencing

15  memo, the government did not know about those properties and

16  assets, and would never know of them unless Mr. Seleznev

17  disclosed them.

18      Perhaps the biggest reason why the recommendation -- why

19  the recommended sentence is completely inappropriate is due to

20  Mr. Seleznev's medical condition.  As was acknowledged by the

21  government, in April of 2011, Mr. Seleznev was very, very

22  seriously injured in a terrorist attack in Morocco.  While in a

23  coma, close to death, he was flown to Russia for emergency

24  treatment and undergone many, many surgeries.  The doctors

25  there did not think that he would survive.  They thought that

1    at best he would be a vegetable for the rest of his life.  It

2    took him months, many months, to learn how to walk and speak

3    again.  Around the same time, he was also diagnosed with

4    hepatitis B, most likely from the blood transfusion in Morocco.

5         Your Honor, medical records submitted to court described

6    in great detail serious, long-term brain trauma as well as

7    other health-related complications.  One of the most serious

8    concerns is the fact that 30 percent of his brain is covered

9    with a titanium plate which requires constant medical attention

10   and care.  In fact, over the past two-and-a-half years, he

11   repeatedly asked the department -- the Bureau of Prisons to be

12   examined by the doctor, only to have all those requests

13   summarily denied.  He made multiple complaints about this issue

14   to no avail.

15        Your Honor, Mr. Seleznev continues to suffer from the

16   injuries he sustained in the bombing, and will continue to do

17   so for the rest of his life.  He needs to be on numerous

18   medications, and periodically has seizures as was recorded in

19   the BOP medical records.

20        Given Mr. Seleznev's medical condition, the sentence being

21   proposed by the government will result in him dying in an

22   American jail.  The government, which was provided with his

23   medical records, failed to really address that issue in its

24   filings, and I think it's telling.  The government urges this

25   Court to send a message to the world that these types of crimes

USA v. Seleznev, 4/21/17

1    will not be tolerated.  However, Your Honor, I'm also asking

2    you to send another type of message, the one that says that

3    American people have compassion and mercy for those who are

4    gravely ill.

5        As I mentioned in my sentencing memo, courts have

6    considered medical condition as a mitigating factor in

7    fashioning sentences in criminal cases.  And given his

8    injuries, he deserves the same consideration.

9        The government's memo talked a lot about sentences

10   received by other defendants, and argues that given the scope

11   of his crimes, and the fact that this case ended in a trial,

12   means that he should be sentenced to a much higher term.  Your

13   Honor, as far as I know, none of those defendants mentioned in

14   the government memo suffered anything resembling Mr. Seleznev's

15   injuries.  In fact, I believe that no cyber criminal with

16   medical conditions similar to his was ever sentenced to a term

17   anywhere close than that proposed by the government.

18       Although Mr. Seleznev's crimes are very, very serious, I

19   think it's also important to remember that this is not a case

20   involving physical violence, drugs, or dangerous weapons.  And

21   considering his physical state, combined with other factors I

22   discussed earlier, including the fact he has two other open

23   cases, Mr. Seleznev should be sentenced to a term far less than

24   that recommended by the government.

25       Your Honor, the government is concerned if Mr. Seleznev

were to be released early, he would return to a life of crime. Your Honor, that's just not the case. The circumstances that led him to -- that led him to the wrong path in life are no longer present. He now has an established relationship with his father, he has a new fiancee, and two daughters, one his own and one he hopes to adopt soon.

Furthermore, during the pendency of this case, Mr. Seleznev participated in 20 Bible study courses, obtained a certificate in paralegal studies with honors, as well as a certificate in advanced paralegal studies in criminal law. Furthermore, he's working on getting a bachelor's degree in hotel and restaurant management. All of these things show that Mr. Seleznev left forever the life of crime behind him, never to return.

He's about to pay a terrible price for his actions, but it's clear that he learned his lesson. He wants to help the government any way he can, and is asking to be given the chance to show that he can reform himself, to show that he could be great father, good son, good husband, and a citizen that Russia would be proud of. And I think he could be that person, Your Honor, as described in multiple letters of support. Furthermore, Your Honor, if he gets out early, he will work tirelessly to pay his victims back.

In conclusion, I respectfully submit to the Court that sentencing Mr. Seleznev to the proposed term will result in a

USA v. Seleznev, 4/21/17

1    complete miscarriage of justice.  Given the particular

2    circumstances of this case and Mr. Seleznev's characteristics,

3    such sentence would send the wrong type of message to the world

4    about America.

5        I detailed my legal arguments in the sentencing memo.  I

6    do not see a reason to repeat them again.  However, I believe I

7    want to make clear to this Court that this Court has the legal

8    basis and authority to sentence Mr. Seleznev to a term which is

9    substantially reduced from the guidelines.  Such sentence will

10   give him a chance and would give him and his family a chance to

11   begin rebuilding their lives.

12       Thank you.

13           THE COURT:  Thank you, Counsel.

14       Mr. Seleznev, your lawyer has spoken for you.  He's

15   provided a detailed memorandum, which I've read.  And that

16   includes the letter that you provided to the Court, which

17   appears to have been written in your own handwriting.

18       Sir, you're not required to say anything, if you choose

19   not to address the Court.  But if there's something that you'd

20   like to tell me, please step to the lecturn and share your

21   thoughts from that location.

22           THE DEFENDANT:  Over there?

23           THE COURT:  Yes.  Thank you.

24           THE DEFENDANT:  Thank you, Your Honor.

25           THE COURT:  You're welcome.

1            THE DEFENDANT:  Firstly, I would like to express my

2    appreciation to Your Honor for allowing me to speak and express

3    how I honestly feel about my behavior and crimes which caused

4    so much damage and suffering to so many.  Your time, effort,

5    and consideration while allowing me the opportunity to voice

6    myself in your courtroom today is very kind.

7            It has been several years since my arrest and

8    incarceration for the crimes I commit.  I want to promise Your

9    Honor, the prosecutor attorney, the government of United States

10   of America, and most important, to all of my victims, that not

11   one day has passed which I have not felt extreme sympathy and

12   sadness for the crimes I commit and negative impact to my

13   victims.  I'm not saying this simply because I got caught or

14   because I'm guilty.  I'm saying this because I want to express

15   my sorrow and how I do realize the impact my crimes caused to

16   the American peoples, law enforcement, and to all those who

17   worked countless hours to bring me to the justice.

18           My crimes have hurt so many people on so many levels that

19   it bring me great shame and humility for what I have done.  I

20   have been advised and have seen the normal penalties that are

21   before me with regards to my sentence.  In no capacity do I

22   want my words or feelings to be understood as an attempt to

23   minimize the seriousness of my wrongdoings.

24           During the past several years of my incarceration, I have

25   been located in many different areas within the Federal Bureau

1    of Prisons.  Most of the time, I have been located in Seattle

2    Sea-Tac Detention Center.  One unit I have spent a lot of time

3    is considered to be a protective custody housing unit.  At this

4    location, I have learned about many individual crimes, crimes

5    such as child rape, child molestation, child pornography, and

6    many, many other morally disgusting offenses.  I have observed

7    these peoples come and go the past few years.  I have seen

8    their sentence between 5 to 15 years for the crimes that are

9    unspeakable.  I understand these crimes different in nature to

10   my crimes, but is it not reasonable -- is it not reasonable for

11   me to beg this Court for -- and Your Honor for the sentence

12   that will allow me to have hope for some day being released so

13   I can pay back the huge restitution that this Court is going to

14   require from me?

15       I understand a long sentence is coming to me today.  As a

16   reasonable man, I accept this as my reality.  I also understand

17   that I'm in no position to ask for anything after what I have

18   done.

19       So in final effort to believe in something other than my

20   days in prison, I breathe, pray, and beg Your Honor for mercy.

21   Please understand, I am not a man connected with politic or the

22   Russian government officials.  I'm not connected with any

23   community.  I am here alone today, 10,000 miles from my home,

24   my father, brothers, fiancee, and children.  I have a family

25   who cares about me very much.  Like any family, they also are

1    going through huge emotional pain having me incarcerated.  My

2    family are good people.  And I know that -- I recognize the

3    pain of my victims also.  My family has pledged the

4    unconditional support of me as well as to my victims.  These

5    are people who want to help me fix and resolve this negative

6    situation that I have created.

7         I ask that you will take into consideration that I have

8    serious brain injury.  Many doctors and surgeons, included

9    those within Federal Bureau of Prisons, believe it is a miracle

10   that I'm alive today.  With my brain trauma, most of them

11   agrees that I will not live past the age of 50 years old, such

12   a person of my health.

13        And I know by God's grace only I will be able to stand

14   here to face my punishment.  I understand the sentence I am

15   about to receive is because my own actions.  Again, I'm very

16   sorry to all for what I have done.  I pray God will bless all

17   of you and allow this Court to have mercy on me.

18        Thank you for your time, consideration, and understanding,

19   Your Honor.

20             THE COURT:  Thank you, Mr. Seleznev.  You may be

21   seated.

22        There being nothing further to come before this Court,

23   Mr. Seleznev, this Court is required to calculate the

24   appropriate guideline range, and I've done that, and to look at

25   that and consider any traditional departures or variances that

1    might be applicable in view of the facts and circumstances, and

2    I've done that as well.  In fashioning a sentence, this Court

3    is required to look at all the Section 3553(a) factors of the

4    sentencing guidelines.  It's my practice to go through those

5    factors that serve as the basis of the sentence that I will

6    ultimately impose.

7         Sir, I look at your history and characteristics.  What I

8    see is, first of all, the lack of parental guidance.  The fact

9    that you were abandoned at a young age and the fact that your

10   mother died at an early age left you in a situation of

11   challenging circumstances for an individual.  And I find that

12   to be a mitigating circumstance as far as your history and

13   background.

14        But, sir, when I look at the other features of your

15   history, for multiple years, in a good percentage of your life

16   after 17, it's been dedicated to credit card fraud.  In many

17   ways, credit card hacking has been your alter ego.  The Court

18   finds that you were characterized by the government as a cyber

19   criminal, and that you manipulated our system of justice at

20   every step along the way to your conviction.  These are

21   aggravating circumstances.

22        The Court then looks to the nature and circumstances of

23   the offense.  And when I look at an offense that involves

24   computer fraud schemes with hacking, repeatedly over the years,

25   with known losses of $170 million, with enormous profits to

USA v. Seleznev, 4/21/17

1   yourself, these damages are enormous and are staggering to

2   businesses, credit unions, banks, resulting in business

3   closures, bankruptcy, added exposure to business expenses,

4   reputation losses.  And these are just a few of the damages

5   that have been sustained by the victims.  So the entirety of

6   the nature and circumstances of this offense are aggravating.

7        The Court looks at the need for the sentence to reflect

8   the seriousness of the offense.  The Court can't help but look

9   at the extraordinary losses with extraordinary devastation to

10  multiple victims at all levels because of your conduct; again,

11  all aggravating circumstances.

12       The Court then looks at the need to promote respect for

13  the law and to provide just punishment.  There had been a

14  finding by this Court that there's no true acceptance of

15  responsibility by you.  I accept that you have filed a letter

16  with this Court, and I accept your, what appear to be,

17  heartfelt statements of apology to the Court.  But I'm not

18  quite certain if the apology and the acceptance of

19  responsibility at this time is reality or pure fiction just to

20  justify a reduced or lowered sentence.  Again, the Court finds

21  these to be aggravating circumstances.

22       The Court also needs to impose a sentence to afford

23  adequate deterrence to criminal conduct, not just to your

24  conduct, but to ensure that other individuals that are even

25  contemplating or thinking about an opportunity in computer

USA v. Seleznev, 4/21/17

1   hacking, that that is not a wise course of action.  The Court

2   also looks at the need to protect the public from further

3   crimes by you, and the Court will impose a sentence that will

4   certainly take that into consideration.

5         I've also looked at the need to avoid sentencing

6   disparity.  So it's of value to the Court to be able to see,

7   from both sides, what they believe to be comparable

8   circumstances and other individuals, for the Court to be able

9   to justify a sentence that would not create sentencing

10  disparity.

11        So with these factors, sir, the first thing I will do is

12  not place you on any term of supervised release.  The Court

13  finds that there are fines that range from $25,000 to $250,000.

14  But I find that in light of the amount of restitution, I will

15  not impose any other fine, but I will impose a special

16  assessment fine for all counts.  And that is $3,800.  That

17  amount is due immediately.

18        It's apparent to the Court, based upon the representation

19  of the government and comments of counsel, that the parties are

20  in agreement on the total amount of restitution.  So as to the

21  financial institutions and the victim businesses, the Court

22  accepts the amount of restitution as represented by the

23  government in its allocution to the Court.

24        Having imposed all the other conditions of sentence, the

25  only real issue is the issue of custodial time.

USA v. Seleznev, 4/21/17

1    Mr. Seleznev, I thought long and hard about what to do

2    with your sentencing.  You and I are not strangers.  You have

3    been in this court multiple times.  That includes hearings

4    which are open to the public and hearings which were closed so

5    that I had the opportunity to consult with you and your lawyers

6    regarding circumstances as you progressed your way to proceed

7    to trial.

8    I suspect, Mr. Seleznev, that you probably never imagined

9    that you would be here today, seated in federal court, with

10   lawyers representing the United States asking for a sentence

11   almost double the amount of time that you've been on this

12   planet.  I suspect that you also never imagined, when you first

13   started down the road of deception in the cyber underworld,

14   that you would ever be caught.

15   For years, you enjoyed hidden destinations, faraway

16   places, believing you were completely beyond the grasp of law

17   enforcement or prosecution in the United States.  It's no

18   wonder the first statement to come out of your mouth upon your

19   arrest was not concern about your fiancee or her child, or even

20   a claim of innocence.  Instead, your only question was whether

21   law enforcement had an extradition treaty.

22   Mr. Seleznev, I respect that you had a challenged

23   upbringing, a father who abandoned you at a tender age, and a

24   mother that succumbed to her battle with alcohol addiction when

25   you were only 17, leaving you to fend for yourself in a world

1    where no one seemed to be your friend or care for you as

2    family.  There's no question that loss of parents at that age

3    and the absence of parental guidance had some influence on

4    choices you made of who you would become or what you wanted to

5    do in life.

6        Mr. Seleznev, while you may have had these obstacles, you

7    fit into the exact same category of countless individuals in

8    this country who face horrendous challenges and financial

9    strain in the early years, yet these individuals did not resort

10   to a life of cyber predator aggression to make their fortunes

11   on the backs of innocent people and their businesses.  They

12   made their fortunes the old-fashioned way.  They got jobs, they

13   earned money, and they created businesses.  Mr. Seleznev, the

14   statute of limitations on you blaming your childhood as a

15   reason for your criminal behavior has long since expired.

16       Mr. Seleznev, you had multiple occurrences in your life

17   where you had the chance to reset your moral navigation system

18   and avoid a life of crime.  You worked hard to educate yourself

19   in computer use.  You're to be applauded for that.  That

20   education was an opportunity to change how you dedicated

21   yourself with that talent.  Unfortunately, you elected to

22   pursue the pathway of a fraudster.  Your education was your

23   first chance to avoid what you face today.

24       In mid-June 2009, you obviously became aware of law

25   enforcement closing in on you, because you abruptly closed your

USA v. Seleznev, 4/21/17

1   operation and notified your customers that you were going out

2   of business, and your cyber alias was shut down.  This was your

3   second chance to cease your activities and probably escape any

4   prosecution by any law enforcement officer in the United

5   States.

6       When you became aware that you were being sought by law

7   enforcement, in lieu of terminating your connection to

8   cybercrime, you took a deep dive and worked more aggressively

9   to cover your tracks and avoid apprehension.  You retooled your

10  operation to become bolder and bigger in your means and

11  methods.

12      Your third chance to avoid all this occurred when you had

13  a near-death experience that should have been your wake-up call

14  to abandon the fraud that you had already committed in multiple

15  ways.  Those months of recovery, struggling for your life,

16  should have been an invitation to give your wrongs -- to right

17  your wrongs and recognize that you had been given a second

18  chance in life.  Instead, your recovery was focused on

19  recalibrating and building a cyber fraud dynasty.  That choice

20  will cost you many years of your freedom.

21      Your entire scheme of fraud and deception have been driven

22  by one goal, and that is greed.  You amassed a fortune that was

23  far beyond your needs, as demonstrated by how you frivolously

24  spent your ill-gotten gains on fast cars, exotic travel, luxury

25  living.  Your lawyer said, at Page 12 of his memorandum, that

USA v. Seleznev, 4/21/17

1   there were large numbers of individuals and businesses subject

2   to your deeds, but they suffered relatively minor financial

3   losses.  I'm not surprised by the advocacy of that argument,

4   when one considers you spent nearly $20,000 for a long weekend

5   in the Maldives just before your arrest.  That $20,000 at that

6   time may have been just pocket change for you, but it was

7   devastating to one of the small business owners who since that

8   time had been nearly crippled in his business and livelihood.

9   His is just one of the litany of damages suffered from scores

10  of plain, ordinary members of our community trying to earn a

11  decent living.

12       Mr. Seleznev, your lawyer is asking the Court to impose a

13  sentence essentially of time served and probation, or something

14  very slight in the scheme of punishment.  So I have to ask you

15  and anyone else, what deterrent value would that have for you

16  or any other individual contemplating hacking as a livelihood?

17       If one looks at the basic math of the $18 million you

18  earned from just one payment system -- just one payment

19  system -- it comes out as follows.  For about three years of

20  cyber fraud, you earned about $6 million per year, just that

21  one system.  If the Court were to give you three years in

22  prison for that rate, I would be sending a message to every

23  other computer hacker that crime really does pay, and pay

24  extremely well with minor consequences.  Not today.

25       While I suspect that there's a community of hackers who

USA v. Seleznev, 4/21/17

1   see you as a cyber genius, I'm deeply confident that every

2   single one of the victims in this case see you as a cyber

3   nightmare.

4        Mr. Seleznev, as I sentence you today, please do not leave

5   this court believing that Judge Jones is punishing you for the

6   deeds of all the other uncaught hackers that are thriving, that

7   are attacking every aspect of our lives in America.

8   Mr. Seleznev, no.  I'm sentencing you for your conduct and your

9   deeds, nothing more, nothing less.

10       Mr. Seleznev, I sentence you to a total of 324 months, or

11  27 years.  I'll follow the recommendation of the probation

12  office in this matter.

13       And that calculates as follows.  On Count 1 through 10 --

14  that's the wire fraud -- that's a total of 300 months,

15  concurrent with one another and concurrent with other counts,

16  except for Counts 39 and 40; Counts 12 through 19, intentional

17  damage to a protected computer, and access device fraud,

18  Counts 30 through 38, sentence of 120 months, concurrent with

19  one another, except for Counts 39 and 40; Counts 21 to 29,

20  obtaining information from a protected computer, 60 months,

21  concurrent with the others and other counts, except for

22  Counts 39 and 40; and on Counts 39 to 40, that's 24 months

23  consecutive to the others, as required by statute.

24       In this regard, I believe the overall sentence is

25  reasonable and sufficient, but no more than necessary to carry

1    out the objectives of sentencing.

2         Counsel for the government, are you in a position to

3    challenge the determination by this Court?

4              MR. BARBOSA:  No, Your Honor.

5              THE COURT:  Counsel for the defendant, are you in a

6    position to challenge the determination by this Court?

7              MR. LITVAK:  No, Your Honor.

8              THE COURT:  Counsel for the government, I'll ask that

9    you wait for the Court to advise the defendant of his

10   constitutional rights before you present the judgment to him.

11        Mr. Seleznev, the Court wishes to give you your rights on

12   appeal.  If you wish to appeal the sentence of a finding of

13   guilt, it's very important that you tell your lawyer that's

14   exactly what you wish to do.  He can explain what issues are

15   appealable and what issues may survive.

16        In addition to those rights, I also wish to advise you you

17   have a right to challenge your counsel's effectiveness.  If you

18   wish to appeal the sentence or your conviction, and you cannot

19   afford the filing fee for the Court of Appeals, you can ask me

20   to waive it, and I'll direct the court clerk to prepare, at no

21   cost to you, a notice of appeal to be filed upon your request.

22        Lastly, the waiver does not preclude you from bringing an

23   appropriate motion, pursuant to Title 28, United States Code,

24   Section 2241, to address the conditions of your confinement or

25   the decisions of the Bureau of Prisons regarding the execution

USA v. Seleznev, 4/21/17

```
 1    of your sentence.

 2          Do you understand each of these rights, sir?

 3                THE DEFENDANT:  Yes, I do.

 4                THE COURT:  I wish to emphasize any notice of appeal

 5    must be filed within 14 days of the entry of this judgment.

 6          Do you understand that as well, sir?

 7                THE DEFENDANT:  Yes, I do.

 8                THE COURT:  All right.  Counsel, if you have the

 9    judgment completed, you may present it.

10                MR. BARBOSA:  It's going to take a moment, Your

11    Honor.

12                THE COURT:  Counsel, I have the order of forfeiture.

13    I'm signing it and presenting it to the in-court deputy.

14                MR. BARBOSA:  Is there a placement recommendation,

15    Your Honor?

16                THE COURT:  Is there a request, Counsel?

17                MR. LITVAK:  Sir?

18                MR. BARBOSA:  Do you have any request for placement

19    in a particular facility?

20                MR. LITVAK:  No.

21                THE COURT:  There wasn't one filed in the sentencing

22    memorandum, Counsel.

23                MR. BARBOSA:  Your Honor, I'm going to show this to

24    probation first.

25          Your Honor, this is probably going to take about five
```

USA v. Seleznev, 4/21/17

```
 1   minutes.  I don't know if the Court wants to have a brief
 2   recess?
 3              THE COURT:  Why don't we take a short recess, and
 4   call the Court when you're ready.
 5              MR. BARBOSA:  Thank you.
 6                          (Recess)
 7              MR. BARBOSA:  Your Honor, we've prepared a judgment,
 8   and counsel has reviewed it.
 9              THE COURT:  Is that correct, Counsel?
10              MR. LITVAK:  Yes, I have, Your Honor.
11              THE COURT:  Any objection to its --
12              MR. LITVAK:  No objection.
13              THE COURT:  And probation, I take it, has had the
14   opportunity to inspect as well?
15              MR. COWAN:  Yes, Your Honor.
16              THE COURT:  You may approach.
17          Counsel, I will note that I did not indicate this in open
18   court, but I will affirm in open court that there's no interest
19   requirement.  That's going to be waived on the restitution
20   amount, because I want the focus to be on restitution, as
21   opposed to the interest rate.
22          I've reviewed the judgment.  It does reflect my oral
23   ruling.  I've signed it.  This concludes this proceeding.
24          We'll be in recess.
25                          (Adjourned)
```

USA v. Seleznev, 4/21/17

1                      (End of requested transcript)

2                          *     *     *

3        I certify that the foregoing is a correct transcript from

4    the record of proceedings in the above matter.

5

6    Date:  4/21/17                    /s/ Andrea Ramirez

7                                      _____

8                                      Signature of Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25